Kailin Wang
2481 Fairway Dr.
Spanish Fork, Utah 84660
801-787-9755
kaywg2372@gmail.com

**UNITED STATES DISTRICT COURT**

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **MOTION FOR APPOINTMENT OF CJA COUNSEL FOR SENTENCING, RESTITUTION, AND PSR LITIGATION** |
| Plaintiff, | |
| v. | Case No. 2:24-cr-00163-TS |
| | Judge Ted Stewart |
| **KAILIN WANG,** | |
| Defendant. | Magistrate Judge Dustin Pead |

Defendant Kailin Wang, currently proceeding pro se with standby counsel, respectfully moves for appointment of substitute counsel under the Criminal Justice Act, 18 U.S.C. § 3006A, to represent her at sentencing and in all related proceedings, including: (1) litigation of contested Guidelines and factual issues; (2) any Fatico-type evidentiary hearing; (3) restitution and post-sentencing financial issues; and (4) ongoing objections, amendments, or addenda to the Presentence Report (PSR).

Ms. Wang further requests that the Court: (a) continue the May 5, 2026 sentencing date to permit appointment and preparation of CJA counsel; and (b) authorize CJA-funded expert services reasonably necessary to rebut the government's newly disclosed forensic report and related sentencing materials.

**I. BACKGROUND**

1

Ms. Wang pleaded guilty on September 30, 2025 to two counts of cyberstalking under 18 U.S.C. § 2261A pursuant to a Rule 11(c)(1)(C) agreement establishing a stipulated range of five years' probation to twelve months' imprisonment. Sentencing is currently set for May 5, 2026.

On April 2, 2026, Ms. Wang sent a written meet-and-confer email asking the government to identify "each expert witness—including any law-enforcement or mental-health expert—whose opinions the government intended to rely on at sentencing," and to produce all expert reports and underlying materials.

On April 6, 2026, AUSA Joey Blanch responded in a single sentence: "We do not expect to call expert witnesses."

On April 15, 2026—twenty days before sentencing—the government produced for the first time: (a) an "Updated Violence Risk and Threat Assessment" by Dr. J. Reid Meloy, Ph.D., ABPP, dated April 14, 2026; (b) a multi-page "Wang Impersonations" narrative prepared by or on behalf of Victim 1's civil counsel; and (c) translations of approximately twenty-two recorded jail calls totaling roughly four hours. (Dkt. 154.)

These April 15 disclosures are now the centerpiece of the government's sentencing presentation. The Meloy report rests on more than one hundred adversarially curated documents assembled exclusively by Victim 1's attorney, was prepared without any direct clinical interview, and includes no records provided by or on behalf of Ms. Wang.

Ms. Wang has filed an Emergency Motion for Continuance and a Supplemental Motion requesting a potential Fatico evidentiary hearing to test the reliability of the Meloy report and the "Wang Impersonations" narrative, and to obtain CJA-funded expert assistance. She now specifically moves for appointment of CJA counsel to take primary responsibility for sentencing and all related proceedings.

Ms. Wang has proceeded pro se with Federal Defender Richard Sorenson as standby counsel. As set out in her Supplemental Continuance Motion, irreconcilable differences have developed on core issues. The deterioration in Ms. Wang's relationship with current counsel is no longer abstract or theoretical. It has been concretely compromised by the government's production of translated jail calls in which Ms. Wang is heard criticizing and second-guessing counsel's strategic decisions, including his assessment of the importance of specific arguments and evidence.

In those recorded calls, made from the Davis County Jail in late May 2024, Ms. Wang repeatedly states that counsel "underestimated" crucial arguments and facts, insists that he "must" pursue particular theories and discovery, and directs third parties to pressure counsel to follow her preferred approach. These statements—captured, translated, and now woven into the sentencing record by the government—have effectively weaponized Ms. Wang's candid communications about counsel's performance and strategy in the litigation environment. This dynamic exacerbates the existing strategic disagreements and makes it unrealistic to expect Ms. Wang to continue working with current counsel in a way that is both genuinely confidential and collaborative. The combination of longstanding strategic disagreements and the government's disclosure of these jail calls has led to a deterioration of the attorney-client relationship that is now irreparable and no longer tenable as a basis for representation at sentencing.

Ms. Wang also has overlapping and time-sensitive obligations in: (a) Utah state criminal proceedings (State v. Wang, No. 211100167, hearing June 16, 2026); (b) California appellate proceedings in the custody matter involving Victim 1 which he has continuously delayed (see Ex. A); and (c) Danish appellate proceedings concerning her child—all scheduled in May and June 2026. These proceedings intersect with the federal sentencing record, PSR content, and restitution issues.

## II. LEGAL STANDARD

The Criminal Justice Act provides that "[r]epresentation shall be provided for any financially eligible person who … is entitled to appointment of counsel under the Sixth Amendment to the Constitution" and that the court may authorize "investigative, expert, and other services necessary for adequate representation." 18 U.S.C. § 3006A(a)(1), (e).

The right to counsel extends through sentencing, encompassing all critical stages at which substantial rights may be affected, including restitution and contested PSR litigation where liberty and financial interests are at stake. See Fed. R. Crim. P. 32(i); 18 U.S.C. §§ 3553, 3664.

When a defendant is technically proceeding pro se but the complexity of the case, the stakes of sentencing, and the presence of expert-driven disputed facts make self-representation impracticable, courts routinely exercise their authority under § 3006A to appoint counsel "in the interests of justice," even after a prior waiver.

3

The Court also has inherent authority and broad discretion to ensure that sentencing and restitution proceedings are fundamentally fair. Fed. R. Crim. P. 32; Morris v. Slappy, 461 U.S. 1, 11–12 (1983).

## III. GROUNDS FOR APPOINTMENT OF CJA COUNSEL

### A. Complexity of the Sentencing Record and Disputed Expert Evidence

The updated Meloy report presents a twenty-one-page forensic psychological risk assessment, supported by a nine-page record list spanning more than one hundred source documents, and concludes that Ms. Wang exhibits "severe and stable psychopathy," a "persistent, high-level risk of stalking violence," and that incarceration is the only fully effective protection.

The report was commissioned and curated by Victim 1's civil attorney, relies exclusively on records supplied by that attorney, includes Ms. Wang's own litigation filings as evidence of "litigation-enabled harassment," and treats Ms. Wang's exercise of her Fifth Amendment rights— her refusal to sit for an interview while facing three overlapping criminal prosecutions—as part of the dangerousness narrative.

The "Wang Impersonations" narrative is an unattributed multi-page document prepared by or for Victim 1's counsel. It is based on no interviews with Ms. Wang or key witnesses and contains multiple layers of hearsay, argumentative legal conclusions, and contested factual assertions spanning multiple jurisdictions.

The jail-call translations add approximately four hours of recorded statements produced for the first time on April 15, 2026, which overlap with counsel-client strategy issues and contested factual characterizations in other courts.

Litigating the admissibility, reliability, and weight of this material will require:

- Careful application of Fed. R. Crim. P. 32(i)(3) and the Fatico doctrine to identify "materially disputed" sentencing facts;

- Strategic decisions about whether and how to cross-examine Dr. Meloy;

4

- Preparation and presentation of a defense expert capable of rebutting PCL-R scoring, stochastic violence and "target dispersion" constructs, and the use of constitutionally protected litigation activity and speech as clinical indicators; and

- Integration of these issues with Guidelines objections—including pattern-of-activity and emotional-distress enhancements—and the First Amendment arguments extensively briefed in the sentencing memorandum.

These are not routine issues for a pro se defendant. They require specialized legal and forensic expertise, and coordinated strategy, that Ms. Wang—a non-lawyer proceeding alone against a nationally credentialed government expert billing at $10,000 per day—cannot realistically provide for herself.

## B. The Role of Victim 1's Counsel and the Government's Departure From Independent Advocacy

The core of the government's sentencing presentation—the Meloy report and the "Wang Impersonations" narrative—originated entirely with Victim 1's civil legal team and was transmitted to the government without meaningful independent vetting. Victim 1's civil attorney, Douglas Rappaport, selected every document in the Meloy record review, prepared or commissioned the "Impersonations" narrative, and has appeared throughout these proceedings simultaneously as V1's family-court advocate and as a conduit to federal and state law enforcement. The government has presented these materials as its own sentencing evidence, effectively functioning as a private advocate for Victim 1 rather than as an independent representative of the United States.

This posture heightens the need for adversarial counsel. Ms. Wang faces not one well-resourced adversary but two: the prosecutorial power of the United States Attorney's Office and the litigation machinery of a private party who has documented retained no fewer than thirty-one attorneys, experts, and private investigators across these proceedings. Without appointed counsel of her own, the sentencing hearing cannot be a meaningfully adversarial proceeding.

## C. Restitution, PSR Litigation, and Financial Complexity

The PSR contemplates significant restitution obligations. Ms. Wang's sentencing memorandum documents a negative net worth of approximately $168,646, with substantial debt

5

attributable to litigation costs in multiple jurisdictions and minimal current income from part-time food-service work at $14.50 per hour. The PSR itself recommends waiving any fine based on her inability to pay—demonstrating CJA financial eligibility.

Determining a realistic restitution schedule and resolving any disputes over restitution amounts, causation, and hardship under 18 U.S.C. § 3664 require counsel competent in financial analysis, Guidelines application, and the long-term collateral consequences of restitution orders on a defendant with overlapping obligations across multiple courts and jurisdictions.

PSR revisions and addenda implicating the "Kill Baby K" post, the Cloudflare forensic record, the scope of relevant conduct, and reliance on the Meloy report and the "Impersonations" narrative must also be litigated by counsel familiar with Federal Rule of Criminal Procedure 32, due process limits on uncharged conduct at sentencing, and the First Amendment issues extensively briefed in Ms. Wang's sentencing memorandum.

### D. Overlapping Proceedings and the Need for Coordinated Representation

Ms. Wang's obligations in Utah state criminal court, California custody appeals, and Danish family-law appellate proceedings are all scheduled in May and June 2026 and intersect factually and legally with the federal sentencing record—particularly with respect to alleged abduction risk, parental fitness, litigation conduct, and the impact of any federal sentence on her ability to participate in foreign proceedings concerning her child.

Without counsel, Ms. Wang faces the impossible task of simultaneously litigating a complex, expert-driven federal sentencing and Fatico hearing; managing restitution and PSR objections; and coordinating or appearing pro se in state, California, and Danish fora—all while under home confinement and GPS monitoring. This degree of complexity would tax a licensed attorney with full resources; it is not manageable for a pro se defendant under current supervision conditions.

### IV. REQUEST FOR CJA-FUNDED EXPERT SERVICES

Ms. Wang renews and incorporates by reference her prior request that the Court authorize CJA funds for a defense-retained forensic psychologist and, as needed, other expert or investigative services "reasonably necessary for adequate representation" at sentencing. 18 U.S.C. § 3006A(e). Specifically, Ms. Wang seeks authorization for:

6

- A qualified forensic psychologist to review the Meloy report and underlying materials, conduct an independent evaluation where appropriate, and prepare a written report and testimony addressing PCL-R methodology, record-selection bias, and the use of litigation conduct and Fifth Amendment invocation as indicators of psychopathy and dangerousness;

- Limited investigative assistance to gather information concerning Dr. Meloy's prior testimony—including the Timothy Masters wrongful-conviction case and any other proceedings in which courts have questioned or limited his methods; and

- Translation or transcription review as needed to verify the accuracy and context of the government's jail-call translations.

Without such assistance, sentencing will proceed on a fundamentally one-sided record in which the government's retained expert's opinions go largely unrebutted, notwithstanding their profound impact on the Court's assessment of risk, supervision conditions, and the need for incarceration.

## V. NEED FOR A CONTINUANCE TO MAKE APPOINTMENT MEANINGFUL

Appointment of CJA counsel on the eve of the May 5, 2026 sentencing date would be illusory. Newly appointed counsel will need adequate time to review:

- The complete federal record and PSR;

- The April 14, 2026 Meloy report and all cited materials;

- The "Wang Impersonations" narrative and underlying exhibits;

- The jail-call recordings and translations; and

- Ms. Wang's sentencing memorandum and supporting exhibits, including the legal authorities on First Amendment protections, Guidelines objections, and the Mossman forensic-literature analysis.

As set out in the Emergency Motion and Supplemental Motion, a continuance of sixty to ninety days is the minimum period that would allow newly appointed CJA counsel to provide constitutionally adequate representation at a contested sentencing and any Fatico-type evidentiary hearing.

7

## VI. PROPOSED RELIEF

For the foregoing reasons, Ms. Wang respectfully requests that the Court:

1.  Appoint CJA counsel forthwith to represent her for all purposes going forward, including sentencing, restitution, PSR litigation, any Fatico-type evidentiary hearing, and any related post-sentencing proceedings;

2.  Relieve current Federal Public Defender counsel and terminate Ms. Wang's pro se status for sentencing, based on the material breakdown in the attorney–client relationship—exacerbated by the government's disclosure of jail calls in which Ms. Wang is heard criticizing counsel's strategy—and on the complexity of the proceedings;

3.  Authorize CJA-funded expert and investigative services reasonably necessary for adequate representation, including a defense forensic psychologist and limited investigative support directed at the Meloy report and related materials;

4.  Continue the May 5, 2026 sentencing date for not less than sixty to ninety days, both to permit CJA counsel to prepare and to allow any authorized expert to complete a review and report;

5.  Clarify that any restitution hearing, PSR amendments, and contested factual issues—including those arising from the Meloy report, the "Wang Impersonations" narrative, and the jail calls—will be addressed with Ms. Wang represented by appointed counsel; and

6.  Grant such other and further relief as the Court deems just and appropriate.

## VII. THIS MOTION DOES NOT SEEK DELAY; THE COURT MAY DENY WITHOUT PREJUDICE IF IT FINDS DEFENDANT'S PRO SE PRESENTATION ADEQUATE

Ms. Wang wishes to make clear that this motion is not filed to cause delay. Notwithstanding the extraordinary volume of late-produced material and the procedural pressures described above, **Ms. Wang has already prepared and filed a ninety-page objection to the Presentence Report and has substantially completed her sentencing memorandum, which now runs to approximately one hundred and one pages** — a length attributable not to unnecessary elaboration but to the government's disclosure, on April 15, 2026, of a new expert report and related materials that required a substantive response. She anticipates that additional filings may follow from Victim 1's side,

given the pattern of production in this case. The breadth of her submissions reflects the complexity of the record, not an intent to obstruct.

The sentencing continuances to date are also relevant context. The first continuance was suggested by the Probation Office, not requested by Ms. Wang. The second continuance was necessitated by defense counsel's trial obligation during the week of March 24, 2026. None of the prior continuances in this case were sought at Ms. Wang's own initiative or at her discretion. The current request for additional time arises not from foot-dragging by the defense but from the government's late disclosure of substantial new sentencing materials on April 15, 2026.

Ms. Wang also recognizes that this is an unusual request. She understands that the Court cannot provide legal advice, and she acknowledges that the Court is in the best position to evaluate whether her pro se submissions demonstrate a sufficient grasp of the relevant legal and factual issues. If the Court, having reviewed her ninety-page PSR objection and her sentencing memorandum, concludes that her self-represented filings are adequate for the purposes of sentencing, the Court may deny this motion without prejudice. Ms. Wang would welcome that outcome as an indication that the Court finds her presentation substantively capable of protecting her interests, and she reserves the right to renew this request should circumstances change.

Ms. Wang's primary wish is to determine whether the government can be more reasonable at this stage of the proceedings. That hope, however, must be weighed against a pattern of conduct over the past several months that gives her serious concern. Beginning with the government's objection to her request to travel to Denmark for the January 26, 2026 custody hearing, the government has taken positions that appear to go well beyond the independent exercise of prosecutorial judgment. It opposed her request to take supervised walks and shop for groceries during home confinement — restrictions having no discernible connection to risk of flight or public safety. It now objects to any self-surrender period longer than one week, notwithstanding this Court's own prior findings that Ms. Wang does not present a serious risk of flight and notwithstanding the same Office's prior acceptance of a seven-week self-surrender period in a comparable cyberstalking case. And it produced, on the eve of sentencing, a forensic risk report assembled entirely from materials supplied by Victim 1's civil attorney — without independent vetting, and nine days after representing in writing that no expert witnesses were expected.

9

Taken together, these positions suggest that the government's judgment in this case has been shaped, to an extent inconsistent with its obligations as a neutral representative of the United States, by the persistent advocacy of Victim 1's private legal team. The pattern is not subtle. Douglas Rappaport has appeared simultaneously as V1's family-court advocate, as a conduit to law enforcement, and now as the architect of the expert record the government presents as its own. Ms. Wang does not ask the Court to resolve that relationship, but she does ask the Court to recognize that its practical effect has been to leave her without a genuinely independent counterpart across the table.

---

A further reason for caution before proceeding to sentencing on the current schedule is that several criminal-procedure cases now pending before the United States Supreme Court are expected to be decided within the next two months and may bear directly on the issues presented here. Of particular relevance is **Hunter v. United States, No. 24-1063 (argued Mar. 3, 2026), which concerns the enforceability and scope of broad plea-agreement appeal waivers, including whether such waivers can bar review of an otherwise unconstitutional sentence and whether a district judge's oral assurance at sentencing that the defendant retains a right to appeal can override the written waiver.** The outcome of Hunter could materially affect the scope of Ms. Wang's post-sentencing rights, the validity and effect of the appeal-waiver provisions in her plea agreement, and the Court's obligations when advising her at the sentencing hearing itself. Proceeding to sentencing before that decision issues risks creating avoidable error at minimal cost to judicial economy. A continuance of sixty to ninety days would allow this case to be sentenced with the benefit of the Supreme Court's guidance.scotusblog+3

In addition, **Abouammo v. United States, No. 25-5146 (argued Mar. 30, 2026), asks whether criminal venue is proper in a district where no offense conduct occurred, based solely on the statute's intent element "contemplating" effects that might be felt there, or whether the Constitution instead requires venue to be tied to actual, essential conduct elements of the offense.** Together, Hunter and Abouammo are likely to clarify the constitutional limits on appellate-rights waivers and on expansive theories of criminal venue in federal prosecutions, and thus may directly inform how this Court evaluates the legality and reviewability of any sentence imposed in this case.

Ms. Wang therefore leaves this motion to the Court's discretion. If the Court, having considered the submissions in this case, concludes that appointed counsel is warranted to ensure a fair and adequate sentencing proceeding, Ms. Wang respectfully requests the relief set out in Section VI. If the Court concludes that her pro se presentation is sufficient and that the government can be expected to exercise independent judgment going forward, Ms. Wang accepts that

10

determination and will continue to advocate for herself to the best of her ability, with the understanding that this request remains available for renewal.

Respectfully submitted,

DATED: April 17, 2026.                                              /s/ Kailin Wang