Kailin Wang
2481 Fairway Dr.
Spanish Fork, Utah 84660
801-787-9755
kaywg2372@gmail.com

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> KAILIN WANG, <br><br> Defendant. | DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF FACTUALLY DISPUTED CONDUCT OVER WHICH THIS COURT LACKS JURISDICTION AT SENTENCING, AND TO EXCLUDE INADMISSIBLE THIRD-PARTY DECLARATIONS AND UNRELIABLE EXPERT OPINION SUBMITTED BY C.T. (VICTIM 1) <br><br> Case No. 2:24-cr-00163-TS <br> Judge Ted Stewart <br><br> Magistrate Judge Dustin Pead |

## INTRODUCTION

Defendant Kailin Wang, proceeding pro se, moves in limine for three related rulings. First, this Court should decline to make adverse factual findings at sentencing regarding disputed conduct whose essential elements occurred outside the District of Utah and therefore fall outside this Court's proper locus delicti. Second, the Court should not treat three categories of out-of-district conduct as established aggravating predicates at sentencing: (1) the anonymous March 6, 2019 "Kill Baby K" post; (2) the alleged conduct underlying Ms. Wang's 2013 New York conviction for disorderly conduct under N.Y. Penal Law § 240.20[1]—a non-criminal

---

[1] In New York, PL § 240.20 defines disorderly conduct as a **violation** (not a crime) involving intent to cause public inconvenience, annoyance, or alarm through fighting, noise, obstruction, or hazardous acts. Punishments typically include up to 15 days in jail, fines up to $250, and a $125 surcharge.

1

violation that was down-pleaded from second-degree harassment under N.Y. Penal Law § 240.26
[2](also a non-criminal violation) and resulted in no misdemeanor or felony conviction; and (3)
conduct between September 1 and October 29, 2017 involving WS ("V2"), for which
California—rather than Utah—has jurisdiction to adjudicate the merits, and for which the only
Utah citation was dismissed with prejudice and expunged. Third, the Court should decline to rely
on sentencing submissions generated by Victim 1's private counsel—specifically the unsworn
"Impersonations Brief" and the April 14, 2026 "Updated Violence Risk and Threat Assessment"
prepared by J. Reid Meloy, Ph.D.—as reliable factual predicates, and instead treat them, at most,
as disputed advocacy materials that cannot support contested factual findings under USSG §
6A1.3(a). Ms. Wang respectfully asks this Court not to resolve, in her disfavor, disputed factual
questions none of which has ever been adjudicated against her in any court with proper territorial
jurisdiction.

The third ruling concerns two documents transmitted to this Court on April 15, 2026 by
CT's private attorney, Douglas Rappaport of San Francisco: (1) a nine-page narrative brief titled
"Defendant Kailin Wang's Use of Impersonation and Her Nude Photo Across Three Victims"
("Impersonations Brief"), and (2) an "Updated Violence Risk and Threat Assessment" by J. Reid
Meloy, Ph.D. ("Meloy Report"), dated April 14, 2026. Both documents are inadmissible hearsay,
lack the reliability required under USSG § 6A1.3(a), and were prepared entirely from records
curated by CT's attorney without cross-examination. Both also depend fundamentally on the
disputed out-of-district factual findings that this motion challenges on jurisdictional grounds.

Although, at first glance, the conduct alleged involving Rory Will, W.S., and C.T. may
appear similar, the intent, context, and surrounding circumstances are fundamentally different.
The speech concerning C.T. served a legitimate purpose: Ms. Wang and C.T. share a child, and
the challenged posts sought to shame C.T. into acknowledging and taking responsibility for a
child he fathered. That parental-accountability context is categorically different from the earlier
alleged, and still disputed, course of conduct relating to Rory Will, which did not arise from an
existing parent–child relationship or from efforts to secure support for a shared child. Sentencing

---

[2] New York Penal Law § 240.26 (Harassment in the Second Degree) is classified as a violation,
not a crime, and is punishable by up to 15 days in jail. It involves physical contact (shoving,
kicking), threats, or repeated, annoying, or alarming conduct without a legitimate purpose.

is not a free-for-all; it is constrained by constitutional venue requirements and by the Sentencing Guidelines' requirement that facts relied on at sentencing bear sufficient indicia of reliability. In assessing context as to W.S. (V2), the evidentiary hearing and record from May 4, 2018, in which three permanent civil stalking injunctions were entered in Wang v. W.S. (V2), Case Nos. 180400131, 180400132, and 180400133, in Ms. Wang's favor—injunctions that C.T. (V1) has falsely characterized as having been obtained through fraudulent, recycled evidence—are highly probative and explain a great deal about the true direction of harassment and the credibility of the competing narratives.

Sentencing is not a free-for-all; it is constrained by constitutional venue requirements and by the Sentencing Guidelines' requirement that facts relied on at sentencing bear sufficient indicia of reliability. Venue in a criminal case must be tied to the statute's "essential conduct elements," not to where the government most keenly feels the "effects" of the alleged offense. You're right to clean this up and make it track the actual Supreme Court opinion. Here's a tightened version with correct citation and phrasing you can drop straight into a brief. See _Smith v. United States_, 599 U.S. 236 (2023), venue turned on where the essential conduct elements of the offense occurred, not on the government's preferred forum. Smith, who resided in Mobile, Alabama (Southern District of Alabama), was prosecuted in the Northern District of Florida for theft of trade secrets from StrikeLines. He argued that venue in the Northern District of Florida was improper because he lived in the Southern District of Alabama and StrikeLines's servers, where the coordinate data were stored, were in Orlando, in the Middle District of Florida, even though StrikeLines was headquartered in Pensacola, in the Northern District of Florida. The Eleventh Circuit agreed that venue was improper as to the trade-secrets count and vacated that conviction, holding that none of the essential elements of the charged crime occurred in the Northern District of Florida.

As to the purpose of the Venue Clause, the Supreme Court rejected Smith's argument that Article III's Venue Clause is primarily about sparing defendants the burdens of trial in an inconvenient or distant forum. The Court explained that the Clause "is keyed to the location of the alleged 'Crimes,'" not to the defendant's residence or personal convenience, and that it "does not allow variation for convenience of the accused." The Court thus confirmed that the venue

3

right is about tying trial to the place where the crime was committed, rather than guaranteeing the most convenient forum for the defendant.

See *United States v. Bennett*, Case No. 6:22-cr-22-JDK, slip op. at 19–21 (E.D. Tex. Jan. 9, 2024) (vacating two § 1621 perjury counts where the defendant executed and notarized his sworn responses in Houston, in the Southern District of Texas, and "the commission of these elements did not occur in the Eastern District of Texas"). In doing so, *Bennett* applies the Supreme Court's and Fifth Circuit's element-based venue framework: see *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279–80 (1999) (venue "is determined from the nature of the crime alleged and the location of the act or acts constituting it," focusing on the statute's conduct elements rather than downstream effects); *United States v. Smith*, 22 F.4th 1236, 1243–44 (11th Cir. 2022), aff'd, 599 U.S. 236 (2023) (venue for theft of trade secrets lies where the statutory conduct occurred, not where the victim corporation resided or felt the harm); and *United States v. Clenney*, 434 F.3d 780, 782 (5th Cir. 2005) (rejecting venue in the district where a custodial parent and child resided in a parental-kidnapping case because the "essential conduct element" was the taking of the child outside the United States, which occurred elsewhere). *Bennett* also distinguishes *United States v. Reed*, 773 F.2d 477, 481–83 (2d Cir. 1985), which had allowed venue for § 1623 perjury "in a proceeding ancillary to" a case in another district based on a "substantial contacts" / effects analysis, explaining that (1) § 1623 contains express "ancillary" language that § 1621 does not, and (2) the Fifth Circuit has never adopted *Reed*'s expansive "substantial contacts" approach and, indeed, has moved the other way in *Clenney* and related decisions. Finally, *Bennett* points to 18 U.S.C. § 3238 and Article III, § 2, cl. 2 of the Constitution to underscore that when Congress wants venue to turn on something other than the district where the conduct occurs (for crimes committed outside any district), it says so expressly—which it did not do here.

The Ninth Circuit has already applied this principle to reverse a conviction on exactly analogous grounds: in *United States v. Fortenberry*, 89 F.4th 702 (9th Cir. 2023), the court reversed a § 1001 false-statements conviction because the defendant made his statements to FBI agents in Nebraska and the District of Columbia, yet the government tried the case in California where the FBI investigation happened to be based. The court held that effects-based venue has

4

"no support in the Constitution, the text of the statute, or historical practice"—the same principle that forecloses the government's theory here.

District courts routinely resolve motions in limine at sentencing to exclude victim-impact material or "relevant conduct" that is not actually tied to the offense of conviction, is factually unreliable, or risks turning sentencing into a trial on uncharged behavior. In one case, the government opposed a motion in limine used at sentencing that sought to bar a portion of a video victim-impact statement at sentencing as "anything but reasonable" under the Crime Victims' Rights Act, but still recognized that the Court would decide whether that segment was appropriate to play. In another, the defendant moved in limine to preclude the government from presenting highly inflammatory "relevant conduct" child-pornography images at sentencing where the devices at issue had not been used during the offense period under a misprision plea. These examples confirm that sentencing-stage motions in limine are a proper vehicle to cabin unreliable, prejudicial, or jurisdictionally improper material.

This motion is grounded in three complementary constitutional and evidentiary principles. The locus delicti rule—derived from Article III, Section 2 and the Sixth Amendment—prohibits this Court from adjudicating disputed facts about conduct whose essential elements occurred outside Utah. _United States v. Rodriguez-Moreno_, 526 U.S. 275, 279 (1999) (holding venue lies where the "essential conduct elements" of the offense occur, not merely where effects are felt). Separately, the hearsay rule and the USSG § 6A1.3 reliability standard prohibit this Court from crediting out-of-court advocacy documents and one-sided expert assessments as established factual predicates for sentencing. _United States v. Williams_, 48 F.4th 1125 (10th Cir. 2022).

The government's entire sentencing presentation rests on a foundation of disputed out-of-district conduct, inadmissible hearsay, and an expert report that its own cover designation identifies as "PRIVILEGED AND CONFIDENTIAL—ATTORNEY WORK PRODUCT." This Court should not make factual findings at sentencing that no court with proper territorial authority has ever made, based on advocacy materials that would be excluded at trial. (Ex. 1 Gmail - Joey Blanch Sentencing Discovery)

**The trial court's role is procedural, not to weigh the credibility of unconfronted hearsay:** In *Hemphill v. New York*, 595 U.S. 140 (2022): confirms that, for Confrontation Clause purposes, the trial judge's role is not to act as a reliability screener for testimonial hearsay, but to enforce the procedures the Constitution demands. As the Court explained, "the role of the trial judge is not, for Confrontation Clause purposes, to weigh the reliability or credibility of testimonial hearsay evidence; it is to ensure that the Constitution's procedures for testing the reliability of that evidence are followed." Hemphill, 595 U.S. at 152. In Hemphill, the trial court erred by admitting unconfronted plea allocution testimony because it thought the defense opening had created a "misleading" impression; the Supreme Court held that "[f]or Confrontation Clause purposes, it was not for the judge to determine whether Hemphill's theory … was unreliable, incredible, or otherwise misleading in light of the State's proffered, unconfronted plea evidence. Such inquiries are antithetical to the Confrontation Clause." Id. at 152–53 (internal quotation marks omitted).

By the same logic, it is not for the sentencing court to decide that the Meloy report or impersonation allegations are "credible enough" and thereby dispense with the constitutionally prescribed mode of testing reliability.

**No open-ended reliability exceptions to confrontation:** Hemphill also reiterates Crawford's holding that courts have no license to invent ad hoc reliability exceptions to confrontation. Quoting Crawford, the Court noted that "[b]ecause '[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts,' the requirement was 'most naturally read' to admit 'only those exceptions established at the time of the founding.'" Hemphill, 595 U.S. at 148 (quoting Crawford, 541 U.S. at 54). That principle forecloses any attempt to justify the Meloy report or impersonations evidence under a free-floating "necessary to correct a misimpression" theory. *Crawford v. Washington*, 541 U.S. 36 (2004).

**Crawford's rejection of bare reliability determinations:** The Supreme Court has squarely rejected judge-made, reliability-based exceptions to the Confrontation Clause that bypass cross-examination. In *Crawford v. Washington,* the Court held that the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular

manner: by testing in the crucible of cross-examination." Crawford, 541 U.S. at 61. It "thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." Id. The Court emphasized that a "mere judicial determination" regarding the reliability of testimonial evidence "is not the same as the constitutionally prescribed method of assessing reliability." Id. at 62.

These principles apply directly here: the Meloy report and the proposed "impersonations" narrative are classic testimonial hearsay, and the government's assertions of "reliability" cannot substitute for confrontation.

**Truth-seeking cannot override confrontation:** The Court in Hemphill expressly rejected the idea that truth-seeking or "correcting" the jury's impression can trump a defendant's confrontation rights: "Even as it has recognized and reaffirmed the vital truth-seeking function of a trial, the Court has not allowed such considerations to override the rights the Constitution confers upon criminal defendants." Hemphill, 595 U.S. at 154. "The Sixth Amendment … admits no exception for cases in which the trial judge believes unconfronted testimonial hearsay might be reasonably necessary to correct a misleading impression. Courts may not overlook its command, no matter how noble the motive." Id.

Thus, even if the government genuinely believes the Meloy report or impersonation allegations would "correct" some supposed misimpression, the Confrontation Clause does not permit their admission as unconfronted testimonial hearsay.

**Existing evidentiary rules already police unreliable evidence:** Finally, Hemphill underscores that existing evidence rules are adequate to address concerns about confusion, prejudice, or misleading the jury, without creating extra-textual confrontation exceptions. The Court quoted Holmes v. South Carolina for the proposition that "'[w]ell-established rules' of evidence 'permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.'" Hemphill, 595 U.S. at 154 (quoting _Holmes v. South Carolina, 547 U.S. 319, 326 (2006)_). In other words, if the government believes certain defense evidence is misleading, it may invoke the ordinary tools of relevance and Rule 403—not ask the court to admit unconfronted testimonial hearsay in violation of the Sixth Amendment.

7

Building on Hemphill, the Court's recent decision in *Smith v. Arizona*, 602 U.S. 779 (2024) forecloses another common end-run around the Confrontation Clause—introducing testimonial hearsay through the "basis" of an expert's opinion. In Smith, the State sent seized substances to a crime lab, where analyst Elizabeth Rast tested them and prepared notes and a signed report; when Rast left the lab before trial, the State called a substitute analyst who relayed Rast's records and then offered his own "independent" drug-identification opinions. *Smith v. Arizona*, 602 U.S. 779 (2024). The Arizona courts held there was no confrontation problem because Rast's statements were admitted only to show the "basis" of the substitute expert's opinion, not for their truth. Id. at 4. The Supreme Court rejected that framing, holding that "[w]hen an expert conveys an absent analyst's statements in support of the expert's opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." Id. at 11. "Truth is everything when it comes to the kind of basis testimony presented here"; if an expert "conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts," regardless of how evidentiary rules label it. Id. at 13. Under Smith, the government cannot circumvent Crawford and Hemphill by having a surrogate witness or expert recount the Meloy report or impersonation allegations as "background" or "basis" for an opinion; because the government's theory depends on those out-of-court assertions being true, they are testimonial hearsay offered for their truth and may not be used against Ms. Wang absent confrontation.

Ms. Wang respectfully requests that the Court enter an order: (1) declining to make adverse factual findings at sentencing regarding disputed conduct whose essential elements occurred outside the District of Utah; (2) declining to treat three categories of out-of-district conduct—the March 6, 2019 "Kill Baby K" post, the alleged conduct underlying the 2013 N.Y. Penal Law § 240.20 disorderly conduct violation (a non-criminal violation with no misdemeanor or felony finding), and WS-related conduct from September 1–October 29, 2017 chargeable only in California—as established aggravating predicates; and (3) declining to rely on the Impersonations Brief or the Meloy Report as reliable factual predicates for any sentencing enhancement or § 3553(a) analysis, treating them at most as disputed advocacy materials. The grounds for each request are set out in full below.

8

Ms. Wang has separately moved to continue the May 5, 2026 sentencing because the late production of the Meloy Report, the Impersonations Brief with its unidentified drafter, and four hours of translated jail calls left her without a meaningful opportunity to retain a rebuttal expert, obtain all underlying materials, or prepare an adequate response. If the Court grants this motion in limine and excludes the Meloy Report and the Impersonations Brief as unreliable sentencing predicates—and declines to make any factual finding regarding the "Kill Baby K" post, the Rory Will matter, or the California WS conduct—much of the need for a continuance will be eliminated.

Conversely, if the Court intends to consider these materials over Ms. Wang's objections, the continuance, Fatico-style evidentiary hearing, and expert authorization requested in her April 16, 2026 motion will remain essential to satisfy due process and Rule 32. The Court may therefore wish to address this motion in limine first, as its ruling will determine the scope and necessity of any further proceedings. Although restitution, self-surrender will still be argued at a separate hearing.

## THE CONDUCT AT ISSUE AND WHY IT IS DISPUTED

The government proposes to present three categories of out-of-district events as "relevant conduct" or "background." Ms. Wang disputes the government's characterization of each. The factual disputes are material, sworn under oath, and unresolved in any forum.

### A. The March 6, 2019 "Kill Baby K" Post (New York / New Jersey / California)

On March 6, 2019, an anonymous post appeared on HolySmoke.org under the name "Kailin Wang," stating: "I'm going to kill myself and our baby if he does not start paying me child support and then he will be guilty of first-degree murder. I hope his parents are happy to hear this!!!" The government attributes authorship to Ms. Wang. Ms. Wang has consistently denied authorship under oath across multiple proceedings for over seven years. Ex. 2 Amended Rebuttal to 2-23-26 Dom_Kill_Baby_K_Post

The following undisputed findings demonstrate why this factual dispute has never been resolved against Ms. Wang in Utah:

- T-Mobile CSLI placed Ms. Wang's device at 65 West 70th Street, New York, NY, continuously throughout March 6, 2019.

- The IP address (108.162.219.228) is a shared Cloudflare edge-proxy node. Cloudflare confirmed in May 2019 that HolySmoke.org was logging incorrect IP addresses and that no user-identifying data exists for posts made through that node. The government concedes this in Doc. 151 at 2, and the parties have stipulated that the address is consistent with a VPN through which any poster can appear to originate from anywhere in the world.

- SFPD Sgt. Martinez used the post to obtain a search warrant in March 2019 but omitted it from all eleven counts of the October 2019 arrest warrant after Cloudflare's forensic confirmation made attribution impossible even at probable cause.

- Utah DCFS reversed its "Supported" finding to "Unsupported" on November 6, 2019, formally concluding that Ms. Wang had not posted the threat.

- CT resided in California on March 6, 2019. Ms. Wang was in New York. The Cloudflare edge node was in the Newark, New Jersey area. No essential conduct element occurred in Utah.

The chronological record established in Ms. Wang's compiled exhibit (Vol. 2, WS (V2)) demonstrates that on February 15, 2019—the same day SFPD Sgt. Martinez first contacted WS (V2) in connection with CT's custody case—multiple HolySmoke posts appeared targeting Ms. Wang with information only WS (V2) and CT would have known. (Ex. 3 March 6, 2019 Kill Baby K Post) That pattern continued through March 6, 2019. CT had powerful motive to benefit from the post: as of March 6, 2019, he had never met the child, had provided no financial support, and had warned Ms. Wang on June 24, 2018 that her decision to continue the pregnancy "will not play out favorably for anyone." The post was the vehicle through which CT obtained ex parte sole legal and physical custody of a child he had never met.

## B. The 2013 Rory Will Matter (New York)

In 2013, a dispute arose in New York between Ms. Wang and Rory Will. Will was arrested first—for posting revenge pornography of Ms. Wang and directing men from AdultFriendFinder.com to her apartment. The Manhattan District Attorney's Office contacted Ms. Wang to proceed; she declined. Only after Will's release did he have Ms. Wang arrested. Ms. Wang's N.Y. Penal Law § 240.20 violation arose from that retaliatory sequence. It is a violation-level offense—not a crime, not reportable on standard "criminal record" background checks, sealed after one year under N.Y. CPL § 160.55, and carrying no factual basis for a plea

10

to any misdemeanor or felony criminal act. (Ex. 3; pp. 99-121 VOLUME 1_RORY WILL_ October 2013 to 2014)

Ms. Wang subsequently filed a civil action against Will for the revenge pornography. She prevailed at Will's motion to dismiss, documented in *Wang v. Will*, 2016 NY Slip Op 76740(U) (App. Div., 2d Dep't, June 15, 2016). The case was heading to depositions, discovery, and trial when the parties mutually stipulated to withdraw—a resolution driven in significant part by Ms. Wang's then-employment at KPMG's tax department, where she routinely worked up to eighty hours a week during busy season, leaving her without the time required to pursue full civil litigation. The mutual withdrawal was not a judgment against either party and produced no adverse factual findings. Will has declined to cooperate with the prosecution despite being approached by WS (V2), Sgt. Martinez, and CT's agents. The New York District Attorney declined prosecution. The NYPL § 160.55 partially sealed records were improperly accessed through the civil action. Every essential fact occurred in New York. No essential conduct element occurred in Utah. No court has ever accepted Will's 2014 affidavit as a factual finding against Ms. Wang, and treating it as such at sentencing would make this Court the first tribunal to do so—in a district where none of the alleged conduct occurred.

### C. WS-Related Conduct (California / Limited Utah Jurisdiction / Dismissed and Expunged)

WS (V2) initiated contact with Ms. Wang in July 2017 from San Francisco while Ms. Wang was in New York. WS (V2)'s escalating conduct—threatening Wang's employers and co-workers, repeatedly calling her parents' Utah residence—originated in California. California properly asserted jurisdiction over September 1 through November 20, 2017 based on WS (V2)'s California residency. (Ex. 5; [p. 4 of 13]; 2019-10-18 People v. California v. Wang 19016407 Felony Complaint-Affidavit of Probable Cause)

The Spanish Fork City citation (Case No. 171301350), which charged Ms. Wang for conduct on October 30 and November 20, 2017—the only dates Ms. Wang was physically present in Utah within the charging period—was dismissed with prejudice and expunged. Ex. 7 [p. 4 of 5] 2018-12-06 Spanish Fork City v. Wang;

California properly asserted jurisdiction over September 1 through November 20, 2017 based on WS (V2)'s California residency at the time; the Utah and California charging periods

11

overlap because Ms. Wang was in New York for the vast majority of that window and physically in Utah only for the Thanksgiving period beginning October 30, 2017 and ending after the November 20, 2017 citation. (Ex. 5; [p. 4 of 13]; Ex. 7; [p. 4 of 5]

Separately, on May 4, 2018, Judge Thomas Low held an evidentiary hearing and found WS (V2) had harassed and stalked the Wang family, that WS (V2)'s conduct "could also be charged as Electronic Harassment," and that WS (V2) was not credible, issuing three permanent civil stalking injunctions (Case Nos. 180400131, 180400132, 180400133). This is the factual record the only Utah court with evidentiary authority actually produced—one favorable to Ms. Wang. Those injunctions were not personally served on WS (V2) until April 14, 2020, nearly two years after issuance, because the Utah Fourth District Court's Judicial Case Manager informed the parties that WS (V2) had not been personally served in 2018; WS (V2)'s father accepted service at WS (V2)'s Alabama address, and filed proofs of service accepted by the Utah court in all three cases. WS (V2) has since relocated to Alabama, a fact brought to Ms. Wang's attention by CT's legal team in filings in the Utah Fourth District Court. (Ex. 8; 2018-05-04 Wang v. WS (V2) 180400131) (Ex. 6 [p. 231-232] WS (V2) July 5, 2017 to November 20, 2017)

Ms. Wang does not dispute that her conduct toward WS during the relevant period rises to the level of a Class B misdemeanor under Utah Criminal Code §76-9-201,[3] electronic communication harassment. That matter is expunged. California subsequently recharged the 2017 conduct involving W.S. as a felony in October 2019 and consolidated that charge to bolster the Count (V1) portion of the California case, which is currently pending before a court of proper jurisdiction. Those same 2017 events involving W.S. have now been recharged in this instant federal indictment, making this the third time the 2017 conduct has been charged. As recently as the March 2025 preliminary hearing in the related California proceeding, W.S. testified that he is unaware that he is identified as a victim in this federal case. Under § 6A1.3(a), the only Utah evidentiary record concerning WS finds that WS stalked and harassed the Wang family and that

---

[3] Under Utah Code §76-9-201, electronic communication harassment is generally a **Class B misdemeanor** (up to 6 months jail, $1,000 fine) for a first offense against an adult. It escalates to a **Class A misdemeanor** (up to 1 year jail, $2,500 fine) for subsequent offenses or if the victim is a minor. Third-degree felonies (up to 5 years prison, $5,000 fine) apply for repeat offenses.

WS was not credible; there is no Utah record that supports the government's adverse WS narrative.

## LEGAL STANDARD

*Two independent standards govern this motion.*

First, the constitutional venue requirement is not suspended at sentencing. The Constitution requires that criminal liability be adjudicated where the offense was committed, not wherever its ripples might later be felt. Article III and the Sixth Amendment encode the common-law vicinage rule: venue is anchored to the locus delicti—the place of the offense's essential conduct elements—not the locus effecti. An effects-based test for venue "has no support in the Constitution, the text of the statute, or historical practice," and the Venue and Vicinage Clauses "preclude trial in a locale where the crime did not occur." *United States v. Fortenberry*, 89 F.4th 702, 706 (9th Cir. 2023) (reversing § 1001 conviction where false statements were made in Nebraska and the District of Columbia but tried in California because the FBI happened to be based there; rejecting effects-based venue as constitutionally impermissible). Even if the district is more convenient or attractive to federal prosecutors, venue requires more than downstream effects felt in the forum. *Rodriguez-Moreno*, 526 U.S. at 279.

The question presented in *Abouammo v. United States*, currently pending before the Supreme Court, the Court has under advisement whether venue is proper in a district "where no offense conduct took place, so long as the statute's intent element 'contemplates' effects that could occur there." The petitioner's opening brief explains that the Court has "never upheld venue based on potential effects" alone, that a statute's intent language is "plainly not an 'essential conduct element'" for venue, and that falsification and posting are "discrete act[s]" completed where created—not continuing offenses that travel with every downstream transmission. A substantial majority of circuits hold that intent "cannot have been 'committed' anywhere but where [the defendant] was physically present." *United States v. Clenney*, 434 F.3d 780, 782 (5th Cir. 2005).

The Tenth Circuit has adopted the same conduct-based venue framework. *United States v. Smith*, 641 F.3d 1200, 1207 (10th Cir. 2011) (holding that courts determine where a crime is "committed" by looking to the statute's terms—especially its verbs—to identify the "essential

13

conduct elements" and to locate where the offense "began, continued, and [was] completed"; venue must lie where the defendant's prohibited acts occurred, not merely where the effects were felt); *United States v. Uchendu*, No. 2:22-cr-00160-JNP-2 (D. Utah Sept. 28, 2023), slip op. at 10 & n.8 (applying *Smith*'s verb-based analysis in this district).

The right to be tried where the offense is committed is rooted in both Article III and the Sixth Amendment, which guarantee trial "in the State where the said Crimes shall have been committed" and "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. art. III, § 2, cl. 3; id. amend. VI. The Supreme Court has long recognized that these provisions "were intended to secure to the accused a trial by jury in the place where the crime was committed," and to prevent Congress or the government from forcing defendants to stand trial in distant or strategically chosen venues. See *Cook v. United States*, 138 U.S. 157, 181–83 (1891); *United States v. Johnson*, 323 U.S. 273, 275–77 (1944).[Cook][Johnson] Venue is therefore improper in a district where the only acts attributable to the defendant are "preparatory to, and not part of, the offense." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188–89 (2d Cir. 1989).[Beech-Nut]

To determine where a crime is "committed" for venue purposes, courts "examine the key verbs in the statute defining the criminal offense to find the scope of relevant conduct" and disregard actions that are merely prior or preparatory. *United States v. Corona*, 34 F.3d 876, 879–81 (9th Cir. 1994) (quoting *United States v. Georgacarakos*, 988 F.2d 1289 (1st Cir. 1993)).[Corona][Georgacarakos] "Actions which are merely preparatory or prior to the crime are not probative in determining venue"; only those acts by the defendant that constitute the statutorily defined conduct are relevant. Corona, 34 F.3d at 880–81.[Corona] Crimes consisting of a "single noncontinuing act" are "committed" in the district where that act is performed. Id.

This preparation/commission distinction is longstanding. In *United States v. Walden*, the Fourth Circuit held that although "enough planning and preparation" occurred in South Carolina to support venue for a conspiracy charge, South Carolina was not a proper venue for substantive bank-robbery counts involving out-of-state banks. 464 F.2d 1015, 1018–20 (4th Cir. 1972).[Walden] The court rejected the theory that an offense "begins" wherever any act in furtherance occurs, explaining that such an approach "overlooks the legal distinction between

14

preparation for a crime and commission of the crime itself, and is contrary to the spirit and letter of the Constitution," and warning that granting the government such a venue theory would "engraft[] a forum-shopping option as to substantive offenses." Id. at 1020.[Walden]

Other circuits have likewise rejected "effects-only" or convenience-driven venue. In *United States v. Williams*, the Sixth Circuit reversed a conspiracy conviction brought in Michigan where "the evidence show[ed], at most, that Williams and Del Bosque agreed to a drug transaction that began, was consummated, and ended in Texas," and where Michigan "was chosen as a venue solely for the convenience of the government." 274 F.3d 1079, 1084–85 (6th Cir. 2001).[Williams] None of the overt acts occurred in Michigan, and the conspiracy "had no effect in Michigan"; the court held that "a government informant may [not] arbitrarily determine venue merely by stating, falsely, where he intends to take the drugs." Id.

Constructive-possession cases reflect the same rule: the locus of the crime cannot be a district where the defendant has never been. In *United States v. Medina-Ramos*, the Tenth Circuit held that "[t]he acts and ability giving rise to constructive possession can only take place where the possessor is physically present," and "the locus of the constructive possession, and hence the locus of a crime committed by constructive possession, cannot be a place where the defendant has never been, personally or by a person whose acts are attributable to him." 834 F.2d 874, 877–78 (10th Cir. 1987).[Medina-Ramos] Even assuming possession is a continuing offense under 18 U.S.C. § 3237(a), the court held, "the possession must nonetheless continue in the district in which the Government seeks to prosecute." Id. at 878.[Medina-Ramos]

The "substantial contacts" test also cuts against effects-only venue. That test looks to "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." *United States v. Bezmalinovic*, 962 F. Supp. 435, 441 (S.D.N.Y. 1997) (quoting *United States v. Reed*, 773 F.2d 477 (2d Cir. 1985)).[Bezmalinovic] Where, as in Bezmalinovic, "the only acts that occurred in [the forum] were ministerial in nature," and the defendant "did not intend and could not have foreseen" any acts there, substantial contacts are lacking and venue is improper. Id. at 442.[Bezmalinovic]

15

Section 3237(a) does not authorize venue in a district that sees only effects without conduct. In *United States v. Davis*, the Fifth Circuit rejected a § 3237(a) "continuing offense" theory where the government failed to show that the defendants possessed or intended to deliver the contraband while in the claimed district, explaining that to adopt the government's argument "would undermine the guarantees of Article III and the Sixth Amendment that defendants will be tried in the state and district where the crime itself was committed." 666 F.2d 195, 199–200 (5th Cir. 1982).[Davis]

Finally, venue cannot rest on the government's unilateral use of communication facilities. In *United States v. Rodgers*, the court rejected venue in the United States for a § 843(b) offense where the defendant's use of the communications facility occurred abroad, holding it "inconceivable that Congress intended … that a DEA agent may create federal offenses all over the world by simply picking up a telephone in the United States and calling suspected narcotics violators outside the country." 575 F. Supp. 246, 248–49 (E.D. Ill. 1983).[Rodgers]

On the sentencing side, U.S.S.G. § 6A1.3(a) independently requires that information used to enhance a sentence have "sufficient indicia of reliability to support its probable accuracy." Where a defendant specifically objects, the government bears the burden of producing reliable evidence. *United States v. McDonald*, 43 F.4th 1090, 1098 (10th Cir. 2022).[McDonald] The Tenth Circuit has held that when a defendant specifically disputes sentencing facts, it is reversible error for a court to rely on unsupported, unreliable information to enhance the sentence. *United States v. Williams*, 48 F.4th 1125, 1130 (10th Cir. 2022).[Williams] Although the Federal Rules of Evidence do not apply at sentencing with full force, hearsay doctrine and § 6A1.3's reliability requirement together exclude out-of-court advocacy documents and expert reports based on one-sided, uncross-examined records. See *United States v. Anthem*, Inc., No. 1:16-cv-01493-ABJ (D.D.C. Nov. 16, 2016) (minute order excluding third-party declarations as hearsay lacking sufficient indicia of reliability); *United States v. UnitedHealth Group Inc.*, No. 1:22-cv-0481 (CJN) (D.D.C. July 22, 2022) (excluding expert testimony that served as a "conduit" for factual assertions not based on personal knowledge and declarations obtained in anticipation of litigation). Other courts have applied § 6A1.3 and due-process principles to exclude unreliable victim-impact evidence where there were serious questions about identity and factual accuracy, recognizing that such material raises "serious issues as to the indicia of

16

reliability required" under § 6A1.3 and Rule 32.

---

# ARGUMENT

## I. This Court Lacks Jurisdiction to Resolve the Disputed Factual Questions Underlying Each Category of Out-of-District Conduct

Ms. Wang does not challenge this Court's venue over the offense of conviction. Rather, she challenges the government's use of a Utah sentencing hearing to make the functional equivalent of factual convictions for conduct whose essential elements occurred in New York and California—conduct that no court in those districts has ever adjudicated against her. As to the California WS-related conduct specifically, an independent threshold basis for exclusion exists: the structure of the plea agreement the parties presented to this Court forecloses adverse sentencing findings about that conduct. See Section I.D, infra. The government's proposed use of the three categories of conduct requires this Court to resolve genuinely contested factual questions that have never been adjudicated against Ms. Wang in any forum with territorial authority.

On March 6, 2019, Ms. Wang was in New York, CT was in California, and the Cloudflare edge node was in New Jersey—no conduct element occurred in Utah. The Rory Will events occurred entirely in New York. The WS conduct underlying California's charges occurred while Ms. Wang was in New York and WS (V2) was in California. Utah's jurisdiction extended only to October 30 and November 20, 2017—and that matter is expunged. (Ex. 3 [pp. 135-139] March 6, 2019 Kill Baby K Post)

The government's theory of Utah's connection to each category is, at bottom, an effects-based theory: the results of out-of-district conduct were felt here. That is precisely the theory the Supreme Court is considering in *Abouammo*. A substantial majority of circuits hold that a statute's intent element is "plainly not an 'essential conduct element'" for venue, and that even obstructive intent "cannot have been 'committed' anywhere but where [the defendant] was physically present." Pet. Br. at 4 (quoting *Clenney*). Whatever effects the out-of-district conduct may have had in Utah, the essential conduct occurred elsewhere.

17

Under *Smith*'s verb-based methodology, looking to the conduct-defining verbs of the offense statutes confirms that none of the three disputed categories has an essential conduct element in Utah. Harassment and cyberstalking offenses are committed where the defendant performs the proscribed acts—posting, transmitting, placing communications in interstate commerce—not where a recipient later reads or experiences the content. *Smith*, 641 F.3d at 1207 (courts look to the statute's verbs to identify where the offense "began, continued, and [was] completed"). Here, the verbs locate all essential acts outside Utah. The March 6, 2019 post was allegedly written and submitted from wherever the author was physically present; Ms. Wang was in New York (T-Mobile CSLI) and CT was in California—no act of posting occurred in Utah. The 2013 Rory Will conduct—alleged online posts, calls, and profile submissions—was committed in New York, where the acts took place. The WS-related conduct for which California properly asserted jurisdiction was committed while Ms. Wang was in New York or California; the only conduct physically in Utah on the relevant dates is the expunged Spanish Fork matter. A district court in this circuit applied *Smith*'s analysis to conclude that venue requires more than downstream effects felt in the district. *Uchendu*, slip op. at 10 & n.8. Applied here, *Smith*'s verb test points to New York and California for each category—not Utah.

Making adverse sentencing findings about events whose conduct elements did not occur here—events never charged here, pending in another jurisdiction or not charged anywhere, and never adjudicated against Ms. Wang—would exercise jurisdictional authority the Constitution does not vest in this District. It would accomplish through sentencing what the government could not accomplish through indictment: convicting Ms. Wang, by judicial finding rather than jury verdict, of uncharged out-of-district acts. The *Abouammo* briefing warns against exactly this dynamic, noting the risk that effects-based venue becomes "a recipe for many federal criminal prosecutions to flow to" whichever forum the government finds advantageous, and citing concerns about "cherry-pick[ing] favored venues through pretextual reliance on out-of-district agents." Pet. Br. at 18–19. The Ninth Circuit has already applied this principle to reverse a conviction on exactly analogous grounds: in *United States v. Fortenberry*, 89 F.4th 702 (9th Cir. 2023), the court reversed a § 1001 false-statements conviction because the defendant made his statements to FBI agents in Nebraska and the District of Columbia, yet the government tried the case in California where the FBI investigation happened to be based. The court held that effects-

18

based venue has "no support in the Constitution, the text of the statute, or historical practice"—the same principle that forecloses the government's theory here.

Using sentencing as a substitute for indictment and trial on these out-of-district episodes raises three intertwined constitutional problems that cannot be cured by labeling the evidence "relevant conduct." First, it is a functional end-run around the venue and jury guarantees: it allows the government to secure the practical equivalent of a conviction for New York and California conduct without satisfying the constitutional requirements for bringing those charges in those districts. Second, it enables precisely the forum-shopping the Abouammo briefing warns against—aggregating disparate episodes into whichever district is tactically advantageous and litigating them under the relaxed evidentiary standards of sentencing rather than the protections of trial. Third, it distorts the § 3553(a) analysis by making adverse findings on out-of-district disputes the gravitational center of the sentencing decision, overshadowing the actual Utah conduct the government chose to charge and prove. A sentence driven by contested New York and California events that local authorities and courts declined to adjudicate against Ms. Wang is not a sentence imposed for the offense of conviction—it is a sentence for uncharged offenses the government was never required to prove beyond a reasonable doubt to any jury drawn from the communities where the conduct allegedly occurred.

Sentencing-stage motions in limine in other districts reflect similar concerns. In *United States v. White*, misprision of felony, the defendant moved in limine to preclude the government from presenting child-pornography images from hard drives that had not been used in years as "relevant conduct" at sentencing, arguing that such proof would create a mini-trial on remote, uncharged conduct and asking the court to "make an initial determination of relevancy before allowing the presentation of this evidence." The same logic applies here: this Court should not convert sentencing into a vehicle for adjudicating disputed New York and California conduct for which Utah is not the locus delicti.

The government's only statutory vehicle for multi-district venue is 18 U.S.C. § 3237(a), which provides that an offense "begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." That provision does not help the government here. The Congressional Research Service's authoritative venue analysis confirms that "a crime occurs in

19

any district in which any of its 'conduct' elements are committed," and that "venue may not be based on elements of the offense which are not conduct elements." Charles Doyle, *Venue: A Legal Analysis of Where a Federal Crime May Be Tried*, CRS Rep. RL33223, at 9 (Dec. 6, 2018). The government's theory is that Utah venue is proper because CT felt the effects of out-of-district conduct here. But "intent to cause effects in a district is plainly not an 'essential conduct element'" for venue purposes. *United States v. Clenney*, 434 F.3d 780, 781–82 (5th Cir. 2005). The conduct elements of cyberstalking—posting, transmitting, placing communications in interstate commerce—are completed where the defendant physically performs them. Ms. Wang was in New York on March 6, 2019 (T-Mobile CSLI). The 2013 Will conduct occurred in New York. The WS-related conduct underlying California's charges occurred while Ms. Wang was in New York and WS was in California. Utah is the locus effecti, not the locus of any essential conduct element for any disputed category.

The second paragraph of § 3237(a)—which makes offenses involving "the use of the mails–transportation in interstate or foreign commerce" triable in any district "from, through, or into which" such commerce moves—likewise does not reach Utah. That provision was enacted to address offenses involving the physical movement of mail or objects across districts. Electronic communications do not "move through" Utah in any territorial sense merely because CT could access a website from there. The Cloudflare edge node through which the March 6, 2019 post was routed was located in the Newark, New Jersey area. The transmission was completed there. The Supreme Court has made clear that downstream effects felt in a second district do not create venue there for conduct begun and completed in a first: in *United States v. Cabrales*, 524 U.S. 1, 7–8 (1998), the Court held that money laundering charges could not be tried in Missouri simply because the predicate drug trafficking generating the proceeds occurred there; the laundering "occurred after the fact of an offense begun and completed by others," and the district of effects is not the district of conduct. The same structural principle forecloses Utah venue here: whatever effects CT experienced in Utah from communications transmitted from New York and New Jersey, those effects do not relocate the essential conduct elements of posting and transmitting into this district. Doyle, *supra*, at 9–10 ("some have held that the effect must also constitute a 'conduct element' under the statute defining the offense; and that venue may not be based on elements of the offense which are not conduct elements") (citing *United States v. Bowens*, 224 F.3d 302, 311 (4th Cir. 2000)).

20

Even the broader "substantial contacts" test applied in some circuits—which considers the site of the defendant's acts, the elements and nature of the crime, the locus of the criminal conduct's effects, and the suitability of the district for accurate factfinding—cuts decisively against Utah. Doyle, *supra*, at 10 (citing *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)). The site of Ms. Wang's acts was New York. The conduct elements of the offense point to New York and New Jersey. The witnesses—SFPD, Cloudflare, T-Mobile, DCFS, the Manhattan District Attorney, and Rory Will—are in New York and California. The law enforcement agencies that investigated and declined to charge are in New York and California. Utah has no forensic record of its own regarding any of the three disputed categories; the only Utah judicial record that exists concerning WS is Judge Low's May 4, 2018 finding that WS stalked and harassed the Wang family and was not credible. On every factor of the substantial contacts test, Utah is the least suitable district for accurate factfinding on these disputes. The Third Circuit's holding in *United States v. Auernheimer*, 748 F.3d 525, 537 (3d Cir. 2014), is directly on point: "The Government has not cited, and we have not found, any case where the locus of the effects, standing by itself, was sufficient to confer constitutionally sound venue."

## A. The Government Has Not Established the Disputed Categories by a Preponderance of Reliable Evidence Under USSG § 6A1.3

Ms. Wang acknowledges, consistent with paragraph 12(g) of the plea agreement, that the Court may consider uncharged conduct in determining the reasonableness of the stipulated sentence. That acknowledgment, however, has a precise scope: it confirms the Court's *authority* to consider relevant conduct, not that any particular factual assertion about Ms. Wang's conduct is accurate or established. The government still bears the burden of proving disputed relevant conduct by a preponderance of reliable evidence. USSG § 6A1.3(a); *United States v. Washington*, 11 F.3d 1510, 1516 (10th Cir. 1993). And the reliability requirement of § 6A1.3(a) applies with full force to each category the government seeks to place before the Court. For the three disputed categories, the government has not met that burden.

The 2013 Rory Will conduct is also categorically excluded from the same-course-of-conduct analysis by the guidelines' own terms. Application Note 5(C) to USSG § 1B1.3 provides expressly that "offense conduct associated with a sentence that was imposed prior to the acts or omissions constituting the instant federal offense (the offense of conviction) is not considered as

21

part of the same course of conduct or common scheme or plan as the offense of conviction." The Queens violation plea was entered and dismissed in 2014—three years before the charged conduct begins in September 2017. Under Application Note 5(C), the conduct underlying that prior New York matter is to be treated as criminal history, not relevant conduct. That is a textual bar from the guidelines themselves, not a balancing judgment, and it applies regardless of how the government characterizes the alleged behavioral similarity.

Even setting aside that categorical bar, the Rory Will conduct does not satisfy the same-course-of-conduct standard. The guidelines specify that when temporal proximity is absent, "a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity." USSG § 1B1.3 cmt. n.5(B)(ii)(ii). A four-year gap, a different victim in a different state, and unproven underlying conduct do not constitute the degree of similarity or regularity the guidelines require. *United States v. Dazey*, 403 F.3d 1147, 1175 (10th Cir. 2005). The government's sole evidentiary basis is the Will affidavit—an unsworn litigation document prepared by Will's counsel to defeat Ms. Wang's civil suit, never cross-examined, and supported only by a forensic record (the Trace Bust subpoena response) that attributes the relevant IP addresses to unidentified free-trial accounts with no user or billing data. That is not evidence with "sufficient indicia of reliability to support its probable accuracy" under § 6A1.3(a). *United States v. Williams*, 48 F.4th 1125, 1130 (10th Cir. 2022); *United States v. Ortiz*, 993 F.2d 204 (10th Cir. 1993) ("unreliable allegations shall not be considered") (cited in § 6A1.3 commentary).

The U.S. Sentencing Commission's Preliminary April 2026 Amendments, approved April 16, 2026, and effective November 1, 2026, confirm that the governing framework relied upon in this motion is settled and unchanged. Section 1B1.3(c), originally enacted by Amendment 826 (effective November 1, 2024), remains intact and provides that "relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction," with no modification in the 2026 amendment cycle, underscoring that the exclusion of acquitted conduct is a stable Commission policy rather than a transitional rule. The Background Commentary to §1B1.3 further clarifies that guideline range determinations are governed exclusively by §1B1.3, while §1B1.4 and 18 U.S.C. §3553(a) address the broader scope of information a court may consider after the range is calculated, reinforcing that even if certain conduct may be considered under §3553(a), it cannot be used to establish the guideline range in

22

contravention of §1B1.3(c). **Consistent with this structure, the Commission's newly adopted Chapter Five introductory commentary reiterates that sentencing courts must impose a sentence "sufficient but not greater than necessary," confirming that reliance on unadjudicated or out-of-district conduct to drive the guideline calculation or ultimate sentence would exceed what is necessary for the offense of conviction.**

The March 6, 2019 "Kill Baby K" post presents a different problem. It falls within the temporal scope of the charged conduct, and Ms. Wang does not dispute that the Court may consider it if its authorship is reliably established. The dispute is precisely whether authorship has been or can be reliably established. It has not. SFPD omitted the post from the October 2019 arrest warrant after Cloudflare confirmed attribution was forensically impossible. Utah DCFS formally reversed its finding to "Unsupported." The San Francisco District Attorney declined to charge based on the post. No court has ever found Ms. Wang authored it. The government's only proffered basis for attribution is the Impersonations Brief and the Meloy Report—both of which assume authorship as a predicate rather than establishing it through independent forensic evidence. An expert report and an advocacy document that bootstrap an unproven assumption cannot constitute the reliable predicate § 6A1.3(a) requires. *See United States v. McDonald*, 43 F.4th 1090, 1098 (10th Cir. 2022) (government bears the burden of producing reliable evidence when defendant specifically objects to a sentencing fact). Where the government cannot establish a disputed sentencing fact by a preponderance of reliable evidence, this Court should decline to make an adverse finding. *Williams*, 48 F.4th at 1130; *United States v. Ortiz*, 993 F.2d 204 (10th Cir. 1993) ("unreliable allegations shall not be considered") (cited in § 6A1.3 commentary).

## B. The 2025 Guidelines and United States v. Watts Do Not Authorize Findings on These Disputed Categories

The Sentencing Commission has now directly addressed the question of contested prior conduct at sentencing, and its answer forecloses the government's position for guideline-range purposes. Effective November 1, 2024, Amendment 826 to the Sentencing Guidelines added § 1B1.3(c), which provides expressly: "Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." USSG § 1B1.3(c) (2025). By excluding even acquitted conduct—where a defendant was charged, tried before a jury, and

found not guilty—from the guideline range calculation, the Commission has drawn the clearest possible line: conduct that was never charged, never tried, and never adjudicated cannot serve as a predicate for guideline range enhancement. The three categories at issue here fall far below even the threshold of acquitted conduct. The Kill Baby K post was never charged anywhere. The Rory Will matter is categorically excluded under Application Note 5(C) as prior-sentence conduct antedating the offense of conviction. The WS-related California charges are being dismissed by agreement as an essential term of the plea. None qualifies as relevant conduct under the 2025 Guidelines for purposes of determining the guideline range.

Even setting aside the categorical bar of § 1B1.3(c), the government may invoke *United States v. Watts*, 519 U.S. 148 (1997), for the broader proposition that sentencing courts may consider contested conduct under § 3553(a). That reliance would also be misplaced. *Watts* addressed a narrow question: whether the Double Jeopardy Clause bars a sentencing court from considering conduct of which a defendant was acquitted at trial. The Court held that it does not, because the preponderance standard at sentencing is lower than the beyond-a-reasonable-doubt standard required for conviction. *Id.* at 154–55. That holding has since been overtaken for guideline-range purposes by Amendment 826, and *Watts* does not govern the broader § 3553(a) analysis for additional reasons.

First, *Watts* concerned conduct that had been charged, tried before a jury, and adjudicated—meaning the defendant had a full opportunity to contest those facts at trial, with counsel, under the rules of evidence, and before a jury drawn from the district where the conduct occurred. The three disputed categories here have never been charged in any forum with proper authority over them. The "Kill Baby K" post has never been charged anywhere. The Rory Will matter produced a sealed violation plea with no factual allocution and no jury finding. The WS-related California charges are being dismissed as an essential part of this plea agreement. The defendant in *Watts* had the procedural protections of a full criminal trial. Ms. Wang has had none with respect to these categories.

Second, *Watts* predates *United States v. Booker*, 543 U.S. 220 (2005), which rendered the Sentencing Guidelines advisory and acknowledged that district courts retain discretion in how they weigh contested sentencing information. Post-*Booker*, a court is not required to find every fact the government proffers. Where reliability concerns are substantial, constitutional

24

implications serious, and the conduct has never been adjudicated in any proper forum, the court acts within its discretion in declining to make adverse findings.

Third, *Watts* does not address the reliability threshold imposed by USSG § 6A1.3(a), which requires that sentencing information carry "sufficient indicia of reliability to support its probable accuracy." The fact that a court *may* consider contested conduct does not mean it *must* do so when the information offered to support that conduct consists of unsworn advocacy documents, an uncross-examined expert report, and out-of-court statements from a victim's private attorney. The permissive rule of *Watts* operates against a baseline of reliable evidence; it is not a warrant to make adverse findings on a contested factual record that would be excluded at trial.

## C. Making These Findings Would Implicate Due Process and the Sixth Amendment

The government's request is not that this Court consider general background context. It is that this Court resolve specific, material factual disputes in Ms. Wang's disfavor—disputes that have never been resolved against her by any court, that multiple law enforcement agencies declined to charge, and that are being resolved globally through the plea agreement itself. Granting that request implicates two independent constitutional guarantees.

*Due process.* The Fifth Amendment's Due Process Clause requires that sentencing proceedings be fundamentally fair. *Townsend v. Burke*, 334 U.S. 736, 741 (1948). A sentencing court violates due process when it relies on "materially false" or "constitutionally unreliable" information to enhance a defendant's sentence. *United States v. Tucker*, 404 U.S. 443, 447 (1972). The three disputed categories are precisely the kind of unreliable information the Due Process Clause protects against. Each involves factual disputes that the only courts with territorial authority to adjudicate them declined to resolve against Ms. Wang—or resolved in her favor. Using sentencing to accomplish through judicial fact-finding what indictment and trial would require in the proper forums is not a permissible exercise of this Court's sentencing authority. *See Gardner v. Florida*, 430 U.S. 349, 358 (1977) (due process requires that a defendant not be sentenced "on the basis of information which he had no opportunity to deny or explain").

25

***Sixth Amendment.*** The Sixth Amendment guarantees a defendant the right to have any fact that increases her sentence beyond the prescribed statutory range found by a jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Alleyne v. United States*, 570 U.S. 99, 103 (2013). To the extent the government intends to use findings about the "Kill Baby K" post, the Rory Will matter, or the WS conduct to support a sentence above what the offense of conviction and admitted conduct would otherwise support, those findings must be submitted to a jury—not resolved at sentencing on the basis of advocacy documents and a one-sided expert report that Ms. Wang has had no meaningful opportunity to cross-examine. Ms. Wang did not admit these facts. No jury found them. They cannot serve as a predicate for increased punishment without offending the constitutional framework *Apprendi* and *Alleyne* established.

The constitutional venue requirement reinforces these protections. Article III, Section 2, and the Sixth Amendment's Vicinage Clause together require that criminal defendants be tried in the district where the crime was committed. U.S. Const. art. III, § 2, cl. 3; *id.* amend. VI. Those provisions reflect a "deep commitment to the principle that one accused of crime is entitled to a trial in the vicinity of the crime." *United States v. Johnson*, 323 U.S. 273, 275 (1944). Sentencing a defendant on the basis of judicial findings about uncharged out-of-district conduct achieves the same functional result as trying her for those offenses in the wrong venue—without any of the procedural protections those provisions were designed to provide. As Judge Parrish recognized in applying *Smith*'s verb-based framework in this district, venue is proper only where the "essential conduct elements" of the offense began, continued, or were completed—not where effects were felt downstream. *Uchendu*, slip op. at 10 & n.8. That principle applies with equal force when the question is not where to hold a trial but whether a sentencing court should resolve disputed factual questions about conduct that no court in the districts of the essential conduct has ever adjudicated against the defendant.

The Supreme Court is currently considering, in *Abouammo v. United States*, whether venue is proper in a district "where no offense conduct took place, so long as the statute's intent element 'contemplates' effects that could occur there." The constitutional principle at stake—that venue must rest on where the defendant acted, not where effects were felt—is the same principle

Ms. Wang invokes here. Ms. Wang respectfully requests leave to file a notice of supplemental authority within seven days of the Court's decision in *Abouammo*.

### D. As a Threshold Matter, Adverse Findings About California-Related Conduct Are Internally Inconsistent With the Global Resolution the Parties Negotiated and Presented to This Court

Paragraph 12(e) of the plea agreement records the San Francisco District Attorney's agreement to dismiss *California v. Wang*—case numbers 19016407 and 24500827—after sentencing in the federal case. The agreement expressly states that "dismissal of the California case is an essential part of the agreement in the federal case." The San Francisco District Attorney's Office signed that agreement with full awareness of the federal case's scope and the conduct at issue.

The government now proposes that this Court make adverse factual findings about the WS-related California conduct—findings that could function, per AUSA Blanch's own acknowledgment, as predicates for future prosecutions—while simultaneously benefiting from a global resolution under which those charges are dismissed. That is internally inconsistent with the structure of the bargain the parties presented to this Court. Using the same California facts as aggravating sentencing predicates in the federal case effectively extracts a double consequence: the California conduct is resolved through the dismissal the SFDA agreed to, and then used again to drive an increased federal sentence based on the same events.

The plea agreement's relevant conduct provision, paragraph 12(g), acknowledges that the PSR may describe uncharged conduct. But paragraph 12(e) reflects the parties' considered judgment about how the California case would be resolved. Reading these provisions together, the most coherent interpretation is that California-related conduct may appear in the PSR as context—not that it should serve as an independent aggravating predicate unconstrained by the fact that the parties' global resolution was specifically designed to discharge those charges. A sentencing court has broad discretion under § 3553(a) to weigh sentencing factors in light of the full context of a case, including the structure of the plea agreement before it. *See Pepper v. United States*, 562 U.S. 476, 490 (2011). This Court should exercise that discretion consistently with the structure of the agreement the parties negotiated and presented to it for acceptance.

27

**E. The Government's Use of Sentencing to Adjudicate Uncharged Out-of-District Conduct Is Structural Over-Federalization That Undermines Both Federalism and the Proper Limits of This Court's Authority**

The constitutional guarantee that trial—and the adverse factual findings that substitute for trial at sentencing—must occur in the district where the crime was committed is not a technical pleading rule. It reflects the Founders' most deeply held grievance against British colonial practice. The Declaration of Independence charged the Crown with "transporting us beyond Seas to be tried for pretended offenses." The Virginia House of Burgesses described the "deplorable" condition of a defendant "dragged from his native Home... thrown into Prison... where no Witness can be found to testify to his Innocence." The Framers responded by encoding in Article III, Section 2 and the Sixth Amendment the requirement that criminal proceedings be held in the state and district where the crime was committed. Doyle, *supra*, Addendum (tracing the constitutional history of venue and vicinage from Magna Carta through the Sixth Amendment). That principle is fully realized here: Ms. Wang cannot effectively rebut the government's New York and California factual allegations in a Utah sentencing because the witnesses, forensic records, and institutional knowledge are concentrated in those other districts. The concurrent jurisdiction framework recognizes this: the purpose of jurisdictional limits is "to protect a defendant by ensuring their case is processed by a court with sufficient authority and resources," and jurisdiction can be raised as a defense when a court lacks authority over the dispute. *Overlapping Jurisdictions: Where Federal and State Jurisdictions Meet* (PeterJohnsonLaw 2025). Utah has concurrent federal jurisdiction over the offense of conviction. It does not have the authority or resources to serve as a surrogate factfinder for disputes that New York and California courts—with territorial authority, local law enforcement knowledge, and access to the relevant witnesses—declined to resolve against Ms. Wang.

What the government proposes is a paradigm case of over-federalization: using the federal sentencing process in Utah to accomplish what state and local authorities in the proper jurisdictions declined to do through prosecution. The San Francisco District Attorney declined to charge Ms. Wang based on the Kill Baby K post. The Manhattan District Attorney declined to prosecute the Rory Will matter. California's charges are being dismissed as an essential term of the plea agreement. Former Reagan Administration Attorney General Edwin Meese wrote that

28

the federalization of traditionally local conduct "contradicts constitutional principles, undermines the state-federal fabric, and disrupts the important balance between the federal and state systems of justice." *Over-Federalization: Federal Intrusion Into State Criminal Law* (The Sentencing Project 2025) (quoting Meese, *The Dangerous Federalization of Crime*, Hoover Institute (1999)). The House Judiciary's bipartisan Overcriminalization Task Force heard testimony that "[i]f something is already a state crime, unless there is some unique federal interest or expertise involved, there should be no reason to make the same conduct a federal offense." *Id.* (quoting Malcolm testimony, 2013). The same principle applies at sentencing: if state and local authorities with proper territorial jurisdiction over the Kill Baby K post, the Rory Will conduct, and the WS California charges declined to pursue those matters against Ms. Wang—and one of those dismissals is an essential term of the very plea agreement before this Court—there is no unique federal interest served by using sentencing to make the adverse factual findings those jurisdictions declined to make.

AUSA Blanch's own April 14, 2026 email acknowledges that a factual finding at sentencing "other prosecuting agencies could use against you in possible future prosecutions." That admission confirms what the over-federalization literature identifies as the core structural problem: federal sentencing proceedings are being used as a vehicle to generate factual findings that function as surrogate convictions—with downstream prosecutorial utility in other jurisdictions—without any of the constitutional protections that a criminal trial in those jurisdictions would require. A finding by this Court that Ms. Wang authored the Kill Baby K post would be the functional equivalent of a New York or California conviction for conduct that occurred in those districts, obtained through a Utah sentencing proceeding at a preponderance standard, without the benefit of a jury drawn from the communities where the conduct allegedly occurred, and based on evidence that no court in those communities has ever accepted. That is not a permissible use of this Court's sentencing authority.

## II. The Specific Consequences of Exercising Jurisdiction Over Each Disputed Category

### A. The "Kill Baby K" Post

If this Court finds that Ms. Wang authored the March 6, 2019 post, it will have resolved what: (1) SFPD could not resolve at probable cause, leading to omission from the October 2019

29

arrest warrant; (2) Utah DCFS resolved in Ms. Wang's favor after receiving the forensic record; (3) the San Francisco District Attorney treated as unresolved, declining to charge; and (4) no court anywhere has resolved against Ms. Wang. Under the conduct-based venue framework established in *Abouammo*, Utah is the locus effecti, not the locus delicti. *Uchendu*, slip op. at 10. It is not the constitutionally correct forum. (Ex. 3 [pp. 158-162] March 6, 2019 Kill Baby K Post]

Moreover, the "Kill Baby K" post is uniquely inflammatory. Presenting it as Ms. Wang's writing at sentencing would risk an emotional response far out of proportion to any properly proven Utah conduct and would invite exactly the sort of "trial within a trial" over uncharged behavior that other sentencing-stage limine motions seek to prevent.

### B. The Rory Will Affidavit

If this Court credits Will's 2014 affidavit, it will have done what Queens County Supreme Court declined to do, what the New York District Attorney declined to do, and what Will himself has declined to support by refusing to cooperate. (Ex. 9 [pp. 157-163] 10-25-2013_Rory Will 497 Pages)

The 2013 conduct occurred entirely in New York and produced a published appellate decision: *Wang v. Will*, 2016 NY Slip Op 76740(U) (App. Div., 2d Dep't, June 15, 2016). Making adverse findings about it at sentencing inverts the constitutional guarantee that disputed facts be adjudicated where the conduct occurred.

### What the Trace Bust Subpoena Record Actually Shows—and What No Court Ever Found

The April 18, 2014 affirmation of Daniel Andrew Kieffer, Executive Vice President of Trace Bust, Inc., was produced in response to a subpoena in Docket #2014QN000495 and is annexed to Will's affidavit as Exhibit 5. It contains two database records showing calls placed through Trace Bust's caller-ID spoofing service in which the Displayed CID was Will's number (646-266-3556). Trace Bust's own summary states that "the call sender and recipient were the same"—meaning each caller called their own number while making Will's number appear as the Displayed CID. Will's affidavit (¶27) presents this as proof that Ms. Wang called herself to fabricate evidence that he was calling her in violation of a Family Court Order of Protection. (Ex. 9 [p. 73 of 497] 10-25-2013_Rory Will 497 Pages)

30

The record does not establish what Will claims, and no court has ever found that it does. Three independent deficiencies preclude treating the Trace Bust record as an established factual predicate at sentencing.

First, the two IP addresses—172.56.19.51 and 207.38.228.228—are unattributed. Trace Bust explicitly states that "there is no user or billing data to provide" because these were free trial accounts. The IP addresses identify the devices that placed the calls; they do not identify the person who controlled those devices. No subpoena was ever served on the ISPs associated with those addresses to establish account holder identity, and no court made any finding connecting either address to Ms. Wang.

Second, the Queens criminal case produced a violation-level sealed plea with no factual findings. The certified transcript of the May 5, 2014 proceedings before Judge Tandra L. Dawson confirms that the plea was to Penal Law § 240.26(1), harassment in the second degree— "a violation, to cover all charges, not a crime" (Tr. at 5:6). It was a structured repleader offer: upon successful completion of a stalker program, Ms. Wang could replead to P.L. § 240.20, disorderly conduct. The case was dismissed on June 18, 2014 and sealed under N.Y. C.P.L. § 160.55. No statement of facts was recited on the record. No judge made any finding that Ms. Wang spoofed calls, authored the Craigslist or AdultFriendFinder profiles, posted revenge pornography, or sent the threatening texts Will attributes to her. Ms. Wang's entire on-record allocution consists of four words—"Yes," "No," "Yes," and "Yes"—in response to procedural colloquy, not admissions of Will's specific factual allegations. (Ex. 9 [pp. 75-82] 10-25-2013_Rory Will 497 Pages)

Third, Ms. Wang prevailed at Will's motion to dismiss in the civil case. Will moved under CPLR §§ 3211(a)(1), (a)(7), and (a)(8)—the precise grounds stated in his Notice of Motion filed May 26, 2015, which attached the Trace Bust record and the affidavit at issue here. The Appellate Division, Second Department, affirmed denial of dismissal in *Wang v. Will*, 2016 NY Slip Op 76740(U), meaning Ms. Wang's civil claims against Will for the revenge pornography survived on the merits. The case was heading to trial when the parties mutually withdrew—leaving no adjudication against Ms. Wang on any of Will's factual allegations. Will subsequently declined to cooperate with federal prosecutors and is not a listed government

31

witness in this proceeding. <mark>(Ex. 4 [p.105 of 126] VOLUME 1_RORY WILL_ October 2013 to 2014)</mark>

The structural problem with Will's affidavit as sentencing evidence is fundamental. It was filed in a Queens civil case in which Ms. Wang was the plaintiff. It was prepared in anticipation of litigation to support a motion to dismiss. It was never tested by cross-examination. The exhibits—text screenshots, Craigslist and AdultFriendFinder profiles, and the Trace Bust record—were selected and presented by Will's counsel, Laura M. Trachtman, for the sole purpose of defeating Ms. Wang's civil claims. The Trace Bust record is the only forensic document in the entire file, and it does not attribute authorship to Ms. Wang: it identifies IP addresses for free-trial accounts with no user or billing data, and the ISPs associated with those addresses were never subpoenaed.

No court in New York—criminal or civil—has ever made a finding that Ms. Wang authored the AdultFriendFinder profiles, sent the Craigslist posts, fabricated call spoofs, or posted the revenge pornography. The Manhattan District Attorney contacted Ms. Wang to prosecute Will for the revenge pornography. The New York criminal case ended in a sealed violation plea with no factual allocution. The civil case was withdrawn before trial. If this Court were to credit Will's affidavit at sentencing, it would be the first tribunal anywhere to resolve these factual disputes against Ms. Wang—based on an advocacy document never subjected to cross-examination, attached to a motion to dismiss in a civil case Ms. Wang was pursuing as plaintiff, and supported only by a forensic record whose two IP addresses were never traced to any identified account holder.

### C. WS-Related Conduct

The California WS charges are pending before a court with proper jurisdiction. The Spanish Fork matter is expunged. Adverse sentencing findings would undermine California's pending proceedings, conflict with Utah's expungement, and contradict—without any evidentiary hearing—the only Utah court that actually conducted one: Judge Low's finding that WS (V2)'s conduct warranted permanent civil stalking injunctions and that WS (V2) was not credible.

32

As in Dr. Kumar's healthcare-fraud case, where the defense moved in limine to exclude uncharged "other acts" of fraud and billing practices because admitting them would cause "trial within a trial," confuse the issues, and encourage decision on the basis of alleged "pattern" rather than the narrow counts charged, the government here seeks to use uncharged, out-of-district WS-related allegations as a backdoor to expand sentencing beyond the offense of conviction. The Court should reject that attempt.

### III. The Government's Sentencing Submissions from CT's Counsel Are Inadmissible Hearsay and Lack the Reliability Required Under USSG § 6A1.3

On April 15, 2026, AUSA Blanch transmitted to this Court two documents provided by CT's private attorney, Douglas Rappaport: the Impersonations Brief and the Meloy Report. Both are out-of-court statements offered to prove the truth of the matters asserted. Both are hearsay. Neither meets any recognized exception. Both lack the "sufficient indicia of reliability" required under USSG § 6A1.3(a). And both are fundamentally dependent on the same disputed out-of-district factual findings that Section I of this motion challenges.

### A. The Impersonations Brief Is Pure Attorney Advocacy Hearsay

The Impersonations Brief is a nine-page narrative prepared by Douglas Rappaport, CT's private attorney in San Francisco. It is not sworn. It was not prepared in the ordinary course of any business activity. It was prepared entirely in anticipation of litigation—specifically, to support CT's sentencing arguments. It has never been subject to cross-examination by Ms. Wang.

Out-of-court written statements offered to prove the truth of the matter asserted constitute hearsay. Fed. R. Evid. 801. Such statements are inadmissible absent an applicable exception. Fed. R. Evid. 802. The Impersonations Brief meets none. It is not a business record because it was "created in anticipation of litigation" rather than "as part of a regularly conducted business activity." *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 72 F. Supp. 3d 131, 136 n.3 (D.D.C. 2014); Fed. R. Evid. 803(6). It does not meet the residual exception under Fed. R. Evid. 807 because its author—CT's attorney—is available to testify and was never presented as a witness; the government chose to transmit advocacy documents rather than call a sworn witness.

33

The government's own discovery correspondence reveals an additional and independent reliability failure: the United States cannot identify who actually wrote the Impersonations Brief. In an April 15, 2026 email, AUSA Blanch produced the brief as one of "documents provided to us by Victim 1's counsel that the government intends to use at sentencing," describing it only as having been "provided to me from Victim 1's attorneys' office." When Ms. Wang asked directly "who wrote the report?" and "Who prepared this report?", AUSA Blanch responded that he had "been informed the report was authored by Victim 1's counsel. That is as specific as I have," and added: "Ms. Wang, I cannot give you information I don't have." CT's litigation team consists of more than thirty attorneys, experts, and consultants. The government's best proffer is that the document was "authored by Victim 1's counsel" in the collective—no name, no title, no personal knowledge represented.

An unsworn narrative with an unidentified drafter, emerging from somewhere within a large private litigation team and transmitted to the government as sentencing advocacy, is the paradigm of hearsay lacking "sufficient indicia of reliability" under USSG § 6A1.3(a). The inability to identify who drafted the Impersonations Brief—and thus who, if anyone, has personal knowledge of the factual assertions in it—is fatal to its use as a sentencing predicate. This Court cannot evaluate the credibility or foundation of a document whose drafter the government cannot name.

Although the Federal Rules of Evidence apply with somewhat less technical force at sentencing, the reliability requirement under USSG § 6A1.3 is not satisfied by an advocacy document from a victim's private attorney. *See UnitedHealth Group*, No. 1:22-cv-0481 (CJN) (D.D.C. July 22, 2022) (excluding declarations as "hearsay that do not meet any of the requirements of any exception or FRE 807"). The Impersonations Brief contains extensive factual assertions about events in New York (Will), California (WS (V2)) who were both not interviewed for this brief, and California (CT)—the same disputed out-of-district conduct this motion challenges on jurisdictional grounds. It cannot serve as a reliable factual predicate for sentencing enhancement.

The Impersonations Brief also mischaracterizes the May 4, 2018 Utah evidentiary hearing. The certified transcript of that hearing reflects that Judge Low found WS (V2)'s conduct warranted civil stalking injunctions, that WS (V2)'s explanations were not credible, and that WS

34

(V2)'s admitted conduct "could also be charged as Electronic Harassment." The Brief's account inverts this record by describing the hearing as supporting CT's narrative. This Court has access to the certified transcript; the advocacy document does not control.

***B. The Meloy Report Is an Unreliable Expert Assessment That Cannot Serve as a Conduit for Inadmissible Hearsay***

The Updated Violence Risk and Threat Assessment prepared by J. Reid Meloy, Ph.D. (April 14, 2026) suffers from multiple, compounding deficiencies that independently require exclusion or, at minimum, preclude this Court from treating it as a reliable factual predicate.

**1. The Report Was Never Reviewed by Ms. Wang and Is Attorney Work Product.**

The Meloy Report is marked on its face: "PRIVILEGED AND CONFIDENTIAL—ATTORNEY WORK PRODUCT." It was prepared at the request of Douglas Rappaport, CT's private attorney, and addressed to him. CT's counsel cannot introduce their own attorney work product at sentencing while hiding behind that designation to prevent Ms. Wang from challenging the materials that form its foundation. The work-product designation is itself an admission that this document was prepared in adversarial anticipation of litigation, not as an objective forensic assessment. If CT's counsel insists on maintaining work-product protection over the materials Dr. Meloy reviewed, then due process forbids using his report as a basis to increase Ms. Wang's punishment. A defendant cannot meaningfully rebut a clinical opinion whose factual foundation is withheld behind privilege.

**2. The Report Was Prepared Without Any Direct Examination of Ms. Wang.**

Dr. Meloy explicitly acknowledges that the absence of direct interviews constitutes a "methodological limitation." He administered the PCL-R (Psychopathy Checklist-Revised) without ever examining Ms. Wang—a methodology that is cautioned against in the clinical literature on which he relies. Ms. Wang declined to submit to evaluation, expressly invoking her Fifth Amendment right to remain silent in three pending criminal proceedings. Using a one-sided psychopathy assessment against a defendant who has invoked her constitutional rights, at sentencing, without any opportunity for cross-examination or rebuttal, raises serious due-process concerns.

35

### 3. The Report's Entire Record Base Was Curated by CT's Attorney.

Dr. Meloy reviewed approximately 150 documents—every one provided by Douglas Rappaport. He did not independently gather records, interview neutral witnesses, or obtain records from Ms. Wang's perspective. The records reviewed are overwhelmingly filings, orders, and declarations from CT's litigation campaign. This one-sided record selection creates obvious bias: the report reflects CT's version of disputed events, dressed in clinical language, without any adversarial testing of the underlying facts.

### 4. The Report Bootstraps Disputed Findings as Established Facts.

The Meloy Report repeatedly cites contested judicial findings in proceedings Ms. Wang is actively appealing as if they were settled facts: the California DVRO findings, the San Francisco preliminary hearing findings, the Danish family-court ruling, and others. It treats the authorship of the March 6, 2019 post—which SFPD could not attribute at probable cause, which DCFS formally concluded was not Ms. Wang's, and which no court has adjudicated against her—as an established predicate for its risk assessment. An expert report cannot establish the disputed facts it assumes. Using the Meloy Report to make findings about the "Kill Baby K" post, the Rory Will matter, or the broader WS narrative would bootstrap CT's unproven allegations into judicial findings through the conduit of an expert opinion.

### 5. An Expert Cannot Serve as a Conduit for Inadmissible Hearsay.

It is well established that "expert opinions may be based on hearsay, but they may not be a conduit for the introduction of factual assertions that are not based on personal knowledge." *Estate of Parsons v. Palestinian Authority*, 715 F. Supp. 2d 27, 33 (D.D.C. 2010). "Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise." *SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013). The *UnitedHealth* court excluded expert testimony premised on inadmissible declarations because "an expert may not simply summarize documents or testimony because those are" lay matters a factfinder can evaluate without expert help. *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004).

The Meloy Report is exactly what these authorities prohibit. Its "clinical" conclusions— that Ms. Wang has severe psychopathy, engaged in stalking, and presents a high violence risk—

36

are derived entirely from a one-sided document set provided by CT's attorney. They narrate CT's version of disputed events, applying clinical labels that cannot cure the underlying hearsay problems. Allowing this report to function as a factual predicate at sentencing would permit CT's private attorney to accomplish through an expert what he cannot do directly: introduce unadjudicated, uncross-examined factual assertions about disputed out-of-district conduct as established sentencing findings.

**6. The Report's Specific Factual Assertions About the Will Conduct, the Kill Baby K Post, and the California Proceedings Are Each Independently Unreliable.**

Now that the Report has been produced, its specific assertions can be evaluated against the actual record. That evaluation confirms that the Report's most consequential factual claims rest entirely on the same disputed out-of-district predicates that the jurisdictional section of this motion challenges. Each is independently unreliable.

The 2013 Rory Will conduct treated as established. The Report describes Ms. Wang as having "engaged in serial stalking of at least three adult male victims" and lists Will (designated as "New York") as the first. It characterizes the alleged 2013 conduct as part of a "highly consistent pattern" that forms the clinical foundation for Dr. Meloy's psychopathy and risk conclusions. But as Section II.B of this motion establishes in detail, the 2013 Will conduct was never adjudicated against Ms. Wang by any court or prosecutor with authority over it. Queens County Supreme Court denied Will's motion to dismiss Ms. Wang's civil claims; the Manhattan District Attorney declined prosecution on the Trace Buster theory; Will refused to cooperate or testify; and the Queens criminal case ended in a sealed violation plea with no factual allocution. The Report presents Will's own 2014 litigation affidavit—prepared by his counsel, Laura M. Trachtman, to defeat Ms. Wang's civil suit—as though it were an established forensic record. It is not. It is advocacy, dressed in clinical language, and it cannot supply the predicate the Report assumes.

The "Kill Baby K" post authorship assumed without forensic basis. The Report characterizes Ms. Wang as having used the March 6, 2019 post as an instrument of stalking against CT, citing the October 16, 2019 Affidavit of Sergeant Martinez and the July 2023 Order Denying Motion to Suppress as establishing the post's authorship. But the October 2019 arrest warrant—prepared by the same Sgt. Martinez after Cloudflare's forensic response—omitted the

post from all eleven counts precisely because attribution was impossible at even the probable cause standard. Utah DCFS formally reversed its finding to "Unsupported" after receiving the forensic record. The San Francisco District Attorney declined to charge based on the post. The July 2023 suppression order addressed the legality of search warrants; it made no finding that Ms. Wang authored the post. Dr. Meloy acknowledges he had no independent forensic access to the underlying IP or device data. His authorship assumption is borrowed wholesale from CT's curated record, which itself excludes the Cloudflare confirmation and the DCFS reversal.

Actively appealed California and Danish rulings cited as settled facts. The Report relies heavily on the California DVRO findings, the San Francisco Superior Court's custody removal, the San Mateo CFS determination, the January 2025 California Family Court visitation denial, and the February 2026 Danish family court ruling. The Report does not disclose that Ms. Wang is actively appealing all of these rulings in both the San Francisco and Danish family courts. An expert report cannot establish the disputed facts it assumes as predicates, and a collection of contested, appealed orders provided exclusively by CT's attorney is not a reliable factual foundation for clinical risk conclusions at a federal sentencing. The Report's own description acknowledges that Ms. Wang "is actively pursuing appeals in both the San Francisco and Danish family courts"—yet treats those very rulings as settled clinical predicates for its risk assessment.

The Report's own admissions defeat its reliability. In the section titled "Immediate Versus Overall Risk," the Report states: "In the absence of a direct evaluation and mental status examination, I cannot rule out other mental disorders that may affect risk assessment." This is a methodological concession embedded in the report itself: without examining Ms. Wang, Dr. Meloy cannot exclude diagnoses that would materially alter his risk conclusions. Yet those conclusions are offered to this Court as a reliable predicate for sentencing enhancement. A clinical opinion that its own author acknowledges may be confounded by unexamined mental health conditions, built on a one-sided record, without direct evaluation, prepared for litigation counsel, and designated attorney work product, does not carry sufficient indicia of reliability to satisfy USSG § 6A1.3(a).

**7. The Report Fails the Reliability Standards Codified in Federal Rule of Evidence 702 As Amended in 2023.**

Under the 2023 amendments to Rule 702, the Court must act as gatekeeper and may not admit expert opinions whose factual basis or application of methodology is unreliable, leaving those flaws "to weight." The Meloy Report exemplifies the errors the amendments were designed to correct. Although the Federal Rules of Evidence apply at sentencing with less technical force, the reliability standards codified in Federal Rule of Evidence 702 directly inform the "sufficient indicia of reliability" requirement under USSG § 6A1.3(a). The 2023 amendments to Rule 702—effective December 1, 2023—clarified that the proponent of expert testimony must demonstrate to the court "more likely than not" that the proffered testimony satisfies all of the Rule's requirements, including that it is based on (b) sufficient facts or data, (c) reliable principles and methods, and (d) a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702. The burden falls on the proponent "alone." *See* Mark A. Behrens & Andrew J. Trask, *Federal Rule of Evidence 702: A History and Guide to the 2023 Amendments Governing Expert Evidence*, 12 Tex. A&M L. Rev. 43, 73 (2024). These are precisely the standards the government cannot satisfy here.

*Rule 702(b)—Sufficient Facts or Data.* An expert's opinion must be grounded in sufficient independent investigation, not a one-sided record assembled by adverse litigation counsel. The Advisory Committee specifically warned against experts who "cherry-pick certain studies or give an opinion based on a limited review." Behrens & Trask, *supra*, at 49. Dr. Meloy reviewed approximately 150 documents—every one provided by Douglas Rappaport, CT's private attorney in a pending adversarial proceeding. He did not independently gather records, interview neutral witnesses, or solicit materials from Ms. Wang. The Advisory Committee's "homework requirement" demands that an expert have done her own homework before testifying; a record pre-selected by opposing counsel for a predetermined forensic conclusion is not "sufficient facts or data" under Rule 702(b).

*Rule 702(d)—Opinion Within the Bounds of the Methodology.* The 2023 amendment to Rule 702(d) was enacted specifically to prevent expert "overstatement"—experts "asserting certainty beyond what the underlying methodology reliably supports." Behrens & Trask, *supra*, at 48. The Advisory Committee Note instructs forensic experts to "avoid assertions of absolute or one hundred percent certainty" when the methodology is subjective and potentially subject to error. Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Dr. Meloy administered

39

the PCL–R without direct examination of Ms. Wang, then concluded she has "severe psychopathy" and presents a "high violence risk," while simultaneously conceding in the Report itself: "In the absence of a direct evaluation and mental status examination, I cannot rule out other mental disorders that may affect risk assessment." An expert cannot assert a high-certainty clinical conclusion while acknowledging his methodology precluded the examination necessary to confirm it. That is overstatement as the 2023 Rule 702(d) amendment was drafted to prohibit.

This Court's gatekeeping obligation is not satisfied by admitting the Report and letting its flaws go to weight. The 2023 amendments were driven by widespread judicial error in treating the "sufficiency of an expert's basis" and "the application of the expert's methodology" as questions of weight rather than admissibility. Behrens & Trask, *supra,* at 45. The Advisory Committee specifically condemned that approach: "It is not the case that the judge can say, 'I see the problems, but they go to the weight of the evidence.'" *Id.* at 67. A Utah federal court recently applied this principle under the amended Rule, holding that "questions as to the sufficiency of the basis for an expert's opinion and the application of his methodology go to admissibility rather than weight." *United States v. Uchendu*, No. 2:22-cr-00160-JNP-2, 2024 WL 1016114, at *2 (D. Utah Mar. 8, 2024). The same reasoning applies here: the Meloy Report's methodological deficiencies—no direct examination, one-sided record, bootstrapped disputed facts, overstatement of certainty—are not credibility questions for the court to weigh. They are reliability failures that disqualify the Report as a sentencing predicate under USSG § 6A1.3(a) and the standards Rule 702 codifies.

Ms. Wang respectfully asks the Court either to exclude the Impersonations Brief and Meloy Report from the sentencing record or, at minimum, to state on the record that it will not treat either document as establishing any disputed factual predicate concerning authorship of the March 6, 2019 post, the 2013 Will conduct, or the WS-related narrative.

## IV. Any Victim-Impact or Allocution Should Be Limited to the Offense of Conviction and Reliable Facts

The Crime Victims' Rights Act gives victims a "reasonable right to be heard" at sentencing, 18 U.S.C. § 3771(a)(4), not an unlimited license to introduce inflammatory or irrelevant material. In *Mays*, the defendant moved in limine to exclude the last portion of a video

40

victim-impact statement at sentencing on the ground that it was "anything but reasonable" and demeaned "the dignity of a courtroom setting," noting that the government could easily redact the objectionable segment.

Here, CT's submissions go far beyond ordinary victim-impact: they seek to re-litigate out-of-district conduct, to relabel sealed New York violations as crimes, and to attribute anonymous internet posts to Ms. Wang despite contrary forensic records and contrary DCFS findings. To the extent CT allocutes, the Court should allow comments about the offense of conviction—the conduct Ms. Wang has admitted—and should exclude, or at minimum expressly disregard, any statements that: (1) attribute the March 6, 2019 "Kill Baby K" post to Ms. Wang contrary to the Cloudflare confirmation, the T-Mobile CSLI, and the DCFS reversal; (2) re-characterize sealed New York violation-level dispositions as criminal convictions; or (3) relitigate California DVRO and Danish family-court findings that Ms. Wang is actively appealing in their proper forums.

An independent constitutional basis for exclusion reinforces this conclusion. The Due Process Clause of the Fourteenth Amendment prohibits the admission of evidence "so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). Although *Payne* arose in the capital-sentencing context, lower courts have applied its due process test to victim-impact material and other unfairly prejudicial evidence at sentencing hearings generally. *See United States v. Sampson*, 335 F. Supp. 2d 166, 192–93 (D. Mass. 2004) (excluding 27-minute victim-impact video with over 200 photographs set to music because "the videotape's images would have inflamed the passion and sympathy of the jury"); *Williamson v. Reynolds*, 904 F. Supp. 1529, 1573–74 (E.D. Okla. 1995) (granting habeas relief where prosecution presented evidence of uncharged crimes at sentencing, finding defendant "was unable to defend against this highly prejudicial testimony, rendering the trial fundamentally unfair in violation of the Due Process Clause"). Under the *Payne* standard, a court may exclude evidence by finding that it "would render the trial fundamentally unfair, without any need to address probative value." Colin Miller, *A Constitutional Right to Exclude Evidence*, 12 Tex. A&M L. Rev. 317, 373 (2024). The Impersonations Brief, the Meloy Report, and any allocution attributing to Ms. Wang anonymous posts never forensically tied to her are precisely the category of one-sided, unadjudicated, inflammatory material whose admission the Due Process

41

Clause prohibits. This Court need not and should not resolve whether those materials clear the admissibility floor; it should exclude them because their admission would render this sentencing proceeding fundamentally unfair.

**V. The Government's Modus Operandi Theory—Using Unadjudicated 2013 New York Conduct to Prove Unadjudicated 2019 Multi-State Conduct—Is Impermissible Propensity Reasoning That Fails Under Any Standard**

AUSA Blanch's April 14, 2026 email confirms that the government intends to present the March 6, 2019 "Kill Baby K" post as "relevant conduct at sentencing" and asks the Court to give it "whatever weight, if any, the court sees fit." The government's sentencing submissions make plain the theory underlying that presentation: that Ms. Wang's alleged conduct toward Rory Will in New York in 2013—posting fake sexual profiles, directing strangers to his apartment, and fabricating evidence of his calls—establishes a modus operandi that proves she authored the anonymous March 6, 2019 HolySmoke post that enabled CT to obtain ex parte custody of a child he had never met. This theory is legally and logically defective at every step.

A modus operandi inference requires two established predicates: (1) the prior act is proven, and (2) the method is sufficiently distinctive to permit an inference that the same person committed both acts. See *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000) (explaining that modus operandi evidence requires acts "so similar and unique that they bear the defendant's signature").

Neither predicate exists here. The 2013 Rory Will conduct alleged in CT's filings has never been adjudicated against Ms. Wang in any forum. The New York plea was to a sealed violation **with no factual allocution**; Queens County Supreme Court denied Will's motion to dismiss; the Manhattan District Attorney declined to prosecute. The 2019 "Kill Baby K" post has never been attributed to Ms. Wang by any court, law enforcement agency, or forensic record— SFPD omitted it from the October 2019 arrest warrant after Cloudflare confirmed attribution was impossible, and Utah DCFS reversed its finding to "Unsupported." The government is therefore not inferring a known act from a known pattern. It is inferring an unproven act from an unproven pattern. That is not modus operandi reasoning—it is stacked propensity reasoning, which is impermissible even at trial under Federal Rule of Evidence 404(b) and doubly so at sentencing

42

under USSG § 6A1.3(a). The government is not arguing from a proven prior act to identify a new offense; it is stacking inferences from two unproven, out-of-district allegations to label Ms. Wang a "serial stalker," which is precisely the sort of propensity reasoning § 404(b) and § 6A1.3(a) are designed to prevent.

The conduct is not distinctive enough to bear anyone's signature in any event. Posting fake online profiles, directing individuals to a target's address, and making anonymous internet posts are common harassment methods documented in thousands of civil and criminal proceedings nationwide. The "Kill Baby K" post is anonymous text on HolySmoke.org, a site the government concedes logs incorrect IP addresses. The alleged 2013 Will conduct involved impersonation profiles on Craigslist and AdultFriendFinder. These are categorically different platforms, different methods, and a six-year gap in time—the opposite of the close temporal and methodological similarity required for a modus operandi finding. *See United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) (prior acts must be "sufficiently similar" and not merely show general criminal propensity).

The government's own email undermines its theory. AUSA Blanch writes that the Court "can consider it, and give it whatever weight, if any, the court sees fit," and that he does "not know whether we will request a specific factual finding." A party that cannot articulate what factual finding it seeks cannot carry its burden of producing reliable evidence under USSG § 6A1.3(a). The government is asking this Court to do something the government itself has not defined: make an unspecified finding about an unproven act based on an unproven pattern, drawn from conduct that occurred in a different state, six years earlier, and was never established in any court. That is not sentencing advocacy. It is an invitation to speculate.

AUSA Blanch's email also acknowledges that a factual finding at sentencing "other prosecuting agencies could use… against you in possible future prosecutions." This admission is significant for two independent reasons. First, it confirms that the government itself recognizes the finding would have consequences beyond this sentencing—consequences it cannot disclaim by noting it gives no "legal advice." A sentencing proceeding cannot be used as a vehicle to obtain factual findings that function as uncharged convictions with downstream prosecutorial utility. Second, Ms. Wang has maintained under oath for over seven years that she did not author the March 6, 2019 post. Using this proceeding to make a contrary finding—explicitly for use in

43

future prosecutions, per the government's own acknowledgment—would effectively adjudicate a perjury predicate without the constitutional protections of a criminal trial. That purpose is improper regardless of the procedural vehicle through which it is pursued.

The modus operandi theory also ignores the most obvious alternative explanation for the "Kill Baby K" post: CT had overwhelming motive to benefit from it. As of March 6, 2019, he had never met the child, had provided no financial support, and had warned Ms. Wang on June 24, 2018 that her decision to continue the pregnancy "will not play out favorably for anyone." The post appeared the same day SFPD Sgt. Martinez first contacted WS (V2) in connection with CT's custody case. It was the vehicle through which CT obtained ex parte sole legal and physical custody of a child he had never met. A modus operandi inference that excludes the party with the most direct motive and instead attributes the post to Ms. Wang based on six-year-old unadjudicated New York conduct is not reliable inference—it is advocacy dressed as pattern evidence.

The government's modus operandi theory also fails the independent constitutional standard recognized in *Payne v. Tennessee*, 501 U.S. 808, 825 (1991), which holds that the Due Process Clause prohibits the admission of evidence "so unduly prejudicial that it renders the trial fundamentally unfair."

**The government's theory is precisely what evidence scholars have identified as a "doctrine of chances" inference:** it asks this Court to find that the coincidence of two unadjudicated events connected to Ms. Wang is too unlikely to be innocent. But where a prosecution "lacks evidence from which a reasonable jury could find wrongdoing by the defendant in the prior events," the doctrine-of-chances inference carries a compounded unfair-prejudice danger—not merely the risk of propensity reasoning, but also the risk that the Court treats the unadjudicated prior event as independent evidence of wrongdoing despite the absence of proof. Colin Miller, *A Constitutional Right to Exclude Evidence*, 12 Tex. A&M L. Rev. 317, 339 (2024). That is precisely the dynamic here. The government concedes it "d[oes] not know whether we will request a specific factual finding" about the Will conduct, yet asks this Court to infer from unproven 2013 New York conduct that Ms. Wang authored an unproven 2019 internet post—a stacked inference from two unestablished predicates. Allowing that inference would create an unacceptable risk that this sentencing is driven by the characterization of Ms. Wang as

44

a "serial stalker," a label built entirely from events no court has adjudicated against her. Under *Payne*'s due process standard, this Court should decline to accept that inference regardless of whether it clears any admissibility floor.

This Court should decline to make any factual finding about the "Kill Baby K" post based on the modus operandi theory. The theory requires establishing the 2013 Will conduct as a predicate, and that conduct has never been adjudicated against Ms. Wang by any court with jurisdiction. It requires a distinctive methodological signature that does not exist across platforms, methods, and a six-year gap. It rests on a forensic record—the Trace Bust subpoena response and the HolySmoke/Cloudflare concession—that affirmatively contradicts attribution in both episodes. And it is offered by a government that cannot specify what finding it seeks, in a proceeding the government itself acknowledges could generate material for future prosecutions. Under USSG § 6A1.3(a) and *Williams*, 48 F.4th at 1130; the court may not rely on those facts to enhance the sentence if the government fails to carry its burden.

## VI. The Appropriate Remedy Is a Ruling That the Court Will Not Make the Disputed Factual Findings and Will Not Treat the Government's Hearsay Submissions as Established Predicates

*Ms. Wang requests a ruling on two related issues.*

First, as to jurisdiction: this Court should decline to make adverse factual findings about events whose essential conduct elements occurred in New York and California. The Court may note—without resolving—that these matters exist, are disputed, and have never been adjudicated against Ms. Wang in any forum with territorial authority over them.

Second, as to reliability: this Court should decline to treat the Impersonations Brief and the Meloy Report as established factual predicates for sentencing enhancement. The Court may consider their existence for context, but it should not make factual findings—about the authorship of the March 6, 2019 post, the accuracy of the Rory Will narrative, or the characterization of the WS conduct—based on advocacy materials and an expert assessment that are inadmissible, one-sided, and fundamentally premised on the same disputed out-of-district conduct the jurisdictional section of this motion addresses. When a defendant specifically objects and the government fails to carry its burden of producing evidence with sufficient indicia of

45

reliability, the court may not rely on those disputed facts to enhance the sentence. USSG § 6A1.3(a); *Williams*, 48 F.4th at 1130.

Similar motions in limine at sentencing have been granted or seriously entertained where the government sought to use victim-impact statements, misidentified "victims," or remote "relevant conduct" to expand sentencing beyond the offense of conviction, as reflected in the *Mays*, *Beddingfield*, and *White* filings cited above.

## CONCLUSION

*Ms. Wang requests three rulings.*

First, that this Court will not make adverse factual findings about factually disputed conduct whose essential elements occurred outside the District of Utah. The "Kill Baby K" authorship question—never resolved against Ms. Wang by any court with forensic access, and affirmatively contradicted by the T-Mobile CSLI and Cloudflare confirmation—is a New York and California dispute. The Rory Will narrative—rejected by every court that received it, declined by the New York District Attorney, and arising from a published New York appellate decision—is a New York dispute; the only New York criminal outcome was a sealed N.Y. Penal Law § 240.20 disorderly conduct violation—a non-criminal infraction that was down-pleaded and produced no misdemeanor or felony finding. The WS allegations—pending in California and expunged in Utah—belong before courts with proper territorial authority.

Second, that this Court will not treat these three categories of out-of-district conduct as established aggravating predicates for purposes of determining the guideline range or imposing sentence under 18 U.S.C. § 3553(a). The Court may acknowledge their existence and that they are disputed, but should not resolve those factual disputes in Ms. Wang's disfavor.

Third, that this Court will not treat the Impersonations Brief or the Meloy Report as established factual predicates for sentencing. Both are inadmissible hearsay lacking sufficient indicia of reliability under USSG § 6A1.3(a). Both were prepared in adversarial anticipation of litigation by CT's private attorney, without cross-examination. The Meloy Report was compiled from a one-sided record, without direct examination of Ms. Wang, and is designated attorney work product on its face. The Court may consider their existence for limited contextual purposes

46

but should not rely on either document as a factual predicate for enhancement or § 3553(a) analysis.

Ms. Wang further requests that, if the Court grants this motion, it state explicitly on the record at sentencing that it has not made factual findings regarding the "Kill Baby K" post, the Rory Will matter, or WS-related California conduct, and that it has not relied on the Impersonations Brief or the Meloy Report as factual predicates under USSG § 6A1.3 or § 3553(a). An explicit statement from the bench will protect Ms. Wang's rights in any future proceedings and provide a clean record for appellate review.

Ms. Wang has separately moved to continue the May 5, 2026 sentencing because the late production of the Meloy Report, the Impersonations Brief with its unidentified drafter, and four hours of translated jail calls left her without a meaningful opportunity to retain a rebuttal expert, obtain all underlying materials, or prepare an adequate response. If the Court grants this motion in limine and excludes the Meloy Report and the Impersonations Brief as unreliable sentencing predicates—and declines to make any factual finding regarding the "Kill Baby K" post, the Rory Will matter, or the California WS conduct—much of the need for a continuance will be eliminated.

Conversely, if the Court intends to consider these materials over Ms. Wang's objections, the continuance, Fatico-style evidentiary hearing, and expert authorization requested in her April 16, 2026 motion will remain essential to satisfy due process and Rule 32. The Court may therefore wish to address this motion in limine first, as its ruling will determine the scope and necessity of any further proceedings. Although restitution, self-surrender will still be argued at a separate hearing.

Respectfully submitted,

_____
Kailin Wang

Defendant, Pro Se

Dated: April 20, 2026

47

**M** Gmail

Kailin Wang <kaywg2372@gmail.com>

---

## Judge Low_Case: 180400131, 180400132, 180400133

---

**Kailin Wang** <kaywg2372@gmail.com>                                          Fri, Apr 17, 2026 at 4:16 AM
To: ██████████████████████████████████████████████████████  joey.blanch2@usdoj.gov,
Conrad_Kaufman@utp.uscourts.gov, "Sorenson, Richard (FD)" <richard_sorenson@fd.org>,
████████████████████████████████████████

Hi Amber,

We have copied UCAO and the federal prosecutors handling (USA v. Kailin Wang) on this email — yes, the same case has been recharged federally. We wanted to confirm something regarding Case No. 180400131, *Wang v.* ██████  WS (V2)

We are also attaching a true and correct copy of the Request for Stalking Injunction, which is 39 pages — not the 5-page fraudulent copy that ██████ provided to prosecutors.

**Question:**

If a petitioner files on 1/22/18 and the court issues a temporary civil stalking injunction on 1/23/18, that order is ordinarily based on the petition and evidence submitted as of 1/22/18. It is not typically based on new, unfiled evidence that arose after that date unless such evidence was formally submitted to the court before the judge signed the temporary order.

In short, the default assumption is that the temporary injunction rests on what was included in the 1/22 filing and any supporting materials actually before the judge at that time — not on subsequently created evidence. **<--- Is this understanding correct?**
CT (V1)
██████████  **is claiming the following:**

> "Note that the evidence KW provided at the time of her January 22 filing to back up her claim that W was harassing her DOES NOT include the online post containing KW's nude photo, as that post did not yet exist on January 22. That post was uploaded to TheDirty on the evening of January 23 (the same day KW obtained her temporary civil stalking injunction against W), and the post went live on the website on January 26. (I have business records that document this, and can provide those as well, if needed.)

My questions are:

1. Were any nude photographs used to obtain the temporary civil stalking injunction in Case No. 180400131?
2. None of the exhibits filed in Case No. 180400131 appear to be sealed or protected, so I am assuming there are no nude photographs in any of the evidence used in Wang v. ██████ at least none that we are aware of. Is there any way you could please confirm this understanding with the prosecutors copied on this email?

As a general matter, a temporary civil stalking injunction is issued based on the evidence contained in the petition and supporting materials filed as of the filing date—not on new evidence that emerges the following day. In practice:

- A petitioner files a verified petition (for example, on 1/22/18) describing the alleged stalking and attaching any supporting evidence available at that time.
- A judge then conducts a paper review of the petition and its attachments to determine whether there is "reason to believe" that stalking has occurred.
- If the judge finds sufficient grounds, the court may issue a temporary (ex parte) civil stalking injunction, often on the same or next business day (for example, on 1/23/18).
- The ex parte temporary order is ordinarily based on what was filed with the petition, not on evidence that emerged afterward, unless that new evidence is formally submitted to the court by supplemental filing or at a later hearing.
- In practice, most temporary stalking injunctions are granted or denied on the original written record and revisited, if at all, at a subsequent hearing where both parties may present updated evidence.

Accordingly, if a petitioner files on 1/22/18 and the court issues a temporary civil stalking injunction on 1/23/18, that order is ordinarily based on the petition and evidence submitted as of 1/22/18. It is not typically based on

new, unfiled evidence that arose after that date unless such evidence was formally submitted to the court before the judge signed the temporary order. In short, the default assumption is that the temporary injunction rests on what was included in the 1/22 filing and any supporting materials actually before the judge at that time—not on subsequently created evidence.

Thank you for your attention to this. Please let us know if you are able to confirm whether any nude photographs were part of the evidence used to obtain the temporary civil stalking injunction in Case No. 180400131.

---

Lastly, thank you so much for coordinating between Kailin Wang and ▮▮▮▮▮▮ Danish family court proceedings.

Kailin had no idea that it was Judge Low who was going to supervise the Danish main hearing; if she had known, she certainly would never have had her family email the court to cancel that proceeding. As reflected in the materials, Kailin truly appreciates what a great judge Judge Low is. He is one of the few who consistently strives to get it right, even in very voluminous and demanding cases.

It also would have been extremely valuable for Judge Low to see ▮▮▮▮▮▮ forum shopping firsthand: first removing the child from Utah to California while claiming that California had jurisdiction despite Judge Darwin's ruling to the contrary, and then later asserting that California had no jurisdiction and that Denmark did instead. We truly wish we had known sooner that the Danish hearing was going to be supervised by Judge Low's staff; that knowledge would certainly have changed our position and, in hindsight, would have been greatly beneficial.

Oh, and if restitution is ordered in State of Utah v. Wang, Case No. 211100167, we want to ensure that any restitution is directed to you and your team, and not to the multi-millionaire ▮▮▮▮▮▮ family. https://www.investing.com/news/insider-trading-news/▮▮▮▮ ▮ ▮▮▮▮▮▮docusign-ceo-sells-125-million-in-docu-stock-93CH-4596651

Thanks again!

---

**4 attachments**

📄 **Exhibit 2 01_22_18_Certified Request for Civil Stalking Injunction** ▮▮▮▮▮▮▮**compressed.pdf**
5010K

📄 **STATEMENT REGARDING JUDGE LOW, THE UTAH COURT CONTACTS, AND COMPARATIVE JUDICIAL CONDUCT.pdf**
4787K

📄 **2026-03-04 Judge Boysen Disqualifies herself from GP case.pdf**
104K

📄 ▮▮▮▮▮▮ ▮▮ **C. - Insider Trades & Share Buys_Sales.pdf**
391K

 **Gmail**

John Wang <yunlong88cong@gmail.com>

## translations of jail calls

**John Wang** <yunlong88cong@gmail.com>                                        Thu, Apr 16, 2026 at 5:38 PM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>, Richard Sorenson <richard_sorenson@fd.org>, Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>

Ms. Blanch, based on your own offer below, **please at least produce the audio recordings of the jail calls,** whether or not you intend to use them at sentencing. The fact that they may have been produced to prior counsel is irrelevant, because the Federal Public Defender's Office no longer represents Ms. Wang, and, as you are aware, all discovery was returned. In any event, these calls were never produced to Ms. Wang, especially given your Motion to Revoke filed on June 4, 2024.

Ms. Wang would like sentencing to proceed on May 5, 2026. However, given that you are attempting to introduce highly disputed, prejudicial evidence, you are backing her into a corner; she cannot simply sit and do nothing about it. If speedy sentencing remains the goal, Ms. Wang again urges the government to refrain from relying on highly disputed evidence, because additional discovery and expert rebuttal will be required.

Thank you,

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

[Quoted text hidden]

 Gmail

**Kailin Wang <kaywg2372@gmail.com>**

## Judge Low_Case: 180400131, 180400132, 180400133

**Kailin Wang** <kaywg2372@gmail.com>                                      Sat, Apr 18, 2026 at 12:39 AM
To: Amber Evans
Cc:                                                                         joey.blanch2@usdoj.gov,
Conrad_Kaufman@utp.uscourts.gov, "Sorenson, Richard (FD)" <richard_sorenson@fd.org>,

Thank you for your response, Amber.

Kailin's intent was to identify you as the point of contact—or, if not you, someone else in your office—for the Utah state and federal prosecutors handling the related criminal matters. These include the case previously pending as 194400718 before Judge Low, which has now been recharged based on the same 2019 conduct that is also the subject of the current federal charges. Accordingly, this matter relates to documents in the following cases: 180400131, 194400734, and 194400718.

This coordination would allow federal prosecutors and federal probation to request any documents needed for sentencing in the federal case, possibly the UCAO case, particularly given concerns that Mr. ███████ has not consistently provided complete and accurate copies of materials and has submitted altered evidence across jurisdictions.

Also, at least to Kailin's knowledge, Mr. ██████ is not the listed victim in the subpoena part of the 211100167 case. Rather, the individuals identified as potential victims are 4th District Utah County Court Clerks Nancy Balderrama, and Elizabeth Peck. Kailin intends to submit an allocution letter at sentencing in Case No. 211100167 addressing this issue. Ultimately, that determination rests with UCAO prosecutor Jared Perkins at sentencing, which is currently scheduled for June 16, 2026, in the state case Case No. 211100167.

We want to ensure that the relevant prosecutors, Assistant United States Attorney Joey L. Blanch and federal probation Conrad Kaufman are aware of these connections and have the opportunity to request any necessary documentation if necessary. Given your familiarity with the parties' cases, it would be helpful if you—or someone you designate—could serve as the point of contact.

Thank you again.

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

[Quoted text hidden]

 Gmail

**Kailin Wang <kaywg2372@gmail.com>**

## Judge Low_Case: 180400131, 180400132, 180400133

**Amber Evans** ████████████                                         Fri, Apr 17, 2026 at 5:32 PM
To: Kay Wg <kaywg2372@gmail.com>
████████████████████████

Kailin,

Stalking injunctions are granted on the information provided at the initial time of filing. The party requesting the injunction can supplement the information if new incidents occur after the initial filing, but before the hearing date. Normally, if a violation occurs, it would have to be reported to the police. That is how criminal cases come from a civil stalking injunction being in place. It usually means the respondent has violated the civil order, but there are also other ways a criminal stalking injunction can occur. You would need to speak with a prosecutor or a criminal attorney to get more information on that.

Restitution would not come to the court, but would go to Mr. ████████ if he is listed as the victim. We have no input on that.

I am happy to upload these documents into our cases, but they are no longer open/active cases, so nothing will happen in these cases in the future even if these documents are uploaded. Please let me know if you want something done with these 4 documents. I can't really answer anything further because I am not going to get myself in trouble by mistakenly giving some sort of legal advice or implying something that I did not intend to imply.

Thank you,



Amber Evans
Judicial Case Manager
4th District Court - Provo
O 801-429-1149
████████████████

*Judicial Case Manager for Judge Christine S. Johnson, Judge Thomas L. Low, and Civil Mental Health Court 137 N Freedom Blvd, Ste. 100, Provo, UT 84601*

████████████████    ████████
████████████  ████████  ██████

**\*I am not an attorney and I do not give legal advice.**

On Fri, Apr 17, 2026 at 9:35 AM ProvoFiling <provofiling@utcourts.gov> wrote:
> Thanks,
> Dezzi B
>
> ---------- Forwarded message ---------
> From: **Kailin Wang** <kaywg2372@gmail.com>
> Date: Fri, Apr 17, 2026 at 4:16 AM
> Subject: Re: Judge Low_Case: 180400131, 180400132, 180400133
> To: Provo Protective Order Filings <provofiling@utcourts.gov>, Amber Evans <ambere@utcourts.gov>, <joey.blanch2@usdoj.gov>, <Conrad_Kaufman@utp.uscourts.gov>, Sorenson, Richard (FD) <richard_sorenson@fd.org>, Erik Jacobson <erikj@utcpd.com>, <jaredp@utahcounty.gov>, Wolf, Lilah (PDR) <lilah.wolf@sfgov.org>
>
> [Quoted text hidden]

# CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, a true and correct copy of the foregoing Motion in Limine  and accompany exhibits was served via electronic mail upon:

Joey L. Blanch
Assistant United States Attorney
Joey.Blanch2@usdoj.gov

Conrad Kaufman
U.S. Probation Officer
Conrad_Kaufman@utp.uscourts.gov

Richard Sorenson
Standby Counsel
richard_sorenson@fd.org

_____
Kailin Wang

48