FILED
2026 APR 21
CLERK
U.S. DISTRICT COURT

Kailin Wang
2481 Fairway Dr.
Spanish Fork, Utah 84660
801-787-9755
kaywg2372@gmail.com

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br><br>**KAILIN WANG**,<br><br>Defendant. | **MOTION IN LIMINE TO EXCLUDE "UPDATED VIOLENCE RISK AND THREAT ASSESSMENT" OF J. REID MELOY, PH.D., AND RELATED MATERIALS FROM SENTENCING**<br><br>Case No. 2:24-cr-00163-TS<br><br>Judge Ted Stewart<br><br>Magistrate Judge Dustin Pead |

Defendant Kailin Wang, proceeding pro se, respectfully moves in limine to exclude from the sentencing record the document titled "UPDATED Violence Risk and Threat Assessment of Kailin Wang," dated April 14, 2026, and authored by J. Reid Meloy, Ph.D. (the "Meloy Report"), as well as any related expert opinions or derivative testimony premised on that report.[1] Ms. Wang further requests that, if the Court declines categorical exclusion, it at minimum state on the record that it will not rely on the Meloy Report to make any disputed factual findings or to enhance Ms. Wang's sentence under 18 U.S.C. § 3553(a) or USSG § 6A1.3.

---

[1] This motion is a companion to Ms. Wang's earlier Motion in Limine, ECF No. 158, which asks the Court (1) not to adjudicate disputed, out-of-district allegations at sentencing and (2) not to treat either the "Impersonations Brief" or the Meloy Report as reliable factual predicates under USSG § 6A1.3(a). This motion focuses on the particular unreliability of the Meloy Report itself, including under the 2023 amendments to Federal Rule of Evidence 702.

1

## PRELIMINARY STATEMENT

This motion cannot be evaluated in isolation from the prosecution that produced it. Three figures—the expert who wrote the Report, the prosecutor who indicted the case, and the prosecutor now carrying it to sentencing—each bring a documented history that bears directly on why the Meloy Report is dangerous, why its defects are not mere technicalities, and why this Court must exercise its gatekeeping function with particular care.

Victim 1 is the adult child of a technology company chief executive whose reported annual compensation is approximately $85 million. From the moment DNA results confirmed paternity—before Ms. Wang had been charged with any crime, before her infant son had been in the grandmother's custody for seventy-two hours—Victim 1's family coordinated directly with law enforcement to ensure that criminal charges would follow. What followed was a seven-year, three-jurisdiction campaign prosecuted with the resources of a corporation: no fewer than thirty-one attorneys, investigators, and expert witnesses; a forensic psychologist retained at $10,000 per day; a retired FBI profiler at $8,000 per day; a former United States Secret Service agent as a cybersecurity expert at $700 per hour; California Super Lawyers billing at $800 per hour; and a Danish attorney retained to coordinate parallel proceedings on a second continent. Kailin Wang had a public defender.

The Meloy Report is the most visible product of that campaign. It is not an independent clinical assessment. It is a litigation weapon—commissioned by Victim 1's private counsel, labeled attorney work product, built from 150 documents hand-selected by that same counsel, and now offered to this Court as a scientific basis for imprisonment. Understanding who assembled it, who indicted the case that brought it here, and who is now presenting it at sentencing is essential to evaluating the Court's gatekeeping obligation.

### *The Expert: A Methodology That Has Already Destroyed One Innocent Life*

J. Reid Meloy, Ph.D. is not unknown to federal courts. (Ex.1) His most consequential prior appearance in a criminal case ended in catastrophe. In the prosecution of Timothy Masters for the 1987 murder of Peggy Hettrick in Fort Collins, Colorado, Dr. Meloy was the central expert witness. His testimony—that Masters's boyhood drawings revealed a "sexual homicide fantasy" that proved motive and intent—was described by the prosecution as the critical element in the decision to charge Masters and the foundation of the conviction itself.

Masters was convicted in 1999 and sentenced to life in prison. He served nearly ten years. In 2008, DNA evidence exonerated him entirely: his DNA was absent from every location where it would have been expected if he were the killer, and DNA matching another man—a local surgeon with a documented voyeuristic obsession and surgical skills—was found instead. The conviction was vacated. The charge was dismissed. The prosecutors who obtained it were publicly

2

censured by the Colorado Supreme Court's Office of Attorney Regulation for withholding exculpatory evidence, including an exculpatory opinion from a plastic surgeon, exculpatory knife expert analysis, and evidence of the far more plausible alternate suspect.

After reviewing the evidence that had been withheld from him, Dr. Meloy himself recanted. He stated that had he been provided the complete record, he could not have supported the prosecution, that the probability Masters committed the crime was "incredibly small," that the alternate suspect "would have strongly overridden" any suspicion of Masters, and that he would have felt obligated to tell the jury so. In other words: the same expert who is now asking this Court to sentence Kailin Wang as a "severely psychopathic" "serial stalker" at the "97th percentile" of psychopathy was, in his last high-profile case, the instrument of a wrongful conviction he later conceded he should not have supported—because the evidence he was given was one-sided, curated by the prosecution, and incomplete.

The parallel to this case is not rhetorical. It is structural. In Masters, Dr. Meloy was given a carefully selected set of materials by investigators intent on conviction and told it was the complete record. He accepted that representation, applied clinical labels, and testified to high-certainty conclusions. An innocent man spent a decade in prison. In this case, Dr. Meloy was given approximately 150 documents, all selected by Victim 1's private litigation team, and told— through the implicit structure of the engagement—that this was the relevant record. He accepted it, applied clinical labels, and now offers high-certainty conclusions about psychopathy and violence risk. No direct examination. No defense-side materials. No independent sources. The methodology is identical. The epistemic danger is identical.

The Court should not allow this history to repeat itself at sentencing.

### *The Indicting Prosecutor: A Documented Record of Suppression and Misrepresentation*

The federal indictment that brought Ms. Wang before this Court was signed by AUSA Jennifer Kerkhoff Muyskens. (Ex. 2) She is the former federal prosecutor who, in the J20 Inauguration Day prosecutions arising from the 2017 presidential inauguration, was found by a D.C. Superior Court judge to have misrepresented information to the court and withheld evidence from the defense. Specifically, she worked with a D.C. Metropolitan Police detective to edit undercover videos of protest-planning meetings—videos that showed organizers explicitly discussing nonviolence—and then concealed from defense attorneys that those recordings had been obtained by Project Veritas. She repeatedly represented to judges that her office possessed only one such recording; in fact, sixty-nine undercover recordings existed.

The J20 cases collapsed entirely. Of 234 people charged, fewer than two dozen were convicted. All remaining cases were dismissed. The District of Columbia government subsequently paid $1.6 million to settle civil lawsuits arising from the prosecution she led. AUSA Muyskens left the U.S. Attorney's Office after those cases resolved. She is now the subject of a

formal disciplinary proceeding before the District of Columbia's Office of Disciplinary Counsel, facing sanctions up to and including disbarment.

That is the prosecutor who signed the indictment in this case. The same instinct that led her to edit protest videos and hide their origin—to make the government's case look stronger than the evidence warranted, to obscure what cut the other way—is the same instinct embedded in the narrative that became the factual predicate for this prosecution. The Meloy Report, which accepts that narrative without independent verification and converts it into clinical "data points," is in direct line of descent from that same instinct.

### *The Current Prosecutor: A Career Built on Child Exploitation—And Why That Matters Here*

The government is now represented by AUSA Joey L. Blanch. (Ex. 3) She is one of the most accomplished child exploitation prosecutors in the federal system. She served as National Project Safe Childhood Coordinator for the Executive Office of U.S. Attorneys in Washington, D.C., with responsibility for child exploitation legal policy across all ninety-four federal districts. Before that, she was a Deputy Chief of the Violent and Organized Crime Section in Los Angeles, where she led the Project Safe Childhood program. She is an adjunct professor of trial advocacy at Loyola Law School.

Her record in the courtroom is extraordinary in its own right. She prosecuted the "Lost Boy" international child pornography ring—a global network spanning Belgium, Brazil, Canada, France, Germany, New Zealand, the United Kingdom, and the United States, in which membership required the production and posting of child pornography and members advised one another on evading law enforcement. The sentences she secured included thirty years in prison, followed by lifetime supervised release. She prosecuted Michael Quinn, an Australian geneticist who traveled to Los Angeles to pay $250 to an undercover agent for a six-year-old boy—a man whose own plea agreement states that "a dominant purpose of his travel was to anally sodomize someone he knew was a six-year-old boy." She sent him to federal prison for twelve years.

These are the cases that define AUSA Blanch's career: international pedophile networks, traveling child predators, the production and distribution of child pornography measured in decades of imprisonment and lifetimes of supervised release. She is, by any measure, one of the Department of Justice's premier practitioners in the prosecution of the most serious crimes against the most vulnerable victims imaginable.

This case is not that. Kailin Wang is a mother who published a documented, first-person account of being abandoned by the father of her newborn child, with his own text messages attached, with the Venmo record attached, with the court filing attached, under her own name. The charged conduct involves no child victim, no exploitation, no sexual predation, and no violence. Cyberstalking is a serious federal offense, and Ms. Wang does not ask this Court to pretend otherwise. But it is not an international child pornography ring. It is not a man flying across the

4

Pacific to rape a six-year-old. The question this Court should ask—and the question the assignment itself raises—is why one of the Department's foremost child exploitation prosecutors is here at all.

The answer, the record suggests, is not the gravity of the offense. It is the resources of the family pursuing it. A technology executive whose annual compensation approaches $85 million has the means to press every available institutional lever. Victim 1's family went to San Francisco. San Francisco declined. They came to Utah. Utah reached its limits. They went federal. The federal indictment was filed six days before a family court hearing that would have required Victim 1 to fund and facilitate Ms. Wang's contact with her son in Denmark. She was detained. Victim 1 left the country with the child. That hearing has never happened.

There is one additional fact the Court should have. In the July 2015 issue of the United States Attorneys' Bulletin—a Department of Justice publication distributed to federal prosecutors nationwide—AUSA Blanch co-authored an article titled "The Sentencing Battleground: Understanding the Current Psychology Research and Refuting Defense Psychology and Risk Assessment Reports at Sentencing." That article is, with precision, a practitioner's guide to opposing exactly what this motion asks the Court to do: scrutinize and exclude unreliable psychological risk assessments at sentencing. AUSA Blanch did not simply arrive in this district to handle a case outside her area of expertise. She co-authored the government's tactical manual for the specific legal battle now before this Court.

The Court is entitled to weigh that combination: an expert whose methodology produced a wrongful conviction he later disavowed; an indicting prosecutor now facing disbarment for suppressing evidence; and a current prosecutor whose entire career has been devoted to prosecuting international child predators, who has now applied that same institutional gravity to a mother's blog post. Each element, standing alone, is relevant. Together, they describe an architecture assembled not in response to the seriousness of Ms. Wang's conduct, but in response to the resources of the family determined to ensure she does not walk free.

It is against that backdrop that this Court must evaluate whether the Meloy Report—the capstone of that architecture, the "severely psychopathic serial stalker" label placed on a first-time felony offender who missed no supervised visits in seven years—satisfies the reliability standards that due process and the Sentencing Guidelines require.

It does not.

### GROUNDS FOR EXCLUSION

### I.  THE MELOY REPORT IS PRIVILEGED ATTORNEY WORK PRODUCT PREPARED FOR VICTIM 1'S PRIVATE COUNSEL AND CANNOT BE USED AGAINST MS. WANG AT SENTENCING

5

The Meloy Report is addressed to Douglas Rappaport, Victim 1's private attorney in the California family-court and criminal matters, and is expressly labeled "PRIVILEGED AND CONFIDENTIAL – ATTORNEY WORK PRODUCT." It was not prepared at the request of the United States, U.S. Probation, or any neutral tribunal. It was commissioned and curated by Victim 1's litigation team as part of an ongoing adversarial strategy—the same strategy described above—and it bears the evidentiary character of that origin.

The government has now adopted this work-product document wholesale and seeks to use it as a sentencing predicate in a federal case in which Ms. Wang is the criminal defendant. That attempt presents a structural due-process problem: Ms. Wang has never been permitted to obtain or test the underlying record on which Dr. Meloy relied, because those materials are shielded behind the same work-product claim that appears on the face of the report. She cannot challenge what she cannot see.

A sentencing court may consider hearsay, but due process requires that the defendant have "an opportunity to rebut" material that meaningfully increases punishment and that the information have "sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a); *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *United States v. Tucker*, 404 U.S. 443, 447 (1972). When the factual foundation of an expert assessment is withheld as privileged work product and was assembled by the victim's own advocate for litigation purposes, the defendant cannot effectively rebut it. That is not an evidentiary technicality; it is a due-process defect.

If Victim 1's counsel insists on maintaining work-product protection over the full file provided to Dr. Meloy, due process forbids using the resulting report to increase Ms. Wang's punishment. The government may not both (1) invoke privilege to prevent scrutiny of the underlying record and (2) ask this Court to treat a work-product opinion grounded in that record as a reliable sentencing predicate.

## II. THE MELOY REPORT FAILS THE RELIABILITY THRESHOLD OF USSG § 6A1.3 AND, BY ANALOGY, AMENDED RULE 702

Although the Federal Rules of Evidence do not apply with full force at sentencing, the Guidelines impose a non-negotiable reliability floor: "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a). The 2023 amendments to Federal Rule of Evidence 702 codify the same reliability requirements for expert testimony and clarify that they are questions of *admissibility*, not merely of weight.

### A. Amended Rule 702: The "More Likely Than Not" Standard and Within-Methodology Limits

6

Effective December 1, 2023, Rule 702 requires that the proponent "demonstrate[] to the court that it is more likely than not" that each element of expert admissibility is satisfied—including that the testimony is based on "sufficient facts or data," is the product of "reliable principles and methods," and that the opinion "reflects a reliable application" of those principles and methods to the facts. The Advisory Committee adopted these changes because many courts were "misstating and misapplying" the preponderance standard, treating the sufficiency of the expert's basis and the reliability of the application as issues for the jury rather than gatekeeping questions for the judge.

The Advisory Committee also emphasized that each opinion must "stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology"—a direct response to experts overstating the certainty their methods can legitimately support. That language describes the Meloy Report precisely.

Even though Rule 702 does not apply mechanically at sentencing, its gatekeeping standards dovetail with USSG § 6A1.3's requirement of "sufficient indicia of reliability," and courts routinely apply Rule 702 principles to evaluate whether expert-type material is reliable enough to influence a sentence.

### B.  No Direct Examination; Psychopathy Label Based Solely on a One-Sided Paper Review

Dr. Meloy concedes that he never interviewed Ms. Wang, never conducted a mental-status examination, and administered the PCL-R psychopathy instrument "in the absence of direct interviews." He acknowledges that "the absence of direct interviews … constitutes a methodological limitation" and that he "cannot rule out other mental disorders that may affect risk assessment."

Despite these admissions, the Report labels Ms. Wang "severely psychopathic," places her at the "97th percentile" of psychopathy relative to female inmates, and characterizes her as posing a "persistent, high-level risk" to others. Those are not modest or tentative conclusions; they are precisely the sort of high-confidence psychiatric judgments that the 2023 amendments to Rule 702 single out for careful gatekeeping. An expert who cannot rule out alternative diagnoses has no basis for placing a subject at the 97th percentile of any clinical construct.

Under amended Rule 702, the proponent must show "more likely than not" that the testimony rests on "sufficient facts or data" and reflects a "reliable application" of methods to the facts. Fed. R. Evid. 702(b), (d). An opinion that simultaneously acknowledges the clinical examination necessary to rule out confounding diagnoses was never conducted, while assigning a high-certainty psychopathy label and a top-percentile risk score, is precisely the overstatement Rule 702(d) was amended to prohibit. The Court should treat that defect as disqualifying under § 6A1.3's reliability standard.

7

### C. *Entire Record Curated by Victim 1's Attorney; No Independent or Defense-Side Sources*

The Meloy Report rests on approximately 150 documents, every one of which was selected and provided by Victim 1's counsel. Dr. Meloy did not independently gather records, did not interview neutral witnesses, did not obtain materials from Ms. Wang or her family, and did not review exculpatory forensic evidence—including the Cloudflare and T-Mobile data bearing on the March 6, 2019 "Kill Baby K" post—that exists in the public record.

The factual base is, in its entirety, a litigation archive: filings, declarations, orders, and narratives generated by the Victim 1/Rappaport apparatus in the California and Danish proceedings. As explained in the Preliminary Statement, this is precisely the structure that produced the catastrophe in Masters: a one-sided record presented to Dr. Meloy as complete, accepted without independent verification, and converted into high-certainty clinical labels. The Report simply accepts that curated record as true and applies those labels again.

Courts have consistently held that an expert may not serve as a "conduit" for hearsay or merely "summarize" one party's documents in the guise of an opinion. *See, e.g.*, *SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). What those cases condemn at trial is even less appropriate at sentencing, where the Guidelines impose a minimum floor of "sufficient indicia of reliability."

A report that (1) never engages with defense-side materials, (2) has no neutral data sources, and (3) rests entirely on documents hand-selected by the adverse party's advocate does not meet that floor.

### D. *The Report Bootstraps Hotly Disputed, Out-of-District Allegations into Purported "Facts"*

As Ms. Wang's prior filing at ECF No. 158 details, the most consequential factual premises of the Meloy Report are the same disputed, out-of-district allegations that no court has ever adjudicated against her: (1) that Ms. Wang authored the March 6, 2019 "Kill Baby K" HolySmoke post—conduct that SFPD could not attribute even at probable cause, that Utah DCFS formally reversed, and that the San Francisco District Attorney declined to charge; (2) that she committed the 2013 "Rory Will" impersonation and revenge-porn conduct in Queens—conduct that ended in a sealed violation-level disposition with no factual allocution, and on which the New York appellate court allowed her civil claims to survive in

*Wang v. Will*, 2016 NY Slip Op 76740(U); and (3) that California and Danish family-court findings regarding custody and visitation are settled facts, even as Ms. Wang actively appeals them in those fora.

The Report does not add any new forensic evidence on these issues. It simply assumes their truth from Victim 1's litigation files and then uses those assumptions as clinical "data points." That

8

is impermissible bootstrapping. An expert opinion cannot establish disputed facts; it can only rest on facts established elsewhere. USSG § 6A1.3(a) does not permit the government to smuggle unadjudicated, territorially remote allegations into this case through the conduit of a privately-commissioned expert report and then treat them as "found" facts for purposes of enhancing a federal sentence. If the allegations were not proven in the jurisdictions where they arose, they cannot be proven here by being fed to an expert who accepts them without question.

### E.  Legal Scholarship on the 2023 Amendments Confirms That the Meloy Report's One-Sided Methodology Is Precisely What the Rule Was Amended to Screen Out—and That Courts in Non-Jury Proceedings Bear Heightened Responsibility

Two significant recent publications—one from the Harvard Law Review and one from the American Association for Justice's flagship practitioner journal—illuminate why the Meloy Report fails the reliability standards the 2023 amendments were designed to enforce, and why the absence of a jury at sentencing makes the Court's gatekeeping obligation more demanding, not less.

The Harvard Law Review note, *Federal Rule of Evidence 702 – Judicial Conference Amends Rule 702*, 138 Harv. L. Rev. 899 (2025), traces the amendment's history directly to judicial misapplication of the sufficiency requirements in Rule 702(b) and (d). The note documents that the Advisory Committee identified cases in which courts were treating "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology," as questions of weight for the jury rather than threshold admissibility questions for the judge. The amendment was specifically designed to correct that error. The Committee's second stated purpose was to "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology"—because "jurors, who lack specialized knowledge," must not be exposed to expert conclusions that "go beyond what the expert's basis and methodology may reliably support."

The Meloy Report violates both corrective purposes. Whether Dr. Meloy had a sufficient factual basis under Rule 702(b) is a threshold admissibility question, not a question of weight: the sufficiency of his basis—150 documents, every one selected by Victim 1's counsel, with no independent sources and no defense-side materials—is precisely the question the amendment directs courts to answer before crediting the opinion. The answer here is that the basis is not sufficient. And whether the Report's conclusions—"severely psychopathic," "97th percentile," "persistent high-level risk"—stay within the bounds of what a paper-only, no-interview assessment can reliably support is a Rule 702(d) question whose answer is equally clear: they do not.

The Harvard note also documents that the Sixth Circuit, in *In re Onglyza*, 93 F.4th 339 (6th Cir. 2024), excluded an expert who "cherry-pick[ed]" evidence and changed the analysis of certain factors "without explanation," even though the expert had used a facially reliable methodology. The court held that the proponent "bears the burden of showing by a preponderance of the evidence that the expert satisfies Rule 702," and that selective engagement with the record defeated that

9

burden. If cherry-picking some studies from a larger field of scientific literature is disqualifying, so is the construction of an entire 150-document factual base by one party's private litigation team, to the exclusion of all other sources. The Meloy Report's one-sidedness is not a variation on cherry-picking; it is cherry-picking by design.

A contemporaneous practitioner article, Diandra "Fu" Debrosse & Grant Patterson, *Unpacking Rule Changes on Expert Testimony*, Trial, May 2025, at 18, written from the perspective of attorneys who support broad expert admissibility, confirms the same floor. Even counsel who view the 2023 amendment skeptically acknowledge that "the 'preponderance of the evidence standard' applies to each individual element of Rule 702" and that experts "must stay within the bounds" of their methodology. The article further observes that courts have already applied this standard in non-jury proceedings, citing *United States ex rel. LaCorte v. Wyeth Pharmaceuticals, Inc.*, 706 F. Supp. 3d 206 (D. Mass. 2024), where the court explicitly applied the 2023 amendment's requirements to its own consideration—even though there was no jury— ensuring that expert opinions "stay[ed] within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."

That non-jury context is critical. The Trial article's primary concern is protecting a jury's right to weigh competing expert testimony. The article cautions against reading the amendment as giving courts "more power or responsibility" at the expense of the jury's fact-finding role. That concern is legitimate in a jury trial. It has no application here. There is no jury at sentencing. The Court is both gatekeeper and factfinder. The concern the Trial article raises—that strict gatekeeping might deprive the jury of evidence it should weigh—is structurally absent from this proceeding. What remains, once the jury concern is removed, is a straightforward obligation: the Court must find by a preponderance that the Meloy Report's factual basis is sufficient and its conclusions are within methodological bounds before crediting it. It cannot make that finding.

### F.  Judicial Gatekeeping at Sentencing Cannot Be Delegated to "Weight"—and the Absence of a Jury Makes That Obligation More Demanding, Not Less

One of the central abuses the 2023 amendments targeted was courts' practice of deferring to juries on whether an expert's factual basis and methodology were sufficient—treating those as weight questions instead of admissibility questions. The Advisory Committee made clear that this is wrong: the judge must find, by a preponderance, that the basis and methodology meet the Rule 702 requirements before the testimony reaches the factfinder.

At sentencing, that principle applies with special force, because the concern that animated the Trial article's caution—protecting the jury's fact-finding role—is entirely absent. There is no jury. The Court is the only factfinder. If the Court treats the Report's defects as going to weight, they will be silently credited by the same actor who should have screened them out. There is no second check. That is the precise failure the amendment and USSG § 6A1.3 are designed to prevent. And it is particularly acute here, where the Report arrives bearing the institutional weight

10

of a senior DOJ prosecutor and the rhetorical authority of clinical labels—"severely psychopathic," "97th percentile," "serial stalker"—that will be difficult to un-hear once they are in the record, regardless of how much "weight" the Court consciously assigns them.

The District of Utah has already applied the amended standard in this context. In *United States v. Uchendu*, No. 2:22-cr-00160-JNP-2, 2024 WL 1016114, at *2 (D. Utah Mar. 8, 2024), the court held that "questions as to the sufficiency of the basis for an expert's opinion and the application of his methodology go to admissibility rather than weight." That holding controls here. The sufficiency of the Meloy Report's factual basis—a 150-document set assembled entirely by the adverse party with no neutral or defense-side inputs—is an admissibility question. Whether Dr. Meloy's conclusions stay within the bounds of what a no-interview, paper-only PCL-R assessment can reliably support is an admissibility question. The Court should answer both questions the same way: the basis is not sufficient, and the conclusions exceed their methodological foundation. The Report should be excluded.

### G.  The Masters Case Proves That This Expert's One-Sided Methodology Produces Catastrophically Wrong Outcomes When Not Rigorously Screened

The Preliminary Statement summarizes the Timothy Masters wrongful conviction. It bears emphasis here, in the context of the legal standards, why that history matters as a matter of gatekeeping rather than merely of background.

In Masters, every defect now present in the Meloy Report was also present: a record curated by one side and presented to Dr. Meloy as complete; clinical conclusions expressed with high certainty from a paper review; heavy reliance on subjective interpretation of the defendant's personal writings; no independent forensic basis for the central claims; and no engagement with evidence that cut the other way. The Advisory Committee's 2023 amendments to Rule 702 were designed precisely to address that pattern—the pattern that convicted an innocent man and kept him in prison for ten years.

Dr. Meloy acknowledged, after the fact, that the one-sided record was the problem. He could not have supported the prosecution, he said, if he had seen what was withheld. But by then the damage was done. Timothy Masters had already served a decade for a crime he did not commit.

At this sentencing, the Court has the opportunity that the Masters trial court did not: it knows, in advance, that the record provided to Dr. Meloy was assembled by one party's private litigation team, labeled work product, and submitted without any defense-side or neutral inputs. It knows that Dr. Meloy again conducted no direct examination and again cannot rule out alternative diagnoses. It knows that the methodology is structurally identical to the one that produced the Masters catastrophe. Rule 702, as amended, and USSG § 6A1.3, as written, both exist to allow the Court to act on that knowledge before, not after, the damage is done.

11

### III.  USING THE MELOY REPORT IN THIS MANNER WOULD RENDER THE SENTENCING FUNDAMENTALLY UNFAIR UNDER THE DUE PROCESS CLAUSE

Even where evidence might clear a minimal admissibility threshold, due process limits the use of information so "unduly prejudicial" that it renders a proceeding fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *see also Williamson v. Reynolds*, 904 F. Supp. 1529, 1573–74 (E.D. Okla. 1995) (granting habeas relief where sentencing was infected by prejudicial testimony about uncharged crimes the defendant could not meaningfully contest).

The Meloy Report is exactly that sort of material. It brands Ms. Wang as "severely psychopathic," asserts a "high-level risk" of future violence, and characterizes her as a chronic "serial stalker"—all based on decades of disputed conduct that no court with proper jurisdiction has ever adjudicated against her. To credit that document at sentencing would effectively: (1) adjudicate disputed New York and California allegations in a Utah federal court under a preponderance standard; (2) on the basis of a record assembled by a private adversary; (3) without any cross-examination of the expert or the witnesses whose narratives he uncritically accepted; and (4) use the resulting labels to increase punishment in a federal case where Ms. Wang has already accepted a binding Rule 11(c)(1)(C) plea based on specified conduct.

That is the definition of the "trial within a sentencing" that courts have consistently condemned. The Due Process Clause requires more. The resources Victim 1's family devoted to constructing the narrative that became the Meloy Report—thirty-one legal professionals, experts billing at $10,000 per day, attorneys coordinating litigation across two continents—do not make that narrative true. They make it persuasive. The Court's gatekeeping function exists precisely to ensure that persuasiveness, and the institutional gravity behind it, does not substitute for reliability.

*See Gardner v. Florida*, 430 U.S. 349, 358 (1977) (due process requires that a defendant not be sentenced on the basis of information she had no meaningful opportunity to deny or explain).

### IV.  THE APPROPRIATE REMEDY IS EXCLUSION, OR AT MINIMUM AN EXPRESS REFUSAL TO TREAT THE MELOY REPORT AS A FACTUAL PREDICATE

For all of the foregoing reasons, Ms. Wang respectfully requests that the Court:

1.  Exclude the April 14, 2026 "UPDATED Violence Risk and Threat Assessment" and any related opinions or testimony by Dr. Meloy from the sentencing record, on the grounds that they lack sufficient indicia of reliability under USSG § 6A1.3(a), are grounded in privileged work-product materials that have not been disclosed, and would render the sentencing fundamentally unfair; or, in the alternative,

2.  If the Court admits the Report for limited contextual purposes, expressly state on the record that it: (a) will not treat the Meloy Report as establishing any disputed factual

predicate concerning (i) authorship of the March 6, 2019 HolySmoke "Kill Baby K" post, (ii) the 2013 "Rory Will" allegations, or (iii) any California or Danish custody findings currently on appeal; and (b) will not rely on the Meloy Report to enhance Ms. Wang's sentence or to characterize her as "severely psychopathic," a "high-level violence risk," or a "serial stalker" beyond the narrow conduct admitted in the plea agreement.

Such a ruling is fully consistent with USSG § 6A1.3(a) and Tenth Circuit precedent holding that where the defendant specifically objects and the government fails to carry its burden of producing reliable evidence, the court may not rely on the disputed material to increase the sentence. *See, e.g.*, *United States v. Williams*, 48 F.4th 1125, 1130 (10th Cir. 2022).

## CONCLUSION

The Meloy Report is the product of a seven-year, multi-jurisdictional campaign funded by one of the wealthiest families in technology, filtered through an indicting prosecutor now facing disbarment for suppressing evidence, and now presented at sentencing by one of the Department of Justice's foremost child exploitation prosecutors—in a case involving a mother's blog post. That campaign could purchase the most expensive experts and retain the most capable lawyers. It could not purchase reliability. The Meloy Report is not reliable: it was assembled one-sidedly, executed without direct examination, and built on contested facts it has no independent basis to establish. It employs the identical methodology that Dr. Meloy himself conceded, after the fact, contributed to the wrongful conviction of Timothy Masters.

For the foregoing reasons, Ms. Wang respectfully requests that the Court grant this Motion in Limine, exclude the Meloy Report and any derivative expert testimony from the sentencing record, or, in the alternative, enter an order and make explicit findings that the Court has not relied, and will not rely, on the Meloy Report as a factual predicate for any enhancement or adverse § 3553(a) finding. This Court is the last institutional check on a prosecution assembled by private wealth and advanced by institutional actors whose records counsel skepticism. It should act like one.

Respectfully submitted,

_____
Kailin Wang
Defendant, Pro Se

Dated: April 21, 2026

13

M Gmail                                                      John Wang <yunlong88cong@gmail.com>

## Request for Notice of Any Danish Court Proceedings Documents Expected to be used at Sentencing

**John Wang** <yunlong88cong@gmail.com>                     Tue, Apr 21, 2026 at 12:59 AM
To: "Blanch, Joey (USAUT)" <joey.blanch2@usdoj.gov>, Richard Sorenson <richard_sorenson@fd.org>, Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>

If the Government is relying on the 66-page 23 February 2026 Denmark Family Court adverse ruling against Ms. Kailin Wang, then any reciprocal discovery will, of course, include that judgment and the underlying record. That judgment is currently on appeal.

For the Government's awareness, out of approximately 24 California appellate matters Ms. Wang has pursued, only two have been selected for publication and designated as citable case law. Ms. Wang prevailed in both of those published decisions, and she also prevailed in a separate interlocutory appeal. Thus, the assertion in Meloy's Opinion that Ms. Wang "never wins anything" is demonstrably false.

Similarly, the characterization of Ms. Wang's vexatious-litigant status is misleading. Since January 5, 2021, Ms. Wang has been subject to a pre-filing-order requirement and must obtain permission before initiating filings. Despite that constraint, a substantial majority of her proposed filings—approximately 85 percent—have been approved for filing after review by the presiding judge. In other words, the very filter invoked to criticize her also shows that most of her proposed filings were deemed to have sufficient merit to proceed. If the Government wishes to put her vexatious-litigant history at issue in this criminal matter, Ms. Wang is prepared to respond filing-by-filing and order-by-order.

In that connection, please confirm whether you have an English translation of the 23 February 2026 Danish judgment.

With respect to the characterizations offered by Mr. Meloy, those statements are inaccurate and can be rebutted with specific evidence. Ms. Wang has successfully obtained the disqualification of three judges in prior proceedings. While Ms. Wang does not claim to have handled every aspect of this long-running litigation perfectly, the record demonstrates that when she has challenged judicial conduct or impartiality, her concerns have often been vindicated. The issue is not whether these allegations can be rebutted—they can—but rather how much detail is necessary for the current proceeding. If required, Ms. Wang is prepared to provide a detailed chronology, including dates, case numbers, and the names of the judicial officers involved, along with the grounds and outcomes of each disqualification request.

Similarly, Ms. Wang previously sought the disqualification of Judge Roeca in California on the basis that he was not able to manage the case competently or impartially. Although he refused to recuse himself at the time, the subsequent history of the matter—culminating in the transfer of a seven-year-old case to a foreign jurisdiction—supports Ms. Wang's position that her concerns were well-founded. From her perspective, the ultimate outcome confirms that her criticisms of the handling of the case were justified, even if they were not accepted when first raised.

---

**10 attachments**

 **2026-02-23_Denmark Judgement Dom_Kailin Wang.pdf**
1445K

**Gmail - RE_ FORMAL DEMAND FOR RECUSAL — INHABILITET CASE_ Case BS-37725_2025-KBH and all related proceedings including grandparent contact proceedings.pdf**
303K

**Gmail - Formal Notice of Factual Errors in Judgment of February 23, 2026- Which Affects the Pending GP Case.pdf**
1401K

**STATEMENT REGARDING JUDGE LOW, THE UTAH COURT CONTACTS, AND COMPARATIVE JUDICIAL CONDUCT (2).pdf**
4787K

**2026-03-04 Judge Boysen Disqualifies herself from GP case.pdf**
104K

**JUDGE HWANG 404 Tentative Rulings 1.5.21 (4).pdf**
88K

**2024_02:27:24_RJN 14 OUT OF 25 VL-110 REQ. FOR PERMISSION TO FILE-.pdf**
9718K

 Gmail

John Wang <yunlong88cong@gmail.com>

## US v Wang sentencing position due dates

2 messages

**Blanch, Joey (USAUT)** <Joey.Blanch2@usdoj.gov>                                    Mon, Apr 20, 2026 at 4:10 PM
To: UTDecf Stewart <utdecf_stewart@utd.uscourts.gov>, utdECF Pead <utdecf_pead@utd.uscourts.gov>
Cc: "yunlong88cong@gmail.com" <yunlong88cong@gmail.com>, Richard Sorenson - FDO <richard_sorenson@fd.org>

Hello,

Pursuant to the March 9, 2026 order by Judge Pead, the parties must file their sentencing positions by April 25, 2026  - this Saturday. However, the PSR has not yet been finalized.  I just checked with Mr. Kaufman, who says probation's deadline for filing the PSR is not until April 28.  Ms Wang and I both agree that we need the PSR to file our sentencing positions.  Could we request that our positions not be due until April 30?  I'm happy to file a stipulation if the court requires.

Thank you,

Joey L. Blanch | Assistant U.S. Attorney

111 S. Main St. Suite 1800 | Salt Lake City, UT 84111

(801) 524-5682 | joey.blanch2@usdoj.gov

**John Wang** <yunlong88cong@gmail.com>                                          Tue, Apr 21, 2026 at 4:37 AM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>, Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>
Cc: UTDecf Stewart <utdecf_stewart@utd.uscourts.gov>, utdECF Pead <utdecf_pead@utd.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

Additionally for the court to consider:

Ms. Wang notes that there are several pending matters that must be resolved before sentencing, including her motion for a continuance, motion in limine, request for expert fees, and application for Rule 17 subpoenas. She further notes that the history of this case is extraordinarily complex, that both U.S. Probation and the Federal Public Defender's Office are operating under heavy caseloads, and that AUSA Blanch's caseload is substantially lighter than either Probation's or the Federal Public Defender's. In addition, Ms. Wang has requested the appointment of CJA counsel in the event her motion in limine is denied, because such a denial will necessitate a Fatico evidentiary hearing. Finally, the objections to the Presentence Report span more than 25 years of history and approximately 90 pages, despite the fact that Ms. Wang does not have a single misdemeanor conviction in her background.

Ms. Wang attaches her PSR objections and extensive exhibits for the Court's reference. She further notes that the government intends to introduce biased expert opinions obtained by Victim 1 in the family-court proceedings, which will be the subject of substantial objections and will likely require rebuttal expert testimony.

Thank you,

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

 Gmail

John Wang <yunlong88cong@gmail.com>

## translations of jail calls

18 messages

---

**Blanch, Joey (USAUT)** <Joey.Blanch2@usdoj.gov>                              Wed, Apr 15, 2026 at 5:44 PM
To: "yunlong88cong@gmail.com" <yunlong88cong@gmail.com>, Richard Sorenson - FDO <richard_sorenson@fd.org>


Attached please find a draft translation of Ms Wang's recorded jail calls.


Joey L. Blanch | Assistant U.S. Attorney

111 S. Main St. Suite 1800 | Salt Lake City, UT 84111

(801) 524-5682 | joey.blanch2@usdoj.gov

---



📄 **Translations_Redacted.pdf**
3608K

---

**John Wang** <yunlong88cong@gmail.com>                                        Wed, Apr 15, 2026 at 11:41 PM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>, Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>
Cc: Richard Sorenson - FDO <richard_sorenson@fd.org>


Thank you for providing this information. However, please clarify why it is relevant at sentencing—aside from the fact that Muyskens misrepresented Wang's dual citizenship, and lied about defendant filing ex parte international absconding, and her extensive history of dishonesty, all of which have now been disclosed for the first time.

**Given these recent developments, we need to confirm once again:** are you objecting to a continuance? If you are objecting we will proceed with drafting a request for continuance due to the significant volume of material submitted at the last minute, including expert reports provided after you previously stated that you did not intend to use experts.

We are also perplexed by the inclusion of jail calls and question their relevance. If you are implying that Muyskens did not lie regarding the phone numbers used to alert Wang about her nude photos posted online, subpoenas will need to be issued to identify who these phone numbers belong to in question.

Additionally, we request the actual jail call audio, as well as identification of the transcriber who transcribed these, especially since errors have already been found—specifically, false claims by the government alleging Wang attempted to abscond to China twice.

**This correspondence serves as a meet-and-confer with both Mr. Conrad and Ms. Blanch.**

 **Please confirm whether you intend to object to a continuance and, if so, provide the basis for your objection.**

Thank you.


John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

---

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination,

distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

[Quoted text hidden]

---

**John Wang** <yunlong88cong@gmail.com>                                          Wed, Apr 15, 2026 at 11:44 PM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>, Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>
Cc: Richard Sorenson - FDO <richard_sorenson@fd.org>

Oh here are the jail calls



John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

---

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

[Quoted text hidden]

📄 **Translations_Redacted.pdf**
3072K

---

**Blanch, Joey (USAUT)** <Joey.Blanch2@usdoj.gov>                                Thu, Apr 16, 2026 at 9:40 AM
To: John Wang <yunlong88cong@gmail.com>, Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>
Cc: Richard Sorenson - FDO <richard_sorenson@fd.org>

I do object to a continuance.

First, we are not planning to call any expert witnesses.  This is an expert report that you have had for many months, and we have indicated multiple times we intend to use.  It's just an updated version.  If you wish to cross examine Dr. Meloy, that is up to you and it is my understanding that he is available.

Second, the documents I provided are all documents you have already or simply analysis of information based on documents you have already.  I'm simply providing them again so there is no question what the attachments were.

Third, I provided the jail calls only because we had them and they had not been produced, not because I believe they are relevant to sentencing.  You're entitled to production of your own statements.

Best,

-Joey Blanch

[Quoted text hidden]

---

**John Wang** <yunlong88cong@gmail.com>                                Thu, Apr 16, 2026 at 10:18 AM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>
Cc: Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

Still need the audio and transcriber info.

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

---

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

[Quoted text hidden]

---

**Blanch, Joey (USAUT)** <Joey.Blanch2@usdoj.gov>                      Thu, Apr 16, 2026 at 11:27 AM
To: John Wang <yunlong88cong@gmail.com>
Cc: Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

I believe the jail calls have already been produced.  If not I am happy to obtain them and produce them.  I do not believe the name of the translator is discoverable.  This still a draft translation provided to you only out of professional courtesy.  I do not intend to request a completed translation as I do not believe it is relevant to the case.


Best,



Joey L. Blanch | Assistant U.S. Attorney

111 S. Main St. Suite 1800 | Salt Lake City, UT 84111

(801) 524-5682 | joey.blanch2@usdoj.gov



[Quoted text hidden]

---

**John Wang** <yunlong88cong@gmail.com>                                Thu, Apr 16, 2026 at 2:52 PM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>
Cc: Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

Subject: Discovery Request – Jail Call Recordings and Related Materials

Dear Ms. Blanch,

I am writing to follow up on an outstanding discovery matter that will need to be resolved in advance of sentencing.

To date, the defense has not received: (1) audio recordings of any jail calls obtained or reviewed by the government in this case; or (2) any information identifying the transcriber(s) or the methods used to prepare any summaries or transcripts of those calls.

As you know, the government referenced jail calls during detention proceedings as evidence of alleged flight risk and obstruction. Those representations bear directly on the sentencing record, and the defense is entitled to review the underlying recordings and transcription materials in order to evaluate their accuracy, context, and potential impeachment value.

We also note that, per the Notice of Errata (Doc. 101), the government previously withdrew the jail calls as a basis for its opposition to modification of conditions of release. To the extent the government intends to rely on those calls — or any portion of them — at sentencing, we would ask that the defense receive the materials with sufficient time to review and, if appropriate, respond.

In the interest of resolving this without motion practice, we ask that you please let us know by [date]:

  (1) Whether the government intends to offer, cite, or otherwise rely on any jail calls or derivative materials at sentencing; and

  (2) If so, when we can expect production of the audio recordings, transcripts, summaries, and associated chain-of-custody documentation.

If the government does not intend to rely on any such materials at sentencing, a representation to that effect on the record would resolve this issue entirely.

We appreciate your attention to this and are happy to discuss further at your convenience. If we do not hear back by [date], we will have no choice but to seek relief from the Court.

Thank you.

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

---

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

[Quoted text hidden]

---

**John Wang** <yunlong88cong@gmail.com>                                         Thu, Apr 16, 2026 at 2:55 PM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>
Cc: Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

Oh discovery disclosure is mandatory btw, even if you do not intend to use them.

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

[Quoted text hidden]

---

**Blanch, Joey (USAUT)** <Joey.Blanch2@usdoj.gov>                    Thu, Apr 16, 2026 at 2:57 PM
To: John Wang <yunlong88cong@gmail.com>
Cc: Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

We do not intend to rely on jail calls or the transcripts.  As I previously stated, I simply produced the draft transcripts to you because we had them and thought you were entitled to any recordings of your own statements.  If you still wish the recordings, to the extent they have not been already been provided, I can ask the FBI for them.

[Quoted text hidden]

---

**Blanch, Joey (USAUT)** <Joey.Blanch2@usdoj.gov>                    Thu, Apr 16, 2026 at 2:58 PM
To: John Wang <yunlong88cong@gmail.com>
Cc: Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

Yes, if you want the calls, I am happy to provide them if they have not already been produced.  However, as I noted previously, we do not intend to rely on them.

[Quoted text hidden]

---

**John Wang** <yunlong88cong@gmail.com>                              Thu, Apr 16, 2026 at 2:58 PM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>
Cc: Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

Yes we want all of them, and translation info.

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

[Quoted text hidden]

---

**Blanch, Joey (USAUT)** <Joey.Blanch2@usdoj.gov>                    Thu, Apr 16, 2026 at 3:00 PM
To: John Wang <yunlong88cong@gmail.com>
Cc: Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

We are not required to prepare translations for you.  We provided the draft translation to you as a courtesy but do not intend to do more.

[Quoted text hidden]

---

**John Wang** <yunlong88cong@gmail.com>                                                    Thu, Apr 16, 2026 at 3:04 PM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>
Cc: Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

No. The name of the transcriber is necessary given the false information you and your office have relied on in the past. You have also provided these materials to V1 and his attorneys, and they are likely to use them in other proceedings. Therefore, if your answer is a firm no, a motion to compel will be forthcoming.

Thank you,

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

---

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

[Quoted text hidden]

---

**Blanch, Joey (USAUT)** <Joey.Blanch2@usdoj.gov>                                          Thu, Apr 16, 2026 at 3:07 PM
To: John Wang <yunlong88cong@gmail.com>
Cc: Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

Feel free to file something.  I'm not in possession of any information suggesting the drafts were provided to the victim's counsel.

[Quoted text hidden]

---

**John Wang** <yunlong88cong@gmail.com>                                                    Thu, Apr 16, 2026 at 3:17 PM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>
Cc: Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>, Richard Sorenson - FDO <richard_sorenson@fd.org>

You still need to disclose the audio and transcriber info.

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

[Quoted text hidden]

---

**John Wang** <yunlong88cong@gmail.com>                                    Thu, Apr 16, 2026 at 5:38 PM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>, Richard Sorenson <richard_sorenson@fd.org>, Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>

Ms. Blanch, based on your own offer below, **please at least produce the audio recordings of the jail calls,** whether or not you intend to use them at sentencing. The fact that they may have been produced to prior counsel is irrelevant, because the Federal Public Defender's Office no longer represents Ms. Wang, and, as you are aware, all discovery was returned. In any event, these calls were never produced to Ms. Wang, especially given  your Motion to Revoke filed on June 4, 2024.

Ms. Wang would like sentencing to proceed on May 5, 2026. However, given that you are attempting to introduce highly disputed, prejudicial evidence, you are backing her into a corner; she cannot simply sit and do nothing about it. If speedy sentencing remains the goal, Ms. Wang again urges the government to refrain from relying on highly disputed evidence, because additional discovery and expert rebuttal will be required.

Thank you,

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

---

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

[Quoted text hidden]

---

**Blanch, Joey (USAUT)** <Joey.Blanch2@usdoj.gov>                          Thu, Apr 16, 2026 at 5:40 PM
To: John Wang <yunlong88cong@gmail.com>, Richard Sorenson <richard_sorenson@fd.org>, Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>

As I have already mentioned to you, I have requested the jail calls in the possession of the FBI and will produce them upon receipt.

[Quoted text hidden]

---

**John Wang** <yunlong88cong@gmail.com>                                    Tue, Apr 21, 2026 at 4:08 AM
To: "Blanch, Joey (USAUT)" <Joey.Blanch2@usdoj.gov>
Cc: Richard Sorenson <richard_sorenson@fd.org>, Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>

Still waiting on these Jail Call Audio files as well.

 Gmail

**John Wang <yunlong88cong@gmail.com>**

## Rory Will Transcripts Complete
1 message

**John Wang** <yunlong88cong@gmail.com>                                      Mon, Apr 20, 2026 at 11:55 PM
To: "Blanch, Joey (USAUT)" <joey.blanch2@usdoj.gov>, Richard Sorenson <richard_sorenson@fd.org>, Conrad Kaufman <Conrad_Kaufman@utp.uscourts.gov>

Someone is going to have to send me these before the Sentencing Memo is due.

We saw them when the discovery turned over but then Wang had to return them due to Joey's 6/4/24 Motion to Revoke.

Wang only has the sentencing transcripts from the public civil case records.

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2026, a true and correct copy of the foregoing Motion in Limine was served via electronic mail upon:

> Joey L. Blanch
> Assistant United States Attorney
> Joey.Blanch2@usdoj.gov
>
> Conrad Kaufman
> U.S. Probation Officer
> Conrad_Kaufman@utp.uscourts.gov
>
> Richard Sorenson
> Standby Counsel
>
> richard_sorenson@fd.org

_____
Kailin Wang

14