Case 2:24-cr-00163-TS    Document 159-1    Filed 04/21/26    PageID.9653 82

 **Pergamon**

Aggression and Violent Behavior, Vol. 5, No. 1, pp. 1–22, 2000
Copyright © 1999 Elsevier Science Ltd
Printed in the USA. All rights reserved
1359-1789/00/$–see front matter

**PII S1359-1789(99)00006-3**

# Special Article
# THE NATURE AND DYNAMICS OF SEXUAL HOMICIDE: AN INTEGRATIVE REVIEW

## J. Reid Meloy

*University of California, San Diego and University of San Diego School of Law*

**ABSTRACT.** *The author reviews the definitions, epidemiology, evolving research, offender, and offense characteristics of sexual homicide, a form of intentional killing that occurs in less than 1% of homicides in the United States. Although the extant research is limited by very few comparative studies, repetitive use of small, nonrandom samples, retrospective data, no prospective studies, and the absence of any predictive statistical analyses, the yield over the past 100 years is impressive. The author advances a clinical typology of sexual murderers. The first group of* compulsive *sexual murderers leaves behind organized crime scenes and are usually diagnosed with sexual sadism and antisocial/narcissistic personality disorders. They are chronically emotionally detached, often primary psychopaths, are autonomically hyporeactive, and the majority experience no early trauma. The second group of* catathymic *sexual murderers leave behind disorganized crime scenes and are usually diagnosed with a mood disorder and various personality disorders that may include schizoid and avoidant traits. They are hungry for attachment, only moderately psychopathic, are autonomically hyperreactive, and have a history of physical and/or sexual trauma. © 1999 Elsevier Science Ltd. All rights reserved.*

**KEY WORDS.** Homicide, rape, paraphilia, catathymia, compulsive, antisocial, narcissistic, psycopathy

## INTRODUCTION

THE WISH TO KILL the object of one's sexual desire is peculiarly understandable, especially for males of our species. Shakespeare understood this when he wrote, "One sin, I know, another doth provoke; murder's as near to lust as flame to smoke" (*Pericles* I, I). T. S. Eliot echoed this hidden desire in his poem, "Sweeney Agonistes":

---

Correspondence should be addressed to J. Reid Meloy, 964 Fifth Avenue, Suite 409, San Diego, CA 92101.

2                                           *J. R. Meloy*

> I knew a man once did a girl in
> Any man might do a girl in
> Any man has to, needs to, wants to
> Once in a lifetime, do a girl in.
> (Eliot, 1963)

And an anonymous person, presumably a young man, captured the feelings of sexualized devaluation and affectional yearning, laced with a certain maternal awareness, when he scrawled on a Los Angeles public bathroom wall:

> All women are whores
> (except for my mom)

The *act* of intentionally killing the object of one's sexual desire, however, is a relatively rare event in our species, perhaps a testament to the strength of male inhibition. Our understanding of this most extreme form of sexual aggression remains limited, yet promising, after more than a century of scientific scrutiny by a handful of physicians, psychiatrists, psychologists, and criminologists.

## DEFINITIONS

Sexual homicide is the intentional killing of a person during which there is sexual behavior by the perpetrator. This definition closely parallels others, such as the one used by Douglas, Burgess, Burgess, and Ressler (1992)—"sexual homicide involves a sexual element (activity) as the basis for the sequence of acts leading to death" (p. 123)—and contains a number of components that are critical to capturing the domain of sexually homicidal acts. First, homicide, or "intentional killing," has several legal meanings, and could range from murder to voluntary manslaughter, each specific crime having a number of legal elements necessary to prove it beyond a reasonable doubt. For our purposes, the range of possible criminal charges underscores the variety of thoughts and emotions that could accompany such an act: from careful planning of the sexual homicide days or weeks before the event (often charged as first degree or aggravated murder), to an impulsive, rageful killing during a sexual encounter, perhaps precipitated by the victim's rebuff and alcohol intoxication of the perpetrator (sometimes charged as a degree of manslaughter). Each sexual killing holds within it facts, independent of assumptions, that the forensic investigator uses to discern the internal dynamics and motivations of the perpetrator.

Second, "during which there is sexual behavior" is sufficiently ambiguous to capture the variety of time frames and sexual acts that may be evident in any one case: When did the sexual activity occur, especially in relation to the killing and death of the victim, and what was the nature of the activity? Sexual behavior might occur before, during, or after the killing, or throughout the event; and the behavior could range from only conscious fantasy, to physiological arousal, to masturbation, or actual penetration (oral, anal, or vaginal) of the victim with a variety of objects, animate or inanimate. Sexual behavior also may be symbolically expressed, often suffused with anger and curiosity, through mutilation of the victim's genitals.

We have operationalized sexual behavior in our research subjects (Gacono & Meloy, 1994; Gacono, Meloy, & Bridges, in press; Meloy, Gacono, & Kenney, 1994) when there is either (a) physical evidence of sexual activity in close temporal or physical proximity to the crime or crime victim; or (b) a legally admissible statement by the perpetrator of sexual activity.

**TABLE 1.  Sex-Related Murders as Proportion of Murders in United States, 1991–1995**

|                     | 1991   | 1992   | 1993   | 1994   | 1995   |
| ------------------- | ------ | ------ | ------ | ------ | ------ |
| Rape                | 132    | 138    | 115    | 78     | 79     |
| Other sex           | 47     | 34     | 28     | 41     | 30     |
| Prostitution        | 20     | 32     | 18     | 14     | 9      |
| Total               | 199    | 204    | 161    | 133    | 118    |
| Total murders       | 21,676 | 22,716 | 23,180 | 22,084 | 20,043 |
| Percent Sex-related | 0.91   | 0.89   | 0.69   | 0.60   | 0.58   |

Data from *Uniform Crime Reports*, by the Federal Bureau of Investigation, 1996, Washington, DC: Department of Justice.

## EPIDEMIOLOGY

The base rate for sexual homicide is unknown. The Federal Bureau of Investigation's (1996) *Uniform Crime Reports* does not collect and publish such data, and to my knowledge, no other statewide or national database exists. There is also no official estimate from the Behavioral Sciences Unit of the Federal Bureau of Investigation (FBI), despite published hearsay, on the number of serial murderers (the majority of whom are likely to be sexual murderers; see Geberth & Turco, 1997) currently at large in the United States (A. J. Pinizzotto, personal communication, January, 1998).

There is a method, however, by which we can estimate sexual homicides as a proportion of homicides in the United States. Table 1 lists data on total homicides between 1991 and 1995, and reported homicides that are categorized as rape, other sex, or prostitution. As noted, the sum of these homicides, which *may* be sexual homicides, typically represent less than 1.0% of homicides reported by law enforcement throughout the United States each year. Despite the temporal reliability of these proportional frequencies, these numbers should be considered both a gross estimate and a likely underrepresentation of the incidence of sexual homicide each year due to confounding variables in reporting such data to the FBI.

## EARLY RESEARCH

The first scientific study of sexual homicide was *Psychopathia Sexualis*, published in 1886 and authored by a German psychiatrist and physician, Richard von Krafft-Ebing, Professor of Psychiatry at the University of Vienna.[1] Appearing within several years of Britain's most notorious serial sexual homicide case, Jack the Ripper, this text remains historically significant because of the clinical detail used to describe a nonrandom sample of varieties of sexual homicide. Dr. von Krafft-Ebing wrote, for instance, of one of the crimes of a serial sexual murderer named Vincenz Verzeni:

> On August 28, 1871, a married woman, Frigeni, aged twenty-eight, set out into the fields early in the morning. As she did not return by eight o'clock, her husband started out to fetch her. He found

---

[1] Although previous writers addressed sexual deviancy, von Krafft-Ebing's text was the most comprehensive collection of case histories to date. The book had 12 German editions, and was translated into seven languages. Freud referred to it in his *Three Contributions to the Theory of Sex* (1905/1953).

her corpse, lying naked in the field, with the mark of a thong, with which she had been strangled, around her neck, and with numerous wounds. The abdomen had been ripped open, and the intestines were hanging out. (von Krafft-Ebing, 1886/1965, p. 99)

He also quoted from Verzeni's confessions, actually first published by Cesar Lombroso, a noted Italian criminologist of the time, in his book, *Verzeni e Agnoletti*, 13 years earlier:

I had an unspeakable delight in strangling women, experiencing during the act erections and real sexual pleasure. It was even a pleasure only to smell female clothing. The feeling of pleasure while strangling them was much greater than that which I experienced while masturbating. (von Krafft-Ebing, 1886/1965, p. 101)

Relatively rare and sensational, these acts of sexual homicide, whether single or serial, became a focus of forensic and clinical interest over the next century. Scientific study has followed a predictable course: small clusterings of descriptive cases lead to certain theoretical formulations (De River, 1949; Gebhard et al., 1965; Groth, 1979; Guttmacher, 1951; Henderson, 1939; Hirschfeld, 1944; Karpman, 1954[2]; MacCulloch, Snowden, Wood, & Mills, 1983; Macdonald, 1961; Meloy, 1988; Stekel, 1929; Revitch, 1965); which are, in turn, superseded by nonrandom descriptive studies (both clinical and archival) of larger samples (Dietz, Hazelwood, & Warren, 1990; Geberth & Turco, 1997; Hickey, 1991; Holmes & DeBurger, 1988; Myers & Blashfield, 1997). Then comparative studies of nonrandom samples of sexual homicide cases are published, usually focusing on intragroup and intergroup similarities and differences in relation to other paraphilias, personality disorders, or homicides, in a search for sensitivity, specificity, and hopefully, prediction (Gratzer & Bradford, 1995; Grubin, 1994; Langevin, Ben-Aron, Wright, Marchese, & Handy, 1988; Meloy, Gacono, & Kenney, 1994; Prentky et al., 1989).

## OFFENDER CHARACTERISTICS

### Demographics

Most sexual homicides are committed by males, the first kill occurring prior to the age of 30. Although sociologists have speculated that sexual homicide, especially serial sexual homicide, is a product of socioeconomic dislocation (Leyton, 1986), the data do not necessarily support this formulation (Stone, 1994; Warren, Hazelwood, & Dietz, 1996).

### Victims

Most victims of sexual homicide are female strangers or casual acquaintances, rather than consensual sexual intimates, of the perpetrator. They are usually the same race as the offender. In a recent series of sexual homicide cases we have gathered ($N = 38$), 86% of the victims were strangers or casual acquaintances, and the perpetrators' relationships to the rest of the victims were unknown. This finding is also robust, and has been commented upon by other researchers (Dietz et al., 1990; Meyers & Blashfield, 1997; Ressler et al., 1988).

---

[2] Internecine rivalry, however, never goes away. Karpman (1954) wrote, "The fact that any man would want to write and publish a book like that of De River's (1949) does not speak well for his own mental health (p. 660)."

The most likely victims of violent crime, including homicide, are males. Female victimization in *sexually* violent crimes, however, is expected. What is unusual about sexual homicide from a relational perspective is that it is similar to other paraphilias and dissimilar to other crimes of violence: some paraphilic individuals deliberately target strangers as their object choice (for example, those who prefer voyeurism, exhibitionism, or frottage), while most individuals who are nonsexually violent select victims well-known to, or intimately involved with them.

Sexual homicide perpetrators, even if intimately sexually involved with a partner at the time, will usually go outside the relationship and select another object to sexually assault and kill. The attachment, or bond, inhibits the extreme sexual aggression, and must, therefore, be circumvented (Meloy, 1992). A more practical reason is that apprehension is lessened if the crime victim is a complete stranger. Sexual homicide of sexual partners does occur, but is rare (Meloy, 1996).

Sexual sadists, as a subgroup of sexual homicide perpetrators, will sometimes practice their cruel acts on consenting partners, having shaped their behavior through various methods of reinforcement to ensure compliance (Dietz, Hazelwood, & Warren, 1990; Hazelwood, Warren, & Dietz, 1993; Warren, Hazelwood, & Dietz, 1996; Meloy, 1992). Sexual sadists may also use their consensual sex partners to assist them when they begin to kill stranger female victims:

> Carol Bundy, a 37-year-old nurse sexually abused as a child, had an 8-month relationship with a man 10 years her junior, Douglas Clark. Although their domestic life was chaotic, their sexual life was unusually exciting, focusing upon the fantasy of capturing young women, subduing them, and using them sexually. Eventually, at Douglas' urging, they began to kill prostitutes in Los Angeles. The usual manipulation was to convince young prostitutes to enter their car with Karen in the back seat, so that they could perform fellatio on Douglas, and Karen could watch. During the course of the sex act, Douglas would shoot the woman in the back of the head with a .22 caliber revolver. Eventually they were both involved in acts of child molestation, necrophilia, and decapitation of two of the victims. Karen confessed to her involvement and was subsequently convicted of two counts of first degree murder and sentenced to life. Douglas Clark was sentenced to death and remains at San Quentin.

### Crime Scene Typology

Sexual homicides are usually organized or disorganized in offense characteristics. This typology, originally developed by the Behavioral Sciences Unit of the FBI, has received some validation (Ressler et al., 1988). For example, it is very rare for a sexual sadist, who invariably leaves an organized crime scene, to engage in postmortem mutilation of the corpse (this is distinguished, of course, from dismemberment of a victim following death to dispose of the body). Table 2 lists the offense characteristics of organized and disorganized sexual homicides. Since the publication of this typology over a decade ago, subsequent research has suggested that (a) organized crime scenes are significantly more likely in serial sexual murders than single sexual murders (Prentky et al., 1989); and (b) organized crime scenes are highly suggestive of sexual sadism (Dietz et al., 1990; Gratzer & Bradford, 1995; Warren et al., 1996).

Although typologies attempt to construct categories to classify phenomena, often the variations in real events are continuous. In this typology, "mixed cases" do emerge, and it is likely that each of these variables is continuous, rather than dichotomous. Any one sexual homicide will often fall on a continuum between organized and disorganized, and

**TABLE 2. Offense Characteristics of Organized and Disorganized Sexual Homicides**

| Organized | Disorganized |
|---|---|
| Offense planned | Spontaneous offense |
| Victim a targeted stranger | Victim or location known |
| Personalizes victim | Depersonalizes victim |
| Controlled conversation | Minimal conversation |
| Crime scene reflects control | Crime scene random and sloppy |
| Demands submissive victim | Sudden violence to victim |
| Restraints used | Minimal use of restraints |
| Aggressive acts before death | Sexual acts after death |
| Body hidden | Body left in view |
| Weapon/evidence absent | Weapon/evidence often present |
| Transports victim or body | Body left at death scene |

From *Sexual Homicide: Patterns and Motives,* by R. Ressler, A. Burgess, and J. Douglas, 1988, Lexington, MA: D.C. Heath.

an investigator's clarity of thought is often helped if each of these variables is conceived as a continuum. A "mixed" case of sexual homicide is evident in the following facts:

> The body of a 38-year-old Caucasian woman was found displayed in an open field approximately 100 yards from where she was stabbed in the back with a large, single-edged knife. The offense occurred at approximately midnight the evening before. The victim's left nipple had been removed, and a large portion of her labia majora had been excised with a smaller, surgical blade. She had not been anally, orally, or vaginally penetrated. There was no evidence of premortem sexual activity, and no evidence that the suspect had previously met the victim, although her walking path was in clear view of his bedroom window. Extensive productions of sexually violent fantasy (drawings and narratives) were found in his room, as well as an accumulation of knives consistent with the likely murder weapon. The perpetrator was 15 years old.

### *Disorganized Sexual Homicide and Catathymia*

Disorganized sexual homicide (see Table 2) may involve a catathymic process (Wertham, 1937). Catathymia has a long and distinguished history in forensic thought (Schlesinger, 1996), but is not well-known. It is a motivational pattern, not a diagnosis, in which "an underlying emotional conflict creates an enormous amount of psychological tension, which is released through the violent act" (p. 307). In its acute form, it may be sexualized, explosive, and homicidal, paralleling the term *blitz attack* used by the FBI to characterize disorganized sexual homicides (Ressler et al., 1988). Catathymia is highly symbolic, transference-based, and in disorganized sexual homicide, is likely to be a displaced matricide (Revitch & Schlesinger, 1981). Observed sexual promiscuities of the mother when the perpetrator was a dependent and helpless boy may contribute to his maternal rage, especially when coupled with an emotionally absent father (Meloy, 1988, 1992; Schlesinger & Revitch, 1997).

### *Organized Sexual Homicide and Obsessive-Compulsion*

Organized sexual homicide (see Table 2), although occurring in a minority of sexual murders, usually involves an obsessive-compulsive pattern of behavior. It is also significantly more likely to be perpetrated by a sexual sadist than a disorganized sexual homicide.

Although there is no research, as yet, on obsessive-compulsive disorder (OCD) or obsessive-compulsive personality disorder (OCPD) among sexual homicide perpetrators, there is clinical and forensic evidence that makes this a plausible hypothesis: (a) clinical descriptors of obsessive-compulsive traits among serial sexual murderers date back to von Krafft-Ebing (1886/1965); (b) patterns of serial sexual murder appear tied (classically paired) to cyclical variations in sexual arousal; (c) self-reports of obsessive-compulsive symptoms by serial sexual murderers are evident (Brittain, 1970; Frank, 1966; Michaud & Ainsworth, 1983); (d) Rorschach test measures indicate an inordinate amount of nonvolitional (obsessional) thoughts in sexual homicide perpetrators (Meloy et al., 1994; Revitch & Schlesinger, 1981); (e) cleanliness and orderliness abound at organized sexual homicide crime scenes; and (f) preferred anal rape among sexual sadists who commit organized sexual homicides (Dietz et al., 1990; Gratzer & Bradford, 1995) empirically supports Freudian theory of anality in compulsive disorders (Fenichel, 1945).

### Absence of Psychosis

With few exceptions, usually case studies (Langevin et al., 1988; Lunde & Morgan, 1980; Meloy & Gacono, 1992a), most sexual homicide perpetrators are not psychotic and do not have a diagnosable psychotic disorder if evaluated (Meloy et al., 1994; Ressler et al., 1988; Warren et al., 1996). This is particularly true in organized sexual homicides, where the likely Axis I diagnosis (from the *Diagnostic and Statistical Manual of Mental Disorders*, fourth edition [*DSM-IV*]; American Psychiatric Association, 1994) is sexual sadism (302.84).

Other Axis I disorders, however, may be present, and need to be considered, including mood disorders and drug and alcohol dependencies. In the 118 victim cases considered by Ressler et al. (1988), 49% of the perpetrators reported consuming alcohol before the sexual killing, and 35% reported drug use. They wrote, "We suspect that these murderers are preoccupied with a kind of internal dialogue that sustains anger, discontent, irritability, or depression. Use of alcohol or drugs is an attempt to moderate such internal stress, but the fantasy continues" (p. 52). In our current series of sexual homicide perpetrators ($N = 38$), 68% had a history of depression and 37% scored positive on the Depression Index (Rorschach) when tested during incarceration.

### Serial Murderers' Diagnoses

Recent evidence, predicted by earlier studies (Holmes & DeBurger, 1988), strongly suggests that a majority of serial murderers are sexually motivated, and when there is enough evidence, the *DSM-IV* dual diagnoses are sexual sadism and antisocial personality disorder (Geberth & Turco, 1997). Serial murder in the latter study ($N = 387$ subjects) was defined as the killing of three or more victims over a period of time.

### Narcissism and Psychopathy

Virtually all sexual homicide perpetrators evidence narcissistic and psychopathic personality traits. The pathological narcissism, whether or not it meets the threshold for a *DSM-IV* diagnosis of narcissistic personality disorder, is usually seen in the perpetrator's sense of entitlement, grandiosity, and emotional detachment. The psychopathy, whether or not it meets the threshold for primary psychopathy (Hare, 1991), is usually manifested in the perpetrator's predation, cruelty toward others (at times diagnosed as sexual sadism), deceptiveness, and manipulation. In our series of sexual homicide perpetrators, approximately two thirds scored in the primary, or severe range of psychopathy on the Psychopathy

Checklist-Revised (Hare, 1991). There is also some research that psychometric measures of sadism significantly correlate with psychopathy (Hart, Forth, & Hare, 1991; Holt, Meloy, & Strack, 1999; Meloy & Gacono, 1992b).

The character pathology of the sexual homicide perpetrator, however, is often less adaptive, and more dysfunctional than other narcissistic and psychopathic individuals. For example, despite similar levels of anger and entitlement, sexual homicide perpetrators are significantly more obsessional, prone to dysphoric rumination, and affectionately hungry than nonsexually offending psychopaths (Gacono & Meloy, 1994; Meloy et al., 1994). Both groups evidence borderline reality testing and moderate amounts of formal thought disorder, expected at a borderline *level* (Kernberg, 1984) of personality organization (Gacono & Meloy, 1994; Meloy, Acklin, Gacono, Murray, & Peterson, 1997). These structural characteristics are also apparent in the sexual homicide perpetrator's use of more primitive defenses, such as projection, projective identification, and devaluation. We also found, somewhat paradoxically, that sexual homicide perpetrators are more whole-object seeking than other psychopaths (Meloy et al., 1994). There is also some suggestive work that they may be more schizoid than other psychopaths. Stone (1994) found in his biographical study of 42 serial murderers that 40% met criteria for schizoid personality disorder.

### Fantasy

Fantasy appears to play a central role in sexual homicide, especially organized (likely serial) sexual homicide. Brittain (1970) detailed his personal clinical experience with an unknown number of sadistic murderers and wrote an anecdotal, yet influential paper, which described what he believed to be the personality characteristics of these offenders: "he is typically a day-dreamer with a very rich, active fantasy life. He imagines sadistic scenes and these he acts out in his killings (p. 199)." MacCulloch, Snowden, Wood, and Mills (1983) drew heavily from Brittain's work and described the criminal histories and sexual fantasies of a small sample ($N = 16$) of forensic patients, seven of whom were sexual murderers. Their sample was concordant with the "compulsive murderer" of Revitch (1965), and their emphasis upon sexual fantasy, first noted by Reinhardt (1957) and his term *lust murderer*, steered much of the subsequent research interest in fantasy as a primary drive mechanism in sexual homicide.

Prentky et al. (1989) defined fantasy as, "an elaborated set of cognitions (thoughts) characterized by preoccupation (or rehearsal), anchored in emotion, and originating in daydreams" (p. 889). They found violent fantasies of rape and/or murder present in 86% of serial sexual murderers and only 23% of single sexual murderers ($p = .001$), and theorized a functional relationship between fantasy and repetitive sexual assaults. They also presented a social learning model to account for the linking of sexual arousal to deviant fantasy. We found in our series of sexual homicide perpetrators ($N = 38$) that 39% produced more passive human movement than active human movement responses on the Rorschach, a validated index of fantasy abuse, rather than active problem-solving (Exner, 1993).

Hazelwood and Warren (1995) developed a detailed understanding of the *structure* of sexual fantasy as acted out in serial sexual crimes, and postulated five components that will often be present: relational, paraphilic, situational, self-perceptual, and demographic. For example, the perpetrator may imagine that a 15-year-old female (demographic) becomes his sex slave (relational), and he is able to anally and orally rape her at his whim (paraphilic) in his isolated mountain cabin (situational), thus enhancing his sense of omnipotence and gratifying himself sadistically (self-perception). I have described such

fantasy, particularly the relational and demographic components, as shaping the sexual homicide perpetrator's search for a suitable victim that achieves a "goodness of fit" with his fantasy (Meloy, 1988).[3] This search, despite its deviancy and violence, is similar to normal human mating strategies during which the male (usually) searches for a female that matches his sexuoerotic map or template (Money, 1986).

I propose that the structuring of such sexual fantasy, in turn, provides the sexual homicide perpetrator with certain positive reinforcements prior to, or between his sexual homicides: (a) it sustains pleasure (through memory or imagination) when coupled with masturbation; (b) it reduces behavioral inhibition while physiologically releasing orgasmic tension; (c) it stimulates grandiosity, since all fantasies are perfect (R. Hazelwood, personal communication, January, 1995), and thus compensates for any felt sexual or relational inadequacies; (d) it stimulates omnipotence, since the fantasy of omnipotent control of the victim is likely imaged; and (e) it allows the perpetrator to practice his paraphilia prior to, or between behavioral "tryouts" (MacCulloch et al., 1983) and the eventual consummation, or repetition of the sexual homicide.

The most difficult question when investigating the role of fantasy in sexual homicide, however, is to understand the factors that contribute to the behavioral acting out of the fantasy: the most important predictive data in sexual homicide cases. Ressler et al. (1988) referred to stress factors (conflict with females, parental conflict, financial stress, marital problems, conflict with males, birth of a child, physical injury, legal problems, employment problems, and stress from a death); frame of mind (frustration, hostility and anger, agitation, and excitement); and planning (who, when, and where the sexual homicide will occur) as dominant antecedent behaviors. Their data, coupled with other research (MacCulloch et al., 1983), indicate that most sexual homicides are not impulsive, and instead, are quite opportunistic: the act is intentionally planned, or at least there is a "congruent mood" (Ressler et al., 1988, p. 48) that is open to the prospect of sexual killing.

Sexually violent fantasy likely forms a "primary drive mechanism" (Prentky et al., 1989) that is affected by, and also alters the perception and emotion of the sexual homicide perpetrator in the face of situational stress. Sexual fantasy is central to deviant sexual arousal as documented in numerous penile plethysmograph studies (Laws & O'Donohue, 1997). Yet, masturbation to a deviant sexual fantasy will decrease in intensity over time as the frequency of its use for sexual gratification increases. As the intensity decreases, the *response tendency* increases (Hull, 1952), a measure of the motivation to act on the environment. At some point in time, a threshold is passed where the response tendency exceeds the intensity of the rehearsal fantasy, and the likelihood of sexual violence substantially increases, only dependent on opportunity (Gacono & Meloy, 1994). If a sexual homicide is committed this mechanism would "reset," but the high arousal of the actual sexual violence would have less propensity to extinguish over time.

The assessment of sexually violent fantasy, however, is notoriously difficult, because it is often dependent upon clinical interview, and therefore the willingness of the subject to articulate his fantasies. The Wilson Sexual Fantasy Questionnaire is recommended by a number of experts in the field (O'Donohue, Letourneau, & Dowling, 1997). It has been my experience that sexually violent fantasies in sexual homicide cases are much more

---

[3] The case of the 15-year-old perpetrator mentioned earlier in this article is the first known successful prosecution of a sexual homicide in which the productions (drawings and narratives) of the defendant were utilized to show the structure of his pre-offense fantasies using the Hazelwood and Warren components (*People v. Timothy Masters*, 98 CR 1149, State of Colorado, Larimar County). The fantasies, in turn, were used to prove motive and intent.

likely to be articulated by the defendant after, rather than before, his criminal trial—not a surprising finding—but can be inferred pretrial by his productions, usually inanimate objects (dolls, clothing, photos, or videos), drawings, or narratives (Hazelwood & Warren, 1995). One 38-year-old man, convicted of both murder and sexual assault of a stranger adolescent girl, revealed the following sexually sadistic fantasy:

> I'd tie up her mother and other girls, kitchen chairs by the bed, gagged and blindfolded, I'd rape mom first. I'd tie the youngest daughter on top of mom, tied to mom's knees, fuck the little girl, play with the mother's tits, do all the girls, take the mother and strangle her, stack cords of wood, pile it up around them, start a fire, like a burial scene . . . enough anger in me to do it.

This perpetrator's misogynistic fury was beyond the pale. One of his most vivid memories as a young adolescent was sitting in the front seat of the family car at a drive-in while his mother had sex with her boyfriend in the back seat. His father would counsel him to "never trust anything that bleeds once a month and lives."

### Modus Operandi and Signature

Sexual homicides usually evidence a *modus operandi* and sometimes evidence a signature (Douglas & Munn, 1990). The modus operandi is typically dynamic (changeable) and serves the practical purposes of protecting the perpetrator's identity (e.g., using condoms during rape to contain DNA evidence); ensuring success (e.g., using a ruse that will accelerate movement of the victim to an isolated location); and facilitating escape (e.g., disposing of the body in a location separate from the kill site) (Hazelwood & Warren, 1995).

The signature is typically static (unchangeable) and infers the ritual or symbolic component of the sexual homicide that gratifies fantasy and remains psychosexually arousing (e.g., the perpetrator surgically removes a nipple from the victim following death). Keppel (1995) reported the use of signature to investigate and successfully link several sexual homicides.

One sexual homicide case from my files involved the death of a 14-year-old girl by a 13-year-old boy, and revealed that he had superficially carved onto her abdomen his highly stylized first initial after her death. The stylized initial was found inside one of his notebooks in his school locker, searched after his arrest. Unfortunately, there are no published reliability studies on the accurate identification of either signatures or modus operandi by forensic investigators.

### Adolescent Sexual Homicide

Adolescents appear to commit sexual homicide at approximately the same rate as adults (Myers, Burgess, & Nelson, 1998). They are usually diagnosed with conduct disorder as per *DSM-IV* and are likely to have a *history* of psychotic symptoms, most commonly paranoia (Myers & Blashfield, 1997). Personality traits within Cluster A (schizoid, paranoid, and schizotypal) are more likely than Cluster B (borderline, antisocial, narcissistic, and histrionic), perhaps accounting for the psychotic symptoms and the absence of a psychotic diagnosis at the time of evaluation. They also appear to be moderately psychopathic, and most report sexually violent fantasies preceding the crime (Myers & Blashfield, 1997; Myers, 1994). Although they are reared in chaotic family environments and are physically abused, most do not have a history of child sexual abuse.

Although the database on adolescent sexual homicides is very limited at present, the typical victim appears to be an acquaintance female of the same race who lives near the

perpetrator and is approximately 10 years his senior. She is vaginally assaulted, stabbed, and bludgeoned to death, and is usually attacked in her own home.

> The parents of a 15-year-old adolescent took a 24-year-old female boarder into their home. The youth found her sexually appealing, but she rebuffed him and accused him of stealing her marijuana. One evening, following her boyfriend's humiliating remarks, the youth went to the garage, picked up a hammer, and assaulted her in her bedroom. He then masturbated onto her thighs. He carried her to the backyard, buried her in a shallow grave, threw his clothes into the grave, and took a shower. The next day he confessed the crime to his mother after contemplating suicide with his stepfather's handgun.

### Sexual Homicide and Other Paraphilias

Consistent with the research on paraphilias in general—where there is one there are likely to be several others—sexual homicide perpetrators are often diagnosed with other paraphilias. Prentky et al. (1989) reported a substantial frequency of exhibitionism, voyeurism, fetishism, and transvestism in their small sample of sexual murderers, the latter two significantly more present among the serial sexual murderers. We reported a case of a psychotic sexual psychopath who had a foot fetish (Meloy & Gacono, 1992a) who attempted a sexual homicide. Dietz et al. (1990) reported a 20% rate of transvestism, voyeurism, exhibitionism, and telephone scatalogia in their sample of sexually sadistic criminals (subjects overlapped with the Prentky sample). Gratzer and Bradford (1995) reported an approximately 40% rate of transvestism, voyeurism, and exhibitionism in their sample of 28 sexually sadistic murderers. And Langevin et al. (1988) found a history of voyeurism (54%), exhibitionism (23%), frottage (31%), and transvestism (54%) in their small sample ($N = 13$) of "sex killers." Although these are all relatively small, nonrandom samples of convenience, it is clear that paraphilias occur at a substantially higher rate in this population than in the general population.

One of the more interesting psychodynamic links that I have found is the high frequency of genital and gender dysphoria in sexual homicide perpetrators, and psychoanalytic theory surrounding these dysphorias and their relationship to two paraphilias: fetishism and transvestism, respectively (Stoller, 1985). An important point of inquiry in any interview of a sexual homicide perpetrator is his feelings and attitudes surrounding his genitals and his masculinity. One sexual murderer that I evaluated at the age of 34, thirteen years after his killing, was still preoccupied with the fantasy that his penis was shrinking. He would regularly measure its girth. Wilson and Gosselin (1980) noted an association between gender dysphoria and sadism, and Snow and Bluestone (1969) described fetishism as a defense against the impulse to kill.

### Biological Anomalies

There is no evidence, as yet, of biological anomalies that predict sexual homicide. There are disparate findings that do suggest biological substrates that may contribute to sexually homicidal behavior. Hucker et al. (1988) found right temporal lobe abnormalities in a small sample of sexual sadists. Langevin et al. (1988) found abnormal computed tomography scans in 40% of their "sex killer" group and 60% of their "sex aggressors" (usually right temporal horn dilation), significantly more frequent ($p = .006$) than their comparison group of nonsexual killers; they also found a trend for the "sex killers" to have elevated testosterone levels. Gratzer and Bradford (1995) found "neurological abnormalities" in

12                                       *J. R. Meloy*

55% of their sample ($N = 28$) of sexual sadists. Money (1995) theorized a parallel between the attacks of serial lust murderers and psychomotor seizures in temporal lobe epilepsy.

In two important studies to date, Raine et al. (1994) found significantly lower glucose metabolism in both the lateral and medial prefrontal cortex in a sample of murderers ($N = 22$) when compared to age and gender matched controls ($N = 22$). They used positron emission tomography (PET) during a continuous performance task. These findings have recently been replicated in an expanded sample of 39 subjects, of whom 13 were sexual murderers (A. Raine, personal communication, November, 1996). They discussed their findings in the context of neurophysiological, neurobehavioral, personality, social, and cognitive aspects of violence.

In one other follow-up study, 41 murderers were divided into predatory ($n = 15$) and affective ($n = 9$) subgroups (Meloy, 1988). Glucose metabolism using PET indicated predatory murderers were more equivalent to controls than affective murderers, the latter showing lower left and right prefrontal functioning, higher right hemisphere subcortical functioning, and lower right hemisphere prefrontal/subcortical ratios. Serial sexual homicide was represented in the predatory subgroup, but not the affective subgroup (Raine et al., 1998). There are no published magnetic resonance imaging studies of sexual homicide perpetrators.

The most compelling biological data that may predispose an individual to sexual homicide is the fact that most individuals who commit such acts are either psychopaths or evidence psychopathic traits, character pathology that is biologically predisposed (Meloy, 1988). Elsewhere we have discussed the impact of psychopathy on the *arousal patterns* of sexual murderers, and have hypothesized a bimodal distribution among this group: those that are hyporeactive and chronically emotionally detached, and, therefore, in need of high levels of stimulation, perhaps sexualized; and those that are hyperaroused, affectionately hungry, and would need little kindling to be activated (Gacono & Meloy, 1994). Our empirical research, in fact, suggests that sexual homicide perpetrators bimodally distribute when their propensity for attachment is measured (Meloy et al., 1994). No research has been done on autonomic reactivity among sexual murderers.

Other lines of research support theories of chronic cortical underarousal among habitual criminals and lower circulating levels of serotonin metabolites (5-hydroxyindoleacetic acid) in the cerebrospinal fluid of various samples of violent individuals (Volavka, 1995). Focused research on sexual homicide perpetrators and these functional measures of biology has also not been done.

### Social Deviancies

There is no evidence, as yet, of social deviancies that predict sexual homicide. There is abundant evidence that sexual homicide perpetrators, like many other individuals who do not commit such acts, grow up in chaotic family environments and exhibit abnormal, usually antisocial behavior, in childhood and adolescence.

Ressler et al. (1988) were the first researchers to carefully study the social antecedents of sexual homicide. They found that a majority of perpetrators came from family backgrounds in which there was alcoholism, psychiatric illness, and criminality. A substantial minority also experienced physical abuse, sexual abuse, sexual violence, sexual injury and disease, and witnessed parental sex. These sociogenic factors (which may have hidden within them biogenic factors, e.g., chronic cortical underarousal as a predictor of habitual criminality) may contribute to the protean antisocial behavior in childhood and adolescence of the fledgling sexual homicide perpetrator (see Table 3).

*The Nature and Dynamics of Sexual Homicide* 13

**TABLE 3. Frequency of Reported Behaviors (>50%) of Sexual Homicide Perpetrators ($N = 28$)**

|  | Childhood (%) | Adolescence (%) |
|---|---|---|
| Isolation | 71 | 77 |
| Chronic lying | 71 | 75 |
| Enuresis | 68 | 60 |
| Rebelliousness | 67 | 84 |
| Nightmares | 67 | 68 |
| Destroying property | 58 | 62 |
| Firesetting | 56 | 52 |
| Stealing | 56 | 81 |
| Cruelty to children | 54 | 64 |

From *Sexual Homicide: Patterns and Motives*, by R. Ressler, A. Burgess, and J. Douglas, 1988, Lexington, MA: D. C. Heath.

Although these behaviors are quite similar to *DSM-IV* conduct disorder (CD) criteria, careful scrutiny reveals an oscillating pattern of social withdrawal into fantasy and aggression against objects in the environment. Early retreat into fantasy, which is eventually sexualized and laced with violence in puberty, may be a risk factor for eventual sexual violence in CD children.

Two cautions, however, are in order. First, Ressler et al. (1988) used no comparison group. Therefore, none of these variables may be *specific* to sexual homicide perpetration in adulthood. And there are no data, even if they are specific, which suggest they *predict* sexual homicide. Unfortunately, this methodological limitation was never mentioned in the study, and may lead the unsophisticated reader astray.

Second, even though social deviance is quite frequent in the early lives of sexual homicide perpetrators, most of their sample did not experience such deviance, an aspect of the data also ignored. This absence of socially deviant backgrounds is even more apparent when sexual sadism is isolated as a diagnosis. Dietz et al. (1990) found in a majority of their sexually sadistic criminals ($n = 30$) *no* evidence of parent infidelity or divorce, no incest of their own children, no physical or sexual abuse, no other paraphilias, no shared sex partners, and no history of suicide attempts. Gratzer and Bradford (1996) also found in a majority of their sexually sadistic murderers ($n = 28$) *no* evidence of incest of their own children, no physical or sexual abuse, no other paraphilias, no shared sex partners, and no history of suicide attempts. As I wrote, "the banality of their known histories was only surpassed by the extraordinary cruelty of their offenses" (Meloy, 1997, p. 632).

If there is one social factor that may be specific to sexual homicide, it is likely to be the classical pairing of sexual arousal and extreme violence toward women. In one case of a 14-year-old sexual homicide perpetrator, he watched sadomasochistic pornographic videos with his father from age 5 to 9. In another case of a 21-year-old sexual homicide perpetrator, his mother would soothe him as a child by stroking his penis after his father would physically assault him, homogenizing his feelings of fear, rage, and sexual arousal. In still another case, the mother would tease her 7-year-old son in public restaurants with her girlfriends by rubbing his penis inside his jeans with her foot until he became erect. In all these examples, the classical Pavlovian pairing of sexual arousal and aggression should be obvious: coercion or violence, rather than affection and love, become the conditioned stimuli for sexual arousal.

In all sexual homicide evaluations, a careful history of sexual arousal should be taken, including structured interviews such as the Clarke Sex History Questionnaire (Langevin, 1990). The examiner should search for such classical pairings, especially during latency age and postpubescence (6–14 years). Events that are repetitive and suffused with intense emotion (anger, fear, shame, excitement) are most likely to be conditioning. Attention should be directed not only toward the familial relationships, but also repetitive exposure to classical pairings of sex and violence in the popular culture (music, movies, video games, computer games, and magazines).

### Psychological Abnormalities

There are, as yet, no identified psychological factors that predict sexual homicide. Psychological aspects of sexual homicide, however, have been described for decades (Brittain, 1970; Revitch, 1965), and were usually based on the clinical-anecdotal experience of the writers.

The first attempt to organize psychological abnormalities in sexual homicide perpetration was done by Revitch and Schlesinger (1981), originating in the work of Revitch (1957, 1965, 1980). Building on their endogenous-exogenous motivational model of homicide, they identified nine risk factors for what they termed *compulsive murder* (cited in Litwack & Schlesinger, 1987):

1. A history of mistreatment of women or fantasies of assaulting women.
2. Breaking and entering committed alone and under bizarre circumstances.
3. Fetishism for female underclothing and destruction of female clothes.
4. Expression of hatred, contempt, or fear of women.
5. Dislike for cats or actual violence against cats or other animals.
6. Violent and primitive fantasy life.
7. Confusion of sexual identity on projective tests.
8. Sexual inhibitions and moral preoccupation with sexual conduct.
9. Feelings of isolation and poor reality testing.

Although these risk factors have never been subjected to any predictive tests, each item is a complex construction whose underlying empirical validity could be measured. For example, Revitch and Schlesinger (1981) believed, as I do, that many sexual homicides are displaced matricides, and items 1, 3, 4, and 7 speak to the evident maternal rage often seen in such violence. In two related empirical studies, in fact, sexual homicide perpetrators were found to commit their crimes against women who were, on average, 10 years older than they were (Grubin, 1994; Myers & Blashfield, 1997).

This maternal rage is likely a product of a lack of differentiation from the mother when the perpetrator was a boy. Many social factors could contribute to this, including aggression, dominance, control, manipulation, or sexualization by the mother; these are often coupled with the absence, either physical or emotional, of a masculine figure, usually the father. Continuous hostility toward women, particularly as emotional and physical intimacy *increases*, has been shown to play a role in certain domestically violent men (Dutton, 1995). In extreme cases, the continuous attempt to disidentify with the mother (Greenson, 1968), felt as mistrust and rage toward the solicitous adult female, and the concomitant symbiotic anxiety (Stoller, 1974) necessary for masculine identification, felt as inadequacy and fear of engulfment by the adult woman, may result in a catathymic sexual homicide. What should have been normatively accomplished as an angry and rebellious male toddler is explosively recapitulated by a homicidal and sexually aroused

adult male, narcissistically sensitive to the victim's *perceived* sexual overtures, rejections, and omnipotent control.

The most detailed motivational model of sexual homicide was developed by Burgess, Ressler, Douglas, and McCormack (1986) and elaborated upon in Ressler et al. (1988):

**1. Ineffective Social Environment.** Parents of sexual homicide perpetrators do not nurture, protect, and consistently discipline. Attachment is likely to be pathological, or abnormal, a finding apparent in other research on the relationship between bonding and violence (Meloy, 1992). Chronic emotional detachment is expected in primary psychopathy, which, as noted earlier, we have found in two thirds of our sexual homicide perpetrator sample ($N = 38$).

**2. Formative Traumatic Events.** The child is likely to experience physical or sexual assault, creating a trauma response (van der Kolk, 1987), which is often biphasic, alternating between hyperarousal and intrusive thoughts, and emotional numbing or constriction. This may lead to an addiction to trauma. Real helplessness may psychologically stimulate compensatory and grandiose fantasies to reassert against internalized objects a sense of dominance and control (Gacono, 1992; MacCulloch et al., 1983). At a biological level, inescapable stress lowers catecholamine levels in the central nervous system, leaving receptors hypersensitive to subsequent stimulation. This can, in turn, create a kindling effect (Goddard, McIntyre, & Leech, 1969) or behavioral sensitization. Opioid-induced analgesia, moreover, immediately follows various stressors that are intense, inescapable, and consciously perceived (van der Kolk, 1987). We theorized (Gacono & Meloy, 1994) that the traumatic pairing of sexual arousal and violence in the childhood of the sexual homicide perpetrator could predispose him to act on the environment as an adult to both master trauma and evoke this endogenous opioid response, felt most intensely immediately following the sexual homicide.

**3. Patterned Responses: Personality.** Table 3 outlined the behavioral and personality traits that often first appear in sexual homicide perpetrators during childhood. Relationships are primarily fantasy-based, which provides both emotional stimulation and narcissistic gratification (entitlement and grandiosity), often in the face of a depleted and barren reality. The characteristics noted by Burgess et al. (1986) parallel nicely the two factor model of psychopathy proposed by Hare (1991): callous and remorseless disregard of others and chronic antisocial behavior.

**4. Patterned Responses: Cognitions.** Conscious cognitive processes have received extensive attention as a focus for treatment of sexual offenders in general (Laws & O'Donohue, 1997). Ressler et al. (1988) emphasized the fixed, negative, and repetitive organization of thought in the sexual homicide perpetrator, motivated by a desire to control and dominate others. The complexity of cognitions, and derivative fantasies, are likely to be greater in compulsive (organized) than in catathymic (disorganized) sexual homicides. In one case in which I consulted, a sexual sadist tortured and killed six young men over the course of 3 years. His seventh victim escaped after 4 days in captivity, which eventually led to the perpetrator's apprehension. This is a portion of his testimony as he recounted his restraint, torture with disinfectants and electricity, and sexual assault:

Q. Now during this time that you were a captive, tell us in your words what seemed to you, from your perspective, he was wanting most or enjoying most about his experience?
A. Seemed to be enjoying the fact that I was powerless and that he had control totally.

16                                           J. R. Meloy

### TABLE 4. A Clinical Typology of Sexual Homicide Perpetrators

|                          | Compulsive          | Catathymic              |
| ------------------------ | ------------------- | ----------------------- |
| Nature of sexual homicide | Organized          | Disorganized            |
| Axis I diagnosis         | Sexual sadism       | Mood disorder           |
| Axis II diagnosis        | ASPD/NPD            | Various traits and PDs  |
| Psychopathy              | Severe (primary)    | Mild–moderate           |
| Attachment pathology     | Chronically detached | Attachment hunger       |
| ANS                      | Hyporeactive        | Hyperreactive           |
| Early trauma             | Often absent        | Often present           |

ASPD = antisocial personality disorder; NPD = narcissistic personality disorder; PD = personality disorder; ANS = Autonomic Nervous System.

> Q. Anything else that he seemed to be really interested in with you?
> A. The sex. It was nonnegotiable. (Gacono & Meloy, 1994, p. 283)

**5. Patterned Responses: Arousal.**  Ressler et al. (1988) hypothesized both hyperarousal, consistent with early trauma, and hypoarousal, consistent with psychopathy, in sexual murderers.

These hypotheses are contradictory, unless one assumes, as I do, that sexual homicide perpetrators may bimodally distribute: most are autonomically hyporeactive, the quintessential sensation-seeker, and some are hyperaroused, damaged products of early and extreme physical and sexual trauma. As mentioned earlier, our data do support such a distribution when pathological attachment is measured (although we have no direct measure of physiological differences in subgroups of sexual homicide perpetrators). Approximately two thirds of our sexual homicide sample ($N = 38$) are psychopaths, suggesting autonomic hyporeactivity and chronic emotional detachment; while the remaining one third are not psychopaths and are affectionally hungry for an attachment (Gacono et al., in press). Further research into this promising hypothesis is necessary. Characteristics of the two subgroups I am postulating are indicated in Table 4.

**6. Antisocial Acts.**  Childhood and adolescent antisocial behavior are likely and appear to represent a displacement of aggression from the parents (both mother and father) onto other children, animals, and property (see Table 3). Such behavior is sexualized during puberty, and its intermittent reinforcement predicts its continuation and escalation into adulthood, especially if the child is chronically cortically underaroused (Raine, 1993). Ressler et al. (1988) noted that such behavior also discourages friendship, and, therefore, facilitates isolation and a dependence on fantasy for gratification. A *subterranean* fantasy life may also develop, imbued with both sexual and violent themes, that is never articulated, but is reinforced through masturbation. Figure 1 is the drawing of a 13-year-old developing sexual sadist who committed a sexual homicide of a 14-year-old female friend. He stabbed her 74 times, including her eyes, and had a long history of preoccupation with and collection of knives. He said to me during the evaluation, "It has always been clear to me that one day I would kill somebody." When I asked him if he would do so again, he said, "for my defense I should say 'no', but I'm not sure." He recounted during the murder, "one side of me was animal, one was calculating where to attack." These subterranean fantasies are often evident *after* the sexual homicide in the narrative or drawing products of the perpetrator seized by law enforcement.



**FIGURE 1.  Drawing by a 13-year-old developing sexual sadist who committed a sexual homicide of a 14-year-old female.**

***7. Feedback Filter (Learning).***  Practice makes perfect; or in these cases, practice makes the crime more closely fit the perfect fantasy. The sexual homicide perpetrator, especially if he is compulsive, organized, and brighter than average, will learn from his mistakes and improve his abduction, sexual assault, killing, and disposing behaviors. Recording of the crime (video, audio, or writing), found in a majority of the Dietz et al. (1990) sample of sexual sadists (53%), can also be used to refine technique. Like psychopaths in general, sexual homicide perpetrators do learn; they just do not learn what we want them to.

   This motivational model of sexual homicide (Ressler et al., 1988) is quite useful for heuristic purposes, although it is quite limited as a scientific study. Despite the psychological focus of the research, there were no standardized psychological tests administered to

18                                   *J. R. Meloy*



**FIGURE 2. Psychodynamics of sexual homicide perpetrators (N = 38) based upon Rorschach data.**

any of the subjects; and, as I noted above, there was no comparison group so we do not know if their motivational model is specific to sexual homicide. It is more likely a generic model that applies to many different kinds of serial sexual aggressors.

Our work has focused on understanding the phenomenology of sexual homicide from a psychological perspective, utilizing the Rorschach test to measure the internal operations (psychodynamics) of sexual homicide perpetrators (Gacono, 1992; Gacono & Meloy, 1988; Gacono et al., in press; Meloy, 1988; Meloy & Gacono, 1992a; Meloy et al., 1994). Figure 2 outlines the measurable characteristics of a sample of sexual homicide perpetrators (*N* = 38) based upon an analysis and interpretation of various Rorschach indices. In our first Rorschach study (Gacono & Meloy, 1994; Meloy et al., 1994), we compared a sample of sexual homicide perpetrators to a comparison group of nonsexually offending psychopaths to measure ways in which they were similar and different. We have recently compared our expanded sample of sexual homicide perpetrators to a larger sample of psychopaths and a third sample of pedophiles to measure the specificity of differences across the three groups (Gacono et al., in press).

Our findings to date indicate that sexual homicide perpetrators exhibit abnormal personality structure when Rorschach indices are used to measure affects, cognitions, self-perception, and object relations. Moving clockwise around Figure 2, sexual homicide perpetrators are chronically angry, much like psychopaths, and are also pathologically narcissistic. This second characteristic, or psychodynamic, is often evident in their sense of entitlement—a belief that they are owed whatever they want—and their grandiosity—a belief that they are a legend in their own mind. The third characteristic is an abnormal bonding pattern that I have already discussed, most commonly the chronic emotional detachment that is also evident in psychopaths. The real world correlate of this third psychodynamic is the absence of a history of stable, positive, and secure attachments; instead, there is likely to be a history of neglectful or cruel parenting as a child, and chaotic, superficially imitative, or absent relationships as an adult.

Moving further clockwise, the sexual homicide perpetrator evidences impaired reality testing, usually at a borderline level. This psychodynamic, quantitatively measured with

the Rorschach X−%, indicates that the sexual homicide perpetrator will confuse the origin and meaning of perceptual stimuli. For example, he might misconstrue friendly behavior by a woman as a sexual invitation; or rejection by a woman as intentional sexual humiliation. Most disturbingly, he might projectively identify his own rage toward women into the woman he is with, and believe that *she* is raging at him, and must be controlled or dominated at all costs.

The fifth psychodynamic is formal thought disorder. The sexual homicide perpetrator will not organize his thinking in a logical or sequential manner, which can further contribute to his emotional dysregulation. For example, if he is genitally dysphoric, he might perceive with his impaired reality testing that when a woman glances at his waist, she is scrutinizing the size of his penis. He may then illogically conclude that all women are scrutinizing the size of his penis when they glance at him, and believe, as he does, that it is too small. This may anger him, and further isolate him from normative social contact with women. On the other hand, after viewing violent pornography as an adolescent, and having witnessed his father rape his mother as a child, he may conclude that all women want *forced sex.* If violence has become a conditioned stimulus for his own sexual arousal, he may find that when a woman resists his sexual advances, he becomes more excited and more erect.

These five characteristics, or psychodynamics, could coalesce in certain situations where physiological sexual arousal is anticipated or unexpected. They embrace certain components of affect, character, perception, and cognition, and establish psychological operations that could predispose a sexual homicide.

Our Rorschach research also identified another characteristic of sexual homicide perpetrators that we did not expect: evidence of an inordinate amount of nonvolitional ideation, or obsessions. This is measured using the feral movement (FM) response. Our sample of sexual homicide perpetrators are significantly more obsessional than psychopathic and normal males, a finding that empirically supports the repetitive clinical observation of obsessive-compulsion in sexual murderers (Brittain, 1970; Revitch & Schlesinger, 1981), especially those that commit serial sexual killing.

## SUMMARY AND CONCLUSIONS

This review has focused on the definitions, epidemiology, evolving research, and offender characteristics of sexual homicide, a rare but very disturbing form of intentional killing. Although the extant research has its limitations—very few comparative studies, repetitive use of small, nonrandom samples, retrospective data, virtually no biopsychosocial studies, and the absence of more sophisticated statistical analyses—the yield in review is impressive. It is unlikely, however, that, given the low base rate for this form of homicide, it will ever be able to be predicted; but with current understanding, and future research, the risk management of such individuals should greatly improve. As Robert Brittain wrote nearly 30 years ago, "we cannot treat, except empirically, what we do not understand and we cannot prevent, except fortuitously, what we do not comprehend" (Brittain, 1970, p. 206).

*Acknowledgment*—This study was supported by Forensis, Inc. with a grant from the Susan Stein Shiva Foundation.

## REFERENCES

American Psychiatric Association. (1994). *Diagnostic and statistical manual of mental disorders* (4th ed.). Washington, DC: Author.

Brittain, R. (1970). The sadistic murderer. *Medicine, Science and the Law, 10*, 198–207.

Burgess, A., Hartman, C., Ressler, R., Douglas, J., & McCormack, A. (1986). Sexual homicide: A motivational model. *Journal of Interpersonal Violence, 1*, 251–272.

De River, P. (1949). *The sexual criminal.* Springfield, IL: Charles C Thomas.

Dietz, P., Hazelwood, R., & Warren, J. (1990). The sexually sadistic criminal and his offenses. *Bulletin of the American Academy of Psychiatry and the Law, 18*, 163–178.

Douglas, J., Burgess, A., Burgess A., & Ressler, R. (1992). *Crime classification manual.* New York: Lexington Books.

Douglas, J., & Munn, C. (1990). Violent crime scene analysis: Modus operandi, signature and staging. *FBI Law Enforcement Bulletin, 1*, 61.

Dutton, D. (1995). *The domestic assault of women.* Vancouver: University of British Columbia Press.

Eliot, T. S. (1963). *Collected poems, 1909–1935.* New York: Harcourt Brace.

Exner, J. (1993). *The Rorschach: A comprehensive system. Vol. 1: Basic foundations* (3rd ed.). New York: John Wiley.

Federal Bureau of Investigation. (1996). *Uniform crime reports.* Washington, DC: Department of Justice.

Fenichel, O. (1945). *Psychoanalytic theory of neurosis.* New York: Norton.

Frank, G. (1966). *The Boston strangler.* New York: New American Library.

Freud, S. (1905/1953). Three essays on the theory of sexuality. *Standard Edition, 7,* 124–245. London: Hogarth Press.

Gacono, C. B. (1992). A Rorschach case study of sexual homicide. *British Journal of Projective Psychology, 37,* 1–21.

Gacono, C. B., & Meloy, J. R. (1994). *The Rorschach assessment of aggressive and psychopathic personalities.* Hillsdale, NJ: Lawrence Erlbaum.

Gacono, C. B., Meloy, J. R., & Bridges, M. (in press). A Rorschach investigation of psychopaths, sexual murderers, and pedophiles. *Journal of Clinical Psychology.*

Geberth, V. J., & Turco, R. N. (1997). Antisocial personality disorder, sexual sadism, malignant narcissism, and serial murder. *Journal of Forensic Sciences, 42*, 49–60.

Gebhard, P., Gagnon, J., Pomeroy, W., & Christenson, C. (1965). *Sex offenders: An analysis of types.* New York: Harper and Row.

Goddard, C., McIntyre, D., & Leech, C. (1969). A permanent change in brain functioning resulting from daily electrical stimulation. *Experimental Neurology, 25*, 295–330.

Gratzer, T., & Bradford, J. (1995). Offender and offense characteristics of sexual sadists: a comparative study. *Journal of Forensic Sciences, 40*, 450–455.

Greenson, R. (1968). Dis-identifying from mother. *International Journal of Psychoanalysis, 49*, 370–374.

Groth, N. (1979). *Men who rape: The psychology of the offender.* New York: Plenum Press.

Grubin, D. (1994). Sexual murder. *British Journal of Psychiatry, 165*, 624–629.

Guttmacher, M. S. (1951). *Sex offenses—The problem, causes, and prevention.* New York: Norton.

Hare, R. D. (1991). *Manual for the Psychopathy Checklist-Revised.* Toronto: Multi-Health Systems.

Hart, S., Forth, A., & Hare, R. (1991). The MCMI-II as a measure of psychopathy. *Journal of Personality Disorders, 5*, 318–327.

Hazelwood, R., & Warren, J. (1995). The relevance of fantasy in serial sexual crime investigation. In R. Hazelwood & A. Burgess (Eds.), *Practical aspects of rape investigation* (2nd ed., pp. 127–138). New York: CRC Press.

Hazelwood, R., Warren, J., & Dietz, P. (1993). Compliant victims of the sexual sadist. *Australian Family Physician, 22*, 474–479.

Henderson, D. K. (1939). *Psychopathic states.* New York: Norton.

Hickey, E. (1991). *Serial murderers and their victims.* Pacific Grove, CA: Brooks/Cole.

Hirschfeld, M. (1944). *Sexual anomalies.* London: Francis Aldor Publishing.

Holmes, R., & DeBurger, J. (1988). *Serial murder.* Newbury Park, CA: Sage.

Holt, S., Meloy, J. R., & Strack, S. (1999). Sadism and psychopathy in violent and sexually violent offenders. *Journal of American Academy of Psychiatry and the Law, 27*, 23–32.

Hucker, S., Langevin, R., Dickey, R., Handy, L., Chambers, J., & Wright, S. (1988). Cerebral damage and dysfunction in sexually aggressive men. *Annals of Sex Research, 1*, 33–47.

Hull, C. (1952). *A behavior system.* New Haven, CT: Yale University Press.

Karpman, B. (1954). *The sexual offender and his offenses.* New York: Julian Press.

Keppel, R. (1995). Signature murders: A report of several related cases. *Journal of Forensic Sciences, 40*, 670–674.

Kernberg, O. (1984). *Severe personality disorders.* New Haven, CT: Yale University Press.

Langevin, R. (1990). *Clarke Sex History Questionnaire for Males.* Oakville, ONT: Juniper Press.

Langevin, R., Ben-Aron, M., Wright, P., Marchese, V., & Handy, L. (1988). The sex killer. *Annals of Sex Research, 1*, 263–301.

Laws, D. R., & O'Donohue, W. (Eds.). (1997). *Sexual deviance.* New York: Guilford Press.

Leyton, E. (1986). *Compulsive killers: The story of modern multiple murder.* New York: New York University Press.

Litwack, T., & Schlesinger, L. (1987). Assessing and predicting violence: Research, law, and applications. In I. Weiner & A. Hess (Eds.), *Handbook of forensic psychology* (pp. 205–257). New York: John Wiley.

Lunde, D., & Morgan, J. (1980). *The die song.* New York: Norton.

MacCulloch, M., Snowden, P., Wood, P., & Mills, H. (1983). Sadistic fantasy, sadistic behavior and offending. *British Journal of Psychiatry, 143*, 20–29.

Macdonald, J. (1961). *The murderer and his victim.* Springfield, IL: Charles C Thomas.

Meloy, J. R. (1988). *The psychopathic mind: Origins, dynamics and treatment.* Northvale, NJ: Jason Aronson.

Meloy, J. R. (1992). *Violent attachments.* Northvale, NJ: Jason Aronson.

Meloy, J. R. (1996). Pseudonecrophilia following spousal homicide. *Journal of Forensic Sciences, 41*, 706–708.

Meloy, J. R. (1997). The psychology of wickedness: Psychopathy and sadism. *Psychiatric Annals, 27*, 630–633.

Meloy, J. R., Acklin, M., Gacono, C. B., Murray, J., & Peterson, C. (1997). *Contemporary Rorschach interpretation.* Mahwah, NJ: Lawrence Erlbaum.

Meloy, J. R., & Gacono, C. B. (1992a). A psychotic (sexual) psychopath: "I just had a violent thought . . ." *Journal of Personality Assessment, 58*, 480–493.

Meloy, J. R., & Gacono, C. B. (1992b). The aggression response and the Rorschach. *Journal of Clinical Psychology, 48*, 104–114.

Meloy, J. R., Gacono, C. B., & Kenney, L. (1994). A Rorschach investigation of sexual homicide. *Journal of Personality Assessment, 62*, 58–67.

Michaud, S., & Ainesworth, H. (1983). *The only living witness.* New York: New American Library.

Money, J. (1986). *Lovemaps.* New York: Irvington.

Money, J. (1995). Forensic sexology: Paraphilic serial rape (biastophilia) and lust murder (erotophonophilia). *Acta Sexologica, 1*, 47–62.

Myers, W. (1994). Sexual homicide by adolescents. *Journal of the American Academy of Child and Adolescent Psychiatry, 33*, 962–969.

Myers, W., & Blashfield, R. (1997). Psychopathology and personality in juvenile sexual homicide offenders. *Journal of the American Academy of Psychiatry and the Law, 25*, 497–508.

Myers, W., Burgess, A., & Nelson, J. (1998). Criminal and behavioral aspects of juvenile sexual homicide. *Journal of Forensic Sciences, 43*, 340–347.

O'Donohue, W., Letourneau, E., & Dowling, H. (1997). Development and preliminary validation of a paraphilic sexual fantasy questionnaire. *Sexual Abuse: A Journal of Research and Treatment, 9*, 167–178.

Prentky, R., Burgess, A., Rokous, F., Lee, A., Hartman, C., Ressler, R., & Douglas, J. (1989). The presumptive role of fantasy in serial sexual homicide. *American Journal of Psychiatry, 146*, 887–891.

Raine, A. (1993). *The psychopathology of crime.* San Diego: Academic Press.

Raine, A., Buchsbaum, M., Stanley, J., Lottenberg, S., Abel, L., & Stoddard, J. (1994). Selective reductions in prefrontal glucose metabolism in murderers. *Biological Psychiatry, 36*, 365–373.

Raine, A., Meloy, J. R., Bihrie, S., Stoddard, J., LaCasse, L., & Buchsbaum, M. (1998). Reduced prefrontal and increased subcortical brain functioning assessed during positron emission tomography in predatory and affective murderers. *Behavioral Sciences and the Law, 16*, 319–332.

Reinhardt, R. (1957). Sex perversion and sex crimes: A psychocultural examination of the causes, nature and criminal manifestations of sex perversions. *Police Science Series.* Springfield, IL: Charles C Thomas.

Ressler, R., Burgess, A., & Douglas, J. (1988). *Sexual homicide: Patterns and motives.* Lexington, MA: D. C. Heath.

Revitch, E. (1957). Sex murder and sex aggression. *Journal of the Medical Society of New Jersey, 54*, 519–524.

Revitch, E. (1965). Sex murder and the potential sex murderer. *Diseases of the Nervous System, 26*, 640–648.

Revitch, E. (1980). Gynocide and unprovoked attacks on women. *Journal of Correctional and Social Psychiatry, 26*, 6–11.

Revitch, E., & Schlesinger, L. (1981). *The psychopathology of homicide.* Springfield, IL: Charles C Thomas.

Schlesinger, L. (1996). The catathymic crisis, 1912–present: A review and clinical study. *Aggression and Violent Behavior, 1*, 307–316.

Schlesinger, L., & Revitch, E. (Eds). (1997). *Sexual dynamics of anti-social behavior* (2nd ed.). Springfield, IL: Charles C Thomas.

Snow, E., & Bluestone, M. (1969). Fetishism and murder. In J. Masserman (Ed.), *Dynamics of deviant sexuality* (pp. 88–100). New York: Grune and Stratton.

Stekel, W. (1929). *Sadism and masochism: The psychology of hatred and cruelty.* Translated by L. Brink. New York: Horace Liveright.

Stoller, R. (1974). Symbiosis anxiety and the development of masculinity. *Archives of General Psychiatry, 30*, 164–172.

Stoller, R. (1985). *Presentations of gender.* New Haven, CT: Yale University Press.

Stone, M. H. (1994). Early traumatic factors in the lives of serial murderers. *American Journal of Forensic Psychiatry, 15*, 5–26.

van der Kolk, B. (1987). *Psychological trauma.* Washington, DC: American Psychiatric Press.

Volavka, J. (1995). *Neurobiology of violence.* Washington, DC: American Psychiatric Press.

von Krafft-Ebing, R. (1886/1965). *Psychopathia sexualis: A medico-forensic study.* New York: G.P. Putnam's Sons.

*J. R. Meloy*

Warren, J., Hazelwood, R., & Dietz, P. (1996). The sexually sadistic serial killer. *Journal of Forensic Sciences,
41*, 970–974.
Wertham, F. (1937). The catathymic crisis: A clinical entity. *Archives of Neurology and Psychiatry, 2*, 669–678.
Wilson, G. D., & Gosselin, C. (1980). Personality characteristics of fetishists, transvestites and sadomasochists.
*Personality and Individual Differences, 1*, 289–295.



Helen Davis, Denver Post

# The Precarious Use Of Forensic Psychology As Evidence: The Timothy Masters Case

*There have been incidences where juries relied on my opinion and in the aftermath, those [opinions] were not supported by evidence.*[1]

Forensic Psychologist Dr. Reid Meloy

**W**ith the assistance of his post-conviction attorneys David Wymore and Maria Liu, Timothy Masters was successful in getting all homicide charges against him dropped after he spent over nine years in a Colorado prison for the murder of Peggy Hettrick. While his conviction was based in large part on faulty forensic psychological testimony introduced at trial, his freedom resulted from the prosecution's review of new DNA evidence pointing to other

*Timothy Masters waves as he leaves the courthouse in January 2008 after his conviction was overturned.*

suspects. The Masters case can be characterized as a series of disasters, beginning with a homicide detective who contacted internationally renowned forensic psychologist Dr. Reid Meloy to help him construct an arrest warrant based on Meloy's opinion that drawings by Masters reflected his motive to kill Hettrick.

The series of disasters ended with a conviction that was upheld by the Colorado Supreme Court; the opinion ignored the fundamental principles of *Daubert*. Absent Meloy's testimony, Masters was convicted without a shred of direct, physical, or circumstantial evidence. This article offers an analysis of the series of events that occurred when a forensic psychologist developed a psychological profile of a killer by interpreting the narratives and drawings made by Masters to conclude that they reflected his fantasy and ultimately his motive to commit sexual murder.

In the past decade, defense attorneys have had the opportunity to observe how forensic sciences have assisted defendants in proving their innocence, especially in the area of DNA analysis and the Innocence Project. Furthermore, false confessions are a reality in the criminal justice system. Dr. Richard Leo has written extensively on the problem of false confessions and has proven through actual cases that the problem is real and should not be ignored, even though there are jurisdictions that do not recognize false confessions as a viable defense argument. What these different disciplines in the forensic or social sciences have in common is reliable and verifiable data to support their opinions to exonerate defendants.

However, one case that appears to defy logic is the Timothy Masters case — a case that sheds light on the problems of introducing unsupported forensic psy-

**BY FRANK S. PERRI AND TERRANCE G. LICHTENWALD**

chological testimony at trial. The Masters case, in which the authors had no involvement, represents a tremendous opportunity for defense counsel to understand the pitfalls of a system that still does not understand how to fairly apply *Daubert.* Defense attorneys should strive to understand basic behavioral science terminology so that they are equipped to challenge prosecutorial introduction of faulty forensic psychological testimony of witnesses who desire to profess their expertise on subjects that are not supported by research and data. Research shows that judges still do not understand how to apply the underlying *Daubert* criteria to forensic science issues and, in this case, to forensic psychological testimony. The burden will be on defense counsel to educate judges — the gatekeepers of evidence — to shed light on the prejudicial impact of faulty forensic psychological testimony.

## Sexual Homicide Investigation

In 1987, Timothy Masters was a 15-year-old high school sophomore living with his father in Fort Collins, Colo., a university town on the plains east of the Rocky Mountains. On Feb. 11, 1987, not far from his residence, the body of Peggy Hettrick lay in a field where she was murdered, with mutilations to her private areas. According to law enforcement, Timothy Masters was an early suspect because he saw the body on the way to school but failed to report it. While at school, Masters told detectives that he had seen Hettrick's body, but assumed it was a mannequin put in the field by friends trying to trick him. Indeed, even the bicyclist who reported the body told police that he too thought it was a mannequin. Without consulting an attorney, Masters and his dad did exactly what police asked; they allowed detectives to search their home and Masters' school locker. The police scooped up his writings, sketches, and his survival-knife collection.

After reading Masters his *Miranda* rights, officers prodded him to talk about killing, to think like a killer, and to talk about what weapons he might use and where he might put a body. Yet, Masters did not confess. By the sixth hour, it was detective James Broderick's turn, telling him to come clean about how he fulfilled a fantasy by killing Hettrick: "Why can't you just say it? Why is it so hard for you to tell me? You got to admit it when it's over. People

get killed in battle, right? Their friends die! A piece in you just died just a minute ago. It's over. You're not free anymore."[2] Masters was interrogated for more than 10 hours without a lawyer and according to Broderick, Masters failed a lie detector test, but the official reports of the test results are lost.[3] At age 15, Timothy Masters was not arrested and after high school he joined the Navy.

However, a decade later the detectives found in his bedroom what would become the most prejudicial of the prosecution's evidence when Masters was put on trial for Hettrick's murder: hundreds of extremely violent drawings and stories. Many of the pictures showed stabbings with knives and swords, and much of the violence was directed at women. While Masters' volume of drawings raised questions and suspicions, they did not trigger his arrest because the bedroom and its contents were equally notable for what officers did not find. Officers found no blood and no body parts anywhere in the house. There was no fiber, hair, skin, fingerprints or other physical evidence that linked Masters to Hettrick or any eyewitness. The survival knives were tested at the Colorado Bureau of Investigation and found to have no trace of the victim's blood or DNA. Police seized additional sets of drawings and writings in 1998 when Masters was arrested. In total, police seized approximately 2,200 pages of material produced by Masters; over 1,000 of these were admitted at trial.

In 1992, detective Linda Wheeler-Holloway thought she had a break when one of Masters' friends said Masters had told him Hettrick's nipple was missing. "That's it. That's holdback information that only the cops knew."[4] During the time he was in the Navy, Wheeler-Holloway and Detective Broderick interviewed Masters for two days in what was called a "tag-team" interrogation. Masters had known about the nipple, but a girl in his art class had told him about it.[5] The detectives checked out the story and it turned out to be true. He also indicated his stories and drawings stemmed from his ambition to write horror stories like Stephen King, which was the same answer he gave when he was 15. The interviews were witnessed by members of Naval Intelligence and the Federal Bureau of Investigation. "You sure you got the right guy?" a naval intelligence officer asked Wheeler-Holloway. "I don't know," she replied.[6]

According to court records, Wheeler-Holloway later wrote in a police report: "The FBI agents here believe Tim Masters is innocent and so do I."[7]

Other detectives, such as Troy Krenning, stated, "My perspective was to get off Masters and let's take a look at maybe someone else. … We seem to be focused on one."[8] Krenning recalls that when he kept pressing his colleagues for evidence proving that Masters was a legitimate suspect, his colleagues would challenge his position by stating, "Prove that Masters did not commit the crime."[9] Yet, Detective Broderick was not satisfied with the belief Masters was innocent. He believed Masters' artwork and stories fit the axiom that sexual homicide suspects generally fantasize about what they are going to do before they do it. In essence, the "fantasy's a template for the murder they actually commit."[10]

## Undisclosed Evidence

When the case went to trial in 1999, the prosecution withheld exculpatory evidence from the defense team. This evidence could have been used to show Masters was not the culprit. For example, prosecutors never told defense attorneys that police initially considered eye surgeon Dr. Richard Hammond as, at the very least, a "person of interest" in 1987 because he lived near Masters and the Hettrick body could be seen from his home.[11] In 1995, police confiscated more than 300 homemade videos and over $10,000 worth of pornography when a house sitter found a hidden camera positioned in Hammond's bathroom — where women's private areas were videotaped.[12]

This does not mean Hammond was the culprit, but that he was purposely overlooked by the prosecution. Prosecutor Jolene Blair argued, "Who else could it possibly be? Nobody else had a motive, nobody else had the opportunity, nobody else had the weapon."[13] Blair said it was not merely the fact that Masters had these drawings, but the number the police found. "What we needed to do is demonstrate that this wasn't just a passing fancy of this kid, this was complete obsession with death, specifically the death of a woman, and try to draw parallels between the drawings and our crime scene."[14] Blair said the issue was "fantasy that becomes obsessive."[15]

Defense attorneys argued that Hammond was never really investigated

THE PRECARIOUS USE OF FORENSIC PSYCHOLOGY

because he was a social acquaintance of lead prosecutor Terry Gilmore. Prosecutor Gilmore initially denied being a social acquaintance of Dr. Hammond and spending time at his home, but later indicated that he did socialize with Dr. Hammond.[16] Prosecutor Gilmore stated, "I had absolutely no reason to believe he [Hammond] was involved in any way with Peggy Hettrick's murder. … It just never occurred to us."[17] According to Blair, "Dr. Hammond wasn't even a blip on the screen. … No one thought of him, no one talked of him. … The crimes that he apparently perpetrated are so much different than the Peggy Hettrick homicide."[18] However, Officer Jack Taylor disputed Blair's comments, indicating it was common knowledge that Hammond was a possible suspect.[19]

## Dr. Meloy did not interview Timothy Masters, and thus he relied on speculation as to what the drawings signified.

Broderick stated there was no reason to investigate Hammond for Hettrick's murder: "Where's the violence? Show me that pattern of violence. … We searched [Hammond's] entire house, and there was nothing to link him to Hettrick's murder."[20] The special prosecutor reviewing the case indicated that there was no evidence tying Dr. Hammond to the murder because there was no evidence of blood, blood splatter, DNA, fingerprints, hair fibers, or persons to whom Hammond confessed the crime.[21] Who destroyed Hammond's videotapes and why? "I had a lot to do with that," Broderick said. "It was an ethical decision. Should we revictimize all these women by telling them they are victims? So it really was an effort to protect them, to preserve these victims' rights."[22] In August 1995, investigators slated for destruction every piece of evidence they seized from Hammond. The seized evidence burned for approximately 8 1/2 hours, according to a report by Officer Sanchez.[23] Detective Krenning stated, "I can't recall one other case where the evidence was taken to a landfill, mashed up with a grater, and then burned."[24] Nine weeks after Hammond's possessions were destroyed, Broderick phoned forensic psychologist Dr. Reid Meloy to have him study Masters' artwork.[25]

In addition, plastic surgeon Christopher Tsoi revealed that he told police investigator Marsha Reed in early 1998 he believed the genital wounds reflected the proficiency of a surgeon.[26] Though police released a report showing Reed set up an appointment with Tsoi, no report detailing their conversation has ever been released.[27] Moreover, during the Peggy Hettrick autopsy, medical examiner Dr. Allen remarked, "A doctor could have done this."[28] In 21 years of performing autopsies, Allen told colleagues, he had never seen wounds like these.[29] Dr. Warren James, a prominent Fort Collins Ob-Gyn, stated, "I find it highly unlikely that any 15-year-old could perform this precise surgical procedure given the advanced anatomical knowledge required and the skill necessary to excise the skin tissue … as most surgeons cannot perform this procedure."[30]

A defense expert identified at least a dozen tracks running alongside the blood drag-trail leading to Hettrick's body as prints from Thom McAn shoes, a brand not worn by Masters. Yet Broderick's testimony at trial alluded to only one Thom McAn print and discounted the chance it was tied to the killing.[31] Moreover, Masters' new defense counsel discovered that the FBI had made high-quality casts of footprints in a drag-trail leading to the spot where Hettrick's body was found. The prints did not belong to Masters, nor was the defense notified of the FBI results.[32]

The crux of Masters' position during the post-conviction process was that Detective Broderick and Prosecutors Gilmore and Blair withheld information from the defense lawyers that could have been used to contradict their case that Masters was a killer. For example, during the review of the violation of pretrial discovery rules, the defense learned that international sexual homicide expert Roy Hazelwood contradicted the direction the investigation took, the theory of the prosecution, and testimony of the forensic psychologist who was the main prosecution witness. Specifically, among the material not disclosed were notes Broderick took after a conversation with Hazelwood.[33] Hazelwood told Broderick that tying the pictures to the

crime, since none of them reflected what happened, was "overreaching."[34] He also told Broderick that "fantasy is not motive," one of the pillars of Meloy's testimony.[35] Mr. Fischer, one of Masters' attorneys, stated, "We would have called Hazelwood as fast as we could have called him. … We've got it backed up by the leading expert in the world and these guys hid it from us." [36] Interestingly, Hazelwood eventually withdrew from the case after he had concerns over the prosecutors' trial strategy and the psychological theories to be used at trial.[37]

## Opinion of Dr. Reid Meloy

Masters was honorably discharged after eight years in the Navy. In 1998, 11 years after Hettrick was slain, Masters moved to California and worked as an aircraft structural mechanic. Yet Detective Broderick was less convinced of Masters' innocence and sought the opinion of forensic psychologist Dr. Reid Meloy, a member of the American Board of Professional Psychology (ABPP) with a specialization in forensic psychology. To find out if there was a relationship between Masters and the murder, Broderick gave Meloy details of the case along with more than 2,000 of Masters' drawings, stories, crime scene videotapes, interpretations of the drawings, police interviews, photographs, maps, and transcripts.

Meloy stated, "In my 18 years of doing this kind of work I have never seen such voluminous productions by a suspect in a sexual homicide. That tells us he was preoccupied with sexual violence, with violence, with sexually sadistic images, with images of domination and degradation of women, and he was also fascinated by knives." Dr. Meloy also stated that after spending six months on the case, "I felt I understood the motivations for this homicide and that I had become convinced that Timothy Masters was the individual that had committed this homicide.[38] Young Timothy, killed Hettrick, and, by doing so, had symbolically killed his own mother. A classic case of 'displaced sexual matricide' brought on by feelings of abandonment."[39]

In court, the prosecution bombarded the jury with violent pictures Masters had drawn. They were shown on a large video monitor while Meloy pointed out features of them that he testified showed the pairing of sex and violence; evidence of "picquerism," the sadistic pleasure derived from stabbing;

degradation of women; and fascination with weapons and death.[40] Meloy would eventually conclude from Masters' drawings and stories that Masters fit the profile of a killer because he was a loner, came from an isolated or deprived background, harbored hidden hostility toward authorities and women, and had violent fantasies.[41]

Not turned over to the defense, however, were Broderick's own interpretations of Masters' artwork that filled dozens of pages dated long before Meloy joined the prosecution's efforts. On July 24, 1998, Detective Broderick updated prosecutors Gilmore and Blair on the status of Meloy's work, and in his letter Broderick wrote that he sent Meloy a draft of Masters' arrest warrant and was waiting for his "approval."[42] Meloy was so convinced that Timothy was the culprit that he sent a pretrial letter to then-Larimer County District Attorney Stuart Van Meveren in which he expressed hope that the work of "superb professionals" Gilmore and Blair "will result in a successful prosecution."[43]

Although Meloy was barred from giving his opinion about whether or not he believed Masters' pictures and stories implicated him in Hettrick's murder or that his productions reflected his belief that it was a displaced matricide, Meloy drew a very clear correlation between the circumstances of Hettrick's death and Masters' artwork as motive for the homicide. He testified about the characteristics of a sexual homicide. He went into detail about how Masters' productions could be considered a "fantasy rehearsal," especially a doodle on Masters' math homework of a knife-wielding hand cutting a diamond shape that Meloy interpreted as a vagina, "which may have been a rehearsal of the genital mutilation."[44]

According to Dr. Meloy, because some of Masters' drawings were of stabbings, dragging, and so on, they were logically relevant to his motive, intent, and plan to commit the crime. The psychologist defined a sexual homicide as one in which there is "primary sexual activity usually involving semen or ejaculation." However, despite labeling this a sexual homicide, there was no semen found in, on, or near the body.[45] Meloy showed how specific pictures could be interpreted to reflect the crime; several showed "blitz attacks," depicted stabbings that Meloy interpreted as sexual in nature, and depicted women as murder victims. He opined that Masters' retreat into a fantasy world combined to create a boiling kettle of latent violence just waiting to erupt: "A retreat into such a compensatory narcissistic fantasy world, replete with sexuality and violence, works for awhile, but at a great cost. The unexpressed rage continues, depression may ensue, and anger toward women as sources of both pain (abandonment) and erotic stimulation builds."[46]

Equally prejudicial was Meloy's interpretation of a picture Masters drew the day after he saw Hettrick's body. It depicted one figure dragging another, which was apparently wounded or dead, from behind. The wounded figure was riddled with arrows and blood seemed to flow from its back. Entirely discounting the presence of the arrows, which had nothing to do with the murder, Meloy wrote in his report that this picture represented the crime as it actually happened. "This is not a drawing of the crime scene as seen by Tim Masters on the morning of Feb. 11 as he went to school. This is an accurate and vivid drawing of the homicide as it is occurring. It is unlikely that Tim Masters could have inferred such criminal behavior by just viewing the corpse, unless he was an experienced forensic investigator. It is much more likely, in my opinion, that he was drawing the crime to rekindle his memory of the sexual homicide he committed the day before."[47]

Meloy stated, "Sexual homicide represents the solution, particularly in the form it took in this case: If I kill a woman, she cannot abandon me; if I desexualize her (genital mutilation), she cannot stimulate me.[48] These are not conscious thoughts for Tim Masters, but likely represent the unconscious beliefs that drove his behavior the night of Feb. 11, 1987, when he killed and sexually mutilated Peggy Hettrick, a victim of choice and opportunity. Ms. Hettrick represented all women to Tim Masters."[49] Meloy indicated that either a conflict with a woman in authority or grief over the death of a loved one triggered his murderous outburst.[50] According to Meloy, "A trigger mechanism or precipitating event is a particular occurrence in the life of the perpetrator which causes him to act out his fantasies in the real world."[51] Dr. Meloy testified that such an event could be conflict with one's spouse or girlfriend, grief over the death of a loved one, or conflict with women of authority in a school or employment setting."[52] In this case, Dr.

**Find Local Bail Bond Agents on AboutBail.com**

AboutBail.com
Find Local Bail Agents, Criminal Attorneys & Investigators

www.AboutBail.com
(866) 411-2245

Meloy stated that Masters' trigger mechanism, which was the catalyst for him to kill, consisted of the argument he had with a female teacher at school about a month prior to the murder. The argument ensued between the teacher and Masters because she took away a military manual he possessed.

## "He admitted his guilt through pictures to us."[67]

### Statement of a juror after convicting Timothy Masters

### Analysis of Dr. Meloy's Opinion

There are multiple problems regarding the way Dr. Meloy was employed in this case. Regardless of the lack of evidence linking Masters to the case and regardless of the opinion of Hazelwood, Meloy continued to push his own psychological profile matching Masters to the murder. This dubious method of profile matching begins with the psychologist identifying the person the psychologist wants to be the suspect. Next, the psychologist adds characteristics to that individual — characteristics of the type of person who would commit such a crime — based on the type of evidence collected. In this case, that evidence included drawings and narratives.

Furthermore, Meloy did not reveal to the court that Hazelwood did not agree with his opinion, even though during Meloy's testimony he cites Hazelwood's scholarship as information he would have relied upon to form an opinion. There was no objective analysis in Meloy's assessment of Masters' behavior because he violated his own forensic psychological protocol. For example, Meloy's own scholarship emphasizes a protocol that, in addition to psychological testing, includes competent and thorough completion of the clinical interview and the gathering of independent historical data. These steps are critically important in arriving at a reliable, valid understanding of the individual.[53] Meloy did not interview Masters, thus relying on speculation as to what the drawing and narratives signified.[54] Because Meloy was not employed as a neutral party that would have been loyal to the court, there would have been no reason to subject Masters to an evaluation by Meloy when he already determined that Masters was the culprit.

Interestingly, Meloy indicated during his testimony that the research on sexual homicide was scant. He testified that current scientific journals have reported that the relationship between sexual fantasies and sexual homicides is tentative, and opined that no conclusions can be drawn linking fantasies to conduct. Indeed, the inconclusive nature of this research is apparent when one of the two studies relied upon by the prosecution's expert is also relied upon for the proposition that "normal people," that is, people who do not commit criminal behavior, also engage in deviant sexual fantasies.[55] If both groups do engage in sadistic sexual fantasies, there is no one causative factor explaining why some act out their fantasies and others do not.[56] In fact, surveys measuring sadistic fantasy make it clear that it is extremely common and the vast majority of it does not lead to sexual offending.[57] As to rehearsed sadistic fantasy, sadistic situations tend to be rehearsed many times in fantasy and at times tried out in real life over a number of years.[58]

The defense called a prominent forensic psychologist, Dr. John Yuille, who stated that the drawings meant nothing. Because research in sexual homicide is relatively new, Yuille does not believe that a correlation necessarily exists between fantasy and homicide; there is room for differing interpretations of the same evidence.[59] "The research is flawed," Dr. Yuille stated in his testimony regarding the current state of research on the relationship between fantasy and sexual homicide.[60] In addition, he indicated that it is difficult to generalize about the link between fantasy and sexual homicide because the sample size in the research is too small.[61] Furthermore, the research is inadequate on how frequently normal people engage in sexual fantasies and do not act out.[62]

One study found that the frequencies of deviant sexual fantasies in control groups representing "normals" tended to be higher than sex offenders.[63] It is incorrect to assume that fantasy is a rehearsal to act out, but it may serve a number of purposes for the individual such as wish fulfillment, curiosity, or to alleviate sexual frustration.[64] Given that there are no certain behavioral indicators to exclusively confirm characteristics in sadistic sexual fantasy, fantasy does not appear to be associated with a type of crime.[65] In the Masters case, there was an absence of evidence showing early rehearsals to act out the fantasy. Amazingly, in order to justify his belief that Masters did in fact commit sexual murder, Meloy relied on research showing that someone like Masters would be the least likely candidate to commit sexual murder. In reviewing Meloy's trial testimony, he was well aware that the research was not conclusive in the link between fantasy and the propensity to commit sexual homicide.

In addition to the problematic position that the drawings represented sadistic sexual fantasy, Meloy then took the position that the drawings represented an illustration of displaced sexual matricide in that Masters killed Peggy Hettrick because Peggy represented his deceased mother. The authors located what is believed to be the only study available prior to the trial, *Sexual Homicide by Adolescents,* with which Meloy would have been familiar regarding an adolescent's displaced rage onto a female victim — rage caused by the mother's threats of separation through suicide.[66]

### Legal Analysis

Courts attempt to filter out evidence that may be inflammatory or prejudicial in order to assure that a defendant receives a fair trial. Courts generally do not allow a defendant's "other crimes, wrongs, or acts" to be used against him because of the fear that jurors would focus too much on these other matters and determine the culpability of the accused based on how they perceive his character. However, there is an exception in the law where a person's "other crimes, wrongs, or acts" can come in as evidence to assist the jury in determining culpability if these other matters go to something other than a person's character such as the ability to commit the crime, motive, state of mind, planning, identity, or modis operandi.

In the Masters case, the majority on the Colorado Supreme Court upheld the conviction and believed that Meloy's testimony was useful because it was not being offered to prove his character. The minority opined that the tendency of juries to overvalue other crimes, wrongs, or other acts evidence disclosed at trial is supported by the findings of several empirical studies on jury behavior

THE PRECARIOUS USE OF FORENSIC PSYCHOLOGY

regarding a defendant's past activities.[68] For example, the minority cited behavioral studies concluding that the distaste jurors may have for the defendant's past activities may tend to distort their perception of the degree of independent evidence necessary to meet the prosecution's burden of proving guilt beyond a reasonable doubt.[69]

The majority's assurance that the prosecution did not emphasize or rely on the inadmissible evidence, described in part as the "sporadic use of ethnic slurs," mischaracterizes the nature of the inadmissible evidence and the trial proceedings. However, the prosecution emphasized to the jury numerous images drafted by the defendant that glorified the Ku Klux Klan, the Nazi party, and killing. The images had no connection to the Hettrick homicide but were used, through Meloy, to prove motive.[70] The prosecution also highlighted many of these inadmissible, inflammatory examples of racial bigotry as Broderick testified regarding drawings that depicted the Nazi death camp welcoming "Each and Every God-damn Jew" and the caption "Kill the Jew."[71]

The logical relevance of the defendant's uncharged fantasies is minimal when compared to the overwhelming power of these fantasies to depict the defendant as an evil and bad person.[72] According to the minority, the writings and drawings are not even "acts" as contemplated by the law, but merely reflect, for the most part, a 15-year-old's fantasies; not one of these 1000 drawings and narratives concerned this victim personally or reflected the manner in which the victim was killed.[73] However, the prosecution was allowed to end its closing argument by urging the jury to convict the defendant because his fantasies proved that he committed this crime: "Please take the time to look at those drawings, read the narratives, study this evidence. The evidence is there. Sometimes it's hard to find. Sometimes you have to do a little thinking as to how the defendant could draw something like that unless he knew how it happened. Please look and read, study, dig into the paper bags. The evidence is there."[74]

In addition, courts have an obligation to ascertain whether expert testimony that is disclosed to a jury actually is in fact generally accepted within the scientific community as reliable to support expert opinion under *Daubert*.[75] The majority indicated that the prosecution presented multiple

theories of logical relevance to the Masters' case and decided that the scientific principles underlying Meloy's testimony were reasonably reliable and that they would aid the jury. According to the majority, Meloy's testimony provided an explanation for the seemingly inexplicable, and without his testimony jurors could not understand the defendant's motivation for murder.[76] The Court stated:

> Dr. Meloy relied on an objective, widely recognized psychological theory, one which was founded on research and study, and one which the trial court determined was generally recognized within the forensic community. His testimony consisted of an objective, complex, and highly developed analysis of the crime scene and defendant's productions that had been refined by years of research. As such, it was reliable and insightful information that assisted the jury by placing the crime in context and helping them to understand bizarre and deviant behavior that was unlikely to be within the knowledge of ordinary citizens; it helped the jury understand the significance of material facts in the case.[77]

The court's entire statement is incorrect. It is clear that the judicial ruling allowing Meloy to testify reflects the findings of the study titled *Asking the Gatekeepers: A National Survey of Judges and Judging Expert Evidence in a Post-Daubert World*. The study concluded that judges, especially state court judges, do not know how to apply *Daubert* guidelines, do not understand scientific evidence, statistical significance, distinctions between reliability and validity in the behavioral sciences, and are in need of judicial education on issues that are raised by expert testimony such as error rates, validity, and reliability.[78]

Moreover research appears to suggest that jurors, perhaps subconsciously, assume that all expert evidence admitted at trial has been "approved" by a judge, thus concluding too much about the quality of the evidence presented.[79] Specifically, jurors assume trial judges review expert evidence before it is presented to them and that any evidence presented to them must be above some threshold of quality.[80] If trial judges adhere to *Daubert* standards, the jurors' assumptions may make sense, but the research indicates that trial judges do a poor job of screening expert evidence, which is unfortunate because the trial judge is implicitly lending credence to the testimony and thus increasing its persuasiveness.[81]

## Recommendations for Practitioners

The introduction of *Daubert* standards altered the landscape — admissible expert testimony must be based on more than "subjective belief or unsupported speculation."[82] The *Daubert* criteria encompassed concerns within the psychological and scientific communities that expert testimony was at times admitted absent acceptable theories and methods to support the opinions expressed, and conversely that relevant expert testimony based on reliable, competent research was at times excluded. Judge Richard Posner characterized the purpose of *Daubert* as "to protect juries from being bamboozled by technical evidence of dubious merit."[83] When determining admissibility, however, it appears that courts are focused on the perceived relevance of the testimony as a whole and whether it is helpful to juries rather than on possible erroneous, non-testable individual methods used by the expert to form an opinion.[84]

Practitioners should advance the *Daubert* factors when challenging baseless forensic psychological testimony. Although not an exhaustive list, some of the *Daubert* factors used by courts in evaluating the reliability of expert testi-

**The defense attorney must, at a minimum, cross-examine the expert on error rates, comparison to similar groups, validity, and reliability of the research.**

THE PRECARIOUS USE OF FORENSIC PSYCHOLOGY

many are (1) whether the method consists of a testable hypothesis, (2) whether the method has been exposed to peer review, (3) whether the method is generally accepted within a given community, (4) whether the method is valid and reliable, (5) whether there are any known error rates, and (6) whether the theory was developed "for litigation only." In some respects, the burden will fall on defense counsel during cross-examination of the prosecution's expert witness to educate judges on these factors. However, what is lacking for many defense attorneys is an understanding of basic behavioral science terminology to help them expose weaknesses in the expert's testimony.

When experts testify, the defense attorney must, at a minimum, cross-examine the expert on error rates, comparison to similar groups, validity, and reliability of the research. Inquiries into these areas will ensure that the conclusions drawn by the expert are properly challenged and weaknesses are exposed to the judge. What follows is a brief outline of some of the basic behavioral science protocol and its application to the Masters case as an illustration of areas on which defense counsel should cross-examine the expert to prove that *Daubert* requirements of admissibility have not been met.

## A. Comparisons of the Masters Drawings to Other Adolescent Male Drawings

When behavioral scientists want to test a theory about their impressions of given data, they compare the data of their case with a known group, if it exists, that is similar in factual characteristics. This simple statistical protocol that is widely accepted by researchers was rejected by Dr. Meloy and ignored by the courts. Defense counsel should cross-examine on how the expert bypassed the protocol of examining comparative groups. It was Meloy's belief that the violent drawings by Masters represented something other than doodles by an adolescent; they represented Masters' desire to commit sexual homicide, specifically a sexual homicide Meloy referred to as displaced sexual matricide.

Meloy should have researched other data to compare whether violent drawings in Masters' age group or students in his special education class produced similar violent drawings resulting in sexual homicide. Meloy had access to Masters' school records. Consequently, he knew that Masters was placed in a special education class, what members of his peer group were likely to draw, what his fellow students were exposed to by the media, and that at least some of the peers thought the drawings were interesting. All of the information could have been used as a method to initially form the basic hypothesis as to how Masters' drawings were the same as other adolescents or those in his special education classes.

In this case, however, Meloy did not show how drawings by Masters were similar to the adolescent sample to which he was being compared. Moreover, Meloy should have considered that these same groups used for comparison did not commit sexual homicide even though they produced violent drawings. If there was no difference between what Masters drew and what the comparative groups produced, then people are more apt to conclude that the drawings did not represent what Meloy believed they represented.

Cross-examining an expert such as Meloy on the failure to develop alternative explanations to his own theory would have been fertile ground for casting doubt on his credibility. Meloy made the assumption that his interpretation of the drawings and the relationship of the drawings to the homicide were sufficient to bypass protocol. Had Meloy conducted the requisite comparative research and concluded that a difference existed by disclosing reliable research showing that a link between violent drawings and sexual homicide committed by adolescents existed, then a genuine debate could be resolved in a court of law as to the extent of the difference between the comparison. He did not come forward with any cases showing that other adolescents who produced drawings similar to Masters' drawings also committed displaced sexual matricide.

Furthermore, the forensic psychologist maintains professional integrity by examining the issue at hand from all reasonable perspectives and actively seeking information that will differentially test plausible rival explanations.[85] For example, there was no evidence that Meloy tested a plausible rival explanation that the drawings did not reflect what the forensic psychologist projected into the drawings or that perhaps the violent stories did not mean Masters had a motive to kill. In fact, Masters said, "My peers seemed to approve of them. … They liked those drawings. … They would offer suggestions, so that encouraged me to draw even more. … We would draw horrible gruesome scenes and share it with a guy. … 'Oh, that's cool,' and pass it back."[86]

Dr. Meloy took Timothy's drawings and cross-referenced the traits used in sexual homicide classification such as blitz attack and mutilating, but to no other type of classification that would have formed a hypothesis different from his own. For example, Meloy would have known of Masters' desire to write like Stephen King because he revealed this to the detectives. It is highly plausible Meloy did not develop alternative explanations for Timothy's drawings because he knew that many of the major drawings would have more in common with non-sexual homicide themes such as the military, horror movies, and Stephen King. Moreover, developing alternative explanations would have robbed Meloy of the opportunity to push psychoanalytic theories as valid and reliable. In fact, the American Psychological Association (APA) discourages using drawings for forensic cases out of the concern that there are erroneous assumptions made about the interpretation of the drawings.[87]

There are publications by Stephen King that Masters may have read that could have been the basis for an alternative explanation for Meloy to consider. Parallels can be found if the themes in King's novels are cross-referenced against the themes in Masters' drawings and stories. For example, the correlations between Masters' drawings depicting murder, Nazi death camps, Nazi sadistic killers, Jews, and an adolescent male student are found in *Summer of Corruption: Apt Pupil* (1982). With respect to the psychological dynamics of a 12-year-old son of a dying mother who must fight evil, the authors direct readers to *The Talisman* (1984). Moreover, with respect to a son who kills his mother, the reader is referred to the short story *The Woman in the Room* published in *Night Shift* (1978).

Cross-referencing the themes of the Stephen King novels with the drawings as an alternative explanation to Meloy's theories is important because there was no evidence of exploration as to the timing and manner of production of the narratives/drawings and what Masters' thoughts and feelings were prior to, during, and following the productions. He was never asked if he hoped to use the drawings to shock others, punish them, or as a way to ask for help; it was assumed by Meloy and the court system that his pictures proved that he was a bigot and racist full of hatred toward everyone.[88]

The only comparison Meloy performed was an attempt to link the pictures to the crime scene and sexual homicide traits. He claimed a 100 percent match, meaning that each of the hundreds of pictures Masters drew matched displaced sexual matricide as applied to Hettrick's murder and nothing else. Thus, if the gruesome drawings by Masters were no different, for example, when compared to other 15-year-old adolescents who drew similar pictures, then Meloy could never have justified his opinion. He had to side step the protocol because he knew that this was his opportunity to push his psychoanalytic theories as valid for legal determinations.

Even if judges, either through ignorance or convenience, allow unreliable testimony to be heard by jurors, defense counsel must elicit from the forensic psychologist the scenario that would have to be present for the expert to reject his or her own opinion. Meloy's hypothesis was that the drawings demonstrated Masters' fantasy to commit sexual murder, rehearsal for murder, and a re-enacting of the murder that supposedly fit the facts of the Hettrick case. All of this was tied to a theory of displaced sexual matricide. Thus, Meloy's initial impressions that Masters was guilty of murder were verified by his analysis of the drawings. If the forensic psychologist on cross-examination cannot conceive of an alternative explanation in contrast to his own theory, as Meloy did not, this indicates a major problem in that the expert does not even have the basic validity and reliability framework to justify his testimony or involvement in the case for that matter. At this point — via a motion to exclude expert testimony — defense counsel must object to the prejudicial nature of allowing such an expert to publicize to a jury an unsupported opinion.

## B. Validity and Reliability

If there is similarity between the data on which the expert has formed a theory and the comparison group, then there can be a discussion of validity and reliability of the comparisons. If there is a distinction between the groups, then again validity and reliability of the comparisons are issues to consider, with the goal being that the attorneys and the courts have the facts to argue their cases of admissibility.

Keep in mind that a match does not have to be and is rarely black and white. There are gradations of what a match of similarity between the comparison groups of acceptability consists of, and it is in this realm that attorneys can have serious debate as to whether a match of similarity exists or not. Yet Meloy side stepped this very important and universally accepted statistical protocol by jumping to an unsupported conclusion that Masters' drawings represented something other than what the comparative groups would draw, thus the validity and reliability of the expert's opinion was never addressed. Moreover, defense counsel should cross-examine regarding issues of validity and reliability of the expert's testimony on research, if any, relied upon to form an opinion. The reason that a literature review on the research is important to forensic psychologists is because they can compare a present court case against similar cases cited in the research for similarities or dissimilarities in given group characteristics.

Very simply, validity is the extent to which a test measures what it is supposed to measure on a consistent basis. The question of validity is raised in the context of the form of the test, the purpose of the test, and the population for whom it is intended. Therefore, the general question, "Is this a valid test?" is not the proper query. "How valid is this test for the decision that I need to make?" or "How valid is the interpretation I propose for the test?" are the questions to ask. Thus, if a scale is used to measure weight accurately, will the scale correctly measure what it is purported to measure, i.e., weight? Without validity, opinions that offer no measurements to indicate what they tested to arrive at an opinion are potentially hazardous and do not increase confidence in an expert's opinion.[88] The ability to interpret the great bulk of behavioral research hinges on the validity of the measurements used to analyze data.[89] Validity is what allows experts to sift through the research to determine whether their opinions are meaningful to resolving a legitimate court issue or potentially harmful to an individual.[90] In this case, Meloy never offered any proof that he used a valid method that would measure the link between violent drawings and displaced sexual matricide.

Research requires dependable, valid measurement. Reliability is the degree to which a method consistently measures whatever it was set out to measure. Can one replicate the experiment and get comparable results? Remember that a reliable measure does not mean that it is valid. For example, a broken ruler may give consistent results in terms of measurement, but the measurements are still wrong, thus unreliable. This is why it is crucial that the method used to measure something is valid. Without validity there is no reliability. In this case, Meloy's opinion is not reliable because the linkage of Masters' drawings to the crime scene or to displaced sexual matricide is non-existent. In fact, when Meloy learned that Masters was innocent, he did not hesitate to completely reverse his opinion on Masters' culpability because he never took the issue of validity and reliability into account in the first place to support his conclusion of what the pictures meant relative to his theory.

## C. Error Rates

Counsel should also cross-examine an expert as to error rates that are considered extremely important in assessing the quality of an expert's opinion as it relates to issues of reliably. Measurements are reliable to the extent that they can be repeated. Any random influence that tends to make measurements different from occasion to occasion or circumstance to circumstance is a source of measurement error, also referred to as the error rate. Errors rates, or false positives, refer to the number of times one is wrong when one says something happened when it did not. Conversely, false negatives occur when something happened and one said it did not. In the Timothy Masters case, there were no other cases about which Dr. Meloy testified nor any available research to rely on in order to disclose the error rates in displaced sexual matricide cases. In this case, the court would have to accept that Meloy was 100 percent correct in his analysis because his validity and reliability were acceptable under *Daubert*. There was no validity or reliability, however, and he could not say what the error rate was because he did not compare Masters' drawing to drawings of adolescents who exhibited displaced sexual matricide. Put another way, Meloy could not disclose, even if asked, what percentage of those adolescents who drew Masters-like pictures did not commit displaced sexual matricide. This is the risk taken when the importance of error rates as they relate to an expert's opinion is ignored, and the focus is simply on relevance and whether it will assist the jury in resolving issues by giving the jury the option to determine what weight it wants to give such testimony even though it can have a devastating impact on the fairness of a trial. This is why "judges as gatekeepers"

THE PRECARIOUS USE OF FORENSIC PSYCHOLOGY

must understand the significance of the statistical aspect of expert testimony, its reliability, or lack of reliability, and the potential prejudicial and inflammatory impact it can have on a jury's perception of the evidence.

There was no data to answer the question regarding error rates, thus Meloy was left with only his personal, non-behavioral, psychoanalytic interpretation of the drawings and his absolute conviction that Masters was guilty. It has been argued by some researchers that one of the most straightforward ways of tempering implied or explicit exaggeration by experts is to require experts to accurately inform the jury about error rates.[91] How often do experts in the field reach the correct or incorrect conclusions in the task relevant to an issue before the court?[92] If there is a lack of data on the precise question at issue, this deficiency is extremely informative and should be considered by the court in determining admissibility.[93]

Meloy indicated, for example, that in his "18 years of doing this kind of work I have never seen such voluminous productions by a suspect in a sexual homicide." When such a statement is made, pertinent questions from defense counsel might include the following: When did the expert speak to other individuals that have seen such voluminous drawings among adolescent males? How often has the expert ever observed such voluminous productions that were not sexual homicide? How often has the expert observed voluminous material reflecting a fascination with sexual violence and weapons where no sexual homicide was committed? If the expert cannot answer these basic behavioral science questions that reflect typical comparative protocol that must be conducted before an opinion is elicited, the expert's opinion is flawed.

One may have difficulty in understanding how the Masters' trial judge and the Colorado Supreme Court allowed the forensic psychologist to testify given what is known about the lack of relationship between fantasy and motive to commit sexual homicide and the lack of research connecting violent drawings to sexual homicide. Judges who may not understand the protocol have the convenient excuse of admitting incredibly prejudicial evidence by claiming that it is "specialized knowledge" that would assist the trier of fact.[94] Perhaps the court used this provision as an escape hatch to justify Meloy's testimony when it stated in its opinion,

"Without the testimony of a specialist in this area, lay jurors would be tremendously disadvantaged in attempting to understand the defendant's motives for killing Ms. Hettrick."[95]

Judges, under most circumstances, will admit most forensic science.[96] There is almost no expert testimony that is considered so threadbare that it will not be admitted if it comes to a criminal proceeding under the forensic science banner, except perhaps for handwriting and voice print identification.[97] Maverick experts who are a field unto themselves, but lack solid foundational research proving the reliability and validity of their methodologies to support their opinions, have had their testimony admitted in *Daubert* jurisdictions.[98] This has resulted in the creation of the Meloy phenomena.

Too often courts view debates about psycho-legal issues as justification for admitting evidence. As Justice Black stated in commenting on how integrity in the legal system can be preserved through *Daubert*: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[99] While debates on the merits of the admissibility of psychoanalytic theory, for example, may be helpful if they lead to further refinement of the reliability of the methods used to support expert opinions, the existence of professional debates should not constitute a formal legal test of admissibility.[100]

Justice Black's position on this issue is wrong. There can be quite a difference between the weight legal and psychological professionals attach to expert testimony weakened by cross-examination and how juries perceive expert testimony on cases that may involve gruesome evidence. This difference should not be taken lightly by courts. There are limitations to the belief that defense counsel can reduce the impact of an expert's testimony heard by a jury through cross-examination. During cross-examination, defense counsel was able to get Meloy to admit that the connection between fantasy and the motive to commit sexual homicide was weak. That admission, however, did not necessarily translate into a benefit for Masters regarding the manner in which the jury perceived the expert's testimony connecting the violent pictures and Masters' motive to turn his fantasy into reality.

## D. Ethical Considerations

Practitioners should consider the ethical implications of forensic psychological testimony as material for cross-examination given that forensic psychologists have American Psychological Association (APA) ethical guidelines to consider when offering expert opinion. The appearance of ethical guideline violations might persuade a judge to more carefully scrutinize forensic testimony, especially when the judge may not understand concepts of validity and reliability and the other *Daubert* factors.

The APA and other professional organizations established ethical guidelines in 1991 for forensic psychologists. While the guidelines, published in *Law and Human Behavior*, do not represent an official statement of the APA, they were endorsed by the American Academy of Forensic Psychology. When testifying, forensic psychologists have an obligation to all parties to a legal proceeding to present their findings, conclusions, evidence, or other professional products in a fair manner.[101] Forensic psychologists do not, by either commission or omission, participate in a misrepresentation of their evidence, nor do they participate in partisan attempts to avoid, deny, or subvert the presentation of evidence contrary to their own position.[102]

For example, Meloy mentioned Hazelwood's research during the trial, but he never disclosed Hazelwood's opinion that attempting to stretch Masters' drawings into behavioral rehearsal and motive was overreaching. The courtroom testimony clearly illustrates what can happen when opinions that do not support the position taken by the forensic psychologist are either avoided or subverted. The forensic psychologist's responsibility to make sure that all legal parties understand the validity and reliability issues ensures that the check and balances built into the legal system can function.

Moreover, forensic psychologists must avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had the opportunity to conduct an examination of the individual as it pertains to conclusions to be drawn by the forensic psychologist.[103] Forensic psychologists must make every reasonable effort to conduct such examinations and when not feasible, they must make clear the impact of such limitations on the reliability and validity of their professional testimony.[104] When he testified, Meloy had the opportunity to uphold this guideline by disclosing that there

were reliability issues as to his testimony because he did not examine Masters.

## E. General Acceptance Within the Forensic Psychological Community

At present, methods for interpreting human figure drawings such as those drawn by Masters meet neither professional nor current legal standards for admissibility because of the lack of standardized measurement methods. Thus, there is no validity, no reliability, and no way to determine error rates.[105] The American Board of Forensic Psychology, for whom Dr. Meloy served as president, strongly agrees with the assessment that attempts to interpret what individuals indicate about why they draw certain types of pictures should not be used, for example, in assessing an individual's risk for violence or mental state at the time of the alleged offense.[106]

## The Aftermath

Upon the release of Timothy Masters from prison, Meloy stated that Detective Broderick and the prosecutors "intentionally manipulated his professional opinion by misrepresenting the physical evidence and providing him only a portion of the evidence necessary to make a judgment with respect to Mr. Masters' psychological state."[107] However, it was Meloy, independent of what the police disclosed to him, who presented his credentialed testimony as "science" and defended the scientific nature of his testimony as reliable before the jury that used his testimony to find Masters guilty.

Meloy indicated that had he known of Dr. Hammond, then he would not have considered Masters to be the killer.[108] Meloy reversed his prior opinion that Masters was the killer when he indicated that relative to Hammond's likely perpetration, the "probability that Mr. Masters committed the Hettrick homicide was incredibly small."[109] Like shifting winds, it was not until it was discovered that Masters was telling the truth that Meloy implicated Hammond as the more likely suspect even though Hammond was irrelevant in terms of Meloy's analysis of the Masters' drawings. And yet again, Meloy has no known direct, physical, or circumstantial evidence that points to Hammond as a more likely suspect.

## Conclusion

Forensic analysis has its benefits, as shown by the exclusion of Timothy Masters as a source of DNA on the victim's clothing, which led to his freedom. However, there is a precarious side to forensics that cannot be discounted, especially when there are lay persons serving as jurors who can be swayed by high-profile expert testimony that is not filtered by judges to adhere to *Daubert* standards. It is important that defense counsel expose weakness in testimony offered by experts so that judges consider the validity and reliability of their testimony before allowing prejudicial testimony to be heard by juries.

© *Frank S. Perri and Terrance G. Lichtenwald, 2010. All rights reserved.*

## Notes

1. A. Coberly & G. Campbell, *Expert in Tim Masters Case Admits His Testimony Was Not Supported by the Facts*, March 14, 2008, *available at* http://www.greeleytribune.com/article/20080314/NEWS/704078416.

2. M. Moffeit, *Sketchy Evidence Raises Doubt.* Jan. 21, 2008, *available at* http://www.denverpost.com/headlines/ci_6373222.

3. Joshua Yager, Taigi Smith & Marc Goldbaum, *Drawn to Murder*, Nov. 29, 2008, *available at* http://www.cbsnews.com/stories/2008/11/24/48hours/main4630559.shtml.

4. E. McLaughlin, *Police Split Over Conviction in Colorado Slaying,* Jan. 18, 2008, *available at* http://www.cnn.com/2008/CRIME/01/18/masters.cops/.

5. *Supra* note 1.

6. *Supra* note 2.

7. G. Campbell, *Convicted Man's Appeal Puts a Lot at Stake.* July 15, 2007, *available at*



http://www.greeleytribune.com/article/20070715/NEWS/107150120.

8. *Supra* note 1.

9. M. Moffeit, *Video: Sketchy Evidence.* Aug. 1, 2007, *available at* http://www.denverpost.com/news/ci_6369280.

10. *Supra* note 2.

11. K. Darst, *Masters' Defense: Doctor Could Have Done It.* Aug. 24, 2007, *available at* http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071106/NEWS01/71107028.

12. S. Reed, *Opinions on Hammond as Hettrick's Killer Mixed,* Aug. 19, 2007, *available at* http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071106/NEWS01/71107027.

13. P. Hartman, *Free Tim Masters Because, June 12, 2007, available at* http://freetimmastersbecause.blogspot.com/.

14. G. Campbell, *The Tim Masters Case: Chasing Reid Meloy.* Feb. 1, 2008, http://www.fortcollinsnow.com/article/20080201/NEWS/297958975.

15. *Supra* note 1.

16. P. Hartman, *The Hartman Report on the Special Prosecutor's Report*, March 11, 2008, *available at* http://freetimmastersbecause.blogspot.com/2008/07/district-attorney-kenneth-t.html.

17. *Supra* note 13.

18. *Id.*

19. *Id.*

20. *Supra* note 1.

21. *Supra* note 13.

22. *Supra* note 1.

23. *Supra* note 1.

24. *Id.*

25. *Id.*

26. *Supra* note 11.

27. *Id.*

28. M. Moffeit, *Undisclosed Masters Evidence Nags,* Dec. 20, 2007, *available at* http://www.denverpost.com/news/ci_7764830.

29. *Id.*

30. *Supra* note 8.

31. *Supra* note 31.

32. P. Banda, *Did a Psychological Profile Go Too Far?* April 6, 2008, *available at* http://www.princegeorgecitizen.com/20080406125908/wire/world-news/did-a-psychological-profile-go-too-far-experts-question-if-practice-is-reliable.html.

33. T. Hughes, *Expert Questioned Testimony in Masters' Case.* Dec. 8, 2007, *available at* http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071208/NEWS01/712080371.

34. *Id.*

35. *Supra* note 16.

36. *Supra* note 36.

37. G. Campbell, *The Tim Masters Case: Chasing Reid Meloy.* Feb. 1, 2008, *available at* http://www.fortcollinsnow.com/article/20080201/NEWS/297958975.

38. *Supra* note 37.

39. *Id.*

40. *Supra* note 16.

41. *Supra* note 1.

42. K. Vaughn, *Taking Up Masters' Cause*, Dec. 1, 2007, *available at* http://www.rockymountainnews.com/news/2007/dec/01/taking-up-masters-cause/.

43. *Id.*

44. *Id.*

45. *Supra* note 15.

46. *Supra* note 16.

47. *Id.*

48. *Supra* note 37.

49. *Id.*

50. *Id.*

51. *Id.*

52. *Id.*

53. J.R. Meloy & C.B. Gacono, *Assessing the Psychopathic Personality*, in J.N. Butcher (ed.), Clinical Personality Assessment: Practical Approaches 410-422 (1995).

54. P. Hartman, *Homegrown Fiasco.* Sept. 2007, *available at* http://freetimmastersbecause.blogspot.com/2007/10/homegrown-fiasco.html.

55. M. MacCulloch, P. Snowden, J. Wood & H. Mills, *Sadistic Fantasy, Sadistic Behavior and Offending,* 143 British J. Psychiatry 20-29 (1983).

56. *Id.*

57. D. Grubin, *Actuarial and Clinical Assessment of Risk in Sex Offenders,* 14 J. Interpersonal Violence 331-343 (March 1999).

58. *Supra* note 55.

59. J. Farrell, *Psychologists Clash Over Meaning Behind Sexual Homicide,* March 25, 1999, *available at* http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071106/NEWS01/71107017.

60. *Masters v. People*, 01 SC 291, *Transcript of Meloy and Yuille*, March 24, 1999, *available at* http://freetimmastersbecause.blogspot.com/.

61. *Id.*

62. *Id.*

63. R. Langevin, R. Lang & S. Curnoe, *The Prevalence of Sex Offenders With Deviant Fantasies,* 13 J. Interpersonal Violence 315-327 (1998).

64. *Id.*

65. N. Gray, A. Watt, S. Hassan & M. MacCulloch, *Behavioral Indicators of Sadistic Sexual Murder Predict the Presence of Sadistic Sexual Fantasy in a Normative Sample.* Journal of Interpersonal Violence. Vol.18. No. 9, 1018-1034 (September, 2003).

66. W. Meyers, *Sexual Homicide by Adolescents*, 51 J. Clinical Psychiatry 239-242 (1994).

67. J. Farrell, *Masters: Prosecution Relied on Character Attacks,* April 13, 2000, *available at* http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071106/NEWS01/71107020.

68. *Masters v. People*, 01 SC 291 (2002), *available at* www.courts.state.co.us/supct/supctcaseannctsindex.htm.

69. *Id.*

70. *Id.*

71. *Id.*

72. *Id.*

73. *Id.*

74. *Id.*

75. *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579 (1993).

76. *Id.*

77. *Id.*

78. S.I. Gatowski, S.A. Dobbin, J.T. Richardson, G.P. Ginsburg, M.L. Merlino & V. Dahir, *Asking the Gatekeepers: A National Survey of Judges and Judging Expert Evidence in a Post-Daubert World,* 25 L. Hum. Behav. 433-458, (2001).

79. N.J. Schweitzer & Michael J. Saks, *The Gatekeeper Effect: The Impact of Judges' Admissibility Decisions on the Persuasiveness of Expert Testimony,* 15 Psychology, Pub. Policy L. 12 (2009).

80. *Id.*

81. *Id.*

82. *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 79 (1993).

83. R.M. Lloyd, *Proving Lost Profits After Daubert: Five Questions Every Court Should Ask Before Admitting Expert Testimony,* 41 Univ. Richmond L. Rev. 379-424 (2008).

84. Michael Hersen, Daniel Segal & Mark Hilsenroth, *Comprehensive Handbook of Psychological Assessment, see generally* pages 562-570 (2003).

85. *Id.*

86. Joshua Yager, Taigi Smith & Marc Goldbaum, *Drawn to Murder*, Nov. 29, 2008, *available at* http://www.cbsnews.com/stories/2008/11/24/48hours/main4630559.shtml.

87. Stephen J. Lally, *What Tests Are Acceptable for Use in Forensic Evaluations?* 34 Professional Psychology: Research and Practice 491-498 (2003).

88. Michael Furr & Verne Bacharach, Psychometrics (2007).

89. *Id.*

90. *Id.*

91. Jane C. Moriarty & Michael J. Saks, *Forensic Science: Grand Goals, Tragic, and Judicial Gatekeeping*, 44 Judges Journal 30 (Fall 2005).

92. *Id.*

93. *Id.*

94. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

95. *Supra* note 68.

96. *Supra* note 82 at 28.

97. *Id.*

98. *Id.* at 28-29.

99. Michael Hersen, Daniel Segal & Mark

HILSENROTH, *COMPREHENSIVE HANDBOOK OF PSYCHOLOGICAL ASSESSMENT* 562-570 (2003).

100. *Id.*

101. American Psychological Association, *Specialty Guidelines for Forensic Psychologists,* 15 L. HUM. BEHAV. (1991).

102. *Id.*

103. *Supra* note 80.

104. *Id.*

105. Stephen Lally, *What Tests Are Acceptable for Use in Forensic Evaluations? A Survey of Experts*, 34 PROFESSIONAL PSYCHOLOGY: RESEARCH AND PRACTICE 491-498 (2003).

106. *Id.*

107. Miles Moffeit, *Masters' Team Plans Federal Suit*. Oct. 21, 2008, *available at* http://www.denverpost.com/specialreports/ci_10771564.

108. *Id.*

109. Vincent Carroll, *Psychologist's Fantasy,* Oct. 23, 2008, *available at* http://www.rockymountainnews.com/news/2008/oct/23/carroll-psychologists-fantasy/. ■

## About the Authors

Frank S. Perri is an NACDL member and currently works as a  state public defender in Illinois. He focuses on white collar criminal defense and violent crimes. He received his law degree from the University of Illinois, and is a licensed certified public accountant and certified fraud examiner.

Terrance G. Lichtenwald earned his Doc-torate in Clinical Psychology and pre-doctorate clinical psychology from an American Psychological Association (APA) approved program. He concentrates in behavioral evaluations for court-appointed cases.

### Frank S. Perri
Winnebago County
Public Defender Office
400 W. State St., Ste. 340
Rockford, IL 61101
815-319-4900
Fax 815-319-4901
E-MAIL frankperri@hotmail.com

### Terrance G. Lichtenwald
PMB 141
6260 East Riverside Blvd.
Loves Park, IL 61111
815-494-0234
Fax 815-282-6457
E-MAIL tgl3155@aol.com

## IQBAL FOR THE ACCUSED?

*Continued from page 32*

vention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *Russell v. United States*, 369 U.S. at 770. *See also* note 1, *supra*. The Supreme Court in *Resendiz-Ponce* described the Court's ruling in *Russell* as requiring more specificity in the indictment than "parroting" the statutory language would provide because this was necessary in order to "*assure that any conviction would arise out of the theory of guilt presented to the grand jury*. …" *Resendiz-Ponce*, 549 U.S. at 109, 127 S. Ct. at 789 (emphasis supplied).

20. *Resendiz-Ponce, see* note 19, *supra*.

21. However, the concern with *Iqbal* pleading requirements is based in large part on the aspect of *Iqbal* that would be inapplicable to indictments returned by grand juries — the "plausibility" requirement of *Iqbal*. In the view of the Chair of the ABA Litigation Section, the plausibility requirement of the *Iqbal* majority opinion "drastically changed the landscape for 12(b)(6) motions." Rothman, Twombly *and* Iqbal: *A License to Dismiss,* 35 Litigation 2 (2009). This requirement gave the district judge a "gatekeeper-like duty" to control plaintiffs' access to the federal district courts. *Id*., 1-2. The *Iqbal* majority held 5-4, over the vigorous dissent of Justice Souter (who had authored the *Twombly* decision), that the factual allegations pleaded in a complaint must also satisfy the trial judge that they were "plausible, based upon the judge's common sense and experience." Justice Souter's dissent (joined by Justices Stevens, Ginsburg and Breyer) opined that a civil complaint whose factual allegations were sufficient on their face could be ruled "implausible" only where the factual allegations "are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiffs recent trip to Pluto, or experiences in time travel." 129 S. Ct. at 1959. The Supreme Court majority held that, applying its standard of plausibility, Mr. Iqbal's allegations as to the "wrongful intent" of Ashcroft and Mueller were not "plausible". *Id*. at 129 S. Ct. 1950-52.

22. 355 U.S. 41 (1957).

23. Notice Pleading Restoration Act of 2009, S. 1504 (2009), cited in *Taming* Twombly, *Even After* Iqbal, 158 U. PA. L. REV. 473, 474, n.7 (2010). Under the *Conley v. Gibson* standard, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46.

24. Previously, before *Twombly* and *Iqbal*, under the "notice pleading" standard that sufficed to survive a motion to dismiss under Rule 8(a)(2) as construed in the landmark case of *Conley v. Gibson*, *supra*, plaintiffs could usually discover the facts ultimately required to prove their case at trial without being foreclosed from discovery by a Rule 12(b)(6) motion.

25. *Russell v. United States, supra*, 369 U.S. at 768, quoting *United States v. Cruikshank*, 92 U.S. 542, 558.

26. *United States v. Lamont*, 18 F.R.D. 27, 31, quoted in *Russell* at 768 n.15.

27. *See* Silverglate, *The Decline and Fall of Mens Rea*, The Champion, Sept./Oct. 2009 at 14. *See also* Jack King, *NACDL, Heritage Report Says Congress Is Eroding Criminal Intent*, THE CHAMPION, May 2010 at 12.

28. *See Skilling v. United States*, No. 08-1394, ___ U.S. ___, (June 24, 2010), and cases cited therein, involving indictments under 18 U.S.C. §§ 1341, 1343, 1346. ■

## About the Author

Robert L. Weinberg is a retired founding partner of the Washington, D.C., law firm of Williams and Connolly. He teaches Criminal Procedure at George Washington University and The University of Virginia law schools. He is a Past President of the D.C. Bar and received the 2009 "Pursuit of Justice Award" presented by the American Association of Jewish Lawyers and Jurists.

### Robert L. Weinberg
5171 N. 37th Rd.
Arlington, VA 22207
703-534-3919
Fax 703-241-7504
E-MAIL bob.weinberg@aya.yale.edu

View publication stats

# Drawn to Injustice

## THE WRONGFUL CONVICTION
## OF TIMOTHY MASTERS

## Timothy Masters

### with Steve Lehto



BERKLEY BOOKS, NEW YORK

were evidence, of course, and there was a strong likelihood that DNA evidence could have been recovered from the bracelet. It didn't matter; Broderick just decided to give the evidence away, and it would take a judge's court order more than ten years later to recover it.

Over two days in October 1995, Broderick attended a seminar entitled "Sexually Violent Offenders and Their Victims," presented by a former FBI agent named Roy Hazelwood. Broderick attended another Hazelwood seminar the next year, this one entitled "Behavioral Analysis of Sexually Related Deaths." After the seminar, Broderick approached Hazelwood and told him about the Hettrick case, starting with the premise that I had killed Peggy. He described my drawings and writings to Hazelwood and asked if someone with psychiatric expertise might be able to somehow tie the case together—that is, conjure evidence linking me to the murder, the evidence that was lacking in the case so far. Hazelwood was optimistic and agreed to look at the evidence—for a fee.

Broderick mailed Hazelwood a pile of documents about me and asked him if he could profile me into the crime. Hazelwood went along with it, but he didn't completely convict me. He couched some of his answers tentatively. In response to Broderick's question, "Does Masters fit the profile of a Lust Murderer?" Hazelwood responded, "YES THE CRIME BEHAVIOR IS DISORGANIZED AND MASTERS' PERSONALITY IS CONSISTENT WITH DISORGANIZED BUT THAT DOESN'T MAKE HIM A KILLER. OTHER PEOPLE ALSO HAVE THE SAME CHARACTERISTICS." Broderick asked him if he would be willing to testify; Hazelwood repeated that question, followed by his answer. "What factors would make me feel comfortable that Masters is the subject in this case? SAME THING THAT WOULD MAKE YOU FEEL COMFORTABLE, FORENSIC EVIDENCE OR WITNESS. HOWEVER, THE CRIME BEHAVIOR IS CONSISTENT WITH THE PERSONALITY OF MASTERS AND THE CIRCUMSTANCES OF THE CASE (PROXIMITY OF RESIDENCE, PERSONALITY, POST-OFFENSE BEHAVIOR, COLLECTIONS, ETC.)." Broderick would not call Hazelwood to testify at my trial; he would go with Reid Meloy, a psychologist much more willing to come right out and say that he thought I had killed Peggy Hettrick.

# 21

## Broderick Returns

IN 1998, AFTER REID MELOY HAD GOTTEN HEAVILY INVOLVED in the Hettrick murder investigation, Broderick decided to arrest me for the murder of Peggy Hettrick. Of course, I had no idea about it at the time, but I heard about it later. To arrest someone in a case like this, they needed to get an arrest warrant signed by a judge; the warrant would have to lay out the case and describe enough evidence against me to convince a judge there was probable cause to arrest me. Broderick worked with Terry Gilmore, the district attorney, and an assistant prosecuting attorney named Jolene Blair on drafting the necessary documents to obtain the warrant. After they were happy with the language, they sent it to Roy Hazelwood, at the FBI, and Reid Meloy to get their approval. We wouldn't find out until much later, but Meloy took a very major role in my prosecution. Although he would present himself to the court and the jury as a man of science, he was really just bent on putting me in jail to validate his work. Meloy looked over the draft sent to him and edited major portions of it. My attorneys later said they had never seen such a thing.

Broderick bolstered his case against me in his affidavit. For example, he wrote that Detective Wheeler-Holloway had found spray-painted drawings of a "very sexual nature" under one of the bridges near the field and that they had been done in orange spray paint. This was an important fact, because the knife found by Gregory Schade had orange spray paint on its handle. By tying the knife to the drawings, Broderick could claim that it was mine, since I also drew quite a bit (even though I had not been the one to draw the stick figures under the bridge). But Wheeler-Holloway never said the paint under the bridge was orange; it wasn't. Broderick used this to get me arrested.

By this time, Broderick had spent countless hours studying my doodles and my stories. Keep in mind that these were the work of a fifteen-year-old boy, and I wouldn't try and tell you that I was an art or a literary prodigy.

against you." What they didn't tell me was that the things I said would be twisted around so much.

I was angry that they brought my mother, who I'd loved very much, into this. They were calling Peggy's murder a "displaced matricide." They had hired a forensic psychologist to "interpret" my stories and drawings and find a link between them and the crime. It was hocus-pocus bullshit. They claimed my drawings and stories showed hatred toward older women, and that was the motive for this murder. I was dumbfounded; almost all of the examples from my drawings and stories used in the search warrant were acts of violence against boys and men. How could they claim that I specifically showed hatred toward women?

It seemed like Broderick was blaming me for every little incident that happened within about a mile radius from my house. There had been sexually graphic stick-figure graffiti painted under a bridge by my house. I've never spray-painted graffiti on anything, but according to Broderick, that was my handiwork. There was a Quonset hut about a half mile south of my house with female figures drawn on a wall and bullet holes through the breasts. Broderick implied I had done this and added that during the 1992 interview, I had admitted to being in this Quonset hut. I had admitted to taking carpet samples out of a camper that Peterson's Carpet used for storage. It was not the same as the Quonset hut. I had no idea where this so-called Quonset hut was.

The psychological parts of the warrant were just flat-out wrong. How could they be so wrong? How could all these seemingly intelligent people get it so wrong? I was just starting to see that people see what they want to see. Broderick never wanted to look at this case with an open mind and convinced those around him to do the same.

Broderick wrote, "It is the opinion of Dr. Meloy that the sexual homicide of a woman was planned and rehearsed in the obsessive fantasies of Masters as evidenced by the following excerpts from his fantasy productions drawings and narratives."

He listed dozens of violent excerpts from my work. He chose the most graphic, violent excerpts he could find. Yet there was never an instance of a sexual homicide. I didn't understand how they could claim I had obsessive fantasies about a sexual homicide, and had planned and rehearsed this

who didn't like the person to say what a bad person the defendant was. None of that is evidence though, which is why it's not admissible. Why would a drawing I had made long before Peggy Hettrick was murdered be considered as evidence? The prosecutor said that they didn't want to bring it in to show that I was a bad person; they claimed it was to show the jury how I had planned my attack on Peggy and how I had carried out the murder. They pointed to a couple of drawings of knives and of violent themes and said they ought to be admissible because they fell outside the realm of character evidence.

The judge held a hearing on this and we spent a day in court arguing about it. We also spent a day in court arguing about whether Reid Meloy would be allowed to testify to the jury about his opinions of me and how he believed, after seeing my drawings but never talking to me, I was a cold-blooded killer. The judge's wife was a psychologist, and he seemed to hold the profession in high esteem. He said he would allow Meloy to testify but that he would have to be careful how he phrased his testimony in front of the jury. He couldn't tell the jury I had killed Peggy; he could only tell them that my drawings showed how I planned on killing her.

As for the drawings, the judge said pretty much the same thing. They could be introduced into evidence but not to prove that I had done the things in the drawings and stories. They just showed my motive for killing Peggy and my plan and "scheme" for carrying out the attack.

body was found. I had seen Peggy's body but had gone to school. He jumped to the next day—February 12—and told the jury that when my room was searched, they found my "collection" of knives on "display." I had pulled the knives out the night of the eleventh after my father had gone to vo-tech and left me alone in the house. He didn't mention that I had consented to let them search my room because I felt I had nothing to hide.

He told the jury they had found thousands of pages of drawings of "cruel and grotesque images, drawings of killing, dismemberment." He then told the jury that I had been brought in for questioning on the twelfth. To the jury, it sounded like this was the first day I had been questioned. It may have seemed a small detail, but I began to notice that the prosecution played fast and loose with the facts and details in my case, always painting the picture a little worse for me.

Gilmore admitted to the jury that I denied any involvement in the murder. He quickly jumped to 1992—he didn't mention how there was absolutely no physical evidence that tied me to the crime—and simply said that the case had been brought back up for review by the police. He mentioned that I had been reinterrogated and had again denied all involvement. Then he told the jury about Broderick attending the seminars in 1995 and 1996 where he learned about the "developing area of investigation, attempting to understand sexual homicides."

Gilmore told the jury that Broderick was directed to Reid Meloy. Meloy had explained to Broderick that the "frightening view into the private fantasy life of Mr. Masters" would explain the Hettrick homicide. According to Gilmore, Meloy could interpret my drawings and, from them, explain how I picked Peggy as a victim, climbed out my bedroom window with a survival knife, scalpel, and a "red-covered flashlight to surprise her," snuck up and killed her by thrusting the knife into her back, lowering her to the curb, dragged her into the field, partially disrobed her, and then cut off her nipple and "vaginal skin." According to Gilmore, Meloy could testify to that based upon nothing but having looked at my drawings. He didn't mention that Meloy had never met or spoken with me.

He started to argue to the jury about how the evidence was going to show I was acting out my fantasy life when the judge cut him off for arguing during an opening statement. "Please get back to what the evidence will be, please."

evidentiary value was found in the field he claimed to not know anything. "I don't know about the other investigators. I know I didn't find anything."

"And nothing belonging to Tim Masters was found in the field?"

"Not that I'm aware of, no, sir."

Dean left the stand and the court took a short recess. James Broderick would take the stand next.

* * *

BRODERICK RETOOK THE stand next for his big show. From this point forward, his testimony and that of Reid Meloy would really be the foundation of the prosecution's case. But first, he started by telling the court of his twenty years with the Fort Collins Police Department and how he had risen to the rank of lieutenant in order to build their confidence in him as a witness.

Broderick had responded to the scene of Hettrick's murder on the morning of February 11. He had then gone out and questioned Matt Zoellner. He had gotten permission to take the car Zoellner said he had been driving for inspection, and had also gotten blood and hair samples from him. He had then gone and searched Zoellner's apartment. The next day, he had come to my home and searched it as well.

He focused on the "large display" of knives in my room. He described the adult magazines in a suitcase in my room—he called them "pornography"—and also some BB guns I had. He even described a couple of toy guns as if they were dangerous.

The knives became a focal point of his testimony. He testified in great detail about which ones were in sheaths and which were not; which way they were pointed and what order they were in from left to right. It was an amazing amount of detail, considering he did none of those things with the footprints out in the field by Peggy's body.

The prosecution then asked for the adult material to be admitted into evidence and suggested to the court that most of it be sealed, except for one photograph of a "very explicit vaginal shot." Clearly, they wanted the jury to believe that a teenaged boy who found such a photo interesting would also go out and kill a stranger so he could slice off a piece of her vagina.

stabbed." Of course, he added the little flourish about pulling it out of someone I had stabbed—something I had not said.

At the time, Broderick hadn't asked me *why* I might think the knife wouldn't be good for stabbing someone. If he had, I would have told him that we had watched the movie *All Quiet on the Western Front* recently at school. There, a World War I officer lectured a recruit who was carving notches into a knife blade, telling him not to do it because it would make it harder to pull it back out of the enemy.

Broderick also told the jury about some of the facts I got wrong, like when he asked me what I saw when I looked at Peggy's body. I didn't remember seeing her breasts so I told him that I thought they had been covered when I walked up to her body. I mentioned that I thought her shoes were pink and I also thought I remembered seeing a number on her shirt—a number like on a football jersey—but it turns out there was no such number on her clothing. Meloy would later turn those mistaken comments of mine into the basis for arguing that I had really killed her.

Peggy had been wearing red boots and pink socks when she was killed. Broderick wanted the jury to believe that I had mistaken her socks for her footwear and that the only way I could have known she was wearing anything pink was if I had killed her. He based this on his examination of the photos of Peggy's body—Broderick had not examined Peggy's body in the field like the other police officers who had shown up that morning.

Broderick also made a big deal of a sketch I had drawn of someone being dragged. I had made the drawing after talking with Wayne Lawson, and Broderick had asked me about it when he interrogated me. He thought it proved I had some kind of specific knowledge of the crime, something only the killer would know. In the drawing, I had put in arrows flying through the air—I have no idea why—and had shown blood dripping from the subject's arm. To make the drawing scarier than it was, the prosecution blew it up really big, and downplayed how the drawing was just a small part of a full page of doodles. Elsewhere on the same page I had drawn a few dinosaurs, Freddy Krueger from *A Nightmare on Elm Street,* and a man with his tongue nailed to a table. At that point, we broke for the day. The prosecution indicated they were about to start a PowerPoint presentation with Broderick that was going to take up quite a bit of time.

to ask teenagers to help them with such a serious investigation. While they were supposedly protecting vital information in the investigation, their teenage helpers were gossiping about it over the lunch tables at the local high school. And that's where I—and everyone else at school—heard about it. I didn't know it at the time, but Broderick and Linda Wheeler-Holloway had followed up on this and found out that others had heard this from the Explorer Scout too and confirmed it when they were asked. Missing this incriminating piece of evidence, they felt they couldn't arrest me then.

Broderick told the jury about how he'd attended seminars on sexual homicides and met the former FBI profiler named Roy Hazelwood. After speaking briefly with Hazelwood about my case, he claimed that he was directed to Reid Meloy. He did not tell the jury—nor did the prosecution tell my attorneys—that Hazelwood expressed doubts about me being Peggy's killer. We later found out that this was a pattern of Broderick's: when he encountered someone who disagreed with his conclusions, he would ignore them and find someone else who agreed with him.

He told the jury that he gave Meloy a "huge volume" of my drawings and writings and that Meloy helped categorize them. He told the jury that Meloy had already been paid more than $27,000 for his work.

He then described for the jury some crumpled-up papers he had found in my wastepaper basket in my bedroom in 1987. These are the kinds of things that are irrelevant—they don't prove anything—but they made me look bad to a jury. One was a drawing of Freddy Krueger from *A Nightmare on Elm Street*. The other was a cartoon I'd drawn of a woman's head and a gun, with the caption "God damn old Ladies." He then walked the jury through a series of my drawings, one by one, often spending more time analyzing them than I took drawing them.

"What does that depict?" the prosecutor asked him, holding up one of my sketches.

"It's a—the drawing in the lower right-hand corner, it's on some schoolwork called Design B, which is a class that Mr. Masters was taking in 1987. It shows an individual with a handgun to his head, shooting himself in the head, with all the debris and blood coming out the left side." He claimed it was significant to the investigation because I had told Wagner that if I had committed a crime like the one I was accused of, I would have killed myself. Obviously, I hadn't killed myself, but the judge let the

prosecution talk about this to the jury and let Broderick tell the jury that my collection contained six or seven depictions of suicide.

After going through another series of my gory cartoons, he told the jury they were connected to the Hettrick murder because they depicted "scratches and body cutting." He had gone through all of my drawings and writing and had counted various details. For example, he found more than 150 references to knives. There were "30 or 40" references to maps. He counted a hundred times I had written the number "10." It was unclear why some of the categories might even be important. Broderick never explained, leaving that for Reid Meloy to do later.

Broderick had also read everything I had written, which included short stories I had been writing for a few years. Most of them were similar to the movies I liked to watch and included war scenes, horror stuff like *Friday the 13th*, or some combination of the two. He summarized some of the stories for the jury. I guess he wasn't just an art critic; he was also a literary critic.

He described one: "From memory, it's a story about an individual by the name of Harry Dagger. He likes to collect weapons. Kids in the neighborhood feel his house is haunted. They get together and shoot arrows into his house, which catches on fire, one which goes through a window and strikes this Mr. Dagger. It talks about how the fire department comes. Mr. Dagger's brought out of the house all burned up, and there's quite a description as to what he looks like."

Broderick claimed it was important for the jury to hear about this story because characters in the story "stashed" weapons in an irrigation ditch. Since the prosecutor was trying to say that the knife found by the young teenager was the murder weapon—even though there was nothing linking it to Peggy or me—there had to be some way to tie it to me. They had no evidence, so the story would have to do. Of course, Broderick loved to let the jury hear the stories I'd written when I was fifteen; they made me sound creepy and scary. Broderick also purposely misinterpreted some of the stories to make me sound worse. In a couple of my stories, I had used a character named "Mace." When Broderick had asked me about it in 1987, I had told him that I had gotten that name from the book *Tex*, by S. E. Hinton. The book was about a fifteen-year-old boy who had an older brother named Mason—nicknamed Mace—and lived in a trailer in the west. Their mother

# 30

## The Trial: Day Five

O N WEDNESDAY, MARCH 24, COURT STARTED AT 8:30 A.M. with Dr. Reid Meloy on the stand telling the court how he had been initially contacted by Broderick in 1997. Broderick had promised to send along "all the evidence on the case," and Meloy had no reason to believe Broderick had withheld anything from him. He told Broderick he was going to charge $300 per hour to work on the case. Broderick sent along piles of documents and statements and nine three-ring binders filled with 2,200 pages of my drawings and writings. Meloy also went to Fort Collins and visited the crime scene and then met with Broderick and the rest of his staff. Before he had been asked about any of his store-bought opinions, he started giving them. "And during that time, I talked extensively with them about my preliminary opinions concerning this case, one of them being that this was a sexual homicide; and two, talking with them in depth about offense characteristics in a sexual homicide, and also motivational aspects of a sexual homicide; in other words, why people do these kinds of acts."

My attorney objected, and Terry Gilmore even agreed with him when they approached the bench and spoke with the judge quietly. Gilmore told the judge—as if Meloy was a loose cannon—"I've told him a hundred time he cannot say an opinion like that."

The court threatened to declare a mistrial and told Gilmore that if Meloy did it again—offered an opinion without being asked for one—he was going to assess the costs of retrying the case against Meloy personally. "You may tell him that," the judge warned Gilmore.

The court sent the jury out, and we took a break so Gilmore could explain to Meloy how he needed to be more careful with what he said. Six minutes later, the jury returned and Meloy continued with his testimony. Meloy said he directed Broderick to go through the 2,200 pages of my stuff and to categorize the items. He did not indicate what psychology training Broderick might have had to help him do this kind of research for Meloy,

Wheeler-Holloway's interview with me had covered all the same ground as my previous interrogations with Broderick and the others in 1987 and lasted five hours.

On cross-examination, Wheeler-Holloway was explicit: a person could not see Peggy's body from my home. The berm in the field blocked the view. In fact, she had stepped out my back door and looked from there and still couldn't see the body. She also admitted that Wayne Lawson was "a little confused" on the facts every time she had talked to him—so the timing of when he heard about the breast mutilation was suspect. She also admitted she had to end her interrogation of me because she had become "exhausted." After her exhausting five-hour marathon interrogation, she stepped back and let Broderick continue with me for another four hours. Still, after nine hours, Wheeler-Holloway admitted my story had not changed from 1987. She told the court that at the end of the second day, I finally broke down and cried. She hadn't told the jury that on her direct examination. Now she also told the jury that I had always maintained my innocence and had cooperated fully, answering every question she had asked.

The next witness for the prosecution would be their last. He would also be the fulcrum on which their entire case rested. Dr. Reid Meloy was the psychologist who claimed to be able to see into my drawings and writings and discern that I had killed Peggy Hettrick. It was an astounding suggestion for a psychologist who had never spoken with me, but the court allowed it. He spent an hour telling the court about his qualifications and the schools where he lectured. He had written numerous articles and books and been given all kinds of awards. He was also paid a pile of money to look at my drawings and stories and to say I had killed Peggy. The court deemed him an expert, which allowed him to tell the jury his opinions of me, gathered from looking at my drawings and writing, and from things told to him by Broderick. At this point, the court took its break for the day.

what portions of it "had some correlation to the investigation into the murder of Peggy Hettrick." Broderick noted an event where a Radio Shack employee was killed, another where someone was attacked in a ditch, and then one with a river full of blood and bodies. Although Broderick testified these things correlated to Peggy's murder, he never said how or why. He also didn't tell the jury that this story was a fantasy, set in a world where the adults had all mysteriously disappeared, and the characters were all children, like in *Lord of the Flies*.

After summarizing several more of my stories, he then jumped ahead to how he had prepared another arrest warrant for me, in 1998. He told the jury he did this after a review of all my materials and a "consultation" with Meloy. He described arresting me in Ridgecrest and searching my place. When asked what he found in the search of "evidentiary value" to this murder case he said, "a large amount of pornography." My attorney objected, and before he could even say why, the judge told the prosecutor to move on. Broderick then told the jury he had found guns and knives as well as more drawings and stories of mine. They kept referring to my drawings and writings as "productions." Again, he summarized them for the jury and kept telling the jury that the stories—some of which were science fiction and involved space travel—were really me talking about myself and things I had actually done.

Erik Fischer cross-examined Broderick and got him to admit that many of my gory drawings were set in wartime and the characters were soldiers. He also admitted that I was a pack rat and many of the drawings and writing he had found at the time of my arrest could have been written many years earlier. I rarely threw away anything that I had written or drawn.

Broderick admitted that many of the drawings were interpreted by him and could be taken to represent other things to other people. One picture I had drawn showed a man being sawed in half; Broderick had said it showed "genital mutilation." In another example, I had drawn an optical illusion of a knife slicing through the page it was drawn on; Broderick insisted it was an illustration of a knife slicing a vagina. Fischer got him to admit that the photo depicted no legs, pubic hair, or any body parts. There was nothing to indicate it was a person being cut. It was just Broderick's imagination. To defend his position, Broderick said he showed the picture to "others," and they had agreed with him.

but he plowed ahead. He admitted that Broderick had come up with some categories of his own, and Meloy had agreed with them. They agreed on 33 categories into which they would subdivide my work. "Preoccupation with death" contained 291 items; the "Knives" category held 186. Some were mundane, like "The color red," and "The number 10."

To impress the jury, the prosecution asked Meloy questions where he could give long discourses on psychology, lectures on things like "sexual homicide." In answering, he rambled on for ten minutes—his answer to that question took up seven and a half pages of the transcript. He told the jury of studies done in England and of researchers who wrote books on the topic and of papers with titles like "Unprovoked Attacks on Women" and "The Sadistic Murderer." He also managed to work in a plug for his own book, *The Psychopathic Mind*. Nowhere in this monologue did he actually come out and say that any of those articles and books applied to me, but the suggestion was clear to the jury.

He did admit to the jury that the methodology for doing research in this field included three sources of information. The first of the three is an interview with the individual. He glossed over—actually, he didn't mention at all—the fact that he never interviewed me.

He then explained a concept to the jury called "sex-violence pairing." He claimed that sexual homicides are committed by people who have come to associate violence with sexual arousal. He admitted that even the forensic psychologists didn't know what could cause such a thing, but he thought it might be inspired by violent pornography or by adolescents seeing adults have sex.

Meloy told the court that the Hettrick murder had been a sexual homicide, particularly because the body—in his opinion—had been "displayed" and "posed" by the killer. "Displaying" means that the body was left out in the open and not hidden. "Posing" means that the killer left the body in a manner meant to degrade the victim. Peggy's body was left in an open field, her pants had been pulled down and her top had been pulled up, exposing much of her body. Meloy claimed this description fit the crime. But again, none of it pointed to me. It didn't matter to Meloy, though. He didn't need evidence; he could see things in my drawings and writing, what he also called my "productions."

Meloy explained to the jury his opinion that Peggy's body was mutilated by a killer who was angry with women. He also said that a killer in a sexual homicide often has fantasies about his desire to kill. He would point to my drawings and writings and say they were evidence that I fantasized about killing.

Meloy gave examples to the jury from "research," but it was clear to the jury who he was talking about. "And then he, perhaps, would be walking down the street and would see a woman who he found sexually attractive; but because of his anger and hostility toward the woman, in his mind he would believe that because of the way she's walking and the way she's dressed, she's deliberately taunting him and flaunting her sexuality, and that might then stoke his anger toward her." He told the jury that he conducted tests on individuals to prove this point but, again, didn't mention that he had never tested me.

Meloy told the jury that sexual homicides were often committed after a "triggering event," something like a job termination or "an emotional upset concerning the death or the loss of somebody." He said there could be an "anniversary reaction." He was setting the scene so he could later tell the jury I had been inspired to kill someone when the anniversary of my mother's death came around. Meloy mentioned Roy Hazelwood from the FBI here, but only that he was a leader in this field of research.

One of the words Meloy introduced to the jury was "*picquerism,*" which he said was a form of paraphilia, or sexual deviance. Picquerism, according to Meloy, is a condition where a person finds sexual gratification from cutting or stabbing someone. At this point, Meloy went through pictures I had drawn—the prosecutor projected them onto a screen so the jury could see them—and pointed out knives, cutting, and stabbing, saying these represented my sexual deviance and my desire to cut up women because I hated them so much. My drawing of Freddy Krueger from *A Nightmare on Elm Street*? "[T]hat represents the picqueristic nature or the interest in cutting, stabbing, slicing instruments in this particular drawing."

Meloy also found great importance in the stories I had written about the character named "Mace." Meloy told the jury that Mace and I were one and the same and that I assumed "the role" of the characters I wrote about. Meloy testified that I did the things my characters did—but he gave no examples. Since I wrote about someone killing someone else, and I was

Mace—according to Meloy—I must have actually killed someone. After all, I had written about it, and Meloy said my writing was real. It was all unbelievable, but the court allowed it. We just hoped the jury wouldn't buy it.

At one point, Gilmore put up a slide of a drawing I had made of a building on fire and asked if it connected sex and violence. Meloy said, "Yes." Even Gilmore realized there was no way to say the drawing had anything to do with sex—despite the fact his expert psychologist had just said it did—so Gilmore corrected him. "I don't believe that slide relates to the sex and violence. Excuse me. Would you relate—I'm sorry." He put up another slide without giving Meloy a chance to explain how a burning building portrayed sex.

Nate Chambers cross-examined Meloy and started by asking him, "Doctor, are you ever wrong?"

"Yes," he replied.

Nate asked the doctor about another case in Colorado where Meloy had testified. In that case, he had testified for the defense, saying that the accused didn't "deliberate" in the manner necessary to be guilty. The jury disagreed and found the man guilty anyway.

On the stand, Meloy said that he had already billed $36,000 for his work on my case.

Nate pulled out a copy of Meloy's book and asked him if *The Psychopathic Mind* was something he relied upon in working on my case. Meloy said yes, it provided "background material for my knowledge base."

Nate read to him one of the reviews of the book, by one of Meloy's peers. "Meloy's idea of psychopathy includes such a widely diverse group of individuals that one must question the concept's usefulness as a psychodynamic formulation since it can apply to just about anyone?"

Meloy wasn't amused. "What's the question?"

"You're familiar with that review of your work?"

"Yes. I didn't remember him specifically saying that."

Nate then pulled out stacks of articles and textbooks, all of which questioned how "scientific" Meloy's theories were. One by one, Meloy said he disagreed with them, even though some of them were textbooks he used when he got his PhD. Meloy also admitted he had no idea how many

fifteen-year-old boys drew drawings like mine in 1987. He just assumed I was unique.

Nate got Meloy to admit that much of what I had done did not fit the diagnosis he had tried to give me. According to Meloy, a person who harbored this deep-seated hatred of women and fantasized about killing them would have kept those thoughts private. Yet I showed my pictures to my friends and let them read my stories. Meloy said he did not know whether I had shared them with anyone. Of course, he had never spoken to me; he would have known if he had asked Wayne Lawson, but he didn't bother with that either.

Nate read portions of studies to Meloy where other psychologists pointed out that "normal" men often have fantasies involving violence. Meloy tried arguing with Nate, saying that recent work in the field disproved this. Nate had read Meloy's books and had found some of it fascinating, in light of Meloy's testimony. Apparently, Meloy admitted in one of his books that he sometimes had violent and sexually sadistic fantasies.

"In fact, sir, you engage in violent fantasies?"

"In sexually sadistic fantasies," he admitted.

"Violent fantasies?"

"I have at times had angry fantasies where I have violent images in my mind, and I spoke about that actually in my second book."

There was more. "You've had predatory fantasies?"

"I did mention that at times I've had that, yes."

Meloy even admitted to having "occasional homicidal feelings" and had gone so far as to write it in one of his books. His explanation? "Yes. In plain English, I'm talking about getting angry and wanting to hurt some people at different times."

Nate turned to my drawings. Meloy admitted that in the 2,200 pages of my "productions," there was not a single picture of a woman being stabbed in the back. Nate asked him about specific examples where Meloy had claimed I had hundreds of examples in different categories. Nate pulled out one and read a passage to the doctor, a portion of a story about a knife fight in Vietnam. Meloy had counted it as a graphic portrayal of sexual homicide.

Nate asked Meloy about Rorschach inkblots and then put up the picture that Broderick and Meloy had both said was a knife slicing a vagina. He admitted the picture had no pubic hair, no legs, and nothing to indicate it

was even a body. "What does that tell you about yourself that when you're shown a drawing of a knife cutting through a flat surface, you see a knife being inserted into a vagina?" It was Nate's last question for Meloy.

\* \* \*

AT THAT POINT, the prosecution rested. That was their entire case against me. We now had the opportunity to put on my defense. We had decided to simply call one witness: a psychologist to counter the theories of Meloy. After all, the prosecution had no evidence against me except for my drawings and writing. Without them, their case should fall apart.

We called John Yuille, a forensic psychologist who taught at the University of British Columbia. Yuille had a résumé longer and more impressive than Meloy's. He had been a psychologist for fourteen years longer than Meloy, and he ran the world's largest forensic-psychology program there. He had sat through Meloy's testimony and had reviewed Meloy's reports and all of my drawings and writing. The court recognized Yuille as an expert.

Yuille explained to the court that forensic psychology was not quite as advanced and accurate as Meloy had claimed. There was not enough research done in the field to prove the link between fantasy and sexual homicide. He pointed out that studies had been done showing "normal" people with deviant fantasies at a surprisingly high rate. One well-respected journal had published an article that reviewed the state of knowledge in the field and had written, "Most important, there is no evidence that sexual fantasies by themselves are either a sufficient or a necessary condition for committing a sexual offense." After pointing out that psychologists could not say there definitely was a link between fantasies and sex crimes, he was done.

Gilmore cross-examined him for a few minutes, but Yuille stuck to his guns. The science of forensic psychology was still in its infancy and could not be considered as exact as mathematics or chemistry.

With that, there was nothing left but closing arguments. The judge told us we had to make our arguments in no more than an hour and a half each.

In the fall of 2000, I spoke with Fischer, and he told me that television producers from the A&E network had called and said they were doing an investigative report on my case. He asked me to write a statement to make sure I got my side of the story told. I had seen the program and knew that they tended to side with whatever result the jury had come back with. They might mention my side, but they'd spend their time talking to the police and the prosecutors. They did talk to Fischer later, but he told me he had stuck to the legal issues in the case. I was disappointed. The average person doesn't care about the nuance and detail of the legal issues. I wished he could have gone over the evidence with the producers of the show—or, more important, the lack of evidence.

Fischer had to be cautious though. We had filed our appeal, and he had already made his arguments before the court of appeals. We were waiting for the court of appeals to rule on the case. I was sitting in my cell one night when A&E ran their documentary about my case in the series *Cold Case Files*. They crucified me. They spent the whole half hour showing my drawings over and over again and then spoke at length with Broderick, Blair, Gilmore, Meloy, and Reed. They even interviewed Wayne Lawson and blacked out his face so no one would know who he was. Jolene Blair trotted out her closing argument for a national audience this time: "Who else could it possibly be? No one else had the motive, the weapons and the opportunity to commit this crime." The host, Bill Curtis, agreed with her that I was guilty.

Now, everyone in prison knew why I was in Bueny, but since they had learned about it from A&E, most also believed I had done it. I assumed everyone who saw the show believed I had done it. The good news is that a few guys came up to me and expressed sympathy. "Man, that's fucked up how they convicted you with no real evidence." There were others who wouldn't talk to me because they now thought I was guilty and belonged in prison and also because of the sexual nature of the crime.

On February 17, 2001, a friend of mine came by and said he had seen my name in the newspaper under the headline: "Murder Conviction Upheld by Appellate Court." I was a little pissed that my attorney hadn't told me the news; I had to get it thirdhand from someone who had read it in the newspaper. Fischer did call me and then sent me a copy of the opinion written by the court of appeals, explaining why they had ruled against me.

Among other things, the court had bought the argument that my mother had red hair! My mother had brown hair. They had gotten several other facts entirely wrong. They wrote that Peggy's body could be seen from my bedroom window. They also bought the nonsense about Peggy's pink socks. According to the court, the knife found by Schade was under the bridge right by the field. In reality, it was found a quarter of a mile away. Somehow, the court of appeals was now twisting and making up facts to support my conviction. Perhaps scariest of all was that the court of appeals found nothing wrong with the prosecution relying so heavily on my drawings and writings to convict me. Since the drawings appeared to show some people being stabbed, they could show them to a jury to prove I stabbed someone.

Amazingly, the court of appeals also upheld the search warrant that Broderick had gotten for my home in Ridgecrest. You may recall that much of what they were searching for were things that Meloy said they might find there. Meloy's beliefs and opinions weren't evidence, however, and we thought the court would have struck the warrant since it wasn't based on evidence. Instead, the court of appeals wrote that Meloy's opinions and beliefs were basis for probable cause because of the prosecutor's theory of the case. It really looked like they were simply writing an opinion to support the conviction, even though they had to ignore common sense to do so.

When I lost my appeal, I lost all faith in God. It was the final nail in the coffin of Christianity for me. I not only stopped believing in him, but I hated him. If he really existed, he was out there, watching me and letting me suffer unjustly. From that point on, I couldn't stand it when people told me to have faith in God.

I also found out that my only hope now was an appeal to the Colorado Supreme Court, and that would take a couple more years as well. Since I had long since spent all my money on legal fees, my sister had been making my mortgage payments on my home in California. I knew now there was no way she could continue to do that, so I talked to her about letting the house go into foreclosure. I made a list of things I'd like to save and sent it to her. Serena made several trips to the house and back and placed my things in storage sheds she put up in her backyard. I knew it was difficult for her. She had helped me get things from our old trailer in Colorado after Dad died;

scenery—inside the walls of the prison—had been bland and hadn't changed in years. It was the strangest thing to be sitting in a comfortable waiting room at an eye doctor's office, chatting with the female secretary, waiting my turn. When I got my prescription, I mailed it to Serena. She spent a small fortune getting me two pairs of glasses. One pair had the tinting that grew darker when exposed to sunlight. At the time, the prison didn't allow shaded lenses, but these got through the mail room because they were inspected indoors. When the guards examined them, it simply looked like I had gotten two pairs of prescription glasses.

* * *

IN OCTOBER 2002, I again heard from a fellow inmate that a court had ruled against me. The papers had the story of the Colorado Supreme Court ruling against me. This opinion was much like the one from the court of appeals. The Colorado Supreme Court bought the nonsense of Meloy's and said it was okay for the court to have allowed into evidence all of my drawings and writings. The court said that my attorneys should have asked for a "limiting instruction" to be given to the jury—to tell them that the drawings and writings didn't prove I killed Peggy; they just proved I was the kind of person who could.

I was also surprised to learn that the vote on my case was 4–3. Of the seven Colorado Supreme Court justices, three of them voted to overturn the conviction and grant me a new trial. I lost by one vote! The three justices who disagreed with the verdict wrote a dissenting opinion, including: "Most of these writings and drawings have nothing to do with this grisly murder." "The sheer volume of the inadmissible evidence so overwhelmed the admissible evidence that the defendant could not have a fair trial. . . . There exists a substantial risk that the defendant was convicted not for what he did, but for who he is."

Now, it looked like I was in for the long haul. If we tried to go to the U.S. Supreme Court, that could take many more years. And, like the Colorado Supreme Court, you just don't get to file an appeal and be heard. You have to file the writ and see if they will let you file your appeal. And the Supreme Court takes very few cases out of all the writs presented to them.

IN A CRIMINAL prosecution, when the prosecution team turns over all the evidence they have—regardless of whether it supports their case or not—a defendant can adequately prepare a defense to the accusations against him or her. In my case, the nature of the evidence they withheld from us indicated that they knew all along I had not killed Peggy Hettrick. Much of what they kept from us pointed to other suspects, and some of it simply showed how sloppy or misguided their investigation was. For example, we were only given some of Meloy's reports before the trial. We should have received them all. Meloy's reports would have been a gold mine for my attorneys when it came their time to cross-examine him.

prints were fresh. The owner of the credit card lived two doors down from the Hammonds on Skysail.

* * *

IN THE FALL of 2006, Maria Liu sent a letter to Reid Meloy. In Meloy's report, he referred to an FBI profile that had been created in response to a request made by the Fort Collins PD after the murder of Peggy Hettrick. An FBI profile used by the police in their investigation is something that should have been turned over to my trial attorneys before the trial. My attorneys never received any such profile. During the appeals process, my attorneys had asked the prosecutor's office to provide them with the profile, and they were told over and over again that no such profile existed. They claimed that there was confusion because someone at the Fort Collins PD had simply spoken to someone over the phone and had a phone conversation with a profiler at the FBI. It was all very informal, and that explained why there was nothing to give my attorneys.

After Maria got Meloy's report—and paid $1,000 for it—she found a reference to an FBI profile. According to the report, there was a full report created by the FBI Behavioral Science Unit that ran for several pages. It raised ten points about the killer of Peggy Hettrick and contained quite a detailed analysis. It certainly didn't look like a simple list of notes made during a phone conversation.

It was a few months before Meloy responded to Maria's letter, but he did not deny that a full profile existed. He claimed he lost his copy but suggested that she contact the prosecutor's office. After all, Meloy pointed out, that's who had given him his copy. The prosecution still claimed there was no such profile. This was the kind of thing we ran into time and time again. The prosecutor's office threw up roadblock after roadblock in front of us, denying us access to even the most innocuous things.

When the prosecutors turned over evidence to my defense team before trial, they included a description of the man who threatened Safris but indicated that his name was unknown. They did not divulge the obvious conclusion that Hammond resembled the icicle stabber who threatened Safris.

At this hearing, I got to hear for the first time all about the weirdness with Hammond. The whole story of his perverted videotaping would have been crazy enough, but then to see how he got special treatment from the Fort Collins establishment was astonishing They protected an obvious sex offender and then never told my attorneys about him. Here was a man who lived just as close to where Peggy was found as I did and had surgical skills and a fascination with female genitalia. Now when I remembered Blair asking the jury, "Who else could have done this?" I knew the answer: Dr. Hammond, for one.

\* \* \*

ONE DAY, I called Wheeler-Holloway from prison, and she told me she had been doing a little poking around on her own. She spoke with one of the jurors who convicted me, Tom Turner, and she was surprised by some of the facts he had believed to be true. He voted to convict me based upon a few mistaken beliefs. He thought I had written in my stories something about wanting all redheaded women dead. He also thought the "drag" drawing was an accurate description of how Peggy had been brought into the field and that the "boots" in the drawing matched the boots Peggy was wearing. He also told Wheeler-Holloway that someone had testified that I had met Peggy at Albertson's the night she was killed and had seen her walking past my house later. Of course, none of this was true, and nothing like it had ever come out in the trial.

\* \* \*

EVERYONE KNEW THAT Reid Meloy was the key to my prosecution. Before Broderick found him, they had decided there was not any evidence to support charging me with the crime. After Broderick met Meloy, he

During our fight to get ahold of all the files on my case, we found out that Meloy was far from being unbiased or scientific in his approach to this case. When he was first consulted, he was asked if he was willing to go out on a limb and say that my drawings proved I killed Peggy Hettrick. Meloy said he would be happy to do it. In fact, he wrote a letter to the prosecution in February 1999—again, we did not see this letter until almost a decade after the trial—congratulating them for getting the court to allow him to testify as an expert. He said he hoped his efforts would "result in a successful prosecution."

Meloy did more than simply study my drawings and render an opinion for the prosecution. He visited the crime scene and wrote reports where he gave his opinion on how the crime was committed, and he even suggested courses of investigation for the police. If he had been a crime-scene expert, this would have made sense. Meloy was a psychologist, however, and had no expertise in interpreting crime scenes. One suggestion he made to the police had to do with the two mutilations found on Peggy Hettrick's body. The police had concluded that I had done this in the open field, in the dark. Meloy wondered if an expert would agree with this theory. Why he thought of it and not the police, we don't know.

Following Meloy's suggestion, the investigators had sent the autopsy photos to a plastic surgeon named Dr. Christopher Tsoi and asked him some specific questions. How long would it take someone to make the cuts found on Peggy's body? Tsoi offered his answers and included some detail. For example, the person who did the cutting was right-handed. Tsoi could tell because of the way the nipple had been cut. He said the cuts were made with "high-grade surgical-quality steel" and that the cut to Peggy's clitoris would have been a "hard cut" to make, even for an experienced plastic surgeon like Tsoi. Under proper conditions and using the skills of a surgeon, Tsoi said the two cuts could have been done in six minutes. Because the information Tsoi gave them contradicted their theory, they decided to not give it to my attorneys before my trial.

It is important to remember that in Colorado, the prosecutor's office is under a duty to provide the defendant with all evidence they have—good or bad—before trial. This is not optional; it is required by law. When the prosecutor and the police chose to hide this information from my attorneys, they were doing so in an attempt to convict me unfairly. Their own expert

suddenly had enough information to get a new arrest warrant and have me tried for Peggy's murder. Everyone knew that nothing had changed; no new evidence had been found. In fact, Meloy didn't actually bring any new evidence to the table. All he did was claim to be able to look at my drawings and see things in them that weren't there. Since courts allow experts to give their opinions to a jury, Meloy—as an expert—could tell the jury all about his opinions on my drawings. No one else could do that. At the heart of deeming Meloy an expert was the notion that what he was testifying about was science—not just conjecture. Science, as we all know, means things that can be measured and verified by others, and is not biased, slanted, or subjective. Two scientists looking at the same evidence should draw the same conclusion from it, right?

On April 20, 2007, there was another hearing on my case, and TJ called me to let me know it was the best one yet. Earlier, Maria had filed a motion to have the Fort Collins district attorney's office disqualified from handling my case. Among other things, their recent mishandling of the evidence showed they were not following the rules in my case, and their stubborn opposition to getting the DNA tested showed they did not really care about the truth or whether I was innocent.

Barie Goetz continued chasing down leads and speaking with witnesses from the trial. He found Tom Bevel, the blood-spatter expert, and showed him the photographs from the crime scene. Bevel was surprised by how many photos there were; he hadn't been shown all of them. He said that if he had seen all of the photos, he would not have testified as he did at my trial. In his opinion, the photos showed that Peggy was killed somewhere else and her body was brought to Landings and dumped. On top of that, he was upset. Why wasn't he shown all of the photos? In a new report, he said he had "serious concerns and questions" about why the evidence was withheld from him at the time of my trial.

Bevel figured something else out. Peggy had been wearing a jacket and a blouse. The cut in the blouse was an inch and a half over from the stab wound; the cut in the jacket was two and a half inches over. When she was stabbed, Peggy had been turning or twisting away from the person with the knife. Again, this was important because it contradicted the prosecution's theory that I had snuck up on Peggy in a "blitz" attack and stabbed her

# 52

## The Lawsuit

AFTER I HAD BEEN OUT A FEW MONTHS, I DECIDED I HAD to do something about what had happened. I guess I was naive, but I thought there was a chance that someone official might issue an apology for what had been done to me. Rather than apologize for what they had done, they actually continued telling people that I was still a suspect in the case!

Dave and Maria arranged meetings with a couple of big law firms that could handle a case like mine, and we went and sat down with them. I decided to hire David Lane's law firm. He got along well with my attorneys, and his office seemed to be more of a place where work got done —not just a place filled with expensive furniture and marble floors. He also had a reputation for taking on big defendants on behalf of the little guy. He was exactly what I needed.

He filed a notice of intent to sue in October 2008, another little hurdle they put in the way of people who have been hurt by government agents like Broderick, Reed, Gilmore, and Blair. Once that was filed, the news started up again with coverage of my story. Although most of the reaction was favorable for me, there were some people who didn't get it. A local news station's website had a section where people could comment on recent stories. A few people posted—anonymously, of course—things like, "Masters has never been proven innocent" and "I wouldn't want my kids around him."

One poster raised a point that probably hurts anyone in my position but it illustrates a common misconception about the legal system. "Maybe now we'll see all the evidence that convicted him in the first place." The poster was suggesting that there was more evidence against me than what the public knew about. Although this may be the case in a trial where the court suppresses a confession or throws out evidence because of a bad search warrant, there were no such exclusions in my case. The prosecutors got to introduce every bit of evidence they found—and then some! If my case had

gone back to trial, the prosecutor would have had to try the case with less evidence than in the first trial, and I would have gotten to put on a proper defense, with all of the evidence the prosecution had withheld from me in the first place.

During this time, Maria arranged to meet with Reid Meloy. What would the doctor say, now that it was proven he was completely wrong in his theories? When she met with him, the first thing he said to her was, "Why didn't you ever contact me?" It appeared he had been following the developments in my case and was feeling that, like Bevel and the others, he had been misled by Broderick, who had only given him the information that pointed to me. He hadn't been told about Hammond. He told Maria to tell me that he was sorry for what happened. Later, he posted a copy of my lawsuit on his website.

The civil suit I filed in federal court named the prosecutors and the police as defendants, which meant that the City of Fort Collins and Larimer County were also defendants. The feedback I got was mostly positive. Many people told me it was "about time" I did something about what they had done to me.

* * *

EARLIER, IN APRIL 2008, A TELEVISION STATION IN AMSTERDAM FLEW ME over to interview me on a late-night talk show. They wanted me to appear with Richard and Selma Eikelenboom to discuss how their groundbreaking DNA techniques had gotten me freed from prison. Barie Goetz and reporters Miles Moffeit and Helen Richardson all flew over, and after I did the show, we drove down to Paris. Barie and I continued a tour of Europe after the others left. I got to see Switzerland, Austria, and Germany before heading back to the Netherlands and home. I visited the Alps and stood on the deck of Piz Gloria, the restaurant on top of Schilthorn Mountain. They had filmed scenes there for the James Bond movie *On Her Majesty's Secret Service*. Just a few months before, I had been looking out at the world

# 53

## Afterward

IN JULY 2010, A GRAND JURY RETURNED AN INDICTMENT against James Broderick. After hearing testimony and reviewing the documents—many which had been discovered by my attorneys in the postconviction hearings and the lawsuit—the grand jury found that Broderick should be tried for eight counts of felony perjury. The grand jury finally said what we had been trying to say for years: Broderick lied to get me arrested and convicted. His lies were part of the affidavit behind my arrest and also in his testimony in court. For example, he had lied in his affidavit, saying that an FBI profiler had provided an opinion that pointed to me. There was no such FBI profiler who gave any such opinion. Broderick had lied in his affidavit and also at trial about my footprint at the field near Peggy's body. He kept saying that there was more than just the one and that my prints were found near the curb. Broderick lied about my mother's hair color, falsely swearing in his affidavit that she had red hair. As we know, the color of my mother's hair played a huge role in Meloy's opinions and in the presentation to the jury. Broderick claimed there was only one Thom McAn footprint at the scene—when there were many—and that he had little involvement in the investigation until 1992. Broderick coordinated the surveillance of me on the anniversary of the murder. If convicted of perjury, Broderick could go to jail for six years for each count. He could also be fined $500,000 per count.

The papers wanted to know how I felt now that Broderick was finally facing some consequences for his actions. I released a statement and made it clear that I held myself to a higher standard than the ones Broderick, Blair, and Gilmore held themselves to. I pointed out how Blair had "pumped her fist in the air in victory, at the courthouse in front of my family. I refuse to act like that. I'm not going to celebrate. But I am pleased to see a glimmer of hope that the man most directly responsible for my wrongful incarceration might be held accountable for his actions to some extent."

60    Book Review

# Drawn to Injustice: The Wrongful Conviction of Timothy Masters



By Timothy Masters with Steve Lehto, published by the Penguin Group, Berkley Books (2012), paperback, 448 pages, $9.99
http://www.penguin.com

Reviewed by Frederick Baker Jr.

In 1987, 15-year-old, 115-pound Timothy Masters took a shortcut through a field behind his house to catch his school bus. He saw something lying in the field that looked to him (and to the man who later reported it to police, and to the first officer on the scene) like a mannequin or a Re-susci Anne CPR simulation doll. Unable to believe it might actually be a dead body and determined not to be fooled by whatever practical joker had posed it there, he hurried to catch his bus, mentioning what he had seen to no one. That choice became the defining moment of his life. For the next 10 years—through the remainder of his high school career and eight years of naval service in the states and abroad—he would remain the prime suspect in the killing of Peggy Lee Hettrick, the victim Masters mistook for a mannequin. His failure to report what he had seen to police, and their discoveries that he was a loner (his mother died when he was 11, and his ex-navy father, a strict disciplinarian, put an end to most of his social life); that he sketched morbid scenes inspired by the combat and horror movies he loved, like *Rambo, First Blood,* and *Nightmare on Elm Street;* and that he possessed a survival knife collection persuaded Fort Collins Police Lt. James Broderick, the villain in this drama, that he had "found his man."

Reading this book will anger you because you will encounter stereotypes of police, prosecutors, and "expert" witnesses that we like to reassure ourselves exist only as heavies in overdrawn Hollywood screenplays. But they were all too real for Timothy



Timothy Masters at 15

Masters. He and co-author Steve Lehto, the Michigan consumer law attorney who has become more or less a book-a-year man, combed through the thousands of pages of documents relating to the prosecution's investigation (about 90 percent of which were withheld from the defense) and transcripts of his trial to produce a chilling portrait of what happens when one man becomes obsessed. Broderick saw to it that evidence that would have discredited his case against Masters was concealed or destroyed. Most incredibly, despite the surgical skill with which Hettrick's body was mutilated—something Broderick knew, from an expert opinion he concealed from the defense, that a 15-year-old could not have done in the dark with a survival knife—the evidence withheld included items obtained at the home of a *surgeon* who committed suicide after he was arrested for surreptitiously videotaping female guests while they used bathroom facilities at his home, *which adjoined the field where Hettrick's body was found!*

Not a shred of physical evidence connected Masters to the crime. The prosecu-tion concealed evidence conclusively establishing that Hettrick was killed elsewhere, driven to the field, and dragged and carried by two men wearing shoes of a different size than Masters wore to the place where her body was found—things a lone boy with no car or driver's license could not have done. And the "expert" testimony against him consisted of selective "interpretations" of his boyhood drawings that were so speculative and fatuous it is hard to believe any judge on earth would have allowed the testimony. When Masters describes one of the prosecutors, Jolene Blair, sharing a fist pump with Broderick in the hallway outside the courtroom after the jury convicted him in a case she knew was built out of a tissue of lies, and the two of them laughing as Masters' aunt chastised them for convicting an innocent boy, you wonder how in the world he could ever be exonerated. That story makes this a worthwhile, even inspiring, read.

One by one, a number of people, including one of the officers involved in the investigation that led to Masters' conviction, decided not to turn away from an injustice but to do something about it. Toward the end, as the prosecution's deceits unravel, the story takes on the feel and accelerating pace of the final thrilling minutes of Costa-Gavras' film, *Z,* when, with the help of the defense team that assembled to reopen his case, Masters succeeds in exposing the travesty of justice committed against him.

I admit I began the book with a skepticism borne of having reviewed hundreds of applications in which defendants have proclaimed their "innocence"—or at least

the possibility of it—unpersuasively, in the face of weighty testimony and forensic evidence. But one cannot read this book without concluding that Timothy Masters was and is, indeed, innocent, and that the people who convicted him *knew* it and yet went ahead to convict him anyway for reasons that apparently had more to do with ego and personal ambition than the cause of justice they were sworn to uphold.

> Not a shred of physical evidence connected Masters to the crime.

I will not reveal all of the outcome that is gratifying, but I will say that, in addition to Masters' belated vindication—he served a decade in prison for a crime he did not commit—two of the prosecutors who made their reputations by convicting Masters, and were subsequently elected to the bench, were voted out of their sinecures when voters learned of the shameful parts they had played in convicting an innocent man. Good.

If you would enjoy a story that restores your faith that terrible injustices will be righted when good people refuse to ignore a wrong—and perhaps being able to say the book was better than the movie when it becomes the next *Shawshank Redemption* (a movie deal may be in the works)—this would be a good selection. ■



*Frederick Baker Jr. served 28 years on the State Bar Publications and Website Advisory Committee, the last 24 as its chair. He continues to contribute occasional reviews of books by Michigan authors or on Michigan law-related subjects. Currently a Supreme Court Commissioner, he will retire in May to take an of counsel position with his former partners at Willingham & Coté, in East Lansing.*



**CE ARTICLE: 3 CE CREDITS**

By Frank S. Perri, JD, MBA, CPA,
and Terrence G. Lichtenwald, PhD



# WHEN WORLDS COLLIDE

## Criminal Investigative Analysis, Forensic Psychology, and the Timothy Masters Case

**This article is approved by the following for continuing education credit:**
The American College of Forensic Examiners International provides this continuing education credit for Diplomates.

**After studying this article, participants should be better able to do the following:**
1. Understand the difference between criminal investigative analysis and forensic psychology.
2. Consider ethical considerations when offering forensic psychological opinions.
3. Implement *Daubert* factors when evaluating the appropriateness of forensic testimony.

**KEY WORDS:** Reid Meloy, Timothy Masters, criminal investigative analysis, forensic psychology, Roy Hazelwood, sexual homicide, motive fantasy, pseudo-profile
**TARGET AUDIENCE:** Criminal investigators and psychologists
**PROGRAM LEVEL:** Basic
**DISCLOSURE:** The author has nothing to disclose.
**PREREQUISITES:** None

This paper offers an analysis of the series of events that occurred when a homicide detective contacted an international expert in forensic psychology to assist in the arrest process and the prosecution of a targeted sexual homicide suspect. The forensic psychologist developed a psychological profile of a killer using narrative and drawings made by the suspect to conclude that the suspect's fantasy was the motive and behavioral preparation for the sexual murder, regardless of the fact that the forensic psychologist knew that there was no direct or physical evidence linking the suspect to the crime. In this article, the authors examine the case of Timothy Masters, who was arrested and convicted of sexual murder based on the testimony of a forensic psychologist while the opinion of a criminal investigative analyst was ignored.

## Introduction

It is not uncommon for lay persons to erroneously believe that criminal investigative analysis, commonly referred to as "criminal profiling," is synonymous with forensic psychology, especially with the rise in popularity of television programs on profiling that incorporate psychological concepts. Further confusion may occur because practitioners in both fields read the same research, interview the same criminals, attend the same seminars, develop professional relationships, and cite one another's scholarship. However, what happens when forensic psychologists advance opinions about criminal matters based on the extrapolation of academic research on psychological concepts involving sexual homicide cases and reject the opinions of professional criminal profilers who incorporate law enforcement analysis coupled with criminal evidentiary considerations into their work?

**Timothy Masters**, who spent over 9 years in a Colorado prison for the murder of Peggy Hettrick, was released on January 22, 2008. Shortly thereafter, all homicide charges were dropped based on new DNA evidence pointing to other suspects. Masters, who always maintained his innocence, was convicted largely on the testimony of **forensic psychologist**, **Dr. Reid Meloy**. His violent sketches and stories produced when he was an adolescent were used as evidence to arrest and convict him in 1999 of killing **Peggy Hettrick** in 1987, a conviction that was upheld by the Colorado Court of Appeals and the Colorado Supreme Court. Masters's prosecution raises troubling questions, primarily because it pivoted on the controversial opinions of a board certified forensic psychologist who analyzed Timothy's sketches and con-



▲ Timothy Masters at the age of 15

▲ Timothy Masters when released from prison

cluded the drawings reflected specific personality traits, a motive and behavioral preparation to commit sexual homicide. Masters was convicted without a single shred of direct evidence, such as a confession, or physical evidence such as DNA, and was sentenced to life in prison without parole.

In this article, the authors review the sexual homicide investigation leading to the arrest of Timothy Masters, analyze the reasoning of the forensic psychologist's theories used to justify the prosecution, include **former FBI profiler Roy Hazelwood's analysis** of the sexual homicide that was never revealed to the defense, and provide an analysis of the legal implications of the case together with recommendations for forensic psychological practitioners.

### The Sexual Homicide Investigation

In 1987, 15-year-old high-school sophomore Timothy Masters lived with his father in Fort Collins, Colorado, a university town on the plains east of the Rocky Mountains. On February 11, 1987, the murdered body of Peggy Hettrick was found in a field not far from his residence. Hettrick's private areas were mutilated; with surgical precision, her killer removed her left nipple, areola, and part of her vulva. She was stabbed in the lower back causing a rib to break and then dragged into a field as evidenced by the drag marks in the soil. The body had been partially disrobed and positioned on its back with the legs slightly apart and arms over the head, exposing the

right breast and pubic area. After the delivery of the fatal wound, a bloody trail indicated that the perpetrator dragged the victim's body 103.5 feet into the field where it was found.

According to law enforcement, Timothy Masters was an early suspect because he saw the body on the way to school but failed to report it. Without consulting an attorney, he and his dad allowed detectives to search their home and Tim's school locker, where the police retrieved his writings, sketches, and survival-knife collection. Timothy's school locker contained a hand-drawn map of what appeared to be the field where Hettrick's body was found and a sketch of a person dragging a body. In his backpack were two Mother's Day cards he had made years before, while his mother was still alive. The detectives also found a calendar with a date circled reflecting the date that Timothy's mother died four years earlier. Peggy Hettrick had been murdered one day shy of the February 12th anniversary of the death of Timothy's mother. **Detective Francis Gonzales** found Masters at school, and Masters told him he

Timothy's knife collection

> **"Officers found no blood and no body parts in the house. There was no fiber, hair, skin, fingerprints, or other evidence that linked Masters to Hettrick, or an eyewitness..."**

had seen Hettrick's body but assumed it was a mannequin put in the field by his friends in an attempt to trick him. Indeed, even the bicyclist who reported the body told police that he too thought it was a mannequin (Yager, Smith, & Goldbaum, 2008).

The detectives also found what would become the most prejudicial of the prosecution's evidence a decade later when Masters was put on trial for Hettrick's murder: hundreds of extremely violent drawings and stories in his bedroom. Many of the pictures showed stabbings with knives and swords; much of the violence was directed at women. A sketch that would be particularly damning showed a figure that had been shot with arrows being dragged by another figure in the same manner police believe Hettrick's killer dragged her. While Masters's volume of drawings raised questions, they did not trigger his arrest because the bedroom and its contents were equally notable for what officers did not find. Officers found no blood and no body parts anywhere in the house. There was no fiber, hair, skin, fingerprints, or other physical evidence that linked Masters to Hettrick, or any eyewitness. The survival knives were tested at the Colorado Bureau of Investigation and found to have no trace of the victim's blood or DNA. There were footprints, but he lived next to the field and walked through it every day, so his footprints would be present.

The police also found a suitcase containing pornographic photographs and a large number of writings and drawings Masters had produced. Additional sets of drawings and writings were seized by police in 1998 when the defendant was arrested. In all, police seized approximately 2,200 pages of material produced by Masters; over 1,000 of these were admitted at trial.

### Drawings by Timothy Masters During His Adolescent Years

During the interrogation, Timothy's father sat outside the interview room. After reading Timothy his Miranda rights, officers prodded him to talk about killing, to think like a killer, to talk about what weapons he might use, and where he might put a body, yet Timothy did not confess. By the sixth hour, it was **Detective James Broderick**'s turn to tell Timothy to come clean about how he fulfilled a fantasy by killing Hettrick: "Why can't you just say it? Why is it so hard for you to tell me? You got to admit it when it's over. People get killed in battle, right? Their friends die! A piece in you just died just a minute ago. It's over. You're not free anymore" (Moffeit, 2008a). Timothy was interrogated for more than 10 hours without a lawyer. According to Broderick, Timothy failed a lie detector test, but the official report of the test results are lost (Yager et al., 2008). At age 15, Timothy Masters was not arrested, and after high school he joined the navy.

In 1992, **Detective Linda Wheeler-Holloway** thought she had a break on the case when one of Masters's friends said Masters had told him Hettrick's nipple was missing. "That's it. That's holdback information that only the cops knew" (McLaughlin, 2008). Wheeler-Holloway and Detective Broderick interviewed Masters for 2 days while he was still in the navy, in what was called a "tag-team" interrogation. Timothy had known about the nipple, but a girl in his art class had told him about it (Moffeit, 2008a).

The detectives checked out the story, and it turned out to be true. Broderick kept battering Masters with questions and at one point forced him to break down in tears (Moffeit, 2008a). The interviews were also witnessed by members of Naval Intelligence and the Federal Bureau of Investigation; a naval intelligence officer asked her, "You sure you got the right guy?" "I don't know," Wheeler-Holloway replied (McLaughlin, 2008).

Wheeler-Holloway, however, was impressed that Masters disclosed the same story he had 5 years earlier—that he did not report Hettrick's body because he thought it was a mannequin/prank, and his stories and drawings stemmed from his ambition to write horror stories like Stephen King. According to court records, Wheeler-Holloway later wrote in a police report, "The FBI agents here believe Tim Masters is innocent, and so do I" (Campbell, 2007). Troubled by a seeming reluctance by the police department to pursue other suspects and to have the FBI perform a profile at her request, Wheeler-Holloway filed the case as cold and later left the department for the Colorado Bureau of Investigation. Even **Detective Troy Krenning** believed it improbable that a boy could have pulled off such a sophisticated, fetishistic killing.

On the first anniversary of Hettrick's death, Krenning was instructed to sit in a mobile home opposite Masters's house to perform surveillance of the crime scene in case the killer came back. Krenning stated, however, "My perspective was to get off Masters and take a look at maybe someone else…We seem to be focused on one" (Moffeit, 2008a). Krenning recalled pressing his colleagues for evidence proving that Masters was a legitimate suspect and his colleagues challenging his position by stating, "Prove that Masters did not commit the crime" (Moffeit, 2007b). Krenning replied that his colleagues' investigatory strategy was the exact opposite of how an investigation unfolds (Moffeit, 2007b).

Yet, even with numerous law enforcement colleagues in his own department and the FBI not convinced that Timothy had anything to do with the murder, Detective Broderick was not satisfied with the belief that Timothy was innocent. Broderick said a search of Masters's bedroom, school locker, and backpack revealed numerous drawings and narratives suggesting the teen was fixated on death and violence. Broderick felt the artwork and stories fit the axiom that sexual homicide suspects generally fantasize about what they are going to do before they do it; in essence, the "fantasy's a template for the murder they actually commit" (McLaughlin, 2008).



Timothy's sketches

Aerial view of Hettrick's body

Hettrick's body on the field

### Undisclosed Evidence

By the time the case went to trial in 1999, there were investigative and prosecutorial issues that related to exculpatory evidence that could be used to show that the alleged defendant was not the culprit, but that was not revealed to the defense. For example, prosecutors never told defense attorneys about a sex offender and surgeon living near the field and close to Timothy's residence where Hettrick's body was found. Police initially considered **eye surgeon Dr. Richard Hammond** as, at the very least, a "person of interest" in 1987 (Darst, 2007). In 1995, police confiscated more than 300 homemade videos and over $10,000 worth of pornography when a housesitter found a hidden camera positioned in Hammond's bathroom where women's private areas were videotaped (Reed, 2007). Other cameras were found in a guest bedroom. After bonding out of jail, Hammond checked himself in to the Mountain Crest Hospital in Fort Collins for counseling, where he talked little but revealed on paper an unhappy life, lonely childhood, and voyeuristic tendencies since his teen years (Moffeit, 2008a).

In addition, **plastic surgeon Christopher Tsoi** revealed to **police investigator Marsha Reed** in early 1998 his belief that Hettrick's genital wounds reflected the proficiency of a surgeon (Darst, 2007). Though police released a report showing that Reed set up an appointment with Tsoi, no report detailing their conversation has ever been released (Darst, 2007). In addition, during the autopsy of 1987 murder victim Peggy Hettrick, the medical examiner remarked, "A doctor could have done this" (Moffeit, 2007a). **Coroner Dr. Patrick Allen**'s surprise at the surgical precision of her wounds was only recently recounted in an interview with Masters's defense team and fits the defense's contention that a 15-year-old could not have pulled off such a sophisticated slaying (Moffeit, 2007a).

Dr. Allen later found the most puzzling wounds, unnoticed by officers. They were "neatly" executed cuts inside her genitalia that, like the one on her left breast, must have been made with an extremely sharp knife, an instrument different from the one used to stab her. In 21 years of performing autopsies, Allen told colleagues, he had never seen wounds like these (Moffeit, 2008). Broderick stated that he never talked to Allen about whether someone with surgical skill must have inflicted Hettrick's wounds: "I can assure you if Dr. Allen's finding was that only a surgeon could have made those cuttings, that would have been forensic information he would have certainly told us" (Moffeit, 2008). Interestingly, Meloy also indicated that the wounds on Hettrick appeared to be surgical, but Broderick never disclosed Meloy's over 250-page report (Yager et al., 2008).

**Dr. Warren James**, prominent **Fort Collins OB-GYN**, indicated that "the perpetrator would not have been able to cut Ms. Hettrick's upper labia and clitoris if her jeans were pulled up above her knees as demonstrated by the crime scene photos during the surgical procedure. Ms. Hettrick would had to have been positioned in a major frog leg position during the surgical procedure. Based on the surgical precision of the excision, a general physician would not have been able to conduct this procedure, and in fact, most surgeons would not be able to perform this type of procedure given the preciseness of the cut. I find it **highly unlikely** that any 15-year-old could perform this precise surgical procedure given the advanced anatomical knowledge required and the skill necessary to excise the skin tissue of the fraenulum, clitoral gland, and nipple as most surgeons cannot perform this procedure" (Moffeit, 2007b).

In addition, Masters's defense team indicated the police did not look hard enough into Hammond's background, which included secret credit cards, a possible fake name, and a Denver residence where Hammond taped sexual encounters with another woman. Hammond was arrested for the illegal taping, but he committed suicide before Masters was convicted. Defense attorneys argued that Hammond was never really investigated because he was a social acquaintance of **lead prosecutor Terry Gilmore**. Prosecutor Gilmore initially denied the claim, but later indicated that he was indeed a social acquaintance of Dr. Hammond (Hartman, 2008). Prosecutor Gilmore and Dr. Hammond had been known to go out together and socialize (Hughes, 2008b).

The authors comment on Dr. Hammond not to imply that he was the killer, but rather to indicate that the arguments used by the police and the prosecution against Timothy applied equally or more to Dr. Hammond in terms of investigating him as a possible suspect, especially with the belief that the murder was a sexual homicide. Yet **Prosecutor Blair** argued, "Who else could it possibly be? Nobody else had a motive, nobody else had the opportunity, nobody else had the weapon" (Hartman, 2007a). "It wasn't just the fact that he had these drawings … but the number, the sheer number we found," she said. Blair added, "What we needed to do is demonstrate that this wasn't just a passing fancy of this kid, this was complete obsession with death, specifically the death of a woman, and try to draw parallels between the drawings and our crime scene" (Campbell, 2008). "We're talking about fantasy that becomes obsessive" (Moffeit, 2008a).

During the trial, the prosecution argued that it was Timothy's familiarity with the area that the body was found and his love for knives that linked him to the crime. It is apparent that the prosecution was not interested in considering other suspects as possible culprits, especially when Dr. Hammond had his own links to the crime—familiarity with the area, an obsession with women's private areas and an interest in sexual deviance, ownership of surgical tools that could be used to kill and mutilate, the skills to perform the type of cuts observed by other doctors, as well as the opportunity to commit the crime. Prosecutor Gilmore stated, "I had absolutely no reason to believe he [Hammond] was involved in any way with Peggy Hettrick's murder . . . it just never occurred to us" (Hartman, 2008). Prosecutor Blair indicated that "Dr. Hammond wasn't even a blip on the screen . . . no one thought of him, no one talked of him . . . the crimes that he apparently perpetrated are so much different than the Peggy Hettrick homicide" (Hartman, 2008). However, **Officer Jack Taylor** disputed Blair's comments, indicating that Hammond and his possibility as a suspect was common knowledge (Hartman, 2008).

In addition, Broderick stated that there was no reason to investigate Hammond for Hettrick's murder: "Where's the violence? Show me that pattern of violence…We searched [Hammond's] entire house, and there was nothing to link him to Hettrick's murder" (Moffeit, 2008a). The special prosecutor reviewing the case indicated that there was no evidence tying Dr. Hammond to the murder because there was no evidence of blood, blood splatter, DNA, fingerprints, hair fibers, confessions, or persons to whom Hammond confessed the crime (Hartman, 2008). Who destroyed Hammond's video tapes, and why? "I had a lot to do with that," Broderick says. "It was an ethical decision. Should we re-victimize all these women by telling them they are victims? So it really was an effort to protect them, to preserve these victims' rights" (Moffeit, 2008a).

After viewing several of the videotapes, **Officer Mickelson** started making connections: the doctor's close proximity to the Hettrick crime scene and his obsession with women's genitalia and breasts. He told **Detective Tony Sanchez** that Hammond should be investigated for Hettrick's murder. In August 1995, investigators had slated for destruction every piece of evidence they seized from Hammond. "Don't do it, save the evidence," Officer Mickelson recalls telling Sanchez after he heard about the plan, knowing that they had reviewed only a small portion of the tapes (Moffeit, 2008a). Mickelson wanted to see if Hettrick may have appeared in any of the tapes, but he testified that at one point he was threatened with the loss of his job if he continued to pursue the Hammond evidence issue (Hartman, 2008). Sanchez, without elaborating, said there were legal issues behind the destruction, even though Sanchez indicated that Hammond should be investigated; "The seized evidence burned for approximately 8 1/2 hours," according to an August 15, 1995, report by Sanchez (Moffeit, 2008a).

Detective Krenning could not believe they burned every piece of evidence, stating, "I can't recall one other case where the evidence was taken to a landfill, mashed up with a grater, and then burned" (Moffeit, 2008a). Nine weeks after Hammond's possessions were destroyed, Broderick phoned forensic psychologist Reid Meloy to have him study Masters's artwork (Moffeit, 2008a). Also, newly discovered records not disclosed to the defense show that a witness reported seeing a man running in shorts expose himself near where Hettrick's body was found; the woman who saw the man said he fit Hammond's description and was seen going in a nearby house (Hughes, 2007c). Prosecutors and police stated in Masters's trial that Hettrick's killer could get sexual satisfaction from passing near where he posed her body (Hughes, 2007c).

**Tom Bevel**, **a 1999 prosecution witness and blood-spatter expert**, told jurors he believed Hettrick was killed at Landings Drive and dragged or carried to the spot where she was found by a bicyclist the next day. Bevel later stated that police failed to provide him "a litany of items" that he had now seen and that led him to believe Hettrick was killed elsewhere and driven to Landings Drive before being dragged to where she was found (McLaughlin, 2008). Bevel was not aware of Hettrick's clothing until August 2005 when he got a call from



Close-up of Hettrick's body

**Barie Goetz**, another **forensic expert** who headed a Colorado Bureau of Investigation crime lab from 1999 to 2004, who stated, "He was never given the physical evidence until I took it to him" (McLaughlin, 2008). Bevel added that Goetz also provided photos and reports he had not seen; "I was never aware all those were available" (McLaughlin, 2008). Bevel said he has never experienced a miscommunication of this level in more than 35 years of testifying as an expert (McLaughlin, 2008).

Also, a defense expert recently identified at least a dozen tracks running alongside the blood drag-trail leading to Hettrick's body as prints from Thom McAn manufactured shoes, not worn by Masters. Yet Broderick's testimony at trial alluded to only one Thom McAn print and discounted the chance it was tied to the killing (Moffeit, 2007a). Moreover, Masters's new defense counsel discovered that the FBI had made high-quality casts of footprints in the "drag trail" leading to the spot where Hettrick's body was found. The prints did not belong to Masters, nor was the defense notified of the FBI results (Banda, 2008).

## The Opinion of Forensic Psychologist Dr. Reid Meloy

Honorably discharged in 1998 after serving eight years in the navy, Masters moved to California, bought a house in the desert town of Ridgecrest, and began work as an aircraft structural mechanic. Detective Broderick was less convinced of Masters's in-

nocence even after his colleagues and the FBI indicated that they believed Timothy was innocent. Broderick sought the opinion of **forensic psychologist Dr. Reid Meloy**, member of the American Board of Professional Psychology (ABPP). Dr. Meloy received details of the case along with more than 2,000 of Masters's drawings, stories, crime scene videotapes, Broderick's interpretation of Masters's drawings, police interviews with Masters, photographs, maps, and transcripts in order to see if there was a relationship between Masters and the murder. Meloy would eventually conclude from Masters's drawings and stories that Masters fit the profile of a killer because he was a loner, he came from an isolated or deprived background, he often had violent fantasies, and harbored hidden hostility toward authorities and women (Moffeit, 2008a).

However, not turned over to the defense were Broderick's own interpretations of Masters's artwork that filled dozens of pages that were dated long before Meloy joined the prosecution's efforts. On July 24, 1998, Detective Broderick updated prosecutors Gilmore and Blair on the status of Meloy's work, and in his letter Broderick wrote that he sent Meloy a draft of Masters's arrest warrant and was waiting for his "approval" (Vaughn, 2007). Meloy was so convinced that Timothy was the culprit that he sent a pretrial letter to then-**Larimer County DA Stuart Van Meveren** in which he hoped the work of "superb professionals" Gilmore and Blair "will result in a successful prosecution" (Vaughn, 2007). Besides the inclusion of Dr. Meloy as a prosecution witness, there was no new evidence to link Timothy to the murder. By this time, Timothy's appearance as an adult helped the prosecution's cause: he had grown into an imposing figure and looked

capable of committing the crime, as contrasted to a skinny 15-year-old adolescent (Yager et al., 2008).

Meloy stated, "In my 18 years of doing this kind of work I have never seen such voluminous productions by a suspect in a sexual homicide; that tells us he was preoccupied with sexual violence, violence, sexually sadistic images, images of domination and degradation of women, and he was also fascinated by knives." Meloy further stated, "'After spending six months on the case, I felt I understood the motivations for this homicide and that I had become convinced that Timothy Masters was the individual that had committed this homicide" (Banda, 2008). "Young Timothy killed Hettrick … and, by doing so, had symbolically killed his own mother. A classic case of 'displaced sexual matricide' brought on by feelings of abandonment" (Banda, 2008). In court, the prosecution bombarded the jury with Masters's violent pictures that were shown on a large video monitor. Meloy pointed out features of the drawings that he testified showed a pairing of sex and violence, which was evidence of "picquerism," the sadistic pleasure derived from stabbing. He also claimed that Masters was interested in the degradation of women and fascinated with weapons and death (Campbell, 2008a).

Although Meloy was barred from giving his opinion about whether or not he believed Masters's pictures and stories implicated him in Hettrick's murder or that his productions reflected his belief that it was a displaced matricide, Meloy drew a very clear correlation between the circumstances of her death and Masters's artwork as motive for the homicide. He testified about the characteristics of a sexual homicide and went into detail about how Masters's productions could be considered a "fantasy rehearsal," especially a doodle on Masters's math homework of a knife-wielding hand cutting a diamond shape that Meloy interpreted as a vagina (see left), "which may have been a rehearsal of the genital mutilation" (Campbell, 2008a).

According to Meloy, because some of Tim's drawings were of stabbings, dragging, and so on, they were logically relevant to the defendant's motive, intent, and plan to commit the crime. The psychologist defined a sexual homicide as one in which there is "primary sexual activity usually involving semen or ejaculation"; yet despite labeling this a sexual homicide, there was no semen found in, on, or near the body (Hartman,



2007a). He showed how specific pictures could be interpreted to reflect the crime; several showed "blitz attacks," depicted stabbings that Meloy interpreted as sexual in nature and depicted women as murder victims. He opined that Timothy's retreat into a fantasy world combined to create a boiling kettle of latent violence just waiting to erupt; "A retreat into such a compensatory narcissistic fantasy world, replete with sexuality and violence, works for awhile, but at a great cost. The unexpressed rage continues, depression may ensue, and anger toward women as sources of both pain (abandonment) and erotic stimulation builds" (Campbell, 2008a).

**Equally prejudicial** was Meloy's interpretation of a picture Masters drew the day after he saw Hettrick's body. It depicted one figure dragging another, which was apparently wounded or dead, from behind. The wounded figure was riddled with arrows and blood seemed to flow from its back (see above right).

Entirely discounting the presence of the arrows, which had nothing to do with the murder, Meloy wrote in his report that this picture represented the crime as it actually happened. "This is not a drawing of the crime scene as seen by Tim Masters on the morning of February 11 as he went to school. This is an accurate and vivid drawing of the homicide as it is occurring. It is unlikely that Tim Masters could have inferred such criminal behavior by just viewing the corpse, unless he was an experienced forensic investigator. It is much more likely, in my opinion, that he was drawing the crime to rekindle his memory of the sexual homicide he committed the day before" (Campbell, 2008a).

Meloy stated, "Sexual homicide represents the solution, particularly in the form it took in this case: If I kill a woman, she cannot abandon me; if I desexualize her (genital mutilation), she cannot stimulate me" (Banda, 2008). "These are not conscious thoughts for Tim Masters, but likely represent the unconscious beliefs that drove his behavior the night of Feb. 11, 1987, when he killed and sexually mutilated Peggy Hettrick, a victim of choice and opportunity. Ms. Hettrick represented all women to Tim Masters" (Banda, 2008). Meloy indicated that either a conflict with a woman in authority or grief over the death of a loved one triggered his murderous outburst (Banda, 2008). According to Meloy, "A trigger mechanism or precipitating event

is a particular occurrence in the life of the perpetrator which causes him to act out his fantasies in the real world" (Banda, 2008). Dr. Meloy testified that such an event could be conflict with one's spouse or girlfriend, grief over the death of a loved one, or conflict with women of authority in a school or employment setting" (Banda, 2008). In this case, Meloy stated that Timothy's trigger mechanism, which was the catalyst for Timothy to kill, consisted of the argument he had with a female teacher at school about a month prior to the murder. The argument ensued between the female teacher and Timothy because the teacher took away a military manual he possessed.

## Retired FBI Agent Roy Hazelwood's Analysis

**The crux of Masters's position** during the post-conviction process was that Detective Broderick and Prosecutors Gilmore and Blair withheld information from the defense lawyers that could have been used to contradict their case that Masters was a killer; specially-appointed prosecutors agreed that the original prosecutors violated pretrial discovery rules. It was during the review of the violation of pretrial discovery rules that the defense learned that Hazelwood was a retired special agent with the FBI who specialized as an FBI profiler and also had published research on the specific type of crime in question. Moreover, it was learned that Hazelwood's opinion contradicted the direction the investigation took, the theory of the prosecution, and testimony of the forensic psychologist who was the main prosecution witness. Specifically, among the material not disclosed that should have been were notes Broderick took after a conversation with Hazelwood (Hughes, 2007b)

as well as faxed memos from Hazelwood to Broderick (Goodbee, n.d.). Hazelwood told Broderick that tying the pictures to the crime, since none of them reflected what happened, was **"overreaching"** (Hughes, 2007b). Hazelwood eventually withdrew from the case after he had concerns over the prosecutors' trial strategy and psychological theories to be used at trial (Campbell, 2008b.)

He also told Broderick that **"fantasy is not motive,"** contradicting one of the pillars of Meloy's testimony (Campbell, 2008a). Hazelwood's opinion is crucial in understanding why Broderick and the police department did not employ Hazelwood or a profiler from the FBI to develop a profile, but instead used the services of a forensic psychologist. The differences between FBI profiles and the forensic psychologist hired for the Hettrick investigation cannot be overstated and the following quote is instructive: "The difference is really a matter of the FBI being more oriented towards investigative experience than [academic psychologists] are," says **retired FBI agent McCrary** (Winerman, 2004).

The investigative aspect and differentiation between disciplines that McCrary refers to includes trained and experienced law enforcement officers who understand practices and procedures of a criminal investigation, interview and interrogation, search and seizure, reviewing police reports, analysis of intelligence from both physical and witness evidence, evidentiary considerations as to how they impact courtroom testimony, and forensic laboratory reports. Academic forensic psychologists focus more on the offender class rather than attempting to solve an individual case. Academic forensic psychologists are more apt to look

at research of those who have already been caught, analyzing their characteristics and searching for patterns involving how they think, personality traits, and psychological/social data.

The study of the available records supports the observations of McCrary in that at some point Meloy believed that academic research on sexual homicide could replace solid law enforcement investigation protocol as evidence. The authors acknowledge that forensic psychologists can be involved in many different aspects of an investigation; however, one of the most overrated concepts of their work is criminal profiling, and this is where the investigation and prosecution of Timothy Masters strayed. Even **University of Wyoming criminal justice professor George Blau** considered the hidden Hazelwood commentary criticizing Meloy's theories particularly troublesome, stating that "Hazelwood destroys the argument of psychological validity" when Meloy attempts to "link the crime scene to Masters's drawings" (Moffeit, 2007a).

In addition to the problems associated with the building of a psychological profile that would have to either ignore or counter the opinions of Hazelwood, Hazelwood stated in a 1997 memo that Hettrick's death was a "crime of opportunity," contrary to the prosecution's theory that Masters snuck out of his trailer home, stalked Peggy, and killed and mutilated her without leaving a shred of evidence (Hughes 2007b). The court transcripts make it clear that Hazelwood never testified and that each of his cautions were rejected by the investigators, the prosecution, and the forensic psychologist. Hazelwood's opinion about the relevance of Masters's drawings to the crime directly contradicted Meloy's eventual testimony, but the conclusions of Hazelwood's report on the case were never introduced during the 1999 trial or disclosed to the defense (Hughes, 2007b). Masters's attorney, Fischer, stated, "We would have called Hazelwood as fast as we could have called him...We've got it backed up by the leading expert in the world, and these guys hid it from us" (Hughes, 2007b).

The formidable obstacle before the forensic psychologist is described by two **veteran FBI agents** who pioneered the bureau's psychological profiling program. In the early 1970s, **Howard Teten and Patrick Mullany** developed the modern investigative approach for the Behavioral Science Unit, which helps trainees to solve crimes by studying the offender, his or her behavior, and the motivation behind it. Teten stated, "People get the wrong idea of what profiling is...It's not a psychic thing...You don't pick out the perpetrator with a profile...Not the individual...You pick out a type of personality" (Banda, 2008). Absent physical evidence, Teten and Mullany said, it would be a mistake to rely on that analysis alone to build a case. Mullany stated that, "We never intended that it would be the sole evidence that would move the case forward...We always intended that it could be a technique to ferret out a suspect... The only thing that should be in court is exact evidence: hair, fiber, DNA. Even if a guy confesses, these are things that need to be put in place" (Banda, 2008). Mullany's comment on the evidentiary aspects of profiling supports McCrary's observation that the FBI is oriented toward the investigative experience where evidence is still necessary for opinions of culpability to withstand legal scrutiny.

The position of McCrary, Teten, and Mullaney is further supported in an article titled *The Academic and the Practitioner: Pragmatists' Views of Offender Profiling* (Alison & Goodwill, 2004). Using personality traits as the main foundation for a psychological profile that masquerades as criminal investigative analysis is of significant concern to professionals in the field (Alison et al., 2004). "While it is acceptable to create a profile as an investigative tool, it is not acceptable to focus investigations on the presumption that the profile is wholly accurate, especially when the consequences of such action might have significant detrimental effects on an individual and/or an investigation" (Alison et al., 2004). It is necessary to "distinguish between information that directs an investigation and information that proves guilt, arguing that while offender profiles have been helpful in police investigations, extending their use to provide evidence of guilt is dangerous" (Alison et al., 2004).

Moreover, as important as profiling is in terms of solving difficult cases, the reality is that professionals in the field should be aware that, to date, the empirical evidence does not support the scientific validity of profilers's predictive abilities from crime scene evidence (Eastwood, Cullen, Kavanagh, & Snook, 2006). The authors acknowledge that profilers provide services in addition to predictions about offender characteristics; however, this is arguably the most frequently requested type of service and the most important task that they perform because the profilers belief about the type of person who committed the crime influences all subsequent types of profiling advice (Eastwood et al., 2006).

### Analysis of Dr. Meloy's Opinion

*"There have been incidences where juries relied on my opinion and in the aftermath those [opinions] were not supported by evidence."*
*—Dr. Reid Meloy*

There are several problems in the way Meloy was employed in this case. Although forensic psychologists may conduct research on criminal profiling, that fact does not make them a profiler. The forensic psychologists who are profilers have had training as profilers and incorporate far more than personality trait theory into their analysis. Regardless of the lack of evidence linking Timothy to the case and the opinion of Hazelwood, Meloy continues to push his own **reversed engineered psychological profile** matching Masters to the murder. This reverse profiling exists when one first determines who they want the suspect to be and then continues to add characteristics to that individual of the type of person who would commit such a crime by the type of evidence that is collected—in this case drawings and narratives.

Furthermore, Meloy did not reveal to the court that Hazelwood did not agree with his opinion, even though during Meloy's testimony he cites Hazelwood's scholarship as scholarship he would have relied upon. Meloy never employed any psychological tests to derive the assumptions of personality traits and was left to derive the assumption of Masters's personality traits from his interpretation of Masters's drawings, knife collections, and pornographic magazines. The authors believe that a serious ethical issue develops when a forensic psychologist offers a reason for the arrest warrant, assists in drafting the arrest warrant, and testifies on behalf of the prosecution as an expert in the same case he helped build.

**Criminal investigative analysis** is employed as a specific method to analyze crimes and develop a hypothesis about the characteristics of the person who might have committed such a crime; practitioners

of the field do not contend that such an analysis can identify the individual(s) who committed the offense. "In some ways, [profiling] is really still as much an art as a science," says psychologist Harvey Schlossberg, PhD, former director of psychological services for the New York Police Department (Winerman, 2004). "We as psychologists do look at database sets on known criminal groups, and that indeed does assist in completing analysis of specific criminal behavior, but such analysis is very different from simply guessing 'who did it'" (Winerman, 2004).

There was no objective analysis in Meloy's assessment of Timothy's behavior because he violates his own forensic psychological protocol. For example, Meloy's own scholarship emphasizes a protocol that, in addition to psychological testing as mentioned above, competent and thorough completion of the clinical interview and the gathering of independent historical data are critically important in arriving at a reliable, valid understanding of the individual (Meloy & Gacono, 1995). **Meloy never interviewed Timothy**, thus relying on speculation as to what the drawing and narratives signified (Hartman, 2007b). Because Meloy was not employed as a neutral party that would have been loyal to the court, there would have been no reason to subject Timothy to an evaluation by Meloy when Meloy already determined that Timothy was the culprit. According to ethical guidelines for forensic psychologists, "forensic psychologists realize that their public role as "expert to the court" confers upon them a special responsibility for fairness and accuracy in their public statements" (APA, 1991). It is incorrect to opine that fantasy is equivalent to motive when the forensic psychologist does not know the purpose or intent of the fantasy. Having fantasies is not synonymous with the intent to fulfill or perform those fantasies; one only needs to observe all the graphic horror films and novels available to the public.

The behavioral science approach mandates that a mental health professional sticks to behavior analysis and never testifies or tries to project psychological theories on to the specifics of a given case. Thus, once a mental health professional abandons this approach as well, the **prejudice** to a suspect can be insurmountable. Given that one of the authors is a clinical psychologist and has spent the last 20 years working in the criminal justice system providing forensic psychological analysis, the point authoritatively may be made that once the mental health professional begins to champion a cause or a theory as Meloy espoused (either for or against the individual before the court), the objective analysis owed to the court is lost.

In fact, according to the American Psychological Association, a forensic psychologist does not take a side; his or her job is to translate psychological terminology in such a way that is acceptable to the legal system (Brodsky, 1991). The reader should be aware of the fact that if the forensic psychologist is testifying for the defense or the prosecution, this does not mean that they are taking sides; the **forensic psychologist's loyalty is to the court**. Furthermore, what is interesting is that even Meloy indicated during his testimony that the research on sexual homicide was scant. Meloy testified that current scientific journals have reported that the relationship between sexual fantasies and sexual homicides is tentative and opined that no conclusions can be drawn linking fantasies to conduct.

Indeed, the inconclusive nature of this research is apparent when one of the two studies relied upon by the prosecution's expert is also relied upon for the proposition that "normal people," that is, persons who do not commit criminal behavior, also engage in deviant sexual fantasies (MacCulloch, Snowden, Wood, & Mills, 1983). If both groups do engage in sadistic sexual fantasies, there is no one causative factor that explains why some act out their fantasies and others do not (MacCulloch et al., 1983). Surveys measuring sadistic fantasy make it clear that it is extremely common and the vast majority of it does not lead to sexual offending (Grubin, 1999). As to rehearsed sadistic fantasy, sadistic situations tend to be rehearsed many times in fantasy and at times are tried out in real life over a number of years (MacCulloch et al., 1983). There was no proof of rehearsal through Meloy's testimony considering that Meloy never interviewed Timothy to validate his conclusion.

Moreover, the defense did call a **prominent forensic psychologist, Dr. John Yuille**, who stated that the drawings meant nothing. Because research in sexual homicide is relatively new, Yuille does not believe that a correlation necessarily exists between fantasy and homicide; there is room for differing interpretations of the same evidence (Farrell, 1999). In his testimony regarding the current state of research on the relationship between fantasy and sexual homicide, Yuille stated, "the research is flawed" (Masters, 1999). In addition, he indicated that it is difficult to generalize about the link between fantasy and sexual homicide because the sample size in the research is small (Masters, 1999). Furthermore, the research on how frequently normal people engage in sexual fantasies and who do not commit sex crimes is inadequate (Masters, 1999).

The research on sexual homicide and its purported application to Masters is **simply incor-**



**Robert R. "Roy" Hazelwood, DABFE, DABLEE,** has been regarded as one of the leading pioneers into the study of sexual predators. His work in criminal profiling helped to define the practice, and he has written several books about profiling.

He was a supervisor for more than 20 years with the FBI Behavioral Science group, and he remains active as a member of the Academy Group, an organization of former FBI agents and law enforcement officers.

He is now Affiliate Professor of Administrative Justice at George Mason University and has appeared as an expert on criminal investigations on numerous radio and television shows. Hazelwood is a commentator for The Forensic Echo.

Before joining the FBI, he achieved the rank of Major in the Army Military Police Corp. Holding a Master of Science from NOVA University, he also studied forensic medicine at the Armed Forces Institute of Pathology in Washington DC. He has received numerous awards and certificates from universities, criminal justice associations, and law enforcement agencies around the country.

Hazelwood's early interest in auto-erotic fatalities initiated a groundbreaking study that compiled the results of over 150 cases. He also conducted the largest known survey of police attitudes toward rape. With Drs. Park Dietz and Janet Warren, Hazelwood interviewed incarcerated men convicted of sexually sadistic crimes. They then did an involved study of the wives and girlfriends of sexual sadists. With Dr. John Hunter of the University of Virginia, Hazelwood is now researching juvenile sex offenders.

Hazelwood is a Diplomate of the American Board of Law Enforcement Experts, and he spoke at the ACFEI 2005 National Conference as a featured presenter.

rect. For example, research indicated that those who engage in sexual murder tended to be isolated and engaged in anti-social behavior (Grubin, 1994). There is a relationship between sexual abuse in childhood and the mutilation of murder victims. Sexually abused murderers are more likely to mutilate victims than are those offenders not sexually abused (67% versus 44%) (Ressler, Burgess, Hartman, Douglas, & McCormack, 1986). We also see a positive relationship between adolescent sexual victimization and the mutilation of the murder victim (78% versus 42%) (Ressler et al., 1986). Furthermore, early fantasies often give rise to behavior tryouts that are precursors to criminal behavior (Burgess, Hartman, Ressler, Douglas, & McCormack, 1986). Lastly, what is most revealing is a study that found that the frequencies of deviant sexual fantasies in control groups representing "normals" tended to be higher than sex offenders (Langevin, Lang, & Curnoe, 1998).

In the Masters case we do not observe evidence of isolation, early try-out behaviors, or abuse. What is amazing is that Meloy relied on the very research that showed that someone like Timothy would be the *least* likely candidate to commit sexual murder to justify his belief that Timothy *did* in fact commit sexual murder. It is incorrect to assume that fantasy is a rehearsal to act out when it may serve a number of other purposes for the individual such as wish fulfillment, curiosity, or alleviation of sexual frustration (Langevin et al., 1998). Given that there are no certain behavioral indicators to exclusively confirm characteristics in sadistic sexual fantasy, fantasy does not appear to be associated toward a type of crime (Gray, Watt, Hassan, & MacCulloch, 2003).

In addition to the problematic position that the drawings represent sadistic sexual fantasy, Meloy then takes the position that the drawings represent an illustration of displaced matricide, indicating that he killed Peggy Hettrick because Peggy represented Timothy's deceased mother. The authors went to some length to gather research that would attempt to justify Meloy's position that Timothy's actions were a form of displaced matricide. The authors located what we believe to be the only study available prior to the trial, titled "Sexual Homicide by Adolescents," of which Meloy would have been familiar. The study regards adolescents who commit sexual homicide and was based on the possibility that at least one

of the three cases of adolescent sexual homicide may have represented the adolescent's displaced rage onto a female victim—rage caused by the mother's threats of separation through suicide (Meyers, 1994).

It is interesting to contrast Meloy's views on a sexual homicide with what retired **FBI profiler John Douglas** states in his book *The Mind Hunter* (1995). Douglas describes a sexual homicide where the victim was found badly beaten. Her nipples had been cut off and placed on her chest, and there were bite marks on her legs and lacerations on her body; she was spread-eagled and tied with her belt and nylons, and an umbrella and pen were placed in her vagina (Douglas, 1995). One of the suspects was a 15-year-old boy who had found the victim's wallet. However, Douglas dismissed the boy

> ## "...Meloy relied on the very research that showed that someone like Timothy would be the *least* likely candidate to commit sexual murder to justify his belief that Timothy *did* in fact commit sexual murder."

as a suspect because the sexual fantasy that pertained to this killer would have taken years to develop (Douglas, 1995). However, Douglas goes on to comment about this particular case after the killer had been apprehended, candidly stating that acting out on fantasies to harm others is a crime, but that in themselves "bizarre and deranged fantasies are not a crime" (Douglas, 1995). Douglas's insight supports Hazelwood's commentary that fantasy is not necessarily motive, and MacCulloch et al.'s (1983) research that sadistic situations tend to be rehearsed many times in fantasy and at times tried out in real life over a number of years.

Moreover, one year after Timothy was found guilty, Meloy published an article titled "The Nature and Dynamics of Sexual Homicide: An Integrative Review" (2000) where he, on several occasions, mentions

Timothy Masters as a case study of sexual homicide. What is interesting about the article is that he describes characteristics that are common in sexual homicide and cites risk factors that are associated with displaced matricide that would be attributable to Masters—namely 1) a history of mistreatment of women or fantasies of assaulting women, 2) fetishism for female underclothing and destruction of female clothes, 3) expression of hatred, contempt, or fear of women, and 4) confusion of sexual identity. The authors could not find any behavioral evidence to support the inclusion of the above criteria to the Masters case.

Meloy's article attempts to show that Masters would have fulfilled the criteria for the motivation model of sexual homicide as developed by Burgess, Ressler, Douglas, and McCormack and elaborated upon by Ressler et al. in their book *Sexual Homicide* (1988), but the authors' next search for evidence to support this theory proved unsuccessful. The authors could not find evidence revealed by the police or Meloy that the criteria outlined in the sexual homicide model applied to Timothy; such evidence could include 1) an ineffective social environment, 2) formative traumatic events in their childhood such as abuse, 3) personality traits such as chronic lying, stealing, cruelty, and destroying property, 4) cognition processes entailing negativity and a desire to control and dominate others, 5) hyperarousal consistent with early trauma and hyperarousal consistent with psychopathy, 6) antisocial acts representing a displacement of aggression, and 7) a feedback filter (learning) where practice makes the crime more closely fit the perfect fantasy.

Meloy is, without question, an expert on narcissism and psychopathic personality traits, having published many peer review articles and either authored or edited many books dealing in part or in whole on the topic. Thus, when Meloy stated that "virtually all sexual homicide perpetrators evidence narcissistic and psychopathic personality traits" (Meloy, 2000), these authors were troubled as the traits are not clearly evident in the Masters documents. In a study titled the "**Characteristics of Sexual Homicides Committed by Psychopathic and Nonpsychopathic Offenders**," the authors offer empirical research that is at odds with Meloy's findings that both psychopathic and non-psychopathic persons engage in sexual homicide (Porter, Woodworth, Earle, Drugge, & Boer, 2003). The authors found

that about 82% of the psychopathic offenders are more likely to engage in sadistic violence during the sexual homicide as opposed to about 52% of the non-psychopathic offender (Porter et al., 2003). Furthermore, the authors of the study indicated that the psychopathic killers more likely tended to kill for thrill and lacked empathy/remorse, while non-psychopathic killers murder because of negative emotions, rage, and/or anger (Porter et al., 2003). By deduction, if Meloy states that Timothy's drawings and narrative represent anger and rage toward women, the probability that Timothy is psychopathic according to Porter's research lessens, which would cast doubt on Meloy's position that all sexual homicide perpetrators evidence narcissistic and psychopathic personality traits.

In addition, Meloy discusses how he used the Hazelwood and Warren (1995) components that violent sexual fantasies in sexual homicide cases can be inferred by the perpetrator's productions, such as inanimate objects, dolls, videos, clothing, photos, drawings, or narratives (Meloy, 2000). Meloy fails to disclose, both in his trial testimony where he refers to Hazelwood and in his article, that Hazelwood indicated there was not enough evidence to suggest that Masters was the perpetrator. In addition, Meloy states that while adolescent sexual homicide perpetrators "are reared in chaotic family environments and are physically abused, most do not have a history of child sexual abuse" (Meloy, 2000). The authors could not find any evidence that Timothy was reared in a chaotic family environment or that he suffered from any type of abuse; in fact, the reports appear to show that he came from a stable household.

There were other methods, although none of them are ideal in terms of validity and reliability, for a forensic psychologist to collect information about a person's character and behavioral inclinations without interacting with the individual. Such methods appear familiar to Meloy as he has advertised that one of his specialties involves remote personality assessments—essentially assessments that do not involve meeting with and interviewing the person under analysis. The authors could not find evidence from Meloy's trial testimony or any other records that he used a well-known remote personality assessment inventory called the **Gittinger Personality Assessment System** to assist in his opinion of what behavioral traits Masters harbored, even though it

was available prior to Masters's arrest and trial. In addition, **Professor Gerald Post of George Washington University** considers other factors in remote personality assessment that have been known for years in the field, including cultural factors, social interaction factors, and peer group comparison factors. For those that do use remote personality assessments, the authors of these remote assessments go to great lengths to advise the reader of the research on their validity and reliability (Krauskopf, 1998).

For example, Timothy was placed in a special education class after a teacher discovered some of his disturbing artwork. An article in the *Denver Post* describes, "In the margins of his notebooks were sketches of dinosaurs with arrows through them, gruesome war scenes described by his Vietnam veteran dad, and horror flicks such as *Nightmare on Elm Street* that father and son watched together" (Moffeit, 2008a). Timothy enjoyed writing, and his goal was to be another Stephen King. In fact, the authors researched, beginning with the year 1987 and back, for publications by Stephen King that Masters may have read. The authors cross-referenced the themes in King's novels against themes in Masters's drawings and stories and were able to find some parallels. For example, the correlations between his drawings depicting murder, Nazi death camps, Nazi sadistic killers, Jews, and an adolescent male student are found in the *Summer of Corruption: Apt Pupil* (1982). With respect to the psychological dynamics of a 12-year-old son of a dying mother who must fight evil, the authors direct readers to *The Talisman* (1984). With respect to a son who kills his mother, the reader is referred to the short story *The Woman in the Room* published in the *Night Shift* (1978).

The authors could not find any evidence that Meloy cross-referenced the stories and drawings to what other adolescents produce, either at the national level or in the particular school Timothy attended. There was no evidence that there was any exploration as to the timing and manner of production of the narratives/drawings and what his thoughts and feelings were prior to, during, and following the productions. For example, Masters was never asked if through the use of his narratives/drawings he hoped to shock others, punish them, or ask for help; Meloy and the court system assumed that his pictures proved that he was a bigot and racist full of hatred for everyone. **Judith Challes**, the special edu-

cation teacher who knew him best, told his reading teacher, "You know, I'm not at all concerned about them [his writings and drawings]," because most of her kids scrawled horrific images (Moffeit, 2008a). There is no evidence that Meloy took the time to speak to family members or classmates about Timothy or whether they had ever seen his drawings and discussed their significance.

Perhaps Meloy or one of his proxies could have asked Ms. Challes if she had any knowledge that Timothy hated women, that he had a desire to commit acts that were depicted in his drawings, if he had hurt others, or if there was a connection between what he said and what he did. Given that one of the authors performs forensic psychological services, this would have been a fertile area to investigate and assist in a remote personality assessment; Timothy spent so much time in the company of those teachers, they would probably know him best. Did Timothy actually possess adolescent psychopathic qualities as Meloy argues in his article? This is an area in which Meloy has written extensively; perhaps interviewing others who knew Timothy may have revealed a behavioral pattern that pointed to him as someone other than a psychopath.

## Legal Implications

*"He admitted his guilt through pictures to us."*
*—a juror after convicting Timothy Masters*

What is introduced at a trial as evidence can have a profound impact on how lay persons serving on a jury perceive a person charged with a crime. Courts attempt to filter out evidence that may be inflammatory or prejudicial in order to assure that a defendant receives a fair trial and that he or she is not held accountable for an act because the jury does not like the individual's character. Courts generally do not allow what is known as a defendant's "other crimes, wrongs, or acts" to be used against them because of the fear that jurors would focus too much on these other matters and determine the culpability of the accused by how they perceive his/her character.

However, there is an exception in the law where a person's "other crimes, wrongs, or acts" can be entered as evidence in a trial to assist the jury in determining culpability if it goes to something other than a person's

character, such as the ability to commit the crime, a person's motive, state of mind, planning, identity, or if it reveals a modis operandi. Courts normally go through a balancing test to determine whether the probative value of letting in evidence of other crimes, wrongs, or acts outweigh the prejudicial effect that it may have on the accused. Thus, if the defendant's other wrongs or acts reveal motive that can be linked to the charged offense, the court may decide to let the evidence of other wrongs and acts be heard by the jury; even though it is prejudicial to the defendant, the benefit to the jury in linking motive to other evidence is probative in understanding why the crime occurred. The judges on the **Colorado Supreme Court** that upheld Timothy's conviction and believed that Meloy's testimony was useful—known as the majority—opined that Timothy's drawings and writings, as well as the testimony pertaining to them, were not being offered to prove his character, but to show that he acted in a way that proved his motive for the crime, his deliberation of the crime, his planning and preparation of the crime, his opportunity to commit the crime, and his subsequent knowledge of the crime.

The judges who did not believe that Meloy's testimony should have been allowed—referred to as the minority—opined that the tendency of juries to overvalue other crimes, wrongs, or acts as evidence disclosed at trial is supported by the findings of several empirical studies on jury behavior regarding a defendant's past activities (Masters, 2002). For example, the studies found that the distaste jurors may have for the defendant's past activities may tend to distort their perception of the degree of independent evidence necessary to meet the prosecution's burden of proving guilt beyond a reasonable doubt (Masters, 2002). In other words, the jury **disproportionately concentrates** on a defendant's past activities at the expense of considering if there is other evidence that does in fact prove the defendant guilty beyond a reasonable doubt. Yet, in this case there was no other independent evidence necessary to meet the prosecution's burden unless you accept the majority's belief of what constitutes incriminating evidence, such as the fact that the victim's hair was red like Timothy's mother, that Timothy was familiar with the area where the victim was found, or that Timothy had knives in his collection similar to the weapon possibly used against the victim.

The majority's assurance that the prosecution did not emphasize or rely on the inadmissible evidence described, in part, as the "sporadic use of ethnic slurs," mischaracterizes the nature of the inadmissible evidence and the trial proceedings. However, the prosecution emphasized to the jury numerous images drafted by the defendant that glorified the Ku Klux Klan; the Nazi party; killing; and torturing of people based on their racial, ethnic, and religious backgrounds, sexual orientation, and physical limitations, none of which had a connection to the Hettrick homicide but were used, through Meloy, to prove motive (Masters, 2002). The prosecution also highlighted many of these inadmissible, inflammatory examples of racial bigotry through the testimony of Broderick as being proof that the defendant committed this murder. For example, Broderick testified as to drawings that depicted the Nazi death camp welcoming "Each and Every Goddamn Jew" and the caption "Kill the Jew" (Masters, 2002). Broderick also testified as to another drawing that showed doctors using saws, machetes, and knives on people, with a caption stating "I've found the cure for AIDS" (Masters, 2002).

Research by Bright and Goodman-Delahunty titled "Gruesome Evidence and Emotion: Anger, Blame and Jury Decision-Making" (2006) concluded that when gruesome photographs, for example, are shown to a mock jury and while all other aspects of evidence remain the same, **the rate of conviction increases dramatically** as contrasted if no gruesome photographs are presented at trial. If those same gruesome photographs are accompanied by oral testimony describing the photograph, the rate of conviction increases even further (Bright & Goodman-Delahunty, 2006). The reason that the conviction rate dramatically increases just on the introduction of gruesome evidence is because there are emotional reactions that activate the desire to hold someone responsible for the gruesome acts (Bright & Goodman-Delahunty, 2006). Yet in a position contrary to Bright's research, when the majority is confronted with the issue of the prejudicial impact the hundreds of depictions of drawings and narratives would have on the jurors, they reasoned that the jury's exposure to violent images through admissible evidence is not substantially influencial; in other words, the jury is desensitized to the disturbing images because of their extensive exposure to them (Masters, 2002).

The lead author of this article works as a criminal trial attorney and has participated in countless criminal jury trials, including homicides. Prior to introducing gruesome evidence in homicide trials, the trial judge places the burden on the party wanting to introduce the evidence to explain its relevance, fully understanding that pictures carry great weight in a juror's mind; as a result, trial judges frequently limit what jurors will be exposed to because the prejudicial impact of gruesome evidence that could be linked to the defendant is simply too prejudicial to admit. It has also been the experience of this author that jurors tend to stop listening to evidence when they are overcome with negative emotions. The volume of drawings and narratives that were introduced in the Masters trial resulted in the **case being decided before it ever began**. There was simply too much negative emotion to overcome to convince jurors, who have promised to listen to all the evidence before coming to a conclusion in order to maintain an open mind before deliberations. The Masters case overwhelmingly supports the research by Bright and Goodman-Delahunty (2006) that gruesome evidence can have a disproportionate impact on the willingness to convict and illustrates why it is crucial that the trial court filter evidence that can inflame jurors' passions and convict based on how they feel about the defendant's interests/lifestyle.

What is equally amazing about the Masters case is that from a legal perspective, the circumstantial evidence was non-existent to extremely weak at best. According to Kevin Heller in his article titled "The Cognitive Psychology of Circumstantial Evidence," when there is no direct or physical evidence linking a defendant to a crime and the circumstantial evidence is weak, jurors are more willing to find the defendant not guilty because they are capable of thinking of different scenarios that may have explained Hettrick's death (Heller, 2006). The stronger the circumstantial evidence, meaning the fewer scenarios of alternative culpability, the stronger the probability of conviction based solely on circumstantial evidence (Heller, 2006). Given this author's trial experience with circumstantial evidence cases, the author would agree with Heller's position; yet interestingly, the Masters case tends to contradict Heller's position in that the jurors still found the defendant guilty without direct or physical evidence and non-existent or weak circumstantial evi-

dence. This observation further supports Bright's research that the impact gruesome evidence has on juror perceptions cannot be overstated.

Without admitting Timothy's drawings and narratives describing violent, hate-filled racist views, **there was no case against him**; this is aptly evidenced by what one juror stated after returning a verdict of guilty: "He admitted his guilt through pictures to us" (Farrell, 2000). This is not arguing that gruesome evidence should not be admitted because, by definition, certain crimes inherently have gruesome evidence attached to their acts; however, it is critical that a legal connection linking gruesome evidence to a crime be established so that the justice system can ensure fair proceedings. Yet, the mere fact that a forensic psychologist was permitted to theorize about the defendant's fantasies depicted in the drawings does not strengthen this weak evidentiary link.

The logical relevance of the defendant's uncharged fantasies is minimal when compared to the overwhelming power of these fantasies to depict the defendant as an evil and bad person (Masters, 2002). Even assuming that some of the drawings and writings would be admissible, there are hundreds and hundreds of pages that have nothing to do with this case. According to the minority, the writings and drawings are not even "acts" as contemplated by the law, but merely reflect, for the most part, a 15-year-old's fantasies; not one of these 1,000 drawings and narratives concerns this victim personally or reflects the manner in which the victim was killed (Masters, 1999). However, the prosecution was allowed to end their closing argument by urging the jury to convict the defendant because his fantasies proved that he committed this crime: "Please take the time to look at those drawings, read the narratives, study this evidence. The evidence is there. Sometimes it's hard to find. Sometimes you have to do a little thinking as to how the defendant could draw something like that unless he knew how it happened. Please look and read, study, dig into the paper bags. The evidence is there" (Masters, 1999).

In addition, courts have an obligation to ascertain whether expert testimony that is disclosed to a jury actually rises to the standard that it is in fact generally accepted within the scientific community as reliable to support expert opinion under *Daubert*. The concern is that jurors may rely on information to determine culpability that is un-

founded, creating a scenario where the prejudice to the defendant denies him/her of a fair trial under the Constitution. The majority indicated that the prosecution presented multiple theories of logical relevance to the Masters case and decided that the scientific principles underlying Dr. Meloy's testimony were reasonably reliable and that they would aid the jury. According to the majority, Dr. Meloy's testimony provided an explanation for the seemingly inexplicable, and without it, jurors cannot understand the defendant's motivation for murder. The Court stated:

Dr. Meloy relied on an objective, widely recognized psychological theory, one which was founded on research and study, and one which the trial court determined was generally recognized within the forensic community. His testimony consisted of an objective, complex, and highly developed analysis of the crime scene and Defendant's productions that had been refined by years of research. As such, it was reliable and insightful information that assisted the jury by placing the crime in context and helping them to understand bizarre and deviant behavior that was unlikely to be within the knowledge of ordinary citizens; it helped the jury understand the significance of material facts in the case. (Masters, 2002)

Unfortunately, in order to bolster their legal position on the appellate review of Masters, the majority opined the exact opposite of what the current research and Dr. Yuille indicated on the subject of sexual homicide, in that the role of fantasy is not generally accepted scientific fact in the forensic psychology community. The majority relies upon the prosecution's expert to link the defendant's fantasies to this crime, in spite of the failure of the fantasies to show a link to this specific victim and this specific crime. When there is **genuine scientific debate** over the validity of the expert's propositions, the non-character purpose of the uncharged acts is much weaker and the danger of use by the forbidden character inference much greater.

It is clear from the Masters case that the judicial ruling allowing Meloy to testify reflects the findings of the study titled "Asking the Gatekeepers: A National Survey of Judges and Judging Expert Evidence in a Post-Daubert World" (2001) that concluded judges, especially state court judges, do not know how to apply *Daubert* guidelines; do not understand scientific evidence; do not know how to ask experts the appropriate

questions, issues of statistical significance, distinctions between reliability, and validity of the hard sciences versus the behavioral sciences; and are in need of judicial education on frequent issues that are brought about by expert testimony such as error rates, validity, and reliability (Gatowski, Dobbin, Richardson, Ginsburg, Merlino, & Dahir, 2001). Moreover, research appears to suggest that jurors, perhaps nonconsciously, assume that all expert evidence admitted at trial has been "approved" by a judge, thus concluding too much about the quality of the evidence presented (Schweitzer et al., 2009).

Specifically, jurors assume trial judges review expert evidence before it is presented to them and that any evidence presented to them must be above some threshold of quality (Schweitzer et al., 2009). If trial judges do adhere to *Daubert* standards, the jurors' assumptions may make sense but the research indicates that trial judges do a poor job of screening expert evidence, which is unfortunate; the trial judge is implicitly lending credence to the testimony, thus increasing its persuasiveness (Schweitzer et al., 2009). Interestingly, as recent as March 2008, Meloy testified for the prosecution in a death penalty case and admitted under cross-examination and in reference to the Masters case that "there have been incidences where juries relied on my opinion and in the aftermath, those [opinions] were not supported by evidence" (Coberly & Campbell, 2008).

## Recommendations for Forensic Psychologists

*"What gets us in trouble is not what we don't know, it's what we know for sure that just ain't so."* —Mark Twain

The introduction of *Daubert* standards changed the landscape for forensic psychology and as the Supreme Court of the United States stated, admissible expert testimony must be based on more than "subjective belief or unsupported speculation" (Daubert, 1993). The *Daubert* criteria encompass concerns within the psychological scientific community that expert testimony was at times admitted absent scientifically acceptable theories and methods to support the opinions expressed, and conversely that relevant expert testimony based on reliable, competent research was at times excluded. **Judge Richard Posner** characterized the

purpose of *Daubert* as "to protect juries from being bamboozled by technical evidence of dubious merit" (Lloyd, 2006).

The authors recommend that practitioners consider the *Daubert* factors so that legal requirements are upheld and ethical considerations are considered when offering expert testimony. Although not an exhaustive list, some of the Daubert factors used by courts in evaluating the reliability of expert testimony are 1) whether a method consists of a testable hypothesis, 2) whether the method has been exposed to peer review, 3) whether the method is generally accepted with a given community, 4) whether the method is valid and reliable, 5) any known error rates, and 6) is the theory developed "for litigation only."

For example, Meloy uses Masters's pictures as his measurement of the behavioral rehearsal of the Hettrick sexual homicide, yet there is no data to support his hypothesis. As to reliability, Meloy does not present research that a test used to measure the connection between fantasy and motive to commit sexual homicide produces consistent results that are reliable. As to error rates, how many times was a woman killed where it was argued to be displaced sexual matricide when in fact it was not a displaced sexual matricide? Meloy could not answer this question because there is no data on error rates on this issue.

The authors believe that practitioners should consider the ethical implications of their testimony given the impact it may have on an individual's liberty, and forensic psychologists do have American Psychological Association (APA) ethical guidelines to consider. Too often courts have admitted **misleading psychological testimony** with the explanation that it could be countered by testimony from opposing experts and by vigorous cross-examination. From the lead author's trial experience, there are practical situations where vigorous cross-examination may not make juries aware of what, to sophisticated observers, were obvious defects in the testimony, thus ethical considerations should not be ignored just because legal requirements appear fulfilled.

The APA, together with other professional organizations, established a set of ethical guidelines for forensic psychologists published in *Law and Human Behavior* (1991), and although the guidelines do not represent an official statement of the APA, they were endorsed by the American Academy of Forensic Psychology. All of the guidelines are important, however, because when testifying, forensic psychologists have an obligation to all parties to a legal proceeding to present their findings, conclusions, evidence, or other professional products in a fair manner (APA, 1991). Forensic psychologists do not, by either commission or omission, participate in a misrepresentation of their evidence, nor do they participate in partisan attempts to avoid, deny, or subvert the presentation of evidence contrary to their own position (APA). For example, Meloy mentioned Hazelwood's research during the trial, but he never disclosed Hazelwood's opinion that attempting to stretch Timothy's drawings into behavioral rehearsal and motive was over-reaching. The courtroom testimony clearly illustrates what can happen when opinions that do not support the position taken by the forensic psychologist are either avoided or subverted. The forensic psychologist's responsibility to make sure that all legal parties understand the **validity and reliability** issues ensures that the checks and balances built into the legal system can function. Meloy committed a significant blunder by attempting to superimpose his expertise with the Rorschach test to bolster his testimony on the connection between Masters's drawings and the homicide.

In order to avoid undue influence from financial gain, the forensic psychologist maintains professional integrity by examining the issue at hand from all reasonable perspectives, actively seeking information that will differentially test plausible rival hypotheses (APA). In this case, the forensic psychologist made it clear, by way of his own scholarship, that he is interested in and supports psychoanalytic theories. It is evident that the desire to "push" the legitimacy of projectives techniques, at least as practiced by him, as a valid and reasonable method for assessing culpability lead to a tragic error accepted by the Colorado Supreme Court.

For example, there is no evidence that Meloy tested a plausible rival hypothesis that the drawings did not reflect what the forensic psychologist projected into the drawings or that perhaps Timothy's violent stories did not mean that his fantastical imagination gave him a motive to kill. In fact, Timothy indicated that, "My peers seemed to approve of them. . . . They liked those drawings . . . they would offer suggestions so that encouraged me to draw even more. . . . We would draw horrible gruesome scenes and share it with a guy . . . 'Oh, that's cool,' and pass it back" (Yager et al., 2008). Meloy had access to Timothy's school records and knew the media adolescents were exposed to; he learned that Timothy was in a special education class, that his peer group liked to draw, and that many of them even thought Timothy's drawings were cool. Meloy could have used all of this information to form an alternative hypothesis.

Meloy was also provided information concerning what Timothy's fellow students were exposed to by the media. Meloy testified during the trial that he categorized Timothy's drawings into over thirty themes; however, these were themes that fit into a sexual homicide hypothesis. He never considered a military theme, even though he admitted that many of the drawings had a military theme to them. He never considered that the drawings had a Freddy Krueger horror movie theme or, as Timothy stated, were a reflection of the work of **Stephen King**—all possibilities that could have been used to form an alternative hypothesis as to why he wrote stories or drew pictures that were violent. Interestingly, in an article Meloy co-authored titled, "Investigating the Role of Screen Violence in Specific Homicide Cases," he considered relevant the content of movies viewed by a sexual homicide defendant named Lucas Salmon (Meloy & Mohandie, 2001). Lucas Salmon, together with George Woldt, abducted a 22-year-old female, took turns vaginally raping her, and stabbed, cut, and smothered the woman to death as she lay naked on the pavement (Meloy & Mohandie, 2001). Meloy wrote of the common theme in the movies his client watched, such as *Blood In, Blood Out . . . Bound By Honor* and *A Clockwork Orange* to explain his pairing of sex and violence and how it would impact Lucas's behavior.

Compare and contrast how Meloy took Timothy's drawings and cross-referenced the classifications used in sexual homicide such as blitz attack, mutilating etc., but not to any other type of classification that would have formed a different hypothesis. For example, Meloy would have known of Timothy's books and movies that the police recovered from his home and his desire to write like Stephen King because Timothy revealed this to the detectives on several occasions. Meloy does not appear to extend the same analysis of developing theme consistencies for Timothy as alternative hypotheses. It

is plausible Meloy did not develop alternative hypotheses because he knew that some of the major drawings would have more in common with non-sexual homicide themes as opposed to the voluminous military, horror movie, and Stephen King themes.

The fatal error in not actively seeking information that will differentially test a plausible rival hypothesis is a caution that forensic psychologists should heed. The **ACFEI** code of conduct also forbids **ACFEI** forensic examiners from engaging in dual roles, not developing and considering alternative hypothesis, and from creating pseudo profiles. Consider that **ACFEI** members are not advocates for one side or the other and must maintain objectivity. Members should not intentionally withhold or omit any findings or opinions discovered during a forensic examination that would cause the facts to be misinterpreted or distorted.

Moreover, forensic psychologists must avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had the opportunity to conduct an examination of the individual as it pertains to conclusions to be drawn by the forensic psychologist (APA, 1991). Forensic psychologists must make **every reasonable effort** to conduct such examinations and when not feasible, they must make it clear the impact of such limitations on the reliability and validity of their professional testimony (APA, 1991). Meloy had the opportunity to uphold this guideline when he testified by disclosing that there were reliability issues as to his testimony because he did not conduct an examination on Masters, but he did not.

Upon Timothy's release from prison, Dr. Meloy stated that Detective Broderick and the prosecutors "intentionally manipulated his professional opinion by misrepresenting the physical evidence and providing him only a portion of the evidence necessary to make a judgment with respect to Mr. Masters's psychological state" (Moffeit, 2008b). Meloy indicated that had he known of Dr. Hammond, then he would not have considered Masters to be the killer (Moffeit, 2008b). Meloy reversed his prior opinion believing that Timothy was the killer when he indicated that relative to Dr. Hammond's likely perpetration, the "probability that Mr. Masters committed the Hettrick homicide was incredibly small" (Carroll, 2008). It was not until it was discovered that Timothy was telling the truth that Meloy offered to create yet another reverse-engineered pseudo-profile that implicated Dr. Hammond as the more likely suspect, even though Dr. Hammond was irrelevant in terms of Meloy's analysis of the drawings. Again, Meloy had no known direct, physical, or circumstantial evidence that pointed to Dr. Hammond as a more likely suspect.

In addition, Meloy never disclosed Hazelwood's position that is independent of what the police did or did not tell him about the evidence. Moreover, Meloy's position that he was manipulated is flawed; he would have known that there was no direct or physical evidence used against Timothy, other than his own testimony, because he was present at the trial. The evidence or **lack of evidence** presented at trial put Meloy on notice as to what exactly was used against Timothy. Furthermore, it was Meloy, independent of what the police disclosed to him, that presented his credentialed testimony as "science" and defended the scientific nature of his testimony as reliable before the jury that used his testimony to find Timothy guilty.

## Conclusion

Timothy's drawings and their perceived significance to the case proved to be the **fatal flaw** that produced a series of disasters, the first of which began with a distorted criminal investigation leading to the hiring of a forensic psychologist. The second disaster occurred when the psychologist engaged in projective analysis of the drawings without sound research to support his opinion. This mistake led to the third disaster: a prosecution that ignored all other evidentiary considerations, resulting in the conviction of an innocent person. This conviction created the fourth disaster, which represented the Colorado Supreme Court upholding the flawed testimony of the forensic psychologist while ignoring the most fundamental aspects of *Daubert*.

Forensic analysis clearly has its benefits, as we have seen with Timothy being excluded as a source of DNA on the victim's clothing, leading to his freedom. However, we also observe that there is a precarious side to forensics that cannot be discounted, especially when we have lay persons who serve as jurors and can be swayed by an expert's testimony involving drawings. It is critical that if law enforcement does rely on profiling services or forensic psychologists to assist in their investigation, the evidentiary aspects of an investigation should not be ignored. As of 2008, Timothy appears to suffer from **post-traumatic stress disorder** (Moffeit, 2008c). His attorneys have encouraged him to see a psychologist, but he is weary, stating that "**A psychologist helped put me away**" (Moffeit, 2008c).

## References

Alison, L., West, A., & Goodwill, A. (2004). The academic and the practitioner: Pragmatists' views of offender profiling. *Psychology, Public Policy and Law, 10*(1/2), 71-101.

APA. (1991). Specialty guidelines for forensic psychologists. *Law and Human Behavior, 15*(6).

Banda, P. (2008, April 6). Did a psychological profile go too far? *Prince George Citizen* Retrieved from http://www.princegeorgecitizen.com/20080406125908/wire/world-news/did-a-psychological-profile-go-too-far-experts-question-if-practice-is-reliable.html

Bright, D., & Goodman-Delahunty, J. (2006, April). Gruesome evidence and emotion: Anger, blame, and jury decision making. *Law and Human Behavior, 30*(2), 183-202.

Brodsky, S. (1991). *Testifying in court, guidelines and maxims for the expert witness.* Washington, DC: American Psychological Association.

Burgess, A., Hartman, C., Ressler, R., Douglas, J., & McCormack, A. (1986, September). Sexual homicide. *Journal of Interpersonal Violence, 1*(3), 251-272.

Campbell, G. (2007, July 15). Convicted man's appeal puts a lot at stake. *Greeley Tribune* Retrieved from http://www.greeleytribune.com/article/20070715/NEWS/107150120

Campbell, G. (2008a, January 5). Fort Collins police face questions in Masters case. *Greeley Tribune* Retrieved from http://www.greeleytribune.com/article/20080105/NEWS/272599777

Campbell, G. (2008b, February 1). The Tim Masters case: Chasing Reid Meloy. *Fort Collins Now* Retrieved from http://www.fortcollinsnow.com/article/20080201/NEWS/297958975

Carroll, V. (2008, October 23). Psychologist's fantasy. Retrieved from http://www.rockymountainnews.com/news/2008/oct/23/carroll-psychologists-fantasy

Coberly, A., & Campbell, G., (2008b, March 14). Expert in Tim Masters case admits his testimony was not supported by the facts. *Greeley Tribune* Retrieved from http://www.greeleytribune.com/article/20080314/NEWS/704078416

Darst, K. (2007, August 24). Masters's defense: Doctor could have done it. *Coloradoan* Retrieved from http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071106/NEWS01/71107028

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 79. (1993).

Douglas, J. (1995). *The mind hunter.* New York: Pocket Star Books.

Eastwood, J., Cullen, R., Kavanagh, J., & Snook, S. (2006, Summer/Fall). A review of the validity of criminal profiling. *The Canadian Journal of Police & Security Services, 4*(2/3), 118-124.

Farrell, J. (1999, March 25). Psychologists clash over meaning behind sexual homicide. *Coloradoan* Retrieved from http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071106/NEWS01/71107017

Farrell, J. (2000, April 13). Masters: Prosecution relied on character attacks. *Coloradoan* Retrieved http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071106/NEWS01/71107020

Gatowski, S., Dobbin, S., Richardson, J., Ginsburg, G., Merlino, M., & Dahir, V. (2001, October). Asking the gatekeepers: A national survey of judges and

judging expert evidence in a post-Daubert world. *Law and Human Behavior, 25*(5), 433-458.

Goodbee, F. M. (n.d). Special prosecutor's offered stipulations. Retrieved from http://i.a.cnn.net/cnn/2008/images/01/16/timothy.lee.masters.pdf

Gray, N., Watt, A., Hassan, S., & MacCulloch, M. (2003, September). Behavioral indicators of sadistic sexual murder predict the presence of sadistic sexual fantasy in a normative sample. *Journal of Interpersonal Violence, 18*(9), 1018-1034.

Grubin, D. (1994). Sexual murder. *British Journal of Psychiatry, 165*, 624-629.

Grubin, D. (1999, March). Actuarial and clinical assessment of risk in sex offenders. *Journal of Interpersonal Violence, 14*(3), 331-343.

Hartman, P. (2007a, June 12). Free Tim Masters because. Retrieved from http://freetimmastersbecause.blogspot.com

Hartman, P. (2007b, September). Homegrown fiasco. Retrieved from http://freetimmastersbecause.blogspot.com/2007/10/homegrown-fiasco.html

Hartman, P. (2008, March 11). The Hartman report on the special prosecutor's report. Retrieved from http://freetimmastersbecause.blogspot.com/2008/07/district-attorney-kenneth-t.html

Hazelwood, R., & Warren, J. (1995). The relevance of fantasy in serial sexual investigation. In R. Hazelwood & A. Burgess (Eds.), *Practical aspects of rape investigation* (2nd ed., pp. 127-138). New York: CRC Press.

Heller, K. (2006). The cognitive psychology of circumstantial evidence. *Michigan Law Review, 105*, 241-306.

Hughes, T. (2007a, December 5). Masters's attorneys focus on transcript. *Coloradoan* Retrieved from http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071205/NEWS01/712050343/1002/CUSTOMERSERVICE02

Hughes, T. (2007b, December 8). Expert questioned testimony in Masters's case. *Coloradoan* Retrieved from http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071208/NEWS01/712080371

Hughes, T. (2007c, December 4). Prosecutor admits evidence destroyed in Masters's case. *Coloradoan* Retrieved from http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071204/NEWS01/712040343/1002/CUSTOMERSERVICE02

Hughes, T. (2008a, January 3). Critical information left out in Masters's original trial. *Coloradoan* Retrieved from http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20080103/NEWS01/801030366/1002/

Hughes, T. (2008b, January 30). Judges investigated in their roles as prosecutors in Tim Masters case. *Coloradoan* Retrieved from http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20080130/NEWS01/801300319/1002/CUSTOMERSERVICE02

Hughes, T. (2008c, January 30). Masters case may have long reach. *Coloradoan* Retrieved from http://coloradoan.com/apps/pbcs.dll/article?AID=/20080124/NEWS01/801240375/1002/CUSTOMERSERVICE02

Krauskopf, C.J., (1998, Winter). The personality assessment system: a radical hypothesis. *Applied and Preventative Psychology, 7*(4), 235-245.

Langevin, R., Lang, R., Curnoe, S. (1998, June). The prevalence of sex offenders with deviant fantasies. *Journal of Interpersonal Violence, 13*(3), 315-327.

Lloyd, R.M. (2006). Proving lost profits after Daubert: Five questions every court should ask before admitting expert testimony. *Universty of Richmond Law Review, 41*, 379-424.

MacCulloch, M., Snowden, P., Wood, J. & Mills, H. (1983). Sadistic fantasy, sadistic behavior and offending. *British Journal of Psychiatry, 143*, 20-29.

Masters v. People, 01 SC 291 (2002). Retrieved from www.courts.state.co.us/supct/supctcaseannctsindex.htm

Masters v. People, 01 SC 291. (1999, March 24). Transcript of Meloy and Yuille, Retrieved from http://freetimmastersbecause.blogspot.com

McLaughlin, E. (2008, January 18). Police split over conviction in Colorado slaying. *CNN* Retrieved from http://www.cnn.com/2008/CRIME/01/18/masters.cops

Meloy, J.R., & Gacono, C.B. (1995). Assessing the psychopathic personality. In J.N. Butcher (Ed.), *Clinical personality assessment: Practical approaches* (pp. 410-422). Oxford, U.K: Oxford University Press.

Meloy, J.R. (2000). The nature and dynamics of sexual homicide: An integrative review. *Agression and Violent Behavior, 5*(1), 1-22.

Meloy, J.R., & Mohandie, K. (2001). Investigating the role of screen violence in specific homicide cases. *Journal of Forensic Science, 46*(4), 113-118.

Meyers, W. (1994, September). Sexual homicide by adolescents. *Journal of Clinical Psychiatry, 51*, 239-242.

Moffeit, M. (2007a, December 20). Undisclosed masters evidence nags. *Denver Post* Retrieved from http://www.denverpost.com/news/ci_7764830

Moffeit, M. (2007b, August 1). Video: Sketchy evidence. *Denver Post* Retrieved from http://www.denverpost.com/news/ci_6369280.

Moffeit, M. (2008a, January 21). Sketchy evidence raises doubt. *Denver Post* Retrieved from http://www.denverpost.com/headlines/ci_6373222

Moffeit, M. (2008b, October 21). Masters's team plans federal suit. *Denver Post* Retrieved from http://www.denverpost.com/specialreports/ci_10771564

Moffeit, M. (2008c, December 28). Mending Masters's broken life. *Denver Post* Retrieved from http://www.denverpost.com/popular/ci_11317809

Porter, S., Woodworth, M., Earle, J., Drugge, J., & Boer, D. (2003, October). Characteristics of sexual homicides committed by psychopathic and nonpsychopathic offenders. *Law and Human Behavior, 27*(5), 459-470.

Reed, S. (2007, August 19). Opinions on Hammond as Hettrick's killer mixed. *Coloradoan* Retrieved http://www.coloradoan.com/apps/pbcs.dll/article?AID=/20071106/NEWS01/71107027

Ressler, R., Burgess, A., Hartman, C., Douglas, J., & McCormack (1986, September). Murderers who rape and mutilate. J*ournal of Interpersonal Violence, 1*(3), 273-286.

Ressler, R., Burgess, A., & Douglas, J. (1988) Sexual Homicide. New York: Lexington Books.

Schweitzer, N. J. & Saks, M. J. (2009). The gatekeeper effect: The impact of judges admissibility decisions on the persuasiveness of expert testimony. *Psychology, Public Policy and Law, 15*(1), 1-18.

Vaughn, K. (2007, December 1). Taking up Masters's cause. *Rocky Mountain News* Retrieved from http://www.rockymountainnews.com/news/2007/dec/01/taking-up-masters-cause

West, A. (2000, August). Clinical assessment of homicide offenders. *Homicide Studies, 4*(3), 219-233

Winerman, L. (2004, July/August). Criminal profiling: The reality behind the myth. Retrieved from http://www.apa.org/monitor/julaug04/criminal.html

Yager, J., Smith, T., & Goldbaum., M. (2008, November 29). Drawn to murder. C*BS News*. Retrieved from http://www.cbsnews.com/stories/2008/11/24/48hours/main4630559.shtml

**Earn CE Credit**
To earn CE credit, complete the exam for this article on page 69 or complete the exam online at www.acfei.com (select "Online CE").

## About the Authors

**Frank S. Perri**, JD, MBA, CPA,



ACFEI member and lead author of this research project, has worked as a prosecutor and defense attorney in the criminal law field for over 12 years. Areas of concentration include violent and white-collar crimes. Mr. Perri received his Juris Doctor from the University of Illinois, his Master's in Business Administration from Case Western Reserve University, and his Bachelor of Arts from Union College. In addition, Mr. Perri is a licensed Certified Public Accountant. Mr. Perri's scholarship includes fraud-detection homicide and application of the developmental smuggling model. You may contact Mr. Perri via e-mail at frankperri@hotmail.com.

**Terrance G. Lichtenwald,** PhD, is



a Life Fellow and Diplomate in the ACFEI. He earned his Doctorate in Clinical Psychology from an American Psychological Association (APA) approved program and completed an APA approved internship. He has a Master's degree in Clinical Psychology and a second Master's in School Psychology. He earned his Bachelor's degree in Broad Field Social Studies and Psychology. Dr. Lichtenwald has spent 20 years completing forensic, behavioral, psychological, and security evaluations as well as threat assessments. Scholarship interests include fraud-detection homicide, the application of the developmental smuggling model, white-collar crime, and security/threat assessments.

## Acknowledgements

The authors would like to thank Attorney Wendell Coates and Attorney Susan Kalbantner for their review of the manuscript. ∎