An official website of the United States government

🏛 **Official websites use .gov**
A **.gov** website belongs to an official government organization in the United States.

🔒 **Secure .gov websites use HTTPS**
A **lock** (🔒) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

🌐 En Español    📄 Contact Us    🔗 Quick Links

 **U.S. Immigration and Customs Enforcement**

Search

Call 1-866-DHS-2-ICE    Report Crime

ICE    NEWSROOM

OCTOBER 31, 2016 • LOS ANGELES, CA • CHILD EXPLOITATION

# Australian man who traveled to US to have sex with young boy sentenced to 12 years in federal prison

LOS ANGELES – An Australian geneticist who pleaded guilty to a federal charge of traveling to Los Angeles to engage in criminal sexual conduct with a 6-year-old boy was sentenced Monday to 144 months in prison.

Michael Quinn, 33, of Melbourne, was sentenced by U.S. District Judge John F. Walter. Quinn was arrested May 21 by special agents with U.S. Immigration and Customs Enforcement's (ICE) Homeland Security Investigations (HSI) when he arrived at a Los Angeles-area hotel to buy a 6-year-old boy for sex.

"This defendant appeared to be a successful, well-liked professional – but he had a secret, online life in which he made clear his sexual interest in children," said United States Attorney Eileen M. Decker. "This defendant thought he had arranged to rape a young child, but the vigilance of law enforcement spared any potential victims from being sexually abused."

According to documents filed in the case, the investigation began in May 2016 after undercover agents observed Quinn on a social networking site that caters to individuals with a sexual interest in children. Quinn admitted he told undercover agents he was traveling to Los Angeles and wanted to "meet up with a dad who shares his young ones." Specifically, Quinn told the agents, whom he believed were like-minded people, that he was hoping to meet "other pervs" in the U.S.

Quinn ultimately agreed to pay a human trafficker $250 to provide him with a young boy with whom he could engage in illicit sex. Once Quinn arrived in Los Angeles, he was arrested after paying the money to another undercover agent. According to the plea agreement filed in this case, "a dominant purpose of his travel was to anally sodomize someone he knew was a 6-year-old boy."

"This sentence should serve as a powerful deterrent to online child predators who mistakenly believe the internet and a plane ticket will enable them to act on their dark desires with impunity," said Joseph Macias, special agent in charge of HSI Los Angeles. "Pedophiles should be on notice, HSI and its law enforcement partners are using all of the resources at our disposal to combat this reprehensible behavior and hold the perpetrators responsible for their crimes."

The case against Quinn is being prosecuted by Assistant U.S. Attorney Joey Blanch of the Violent and Organized Crime Section.

This case is a product of Project Safe Childhood, a Department of Justice initiative launched in 2006 to combat the growing epidemic of child sexual exploitation and abuse, and HSI's Operation Predator, an international initiative to protect children from sexual predators.

Led by the U.S. Attorneys' Offices and the DOJ Criminal Division's Child Exploitation and Obscenity Section, Project Safe Childhood marshals state and local resources to locate, apprehend and prosecute those who sexually exploit children, and to identify and rescue victims. For more information about Project Safe Childhood, please visit www.justice.gov/psc.

Since the launch of Operation Predator in 2003, HSI has arrested more than 12,000 individuals for crimes against children, including the production and distribution of online child pornography, traveling overseas for sex with minors, and sex trafficking of children. In fiscal year 2014, more than 2,000 individuals were arrested by HSI special agents under this initiative.

HSI encourages the public to report suspected child predators and any suspicious activity through its toll-free Tip Line at 1-866-DHS-2-ICE or by completing its online tip form. Suspected child sexual exploitation or missing children may be reported to the National Center for Missing & Exploited Children, an Operation Predator partner, via its toll-free 24-hour hotline, 1-800-THE-LOST.

Updated: 11/18/2024

## MEDIA INQUIRIES

For media inquiries about ICE activities, operations, or policies, contact the ICE Office of Public Affairs at ICEMedia@ice.dhs.gov.

**About Us**                                   **Enforcement and Removal Operations**

**Homeland Security Investigations**                          **Newsroom**

     

 

## Los Angeles Division

Home • Los Angeles • Press Releases • 2012 • Three Individuals Sentenced to Prison for Participating in International Child Pornography Ring

### Three Individuals Sentenced to Prison for Participating in International Child Pornography Ring

**U.S. Department of Justice**
March 09, 2012

**Office of Public Affairs**
(202) 514-2007/TDD (202) 514-1888

WASHINGTON—Three men were sentenced to prison today in Los Angeles for their participation in an international child pornography ring, announced Assistant Attorney General Lanny A. Breuer of the Justice Department's Criminal Division, U.S. Attorney André Birotte Jr. of the Central District of California, and Assistant Director in Charge Steve Martinez of the FBI's Los Angeles Field Office.

Andrew Neil Scott, 31, of Flint, Michigan, was sentenced to 30 years in prison followed by lifetime supervised release. Scott pleaded guilty on December 2, 2010 to participating in a child exploitation enterprise and two counts of production of child pornography.

Woodrow Tracy, 68, of Sun Valley, California, was sentenced to 96 months in prison followed by lifetime supervised release. Tracy pleaded guilty on September 21, 2010 to conspiracy to transport child pornography.

Justin Lee, 34, of League City, Texas, was sentenced to 66 months in prison followed by lifetime supervised release. Lee pleaded guilty on September 7, 2010 to conspiracy to advertise, receive, distribute, solicit and possess child pornography.

Tracy, Lee, and Scott were all sentenced by U.S. District Judge Virginia A. Phillips.

The sentences are the result of an international investigation into the "Lost Boy" online bulletin board. The Lost Boy bulletin board, according to court documents and proceedings, was dedicated to men who have a sexual interest in young boys and was established to provide a forum to trade child pornography.

Federal authorities, working in conjunction with a coalition of international law enforcement agencies, shut down the Lost Boy bulletin board approximately three years ago. As a result of the investigation, 16 named defendants were charged in the United States and arrested for their roles in the bulletin board. To date, 15 defendants have pleaded guilty or have been convicted at trial and one defendant passed away. Six additional men have been charged with child molestation as a result of the investigation, which also led to the identification of 27 domestic victims of child abuse, some of whom were portrayed in images posted to the Lost Boy bulletin board.

According to court documents and proceedings, law enforcement authorities discovered the Lost Boy bulletin board after receiving information from Eurojust, the judicial cooperation arm of the European Union. Eurojust provided U.S. law enforcement with leads obtained from Norwegian and Italian authorities indicating that a North Hollywood, California man was communicating with an Italian national about child pornography and how to engage in child sex tourism in Romania. Acting on the information from Europe, the FBI executed search warrants that led to the discovery of the Lost Boy network. Further investigation revealed that Lost Boy had 35 members, 16 of whom were U.S. nationals. Other members of the network were located in countries around the world, including Belgium, Brazil, Canada, France, Germany, New Zealand, and the United Kingdom.

According to court documents, Lost Boy had a thorough vetting process for new members, who were required to post child pornography to join the organization. Once accepted, members were required to continue posting child pornography to remain in good standing and to avoid removal from the board. According to court documents, Lost Boy members advised each other on techniques to evade detection by law enforcement, which included using screen names to mask identities and encrypting computer data.

International law enforcement efforts involving European law enforcement, the Brazilian Federal Police, and other agencies have identified child molestation suspects in South America, Europe, and New Zealand. Three suspects in Romania, one in France, and another in Brazil have been charged, and offenders have been convicted in Norway and the United Kingdom. Law enforcement efforts have also identified dozens of child victims located in Norway, Romania, Brazil, and other nations.

The investigation into the Lost Boy bulletin board was led by the FBI and the U.S. Postal Inspection Service, in conjunction with the Los Angeles-based Sexual Assault Felony Enforcement (SAFE) Team. The High Technology Investigative Unit of the Child Exploitation and Obscenity Section (CEOS) in the

Justice Department's Criminal Division, along with Eurojust, provided invaluable assistance during the

## Los Angeles Division Links

**Los Angeles Home**

Contact Us
- Overview
- Territory/Jurisdiction

News and Outreach
- Press Room | Stories
- In Your Community

About Us
- Our People & Capabilities
- What We Investigate
- Our Partnerships
- Los Angeles History

**Wanted by the FBI - Los Angeles**

**FBI Jobs**

Justice Department's Criminal Division, along with Eurojust, provided invaluable assistance during the investigation.

The case is being prosecuted by Assistant U.S. Attorneys Joey L. Blanch and Yvonne Garcia of the Central District of California and CEOS Trial Attorney Andrew McCormack.

This content has been reproduced from its original source.

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. government, U.S. Department of Justice

Close

ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JOEY L. BLANCH (Cal. Bar No. 186487)
Assistant United States Attorney
Deputy Chief, General Crimes Section
YVONNE L. GARCIA (Cal. Bar No. 248285)
Assistant United States Attorney
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3315/0719
     Facsimile: (213) 894-0141/3713
     E-mail: joey.blanch@usdoj.gov
             yvonne.garcia@usdoj.gov

LANNY A. BREUER
Assistant Attorney General
United States Department of Justice,
     Criminal Division
ANDREW MCCORMACK (D.C. Bar No. 470606)
Trial Attorney
Child Exploitation and Obscenity Section
     1400 New York Avenue, N.W., Suite 600
     Washington, DC 20005
     Telephone: (202) 353-2057
     Facsimile: (202) 514-1793
     E-mail: andrew.mccormack@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR No. 09-68B-VBF-[11] |
| | ) |
| Plaintiff, | ) <u>PLEA AGREEMENT FOR DEFENDANT</u> |
| | ) <u>JONATHON SUDDUTH</u> |
| v. | ) |
| | ) |
| HAROUT HAGOP SARAFIAN, | ) |
|   et al. -- JONATHON SUDDUTH, | ) |
| | ) |
| Defendants. | ) |
| | ) |

and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony conviction in this case. Defendant understands that by entering a guilty plea defendant waives any claim that unexpected immigration consequences may render defendant's guilty plea invalid.

FACTUAL BASIS

11. Defendant and the USAO agree to the statement of facts provided below. Defendant and the USAO agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 13 below, but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

At all relevant times:

- defendant and others were members of an Internet-based, members-only bulletin board known as "Lost Boy"; and

- Lost Boy was located on an Internet server in Texas, but also operated in every location where a member of the bulletin board accessed it through the Internet, including the Central District of California.

Defendant joined the most recent version of Lost Boy on or about May 29, 2008. At the time defendant joined Lost Boy, he knew that the main purpose of Lost Boy was to provide a forum for the trading of child pornography. Defendant knew that Lost Boy was reserved for serious traders of child pornography; by its very nature, membership in Lost Boy constituted an offer to receive, exchange, display, distribute, and reproduce child pornography. Defendant also know that Lost Boy is dedicated to "boylovers" -- men who have a sexual interest in young boys.

Among the means and methods by which defendant and other Lost Boy members conduct and participate in the conduct of the affairs of Lost Boy are the following:

11

- Members of Lost Boy are encouraged and required to post images and videos directly into the "Pictures" and "Videos" fora on the message board; use the "Links" forum to post messages including links to other password-protected child pornography websites; and use the dedicated online storage space associated with Lost Boy (the "FTP," or "File Transfer Protocol" site) to maintain a massive and secure private library of child pornography that is available for viewing or download only by members.

- Members of Lost Boy can post images of boys they find attractive, even if the image is not pornographic, but the majority of the images and videos of children posted on the message board are sexual in nature, and are child pornography.

- Any posts to Lost Boy not dealing with child pornography, a member's sexual interest in boys, or board membership and security matters must be posted in the "off topic" forum.

- Once a Lost Boy member has made a post to Lost Boy, any other member may post comments on the post. For instance, a member can post a picture of child pornography, and other members who view it can post how much they like the picture, and ask for similar pictures to be posted.

- Lost Boy has written rules, including one that requires members to notify everyone on the message board if they or another member are contacted by law enforcement.

- The group recommends that Lost Boy members use encryption software to protect their collection of child pornography. The group also discusses the use of proxy servers, which mask an Internet user's true Internet Protocol address, allowing members to hide their identity.

- Lost Boy members communicate with one another extensively about their private collections of child pornography images, as well as their ongoing contact with children in the United States and abroad.

- In order to improve the mechanisms by which Lost Boy members can trade child pornography, Lost Boy members maintain a Rapid Share account for all of the members to use to share child pornography material. Rapid Share is a hosting company that facilitates file sharing by allowing users to quickly download large amounts of content from the Rapid Share servers. Members routinely upload child pornography to Rapid Share and then provide other Board members with access to it.

12

In furtherance of the conspiracy to use the Lost Boy message board to advertise the receipt, exchange, display, distribution and reproduction of child pornography amongst members, in interstate and foreign commerce, defendant actively participated in Lost Boy. Using the screen name "Trent," defendant made approximately 27 public posts to other message board users. In these messages, defendant commented on child pornography posted by other members, and asked other members to post child pornography onto Lost Boy. For example:

- On or about May 30, 2008, an unidentified Lost Boy member using the screen name "Mr. Bean" posted a message titled "P101" in the "Pictures" section of the message board. He subsequently posted two responsive messages to his own "P101" post. Each of the three messages contained thumbnail images which, when clicked, expand to full-size images. These thumbnail images depict, among other things, prepubescent boys being anally penetrated by adult men, an adult man touching the erect penis of a prepubescent child, and prepubescent boys orally copulating each other and adult men. Mr. Bean also posted a message claiming that he has "apprx 5,000 pics in 1gig+." On or about June 2, 2008, defendant posted a responsive message stating, "I would LOVE it if someone uploaded all the pics into sever .rar files ^_^"

- On or about September 8, 2008, a member of Lost Boy posted a message to the "Pictures" section of the message board titled "Dec 6th." This post contains 19 thumbnail images which, when clicked, expand to full-size images. The images depict two minor boys. In one of the images, both boys are masturbating. In another, one boy is anally penetrating the other boy with his penis. Between September 10 and September 14, 2008, another member of Lost Boy member using the screen name "Ghost" posted responsive messages which indicated that he had "some fills," which means more images in the same child pornography series, and provided an Internet address where the "fills" could be found. On or about September 17, 2008, an unidentified Lost Boy member using the screen name "Orphee" posted a responsive message expressing difficulty accessing the website Ghost had indicated contained the fills. On or about September 17, 2008, defendant posted a responsive message assisting Lost Boy member Orphee in accessing the child pornography "fills." Specifically, defendant stated "its in the upload area" and provided a user name and password to allow Orphee to access the fills.

- On or about September 24, 2008, an unidentified Lost Boy member using the screen name "Orphee" posted a message titled "Make your choyce III" to the "Videos" section of Lost Boy. This post contained six contact

13

sheets, each of which contains approximately 30 images. One of these contact sheets, titled "shanghaididi.mpg," contains an image that depicts a naked prepubescent boy being anally penetrated by an adult male penis. Another image on the same contact sheet depicts the adult male masturbating the boy while anally penetrating him with his penis. On or about September 24, 2008, defendant posted a responsive message asking for these child pornography images to be uploaded to Lost Boy.

- On or about October 14, 2008, another Lost Boy member, using the screen name "Blinkinglight28," posted a message titled "b-depao" to the "Videos" section of Lost Boy. This post contained a contact sheet containing approximately 50 images of two naked prepubescent boys. One of the images on the contact sheet depicts one of the boys performing oral sex on the other boy. Another image depicts one of the boys anally penetrating the other boy's anus with his tongue. That same day, an unidentified member of Lost Boy using the screen name "Orphee" posted a responsive message containing four additional contact sheets. Three of these contact sheets contain images depicting the same naked boys depicted in Blinkinglight28's original post. In the contact sheets posted by Orphee, the images depict the boys masturbating themselves and each other, and them performing oral sex on one another. The next day, on or about October 15, 2008, defendant posted a responsive message asking that Blinkinglight28 and Orphee post the videos, not just the contact sheets. Specifically, defendant's post stated, "Hey would you mind uploading them for us? - hugs - Thanks in advance."

At the time defendant joined Lost Boy and at all times relevant while he participated in Lost Boy, he agreed that the Lost Boy board was itself a notice and advertisement, seeking and offering to receive, exchange, buy, produce, display, distribute and reproduce visual depictions of minors engaged in sexually explicit conduct, where the production of these images involved the use of minors engaged in sexually explicit activity. Defendant also agreed that Lost Boy members would use Lost Boy to post notices and advertisements seeking and offering to receive, exchange, buy, produce, display, distribute and reproduce visual depictions of minors engaged in sexually explicit conduct, where the production of these images involved the use of minors engaged in sexually explicit activity. Defendant knew that Lost Boy existed on the Internet, a means of interstate and foreign commerce, and that any notices and advertisements made on Lost Boy would be transported in interstate and foreign commerce through using the Internet.

14

SENTENCING FACTORS

12. Defendant understands that in determining defendant's sentence the Court is required to consider the factors set forth in Title 18, United States Code, Section 3553(a)(1)-(7), including the kinds of sentence and sentencing range established under the Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other Section 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

13. Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | | |
|---|---|---|---|
| Base Offense Level | : | 22 | [U.S.S.G. § 2G2.2(a)(2)] |
| Specific Offense Characteristics | | | |
| Age of victim under 12 | : | +2 | [U.S.S.G. § 2G2.2(b)(2)] |
| Distribution for receipt of a thing of value (other images) | : | +5 | [U.S.S.G. § 2G2.2(b)(3)(B)] |
| Material that portrays sadistic or masochistic conduct | : | +4 | [U.S.S.G. § 2G2.2(b)(4)] |
| Pattern of activity involving the sexual abuse/exploitation of a minor | : | +5 | [U.S.S.G. § 2G2.2(b)(5)] |
| Use of computer | : | +2 | [U.S.S.G. § 2G2.2(b)(6)] |

15

600 or more images : +5 [U.S.S.G. § 2G2.2(b)(7)(A)] Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate. Defendant understands that defendant's offense level could be increased if defendant is a career offender under U.S.S.G. §§ 4B1.1 and 4B1.2. If defendant's offense level is so altered, defendant and the USAO will not be bound by the agreement to Sentencing Guideline factors set forth above.

14. Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

15. Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in Title 18, United States Code, Section 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

## WAIVER OF CONSTITUTIONAL RIGHTS

16. Defendant understands that by pleading guilty, defendant gives up the following rights:

a) The right to persist in a plea of not guilty.

b) The right to a speedy and public trial by jury.

c) The right to the assistance of an attorney at trial, including the right to have the Court appoint an attorney to represent defendant at trial. Defendant understands, however, that, despite defendant's guilty plea, defendant retains the right to be represented by an attorney -- and, if necessary, to have the Court appoint an attorney if defendant cannot afford one -- at every other stage of the proceeding.

16

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

31.  The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF CALIFORNIA

ANDRÉ BIROTTE JR.
United States Attorney

_____          2/28/11
JOEY L. BLANCH                            Date
YVONNE L. GARCIA
Assistant United States Attorneys


_____          2/26/11
JONATHON SUDDUTH                          Date
Defendant

_____          2/26/2011
MICHAEL MAYOCK                            Date
Attorney for Defendant
Jonathon Sudduth



OFFICES *of* THE UNITED STATES ATTORNEYS

THE UNITED STATES ATTORNEY'S OFFICE

SOUTHERN DISTRICT *of* OHIO

ARCHIVE

SEARCH THE ARCHIVE

[ SEARCH ]

Home » News » Press Release

NEWS

# COLUMBUS MAN TO SERVE 15 YEARS IN PRISON FOR ADVERTISING CHILD PORNOGRAPHY ON INTERNET-BASED BULLETIN BOARD

**Current Site**

Department of Justice

⌐ U.S. Attorneys

⌐ Southern District of Ohio

**Archives**

Department of Justice

⌐ U.S. Attorneys

⌐ Southern District of Ohio

FOR IMMEDIATE RELEASE
WEDNESDAY November 02, 2011
http://www.justice.gov/usao/ohs

CONTACT: Fred Alverson
Public Affairs Officer
(614) 469-5715

COLUMBUS – Christopher J. Klein, 47, of Columbus, was sentenced in United States District Court to 180 months in prison for advertising child pornography on an Internet-based, members-only child pornography bulletin board known as "Lost Boy," and 60 months in prison for receipt of child pornography. The sentences were ordered to run concurrently.

Carter M. Stewart, United States Attorney for the Southern District of Ohio, Edward J. Hanko, Special Agent in Charge, Federal Bureau of Investigation (FBI), and Dugan T. Wong, Assistant Inspector in Charge, U.S. Postal Inspection Service, announced the sentence handed down today by Senior United States District Judge George C. Smith.

Klein pleaded guilty on April 19, 2011 to the crimes. According to a statement of facts filed with the plea agreement, Klein and others set up Lost Boy in September 2007 as a forum for trading child pornography. "Klein knew that Lost Boy was reserved for serious traders of child pornography; by its very nature, membership in Lost Boy constituted an offer to receive, exchange, display, distribute, and reproduce child pornography," the statement of facts read.

On September 30, 2010, agents executed a federal search warrant at Klein's house. When they entered the house, they found Klein in the process of knowingly downloading child pornography to his computer. Thousands of additional images of child pornography were found on Klein's computer. Agents arrested Klein. He has been in custody since his arrest.

A federal grand jury in the Central District of California initially indicted Klein and others as part of their investigation into Lost Boy.

Stewart commended the cooperative investigation by Special Agents of the FBI and Postal Inspectors, as well as Trial Attorney Andrew McCormick with the U.S. Department of Justice Child Exploitation and Obscenity Section, Assistant U.S. Attorney Joey Blanch in the Central District of California and Assistant U.S. Attorney Michael Hunter in the Southern District of Ohio, who prosecuted the case.

Return to Top

USAO ARCHIVE
HOME

JUSTICE.GOV/USAO

Accessibility          Justice.gov
FOIA                   USA.gov
Privacy Policy

# The Sentencing Battleground: Understanding the Current Psychology Research and Refuting Defense Psychology and Risk Assessment Reports at Sentencing

*Dr. Darrel Turner, Ph.D.*
*Clinical and Forensic Psychologist*

*Meghan Hanks, M.A.*
*Mental Health Practitioner*

*Joey L. Blanch*
*National Project Safe Childhood Coordinator*
*Executive Office for United States Attorneys*

*Camille E. Sparks*
*Project Safe Childhood Coordinator*
*Northern District of Texas*

## I. Introduction

Sentencing is a hotly contested battleground in child pornography cases. Unable to dispute the evidence plainly recorded on their computers, defendants frequently abandon claims of innocence, instead focusing their efforts on convincing courts that they pose no danger to children. Without evidence of "contact offenses," defendants argue, they do not deserve the lengthy sentences advised by the U.S. Sentencing Guidelines.

Internet sex offenders are one of the fastest-growing subpopulations of federal offenders, and child pornography offenders, in particular, are one of the most frequently arrested and prosecuted subtype of sex offenders (1, 2). In the United States, the number of child pornography cases prosecuted by federal prosecutors increased by over 1,000 percent from 1994 to 2006 (1). Many authors suggest that possession of illicit images of children acts as one step in a behavioral pathway that could lead to contact offending against children (3, 4). Indeed, this area is of primary concern for prosecutors, triers of fact, and society in general. However, defendants counter with studies suggesting the opposite—that non-contact child pornography offenders rarely pose a danger of reoffending. They frequently present "expert" psychological evaluations and risk assessments, opining that the offender poses no danger at all. Are these studies valid? Are they being cited correctly? Was the risk assessment properly done?

It may not be possible, or even desirable, for the Government to counter every defense expert psychological report by obtaining its own psychological evaluation and turning every sentencing hearing into a battle of the experts. However, an understanding of the current psychological literature can greatly assist law enforcement and prosecutors to search for evidence of risk factors during the course of the

investigation, decipher defense expert reports at sentencing, and assist courts to more accurately assess the risk a child pornography offender poses to children.

## II. Why science matters:  below-Guidelines sentences have become the norm

For defendants to succeed in convincing sentencing courts that they do not deserve a significant sentence for a child pornography offense because they pose no danger to children, they must first convince the court not to impose a sentence under the current Sentencing Guidelines. Therefore, it is helpful to understand the history of the Guidelines, the attacks made against them, and why now, more than ever, courts appear receptive to arguments that defendants should receive a reduced sentence, simply because there is no evidence that they committed other, more serious offenses.

Much has already been written about the history of the Sentencing Guidelines (5, 6). In short, the Sentencing Commission generally develops the Guidelines based on data about past sentencing practices (7). A number of the child pornography Guidelines provisions, however, were mandated by Congress—in other words, these provisions are not "empirically" based (8).

In 2005 the Supreme Court, in *United States v. Booker*, rendered the Guidelines effectively advisory (9). Two years later, in *Kimbrough v. United States*, the Supreme Court held that sentencing courts had the discretion to depart from the Guidelines for purely policy reasons—including a sentencing court's disagreement with sentencing guidelines that were not set using the Sentencing Commission's normal empirical approach (10). Together, *Booker* and *Kimbrough* gave defendants—and sentencing courts—who already disagreed with the high sentences advised by the Guidelines, the hook they needed to disregard them and look to other 18 U.S.C. § 3553(a) factors, such as psychological examinations and risk assessments, to guide their sentencing decisions.

This argument gained traction following an article published in 2008 by Assistant Federal Public Defender Troy Stabenow (11). He argued that judges should depart from the Guidelines because they "are not the product of empirical data, national experience, or independent expertise, and thus, do not satisfy § 3553(a)'s objectives" (12).

Significantly, Stabenow's criticism of the Guidelines relies, in part, on his citations to psychological literature. Stabenow argued that the high sentences dictated by the PROTECT Act were based on the fear that child pornography defendants are contact offenders, predisposed to engage in sexual relations with children. He claimed that "new studies focused purely on child pornography defendants have empirically demonstrated that many child pornographers are less dangerous than previously believed" (13). Citing to studies by Dr. Michael Seto and Angela Eke, Stabenow concluded that "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children" (14). Furthermore, Stabenow suggests that, using the current psychological literature, it is possible to conduct an accurate risk assessment of defendants in order to reliably "separate 'fantasy' pedophiles from intentional contact offenders" (15). Stabenow's claim, based upon select psychological studies that most child pornography offenders pose no danger to children, is commonplace in defense sentencing briefs and even in defense expert psychologist evaluations. Defendants present their own risk assessments to the court, arguing that they pose no risk at all.

The U.S. Sentencing Commission, in its 2012 report to Congress (2012 Report), stated that by 2011 only 32.7 percent of non-production child pornography offenders received within-Guidelines sentences (6). This Report was the result of the Sentencing Commission's multi-year study of issues involved in child pornography sentencing, and contained a number of critical findings regarding child pornography offender behavior, risk factors, and recidivism rates (6). The Report was highly critical of § 2G2.2 (the Guideline most often used in child pornography cases) and called for substantial revisions.

On March 5, 2013, the Department of Justice responded to the 2012 Report, disagreeing with a number of the Sentencing Commission's findings (16). The Department agreed, however, that the current

Guidelines are imperfect and recommended a number of changes. No changes, however, have been enacted.

Defendants have taken advantage of the 2012 Report and the Department's response to it to argue that the Guidelines should be disregarded. While defendants have raised numerous creative arguments supporting low sentencing recommendations, none are as ubiquitous as the claim that a low sentence is warranted because the defendant poses no danger to children and is a low risk of recidivism. Defense experts often rely on the current psychology literature to support their assertions that the defendant poses a low risk of reoffending in the future. But are they citing this literature correctly? A familiarity with the current social science literature can greatly assist prosecutors in understanding these defense arguments, and countering them.

## III. How to respond to psychological themes raised by defendant's sentencing papers

Non-contact, child pornography offenders are generally lumped into an all-inclusive "low risk" category. Unfortunately, limited research exists regarding these offenders, unlike the enormous body of psychological research conducted informing best practices when conducting risk assessments of *contact* sex offenders. Consequently, triers of fact are often mislead by defense experts who use either non-empirically supported mitigating factors (that is, PTSD, depression, "therapeutic" use of child pornography due to a personal history of sexual abuse as a child) or limited research findings (for example, "The Seto Study" (17)) to support their findings.

This section looks at what factors actually increase a child pornography offender's risk and examines how to counter arguments frequently made by defense experts in these cases by analyzing the content of a random sample of psychological evaluations utilized by defense attorneys in federal child pornography cases.

### A. Defense counsels' oft-cited "Seto Study" and its limitations

In 2011 Dr. Seto and colleagues published a paper analyzing 21 separate recidivism studies. This paper suggested that child pornography offenders, in general, are at a low risk to reoffend sexually (4.6 percent recidivism rate) (17). Just as Stabenow cited Seto's earlier work in his criticism of the Guidelines, defense experts frequently cite Seto's 2011 paper during legal proceedings. Triers of fact are often influenced by this data because Seto is a well-respected researcher, the study is well designed, and, being in an area of criminal behavior that is relatively new to modern society, there is an absence of additional studies.

What defense experts and sentencing positions generally do *not* address are the limitations to this study. The Seto Study is characterized by important, inherent factors that result in what is likely a significant underrepresentation of the re-offense pattern of child pornography offenders. These factors are expressly addressed by the authors of the study—a fact which is not usually mentioned by defense experts (17).

**The study fails to adequately address the need for case-by-case assessment:** Presenting one article of generalized risk without assessing the unique, ideographic factors inherent in each individual case is remiss at best and dangerous at worst. Seto himself warns, "The fact that child pornography offenders as a group appear relatively low in risk for detected sexual reoffending does not mean, however, that offenders are homogeneous with regard to risk" (17). The author goes on to concede that "[w]e need research on the factors that predict recidivism in this population" (17).

While determining risk in child pornography offenders may be a new area of study, the practice of determining risk factors in various populations is not new. This limitation of Seto's study can be

explained by comparison to another area of risk assessment: suicide. Judges are often called upon to make decisions regarding involuntary commitment to inpatient mental health facilities for suicidal patients. Research indicates that suicide occurs in approximately 12.7 out of 100,000 deaths in the United States per year on average (18). This is far less than 1 percent of the population, yet we are aware as a society that certain *individuals represent a much higher risk than others in the group* for suicide, and do indeed warrant additional care. We know that, for example, military veterans are twice as likely to commit suicide (19) and lesbian/gay/bisexual/transgendered/questioning individuals commit suicide at a rate three times higher than the national average (20). Additional factors that increase risk include mental illness, lack of social support, access to means, family history of suicide, and prior attempts (21). Therefore, in terms of risk, an individual who is a returning Iraqi war veteran, who is homosexual, who lives alone, and who has a history of two prior attempts at suicide looks very different from the general studies that report suicide in less than 1 percent of the population. The same is true with all risk assessments, including an assessment involving the risk of recidivism among child pornography offenders.

**The study analyzes offenders over a brief period of time:** Ideally, a recidivism study follows released offenders over a long period of time—even decades. A primary weakness of the Seto Study is the brief period of time over which the offenders were followed. The average amount of time an offender had been in free society after release in the Seto Study is only 3.4 years. Even at the high end of "street time," the offenders had been released for only 6 years, and some offenders in the study had been released for only 1.5 years. Many or most of these offenders were also subject to restrictive supervision guidelines that limited their access to children, and often to the Internet (17).

As the follow-up time in any recidivism study is extended, the recidivism rate inevitably increases. For example, in a study conducted by Seto and Eke in 2005 (22), 201 registered male child pornography offenders were followed for an average of 2.5 years post release. A total of 4.5 percent of those offenders had been convicted of a new contact child sexual offense. In 2010 authors conducted a follow-up study with this same group of offenders (23). Interestingly, with the average follow-up time in the new study increasing to an average of only 5.9 years, the total number of these offenders with a new contact child sexual offense had doubled to 9 percent. This approaches the 10 to 15 percent marker identified as an average level of re-offense after 5 years among *contact* offenders (24). While some of these offenses occurred during the follow-up period, some were new convictions for older contact offenses that occurred *prior* to the instant child pornography offense (23). This raises another issue in the prosecution and sentencing of child pornography offenders: What is the likelihood that a child pornography offender has *already* committed a contact sex offense for which he was not caught, and how is it accounted for in a risk assessment?

**Child molestation and pornography offenses are underreported:** Another and, perhaps, most crucial point of contention in the Seto Study is the singular nature of sex offending among criminal behavior as an immensely underreported phenomenon. There is clearly a huge difference in detecting, for example, murder or bank robbery in a group of offenders being studied for reoffending versus detecting child molestation or viewing of child pornography. Research repeatedly indicates that an incredibly small number of sexual assaults are ever reported—with figures ranging from 2 to 13 percent in various studies (25, 26). Compounding this effect is the fact that a majority of victims of childhood sexual abuse that do disclose do not do so until adulthood due to the negative psychological and social ramifications inherent in the process of disclosure (26–28). Perhaps most germane to this discussion is the extremely small percentage of the reported cases that actually progress to arrest, prosecution, and/or conviction. Only a fraction, in fact, of this small percentage of reported cases of child abuse are even made known to law enforcement due to a variety of factors, including the various channels of disclosure across jurisdictions (mental health providers, Child Protective Services, family practitioners, etc.) (29). Additionally, of those that are disclosed to police, research has found that arrests are made in only 29 percent of cases—and for

---

children under age 6, only 19 percent of reported sexual abuse incidents result in arrest (30). As we follow the legal process, we inevitably find an even smaller percentage being prosecuted and an additionally smaller percentage ending in conviction.

This discrepancy is further born out in studies that examine rates of conviction versus self-report data among child sexual offenders. Studies that allow for self-reporting of number of victims and proliferation of offending by convicted child sex offenders (31) suggest higher prevalence and, perhaps, more accurate estimates of offense rates (17, 32). For example:

- Self-report data was evaluated in a clinical sample of 561 sex offenders with both contact and non-contact offenses. Collectively, the offenders in this study reported over 250,000 incidents of sexual offending. Furthermore, if child sex offenders providing self-report are able to do so anonymously, the differences in the number of crimes claimed and the number of convictions increase further (33).

- Another survey evaluated contact offenders and found that rapists reported an average of 5.2 rapes compared to only 2.8 documented rapes per offender. For the child molesters in the sample, there was an average of one conviction per offender. However, anonymous self-reporting revealed an average of 4.7 molestations per offender (34).

- Yet another study also found major discrepancies in official criminal records and self-report data. The 23 rapists in the sample averaged approximately 2 arrests per offender, yet they self-reported an average of 221 crimes per man. The 30 child molesters averaged 1.5 arrests, but self-reports revealed an average of about 666 crimes, including crimes against children and adults (35).

- Anonymous self-report data was obtained from 99 convicted sex offenders. Official records showed that 37 had been arrested a total of 52 times and charged with 66 offenses for contact offenses against a female adult—yielding an average of 1.8 victims per offender. Self-reporting, however, revealed an average of 11.7 victims per offender. The child molesters in this sample (n=67) had official records reflecting a total of 136 victims, but the men anonymously admitted to over 8,000 incidents of sexual contact with 959 children (32).

- In a recent study, 127 child pornography suspects with no known history of contact offending were interviewed regarding undetected contact offenses. Only 4.7 percent initially admitted to previously abusing at least one child. After administration of a tactical polygraph, an additional 52.8 percent disclosed undetected contact offenses (36).

Considering that many of the studies included in Seto's meta-analysis only used conviction data to determine recidivism, it becomes increasingly likely that the results indicate, at best, a serious underrepresentation of the actual re-offense rates of child pornography offenders.

## B.  Identifiable factors increase a child pornography offender's recidivism risk

A growing body of research identifies variables and characteristics of offenders, collections, images, online behavior, and demographics that are significantly related to a higher risk of reoffending with either additional child pornography offenses or by progressing to contact offending with children. As discussed in more detail below, such risk factors include living with or having access to children, drug and alcohol problems, antisocial peer networks, criminal attitudes or beliefs, antisocial behavior, and sexual deviance.

Defendants regularly cite certain social science literature, such as the Seto Study, for the proposition that child pornography offenders—as a homogeneous group—pose a low risk of recidivism. There are certainly individual child pornography offenders that pose a low risk to reoffend. There are also, however, in the group of child pornography offenders, individuals who represent a higher level of risk to reoffend.

The burning question becomes:  How do we identify those at a higher level of risk of reoffending among child pornography offenders? This section examines this question by relying on empirical studies that examined and compared child pornography offenders with contact offenders and mixed offenders (those with both child pornography and contact offenses). Armed with the knowledge of risk factors identified by reputable, empirical, peer-reviewed studies, prosecutors can more accurately assess the risk of reoffending.

**Access to children:**  A 2011 study examined the differences between child pornography offenders and mixed offenders who began with child pornography possession and progressed to contact offending (37). The findings indicated that the primary difference between the two groups was that the mixed offenders that started with child pornography possession were more likely to live with children or have access to children through their places of employment. In addition, they found higher proportions of drug and alcohol problems in these mixed offenders. Two years later, another study found that, overall, mixed offenders appear to present psychologically in a manner more commensurate with Internet offenders than contact offenders (38).

These findings can greatly assist prosecutors at sentencing because it is not uncommon for a defendant to claim that his drug and alcohol problem indicates that he poses a *lower* risk to children, because his child pornography offense was the result of drunk/high behavior, and not a sexual interest in children.

**Criminal history/lifestyle:**  It is not uncommon for child pornography offenders to have no prior criminal history of any kind. This does not mean that most child pornography offenders have not previously engaged in criminal behavior. It may simply mean that they were not caught by the criminal justice system. Self-report studies reveal the prevalence of undetected contact offenses in child pornography offenders anywhere from none or very few to over 80 percent (31, 39). Although some studies have found evidence of a criminal history, most agree that the criminal history of child pornography users is significantly less prevalent, prolific, and significant than contact offenders (40–42). Another study confirmed this, indicating that child pornography offenders tend to display fewer factors associated with a criminal lifestyle compared to contact offenders (2). Additional research has found that child pornography offenders generally have fewer criminal attitudes or beliefs, criminal lifestyle endorsement, or antisocial peer networks (2, 23, 42). Mixed offenders proved to be more criminogenic when these findings were translated to them (43).

**Antisocial behavior and sexual deviance:**  The 2012 Sentencing Commission Report proffered that, despite the limited research, a consensus exists that the two primary risk factors for repeat child pornography or escalated contact offenses are antisocial behavior and degree of sexual deviance. Antisocial behavior can generally be described as criminality in thought and behavior, general difficulties in self-regulation, and antisocial personality characteristics as outlined in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM 5), such as entitlement, lack of empathy, and manipulation of others (44). One of the most effective and most popular instruments used to measure antisocial behaviors and personality traits is the Psychopathy Checklist-Revised (45). The PCL-R is a 20-item checklist of a variety of characteristics that are commonly found in individuals with psychopathy. It is also used as a risk measure for reoffending in many different contexts, given that the construct measured by the instrument—antisociality—is one of the most predictive variables in reoffending of any kind (45, 46).

Interestingly, among sex offenders, child molesters generally present with less criminal *behaviors* as measured on the PCL-R than do adult rapists. However, the "Factor 1" items on the PCL-R, which measure personality characteristics of psychopathy and antisociality as opposed to actual behaviors, are themselves predictive of the risk of reoffending among child molesters (46). Given this, and because research indicates a general pattern of less criminality among child pornography offenders than among

contact or mixed offenders, measuring the presence of characteristics of criminality by this instrument is an excellent manner to assess the degree of antisocial characteristics in a given offender and is, therefore, a key step in defining a significant portion of that offender's risk of reoffending.

Simply put, as a child pornography offender begins to increase in level of antisociality, that offender begins to look more like those who have offended or may offend against an actual child. Some traits that may be present as examples of antisociality that may not manifest as criminal charges are (45):

- Substance abuse

- Impulsivity

- Irresponsibility in financial matters

- Parasitic lifestyle

- Early behavioral problems (in childhood, such as suspensions, bullying, hurting animals, playing with fire)

- Sexual promiscuity

- Unstable work history

- Unstable relationship history

- Pathological lying

- A lack of emotional depth

- A lack of remorse

- A pattern of blaming others for one's own problems, and

- Any illegal behaviors not resulting in criminal charges

Another major variable that increases the risk of reoffending among child pornography offenders is sexual deviance (6, 17). Sexual deviance can be defined as any abnormal source of sexual attraction, especially one that involves non-consenting sexual partners (for example, children or non-consenting adults). The primary means of assessing sexual deviance is through a complete psycho-sexual evaluation. One area of sexual deviance often associated with child pornography offenders is pedophilia. Per the DSM 5, pedophilia is characterized by a pattern of sexual attraction to children lasting for at least a period of 6 months. Research supports the notion of using child pornography offending as a valid means of diagnosing pedophilia (47). Thus, forensic examination should address how long an offender has been downloading child pornography and, if possible, the amount of time spent viewing it. Forensic analysis of the number and type of images collected by an offender may also be important, because recent research suggests that these factors also speak to sexual deviance. There is conflicting research regarding whether the size of the child pornography collection is a distinguishing variable between contact and non-contact offenders. A 2010 study found contact offenders to possess significantly more child pornography than non-contact offenders (48). A 2014 study also found that mixed offenders (child pornography offenders with contact offenses) were more likely to have a larger collection of child pornography images than non-contact offenders (2). Another study controlled for the severity and violence of the images, and found that although non-contact (child pornography only) offenders had a greater overall number of child pornography images as compared to mixed offenders, they had a smaller proportion of the more severe and violent pornography, as compared to mixed offenders (43). In addition, the more severe the contact child sexual offense committed, the higher the proportion of penetrative child pornography images possessed (43).

A determination of masturbatory behavior is also crucial in diagnosing pedophilia. This is an important factor in any thorough risk assessment of a child pornography offender. In an attempt to deny

any sexual interest in children, defendants often proffer creative justifications for their child pornography offenses, such as "He was only trying to complete a collection," or "It was an OCD/Hoarding problem." Whether the offender masturbated to the images is a simple, but important, factor in examining sexual deviance in the face of such excuses. As discussed in more detail below, this behavior is often not addressed in defense experts' risk assessments.

## IV. Current studies:  a qualitative analysis of defense expert reports in federal child pornography cases

### A. Method and results

Defense psychology exams commonly ignore the risk factors presented above and rely instead on non-empirically supported mitigating factors, inappropriate risk assessment tools, and simply advocacy—rather than science—to support their conclusions that a defendant's behavior does not warrant a significant sentence. In order to properly assess the types of claims related to psychology and social science literature being made by defendants (and their expert psychologists), a request was made via a Project Safe Childhood listserv to federal prosecuting attorneys to supply defense expert risk assessment evaluations or sentencing memoranda addressing psychological evaluations of offenders in child pornography cases. In response, prosecutors provided information on 17 distinct cases. In some cases, multiple documents were received for the same case (for example, a letter to the judge in support of the defendant from family members, a sentencing memorandum, an offender statement, and a defense expert psychological evaluation). In total, 13 complete psychological evaluations, 9 defense sentencing memoranda, 2 letters from family members of 2 offenders to the judge in each case in support of the offenders, 1 letter from a therapist of an offender to the judge, hospital records for 1 defendant, and 3 defense expert curriculum vitae were received. Of the nine defense sentencing memoranda, two were not used as they did not refer to a psychological evaluation. All 17 of the cases included in the study contained either a complete psychological evaluation by the defense expert or detailed reference to findings of a defense expert evaluation in the defense sentencing memorandum.

Documents were analyzed for diagnoses, instruments used, education level of experts, risk factors listed, and reasons or explanations made for accessing and viewing child pornography. Diagnoses were not made in all cases. A mood disorder diagnosis was rendered in four cases (Bipolar II, Schizoaffective Disorder (two cases), and Major Depressive Disorder). Adjustment Disorders were diagnosed in two separate cases, both referencing depression (Adjustment Disorder with Mixed Anxiety and Depressed Mood, Adjustment Disorder with Mixed Disturbance of Emotions and Conduct). Of the 17 evaluations viewed, 4 of them utilized a PTSD diagnosis due to military service as a means to defend the actions of a child pornography offender. Substance Use Disorders were diagnosed on two separate occasions (Cannabis Use, in remission; Alcohol use disorder), though alcohol abuse was discussed as a reason for viewing child pornography in six additional cases without a formal diagnosis. Obsessive-Compulsive Disorder (OCD) was diagnosed in one evaluation, as were Attention Deficit Hyperactivity Disorder (ADHD), and Learning Disorder by History. Sexual Disorders were diagnosed in four cases (Paraphilia with reference to Hebephilia, Rule Out Pedophilia, Sexual Disorder, and Not Otherwise Specified (NOS) (two cases)).

Various psychological assessment instruments were used in the evaluations. Tests were used that speak directly to an offenders sexual deviance, antisociality, or other factors used to address risk, including the M-Fast (test for malingering; one case), the MMPI-2 (a personality inventory; eight cases), the MCMI-III (a personality inventory and general diagnostic instrument; one case), the PAI (a personality inventory; two cases), AASI (sexual interest inventory; one case), the AASI screening instrument; one case), and the PCL-R (measure of psychopathy; five cases). The specific sex offender risk assessment instruments used were the SVR-20 (three cases), the Static-99 (one case), the SONAR (one case), and the RRASOR (one case). Other instruments used in the defense psychological evaluations of

the risk level of the child pornography offender were the Standard Progressive Matrices, Test of Nonverbal Intelligence, Bender Visual-Motor Gestalt Test with Recall (two cases); House-Tree-Person projective drawing test (two cases); Kinetic Family Drawing (two cases); Rorschach Inkblot Test (two cases), Adult Sentence Completion Test (two cases); Beck Depression Inventory (three cases); Beck Suicide Inventory (two cases); Beck Anxiety Inventory (two cases); Beck Hopelessness Scale (two cases); Mood Disorder Questionnaire (two cases); Aggression Questionnaire (two cases); Clinician Administered PTSD scale; and Michigan Alcohol Screening Test.

In assessing the training of the defense expert and their role in each case, it was determined that 13 experts were licensed psychologists, 3 were licensed marriage and family therapists, and 1 was a master's level clinician. Three experts that completed psychological evaluations were actually treating the offenders prior to the evaluation, which is in direct conflict with APA ethics codes related to conflict of interest (49).

## B. Common problems

**Non-empirically supported mitigating factors:**  The principal finding from defense experts' psychological evaluations is the reliance on non-empirically supported mitigating factors, reasons, or excuses for accessing and viewing child pornography. The most common reasons given for accessing child pornography were Major Depression, Posttraumatic Stress Disorder (PTSD), and the use of child pornography as a way to "treat" untreated sexual abuse experienced by the offender as a child. Depression was listed as a mitigating factor in 11 of the 17 evaluations. A general (but not an official diagnostic) reference to depression was utilized as a defense argument in four evaluations, and seven evaluations were centered on the defense argument that depression due to a history of sexual abuse endured by the offender as a child drove offenders to view child pornography as a form of "therapy." The remaining evaluations consisted of defense arguments, including profound intimacy skill deficits, use of Internet pornography as a source of sex education, use of child pornography as an outlet for undisclosed homosexual orientation, use of child pornography to relieve boredom, and compulsive "hoarding" behaviors.

**Misidentification of risk factors as mitigating factors:**  There are many risk factors that increase a person's likelihood of reoffending. Such factors could rationally be viewed by prosecutors and courts as aggravating factors when considering the danger a defendant poses to the community. Many of these risk factors were present and addressed by defense experts in the cases reviewed. However, with one exception, the defense experts from the sample spun these risk factors as mitigating factors—reasons or excuses why the offender might have engaged in viewing child pornography in the first place. For example, in one case, the defense stated that the offender "did not present with any symptoms of paraphilia; however, he is easily influenced by others." Being easily influenced would be considered a risk factor for reoffending in the form of poor self-regulation (50). Other examiners described the offenders' use of alcohol in connection with viewing/collecting child pornography as coping strategies, used by offenders to deal with a history of abuse. In reality, the use of alcohol is a risk factor among sex offenders, not a mitigating one. Other mitigating factors used by experts that are actually risk factors for reoffending are proneness to boredom, a history of sexual experimentation with family members, and the desire or act of working in an environment where children are present. In multiple cases reviewed, examiners discuss the offender's emotionless or detached personality as a product of untreated sexual abuse or depression. However, the inability to express emotion and/or callousness is a risk factor for antisocial personality and reoffending. The lone exception occurred in one report where PTSD was listed as a risk factor—not for reoffending, however—but for progress in sex offender treatment.

Prosecutors report that another mitigating factor raised by defense experts—although not in the 17 reports examined—is that the defendant suffers from autism or Asperger syndrome (on the autism spectrum). There is no scientific support for the argument that autism/Asperger syndrome would cause

someone to be sexually interested in children or sexual images of children. While autism/Asperger syndrome may contribute to compulsive collecting behavior or a lack of victim empathy, these are not factors that decrease risk. To the contrary, poor self-regulation and victim empathy are risk factors that increase the likelihood of recidivism.

**Non-objectivity:** Along with non-empirically supported mitigating factors, prejudicial and emotional language was used in the majority of defense evaluations. Many of the defense examiners in the cases reviewed employed prejudicial language, such as "unfortunately," "thankfully," "looked on in horror," and "on a positive note," which shows favor and can influence the trier of fact's decision. Other examiners used statements like "unlike most pedophiles" and "his arrest was a blessing in disguise." Two examiners used statements like "his accessing of images on the computer was low in comparison to individuals who evidence paraphilia" without any mention of research (to include federal Sentencing Guidelines) that address average size of collections or what was considered "small" or "large."

In some cases, experts expressly argued for lower sentences, rather than confining their expert opinion to the realm of risk assessment and psychology. For instance, experts opined that defendants should not be incarcerated because the offender "will never get any significant help while incarcerated" and/or that "removing [the offender] from his current structure, even for a short term of imprisonment, will be highly disruptive to his life-saving treatment." One expert even opined that because the offender "possessed a limited amount of child pornography," the court "should not punish him as a collector." Another expert defended an offender's sexual interest in adolescent girls by stating that an adult heterosexual male's interest in adolescent girls was simply "normal," because girls of that age have developed secondary sexual characteristics. In fact, an adult male's ongoing sexual interest in adolescent girls is a sexual deviance specifically referred to as hebephilia.

Objectivity is of most importance when completing a psychological evaluation, regardless of the reason for referral. Such advocacy casts doubt on the validity of the experts' conclusions.

**Use of incorrect risk assessment tools and undue reliance on personality and malingering tests:** Risk level was addressed in each of the 17 cases reviewed, and all offenders were found by the defense experts to be a low risk or no risk to recidivate. To assess the child pornography offender's level of risk for reoffending, experts in this sample used the Static-99 (51), the Sex Offender Need Assessment Rating (52), the Rapid Risk Assessment for Sexual Offense Recidivism (24), the Sexual Violence Risk-20 (SVR-20) (53), and the Sex Offender Risk Appraisal Guide (SORAG) (54). All of these instruments, however, were created to assess degree of risk among *contact* offenders only. That is, the instruments were designed and created using data from offenders with *hands-on* offenses. Child pornography offenders were not included in the normative samples. Their validity in measuring risk among non-contact and child pornography offenders has not been established, and their use is not recommended empirically in the assessment of risk in these offenders.

As a means of measuring antisociality and sexual deviancy, as well as risk of recidivism, defense experts utilized the Abel Assessment for Sexual Interest (AASI) (55), the Abel Screen, and the Psychopathy Checklist-Revised (PCL-R) (45). As a means of assessing sexual deviance, the Abel instruments measure the amount of time a subject looks at deviant sexual images displayed before him or her on a screen and compares this with self-report data gathered from the subject. Due to lack of empirical support, the Abel instruments have been disqualified as evidence in some jurisdictions and are generally recommended for treatment purposes only (56, 57). By contrast, the PCL-R is an appropriate and effective means of measuring antisociality. However, in each of the defense exams reviewed, the experts provided only the whole scores for the PCL-R, with no reference to any specific portion of the test that could indicate the presence of risk factors. For instance, none of the expert reports provided the Factor 1 scores for the PCL-R. These scores are personality items, the portion of the total score that is proven to be predictive of risk among child molesters. Also not addressed were any specific antisocial behaviors not

explicitly listed by the PCL-R that are known to increase level of risk, such as substance abuse, unstable job history, poor self-control, etc.

Pedophilia, a paraphilia one would expect to commonly find in child pornography offenders, was diagnosed in only one report. Other reports attempted to set forth reasons why the offender was not a pedophile. For example, one expert explained that the offender was "not as much a pedophile as he was uninformed" and "incapable of intimacy." The expert continued, describing the defendant as "bored—without knowing how profoundly—and he is unaware of how bored he is or what he should do about this." Ultimately, the expert rationalized that the offender viewed child pornography not because he was sexually interested in children, but as a way to cope with his boredom. This rationalization is not supported in any social science literature. In a different case, an expert argued that the offender was not a pedophile because he "does not dress like a child." Dressing like a child is not a factor in diagnosing pedophilia.

In an effort to endorse positive symptoms of the offenders or to disprove the presence of risk factors, the defense experts administered personality and malingering tests. Examples of those assessments that were found in the reviewed cases are the Minnesota Multiphasic Personality Inventory (MMPI-2), the Personality Assessment Inventory (PAI), and the Miller Forensic Assessment of Symptoms Test (M-FAST). The MMPI-2 is an objective personality inventory consisting of 567 true/false items that assess test-taking attitudes, personality traits, and psychopathology (58). The PAI is a 344-item instrument that constitutes 22 non-overlapping scales covering constructs most relevant to a broad-based assessment of mental disorders (59, 60). The M-FAST is a 25-item screening interview for adults that helps assess the likelihood that an individual is feigning psychiatric illness (61). Though well-respected in the field, none of these instruments has been shown to be predictive of risk of reoffending (46), and none are appropriate for use in a psycho-sexual risk assessment.

Aside from the PCL-R, none of the tests or instruments used by the experts in these cases have ever been shown to be predictive of risk of re-offense in child pornography offenders, and the vast majority of instruments (projective tests such as the Rorschach Inkblot or the drawing tests, instruments used to measure depression or suicidality, measures of intelligence) have no bearing whatsoever on the risk of sex offenders in general. The M-FAST, for example, is a well-respected and sound instrument (like most of the instruments used). However, the M-FAST measures malingering of mostly bizarre atypical psychotic symptoms that are often endorsed by persons feigning serious mental illness (tactile and olfactory hallucinations, extremely bizarre thought processing, atypical delusional behavior, atypical presentation of auditory hallucinations).

What appears to be a recurrent theme in the defense evaluations is not only a lack of attention to variables that are empirically shown to relate to risk of reoffending (sexual deviance, antisociality, accepting attitudes of child sexual behaviors, placing oneself in a position through work or recreation to access children, sexual preoccupation), but a "throw everything and see what sticks" methodology. It is as if defense counsels' approach is, "If I can show my offender to be 'normal' on enough tests that look impressive but are unrelated to the issue of risk, then, by proximity and association, my offender will look 'normal' in regards to sexual deviance and risk to reoffend."

**Failure to address masturbatory behavior and other case-specific evidence in the pycho-sexual evaluation:**  One of the key elements of a psycho-sexual evaluation is the psycho-sexual functioning of an offender. Masturbatory behavior—as well as sexual preoccupation and use of pornography—has been shown to be a risk factor of reoffending among sexual offenders (50, 62). Whether the offender masturbated to the images, how often, and how deviant images were, is crucial information in a risk assessment of a child pornography offender. It speaks directly to sexual deviance, attitudes toward sexualizing children, and preoccupation with sex. Failure to explore masturbatory behavior in a psycho-sexual evaluation is akin to not discussing the instant offense in an insanity evaluation. It is also terminally damaging to any argument that an offender was simply a "collector" or

"bored" or that he viewed child pornography because it was therapeutic to see that he was "not the only one who was abused"—all justifications found in the sample psychological evaluations.

Masturbation is critical to an accurate diagnosis of pedophilia, which is a sexual deviance. As outlined in the DSM 5, pedophilia is characterized by a pattern of at least 6 months of sexual attraction to children (44). Thus, a diagnosis of pedophilia should certainly address evidence of masturbation to images of children (evidencing a sexual attraction to children) and information about length of time spent accessing child pornography (evidencing whether this attraction lasted at least 6 months).

During the evaluation, the issue of masturbation should be carefully and thoroughly addressed. For this reason, adequate training in interviewing techniques is an invaluable asset for an evaluator. For example, it is easier for an offender to be less than forthright when asked, "Did you masturbate to child pornography?" than when asked, "Did you masturbate to the images with boys as well as the images with girls?" or "Did you masturbate more often to the videos or still images in your collection?" If an offender indeed did not masturbate to the images, the answer will be the same regardless of how the question is phrased.

Interestingly, masturbation was rarely addressed in the evaluations. Only three of the evaluations reviewed discussed masturbatory behavior.

**Reliance on motivation for treatment:**  All 17 defendants were found by their experts to be low- to no-risk of reoffending. The reasoning in all 17 cases included that there was no prior criminal history and/or contact offenses and that the offender was motivated for treatment. Notably, none of the evaluations utilized a tactical polygraph portion to verify these claims. Motivation for treatment has been shown to have no significant correlation to reoffending sexually (50).

**Offense was motivated by offender's own victimization as a child:**  In approximately five of the cases reviewed, the examiner used the argument that the offender's desire toward adolescent pornography was based on the offender's preoccupation with his own victimization as a youth. Another expert, using the same line of argument, stated that viewing child pornography was a means of "self-therapy" due to the offender's own history of abuse and was "a psychologically plausible explanation and consistent with the fact that treatment in group with other abuse victims is particularly effective psychological intervention for sexual trauma. It is also a well-established psychological phenomenon that individuals who have been subjected to sexual abuse, if left untreated, can reenact their abuse at a later stage in life." This statement is, simply put, completely false. Research across decades has shown that being sexually abused as a child is not a significant risk factor for reoffending among sex offenders (50). Further, it is not predictive or correlated with sexual offending in general—that is, being sexually abused as a child does not mean one is likely to grow up and commit a sex offense against a child at some point. (63). This fact is a major point of therapeutic relief for victims of childhood sexual trauma who are in treatment. Essentially, these victims learn that, despite what occurred to them in their childhood, there is not a likelihood that they will one day have an urge to offend against children or to develop a sexual attraction to children.

**Compulsive behavior:**  One defense explanation for seeking out and viewing child pornography that was addressed in three evaluations was compulsive behavior, Obsessive-Compulsive Disorder, compulsive hoarding, and repetition compulsion. Some defense experts argued that the defendants' collections of the child pornographic material had more to do with obsessively downloading, organizing, and filing than with sexual gratification. One psychologist described the need for an offender to collect and keep over 7,000 child pornography images and videos as a manifestation of "compulsive hoarding." Other defense experts argued that the compulsive behaviors and addictive behaviors linked to PTSD may be a way for the person to "self-medicate" their feelings of anxiety, depression, anger, guilt, and shame related to a traumatic event. Furthermore, the experts argued that child pornography becomes the "drug of

choice for the person with PTSD who is trying to escape the myriad of negative symptoms caused by the disorder."

Perhaps the most important factor when considering the use of diagnoses claimed to be related to compulsive behavior, such as Major Depression or PTSD, as an excuse for child pornography viewing is the notion of volitional control. Such diagnoses do not control an offender's behavior. The decision to engage in viewing child pornography, especially over a period of time and with efforts made to hide the material from others, is an active and organized choice made by the offender. Criminals break the law for many reasons. Individuals rob banks for money, assault others out of anger or passion, etc. Certainly, many of these criminals throughout history have suffered symptoms of depression or anxiety—even PTSD. However, much like the above discussion explaining that suffering sexual abuse is not predictive of being a sexual abuser, research does not indicate any empirical link between anxiety disorders or mood disorders and viewing child pornography. Depression and anxiety (or learning disorders) do not alter one's sexual orientation. This is good news for combat veterans who suffer from PTSD, who do not have to sit at home wondering if today will be the day that they suddenly have an urge to view child pornography. Indeed, if viewing child pornography *is* a coping mechanism for an individual for any reason, that factor would register as a risk factor for reoffending. He has engaged in the behavior before; he demonstrates poor impulse control, irresponsibility, and a willingness to break the law to satisfy his own urges. And all of this occurs by choice as organized and goal-oriented behavior in the context of disorders (depression and PTSD) that have, after all, been empirically linked to a reduction in sexual interest and libido (44, 64–67). Furthermore, even if offense behavior is *not* volitional—for example, if an individual legitimately suffers from an obsessive-compulsive disorder that contributes to criminal activity—this is as much a risk factor as it is a mitigating factor. This is supported by the 2005 Hanson study that found general problems with self-regulation to be among the predictive risk factors for sexual recidivism (50).

**Offender's youth *increases*, rather than decreases, risk:**  While not seen in any of the 17 sample cases reviewed, experienced prosecutors suggest that another variable frequently used as a protective factor by defense experts is age. Often, an offender's young age or immaturity is proffered as a mitigating factor—suggesting that the offense resulted from the poor judgment of youth and therefore the child pornography offense is not indicative of risk to children. On the contrary, research has consistently shown that a younger offender is significantly *more* likely to reoffend than offenders who are older, with risk declining as the offender ages (46, 50). Should an older offender similarly use age as a mitigating factor, it is important to remember that the finding that risk declines with age is a generalized finding based on large sample sizes and numerous studies. Case-specific variables may indicate a departure from this assignment of low risk of older offenders (if, for example, the instant offense occurred later in the offender's life, indicating a sexual drive and willingness to victimize others even at an older age).

**Pornography collection is non-exclusive to child pornography:**  Another argument that may be made by experts—though not seen in the sample of 17 reports reviewed—is that the offender is at a lower risk due to the fact that his interest in pornography was not specific to children, that is, the offender viewed all types of pornography, and was only interested in increasingly "bizarre" or "taboo" images in order to satisfy sexual interest. Research suggests that this type of viewing pattern ("the sicker the better") would represent poor self-regulation, increased level of sexual deviance, and, obviously, use of pornography, which have all been shown to increase an offender's risk of reoffending (50). Additionally, it is important to note that whether a child pornography offender's collection is exclusive to child pornography is not determinative of whether that offender is a pedophile. Diagnostic criteria in the DSM 5 allows for a distinction to be made between pedophiles who are "Exclusive Type" or "Non-Exclusive Type"—in other words, only attracted to children or attracted to children as well as adults (44). Again, information about masturbatory behavior is crucial in assessing the degree of risk based on this claim.

## C. What *should* an exam include?

In many respects, a sex offender risk assessment of a child pornography offender should be an examination of the past as well as the future. Given the research discussed at the beginning of this article indicating the prevalence of undetected earlier contact offenses among child pornography offenders, the use of a tactical polygraph should be administered whenever possible during an evaluation to assess for such offenses (36). The tactical polygraph can also inform findings about masturbatory behavior and length of time spent downloading and collecting images when such information is not clear based on computer forensic evidence. In addition, the polygraph examination allows for a more in-depth examination of thoughts and fantasies that may be experienced by child pornography offenders about acting on their sexual urges in the future. (For a description of how tactical polygraphs can be used, see The Use of Tactical Polygraph With Sex Offenders (36).

Ideally, evaluations should also include the administration of the PCL-R. Careful consideration should be given to the above discussion regarding literature on criminality among child pornography offenders. Namely, child pornography offenders, as a whole, present with less criminality than contact offenders. Certain antisocial behaviors such as a history of childhood behavioral problems, work instability, deliberate access to children, failure to accept responsibility for one's own actions, and substance abuse can be indicative of risk among child pornography offenders. Amount and organization of images, as well as degree of deviance and violence among images, should be assessed. The importance of the assessment of masturbatory behavior cannot be overstated. Currently, in the relative dawn of this genre of criminality and risk assessment, and without empirically supported actuarial instruments normed on this sub-population of offenders, attention to these variables and not to superfluous ones is the key to a more accurate risk assessment of child pornography offenders.

## V. Evidence collection during the investigative stage:  setting yourself up for success

Investigators and prosecutors should be familiar with the social science literature regarding risk factors and search for evidence of these factors as early as possible in the investigation stage. This will be invaluable later on at the sentencing stage, when prosecutors must counter a defendant's argument that he or she poses a low risk of recidivism. For example, most child pornography defendants agree to be interviewed in connection with the execution of a search warrant. All such interviews should include questions about whether the target masturbated to the child pornography images. Investigators should also inquire about prior sexual behavior. While it may be obvious that investigators should ask about contact with minors, it may be less obvious that they should inquire about sexual behavior with adults because sexual promiscuity and sexual deviance are also risk factors. If possible, offenders should be offered a polygraph on the day of the interview.

A search of offenders' homes can yield evidence of all manner of sexual fetishes. Investigators often take mental note of this evidence, but do not seize it, photograph it, or include it in their reports. Even if these fetishes do not directly relate to children and are not illegal, investigators should make a record of what they find, as it could later be relevant to an accurate risk assessment. Search of an offender's home also affords investigators the opportunity to note any evidence of substance abuse or financial problems. An adult offender who still lives in his parent's basement may be an outdated cliché of a sex offender, but such behavior would be evidence of a parasitic lifestyle, poor self-regulation, irresponsibility, and, possibly, emotional immaturity—all risk factors.

Investigators should also attempt to determine whether the offender is part of any groups that advocate antisocial behavior. Such groups are not limited to organizations that openly advocate violence or an overtly criminal lifestyle, such as outlaw motorcycle gangs. In this context, antisocial groups include child pornography message boards and other online groups that offenders use to communicate with each other about their sexual interest in children and child pornography. Of specific interest to a psychologist conducting a risk assessment would be the content of these communications. It is not

uncommon for offenders who chat online to "instruct" one another on successful means of grooming children for abuse. Insight into what means of rationalization are engaged in by an offender online are of special interest in formulating a psychological profile of the offender for purposes of a successful psychological evaluation and discussion of risk factors. Computer forensic examiners should also be on the lookout for evidence of antisocial behavior, such as the use of sophisticated technology to actively evade detection by law enforcement. Evidence of encryption, anonymization, and destruction of evidence would all be examples of antisocial behavior that should be considered as a possible risk factor. In addition, computer forensic exams should include an analysis of both the amount and type of child pornography that is found.

## VI. Conclusion

It is no coincidence that these factors almost exactly align with the changes to the Sentencing Guidelines proposed by the Department of Justice in its March 5, 2013 response to the 2012 Report. The Department suggested enhancements for communication with others concerning the sexual abuse or exploitation of a minor, membership in formal groups dedicated to trafficking in or communicating about the sexual exploitation of children, the duration of the offense conduct, offender sophistication, image severity, and image quantity (16). Armed with as much knowledge about an offender as possible, prosecutors can evaluate whether a defense expert report appropriately took account of existing risk factors before declaring a defendant to be risk-free. This will assist prosecutors in advocating for a sentence that is appropriately tailored to the serious crime the defendant committed and more fully address the concerns of sentencing courts regarding whether the defendant poses a danger.

## VII. References

1. Mark Motivans & Tracey Kyckelhahn, Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Federal Prosecution of Child Exploitation Offenders, 2006*, BUREAU OF JUSTICE PROGRAMS BULL. 1, 1–8 (2007).

2. Philip Magaletta, Erik Faust, William Bickart & Alix McLearen, *Exploring Clinical and Personality Characteristics of Adult Male Internet-Only Child Pornography Offenders*, 58 INT'L J. OF OFFENDER THERAPY AND COMPARATIVE CRIMINOLOGY 137, 137–153 (2014).

3. Jos Buschman, Dan Wilcox, Donald Krapohl, Marty Oelrich & Simon Hackett, *Cybersex Offender Risk Assessment: An Explorative Study*, 16 J. OF SEXUAL AGGRESSION 197, 197–209 (2010).

4. J. Sullivan, *The Spiral of Sexual Abuse: A Conceptual Framework for Understanding and Illustrating the Evolution of Sexually Abusive Behaviour*, 41 NOTANEWS 17, 17–21 (2002).

5. U.S. SENTENCING COMM'N, THE HISTORY OF THE CHILD PORNOGRAPHY GUIDELINES (2009).

6. U.S. SENTENCING COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES i–iv, 7, 207 (2012).

7. U.S. SENTENCING GUIDELINES MANUAL § 1A1.3 (2014).

8. Prosecutorial Remedies and Tools Against the Exploitation of Children Today (PROTECT) Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (2003).

9. *United States v. Booker*, 543 U.S.220, 245 (2005).

10. *Kimbrough v. United States*, 552 U.S. 85, 96 (2007).

11. Troy Stabenow, DECONSTRUCTING THE MYTH OF CAREFUL STUDY: A PRIMER ON THE FLAWED PROGRESSION OF THE CHILD PORNOGRAPHY GUIDELINES (2009), *available at*

http://www.fd.org/docs/select-topics---sentencing/child-porn-july-revision.pdf#search=Deconstructing the Myth of Careful Study.

12. *Id.* at 34.

13. *Id.* at 30.

14. *Id.* at 31.

15. *Id.* at 33.

16. *See* Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation Prevention and Interdiction, Office of the Deputy Attorney Gen., U.S. Dep't of Justice, to Patti B. Saris, Judge, U.S. Sentencing Comm'n (Mar. 5, 2013), *available at* http://sentencing.typepad.com/files/doj-letter-to-ussc-on-cp-report.pdf.

17. Michael Seto, Karl Hanson & Kelly Babchishin, *Contact Sexual Offending by Men With Online Sexual Offenses*, 23 SEXUAL ABUSE: A J. OF RES. & TREATMENT 124, 124–145 (2011).

18. CENTERS FOR DISEASE CONTROL & PREVENTION, NATIONAL HOSPITAL AMBULATORY MEDICAL CARE SURVEY (2010).

19. James Griffith, Brian Pace, Kent Hinkson, Craig Bryan, Tracy Clemans & Zac Imel, *Combat Exposure and Risk for Suicidal Thoughts and Behaviors Among Military Personnel and Veterans: A Systematic Review and Meta-Analysis*, SUICIDE AND LIFE-THREATENING BEHAVIOR (2015).

20. Ann Haas et al., *Suicide and Suicide Risk in Lesbian, Gay, Bisexual, and Transgender Populations: Review and Recommendations*, 58 J. OF HOMOSEXUALITY 10, 10–51 (2010).

21. Ping Qin, Esben Agerbo & Preben Mortensen, *Factors Contributing to Suicide: The Epidemiological Evidence From Large-Scale Registers*, PREVENTION AND TREATMENT OF SUICIDAL BEHAVIOR: FROM SCIENCE TO PRACTICE 11 (2005); Ping Qin, Esben Agerbo & Preben Mortensen, *Suicide Risk in Relation to Socioeconomic, Demographic, Psychiatric, and Familial Factors: A National Register-Based Study of All Suicides in Denmark, 1981-1997*, 160 AM. J. PSYCHIATRY 765, 765–72 (2003).

22. Michael Seto & Angela Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders*, 17 SEXUAL ABUSE: A J. OF RES. & TREATMENT 201, 201–210 (2005).

23. Angela Eke, Michael Seto & Jennette Williams, *Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow-Up Study*, 35 L. & HUM. BEHAV. 466, 466–478 (2011).

24. KARL HANSON, DEP'T OF THE SOLICITOR GEN. OF CANADA, THE DEVELOPMENT OF A BRIEF ACTUARIAL RISK SCALE FOR SEXUAL OFFENSE RECIDIVISM 2 (1998).

25. Anne-Marie McAlinden, *Managing risk: From regulation to the reintegration of sexual offenders*, CRIMINOLOGY AND CRIMINAL JUSTICE 6, 197–218 (2006).

26. Kamala London, Maggie Bruck, Stephen Ceci & Daniel Shuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways That Children Tell*? 11 PSYCHOLOGY, PUB. POL'Y & L. 194, 194–226 (2005).

27. Martine Hébert, Marc Tourigny,  Mireille Cyr, Pierre McDuf & Jacques Joly, *Prevalence of Childhood Sexual Abuse and Timing of Disclosure in a Representative Sample of Adults from Quebec*, 54 CANADIAN J. OF PSYCHIATRY 631, 631–36 (2009).

28. Eli Somer & Sharona Szwarcberg, *Variables in Delayed Disclosure of Childhood Sexual Abuse*, 71 AM. J. OF ORTHOPSYCHIATRY 332, 332–341 (2001).

29. David Finkelhor & Richard Ormrod, *Child Abuse Reported to the Police*, JUVENILE JUSTICE BULL. 1, 1–8 (2001).

30. HOWARD SNYDER, BUREAU OF JUSTICE STATISTICS, OFFICE OF JUSTICE PROGRAMS, U.S. DEP'T OF JUSTICE, SEXUAL ASSAULT OF YOUNG CHILDREN AS REPORTED TO LAW ENFORCEMENT: VICTIM, INCIDENT, AND OFFENDER CHARACTERISTICS (2000).

31. Michael Bourke & Andres Hernandez, *The 'Butner Study' Redux:  A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders*, 24 J. OF FAM. VIOLENCE 183, 183–191 (2009).

32. Mark Weinrott & Maureen Saylor, *Self-Report of Crimes Committed by Sex Offenders*, 6 J. OF INTERPERSONAL VIOLENCE 286, 286–300 (1991).

33. Gene Abel, Judith Becker, Mary Mittelman, Jerry Cunningham-Rathner, Joanne Rouleau & William Murphy, *Self-Reported Sex Crimes of Nonincarcerated Paraphiliacs*, 2 J. OF INTERPERSONAL VIOLENCE 2, 3–25 (1987).

34. Nicholas Groth, Robert Longo & Bradley McFadin, *Undetected Recidivism in Rapists and Child Molesters*, 28 CRIME & DELINQUENCY 450, 450–458 (1982).

35. R. Freeman-Longo, *Incidence of self-reported sex crimes among incarcerated rapists and child molesters*, Correctional Treatment Program, Oregon State Hospital (unpublished manuscript, 1985).

36. Michael Bourke, Lance Fragomeli, Paul Detar, Michael Sullivan, Edward Meyle & Mark O'Riordan, *The Use of Tactical Polygraph With Sex Offenders*, J. OF SEXUAL AGGRESSION (2014).

37. Janis Wolak, David Finkelhor & Kimberly Mitchell, *Child Pornography Possessors:  Trends in Offender and Case Characteristics*, 23 SEXUAL ABUSE:  A J. OF RES. & TREATMENT 22, 22–42 (2011).

38. Ian Elliott, Anthony Beech & Rebecca Mandeville-Norden, *The Psychological Profiles of Internet, Contact, and Mixed Internet/Contact Sex Offenders*, 25 SEXUAL ABUSE:  A J. OF RES. & TREATMENT 3, 3–20 (2013).

39. Jérôme Endrass, Frank Urbaniok, L. Hammermeister, C. Benz, T. Elbert, A. Laubacher & A. Rossegger, *The Consumption of Internet Child Pornography and Violent and Sex Offending*, 9 BMC PSYCHIATRY 43–50 (2009).

40. Ian Elliott, Anthony Beech, Rebecca Mandeville-Norden & Elizabeth Hayes, *Psychological Profiles of Internet Sexual Offenders:  Comparisons With Contact Sexual Offenders*, 21 SEXUAL ABUSE:  A J. OF RES. & TREATMENT 76, 76–92 (2009).

41. Kerry Sheldon & Dennis Howitt, *Sexual Fantasy in Paedophile Offenders:  Can Any Model Explain Satisfactorily New Findings From a Study of Internet and Contact Sexual Offenders?*, 13 LEGAL AND CRIMINOLOGICAL PSYCHOLOGY 137, 137–158 (2008).

42. Laura Webb, Jackie Craissati & Susan Keen, *Characteristics of Internet Child Pornography Offenders:  A Comparison With Child Molesters*, 19 SEX ABUSE 449, 449–465 (2007).

43. Long, M. L., Alison, L. A., & McManus, M. A., *Child pornography and likelihood of contact abuse:  A comparison between contact child offenders and noncontact offenders*, SEXUAL ABUSE: A J. OF RES. & TREATMENT, 25, 370–395 (2012).

44. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (Am. Psychiatric Ass'n ed., 5th ed. 2013).

45. ROBERT HARE, THE HARE PSYCHOPATHY CHECKLIST (2d ed. 2003).

46. M. Boccaccini, D. Murrie, S. Hawes, A. Simpler & J. Johnson, *Predicting Recidivism With the Personality Assessment Inventory in a Sample of Sex Offenders Screened for Civil Commitment as Sexually Violent Predators*, 22 PSYCHOLOGICAL ASSESSMENT 142, 142–148 (2010).

47. Michael Seto, James Cantor & Ray Blanchard, *Child Pornography Offenses are a Valid Diagnostic Indicator of Pedophilia*, 115 J. OF ABNORMAL PSYCHOLOGY 610, 610–615 (2006).

48. Jennifer McCarthy, *Internet Sexual Activity:  A Comparison Between Contact and Non-Contact Child Pornography Offenders*, 16 J. OF SEXUAL AGGRESSION 181, 181–195 (2010).

49. AM. PSYCHOLOGICAL ASS'N, ETHICAL PRINCIPLES OF PSYCHOLOGISTS AND CODE OF CONDUCT 5 (2010).

50. Karl Hanson & Kelly Morton-Bourgon, *The Characteristics of Persistent Sexual Offenders:  A Meta-Analysis of Recidivism Studies*, 73 J. OF CONSULTING AND CLINICAL PSYCHOLOGY 1154, 1154–1163 (2005).

51. KARL HANSON & DAVID THORNTON, DEPARTMENT OF THE SOLICITOR GENERAL OF CANADA, STATIC-99:  IMPROVING ACTUARIAL RISK ASSESSMENTS FOR SEX OFFENDERS (User Report 99–02) (1999).

52. Karl Hanson & Andrew Harris, *A Structured Approach to Evaluating Change Among Sexual Offenders*, 13 SEXUAL ABUSE:  A J. OF RES. & TREATMENT 105, 105–122 (2001).

53. DOUGLAS BOER, STEPHEN HART, RANDALL KROPP & CHRISTOPHER WEBSTER, SEXUAL VIOLENCE RISK-20 (The British Columbia Institute Against Family Violence ed., 1997).

54. VERNON QUINSEY, GRANT HARRIS, MARNIE RICE & CATHERINE CORMIER, VIOLENT OFFENDERS:  APPRAISING AND MANAGING RISK (2d ed. 2006).

55. ABEL SCREENING, INC., REVIEW OF THE EMPIRICAL SUPPORT FOR THE AASI 1 (2005).

56. Lane Fischer & Gillan Smith, *Statistical Adequacy of the Abel Assessment for Interest in Paraphilias*, 11 SEXUAL ABUSE:  A J. OF RES. & TREATMENT 195, 195–205 (1999).

57. Susan Sachsenmaier & Carmen Gress, *The Abel Assessment for Sexual Interests – 2:  A Critical Review*, COGNITIVE APPROACHES TO THE ASSESSMENT OF SEXUAL INTEREST IN SEXUAL OFFENDERS 31–57 (2009).

58. JAMES BUTCHER, MMPI-2:  MINNESOTA MULTIPHASIC PERSONALITY INVENTORY-2 :  MANUAL FOR ADMINISTRATION, SCORING, AND INTERPRETATION (Univ. of Minn. Press ed., 2001).

59. LESLIE MOREY, PERSONALITY ASSESSMENT INVENTORY:  PROFESSIONAL MANUAL (1991).

60. LESLIE MOREY, PERSONALITY ASSESSMENT INVENTORY:  PROFESSIONAL MANUAL (2d ed. 2007).

61. HOLLY MILLER, M-FAST:  MILLER FORENSIC ASSESSMENT OF SYMPTOMS TEST PROFESSIONAL MANUAL (2001).

62. Martin Kafka, *Hypersexual Desire in Males:  An Operational Definition and Clinical Implications for Men With Paraphilias and Paraphilia-Related Disorders*, 26 ARCHIVES OF SEXUAL BEHAV. 505, 505–526 (1997).

63. CENTER FOR SEX OFFENDER MANAGEMENT, http://csom.org/train/etiology/index.html.

64. V. Gruden & V. Gruden, Jr., *Libido and PTSD*, 24 COLLEGIUM ANTROPOLOGICUM 253, 253–256 (2000).

65. Khodabakhsh Ahmadi, Ali Fathi-Ashtiani, Ali Zareir, Alireza Arabnia & Mandana Amiri, *Sexual Dysfunctions and Marital Adjustment in Veterans with PTSD*, ARCHIVES OF MED. SCI. 280, 280–285 (2006).

66. Kenneth Hirsch, *Sexual Dysfunction in Male Operation Enduring Freedom/Operation Iraqi Freedom Patients With Severe Post-Traumatic Stress Disorder*, 174 MIL. MED. 520, 520–522 (2009).

67. Katherine Williams & Margaret Reynolds, *Sexual Dysfunction in Major Depression*, 11 CNS SPECTRUMS 19, 19–23 (2006). ❖

## ABOUT THE AUTHORS

❏ **Dr. Darrel Turner** is a clinical and forensic psychologist with a specialty in sex offender risk assessment. He has worked with numerous federal, state, and local law enforcement agencies and courts in a variety of forensic contexts. Dr. Turner has also presented nationally and internationally on his research findings related to grooming behaviors of child molesters, the impact of grooming on child victims, risk assessment of sex offenders, and risk assessment of child pornography offenders. Please direct any questions or comments to Dr. Turner through his Web site at http://www.turnerforensicpsychology.com/. ✠

❏ **Meghan Hanks** is a mental health professional and recent graduate currently working in private practice, with a focus on psychological testing and research in areas of forensic psychology. ✠

❏ **Joey L. Blanch** is an Assistant U.S. Attorney in the Central District of California, currently serving as the National Project Safe Childhood Coordinator for the Executive Office of U.S. Attorneys in Washington, DC, focusing on child exploitation legal policy. She worked for the law firm of Fried, Frank, Harris, Shriver & Jacobson prior to joining the U.S. Attorney's Office in 2002. Before accepting the detail in Washington, Ms. Blanch was a Deputy Chief of Violent and Organized Crime section of the U.S. Attorney's Office in Los Angeles, where she was responsible for the Project Safe Childhood program, focusing on the prosecution of crimes against children. Prior to that, she was a Deputy Chief for General Crimes training, responsible for supervising and training new AUSAs. Ms. Blanch has taught trial advocacy as an adjunct professor at Loyola Law School and also lectured on subjects related to trial advocacy and child exploitation at various locations across the country. ✠

❏ **Camille E. Sparks** is an Assistant U.S. Attorney for the Northern District of Texas. She has been the Project Safe Childhood Coordinator since 2009. Her caseload is exclusively child exploitation cases. Ms. Sparks has taught and lectured at different venues across the country, including the Advanced Criminal Law Course, Internet Crimes Against Children Conference, Dallas Crimes Against Children Conference, the Advanced Project Safe Childhood Conference, and the National Advocacy Center for the National District Attorney's Association. ✠