- ○ While Ms. Wang denies accessing the internet (see, e.g., ECF No. 80) (which would be a violation of the COR), there is ample evidence that she is accessing the internet and uses at least the "John Wang" yunlong█████████email account, for example, as summarized at ECF No. 134:

  - ■ The November 26, 2025 1:52 a.m. email to 68 Utah court staff (internet use would have been involved in finding 68 email addresses), warning the Utah Fourth District Court to rescind its offer to supervise the January 26, 2026 Danish hearing or face "unnecessary and excessive litigation beyond the court's capacity to manage." (ECF No. 134-4).

  - ■ The January 12, 2026 Transcript reveals that Defendant researched Magistrate Judge Pead, found his university email address, and emailed him there (ECF No. 134-5).

  - ■ In other emails to courts, she has reverted to the first-person pronoun "I" and "Sincerely, Kailin Wang" when using the "John Wang" yunlong█████████email account (ECF No. 134).

  - ■ As this Court observed in its 1/21/26 Memorandum and Order, "There is some question as to her access to the internet considering the Court has received numerous emails on her behalf from her father's account. The government further asserts that Defendant has communicated with the AUSA assigned to this case via email 'repeatedly.' Docket No. 96, at 10." (ECF No. 119 n.16).

- • **Indirect / Proxy Violation** — Use of third parties or intermediaries to carry out conduct that the Defendant is prohibited from engaging in directly. E.g.,

  - ○ Dec. 8-12, 2024: filing routed to S.B., a third party, who in turn posted to social media

  - ○ Oct. 3, 2025: filing routed to J.H., a third party, who in turn sent a threatening communication to a protected party

- • **Evasion of Restrictions** — Circumvention or attempted circumvention of imposed limitations, including through the use of aliases, alternate accounts, or third-party routing to engage in otherwise prohibited conduct while creating plausible deniability. E.g.,

  - ○ Ms. Wang's use of "John Wang" — either as an alias or as an actor on her behalf — further undermines the effectiveness of federal monitoring. Federal oversight cannot easily determine whether communications from the account yunlong█████████originate from her father, John Wang, or from Kailin Wang herself. Although John Wang has claimed that Kailin Wang does not have access to the account, there is ample evidence demonstrating that she does.

  - ○ In Ms. Wang's ECF No. 140 "Email Filing and Electronic Notification Form For Unrepresented Parties," she gave her primary email address as yunlong█████████and her secondary email address as kaywg█████████

## C. Pathological Fixation

Pathological fixation is a preoccupation with a person or a cause that is accompanied by deterioration in social and occupational functioning (Meloy, 2017). I first addressed this in detail in my January 2024 report. It continues unabated in her accessing the internet in violation of one condition of probation—"May not own, possess or *have* access to any internet capable device"—as well as her chronic underemployment given her intelligence and education; and to my knowledge, the absence of any interpersonal relations other than living at home with her elderly parents and depending upon their income and assets. The self-destructiveness of her fixation is most apparent when one considers this question: What would life be like for K█ W███ if she had not engaged in her serial stalking of R█ W██ W████ S███ and C█ T████? She certainly has the intellectual capacity to earn a steady income, but her pathological drive to dominate one victim after another to satisfy her sadistic impulses is all-consuming. This pathological drive is the hallmark behavior of a severely psychopathic individual, and as previously discussed, psychopathy is a stable constellation of affective, interpersonal, and behavioral traits that does not meaningfully diminish over time.

## D. Stochastic Violence Risk

There is also an ongoing risk of stochastic violence in this case. Stochastic violence is random violence when a third party, typically unknown to both Ms. Wang and others, perpetrates violence on behalf of Ms. Wang (Amman & Meloy, 2021, 2022). It is directly related to the number of individuals online who identify with Ms. Wang's outrage as to how she alleges she has been treated by C██████ T██████, attorneys, and the courts over the past seven years. Ms. Wang has already demonstrated her ability to use the internet and various platforms to build a following and stimulate such anger in others; her use has been suppressed, but not eliminated, by her orders of probation; it will likely return to prior levels of use once the court removes such confinement and semblance of control. This will increase the risk of stochastic violence once again, and the likely targets are C██████ T██████, the child through abduction, and others in the T█████ family. The potential number of followers and advocates for Ms. Wang cannot be predicted, but her internet reach is global if she is once again allowed unfettered access to a computer and the internet.

## E. Target Dispersion

Target dispersion in this case is also a magnifier of risk. Target dispersion is the movement from Ms. Wang targeting just one individual to including others who are perceived by her as being related to, or joined in an alliance, often conspiratorial, against Ms. Wang (Meloy & Hoffmann, 2021; Meloy & Kupper, 2025). In this case, the others historically have included judicial officers, victims' attorneys, members of the extended T█████ family (father, mother, siblings, and grandparents), and third parties such as doctors and experts. Ms. Wang has repeatedly engaged in online attacks against the judicial officers tasked with presiding over her cases, and she has also filed numerous motions, all denied, to disqualify them for alleged misconduct. Third parties targeted have even included me and Dr. Jennifer Denton, wherein Ms. Wang posted online attacks and also filed complaints with the California Board of Psychology. Both cases were determined to be meritless and summarily dismissed.

10

### F. Non-Responsiveness to Treatment

There is no evidence that treatment meaningfully reduces risk in individuals with psychopathy of this severity. Ms. Wang's history reflects repeated external controls and judicial interventions, including court-ordered psychological interventions, without durable behavioral change. Management and containment, rather than rehabilitation, are therefore the appropriate risk-management priorities.

On October 3, 2025, just three days after her guilty plea to federal cyberstalking on September 29, 2025, Defendant placed a document into the public record in California:

- The document contains numerous emails she sent directly to a U.S. prosecutor during negotiations for her plea bargain, in which she makes clear that she accepts no responsibility for her conduct. These documents show Ms. Wang attempting to negotiate language in her plea agreement that she believes will allow her to claim that her conduct against her victims in the ██████ family only involved making "derogatory" comments about C████ T██████. In fact, her stalking of the entire T██████ family consisted of making threats about the health, safety and welfare of the child, both while the child was in her custody as well as later after she had lost custody.
- The document also contains Ms. Wang's claims that her prosecution was only due to collusion and corruption and that she is actually the victim of both W███ S███ and C██████ T██████.

(Defendant Wang's 10/3/25 filing in Case FDV-19-814465.)

### G. Supervision Vulnerabilities

A critical feature of this case is that Ms. Wang's misconduct is deliberately siloed across jurisdictions and modalities, preventing any single court or supervisory body from observing the full pattern, let alone in real time.

Since she was arrested and released on bail in October of 2019, Ms. Wang has been charged with new crimes in January of 2021, July of 2021, May of 2024, and December of 2024 (forgery, perjury, restraining order violations, and other violations of protective orders). Being charged with crimes has had no effect in curbing her misconduct. While her 41-day period of incarceration in 2024 prevented her from committing new offenses, after being released into home confinement, she resumed engaging in prohibited conduct.

Her conduct has also resulted in third parties targeting C██████ T██████ the child, their immediate family (all protected parties), and his counsel. (Some of these encounters are described in C██████ T██████ May 15, 2023 Declaration in the Utah state court prosecution.)

As previously mentioned, Ms. Wang also uses litigation misconduct as an instrument of abuse, despite explicit warnings and sanctions. Courts have attempted to control her behavior by striking her filings, admonishing her for using litigation for harassment, and prohibiting her from emailing court personnel. She has repeatedly violated all of these prohibitions.

Ms. Wang's misconduct continued even after July 10, 2024, while she was under federal pre-trial release subject to strict conditions, including monitoring and communication restrictions. Her defiance of even federal supervision highlights both the persistence of her

11

 **Gmail**                                        **John Wang <yunlong88cong@gmail.com>**

## Additional Discovery

**Blanch, Joey (USAUT)** <Joey.Blanch2@usdoj.gov>                    Tue, Apr 21, 2026 at 1:56 PM
To: "yunlong88cong@gmail.com" <yunlong88cong@gmail.com>
Cc: Richard Sorenson - FDO <richard_sorenson@fd.org>

Ms Wang,

As I previously mentioned, the documents reviewed by Dr. Meloy for the updated assessment are all documents you should already have, other than the attached. If you nevertheless wish us to produce the rest of the documents he reviewed, I am happy to produce them to Mr. Sorenson so you can review them at his offices in accordance with the protective order. I am also attaching a copy of the discovery index as it currently exists. Please be aware it does not include documents produced after NOC5.

1. **RM0012763 (2024-04-16 search results)**: Capture of Google search results for the name of Minor-1.

2. **RM0013053 (2024-12-11 SB)**: Capture of a social media post by third-party S.B., including Defendant's court filing.

3. **RM0014156 (2025-03-17 Page Vault capture of Discovery folder)**: Capture of Defendant's discovery posted online at the publicly available URL https://drive.google.com/drive/folders/1Y0h1xsOTLlvh2YwW0N6o2f92Ba5gyg4W ("URL 1Y0h1").

4. **RM0014159 (2025-03-17i Discovery folder)**: Capture of Defendant's discovery posted at "URL 1Y0h1" on March 17, 2025.

5. **RM0014160 (2025-03-17ii Discovery folder)**: Capture of Defendant's discovery posted at "URL 1Y0h1" on March 17, 2025.

6. **RM0014166 (2025-03-26 917am PT Page Vault capture of Discovery folder)**: Capture of Defendant's discovery posted online at "URL 1Y0h1" on the morning of March 26, 2025.

7. **RM0016162 (2025-10-04 Gmail - Julie just messaged you)**: LinkedIn private message sent by third-party J.H. to a protected party in Victim-1's family, the day after Defendant filed allegations in San Francisco Superior Court.

Best,

Joey L. Blanch | Assistant U.S. Attorney

111 S. Main St. Suite 1800 | Salt Lake City, UT 84111

(801) 524-5682 | joey.blanch2@usdoj.gov

---

**8 attachments**

**RM0012763 2024-04-16 search results_Redacted.pdf**
3084K

**RM0016162 2025-10-04 Gmail - Julie just messaged you_Redacted.pdf**
136K

**._RM0013053 2024-12-11 SB.pdf**
4K

**RM0014156 2025-03-17 Page Vault capture of Discovery folder (1).pdf**
116K

**RM0014159 2025-03-17i Discovery folderpdf.pdf**
182K

**RM0014160 2025-03-17ii Discovery folder.pdf**
138K

 Gmail

Terry Thygesen <terry.thygesen@gmail.com>

---

**Julie just messaged you**

**Julie Haskell via LinkedIn** <messages-noreply@linkedin.com>
To: T█████ ████ █████ █████████ ██████     Sat, Oct 4, 2025 at 8:53 AM

Linked**in**    💬7  👥1  🔔9+

## Your InMail from Julie is awaiting response

### Julie Haskell

Legal Abuse Advocate/CAMERAS IN THE COURTS / Opinions are my own

Concern for Kayson

T████

What you have done to that little K██████ and the Wang family is truly despicable. It's deeply concerning and unacceptable.

That little boy and the Wang family are forever ruined due to you and your husband's reprehensible behavior.

Karma always finds a way.

Julie

**Reply**

### Get the new LinkedIn desktop app

Get it from Microsoft

Also available on mobile

Download on the App Store     GET IT ON Google Play

This email was intended for Terry Thygesen (Board Governance)

Learn why we included this.

You are receiving Inmail Digest emails.

Unsubscribe  ·  Help

Linked**in**

© 2025 LinkedIn Corporation, 1000 West Maude Avenue, Sunnyvale, CA 94085.
LinkedIn and the LinkedIn logo are registered trademarks of LinkedIn.

RM0016162

 Gmail

████████████████████

## Fwd: Screenshot 2026-04-16 at 4.12.07 PM

**Julie Haskell** ████████████                                    Thu, Apr 16, 2026 at 8:31 AM
████████████████

My attorney prefers a phone call if ████'s attorneys want to contact him. His number is 415 307 5383. If they do decide to reach out to him he is traveling abroad and will net be available until 2 weeks from now so please refrain from contacting during the two week duration.

Thank you.

---------- Forwarded message ---------
From: **Julie Haskell** ████████████████
Date: Thu, Apr 16, 2026 at 4:24 PM
Subject: Fwd: Screenshot 2026-04-16 at 4.12.07 PM
To: ████████████████████

Tell ████ that I sent this message to her on my own accord. There is no way shape or form that Kailin instructed me to direct communication to ████ I was simply expressing my disgust with the horrific abuse they have inflicted on Kailin and her son. If they have a problem with anything they can contact my attorney Paul Frassetto. My email was in no way threatening only expressing how karma can be bad for all humans who conduct themselves as do the T████████ns. BTW - T████ went on to like some of my posts on LinkedIn.

Please be free to send my email to T████ and her attorneys. If the attorneys have any questions they can contact my attorney.

Additionally, let ████ know moving forward I will not contact her again, since it was so upsetting to her.

Julie



Sent from my iPhone

**Screenshot 2026-04-16 at 4.12.07 PM.png**
289K

11/5/24, 9:58

# Post

**Reid Meloy**
@ReidMeloy

...

If you still have any lingering doubt about the application of section 3 of the 14th amendment to Donald Trump, please read this carefully.

open.substack.com/pub/snyder/p/b...

6:20 PM · Feb 3, 2024 · **144** Views

💬    ↻ 1    ♡ 1    🔖    ⬆️

Post your reply

**Reply**

Search

## Relevant people

**Reid Meloy**
@ReidMeloy                    **Follow**

Faculty, San Diego Psychoanalytic Center; Consulting Operational Psychologist, FBI Behavioral Analysis Unit, Quantico; former clinical professor UCSD psychiatry

## What's happening

**2024 US Elections**
US national news · **LIVE**

**#VotedforTrump**
Promoted by Team Trump (Text TRUMP to 88022)

Politics · Trending    ...
**Pennsylvania**
Trending with Philadelphia, California

Politics · Trending    ...
**Utah County**

Politics · Trending    ...
**Cheating**
338K posts

**Show more**

Terms of Service    Privacy Policy    Cookie Policy
Accessibility    Ads info    More ···    © 2024 X Corp.

**Messages**

https://x.com/ReidMeloy/status/1753951522994663559    1/1

**Reid Meloy** @ReidMeloy · Aug 20, 2023

The Constitution Prohibits Trump From Ever Being President Again

From theatlantic.com

💬 1    🔁 2    ♡ 4    📊 1.1K

**Reid Meloy** @ReidMeloy · Aug 25, 2023

Cosplay **Donald**

The Mobster Cosplay of Donald Trump

From newyorker.com

💬    🔁    ♡ 1    📊 202

**Reid Meloy** @ReidMeloy · Aug 28, 2020

"We have pioneered fatality rates." **Donald** Trump, August 27, 2020. The White House acceptance speech. Freud never sleeps.

💬    🔁    ♡ 2    📊

**Reid Meloy** @ReidMeloy · Jan 15, 2021

**Donald** Trump right now is like a horse in a china shop. No one knows what he's going to do next, least of all the horse.

Messages

 

 **Reid Meloy** @ReidMeloy · Aug 25, 2020
I used to have no sympathy for **Donald** Trump Jr.  —then I watched and heard Kimberly Guilfoyle.  Abandon all hope, ye who enter here.

1

 **Reid Meloy** @ReidMeloy · Aug 8, 2016
Excellent psychological analysis of Trump--but misses his lack of conscience --still worth a read The Narcissist theatlantic.com/magazine/archi...

1            4            11

 **Reid Meloy** @ReidMeloy · Jun 2, 2017
**Donald** Trump Poisons the World, via @nytimes nytimes.com/2017/06/02/opi...

1            3

 **Reid Meloy** @ReidMeloy · Dec 9, 2017
Inside Trump's Hour-by-Hour Battle for Self-Preservation via @NYTimes.

The anxiety of pathological narcissism nytimes.com/2017/12/09/us/...

1            4            4

 **Reid Meloy** @ReidMeloy · Nov 9, 2016
An American Tragedy newyorker.com/news/news-desk... via @newyorker

2            1

 **Reid Meloy** @ReidMeloy · Oct 3, 2016
Excellent article by a fine journalist: **Donald** Trump, American Oligarch newyorker.com/news/news-desk... via @newyorker

1            1

**Reid Meloy** @ReidMeloy · Jun 30, 2018
Prankster Calls the President, and the White House Puts Him Right Through via @NYTimes nyti.ms/2lGqEiJ?smid=n...

2

**Reid Meloy** @ReidMeloy · Dec 12, 2015
Threat assessment: the neo-nazis have now endorsed Trump, "heil **Donald** trump, our ultimate savior".

2            1            1





Messages














## Search filters

**People**
From anyone
People you follow

**Location**
Anywhere
Near you

[Advanced search](#)

## What's happening



**2024 US Elections**
US national news · **LIVE**

**#VotedforTrump**
Promoted by Team Trump (Text TRUMP to 88022)

Politics · Trending                    ...
**#Trump2024**
Trending with TOO BIG TO RIG

Politics · Trending                    ...
**Utah County**

Politics · Trending                    ...
**Cheating**
334K posts

Show more

## Who to follow

**Messages**



7/2/23, 6:50 PM
Case 2:24-cr-00163-TS    Document 166-1    Filed 04/21/26    PageID.9929    Page 11 of 32
Man accused of stalking via Twitter claims free speech - The New York Times

**The New York Times** | https://www.nytimes.com/2011/08/27/technology/man-accused-of-stalking-via-twitter-claims-free-speech.html

# Case of 8,000 Menacing Posts Tests Limits of Twitter Speech

By Somini Sengupta

Aug. 26, 2011

Even the Buddha of compassion might have been distressed to be on the receiving end of the diatribes that William Lawrence Cassidy is accused of posting on Twitter.

They certainly rattled Alyce Zeoli, a Buddhist leader based in Maryland. Using an ever-changing series of pseudonyms, the authorities say, Mr. Cassidy published thousands of Twitter posts about Ms. Zeoli. Some were weird horror-movie descriptions of what would befall her; others were more along these lines: "Do the world a favor and go kill yourself. P.S. Have a nice day."

Those relentless tweets landed Mr. Cassidy in jail on charges of online stalking and placed him at the center of an unusual federal case that asks the question: Is posting a public message on Twitter akin to speaking from an old-fashioned soapbox, or can it also be regarded as a means of direct personal communication, like a letter or phone call?

Twitter posts have fueled defamation suits in civil courts worldwide. But this is a criminal case, invoking a somewhat rarely used law on cyberstalking. And it straddles a new, thin line between online communications that can be upsetting — even frightening — and constitutional safeguards on freedom of expression.

Federal authorities say Mr. Cassidy's Twitter messages caused Ms. Zeoli "substantial emotional distress" and made her fear for her life, so much so that she once did not leave home for 18 months and hired armed guards to protect her residence.

In a complaint filed in federal court in Maryland, the Federal Bureau of Investigation concluded that Mr. Cassidy had published 8,000 Twitter posts, almost all of them about Ms. Zeoli and her Buddhist group, along with similar posts on several blogs.

Mr. Cassidy's lawyers with the federal public defender's office argue that even offensive, emotionally distressing speech is protected by the First Amendment when it is conveyed on a public platform like Twitter. Legal scholars say the case is significant because it grapples with what can be said about a person, particularly a public person like a religious leader, versus what can be said to a person.

Eugene Volokh, a law professor at the University of California, Los Angeles, offered an analogy: the difference between harassing telephone calls and ranting from a street-corner pulpit. "When the government restricts speech to one person, the speaker remains free to speak to the public at large," Mr. Volokh argued.

Certainly Mr. Cassidy's previous trespasses have not helped him. He has a record of assault, arson and domestic violence. According to the federal complaint, he was also convicted of carrying an unspecified "dangerous weapon" onto a plane in 1993.

But the defense has taken pains to point out that across the Internet, people post things that may cause emotional distress to others: an unkind review of a book on Amazon, even an unvarnished assessment by a college student on RateMyProfessors.com. They point out, moreover, that Mr. Cassidy lived across the country in California and is not accused of getting anywhere close to Ms. Zeoli. He is now in jail in Maryland pending trial.

In support of a defense motion to dismiss the case, the Electronic Frontier Foundation, an advocacy group based in San Francisco, appealed to the court to protect online expression.



Man accused of Stalking via Twitter claims free Speech - The New York Times



Alyce Zeoli, a Buddhist leader now based in Maryland, in 1995.  Mannie Garcia

"While not all speech is protected by the First Amendment, the idea that the courts must police every inflammatory word spoken online not only chills freedom of speech but is unsupported by decades of First Amendment jurisprudence," it wrote.

Born in Canarsie, Brooklyn, Ms. Zeoli is considered to be a reincarnated master in the Tibetan Buddhist religious tradition, and is known to her followers as Jetsunma Ahkon Lhamo. She is an avid Twitter user, with 23,000 followers. A representative for Ms. Zeoli said she declined to be interviewed for this article.

According to the F.B.I. and Ms. Zeoli's lawyer, Mr. Cassidy also claimed to be a reincarnated Buddhist when he joined Ms. Zeoli's organization, Kunzang Palyul Choling, in 2007. He signed up using a false name and claimed to have had lung cancer, they said. Ms. Zeoli's organization cared for him and, briefly, even appointed him to its executive team. The relationship soured after they came to doubt his reincarnation credentials and found that his claims of cancer were false. Mr. Cassidy left. Then came the relentless tweets, they said.

"A thousand voices call out to (Victim 1) and she cannot shut off the silent scream," read one in the summer of 2010, as redacted in the criminal complaint.

"Ya like haiku? Here's one for ya. Long limb, sharp saw, hard drop," read another.

Shanlon Wu, a former federal prosecutor who is representing Ms. Zeoli, likened the tweets to "handwritten notes." Every time Ms. Zeoli blocked the messages, more appeared from a different Twitter account. Ms. Zeoli for some time stopped using Twitter altogether.

"She felt constantly attacked and monitored by these anonymous people, and the attacks went on whether or not she was online," Mr. Wu said by e-mail.

Twitter, in response to a subpoena, revealed the Internet protocol address of the computer used to post the messages. The authorities found Mr. Cassidy at home in a small Southern California town called Lucerne Valley. Similar rants were posted on blogs that law enforcement authorities say they traced to him. Twitter did not respond to a request for comment.

The case is an example of the many ways in which the law is having to wrestle with behavior on new, rapidly changing modes of communication.

Similar issues have come up in state courts: a boy who hacked into the Facebook account of an acquaintance was charged with felony identity theft, and a student who bombarded a professor with mean e-mail was accused of disturbing the peace.

"Technology creates new ways for people to interact with each other," said Eric Goldman, a law professor at Santa Clara University in California. "You have to figure out if old law maps to new interactions."

Twitter is an especially vexing new tool. It prompts ordinary people who use it to create public personas and it can put celebrities, including religious leaders, in direct contact with a large and sometimes unruly following, including some who insist on using pseudonyms.

"How do you cope with them?" Mr. Goldman wondered aloud. "Do you just block them? Or do you make a federal case out of it?"

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Case of 8,000 Menacing Posts Tests Limits of Twitter Speech

Case 2:24-cr-00163-TS    Document 166-1    Filed 04/21/26    PageID.9031    Page 13 of 32

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▼

---

VOLOKH CONSPIRACY

## Court Ordered Divorcing Husband Not "to Post Anything on Facebook ... in Regards to This Action"

Fortunately, the California Court of Appeal has just reversed the decision, on First Amendment grounds.

**EUGENE VOLOKH** | 2.27.2019 7:58 PM

From yesterday's California Court of Appeal decision in *Molinaro v. Molinaro*:

> [T]he part of the order prohibiting Michael [Molinaro] from posting "anything about the case on Facebook" is overbroad and impermissibly infringes upon his constitutionally protected right of free speech….
>
> To establish a valid prior restraint under the federal Constitution, a proponent has the heavy burden to show the countervailing interest is compelling, the prior restraint is necessary and would be effective in promoting this interest, and less extreme measures are unavailable. A permissible order restraining future speech "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." …
>
> Applying these principles, the court in *In re Marriage of Candiotti* (Cal. Ct. App. 1995) held a custody order limiting a parent's right to communicate with third parties about matters related to the custody proceeding was an unconstitutional prior restraint. There, the order prohibited a mother from disclosing negative information about her former husband's new wife to anyone except certain specified professionals. The *Candiotti* court recognized that courts "are given broad authority to supervise and promote the welfare of children" and may constitutionally order parents to refrain from disparaging their former spouse in front of their children. However, the court observed the challenged order "went further, actually impinging on a parent's right to speak about another adult, outside the presence of the children."
>
> The court held the order was overbroad in this respect and constituted an undue prior restraint of speech under the California Constitution, reasoning the order "would prevent [the mother] from talking privately to her family, friends, coworkers, or perfect strangers about her dissatisfaction with her children's living situation." Although the trial court "certainly ha[d] the power to prevent [the mother] from undermining [the father's] parental relationship by alienating the children from [the stepmother]," the *Candiotti* court found the challenged order to be "much more far-reaching, aimed at conduct that might cause others, outside the immediate family, to think ill of [the stepmother]." The court explained: "Such remarks by [the mother] may be rude or unkind. They may be motivated by hostility. To the extent they are libelous, they may be actionable. But they are too attenuated from conduct directly affecting the children to support a prior restraint on [the mother's] constitutional right to utter them."
>
> The same reasoning applies to the part of the restraining order prohibiting Michael from posting information about the case to Facebook. The record shows Michael's Facebook posts were not specifically directed to the minor children, but in many cases invited comments from Michael's adult friends and extended family, some of whom urged him not to dwell on the divorce, while others suggested he seek legal representation. Moreover, although the trial court plainly had the power to prohibit Michael from disparaging Bertha in the children's presence (see *In re Marriage of Hartmann* (2010)), the order here, like the order in *Candiotti*, was "much more far-reaching," proscribing speech only peripherally related to the case and speech that might, at worst, "cause others, outside the immediate family, to think ill" of Bertha.
>
> Indeed, most of Michael's earlier posts were of this variety?they expressed his apparent despair about the divorce and his separation from the children, but did not directly disparage Bertha or openly seek to alienate her from the children. Posts of this sort are "too attenuated from conduct directly affecting the children to support a prior restraint on [Michael's] constitutional right to utter them."
>
> "It is certainly in the best interests of any children of divorce that the adults in their lives act in a mature and courteous manner"; however, where a restraint on the freedom of speech is concerned, the restriction must be necessary and narrowly tailored to promoting those interests. The part of the restraining order prohibiting Michael from posting about the case on Facebook does not meet this test. We conclude it is overbroad, constituting an invalid prior restraint, and must be stricken from the domestic violence restraining order.

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▾

VOLOKH CONSPIRACY

## Ex-Wife Prosecuted for Violating Order That She "Shall Not Post Anything" About Ex-Husband

But the judge threw out the prosecution, on the ground that the order violated the First Amendment.

**EUGENE VOLOKH** | 8.5.2020 12:56 PM

From Marin County (Cal.) Judge Roy O. Chernus's decision last week in _People v. Velyvis_:

> [T]he Family Law court granted petitioner John Velyvis' application for a Family Code § 6218 Domestic Violence Protective Order (DVPO) against his former wife Melissanne Velyvis (Velyvis or defendant), finding that she "harassed" petitioner in violation of Family Code§ 6320(a) by posting a March 13, 2018 "blog" on WordPress.com, entitled: "NonFatal Strangulation Administered by Husband Dr., John H. Velyvis, from Victim to Survivor … The Untold Story 2018."
>
> Among the prohibitions, the court ordered Velyvis to remove "all social media, blogs and internet" postings regarding petitioner and his children and barred her from making any new social media postings about them[:] …
>
> "The intent of this restraining order is to curtail ongoing posting and communications made by Melissanne Velyvis involving John Velyvis. While recognizing an individual's freedom of expression, in connection with this dissolution and given the relationship qualifying for a domestic violence restraining order, the court has found the statements to have been made for the purpose of harassing Petitioner, damaging Petitioner's reputation, interfering with Petitioner's professional livelihood and damaging Petitioner's personal relationships. Accordingly:
>
> "Melissanne Velyvis shall remove any postings on social media/biogs/internet regarding Petitioner or his children. This includes direct and indirect postings (Example referring to Petitioner as [']former husband/person with fiduciary duty['] and then using Melissanne Velyvis as identification of author).
>
> "Melissanne Velyvis shall not post anything on social media, biogs, and internet regarding Petitioner or his children.
>
> "Melissanne Velyvis shall cease and desist from publishing any information concerning Petitioner and his children for the duration of this restraining order. This includes, but is not limited to providing defamatory statements and documents to third parties about Petitioner. Melissanne Velyvis shall refrain from interjection into custody proceedings involving or related to John Velyvis, directly or indirectly, absent a court order.
>
> "Melissanne Velyvis shall remove John Velyvis' likeness from her own social posting and remove any references indicating they are currently married …."
>
> Six months later, the Marin County District Attorney filed a misdemeanor complaint against Velyvis .alleging one count of Penal Code§ 273.6; i.e., between July 19 to July 25, 2019 Velyvis "willfully, unlawfully, and knowingly" violated the DVPO "issued by Marin County Superior Court case number FL1603174."
>
> The complaint did not describe the offending activities. Defendant states, without contradiction, that she is charged with violating the "no speech" prohibition….

The court in the criminal case began by noting that, under California law, a criminal defendant who is being prosecuted for violating a court order can raise the unconstitutionality of the order as a defense. California thus rejects the "collateral bar" rule (which is applied in federal court for federal orders), under which the target of an order has to object to it by appealing it, and generally can't just violate it and defend herself by arguing that the order is unconstitutional.

And the court then went on to conclude that the family court order was indeed unconstitutional (quite correctly, I think, for reasons given in this article):

Case 2:24-cr-00163-TS   Document 166-1   Filed 04/21/26   PageID.9833   Page 15
of 32

Defendant asserts the broad language in the DVPO that directs: "Melissanne Velyvis shall not post anything on social media, biogs, and internet regarding Petitioner or his children" and "Melissanne Velyvis shall cease and desist from publishing any information concerning Petitioner and his children for the duration of this restraining order," constitutes an invalid prior restraint that impermissibly infringes on her free speech rights …. Defendant contends this overbroad language of the DVPO unlawfully prevents her from sharing her life experiences and feelings she attributes to her marriage to petitioner with her family, friends and other adults willing to read her comments and criticisms ….

The People respond by asserting that the restraining order may lawfully limit speech that exhibits a pattern of conduct the court deems "abusive." As proof of this pattern of abuse, the People rely on evidence presented at the hearing which showed, in addition to posting the blog, … defendant interjected herself into other family law matters involving her ex-husband: she made unsolicited comments to a custody evaluator during the current contested custody hearing involving petitioner and his first ex-wife; and defendant made disparaging remarks about petitioner during his current girlfriend's divorce proceedings to another man. The People also cite defendant's plans to file a complaint against petitioner with the California Medical Board….

In California, a court must find that "extraordinary circumstances" exist in order to restrain the defendant's right to share independently obtained information about another adult with other willing adults. The fact the public sharing of these comments might be humiliating to the targeted adult, or cause emotional distress or even cause harm to the subject's professional reputation, does not rise to the level of a compelling or extraordinary circumstance.

In *In re Marriage of Candiotti* (1995) 34 Cal. App. 4th 718, the court struck down a protective order which permitted the ex-wife's (Debra) to share negative, independently obtained information about her ex-husband's new wife during contentious child custody proceedings, only to a specific set of adults and professionals associated with the court proceedings.

The court held that while the state has a compelling interest to restrain Debra from disparaging the new wife to the divorced couple's children or in the children's presence, "the order here went further, actually impinging on a parent's right to speak about another adult, outside the presence of the children. Such an order, under these circumstances, constitutes undue prior restraint of speech. *It would prevent Debra from talking privately to her family, friends, coworkers, or perfect strangers about her dissatisfaction with her children's living situation.*"

In reaching this conclusion, the court in *Candiotti* recognized that the emotional discomfort or harm to reputation that disparaging comments may cause to the targeted adult do not constitute sufficiently compelling reasons to restrain them:

"Thus, while we agree that the court certainly has the power to prevent Debra from undermining Thomas's parental relationship by alienating the children from Donna, the order here was much more far-reaching, aimed at conduct that might cause others, outside the immediate family, to think ill of Donna. Such remarks by Debra may be rude or unkind. They may be motivated by hostility. To the extent they are libelous, they may be actionable. But they are too attenuated from conduct directly affecting the children to support a prior restraint on Debra's constitutional right to utter them."

Likewise, in *Gilbert v. National Enquirer, Inc.* (1996) 43 Cal.App.4th 1135, the trial court issued a preliminary injunction prohibiting plaintiff actress Gilbert's ex-husband Brinkman from disclosing any information regarding Gilbert's drug or alcohol use or sexual relations with other men that Brinkman acquired before, during or after their marriage, to anyone (except as necessary to the current court proceedings).

The court held the preliminary injunction was an invalid prior restraint on Brinkman's free speech rights and that Gilbert's claimed emotional distress and reputational damage are not sufficiently compelling reasons to justify the prohibition….

Under circumstances similar to our case, the trial court in *Molinaro v. Molinaro, supra,* 33 Cal. App. 5th 824 issued a DVPO prohibiting the husband Michael from posting anything about his pending divorce from Bertha on Facebook. Bertha complained that Michael had physically obstructed her from moving out of the couple's home and had physically intimidated her. At a contested hearing on her application for the DVPO, Bertha complained that Michael was posting everything about the divorce case on Facebook; he gave their children ages 18, 17 and 13 years old, copies of Bertha's pleadings; he posted on Facebook false statements that Bertha ran away with $250,000 from the couple's home equity line of credit and that she is crazy and has hallucinations; and she said his behavior was getting worse and she feared for her life and her children's safety.

The DVPO issued by the court included a stay-away order and ordered Michael not "'to post anything about the case on Facebook'" and "'not to discuss the case with the children.'"

On appeal from the DVPO, the appellate court held that the portion of the restraining order barring Michael from "posting anything about the case on Facebook" was unconstitutionally overbroad and impermissibly infringed on his free speech rights. It found that his "posts were not specifically directed to the minor children, but in many cases invited comments from Michael's adult friends and extended family," and that most of his posts "expressed his apparent despair about the divorce and his separation from the children." The court concluded, as did the court in *Candiotti,* that such comments were "'too attenuated from conduct directly affecting the children to support a prior restraint on [Michael's] constitutional right to utter them.'"

Our courts also recognize that a person has a constitutional right to repeat or comment upon public or private information, not previously found by a trial court to be defamatory. "'The attempt to enjoin the initial distribution of a defamatory matter meets several barriers, the most impervious being the constitutional prohibitions against prior restraints on free speech and press….'" *(Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1158 [injunction may properly issue *after* a trial prohibiting the defendant from repeating specific statements found at trial to be defamatory]; accord. *Evans, supra,* 162 Cal.App.4th at p. 1169 ["[A] court may not constitutionally prevent a person from uttering a 'defamatory' statement before it has been determined at trial that the statement was defamatory."].) There is nothing on the face of the complaint, or in the Family Court judge's judicially noticed fmdings of fact to indicate any of defendant's communications were previously found to be defamatory.

As stated in the DVPO, the Family Law judge found that defendant's statements about Dr. Velyvis were intentionally harassing, damaged his reputation and interfered with his personal relationships.

Based on the authorities discussed above, these reasons are insufficient to justify such a broad prohibition. The court finds that the portion of the DVPO restraining defendant from posting on the internet or communicating any information about defendant's ex-husband or his children is impermissibly overbroad and constitutes an invalid prior restraint under the federal and California constitutions. Violation of this portion of the DVPO, therefore, is not an actionable offense.

I'm particularly pleased to see the use of *Molinaro*; when that case was first handed down, it was as a nonprecedential opinion, but two groups and I filed letters asking that the First Amendment analysis be published—on the grounds that it would set a precedent that would be useful to future courts—and the Court of Appeal agreed. I'm pleased to see that this case justifies the predictions we had made.

To get the Volokh Conspiracy Daily e-mail, please sign up here.

**Email** *(Required)*

e.g. jane@example.com    **Submit**

## <u>*NEXT:*</u> <u>Today in Supreme Court History: August 5, 1974</u>

**EUGENE VOLOKH** is the Gary T. Schwartz Distinguished Professor of Law at UCLA. Naturally, his posts here (like the opinions of the other bloggers) are his own, and not endorsed by any educational institution.

VOLOKH CONSPIRACY    FREE SPEECH    HARASSMENT

       MEDIA CONTACT & REPRINT REQUESTS

 Show Comments (12)

## *RECOMMENDED*

### <u>Court Rejects "Speech Integral to Criminal Conduct" Justification for Harassment Prosecution</u>

### <u>Court Reverses Order That Barred Former Church Member from Saying Anything About Pastor</u>

### <u>Can a Person Be Banned from Posting Anything About Someone Else, Because His Past Speech Supposedly Stems from a "Vendetta"?</u>

### <u>Court Refuses to Order Me to Remove References to Frequent Litigant from Law Review Article</u>

### <u>D.C. High Court Opines on Injunctions Against Speech About People</u>

<u>About</u>

<u>Browse Topics</u>

<u>Events</u>

<u>Staff</u>

<u>Jobs</u>

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▼

FREE SPEECH

## Law Banning Distressing Speech "About" a Person Must Be Limited to Speech Within First Amendment Exceptions

So holds the D.C. Court of Appeals, D.C.'s equivalent of a state supreme court.

EUGENE VOLOKH | 6.8.2023 1:02 PM

From the 6-judge majority opinion in *Mashaud v. Boone*:

> [T]he District's stalking statute … makes it a criminal offense to engage in a course of conduct—including two or more "communicat[ions] to or about another individual"—that one knows or should know would reasonably cause another to suffer emotional distress. D.C. Code §§ 22-3132(8)(A), -3133. By its terms, it restricts all manner of speech, without regard to its truth or falsity, and without regard to whether it is of public or purely private concern. The constitutional problems with the statute are glaring. *See Forsyth County, Ga. v. Nationalist Movement* (1992) ("Listeners' reaction to speech is not a content- neutral basis for regulation."); *R.A.V. v. City of St. Paul* (1992) ("Content-based regulations are presumptively invalid."); *Garrison v. Louisiana* (1964) ("Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned.").
>
> People are generally allowed to say things that they know or should know will cause others emotional distress. Such speech is frequently socially valuable or, at the very least, accepted. Doctors tell patients that they likely have only months to live, or more distressing yet, that their children do. Spouses may knowingly inflict emotional distress by revealing a longstanding paramour and demanding a divorce. Police officers bring news of loved ones having been killed. Judges pronounce death sentences. All of those messages undoubtedly trigger extraordinary distress, and as a result, they are prohibited by the stalking statute's plain terms (at least if the messages need repeating). The statute is unconstitutional if read in that straightforward fashion, as "[s]peech may not be banned on the ground that it expresses ideas that offend."
>
> But the stalking statute has a savings clause, and we granted en banc review in this case to resolve its meaning. The stalking statute provides that "[t]his section does not apply to constitutionally protected activity." D.C. Code § 22-3133(b). To save the District's stalking statute from unconstitutionality, we interpret this clause to mean that, when speech is at issue, the statute covers only speech that fits within the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."
>
> That includes threats, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. Outside of those narrow categories, speech is constitutionally protected activity that the statute does not apply to.
>
> In this case, the Superior Court found that there was good cause to believe that Lauren Mashaud, a married man, stalked Christopher Boone when he truthfully revealed to Boone's family, friends, and colleagues that Boone had an affair with Mashaud's wife. Mashaud now appeals. Because Mashaud's speech was constitutionally protected activity—i.e., it does not fit within any of the categories outside of the First Amendment's protections—we conclude that he did not stalk Boone. We therefore reverse….

Quite right, I think. (Note that Schaerr | Jaffe's Gene Schaerr, Erik Jaffe, and Joshua Prince and I filed an amicus brief in the case, on behalf of Protect the 1st Foundation and myself, advocating for this result. Many thanks to UCLA First Amendment Amicus Brief Clinic law students Max Hyams, So-Young Kim, and Jason Lundry, who drafted the brief under my supervision; and to Scott & Cyan Banister, whose generosity makes the Clinic possible.)

A few excerpts from the very long opinion:

Extra 15% Off Your First Order

SHEIN

What's more, the statute's broad scope applies not only to speech concerning purely private matters, but also to communications on matters of public concern: speech that "occupies the highest rung of the hierarchy of First Amendment values." The desire to elicit an extreme emotional reaction is "not an uncommon purpose, nor one held only by a few evil people." Consider the abortion rights opponent who tells clinic staff that they are murderers, or the animal rights activist whose messaging includes graphic images of slaughtered, mangled, and deformed infant livestock. Both speak on issues of public concern and are therefore entitled to the strongest First Amendment protections. But both invariably intend to evoke deep emotional distress with the hope of making their targets feel "socially ostracized … and emotionally racked with guilt, regret, and a perception of social condemnation." Yet both would be in violation of the plain text of the District's stalking statute, which includes no special carve-out for speech on matters of public concern.

It is a foundational principle of the First Amendment that "speech cannot be restricted simply because it is upsetting or arouses contempt." "The First Amendment protects lots of speech that is substantially emotionally distressing." "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."

The District's stalking statute runs headlong into that bedrock prohibition. Absent some narrowing construction, the District's statute would criminalize speech at the heart of many touchstone First Amendment cases. Protesters carrying signs reading "Thank God for IEDs" and "Thank God for Dead Soldiers" outside a deceased service member's funeral would likely be stalkers in the District, at least if their protests were repeated. The same is true for individuals who display burning crosses, swastikas, and other hateful symbols despite knowing that this expressive conduct will arouse "anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." A repeat neo-Nazi march through a neighborhood that is home to numerous Holocaust survivors, would likewise be considered stalking. And when a national publication satirized an interview with Minister Jerry Falwell, indicating that his first time having sex was "a drunken incestuous rendezvous with his mother in an outhouse," that too would seem sufficiently distressing to be prohibited by the District's stalking statute….

We do not doubt that there is a compelling interest in prohibiting stalking, and that a narrowly tailored statute might prohibit at least some of the communications at issue here (probably not the email, though). As written, however, the statute is unconstitutionally overbroad and would need to be struck down unless some narrowing construction can save it from wholesale invalidation….

Because we may strike down a constitutionally overbroad statute only "as a last resort," we are obliged to determine if the stalking statute is "'readily susceptible' to a narrowing construction that would make it constitutional."

The stalking statute gives us a natural entry point for that inquiry. It provides that it "does not apply to constitutionally protected activity." Amici argue that we should read the savings clause as a categorical limitation on the statute's scope, as Judge Beckwith advocated in her dissent from the division's opinion. When it comes to communications to or about another person, they assert, the clause limits the definition of stalking to just those discrete, well-defined categories of speech that lack First Amendment protections: threats, defamation, and the like. The District counters that the savings clause states no more than a truism, leaving us to scrutinize on a case-by-case basis which of its particular applications run afoul of the Constitution.

For the reasons that follow, we conclude that the first approach is not only the superior of the two, but the only one that would save the statute from invalidation….

Amici argue that we should read the savings clause as exempting entire categories of constitutionally protected speech from the stalking statute's reach.

Under this reading, when the savings clause says it does not apply to "constitutionally protected" speech, it exempts all speech except that which fits within the "narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." That would leave threats, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct [and] {"fighting words," "child pornography," and "speech presenting some grave and imminent threat"} within the stalking statute's reach, while leaving the balance of speech beyond it.

There are substantial advantages to this interpretation of the statute. Most importantly, it would eliminate the statute's unconstitutional overbreadth. The statute would proscribe only that speech that lacks First Amendment protections. It would likewise avoid any vagueness problems—which the District's interpretation suffers from, as discussed below—as a would-be perpetrator would not need to perform a full constitutional analysis to determine if their conduct falls within the statute's scope…. [I]f interpreted in this way, "the statute would be a combination of a criminal libel statute, a threat statute, a fighting words statute, and the like" ….

The District counters that the savings clause should be read to state a truism: that like all legislative enactments, the stalking statute only applies to "conduct or expression," which we take to include expressive conduct, "that the Constitution does not shield after conducting the relevant constitutional analysis."

Case 2:24-cr-00163-TS   Document 166-1   Filed 04/21/26   PageID.9937   Page 19 of 32

If read in this way, then it is technically true (as the District contends) that the statute would no longer be overbroad; by its literal terms, it would forbid nothing that the Constitution protects. But that walks right into a different and equally devastating constitutional problem: it substitutes vagueness for overbreadth, thereby leaving the statute on no firmer constitutional footing. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited."

First, it makes little sense to say (as the District asserts) that the stalking statute applies to all speech except that which the "Council could not permissibly prohibit under the Constitution." Whether speech has been permissibly regulated depends on how narrowly tailored the regulation is to a compelling interest. The Council cannot get around the narrow tailoring requirement by simply declaring that it is prohibiting all distressing speech that, through a narrowly tailored statute, it otherwise might. It must actually do the tailoring. A statute that simply directs judges to determine if speech of a particular type could be constitutionally proscribed lacks the requisite tailoring and is constitutionally infirm on its face. The stalking statute is not narrowly tailored to a compelling state interest if we read the savings clause to state a truism, regardless of whether a variety of the speech it covers might be proscribed through a more targeted statute.

The District thus fundamentally misunderstands what strict scrutiny is when it counters that "[m]ost applications of the stalking law would survive even strict scrutiny" if the savings clause were interpreted as a mere truism. Strict scrutiny takes stock of the statute as a whole and asks whether it is narrowly tailored to achieve a compelling state interest, and a statute will fail that test if a "narrower regulation would suffice" to satisfy the state's interest. It is a category error to say a statute would survive strict scrutiny in "most applications"; "'overinclusive' statutes also fail strict judicial scrutiny."

Second, a statute with terms requiring "application of the appropriate constitutional test" would leave the line between innocent and prohibited conduct a matter of guesswork for most of the District's residents. As one treatise describes the problem, such a statute would be "patently vague":

> [T]he Constitution does not, in and of itself, provide a bright enough line to guide primary conduct, and [] a law whose reach into the protected sphere is limited only by the background assurance that unconstitutional applications will eventually be set aside is a law that will deter too much that is in fact protected.

Laurence H. Tribe, *American Constitutional Law* 1031 (2d ed. 1988) (discussing the risk of vagueness in "judicial reconstruction" of unconstitutionally broad statutes). Even for trained attorneys, a statute requiring ex ante constitutional analysis to determine its scope fails to give adequate notice of its requirements. And particularly when that statute imposes criminal liability, the result of this vagueness is inevitably the impermissible chilling of protected speech….

The only question remaining is whether Mashaud's speech fits within a narrow category of speech that lacks First Amendment protection. That is a pretty open and shut case: it does not. Mashaud did not defame Boone; it is undisputed that his statements were true. He did not threaten him. His speech did not incite criminal activity, and it was neither obscene nor fraudulent.

Boone counters that Mashaud's speech fits within one recognized exception to the First Amendment's protections, because it was integral to a criminal act— namely, stalking. This argument is fatally circular. While it is true that the First Amendment does not protect speech integral to criminal conduct, "the speech must be integral to conduct that constitutes another offense that does not involve protected speech." The exception is typified by crimes like solicitation or conspiracy, which encourage others to participate in and thereby advance a non-speech offense.

It makes no sense as an exception if the speech both constitutes the crime itself and thereby avoids First Amendment protections by being integral to its own commission. By Boone's reasoning, the government could prohibit any disfavored speech by first defining it as a crime and then claiming that the First Amendment no longer applies because that speech is now integral to that same offense. An exception like that would swallow the First Amendment whole and bears no resemblance to what this narrowly drawn exception actually is.

Because the course of conduct identified by the trial court consisted solely of "communications to or about another individual," and those communications did not fall within one of the categories of speech that lack First Amendment protections, the court erred by finding that Mashaud committed the crime of stalking…

Judge McLeese, joined by Judge Alikhan, dissented from the court's analysis (though they agreed that the order should be reversed); they would have instead read the statute as limited to behavior that "involve[s] a severe intrusion on the victim's personal privacy and autonomy."

To get the Volokh Conspiracy Daily e-mail, please sign up here.

**Email** (Required)

e.g. jane@example.com        Submit

Case 2:24-cr-00163-TS    Document 166-1    Filed 04/21/26    PageID.9938    Page 20 of 32

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy 🔽

FREE SPEECH

## Illinois Appellate Court Overturns a Stop-Posting-About-Plaintiff Order

Trial court: "I understand that you have a first amendment privilege, but sometimes the first amendment privilege contravenes certain statutes that are enacted by the State ...." Appellate court: That's "a misunderstanding of the relationship between statutes and constitutions."

EUGENE VOLOKH | 12.27.2022 8:01 AM

From Thursday's Appellate Court of Illinois decision in _Pokorny v. DeBolt_, written by Justice Joseph Birkett and joined by Justices Susan Hutchinson and Donald Hudson:

> A plenary order of protection barring respondent from disseminating on social media any information identifying petitioner in any way, was improper. The petitioner failed to meet her burden to show that the first amendment did not protect respondent's communications that were the basis for the order.
>
> Respondent, Lori W. DeBolt, appeals a judgment issuing a plenary order of protection under the Stalking No Contact Order Act … and an injunction in favor of petitioner, Amber Pokorny, and her daughters, A. Z. and A.V.….
>
> [P]etitioner listed the following seven writings as justifying the requested order. On June 28, 2020, respondent "post[ed]" that she was praying for "Billy," who had not seen his daughter for a year. On July 4, 2020, respondent posted on Facebook that petitioner had alienated the father of A.Z. and had abducted A.V. and taken her out of state. She also went into detail about a "claimed Rape." On July 7, 2020, respondent posted on Facebook that petitioner repeatedly lied to alienate her daughters from their fathers.

On December 23, 2020, she posted on Facebook petitioner's "victim statement" and wrote that "Amber lies" were "destroying our men." On December 31, 2020, she posted on Facebook that petitioner had (1) falsely accused respondent's son of a crime, (2) falsely accused the father of one of petitioner's daughters of abusing the girl, and (3) forced her daughter to accuse petitioner's ex-husband of sexual assault. On January 2, 2021, she posted on Facebook, urging "Amber" to stop lying and let her daughter see her father, even though the father had never contested the matter in court. Finally, on January 5, 2021, respondent posted petitioner's "police Report" on Facebook and stated that petitioner was alienating her daughter from her father.

Petitioner also alleged that, in the summer of 2020, respondent contacted A.Z.'s father and spoke to him about the custody issue. Further, respondent attended the trial in petitioner's custody case against A.V.'s father and had been helping him. Finally, respondent contacted another man and his ex-wife on Facebook and shared details about a 2013 custody order in A.V.'s custody case.

On February 10, 2021, the trial court held an evidentiary hearing. Both parties appeared *pro se*. For petitioner, A.Z. testified as follows. Her father had contacted her about the Facebook posts. Going through social media, she had seen false information about her and petitioner. These posts had made A.Z. very nervous and had traumatized her by "bringing up a lot of back story" and leading to considerable contact with her father. A.Z. did not want contact with him, because they had "no relationship" and he was abusive when there was contact.

A.Z. testified that she had seen petitioner's full name displayed on some posts. One document was posted on Twitter. A.Z. pointed out the document from a group of documents shown to her. Nothing in the record identifies this document more specifically. However, two exhibits are consistent with A.Z.'s description of the document. The first was later placed into evidence as petitioner's exhibit B. On April 12, 2020, respondent posted on Twitter:

"She has her two daughters believing she was raped all so the fathers and Family Services wouldn't take the girls away from her. Amber Pokorny has 2 DNA [*sic*] and the court covered up her lies for a fast win. False Accusers are done lying in court."

The second was shorter and less specific. It was later admitted as petitioner's exhibit A. On September 11, 2020, one Arunder Sigh posted on Twitter, "Write your horror story in two words." On September 12, 2020, respondent replied, in full, "Amber pokorny [*sic*]."

Petitioner testified in narrative form that she had no personal relationship with respondent. After a court case involving respondent's son and petitioner, respondent (1) made personal information public; (2) contacted petitioner's ex-husband, family members, and friends; and (3) "post[ed] many things all over social media," much of it false, using petitioner's full name. {The case was *People v. DeBolt*, 2022 IL App (2d) 200784-U, in which petitioner was the complaining witness. The jury found the defendant, Kevin DeBolt, guilty of one count of criminal sexual assault of someone who was unable to give knowing consent to sexual penetration. The trial court sentenced him to seven years' imprisonment. We affirmed the judgment.} …

The trial court issued a restraining order:

The trial court explained that respondent had engaged in advocacy, but "when it becomes personal, you cross the line." Respondent's contention that she never identified petitioner in her social media posts was false; she had "consistently and repeatedly ma[de] reference to Amber Pokorny." In her April 12, 2020, post, she stated, "'Amber Pokorny had two DNA [*sic*], and the court covered up her lies for a fast [win].'"

The court continued:

"I understand that you have a first amendment privilege, but sometimes the first amendment privilege contravenes certain statutes that are enacted by the State of Illinois, and this is one of those cases.

And again, it's the old adage, you have a first amendment right, but you can't yell fire in a crowded theater. And that's what you're doing.

You are making allegations that the court specifically finds that [*sic*] the material that you're printing has the intended effect to cause emotional distress to [petitioner]. And it's going to stop.

And I'm entering an order extending this order of protection for two years. And this order of protection indicates … that you're prohibited from threatening to commit or committing stalking personally or through a third-party [*sic*]. That you may not contact the petitioner or other protected persons in any way, directly or indirectly through third parties, okay, in any manner.

And I'm also adding … injunctive relief that says, you shall not disseminate any information on social media identifying the petitioner in any way." …

The appellate court reversed:

Section 10 of the Act states, "Stalking does not include an exercise of the right to free speech or assembly that is otherwise lawful." …

Here, the trial court's finding that respondent committed stalking is against the manifest weight of the evidence. Petitioner introduced no evidence that any of respondent's communications fell outside the protection of the first amendment. Petitioner did not even argue that anything respondent said was either a true threat or integral to the commission of a crime, but she relied entirely on the allegation that what respondent said would cause emotional distress to a reasonable person. The only suggestion of defamation was the unsupported assertion that some of what respondent said was false, but the trial court did not accept this assertion anyway.

{Indeed, the trial court failed to recognize that petitioner was required to prove that respondent's acts were unprotected by the first amendment. The court also explicitly stated that the Act prevailed over respondent's first-amendment rights. Thus, the judgment was based on insufficient evidence, a misreading of the Act, *and* a misunderstanding of the relationship between statutes and constitutions.} …

Respondent argues third that the injunction against her was an unconstitutional prior restraint. We do not address the constitutional issue. With no valid finding that respondent committed stalking, there was no basis for the stalking-no-contact order; *a fortiori*, there was no basis for the equally broad restriction on respondent's future speech. Thus, we reverse the injunction….

To get the Volokh Conspiracy Daily e-mail, please sign up here.

**Email** *(Required)*

 e.g. jane@example.com    **Submit**

## <u>*NEXT:*</u> <u>Today in Supreme Court History: December 27, 1771</u>

**EUGENE VOLOKH** is the Gary T. Schwartz Distinguished Professor of Law at UCLA. Naturally, his posts here (like the opinions of the other bloggers) are his own, and not endorsed by any educational institution.

**FREE SPEECH**    **HARASSMENT**

MEDIA CONTACT & REPRINT REQUESTS

 Show Comments (22)

## *RECOMMENDED*

**Court Rejects "Speech Integral to Criminal Conduct" Justification for Harassment Prosecution**

**Court Reverses Order That Barred Former Church Member from Saying Anything About Pastor**

**Can a Person Be Banned from Posting Anything About Someone Else, Because His Past Speech Supposedly Stems from a "Vendetta"?**

**Court Refuses to Order Me to Remove References to Frequent Litigant from Law Review Article**

**D.C. High Court Opines on Injunctions Against Speech About People**



About

Browse Topics

Events

Staff

Jobs

Donate

Advertise

Subscribe

Copyright 2013 by Northwestern University School of Law
Northwestern University Law Review

Printed in U.S.A.
Vol. 107, No. 2

# ONE-TO-ONE SPEECH VS. ONE-TO-MANY SPEECH, CRIMINAL HARASSMENT LAWS, AND "CYBERSTALKING"

*Eugene Volokh*

**ABSTRACT**—Until recently, criminal "harassment" usually referred to telephone harassment—unwanted communications *to* a particular person. Likewise, stalking laws were originally created to deal with people who were physically following a person or trying to talk to that person. The same has historically been true with regard to restraining orders.

But in recent years, these laws have been increasingly reworded or interpreted in ways that also cover speech *about* a person, even when that speech is communicated to potentially willing listeners. The law is in effect returning to an era when criminal libel laws could impose liability not just for falsehoods, but also for true statements or opinions that were supposedly not said with "good motives."

This Article will argue that this approach is unconstitutional when applied to speech said about the target rather than just to the target, at least when the speech is outside the traditional First Amendment exceptions (chiefly threats and "fighting words," plus perhaps libel). Courts should therefore reject the application of these laws to such one-to-many speech, and legislatures should resist the broadening of such laws.

**AUTHOR**—Gary T. Schwartz Professor of Law, UCLA School of Law (volokh@law.ucla.edu). Thanks to Stuart Banner, Paul Bergman, Dan Bussel, Robert Goldstein, Mark Grady, Carole Heyward, Bill Klein, Maximo Langer, Bill McGovern, Seana Shiffrin, Alexander Stremitzer, Jonathan Varat, and Steve Yeazell for their help.

I'm delighted to have been invited to participate in this Festschrift honoring Marty Redish, whose theoretical and doctrinal First Amendment work I have long admired. Having little to add to Marty's important contributions on the particular subjects that he has confronted, and little to say in disagreement with them, I thought I'd follow another Festschrift tradition by writing an article in Marty's honor and in Marty's field, inspired by the high standards that he has set.

731

NORTHWESTERN UNIVERSITY LAW REVIEW

INTRODUCTION ..................................................................................................732

I.  THE ORIGIN OF HARASSMENT, STALKING, AND RESTRAINING ORDER LAWS:
    UNWANTED SPEECH *TO* A PARTICULAR PERSON......................................................740

    A.  *Restrictions on Unwanted One-to-One Speech*............................................740

    B.  *Protection Even for Some Unwanted One-to-One Speech*...........................744

    C.  *The Supreme Court Doctrine*......................................................................745

II.  INSULTING SPEECH ABOUT PEOPLE AND THE FIRST AMENDMENT.........................751

    A.  *The General Protection of Speech About People*.........................................751

    B.  *First Amendment Exceptions: Threats, Knowingly False Statements,
        Incitement, and Solicitation*........................................................................751

    C.  *Speech About a Person that Allegedly Invades "Privacy"*.........................755

    D.  *General Statutory Exceptions for "Constitutionally Protected Activity"*....762

    E.  *Content-Based Speech Restrictions*............................................................767

    F.  *Bad Purpose*...............................................................................................773

    G.  *Speech on Matters of Purely Private Concern*............................................783

    H.  *Harm*...........................................................................................................788

CONCLUSION ....................................................................................................793

## INTRODUCTION

Let me begin with four stories, as it happens all from Summer 2011.

1. Philip Speulda was a primary candidate for the Hawthorne, New Jersey city council. One of Speulda's campaign flyers, pictured below in Figure 1, included a picture of his opponent, Robert Van Deusen, in a hot tub with two other men. (Van Deusen apparently had the picture taken as a joke and had posted it online himself.) Speulda used the photo to suggest that Van Deusen shouldn't be elected because he was gay, or at least because he had acted inappropriately by posting the photo.[1]

It was a silly flyer from someone who wasn't a serious candidate, and it likely didn't impress the voters. But it did impress the police, who in June 2011 issued Speulda a criminal summons for "harassment." Under New Jersey law, it is a crime to, "with purpose to harass another . . . [m]ake[] . . . a communication . . . anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner

---

[1] *See* Complaint–Summons, State v. Speulda, No. 1604-S-2011-000159 (Hawthorne Bor. Mun. Ct., June 9, 2011), *available at* http://www.volokh.com/wp/wp-content/uploads/2011/07/speuldacomplaint. pdf; Kristie Cattafi, *Hawthorne PD Files Harassment Charges Against Primary Candidate*, GAZETTE (Hawthorne, N.J.) (June 28, 2011, 12:28 PM), http://www.northjersey.com/news/124654139_ Harassment_charges_filed_against_candidate.html.

107:731 (2013)                                          *Free Speech and Criminal Harassment Laws*

likely to cause annoyance or alarm."[2] The police theory was apparently that the flyer was made with the "purpose to harass" Van Deusen and was "likely to cause annoyance or alarm" to Van Deusen. Some months later, the charges were dismissed, though with no precedent being set foreclosing similar future uses of the statute.[3]

FIGURE 1: SPEULDA CAMPAIGN FLYER



_____

[2]  N.J. STAT. ANN. § 2C:33-4 (West 2005).

[3]  Kristie Cattafi, *Harassment Charges Dismissed Against Hawthorne Primary Candidate*, GAZETTE (Hawthorne, N.J.) (Oct. 6, 2011), http://www.northjersey.com/news/131197624_Harassment_charges_ dismissed_.html.

NORTHWESTERN UNIVERSITY LAW REVIEW

2. A couple of weeks later, an anonymous cartoonist who went by MrFuddlesticks created a set of Internet video cartoons parodying the Renton, Washington police department. Some of the videos seemed to relate to real incidents, including incidents with a sexual component, and some of the police officers who were involved in those incidents could be identified by those in the know.[4]

The city prosecutor concluded that the videos might constitute "cyberstalking," which is defined under Washington law as "mak[ing] an electronic communication to [another] person or a third party" "with intent to harass, intimidate, torment, or embarrass [that] other person" "[u]sing any lewd, lascivious, indecent, or obscene words, images, or language."[5] The theory was that some of the sexual references used "lewd" or "indecent" words, and that the video was created "with intent to harass, intimidate, torment, or embarrass" its subjects.[6] The prosecutor got a search warrant aimed at figuring out MrFuddlesticks' identity, though after a public outcry the warrant was stayed and later withdrawn, and the city decided not to press charges.[7]

3. Around the same time, Johanna Hamrick—who runs the *Berea Post* blog and had been candidate for mayor and city council president of Berea, Ohio—posted various items critical of Norma Kleem. Kleem was a member of the Berea Commission on Aging, the organizer of the Berea July Fourth parade, and the sister of Berea mayor Cyril Kleem. One of Hamrick's blog posts read:

DON'T FORGET YOUR TOMATOES!

As the Fourth of July Parade is approaching we are getting so excited here at The Berea Post. It is sure to be a special year as we have heard of only one parade participant having a discriminatory letter.

All persons receive a letter to be a part of the parade. As you guessed it, you have to return your form to Norma Kleem. In prior years she has limited who is allowed in the gate, what vehicles, and many other obstacles have been

---

[4] *Cartoonist Targeted with Criminal Probe for Mocking Police*, KIROTV.COM (Aug. 3, 2011, 4:46 PM), http://www.kirotv.com/news/news/cartoonist-targeted-with-criminal-probe-for-mockin/nDjfB; *see also* Affidavit for Search Warrant, *In re* King County Search Warrants 11-1172, No. 11-2-12056-2 KNT (Wash. Super. Ct. July 28, 2011), *available at* http://www.law.ucla.edu/volokh/crimharass/61571607-Renton-Parody-Doc1-8.pdf; Declaration of City of Renton Police Chief Kevin Milosevich, *In re King County*, No. 11-2-12056-2 KNT (Wash. Super. Ct. Aug. 16, 2011), *available at* http://www.volokh.com/wp-content/uploads/2012/06/Renton-Declarations.pdf.

[5] WASH. REV. CODE ANN. § 9.61.260 (West 2010).

[6] City of Renton's Response to Movant's Motions at 4 n.3, 5, *In re King County*, No. 11-2-12056-2 KNT (Wash. Super. Ct. Aug. 17, 2011) (emphasis omitted), *available at* http://www.volokh.com/wp-content/uploads/2012/06/Renton-Memorandum.pdf (arguing that the videos "involve the use of obscene language by using the 'F' word" and "suggest the commission of a lewd or lascivious act . . . when discussing [alleged] sexual relations in a car or while bent over a motorcycle").

[7] Jeff Hodson, *Renton Drops Court Quest to Find 'Mrfuddlesticks*,*' SEATTLE TIMES, Aug. 11, 2011, at B1.

put up. This year the letter was the same as prior years, all except one. One persons letter stated that only Berea City Fire Trucks were allowed in. Why? Well if the City Club gets their donated fire truck in, someone could look better on the fire truck. Yes, one letter stated this information. How low can you go? Well the little dictator wants control. Little dictator wants to make sure any opponent is denied like in past years.

Please Sunday July 3rd, DO NOT FORGET YOUR TOMATOES!!! I truly would love to chuck one right at someone in THAT camp. It would be quite enjoyable. Happy Independence Day Berea.[8]

Now, if Hamrick had thrown a tomato at Kleem, she would have been guilty of a crime. Perhaps if Hamrick's post were seen as serious—maybe based on past interactions between Hamrick and Kleem—she might be guilty of punishable solicitation of crime.[9] But the Ohio legal system's response to Hamrick's post was something else: Norma Kleem sought a protection order against Hamrick based on this post and other conduct (including, allegedly, following Kleem in her car and trying to hit Kleem with her car), and Judge Nancy Russo entered the following order:

> [Hamrick] is prohibited from posting any information/comments/threats/or any other data on any internet site, regarding the petitioner and any member of her immediate or extended family; . . . Respon[dent] is known to post as Lilly on the cleveland.com blog and Berea Post; she is prohibited from blogging/posting on any site [about] petitioner including but not limited to these blogs.[10]

So Hamrick was barred from saying *anything* on her own blog or in the comments to the Cleveland.com blog either about local commissioner and parade organizer Norma Kleem or about her brother Mayor Cyril Kleem. The order was reversed a week later.[11]

4. One week later, federal prosecutors started a criminal harassment prosecution in Maryland. Alyce Zeoli is a leading American Tibetan Buddhist religious figure,[12] the subject of a somewhat critical book-length biography written by a *Washington Post* writer,[13] and a Twitter user with

---

[8] Johanna Hamrick, *Don't Forget Your Tomatoes!*, BEREA POST, http://berea-post.celebration-of.com/About.aspx (last visited Mar. 10, 2012).

[9] *Compare* United States v. Williams, 553 U.S. 285 (2008) (solicitation of child pornography is constitutionally unprotected), *with* Hess v. Indiana, 414 U.S. 105, 107–09 (1973) (per curiam) (statement by a demonstrator, as an illegal demonstration was being cleared up, that "We'll take the fucking street later" was constitutionally protected even if seen as "advocacy of illegal action at some indefinite future time").

[10] Order of Protection at 3, Kleem v. Hamrick, No. CV 11 761954 (Ohio Ct. Com. Pl. Aug. 15, 2011), *available at* http://www.volokh.com/wp-content/uploads/2012/07/KleemvHamrickOrder.pdf.

[11] Journal Entry, *Kleem*, No. CV 11 761954, *available at* http://www.volokh.com/wp-content/uploads/2012/07/KleemvHamrickOrder.pdf, at 5.

[12] Martha Sherrill, *The Buddha from Poolesville*, WASH. POST, Apr. 16, 2000, at W12. As of 2000, Zeoli was the leader of the largest Tibetan Buddhist monastery in the United States.

[13] MARTHA SHERRILL, THE BUDDHA FROM BROOKLYN (2000).

23,000 followers.[14] William Lawrence Cassidy had gotten involved with Zeoli's Buddhist group (Kunzang Palyul Choling) to the point of becoming Chief Operating Officer of the group; but he was then expelled because he had apparently lied to them about having had cancer and because "they came to doubt his reincarnation credentials."[15] After he left, Cassidy began to post insulting Twitter messages about Zeoli, eventually producing about 8000 tweets over the span of several months.[16]

A few could be seen as potentially threatening, e.g., "ya like haiku? Here's one for ya: 'Long, Limb, Sharp Saw, Hard Drop' ROFLMAO."[17] But others were criticisms of Zeoli: for instance, "[Zeoli] is a demonic force who tries to destroy Buddhism" and "[Zeoli] is no dakini: shes a grossly overweight 61 yr old burnt out freak with bad bowels & a lousy outlook: her 'crown' is a joke."[18] And federal prosecutors prosecuted Cassidy not under the threat provision of the statute,[19] but rather on the theory that Cassidy's messages constituted the federal crime of "engag[ing] in a course of conduct [using the mail or interactive computer services] that caused substantial emotional distress to a person" "with the intent to harass and cause substantial emotional distress to [that] person."[20] The district judge eventually threw out the prosecution on First Amendment grounds.[21]

In May 2012, a Maryland court likewise enjoined a blogger from blogging about a political activist who was also a convicted criminal.[22] Some weeks later, a Massachusetts court ordered a blogger (and former

---

[14] Somini Sengupta, *Case of 8,000 Menacing Posts Tests Limits of Twitter Speech*, N.Y. TIMES, Aug. 27, 2011, at A1.

[15] *Id.*

[16] United States v. Cassidy, 814 F. Supp. 2d 574, 579 (D. Md. 2011).

[17] Careful readers may notice that this is not actually a haiku.

[18] Criminal Complaint at 5–6, *Cassidy*, 814 F. Supp. 2d 574 (No. 11-501 CBD).

[19] *Cassidy*, 814 F. Supp. 2d at 583 n.11.

[20] *Id.* at 576; *see also* 18 U.S.C. § 2261A(2) (2006).

Cassidy apparently deliberately copied Zeoli on his tweets by including the text @ZeoliUserName, which would lead those tweets to show up in Zeoli's @Mentions tab in Twitter. One might argue that this decision to include the @ sign followed by Zeoli's username makes the tweets one-to-one speech sent to Zeoli as well as one-to-many speech about Zeoli. But this wasn't the government's theory. The indictment doesn't refer to sending messages to Zeoli; it says Cassidy is guilty for "us[ing] an interactive computer service . . . to engage in a course of conduct that caused substantial emotional distress to that person, to wit: the posting of messages on www.twitter.com and other Internet websites concerning [Alyce Zeoli]." Indictment, *Cassidy*, 814 F. Supp. 2d 574 (No. 11 CR 0091). The criminal complaint filed by the FBI agent doesn't note any use of the @ feature by Cassidy; indeed, it lists Cassidy's anti-Zeoli blog posts alongside his Twitter messages—blog posts, of course, don't have an analog to the @ feature. Criminal Complaint, *Cassidy*, 814 F. Supp. 2d 574 (No. 11 CR 0091). And the statute under which Cassidy is being prosecuted doesn't impose any such limitation.

[21] *Cassidy*, 814 F. Supp. 2d at 581–88.

[22] Final Peace Order, Kimberlin v. Walker, No. 0601SP019792012 (Md. Dist. Ct. May 19, 2012), *available at* http://www.law.ucla.edu/volokh/crimharass/AaronWorthing-order.jpg; Hearing at 59–60, *Kimberlin*, No. 0601SP019792012 (Md. Dist. Ct. May 29, 2012). I assisted the defendant's lawyer, on a pro bono basis, in getting the order vacated.

Case 2:24-cc-00163-TS   Document 166-1   Filed 04/21/26   PageID.9947   Page 29 of 32

 **Navigation**

# The Volokh Conspiracy

# Federal Government Prosecuting Man for Writing Many Insulting Tweets and Blog Posts About Religious Leader

by **Eugene Volokh** on August 27, 2011 3:18 pm in **"Bullying" Bans**, **Freedom of Speech**

Somini Sengupta at the *New York Times* wrote today about this case, in which William Lawrence Cassidy is charged with violating the federal antistalking statute, 18 U.S.C. § 2261A by "with the intent to harass and cause substantial emotional distress to a person … us[ing] an interactive computer service … to engage in a course of conduct that caused emotional distress to that person, to wit: the posting of messages on www.twitter.com and other Internet websites concerning [Alyce Zeoli]." (For details about Cassidy's tweets and post, see the criminal complaint [UPDATE: fixed link].)

Here's the backstory:



> Born in Canarsie, Brooklyn, Ms. Zeoli is considered to be a reincarnated master in the Tibetan Buddhist religious tradition, and is known to her followers as Jetsunma Ahkon Lhamo. She is an avid Twitter user, with 23,000 followers. A representative for Ms. Zeoli said she declined to be interviewed for this article.
>
> According to the F.B.I. and Ms. Zeoli's lawyer, Mr. Cassidy also claimed to be a reincarnated Buddhist when he joined Ms. Zeoli's organization, Kunzang Palyul Choling, in 2007. He signed up using a false name and claimed to have had lung cancer, they said. Ms. Zeoli's organization cared for him and, briefly, even appointed him to its executive team [as Chief Operating Officer]. The relationship soured after they came to doubt his reincarnation credentials and found that his claims of cancer were false. Mr. Cassidy left.

After Cassidy left, he started saying insulting things about Zeoli online, ultimately with over 8000 tweets over the span of several months. A few could be seen as potentially threatening, e.g., "ya like haiku? Here's one for ya: 'Long, Limb, Sharp Saw, Hard Drop' ROFLMAO." But the complaint isn't limited to those, or even mostly focused on them; it also includes statemento like, "[Zeoli] is a demonic force who tries to destroy Buddhism," "[Zeoli]: somebody throw a couple shots of gin in the bitch & get her back on twitter: shes fun 2 play with," and "[Zeoli] is no dakini: shes a grossly overweight 61 yer old burnt out freak

7/2/23, 6:50 PM          Federal Government Prosecuting Man for Writing Many Insulting Tweets and Blog Posts About Religious Leader · The Volokh ConspiracyThe V…

Case 2:24-cr-00163-TS   Document 166-1   Filed 04/21/26   PageID.9948   Page 30
of 32

with bad bowels & a lousy outlook: her 'crown' is a joke." And the statute under which Cassidy is prosecuted is by no means limited to threats — the relevant provisions generally ban



> engag[ing] in a course of conduct [using the mail or interactive computer services] that causes substantial emotional distress to [a] person" "with the intent to … harass … or cause substantial emotional distress to [that] person."

This, it seems to me unconstitutional. Speech doesn't lose its First Amendment protection just because it intentionally causes emotional distress to a person (see *Snyder v. Phelps* and *Hustler v. Falwell*), even when there's a "course of conduct" consisting of two or more incidents of speech rather than just one. If Larry Flynt had published several nasty criticisms of Jerry Falwell rather than just the one in *Hustler v. Falwell*, his speech would have remained protected. So this portion of the statute is overbroad on its face.

And the statute is in any event unconstitutional as applied to Cassidy. To be sure, he badmouthed Zeoli a lot, but the First Amendment protects frequent speech as well as occasional speech. Someone who makes it his mission to repeatedly criticize a religious leader, whether Jerry Falwell or a leading Scientologist or Ms. Zeoli remains constitutionally protected, just as a newspaper is constitutionally protected even when it goes on a campaign of repeatedly criticizing some government official (unless the speech constitutes a true threat or libel, which are traditional exceptions to First Amendment protection).

And while *Snyder* leaves open the possibility that speech can lead to civil liability under the intentional infliction of emotional distress tort if it's on a matter of merely "private concern" (though see the contrary view as to a criminal law in the *United States v. Stevens* "serious value" discussion), here many of the statements were on a matter of public concern — the moral and spiritual qualifications of a relatively prominent religious leader (again, compare the add in *Hustler v. Falwell*). For a sense of the prominence of Zeoli (also known as Catharine Burroughs), note that she was the subject of this somewhat critical biography by a *Washington Post* writer. (For more on the First Amendment overbreadth and as-applied challenges, see Cassidy's motion to dismiss the indictment, which strikes me as largely correct on these points.)

Naturally, if the prosecution was brought under a statute that banned threats, and the prosecution was focused on those tweets and blog posts that might be seen as true threats, which are emotionally distressing because they are threatening, then the prosecution would be constitutionally permissible. The First Amendment doesn't protect true threats. But this prosecution appears to go far beyond the threatening statements.

What's happening — in this case and in some others, such as the abortive Renton prosecution related to videos that mocked certain police officers — is something that I warned about in this 1996 University of Chicago Legal Forum article: Narrow speech restrictions, such as restrictions on telephone harassment, stalking, and other unwanted contact, are now being broadened from essentially one-to-one contact (an insulting phone call, coming up to someone to berate them, sending continued unwanted mail or e-mail) to one-to-many contact (blog posts, tweets, messages readable by everyone in a chat room or on a discussion list, and so on).

The old narrow restrictions might well be constitutional (see, e.g., *Rowan v. U.S. Post Office Department*), but precisely because they deal with essentially one-to-one speech — restricting such unwanted speech to an unwilling listener leaves the speaker free to keep talking to other, potentially willing listeners. But they are now being expanded to cover not just insults said **to** a person, but also insults said **about** the person to the public at large. To be sure, such one-to-many speech can be just as offensive as one-to-one speech (and perhaps sometimes more so). But it is much more constitutionally valuable, precisely because it can reach potentially willing listeners. And suppressing it unconstitutionally blocks communication to such potentially willing listeners.

And of course this case is yet another illustration that the various proposed anti-bullying bans, which — like the federal statute — on their face apply to a wide range of speech will indeed often be applied to speech about government officials (consider the Berea, Renton, and Hawthorne incidents discussed here) and other public figures (consider the Berea incident as well as this one). I think even speech on matters of private concern should generally be constitutionally protected. But these laws can apply to speech on matters of public concern as well, and are indeed being so applied.

UPDATE: Some commenters suggest that Cassidy might be reasonably prosecuted because he deliberately copied Zeoli on his tweets, by including the text *@ZeoliUserName* feature, which would lead those tweets to show up in Zeoli's @Mentions tab. This, the theory goes, makes that decision (to include the @ sign followed by Zeoli's user name) into an instance of one-to-one speech sent *to* Zeoli as well as one-to-many speech *about* Zeoli.

But I don't think this is the government's theory. The indictment doesn't refer to sending messages *to* Zeoli; it says Cassidy is guilty for "us[ing] an interactive computer service … to engage in a course of conduct that caused emotional distress to that person, to wit: the posting of messages on www.twitter.com and other Internet websites *concerning* [Alyce Zeoli]" (emphasis added). The criminal complaint filed by the FBI agent doesn't note any use of the @ feature by Cassidy; indeed, it lists Cassidy's anti-Zeoli blog posts alongside his Twitter messages — blog posts, of course, don't have an analog to the @ feature. And the statute under which Cassidy is being prosecuted doesn't impose any such limitation.

Perhaps a specific statute that bars the deliberate sending of one-to-one messages to a person who has asked that the messages stop, or who would otherwise clearly be substantially distressed by the messages, might be constitutional. But I know of nothing either in the text of the statute or the caselaw interpreting the statute that suggests that this statute is so limited.

By way of analogy, consider *Cohen v. California* (1971), which reversed Cohen's conviction for "disturbing the peace" by wearing a jacket that said "Fuck the Draft" in a courthouse. It's possible that such speech in a courthouse could be banned by a suitably narrow law (on the theory that this would be a reasonable and viewpoint-neutral restriction on speech in what First Amendment law labels a "nonpublic forum"). But the Court held that this possibility couldn't save the prosecution: "Cohen was tried under a statute applicable throughout the entire State. Any attempt to support this conviction on the ground that the statute seeks to preserve an appropriately decorous atmosphere in the courthouse where Cohen was arrested must fail in the absence of any language in the statute that would have put appellant on notice that certain kinds of otherwise permissible speech or conduct would nevertheless, under California law,

Case 2:24-cr-00163-TS    Document 166-1    Filed 04/21/26    PageID 9950    Page 32 of 32

not be tolerated in certain places. No fair reading of the phrase 'offensive conduct' can be said sufficiently to inform the ordinary person that distinctions between certain locations are thereby created."

Likewise, a fair reading of the statute in the Cassidy case wouldn't have informed an ordinary person that using the Twitter @ tag is prohibited by the statute but other insulting tweets are not. And certainly the government's own theory, with its reference to blog posts as well as tweets, makes clear that the government doesn't see the statute as being thus limited.

‹ "Gunpowder Lust"

Adult Children Sue Mother, for Allegedly Having Been Really Mean ›