Kailin Wang
2481 Fairway Dr.
Spanish Fork, Utah 84660
801-787-9755
kaywg2372@gmail.com

FILED
2026 APR 23
CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**KAILIN WANG**,<br><br>Defendant. | **DEFENDANT'S RENEWED MOTION TO COMPEL DISCLOSURE OF IDENTITY OF "LOCAL LAW ENFORCEMENT" REFERRAL OFFICER / IN THE ALTERNATIVE FOR IN CAMERA REVIEW**<br><br>Case No. 2:24-cr-00163-TS<br><br>Judge Ted Stewart<br><br>Magistrate Judge Dustin Pead |

**DEFENDANT'S RENEWED MOTION TO COMPEL DISCLOSURE OF IDENTITY OF "LOCAL LAW ENFORCEMENT" REFERRAL OFFICER / IN THE ALTERNATIVE FOR IN CAMERA REVIEW**

## PRELIMINARY STATEMENT

Defendant Kailin Wang, proceeding pro se, moves the Court to compel the Government to disclose the identity of the "local law enforcement in Utah" officer who emailed the FBI Task Force Officer on January 15, 2024 and asked him to review this case for possible federal prosecution. ECF 164 at 2. In the alternative, Ms. Wang requests in camera review of the January 15 email and any FBI case-opening records reflecting the referral source.

The Government has placed this referral on the record, confirmed it reviewed the email, and made a unilateral determination that it contains nothing discoverable. That determination is not Brady compliance. Brady is a "rule of fairness," *Curry v. United States*, 658 A.2d 193, 197 (D.C. 1995), whose animating principle is that "society wins not only when the guilty are convicted but when criminal trials are fair." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A prosecutor must not be the "architect of a proceeding that does not comport with standards of justice," id. at 88, and is "the representative not of an ordinary party to a controversy, but of a sovereignty... whose interest... in a criminal prosecution is not that it shall win a case, but that justice shall be done." *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). The Government's assertion that it reviewed its own referral email and found nothing discoverable is the substitution of adversarial self-interest for the independent judicial oversight Brady requires.

This motion also responds to the Government's invocation of the Crime Victims' Rights Act to shield records of how CT/V1's private counsel and retained investigators actively directed and steered this federal prosecution. The question is governed by Brady, Giglio, Rule 16, and the constitutional due-process principles of *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), *People v. Eubanks*, 14 Cal. 4th 580 (1996), and their progeny.

This is not a speculative request. Official law enforcement documents record Rappaport's own forum-shopping admissions and search-warrant suggestions adopted by prosecutors. An

1

SFPD investigative report records CT/V1's Utah-based private attorney misidentifying himself to law enforcement as a "court appointed victim advocate" while building a coordination channel with Utah investigators. And as detailed below, the January 15, 2024 FBI referral arrived in precise sequence: after the San Francisco Superior Court denied CT/V1's emergency motion to terminate all forms of visitation on November 30, 2023 See Dkt. 174, and 175 [Ex. A pp. 113-138]

, CT/V1's network simultaneously referred to San Mateo County CPS (January 17, 2024) using his team of one-sided hired guns, experts including J. Reid Meloy and made the January 15 FBI referral — both premised on the same manufactured allegations that an independent CPS investigation subsequently closed as unfounded.

## BACKGROUND

### A.  The Government Confirms the Referral and Refuses to Identify Its Source

ECF 164 establishes three facts. First, the federal investigation began on or after January 15, 2024, when a local Utah law enforcement officer emailed the FBI TFO and asked him to "review this case for possible federal prosecution." ECF 164 at 2. Second, the FBI TFO who later queried the IC3 database has no record of when he did so. Id. Third, the Government reviewed the January 15 email and decided, without court involvement, that it is "internal" and "not discoverable." Id.

The PSR rests two enhancements — a +4 under USSG § 2A6.2(b)(2) and a +2 under USSG § 2A6.2(b)(1) — on the theory that Ms. Wang's 2019 IC3 filings constituted "harassment by having [the victim] investigated by law enforcement." PSR ¶¶ 54, 60. The Government's own admissions confirm the FBI was already open before IC3 was queried and that no one referred the complaints. Whether the IC3 filings drove the investigation is essential to those enhancements, and who opened the investigation on whose initiative is essential to that question.

### B.  The Documented Network: Private Counsel and Investigators Who Directed Criminal Proceedings Against Ms. Wang

The following individuals are identified in official law enforcement documents, certified court records, sworn declarations, and corporate filings:

2

**1.     Douglas Rappaport (CT/V1's private counsel).** (CT Private Investigators List_Redacted; [Ex. 1 pp. 1-5]) Rappaport's forum-shopping campaign is recorded in official law enforcement documents, not alleged.

On June 22, 2020, Rappaport sent ADA Donald du Bain a letter (Doc. 003745) urging felony perjury charges, stating that a perjury conviction was "exactly the scarlet letter that is needed to ensure that future victims, prosecutors and judges understand who they are dealing with when Ms. Wang inevitably finds herself back in court down the road."

On January 6, 2020, Rappaport emailed du Bain and SFPD Inspector Michele Martinez (Doc. 003115) stating there was "no doubt that it will contain a treasure-trove of incriminating information" about Ms. Wang's phone. ADA du Bain replied: "After discussing the matter, Michele and I have agreed to seek a search warrant for the defendant's phone." Rappaport proposed the investigative step; prosecutors followed it.

On January 26, 2021, Rappaport gave a recorded statement to San Mateo County DA Inspector Matt Broad (Case No. 21-0120-01, approved by Senior Inspector Bill Massey). The official investigative narrative records verbatim: "Rappaport stated that he did not have any contacts in Utah that he believed would take this case seriously and he did not want the case to be investigated by San Francisco... based upon his belief that the San Francisco District Attorney's Office would not prosecute the case in a manner that would result in any significant repercussions for Wang." This is an official law enforcement record. Three years later, the Utah-based federal prosecution he sought was initiated.

Rappaport simultaneously represented CT/V1 in civil family court proceedings throughout this period. Each criminal escalation was immediately fed back into the family court to restrict Ms. Wang's visitation.

**2.   Gregory Ferbrache (CT/V1's Utah-based private attorney; local counsel in this case).** (CT Private Investigators List_Redacted; [Ex. 1 pp. 7-8]) Ferbrache is CT/V1's Salt Lake City attorney (Utah Bar No. 10199, Ferbrache Law, 2150 South 1300 East, Suite 500, Salt Lake City, Utah 84106). He filed the Motion for Pro Hac Vice Admission of Rappaport as CT/V1's victim counsel in this federal case. ECF 68 (May 9, 2025). The SFPD Chronological Report of Investigation (page 32 of 32, dated August 4, 2020, Doc. 003115) documents that Ferbrache called

3

SFPD and identified himself as CT/V1's "court appointed legal victim advocate in Utah" — misrepresenting his status as private counsel — to build a coordination channel between San Francisco evidence and Utah investigators. His communications with Utah law enforcement from August 2020 through January 2024 have never been disclosed.

3.  **Chris Bertram (Bertram and Associates Private Investigations).** (CT Private Investigators List_Redacted; [Ex. 1 pp. 9-13])  Retained by CT/V1 continuously since December 2018. Retired Deputy Chief, Unified Police Department of Greater Salt Lake / Salt Lake County Sheriff's Office; FBI National Academy graduate (Session 223, Quantico, 2005); FBI Command College and Utah POST Command College graduate; Utah Deputy Sheriff of the Year (1997). Father Lou Bertram is a retired FBI Special Agent (1968–1988). A Bureau of Vital Records receipt (Request No. 3036839, July 28, 2020) documents Bertram obtaining the child's birth certificate. He submitted GRAMA requests to the Provo Police Department (September 2022) and filed a sworn Declaration in Rappaport's SF family court case on January 19, 2023 — two weeks before the January 15, 2024 FBI referral.

4.  **Justin Lampropoulos** (Ex. 1 pp. 111-155), **Richard Hales** (Ex.1 pp. 56, 93-106, 263, 290) **Adam Zoll** (Ex.1 19, 33-36) **and Patrick Adams** (Ex. 1 p. 136-151).   Lampropoulos (retained Utah constable): documented pretexting under a fake Facebook identity (Custodian of Records Cynthia Velazquez, certified records) (Ex. 1 pp. 156-200); appeared alongside Salem PD officers while presenting as law enforcement; pursued the Wang family across 40 miles of Utah freeway (Ex. 1 pp. 237-261); styled himself "Constable for the State of Utah" in Summit County — a title with no basis in Utah law. Hales: actual Utah County DA Investigator used by Rappaport to route false allegations. Zoll: pretextual DMV record pulls and social media monitoring. (Ex.1 19, 33-36; 40-44)  Adams: hired to impersonate Wang's Utah State public defender staff to obtain mental health records. (Ex. 1 p. 136-151).

## C.  The January 15, 2024 Referral in Context

As of January 2024, Rappaport had documented contacts capable of making that referral: Bertram (FBI National Academy graduate, retired UPD Deputy Chief, filing declarations in Rappaport's cases two weeks before the referral); Ferbrache (CT/V1's Utah private attorney who had been coordinating with Utah investigators since 2020 while misrepresenting his official

4

status); and Hales (an actual Utah County DA Investigator). Rappaport stated in 2021 that he lacked Utah contacts who would take the case seriously — by January 2024, following years of coordinated effort through these individuals, that had changed. The Government's refusal to identify the referral source makes it impossible to determine which contact made the referral.

**D.  The Coordinated Escalation: Events Parallel to the January 15, 2024 FBI Referral**

The FBI referral did not arrive in a vacuum. It arrived as the latest escalation in a documented sequence in which CT/V1's team simultaneously deployed multiple government agencies — federal and state — at the precise moment judicial channels had failed. The timeline of events immediately surrounding the January 15, 2024 referral establishes the context against which the Government's "nothing discoverable" assertion must be assessed.

**11/30/2023**  San Francisco Superior Court (Judge Darwin) denies CT/V1's emergency ex parte motion to terminate all forms of visitation. Judge Darwin denies the request before any evidentiary hearing and declines to set a future hearing, finding CT/V1's allegations echoed prior unsubstantiated claims. (See Dkt. 174, and 175 [Ex. A pp. 85-94] Complete timeline of prosecution and custody events in the Wang-CT (V1) case, 2019–2026)

**1/8/2024**  CT/V1's legal team files 200-page psychological evaluations from three non-court-appointed experts who never directly evaluated Ms. Wang — Dr. J. Reid Meloy ($600/hour), Molly Amman ($8,000/day), and Dr. Stephanie Stein Leite ($325/hour) — in renewed support of complete termination of all visitation. See Dkt. 174, and 175 [Ex. A pp. 101-120]

**1/15/2024**  A "local law enforcement" officer in Utah emails the FBI Task Force Officer and asks him to "review this case for possible federal prosecution." ECF 164 at 2. The Government has reviewed this email and refuses to identify the sender or disclose its contents.

**1/17/2024**  San Mateo County CPS receives a child abuse referral (Referral No. 1310-7050-2514-8080290) premised on allegations that Ms. Wang was causing emotional harm to the child by calling him by his birth name "Kayson" and the term of endearment "Sweetie." The referral arrives two days after the FBI referral, based on allegations from CT/V1's household. The CPS narrative notes the child's paternal grandmother reporting that the five-year-old had, during play, grabbed two toy animals and said "If you call me the wrong

5

name, I will kill you" — a statement the reporting party acknowledged reflected no genuine threat or plan. See Dkt. 174, and 175 [Ex. A pp. 101-120]

The CPS investigation that followed documented what the FBI referral process obscures. Over the course of interviews from January through May 2024, independent social workers found:

During a February 14, 2024 school interview, the "Child" stated that there were three "bad people" — Kailin, Nani, and Yeye — but could not explain why they were bad. His use of adult phrasing ("I cancelled the visits — I did not want them") is consistent with coached language rather than genuine understanding, as independently observed by CPS Social Worker Elisabeth Barragan. See Dkt. 174, and 175 [Ex. A pp. 101-120]

The child's statements about violent imagery (wanting to "stab" Ms. Wang, saying it would be "lucky" if she died, wanting his Pokémon toys to "kill" her) were reported exclusively by CT/V1 and his household — never observed during any of the years of supervised visits at Rally Family Visitation Services. Rally reports covering June 2023 through February 2024 documented no distress, no stomach complaints, and a child who consistently did not want to leave at the end of two-hour visits. See Dkt. 174, and 175 [Ex. A pp. 101-120]

**1/24/2024** The San Mateo CPS investigation narrative formally records that the initial referral criteria were not met: "SOM criteria not met as there are no clear indications of how mother's actions are impacting the child. There are no indications of abuse/neglect that rises to the level of concern." The social worker finds that Ms. Wang has no physical or legal custody and is not a statutory "caregiver" — meaning the predicate for the emotional abuse finding was facially defective from the outset. See Dkt. 174, and 175 [Ex. A pp. 101-120]

**2/29/2024** After Judge Darwin's November 30, 2023 denial and two failed CPS referrals, See Dkt. 174, and 175 [Ex. A pp. 113-138] CT/V1 re-files an emergency ex parte motion before Judge Roeca seeking to suspend all visitation, relying on paid experts Dr. Karli Cleary and Dr. Jennifer Denton to claim the child suffered "immediate psychological and physical harm" and "stress-induced gastrointestinal pain" from Ms. Wang using the child's birth name and terms of endearment. See Dkt. 174, and 175 [Ex. A pp. 113-138]

**3/1/2024** Judge Roeca denies CT/V1's second emergency ex parte request for immediate suspension of all visitation — the second judicial denial of this application in three months. See Dkt. 174, and 175 [Ex. A pp. 113-138]

6

**4/6/2024**  Rally Family Visitation Services completes comprehensive case reports covering all supervised visits from June 2023 through February 2024. The reports document no distress, no stomach complaints, and consistent positive bonding. On February 10, 2024 — the last Rally visit before suspension — the child playfully told staff "Let's scare Kailin," demonstrating comfort and joy. These reports directly contradicted every central allegation CT/V1's paid experts had submitted to courts and CPS.

**4/8/2024** CT files an Emergency Ex Parte Request to move with child to Denmark, and for the court to terminate all forms of visitation and terminate California's jurisdiction over custody and visitation. See Dkt. 174, and 175 [Ex. A pp. 144-167]

**4/26/2024**  Judge Roeca denies all of CT/V1's declarations in support of terminating visitation and orders therapeutic visitation to continue.

**5/2/2024**  Judge Roeca grants CT/V1's international move to Denmark but expressly orders ongoing visitation: CT/V1 must facilitate the child's travel to the Bay Area every other month, or arrange approved Danish providers for supervised therapeutic visitation. Twice-monthly supervised video visitation required when in-person does not occur.

That international visitation plan was set to be finalized on June 11, 2024. Before it could be, CT/V1 had Ms. Wang detained by the Federal Government in Utah — charging her with the exact same allegations underlying the California, San Francisco cyberstalking case that had been pending since October 17, 2019. This was not the first time CT/V1 engineered Ms. Wang's arrest on the eve of a consequential custody ruling. On October 17, 2019, Ms. Wang was recharged with those identical cyberstalking allegations and arrested the following day — October 18, 2019 — just hours before her Utah child custody and visitation hearing. See Dkt. 174, and 175 [Ex. A pp.72-84]

That hearing was set to determine whether Utah would accept or decline California Judge Darwin's order designating Utah as the exclusive forum for all custody and visitation litigation. Had Utah assumed jurisdiction, the entire trajectory of Ms. Wang's relationship with her son would have changed: Utah's statutory framework enshrines a highly favorable parent-timeshare presumption that would have governed all future proceedings. CT/V1's arrest of Ms. Wang on October 17, 2019 foreclosed that hearing and preserved California jurisdiction. Now, five years later, CT/V1 absconded to Denmark with the child and once again arranged Ms. Wang's arrest at the precise

7

moment a compelling and favorable custody and visitation determination was imminent. See Dkt. 174, and 175 [Ex. A pp.72-84]

*See below*: *5/2/24 Order for Denmark International Visitation Plan to be Finalized on 6/11/24, that never happened because CT (V1) had instigated the federal government to detain her, and he then disappeared with the child to Denmark.*

---

are among the very highest in the entire world; the Danish education system will also ensure that the child remains fully fluent in English; Denmark is a safe country; schooling and after-school care are provided at no cost in Denmark; and the Danish work culture is very family friendly. Mother has not contested these assertions.

i. The extent to which the parents are currently sharing custody. Father has had sole legal and sole physical custody of the child for over five years. Mother's visitation has been limited to twice monthly supervised visitation through Rally and supervised video visitation until cancelled by the provider.

The automatic 30-day stay pursuant to Code of Civil Procedure Section 917.7 shall commence upon the entry of this order.

This Court shall retain its jurisdiction under the UCCJEA.

**2. Ongoing Visitation Pending Evidentiary Hearing Regarding Request for Termination of Visitation and the Newly Filed Request for Child Custody and Rebuttal of the 3044 Presumption.**

Mother shall continue to have therapeutic sessions with Rally as ordered by this Court. Father shall be responsible for having the child travel every other month to the Bay Area for visitation. Alternatively, at Father's discretion, Father shall arrange for supervised therapeutic sessions with an authorized provider in Denmark so Mother can have supervised therapeutic visitation every other month. Additionally, Father shall provide this Court with authorized professional providers for approval by this court. In the months where there is no in person visitation, Father shall also arrange for the retention of authorized professional supervisors in Denmark to set up twice monthly supervised video visitation.

The Court will hold a review hearing on Tuesday, June 11, 2024 at 9:00 AM in Dept. 403 to confirm and order the visitation schedule. Father shall file and serve his proposals reflecting the foregoing visitation orders ten days in advance. Mother shall file and serve her response declaration five days in advance of the hearing. Neither brief is to be more than ten pages. Both parties shall file and serve updated

Page 5 of 8

---

Income and Expense Declarations ten days in advance of the hearing. The Court will consider cost allocation in the event Father choses the alternative to have supervised visitation in Denmark.

**3. Child Custody Evaluation**

Mother's request for a child custody evaluation is granted. The Court finds that it is in the child's best interest to order a custody evaluation because of extensive allegations of criminal conduct, the findings of domestic violence and stalking, as well as serious allegations of psychological instability and challenges to parental fitness. The Court orders a full custody evaluation, investigation, and assessment addressing all issues related the child's health, safety, welfare, and best interests. The evaluation shall include recommended custody orders and a proposed parenting plan. The Court will review the parties' Income and Expense declarations to be filed to determine allocation for payment of the expert custody evaluator fees.

The parties are ordered to meet and confer on the selection of a custody evaluator. A list of custody evaluators maintained by the Unified Family Court Family Court Services will be sent to the parties. If the parties are unable to come to an agreement on the custody evaluator by the close of business on June 10, 2024, then each party shall submit the names of three (3) custody evaluators to the court by June 18, 2024, and the court will select the custody evaluator. Any contact that a party makes with a prospective custody evaluator shall be in writing by email or letter and shall be copied to the other side. Neither party shall contact a prospective evaluator by telephone. Neither party shall allow a third-party designee or agent to contact a prospective custody evaluator.

The evidentiary hearing regarding Father's request to terminate visitation shall remain on calendar as currently scheduled starting July 24, 2024. If the Child Custody Evaluation is not concluded the hearing dates will be addressed so the Court has available the recommendations of the Child Custody Evaluation.

///
///
///
///

Page 6 of 8

---

**5/8/2024** Ms. Wang is indicted by a federal grand jury. The indictment is filed by AUSA Jennifer Kerkhoff Muyskens — twelve days after Judge Roeca denied CT/V1's motion to terminate all visitation. This is the third time in five years that criminal prosecution was activated within days of a favorable custody ruling for Ms. Wang.

**5/13/2024** San Mateo County CPS closes the investigation (Referral No. 1310-7050-2514-8080290). Supervisor Brianna Padilla's final narrative finds the General Neglect allegation against the father "Unfounded" — noting "The father is acting protectively. No safety threats." An

independent California government agency investigated the same manufactured allegations that generated the January 15 FBI referral and rejected them entirely. See Dkt. 174, and 175 [Ex. A pp.110-111]

**5/17/2024**  The last supervised visit between Ms. Wang and her son. Rally documents a two-hour visit marked by playfulness, sushi-making, reading together, and laughter — consistent with five years of documented positive bonding. Nine days later, Ms. Wang was detained. See Dkt. 174, and 175 [Ex. A pp.195-212]

**6/1/2024**  CT/V1 moves to Denmark with the child and refuses to comply with any of Judge Roeca's May 2 visitation conditions. The child has had no contact with Ms. Wang since May 17, 2024. See Dkt. 174, and 175 [Ex. A pp. 213-231]

The sequence is dispositive. The FBI referral (January 15, 2024) and the CPS referral (January 17, 2024) See Dkt. 174, and 175 [Ex. A pp.103-138] arrived in the same two-day window, both following the November 30, 2023 judicial denial See Dkt. 174, and 175 [Ex. A pp. 113-138], both premised on CT/V1's manufactured narrative. The CPS investigation — conducted by independent social workers over four months — concluded the allegations were unfounded, the father was using proceedings to pursue family court objectives, and there were no safety threats. The FBI referral was never subject to any independent scrutiny because the Government will not identify who made it. That asymmetry is precisely what this motion seeks to remedy.

## ARGUMENT

## I.  THE OFFICER'S IDENTITY IS BRADY AND GIGLIO MATERIAL

Brady and its progeny impose on the prosecution a "duty to learn of" and disclose all "favorable, material information known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). That duty extends to state and local officers participating in a joint investigation or acting as the conduit for a federal referral, and encompasses information held orally by agents, not just pre-existing documents. Brady "represents a limited departure from a pure adversary model" by "requiring the prosecutor to assist the defense in making its case." *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985). Its

disclosure obligation "is for the purpose of allowing defense counsel an opportunity to investigate the facts of the case and... craft an appropriate defense." *Perez v. United States*, 968 A.2d 39, 66 (D.C. 2009).

Most critically, "the critical task of evaluating the usefulness and exculpatory value of the information is a matter primarily for defense counsel, who has a different perspective and interest from that of the police or prosecutor." *Miller v. United States*, 14 A.3d 1094, 1110 (D.C. 2011) (quoting *Zanders v. United States*, 999 A.2d 149, 163–64 (D.C. 2010)); Brady Outline, supra, at 7–8. The Brady Outline further provides that "it is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited." Id. at 8. The Government's assertion that it reviewed the January 15 email and found nothing discoverable is precisely the unilateral prosecutorial materiality assessment these authorities forbid. Prosecutors who "play games with justice and commit constitutional violations by secreting and/or withholding exculpatory evidence from the defense" act contrary to Brady's most basic command. *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011).

That concern is not abstract. Brandon L. Garrett, Adam M. Gershowitz & Jennifer Teitcher, *The Brady Database*, 114 J. Crim. L. & Criminology 185 (2024).

A 2024 study by Professors *Garrett, Gershowitz*, and *Teitcher* coded 808 Brady decisions from 2015–2019 and found courts identified Brady violations in approximately 10% of litigated claims, with prosecutors — not police — responsible for the majority of suppression episodes, and federal prosecutors accounting for a disproportionate share of violations relative to their share of national prosecutions. In an additional 65 cases courts agreed that prosecutors suppressed favorable evidence but refused relief on materiality grounds, and in 199 more cases courts disposed of Brady claims on materiality alone without ever resolving whether the evidence was favorable. That empirical record confirms that structural under-disclosure is not hypothetical; it is a recurring documented reality, and the Government's "we reviewed it and it's not discoverable" representation cannot substitute for judicial review. And because the study includes Brady claims involving punishment and sentencing, it reinforces that suppression of favorable information about how an investigation began, who triggered it, and what role victim-aligned actors played has constitutional significance even when the conviction itself is not in dispute.

10

This concern is heightened given the charging AUSA's disciplinary history. In pending proceedings before the D.C. Bar (Matter of Jennifer Kerkhoff Muyskens, No. 24-BD-038), the Office of Disciplinary Counsel has charged former AUSA Muyskens with multiple violations based on allegations that, in the 2017 DisruptJ20 prosecutions, she edited video evidence to remove exculpatory material, withheld additional recordings from the defense, failed to produce complete Jencks material, and made false representations to the grand jury, defense, and court — assuring them that videos were "complete" and "unredacted" when relevant segments had been omitted and other recordings were not produced. When the very prosecutor who signed this indictment faces formal charges that she previously altered and concealed evidence and misled courts about the completeness of discovery, the Court should be especially wary of allowing the prosecution team to decide for itself whether material about how this case was initiated and steered is "not Brady."

**The officer's identity is favorable and material on three independent grounds.**

First, the PSR's enhancement theory. The § 2A6.2(b) enhancements rest on the narrative that Ms. Wang harassed CT/V1 by "having [the victim] investigated by law enforcement" through IC3 filings. The timeline in Background Section D makes that narrative implausible on its face: the FBI was already open before the IC3 database was queried; the CPS referral made two days after the FBI referral was independently closed as unfounded after four months of investigation; and Rally reports covering the same period documented none of the distress CT/V1's experts claimed. Whether the investigation was opened by a neutral officer, or was channeled through CT/V1's network as one prong of a coordinated multi-agency escalation following the November 30, 2023 judicial denial See Dkt. 174, and 175 [Ex. A pp. 113-138]

, goes directly to the factual accuracy of the enhancement theory. Brady applies at sentencing. *United States v. Camick*, 796 F.3d 1206, 1221 (10th Cir. 2015); *Cone v. Bell*, 556 U.S. 449, 469–70 (2009). The Brady Outline confirms Brady covers favorable information bearing on "punishment and sentencing." Brady Outline, supra, at 10–11, 16–17. Due process independently prohibits a sentence based on materially false or unreliable information. *United States v. Tucker*, 404 U.S. 443, 447 (1972).

11

Second, the § 1001 materiality theory. Under *United States v. Tao*, 107 F.4th 1179, 1185 (10th Cir. 2024), § 1001 materiality requires an actual pending agency decision capable of being influenced. The Government confirms the FBI was already open before IC3 was queried and no one referred the complaints. The IC3 filings could not have influenced any pending decision. Knowing who initiated the referral — and when, relative to the IC3 filings — is prerequisite to the Tao analysis.

Third, impeachment of the investigation's independence. The January 15, 2024 FBI referral arrived two days before a CPS referral based on the same manufactured allegations — a CPS referral that an independent government agency subsequently closed as unfounded. Evidence that the FBI referral was similarly premised on CT/V1's manufactured narrative, routed through CT/V1's network rather than generated by neutral law enforcement, would be classic Giglio material. Favorable information includes "any information that might help the defense attack the government's case or mount an affirmative defense." Brady Outline, supra, at 7.

## II.  RULE 16 INDEPENDENTLY REQUIRES DISCLOSURE

Rule 16(a)(1)(E) requires production of documents material to preparing the defense. Materiality is not a heavy burden. *United States v. Budziak*, 697 F.3d 1105, 1111 (9th Cir. 2012). Rule 16(a)(2)'s protection for internal deliberative documents does not shield purely factual data — who authored a communication, when, from what agency. *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). The officer's name, title, agency, and the factual referral language are facts, not deliberations.

## III.  THE PROSECUTION TEAM CANNOT SHIELD ITS OWN REFERRAL SOURCE

Once a local officer takes the affirmative step of urging federal prosecution, that officer is acting on the government's behalf in the case, and the officer's identity and any relationship to the complaining witness or his agents are Brady/Giglio issues the Court — not the Government — must assess. *Kyles v. Whitley*, 514 U.S. at 437; JM § 9-5.002. Brady's "duty to learn" of favorable information encompasses state and local officers participating in a joint investigation or acting as the conduit for a federal referral. Brady Outline, supra, at 22–24. "The format of the information does not determine whether it is discoverable." JM § 9-5.002.

## IV.  IN CAMERA REVIEW IS WARRANTED IN THE ALTERNATIVE

12

Where the government represents it has reviewed its files and found nothing producible, but the defense presents a specific, articulable factual basis for believing otherwise, in camera review is the appropriate mechanism. *United States v. Olsen*, 519 F.3d 1096, 1105 (10th Cir. 2008). The Brady Outline synthesizes the applicable standard: pretrial Brady materiality is "more inclusive" than the post-conviction standard, prosecutors must disclose all "arguably material" favorable information, must "resolve doubtful questions in favor of disclosure," and in arguable cases the court "should insist upon reviewing" such information in camera before allowing non-disclosure. Brady Outline, supra, at 28–34. "The defendant, not the post-trial reviewing court, should have control over materiality to outcome." Id. at 30. Prosecutorial discretion "is not unlimited," and courts "have the obligation to assure that it is exercised in a manner consistent with the right of the accused to a fair trial." Id. at 32.

**Eight independent factors satisfy that standard here.**

First, the Government's own admissions establish the investigation-before-IC3 sequencing material to both PSR enhancements. Second, the FBI TFO has no record of when he queried the database. Third, the January 15, 2024 FBI referral and the January 17, 2024 San Mateo CPS referral arrived in the same two-day window, both following the November 30, 2023 judicial denial See Dkt. 174, and 175 [Ex. A pp. 113-138]

— a documented pattern of simultaneous multi-agency escalation the Government has never addressed. Fourth, the CPS investigation closed the same allegations as unfounded after four months of independent review, while the FBI referral has never been subject to any comparable scrutiny. Fifth, Gregory Ferbrache — CT/V1's Utah private attorney and local counsel in this case — misidentified himself to SFPD as a "court appointed legal victim advocate" in August 2020 while building a coordination channel with Utah investigators; his Utah law enforcement communications from 2020 to January 2024 have never been disclosed. Sixth, Chris Bertram's law enforcement credentials (retired UPD Deputy Chief, FBI National Academy graduate) match precisely the profile an FBI Task Force Officer would receive as "local law enforcement"; he filed a sworn declaration in Rappaport's case two weeks before the referral. Seventh, the empirical evidence on Brady under-disclosure confirms that the Government's "nothing discoverable" representation cannot substitute for judicial review. Eighth, charging AUSA Jennifer Kerkhoff Muyskens faces pending D.C. Bar disciplinary proceedings (Matter No. 24-BD-038) in which a

13

hearing committee found probable cause that she edited video evidence to remove exculpatory material, withheld recordings, and made affirmative misrepresentations to courts and juries about the completeness of discovery in prior federal prosecutions.

## V.  THE CVRA DOES NOT IMMUNIZE COUNSEL-DRIVEN INVESTIGATIVE COMMUNICATIONS FROM BRADY, RULE 16, OR DUE PROCESS

The Government invokes the CVRA for the uncontroversial proposition that crime victims may confer with prosecutors. Ms. Wang does not challenge that. She challenges undisclosed, outcome-shaping participation by CT/V1's private counsel and his investigative network in initiating and steering this federal prosecution. The Government's obligation under Brady is not to act strategically in limiting the scope of disclosure — that is "antithetical to its duty to 'transcend' its role as an adversary." *United States v. Bagley*, 473 U.S. at 675 n.6.

### A.  *Communications from victim's counsel to the Government are not privileged*

The attorney-client privilege protects confidential communications between lawyer and client made for the purpose of obtaining legal advice. It does not protect communications from the lawyer to an adversary or to law enforcement. Rappaport's letters and emails to ADA du Bain urging charges (Doc. 003745), suggesting investigative tactics (Doc. 003115), and providing factual characterizations of Ms. Wang were directed to adversaries of his client's interests as against Ms. Wang. They are not privileged. Any opinion work product may be redacted, leaving factual substance discoverable. Work-product protection dissolves upon disclosure to adversaries or third parties in circumstances that substantially increase the likelihood an adversary will obtain the materials.

### B.  *The documentary record establishes counsel was directing investigative steps — not merely conferring about victim impact*

The record is no longer based on inference. Official documents establish:

- Rappaport suggested the search warrant for Ms. Wang's phone; ADA du Bain confirmed adoption: "After discussing the matter, Michele and I have agreed to seek a search warrant." Email chain, January 3–6, 2020 (Doc. 003115).

14

- Rappaport's forum-shopping is recorded in San Mateo County DA's Office Investigative Narrative, Case No. 21-0120-01 (Inspector Broad, approved Senior Inspector Massey, January 27–28, 2021) — an official law enforcement document recording his own words.

- Ferbrache misidentified himself to SFPD as CT/V1's "court appointed legal victim advocate in Utah" to build a coordination channel with Utah investigators. SFPD Chronological Report of Investigation, page 32 of 32 (August 4, 2020, Doc. 003115). He is CT/V1's private Utah attorney and local counsel in this federal case (ECF 68).

- CT/V1's California counsel, Douglas Rappaport, provided Utah prosecutors with an altered and misleading version of Ms. Wang's civil stalking-injunction filing. The Provo court clerk confirmed in writing that the true and correct Request for Civil Stalking Injunction in Wang v. WS (V2), Case No. 180400131, is a 39-page document consisting of the verified request plus 34 pages of exhibits. (Ex. 1 pp. 320-327; CT Private Investigators List_Redacted) The version Rappaport supplied to Utah prosecutors was only 25 pages — a cover page, 5 pages of the request, and 20 pages of exhibits. Provo Police Report 20PR18778 then adopted Rappaport's narrative that Ms. Wang was "using the same evidence from different cases to file for protective orders and stalking injunctions against different male victims" and had reported two different men a year apart had posted the same nude photograph online — a theory used to obtain injunctions against both WS (V2) and CT (V1). That narrative depends entirely on the truncated, re-assembled version Rappaport provided. The full 39-page filing and standard civil stalking procedure confirm that the temporary injunction in Case No. 180400131 issued on January 23, 2018 was based solely on the January 22 petition and exhibits actually before Judge Low — not on nude-photo evidence that did not yet exist and was never part of that record. Rappaport's knowing presentment of an altered, incomplete filing to Utah law enforcement, and its adoption in an official police report disseminated to prosecutors, is itself classic Giglio material: it bears directly on the credibility of the victim's network and on whether this prosecution rests on neutral law-enforcement judgment or on a manipulated record assembled by interested private actors. (Ex. 1 pp. 320-327; CT Private Investigators List_Redacted)

15

CT/V1's network simultaneously deployed the FBI referral (January 15, 2024) and a San Mateo County CPS referral (January 17, 2024) premised on the same manufactured allegations — both following the November 30, 2023 judicial denial. See Dkt. 174, and 175 [Ex. A pp. 113-138]

- The CPS referral was independently closed as unfounded. The FBI referral was not.

These are documented acts of charge advocacy, investigative direction, evidence sharing, and official-status misrepresentation. "The critical task of evaluating the usefulness and exculpatory value of the information is a matter primarily for defense counsel." *Miller v. United States*, 14 A.3d at 1110; Brady Outline, supra, at 7–8.

### C.   These communications are Brady/Giglio and Rule 16 material

The communications are exculpatory: evidence that this case is the documented endpoint of Rappaport's years-long forum-shopping campaign — and that the same allegations generating the January 15 FBI referral were independently investigated by CPS and closed as unfounded — directly undermines the PSR's enhancement theory. They are impeachment material: Rappaport's financial and strategic stake in conviction, his documented characterizations, his adopted search-warrant suggestion, and his explicit forum-shopping statement are classic Giglio material. *United States v. Bagley*, 473 U.S. 667, 676 (1985). The Brady Outline confirms Brady covers favorable information bearing on punishment and sentencing. Brady Outline, supra, at 10–11, 16–17.

### D.   Due process independently prohibits privately steered prosecutions; Eubanks provides the factual analogy; disclosure is the remedy

Constitutional due process sets a structural floor: a criminal prosecution cannot be steered by private actors with parallel civil, financial, or custody stakes against the defendant. The prosecutor is "the representative not of an ordinary party to a controversy, but of a sovereignty... whose interest... is not that it shall win a case, but that justice shall be done." *United States v. Bagley*, 473 U.S. at 675 n.6.

In *People v. Eubanks*, 14 Cal. 4th 580 (1996), the California Supreme Court held that a corporate victim's payment of approximately $13,000 in investigative costs at the district attorney's request created a cognizable conflict of interest, because it tied the prosecutor "too closely" to a private party with its own stake in the prosecution and created a "reasonable possibility" the office

would not exercise discretionary functions evenhandedly. The court rejected the argument that only personal financial stakes qualify: institutional arrangements where the prosecutor depends, financially or structurally, on a private party with interests in the outcome create the same problem. A prosecutor "is not disinterested if he has, or is under the influence of others who have, an axe to grind against the defendant." Id. (quoting *Wright v. United States*). *People v. Eubanks* extended this principle to all phases — investigation, charging, and sentencing — and reaffirmed that the prosecutor must represent the People at large, not a victim or corporate complainant. The Supreme Court applies the same structural principle federally: *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 814 (1987).

The *People v. Eubanks* analogy is direct. Borland's $13,000 funded a single computer expert. Here the record reflects not simply a CVRA "right to confer," but years of victim-counsel-driven investigative direction: search-warrant proposals adopted by prosecutors; forum-shopping admissions recorded in official investigative narratives; a Utah private attorney misrepresenting himself as a court-appointed victim advocate to build a coordination channel with Utah investigators; a retained PI with FBI National Academy credentials filing declarations in Rappaport's cases on the eve of a federal referral; and — most strikingly — a simultaneous CPS referral two days after the FBI referral, based on the same manufactured allegations, which an independent government agency subsequently closed as unfounded. The January 15 FBI referral has never been subject to any comparable independent scrutiny. That asymmetry is the problem *People v. Eubanks* addresses.

In *Ganger v. Peyton,* 379 F.2d at 712. , the Fourth Circuit vacated a conviction where the same attorney prosecuted the defendant and simultaneously represented the victim in related civil litigation, holding that "attempting at once to serve two masters" substituted private vengeance for impartial enforcement of the criminal law. *Cantrell v. Commonwealth* 229 Va. 387 (Va. 1985) reversed a conviction where the victim's parents' lawyer both led the prosecution and sought custody of the defendant's child — concurrent criminal prosecution and custody advocacy, which is precisely the structure of Rappaport's conduct here. *Price v. Commonwealth* 72 Va. App. 474 (Va. Ct. App. 2020) applied the same rule where private counsel prosecuted while simultaneously representing the victim in civil litigation. *People v. Vasquez*, 39 Cal.4th 47, 61-62 (Cal. 2006) (

17

In *Ganger v. Peyton* 379 F.2d at 712, the Fourth Circuit vacated a conviction where the same attorney prosecuted the defendant and simultaneously represented the victim in related civil litigation. *Cantrell v. Commonwealth* 229 Va. 387 (Va. 1985) reversed a conviction where the victim's parents' lawyer led the prosecution while simultaneously seeking custody of the defendant's child — concurrent criminal prosecution and custody advocacy that is the precise structure of Rappaport's conduct. *Price v. Commonwealth* 72 Va. App. 474 (Va. Ct. App. 2020) applied the same rule where private counsel prosecuted while representing the victim in related civil litigation. *People v. Vasquez* 39 Cal.4th 47, 61-62 (Cal. 2006) recognizes that concurrent private civil or custodial interests create an "overwhelming probability" of conflict risking "substituting private vengeance [for] impartial application of the criminal law."

Ms. Wang does not ask the Court to presume a conflict. She asks only for the identity of the referral officer and the victim-counsel communications necessary to determine whether the investigation was in fact initiated and directed by neutral law enforcement — or by the same private network whose advocacy is documented in official records and whose simultaneous CPS referral was independently rejected as unfounded. Under the Brady Outline's pretrial standard, that evidence is "arguably material" and must either be disclosed or submitted for in camera inspection. Brady Outline, supra, at 29–32. Due process, Brady, and Rule 16 do not permit the Government to resolve that question by unilateral assertion.

### E.  The Government's CVRA argument does not reach the actual question

The Government's CVRA response sidesteps the actual issue: the extent to which Rappaport and his network functioned as de facto investigators, strategists, and gatekeepers whose advocacy — documented in official law enforcement records and parallel CPS filings — materially determined who was prosecuted, where, under what theory, and at what moment relative to the custody proceedings. The Government has not disputed that Rappaport communicated with federal law enforcement, and has not disclosed whether Ferbrache's coordination with Utah law enforcement intersected with the January 15 referral. Neither the CVRA, attorney-client privilege, nor the work-product doctrine justifies that non-disclosure.

18

**REQUESTED RELIEF**

Ms. Wang respectfully requests that the Court:

1. Order the Government, within seven (7) days, to disclose: (a) the full name, title, and agency of the 'local law enforcement' officer who sent the January 15, 2024 email referenced in ECF 164 at 2; and (b) the email and any attachments, with only deliberative language subject to redaction.

2. Order the Government to search for and produce all emails, letters, and other communications between federal prosecutors or FBI personnel and Victim 1, CT/V1's counsel (including Douglas Rappaport and Gregory Ferbrache), CT/V1's family members, or CT/V1's identified private investigators that: (a) request, recommend, or discuss initiation of federal charges; (b) suggest or advocate particular statutes, charging theories, venues, or investigative steps; or (c) provide factual narratives about Ms. Wang's alleged conduct beyond victim-impact statements.

3. In the alternative, conduct in camera review of: (a) the January 15, 2024 referral email and any attachments; (b) FBI case-opening documents reflecting the referral source and case-open date; (c) any communications between USAO or FBI personnel and CT/V1's counsel, family, or retained investigators — including Rappaport, Ferbrache, and Bertram — regarding initiation or direction of the federal investigation; and thereafter direct disclosure of the officer's identity and any non-privileged factual portions bearing on (i) who initiated the referral and (ii) whether the IC3 complaints played any actual role in investigative decisions material to the PSR's enhancements.

**CONCLUSION**

*Brady v. Maryland* is a rule of fairness. Its purpose is to ensure that the prosecution does not become the "architect of a proceeding that does not comport with standards of justice," *Brady v. Maryland*, 373 U.S. at 88, and that evaluating the usefulness of exculpatory information is a task for defense counsel, not for the prosecution deciding unilaterally what the defense needs to know. *Miller v. United States*, 14 A.3d at 1110.

Official law enforcement documents record Rappaport's own statement that he sought a jurisdiction willing to impose "significant repercussions" and his suggestion of a search warrant that prosecutors then adopted. An SFPD report records Rappaport's Utah-based private attorney misidentifying himself as a court-appointed victim advocate while building a coordination channel with Utah investigators. Chris Bertram — retired UPD Deputy Chief, FBI National Academy graduate, retained since December 2018 — filed a sworn declaration in Rappaport's case two

19

weeks before the January 15, 2024 FBI referral. And the AUSA who signed this indictment faces formal disciplinary charges that she previously altered and concealed evidence and misled courts about discovery completeness.

Most tellingly, the January 15, 2024 FBI referral and the January 17, 2024 San Mateo County CPS referral arrived in the same two-day window, both following the November 30, 2023 judicial denial See Dkt. 174, and 175 [Ex. A pp. 113-138] of CT/V1's emergency termination motion, both premised on the same manufactured allegations. An independent California government agency investigated the CPS referral over four months and closed it as unfounded — finding no safety threats and concluding the father was using the proceedings to pursue family court objectives. The FBI referral has never been subject to any independent scrutiny, because the Government will not identify who made it. That asymmetry — an independent government agency rejecting the same allegations that a nameless "local law enforcement" officer simultaneously referred to federal prosecution — is precisely what *Brady v. Maryland*'s rule of fairness requires the Court to examine.

In arguable cases, courts "should insist upon reviewing" Brady material in camera. Brady Outline, supra, at 32–34. This is that case. Ms. Wang respectfully requests that the Court grant this motion, or at minimum conduct in camera review, with any disclosure produced in sufficient time to address its impact at sentencing.

Respectfully submitted,

_____

KAILIN WANG, Defendant Pro Se

Dated: April 24, 2026

 Gmail

John Wang <yunlong88cong@gmail.com>

## Request for the Identity of the "Local Police Officer" who reported a 2019 Stalking Case in 2024

**John Wang** <yunlong88cong@gmail.com>                                                    Wed, Apr 22, 2026 at 10:50 PM
To: "Blanch, Joey (USAUT)" <joey.blanch2@usdoj.gov>, Richard Sorenson <richard_sorenson@fd.org>

John Wang sent on behalf of Kailin Wang, who dictated the message  (+1 801 709-0209); (+1 801-787-9755) (+1 801 361-8742)

The information in this email is intended solely for the use of the individual or entity to whom it is addressed and may contain proprietary, confidential, or privileged material, including attorney-client communications and information related to pending privileged litigation matters. If you are not the intended recipient, any review, dissemination, distribution, or copying of this message and any attached materials is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete all copies of this message and any attachments.

## I.    THE BASIC RULE

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . .violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

Today, *Brady* and its progeny impose on the prosecution a "duty to learn of"[1] and disclose to the defense all "favorable,"[2] "material"[3] information[4] "known to the others acting on the government's behalf in the case, including the police,"[5] a group commonly referred to as "the prosecution team."[6]  The prosecution must disclose this information "at such a time" and in such a manner "as to allow the defense to use the favorable material effectively"[7] – which, as a practical matter, means well before trial if not at the outset of the case, because "the due process obligation under *Brady* to disclose exculpatory information is for the purpose of allowing defense counsel an opportunity to investigate the facts of the case and, with the help of the defendant, craft an appropriate defense."[8]

Each of these requirements – what is favorable information, where the prosecution must look for it, how materiality must be assessed, when it must be disclosed, and in what format – has been analyzed by courts and is discussed in further detail below.  But in litigating *Brady* claims, the defense should never lose sight of the fact that *Brady* is the furthest thing from a technicality.  It is a "rule of fairness."[9]  The motivating force behind the Court's decision in *Brady* was the belief that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."[10]  The Court affirmed that a prosecutor should not be the "architect of a proceeding that does not comport with standards of justice."[11]

---

[1] *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), *see also* III *infra*.

[2] *Brady*, 373 U.S. at 87; *see also* II *infra.*

[3] *Brady*, 373 U.S. at 87; *see also* IV *infra*.

[4] *See* II.D & III.B.3 *infra* (explaining that the prosecution has an obligation to disclose favorable information whether or not it has been documented and whether or not it is itself admissible if it may lead to admissible evidence).

[5] *Kyles,* 514 U.S. at 437; *see also* III.B.2 *infra*.

[6] *See, e.g.,* DAG Guidance Memo, Step 1.A.

[7] *Lindsey v. United States*, 911 A.2d 824, 838 (D.C. 2006) (internal quotation and citation omitted).

[8] *Perez v. United States*, 968 A.2d 39, 66 (D.C. 2009).

[9] *Curry v. United States*, 658 A.2d 193, 197 (D.C. 1995) (internal quotations and citations omitted).

[10] *Brady*, 373 U.S. at 87.

[11] *Id*. at 88.

6

"By requiring the prosecutor to assist the defense in making its case, the *Brady* rule represents a limited departure from a pure adversary model."[12]  This is because "the prosecutor's role transcends that of an adversary: the prosecutor 'is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'"[13]  When litigating *Brady* claims, the defense should examine whether the prosecution is acting consistently with its obligation "to assist the defense in making its case" or whether it is acting strategically – *e.g.,* to limit the scope of disclosure or to delay the timing – which is antithetical to its duty to "transcend" its role as "an adversary."[14]

## II.    WHAT CONSTITUTES FAVORABLE INFORMATION?

### A.  Favorable information is any information that the defense can use to assist its defense either offensively or defensively:

1.    Favorable information is any information that might help the defense attack the government's case or mount an affirmative defense.  In determining what must be disclosed under *Brady* "the [prosecution's] guiding principle must be that *the critical task of evaluating the usefulness and exculpatory value of the information is a matter primarily for defense counsel*, who has a different perspective and interest from that of the police or prosecutor."  *Miller,* 14 A.3d 1094, 1110 (D.C. 2011) (quoting *Zanders v. United States*, 999 A.2d 149, 163-64 (D.C. 2010) (emphasis added).

2.    Certain categories of information are listed below, *see* II.E. *infra*, but ultimately what is favorable to the defense in a case will be fact-specific.

3.    Thus, defense counsel should be prepared to explain (*ex parte* when appropriate) why certain types of information might be favorable in light of the government's apparent theory and the defendant's defense.

---

[12] *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985).

[13] *Id.* (quoting *Berger v. United States,* 295 U.S. 78, 88 (1935)); *Miller,* 14 A.3d at 1107 ("the constitutional command of *Brady* unambiguously prescribes the prosecutor's priorities: The prosecutor's obligation is to seek justice before victory") (internal quotation and citation omitted).

[14] *Bagley*, 473 U.S. at 675 n.6; *see also Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011) (expressing dismay that "prosecutors, so long after *Brady* became law, still play games with justice and commit constitutional violations by secreting and/or withholding exculpatory evidence from the defense").

## CERTIFICATE OF SERVICE

I hereby certify that on the date indicated above, a true and correct copy of the foregoing was served via electronic mail upon:

Joey L. Blanch, Assistant United States Attorney, joey.blanch2@usdoj.gov; Richard Sorenson (former counsel, courtesy copy), richard_sorenson@fd.org; Conrad Kaufman, U.S. Probation Officer, conrad_kaufman@utp.uscourts.gov.

Dated: April 24, 2026

_____
KAILIN WANG

21