LAW OFFICES OF
**DOUGLAS L. RAPPAPORT**
260 CALIFORNIA STREET, SUITE 1002
SAN FRANCISCO, CA 94111
(415) 989-7900
FAX (415) 989-7950

June 22, 2020

**Via FedEx**

Donald du Bain, Assistant District Attorney
Office of the District Attorney
350 Rhode Island Street
North Building, Suite 400N
San Francisco, CA 94103

*Re: People v. Kailin Wang*
*San Francisco Case Number 19016407–*
*Wang's Perjury*

Don,

As discussed, normally one more felony charge doesu't add much to the overall custody time calculation, but charging felony perjury (PC §118) here makes sense for two equally important reasons. First, it makes your job so much easier because regardless of Wang's alleged defenses on the hundreds of internet posts, you can easily convict her of perjury with very little effort. And more importantly, given that Ms. Wang is unable to control her anger and has continued to harass ███████ ████ even while she is being prosecuted, it is a certainty that ███████ ████ will not be her last victim. A perjury conviction is exactly the scarlet letter that is needed to ensure that future victims, prosecutors and judges understand who they are dealing with when Ms. Wang inevitably finds herself back in court down the road.

**Background**
After meeting on Tinder, 25 year old ███████ ████ and 35 year old Kailin Wang had a total of two dates in late February and early March, 2018, both romantic. As a result, Ms. Wang became pregnant and had a child, ████ in November, 2018. Following the birth, Ms. Wang declared Los Angeles was her residence on the birth certificate and filed a paternity/child support case in Los Angeles. ███████ got himself voluntarily served, and shortly thereafter she began stalking him. She then sent ███████ attorney an email on December 28, 2018, stating that she and the baby were between three states, California, Utah and New York, but she maintained residence in New York. Consequently, she requested that ███████ agree to transfer jurisdiction for the family law case from Los Angeles to San Francisco for the convenience of both parties, and he agreed. (The December 28, 2018 email is attached hereto as Exhibit "A")

1

003745

**Exhibit G:**
**Email from Rappaport to ADA Du Bain and Martinez, 1.6.20**

**RE:** ███████ ████████ **v. Kailin Wang**

████████████████████████████████

Mon 1/6/2020 9:08 AM

To: du Bain, Donald (DAT) ████████████████

Cc: Martinez, Michele (POL) ████████████

Don & Michelle,

Good morning. Thank you for this update and to poorly paraphrase Tennyson, 'Tis better to have obtained a search warrant and not gotten into the phone than never to have tried at all.'   If you do obtain access, there is no doubt that it will contain a treasure-trove of incriminating information.

Doug

**From:** du Bain, Donald (DAT) █████████████
**Sent:** Friday, January 3, 2020 5:38 PM
**To:** ████████████
**Cc:** Martinez, Michele (POL) ███████████████
**Subject:** RE: ██████ █████ v. Kailin Wang

Doug,

Thanks for your suggestion.

After discussing the matter, Michele and I have agreed to seek a search warrant for the defendant's phone.  Since we don't have the defendant's password, our efforts may be futile but we'll try our best.

Best regards,
Don

Donald du Bain
Assistant District Attorney
Office of the District Attorney
350 Rhode Island Street
North Building, Suite 400N
San Francisco, CA 94103

████████████████████

*The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you*

**From:** ██████████████████████
**Sent:** Thursday, December 12, 2019 12:24 PM
**To:** du Bain, Donald (DAT) ████████████████████; Martinez, Michele (POL) ██████████████
**Subject:** ██████ █████ v. Kailin Wang

This message is from outside the City email system. Do not open links or attachments from untrusted sources.



| **SAN MATEO COUNTY DISTRICT ATTORNEY'S OFFICE** | Page 1 |
|---|---|
| **400 COUNTY CENTER, 3RD FLOOR    REDWOOD CITY, CA 94063    650-363-4636**<br>**NARRATIVE - Opening Narrative** | 21-0120-01 |

## SUMMARY:

On 1/20/2021, I was assigned this case by Chief Inspector John Warren. I reviewed the attached documentation and found that the case involved the passing of a fictitious subpoena by Suspect Wang. Wang apparently created and submitted a fictitious Utah subpoena to a pre-school located in Menlo Park in violation of PC 470(a)/(c) - Forgery and PC 166(a)(4) - violation of a restraining order. The records indicate that there is a substantial history concerning Wang committing similar acts, domestic violence, and stalking.

## INVESTIGATION:

**1/21/2021:**

Because of a possible child abduction risk and/or threat to the personal safety of the involved parties in this case, Senior Inspector Bill Massey sent an email (attached) to Attorney Doug Rappaport (representing the victims) and Menlo Park Police Department Sgt. Ed Soares whereby he introduced them to each other and encouraged them to open a dialog about ensuring the safety of the victims in this case.

**1/26/2021:**

On 1/26/2021, I contacted Attorney Doug Rappaport regarding this case. He told me the following:

**STATEMENT OF ATTORNEY DOUG RAPPAPORT:**

Rappaport stated that he is representing ▮▮▮▮▮ (sic) ▮▮▮▮▮ and ▮▮▮▮▮ son, ▮▮▮▮ ▮▮▮▮▮▮ had a brief relationship with Kailin Wang that resulted in their son ▮▮▮▮ ▮▮▮▮▮ (2 years old). Rapport said that Wang is "absolutely insane" and she has significant mental health issues. Wang also has a history of becoming involved in relationships with men and then committing crimes that have included stalking and the creation of false evidence. During one relationship, Wang falsified evidence that resulted in a false arrest.

Rappaport said that ▮▮▮▮▮ has dealt with numerous legal issues concerning Wang. Wang currently has a stalking case filed against her by the San Francisco District Attorney's Office. The next appearance on the San Francisco stalking case is currently set for March. As a result of stalking case and other issues, ▮▮▮▮▮ currently possess full legal custody of their son. Wang is currently limited to minimal supervised visits wherein she is not allowed to take photographs of their son because the court has found her to be a flight risk.

Rappaport stated that he and ▮▮▮▮▮ believe Wang is a danger to both ▮▮▮▮▮ and their son. She has made threats to kill their son in the past and she is mentally unstable.

Rappaport stated that Wang is believed to currently reside in Utah. Wang has listed her address 2481 Fairway Drive, Spanish Fork, Utah with the courts. Wang has also been utilizing the Utah courts for the current child custody case where she is representing herself. As part of her custody case, Wang has subpoena rights wherein she has previously legally utilized the system to subpoena records related to their child. The process requires Wang to make a subpoena request through the court system. Other party members are then given an opportunity to review the subpoena and raise an objection if desired.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 14860 | BROAD, MATT | 01/27/2021 | 80202 | MASSEY, BILL | 01/28/2021 |



which he provided to the SMDAO. The two legitimate subpoenas were a Comcast subpoena and a subpoena for medical records. Both of which were legitimately obtained via the process previously discussed.

Rappaport also stated that he and his client were concerned because Wang was not supposed to know where their child was attending school and they did not know how she made that determination. They therefore feared that Wang might be in the area, which possessed a safety concern based upon Wang's prior history and behavior.

I discussed the jurisdictional issues involving this case; primarily the fact that Suspect Wang appears to reside in Utah. Rappaport stated that he did not have any contacts in Utah that he believed would take this case seriously and he did not want the case to be investigated by San Francisco (jurisdiction with the stalking criminal case and protective order) based upon his belief that the San Francisco District Attorney's Office would not prosecute the case in a manner that would result in any significant repercussions for Wang.

During the interview, I told Rappaport that the San Mateo Co District Attorney's Office did not possess the capability to assure the safety of his client or the child. I further advised him to contact the Menlo Park Police Department to discuss safety related issues. Rappaport stated he understood and did not expect the SMCDAO to do anything other than investigate the alleged forgery allegation.

***END OF INTERVIEW***

**1/27/2021:**
On 1/27/2021, I compared the fictitious subpoena to the subpoena that was reportedly utilized to create the fictious subpoena that was sent to the preschool. I observed the following:

Subpoena dated 6/4/2020 for Comcast records:
- The header and first page of this subpoena possessed the same information that was contained on the reportedly fictitious subpoena.
- The second page of the subpoena was clearly different, wherein it requested records from Comcast.
- The third pages of both subpoenas were identical. They both were dated 6/4/2020 and both possessed an identical signature and court stamp/seal. The signature and stamp clearly appeared to be the same document in both subpoenas.

Attorney Rappaport previously told me that the fictitious document was a combination of two prior subpoenas / court orders. He said the second order was for medical records, was valid, and appeared to be attached to the fictitious subpoena for the purpose of making the document look valid. I could not find the order that was attached to the fictitious subpoena within the documents provided by Rappaport.

From further review of the documents provided by Attorney Rappaport, I observed that Suspect Kang was prosecuted in Spanish Fork City, Utah for 50 counts of electronic communication harassment in

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 14860 | BROAD, MATT | 01/27/2021 | 80202 | MASSEY, BILL | 01/28/2021 |

**Exhibit H:**
**1.20.21 San Mateo Police Report filed by Rappaport**

## SAN FRANCISCO POLICE DEPARTMENT
## CHRONOLOGICAL REPORT OF INVESTIGATION    Page 32 of 32

| DATE | TIME | ACTIVITY |
|---|---|---|
|  | 1345 | I booked evidence received from Sgt. Rodriguez into property, and retained the Thumb drive. |
|  | 1500 | I received a phone call from Gregory Ferbrache who identified himself as Th███████'s court appointed legal victim advocate in Utah. Ferbrache explained that ███████ is the victim of false reports in Utah, and believes that there is evidence in San Francisco that would be useful to the investigators in Utah. Ferbrache told me that he is not requesting that I provide him with anything, he just wants to help point Utah Investigators in the right direction. I asked Ferbrache to email me a request. |
| 8/4/20 | 1150 | I received an email request from Ferbrache. Retained in case file. Ferbrache described evidence used against T███████ in Utah, and asked if the same evidence was used in San Francisco. |
|  | 1210 | Retrieved evidence (180132399) from Property Control. Evidence includes Screen shots from text messages, request for civil stalking injunction, and submission to District Attorney Victim Services. |
|  | 1229 | I contacted Ferbrache and advised him that I could not divulge any information to him regarding an open case, but he can provide my contact information to the investigators in Utah if they have any questions for me. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

GREGORY FERBRACHE (Utah Bar No. 10199)
FERBRACHE LAW
2150 South 1300 East, Suite 500
Salt Lake City, Utah 84106
Phone: (801) 440-7476
Email: gregory@ferbrachelaw.com

---

## THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br><br>KAILIN WANG,<br><br>Defendant. | **MOTION FOR PRO HAC VICE ADMISSION**<br><br>Case No. 2:24-cr-00163-TS-1<br><br>District Judge Ted Stewart<br>Magistrate Judge Daphne A. Oberg |

I move for the pro hac vice admission of Douglas L. Rappaport, Esq. as counsel for

Crime Victim-1 in accordance with The Crime Victim Rights Act, 18 U.S.C. § 3771 et seq., and I

consent to serve as local counsel. I am an active member of this court's bar. Attached hereto as

Exhibits 1 and 2 are the Application and Proposed Order, and the admission fee will be paid to

the court at the time of filing. Attached hereto as Exhibit 3 is the Notice of Appearance For

Crime Victim-1. Mr. Rappaport will electronically file Exhibit 3 after the court approves this

Motion for Pro Hac Vice Admission and accepts Mr. Rappaport's registration for CM/ECF. I

certify that I have verified with the Applicant that the information contained in the application is

true and accurate.

Dated: April 17, 2025

FERBRACHE LAW

Gregory Ferbrache, Esq.

# EXHIBIT 1

███████ Utah Private Investigators **Chris Bertham and  Patrick Adams** Utah Private Investigator. Chris Bertham has been retained continuously by ██████ since █████ber 2018-Present  his duties include, obtaining our child's Utah Birth Certificate on 01/17/19 before DNA genetic testing proved ████████ to be the father of the child.

Chris Bertram is also hired to follow, surveil, monitors the Wang's in Utah, appear at her Utah hearings, and obtaining Wang's Juvenile Court records recently on 01/09/23 from when she was 15 years old, and publicly filing them to smear campaign her  in California in violation of WIC 827.  Patrick Adams is a Utah PI who ████████████ conduct *unlawful pre-text method to obtain my Mental Health records by hiring investigators who pretended to be from my Public Defender's office attempting to obtain my records.*



HOME | ABOUT US | TEAM | ASIP | CONTACT US

**Chris D. Bertram**
**Lou F. Bertram**
(801) 944-7310
P.O. Box 712532
SLC, UT 84171



## Lou F. Bertram

Founder of Bertram and Associates, has over 45 years of investigative experience and is a retired Special Agent with the Federal Bureau of Investigation (1968-1988). Lou started Bertram and Associates in 1989 and focused the business on private investigations, security consulting, including security consulting services during the 2002 Winter Olympics for a Fortune 500 Top 50 company.

Lou also taught at Salt Lake Community College as an adjunct professor for 20 years. He has run Service Industries, an alcohol training and liability program, since 1989. He is a court certified expert in Utah Dram Shop law and police operations. Lou is a third generation law enforcement officer.



## Chris D. Bertram

Chris has 25 years of law enforcement and investigative experience with a major county sheriff's office and police department. He retired as a Deputy Chief from the Unified Police Department of Greater Salt Lake / Salt Lake County Sheriff Office. Chris has a Master of Arts in Homeland Defense and Security from the Naval Postgraduate School (NPS) in Monterey, CA., and a MBA from City University of Seattle. He is a graduate of the FBI National Academy Session 223 at Quantico, VA in 2005. In addition, he is a graduate of the FBI Command College (2003) and Utah POST Command College (2004).

Chris has a wide range of investigative experience, law enforcement operational and tactical proficiency as well as homeland security and intelligence knowledge. He served with several federal and local investigative task forces. He was named Utah's Deputy Sheriff of the Year in 1997. Chris started his work with Bertram and Associates in 1990. He also teaches as an adjunct professor and assistant professor at both the college and university level. Chris is the fourth generation of law enforcement in his family.

AA 1000

Bureau of Vital Records
Vital Records Receipt

July 28, 2020

2020 JUL 30  PM 1:08

FOURTH ........ ....
PROVO

Request Number:  3036839
Request Type:    Counter
Customer Name:   Chris Bertram

| Description | Quantity | Amount |
|---|---|---|
| Birth Certificate   1/17/2019 | 1 | 20.00 |
| Total Charges | | 20.00 |

Payment Method(s): Credit

Clerk: TiffanyFitzpatrick

Bureau of Vital Records
Vital Records Receipt

July 28, 2020

Request Number:  3036839
Request Type:    Counter
Customer Name:   Chris Bertram

| Description | Quantity | Amount |
|---|---|---|
| Birth Certificate | 1 | 20.00 |
| Total Charges | | 20.00 |

Payment Method(s): Credit

Clerk: TiffanyFitzpatrick

3

AA 999

DOUGLAS RAPPAPORT (136194)
LAW OFFICES OF DOUGLAS L. RAPPAPORT
260 California Street, Suite 1002
San Francisco, CA 94111
Telephone:    (415) 989-7900
Facsimile:    (415) 989-7950
Email:        admin@sfcrimlaw.com
Attorneys for Petitioner,
████████  ████████

ELECTRONICALLY

**F I L E D**

*Superior Court of California,*
*County of San Francisco*

**01/20/2023**
**Clerk of the Court**
BY: TIM KYU

**Deputy Clerk**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

In re the Matter of:

████████  ████████

          Petitioner,

     and

KAILIN WANG,

          Respondent.

Case No.:  FDV-19-814465

**DECLARATION OF CHRIS BERTRAM**

I, Chris Bertram, do hereby declare:

1.      I am a licensed private investigator in Utah. I know personally the matters stated herein.  If called as a witness, I could and would competently testify thereto.

2.      As part of my investigative work on this case, in September, 2022, I submitted a GRAMA (Utah's equivalent of a FOIA) to the Provo Police Department seeking information including emergency calls made to addresses where the Wang family had previously lived, including on S 990 W in Provo.

3.      In response, the Provo Police Department produced a redacted report pertaining to an emergency response on July 28, 1998 at 11:01pm, to S 990 W which resulted in Wang's

1

*In re the Matter of* ████ *v. Wang*, Case No.:  FDV-19-814465; DECLARATION OF CHRIS BERTRAM

arrest for aggravated assault against her parents.

4.    A September 13, 2022 letter from the Provo Police Department, which shows that the July 28, 1998 police report was produced as responsive to my GRAMA request, is attached hereto as Exhibit A.

5.    Contrary to Ms. Wang's allegations, this document was legitimately obtained pursuant to a Utah GRAMA request.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:  January 19, 2023

DocuSigned by:

*Chris Bertram*

CHRIS BERTRAM

2

*In re the Matter of* ███ *v. Wang*, Case No.:  FDV-19-814465; DECLARATION OF CHRIS BERTRAM

## SAN FRANCISCO POLICE DEPARTMENT
## CHRONOLOGICAL REPORT OF INVESTIGATION    Page 32 of 32

| DATE | TIME | ACTIVITY |
|---|---|---|
| | 1345 | I booked evidence received from Sgt. Rodriguez into property, and retained the Thumb drive. |
| | 1500 | I received a phone call from Gregory Ferbrache who identified himself as Th████'s court appointed legal victim advocate in Utah. Ferbrache explained that ████████ is the victim of false reports in Utah, and believes that there is evidence in San Francisco that would be useful to the investigators in Utah. Ferbrache told me that he is not requesting that I provide him with anything, he just wants to help point Utah Investigators in the right direction. I asked Ferbrache to email me a request. |
| 8/4/20 | 1150 | I received an email request from Ferbrache. Retained in case file. Ferbrache described evidence used against T████████ in Utah, and asked if the same evidence was used in San Francisco. |
| | 1210 | Retrieved evidence (180132399) from Property Control. Evidence includes Screen shots from text messages, request for civil stalking injunction, and submission to District Attorney Victim Services. |
| | 1229 | I contacted Ferbrache and advised him that I could not divulge any information to him regarding an open case, but he can provide my contact information to the investigators in Utah if they have any questions for me. |
| | | |
| | | |
| | | |
| | | |

SFPD 298 (10/76)

003115

GREGORY FERBRACHE (Utah Bar No. 10199)
FERBRACHE LAW
2150 South 1300 East, Suite 500
Salt Lake City, Utah 84106
Phone: (801) 440-7476
Email: gregory@ferbrachelaw.com

---

## THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br><br> KAILIN WANG, <br><br> Defendant. | **MOTION FOR PRO HAC VICE ADMISSION** <br><br><br> Case No. 2:24-cr-00163-TS-1 <br><br><br> District Judge Ted Stewart <br> Magistrate Judge Daphne A. Oberg |

I move for the pro hac vice admission of Douglas L. Rappaport, Esq. as counsel for Crime Victim-1 in accordance with The Crime Victim Rights Act, 18 U.S.C. § 3771 et seq., and I consent to serve as local counsel. I am an active member of this court's bar. Attached hereto as Exhibits 1 and 2 are the Application and Proposed Order, and the admission fee will be paid to the court at the time of filing. Attached hereto as Exhibit 3 is the Notice of Appearance For Crime Victim-1. Mr. Rappaport will electronically file Exhibit 3 after the court approves this Motion for Pro Hac Vice Admission and accepts Mr. Rappaport's registration for CM/ECF. I certify that I have verified with the Applicant that the information contained in the application is true and accurate.

Dated: April 17, 2025

FERBRACHE LAW

Gregory Ferbrache, Esq.

DARRICK T. CHASE, ESQ. (CSB #151256)
KAYE●MOSER●HIERBAUM ●FORD LLP
101 California Street, Suite 2300
San Francisco, CA   94111
Telephone:  (415) 296-8868
Facsimile:  (415) 495-1771
Email:      dchase@kayemoser.com

Attorneys for Petitioner
██████████ ████████ ████████

**F I L E D**
**ENDORSED**
San Francisco County Superior Court

MAR - 4 2019

CLERK OF THE COURT
BY: ─────── DENNIS TOYAMA
                    Deputy Clerk

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

████████ ████████ ████████

Petitioner,

v.

KAILIN WANG

Respondent.

) Case No. FDV-19-814465
)
) **DECLARATION OF** █████████
) **STANFORD** ██████ **IN**
) **SUPPORT OF THIS REQUEST FOR**
) **DOMESTIC VIOLENCE**
) **PROTECTIVE ORDERS AND**
) **CUSTODY ORDERS**
)
)
) Date: March 6, 2019
) Time: 8:30 a.m.
) Dept: 404
)
)
)
)
)
)
)

I.    **Update**

1.    This declaration supplements the declaration of February 15, 2019 by providing additional information and updating the court on events that have taken place since then, including further disturbing actions that lead me to believe my son is not healthy or safe.

II.    **Ms. Wang is Stalking Me and My Family**

2. Since my February 15, 2019 declaration, my lawyer has been able to further quantify the harassment and stalking that is targeting me and my family. Exhibit Z is an index of over 100

1

The person she had traveled to find is the victim in the Utah criminal prosecution against Kailin.

## IV.    I Am Terrified For The Safety Of My Son

15. I don't know where Ms. Wang is. She has disappeared and has thus far successfully evaded service of this Court's February 15, 2019 DV-110 Temporary Restraining Order (CLETS-TRO).

16. I don't know where my son is. I desperately fear that he is in danger, and given Ms. Wang's extreme conduct toward me and others I believe that any other reasonable parent would feel the same way.

17. I've learned that Ms. Wang has mental health issues. (2/15/2019 RDVRO, Exhibits L and I.)

18. The pace of the incoming harassment shows that she's compulsive.

19. She is not acting rationally. Publishing this unlawful content destroys my prospects, network, and life, including my ability to provide for my child.

20. Her most disturbing posts are about dead babies.

21. She also posts that the baby is sick, starving, and has severe jaundice. Infants require around the clock care. Ms. Wang's posts don't suggest that my son is okay. Instead they suggest that he is sick, and that she is full of compulsive rage. He's not getting the care that he needs, and she enjoys dangling an infant in the crosshairs of her sick stalking campaign.

22. I have trouble sleeping. I have trouble concentrating. My mind is consumed with what she will do next, and when can I rescue my son. I need to know that my son is safe.

## V.    ███████ Will Be Safe With Me

23. I will strive every day to be the best father to this little boy. I know that my son will thrive in our care. When I say "our" I mean, yes, primarily me as the father, but I also I have an incredible family alongside me and we, as a team, embrace this baby with unwavering love and support. He will thrive; be treasured; and, he will be the light of our lives.

24. The evidence indicates that Ms. Wang wants to destroy me, and everyone related to me. Who is more related to me than the infant in her care?

## VI.    Ms. Wang is Evading Service and Hiding Herself and ███████

25. **Attempted Process Service in Utah**: Ms. Wang was in Spanish Fork, Utah on February 11, 2019 for a pretrial conference in Spanish Fork City v. Kailin Wang, Case No. 171301350 (filed

November 22, 2017) on 20 counts of criminal harassment. My investigators witnessed Ms. Wang's mother and Ms. Wang arrive at the Court house for her hearing. They had the baby with them.

26. Beginning on February 15, 2019, I attempted, through the Office of the Utah County Constable to serve Ms. Wang at her parents' home in Spanish City. I believed that Ms. Wang was with her parents and we would be able to effect service at her parent's home.

27. In Mr. Chase's email to Ms. Wang on 12/27/18, he said, "I understand you are residing with your parents at 2481 Fairway Drive, Spanish Fork, UT 84660. Please confirm that for me." Ms. Wang's reply to Mr. Chase on 12/28/18 said, "I am currently in between 3 states, and am only in Utah due to my pending case which requires my mandatory monthly appearances. And ███ has been in between New York, Utah and California since birth. The Utah address can be used as a mailing address only."

28. See, Exhibit J-1, document titled AFFIDAVIT OF NON-SERVICE. The affidavit lists 9 attempted serves with brief descriptions.

29. Ms. Wang's father refused to cooperate. It is not credible that her parents did not have a contact number for Kailin, did not attempt to contact her, and claimed they had no idea where she was. But, if they had the baby, and they had no idea where she was, then, again, she must have left the baby with her parents.

30. Utah Constable Ben Stowell went in person to see Ms. Wang's criminal defense lawyer, Ed Brass, at Mr. Brass' office on 2/19/2019, identified himself, that he had process to serve for Ms. Wang, and requested that Mr. Brass accept service for her. Constable Stowell reports that he was told by Mr. Brass' secretary that **Ms. Wang had instructed the office to not accept service** for her. See, Exhibit K-1, AFFIDAVIT ON NON-SERVICE.

31. Mr. Chase emailed Mr. Brass on February 20, 2019. Mr. Chase requested Mr. Brass notify Ms. Wang that there was a DV-110 Temporary Restraining Order (CLETS-TRO) to be served on her, and other required documents which were itemized in the email, requested Mr. Brass ask Ms. Wang to allow a meeting with the Utah Constable to effect service of the listed documents.

32. Mr. Chase did not receive a reply. See Exhibit L-1. I believe it is reasonable to infer that Mr.

# EXHIBIT 2

221B Partners, a Private Investigations Company a group of known I███████ hired by ████████ since December 2018-Present t falsely incriminate Wang. As part of their duties they capture tens of thousands of pages of Page Vault Social Me███████s where ████████ pays them hourly to Stalk my Twitter, Facebook, ████████, and other Court Watcher, Reporters and Social Media Activity, including thousands of pages of Social Media Activity that has nothing to do with ████████ These PI's range from $300-$500/hr.

221B Partners, a Private Investigations Company made up of members from Jensen Hughes Formerly Hillard and **JENNIFER MACKOVJAK, PARTN**████████ listed as one of the 7 Expert Witnesses for ████████ DV Trial per his Trial Brief filed on 10/15/19 has worked with the ████████ continuously since December 2018-Present.

221B Partners **CHRIS BRENNER, SENIOR DIRECTOR** has also worked for ████████ since December 2018-Present and was flown in by ████████ from Chicago to appear in person for our DV Trial 10/18/22 through 10/20/22, he was present in the San Francisco Superior Court Dept. 416 for all three days.

221B Partners **ADAM ZOLL, SENIOR DIRECTOR** has worked for ████████ since December 2018-Present, and has conducted Private Investigations, Skip Tracing, Pre-Texting for ████████ including obtaining Wang's DMV records, Minors Birth Certificate before ████████ DNA test came back, amongst other PI activities.



# WHO WE ARE

**221B Partners** works with clients across a range of industries to help them solve problems by providing information and intelligence to support their decision-making processes. Whether a client is considering a complex business transaction or potential partnership, interested in augmenting its legal strategy, or facing internal or external business risks including fraud, competition, unfair market practices, or virtual or actual threats to their brand integrity or employees, 221B Partners can help. We design and implement custom, legal and ethical research strategies to support successful resolutions and outcomes.

## OUR EXPERIENCE

Our partners' backgrounds include more than 50-years' combined experience domestically and internationally across law enforcement, journalism, public-interest research, and investigations consulting. We hold undergraduate and advanced academic degrees in criminal justice, public administration, Russian/Soviet studies, and journalism.



### JENNIFER MACKOVJAK, PARTNER

There were moments when Jennifer was investigating narcotics trafficking and violent crimes, insurance fraud, identity theft, homicides and arresting suspects in major crimes cases in New York City as a senior detective investigator in the Manhattan District Attorney's Office when she would stop and remember her bookshelf as a young girl in Cleveland. Lined across it were back-to-back copies of books detailing the heroics and imaginative sleuthing of Leroy Brown, the eponymous hero of the Encyclopedia Brown mysteries which inspired her as a young reader.

READ MORE +

**p:** 312.810.6257 | **e:** jmackovjak@221bpartners.com | **l:** LinkedIn



### ANDREW KEITH, PARTNER

In the practice of corporate investigations, Andrew discovered an unanticipated outlet for the tools he nurtured and relied on as a restless expatriate and journalist more than two decades ago. 221B Partners' clients benefit from his tenacious curiosity hitched to his storytelling ability. He combines these with the professional and interpersonal improvisational skills, all of which were developed as he navigated the fluid and shifting social and economic landscape in Russia, where Andrew began his career.

READ MORE +

**p:** 312.806.6257 | **e:** akeith@221bpartners.com | **l:** LinkedIn



### AMANDA MARIGLIANO, SENIOR DIRECTOR + OPERATIONS MANAGER

Fortunate to have landed at an investigations firm early on in her professional career, Amanda was taught and mentored by some of the best investigators in the industry, including 221B founding partners, Jennifer and Andrew.

READ MORE +

**p:** 312.806.6257 | **e:** amarigliano@221bpartners.com | **l:** LinkedIn



### CHRIS BRENNER, SENIOR DIRECTOR

Like his colleagues, Chris' career path was influenced by early exposure to fictional problem solvers including Encyclopedia Brown, The Three Investigators, Sherlock Holmes and John Grisham's protagonists. When he wasn't busy reading, you could find Chris tinkering: He sent his first email over a 14.4 kbps modem, was providing "tech support" to family members by first grade and, years later, programming his TI-83+ graphing calculator to do his homework in high school. As an investigator, he has been able to merge these interests.

READ MORE +

Case 2:24-cr-00163-TS     Document 179-1     Filed 04/28/26     PageID.10218     Page 23 of 327



### ADAM ZOLL, SENIOR DIRECTOR

While others run from complexity, Adam races toward it. In a career spent in corporate investigations and journalism, he has always embraced the challenge of understanding and communicating the deeper causes and dynamics at play in any given situation.

READ MORE +

**p:** 312.806.6257 | **e:** azoll@221bpartners.com | **l:** LinkedIn

221B Partners

5547 North Ravenswood Avenue, Suite 406

Chicago, Illinois 60640

Map Us

Home

Who We Are

What We Do

Contact

221B Partners PLLC operates under Illinois Private Detective License No. 117-001844

**DOUGLAS L. RAPPAPORT (SBN 136194)**
Law Offices of Douglas L. Rappaport
260 California Street, Suite 1002
San Francisco, CA 94111
Telephone: 415-989-7900
Facsimile: 415-989-7950

Attorney for Petitioner
██████████ ██████████ ██████████

ENDORSED
FILED
San Francisco County Superior Court

OCT 1 5 2019

CLERK OF THE COURT
By: _____ NESTOR PANELO
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

██████████ ██████████ ██████████,

Petitioner,

v.

**KAILIN WANG,**

Respondent.

_____/

Case No. FDV-19-814465

**TRIAL BRIEF**

This Trial Brief is offered pursuant to California Rule of Court 5.394.

**I.    Brief Summary of the Case**

*Background*

Valentine's Day, 2018 was a day that would change Petitioner ██████████ ██████████'s life forever. At twenty-five years old, he had recently graduated from Carnegie Mellon and moved from the East Coast back to the San Francisco Bay Area where he began his first "real" job at a tech company. He was lonely, and turned to Tinder, a dating/hook-up app. There, he connected with Kailin Wang. Little did he know that Ms. Wang, who represented herself as an international tax accountant in her late twenties, was in reality a thirty-six year old mentally ill serial stalker, obsessed with having a baby with her victims.

In 2014 in New York, Ms. Wang was criminally charged after terrorizing her first victim, Rory Will. According to court documents, Ms. Wang met Rory Will on Tinder–the same dating app where she would later meet Petitioner--and after Mr. Will would not have unprotected intercourse

Trial Brief                                                    1

DOUGLAS L. RAPPAPORT (SBN 136194)
Law Offices of Douglas L. Rappaport
260 California Street, Suite 1002
San Francisco, CA 94111
Telephone: 415-989-7900
Facsimile: 415-989-7950

Attorney for Petitioner ███████ ███████ ███████

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

███████ ███████ ███████,

        Petitioner,

  v.

KAILIN WANG,

        Respondent.

_____/

Case No. FDV-19-814465

**WITNESS LIST: EXHIBIT A TO PETITIONER'S TRIAL BRIEF**

**PETITIONER'S LIST OF POTENTIAL WITNESSES**

The defense intends to call the following persons to testify in the trial of the above-captioned matter, or their names may be mentioned in the testimony.

**Immediate family members:**

1. ███████ ███████ Petitioner ███████ ███████ may be called to testify about his interactions with Ms. Wang, his experiences parenting and caring for Baby K, the impact of Ms. Wang's abuse, evidence authentication.

2. ███████ ███████ ███████ father / Baby K's grandfather. Mr. ███████ ███████ may be called to testify about his interactions with Ms. Wang, his experiences grandparenting and caring for Baby K, the impact of Ms. Wang's abuse, evidence authentication.

3. ███████ ███████ ███████ mother / Baby K's grandmother. Mrs. ███████ ███████ may be called to testify about her interactions with Ms. Wang, her experiences grandparenting and caring for Baby K, the impact of Ms. Wang's abuse, evidence authentication.

4. ███████ ███████ ███████ sister / Baby K's aunt. Ms. Elise ███████ may be called to testify about her interactions with Ms. Wang, the impact of Ms. Wang's abuse, her

-1-

(eggfu45@gmail.com).

28. Stacey Jones. ████████ mother's former colleague.  Ms. Jones may be called to testify about the receipt of unwanted communications — and the content delivered to her — via email aliases courtorder6678@gmail.com and servebyemails@gmail.com.

29. Caroline Lucas. ████████ mother's former colleague. Ms. Lucas may be called to testify about the receipt of unwanted communications — and the content delivered to her — via email aliases courtorder6678@gmail.com and servebyemails@gmail.com.

30. David Ackerman. ████████ mother's former colleague. Mr. Ackerman may be called to testify about the receipt of unwanted communications — and the content delivered to him — via email aliases courtorder6678@gmail.com and servebyemails@gmail.com.

31. Scott Saywell. ████████ mother's former colleague. Mr. Saywell may be called to testify about the receipt of unwanted communications — and the content delivered to him — via email aliases courtorder6678@gmail.com and servebyemails@gmail.com.

32. Sherwin Chen. ████████ mother's former colleague. Mr. Chen may be called to testify about the receipt of unwanted communications — and the content delivered to him — via email aliases courtorder6678@gmail.com and servebyemails@gmail.com.

**Investigation:**

33. Alex Feerst. Mr. Feerst is the former Head of Legal at A Medium Corporation.

34. Justin Paine. Mr. Paine is the Director of Trust and Safety at Cloudflare.

35. Christopher Brenner. Mr. Brenner is a Director of Investigations at Hillard Heintze.

36. Adam Zoll. Mr. Zoll is a Director of Investigations at Hillard Heintze.

37. Jennifer L. Mackovjak. Ms. Mackovjak is seasoned civil and criminal investigator and leads Hillard Heintze's Investigations Practice.

38. Ellen McDonald. Ms. McDonald is a Senior Analyst at Hillard Heintze.

39. Erik Rasmussen. Erik Rasmussen is an expert in the field of cybersecurity. As provided in Petitioner ████████ expert witness disclosure, Mr. Rasmussen may be called to

provide: Technical background on the internet and technology at issue in this case; Explanation of methods for attributing anonymous postings/messages to individuals; Explanation and analysis of computer data including subscriber information, login records, and IP address records, to include both IPv4 and IPv6 addresses, provided by technology companies (websites/platforms, content delivery networks, internet service providers, email providers, service providers) relating to the identity of the person responsible for various internet postings and internet/email contacts. Explanation and analysis of subpoenaed records and weblogs; geolocation tools; email addresses, social media accounts, search engine optimization; anonymization services.

Respondent reserves the right to supplement this list and/or call other witnesses in rebuttal.

The above list of potential witnesses constitutes those that the defense intends to call as of today's date. However, investigation continues, and as additional witnesses are discovered, the names and addresses will be provided without delay.

DATED: October 15, 2019

DOUGLAS L. RAPPAPORT
Attorney for Petitioner

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE DANIEL FLORES, JUDGE PRESIDING

UNIFIED FAMILY COURT

DEPARTMENT 416

--o0o--

|  |  |
|---|---|
| ███████ ████████ ███ ) | COURT NO. FDV-19-814465 |
| Petitioner, ) | Pages  1 - 162 |
| VS. ) | Volume 1 |
| KAILIN WANG, ) | |
| Respondent. ) | |

Reporter's Transcript of Proceedings

Tuesday, October 18, 2022

APPEARANCES OF COUNSEL:

For The Petitioner:

Law Offices of Douglas L. Rappaport,
260 California Street, Suite 1002
San Francisco, California  94111-4360
By:  DOUGLAS LEE RAPPAPORT,
     Attorney at Law

For The Petitioner:

Ridder, Costa & Johnstone, LLP.
440 N. Barranca Avenue, # 7750
Covina, California  91723
By:  ERICA JOHNSTONE,
     Attorney at Law

sorry

THE COURT:  I did not ask you a question, Ms. Wang.

MS. WANG:  Oh, oka

THE COURT:  We are getting a lot of feedback though.

MS. WANG:  I don'    v    er electronics on.  No.

THE COURT:  Okay.  Can you leave your microphone on?  No feedback there.

MS. WANG:  My microphone is on.  Can you -- can you hear me okay?

THE COURT:  I can.  I'm just trying to run a test to see if I speak when your microphone is unmuted if that made a difference.  It doesn    o be corresponding with your microphone.  Okay.  There is a gentleman sitting --

MS. WANG:  Last time the --

THE COURT:  There is a gentleman sitting at counsel table --

MS. WANG:  I mean, if I turn off --

THE COURT:  Ms. Wang, can you hear me?

MS. WANG:  Let me try to turn this off and turn it right back on?  Okay?  Let me.

THE COURT:  Okay.

MS. WANG:  I don't know.  I -- I tried to lower the microphone sound.  The only thing I can think of is the microphone, but Mr. Rappaport is incorrect.  The Appellate Court -- it was actually Justice Pollak that -- where the echo was coming from last time, not me.  So that's -- that's a lie.

THE COURT:  Okay.  I was waiting for you to finish doing what you were doing, Ms. Wang.  I have something I'm going to address with someone other than you right now.

O█████████  █████████ l█████████

MS. WANG:  Okay.

THE COURT:  -- at █n█████e█████ised your hand when I asked who was the person logged on as screen share.  Would you please identify yours█u█████microphone?

MR. BRENNER:  Hi, my name is Chris Brenner.

THE COURT:  Thank█u.█████hat, please?

MR. BRENNER:  B-R-E-N-N-E-R.

THE COURT:  First nam█  █████

MR. BRENNER:  Chris -- Christopher, C-H-R-I-S-T-O-P-H-E-R.

THE COURT:  Good morning to you.  And --

MR. BRENNER:  Goo█████.

THE COURT:  -- your role here today is?

MR. BRENNER:  Assisting Mr. Rappaport and Ms. Johnstone with technology.

THE COURT:  Okay.  Thank you.

And we have someone logged in.  I think that's it. Courtroom clerk, is that you, madam clerk?

THE CLERK:  Yes, Your Honor.

THE COURT:  Thank you.  Appearances by counsel, please?

MR. RAPPAPORT:  Good morning, Your Honor, Douglas Rappaport.

MS. JOHNSTONE:  Good morning, Your Honor.  Erica Johnstone.

THE COURT:  Good morning.

MR. RAPPAPORT:  On behalf of the protected parties who are all -- who are all here in the courtroom.

THE COURT:  Thank you.  You can go ahead and name the people who are in court, please, as protected parties.

MR. RAPPAPORT:  Certainly I will.  From left to right, we

have ████████ ████████ ████████████

THE COURT: Good morning.

MR. RAPPAPORT: Ja██ ████████ ████████████

THE COURT: Good morning.

MR. RAPPAPORT: E██ ████████████

THE COURT: Good morning.

MR. RAPPAPORT: A██n ████████████

THE COURT: Good morning.

MR. RAPPAPORT: And E██ ████████████

THE COURT: Good morning.

MR. RAPPAPORT: And in the back is Mr. Darrick Chase. He is also counsel for Mr. ████████ albeit on the custody matter.

THE COURT: Thank you.

MR. RAPPAPORT: On the -- previously. I think he -- but he does have a declaration should we need one here this morning. That's why he is here from his previous work related to the issuance of the subpoenas.

THE COURT: Thank you.

Okay. And Ms. Wang is present. Good morning.

MS. WANG: Good morning.

THE COURT: All right. Let's first address some procedural things.

Okay. You've made a motion to continue the trial, Ms. Wang?

MS. WANG: Yes. I would like to make a record on some points on that motion, if I may.

THE COURT: Thank you. I see that that motion or that request has been stated a number of different ways including something that's on my bench right now that appears to not have

 **Department of Motor Vehicles**

# FREEDOM OF INFORMATION LAW REQUEST FORM

## FREEDOM OF INFORMATION LAW REQUEST FOR DMV RECORDS

### MAKE SURE YOU USE THE CORRECT FORM TO REQUEST RECORDS!

You will receive your records more quickly when you use the correct request form. DMV forms are available at dmv.ny.gov

**STOP** **DO NOT USE THIS FORM TO REQUEST THE FOLLOWING RECORDS:**

- Driver license record ("abstract") - use form MV-15
- Driver history ("lifetime abstract") - use form MV-15
- Vehicle registration record ("abstract") - use form MV-15
- Accident report - use form MV-198C

- Vehicle title record - use form MV-15
- Copy of a ticket and/or ticket disposition - use form MV-15
- Copy of a revocation or suspension order - use form MV-15

## 1. Information About You (the Requestor):

| Name |
|---|
| Adam Zoll |

| Organization (if applicable) |
|---|
| Hillard Heintze |

| Address (Number and Street) |
|---|
| 30 S. Wacker Drive, Suite 1400 |

| City | State | ZIP Code |
|---|---|---|
| Chicago | IL | 60606 |

| E-mail Address (Required if you want your records sent to you electronically)* | Phone Number (optional) |
|---|---|
| adam.zoll@hillardheintze.com | ( 312 ) 229-5813 |

*Records sent by email or by fax will not be certified. Certified records must be mailed. We can only provide your records by one method (mail, email, or fax).

## 2. Important Information About Requests for Certain DMV Records:

Personal information on certain DMV records is protected by the Federal Driver's Privacy Protection Act (18 U.S.C. §2721 et seq.) and by §87 and §89 of the NYS Public Officers Law. Records about a driver license or permit, motor vehicle title, motor vehicle registration, or identification card issued by DMV are protected by the Driver's Privacy Protection Act.

If any of the records you want are protected by the Driver's Privacy Protection Act, you must do the following:

1. Mark your permissible use in the list on page 3 of this form;

2. Send a photocopy of your driver license or government-issued non-driver ID card with this form (you can cover the photo on the document); and

3. Sign the certification on the bottom of page 3.

APPLICATION FOR PERMIT, DRIVER LICENSE OR NON-DRIVER ID CARD

New York | Department of
State | Motor Vehicles

PRINT CLEARLY IN BLUE OR BLACK INK
This form is also available at dmv.ny.gov

810/60271 2

PAGE 1 OF 2
MV-44 (1/18)

OFFICE USE ONLY

## APPLYING FOR

☑ License    ☐ Permit    ☐ ID card

## PURPOSE FOR APPLICATION

☐ New    ☐ Renew    ☐ Update Info    ☐ Change Type    ☐ Replacement    ☐ Conditional    ☐ Restricted    ☐ Transfer to NY

## IDENTIFICATION INFORMATION

Do you now have, or did you ever have a New York driver license, learner permit, or non-driver ID card?  ☑ Yes  ☐ No

Applying for a Non-Driver ID card will cancel any NY State driver license privilege.

ID NUMBER ON NYS DRIVER LICENSE, LEARNER PERMIT, or NON-DRIVER ID CARD

FULL LAST NAME
Wang

FULL FIRST NAME
Kaitlin

FULL MIDDLE NAME

Do you have or did you ever have a driver license that is valid or that expired within the last two years, issued by another US State, the District of Columbia or a Canadian Province? ☐ Yes ☑ No

If "Yes", where was it issued? _____

Date of Expiration: | Type of License: | Out-of-State License ID No.:

| SUFFIX | DATE OF BIRTH | | | SEX | | HEIGHT | | EYE COLOR | TELEPHONE NUMBER (Home/Mobile) |
|---|---|---|---|---|---|---|---|---|---|
| | Month 01 | Day 20 | Year 83 | Male ☐ | Female ☑ | Feet 5 | Inches 4 | Brown | Area Code |

Has your name changed? ☐ Yes ☑ No If "Yes", print your former name exactly as it appears on your present license or non-driver ID card.

OTHER CHANGE: What is the change and the reason for it (new license class, wrong date of birth, etc.)?

SOCIAL SECURITY NUMBER (SSN)    * You must provide your SSN. Authority to collect your SSN is granted by Sections 489(3) and 502(1) of the Vehicle and Traffic Law. The information will be used for exchange with other jurisdictions, to assist in verification of identity, and for driver license sanctions pursuant to V&T Law Section 510(4-e) and 510(4-f). Your SSN will not be given to the public.

ADDRESS WHERE YOU GET YOUR MAIL - include Street Number and Name, Rural Delivery and/or box number (If PO Box, also fill in "Address Where You Live" below)
THIS ADDRESS WILL APPEAR ON YOUR STANDARD IDENTITY DOCUMENT

| | Apt. No. | City or Town | State | Zip Code | County |
|---|---|---|---|---|---|

ADDRESS WHERE YOU LIVE REQUIRED IF DIFFERENT FROM ADDRESS FOR MAIL - DO NOT GIVE P.O. BOX
THIS ADDRESS WILL APPEAR ON YOUR ENHANCED/REAL ID IDENTITY DOCUMENT

| | Apt. No. | City or Town | State | Zip Code | County |
|---|---|---|---|---|---|
| 396 E 59th St | 12 | New York | N.Y. | 10022 | |

HAS YOUR MAILING ADDRESS CHANGED? ☑ Yes  ☐ No     HAS THE ADDRESS WHERE YOU LIVE CHANGED? ☑ Yes  ☐ No

If you answered yes to either of the questions above, then addresses on all vehicle registrations tied to your ID number will also be updated with this address, unless you check this box ☐. If you are registered to vote, your voter registration record will be updated when you complete and submit this form. If you do NOT want your new address on your voter registration record, check this box ☐. If you do not check the box, your new address will be sent to the Board of Elections of your county of residence.

## VETERAN STATUS
☐ Check this box if you would like to have "Veteran" printed on the front of your photo document. You must present proof that indicates an honorable discharge from military service (DD-214, DD-215, or see form MV-44.1).

## NEW YORK STATE ORGAN AND TISSUE DONATION (You must fill out the following section)
To enroll in the New York State Donate Life℠ Registry, check the "yes" box and then sign and date below. You are certifying that you are: 18 years of age or older; consenting to donate your organs and tissues for transplantation and research; authorizing DMV to transfer your name and identifying information to the Donate Life Registry; and authorizing Donate Life NYS to give access to this information to federally regulated organ donation organizations and NYS-licensed tissue and eye banks and hospitals, upon your death. "ORGAN DONOR" will be printed on the front of your DMV photo document. You will receive a confirmation, which will also provide you an opportunity to limit your donation. If you are 16 or 17 years of age, a parent or legal guardian may change your decision upon your death. For more information, contact DLNYS at donatelife.ny.gov.

You must answer the following question: Would you like to be added to the Donate Life Registry? ☐ Yes (sign and date consent below)
☑ Skip This Question

☐ Check this box to make a $1 voluntary donation to the Life...Pass It On Trust Fund for organ and tissue donation research and outreach. Your total transaction fee will include the $1.

♥ Donor Consent
Signature: X _____    Date _____

## VOTER REGISTRATION QUESTIONS (Please check "yes" or "no"). NOTE: If you do not check either box, you will be considered to have declined not to register to vote.
If you are not registered to vote where you live now, would you like to apply to register?

☐ YES - Complete Voter Registration Application Section (Not necessary if you bring this form to a DMV office).    ☐ NO - I Decline to Register/Already Registered

PLEASE COMPLETE AND SIGN PAGE 2.

| CDL Certifications | NI | NA | HI | EA | License Class | Special Conditions | | New York State Department of Motor Vehicles | ☐ TEENS |
|---|---|---|---|---|---|---|---|---|---|

| Document Type | Proof Submitted: | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ Enhanced | ☐ Birth Certificate | ☐ Driver License | ☐ SHS Documents | | Other Restrictions | | |
| ☐ Real ID | ☑ U.S. Passport | ☐ Learners Permit | ☐ Medical Certificate (CDL Only) | | Approved By | OCT 16 2018 | Date |
| ☑ Standard Not for Federal Purposes | ☐ Foreign Passport | ☐ MV44 | ☐ Import National | ☐ Credit Card | | | |
| | Other: | ☐ Out-of-State License | ☑ Social Security Card | ☐ ATM Card | | LICENSE EXPRESS | |

| NEW YORK State Department of Motor Vehicles | **FREEDOM OF INFORMATION LAW REQUEST FORM** |

**" Describe the DMV Records That You Want:**

Please provide as much detail as possible about the records you are requesting. You may attach additional sheets if necessary.

### YOU CANNOT USE THIS FORM TO REQUEST YOUR LIFETIME ABSTRACT. YOU MUST USE FORM MV-15!

I would like to request any DMV documentation (application, transaction records, etc.) associated with a request made on or around 3/13/2019 by Karl a Kang of 9 W. 70th Street, NY, NY for a non-driver ID card or replacement card.

**4. Fee Information:**

Section 202 of the NYS Vehicle and Traffic Law requires a $10 search fee and a copy fee of $1 per page. You must send a $10 search fee with your FOIL request, unless you or your organization is exempt from these fees.

**Only these groups are exempt from search fees:**

- Government agencies
- Volunteer fire companies
- Volunteer ambulance services
- Public officers, boards, or bodies
- Legal aid bureaus or societies or other private entities when acting pursuant to §722 of the New York State County Law

**5. Method of Payment:**

Check the box that shows your payment method. If you pay with a credit card, you must sign on the Authorized Signature line to authorize DMV to charge your card.

☐ **Exempt** (Check this box ONLY if you belong to one of the exempt groups described in the Fee Information section above.)

☐ **Check**

☐ **Money Order**

☐ **DMV Escrow Account**

☑ **Credit Card:**

  ☐ MasterCard      ☐ Visa      ☑ American Express      ☐ Discover Card

  Credit Card Number: ▬▬▬▬▬▬▬▬▬    Expiration Date: ▬▬▬▬▬▬

  Zip Code Associated with Credit Card: ▬▬▬▬▬▬    Security Code: ▬▬▬ 3 or 4 digit code on the back or front of your card

  Authorized Signature **X** _Adam Zell_

MV-FOIL (6/03)



# EXHIBIT 3

Molly Amman, Stochastic Terrorism Expert Witness per Douglas Rappaports Declaration filed on 07/30/23 she is $500 hourly; or if on-site presence is ███████ a daily fee of $8,000. Molly Amman is hired by ██████ for the 3-Day Termination of Visitation even Supervised Evidentiary Hearing set for February 27, 29, March 12, 2024, where Wang is forced to be Pro S██████e Roeca.

DocuSign Envelope ID: 98F61D8C-36AF-4230-AA6C-B4A647232DD3

DOUGLAS RAPPAPORT (136194)
LAW OFFICES OF DOUGLAS L. RAPPAPORT
260 California Street, Suite 1002
San Francisco, CA 94111
Telephone:  (415) 989-7900
Facsimile:  (415) 989-7950
Email:    admin@sfcrimlaw.com

Attorney for Petitioner.
███████  ███████

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**07/31/2023**
**Clerk of the Court**
BY: MARK ANTONIO
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| In re the Matter of:<br><br>███████  ███████<br><br>Petitioner,<br><br>and<br><br>KAILIN WANG,<br><br>Respondent. | Case No.:  FDV-19-814465<br><br>**DECLARATION OF DOUGLAS RAPPAPORT RE PETITIONER'S EXPERT TRIAL WITNESSES**<br><br>---<br><br>Date:       Sept 19 & 21, 2023<br>Time:      1:45 p.m.<br>Dept.:      403<br>Judge:     The Hon. Russell Roeca |

I, DOUGLAS RAPPAPORT, declare:

1.      I am the attorney of record for Petitioner in the above-entitled action. I make this declaration pursuant to California Code of Civil Procedure Section 2034.260(c) and San Francisco Local Rules of Court, Rule 11. 13(A).

      **Molly Amman**

2.      **Qualification:** Molly Amman is qualified to testify as an expert in this matter. For information about Molly Amman's qualifications, please see her Curriculum Vitae attached hereto as Exhibit A.

1

*In re the Matter of* ███████ *v. Wang*, Case No.:  FDV-19-814465; DECLARATION OF DOUGLAS RAPAPPORT

3.    **Area of expertise**. I am informed and believe and thereon state that Molly Amman is an expert in the field of behavioral threat assessment and management (BTAM). This professional discipline is principally focused on preventing acts or attempted acts of planned, interpersonal violence.

4.    **Substance of testimony.** Ms. Amman will be called to testify about a category of behavior that is unfamiliar to most but known in the threat assessment community as stochastic violence.

5.    **Agreement to Testify**: Ms. Amman has agreed to testify as an expert at the upcoming trial scheduled to commence at 1:45 p.m. on September 19, 2023 in Department 403 of the San Francisco Superior Court.

6.    **Sufficient Familiarity**: Ms. Amman will be sufficiently familiar with the pending action to submit to a meaningful oral deposition concerning the testimony, including any opinion and its basis, that she is expected to give at trial.

7.    **Fees**: The hourly and daily fees of Molly Amman for providing deposition testimony and for consulting with the retaining attorney are as follows: $500 hourly; or if on-site presence is requested a daily fee of $8,000.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:  July 31, 2023

LAW OFFICES OF DOUGLAS RAPPAPORT

DocuSigned by:

*Douglas Rappaport*

DOUGLAS L. RAPPAPORT

Attorney for Petitioner,

██████  ██████

2

*In re the Matter of* ██████ *v. Wang*, Case No.:  FDV-19-814465; DECLARATION OF DOUGLAS RAPAPPORT

# EXHIBIT 4

| | | | | | |
|---|---|---|---|---|---|
| 22 | TIFFANY BOSTROM (Jensen Hughs formerly Hillard and Heintz) | In April 2022, I was employed by Jensen Hughes, Inc. ("JH"), which is a company hired by Ridder, Costa & Johnstone LLP ("RCJ"), to provide professional services for the benefit of RCJ (Erica Johnstone's Firm for ▮▮▮▮) in the advisement of their clients. Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration. | As part of my duties at JH, I was responsible for monitoring any andl all Twitter accounts associated with Kailin Wang that were publicly accessible on the internet. | | December 2018-Present |
| 23 | TALIA BEECHICK (Jensen Hughs formerly Hillard and Heintz) | In April 2020, I was employed by Hillard Heintze LLC"), which was a company hired by Ridder, Costa & Johnstone LLP ("RCJ"), to provide professionals ervices for the benefit of RCJ in the advisement of their clients. Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration. | As part of my duties at HH, I was responsible for monitoring any and all Twitter accounts associated with Kailin Wang that were publicly accessible on the internet. | | December 2018-Present |

DOUGLAS L. RAPPAPORT (SBN 136194)
Law Offices of Douglas L. Rappaport
260 California Street, Suite 1002
San Francisco, CA 94111
Tel: (415) 989-7900
Fax: (415) 989-7950

DARRICK T. CHASE (SBN 151256)
Kaye Moser Hierbaum Ford, LLP
The Russ Building
235 Montgomery Street, 27ᵗʰ Floor
San Francisco, CA 94104
Tel: (415) 202-5824

Attorneys for Petitioner
████████████ TANFORD THYGESEN

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

| CHRISTOFFER STANFORD THYGESEN, | Case No. FDV-19-814465 |
|---|---|
| Petitioner, | DECLARATION OF TALIA BEECHICK ISO PETITIONER'S MOTION TO ENFORCE RESPONDENT'S STIPULATION ON THE RECORD TO REMOVE/REDACT THE MINOR'S IDENTIFYING INFORMATION FROM HER ONLINE POSTINGS |
| v. | |
| KAILIN WANG, | |
| Respondent. | |
| | Date: May 18, 2022 Time: 1:30 p.m. Dept.: 405 |

I, Talia Beechick, do hereby declare:

1.     In April 2020, I was employed by Hillard Heinaze LLC ("HH"), which was a company hired by Ridder, Costa & Johnstone LLP ("RCJ"), to provide professional services for the benefit of RCJ in the advisement of their clients. Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration.

2.    As part of my duties at ▮▮▮▮, I was responsible for monitoring any and all Twitter accounts associated with Kailin Wang that were publicly accessible on the internet.

3.    On April 10, 2020, while viewing the Twitter account entitled "Kailin Wang @kk978678," I viewed a Post ("Post") with the URL https://twitter.com/kk978678/with_replies.

4.    On April 10, 2020, after viewing this Post, I captured the exact image of this Post at 13:07:59 GMT.

5.    On May 11, 2022, I reviewed page 1 of Exhibit 4 of Petitioner's Motion To Enforce Respondent's Stipulation On The Record To Remove/Redact The Minor's Identifying Information From Her Online Postings lodged with the Court on April 12, 2022.

6.    Page 1 of Exhibit 4 is a fair and accurate printed representation of the Post as it exactly appeared on the internet on April 10, 2020, at 13:07:59 GMT.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated:  _May 11, 2022_        By: _____
                                           Talia Beechick

DOUGLAS L. RAPPAPORT (SBN 136194)
Law Offices of Douglas L. Rappaport
260 California Street, Suite 1002
San Francisco, CA 94111
Tel: (415) 989-7900
Fax: (415) 989-7950

DARRICK T. CHASE (SBN 151256)
Kaye Moser Hierbaum Ford, LLP
The Russ Building
235 Montgomery Street, 27th Floor
San Francisco, CA 94104
Tel: (415) 202-5824

Attorneys for Petitioner ███████████████

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

| ████████████████████ | Case No. FDV-19-814465 |
|---|---|
| Petitioner. | DECLARATION OF TIFFANY BOSTROM ISO PETITIONER'S MOTION TO ENFORCE RESPONDENT'S STIPULATION ON THE RECORD TO REMOVE/REDACT THE MINOR'S IDENTIFYING INFORMATION FROM HER ONLINE POSTINGS |
| v. | |
| KAILIN WANG, | |
| Respondent. | |
| | Date: May 18, 2022 |
| | Time: 1:30 p.m. |
| | Dept.: 405 |

I, Tiffany Bostrom, do hereby declare:

1.    In April 2022, I was employed by Jensen Hughes, Inc. ("JH"), which is a company hired by Ridder, Costa & Johnstone LLP ("RCJ"), to provide professional services for the benefit of RCJ in the advisement of their clients. Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration.

DECL. OF TIFFANY BOSTROM                                                    Case No. FDV-19-814465

2.    As part of my duties at JH, I was responsible for monitoring any and all Twitter accounts associated with Kailin Wang that were publicly accessible on the internet.

3.    On April 4, 2022, while viewing the Twitter account entitled "Kailin Wang @kwff14," I viewed a Post ("Post") with the URL https://twitter.com/kwff14/status/1248379978724458496

4.    On April 4, 2022, after viewing this Post, I captured the exact image of this Post at 17:56:01 GMT.

5.    On May 11, 2022, I reviewed page 2 of Exhibit 4 of Petitioner's Motion To Enforce Respondent's Stipulation On The Record To Remove/Redact The Minor's Identifying Information From Her Online Postings lodged with the Court on April 12, 2022.

6.    Page 2 of Exhibit 4 is a fair and accurate printed representation of the Post as it exactly appeared on the internet on April 4, 2022, at 17:56:01 GMT.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated:  May 11, 2022            By: _____
                                    Tiffany Bostrom

Case No. FDV-19-814465

# EXHIBIT 5

| | | | | | |
|---|---|---|---|---|---|
| 20 | Matthew Dennis | Private Investigator, Matthew Dennis. (11/18/21 RT 3:1-3, RT 6:1-28) Matthew Dennis is a Private Investigator (PI) hired by the ▇▇▇▇ family to surveillance the Wang Family at Terra Firma, and at Rally. | Security Detail | | December 2018-Present |
| 21 | Gregory Johnson | "Private Investigator, Matthew Dennis. (11/18/21 RT 3:1-3, RT 6:1-28) Matthew Dennis is a Private Investigator (PI) hired by the ▇▇▇▇ family to surveillance the Wang Family at Terra Firma, and at Rally." | Security Detail | | December 2018-Present |

# SECURE OUTCOMES PROTECTION INC.

May 4, 2021

**Matthew Dennis' Statement**

I, Matthew Dennis, am employed as a security agent at Secure Outcomes Protection, Inc.

In the course of my employment, I was assigned to observe and secure the safety of ▮▮▮▮▮ ▮▮▮▮▮ and his baby, ▮▮▮▮ Wang, on September 30, 2020. As part of my assignment on that day, I conducted observation of Terra Firma, the supervised visitation facility where ▮▮▮▮▮ was to drop off ▮▮▮▮ for ▮▮▮▮▮ visit with his biological mother, Kailin Wang.

During the course of my observation from a secured position, I noted the following:

1618: Kailin Wang, John Wang, and Jan Wang arrived at Terra Firma, in ▮▮▮▮▮ ▮▮▮▮▮ UT plate.
    Wang Family made 3 passes driving in the rear parking lot, filming out of the car window on 3rd pass. It appeared that they were filming the rear of the Terra Firma facility where the visit was to take place.

1700: ▮▮▮▮▮ ▮▮▮▮▮ delivered baby to Terra Firma.

1920: Visitation ended. CT retrieved baby from Terra Firma, departed Hayward.

1920: Surveillance terminated.

Mathew Dennis

PO Box 980333
West
Sacramento CA
95798

PHONE     (209) 769-4483
EMAIL     Admin@SecureOutcomes.com
WEBSITE   WWW.SecureOutcomes.com

# SECURE OUTCOMES PROTECTION INC.

**May 4, 2021**

**Gregory Johnson's Statement**

I, Gregory Johnson, am employed as a security agent at Secure Outcomes Protection, Inc.

In the course of my employment, I was assigned to observe and secure the safety of ▓▓▓▓▓▓▓▓▓▓ n and his baby son, ▓▓▓▓ Wang, on October 14, 2020. As part of my assignment on that day, I conducted observation of Terra Firma, the supervised visitation facility where ▓▓▓▓▓ r was to drop off ▓▓▓▓ for ▓▓▓▓ visit with his biological mother, Kailin Wang.

During the course of my observation from a secured position, I noted the following:

1622 John Wang's Vehicle ▓▓▓▓▓ Utah Plates, entered the front parking lot. The vehicle circled the parking lot to Pupuseria restaurant (aprox 200 feet) with a cell phone in recording position. It appeared as if they were filming the Terra Firma facility.

1628 Kailin Wang and her parents John Wang and Jan Wang enter Terra Firma via rear door.

1657 ▓▓▓▓▓▓▓▓▓ n delivered ▓▓▓▓ to Terra Firma.

1739 ▓▓▓▓▓▓▓▓▓▓ n retrieved ▓▓▓▓. I observed John Wang, Jan Wang and Kailin Wang depart Terra Firma.

Gregory Johnson



| | PO Box 980333 W. Sacramento CA 95798 | PHONE | (209) 769-4483 |
|---|---|---|---|
| | | EMAIL | Admin@SecureOutcomes.com |
| | | WEBSITE | WWW.SecureOutcomes.com |

From:  **Kailin Wang** kaywg2372@gmail.com
Subject:  Abduction Observations in Case FDV-19-814465: ███████ ███████ v. Kailin Wang
Date:  July 26, 2021 at 1:55 PM
To:  Bertha Cuellar bcuellar@terrafirmadiversion.com

Hi Bertha,

This is Kailin Wang, I used your facility for Supervised Visitation with:

Child: █████ T. Wang
Custodial Parent: ████████ S. ████████

for Court Ordered visits through the San Francisco Superior Court Case No.
FDV-19-814465, on the following dates:

1. September 03,2020
2. September 30, 2020
3. September 16, 2020
4. October 14,2020

as per Terra Firma Policies Terra Firma/SV Contract

> PARENT22. Prior to a scheduled visit, the Custodial Parent will park in
> front and enter Terra Firma's premises through the front door. The
> Visiting Parent will park in the back and enter Terra Firma's premises
> through the back door. **This also means the Custodial Parent should not
> be driving anywhere in the back side where the Visiting Parent is
> parked and the Visiting Parent should not be driving through the
> front area where the Custodial Parent is parked.** Non-compliance of this
> rule will result in termination of that visit and the person responsible for the
> termination will be charged for the visit. This includes any additional guests,
> family or friends before and after the visit.

There has been a Criminal Investigation by Utah Investigator Richard C.
Hales, Affidavit for Search Warrant No. 2267231, Utah Criminal Case no.
211100167

> 10. In February 2021, Ms. Wang attempted to obtain personal information
> and the US Passport of █████ █████ █████ 2-years-old. Ms. Wang
> has no legal custody of the boy as ordered by a California Court. **Ms. Wang
> and her parents, John Wang and Jan Cheng, have been seen at Terra
> Firma, a visitation center located in Hayward, CA. They were video
> recording the exterior of the visitation center, therefore, posing a
> possible threat of abduction of █████ █████ █████ from █████
> █████** the boy's father who has full custody.

1. From your professional observation, did you observe during those four visits of

921



any signs of abduction by Kailin Wang? Did you make that statement to the Utah Police Richard C. Hales?

2.	And did Utah Investigator Richard C. Hales contact Terra Firma about this alleged incident above?

*Please let me know if you have any further questions.

Thank you,

--
Kailin Wang
Phone: 801-645-1060

922

From: **Bertha Cuellar** bcuellar@terrafirmadiversion.com
Subject: Re: Abduction Risk
Date: July 26, 2021 at 5:47 PM
To: Kailin Wang kaywg2372@gmail.com

No , I did not.

Get Outlook for iOS

**From:** Kailin Wang <kaywg2372@gmail.com>
**Sent:** Monday, July 26, 2021 4:36:08 PM
**To:** Bertha Cuellar <bcuellar@terrafirmadiversion.com>
**Subject:** Abduction Risk

Hello,

This maybe more simple and straightforward.

Did you witness, obeserve any Abduction risk in the visits attended by the parties at Terra Firma?

Thanks

920

**Terra Firma/SV Contract**

TERRA FIRMA COPY

16. *We are mandated reporters and are required by law to report any reasonable suspicion of child abuse or neglect. This includes physical, sexual, extreme emotional abuse or physical neglect including the child's direct exposure to domestic violence.*

17. *Neither the visiting site nor the child may be used to pass messages, make child support payments, serve papers to the other parent or call the police. Any attempt to pass messages, call the police or serve papers either inside or outside of the premises can result in termination of services at Terra Firma. If there is information that needs to be exchanged concerning the child, it can be passed only through the Supervisor and at the Supervisor's discretion or by court order.*

18. *Picture taking is not allowed.* **No exceptions.**

19. *Your cell phone is to be powered off during all supervised visits. Unless, your are playing games, watching a movie, looking at pictures and/or listening to music. Using your cell phone during visits for any other purposes can result in having your cell phone turned off or not allowed to be brought in during the entire visitation time. If you absolutely have to take a call for a specific reason, please alert the Supervisor. You will have to leave the room to take the call.*

20. **VIDEOTAPING** *and* **AUDIO RECORDING** *is not allowed during any visits. This will result in automatic termination of the visit. Additionally, you will be required to pay for the visit regardless.* **No exceptions.**

21. *Supervised visitations may include going outside, walking to the park and/or any other nearby facilities within the surrounding area. If the Visiting Parent wants to schedule a visit outside of Terra Firma's premises, additional fees will be applied based on location, time, and entrance fees, etc. Terra Firma does not transport. Once an outside visit is confirmed, the Custodial Parent will meet the Supervisor ten (10) minutes prior to the scheduled visit at the front entrance and before the Visiting Parent arrives.*

22. *Prior to a scheduled visit, the Custodial Parent will park in front and enter Terra Firma's premises through the front door. The Visiting Parent will park in the back and enter Terra Firma's premises through the back door. This also means the Custodial Parent should not be driving anywhere in the back side where the Visiting Parent is parked and the Visiting Parent should not be driving through the front area where the Custodial Parent is parked. Non-compliance of this rule will result in termination of that visit and the person responsible for the termination will be charged for the visit. This includes any additional guests, family or friends before and after the visit.*

**From:** **John Wang** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 📎
**Subject:** License Plate Number of the car parked at back of Terra Firma
**Date:** September 18, 2020 at 10:01 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮

6VHT147 CA
Honda CRV

# Gmail

**Kailin Wang** ███████████████████████████████

## Terra Firma ████████████ PI's in the "Rear" Entrance
3 messages

**Kailin Wang** ████████████████████████  Wed, Aug 11, 2021 at 1:35 PM
████████████████████████████████████████

**2 attachments**

 **9-5 Security Report 9 30 20 MD.pdf**
212K

 **9-6 Security Report 10 14 20 GJ.pdf**
33K

████████████████████████  Wed, Aug 11, 2021 at 1:46 PM

We took the photo to find out why this car was out there every time while we arrived for the visitation (which violated the facility policy). That is the photo I took and it only shows the car and its license plate and the background is not Terra Firma's back building as the car parked away from the back entrance of the building. The PI is totally a lier!



████████████████████████  Wed, Aug 11, 2021 at 1:50 PM

**(3) Controlling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services.** Since 2019 ▮▮ ▮▮▮▮ CEO of DocuSign  paid to have his Agents  to  Follow, Stalk, and Surveil the Wang's in another attempt to Falsely incriminate her on bogus Criminal Charges.

https://▮▮▮▮▮▮▮▮blogspot.com/2023/06/false-kidnapping-police-reports-are.html

The Wang's are constantly afraid for their lives and documented ▮▮▮▮▮ abuse, his agents following them, however when caught red-handed ▮▮▮▮ instead  then made a False Police report that the Wang's were 'casing' the  Supervised Visitation in order   to kidnap the child, clearly this is outrageously false.

However the ▮▮▮▮▮ were able to convince the authorities to issue a search warrant to search Wang's  issue Statements to the Police that Wang was seen "casing" the area around Terra Firma located in Alameda, California in an attempt to the Kidnap the child.

## SECURE OUTCOMES PROTECTION INC.

May 4, 2021

**Matthew Dennis' Statement**

I, Matthew Dennis, am employed as a security agent at Secure Outcomes Protection, Inc.

In the course of my employment, I was assigned to observe and secure the safety of ▮▮▮▮▮r Thygesen and his baby, ▮▮▮▮▮▮▮ on September 30, 2020.  As part of my assignment on that day, I conducted observation of Terra Firma, the supervised visitation facility where Christoffer was to drop off ▮▮▮▮ for ▮▮▮▮s visit with his biological mother, Kailin Wang.

During the course of my observation from a secured position, I noted the following:

1618: Kailin Wang, John Wang, and Jan Wang arrived at Terra Firma, in ▮▮▮▮▮ ▮▮▮▮▮ UT plate.

Wang Family made 3 passes driving in the rear parking lot, filming out of the car window on 3rd pass. It appeared that they were filming the rear of the Terra Firma facility where the visit was to take place.

1700: ▮▮▮▮r Thygesen delivered baby to Terra Firma.

1920: Visitation ended. CT retrieved baby from Terra Firma, departed Hayward.

1920: Surveillance terminated.

Statement by ▮▮▮▮▮ Agent Matthew Dennis Admitting They were surveilling the Wang's in the "rear" of Terra Firma the Non-Custodial Parent's Designating Entrance

███████ then makes a False Police Report to Utah DA Investigator Richard Hales that he saw Wang's casing Terra Firma and that this was an Abduction/Kidnapping Attempt

On 6/1/21 Utah Richard Hales Executes based on Douglas L. Rappaports' False Allegations, and Staging of a Kidnapping, with this False information Sgt. Richard Hales Issued a Search Warrant based on this False Information on Wang's Home, obviously nothing relevant was found, because ███████ and his attorneys lied.

10.    In February 2021, Ms. Wang attempted to obtain personal information and the ████████████████████████████ 2-years-old. Ms. Wang has no legal custody of the boy as ordered by a California Court. Ms. Wang and her parents, ████████████████ have been seen at Terra Firma, a visitation center located in Hayward, CA. They were video recording the exterior of the visitation center, therefore, posing a possible threat of abduction of ████████ ████ from ████████ ████ , the boy's father who has full custody.

11.    The investigation indicates some of the subpoenas issued by Ms. Wang have been honored. Preliminary information indicates its possible

- Page 3 of Affidavit for Search Warrant No. 2267231 -

███████ Paid Douglas Rappaport to Lie and Stage a Fake Crime and communicated False Kidnapping allegations to Utah County District Attorney Investigator Richard Hales which resulted in a SWAT search of Wang's home NOTHING WAS FOUND!!!!

On 7/19/21 ███████ attorney Douglas Rappaport further used Utah Sgt. Richard Hales as a conduit by telling the court that an Officer a Police Sargent concluded a Possible Kidnapping Attempt (although it was ███████ who had Rappaport first spread the lies about the Terra Firma Incident), in an attempt to further Terminate all Visitation between Wang and her then 3 year old son. This is the sickening, highly unethical and fraudulent nature of ███████ and their attorneys a.k.a Google Grandpa, Current DocuSign CEO.

MR. RAPPAPORT:  Thank you, Your Honor.

Contrary to Ms. Wang's statement, there is something very new.  Within a week of filing the Ex Parte request to temporarily suspend the in-person visitation, the in-person visitation in lieu of video visitation.  There we received a sworn statement from an officer of the law stating that there appear to be an abduction risk.  He swore that --

MS. WANG:  Who gave him that information?

THE COURT:  Ms. Wang, Ms. Wang, please do not interrupt.  I'm going to ask that you not interrupt.  I will give you a brief opportunity to respond.

MR. RAPPAPORT:  He swore that under penalty of perjury as a statement to a court in order to obtain a Search Warrant from Ms. Wang's home and Ms. Wang's computer and electronic data, it is a sworn statement in which the officer stated -- inspector, actually, states that it wasn't just the fact that she was seen videotaping the back of Terra Firma.

███████ Hired Liar Attorney Douglas Rappaport using Utah County DA Investigator Richard Hales as a conduit for his lies.

22. Prior to a scheduled visit, the Custodial Parent will park in front and enter Terra Firma's premises through the front door.  The Visiting Parent will park in the back and enter Terra Firma's premises through the back door.  This also means the Custodial Parent should not be driving anywhere in the back side where the Visiting Parent is parked and the Visiting Parent should not be driving through the front area where the Custodial Parent is parked.  Non-compliance of this rule will result in termination of that visit and the person responsible for the termination will be charged for the visit.  This includes any additional guests, family or friends before and after the visit.

Terra Firma Policies which ███████ signed knowingly yet  no only violated this by hiring agents to surveil, stalk and harass the Wang's he additional staged a Fake Crime and Falsely reported Kidnapping Allegations.

██████ deliberately omitted material on, he withheld that the Terra Firma Policy FORBIDS THE PARENT W. CUSTODY TO BE WAITING IN THE DESIGNATED ENTRANCE OF THE NON-CUSTODIAL PARENT.

████████

Under California law, telling only part of the truth in any court filing by an attorney is the same as telling a lie, and withholding, concealing, or omitting relevant information in court filings is the same as telling a lie. And is considered fraud on the court, according to the State Bar. A lawyer who tells a half-truth in court or in court filings is considered to have told an outright lie. Under state attorney ethical standards, an attorney who withholds or conceals material facts or information from a judge also is guilty of lying, according to the State Bar.

████████ continues to have us stalked, surveilled in an attempt to again have me falsely prosecuted again.

**Do you see the license pl████████ (6VHT147) in the Green ████ Terra Firma?**

In the photo in an email dated 9/18/20 below  of the Green Honda license plate number (6VHT147)  that picture was taken in September 2020.



**Gmail**

**License Plate Number of the car parked at back of Terra Firma**

3 messages

John Wang                                                  Fri, Sep 18, 2020 at 10:00 PM
To:

6VHT147 CA
Honda CRV

Now almost 3 years later that exact same car with the exact same license plate (6VHT147) was seen surveilling us outside Rally San Mateo on  June 11, 2023 !



The exact same car with the exact same license number (6VHT147)  was surveilling us before I arrived for my Rally visit, and was still surveilling us after my visit.

██████ continues his campaign of Terror and Attempts to Fake, Manipulate new Criminal Charges.

Clearly, ██████ feels that the Rally rules and policies do not apply to him. ██████ has made numerous false police reports at Rally despite him violating the law by again having his private investigators Surveil us before and after his designated arrival and departure time, this is frightening because last time he falsely accused us of kidnapping the child when we documented his agents following us, he is literally covering up his illegal activities with false allegations to the police about me, can Rally document again that ██████ has been warned.

On June 17, 2021 Rally Staff sent the following e-mail to Father:

Hello Mr. ██████

This is a friendly reminder that per Rally guidelines, "Parents are asked not to bring anyone else to the facility or surrounding areas when visiting at Rally."

Please let us know if you have any questions.

███████ on numerous occasions June 2, 2022 had a Black Jeep wait on-site at Rally to Stalk, Surveil, and film the Wang's the Black Jeep was surveilling the Wang's before ████████ arrived with the child, and would wait long after ████████ has left with the child. See Previous False Kidnapping Allegations ████████ has made against Wang at Terra Firma.

*June 2, 2022 (In-person visit)*

The Visiting Parent and Grandparents arrived at their designated arrival time with one big suitcase and a carry-on. As Staff was escorting them to the Visitation room, the Visiting Parent showed Staff a picture on her phone of a black *Jeep* car with no license plate. The Visiting Parent stated that the car was following them on their way to the visit and that it was parked outside the building. The Visiting Parent also mentioned that they were concerned about their safety and she also mentioned that these were private investigators hired by the Custodial Parent and his family. The Visiting Parent added that this happened before and that it had been documented but that the Custodial Parent lied to the court. Staff informed the Visiting Parent that all they could was document what she was reporting to Staff. Once they were in the visitation room Staff checked the suitcases and they had books, toys, markers colors, and some drinks such as yogurt. As Staff was checking the suitcases, the Visiting Parent mentioned that they wanted the court to know about them being followed indicating the Custodial Parent came from a wealthy family and they had lied to court in previous hearings. The Custodial Parent and ███████ arrived at their designated arrival time then Staff escorted ███████ to the Visitation room.



June 2, 2022 ▇▇▇▇▇▇ PI's Surveilling in Black Jeep the Wang's Onsite at Rally Before ▇▇▇▇▇ arrived w/ Child



June 2, 2022 ████████ PI's Surveilling in Black Jeep the Wang's Onsite at Rally Before ████████ arrived w/ Child

**On June 30, 2022 ████████ made another False Kidnapping Police Report against the Wang's at Rally Visitation, by false stating Wang approached their security team who again were Stalking, Surveilling, the Wangs' for no apparent reason except to make new False Allegations against them by filming them, or to prompt more False Kidnapping Police Reports in efforts to have Wang falsely indicted.**

## SAN MATEO POLICE DEPARTMENT

Page 1

### CAD INCIDENT REPORT
### 2206300137

02/09/2023

| Location | | Cross Streets | City |
|---|---|---|---|
| RALLY FAMILY VISITATION SERVICES, 427 9TH AV #109 | | S CLAREMONT ST/S DELA | SAN MATEO |

| Incident Type | | Call Taker | Dispatcher |
|---|---|---|---|
| INFO – INFORMATION ONLY | | REYES, REINA | |

| Date | Priority | Primary Unit | Beat | Fire Zone | Area | Map | Source |
|---|---|---|---|---|---|---|---|
| 06/30/2022 | | | DT | | 17A | | TELEPHONE CALL |

| Caller Name | Caller Address | Caller Phone |
|---|---|---|
| | | |

| Disposition | Weapon | Alm Level | Case Number |
|---|---|---|---|
| Canceled | | | |

| Vehicles | Associated Incidents |
|---|---|
| | |

| Incident Times | | Special Circumstances |
|---|---|---|
| Received | 16:27:02 | |
| Created | 16:34:11 | |
| Dispatched | | Persons — Te___ T_____ AGAIN called 911, aking FALSE Kidnapping Allegations against the Wang's | Sex | DOB | Race | U1 |
| En Route | | |
| On Scene | | |
| Closed | 04:45:25 | |
| Revd-Closed | 12:18:23 | |

| Unit Times  Officers | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | Enrt-On Scene | On Scene-Clear | Disp-Clear |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

**Incident Comments**

SUBJ IS KNOWN TO ATTEMPT TO KIDNAPP HER OWN CHILD DURING VISITATION..TWO WEEKS AGO SHE CONFRONTED ONE OF THE GUARDS..NO ASST NEEDED

---

**Kailin Wang** <kaywg2372@gmail.com>
to Shared ▾

Tue, Aug 9, 2022, 3:52PM  ☆  ↩  ⋮

Thank you, and noted, **thank you for letting me know right away.** Absolutely, these issues will only be addressed **before and after** the visit, not during.

There was a car with a man waiting in a black Tesla on 8/4/22 with no license plates in the front and a sticker license plate in the back.

Back on March 24, 20222, the same day the San Mateo Police showed up @ Rally, this jeep with no front nor back license plate was surveilling us

On June 17, 2021 Rally Staff sent the following e-mail to Father:

Hello Mr. Thygesen,

This is a friendly reminder that per Rally guidelines, "Parents are asked not to bring anyone else to the facility or surrounding areas when visiting at Rally."

Please let us know if you have any questions.

Thank you for the update, see you Thursday Aug. 11, 2022.

Kailin Wang

...

--
Kailin Wang
Phone: 801-645-1060

**5 Attachments** · Scanned by Gmail ⓘ

PDF Surveillancing No...

**████████ on July 16, 2023 again had his agents wait in the same Black Jeep at Rally On-Site, this is continuous course of conduct in violation of Cal. Fam. Code § 6320 ("monitoring the other party's movements,")**



July 16, 2023 ████████ again had PI's Surveilling in Black Jeep the Wang's Onsite at Rally Before ████████ arrived w/ Child, This is another attempt to Stage a Fake Crime



July 16, 2023 ████████ again had PI's Surveilling in Black Jeep the Wang's Onsite at Rally Before ████████ arrived w/ Child, This is another attempt to Stage a Fake Crime



July 16, 2023 ███████ again had PI's Surveilling in Black Jeep the Wang's Onsite at Rally Before ███████ arrived w/ Child, This is another attempt to Stage a Fake Crime



July 16, 2023 ████████ again had PI's Surveilling in Black Jeep the Wang's Onsite at Rally Before ████████ arrived w/ Child, This is another attempt to Stage a Fake Crime

████████ due to A█ ████████ $86 Million+ in salary as the CEO of DocuSign never feels as laws, or policies of Rally, Terra Firma should ever apply to them, they feel as if they are above the law, that it does not apply to them that cannot be tolerated.

## OVERVIEW OF OBSERVATION NOTES:

For the period of time covered by this case report, two (2) in-person visits were scheduled to occur, and two (2) actually took place.  The complete observation notes, as documented by Rally Staff are included in this report for review by the Court at the next scheduled hearing.

**Cancellations, No-shows, Late/early arrivals:**

Date:              Parent:              Reason (if any provided): _____

_**March 24, 2022 (In-person visit)**_

Five (5) hours prior to the visit's designated start time, a police officer arrived at Rally asking to speak to Staff about the visit. The police officer explained that there were some concerns made and asked to talk about the plans for the visit. The Supervisor spoke to the police officer and he said that the Custodial Parent's Mother had called and voiced concerns about the visit.  He added that the Custodial Parent's Mother indicated that the Visiting Parent posted details on a social media platform about the visit's location and also posted the schedule when the Visiting Parent was attending the visit. The Supervisor told him that Rally had their own policies that were placed in to ensure the safety of the Child and would be implemented if needed. The police officer mentioned that as a precautionary measure, he would remain near the area in case something happened during the visit. The police officer thanked Staff and left the Rally.

The Visiting Parent, Grandmother, and Grandfather arrived at their designated time. The Grandfather placed two (2) bags of his personal belongings in a room. Staff checked the bags and in the bags, it contained books, toys, and some sealed beverages. Afterwards, Staff escorted

_____

IN THE FOURTH DISTRICT COURT - ALL DEPARTMENT

IN AND FOR UTAH COUNTY, STATE OF UTAH

_____

**AFFIDAVIT FOR SEARCH WARRANT**

STATE OF UTAH )
                        :ss
County of Utah )


The undersigned affiant, Sergeant RICHARD HALES of UCAO-BOI, upon an oath or written affidavit subscribed under criminal penalty, declares:

That your affiant has reason to believe:

THAT

> On the premises known as 2481 Fairway Dr.
> Spanish Fork, Utah 84660, further described as The home is located on Fairway Drive with the front facing the street. The rear facing the 16th hole of The Oaks Golf Course. The home shares a common wall with 2485. The garage is on the north side at a lower elevation than the front door. The numbers 2481 are above the garage door. It is tan stucco with brown garage door and front entry door that is partially enclosed by a covered porch/entrance.;

In the City of SPANISH FORK, County of Utah, State of Utah, there is now certain property or evidence described as:

> To seize any computer, cell phone, electronic device, paper documents or electronic storage device capable of creating, storing, or transmitting information related to the creation of unauthorized or fraudulent subpoena documents.

and that said property or evidence:

> Was unlawfully acquired or is unlawfully possessed;

> has been used or is possessed for the purpose of being used to commit or conceal the commission of an offense; or

> is evidence of illegal conduct.

5.      Ms. Wang, without consent or knowledge of Judge Low, has used the Court's authority to issue at least ten out of state subpoenas. Ms. Wang copied the original Utah Court order dated June 4, 2020 in order to support the domestication of fraudulent subpoenas through the California courts. In creating these fraudulent subpoenas, Ms. Wang used a computer to electronically create the subpoenas, then served the subpoenas electronically to the businesses.

6.      I have obtained copies of the fraudulent subpoenas. All of the subpoenas direct the recipient to return the requested information to Kailin Wang either electronically by PDF at email address KAYWG2372@gmail.com or to the physical address of 2481 Fairway Drive, Spanish Fork, UT 84660.

7.      On March 12, 2021, Inspector Matt Broad of the San Mateo County District Attorney's Office received information from Comcast relevant to a search warrant issued by his office. The search warrant was for related information to IP addresses and location information related to email address KAYWG2372@gmail.com. The certified documents from Comcast returned to the location 2481 Fairway Drive, Spanish Fork, UT 84660. The subscriber information was John Wang at the same address. (John Wang is Kalin Wang's father.) The IP addresses used to obtain and serve the subpoenas matched the subscriber information.

8.     Ms. Wang has personally communicated either by phone or email with parties receiving the subpoenas in California. She has negotiated time extensions by phone with at least one party using phone number (801) 645-1060. This phone number is registered to K. Wang using T-Mobile service. Ms. Wang represented, both by email and voice, she has the Court's authority to issue the subpoenas. Ms. Wang used the email address KAYWG2372@gmail.com in her correspondence.

9.     Amber Evans, custodian of records for the 4th District Court, State of Utah has verified the original order on June 4, 2020 is a valid order. The custodian of records has confirmed there is no record of the additional subpoenas issued by Ms. Wang other than the original two mentioned in paragraph 4.

10.     In February 2021, Ms. Wang attempted to obtain personal information and the US Passport of ▮▮▮▮ (▮▮▮ ▮▮▮▮▮ 2-years-old. Ms. Wang has no legal custody of the boy as ordered by a California Court. Ms. Wang and her parents, John Wang and Jan Cheng, have been seen at Terra Firma, a visitation center located in Hayward, CA. They were video recording the exterior of the visitation center, therefore, posing a possible threat of abduction of ▮▮▮▮ (▮▮▮ ▮▮▮▮ from ▮▮▮▮▮ ▮▮▮▮▮ the boy's father who has full custody.

11.     The investigation indicates some of the subpoenas issued by Ms. Wang have been honored. Preliminary information indicates its possible

# EXHIBIT 6



| 26 | Mark Brenzinger Psychologist, PsyD | In March of 2019 ▮▮▮▮ hired Mark Brenzinger to falsely state that Wang made the March 6, 2019 "Kill Baby K" post and had him lie to law enforcement and Utah DCFS about Wang have Severe Mental Disorders | | | December 2018-Present |

Sheet1    Sheet2    +

City, Zip or Name



Home > Schaumburg Mark Brenzinger
Psychologist, PsyD

# Mark Brenzinger

Psychologist, PsyD
Verified by Psychology Today

| Email Me | (847) 603-4745 |



| (847) 603-4745 |
| Email Me |

Midwest Behavioral Risk Management, P.C.
869 East Schaumburg Road
Suite 252
Schaumburg, Illinois 60194
**(847) 603-4745**

I provide Forensic and Clinical Evaluations / Consultation Services in the Chicagoland area and Nationally. Psychological Evaluation Services: Psychosexual Risk Evaluation (Pre-Trial, Post-Conviction / Pre-Sentence, Post-Sentence and for DCFS); Sex Offender Evaluation (State and Federal Cases); Psychosexual Evaluation (Sexually Problematic Behaviors / Addiction); Violence Risk and Threat Assessment (Workplace, K-12, University, and Private Individuals); Mental Health Certification for Firearm Possession Evaluation (IL-FOID). Clients include adult and adolescent males and females.

I also provide Fitness for Duty Evaluation (Public Safety Personnel and Corporate Employees); Independent Medical Examination (IME); and General Evaluation (Mental Status, Cognitive Functioning, Psychopathology, Substance Use).

I hold the following Illinois Licenses: Clinical Psychologist, Sex Offender Evaluator and Treatment Provider. I am a Member of the Cook County SOMB; Approved Provider for

IN THE FOURTH JUDICIAL DISTRICT COURT
OF UTAH COUNTY, STATE OF UTAH


_____
                              )
KAILIN WANG,                  )
                              )
            Petitioner,       )
                              )
        vs.                   ) Case No. 194400718 PT
                              )
███████ ██████ ███████        )
                              )
        Respondent.           )
_____)


911 Call
Electronically Recorded on
March 6, 2019


Transcribed by: Natalie Lake, OCT


152 E. Katresha St.
Grantsville, UT 84029
Telephone: (435) 590-5575

-1-

P R O C E E D I N G S

(Electronically recorded on March 6, 2019)

OPERATOR:  March 6, 2019, 14:12:23.

911 OPERATOR:  Police and fire dispatch.

MR. BRENZINGER:  Hi.  My name is Mark Brenzinger. I'm calling from Chicago.  I work at a private security risk management firm, and we have an emergent situation in your jurisdiction.  I was hoping to speak with -- we've been working with your constable in the area, and he's been working with a sergeant, and we have some information we want to share with you in a fresh court order.  Is there any way you can get connected to a watch commander or a sergeant?

911 OPERATOR:  For what city, sir?

MR. BRENZINGER:  Spanish Fork's.

911 OPERATOR:  Let's see.  Yeah, I can go ahead and get your information and then ask a sergeant to give you a call back.

MR. BRENZINGER:  Okay.  The long and the short of it is we have a court order coming out of California that's allowing -- it's allowing law enforcement to go and remove a child that is at risk right now and hand that child over to the biological father, who is en route.

911 OPERATOR:  Okay.  Sir, can I have your phone number?

MR. BRENZINGER:  Yes.  It's 847-306-2220.

-2-

911 ████████████n, what is your first and last name again?

MR. BRENZINGER: First name Mark, M-a-r-k, last name Brenzinger, B as in boy, r-e-n, z as in zebra, i-n-g-e-r.

911 OPERATOR: Okay. What agency did you say you're with, Mark? ██████████

MR. BRENZINGER: Hillard Heintze, H-i-l-l-a-r-d, H-e-i-n-t-z-e. We████████████icago.

911 OPERATOR: Okay. That's a private investigation firm, you said?

MR. BRENZINGER: Private investigation firm, yes, ma'am. ██████████

911 OPERATOR: Okay. Is the 847 number a good call back number for Hillard Heintze?

MR. ██████████'s a good call back number for me. I'll give you a back up number of 312-22████████

MS. ██████████ 9806.

MR. BRENZINGER: -- 9806.

911 ██████████. Mark, could you just update for me, please, th████████ that's not necessary. I'll just take that out. Okay. I'm going to have a sergeant from Spanish Fork give you a call back.

MR. ██████████ay. Can we make this -- with all due respect --████████e believe our subject is mentally unstable, has just got bad news, and she just posted a threat

-3-

about two hour██████████████omicidal threat and a suicidal threat regarding herself and this baby.

911 OPERATOR:  Okay.  What is -- what is your subject's name?

MR. BRENZINGER:  My subject's name is --

MS. ██████████████  Kailin.

MR. BRENZINGER:  -- Kailin.  K-a-i-l-i-n, Wang, W-a-n-g.  ██████████████

911 OPERATOR:  Okay.  Do we need to have an officer respond to her address?

MR. BRENZINGER:  Well, I think we do.  I'd like to give you the a██████████████

911 OPERATOR:  Okay.

MR. BRENZINGER:  The address is 2481 Fairway Drive in Spanish Fork, ██████████████r should be prepared for anything, really.  This family has not been cooper███████We've not been able to serve ██████████████an several weeks.

911 OPERATOR:  Okay.

MR. ██████████████e's been very evasive, and her parent that sh██████████████

911 OPERATOR:  And has she been --

MR. BRENZINGER:  -- has also --

911 ██████████████ excuse me, Mark, has she made threats to her██████████████

MR. BRENZINGER:  She has made threats to herself on

-4-

social media, ████████████████

911 OPERATOR:  And to the baby?

MR. BRENZINGER:  And to the baby, as of two hours ago there was a posting.  She was aware there was a hearing in San Francisco.  She was not present, and we're not certain how much information sh████████████████

911 OPERATOR:  Okay.

MR. ████████████████ but the Court found that the baby needs to be removed from --

911 OPERATOR:  Okay.  Do you have -- do you have a phone number for Kailin?

MR. ████████████████e second, let me --

MR. DARRICK CHASE:  And just more information, the order that we have is a domestic violence prevention order that gets entered i████████████ble) system, so this is the order that gives full custody to my -- to Mr. ████████ and has an effecting orde████████████ement to get the baby from Kailin or anybody else who --

911 ████████████████.  Sir, do you have a phone number for her?  ████████████████

MR. BRENZINGER:  We're looking that up right now.  If you have an email where we could forward you these orders, that would probably████████████████

911 ████████████████threats that she made to herself, did she make any mention of how she would hurt herself or the

-5-

child? ████████████████

MR. BRENZINGER:  I do not believe there was a method noted in this statement, no, ma'am.

911 OPERATOR:  Okay.  Do you know if she has any weapons or any access to weapons?

MR. ████████████don't know if she has weapons or access.

911 ████████████ou know if she has any history of using alcohol or drugs?

MR. BRENZINGER:  She does have a history of using alcohol.  I cannot confirm on drugs.

MR. ████████████ So can I give you something on the temporary restraining order with respect to guns?

911 OPERATOR:  Okay.  No, I'll have an officer call you for the in████████████ the orders, but right now I just need to get the information so we can go████████nd do a welfare check, and the████████████ to an officer when he calls you back about the orders in particular.

MS. ████████████  I'm going to give you three phone numbers.████████████ is at the residence.

911 OPERATOR:  Okay.  Hold on, ma'am.  Hold on, please.

MS. ████████████  Sorry.

911 ████████████.  Go ahead with the phone numbers, ma'am.

-6-

MS. ████████████████  Okay.  The first one is where we believe she's residing with her parents, and that's -- it's a land line, we believe, and it's 801-794-2801.

911 OPERATOR:  Okay.  Is this the parent's house address, the Fairway Drive?

MS. ████████████████  Yes.

911 OPERATOR:  Okay.

MS. ████████████████  The next number is a cell phone that we believe belongs to Kailin, and that number is 323-244-3244.

911 OPERATOR:  And that's Kailin's cell phone?

MS. ████████████████  Yes.  I have one more cell phone number for her.

911 OPERATOR:  Okay.

MS. ████████████████  And that is 917-432-4181.

911 OPERATOR:  Okay.  ████████

MS. ████████████████  I don't know which of the two cell phones are still active, or if they both are.

911 ████████████████ou know how old the baby is?

MS. ████████████  Three months.

MR. BRENZINGER:  Three months.

911 OPERATOR:  Okay.  Do you know if Kailin has a vehicle?  ████████████

MS. ████████████████  Yes.  There are two vehicles and a -- they belong to either her or her parents, unclear, but let

-7-

me give you both of them.  Hold on one second.

911 OPERATOR:  Do you guys know the baby's name and what sex the baby is?

MR. DARRICK CHASE:  Yes.  Baby's name is ███████ ██████ ████████  His middle name is █████████ T-h-y-g-e-s-e-n, last name Wang.  He's a boy.  His birth date is 11/26/2018.

911 OPERATOR:  Okay.

MR. DARRICK CHASE:  He's a white baby.  Well, as far as we know.

911 OPERATOR:  Okay.  Then the vehicle information for Kailin?

MS. █████████████  Give me one second.  I'm opening it up.  Okay.  It's a -- there are two cars.  One is a gold BMW SUV.  The license plate is Boy, 5, 3, 8, Edward, Apple.

911 OPERATOR:  Okay.

MS. █████████████  I'll read that back to you, Boy, 5, 3, 8, Edward Apple.  The second car is a red Lexus SUV.  The license plate is David, 5, 6, 9, X-ray, Tango.  We believe the baby seat is usually in the red Lexus, FYI.

911 OPERATOR:  Okay.  So I have all the information that I need.  We're going to send out for us to do a welfare check, and then I've put in here a note for someone to contact you by phone after they've made contact.

MS. █████████████  Can we do that before just to give more information?

-8-

911 ████████████ally, our main priority right now is to make sure everything is okay, and then we'll have someone give you a call when they're done.

MR. BRENZINGER:  Okay.  Then we can send over the orders at that time as well, if that's okay?

911 ████████████.

MR. DARRICK CHASE:  We want to get the baby at the time we do the ████████████

911 OPERATOR:  When the officer does call you, he'll likely be calling from a blocked or a private number, so just look out for that.

MR. ████████████s, ma'am.  Thank you.

911 OPERATOR:  Okay.  Thank you.

MS. CHASE:  Thank you.

911 ████████████.  Bye-bye.

MR. DARRICK CHASE:  Bye.    ████████

(Con████████████call)

-9-

## REPORTER'S CERTIFICATE

STATE OF UTAH           )
                        ) ss.
COUNTY OF TOOELE        )

I, Natalie Lake, a Notary Public in and for the State of Utah, do hereby certify:

That this proceeding was transcribed under my direction from the transmitter records made of these meetings.

That I have been authorized by Beverly Lowe to prepare said transcript, as an independent contractor working under her court reporter's license, appropriately authorized under Utah statutes.

That this transcript is full, true, correct, and contains all of the evidence and all matters to which the same related which were audible through said recording.

I further certify that I am not interested in the outcome thereof.

That certain parties were not identified in the record, and therefore, the name associated with the statement may not be the correct name as to the speaker.

WITNESS MY HAND AND SEAL this 11th day of May 2020.

My commission expires:
January 9, 2024

Natalie Lake
NOTARY PUBLIC
Residing in Tooele County

Beverly Lowe, RSR, CCR



Natalie Lake
Notary Public, State of Utah
Commission # 709897
My Commission Expires
January 9, 2024

```
08/26/19                      Utah Valley Dispatch                        6475
08:58                         CALL DETAIL REPORT                  Page:      1

Call Number:        C6050525

Nature:             WELF CHEC 6
Reported:           14:13:17 03/06/19
Rcvd By:            Tauaefa K DD                    How Rcvd: T
Occ Btwn:           14:12:27 03/06/19    and 14:12:27 03/06/19
Type:               1
Priority:           3

Address:            2481 S FAIRWAY DR
City:

Alarm:

COMPLAINANT/CONTACT
-------------------
Complainant: HILLARD HEINTZE,                      Name#:    1206993
Race:       Sex:      DOB: **/**/**
Address: 30 S Wacker Dr, Chicago
Home Phone: (312)229-9806             Work Phone: (312)869-8500

Contact: mark brenzinger
Address:
Phone: (847)306-2220

RADIO LOG
---------
Dispatcher Time/Date          Unit    Code Zone Agnc Description
---------- ------------------ ------  ---- ---- ---- ------------------------
Willden L  14:19:29 03/06/19 6J34     ENRT SFPD SFPD incid#=19SF01599 Enroute to
                                                     a Call call=7201
Willden L  14:19:41 03/06/19 6J22     ENRT SFPD SFPD incid#=19SF01599 Enroute to
                                                     a Call call=7201
Smith D (S 14:22:36 03/06/19 6J22     DLIN SFPD SFPD MDC: name=WANG, KAILIN
                                                     dob=01/20/1983 sex=F
                                                     dl=167959889 state=UT
Willden L  14:27:22 03/06/19 6J22     ARRV SFPD SFPD call=7201
Willden L  14:29:36 03/06/19 6J34     ARRV SFPD SFPD call=7201
Smith D (S 14:32:18 03/06/19 6J22     VHIN SFPD SFPD MDC: pl=B538EA st=UT
                                                     lptyp=PC
Smith D (S 14:32:19 03/06/19 6J22     VHRE SFPD SFPD MDC: pl=B538EA st=UT
                                                     lptyp=PC
Willden L  15:09:19 03/06/19 6J22     TS   SFPD SFPD 3313 E HAWK DR, SF; pl=,
                                                     call=7201
Willden L  15:09:20 03/06/19 6J22     CMPL SFPD SFPD incid#=19SF01599 Reassigned
                                                     to call 8141, completed call
                                                     7201
Willden L  15:09:41 03/06/19 6J34     CMPL SFPD SFPD incid#=19SF01599 Reassigned
                                                     to call 8141, completed call
                                                     7201
Willden L  15:29:35 03/06/19 6J34     ARRV SFPD SFPD incid#=19SF01599 Arrived on
                                                     Scene call=7201
Willden L  15:40:59 03/06/19 6J34     4    SFPD SFPD incid#=19SF01599 suspend
                                                     call=7201
```

```
08/26/19                        Utah Valley Dispatch                          6475
08:58                           CALL DETAIL REPORT                   Page:     2

Willden L  15:45:47 03/06/19 6J34    CMPL SFPD SFPD incid#=19SF01599 Reassigned
                                                    to call 8781, completed call
                                                    7201
Willden L  16:11:53 03/06/19 6J34    ARRV SFPD SFPD incid#=19SF01599 Arrived on
                                                    Scene call=7201
Solie E (S 17:36:57 03/06/19 6J34    NMIN SFPD SFPD MDC: name=WANG, KAILIN
Solie E (S 17:36:58 03/06/19 6J34    DLIN SFPD SFPD MDC: name=WANG, KAILIN
Solie E (S 17:37:18 03/06/19 6J34    DLIN SFPD SFPD MDC: name=WANG, KAILIN
                                                    dob=01/20/1983 sex=F
                                                    dl=167959889 state=UT
Solie E (S 17:37:19 03/06/19 6J34    NMIN SFPD SFPD MDC: name=WANG, KAILIN
                                                    dob=01/20/1983 sex=F
                                                    dl=167959889 state=UT
Solie E (S 17:37:50 03/06/19 6J34    NMIN SFPD SFPD MDC: name=███████
Solie E (S 17:37:51 03/06/19 6J34    DLIN SFPD SFPD MDC: name=███████
Willden L  18:12:16 03/06/19 6J34    CMPL SFPD SFPD
```

COMMENTS
--------
subject re kailin wang / mental problems / has made threats to herself and to
baby as of two hours ago / rp is calling from out of state / has orders for
custody to be given to father / no method mentioned / hx of alc / unk drugs
14:19:03 03/06/2019 - Tauaefa K DD
unk weapons
14:19:52 03/06/2019 - Tauaefa K DD
poss #801 794 2801 parents house / 323 244 3244 kailins cell / 917 432 4181 cell
14:20:01 03/06/2019 - Tauaefa K DD
baby is 3 months old
14:20:50 03/06/2019 - Tauaefa K DD
babys name is ████████ ███████ ██████
14:21:07 03/06/2019 - Tauaefa K DD
rp req 1021 after contact
14:21:42 03/06/2019 - Tauaefa K DD
poss veh gold suv b538ea / red lexus suv d569xt
14:39:56 03/06/2019 - Frazier J DD - From: Solie E (SF)
c4
14:50:37 03/06/2019 - Willden L  DD - From: Solie E (SF)
code 4
15:01:23 03/06/2019 - Willden L  DD - From: Solie E (SF)
code 4

UNIT HISTORY
------------
```
Unit    Time/Date              Code
-----   -------------------    ----
6J22    14:19:41 03/06/19      ENRT
6J22    14:22:36 03/06/19      DLIN
6J22    14:27:22 03/06/19      ARRV
6J22    14:32:18 03/06/19      VHIN
6J22    14:32:19 03/06/19      VHRE
6J22    15:09:19 03/06/19      TS
6J22    15:09:20 03/06/19      CMPL
6J34    14:19:29 03/06/19      ENRT
6J34    14:29:36 03/06/19      ARRV
```

**FL-300**

| PARTY WITHOUT ATTORNEY OR ATTORNEY | STATE BAR NUMBER: | FOR COURT USE ONLY |
|---|---|---|
| NAME: Douglas L. Rappaport (136194) | | |
| FIRM NAME: LAW OFFICES OF DOUGLAS L. RAPPAPORT | | |
| STREET ADDRESS: 260 California Street, Suite 1002 | | |
| CITY: San Francisco    STATE: CA    ZIP CODE: 94111 | | |
| TELEPHONE NO.: (415) 989-7900    FAX NO.: (415) 989-7950 | | |
| E-MAIL ADDRESS: admin@sfcrimlaw.com | | |
| ATTORNEY FOR (name): ▮▮▮▮ | | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF    San Francisco
STREET ADDRESS:    400 McAllister Street
MAILING ADDRESS:    400 McAllister Street
CITY AND ZIP CODE:    San Francisco, CA 94102
BRANCH NAME:    Civic Center Courthouse

PETITIONER: ▮▮▮▮ R ▮▮▮▮
RESPONDENT: KAILIN WANG
OTHER PARENT/PARTY:

| REQUEST FOR ORDER [ ] CHANGE [X] TEMPORARY EMERGENCY ORDERS | CASE NUMBER: |
|---|---|
| [ ] Child Custody  [X] Visitation (Parenting Time)  [ ] Spousal or Partner Support | FDV-19-814465 |
| [ ] Child Support  [ ] Domestic Violence Order  [ ] Attorney's Fees and Costs | |
| [ ] Property Control  [ ] Other (specify): | |

## NOTICE OF HEARING

1.  TO (name(s)): Kailin Wang
    [ ] Petitioner  [X] Respondent  [ ] Other Parent/Party  [ ] Other (specify):

2.  **A COURT HEARING WILL BE HELD AS FOLLOWS:**

    a. Date: **March 1, 2024**    Time: **1:30 p.m.**    [X] Dept.: **403**    [ ] Room.:
    b. Address of court [X] same as noted above [ ] other (specify):

3.  **WARNING to the person served with the *Request for Order:*** The court may make the requested orders without you if you do not file a *Responsive Declaration to Request for Order* (form FL-320), serve a copy on the other parties at least nine court days before the hearing (unless the court has ordered a shorter period of time), and appear at the hearing. *(See form FL-320-INFO for more information.)*

    *(Forms FL-300-INFO and DV-400-INFO provide information about completing this form.)*

## COURT ORDER
*It is ordered that:*    (FOR COURT USE ONLY)

4.  [ ] Time [ ] for service [ ] until the hearing is shortened. Service must be on or before (date):

5.  [ ] A *Responsive Declaration to Request for Order* (form FL-320) must be served on or before (date):

6.  [ ] The parties must attend an appointment for child custody mediation or child custody recommending counseling as follows (specify date, time, and location):

7.  [ ] The orders in *Temporary Emergency (Ex Parte) Orders* (form FL-305) apply to this proceeding and must be personally served with all documents filed with this *Request for Order*.

8.  [ ] Other (specify):

Date: _____    _____
                                                    JUDICIAL OFFICER

                                                    Page 1 of 4

Form Adopted for Mandatory Use
Judicial Council of California
FL-300 [Rev July 1, 2016]

**REQUEST FOR ORDER**

Family Code, §§ 2045, 2107, 6224,
6226, 6320–6326, 6380–6383;
Government Code, § 26826
Cal. Rules of Court, rule 5.92
www.courts.ca.gov

FL-305

| ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER: | FOR COURT USE ONLY |
|---|---|---|

NAME: Douglas L. Rappaport (136194)
FIRM NAME: LAW OFFICES OF DOUGLAS L. RAPPAPORT
STREET ADDRESS: 260 California Street, Suite 1002
CITY: San Francisco    STATE: CA    ZIP CODE: 94111
TELEPHONE NO.: (415) 989-7900    FAX NO.: (415) 989-7950
E-MAIL ADDRESS: admin@sfcrimlaw.com
ATTORNEY FOR (name): ▮▮▮▮▮▮▮▮▮▮

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

PETITIONER: ▮▮▮▮▮▮▮▮▮▮
RESPONDENT: KAILIN WANG
OTHER PARENT/PARTY:

| TEMPORARY EMERGENCY (EX PARTE) ORDERS | CASE NUMBER: |
|---|---|
| [ ] Child Custody [x] Visitation (Parenting Time) [ ] Property Control<br>[ ] Other (specify): | FDV-19-814465 |

1. **TO (name(s)):** Kailin Wang

   [ ] Petitioner  [x] Respondent  [ ] Other Parent/Party  [ ] Other (specify):

   A court hearing will be held on the *Request for Order* (form FL-300) served with this order, as follows:

   a. Date: **March 1, 2024**   Time: **1:30 p.m.**   [x] Dept.: **403**   [x] Room: **403**

   b. Address of court [x] same as noted above   [ ] other (specify):

2. **Findings:** Temporary emergency (ex parte) orders are needed to: (a) help prevent an immediate loss or irreparable harm to a party or to children in the case, (b) help prevent immediate loss or damage to property subject to disposition in the case, or (c) set or change procedures for a hearing or trial.

**COURT ORDERS:** The following temporary emergency orders expire on the date and time of the hearing scheduled in (1), unless extended by court order:

3. [x] **CHILD CUSTODY**

   a. Child's name    Date of Birth    Temporary physical custody, care, and control to:
   Petitioner   Respondent   Other Party/Parent

   ▮▮▮▮▮▮▮▮    ▮▮/2018

   [ ] Continued on Attachment 3(a)

   b. [x] **Visitation (Parenting Time)**   The temporary orders for physical custody, care, and control of the minor children in (3) are subject to the other party's or parties' rights of visitation (parenting time) as follows (specify):

   Petitioner has sole legal/physical custody of Minor Child ("MC") in 3.a., above. This Ex Parte Order relates to Respondent's visitation with MC. See Attachment 3(b).

[x] See Attachment 3(b)

Page 1 of 2

***THIS IS A COURT ORDER.***

Form Adopted for Mandatory Use
Judicial Council of California
FL-305 [Rev. July 1, 2016]

**TEMPORARY EMERGENCY (EX PARTE) ORDERS**

Family Code, §§ 2045, 3062–3064,
Cal. Rules of Court, rules 5.151–5.169
www.courts.ca.gov

FL-305

| PETITIONER: ▆▆▆▆▆▆▆▆▆▆ | CASE NUMBER: |
|---|---|
| RESPONDENT: KAILIN WANG | FDV-19-814465 |
| OTHER PARENT/PARTY: | |

3. ☐ **CHILD CUSTODY** (continued)

   c. **Travel restrictions**

     (1) The party or parties with temporary physical custody, care, and control of minor children **must not remove the minor children from the state of California unless the court allows it after a noticed hearing.**

     (2) ☐ Petitioner  ☐ Respondent  ☐ Other Parent/Party  must not remove their minor children *(specify):*

       (a) ☐ from the state of California.

       (b) ☐ from the following counties *(specify):*

       (c) ☐ other *(specify):*

   d. ☐ **Child abduction prevention orders** are attached (see form FL-341(B)).

   e. (1) **Jurisdiction:** This court has jurisdiction to make child custody orders in this case under the Uniform Child Custody Jurisdiction and Enforcement Act (part 3 of the California Family Code, commencing with section 3400).

     (2) **Notice and opportunity to be heard:** The responding party was given notice and an opportunity to be heard as provided by the laws of the State of California.

     (3) **Country of habitual residence:** The country of habitual residence of the child or children is *(specify):*

       ☐ The United States of America  ☐ Other *(specify):*

     (4) **If you violate this order, you may be subject to civil or criminal penalties, or both.**

4. ☐ **PROPERTY CONTROL**

   a. ☐ Petitioner  ☐ Respondent  ☐ Other Parent/Party  is given exclusive temporary use, possession, and control of the following property that the parties ☐ own or are buying ☐ lease or rent

   b. ☐ Petitioner  ☐ Respondent  ☐ Other Parent/Party  is ordered to make the following payments on the liens and encumbrances coming due while the order is in effect:

| Pay to: | For: | Amount: $ | Due date: |
|---|---|---|---|
| Pay to: | For: | Amount: $ | Due date: |
| Pay to: | For: | Amount: $ | Due date: |
| Pay to: | For: | Amount: $ | Due date: |

5. ☒ All other existing orders, not in conflict with these temporary emergency orders, remain in full force and effect.

6. ☐ **OTHER ORDERS** *(specify):*      ☐ Additional orders are listed in Attachment 6.

Date: _____

_____
JUDGE OF THE SUPERIOR COURT

**THIS IS A COURT ORDER.**

Attachment 3(b) [Proposed] Ex Parte Order

Petitioner's Ex Parte Application is GRANTED.  The Court ORDERS Respondent's visitation suspended pending the long-cause evidentiary hearing on calendar for July 24, July 31, and August 6, 2024.

Based on the evidence presented and the applicable law, the Court FINDS:
- There has been a Family Code § 3064 showing of immediate harm to the child ("MC").
- The temporary suspension of Respondent's visitation is in MC's best interest (Family Code § 3011 factors and § 3020 (a)-(c)).
- The temporary suspension of Respondent's visitation is in the best interest of the child, based on the circumstances of the case (Family Code § 3031 (c)).
- The temporary suspension of Respondent's visitation comports with the court's § 3100(b) mandate that visitation orders shall consider the nature of the acts that led to the protective order, the period of time that has elapsed since that order, and whether the restrained party has committed further acts of abuse (Family Code § 3100 (b)).
- The temporary suspension of Respondent's visitation comports with the court's Family Code § 3020 mandate that visitation orders shall be made in a manner that ensures the health, safety, and welfare of the child and the safety of all family members.

It is the court's bottom-line responsibility to generate court orders that ensure the health, safety, and welfare of the child. Based on the evidence presented, the Court finds it is in the best interest of the child for Respondent's visitation to be suspended pending further order of the Court.

**Family Code § 3020**:
In Family Code § 3020, the California Legislature has declared it the public policy of California to ensure that the health, safety, and welfare of children shall be the court's primary concern in determining the best interests of children when making any orders regarding the visitation of children, and that children have the right to be safe and free from abuse. Fam. Code, § 3020, subd. (a). The Legislature has also stated that when these policies conflict with the additional public policy of ensuring that children have frequent and continuing contact with both parents after the parents have ended their relationship, a court's order regarding visitation shall be made in a manner that ensures the health, safety, and welfare of the child and the safety of all family members. § 3020, subds. (b) & (c).

**Family Code § 3011**:
Cal. Fam. Code § 3011 lists specific factors the trial court must consider, "among any other factors . . . relevant and consistent with Section 3020," in determining the best interest of the child in a custody proceeding: (1) the health, safety, and welfare of the child; (2) any history of abuse by one parent seeking custody against any of the § 3011 statutorily identified parties (i.e., the child, the other parent, their parents, a prior ex-romantic partner); (3) the nature and amount of contact with both parents; and (4) the habitual or continual illegal use of controlled substances or the habitual or continual abuse of alcohol or prescribed controlled substances.

1

**Family Code § 3031**:

Cal. Fam. Code § 3031 states, "When making an order for custody or visitation in a case in which domestic violence is alleged and an emergency protective order, protective order, or other restraining order has been issued, the court shall consider whether the best interest of the child, based upon the circumstances of the case, requires that any custody or visitation arrangement shall be limited to situations in which a third person, specified by the court, is present, or whether custody or visitation shall be suspended or denied." Cal. Fam. Code § 3031.

# EXHIBIT 12

█████████ Utah Private Investigators **Chris Bertham and  Patrick Adams** Utah Private Investigator. Chris Bertham has been retained continuously by ████████ since ████████ber 2018-Present  his duties include, obtaining our child's Utah Birth Certificate on 01/17/19 before DNA genetic testing proved ████████ to be the father of the child.

Chris Bertram is also hired to follow, surveil, monitors the Wang's in Utah, appear at her Utah hearings, and obtaining Wang's Juvenile Court records recently on 01/09/23 from when she was 15 years old, and publicly filing them to smear campaign her  in California in violation of WIC 827.  Patrick Adams is a Utah PI who ████████████o conduct *unlawful pre-text method to █████████ Mental Health records by hiring investigators who pretended to be from my Public Defender's office attempting to obtain my records.*



HOME | ABOUT US | TEAM | ASIP | CONTACT US



**Chris D. Bertram**
**Lou F. Bertram**
(801) 944-7310
P.O. Box 712532
SLC, UT 84171

## Lou F. Bertram

Founder of Bertram and Associates, has over 45 years of investigative experience and is a retired Special Agent with the Federal Bureau of Investigation (1968-1988). Lou started Bertram and Associates in 1989 and focused the business on private investigations, security consulting, including security consulting services during the 2002 Winter Olympics for a Fortune 500 Top 50 company.

Lou also taught at Salt Lake Community College as an adjunct professor for 20 years. He has run Service Industries, an alcohol training and liability program, since 1989. He is a court certified expert in Utah Dram Shop law and police operations. Lou is a third generation law enforcement officer.



## Chris D. Bertram

Chris has 25 years of law enforcement and investigative experience with a major county sheriff's office and police department. He retired as a Deputy Chief from the Unified Police Department of Greater Salt Lake / Salt Lake County Sheriff Office. Chris has a Master of Arts in Homeland Defense and Security from the Naval Postgraduate School (NPS) in Monterey, CA., and a MBA from City University of Seattle. He is a graduate of the FBI National Academy Session 223 at Quantico, VA in 2005. In addition, he is a graduate of the FBI Command College (2003) and Utah POST Command College (2004).

Chris has a wide range of investigative experience, law enforcement operational and tactical proficiency as well as homeland security and intelligence knowledge. He served with several federal and local investigative task forces. He was named Utah's Deputy Sheriff of the Year in 1997. Chris started his work with Bertram and Associates in 1990. He also teaches as an adjunct professor and assistant professor at both the college and university level. Chris is the fourth generation of law enforcement in his family.

AA 1000

Bureau of Vital Records                              July 28, 2020
Vital Records Receipt

Request Number: 3036839                    2020 JUL 30  PM 1:08
Request Type:    Counter
Customer Name:  Chris Bertram             FOURTH           PROVO

| Description | Quantity | Amount |
|---|---|---|
| Birth Certificate   1/17/2019 | 1 | 20.00 |
| Total Charges | | 20.00 |

Payment Method(s): Credit

Clerk: TiffanyFitzpatrick

Bureau of Vital Records                              July 28, 2020
Vital Records Receipt

Request Number: 3036839
Request Type:    Counter
Customer Name:  Chris Bertram

| Description | Quantity | Amount |
|---|---|---|
| Birth Certificate | 1 | 20.00 |
| Total Charges | | 20.00 |

Payment Method(s): Credit

Clerk: TiffanyFitzpatrick

AA 999

DOUGLAS RAPPAPORT (136194)
LAW OFFICES OF DOUGLAS L. RAPPAPORT
260 California Street, Suite 1002
San Francisco, CA 94111
Telephone:   (415) 989-7900
Facsimile:   (415) 989-7950
Email:        admin@sfcrimlaw.com
Attorneys for Petitioner,
███████  ████████

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**01/20/2023**
**Clerk of the Court**
BY: TIM KYU
**Deputy Clerk**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

In re the Matter of:

███████  ████████

            Petitioner,

    and

KAILIN WANG,

            Respondent.

Case No.:  FDV-19-814465

**DECLARATION OF CHRIS BERTRAM**

I, Chris Bertram, do hereby declare:

1.      I am a licensed private investigator in Utah. I know personally the matters stated herein.  If called as a witness, I could and would competently testify thereto.

2.      As part of my investigative work on this case, in September, 2022, I submitted a GRAMA (Utah's equivalent of a FOIA) to the Provo Police Department seeking information including emergency calls made to addresses where the Wang family had previously lived, including on S 990 W in Provo.

3.      In response, the Provo Police Department produced a redacted report pertaining to an emergency response on July 28, 1998 at 11:01pm, to S 990 W which resulted in Wang's

1

*In re the Matter of* ████ *v. Wang*, Case No.:  FDV-19-814465; DECLARATION OF CHRIS BERTRAM

arrest for aggravated assault against her parents.

4.    A September 13, 2022 letter from the Provo Police Department, which shows that the July 28, 1998 police report was produced as responsive to my GRAMA request, is attached hereto as Exhibit A.

5.    Contrary to Ms. Wang's allegations, this document was legitimately obtained pursuant to a Utah GRAMA request.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:  January 19, 2023

DocuSigned by:

*Chris Bertram*

CHRIS BERTRAM

2

*In re the Matter of* ▬▬▬ *v. Wang*, Case No.:  FDV-19-814465; DECLARATION OF CHRIS BERTRAM

DARRICK T. CHASE, ESQ. (CSB #151256)
KAYE●MOSER●HIERBAUM ●FORD LLP
101 California Street, Suite 2300
San Francisco, CA   94111
Telephone:  (415) 296-8868
Facsimile:  (415) 495-1771
Email:      dchase@kayemoser.com

Attorneys for Petitioner
████████ ████████ ████████

███ ███ENDORSED███ ███

San Francisco County Superior Court

MAR - 4 2019

CLERK OF THE COURT

BY: _____
    Deputy Clerk

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| ████████ ████████ ████████<br><br>                    Petitioner,<br><br>        v.<br><br>KAILIN WANG<br><br>                    Respondent. | Case No. FDV-19-814465<br><br>**DECLARATION OF** ████████ **STANFORD** ████████ **IN SUPPORT OF THIS REQUEST FOR DOMESTIC VIOLENCE PROTECTIVE ORDERS AND CUSTODY ORDERS**<br><br>Date: March 6, 2019<br>Time: 8:30 a.m.<br>Dept: 404 |

I.    **Update**

1.    This declaration supplements the declaration of February 15, 2019 by providing

additional information and updating the court on events that have taken place since then,

including further disturbing actions that lead me to believe my son is not healthy or safe.

II.    **Ms. Wang is Stalking Me and My Family**

2. Since my February 15, 2019 declaration, my lawyer has been able to further quantify the

harassment and stalking that is targeting me and my family. Exhibit Z is an index of over 100

1

The person she had traveled to find is the victim in the Utah criminal prosecution against Kailin.

**IV.    I Am Terrified For The Safety Of My Son**

15. I don't know where Ms. Wang is. She has disappeared and has thus far successfully evaded service of this Court's February 15, 2019 DV-110 Temporary Restraining Order (CLETS-TRO).

16. I don't know where my son is. I desperately fear that he is in danger, and given Ms. Wang's extreme conduct toward me and others I believe that any other reasonable parent would feel the same way.

17. I've learned that Ms. Wang has mental health issues. (2/15/2019 RDVRO, Exhibits L and I.)

18. The pace of the incoming harassment shows that she's compulsive.

19. She is not acting rationally. Publishing this unlawful content destroys my prospects, network, and life, including my ability to provide for my child.

20. Her most disturbing posts are about dead babies.

21. She also posts that the baby is sick, starving, and has severe jaundice. Infants require around the clock care. Ms. Wang's posts don't suggest that my son is okay. Instead they suggest that he is sick, and that she is full of compulsive rage. He's not getting the care that he needs, and she enjoys dangling an infant in the crosshairs of her sick stalking campaign.

22. I have trouble sleeping. I have trouble concentrating. My mind is consumed with what she will do next, and when can I rescue my son. I need to know that my son is safe.

**V.    ███████ Will Be Safe With Me**

23. I will strive every day to be the best father to this little boy. I know that my son will thrive in our care. When I say "our" I mean, yes, primarily me as the father, but I also I have an incredible family alongside me and we, as a team, embrace this baby with unwavering love and support. He will thrive; be treasured; and, he will be the light of our lives.

24. The evidence indicates that Ms. Wang wants to destroy me, and everyone related to me. Who is more related to me than the infant in her care?

**VI.    Ms. Wang is Evading Service and Hiding Herself and ███████**

25. **Attempted Process Service in Utah**: Ms. Wang was in Spanish Fork, Utah on February 11, 2019 for a pretrial conference in Spanish Fork City v. Kailin Wang, Case No. 171301350 (filed

November 22, 2017) on 20 counts of criminal harassment. My investigators witnessed Ms. Wang's mother and Ms. Wang arrive at the Court house for her hearing. They had the baby with them.

26. Beginning on February 15, 2019, I attempted, through the Office of the Utah County Constable to serve Ms. Wang at her parents' home in Spanish City. I believed that Ms. Wang was with her parents and we would be able to effect service at her parent's home.

27. In Mr. Chase's email to Ms. Wang on 12/27/18, he said, "I understand you are residing with your parents at 2481 Fairway Drive, Spanish Fork, UT 84660. Please confirm that for me." Ms. Wang's reply to Mr. Chase on 12/28/18 said, "I am currently in between 3 states, and am only in Utah due to my pending case which requires my mandatory monthly appearances. And ███ has been in between New York, Utah and California since birth. The Utah address can be used as a mailing address only."

28. See, Exhibit J-1, document titled AFFIDAVIT OF NON-SERVICE. The affidavit lists 9 attempted serves with brief descriptions.

29. Ms. Wang's father refused to cooperate. It is not credible that her parents did not have a contact number for Kailin, did not attempt to contact her, and claimed they had no idea where she was. But, if they had the baby, and they had no idea where she was, then, again, she must have left the baby with her parents.

30. Utah Constable Ben Stowell went in person to see Ms. Wang's criminal defense lawyer, Ed Brass, at Mr. Brass' office on 2/19/2019, identified himself, that he had process to serve for Ms. Wang, and requested that Mr. Brass accept service for her. Constable Stowell reports that he was told by Mr. Brass' secretary that **Ms. Wang had instructed the office to not accept service** for her. See, Exhibit K-1, AFFIDAVIT ON NON-SERVICE.

31. Mr. Chase emailed Mr. Brass on February 20, 2019. Mr. Chase requested Mr. Brass notify Ms. Wang that there was a DV-110 Temporary Restraining Order (CLETS-TRO) to be served on her, and other required documents which were itemized in the email, requested Mr. Brass ask Ms. Wang to allow a meeting with the Utah Constable to effect service of the listed documents.

32. Mr. Chase did not receive a reply. See Exhibit L-1. I believe it is reasonable to infer that Mr.

000241



March 12, 2019


Re: Qizhong (John) Wang


My name is Randall L Barker. I reside at 450 N 850 E Springville, UT 84663.

I am employed by Olson's Greenhouse Gardens and serve as the Director of Human Resources for Olson's Greenhouse UT, Olson's of Colorado, and ProGro. Each organization also has a Human Resources Manager.

I have been employed by Olson's since January 18, 2016.

I was introduced to Mr. Wang during the first week of my employment. My original office was directly next to Mr. Wang's office so we interacted on a frequent basis. Mr. Wang and I have also partnered on several projects.

I have never known Mr. Wang to be anything but a gentleman in the interactions I have had with him and the interactions that I have witnessed him having with other people in the organization. If any of Mr. Wang's co-workers had a problem with him, if he was treating a co-worker improperly, or acting out in an unacceptable manner, as the Director of Human Resources improper conduct would be reported to my office.

Mr. Wang is a peaceable individual. I have never known, nor has it been reported to me, that Mr. Wang has ever shown violent tendencies, been in possession of a weapon, or acting in a threatening nature to anyone in our three divisions.

A few weeks ago ( February 20 ) two individuals, a Salem Police Officer and a Constable, came to the Olson's Salem location at approximately 12:20pm, at the time I was in my office.. While I expected and was not surprised to see the Salem police officer carrying a weapon I was a bit surprised to see the constable attired similar to an officer of the law and carrying a sidearm when our receptionist brought these men to my office. The demeanor and stance of the constable was a bit aggressive and he stood in a manner that always put his sidearm between me and him.

The police officer told me that they had come to the operation that day to talk to Mr. Wang. The officer said Mr. Wang was not "in trouble" they simply needed to talk to Mr. Wang about a civil matter related to his daughter.

At that moment I believed that Mr. Wang was in our assembly area taking some video of a meeting that was happening at the time. I had seen him in that area just a few minutes before the officer and constable arrived. I asked my co-worker, Adrienne Wall, to step into the assembly area and ask Mr. Wang to come to

000241

Wang v ████ 194400718

my office. She returned within a few minutes to say that the group had just disbanded and Mr. Wang had left the property. I offered to call the officer and/or constable when Mr. Wang returned. The response from the constable was that they were not going to leave the property until they had the opportunity to talk to Mr. Wang. I found that response a bit strange and aggressive since the officer had said that Mr. Wang was not in trouble. If not in trouble then why the urgency to speak with Mr. Wang? And why the need to have a police officer accompany a constable for a civil matter? And why make such a statement to a manager of the company? We are not going to leave until....? They were after all guests of the company.

During my career in Human Resources I have interacted with constables numerous times, never have I interacted with a constable who is delivering a civil summons, garnishment, etc. to be attired as a police office and openly and aggressively carrying a sidearm.

When Adrienne had left to look for Mr. Wang she ran into another co-worker and mentioned that she was looking for Mr. Wang at my request. This other co-worker called Mr. Wang to tell him that I was looking for him. Mr. Wang returned to the property quickly and came looking for me. I ran into Mr. Wang on the hallway and told him that two "cops" we there to talk to him and would he be willing to go into my office with them? He agreed to do so but seemed a bit unsettled to have these men requesting an interview.

Mr. Wang, the police officer, and the constable meet in my office. At that time I left the property to go to lunch and upon returning 45 minutes later observed that the car that the police officer and constable had arrived in had left the property.

This narrative/letter represents my truthful recollection of the events as described.

*Randall Ba~*

Randall L Barker
3/12/2019
09:58

Wang v. ████ 194400718

Melisa Todd
140 West 9000 South, Suite 9
Sandy, Utah 84070
801-566-1884
melisa@spencerandcollier.com

February 21, 2019

To Whom it Concerns:

On February 20, 2019 at approximately 3:50 p.m., attorney Jeff Rifleman came into the office where I work and asked me to put my jacket on and come with him. I heard he was on the phone with someone who sounded pretty panicked. I had heard Jeff ask the person on the phone, "Are they still following you?" and the person reply "Yes". Jeff had his phone on speaker, so I heard the back and forth between them, while I put my jacket on and followed Jeff outside. Within a minute of us going outside a maroon Lexus SUV pulled into the parking lot and parked. Jeff waived to them, so I knew this was the person he was talking to on the phone. Immediately following the Lexus into the lot was a black Dodge Charger, that parked so it was blocking the bank drive thru area. The man jumped out of the Charger and immediately went towards the Lexus, Jeff walked between the two and asked the man if he could help him. The man refused to tell Jeff what his name is and who he works for, he just kept stating over and over that "I don't have to tell you my name." Jeff mentioned the fact that that man was carrying a gun and the man replied, "It is open carry." From the rest of the conversation between this man and Jeff I understood they wanted to serve some documents on a girl who is the daughter of the man driving the Lexus and the assumption was that this girl was in the Lexus.

Approximately 2-3 minutes into all this another Dodge Charger, charcoal in color, pulled up and another man jumped out going towards what I thought at the time was the man in the Lexus. However, he too went towards Jeff and got into his face. Jeff asked his name, which he did give, but because I was too far away to hear it, I did not catch his name. Jeff tried to get the first man to tell him why he was harassing his client, by following him all the way from Spanish Fork to Sandy, after he had already been to the mans work place and interrogated him there, but the man would only say he had to serve papers on the daughter and wanted to know if she was in the vehicle. Jeff asked if they were conducting a stop on his client and the man from the charcoal Charger stated something along the lines that it was not a stop and that the Lexus was free to go. Jeff at this point told me to call 911, which I proceeded to do at 4:12 p.m. I heard the man from the black Charger state they had already talked to Sandy Police, which I felt was a way for him to intimidate me into not calling 911. I gave the 911 operator all the information I knew, as I still was a bit confused as to what was going on, while trying to keep an eye on what was going on around me. After a bit more conversation between the two men and Jeff, the two men went to their own vehicles, and Jeff was able to get his client, his client's wife and their grandbaby out of the Lexus and into the "Bank of the West" building. I told the 911 operator everything that was going on, as it was happening, including that these two men appeared to be undercover cops, from looking at their dress to their cars, but that they would not identify. From my personal knowledge and college training in Criminal Justice, if a person is asked, they are to identify that they are a police officer, if they are in fact one. The black Charger had the "police" laptop set up, he was wearing what appeared to be "police" uniform pants in the sage green color, he also had a "police"

Wang v ████████ 194400718

issue weapon, and other "police" gear around his belt, he also had on a plain black coat. The man in the charcoal Charger had on a navy-blue suit jacket and pants with a white shirt and a tie that I didn't pay too much attention to, his car did not appear to have the laptop setup, but it did have the police lights. NEITHER car had any lights on to indicate there was an official police stop happening at any point and time. At this time there was no indication of who these people actually worked for, other than they were trying to serve a person with documents.

I followed Jeff and his clients into the building but stayed in the entrance way for a bit longer, so I could finish answering the questions regarding the cars that I was being asked. I was told to stay on the phone and to let the operator know if the men tried to enter the building, as they were not to enter it. The first Sandy Police officer arrived, and I went upstairs to Jeff's office to see if I could see the officer. When the Sandy officer arrived, he first talked to the two men outside, both of whom identified themselves as working for the Utah County Constables office, showing him badges, cards and logos on their shirts (this was confirmed by the officer when he joined us upstairs and a visual as I was watching out the building windows). The Sandy officer came up to Jeff's office and the two men left in their cars. After the police talked to Jeff about the matter, and Jeff was able to obtain a case number for his client, I then assisted Jeff in calming down the client and his wife. It was at this time, I fully understood how scared these two people were, as they had been being harassed for more than just at this time. I truly believe these two people were so afraid that they didn't know if their lives were in jeopardy or not. They had mentioned that maybe they should leave and go on a vacation, so they could calm down and be left alone.



Melisa Todd
Affiant
DL#.........8034

On the 21st day of February 2019, personally appeared before me, the undersigned notary, Melisa Todd, the signer of the foregoing Affidavit, who duly acknowledged to me that she signed the same voluntarily and for its stated purpose.

TERRY R. SPENCER
NOTARY PUBLIC - STATE OF UTAH
My Comm. Exp 02/01/2021
Commission # 692634

NOTARY PUBLIC

## Contact

www.linkedin.com/in/patrick-adams-52098182 (LinkedIn)

# Patrick Adams

Treatment Coordinator at Salt Lake Legal Defenders
Salt Lake City, Utah, United States

## Experience

Salt Lake Legal Defenders
Treatment Coordinator

———

## Contact

www.linkedin.com/in/patrick-adams-452576121 (LinkedIn)

# Patrick Adams

forensic social worker at consulting LLC
Salt Lake City, Utah, United States

## Experience

consulting LLC
forensic social worker

─────



## Debbie This Guy from the Salt lake PD attempted to get my Mental Health Records

▬▬▬

**Kailin Wang** <kailinwang121314@gmail.com>                    Thu, Mar 2, 2023 at 6:08 PM
To: Debbie Hill <debbieh@utcpd.com>, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Debbie I'm sure you did not send this guy but FYI ▬▬▬▬ attempted to trick my D.V. Class into disclosing my Mental Health

**2 attachments**

**Screenshot_20230302-180350.png**
162K

**Screenshot_20230302-175640.png**
119K

**Debbie Hill** <debbieh@utcpd.com>                    Thu, Mar 2, 2023 at 6:13 PM
To: Kailin Wang ▬▬▬▬▬▬▬▬▬▬▬

You are absolutely right - I didn't.  We discuss all issues over the phone - I'd never text a request for release of records.
Let's talk Monday - are you free in the afternoon?  2ish?
thanks,
Debbie
[Quoted text hidden]



[Quoted text hidden]



**Eric Landon**
+18019603040

or wandering around.

📱 VIEW ALL  ›

9:52 AM

Ⓔ Hi Kailin! A release of information was emailed to you for you to fill out. This is asking for permission that Patrick Adams can get updates on you progress. The phone number is 8019796411 and email is padams1972@yahoo.com.

5:11 PM

Enter message

Yes          News          Oh

1 2 3 4 5 6 7 8 9 0

Q W E R T Y U I O P

A S D F G H J K L

Z X C V B N M

!#☺   🎤   ,   English (US)   .



google.com/sear

News | Images | Videos | Shop

LinkedIn
https://www.linkedin.com › patrick-...

## Patrick Adams - forensic social worker - consulting LLC

Salt Lake City, Utah, United States · forensic social worker · consulting LLC

Patrick Adams. forensic social worker at consulting LLC. consulting LLC. Salt Lake City, Utah, United States. 9 followers ...

https://www.linkedin.com › patrick-...

## Patrick Adams - Salt Lake Legal Defenders

Salt Lake City, Utah, United States · Treatment Coordinator · Salt Lake Legal Defenders

Patrick Adams. Treatment Coordinator at Salt Lake Legal Defenders. Salt Lake Legal Defenders. Salt...

## SAN FRANCISCO POLICE DEPARTMENT
## CHRONOLOGICAL REPORT OF INVESTIGATION    Page 32 of 34

| DATE | TIME | ACTIVITY |
|---|---|---|
| | 1345 | I booked evidence received from Sgt. Rodriguez into property, and retained the Thumb drive. |
| | 1500 | I received a phone call from Gregory Ferbrache who identified himself as ▇▇▇▇▇▇ court appointed legal victim advocate in Utah. Ferbrache explained that ▇▇▇▇▇ is the victim of false reports in Utah, and believes that there is evidence in San Francisco that would be useful to the investigators in Utah. Ferbrache told me that he is not requesting that I provide him with anything, he just wants to help point Utah Investigators in the right direction. I asked Ferbrache to email me a request. |
| 8/4/20 | 1150 | I received an email request from Ferbrache. Retained in case file. Ferbrache described evidence used against ▇▇▇▇▇ in Utah, and asked if the same evidence was used in San Francisco. |
| | 1210 | Retrieved evidence (180132399) from Property Control. Evidence includes Screen shots from text messages, request for civil stalking injunction, and submission to District Attorney Victim Services. |
| | 1229 | I contacted Ferbrache and advised him that I could not divulge any information to him regarding an open case, but he can provide my contact information to the investigators in Utah if they have any questions for me. |
| 8/25/20 | 0800 | Received email from Detective Patterson (Provo Police) who advised me that he is conducting an investigation into Kailin Wang. Detective Patterson said he was made aware of a similar investigation that I am conducting. Detective Patterson requested the evidence submitted by Kailin Wang. |
| | 0900 | I reviewed incident reports and evidence submitted by Kailin Wang. Wang filed one police report in San Francisco. Incident report: 180-132-399 Reportee: Kailin Wang Evidence Submitted by Wang: Copy of Request for Civil Stalking Injunction & Screen Shots from Cell Phone. |
| 9/1/20 | 1130 | I contacted Det. Patterson to confirm the report and documents that I would be sending to him via email. |
| | 1140 | Scanned and emailed incident report 180132399 and evidence to Det. Patterson at _____ |
| | 1202 | Email received from Erica Johnstone advising me that they were trying to remove content associated with (V) ▇▇▇▇▇ ▇▇▇▇▇ Johnstone indicated that she was going to try to remove the content from Reddit, but wanted me to know that Reddit will remove the content, but will only preserve it with a request from law enforcmtn. I emailed a preservation request to Reddit. |
| 9/2/20 | 0800 | Copy of complaint emailed to Special Agent Sean Fagan (SSA OIG) |
| 9/29/20 | 0755 | Received presentation memo and ROI from Agent Sean Fagan. Forwarded this information to ADA du Bain. |
| 12/29/20 | 0735 | Provided Thumb Drive received from RCFL to SFPD CSI (Officer Wood) and requested two copies. |
| | 1230 | Retrieved Thumb Drive and two copies from SFPD CSI. |
| 12/30/20 | 1430 | Provided copies of thumb drive and Report of Examination received from RCFL to ADA du Bain. |

MITCHELL J. OLSEN JR.
Utah State Bar No. 13826
BEAU J. OLSEN
Utah State Bar No. 15213
OLSEN & OLSEN, L.L.C.
*Attorneys for Respondent*
8142 South State Street
Midvale, Utah  84047
Telephone:  (801) 255-7176
beau@olsenfamilylaw.net

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT
## IN AND FOR UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| KAILIN WANG,<br><br>Petitioner,<br><br>vs.<br><br>▮▮▮▮▮▮ ▮▮▮▮▮<br>CT (V1)      Respondent. | **RESPONDENT'S VERIFIED ANSWER TO PETITIONER'S REQUEST FOR PROTECTIVE ORDER**<br><br>Civil No.  194400734<br><br>Judge Thomas Low<br>Commissioner Thomas Patton |

COMES NOW Respondent, ▮▮▮▮▮ ▮▮▮▮▮ and, in answer to Petitioner's Request for Protective Order ("Petitioner's Request"), admits, denies and alleges as follows:

1.     In answer to paragraph 1 of  Petitioner's Request, Respondent admits that Kailin Wang is the Petitioner.

2.     In answer to paragraph 2 of  Petitioner's Request,  Respondent admits that he and Petitioner have a child in common. Respondent denies all remaining allegations in paragraph 2 of Petitioner's Request.

Respondent affirmatively alleges he has never been violent in the past towards Petitioner of the parties' child.

8.      Respondent denies paragraphs 4(g) through 4(k) of Petitioner's Request. *See Respondent's Declaration in Opposition to Protective Order.*

Respondent affirmatively alleges that he owns no guns or weapons.

Respondent further alleges that he never impersonated Petitioner on any online forums. Two separate courts, the California Superior Court and the Utah Juvenile Court, have found that the child should be with Respondent. *See* Utah Juvenile Order and California Order.

9.      Respondent denies paragraph 5 through 5(e) of Petitioner's Request. *See Respondent's Declaration in Opposition to Protective Order.*

Respondent affirmatively alleges that he has never had a threatening conversation with Petitioner, although the issue of abortion was discussed through phone conversations and text messages.

Respondent affirmatively alleges that he never made any racial comments regarding Petitioner or his child.

Respondent affirmatively alleges that he has never threatened to send Petitioner to jail.

Respondent affirmatively alleges that he is not colluding in any way with ███ ███ and has never had any contact with ███ ███ WS (V2)                                        WS (V2)

10.     Respondent denies paragraph 6 of Petitioner's Request. *See Respondent's Declaration in Opposition to Protective Order.*

Respondent affirmatively alleges that he is not stalking Respondent or her family, nor does he have anyone surveiling her parents' house.

4

## **VERIFICATION**

███████████  ███████████ being first duly sworn, deposes and says that he is the

Respondent in the above-entitled matter, that he has read the foregoing **RESPONDENT'S**

**VERIFIED ANSWER TO PETITIONER'S REQUEST FOR PROTECTIVE ORDER** and

knows the contents thereof, that the same is true to the best of his knowledge and belief under

criminal penalty under Utah Code § 78B-5-705 and the laws of the State of Utah.

/s/

*Respondent*

6

# SAN FRANCISCO POLICE DEPARTMENT
## CHRONOLOGICAL REPORT OF INVESTIGATION    Page 4 of 31

| DATE | TIME | ACTIVITY |
|------|------|----------|
| | 1748 | Initial incident report submitted. |
| | 1755 | L/M for Ana Burgi (Spanish Fork DA) at ███████████ |
| 2/19/19 | 0726 | Received email from Erica Johnstone, attorney for C. ██████████ who stated that she has begun to submit evidence preservation requests to social media platforms.  She also stated that the baby was seen through a window at Kailin Wang's parent's home in Utah.  The parents claim that Wang is in New York.  Email retained in case file. |
| | 0814 | I spoke with Angie Jackson (Department Secretary) from the Spanish Fork Legal Department.<br>Jackson told me that Kailin Wang is scheduled for a final pre-trial conference on 4/8/19, and that there may be a plea.<br>The prosecutor on this case is Jason Sant.<br><br>I spoke with Jason Sant who told me that they are close to a resolution.  Mental health treatment will be part of the plea.  Wang is charged with 50 counts of misdemeanor harassment.<br>I advised Sant that Wang is a suspect in a stalking/harassment investigation in San Francisco.<br><br>Attorney for Wang is Edward Brass (801-322-5678)<br>Wang was in court last week for an appearance, and will have to appear on 4/8. |
| | 0827 | L/M for ██████████  ██████████  ██████████ |
| 2/21/19 | 0855 | I spoke with ██████████  ██████████ at ██████████. ██████████ told me that he is currently compiling a list, including screen shots and copies of everything Wang has posted and everyone who she has contacted.  ██████████ told me that he will provide me with a copy of everything when it is ready.  He told me that it will probably be another day or two because he is still attempting to reach people who Wang had contacted. |
| 2/22/19 | 1007 | Received emails from ██████████ alerting me to additional posts and contacts made by Wang to C. ██████████ sister and friends. |
| | 1135 | L/M for Erica Johnstone, attorney for C. ██████████ regarding any Documents/Postings she may have related to the ████████ case. |
| | 1404 | I spoke with Darrick Chase (attorney), and requested documents/evidence he filed as part of the TRO application.  Chase told me that he will send me a dropbox with the documents. |
| | 1415 | Received TRO documents via dropbox from Darrick Chase office. |
| | 1518 | I spoke with Justin Lampropoulos, Utah County Constable who is attempting to serve Kailin Wang with the TRO.<br>In summary, Lampropoulos told me the following:<br>There is a PI firm hired to surveil the Wang home in Spanish Fork, UT.<br>Lampropoulos and his team ended up liaising with them several times.<br>Lampropoulos believes that Wang still lives in Utah, at least part of the time.<br>There was a baby shower held for Wang a couple of months ago in Utah.<br>Neighbors have stated that Wang still lives in the Utah house, but doesn't come out much. |

## Certificate of Authenticity of Domestic Records of Regularly Conducted Activity

Under California Evidence Code section 1561, I _____Cynthia Velazquez_____, certify:

1.  I am employed by Facebook, Inc. ("Facebook"), headquartered in Menlo Park, California. I am a duly authorized custodian of records for Facebook and am qualified to certify Facebook's domestic records of regularly conducted activity.

2.  I have reviewed the records produced by Facebook in this matter in response to the subpoena to Facebook ████████████████████████████████████████ ████████████████ The records are those located after a reasonable search and are true copies of the reasonably available basic subscriber information associated with the Facebook ID/URL:

    Jamie.nelson.52438174

3.  The records provided were made and kept by the automated systems of Facebook in the course of regularly conducted activity as a regular practice of Facebook. The records were made at or near the time the information was transmitted by the account holder.

    I declare under penalty of perjury under the laws of the State of California that the foregoing certification is true and correct to the best of my knowledge.

Cynthia Velazquez
**Custodian of Records**

**facebook**

Address:    1 Hacker Way
            Menlo Park, CA 94025

| | |
|---|---|
| **Service** | Facebook |
| **Target** | 100015417708834 |
| **Account Identifier** | jamie.nelson.52438174 |
| **Account Type** | User |
| **Generated** | 2021-01-15 04:00:42 UTC |
| **Date Range** | 2018-02-01 00:00:00 UTC to 2019-12-31 23:59:59 UTC |

**Name Definition**   Name: Name provided by the account holder.
First: First name provided by the account holder.
Middle: Middle name provided by the account holder.
Last: Last name provided by the account holder.

**Name**

| | | |
|---|---|---|
| | **First** | Jamie |
| | **Middle** | |
| | **Last** | Nelson |

**Emails Definition**   Registered Email Addresses: Displays a list of registered email addresses. To "register" an address, it requires confirmation by the account holder.

**Registered Email Addresses**   jjlampropoulos@gmail.com

**Vanity Definition**   Vanity: Username associated with the account.

**Vanity Name**   jamie.nelson.52438174

**Registration Date Definition**   Registration Date: Date and time of account creation.

**Registration Date**   2017-03-02 01:02:09 UTC

**Registration Ip Definition**   IP address associated with account creation.

**Registration Ip**   69.169.138.85

**Account End Date Definition**   Account End Date: Displays the status of the account at the time the records were generated.

| | | |
|---|---|---|
| **Account Closure Date** | **Account Still Active** | true |

## Nuwber

PERSON   PHONE   ADDRESS

First and Last Name
**Justin Lampropoulos**

City, State
**Lehi, UT**

SEARCH

LOG IN

# Justin Lampropoulos from Lehi, UT

**VIEW FULL REPORT** →

**Age:** 38 years old

**Also known as:** Mr Justin Lampropoulos, Justin Lampropoulos

Landline number
**(801) 341-4022**

Mobile number
**(801) 864-5580**

Email
**jjlampropoulos@gmail.c...**
**jlamprop@yahoo.com**
**jlampropoulos@cox.net**

Relatives
**Kathryn N Lampropoulos**

Current address
**4870 N Eagle Nest Ln, Lehi, UT, 84043-7705**



SHOW ON MAP

## MORE RESULTS

**Justin Lampropoulos**
Age 38 * West Jordan, UT

**VIEW ALL RESULTS** →

See more results for **Justin Lampropoulos**

- **in Lehi, UT**

See more results for **Lampropoulos**

- **in Lehi, UT**
- **in UT**

Justin Lampropoulos, (801) 341-4022, 8704 N Eagle Nest Ln, Lehi, UT, Nuwber

## Nuwber

PERSON    PHONE    ADDRESS

First and Last Name
Justin Lampropoulos

City, State
Lehi, UT

SEARCH

LOG IN

**What year was Justin Lampropoulos born and how old is he?**

Justin Lampropoulos was born on December 10, 1982 and now he is 38.

**How do I reach out to Justin Lampropoulos by email?**

You can try to contact Justin at the following email addresses: jjlampropoulos@gmail.com · jlamprop@yahoo.com · jlampropoulos@cox.net.

**Where did Justin Lampropoulos live before he moved to his current place?**

Justin Lampropoulos has moved frequently. His previous home addresses are as follows: 29310 N 20th Ln, Phoenix, AZ, 85085-2000 ·

SHOW MORE ∨

**Who is related to Justin Lampropoulos?**

Our records identify the following people as the relatives of Justin Lampropoulos: Kathryn N Lampropoulos.

**Do you know Justin Lampropoulos's phone number?**

You can try to reach Justin on his home phone at (801) 341-4022 or call his mobile phone at (801) 864-5580.

**What is Justin Lampropoulos's current place of residence?**

Justin resides at N Eagle Nest Ln, Lehi, Utah, 84043-7705 and has been living there since 2008.

**Who are Justin Lampropoulos's neighbors?**

Multiple records indicate the following people as Justin's neighbors: Christopher Cook · Robert D Rohde · Britt J Rohde · Bryan D

SHOW MORE ∨

**What is Justin Lampropoulos's astrological sign by date of birth?**

Justin's astrological sign by date of birth is a Sagittarius.

https://www.facebook.com/jamie.nelson.62438174/friends_mutual



Jamie Nelson

Timeline    About    Friends 6 Mutual    Photos    More ▾

**DO YOU KNOW JAMIE?**

To see what she shares with friends, send her a friend request.

 6 Mutual Friends

Add Friend

## 👥 Friends

All Friends    Mutual Friends



Avalon Max
7 mutual friends
✓ Friends

Florin Predoi
Works at Landry's, Inc.
✓ Friends

Justin David Kramer
850 friends
✓ Friends

Justin Warner
611 friends
✓ Friends

Larry LaVoice
304 friends
✓ Friends

Mok Auger
2,344 friends
✓ Friends

https://www.facebook.com/jamie.nelson.62438174/friends_mutual



## DO YOU KNOW JAMIE?

To see what she shares with friends, send her a friend request.

 6 Mutual Friends



## 🎎 Friends

All Friends     Mutual Friends



**Avalon Max**
17 mutual friends
✓ Friends

**Florin Predoi**
Works at Landry's Inc
✓ Friends

**Justin David Kramer**
889 friends
✓ Friends

**Justin Warner**
611 friends
✓ Friends

**Larry LaVoice**
104 friends
✓ Friends

**Mok Auger**
2,344 friends
✓ Friends



**Kristina**

Tue, Feb 19

Hi love

Do you know a Jamie Nelson

She fb messaged me asking me for ur address

No omg stalker

Record everything and DO NOt send anything !

Do u have a screenshot ?

I'm in nyc . Do not tell them !!

Can u show me the profile ?

No no

**Jamie Nelson**

You're friends on Facebook

Works at Fitness Coach

Lives in Pleasant Grove, Utah

Hey Girl! I am trying to get in touch with Kay. We are old friends. I have a

.ıll T-Mobile  LTE ⚡        9:55 PM        ✈ ✳ 70% 🔋

 **Jamie Nelson**
Messenger



# Jamie Nelson

You're friends on Facebook

Works at Fitness Coach
Lives in Pleasant Grove, Utah

SUN 2:31 PM

 Hey Girl! I am trying to get in touch
with Kay. We are old friends. I have a
baby present for her but can't get a
hold of her. Is she in Utah still?

SUN 3:10 PM


Hey

Yes she is

Hmmmm! I can't find her new
address. 😩

 I also want to surprise her. The little
one is so cute.

     Aa

T-Mobile LTE    9:55 PM    70%



## Jamie Nelson
Messenger

Hey

Yes she is



Hmmmm! I can't find her new address.

I also want to surprise her. The little one is so cute.

I don't have her address



Is she living with Jan and John? I can look them up.

Iam not sure I can find out



That would be great.  Would love to see her but happy to drop off a baby present at her house. Thanks girl. So appreciated.

Offcourse

Hey Girl! Did you find out?



T-Mobile  LTE                    9:55 PM                              70%



**Jamie Nelson**
Messenger

That would be great.  Would love to
see her but happy to drop off a baby
present at her house. Thanks girl.
So appreciated.



Offcourse

Hey Girl! Did you find out?

Thanks so much.





SUBP-035

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | |
|---|---|
| KAILIN WANG<br>2481 FAIRWAY DR. SPANISH FORK, UT 84660 | To keep other people from seeing what you entered on your form, please press the Clear This Form button at the end of the form when finished. |

TELEPHONE NO.: 801-645-1060    FAX NO.:
E-MAIL ADDRESS: kaywa2372@gmail.com
ATTORNEY FOR (Name): PRO PER

Court for county in which discovery is to be conducted: SAN MATEO SUPERIOR
SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO
STREET ADDRESS: 400 County Center, Redwood City, CA 94063
MAILING ADDRESS: 400 County Center, Redwood City, CA 94063
CITY, STATE, AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: FAMILY COURT

Court in which action is pending: FOURT DISTRICT COURT
Name of Court: Utah County - Provo District Court
STREET ADDRESS: 137 Freedom Blvd 200 W
MAILING ADDRESS: 137 Freedom Blvd 200 W
CITY, STATE, AND ZIP CODE: Provo, UT 84604
COUNTRY: UNITED STATES

PLAINTIFF/PETITIONER: KAILIN WANG
DEFENDANT/RESPONDENT: ██████████ ██████████ ██████████

CALIFORNIA CASE NUMBER (if any assigned by court):
FDV-19-814465

| SUBPOENA FOR PRODUCTION OF BUSINESS RECORDS<br>IN ACTION PENDING OUTSIDE CALIFORNIA | CASE NUMBER (of action pending outside California):<br>194400718 |
|---|---|

THE PEOPLE OF THE STATE OF CALIFORNIA, TO (name, address, and telephone number of deponent, if known):
FACEBOOK c/o CSC Lawyers 2710 GATEWAY OAKS DR. STE 150N. SACRAMENTO CA 95833

1. **YOU ARE ORDERED TO PRODUCE THE BUSINESS RECORDS** described in item 3, as follows:

To (name of deposition officer): KAILIN WANG
On (date): JANUARY 3, 2021          At (time): 9:00 A.M.
Location (address): 2481 FAIRWAY DR. SPANISH FORK, UT

**Do not release the requested records to the deposition officer prior to the date and time stated above.**

a. [✔] by delivering a true, legible, and durable **copy** of the business records described in item 3, enclosed in a sealed inner wrapper with the title and number of the action, name of witness, and date of subpoena clearly written on it. The inner wrapper shall then be enclosed in an outer envelope or wrapper, sealed, and mailed to the deposition officer at the address in item 1.

b. [ ] by delivering a true, legible, and durable **copy** of the business records described in item 3 to the deposition officer at the witness's address, on receipt of payment in cash or by check of the reasonable costs of preparing the copy, as determined under Evidence Code section 1563(b).

c. [ ] by making the **original** business records described in item 3 available for inspection at your business address by the attorney's representative and permitting **copying** at your business address under reasonable conditions during normal business hours.

2. *The records are to be produced by the date and time shown in item 1 (but not sooner than 20 days after the issuance of the deposition subpoena, or 15 days after service, whichever date is later). Reasonable costs of locating records, making them available or copying them, and postage, if any, are recoverable as set forth in Evidence Code section 1563(b). The records must be accompanied by an affidavit of the custodian or other qualified witness pursuant to Evidence Code section 1561.*

3. *The records to be produced are described as follows (if electronically stored information is demanded, the form or forms in which each type of information is to be produced may be specified):*

[✔] Continued on Attachment 3 (use form MC-025).

4. Attorneys of record in this action or parties without attorneys are (name, address, telephone number, and name of party represented): SEE ATTACHMENT-3

[ ] Continued on Attachment 4 (use form MC-025).

Page 1 of 2

**SUBPOENA FOR PRODUCTION OF BUSINESS RECORDS
IN ACTION PENDING OUTSIDE CALIFORNIA**

Code of Civil Procedure, §§ 2029.100–2029.900,
2020.410–2020.440;
Government Code, § 68097.1
www.courts.ca.gov

SUBP-035

| PLAINTIFF/PETITIONER: KAILIN WANG | CASE NUMBER (of action pending outside California): |
| --- | --- |
| DEFENDANT/RESPONDENT: | |

5. If you have been served with this subpoena as a custodian of consumer or employee records under Code of Civil Procedure section 1985.6 *and* a motion to quash or an objection has been served on you, a court order or agreement of the parties, witnesses, and consumer or employee affected must be obtained before you are required to produce consumer or employee records.

6. [ ] Other terms or provisions from out-of-state subpoena, if any *(specify):*

[✓] Continued on Attachment 6 *(use form MC-025).*

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF $500 AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued: AUG 17 2020

WAI SHAN LEE

_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF PERSON ISSUING SUBPOENA)

Deputy Court Clerk
(TITLE)

## PROOF OF SERVICE OF SUBPOENA FOR PRODUCTION OF BUSINESS RECORDS

1. I served this *Subpoena for Production of Business Records In Action Pending Outside California* by personally delivering a copy to the person served as follows:
   a. Person served *(name):*
   b. Address where served:

   c. Date of delivery:                    d. Time of delivery:
   e. Witness fees and mileage both ways *(check one):*
      (1) [ ] were paid. Amount: . . . . . . . . . . $ _____
      (2) [ ] were not paid.
      (3) [ ] were tendered to the witness's public entity employer as required by Government Code section 68097.2. The amount tendered was *(specify):*    $ _____
   f. Fee for service: . . . . . . . . . . . . . . . . . . . . . . $ _____

2. I received this subpoena for service on *(date):*

3. [ ] I also served a completed *Proof of Service of Notice to Consumer or Employee and Objection* (form SUBP-025) by personally delivering a copy to the person served as described in 1 above.

4. Person serving:
   a. [ ] Not a registered California process server
   b. [ ] California sheriff or marshal
   c. [ ] Registered California process server
   d. [ ] Employee or independent contractor of a registered California process server
   e. [ ] Exempt from registration under Business and Professions Code section 22350(b)
   f. [ ] Registered professional photocopier
   g. [ ] Exempt from registration under Business and Professions Code section 22451
   h. Name, address, telephone number, and, if applicable, county of registration and number:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶ _____
(SIGNATURE)

(For California sheriff or marshal use only)
I certify that the foregoing is true and correct.

Date:

▶ _____
(SIGNATURE)

SUBP-035 | [Rev. January 1, 2012]

**SUBPOENA FOR PRODUCTION OF BUSINESS RECORDS IN ACTION PENDING OUTSIDE CALIFORNIA**

Page 2 of 2

## REQUESTS

REQUEST NO. 1:  All documents, including records and logs, reflecting user/subscriber information that may identify or lead to the identity or location of the person or persons associated with each account listed below, including, but not limited to: all first and last names, present or last known mailing addresses, billing information, subscriber information, telephone numbers, email addresses, login data, IP addresses, hardware/MAC addresses, and IMEI numbers, exclusive of the contents of any communication stored, carried, or maintained by Facebook.

REQUEST NO. 2:  Sender's IP address and the location of sender for the Time Period of the communications listed below for "To From Message/Follow Request From Message/Follow Request".

Date: 02/01/2018 to 12/31/2019

SUBP-030

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>KAILIN WANG<br>2481 FAIRWAY DR., SPANISH FORK, UT 84660<br>KAYWG2372@GMAIL.COM<br>TELEPHONE NO: 801-645-1060        FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* KAYWG2372@GMAIL.COM<br>ATTORNEY FOR *(Name):* PRO PER | FOR COURT USE ONLY<br><br>**FILED**<br>**SAN MATEO COUNTY**<br><br>AUG 1 7 2020<br><br>Clerk of the Superior Court<br>By<br>DEPUTY CLERK |

Court for county in which discovery is to be conducted: SAN MATEO SUPERIOR
SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO
STREET ADDRESS: 400 County Center, Redwood City, CA 94063
MAILING ADDRESS: 400 County Center, Redwood City, CA 94063
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: FAMILY COURT

Court in which action is pending: FOURTH DISTRICT COURT
Name of Court: Utah County - Provo District Court
STREET ADDRESS: 137 Freedom Blvd 200 W
MAILING ADDRESS: SAME
CITY, STATE, AND ZIP CODE: Provo, UT 84601
COUNTRY: UNITED STATES

| | |
|---|---|
| PLAINTIFF/PETITIONER: KAILIN WANG | CALIFORNIA CASE NUMBER *(if any assigned by court)* |
| DEFENDANT/RESPONDENT: ▉▉▉▉ THYESEN | |
| **APPLICATION FOR DISCOVERY SUBPOENA**<br>**IN ACTION PENDING OUTSIDE CALIFORNIA** | CASE NUMBER *(of action pending outside California):*<br>194400718 |

1. Applicant *(name):* KAILIN WANG                                                  is *(check one):*

☐ Plaintiff   ☑ Petitioner   ☐ Defendant   ☐ Respondent   ☐ Other *(specify):*

in the above action.

2. Applicant requests that this court issue a subpoena for discovery under Code of Civil Procedure sections 2029.100 – 2029.900 to *(name and address of deponent or person in control of property):*

FACEBOOK, INC.AND INSTAGRAM REGISTERED AGENT. 2710 GATEWAY OAKS DRIVE SUITE 150N, SACRAMENTO , CA 95833

3. Attached is *(check one):* ☐ the original   ☑ a true and correct copy   of the document from the court in which the action is pending that requires the person in 2 to *(check all that apply):*

a. ☐ attend and give testimony at a deposition;

b. ☑ produce and permit inspection and copying of designated materials, information, or tangible things in the possession, custody, or control of the deponent;

c. ☐ permit the inspection of premises under the control of the deponent.

4. Applicant submits with this application a proposed subpoena that includes terms identical to those in the document from the out-of-state court. (Code of Civil Procedure section 2029.300(d).)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: AUGUST 6, 2020

KAILIN WANG
_____
*(TYPE OR PRINT NAME)*

► _____
*(SIGNATURE OF ATTORNEY OR PARTY WITHOUT ATTORNEY)*

**Note:** This application must be accompanied by the fee specified in Government Code section 70626. A discovery subpoena must be personally served on the deponent in compliance with California law, including Code of Civil Procedure section 1985.

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUBP-030 [New January 1, 2010]

**APPLICATION FOR DISCOVERY SUBPOENA**
**IN ACTION PENDING OUTSIDE CALIFORNIA**

Code of Civil Procedure §§ 2029.100–900
www.courtinfo.ca.gov

# EXHIBIT 1.

https://www.facebook.com/jamie.nelson.62438174/friends_mutual



Jamie Nelson

Kay    Home    Create

Jamie Nelson

Add Friend    Message    ...

Timeline    About    Friends 6 Mutual    Photos    More ▾

DO YOU KNOW JAMIE?

To see what she shares with friends, send her a friend request.

Add Friend

 6 Mutual Friends

## 👥 Friends

All Friends    Mutual Friends



Avalon Max
17 mutual friends
✓ Friends

Florin Predoi
Works at Landry's, Inc
✓ Friends

Justin David Kramer
850 friends
✓ Friends

Justin Warner
611 friends
✓ Friends

Larry LaVoice
304 friends
✓ Friends

Mok Auger
2,344 friends
✓ Friends

https://www.facebook.com/jamie.nelson.62438174/friends_mutual



**Jamie Nelson**

Timeline    About    Friends 6 Mutual    Photos    More ▾

DO YOU KNOW JAMIE?

To see what she shares with friends, send her a friend request.

 6 Mutual Friends

## 👥 Friends

All Friends    Mutual Friends



| | | |
|---|---|---|
| **Avalon Max** 17 mutual friends | ✓ Friends | |
| **Florin Predoi** Works at Landry's, Inc. | ✓ Friends | |
| **Justin David Kramer** 889 friends | ✓ Friends | |
| **Justin Warner** 611 friends | ✓ Friends | |
| **Larry LaVoice** 104 friends | ✓ Friends | |
| **Mok Auger** 2,344 friends | ✓ Friends | |

### Kristina



Tue, Feb 19

Hi love

Do you know a Jamie Nelson

She fb messaged me asking me for ur address

No omg stalker

Record everything and DO NOt send anything !

Do u have a screenshot ?

I'm in nyc . Do not tell them !!

Can u show me the profile ?

No no

## Jamie Nelson

You're friends on Facebook

Works at Fitness Coach

Lives in Pleasant Grove, Utah

Hey Girl! I am trying to get in touch with Kay. We are old friends. I have a

  

**Jamie Nelson**
Messenger



# Jamie Nelson

You're friends on Facebook

Works at Fitness Coach
Lives in Pleasant Grove, Utah

SUN 2:31 PM



Hey Girl! I am trying to get in touch with Kay. We are old friends. I have a baby present for her but can't get a hold of her. Is she in Utah still?

SUN 3:10 PM



Hey

Yes she is

Hmmmm! I can't find her new address. 😫

I also want to surprise her. The little one is so cute.



    Aa

T-Mobile  LTE                    9:55 PM                    70%

 **Jamie Nelson**
Messenger

Hey

Yes she is

Hmmmm! I can't find her new address.

 I also want to surprise her. The little one is so cute.

I don't have her address

 Is she living with Jan and John? I can look them up.

Iam not sure I can find out

 That would be great.  Would love to see her but happy to drop off a baby present at her house. Thanks girl. So appreciated.

Offcourse

Hey Girl! Did you find out?

    Aa



**Jamie Nelson**
Messenger

That would be great.  Would love to see her but happy to drop off a baby present at her house. Thanks girl. So appreciated.

SUN 5:57 PM

Offcourse

Hey Girl! Did you find out?

Thanks so much.



# EXHIBIT 1.

10:48

 

## David Wallace
Messenger

 

# David Wallace
## You and David aren't connected on Facebook

10:18 PM

> Maybe you'll get to c ur Nephew at the hospital one day. As he is sick and on Welfare.



...n Impregnated me and then...

**Case Access**

_____ a Data Scientist at Square Inc. impregnated me then abandoned his son. _____ refused to wear a condom and ejaculated inside me w/o telling me. He then left me stranded at the Abortion Clinic and then blocked me when his son was born.

     Aa

# EXHIBIT 2.



## David Wallace
Messenger

> If u do end up in politics I hope u make Abortions more accessible for women. So they aren't Abandoned at the Abortion Clinic like what ▌▌▌▌▌▌▌ did.



me and then...

Case Access

[redacted] a Data Scientist at Square Inc. impregnated me then abandoned his son. C▌▌▌▌▌r refused to wear a condom and ejaculated inside me w/o telling me. He then left me stranded at the Abortion Clinic and then blocked me when his son was born.

+1 (650) 862-8473

Fri, Jun 22, 11:35 AM

If you reply, David will be able to call you and see information like your Active Status and when you've read messages.

I don't want to hear from David

    Aa

# RIDDER, COSTA & JOHNSTONE LLP

attorneys at law

12 Geary Street, Suite 701
San Francisco, CA 94108
Tel: (415) 391-3311
Fax: (415) 358-4975

Erica T. Johnstone, Esq.
*erica@rcjlawgroup.com*

July 26, 2019

Via Personal Delivery

Facebook, Inc.
c/o CSC Lawyers Inc.
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833

Re:    BUSINESS RECORDS SUBPOENA
        █████ ████ v. Kailin Wang, FDV-19-814465 (Unified Family
Court – San Francisco Superior Court)

Dear Custodian of Records,

Enclosed, please find a subpoena for production of records in the above-referenced action. We have also provided a copy of the relevant court order and a declaration for execution by the custodian of records.

Please be advised that this is a domestic violence matter, and we are working on a very accelerated schedule. Therefore, although the date of the subpoena requires production of records by August 19, 2019, we would greatly appreciate if you could provide the requested information sooner than that if possible.

Thank you for your assistance. Please do not hesitate to contact me if you have any questions regarding our requests, or require any additional information in order to facilitate compliance with the subpoena.

Very truly yours,

Ridder, Costa & Johnstone LLP

Erica T. Johnstone

SUBP-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Erica T. Johnstone (242067)<br>RIDDER, COSTA & JOHNSTONE LLP<br>12 Geary Street, Suite 701 – San Francisco, CA 94108<br>TELEPHONE NO.: (415) 391-3311    FAX NO.:<br>E-MAIL ADDRESS: erica@rcjlawgroup.com<br>ATTORNEY FOR *(Name)*: ▮▮▮▮▮▮▮▮▮▮ | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   San Francisco

STREET ADDRESS:    400 McAllister Street

MAILING ADDRESS:

CITY AND ZIP CODE:    San Francisco CA 94102

BRANCH NAME:

PLAINTIFF/PETITIONER: ▮▮▮▮▮▮▮▮▮▮

DEFENDANT/RESPONDENT: Kailin Wang

| DEPOSITION SUBPOENA<br>FOR PRODUCTION OF BUSINESS RECORDS | CASE NUMBER:<br>FDV-19-814465 |
|---|---|

THE PEOPLE OF THE STATE OF CALIFORNIA, TO *(name, address, and telephone number of deponent, if known)*:

Facebook, Inc. c/o CSC Lawyers, Inc. 2710 Gateway Oaks Dr Ste 150N Sacramento, CA 95833

**1. YOU ARE ORDERED TO PRODUCE THE BUSINESS RECORDS** described in item 3, as follows:

To *(name of deposition officer)*: Erica T. Johnstone

On *(date)* : August 19, 2019                                    At *(time)*: 10:00 a.m.

Location *(address)*: 12 Geary Street, Suite 701, San Francisco, CA 94108

**Do not release the requested records to the deposition officer prior to the date and time stated above.**

a. ☐ by delivering a true, legible, and durable **copy** of the business records described in item 3, enclosed in a sealed inner wrapper with the title and number of the action, name of witness, and date of subpoena clearly written on it. The inner wrapper shall then be enclosed in an outer envelope or wrapper, sealed, and mailed to the deposition officer at the address in item 1.

b. ☑ by delivering a true, legible, and durable **copy** of the business records described in item 3 to the deposition officer at the witness's address, on receipt of payment in cash or by check of the reasonable costs of preparing the copy, as determined under Evidence Code section 1563(b).

c. ☐ by making the **original** business records described in item 3 available for inspection at your business address by the attorney's representative and permitting **copying** at your business address under reasonable conditions during normal business hours.

2. The records are to be produced by the date and time shown in item 1 (but not sooner than 20 days after the issuance of the deposition subpoena, or 15 days after service, whichever date is later). Reasonable costs of locating records, making them available or copying them, and postage, if any, are recoverable as set forth in Evidence Code section 1563(b). The records shall be accompanied by an affidavit of the custodian or other qualified witness pursuant to Evidence Code section 1561.

3. The records to be produced are described as follows *(if electronically stored information is demanded, the form or forms in which each type of information is to be produced may be specified)*:

☑ Continued on Attachment 3.

4. **IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, *AND* CONSUMER OR EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE RECORDS.**

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF FIVE HUNDRED DOLLARS AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued: July 26, 2019

Erica T. Johnstone                                                     ▶ *(signature)*

(TYPE OR PRINT NAME)                                                  (SIGNATURE OF PERSON ISSUING SUBPOENA)

Attorney for Petitioner

(Proof of service on reverse)                              (TITLE)                          Page 1 of 2

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUBP-010 [Rev. January 1, 2012]

**DEPOSITION SUBPOENA FOR PRODUCTION OF BUSINESS RECORDS**

Code of Civil Procedure, §§ 2020.410–2020.440;<br>Government Code, § 68097.1<br>www.courts.ca.gov

**SUBP-010**

| | |
|---|---|
| PLAINTIFF/PETITIONER: ▮▮▮▮ S. ▮▮▮▮ | CASE NUMBER: FDV-19-814465 |
| DEFENDANT/RESPONDENT: Kailin Wang | |

## PROOF OF SERVICE OF DEPOSITION SUBPOENA FOR PRODUCTION OF BUSINESS RECORDS

1. I served this *Deposition Subpoena for Production of Business Records* by personally delivering a copy to the person served as follows:

   a. Person served *(name)*:

   b. Address where served:

   c. Date of delivery:

   d. Time of delivery:

   e. (1) ☐ Witness fees were paid.
   Amount: . . . . . . . . . . . . . . $ _____
   (2) ☐ Copying fees were paid.
   Amount: . . . . . . . . . . . . . . $ _____

   f. Fee for service: . . . . . . . . . . . . . . . . . $ _____

2. I received this subpoena for service on *(date)*:

3. Person serving:
   a. ☐ Not a registered California process server.
   b. ☐ California sheriff or marshal.
   c. ☐ Registered California process server.
   d. ☐ Employee or independent contractor of a registered California process server.
   e. ☐ Exempt from registration under Business and Professions Code section 22350(b).
   f. ☐ Registered professional photocopier.
   g. ☐ Exempt from registration under Business and Professions Code section 22451.
   h. Name, address, telephone number, and, if applicable, county of registration and number:

I **declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶ _____
(SIGNATURE)

**(For California sheriff or marshal use only)**
I **certify** that the foregoing is true and correct.

Date:

▶ _____
(SIGNATURE)

SUBP-010 [Rev. January 1, 2012]　　　**DEPOSITION SUBPOENA FOR PRODUCTION OF BUSINESS RECORDS**　　　Page 2 of 2

# EXHIBIT 3.

**10:32**

◀ Gmail

Done                          **1 of 3**

Ur an Uncle now. 😊. Don't impregnate any girls like ████████████ , and if u do make sure u cover their abortion 😊.



Impregnated me and then...

**Case Access**

████████████████ a Data Scientist at Square Inc. impregnated me then abandoned his son. C██████ refused to wear a condom and ejaculated inside me w/o telling me. He then left me stranded at the Abortion Clinic and then blocked me when his son was born.

+1 (650) 882-8473

If you reply, David will be able to call you and see information like your Active Status and when you've read messages.

I don't want to hear from David







**Certificate of Authenticity of Domestic Records of Regularly Conducted Activity**

Under California Evidence Code section 1561, I _____Cynthia Velazquez_____, certify:

1.  I am employed by Facebook, Inc. ("Facebook"), headquartered in Menlo Park, California. I am a duly authorized custodian of records for Facebook and am qualified to certify Facebook's domestic records of regularly conducted activity.

2.  I have reviewed the records produced by Facebook in this matter in response to the subpoena to Facebook ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The records are those located after a reasonable search and are true copies of the reasonably available basic subscriber information associated with the Facebook ID/URL:

    Jamie.nelson.52438174

3.  The records provided were made and kept by the automated systems of Facebook in the course of regularly conducted activity as a regular practice of Facebook. The records were made at or near the time the information was transmitted by the account holder.

    I declare under penalty of perjury under the laws of the State of California that the foregoing certification is true and correct to the best of my knowledge.


_____
Cynthia Velazquez
**Custodian of Records**


**facebook**

Address:    1 Hacker Way
            Menlo Park, CA 94025

| | |
|---|---|
| **Service** | Facebook |
| **Target** | 100015417708834 |
| **Account Identifier** | jamie.nelson.52438174 |
| **Account Type** | User |
| **Generated** | 2021-01-15 04:00:42 UTC |
| **Date Range** | 2018-02-01 00:00:00 UTC to 2019-12-31 23:59:59 UTC |

**Name Definition**  Name: Name provided by the account holder.
First: First name provided by the account holder.
Middle: Middle name provided by the account holder.
Last: Last name provided by the account holder.

**Name**

| | | |
|---|---|---|
| | **First** | Jamie |
| | **Middle** | |
| | **Last** | Nelson |

**Emails Definition**  Registered Email Addresses: Displays a list of registered email addresses. To "register" an address, it requires confirmation by the account holder.

**Registered Email Addresses**  jjlampropoulos@gmail.com

**Vanity Definition**  Vanity: Username associated with the account.

**Vanity Name**  jamie.nelson.52438174

**Registration Date Definition**  Registration Date: Date and time of account creation.

**Registration Date**  2017-03-02 01:02:09 UTC

**Registration Ip Definition**  IP address associated with account creation.

**Registration Ip**  69.169.138.85

**Account End Date Definition**  Account End Date: Displays the status of the account at the time the records were generated.

| | | |
|---|---|---|
| **Account Closure Date** | **Account Still Active** | true |

**Phone Numbers Definition**   Phone numbers: Phone number(s) provided by the account holder. "Verified" indicates the account holder responded to a text sent to the listed phone number.

**Phone Numbers**   No responsive records located

**Credit Cards Definition**   Credit Cards: Credit card(s) associated to the account at the time the records were generated.
Payment Account ID: Facebook internal unique identifier for the payment account associated with the account holder.
First: First name associated with the credit card.
Middle: Middle name associated with the credit card.
Last: Last name associated with the credit card.
Street: Street address provided by account holder.
Street2: Street address provided by account holder.
City: City provided by the account holder.
State: State provided by the account holder.
Zip: Zip code provided by the account holder.
Country: Country provided by the account holder.

**Registered Credit Card Number**   No responsive records located

**Paypal Accounts Definition**   PayPal Accounts: PayPal account(s) associated to the account.
Email: Email address associated with PayPal account.
Payment Account ID: Unique identifier for the PayPal account associated with the account holder.

**Paypal Accounts**   No responsive records located

**Direct Debit Definition**   Direct Debit: Bank account information from the user's personal payment account.
Bank Accounts: Bank account associated with the direct debit information.
Routing and Account Numbers: Routing and account numbers associated with the bank account.
Payment Account ID: Unique identifier associated with the payment account.

**Direct Debit**   No responsive records located

**Logins Definition**   Logins: Information collected at the time the account was logged into.
IP Address: IP address associated to the login.
Time: Date and time of the login.
Location: Location of the login.

**Logins**   **IP Address** 2607:fb90:34ef:283c:c9f:80cd:338:8bdf
**Time** 2019-12-28 21:01:01 UTC

**IP Address** 98.202.251.76
**Time** 2019-12-18 04:07:02 UTC

**IP Address** 198.161.200.100
**Time** 2019-12-17 17:55:32 UTC

**IP Address**
    2607:fb90:3443:b7f3:5c41:7acb:8b02:5b8f
    **Time** 2019-12-14 20:59:27 UTC

**IP Address** 2607:fb90:343e:4e02:4ee:d786:9c7a:8cd
    **Time** 2019-12-08 16:34:50 UTC

**IP Address** 2607:fb90:3410:b39:5d25:c4b0:590e:15a8
    **Time** 2019-12-08 04:20:00 UTC

**IP Address** 2607:fb90:3410:b39:8594:7afb:8ca1:9aff
    **Time** 2019-12-07 22:13:43 UTC

**IP Address** 98.202.251.76
    **Time** 2019-12-07 17:42:42 UTC

**IP Address** 98.202.251.76
    **Time** 2019-12-07 02:07:26 UTC

**IP Address** 2607:fb90:3454:267c:6c99:530b:eb:473
    **Time** 2019-12-06 20:26:16 UTC

**IP Address** 2607:fb90:3455:6dd:38f8:7fec:abc0:44b5
    **Time** 2019-12-01 19:04:34 UTC

**IP Address** 2607:fb90:3455:6dd:29b0:d5b9:f97c:9b40
    **Time** 2019-12-01 14:26:50 UTC

**IP Address** 2607:fb90:3441:be93:583f:f312:79a1:bbb2
    **Time** 2019-11-28 01:25:48 UTC

**IP Address** 89.146.32.228
    **Time** 2019-11-19 08:28:20 UTC

**IP Address** 98.202.251.76
    **Time** 2019-11-08 13:05:50 UTC

**IP Address** 98.202.251.76
    **Time** 2019-10-23 11:01:32 UTC

**IP Address** 2607:fb90:3457:c5dc:b4a4:8593:d4fe:dca6
    **Time** 2019-10-20 16:12:15 UTC

**IP Address** 98.202.251.76
    **Time** 2019-10-05 13:43:14 UTC

**IP Address** 98.202.251.76
    **Time** 2019-10-05 13:42:42 UTC

**IP Address** 98.202.251.76
    **Time** 2019-10-04 02:49:33 UTC

**IP Address** 2607:fb90:34d7:ca38:9126:2ff6:4b63:825c
    **Time** 2019-10-02 22:04:17 UTC

**IP Address** 2607:fb90:1370:fac6:c95d:de68:aa93:71b1
    **Time** 2019-10-02 09:22:56 UTC

**IP Address** 2607:fb90:6093:ec56:ac63:dd09:a446:d3ef

IN THE FOURTH JUDICIAL DISTRICT COURT
OF UTAH COUNTY, STATE OF UTAH

|  |  |
|---|---|
| KAILIN WANG, | ) |
|  | ) |
| Petitioner, | ) |
|  | ) |
| vs. | ) Case No. 194400718 PA |
|  | ) |
| ██████ STANFORD ██████ | ) |
|  | ) |
| Respondent. | ) |
|  | ) |

Hearing
Electronically Recorded on
August 27, 2021


BEFORE: THE HONORABLE THOMAS LOW
        Fourth District Court Judge


APPEARANCES


For the Petitioner:        Scott Williams
                           3450 Triumph Blvd. #102
                           Lehi, UT 84043
                           Telephone: (801)753-5733


For the Respondent:        Mitchell Olsen
                           8142 South State Street
                           Midvale, UT 84047
                           Telephone: (801)255-7176


Transcribed by: Natalie Lake, OCT


                8020 W. 3500 N.
               Abraham, UT 84635
            Telephone: (435) 590-5575


-1-

CT 40

own information, and some of it might be inappropriate to share, I didn't -- I think I remember an order that required that she only share that which she is going to use.

MR. WILLIAMS:  Let me -- hold in, Kailin.  So here's what I understand, Judge.  The Eric T. Johnson, those are ████████ attorney, and they sent the same subpoena, so she sent the identical pretty much asking for her own -- all these Lancer and these things are her information.  They subpoenaed them back in April of 2019, and then you go up to her, she asked for the same information.  Again, she just tries to verify, you know, if she gets records from them, she'd like to know that they are -- she's getting the right information.

THE COURT:  So she was trying to --

MR. OLSEN:  Your Honor --

MR. WILLIAMS:  A very similar thing a couple months later.

THE COURT:  So is this the subpoena to Google that was intended to reflect Mr. ████████ California attorney's subpoenas to Google?

MR. WILLIAMS:  Yeah, that's -- the one down below is his -- his subpoena that he sent in California for her information.  Then a couple of months later she files subpoenas herself asking for the exact same information, which was authorized by this Court to get.

THE COURT:  For just her information.

-23-

CT 62

MR. WILLIAMS:  Yeah, just her -- her accounts.

THE COURT:  Well, I -- the format she's using is so difficult to follow because the email -- emails you're referring to, Mr. Williams, those are -- that's from a request for production.  That looks like it's a discovery something that she sent to --

MR. WILLIAMS:  But I think she attached that as the -- what she was requesting.

THE COURT:  So voplan310 is your client's email?

MR. WILLIAMS:  Say that again.

THE COURT:  Voplan310 is your -- @gmail.com is your client's gmail?

MR. WILLIAMS:  Yes.

THE COURT:  And gould8824@gmail.com is your client's email?

MR. WILLIAMS:  That's one she's accused of owning, but she does not admit that that was hers.  Yeah, it's not ████████  That's an account that she's been accused of owning.  Yeah, and that -- and that gmail is listed as an exhibit, she says, in the UCJEAA case.

THE COURT:  Well, I'll just do this, I'll just quash -- to the extent this subpoena is intended to obtain information from Google on the email addresses for erica@rcjlawgroup.com or dchase@kayemoser.com or dcourt@utahcounty.gov, they're quashed.  To the extent it is

-24-

CT 63

just seeking response from Google on the three emails, lancewr12@gmail.com, voplan310@gmail.com and gould8824@gmail.com, it is not quashed.  There's handwritten in here timmycanter@gmail.com.  Mr. Williams, is that --

MR. WILLIAMS:  What (inaudible).  That's just another one she's accused of owning.

THE COURT:  All right.  We won't quash that one.

MR. OLSEN:  Your Honor, but what about the gould email one?  You mentioned -- I think Mr. Williams said that she's just claiming she was accused of that -- using that email address but it was not necessarily hers, so that wouldn't be quashed, similar to the other one as well?

THE COURT:  Well, I'm accepting as true Mr. Williams' representation that she has been accused in some court somewhere of owning that.  Do you know -- somewhere in California she's been accused of owning gould?

MR. WILLIAMS:  And in this court.

THE COURT:  Do you agree with that, Mr. Olsen?

MR. OLSEN:  Your Honor, I don't know the answer to that right now, but if she's claiming they're not hers, then would we able to get copies of that information if she's claiming that's not her personal information?

THE COURT:  Oh, I see what you're saying.  It's not quashed, but you're asking if you should be required -- if she should be required to share that.  Yes.

-25-

CT 64

MR. WILLIAMS:  She is required to share that already.

THE COURT:  Yeah, well -- I'm not sure if she's sharing it though, so timmycanter@gmail.com and gould8824@gmail.com --

MR. WILLIAMS:  Did you get anything on that, Kailin?

(Counsel confers with client)

THE COURT:  I want to make sure you hear this, so if you're listening to your client, I'll let you have a moment.

MR. WILLIAMS:  Okay.  No, we're good.

THE COURT:  Okay.

MR. WILLIAMS:  If it hasn't already been turned over, it will be, but she says it already has.

THE COURT:  For those two emails, right, the timmycanter and gould8824?

MR. WILLIAMS:  Correct.

THE COURT:  Okay.  I hope you're taking good notes on that.  My notes are a little sketchy, and I don't want to have to listen to this again, so Mr. Olsen, we'll rely on you to reduce that to writing.  The other -- in those last three emails, to the extent anybody interpreted that as being a request for those email records from Google, they are quashed. It looks to me like that's what she was requesting there, at least in one of those.

MR. WILLIAMS:  I still don't understand where you're looking at there.

-26-

THE COURT:  It's at the very bottom of that group of subpoenas.  It may be a California subpoena, so I just -- I just don't know.  It's just a jumble of documents.

MR. WILLIAMS:  Again, you're looking at his subpoena.

THE COURT:  Oh, is that his subpoena?

MR. WILLIAMS:  That's what -- I still don't even see it, but that's what Ms. Wang says.  The bottom subpoena there, the California subpoena, is the subpoena he sent.

THE COURT:  Oh, yeah, it does say attorney for petitioner ████████  but why -- why would he be subpoenaing something regarding prosecution racism?

MR. WILLIAMS:  Yeah.

MR. OLSEN:  I'm not exactly sure whose that one is, because it comes down in that second -- if you're looking at the very last page, again, I'm not sure --

THE COURT:  It looks like it's an attachment to her subpoena that she's trying to give them a copy of what has already been subpoenaed by the --

MR. WILLIAMS:  That is what happened.

THE COURT:  Yeah.  So she's serving Google a copy of ████████  subpoena, apparently saying I want the same things and these are what I want down below here, and very confusing. I'm sure Google didn't even know what she was talking about, but to the extent that's what she was doing, it's quashed.  All right.

-27-

CT 66

The next one is the Google April 13 subpoena.  Oh, no, wait.  That was -- yeah, that was the Google November 25 subpoena, right?

MR. WILLIAMS:  Say that again, your Honor.

MR. OLSEN:  Yeah, you were right, Judge.

COURT CLERK:  Yeah, so it was the November one.

THE COURT:  Okay.  Thank you.  I'm waiting for Mr. Williams just to see if there's any reason why to the extent there's a Utah --

MR. WILLIAMS:  Yeah.  Well, it wasn't authorized. Yeah, on this -- on the fifth one, the Google subpoena, those are her voice numbers -- or -- that she was accused of using again.

THE COURT:  It's the California subpoena based on a Utah court order again, right, like the previous one we discussed that was that way?

MR. WILLIAMS:  Yeah.  Yeah.  She just says -- again, this is one where they filed the same subpoena, and so she did the same thing as them.  It's a California subpoena, yeah, requesting these voice numbers that she is accused of using.

THE COURT:  So 310-362-6754 is not her phone number?

MR. WILLIAMS:  It's only a number she's accused by ██████ of using.

THE COURT:  All right.

MR. WILLIAMS:  And he's -- and he sent the same

-28-

subpoena.

THE COURT: Yeah. It's hard for me to rely much on that because she's merged all of these cases into one, and whenever she says he, now I'm finally queued into the fact that she's probably referring to he did that in a California case somewhere, or --

MR. WILLIAMS: Well, that's probably true.

THE COURT: Or (inaudible) somewhere and he attrib -- she attributes that to ▮▮▮▮▮ too. So it's hard for me to know exactly what -- I don't think a subpoena like this is issued out of this Court, but Mr. Olsen can tell me if that happened or not.

I think what I'm going to do is first of all, it's not a Utah subpoena, but to the extent it's a phone number that she's been accused of using, it's not quashed, but she is required to share any response that she's received with Mr. ▮▮▮▮▮ in this case with Mr. Olsen is what I'm referring to here.

MR. WILLIAMS: That's fine, Judge.

THE COURT: All right. Number 6 is the University Healthcare Alliance and Menlo Medical Clinic.

MR. WILLIAMS: Judge, these are pediatrician records. This is not a good copy. It's hard for me to tell exactly what I'm looking at, but she did send a subpoena, whether it's -- whatever is listed here or not -- but that would have been

-29-

CT 68

authorized by the March 6th order.

THE COURT:  All right.  Mr. Olsen, any reason why this would not have been authorized by the March 6th order of mine?

MR. OLSEN:  Your Honor, one of the concerns we've got -- and again, just some confusion terms of what she actually submitted, but one thing we've got is there were California court orders that were concerned about abduction issues, and so that was part of our objection and motion to quash on these.  Again your Honor, just to reiterate the same, that she didn't follow the Rules of Civil Procedure, we didn't get notice of any of this, so kind of the same stuff that we discussed before.

THE COURT:  All right.  We're not going to quash No. 6.

MR. WILLIAMS:  And No. 7 and 11 are pretty much the same thing.

THE COURT:  Let's go to No. 7, then.  Number 7 is Menlo-Atherton Cooperative Nursery.

MR. WILLIAMS:  Oh, the nursery one has already been quashed.  Yeah, so you're on to No. 7 now.  Agin, these copies are hard to look at, so I'm sure she did send one.  It's already been quashed.

THE COURT:  All right.  Do you agree, Mr. Olsen? Even in your briefing you just indicated that No. 8 and 9 to

-30-

CT 69

GARY L. BELL #6485
Assistant Attorney General
SEAN REYES #7969
UTAH ATTORNEY GENERAL
Attorneys for the State of Utah
55 North University Ave. Suite 219
Provo, Utah 84601
Email: agcppr@agutah.gov
Telephone: (801) 812-5200

---

## IN THE FOURTH DISTRICT JUVENILE COURT

## UTAH COUNTY, STATE OF UTAH

| STATE OF UTAH In the interest of: | SHELTER REQUEST |
|---|---|
| ██████████        ████-2018 | Case No. |
| Person under 18 years of age | Judge Smith |

The State of Utah, through counsel, request that the court schedule a shelter hearing for the

above-named child who was removed from the care of the parents on March 7, 2019.

Dated this 8th day of March 2019.

SEAN D. REYES
UTAH ATTORNEY GENERAL

/s/Gary L. Bell
GARY L. BELL
Assistant Attorney General

549

IN THE
COUNTY OF UTAH, STATE OF UTAH

| State of Utah | |
|---|---|
| vs. | Affidavit of Probable Cause |
| BELL, GARY LEE | |
| Date Of Birth: 07/10/1956 | |
| 2044 E 30 NORTH SPANISH FORK. UT 84660 | |
| Arrestee | |

**On 09/13/2022 17:30 the defendant was arrested for the offense(s) of:**

| | Offense Date | Offense Description | Enhancement | Statute | Severity | Court |
|---|---|---|---|---|---|---|
| 1 | 09/13/2022 | AGGRAVATED SEXUAL ABUSE OF A CHILD | | 76-5-404.3(3) | F1 | DST |
| 2 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 3 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 4 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 5 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 6 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 7 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 8 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 9 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 10 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 11 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 12 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 13 | 09/13/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 14 | 09/13/2022 | SODOMY ON A CHILD | | 76-5-403.1(3) | F1 | DST |

**I believe there is probable cause to charge the defendant with these charges because:**

On September 13, 2022, I was working as a Detective in the Special Victims Unit for the Utah County Sheriff's Office. I previously investigated a Cyber Tip from The National Center for Missing and Exploited Children (NCMEC) for Child Sexual Abuse Material (CSAM), where a search warrant was served on the address 2044 E 30 N Spanish Fork, Utah 84660 for the person Gary Bell. During the course of the search warrant all electronics were seized and had a forensic download conducted by a forensic technician. The forensic technician provided me with the data extracted from the devices seized from the above address.

On the above date I was reviewing the data on a micro SD card belonging to Gary Bell when I found a series of nine photos depicting a male with his jeans pulled down to his knees exposing an erect penis. There is a child approximately 1-2 years old in the photos looking at the penis and touching the penis. I recognized the background of the photos as looking like the front room of the above address. I accessed crime scene photos taken the day of the warrant service and found a photo of the front room and determined this was the same room in the CSAM photo's. The couch in both photos is the same as well as the carpet. There are also children's toys that are the same in both photos, a yellow school buss and two stuffed animals. The day of the warrant service the occupants of the home were Gary Bell, his wife and a 1-2 year old granddaughter that Gary's wife said they are caretakers for during the week. I recognized the child in the CSAM photo's as the granddaughter.

Upon further investigation video file 20220125_161745.mp4 was found and it is a video of the above described series of photos. It depicts the 1-2 year old female child touching the adult males erect penis with her hands and at two different times putting her mouth on the penis.

It should be noted there are hundreds of photo's of Gary Bell nude on the

extraction and the adult penis in the video looks exactly like Gary's in the full nude photo's he had taken of himself.

I continued to look through the photo's and found two photo's of a 1-2 year old female child that showed her bare genitals. I looked at the EXIF data for both photo's, which shows the device the photo's were taken on and the creation date of the photos. Both photo's were taken on a Samsung cell phone model #SM-A102U1 which is the same cell phone seized from Gary during the course of the warrant service.

I responded to the above address and arrested Gary Bell and transported him to the Utah County Jail. While en route to the jail Gary stated he thought the photo's and video was erased because he was disgusted with himself over them.

Gary was booked on Aggravated Sodomy on a Child, Aggravated Sexual Abuse of a Child and Manufacturing Child Sexual Abuse Material x12
By submitting this affidavit, I declare under criminal penalty of the State of Utah that the foregoing is true and correct.
/S/ Robertson, Cassandra

| | |
|---|---|
| **Officer Name:** UCCSMITH - Cassandra Robertson | **Probable Cause Entered:** 09/13/2022 18:10 |
| **A sworn officer with:** UT0250000 - UCSO | **Probable Cause ID:** 168845 |
| **Agency Case** 22UC11255 | **Suggested Bail Amount:** |

**SUBMISSION IDENTIFICATION INFORMATION**

| | | |
|---|---|---|
| **Booking Agency:** Utah County Sheriff Office | | **Booking Agency ORI:** UT0250000 |
| **Agency Inmate ID:** 420682 | **SID:** NONE | **OTN:** 64063738 |
| **Arrest Date/Time:** 09/13/2022 17:30 | **FBI ID:** 588455V8 | |

IN THE

COUNTY OF UTAH, STATE OF UTAH

| State of Utah | | |
|---|---|---|
| vs. | | Affidavit of Probable Cause |
| BELL, GARY LEE<br>Date Of Birth: 07/10/1956<br>2044 E 30 NORTH SPANISH FORK. UT 84660 | | |
| | Arrestee | |

**On 08/24/2022 10:00 the defendant was arrested for the offense(s) of:**

| | Offense Date | Offense Description | Enhancement | Statute | Severity | Court |
|---|---|---|---|---|---|---|
| 1 | 08/24/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 2 | 08/24/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 3 | 08/24/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 4 | 08/24/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 5 | 08/24/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |
| 6 | 08/24/2022 | SEXUAL EXPLOITATION OF A MINOR | | 76-5B-201(3) | F2 | DST |

**I believe there is probable cause to charge the defendant with these charges because:**

On August 4, 2022, I was working as a detective in the Special Victims Unit for the Utah County Sheriff's Office. I reviewed the information for a cyber tip from the National Center for Missing and Exploited Children (NCMEC). The cyber tip #125704231 was made by MeWe and reported that on May 22, 2022 at 0552 hours images depicting
child sex abuse material (CSAM) was uploaded from the IP Address 67.199.173.218. The name for the account was G B with an e-mail glbell0710@gmail.com.

IMAGES

I viewed the reported images and found the following as described:

Image 012.jpeg shows a pubescent female that is age difficult laying on a bed with white sheets. The female is nude and has her legs in the air spread with her hands on her buttocks, exposing her vagina and anus.

Image 014.jpg shows a prepubescent girl approximately 6-8 years old. The child is laying on a bed with pink sheets, blue pillows, a nemo stuffed animal and a small dog on the bed. The child is nude except for socks and pink shoes on. The child is laying on her right side and her hand is on her buttocks exposing her anus.

Image 015.jpg shows a prepubescent girl approximately 6-8 years old. The child is laying on a bed with pink sheets, blue pillows, a nemo stuffed animal and a small dog on the bed. The child is nude except for socks on. The child is laying on her back and her legs are spread apart with her hands on her labia exposing her vagina.

Image 016.jpg shows a prepubescent girl approximately 6-8 years old. The child is laying on a bed with pink sheets. There is an older female fully dressed sitting next to the child on the bed. The child face down on her hands and knees with her buttocks towards the camera. The child's pants and underwear are down around her ankles and her vagina and anus are exposed.

Image 017.jpg shows a prepubescent girl approximately 6-8 years old sitting on the floor in front of a bed with pink and white sheets. There is an age difficult girl sitting next to her. The child has no shirt on exposing her undeveloped breasts and a jean skirt with red underwear pulled down to her knees exposing her buttocks. The age difficult girl has no shirt on exposing her under developed breasts and has a jean skirt with pink underwear around her knees exposing her vagina and anus.

Image 019.jpg shows a prepubescent girl approximately 6-8 years old laying on her stomach on the floor in front of a bed with pink and white sheets. There is an age difficult girl laying on her stomach next to her. The child has a skirt that is pulled up and her vagina and anus are exposed. The age difficult girl also has a skirt pulled up exposing her vagina and anus.

After obtaining a judicial order for the IP Address subscriber information I was able to identify the suspect as Gary Lee Bell DOB 07/10/1956, address 2044 E 30 N Spanish Fork, Utah 84660.

An affidavit for a search warrant was submitted and a search warrant for the above address signed by Judge Denise Porter.

IN THE FOURTH DISTRICT JUVENILE COURT
OF UTAH COUNTY, STATE OF UTAH

```
_____     )
                                   )
STATE OF UTAH,                     )
                                   )
in the interest of:                )
                                   ) Case No. 1170844
KW, (11/26/2018)                   )
                                   ) (Partial transcript)
Person under 18 years of age.      )
                                   )
_____     )
```

Hearing
Electronically Recorded on
March 12, 2019


BEFORE: <u>THE HONORABLE F. RICHARDS SMITH III</u>
Fourth District Juvenile Court Judge


Transcribed by: Natalie Lake, OCT


8020 W. 3500 N.
Abraham, UT 84635
Telephone: (435) 590-5575

-1-

APPEARANCES

For the State:                    Gary Bell
                                  UTAH ATTORNEY GENERAL
                                  350 North State Street Suite 230
                                  SLC, UT 84114
                                  Telephone: (801)366-0260


For the Mother:                   Terry Spencer
                                  140 West 9000 South, Suite 9
                                  Sandy, UT 84070
                                  Telephone: (801)566-1884


For the Father:                   Mitchell Olsen
                                  8142 S. State Street
                                  Midvale, UT 84047
                                  Telephone: (801)255-7176


Guardian ad litem:                Daniel Gubler
                                  OFFICE OF THE GUARDIAN AD LITEM
                                  32 W. Center Street
                                  Provo, UT 84601
                                  Telephone: (801)


For the grandparents:             Jeff Rifleman
                                  408 Indian Summer Way
                                  Saratoga Springs, UT 84045
                                  Telephone: (801)510-0503

-2-

P R O C E E D I N G S

(Electronically recorded on March 12, 2019)

THE COURT:  Okay.  Mr. Bell, anything further?

MR. BELL:  Your Honor, basically just this is clearly a custody battle is what it is.

THE COURT:  Yeah.

MR. BELL:  The issue here is does this Court have emergency jurisdiction.  The State argues that it had emergency jurisdiction at the time we got the warrant.  Mr. Rifleman is even questioning now whether or not we had jurisdiction to get that warrant, so if that's the case, it -- it also argues to the point, I would state, your Honor, that this Court does not have jurisdiction any longer under the emergency.  There isn't an emergency.  There is clearly a custody battle.

THE COURT:  Uh-huh.

MR. BELL:  But this Court should not be getting involved in a custody battle when the only party that's in Utah right now hasn't even filed their petition.  That's the grandparents.  We're being told that they're going to file something, but there isn't anything there.  The only petitions, the only custody orders that are in place right now is that out of the State of New York and the State of California.  The State of Utah, I don't believe, and the juvenile court especially does not have the jurisdiction to get involved in that custody battle.

-3-

So it's our position at this point, your Honor, that there's not an emergency. The statute that says a child should be returned to a parent, it doesn't say the child should be returned to the custodial parent. It says the child should be returned to the parent. There's a paternity action that has been done. That DNA test, this is a parent. He's the father.

So there's not an emergency. We've done a background check on this father. We cannot find anything that says the child would be unsafe in his care and custody. So it's our belief, your Honor, that the Court should just basically dismiss the action and let the parents fight it out however they're going to do it in whatever court is ultimately determined to be the appropriate court.

THE COURT: All right. Mr. Gubler?

MR. GUBLER: Well, and I agree with what Mr. Bell just said, and the statute about getting custody back to the parent, that would be -- well, the father is the custodial parent. He's got an order where he has custody, so the Court doesn't need to restore custody. Really, nobody -- well, the State and I are not asking for any sort of changes to custody. We're asking that it be dismissed and the Court not issue any orders, and -- yeah.

Let's see, I wanted to clarify, so the New York order that's been entered is a protective order against -- from mom against dad, and so the child is not even mentioned in that

-4-

MR. SPENCER:  That's fine.

MR. BELL:  Works for the State, your Honor.

THE COURT:  Okay.  All right.  We'll be back Monday at 4 o'clock and hopefully have a little more clarity.

MR. OLSEN:  Your Honor, just to make sure, so the child is going to stay with my client?

THE COURT:  Yes.

MR. OLSEN:  Okay.  Then --

MR. SPENCER:  In the State of Utah, I assume?

MR. OLSEN:  -- we'll return Monday at 4 o'clock?

THE COURT:  Yes.  Yes.  Yeah, the child stays in Utah with dad until Monday at 4 o'clock when we come back.

MR. OLSEN:  Would the Court allow the child --

MR. SPENCER:  In the custody --

MR. OLSEN:  -- to return back if my client has to go to California to come back to ensure that he's here?

MATERNAL GRANDMOTHER:  No.

MR. SPENCER:  I would oppose that, your Honor.

THE COURT:  Why?

MR. OLSEN:  He'll sign a promise to be here with the child Monday at 4 o'clock, your Honor.

THE COURT:  Okay.

MATERNAL GRANDMOTHER:  No, he can't -- can't take the --

THE COURT:  Yeah, he can.  Okay.

-28-

MR. OLSEN:  Thank you, your Honor.

THE COURT:  That's fine.  Thank you.

MR. SPENCER:  It's not a problem.  All right.  Monday at 4.  Thanks.  Appreciate it, your Honor.

THE COURT:  Thank you.

MR. SPENCER:  Thank you.

THE COURT:  Ms. Wang, are you still there?

MS. WANG:  Yes, I am.

THE COURT:  Okay.  We'll terminate the phone call. Thank you.

MS. WANG:  Thank you.

(Hearing concluded)

-29-

REPORTER'S CERTIFICATE

STATE OF UTAH           )
                        ) ss.
COUNTY OF MILLARD       )

I, Natalie Lake, a Notary Public in and for the State of Utah, do hereby certify:

That this proceeding was transcribed under my direction from the transmitter records made of these meetings.

That I have been authorized by Beverly Lowe to prepare said transcript, as an independent contractor working under her court reporter's license, appropriately authorized under Utah statutes.

That this transcript is full, true, correct, and contains all of the evidence and all matters to which the same related which were audible through said recording.

I further certify that I am not interested in the outcome thereof.

That certain parties were not identified in the record, and therefore, the name associated with the statement may not be the correct name as to the speaker.

WITNESS MY HAND AND SEAL this 8th day of February 2021.

My commission expires:
January 9, 2024

Natalie Lake
NOTARY PUBLIC
Residing in Millard County

Beverly Lowe, RSR, CCR

NATALIE LAKE
Notary Public, State of Utah
Commission # 709897
My Commission Expires On
January 09, 2024

8/27/2019                                          71 - Email to school board members, Feb. 20.JPG

From: **Courtorder6678 Order** <courtorder6678@gmail.com>
Date: Wed, Feb 20, 2019 at 11:55 AM
Subject: Order of Protection against ▋▋▋▋ Standford ▋▋▋▋
To: ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋>, board@mpcsd.org <board@mpcsd.org>

|  |  |  |
|---|---|---|
| **FAMILY COURT OF THE STATE OF NEW YORK**<br>**COUNTY OF NEW YORK** |  | GF2 8/2002 |

In the Matter of a **Family Offense** Proceeding                    File #:    302011
                                                                    Docket #:  O-02057-19

**Kailin Wang,**
                            Petitioner,                             **SUMMONS**

        - against -

▋▋▋▋▋▋▋▋▋▋▋▋▋▋-

**00104**

March 8, 2019

David H. Shawcroft
Civil Division Chief
Utah County Attorney
100 East Center, Suite 200
Provo, UT 84606

Via Email

Dear Mr. Shawcroft,

On February 29, 2018, you sent me an email which contained a complaint received by the Utah County Attorney's Office from a Mr. John Wang. Listed in that complaint were several allegations regarding myself, my associate, or my business, Unified Constable Service, Office of the Utah County Constable. These allegations are gross mischaracterizations of events and omit the serious underlying legal issues in this case.

I am grateful for the opportunity to respond to these grossly mischaracterized allegations.

In my response, I summarize review my business and its lawful authority, provide a summary of the Domestic Violence Temporary Restraining Order, along with other Court Orders and concerning issues presented to us, and provide a truthful and accurate factual summary of the attempts to serve legal paperwork.

## Unified Constable Service, Office of the Utah County Constable

Unified Constable Service, Office of the Utah County Constable, serves and enforces civil and criminal court process throughout Utah County, Salt Lake County and the Greater Wasatch Front. A constable "may serve any process throughout the state." Utah Code Ann. § 17-25-1(2).

 "To qualify as a constable, a person shall be certified as a *special function* peace officer in the state." Utah Code Ann. § 17-25a-2(1) (emphasis added). Therefore, constables are sworn and certified peace officers, certified through the Utah Peace Officer Standards and Training. In essence, constables have police powers and are public servants, asked by the community to serve legal documents.

Oftentimes this public service of serving legal papers is not easy. Difficult consequences may follow the service of process. Most people do not enjoy being served with legal papers, particularly, a Domestic Violence Temporary Restraining Order with serious underlying and ongoing civil and criminal matters.

## Factual Summary Of Domestic Violence Temporary Restraining Order

1

*See* Court Docket of Utah Fourth District Case # 171301350. Thus, it appears that over a year ago, Kailin did not want people to know of her whereabouts.

Later, that afternoon, Lampropoulos sent Ms. Wang a polite and professional email asking her to give him a phone call regarding some legal documents. Kailin Wang never replied.

Additionally, Kailin never answered phone calls or responded to text messages from Lampropoulos requesting that she please call Lampropoulos.

**February 19, 2019**

Ben Stowell attempted to contact Kailin Wang and spoke to her mother, Mrs. Wang. Mr. Stowell said he would be happy to contact Kailin at a new address but could not move from the current address of record without speaking to her. Mrs. Wang indicated that Kailin did not live at the home and she did not have a phone number for her. Mrs. Wang was abrasive and yelled through the door that Stowell should contact Kailin's attorney. Mrs. Wang said she would not cooperate with Stowell to get the papers to Kailin.

Stowell never indicated that he was police but was with the Constable's Office.

**February 20, 2019**

Earlier in the day, Stowell went to the office of Ed Brass, the attorney for Kailin, to attempt service there. Stowell was instructed that at Kailin's direction, the law office may not accept service on her behalf.

Stowell and Officer Gurney of the Salem Police Department attempted to contact Mr. Wang at his place of employment to seek his assistance in serving Kailin provided the earlier stated unsuccessful attempts, including Kailin's attorney. Stowell requested an officer to be present for officer safety purposes. The Constable's Office was informed that Kailin may have a firearm and with the Wang's determined non-cooperation and hostility, having another officer was prudent in case Mr. Wang had a firearm as well.

The Unified Constable Service employees, process servers, and deputies are issued a professional uniform which consists of green pants and a golf shirt with embroidery which identifies the employee as a representative of the Constable's Office. This uniform complies with Utah Code Ann. § 17-25-6.

Mr. Stowell, an experienced peace officer, and Deputy Constable trainee was wearing this uniform, which is in stark contrast with a formal police uniform. Stowell was wearing his duty belt which is standard practice for deputies and officers alike.

7

At Mr. Wang's employment, his employer was informed that Mr. Wang was not in any sort of trouble, but they needed to ask a few questions in a whereabouts investigation. The company's human resources department kindly suggested a room for the conversation.

Mr. Wang arrived and was told that despite their best efforts and no cooperation from the Wang's or Kailin's attorney, the Unified Constable Service could not serve Kailin with the DVTRO.

Stowell explained their predicament and the efforts put into find Kailin. Mr. Wang said he had NO idea where his daughter was located and was evasive in answering questions.

Mr. Wang said to contact his daughter's attorney. It was explained that the Unified Constable Service went to Kailin's attorney's firm in downtown Salt Lake City which refused to accept service and, it was understood that Kailin gave this direction. Mr. Wang was informed that the Unified Constable Service would be happy to serve Kailin's attorney if Mr. Wang could convince his daughter to have them accept service. Mr. Wang was apprehensive about a secondary path to get the documents to Kailin. Eventually, Mr. Wang said he would see if he could arrange service of Kailin through her attorney.

Mr. Wang asked Stowell and Officer Gurney if he was free to go to which Stowell and Gurney indicated he was indeed free to leave at any time. Mr. Wang also stated that he would not answer any more questions, but they could contact his attorney. Stowell understood and immediately ended the conversation.

Mr. Wang was pleasant and even joked that they were able to find his place of employment. As Stowell was leaving, he reassured Mr. Wang's employer, at Mr. Wang's request, that he was not in trouble and thanked Mr. Wang for his time. Everyone was pleasant and cordial.

**Afternoon of February 20, 2009**

Mr. Stowell attempted to serve the DVTRO at the Spanish Fork residence and saw two vehicles separately leave the home within minutes of each other. One vehicle was a gold BMW SUV, which Mr. Wang frequently drove, and the other was a maroon Lexus SUV. Mr. Stowell saw a woman in the back seat of the Lexus along with a baby seat. Mr. Stowell reasonably believed that the woman was Kailin Wang and followed the car in hopes of serving Kailin.

Mr. Stowell proactively notified local jurisdictions, including Provo and Sandy, that he was shadowing a vehicle that he reasonably believed contained the subject of a DVTRO. Mr. Stowell subsequently contacted Lampropoulos and requested that he meet in Sandy at an address that appeared to be Mr. Wang's lawyer.

Mr. Wang incorrectly alleges Stowell had a police sticker on his window that was removed. Stowell's vehicle is a take-home vehicle which has personal effects in it. The sticker in question

8

was not a sticker at all; rather, it was a personal hat Stowell had on his dash, which is not part of his issued uniform, but a wearable item from his law enforcement training.

Stowell arrived and was met with a semi-hostile reception from Mr. Wang's attorney. Threats were made and cameras were utilized.

Lampropoulos arrived at the address moments after Stowell and attempted to visually identify the woman in the vehicle. Kailin Wang was not in the vehicle, but it was instead Mrs. Wang. Kailin's baby was also in the vehicle.

Lampropoulos spoke with Mr. Wang's attorney who was hostile towards Lampropoulos. Mr. Wang's attorney was informed that they had a DVTRO that needed to be served and Stowell believed Kailin Wang was in the vehicle.

Mr. Wang's attorney said he was going to call the Sandy Police Department, which Lampropoulos encouraged him to do, and they later arrived. The situation was explained and Lampropoulos and Stowell left the scene.

Of note, as two vehicles left the home, one with two adults inside of it, it was reasonably deduced that three adults were staying inside the home. As a reminder, the Wang's neighbors indicated that Kailin would drive either vehicle. This activity, along with the report of neighbors of Kailin residing in the home and the obfuscation by the Wang's in providing any contact information of Kailin, corroborates the reasonable belief that Kailin resides at the Spanish Fork residence. Moreover, Kailin's baby was with the Wang's when the incident occurred in Sandy – indicating that they had good contact with Kailin, which is contrary to every statement they made of not knowing her whereabouts.

**February 21, 2019**

The Wang's noticed a red Toyota Hybrid parked near their home. This vehicle does not belong to the Unified Constable Service. However, the office was aware of several private investigators in the area during attempts to serve the DVTRO.

Afterwards, the Wang's continued to be uncooperative.[3] The case has become more dire with additional intervention from government authorities.[4]

---

[3] On March 6, 2019, after the Amended DVTRO, see Footnote 2, was issued out of California which gave sole legal and physical custody to C▆▆▆▆▆▆ ▆▆▆▆▆▆ the Spanish Fork Police Department made a traffic stop of Mrs. Wang. Sgt. Adams of the SFPD stated that the parents "were not going to be cooperative." Sgt. Adams was going to speak with the city attorney about the Amended DVTRO and Child Custody Order.

[4] With a Child Custody Order from California granting sole custody to Ch▆▆▆▆ r ▆▆▆▆▆▆ Lampropoulos was informed that Robbie Adams with the Utah Department of Child and Family Services (DCFS) is now investigating the case. On March 7, 2019, the baby was re-appropriated to the custodial parent, Mr. ▆▆▆▆ by the Utah DCFS.

9

Jason E. Greene (#13990)
Jared D. Scott (#15066)
Jacob D. Barney (#16777)
ANDERSON & KARRENBERG
50 W. Broadway, Suite 700
Salt Lake City, UT 84101-2035
Telephone: 801-534-1700
Fax: 801-364-7697
jgreene@aklawfirm.com
jscott@aklawfirm.com
jbarney@aklawfirm.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| STEFFEN MAUTE, derivatively on behalf of MERIT MEDICAL SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> FRED P. LAMPROPOULOS; RAUL PARRA; A. SCOTT ANDERSON; JILL D. ANDERSON; THOMAS J. GUNDERSON; F. ANN MILLNER; LYNNE N. WARD; and JUSTIN F. LAMPROPOULOS, <br><br> Defendants, <br><br> – and – <br><br> MERIT MEDICAL SYSTEMS, INC., a Utah corporation, <br><br> Nominal Defendant. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT (REDACTED VERSION)** <br><br> **(DEMAND FOR JURY TRIAL)** <br><br><br> Case No. 2:21-cv-00346-DBP <br><br> Magistrate Judge Dustin B. Pead |

Plaintiff Steffen Maute ("Plaintiff"), by and through his undersigned attorneys, hereby

submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of

Upon information and belief, defendant Millner is a citizen of Utah.

35. Defendant Lynne N. Ward ("Ward") has served as a director of the Company since August 2019 and has also served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Ward is a citizen of Utah.

36. Defendant Justin Lampropoulos ("J. Lampropoulos") is the son of defendant F. Lampropoulos and upon information and belief, has served as a Merit executive since at least 2010. J. Lampropoulos currently serves as Merit's President of Europe, the Middle East, and Africa. Prior to holding that position, defendant J. Lampropoulos served as Merit's Executive Vice President of Sales, Marketing, and Strategy for United States, Europe, and Global Marketing. Upon information and belief, defendant J. Lampropoulos is a citizen of Utah.

37. Defendants F. Lampropoulos, Parra, A.S. Anderson, J. Anderson, Gunderson, Millner, Ward, and J. Lampropoulos are collectively referred to herein as the "Individual Defendants."

38. Defendants Gunderson, Millner, and Ward are collectively referred to herein as the "Audit Committee Defendants."

## IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

39. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as

15

MARGARET H. OLSON (Bar No. 6296)
Summit County Attorney
DAVID L. THOMAS (Bar No. 7106)
Chief Civil Deputy County Attorney
JAMI R. BRACKIN (Bar No. 8753)
Deputy County Attorney
SUMMIT COUNTY ATTORNEY'S OFFICE
60 N. Main Street, P.O. Box 128
Coalville, Utah 84017
Telephone:    435-336-3206
Fax:             435-336-3287
molson@summitcounty.org
dthomas@summitcounty.org
jbrackin@summitcounty.org

Attorneys for Plaintiff and Petitioner

_____

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SUMMIT COUNTY, STATE OF UTAH

_____

_____

| | | |
|---|---|---|
| SUMMIT COUNTY, a political subdivision of the State of Utah, | : | **SECOND AMENDED COMPLAINT & PETITION FOR DECLARATORY & INJUNCTIVE RELIEF** |
| Plaintiff and Petitioner, | : | |
| v. | : | **Tier II** |
| NATHAN A. BROCKBANK, an individual, JOSHUA J. ROMNEY, an individual, RB 248, LLC, NB 248, LLC, N. BROCKBANK INVESTMENTS, LLC, JJR VENTURES, LTD, WELLS FARGO BANK, NA, REDUS PARK CITY, LLC, UNITED PARK CITY MINES COMPANY, and JUSTIN LAMPROPOULOS. | : | Civil No. 200500346 Judge Richard Mrazik |
| Defendants and Respondents. | : | |

8.      RB 248, LLC is a Utah limited liability company with offices in Salt Lake County, Utah, whose principals are N. Brockbank Investments, LLC and JJR Ventures, LTD, and are the alleged owners of Parcels SS-87 and SS-88 in Summit County, Utah.

9.      NB 248, LLC is a Delaware limited liability company with offices in Salt Lake County, Utah and is an alleged owner of Parcels SS-87 and SS-88 in Summit County, Utah.

10.     Wells Fargo Bank, NA is a foreign corporation and is alleged to have owned Parcels SS-87 and SS-88 in Summit County, Utah.

11.     REDUS Park City, LLC is a foreign limited liability company and is alleged to have owned Parcels SS-87 and SS-88 in Summit County, Utah.

12.     United Park City Mines Company is a foreign corporation and record title owner of Parcels SS-87 and SS-88 in Summit County, Utah.

14.     Wells Fargo has a civil Judgment ("Judgment") against United Park City Mines, of which $107,391,665.48 is still owing.

13.     Justin Lampropoulos is an individual living in Salt Lake County, Utah. On information and belief, in February 2020 Justin Lampropoulos was a deputy constable working under the authority of an appointed constable in a county on the Wasatch front.  Justin Lampropoulos is, according to online records, also an executive vice-president of Merit Medical and earns $1.2 million per year.

GENERAL ALLEGATIONS

*Commencement of an Enterprise*

14.     Parcels SS-87 and SS-88 are located in Summit County, Utah, are not contiguous to Hideout, and are owned by United Park City Mines Company ("UPCM").

7

avoid the Summit County Sheriff, and instead employed the services of Justin Lampropoulos, a deputy constable from another county to conduct a purported foreclosure sale pursuant to the Writs of Execution on February 22, 2020 (the "Foreclosure Sale").

79.     Wells Fargo and its lawyers Snell and Wilmer have been obtaining Writs of Execution from the Third District Court in Summit County and holding foreclosure sales in Summit County for years.  A five-year look back for all Writs of Execution prior to the November 25, 2020 Writs reveals that at all times, Wells Fargo has asked Silver Summit judges to issue the Writs to the "Summit County Sheriff" who has, for years, been holding Sheriff's Sales at the request of Wells Fargo. This Writ, however, was presented to Judge Holmberg in proposed form to the "Summit County Sheriff or Constable". This was another act in furtherance of the Enterprise.

80.     On February 22, 2020 Justin Lampropoulos, calling himself "Constable for the State of Utah", held the Foreclosure Sale at the Silver Summit Courthouse located in Summit County.

81.     There is no such thing as a "Constable for the State of Utah".  Constables are county offices and governed by Title 17 of the Utah Code.

82.     Justin Lampropoulos has not been appointed or authorized by the Summit County Council act as a Constable in Summit County as required by Utah law.  Utah Code § 17-25a-1.

83.     Yet on August 21, 2020, Justin Lampropoulos signed a "Constable's Deed" which Brockbank caused to be recorded in the Summit County Recorder's Office on August 26, 2020. In the notary block on this deed, Justin Lampropoulos again represents himself as "Constable for the State of Utah."

84.     While performing any constable duties, a constable is required to prominently identify the "county or municipality for which the constable is appointed." Utah Code § 17-25-6(1).

22

85.     Online records do not reveal under which county's appointment or authority Justin Lampropoulos may have been purporting to act on February 22, 2020 when he came to the Silver Summit Courthouse and held a sale.

86.     On information and belief, in February 2020, Justin Lampropoulos may have been a deputy constable working under an individual appointed in another county although he is also an Executive Vice President of Merit Medical.

87.     Additionally, under Utah Code § 17-25a-3(2)(a), any constable entering another county to serve process is required to contact the Sheriff of that county prior to serving process or seizing (personal) property.  Justin Lampropoulos did not contact the Sheriff of Summit County during February, 2020 prior to conducting the foreclosure sale or at any time. The Sheriff of Summit County does not know who Justin Lampropoulos is.

88.     Constables are authorized to *serve* any process throughout the state.  Utah Code §17-25-1(2).  Constables are not, however, authorized to hold foreclosure sales or issue real property deeds.  Nor may constables execute any process outside the county or city where they have been authorized. *Compare* Utah Code § 17-25-1(1) and (2).

89.     Utah R. Civ. P. 64 (Writs) provides that writs directing the seizure of real property are directed to the Sheriff of the County in which the real property is located.  Writs for the seizure of personal property can be directed to any officers; i.e. constables.

90.     In fact, there is no such thing as a "Constable's Deed."  A Westlaw search for this term reveals that "Constable's Deed" does not appear in any Rule, Statute, or reported case in the State of Utah, ever.

service of the Writ and, if Property has been seized, an inventory of the Property seized and whether the Property is held by you or by your designee."

94.    Even though Justin Lampropoulos was purporting to act as a Summit County Constable with authority to execute this Writ, Justin Lampropoulos did not do the things directed by the court (issue a certificate of sale, file proof of service and inventory).  Justin Lampropoulos instead did things not authorized by the Writ, i.e. issued a real property deed and called it a "Constable's Deed."

95.    By employing Justin Lampropoulos and holding the purported Foreclosure Sale in Summit County Wells Fargo acquired portions of Parcels SS-87 and SS-88 at the Foreclosure Sale and assigned their interests to RB 248 LLC, a company under the control of Brockbank.

96.    Parcels SS-87 and SS-88 were not subdivided in accordance with state statute or Summit County Code.  Neither Brockbank, nor Wells Fargo ever submitted an application to Summit County for a subdivision plat on Parcels SS-87 and SS-88. Neither Brockbank, nor Wells Fargo has ever been granted approval for a subdivision plat on Parcels SS-87 and SS-88.  In fact, according to the official records of Summit County, there is no subdivision plat on file with Summit County subdividing Parcels SS-87 and SS-88 in the manner set forth in either the Writs of Execution or Constable's Deed.

97.    On information and belief, Wells Fargo hoped to have a portion of Parcels SS-87 and SS-88 annexed into Hideout in Wasatch County, where Parcels SS-87 and SS-88 could be granted urban development, notwithstanding the violations of state and local land use laws.

98.     On August 21, 2020, Patrick Putt, Community Development Director of Summit County and land use authority, issued a Notice to Show Cause to Wells Fargo and UPCM as to the illegal subdivision of Parcels SS-87 and SS-88 (the "Notice to Show Cause").

99.     In response to the Notice to Show Cause, Brockbank rushed to record Justin Lampropoulos' Constable's Deed on August 26, 2020.

100.    On the same day, in a continuing effort to obfuscate their actions and create confusion as to ownership, RB 248, LLC quit claimed the illegal parcels created in the Constable's Deed to another Brockbank entity, NB 248, LLC, a Delaware company, which was formed on August 24, 2020, and which is not registered in the state of Utah.

101.    In accordance with that certain Amended and Restated Development Agreement for Flagstaff Mountain, Bonanza Flats, Richardson Flats, The 20-acre Quinn's Junction Parcel and Iron Mountain, dated March 2, 2007, and recorded as Entry No 00806100 in the Office of the Summit County Recorder, Book 1850, beginning at Page 1897, Section 3.1 (the "Flagstaff Development Agreement"), the property owner of Parcels SS-87 and SS-88 is obligated to annex these parcels into Park City Municipal Corporation ("Park City").

102.    In accordance with statutory interpretation, the Flagstaff Development Agreement bars any property owner of Parcels SS-87 and SS-88 from consenting to any annexation that is not into Park City.

*Brockbank*

103.    On information and belief, beginning in early 2019 and continuing until the present, Brockbank and Wells Fargo approached Hideout about an Enterprise to annex lands located in

26

143. An actual dispute exists between Plaintiff Summit County and Brockbank, Wells Fargo. and Justin Lampropoulos.

144. Justin Lampropoulos has never been appointed by the legislative body of Summit County or authorized to act as a constable in Summit County as required by Utah Code.

145. On information and belief, in February 2020 Justin Lampropoulos was employed by a constable appointed in another county as a deputy constable.

146. Constables have no authority to execute or return process in counties other than the counties where they have been appointed. Utah Code § 17-25-1.

147. Only Sheriffs of the county in which real property is located are authorized to execute writs of execution on real property. Constables' authority is limited to writs of execution on personal property. Utah R. Civ. P. 64(d).

148. Judge Holmberg's November 25, 2019 Writs of Execution did not authorize the issuance of any deed, only a certificate of sale.

149. There is no such legal instrument as a "Constable's Deed" for real property in Utah.

150. Consequently, the Court should declare and rule that:

A. Justin Lampropoulos has no legal authority within Summit County to execute on real property, hold foreclosure sales, or issue real property deeds.

B. Justin Lampropoulos' entry into Summit County without notice to the Sheriff, purporting to act as a "Constable for the State of Utah", and holding a Foreclosure Sale was a violation of Utah Code § 17-25-1, 17-25-6(1), Utah R. Civ. P. 64(d), and Utah Code § 76-8-201 (Official Misconduct).

B. Justin Lampropoulos' Constable's Deed dated February 22, 2020 has no legal force or effect or in the alternative is void ab initio.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Summit County prays for judgment against Brockbank and Wells Fargo on its claim for relief and all available additional relief as follows:

**CLAIM FOR RELIEF (Declaratory Judgment; Injunctive Relief; and Abatement – Illegal Subdivision, Parcels SS-87 and SS-88)**:  For judgment in favor of Plaintiff Summit County declaring and ordering that:

A. Parcels SS-87 and SS-88 were illegally subdivided by the Foreclosure Sale and remain unified parcels;

B. The Foreclosure Sale is abated and void, and title to Parcels SS-87 and SS-88 did not pass to Wells Fargo or Brockbank or any subsequent transferees through the Constable's Deed;

C. The Constable's Deed is abated and void, and all subsequent transfers therefrom are void;

D. Brockbank and Wells Fargo are enjoined from recording the Constable's Deed and any other subsequent deed regarding Parcels SS-87 and SS-88;

E. Brockbank and Wells Fargo are enjoined from providing consent to annex any portion of Parcels SS-87 or SS-88 into Hideout pursuant to Utah Code §10-2-418(3)(c); and

F. Brockbank and Wells Fargo are enjoined from exercising any ownership interest in Parcels SS-87 and SS-88 until those parcels are properly subdivided and an appropriate and legal foreclosure sale has been held.

**SECOND CLAIM FOR RELIEF** (Declaratory Judgment; Injunctive Relief; and Abatement – Fraudulent and Invalid Real Property Deed (Constable's Deed): For judgment in favor of Plaintiff Summit County declaring and ordering that:

A.  Justin Lampropoulos has no legal authority within Summit County to execute on real property, hold foreclosure sales, or issue real property deeds.

B.  Justin Lampropoulos' entry into Summit County without notice to the Sheriff and purporting to act as a "Constable for the State of Utah" and holding a Foreclosure Sale  was a violation of Utah Code § 17-25-1, 17-25-6(1), Utah R. Civ. P. 64(d), and Utah Code § 76-8-201 (Official Misconduct).

C.  Justin Lampropoulos' Constable's Deed dated February 22, 2020 has no legal force or effect or in the alternative is void ab initio.

AS TO EACH CLAIM FOR RELIEF, Plaintiff Summit County prays for reasonable attorney's fees, costs, and prejudgment interest as allowed by law; and such other and further relief as this Court determines is required to do equity and justice under the circumstances.

RESPECTFULLY SUBMITTED this 30th day of August, 2020.

SUMMIT COUNTY ATTORNEY'S OFFICE


*Margaret H. Olson*

By:_____
        Margaret H. Olson


*David L. Thomas*

By:_____
        David L. Thomas


*Jami R. Brackin*

By: _____

        Jami R. Brackin
        *Attorneys for Plaintiff Summit County*


Plaintiff Summit County's address:
Summit County Courthouse
60 N. Main Street
P.O. Box 128
Coalville, Utah 84017

38

11/14/25, 12:... Office of Public Affairs | Medical Device Maker Merit Medical To Pay $18 Million To Settle Allegations Of Improper Payments To Physicians |...

Case 2:24-cr-00163-TS    Document 179-1    Filed 04/23/26    PageID.10379    Page 184 of 327



## Archives
### U.S. Department of Justice



**PRESS RELEASE**

# Medical Device Maker Merit Medical To Pay $18 Million To Settle Allegations Of Improper Payments To Physicians

Wednesday, October 14, 2020

**For Immediate Release**

Office of Public Affairs

Medical device maker Merit Medical Systems Inc. (MMSI), of South Jordan, Utah, has agreed to pay $18 million to resolve allegations that the company caused the submission of false claims to the Medicare, Medicaid, and TRICARE programs by paying kickbacks to physicians and hospitals to induce the use of MMSI products, the Department of Justice announced today.

"Paying kickbacks to doctors in exchange for referrals undermines the integrity of federal healthcare programs," said Acting Assistant Attorney General Jeffrey Bossert Clark of the Department of Justice's Civil Division.  "When medical devices are used in surgical procedures, patients deserve to know that their device was selected based on quality of care considerations and not because of improper payments from manufacturers."

The Anti-Kickback Statute prohibits offering or paying anything of value to induce the referral of items or services covered by Medicare, Medicaid, TRICARE, and other federal healthcare programs.  The statute is intended to ensure that medical providers' judgments are not compromised by improper financial incentives.

The settlement announced today resolves allegations that, for over six years, MMSI engaged in a kickback scheme to pay physicians, medical practices, and hospitals to induce their use of MMSI products in medical procedures performed on Medicare, Medicaid, and TRICARE

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C.  20549**

# FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (date of earliest event reported): October 19, 2021



# Merit Medical Systems, Inc.

(Exact name of registrant as specified in its charter)

| **Utah** | **0-18592** | **87-0447695** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1600 West Merit Parkway**
**South Jordan, Utah**                                    **84095**
(Address of principal executive offices)              (Zip Code)

**(801) 253-1600**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, no par value | MMSI | Nasdaq Global Select Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company        ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.02  Departure of Directors or Certain Officers; Election of Directors: Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

Effective as of October 19, 2021, Merit Medical Systems, Inc., through a wholly-owned subsidiary, terminated the employment of Justin Lampropoulos, President, Europe, Middle East and Africa.

**Item 9.01.  Financial Statements and Exhibits.**

(d)      Exhibits

| Exhibit No. | Exhibit |
|---|---|
| 104 | The cover page from this Current Report on Form 8-K, formatted in Inline XBRL. |

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

MERIT MEDICAL SYSTEMS, INC.

Date: October 22, 2021

By: /s/ Brian G. Lloyd

Brian G. Lloyd
Chief Legal Officer and Corporate Secretary

3

000644



March 12, 2019

Re: Qizhong (John) Wang

My name is Randall L Barker. I reside at 450 N 850 E Springville, UT 84663.

I am employed by Olson's Greenhouse Gardens and serve as the Director of Human Resources for Olson's Greenhouse UT, Olson's of Colorado, and ProGro. Each organization also has a Human Resources Manager.

I have been employed by Olson's since January 18, 2016.

I was introduced to Mr. Wang during the first week of my employment. My original office was directly next to Mr. Wang's office so we interacted on a frequent basis. Mr. Wang and I have also partnered on several projects.

I have never known Mr. Wang to be anything but a gentleman in the interactions I have had with him and the interactions that I have witnessed him having with other people in the organization. If any of Mr. Wang's co-workers had a problem with him, if he was treating a co-worker improperly, or acting out in an unacceptable manner, as the Director of Human Resources improper conduct would be reported to my office.

Mr. Wang is a peaceable individual. I have never known, nor has it been reported to me, that Mr. Wang has ever shown violent tendencies, been in possession of a weapon, or acting in a threatening nature to anyone in our three divisions.

A few weeks ago ( February 20 ) two individuals, a Salem Police Officer and a Constable, came to the Olson's Salem location at approximately 12:20pm, at the time I was in my office.. While I expected and was not surprised to see the Salem police officer carrying a weapon I was a bit surprised to see the constable attired similar to an officer of the law and carrying a sidearm when our receptionist brought these men to my office. The demeanor and stance of the constable was a bit aggressive and he stood in a manner that always put his sidearm between me and him.

The police officer told me that they had come to the operation that day to talk to Mr. Wang. The officer said Mr. Wang was not "in trouble" they simply needed to talk to Mr. Wang about a civil matter related to his daughter.

At that moment I believed that Mr. Wang was in our assembly area taking some video of a meeting that was happening at the time. I had seen him in that area just a few minutes before the officer and constable arrived. I asked my co-worker, Adrienne Wall, to step into the assembly area and ask Mr. Wang to come to

my office. She returned within a few minutes to say that the group had just disbanded and Mr. Wang had left the property. I offered to call the officer and/or constable when Mr. Wang returned. The response from the constable was that they were not going to leave the property until they had the opportunity to talk to Mr. Wang. I found that response a bit strange and aggressive since the officer had said that Mr. Wang was not in trouble. If not in trouble then why the urgency to speak with Mr. Wang? And why the need to have a police officer accompany a constable for a civil matter? And why make such a statement to a manager of the company? We are not going to leave until....? They were after all guests of the company.

During my career in Human Resources I have interacted with constables numerous times, never have I interacted with a constable who is delivering a civil summons, garnishment, etc. to be attired as a police office and openly and aggressively carrying a sidearm.

When Adrienne had left to look for Mr. Wang she ran into another co-worker and mentioned that she was looking for Mr. Wang at my request. This other co-worker called Mr. Wang to tell him that I was looking for him. Mr. Wang returned to the property quickly and came looking for me. I ran into Mr. Wang on the hallway and told him that two "cops" we there to talk to him and would he be willing to go into my office with them? He agreed to do so but seemed a bit unsettled to have these men requesting an interview.

Mr. Wang, the police officer, and the constable meet in my office. At that time I left the property to go to lunch and upon returning 45 minutes later observed that the car that the police officer and constable had arrived in had left the property.

This narrative/letter represents my truthful recollection of the events as described.

*Randall Bar*

Randall L Barker
3/12/2019
09:58

000646

Melisa Todd
140 West 9000 South, Suite 9
Sandy, Utah 84070
801-566-1884
melisa@spencerandcollier.com

February 21, 2019

To Whom it Concerns:

On February 20, 2019 at approximately 3:50 p.m., attorney Jeff Rifleman came into the office where I work and asked me to put my jacket on and come with him. I heard he was on the phone with someone who sounded pretty panicked. I had heard Jeff ask the person on the phone, "Are they still following you?" and the person reply "Yes". Jeff had his phone on speaker, so I heard the back and forth between them, while I put my jacket on and followed Jeff outside. Within a minute of us going outside a maroon Lexus SUV pulled into the parking lot and parked. Jeff waived to them, so I knew this was the person he was talking to on the phone. Immediately following the Lexus into the lot was a black Dodge Charger, that parked so it was blocking the bank drive thru area. The man jumped out of the Charger and immediately went towards the Lexus, Jeff walked between the two and asked the man if he could help him. The man refused to tell Jeff what his name is and who he works for, he just kept stating over and over that "I don't have to tell you my name." Jeff mentioned the fact that that man was carrying a gun and the man replied, "It is open carry." From the rest of the conversation between this man and Jeff I understood they wanted to serve some documents on a girl who is the daughter of the man driving the Lexus and the assumption was that this girl was in the Lexus.

Approximately 2-3 minutes into all this another Dodge Charger, charcoal in color, pulled up and another man jumped out going towards what I thought at the time was the man in the Lexus. However, he too went towards Jeff and got into his face. Jeff asked his name, which he did give, but because I was too far away to hear it, I did not catch his name. Jeff tried to get the first man to tell him why he was harassing his client, by following him all the way from Spanish Fork to Sandy, after he had already been to the mans work place and interrogated him there, but the man would only say he had to serve papers on the daughter and wanted to know if she was in the vehicle. Jeff asked if they were conducting a stop on his client and the man from the charcoal Charger stated something along the lines that it was not a stop and that the Lexus was free to go. Jeff at this point told me to call 911, which I proceeded to do at 4:12 p.m. I heard the man from the black Charger state they had already talked to Sandy Police, which I felt was a way for him to intimidate me into not calling 911. I gave the 911 operator all the information I knew, as I still was a bit confused as to what was going on, while trying to keep an eye on what was going on around me. After a bit more conversation between the two men and Jeff, the two men went to their own vehicles, and Jeff was able to get his client, his client's wife and their grandbaby out of the Lexus and into the "Bank of the West" building. I told the 911 operator everything that was going on, as it was happening, including that these two men appeared to be undercover cops, from looking at their dress to their cars, but that they would not identify. From my personal knowledge and college training in Criminal Justice, if a person is asked, they are to identify that they are a police officer, if they are in fact one. The black Charger had the "police" laptop set up, he was wearing what appeared to be "police" uniform pants in the sage green color, he also had a "police"

000646

issue weapon, and other "police" gear around his belt, he also had on a plain black coat. The man in the charcoal Charger had on a navy-blue suit jacket and pants with a white shirt and a tie that I didn't pay too much attention to, his car did not appear to have the laptop setup, but it did have the police lights. NEITHER car had any lights on to indicate there was an official police stop happening at any point and time. At this time there was no indication of who these people actually worked for, other than they were trying to serve a person with documents.

I followed Jeff and his clients into the building but stayed in the entrance way for a bit longer, so I could finish answering the questions regarding the cars that I was being asked. I was told to stay on the phone and to let the operator know if the men tried to enter the building, as they were not to enter it. The first Sandy Police officer arrived, and I went upstairs to Jeff's office to see if I could see the officer. When the Sandy officer arrived, he first talked to the two men outside, both of whom identified themselves as working for the Utah County Constables office, showing him badges, cards and logos on their shirts (this was confirmed by the officer when he joined us upstairs and a visual as I was watching out the building windows). The Sandy officer came up to Jeff's office and the two men left in their cars. After the police talked to Jeff about the matter, and Jeff was able to obtain a case number for his client, I then assisted Jeff in calming down the client and his wife. It was at this time, I fully understood how scared these two people were, as they had been being harassed for more than just at this time. I truly believe these two people were so afraid that they didn't know if their lives were in jeopardy or not. They had mentioned that maybe they should leave and go on a vacation, so they could calm down and be left alone.

_Melisa Todd_

Melisa Todd
Affiant
DL#.........8034

On the 21st day of February 2019, personally appeared before me, the undersigned notary, Melisa Todd, the signer of the foregoing Affidavit, who duly acknowledged to me that she signed the same voluntarily and for its stated purpose.

TERRY R. SPENCER
NOTARY PUBLIC -STATE OF UTAH
My Comm. Exp 02/01/2021
Commission # 692634

_T. R._

NOTARY PUBLIC

000644



March 12, 2019

Re: Qizhong (John) Wang

My name is Randall L Barker. I reside at 450 N 850 E Springville, UT 84663.

I am employed by Olson's Greenhouse Gardens and serve as the Director of Human Resources for Olson's Greenhouse UT, Olson's of Colorado, and ProGro. Each organization also has a Human Resources Manager.

I have been employed by Olson's since January 18, 2016.

I was introduced to Mr. Wang during the first week of my employment. My original office was directly next to Mr. Wang's office so we interacted on a frequent basis. Mr. Wang and I have also partnered on several projects.

I have never known Mr. Wang to be anything but a gentleman in the interactions I have had with him and the interactions that I have witnessed him having with other people in the organization. If any of Mr. Wang's co-workers had a problem with him, if he was treating a co-worker improperly, or acting out in an unacceptable manner, as the Director of Human Resources improper conduct would be reported to my office.

Mr. Wang is a peaceable individual. I have never known, nor has it been reported to me, that Mr. Wang has ever shown violent tendencies, been in possession of a weapon, or acting in a threatening nature to anyone in our three divisions.

A few weeks ago ( February 20 ) two individuals, a Salem Police Officer and a Constable, came to the Olson's Salem location at approximately 12:20pm, at the time I was in my office.. While I expected and was not surprised to see the Salem police officer carrying a weapon I was a bit surprised to see the constable attired similar to an officer of the law and carrying a sidearm when our receptionist brought these men to my office. The demeanor and stance of the constable was a bit aggressive and he stood in a manner that always put his sidearm between me and him.

The police officer told me that they had come to the operation that day to talk to Mr. Wang. The officer said Mr. Wang was not "in trouble" they simply needed to talk to Mr. Wang about a civil matter related to his daughter.

At that moment I believed that Mr. Wang was in our assembly area taking some video of a meeting that was happening at the time. I had seen him in that area just a few minutes before the officer and constable arrived. I asked my co-worker, Adrienne Wall, to step into the assembly area and ask Mr. Wang to come to

000644

000645

my office. She returned within a few minutes to say that the group had just disbanded and Mr. Wang had left the property. I offered to call the officer and/or constable when Mr. Wang returned. The response from the constable was that they were not going to leave the property until they had the opportunity to talk to Mr. Wang. I found that response a bit strange and aggressive since the officer had said that Mr. Wang was not in trouble. If not in trouble then why the urgency to speak with Mr. Wang? And why the need to have a police officer accompany a constable for a civil matter? And why make such a statement to a manager of the company? We are not going to leave until....? They were after all guests of the company.

During my career in Human Resources I have interacted with constables numerous times, never have I interacted with a constable who is delivering a civil summons, garnishment, etc. to be attired as a police office and openly and aggressively carrying a sidearm.

When Adrienne had left to look for Mr. Wang she ran into another co-worker and mentioned that she was looking for Mr. Wang at my request. This other co-worker called Mr. Wang to tell him that I was looking for him. Mr. Wang returned to the property quickly and came looking for me. I ran into Mr. Wang on the hallway and told him that two "cops" we there to talk to him and would he be willing to go into my office with them? He agreed to do so but seemed a bit unsettled to have these men requesting an interview.

Mr. Wang, the police officer, and the constable meet in my office. At that time I left the property to go to lunch and upon returning 45 minutes later observed that the car that the police officer and constable had arrived in had left the property.

This narrative/letter represents my truthful recollection of the events as described.

Randall L Barker
3/12/2019
09:58

000645

000646

Melisa Todd
140 West 9000 South, Suite 9
Sandy, Utah 84070
801-566-1884
melisa@spencerandcollier.com

February 21, 2019

To Whom it Concerns:

On February 20, 2019 at approximately 3:50 p.m., attorney Jeff Rifleman came into the office where I work and asked me to put my jacket on and come with him. I heard he was on the phone with someone who sounded pretty panicked. I had heard Jeff ask the person on the phone, "Are they still following you?" and the person reply "Yes". Jeff had his phone on speaker, so I heard the back and forth between them, while I put my jacket on and followed Jeff outside. Within a minute of us going outside a maroon Lexus SUV pulled into the parking lot and parked. Jeff waived to them, so I knew this was the person he was talking to on the phone. Immediately following the Lexus into the lot was a black Dodge Charger, that parked so it was blocking the bank drive thru area. The man jumped out of the Charger and immediately went towards the Lexus, Jeff walked between the two and asked the man if he could help him. The man refused to tell Jeff what his name is and who he works for, he just kept stating over and over that "I don't have to tell you my name." Jeff mentioned the fact that that man was carrying a gun and the man replied, "It is open carry." From the rest of the conversation between this man and Jeff I understood they wanted to serve some documents on a girl who is the daughter of the man driving the Lexus and the assumption was that this girl was in the Lexus.

Approximately 2-3 minutes into all this another Dodge Charger, charcoal in color, pulled up and another man jumped out going towards what I thought at the time was the man in the Lexus. However, he too went towards Jeff and got into his face. Jeff asked his name, which he did give, but because I was too far away to hear it, I did not catch his name. Jeff tried to get the first man to tell him why he was harassing his client, by following him all the way from Spanish Fork to Sandy, after he had already been to the mans work place and interrogated him there, but the man would only say he had to serve papers on the daughter and wanted to know if she was in the vehicle. Jeff asked if they were conducting a stop on his client and the man from the charcoal Charger stated something along the lines that it was not a stop and that the Lexus was free to go. Jeff at this point told me to call 911, which I proceeded to do at 4:12 p.m. I heard the man from the black Charger state they had already talked to Sandy Police, which I felt was a way for him to intimidate me into not calling 911. I gave the 911 operator all the information I knew, as I still was a bit confused as to what was going on, while trying to keep an eye on what was going on around me. After a bit more conversation between the two men and Jeff, the two men went to their own vehicles, and Jeff was able to get his client, his client's wife and their grandbaby out of the Lexus and into the "Bank of the West" building. I told the 911 operator everything that was going on, as it was happening, including that these two men appeared to be undercover cops, from looking at their dress to their cars, but that they would not identify. From my personal knowledge and college training in Criminal Justice, if a person is asked, they are to identify that they are a police officer, if they are in fact one. The black Charger had the "police" laptop set up, he was wearing what appeared to be "police" uniform pants in the sage green color, he also had a "police"

000646

issue weapon, and other "police" gear around his belt, he also had on a plain black coat. The man in the charcoal Charger had on a navy-blue suit jacket and pants with a white shirt and a tie that I didn't pay too much attention to, his car did not appear to have the laptop setup, but it did have the police lights. NEITHER car had any lights on to indicate there was an official police stop happening at any point and time. At this time there was no indication of who these people actually worked for, other than they were trying to serve a person with documents.

I followed Jeff and his clients into the building but stayed in the entrance way for a bit longer, so I could finish answering the questions regarding the cars that I was being asked. I was told to stay on the phone and to let the operator know if the men tried to enter the building, as they were not to enter it. The first Sandy Police officer arrived, and I went upstairs to Jeff's office to see if I could see the officer. When the Sandy officer arrived, he first talked to the two men outside, both of whom identified themselves as working for the Utah County Constables office, showing him badges, cards and logos on their shirts (this was confirmed by the officer when he joined us upstairs and a visual as I was watching out the building windows). The Sandy officer came up to Jeff's office and the two men left in their cars. After the police talked to Jeff about the matter, and Jeff was able to obtain a case number for his client, I then assisted Jeff in calming down the client and his wife. It was at this time, I fully understood how scared these two people were, as they had been being harassed for more than just at this time. I truly believe these two people were so afraid that they didn't know if their lives were in jeopardy or not. They had mentioned that maybe they should leave and go on a vacation, so they could calm down and be left alone.

*Melisa Todd*

Melisa Todd
Affiant
DL#.........8034

On the 21st day of February 2019, personally appeared before me, the undersigned notary, Melisa Todd, the signer of the foregoing Affidavit, who duly acknowledged to me that she signed the same voluntarily and for its stated purpose.

TERRY R. SPENCER
NOTARY PUBLIC -STATE OF UTAH
My Comm. Exp 02/01/2021
Commission # 692634

NOTARY PUBLIC



Ben and Salem police coming to my office.jpg



Ben's car leaving my workplace.jpg



Private Investigator watching my house.jpg



Private Investigator parked in No Trespassing ...



Private Investigator in front of my house.jpg



Private Investigator watching my house 2.png



Private Investigator watching my house 3.png



Ben's car getting so close and almost hit my ca...



Ben's car chasing my car on the I-15 freeway.jpg





Ben Stowell's car chasing our car in Provo















Ben Stowell's car chasing our car from Provo to Sany on I 15 freeway for 37 min

4:01 PM
Feb 20, 2019

Play (k)

26:48 / 37:41

Scroll for details

Ben Stowell's car chasing our car from Provo to Sany on I 15 freeway for 37 min

4:11 PM
Feb 20, 2019

Scroll for details

37:03 / 37:41

Justin Lampropoulos trying to open my car door



4:12 PM
Feb 20, 2019

Play (k)

0:04 / 0:14

Scroll for details

Justin Lampropoulos trying to open my car door



4:12 PM
Feb 20, 2019

Play (k)

0:12 / 0:14

Scroll for details

Justin Lampropoulos trying to open my car door



4:12 PM
Feb 20, 2019

Scroll for details

0:05 / 0:14

Table of Contents



**JUSTIN J. LAMPROPOULOS**

**Executive Vice President, Sales, Marketing and Strategy**

**Age**: 37

**Current Position Since:** May 2015

**Education:** Completed postgraduate studies at Oxford University's Saïd Business School in Oxford, England in strategic management and is an alumnus of Harvard Business School.

Mr. Justin J. Lampropoulos is the son of Fred P. Lampropoulos, Merit's Chair of the Board, President and CEO

**Highlights**

● From 2010 to 2015 led Merit's Europe, Middle East and Africa business unit from Maastricht, the Netherlands
● Began his career in the medical device technology field in 2004

### *Corporate Governance Guidelines*

Our Corporate Governance Guidelines (the "Governance Guidelines") set forth the responsibilities of our directors.

The Governance Guidelines were amended in May 2016 to require each director to submit a letter of resignation upon reaching 75 years of age, which resignation becomes effective at the next succeeding annual meeting of shareholders and will be accepted by the Board absent a determination by the ESG Committee or the entire Board to nominate the director for an additional term.

The Governance Guidelines were further amended in October 2017 to include director guidelines that, among other things, require directors to maintain minimum stock ownership equal to at least three times the annual retainer received. The Board expects directors to meet this requirement by December 31, 2020. In October 2019 the Governance Guidelines were further amended to extend the stock ownership requirements to include the Company's CEO. As amended, the Governance Guidelines require the CEO of the Company to maintain minimum stock ownership equal to at least five times his or her annual base salary. The ESG Committee will determine compliance and may allow waivers with respect to the stock ownership guidelines for directors and the CEO on a case-by-case basis.

---

**GOVERNANCE MATERIALS**

The following materials relating to corporate governance are available via our website at:
*www.merit.com/investors/corporate-governance-leadership/*

● **Code of Business Conduct and Ethics**
● **Corporate Governance Guidelines**
● **Audit Committee Charter**

● **Compensation Committee Charter**
● **Finance Committee Charter**
● **Environmental, Social and Governance Committee Charter**

---

### *Code of Business Conduct and Ethics*

Our Code of Business Conduct and Ethics ("Code of Conduct") applies to our directors and employees, including our named executive officers ("NEOs"), and is supplemented by additional provisions applicable to our CEO and senior financial and accounting officers. All Merit directors, officers and employees are required to act ethically at all times and in accordance with the principles and policies set forth in the Code of Conduct.

Jeffery A. Balls (12437)
Steven R. Glauser (15607)
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750
jballs@parrbrown.com
sglauser@parrbrown.com
*Attorneys for Justin Lampropoulos*

## IN THE FOURTH JUDICIAL DISTRICT COURT
## FOR THE STATE OF UTAH, UTAH COUNTY

| | |
|---|---|
| KAILIN WANG,<br><br>Plaintiff,<br><br>v.<br><br>██████  ██████  ██████<br><br>Defendant. | **JUSTIN LAMPROPOULOS'S OBJECTION TO PLAINTIFF'S SUBPOENAS TO FACEBOOK AND GOOGLE**<br><br>**(Hearing Requested)**<br><br>Case No. 194400718<br><br>Judge Thomas Low<br><br>Commissioner Marion Ito |

Third party Justin Lampropoulos ("Lampropoulos"), through counsel, files this Objection to Plaintiff Kailin Wang's Subpoenas Duces Tecum served upon Facebook and Google.

### RELIEF REQUESTED AND GROUNDS FOR THE RELIEF

Pursuant to Utah Rules of Civil Procedure 45(e)(3) and 37(a)(1)(C) and (D), Lampropoulos requests that the Court quash the subpoenas duces tecum Plaintiff served upon Facebook and

Google (the "Subpoenas" [1]), award Lampropoulos his attorney fees incurred in responding to the Subpoenas, and enter sanctions against Plaintiff for her fraudulent conduct. This relief is justified because Plaintiff fabricated the Subpoenas by copying and revising a prior subpoena signed by this Court to falsely make it appear as if the Court issued the Subpoenas. In addition to being fake, the subpoenas are overly broad, seek irrelevant matters, and violate Lampropoulos's privacy rights.

Lampropoulos is not a party to this action; he is simply a Utah constable who served Plaintiff with restraining order papers over two years ago in a California matter where Plaintiff "deliberately evaded service of process."[2] Plaintiff is now retaliating against those who played a role in holding her accountable in that action. Part of her retaliatory conduct includes impersonating this Court to counterfeit subpoenas and serve them on unknowing third parties to gain access to her targets' private information to which she is not entitled.

On December 14, 2020, this Court, through Court Clerk Elizabeth A. Foster, signed and stamped a subpoena to be served on the Utah Department of Public Safety (the "DPS Subpoena").[3] Plaintiff then took the stamp and signature page of the DPS Subpoena and inserted into a subpoena she created to be served on Facebook and Google. Comparing the signature and stamp entries of the Facebook/Google subpoena [Ex. A] and the DPS subpoena [Ex. C], Plaintiff's fabrication is readily apparent–the signatures are the exact same. Plaintiff then represented to a California court that this Court had entered the Facebook/Google subpoena, domesticated the Facebook/Google

---

[1] The Subpoenas are attached hereto as Exhibit A and Exhibit B.
[2] Order on Request to Continue Hearing, filed March 6, 2019, ███ v. Wang, Case No. FDV-19-814465 (S.F. Super. Ct., Fam. Ct., 3/6/2019 DV-116 Order).
[3] The DPS Subpoena is attached hereto as Exhibit C.

2

subpoena through that false representation, and served it on those entities. But this Court never signed the Facebook/Google subpoena. Because it is fabricated, that subpoena must be quashed.

Likewise, the Subpoenas objected to by Lampropoulos include ones Plaintiff created and served upon the same entities with various deceptive and unnecessary attachments.[4] Looking at those documents [Ex. B], it is apparent that Plaintiff attached different subpoenas signed by the Court and orders entered by the Court to represent to a California court that it could properly domesticate the subpoenas. Plaintiff then used this misleading pile of legal documents to entice third parties to produce, even though the legal authority behind the subpoenas was lacking. In other words, she attached irrelevant subpoenas and discovery orders signed by this Court to other subpoenas targeted at different third parties to make those parties think this Court had already ruled on the issue and was forcing those parties to produce.

In addition to being forged and misleadingly comingled, the Subpoenas are overbroad and unnecessary for the lawsuit before the Court. The Subpoenas seek the production of private, personal information relating to Lampropoulos's family and his business operations. The Subpoenas seek a log of "all emails sent and received" by Lampropoulos, his phone number, his IP address and "location," his "backup email address," his billing and payment information, and even his "financial institution name for each account." This information would allow Plaintiff to target and harass Lampropoulos and the other third parties named in the subpoenas in various, severe ways. Such information is completely irrelevant to the lawsuit yet it seeks highly

---

[4] These many confusing subpoenas and their misleading attachments are attached hereto as Exhibit B. To clarify the issue for the Court, the subpoena in Exhibit A is separated so it is easily comparable to the subpoena contained in Exhibit C to see that Plaintiff abused the Court's signature and stamp by copying them into a fabricated subpoenas.

confidential personal and business information that should not be disclosed. Thus, Lampropoulos seeks an order of the Court limiting the Subpoena to safeguard his protected and personal information and to prevent the undue burden such disclosure would cause him.

## MEET AND CONFER EFFORTS AND PROPORTIONALITY

Lampropoulos understands that Mr. ▓▓▓▓▓ counsel has made multiple requests to Plaintiff that she follow the procedural rules and withdraw her burdensome, irrelevant, intrusive, and false discovery but that she refuses to do so. Lampropoulos is not requesting discovery, thus there is no risk that the relief requested herein is disproportional under Rule 26(b)(2).

## REQUEST FOR COSTS, ATTORNEY FEES, AND SANCTIONS

Pursuant to Rule 37(a)(8), Lampropoulos requests the costs and attorney fees incurred in objecting to the Subpoenas. As explained, Plaintiff intentionally counterfeited the Subpoenas and misrepresented their veracity to a California court and third parties. Moreover, the Subpoenas are overbroad and unjustified as it targets Lampropoulos's personal information despite him not being a party to this action. Accordingly, Lampropoulos is entitled to his costs and attorney fees incurred in objecting to the Subpoenas. Moreover, the Court should sanction Plaintiff for falsifying a Court document and abusing the Court's signature and stamp.

Pursuant to Rule 37(a)(5), Lampropoulos submits a proposed order concurrently herewith.

DATED this 30th day of April, 2021.

PARR BROWN GEE & LOVELESS

By: /s/ *Steven R. Glauser*
Jeffery A. Balls
Steven R. Glauser
*Attorneys for Justin Lampropoulos*

4

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 30th day of April, 2021, I electronically filed the foregoing document

with the Clerk of the Court using the GreenFiling system, which sent notification of such filing

to the following:

Kailin Wang
2481 Fairway Drive
Spanish Fork, Utah 84660
Kaywg2372@gmail.com

Beau Olsen
Mitchell Olsen
OLSEN & OLSEN
8142 South State Street
Midvale, Utah 84047

/s/ *Steven R. Glauser*

DAVID O. LEAVITT #5990
Utah County Attorney
TIMOTHY L. TAYLOR #8001
Deputy Utah County Attorney
100 East Center, Suite 2100
Provo, Utah 84606
Email: dcourt@utahcounty.gov
Phone: (801) 851-8026
Fax: (801) 851-8051

IN THE FOURTH JUDICIAL DISTRICT COURT

UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH,<br><br>Plaintiff,<br><br>vs.<br><br>KAILIN WANG<br>2481 S Fairway Dr<br>Spanish Fork, UT 84660<br>DOB:<br>SID: 1380575<br><br>Defendant. | FIRST AMENDED INFORMATION<br><br><br><br><br><br><br>Case No. 211100167<br><br>Judge Denise Porter |

The State of Utah, by and through the Utah County Attorney's Office, charges the defendant with the commission of the following offense:

COUNT 1: FALSE OR INCONSISTENT MATERIAL STATEMENTS, a second degree felony, in violation of Utah Code Ann 76-8-502, in that on or about March 18, 2019, in Utah County, the defendant, Kailin Wang did, in an official proceeding make a false material statement under oath or affirmation or swore or affirmed the truth of a material statement previously made while believing the statement to be untrue.

1

Utah Code Ann. 76-6-501 (Forgery) states in part:

*"A person is guilty of forgery if, with purpose to defraud anyone, or with knowledge that the person is facilitating a fraud to be perpetrated by anyone, the person:*
*(a)      alters any writing of another without his authority or utters the altered writing; or*
*(b)      makes, completes, executes, authenticates, issues, transfers, publishes, or utters any writing so that the writing or the making, completion, execution, authentication, issuance, transference, publication, or utterance:*
*(i)      purports to be the act of another, whether the person is existent or nonexistent;*
*(ii)      purports to be an act on behalf of another party with the authority of that other party;"*

The investigation reveals that Wang intended to defraud numerous entities by issuing subpoenas without having authority to do so. Wang utilized the Fourth District Court's signature stamp and the court clerk's signature without authorization to authenticate subpoenas which were fraudulent. By issuing the fraudulent subpoenas, Wang was purporting to act with authorization from the Fourth District Court and it appears her purpose was to obtain personal and sensitive personal identifying information for which she was not authorized.

Utah Code Ann. 76-10-1801 (Communications Fraud) states in part:

*(1) Any person who has devised any scheme or artifice to defraud another or to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions, and who communicates directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice is guilty of:*
  *(e) a second degree felony when the object or purpose of the scheme or artifice to defraud is the obtaining of sensitive personal identifying information, regardless of the value.*

Based upon evidence received from Nick Patterson of the Provo Police Department and Richard Hales with the Utah County Attorney's Office Investigation Bureau, I have reason to believe the defendant committed the offense as charged herein.

Authorized for presentment and filing this 22nd day of July, 2021.

UTAH COUNTY ATTORNEY'S OFFICE

Sworn to by:

/s/ *TIMOTHY L. TAYLOR*
Timothy L. Taylor
Deputy Utah County Attorney

≡ SEARCH

*The Salt Lake Tribune*

SUBSCRIBE    LOG IN    SUBSCRIBE    👤

# Who or what is to blame for the racial disparity in Utah's prison population?

Tim Taylor

☰ **SEARCH**

**SUBSCRIBE** | **LOG IN** | **SUBSCRIBE** |

*The Salt Lake Tribune*



(Al Hartmann | Tribune file photo) Utah County prosecutor Tim Taylor took issue with a Utah Bar Journal article about racial disparities in the state's inmate population, arguing that criminals needs to take more "individual responsibility."

By Jessica Miller  | May 13, 2019, 6:00 a.m.  | Updated: 8:20 a.m.

So what explains the racial disparity in Utah's prison?

Case 2:24-cr-00163-TS    Document 179-1    Filed 04/23/26    PageID.10416

≡ **SEARCH**        The Salt Lake Tribune        **SUBSCRIBE**    LOG IN    **SUBSCRIBE**    👤

long sentences without adequately weighing alternatives.

That argument, laid out in a recent Utah Bar Journal article, frustrated a prominent Utah County prosecutor, so he responded, writing his own piece that laid the blame not on the system but on the people of color who commit crimes.

"The ACLU is often quick to blame 'The Man' or 'The System' for perceived disparities," wrote Tim Taylor, Utah County's criminal chief deputy, "but perhaps the ACLU should also consider individual responsibility."

Groth, ACLU of Utah's Smart Justice coordinator, says the prosecutor's response ignores the data, that 43% of Utah's prison population were ethnic minorities in 2017, while they represent only 20% of the general population. Even Taylor's boss said his comments are an overly simplistic view of a complicated problem.

Taylor told The Salt Lake Tribune this week that he wrote the letter — which was published in a magazine sent bi-monthly to every active attorney and paralegal in the Beehive State — because he felt that the ACLU article implied that Utah's prosecutors are racist or consider someone's race in their charging decisions. That's simply not true, he said.

"We just don't take a person's skin color or ethnicity into account when we charge or handle a case," he said. "Maybe I'm saying, 'Not in my backyard.' I know how hard we work to be fair and unbiased, and we try to look at the facts because that's all we can prove in court."

6/12/2021

☰ SEARCH

*The Salt Lake Tribune*

SUBSCRIBE    LOG IN    SUBSCRIBE    👤

## Letter to the Editor

Dear Editor:

In the January/February issue of the *Utah Bar Journal*, Mr. Jason M. Groth penned an article entitled, "Criminal Justice Reform in Utah: From Prosecution to Parole." One of Mr. Groth's concerns in his article dealt with the disparate incarceration rates among certain groups of individuals. Because Mr. Groth believes that prosecutors and law enforcement are somewhat responsible for the disparate incarceration rates, he provides suggestions as to how prosecutors can help limit racial disparities within the criminal justice system. Although some of Mr. Groth's suggestions may have merit, the issue of 'individual responsibility' is conspicuously absent from his article. Mr. Groth advocates for more programs, resources and holding law enforcement and prosecutors more accountable to help reduce "racial disparities." However, a plethora of programs and maximum oversight will not result in lower criminal conduct until an individual chooses to change his/her behavior. The great Justice Reinvestment Initiative has helped empty the prison but the number of criminal cases we receive from law enforcement has not decreased. And with all due respect to Mr. Groth, the prosecutors in my office do not screen cases differently based on a person's skin color. The ACLU is often quick to blame "The Man" or "The System" for perceived disparities but perhaps the ACLU should also consider individual responsibility.

Respectfully,
Timothy L. Taylor

A letter to the Utah State Bar Journal from Deputy Utah County Attorney Tim Taylor, printed in the May/June 2019 edition.

Taylor knows that people of color are going to prison at a higher rate — he's just not sure police and prosecutor bias are to blame.

He said in Utah County investigators target drug distributors aggressively. Most of the drugs, he said, come from Mexico.

"Are we being racist by focusing on those individuals actually committing the crimes?" he said. "We know a lot of drugs

Who or what is to blame for the racial disparity in Utah's prison population?

☰ SEARCH

*The Salt Lake Tribune*

SUBSCRIBE    LOG IN    SUBSCRIBE    👤

But Groth said Taylor's viewpoint is conflating two issues — "individual responsibility" and systemic discrimination. Communities of color are over-policed, prosecuted and punished in Utah, Groth argued, and it's a problem that those in the state's criminal justice system need to start thinking about.

In 2017, black Utahns were imprisoned at a rate eight times higher than that of white people, according to an ACLU analysis of state data. Latinos are incarcerated at twice the rate of white people, while Native Americans are at a rate six times higher.

And the percentage of minorities behind bars has risen in recent years. In 2015, 34% of the prison population were ethnic minorities. Two years later, that had jumped to 43%. This is despite a sweeping reform passed by legislators in 2015 that reduced penalties for drug crimes and put more emphasis on rehabilitation.

Everyone in the criminal justice system — from public defenders to prosecutors to police — should be looking at their practices to try to lessen that disparity, Groth said. Specific to prosecutors, Groth wants them to undergo more training about implicit biases and provide more alternatives to incarceration, including treatment programs.

"Racial disparities exist, that's not up for debate," he said. "We need to take a hard, honest look at how the criminal justice system treats people of color."

Taylor's stance on the issue seems to be in conflict with his new boss, Utah County Attorney David Leavitt, who has

Case 2:24-cr-00163-TS    Document 179-1    Filed 04/23/26    PageID.10419    Page 224 of 327

 

SEARCH      SUBSCRIBE      LOG IN      SUBSCRIBE

Leavitt hadn't seen Taylor's letter until a reporter sent him a text message asking about it. He said that while Taylor is right in that there needs to be personal accountability, it's much more complicated than that. A prosecutor should also analyze the "social constructs," he said, and the circumstances that led to a crime when making decisions on how to proceed.

The county attorney, who took office in January, said he's revamping the process they use in deciding to pursue criminal charges. A case will now be screened by more than one person, he said, in an effort to try to eliminate any bias that could unknowingly creep into the process.

They are also reprioritizing what sorts of cases they file, with the goal of reducing the number of cases that Utah County prosecutors are juggling. Leavitt said he hopes that gives his prosecutors more time to think deeply about each case, and to ask themselves hard questions.

"It's engaging in a process where we try to recognize our own bias," he said, "and accommodate that through discussion and more eyes looking at it."

 **jmiller@sltrib.com**

Follow @jm_miller

**Donate to the newsroom now.** The Salt Lake Tribune, Inc. is a 501(c)(3) public charity and contributions are tax deductible

Who or what is to blame for the racial disparity in Utah's prison population

≡ **SEARCH**

 The Salt Lake Tribune

SUBSCRIBE    LOG IN    SUBSCRIBE    👤

---

**FEATURED COMMENTS**

 

**94**

**Thomas Thompson**

If you want to examine this issue fairly, the very first consideration should be the significant disparity in income between the "white and delightsome" folk and people of color. The latter frequently are thrown to the wolves by our "criminal justice system" because they can't afford to retain the best and the brightest attorneys to represent them. Consequently, they usually end up at the mercy of that system. Additionally the attorneys who do end up representing people of color are often very overworked and very underpaid. Their case loads are extremely high, and this often results in a mere cursory look at the prosecution's files -- because that's really all they have time for....

View all 46 comments

## RELATED STORIES

NEWS

A Utah high school was locked down after a student reported a gunman. It turned out to be a state employee looking for an injured deer.

NEWS

A Utah woman accused of strangling her children nearly nine years ago is now deemed competent to face murder charges

NEWS

The Utah man who killed a city worker over complaints about his messy lawn will never get out of prison

Orem man acquitted of murder now accused of lying during trial - Deseret News

Deseret News | Church News

Print Subscriptions



UTAH    POLICE/COURTS    UTAH COUNTY

Tim Taylor's Case
Case No. 201401468 FS
, Prosecutor Retaliation after complete
Acquittal of this guy after 7 Day Jury Trial

# Orem man acquitted of murder now accused of lying during trial

Defense attorney says new charges 'definitely taking two bites of the apple'

By Pat Reavy, KSL.com and Annie Knox, KSL.com    |    Updated May 21, 2020, 2:30pm MDT



Orem man acquitted of murder now accused of lying during trial - Deseret News

of 327

> **State v. Valdez**
> **2021 UT App 13 (Feb. 11, 2021)**
> Reversing convictions for kidnapping, robbery, and aggravated assault, the court of appeals held that **the defendant's right against self-incrimination under the Fifth Amendment was violated when the prosecution presented evidence that he refused to provide the swipe code to his cell phone to officers and relied upon that evidence in closing argument,** thereby inviting the jury to infer guilt from the defendant's silence.

Elbert Paule was charged Thursday in 4th District Court with two counts of making a false or inconsistent material statement, a second-degree felony.  |  Utah County Jail

PROVO — An Orem man acquitted of murder two months ago is now accused of lying under oath during his trial.

Elbert John Paule, 20, was charged Thursday in 4th District Court with two counts of making a false or inconsistent material statement, a second-degree felony.

In February 2019, Paule shot and killed Dominique Barnett, 26, with a shotgun at point-blank range, without saying a word, in the doorway of Paule's apartment after Barnett had gone to the complex with his fiancé and their child to confront Paule about a drug deal, according to prosecutors.

Paule was charged with murder. But following a one week trial, a jury acquitted him of the murder charge, believing that the shooting was in self-defense. He was convicted, however, on a charge of obstructing justice, a second-degree felony.

Case 2:24-cr-00163-TS   Document 179-1   Filed 04/23/26   PageID.10423   Page 228 of 327

On Thursday, Paule's defense attorney Rudy Bautista called the charges "ridiculous."

"This is inappropriate on so many levels," Bautista said. "It's definitely taking two bites of the apple in order to get him a prison sentence he doesn't deserve."

During the trial, Paule took the witness stand in his own defense. He stated that after retrieving his shotgun and while standing in the kitchen, "Paule claims Barnett opened the door, entered the apartment with a knife in his hand and advanced toward Paule. Paule testified that Barnett was inside his apartment when he shot Barnett. Paule testified that he did not open the door and although the door was locked, Paule claimed that Barnett somehow opened the door and entered the apartment," according to charging documents filed Thursday.

However, two other witnesses who were present that night, including the fiancé, told police that it was Paule who opened the door and shot Barnett in the outside hallway, the charges state.

In addition, after Paule was acquitted, prosecutors "asked two blood spatter experts to review the photographs, scene videos and other physical evidence obtained in Barnett's death. The expert witnesses indicate that the evidence in the case supports a finding that Barnett was not inside the apartment when Paule shot Barnett," according to charging documents.

Prosecutors note that three witnesses who were present the night of the shooting and the two blood spatter experts did not testify during Paule's trial.

"Paule made several false material statements under oath during the trial when he testified. These false statements include Paule's claim that Barnett opened the door to the apartment and that Barnett entered the apartment when Paule shot Barnett," the charges state. "The false statements that Paule made while testifying were material and capable of affecting the outcome of the trial as to whether Paule committed murder."

6/12/2021

Bautista said he was not ready to call the new charges double jeopardy or prosecutorial misconduct, "but it certainly stinks of that."

"Here they're trying to say a jury should believe their witnesses when a previous jury didn't. It's offensive," Bautista said. His client's testimony at trial did not conflict with his own earlier statements, he added. Rather, they go against the assertions of other witnesses.

"In 21 years and 196 jury trials, I've never seen someone acquitted be turned around and charged with perjury when it's simply an issue of credibility," Bautista said.

He questioned whether the timing of the new charges — a week before Paule is set to be sentenced in the earlier case — seeks to sway a judge to order prison time instead of a lesser penalty.

Bautista noted Republican Utah County Attorney David Leavitt is running for the state's top law enforcement post and has campaigned on a platform that prosecutors currently have too much power and should offer fewer plea deals in favor of more trials, a move allowing fellow Utahns to decide a defendant's fate.

"This is a slap across the face of such a platform," said Bautista, a Libertarian who also has joined the attorney general race. "What it's showing is prosecutors still have too much power. They can just decide, 'We don't believe him. We want a jury to believe these other people.'"



Deseret News.  **Paid Ad**



Tim Taylor

UTAH   POLICE/COURTS   UTAH COUNTY

# New jury acquits Orem man of murdering his wife

By McKenzie Romero and Sam Penrod | Feb 24, 2017, 9:03pm MST

 GRID VIEW



**Conrad Truman, right, speaks with Mark Moffatt, his defense attorney, during the coming arguments for the new Conrad Truman murder trail on Thursday, Feb. 23, 2017 at the Fourth Judicial District Court in Provo.** | Sammy Jo Hester

1 of 6

     



PROVO — An Orem man once convicted of murdering his wife in 2012 was exonerated Friday by a new jury after the case went to trial for a second time.

Conrad Truman, 35, was found not guilty Friday of murder in the shooting death of his wife, Heidy Truman, 25, after a jury deliberated the case for 8½ hours. He was also cleared of obstruction of justice, a second-degree felony.

Truman grinned widely as he walked out of the Utah County Jail and into the arms of his cheering family after the verdict was handed down Friday. He said the moment marked the end of a nightmare, comparing it to the end of the movie "Groundhog Day."

"(The character) said 'today is tomorrow,' and that's what this is. Today is my tomorrow," Truman explained, a slight crack in his voice.

He then praised his family before leaving, his arm wrapped around his father.

"I love my family so much," Truman said. "Thank you."

Truman has been behind bars since his arrest in July 2013. The experience, he said, cannot be explained.

"I've been locked up for something I didn't do, I don't know what else to say to that," Truman said.

Truman's attorneys argued during the three-week trial that the Orem man had been caught up in a single-minded investigation by police who pegged him as responsible for his wife's death the moment they came in the door. According to Truman, his wife shot herself in front of him.

Prosecutors have maintained that Heidy Truman, who they described in court as "sassy" and determined, had no reason to take her own life, but died at the hands of her husband after a night drinking and arguing. Conrad Truman's erratic and violent behavior toward police and first responders arriving at the scene was evidence of his guilt, prosecutors said, as were his varying accounts of what happened that night.

A jury convicted Truman in 2014 of killing his wife in their Orem home. He maintained throughout the first trial and at his sentencing that he was innocent. The conviction was overturned in August after Truman claimed inaccurate crime scene evidence taken by police influenced the verdict.

The couple had been home watching television and drinking whiskey on Sept. 30, 2012. At one point the couple bickered, according to Truman, though not about anything consequential. Police responded to a frantic 911 call from Truman just before 11 p.m.

Heidy Truman died from a single gunshot wound to the head. While Truman insists he heard a popping noise that night before rushing down the hallway to see his wife collapse from a self-inflicted gunshot, her family claims she was a tragic victim of domestic violence.

The tense courtroom was mostly quiet as the jury's verdict was read Friday, but once the judge exited, two waves of emotion broke as Conrad Truman's family celebrated and Heidy Truman's family sobbed.

Utah County deputy attorney Tim Taylor expressed prosecutors' remorse for Heidy Truman's family. Going into the re-trial, Taylor said prosecutors knew it would be difficult to present the case.

"We really believed in this case," Taylor said, praising his office as well as police involved in the case.

"We wanted a certain outcome, because we still feel that what we were trying to prove was the correct thing, but you know what, we absolutely trust the system," Taylor said.

After speaking with jurors, Taylor said the group "struggled" to come to their decision.

Taylor said he thinks several factors may have pushed the jury to a different verdict than the one rendered in the first trial, including the corrected measurements of the Truman home and the medical examiner's decision to change Heidy Truman's manner of death from "unknown" to "homicide," then back to "unknown" once new information was presented to him during Truman's appeal.

"We acknowledge there was a mistake in the measurements, and if there was a mistake in the measurements and the way that things were done, then you know what, we need to do things the right way. I don't have a problem with that at all," Taylor said. "We support that the right information came in this time."

Defense attorney Mark Moffat called the verdict "a huge victory" for Truman and his family, commenting on the years his client has spent behind bars and the transition he now faces.

"This day has been long in coming, he has endured incredible hardship over that period of time," Moffat said.

Moffat believes the trial had a different outcome because of the evidentiary problems uncovered in the police investigation, specifically incorrect measurements of the home that had made Truman's explanation of the shooting seem implausible.

"It's hard to say what the jury focused on specifically, but those measurements in that house had a big deal to do with it, those diagrams had a big impact on that first trial," Moffat said. "The jury (in the second trial) went to that house, they saw the size of that space, and I think they knew that investigation was heavily flawed."

Truman had been sentenced to serve 15 years to life in prison in February 2015. When his conviction was overturned, 4th District Judge Samuel McVey declined to reduce Truman's $1 million bail and he remained in custody.

 **Deseret News.**

Richard C. Hales and Tim Taylor

`UTAH`  `POLITICS`  `POLICE/COURTS`

# Ex-Provo councilman sues for 'malicious prosecution' in dismissed case

By McKenzie Romero | @McKenzieRomero | Feb 5, 2017, 8:50pm MST



TIMOTHY L. TAYLOR #8001
Utah County Attorney
MARIANE O'BRYANT #5442
Deputy Utah County Attorney
100 East Center, Suite 2100
Provo, Utah 84606
Email: ucadm.Dcourt@state.ut.us
Phone: (801) 851-8026
Fax: (801) 851-8051

## IN THE FOURTH JUDICIAL DISTRICT COURT
## UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH,<br><br>       Plaintiff,<br><br>vs.<br><br>STEVEN TURLEY<br><br>       Defendant. | STATE'S REQUEST FOR AN EVIDENTIARY HEARING ON DEFENDANT'S MOTION TO DISMISS AND REQUEST TO CONTINUE PRELIMINARY HEARING<br><br><br>Case No. 111402028<br><br>Judge James R. Taylor |

Plaintiff, by and through Deputy Utah County Attorney, Mariane O'Bryant, hereby requests an evidentiary hearing regarding defendant's Motion to Dismiss Counts 2, 3, and 4 as Time Barred and to continue the preliminary hearing until after a hearing is held and the court rules on defendant's Motion. This Request is made based on the following:

The State has reviewed the defendant's Motion and Memorandum in Support of Defendant's Motion to Dismiss Counts 2, 3, and 4 as Time Barred and believes that an evidentiary hearing is necessary to fully develop the relevant facts necessary for the State's

Case 2:24-cr-00163-TS     Document 179-1     Filed 04/23/26     PageID.10431

of 327

Steve Turley, right, makes an appearance in 4th District Court in Provo alongside attorney Brett Tolman on Aug. 24, 2011.  | Francisco Kjolseth

PROVO — A former Provo City councilman once charged with fraud is now suing the Utah County attorney for what he called "malicious" and improper prosecution designed to oust him from office.

Steve Turley, who bowed to calls for his resignation in September 2011 after fraud charges were filed against him, is suing for unspecified punitive damages and legal fees over the case that he says stemmed from "a multi-year effort by (his) legal and political foes to remove him from office and harm his business dealings," according to a complaint filed Thursday in 4th District Court.

The civil rights lawsuit names the Utah County Attorney's Office, County Attorney Jeff Buhman, and investigator Richard Hales, and claims "malicious prosecution," abuse of process, civil conspiracy and a violation of Utah rules of professional conduct.

Following his 2003 win in "a bitterly contested election," the lawsuit claims that Turley often found himself at odds with his fellow council members. After a rival on the council, Councilwoman Cindy Richards, was ousted from her

Case 2:24-cr-00163-TS    Document 179-1    Filed 04/23/26    PageID.10432    Page 237
of 327

seat in 2009, meetings were held "in an effort to gather as much inflammatory information about Mr. Turley as possible and to use that information to run him out of office," the lawsuit states.

Ultimately, 23 Provo residents filed a conflict-of-interest complaint against Turley, citing several instances in which the councilman allegedly used his public position for personal financial gain, sparking an investigation by the Utah County Attorney's Office.

Learning of the investigation, Turley and his attorney went to meet with Buhman and Richards. During a recess in the conversation, Turley and his attorney were left to talk in a conference room, and when Buhman and Richards returned, Turley was informed that the conversation had been recorded via closed-circuit camera and that prosecutors had been listening in real time, according to the lawsuit.

The tape was destroyed following objections from Turley and his attorney.

Charges were later filed against Turley alleging that between July 2006 and December 2009 Turley used his position for financial gain. Three counts of communication fraud, a second-degree felony, were dismissed in November 2013, while remaining charges were dismissed in February 2015.

The lawsuit claims that the prosecution was "malicious and improper," leading to "significant damages, including (Turley) funding a nearly four-year litigation effort to defeat the bogus criminal charges, irreparable damage to Turley's reputation and business dealings and severe emotional distress."

Turley spoke out in February 2015 when the case was dismissed, asserting his innocence and calling the years spent fighting the allegations "a nightmare."

"It has devastated our family, and it's a shame we had to go through that — that some overzealous prosecutors had the ability to do that to an innocent family's life," Turley said at the time. "I don't know how something like this can be made right."

Mortensen family: 'We are glad the truth has finally come out' | KSL.com



Advertise with us

# Mortensen family: 'We are glad the truth has finally come out'

By Sam Penrod | Posted - Jan. 19, 2013 at 6:53 p.m.



News    Sports    Brandview    TV    Radio    Live    Obituaries    Weather    Classifieds    Cars    Homes    Jobs    Services    Seniors

    

13

 **6PM: Mortensen family: 'We are glad the truth has finally come out'**



Mortensen family: We are glad the truth has finally come out - KSL.com



News   Sports   Brandview   TV   Radio   Live   Obituaries   Weather   ☀Classifieds   Cars   Homes   Jobs   Services   Seniors



outdated or superseded by additional information. Reading or replaying the story in its archived form does not constitute a republication of the story.

AMERICAN FORK — As the verdict pronouncing Martin Bond guilty in the murder of a retired BYU professor was read late Friday night, Kay Mortensen's son and daughter-in-law couldn't hold back their emotions.

Roger and Pamela Mortensen at one point were considered suspects in the November 2009 killing and were put in jail, until Bond's ex-wife and her boyfriend contacted police when they realized the couple was to stand trial for the murder.

The Mortensens had been held hostage at gunpoint by Bond, who was convicted of three counts of aggravated kidnapping in addition to single counts of aggravated murder, aggravated robbery and aggravated burglary.

"Due to false charges, family members and friends turned on us," Pamela Mortensen said. "Our reputations in our community and church were destroyed. We are glad that the truth has finally come out."

ADVERTISEMENT



Mormon family: We are glad the truth has finally come out | KSL.com



News    Sports    Brandview    TV    Radio    Live    Obituaries    Weather    Classifieds    Cars    Homes    Jobs    Services    Seniors

MARKETPLACE



Benjamin Rettig testifying at the trial of Martin Bond.

Mortensen family: We are grateful truth has finally come out | KSL.com



News   Sports   Brandview   TV   Radio   Live   Obituaries   Weather   Classifieds   Cars   Homes   Jobs   Services   Seniors



MARKETPLACE

Prosecutor Tim Taylor said he has apologized to the Mortensens.

"We made a mistake," Taylor said. "The ironic thing about this whole thing is that if we wouldn't have put them in jail, the chances of us finding out who really did this may not have ever come to fruition."

After more than three years, Kay Mortensen's widow, Darla, is grateful the truth is known.

"It is such a tragedy, the lives that have been shattered and damaged," she said. "Things will never be the same for so many families. I am grateful the truth has come out, that Roger and Pam have been exonerated."

Bond will have a chance at appeal and will not face the death penalty. He will be formally sentenced March 5.

## Related Stories

Man found guilty in killing of retired BYU professor

Rettig sentenced to 25 years for killing BYU professor

Court document reveals details about Mortensen investigation

Retired BYU professor let killers in his home, prosecutors say

**Sam Penrod**

| 13 | Comments | 0 Pending |
| --- | --- | --- |

Court of Appeal, First Appellate District
Charles D. Johnson, Clerk/Executive Officer
Electronically RECEIVED on 1/18/2022 at 3:09:15 PM

Court of Appeal, First Appellate District
Charles D. Johnson, Clerk/Executive Officer
Electronically RECEIVED BUT NOT FILED on 1/18/2022 by M.

DAVID O. LEAVITT #5990
Utah County Attorney
TIMOTHY L. TAYLOR #8001
Deputy Utah County Attorney
100 East Center, Suite 2100
Provo, Utah 84606
Email: dcourt@utahcounty.gov
Phone: (801) 851-8026
Fax: (801) 851-8051

---

## IN THE FOURTH JUDICIAL DISTRICT COURT

## UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH, | FIRST AMENDED INFORMATION |
| Plaintiff, | |
| vs. | |
| KAILIN WANG<br>2481 S Fairway Dr<br>Spanish Fork, UT 84660<br>DOB: 01/20/1983<br>SID: 1380575 | Case No. 211100167 |
| | Judge Denise Porter |
| Defendant. | |

The State of Utah, by and through the Utah County Attorney's Office, charges the defendant with the commission of the following offense:

COUNT 1: FALSE OR INCONSISTENT MATERIAL STATEMENTS, a second degree felony, in violation of Utah Code Ann 76-8-502, in that on or about March 18, 2019, in Utah County, the defendant, Kailin Wang did, in an official proceeding make a false material statement under oath or affirmation or swore or affirmed the truth of a material statement previously made while believing the statement to be untrue.

Document received by the CA 1st District Court of Appeal.

1

Utah Code Ann. 76-6-501 (Forgery) states in part:

*"A person is guilty of forgery if, with purpose to defraud anyone, or with knowledge that the person is facilitating a fraud to be perpetrated by anyone, the person:*
*(a)      alters any writing of another without his authority or utters the altered writing; or*
*(b)      makes, completes, executes, authenticates, issues, transfers, publishes, or utters any writing so that the writing or the making, completion, execution, authentication, issuance, transference, publication, or utterance:*
*(i)      purports to be the act of another, whether the person is existent or nonexistent;*
*(ii)      purports to be an act on behalf of another party with the authority of that other party;"*

The investigation reveals that Wang intended to defraud numerous entities by issuing subpoenas without having authority to do so. Wang utilized the Fourth District Court's signature stamp and the court clerk's signature without authorization to authenticate subpoenas which were fraudulent. By issuing the fraudulent subpoenas, Wang was purporting to act with authorization from the Fourth District Court and it appears her purpose was to obtain personal and sensitive personal identifying information for which she was not authorized.

Utah Code Ann. 76-10-1801 (Communications Fraud) states in part:

*(1) Any person who has devised any scheme or artifice to defraud another or to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions, and who communicates directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice is guilty of:*
  *(e) a second degree felony when the object or purpose of the scheme or artifice to defraud is the obtaining of sensitive personal identifying information, regardless of the value.*

Based upon evidence received from Nick Patterson of the Provo Police Department and Richard Hales with the Utah County Attorney's Office Investigation Bureau, I have reason to believe the defendant committed the offense as charged herein.

Authorized for presentment and filing this 22nd day of July, 2021.

UTAH COUNTY ATTORNEY'S OFFICE

Sworn to by:

/s/ *TIMOTHY L. TAYLOR*
Timothy L. Taylor
Deputy Utah County Attorney

11

Document received by the CA 1st District Court of Appeal.

_____

IN THE FOURTH DISTRICT COURT - ALL DEPARTMENT

IN AND FOR UTAH COUNTY, STATE OF UTAH

_____

**AFFIDAVIT FOR SEARCH WARRANT**

STATE OF UTAH )

                     :ss

County of Utah )

The undersigned affiant, Sergeant RICHARD HALES of UCAO-BOI, upon an oath or written affidavit subscribed under criminal penalty, declares:

That your affiant has reason to believe:

THAT

On the premises known as 2481 Fairway Dr.
Spanish Fork, Utah 84660, further described as The home is located on Fairway Drive with the front facing the street. The rear facing the 16th hole of The Oaks Golf Course. The home shares a common wall with 2485. The garage is on the north side at a lower elevation than the front door. The numbers 2481 are above the garage door. It is tan stucco with brown garage door and front entry door that is partially enclosed by a covered porch/entrance.;

In the City of SPANISH FORK, County of Utah, State of Utah, there is now certain property or evidence described as:

To seize any computer, cell phone, electronic device, paper documents or electronic storage device capable of creating, storing, or transmitting information related to the creation of unauthorized or fraudulent subpoena documents.

and that said property or evidence:

Was unlawfully acquired or is unlawfully possessed;

has been used or is possessed for the purpose of being used to commit or conceal the commission of an offense; or

is evidence of illegal conduct.

- Page 1 of Affidavit for Search Warrant No. 2267231 -

Document received by the CA 1st District Court of Appeal.

17.     Based on information obtained through the investigation, I have determined there is a strong likelihood of privileged attorney-client information on the electronic devices in Ms. Wang's possession. Therefore, an independent third party, under no authority of the Utah County Attorney's Office, will be present during the service of this warrant. The independent third party will take possession of all evidence obtained in the warrant and store the evidence. The evidence will be held by the independent third party pending an additional search warrant outlining the procedure to search the items for evidence and protect any and all privileged information therein.

18.     Based on the information contained within this affidavit, I believe there is probable cause to believe there is evidence of the crime of Forgery 76-6-501 and Communication Fraud 76-10-1801 of the Utah Criminal Code. This evidence is being held at the address of 2481 Fairway Dr. Spanish Fork, UT 84660. Specifically, in any computer, cell phone, electronic device, electronic storage device or paper document held within the premises.

19.     Therefore, based on the information within this affidavit, I respectfully request the Court authorize the issuance of a search warrant for the home located at 2481 Fairway Dr. Spanish Fork, UT 84660 and to seize any computer, cell phone, electronic device, paper documents or electronic storage device capable of creating, storing, or transmitting information related to the creation of unauthorized or fraudulent subpoena documents. The home is located on Fairway Drive with the front facing the street. The rear facing the 16th hole of The Oaks Golf Course. The home shares a common wall with 2485. The garage is on the north side at a lower elevation than the front door. The numbers 2481 are above the garage door. It is tan stucco with brown garage door and front entry door that is partially enclosed by a covered porch/entrance. This warrant will be served during daytime hours by knocking at the door and announcing authority to serve the warrant.

20.     Therefore, based on the information within this affidavit, I respectfully ask for the Court to seal this affidavit and warrant from public purview for 30 days after the issuance of the warrant. Ms. Wang has and continues to represent herself in legal matters. She has significant knowledge and monitors legal proceedings involving herself. If Ms. Wang becomes aware of the pending search warrant, she could conceal or destroy evidence significantly hindering the investigation.

This affidavit has been reviewed by Tim Taylor of the Utah County Attorney Office, and it has been approved for presentation to the court.

WHEREFORE, your affiant prays that a Search Warrant be issued for the seizure of said items in the daytime.

APPLICATION TO SEAL SEARCH WARRANT AND RELATED DOCUMENTS:

Document received by the CA 1st District Court of Appeal.

The Order of the Court is stated below:
Dated:  October 15, 2021                    At the direction of:
          12:15:20 PM              /s/  ROBERT C LUNNEN
                                                District Court Judge
                              **by**
                                        /s/  TREENA HANSEN
                                              District Court Clerk

4TH DISTRICT COURT - PROVO

UTAH COUNTY, STATE OF UTAH

| STATE OF UTAH, | MINUTES |
|---|---|
| Plaintiff, | JURY TRIAL - DAY 3 |
| | |
| vs. | Case No: 201401468 FS |
| ELBERT JOHN PAULE, | Judge: ROBERT C LUNNEN |
| Defendant. | Date: October 15, 2021 |
| Custody: Utah State Prison - Draper | |

## PRESENT

Clerk: treenah

Prosecutor: TAYLOR, TIMOTHY              same Prosecutor

Defendant Present

The defendant is in the custody of the Department of Corrections Utah State Prison - Draper

Defendant's Attorney(s): BAUTISTA, RUDY

## DEFENDANT INFORMATION

Date of birth: January 26, 2000

Audio

Tape Number: FTR 8A-21 Tape Count: 8:52 - 11:02

## CHARGES

1. FALSE/INCONSISTENT MATERIAL STATEMENTS - 2nd Degree Felony - Disposition: 10/14/21 Dismissed w/ Prejudi

2. FALSE/INCONSISTENT MATERIAL STATEMENTS - 2nd Degree Felony Plea: Not Guilty - Disposition: 10/15/21 Dismissed w/ Prejudi

## TRIAL

This matter comes before the court for the thrid day of trial.
Counsel address the court and dicuss witnesses to testify.
Court gives instructions as to testimony of potential witness.
9:31 The court takes recess.
9:37 Court reconvenes.
Mr. Taylor moves to admit exhibits #64 and 54.  They are marked, identified, offered and received.
Mr. Bautista addressses the court and makes motion to dismiss/directed verdict.
Court addresses counsel and outlines the elements.
10:32 Mr. Taylor responds and addresses elements.

10:43 Court grants the motion for directed verdict and dismisses the case.
10:50 The Jury retruns.
Court addresses Jurors and excuses the Jury.  Court thanks the jury for their service.
11:02 End

**End Of Order - Signature at the Top of the First Page**



News    Sports    Brandview    TV    Radio    Live    Obituaries    Weather     39°

 MARKE Classifieds

NEWS / UTAH / **More sections »**

Advertise with us

# In 'very infrequent' ruling, judge tosses perjury charge against Orem man acquitted of murder

By Emily Ashcraft, KSL.com | Posted - Oct. 15, 2021 at 9:07 p.m.



The 4th District Courthouse in Provo is pictured on Thursday, Nov. 12, 2020. (Kristin Murphy, Deseret News)

 1 photo    18

**Estimated read time: 5-6 minutes**



KSL.com

News   Sports   Brandview   TV   Radio   Live   Obituaries   Weather   ☀️🌥 39°   MARKE
Classifieds

==Elbert John Paule, 21, was acquitted of murder in March 2020== after he took the stand in his own defense, stating that when he shot and killed Dominique Barnett, 26, near his apartment door in self-defense. He was convicted of obstructing justice, a second-degree felony, and remains in Utah State Prison.

==Following the murder acquittal, Paule was charged with two counts of perjury, a second-degree felony, for statements he made during the trial.== One count was dismissed earlier and the other was considered in a jury trial this week.

Judge Robert Lunnen, however, dismissed the second perjury charge Friday following testimony from the prosecution's witnesses. Lunnen determined that a reasonable jury would find that Paule was "not sure" when he answered questions during his previous trial about where Barnett was standing when Paule shot him and that Paule was not making any knowing or recklessly false statements, as the charge claimed.

ADVERTISEMENT



Young
NOW IN LAYTON!

Advertise with us                              Report ad

Lunnen said that making a directed verdict to dismiss the case, as he did in this instance, is "very, very infrequent." Lunnen said he has not made a directed verdict on any previous cases and that he did not make the decision lightly.

Marissa Marquez, Paule's mother, expressed gratitude following the judge's decision and said that she and her family feel "so blessed."

Case 2:24-cr-00163-TS    Document 179-1    Filed 04/23/26    PageID.10446    Page 251 of 327



KSL.com    News  Sports  Brandview  TV  Radio  Live  Obituaries  Weather  ☀️ 39°  | MARKE Classifieds

happened."

According to testimony at both trials, Paule shot and killed Barnett with a 12-gauge shotgun near the entrance to Paule's apartment at the Parkway Lofts Apartments near Utah Valley University. The two men were friends, and Barnett was allegedly coming over to the apartment to address a disagreement they had talked about on the phone.

Among the questions presented at trial this week was whether Paule gave false statements in the previous trial regarding who opened the door and whether Barnett stepped into the apartment or was coming toward Paule before Barnett was shot.

On Friday, Lunnen ruled that Barnett was outside, as the prosecution argued, but the judge said this determination is not material to the perjury charge against Paule claiming that he lied at the trial about Barnett entering the apartment before he was shot.

At the previous trial, when asked about Barnett moving toward him before he fired the shotgun, Paule said, "maybe a foot, like I said, everything happened so fast," and later "who knows, I'm not sure." Lunnen noted that these answers were in response to leading questions.

"Based on the transcript that I have before me," Lunnen said, "no reasonable jury could find that these statements are so reckless … that they're a false statement or that he intended them to be a false statement."

Case 2:24-cr-00163-TS    Document 179-1    Filed 04/23/26    PageID.10447    Page 252 of 327



Elbert John Paule, 21, of Orem, was charged with murdering Dominique Barnett, 26. Paule was found not guilty of murder in a jury trial and charges brought against him for perjury after the trial were dismissed Friday.

This judge's decision restored Paule's family's faith in the justice system, said Paule's aunt, Jasmin Elpano. She and Marquez attended the murder trial last year and said that they were frustrated about the evidence that was allowed to be presented in this trial.

"When all these things were happening to my nephew, we just felt like, 'Oh, my gosh. Why do they keep pursuing something like that?' You know, he was already acquitted. It was self-defense. But then the (district attorney) still wants to continue," Elpano said.

She said this ruling helped her family believe that "there's still good people out there in the justice system that want to do it right."

really hard."

*–Marissa Marquez, mother of Elbert John Paule*

Marquez said multiple members of her family sacrificed to finance Paule's defense, paying between $70,000 and $80,000 upfront and additional money for the second trial. Members of the family withdrew money from their retirement plans, she said, in addition to taking time off work to travel from California to Utah for the trials and to visit Paule to help support him.

"We can't just give up on family," Marquez said.

Paule is still incarcerated while waiting for Friday's decision to be processed, which could take months according to Marquez. Although she says Paule has served more time than should be given for the one charge of obstruction of justice he was found guilty for, he was kept in prison because of the additional perjury charges.

Marquez said that Paule hopes to go back to school; he was enrolled at UVU before he was arrested but had not yet started taking classes. She said he has talked about studying economics or business, becoming a defense lawyer after his experience in a trial or being a therapist to others who are in the prison system or are dealing with things that he has gone through.

She also expressed gratitude for the lawyers and the investigator who have helped her family through this process, adding they want to share a message of hope with other families who are going through a similar situation and encourage them not to give up.

"There's still good judges, still good people out in the judiciary system," Marquez said, "even though what we went through was really hard."

## Photos

Photo 1 of 1



UTAH    POLICE/COURTS    UTAH COUNTY

# Orem man acquitted of murder now accused of lying during trial

Defense attorney says new charges 'definitely taking two bites of the apple'

By Pat Reavy and Annie Knox  |  Updated May 21, 2020, 2:30pm MDT



Elbert Paule was charged Thursday in 4th District Court with two counts of making a false or inconsistent material statement, a second-degree felony.  |  Utah County Jail

PROVO — An Orem man acquitted of murder two months ago is now accused of lying under oath during his trial.

Case 2:24-cr-00163-TS    Document 179-1    Filed 04/23/26    PageID.10450    Page 255 of 327

Elbert John Paule, 20, was charged Thursday in 4th District Court with two counts of making a false or inconsistent material statement, a second-degree felony.

In February 2019, Paule shot and killed Dominique Barnett, 26, with a shotgun at point-blank range, without saying a word, in the doorway of Paule's apartment after Barnett had gone to the complex with his fiancé and their child to confront Paule about a drug deal, according to prosecutors.

Paule was charged with murder. But following a one week trial, a jury acquitted him of the murder charge, believing that the shooting was in self-defense. He was convicted, however, on a charge of obstructing justice, a second-degree felony.

On Thursday, Paule's defense attorney Rudy Bautista called the charges "ridiculous."

"This is inappropriate on so many levels," Bautista said. "It's definitely taking two bites of the apple in order to get him a prison sentence he doesn't deserve."

During the trial, Paule took the witness stand in his own defense. He stated that after retrieving his shotgun and while standing in the kitchen, "Paule claims Barnett opened the door, entered the apartment with a knife in his hand and advanced toward Paule. Paule testified that Barnett was inside his apartment when he shot Barnett. Paule testified that he did not open the door and although the door was locked, Paule claimed that Barnett somehow opened the door and entered the apartment," according to charging documents filed Thursday.

However, two other witnesses who were present that night, including the fiancé, told police that it was Paule who opened the door and shot Barnett in the outside hallway, the charges state.

In addition, after Paule was acquitted, prosecutors "asked two blood spatter experts to review the photographs, scene videos and other physical evidence obtained in Barnett's death. The expert witnesses indicate that the evidence in the case supports a finding that Barnett was not inside the apartment when Paule shot Barnett," according to charging documents.

Prosecutors note that three witnesses who were present the night of the shooting and the two blood spatter experts did not testify during Paule's trial.

Deseret News | Church News                                                                    Print Subscriptions

UTAH    POLICE/COURTS    UTAH COUNTY

# New jury acquits Orem man of murdering his wife

By McKenzie Romero and Sam Penrod   Feb 24, 2017, 9:03pm MST



GRID VIEW





Conrad Truman, right, speaks with Mark Moffatt, his defense attorney, during the coming arguments for the new Conrad Truman murder trail on Thursday, Feb. 23, 2017 at the Fourth Judicial District Court in Provo. Sammy Jo Hester                                         | 1 of 6

     

PROVO — An Orem man once convicted of murdering his wife in 2012 was exonerated Friday by a new jury after the case went to trial for a second time.

Conrad Truman, 35, was found not guilty Friday of murder in the shooting death of his wife, Heidy Truman, 25, after a jury deliberated the case for 8½ hours. He was also cleared of obstruction of justice, a second-degree felony.

Truman grinned widely as he walked out of the Utah County Jail and into the arms of his cheering family after the verdict was handed down Friday. He said the moment marked the end of a nightmare, comparing it to the end of the movie "Groundhog Day."

"(The character) said 'today is tomorrow,' and that's what this is. Today is my tomorrow," Truman explained, a slight crack in his voice.

He then praised his family before leaving, his arm wrapped around his father.

"I love my family so much," Truman said. "Thank you."

Truman has been behind bars since his arrest in July 2013. The experience, he said, cannot be explained.

"I've been locked up for something I didn't do, I don't know what else to say to that," Truman said.

Truman's attorneys argued during the three-week trial that the Orem man had been caught up in a single-minded investigation by police who pegged him as responsible for his wife's death the moment they came in the door.

According to Truman, his wife shot herself in front of him.

Prosecutors have maintained that Heidy Truman, who they described in court as "sassy" and determined, had no reason to take her own life, but died at the hands of her husband after a night drinking and arguing. Conrad Truman's erratic and violent behavior toward police and first responders arriving at the scene was evidence of his guilt, prosecutors said, as were his varying accounts of what happened that night.

A jury convicted Truman in 2014 of killing his wife in their Orem home. He maintained throughout the first trial and at his sentencing that he was innocent. The conviction was overturned in August after Truman claimed inaccurate crime scene evidence taken by police influenced the verdict.

The couple had been home watching television and drinking whiskey on Sept. 30, 2012. At one point the couple bickered, according to Truman, though not about anything consequential. Police responded to a frantic 911 call from Truman just before 11 p.m.

Heidy Truman died from a single gunshot wound to the head. While Truman insists he heard a popping noise that night before rushing down the hallway to see his wife collapse from a self-inflicted gunshot, her family claims she was a tragic victim of domestic violence.

The tense courtroom was mostly quiet as the jury's verdict was read Friday, but once the judge exited, two waves of emotion broke as Conrad Truman's family celebrated and Heidy Truman's family sobbed.

Utah County deputy attorney Tim Taylor expressed prosecutors' remorse for Heidy Truman's family. Going into the re-trial, Taylor said prosecutors knew it would be difficult to present the case.

"We really believed in this case," Taylor said, praising his office as well as police involved in the case.

"We wanted a certain outcome, because we still feel that what we were trying to prove was the correct thing, but you know what, we absolutely trust the system," Taylor said.

After speaking with jurors, Taylor said the group "struggled" to come to their decision.

Taylor said he thinks several factors may have pushed the jury to a different verdict than the one rendered in the first trial, including the corrected measurements of the Truman home and the medical examiner's decision to change Heidy Truman's manner of death from "unknown" to "homicide," then back to "unknown" once new information was presented to him during Truman's appeal.

"We acknowledge there was a mistake in the measurements, and if there was a mistake in the measurements and the way that things were done, then you know what, we need to do things the right way. I don't have a problem with that at all," Taylor said. "We support that the right information came in this time."

Defense attorney Mark Moffat called the verdict "a huge victory" for Truman and his family, commenting on the years his client has spent behind bars and the transition he now faces.

"This day has been long in coming, he has endured incredible hardship over that period of time," Moffat said.

Moffat believes the trial had a different outcome because of the evidentiary problems uncovered in the police investigation, specifically incorrect measurements of the home that had made Truman's explanation of the shooting seem implausible.

"It's hard to say what the jury focused on specifically, but those measurements in that house had a big deal to do with it, those diagrams had a big impact on that first trial," Moffat said. "The jury (in the second trial) went to that house, they saw the size of that space, and I think they knew that investigation was heavily flawed."

Truman had been sentenced to serve 15 years to life in prison in February 2015. When his conviction was overturned, 4th District Judge Samuel McVey declined to reduce Truman's $1 million bail and he remained in custody.

As the defense focused on the trial, Moffat said the possibility of a civil lawsuit has not been discussed.

---

RELATED

**Jury deliberating whether Orem man killed his wife in 2012**

**Medical examiner says Orem woman's death may not be homicide**



NEWS / UTAH /   [ More sections » ▾ ]

Advertise with us

# Mortensen family: 'We are glad the truth has finally come out'

By Sam Penrod | Posted - Jan. 19, 2013 at 6:53 p.m.



 **13**  

        **6PM: Mortensen family: 'We are glad the truth has finally come out'**





News   Sports   Brandview   TV   Radio   Live   Obituaries   Weather   ☀ Classifieds   Cars



Benjamin Rettig testifying at the trial of Martin Bond.

"If it hadn't been for their actions, Kay Mortensen's murder would have gone unsolved," she said. "Even worse, Roger and I could be serving the rest of our lives in prison, not only for a crime we did not commit, for one one in which we ourselves were victims."

Prosecutor Tim Taylor said he has apologized to the Mortensens.

"We made a mistake," Taylor said. "The ironic thing about this whole thing is that if we wouldn't have put them in jail, the chances of us finding out who really did this may not have ever come to fruition."

After more than three years, Kay Mortensen's widow, Darla, is grateful the truth is known.

"It is such a tragedy, the lives that have been shattered and damaged," she said. "Things will never be the same for so many families. I am grateful the truth has come out, that Roger and Pam have been exonerated."

Bond will have a chance at appeal and will not face the death penalty. He will be formally sentenced March 5.

Deseret News | Church News                                                                 Print Subscriptions



UTAH    POLITICS    POLICE/COURTS

# Ex-Provo councilman sues for 'malicious prosecution' in dismissed case

By McKenzie Romero | @McKenzieRomero | Feb 5, 2017, 8:50pm MST



Steve Turley, right, makes an appearance in 4th District Court in Provo alongside attorney Brett Tolman on Aug. 24, 2011.  | Francisco Kjolseth

PROVO — A former Provo City councilman once charged with fraud is now suing the Utah County attorney for what he called "malicious" and improper prosecution designed to oust him from office.

TIMOTHY L. TAYLOR #8001
Utah County Attorney
MARIANE O'BRYANT #5442
Deputy Utah County Attorney
100 East Center, Suite 2100
Provo, Utah 84606
Email:  ucadm.Dcourt@state.ut.us
Phone: (801) 851-8026
Fax: (801) 851-8051

IN THE FOURTH JUDICIAL DISTRICT COURT
UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH,<br><br>          Plaintiff,<br><br>vs.<br><br>STEVEN TURLEY<br><br>          Defendant. | STATE'S REQUEST FOR AN EVIDENTIARY HEARING ON DEFENDANT'S MOTION TO DISMISS AND REQUEST TO CONTINUE PRELIMINARY HEARING<br><br><br>Case No. 111402028<br><br>Judge James R. Taylor |

Plaintiff, by and through Deputy Utah County Attorney, Mariane O'Bryant, hereby requests an evidentiary hearing regarding defendant's Motion to Dismiss Counts 2, 3, and 4 as Time Barred and to continue the preliminary hearing until after a hearing is held and the court rules on defendant's Motion.  This Request is made based on the following:

The State has reviewed the defendant's Motion and Memorandum in Support of Defendant's  Motion to Dismiss Counts 2, 3, and 4 as Time Barred and believes that an evidentiary hearing is necessary to fully develop the relevant facts necessary for the State's

ROBERT B. SYKES (#3180)
　　bob@sykesinjurylaw.com
ALYSON E. CARTER (#9886)
　　alyson@sykesinjurylaw.com
**ROBERT B. SYKES & ASSOCIATES, P.C.**
311 South State Street, Suite 240
Salt Lake City, Utah  84111
Telephone (801) 533-0222
Facsimile (801) 533-8081
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | | |
|---|---|---|
| ROGER KAY MORTENSEN, and PAM MORTENSEN, | ) ) ) ) | **COMPLAINT** and **JURY DEMAND** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DET. JOSH CHAPPELL; SGT. MATT HIGLEY; DET. ERIK KNUTZEN; LT. MIKE BROWER, THE UTAH COUNTY SHERIFFS OFFICE; TIM TAYLOR and JOHN NIELSEN, Prosecutors, Utah County Attorney's Office; and JOHN AND JANE DOES 1-20, | ) ) ) ) ) ) ) ) ) ) | Civil No. _____ Judge _____ |
| Defendants. | ) ) | |

12.    Defendant **Lt. Mike BROWER**, at all times relevant herein, was a Lieutenant employed by the UCSO, and was the "lieutenant over the investigation division." Lt. Brower supervised the entire murder investigation and those working on it, including CHAPPELL and KNUTZEN.  Brower's division was "responsible for the investigation."  He responded to the crime scene and "kind of oversaw efforts, investigative process with regarding interviews with suspects, with witnesses.  Also involved with warrants that had been executed.  It was kind of overseeing the case."  Brower Testimony, Grand Jury Day 1 (hereinafter, "GJD-1"), 85:12-19.

13.    Defendant **John J. NIELSEN**, at all times relevant herein, was a prosecutor employed by the Utah County Attorney's Office, a governmental entity operating under the laws and statutes of the State of Utah.  NIELSEN served as both an investigator in the underlying murder investigation, as a witness before the Grand Jury, and as an attorney for the prosecution at the Grand Jury proceeding.

14.    Defendant **Timothy L. TAYLOR**, at all times relevant herein, was a prosecutor employed by the Utah County Attorney's Office, a governmental entity operating under the laws and statutes of the State of Utah.  TAYLOR served as both an investigator in the underlying murder investigation, as a witness

Orem man acquitted of murder now accused of lying during trial - Deseret News

Deseret News  |  Church News

Print Subscriptions



UTAH    POLICE/COURTS    UTAH COUNTY

Tim Taylor's Case
 Case No. 201401468  after complete Acquittal of this guy after 7 Day Jury Trial

# Orem man acquitted of murder now accused of lying during trial

Defense attorney says new charges 'definitely taking two bites of the apple'

By Pat Reavy, KSL.com and Annie Knox, KSL.com  |  Updated May 21, 2020, 2:30pm MDT



*Pleasant Grove City v. Terry*
2020 UT 69 (Oct. 29, 2020)
Terry was convicted by a jury of domestic violence in front of a child but was acquitted of the predicate offense of domestic violence assault. The supreme court invalidated the conviction as a legally impossible verdict, explaining that both charges "turn on the same offense – domestic violence assault – and the jury's different answers are irreconcilable as a matter of law." Ultimately, the court held that **"legally impossible verdicts – in which the defendant is acquitted on the predicate offense but convicted on the compound offense – cannot stand."**

Elbert Paule was charged Thursday in 4th District Court with two counts of making a false or inconsistent material statement, a second-degree felony. | Utah County Jail

PROVO — An Orem man acquitted of murder two months ago is now accused of lying under oath during his trial.

Elbert John Paule, 20, was charged Thursday in 4th District Court with two counts of making a false or inconsistent material statement, a second-degree felony.

In February 2019, Paule shot and killed Dominique Barnett, 26, with a shotgun at point-blank range, without saying a word, in the doorway of Paule's apartment after Barnett had gone to the complex with his fiancé and their child to confront Paule about a drug deal, according to prosecutors.

Paule was charged with murder. But following a one week trial, a jury acquitted him of the murder charge, believing that the shooting was in self-defense. He was convicted, however, on a charge of obstructing justice, a second-degree felony.

Orem man acquitted of murder now accused of lying during trial, prosecutors say of 327

On Thursday, Paule's defense attorney Rudy Bautista called the charges "ridiculous."

"This is inappropriate on so many levels," Bautista said. "It's definitely taking two bites of the apple in order to get him a prison sentence he doesn't deserve."

During the trial, Paule took the witness stand in his own defense. He stated that after retrieving his shotgun and while standing in the kitchen, "Paule claims Barnett opened the door, entered the apartment with a knife in his hand and advanced toward Paule. Paule testified that Barnett was inside his apartment when he shot Barnett. Paule testified that he did not open the door and although the door was locked, Paule claimed that Barnett somehow opened the door and entered the apartment," according to charging documents filed Thursday.

However, two other witnesses who were present that night, including the fiancé, told police that it was Paule who opened the door and shot Barnett in the outside hallway, the charges state.

In addition, after Paule was acquitted, prosecutors "asked two blood spatter experts to review the photographs, scene videos and other physical evidence obtained in Barnett's death. The expert witnesses indicate that the evidence in the case supports a finding that Barnett was not inside the apartment when Paule shot Barnett," according to charging documents.

Prosecutors note that three witnesses who were present the night of the shooting and the two blood spatter experts did not testify during Paule's trial.

"Paule made several false material statements under oath during the trial when he testified. These false statements include Paule's claim that Barnett opened the door to the apartment and that Barnett entered the apartment when Paule shot Barnett," the charges state. "The false statements that Paule made while testifying were material and capable of affecting the outcome of the trial as to whether Paule committed murder."

Case 2:24-cr-00163-TS     Document 179-1    Filed 04/23/26    PageID.10462     of 327

Bautista said he was not ready to call the new charges double jeopardy or prosecutorial misconduct, "but it certainly stinks of that."

"Here they're trying to say a jury should believe their witnesses when a previous jury didn't. It's offensive," Bautista said. His client's testimony at trial did not conflict with his own earlier statements, he added. Rather, they go against the assertions of other witnesses.

"In 21 years and 196 jury trials, I've never seen someone acquitted be turned around and charged with perjury when it's simply an issue of credibility," Bautista said.

He questioned whether the timing of the new charges — a week before Paule is set to be sentenced in the earlier case — seeks to sway a judge to order prison time instead of a lesser penalty.

Bautista noted Republican Utah County Attorney David Leavitt is running for the state's top law enforcement post and has campaigned on a platform that prosecutors currently have too much power and should offer fewer plea deals in favor of more trials, a move allowing fellow Utahns to decide a defendant's fate.

"This is a slap across the face of such a platform," said Bautista, a Libertarian who also has joined the attorney general race. "What it's showing is prosecutors still have too much power. They can just decide, 'We don't believe him. We want a jury to believe these other people.'"



*Deseret News.* **Paid Ad**

The Order of the Court is stated below:
**Dated:** October 15, 2021          **At the direction of:**
          12:15:20 PM          /s/  ROBERT C LUNNEN
                              District Court Judge
                    **by**
          /s/  TREENA HANSEN
          District Court Clerk

## 4TH DISTRICT COURT - PROVO
## UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH,<br><br>Plaintiff,<br><br><br>vs.<br><br>ELBERT JOHN PAULE,<br><br>Defendant.<br>　　Custody: Utah State Prison - Draper | MINUTES<br><br>JURY TRIAL - DAY 3<br><br><br>Case No: 201401468 FS<br><br>Judge: ROBERT C LUNNEN<br><br>Date: October 15, 2021 |

## PRESENT

　　Clerk: treenah

　　Prosecutor: TAYLOR, TIMOTHY

　　Defendant Present

　　The defendant is in the custody of the Department of Corrections Utah State Prison - Draper

　　Defendant's Attorney(s): BAUTISTA, RUDY

## DEFENDANT INFORMATION

　　Date of birth: January 26, 2000

　　Audio

　　Tape Number: FTR 8A-21 Tape Count: 8:52 - 11:02

## CHARGES

　　1. FALSE/INCONSISTENT MATERIAL STATEMENTS - 2nd Degree Felony - Disposition: 10/14/21 Dismissed w/ Prejudi

　　2. FALSE/INCONSISTENT MATERIAL STATEMENTS - 2nd Degree Felony Plea: Not Guilty - Disposition: 10/15/21 Dismissed w/ Prejudi

## TRIAL

　　This matter comes before the court for the thrid day of trial.
　　Counsel address the court and dicuss witnesses to testify.
　　Court gives instructions as to testimony of potential witness.
　　9:31 The court takes recess.
　　9:37 Court reconvenes.
　　Mr. Taylor moves to admit exhibits #64 and 54.  They are marked, identified, offered and received.
　　Mr. Bautista addressses the court and makes motion to dismiss/directed verdict.
　　Court addresses counsel and outlines the elements.
　　10:32 Mr. Taylor responds and addresses elements.

10:43 Court grants the motion for directed verdict and dismisses the case.
10:50 The Jury retruns.
Court addresses Jurors and excuses the Jury.  Court thanks the jury for their service.
11:02 End

**End Of Order - Signature at the Top of the First Page**

## CERTIFICATE OF NOTIFICATION

I certify that a copy of the attached document was sent to the following people for case 201401468 by the method and on the date specified.

EMAIL: UTAH STATE PRISON udc-records@utah.gov

10/15/21                    /s/ TREENA HANSEN

Date: _____      _____

                                             Signature

≡  **SEARCH**

*The Salt Lake Tribune*

**SUBSCRIBE**    **LOG IN**    **SUBSCRIBE**    👤

# Who or what is to blame for the racial disparity in Utah's prison population?

6/12/2021 Who or what is to blame for the racial disparity in Utah's prison population?

Case 2:24-cr-00163-TS     Document 179-1     Filed 04/23/26     PageID.10467     Page 272 of 327

☰ **SEARCH**

*The Salt Lake Tribune*

| SUBSCRIBE | | LOG IN | | SUBSCRIBE |  |

(Al Hartmann | Tribune file photo) Utah County prosecutor Tim Taylor took issue with a Utah Bar Journal article about racial disparities in the state's inmate population, arguing that criminals needs to take more "individual responsibility."

By Jessica Miller  | May 13, 2019, 6:00 a.m.  | Updated: 8:20 a.m.

So what explains the racial disparity in Utah's prison?

Case 2:24-cr-00163-TS    Document 179-1    Filed 04/23/26    PageID.10468    Page 273 of 327

long sentences without adequately weighing alternatives.

That argument, laid out in a recent Utah Bar Journal article, frustrated a prominent Utah County prosecutor, so he responded, writing his own piece that laid the blame not on the system but on the people of color who commit crimes.

"The ACLU is often quick to blame 'The Man' or 'The System' for perceived disparities," wrote Tim Taylor, Utah County's criminal chief deputy, "but perhaps the ACLU should also consider individual responsibility."

Groth, ACLU of Utah's Smart Justice coordinator, says the prosecutor's response ignores the data, that 43% of Utah's prison population were ethnic minorities in 2017, while they represent only 20% of the general population. Even Taylor's boss said his comments are an overly simplistic view of a complicated problem.

Taylor told The Salt Lake Tribune this week that he wrote the letter — which was published in a magazine sent bi-monthly to every active attorney and paralegal in the Beehive State — because he felt that the ACLU article implied that Utah's prosecutors are racist or consider someone's race in their charging decisions. That's simply not true, he said.

"We just don't take a person's skin color or ethnicity into account when we charge or handle a case," he said. "Maybe I'm saying, 'Not in my backyard.' I know how hard we work to be fair and unbiased, and we try to look at the facts because that's all we can prove in court."

Who or what is to blame for the racial disparity in Utah's prison population

The Salt Lake Tribune



## Letter to the Editor

Dear Editor:

In the January/February issue of the *Utah Bar Journal*, Mr. Jason M. Groth penned an article entitled, "Criminal Justice Reform in Utah: From Prosecution to Parole." One of Mr. Groth's concerns in his article dealt with the disparate incarceration rates among certain groups of individuals. Because Mr. Groth believes that prosecutors and law enforcement are somewhat responsible for the disparate incarceration rates, he provides suggestions as to how prosecutors can help limit racial disparities within the criminal justice system. Although some of Mr. Groth's suggestions may have merit, the issue of 'individual responsibility' is conspicuously absent from his article. Mr. Groth advocates for more programs, resources and holding law enforcement and prosecutors more accountable to help reduce "racial

disparities." However, a plethora of programs and maximum oversight will not result in lower criminal conduct until an individual chooses to change his/her behavior. The great Justice Reinvestment Initiative has helped empty the prison but the number of criminal cases we receive from law enforcement has not decreased. And with all due respect to Mr. Groth, the prosecutors in my office do not screen cases differently based on a person's skin color. The ACLU is often quick to blame "The Man" or "The System" for perceived disparities but perhaps the ACLU should also consider individual responsibility.

Respectfully,
Timothy L. Taylor

A letter to the Utah State Bar Journal from Deputy Utah County Attorney Tim Taylor, printed in the May/June 2019 edition.

Taylor knows that people of color are going to prison at a higher rate — he's just not sure police and prosecutor bias are to blame.

He said in Utah County investigators target drug distributors aggressively. Most of the drugs, he said, come from Mexico.

"Are we being racist by focusing on those individuals actually committing the crimes?" he said. "We know a lot of drugs

Case 2:24-cr-00163-TS     Document 179-1     Filed 04/23/26     PageID.10470     Page 275 of 327

 
But Groth said Taylor's viewpoint is conflating two issues — "individual responsibility" and systemic discrimination. Communities of color are over-policed, prosecuted and punished in Utah, Groth argued, and it's a problem that those in the state's criminal justice system need to start thinking about.

In 2017, black Utahns were imprisoned at a rate eight times higher than that of white people, according to an ACLU analysis of state data. Latinos are incarcerated at twice the rate of white people, while Native Americans are at a rate six times higher.

And the percentage of minorities behind bars has risen in recent years. In 2015, 34% of the prison population were ethnic minorities. Two years later, that had jumped to 43%. This is despite a sweeping reform passed by legislators in 2015 that reduced penalties for drug crimes and put more emphasis on rehabilitation.

Everyone in the criminal justice system — from public defenders to prosecutors to police — should be looking at their practices to try to lessen that disparity, Groth said. Specific to prosecutors, Groth wants them to undergo more training about implicit biases and provide more alternatives to incarceration, including treatment programs.

"Racial disparities exist, that's not up for debate," he said. "We need to take a hard, honest look at how the criminal justice system treats people of color."

Taylor's stance on the issue seems to be in conflict with his new boss, Utah County Attorney David Leavitt, who has

☰ SEARCH

*The Salt Lake Tribune*

SUBSCRIBE    LOG IN    SUBSCRIBE    👤

Leavitt hadn't seen Taylor's letter until a reporter sent him a text message asking about it. He said that while Taylor is right in that there needs to be personal accountability, it's much more complicated than that. A prosecutor should also analyze the "social constructs," he said, and the circumstances that led to a crime when making decisions on how to proceed.

The county attorney, who took office in January, said he's revamping the process they use in deciding to pursue criminal charges. A case will now be screened by more than one person, he said, in an effort to try to eliminate any bias that could unknowingly creep into the process.

They are also reprioritizing what sorts of cases they file, with the goal of reducing the number of cases that Utah County prosecutors are juggling. Leavitt said he hopes that gives his prosecutors more time to think deeply about each case, and to ask themselves hard questions.

"It's engaging in a process where we try to recognize our own bias," he said, "and accommodate that through discussion and more eyes looking at it."



**jmiller@sltrib.com**
🐦 Follow @jm_miller

**Donate to the newsroom now.** The Salt Lake Tribune, Inc. is a 501(c)(3) public charity and contributions are tax deductible

Who or what is to blame for the racial disparity in Utah's prison population?

☰  SEARCH                          *The Salt Lake Tribune*        SUBSCRIBE        LOG IN        SUBSCRIBE        👤



**FEATURED COMMENTS**

**94**

**Thomas Thompson**

If you want to examine this issue fairly, the very first consideration should be the significant disparity in income between the "white and delightsome" folk and people of color. The latter frequently are thrown to the wolves by our "criminal justice system" because they can't afford to retain the best and the brightest attorneys to represent them. Consequently, they usually end up at the mercy of that system. Additionally the attorneys who do end up representing people of color are often very overworked and very underpaid. Their case loads are extremely high, and this often results in a mere cursory look at the prosecution's files -- because that's really all they have time for....

View all 46 comments

## RELATED STORIES

NEWS

A Utah high school was locked down after a student reported a gunman. It turned out to be a state employee looking for an injured deer.

NEWS

A Utah woman accused of strangling her children nearly nine years ago is now deemed competent to face murder charges

NEWS

The Utah man who killed a city worker over complaints about his messy lawn will never get out of prison



Deseret News | Church News

Print Subscriptions

UTAH    POLICE/COURTS    UTAH COUNTY

# New jury acquits Orem man of murdering his wife

By McKenzie Romero and Sam Penrod | Feb 24, 2017, 9:03pm MST

 GRID VIEW



**Conrad Truman, right, speaks with Mark Moffatt, his defense attorney, during the coming arguments for the new Conrad Truman murder trail on Thursday, Feb. 23, 2017 at the Fourth Judicial District Court in Provo.** | Sammy Jo Hester

1 of 6

     



PROVO — An Orem man once convicted of murdering his wife in 2012 was exonerated Friday by a new jury after the case went to trial for a second time.

Conrad Truman, 35, was found not guilty Friday of murder in the shooting death of his wife, Heidy Truman, 25, after a jury deliberated the case for 8½ hours. He was also cleared of obstruction of justice, a second-degree felony.

Truman grinned widely as he walked out of the Utah County Jail and into the arms of his cheering family after the verdict was handed down Friday. He said the moment marked the end of a nightmare, comparing it to the end of the movie "Groundhog Day."

"(The character) said 'today is tomorrow,' and that's what this is. Today is my tomorrow," Truman explained, a slight crack in his voice.

He then praised his family before leaving, his arm wrapped around his father.

"I love my family so much," Truman said. "Thank you."

Truman has been behind bars since his arrest in July 2013. The experience, he said, cannot be explained.

"I've been locked up for something I didn't do, I don't know what else to say to that," Truman said.

Truman's attorneys argued during the three-week trial that the Orem man had been caught up in a single-minded investigation by police who pegged him as responsible for his wife's death the moment they came in the door. According to Truman, his wife shot herself in front of him.

Prosecutors have maintained that Heidy Truman, who they described in court as "sassy" and determined, had no reason to take her own life, but died at the hands of her husband after a night drinking and arguing. Conrad Truman's erratic and violent behavior toward police and first responders arriving at the scene was evidence of his guilt, prosecutors said, as were his varying accounts of what happened that night.

A jury convicted Truman in 2014 of killing his wife in their Orem home. He maintained throughout the first trial and at his sentencing that he was innocent. The conviction was overturned in August after Truman claimed inaccurate crime scene evidence taken by police influenced the verdict.

The couple had been home watching television and drinking whiskey on Sept. 30, 2012. At one point the couple bickered, according to Truman, though not about anything consequential. Police responded to a frantic 911 call from Truman just before 11 p.m.

Heidy Truman died from a single gunshot wound to the head. While Truman insists he heard a popping noise that night before rushing down the hallway to see his wife collapse from a self-inflicted gunshot, her family claims she was a tragic victim of domestic violence.

The tense courtroom was mostly quiet as the jury's verdict was read Friday, but once the judge exited, two waves of emotion broke as Conrad Truman's family celebrated and Heidy Truman's family sobbed.

Utah County deputy attorney Tim Taylor expressed prosecutors' remorse for Heidy Truman's family. Going into the re-trial, Taylor said prosecutors knew it would be difficult to present the case.

"We really believed in this case," Taylor said, praising his office as well as police involved in the case.

"We wanted a certain outcome, because we still feel that what we were trying to prove was the correct thing, but you know what, we absolutely trust the system," Taylor said.

After speaking with jurors, Taylor said the group "struggled" to come to their decision.

Taylor said he thinks several factors may have pushed the jury to a different verdict than the one rendered in the first trial, including the corrected measurements of the Truman home and the medical examiner's decision to change Heidy Truman's manner of death from "unknown" to "homicide," then back to "unknown" once new information was presented to him during Truman's appeal.

"We acknowledge there was a mistake in the measurements, and if there was a mistake in the measurements and the way that things were done, then you know what, we need to do things the right way. I don't have a problem with that at all," Taylor said. "We support that the right information came in this time."

Defense attorney Mark Moffat called the verdict "a huge victory" for Truman and his family, commenting on the years his client has spent behind bars and the transition he now faces.

"This day has been long in coming, he has endured incredible hardship over that period of time," Moffat said.

Moffat believes the trial had a different outcome because of the evidentiary problems uncovered in the police investigation, specifically incorrect measurements of the home that had made Truman's explanation of the shooting seem implausible.

"It's hard to say what the jury focused on specifically, but those measurements in that house had a big deal to do with it, those diagrams had a big impact on that first trial," Moffat said. "The jury (in the second trial) went to that house, they saw the size of that space, and I think they knew that investigation was heavily flawed."

Truman had been sentenced to serve 15 years to life in prison in February 2015. When his conviction was overturned, 4th District Judge Samuel McVey declined to reduce Truman's $1 million bail and he remained in custody.

Enter a name to search

🔍 SEARCH

Home (/)  /  Search (/voters/richard-hales/1)  /  Richard C Hales



Utah DA's Office Lead Investigator

# Richard C Hales's Utah Voter Registration

## Spanish Fork, Utah

Richard C Hales is listed at 392 N 450 W Spanish Fork, Ut 84660-5863 (/address/392-n_450_w-spanish_fork-ut-84660) and is affiliated with the Republican Party. Richard is registered to vote in Utah County, Utah.

Share    ☐  ☐

(https://www.facebook.com/sharer/sharer.php?u=https://voterrecords.com/voter/38700125/richard-hales) ☐  (https://twitter.com/share?url=https://voterrecords.com/voter/38700125/richard-hales)

**Full Background Report (/btn/bg/bv-person/3/38700125)**

Case 2:24-cr-00163-TS    Document 179-1    Filed 04/23/26    PageID.10478    Page 283 of 327

 **DeseretNews.**

UTAH   POLITICS   POLICE/COURTS

# Ex-Provo councilman sues for 'malicious prosecution' in dismissed case

By McKenzie Romero | @McKenzieRomero | Feb 5, 2017, 8:50pm MST



TIMOTHY L. TAYLOR #8001
Utah County Attorney
MARIANE O'BRYANT #5442
Deputy Utah County Attorney
100 East Center, Suite 2100
Provo, Utah 84606
Email: ucadm.Dcourt@state.ut.us
Phone: (801) 851-8026
Fax: (801) 851-8051

IN THE FOURTH JUDICIAL DISTRICT COURT
UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH,<br><br>        Plaintiff,<br><br>vs.<br><br>STEVEN TURLEY<br><br>        Defendant. | STATE'S REQUEST FOR AN EVIDENTIARY HEARING ON DEFENDANT'S MOTION TO DISMISS AND REQUEST TO CONTINUE PRELIMINARY HEARING<br><br><br>Case No. 111402028<br><br>Judge James R. Taylor |

Plaintiff, by and through Deputy Utah County Attorney, Mariane O'Bryant, hereby requests an evidentiary hearing regarding defendant's Motion to Dismiss Counts 2, 3, and 4 as Time Barred and to continue the preliminary hearing until after a hearing is held and the court rules on defendant's Motion. This Request is made based on the following:

The State has reviewed the defendant's Motion and Memorandum in Support of Defendant's Motion to Dismiss Counts 2, 3, and 4 as Time Barred and believes that an evidentiary hearing is necessary to fully develop the relevant facts necessary for the State's

Case 2:24-cr-00163-TS    Document 179-1    Filed 04/23/26    PageID.10480    Page 285 of 327

Steve Turley, right, makes an appearance in 4th District Court in Provo alongside attorney Brett Tolman on Aug. 24, 2011.  | Francisco Kjolseth

PROVO — A former Provo City councilman once charged with fraud is now suing the Utah County attorney for what he called "malicious" and improper prosecution designed to oust him from office.

Steve Turley, who bowed to calls for his resignation in September 2011 after fraud charges were filed against him, is suing for unspecified punitive damages and legal fees over the case that he says stemmed from "a multi-year effort by (his) legal and political foes to remove him from office and harm his business dealings," according to a complaint filed Thursday in 4th District Court.

The civil rights lawsuit names the Utah County Attorney's Office, County Attorney Jeff Buhman, and investigator Richard Hales, and claims "malicious prosecution," abuse of process, civil conspiracy and a violation of Utah rules of professional conduct.

Following his 2003 win in "a bitterly contested election," the lawsuit claims that Turley often found himself at odds with his fellow council members. After a rival on the council, Councilwoman Cindy Richards, was ousted from her

Case 2:24-cr-00163-TS   Document 179-1   Filed 04/23/26   PageID.10481   Page 286 of 327

seat in 2009, meetings were held "in an effort to gather as much inflammatory information about Mr. Turley as possible and to use that information to run him out of office," the lawsuit states.

Ultimately, 23 Provo residents filed a conflict-of-interest complaint against Turley, citing several instances in which the councilman allegedly used his public position for personal financial gain, sparking an investigation by the Utah County Attorney's Office.

Learning of the investigation, Turley and his attorney went to meet with Buhman and Richards. During a recess in the conversation, Turley and his attorney were left to talk in a conference room, and when Buhman and Richards returned, Turley was informed that the conversation had been recorded via closed-circuit camera and that prosecutors had been listening in real time, according to the lawsuit.

The tape was destroyed following objections from Turley and his attorney.

Charges were later filed against Turley alleging that between July 2006 and December 2009 Turley used his position for financial gain. Three counts of communication fraud, a second-degree felony, were dismissed in November 2013, while remaining charges were dismissed in February 2015.

The lawsuit claims that the prosecution was "malicious and improper," leading to "significant damages, including (Turley) funding a nearly four-year litigation effort to defeat the bogus criminal charges, irreparable damage to Turley's reputation and business dealings and severe emotional distress."

Turley spoke out in February 2015 when the case was dismissed, asserting his innocence and calling the years spent fighting the allegations "a nightmare."

"It has devastated our family, and it's a shame we had to go through that — that some overzealous prosecutors had the ability to do that to an innocent family's life," Turley said at the time. "I don't know how something like this can be made right."

Mortensen family: 'We are glad the truth has finally come out' | KSL.com



Advertise with us

# Mortensen family: 'We are glad the truth has finally come out'

By Sam Penrod | Posted - Jan. 19, 2013 at 6:53 p.m.



News    Sports    Brandview    TV    Radio    Live    Obituaries    Weather    Classifieds    Cars    Homes    Jobs    Services    Seniors



    

**13**

 **6PM: Mortensen family: 'We are glad the truth has finally come out'**





News    Sports    Brandview    TV    Radio    Live    Obituaries    Weather    Classifieds    Cars    Homes    Jobs    Services    Seniors



outdated or superseded by additional information. Reading or replaying the story in its archived form does not constitute a republication of the story.

AMERICAN FORK — As the verdict pronouncing Martin Bond guilty in the murder of a retired BYU professor was read late Friday night, Kay Mortensen's son and daughter-in-law couldn't hold back their emotions.

Roger and Pamela Mortensen at one point were considered suspects in the November 2009 killing and were put in jail, until Bond's ex-wife and her boyfriend contacted police when they realized the couple was to stand trial for the murder.

The Mortensens had been held hostage at gunpoint by Bond, who was convicted of three counts of aggravated kidnapping in addition to single counts of aggravated murder, aggravated robbery and aggravated burglary.

"Due to false charges, family members and friends turned on us," Pamela Mortensen said. "Our reputations in our community and church were destroyed. We are glad that the truth has finally come out."

ADVERTISEMENT



Ads by Google

Send feedback

Why this ad? ▷

Mormon family: We are glad the truth has finally come out - KSL.com







Benjamin Rettig testifying at the trial of Martin Bond.

KSL.com

News   Sports   Brandview   TV   Radio   Live   Obituaries   Weather   Classifieds   Cars   Homes   Jobs   Services   Seniors

MARKETPLACE

Prosecutor Tim Taylor said he has apologized to the Mortensens.

"We made a mistake," Taylor said. "The ironic thing about this whole thing is that if we wouldn't have put them in jail, the chances of us finding out who really did this may not have ever come to fruition."

After more than three years, Kay Mortensen's widow, Darla, is grateful the truth is known.

"It is such a tragedy, the lives that have been shattered and damaged," she said. "Things will never be the same for so many families. I am grateful the truth has come out, that Roger and Pam have been exonerated."

Bond will have a chance at appeal and will not face the death penalty. He will be formally sentenced March 5.

### Related Stories

Man found guilty in killing of retired BYU professor

Rettig sentenced to 25 years for killing BYU professor

Court document reveals details about Mortensen investigation

Retired BYU professor let killers in his home, prosecutors say

**Sam Penrod**

| 13 | Comments | 0 Pending |
|----|----------|-----------|

ROBERT B. SYKES (#3180)
     bob@sykesinjurylaw.com
ALYSON E. CARTER (#9886)
     alyson@sykesinjurylaw.com
**ROBERT B. SYKES & ASSOCIATES, P.C.**
311 South State Street, Suite 240
Salt Lake City, Utah  84111
Telephone (801) 533-0222
Facsimile (801) 533-8081
*Attorneys for Plaintiffs*


**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| ROGER KAY MORTENSEN, and PAM MORTENSEN, | **COMPLAINT** **and** **JURY DEMAND** |
| Plaintiffs, | |
| vs. | |
| DET. JOSH CHAPPELL; SGT. MATT HIGLEY; DET. ERIK KNUTZEN; LT. MIKE BROWER, THE UTAH COUNTY SHERIFFS OFFICE; TIM TAYLOR and JOHN NIELSEN, Prosecutors, Utah County Attorney's Office; and JOHN AND JANE DOES 1-20, | Civil No. _____ |
| | Judge _____ |
| Defendants. | |

12.    Defendant **Lt. Mike BROWER**, at all times relevant herein, was a Lieutenant employed by the UCSO, and was the "lieutenant over the investigation division." Lt. Brower supervised the entire murder investigation and those working on it, including CHAPPELL and KNUTZEN.  Brower's division was "responsible for the investigation."  He responded to the crime scene and "kind of oversaw efforts, investigative process with regarding interviews with suspects, with witnesses.  Also involved with warrants that had been executed.  It was kind of overseeing the case."   Brower Testimony, Grand Jury Day 1 (hereinafter, "GJD-1"), 85:12-19.

13.    Defendant **John J. NIELSEN**, at all times relevant herein, was a prosecutor employed by the Utah County Attorney's Office, a governmental entity operating under the laws and statutes of the State of Utah.  NIELSEN served as both an investigator in the underlying murder investigation, as a witness before the Grand Jury, and as an attorney for the prosecution at the Grand Jury proceeding.

14.    Defendant **Timothy L. TAYLOR**, at all times relevant herein, was a prosecutor employed by the Utah County Attorney's Office, a governmental entity operating under the laws and statutes of the State of Utah.  TAYLOR served as both an investigator in the underlying murder investigation, as a witness

 Gmail

# Both Magistrate Oberg and Judge Ted Stewart found defendant NOT a flight risk, and not a danger to the community, so the government repeating Muyskens rejected arguments outlined in her Dkt. 10 is definitely unavailing.

**Erik Jacobson** <erikj@utcpd.com>                                       Fri, Jan 2, 2026 at 10:59 AM

Jared response below.

Erik



Erik G. Jacobson
Public Defender
5152 N. Edgewood Drive, Suite 300
Provo, UT,84604 (801) 852-1070

This e-mail message and the documents attached to it, if any, are intended only for the use of the addressee and may contain information that is  PRIVILEGED and CONFIDENTIAL, and/or may contain ATTORNEY WORK PRODUCT. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please delete all electronic copies of the message and its attachments, destroy any hard copies that you may have created, and reply to the sender advising of the transmission error.

**From:** Jared Perkins <jaredp@UtahCounty.gov>
**Sent:** Friday, January 2, 2026 9:12 AM
**To:** Erik Jacobson <erikj@utcpd.com>; wangkailinz8755606@utcpd.filevineapp.com <wangkailinz8755606@utcpd.filevineapp.com>
**Cc:** wangkailinfalseorinconsistentmaterialstatemz340086@utahcountyattorneysoffice.filevinegov.com <wangkailinfalseorinconsistentmaterialstatemz340086@utahcountyattorneysoffice.filevinegov.com>
**Subject:** Re: Both Magistrate Oberg and Judge Ted Stewart found defendant NOT a flight risk, and not a danger to the community, so the government repeating Muyskens rejected arguments outlined in her Dkt. 10 is definitely unavailing.

Ever since I took over the case in July 2023, I ==have operated under the understanding that Wang was summoned on these charges, that she has never been held in custody on this case, that bail has never been set, and that no release conditions were set.== This morning, I reviewed the court's minutes and docket to determine whether this had been addressed before the case was reassigned to me, and I do not see any bail or release conditions in the history of this case.

.

Jared Perkins
Utah County Attorney's Office
Criminal Division – General Crimes Section Chief

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY



RECEIVED

Jul 10 2024 10:16am

Board on Professional
Responsibility

|  |  |  |
|---|---|---|
| In the Matter of | : | |
| | : | |
| JENNIFER KERKHOFF MUYSKENS, | : | Disciplinary Docket Nos. |
| | : | 2018-D218 |
| Respondent, | : | 2018-D262 |
| | : | 2018-D300 |
| A Member of the Bar of the | : | |
| District of Columbia Court of Appeals | : | |
| Bar Registration No. 475353 | : | |
| | : | |

## SPECIFICATION OF CHARGES

The disciplinary proceedings instituted by this petition are based on conduct that violates the standards governing the practice of law in the District of Columbia as prescribed by D.C. Bar Rule X and Rule XI, § 2(b).

1. Pursuant to D.C. Bar R. XI, § 1(a), jurisdiction is found because Respondent, Jennifer Kerkhoff Muyskens, is a member of the D.C. Bar, having been admitted on December 3, 2001, and assigned Bar number 475353.

2. During the relevant period, Respondent was an Assistant United States Attorney ("AUSA") for the District of Columbia.

3. Respondent was the lead prosecutor in over 200 related criminal cases against defendants charged with felony rioting, conspiracy to riot, and destruction of property during the inauguration of President Donald J. Trump, on January 20, 2017.

Respondent falsely said that she personally reviewed the U.S. Attorney Office's grand jury logbook and confirmed the entry for April 25, 2017 was missing. In fact, the logbook correctly listed Pemberton's grand jury testimony for April 18, 21, and 25, 2017. To explain not correcting her misrepresentations to Judge Morin, she falsely claimed to have turned over responsibility for disclosing the misrepresentation to others in the office.

138.    Respondent's statements and omissions to the government, OPR, and Disciplinary Counsel were false and misleading.

139.    Respondent's conduct violated the following Rules of Professional Conduct of the District of Columbia:

a.    **Rule 3.3(a) (*Candor to Tribunal*)**, by knowingly making false statements, offering false evidence, and failing to correct material false statements to the court;

b.    **Rule 3.4(a), (c), & (d) (*Fairness to Opposing Party and Counsel*)**, by obstructing the defense's access to evidence and altering or concealing evidence, or assisting another person to do so when she reasonably should have known that the evidence was or may have been subject to discovery; knowingly disobeying the court's direct orders to produce information in the government's possession without openly asserting that no valid obligation existed; and/or failing to make reasonably diligent efforts to comply with the defense's discovery requests;

c.    **Rule 3.8(d) & (e) (*Special Responsibilities of a Prosecutor*)**, by intentionally avoiding pursuit of evidence and information because it may have damaged the prosecution's case or aided the defense; and by intentionally failing to disclose to the defense, upon request and at a time when use by the defense was reasonably feasible, evidence and information that she knew or reasonably should have known tended to negate the guilt of the accused or mitigate the offense;

42

d.   **Rule 8.4(a)**, by knowingly assisting or inducing another to violate the Rules of Professional Conduct and/or doing so through the acts of another;

e.   **Rule 8.4(c) (*Dishonesty, Misrepresentation, Deceit, and Fraud*)**, by engaging in conduct that involved reckless or intentional dishonesty, misrepresentations, deceit, and fraud, which misled the grand jury, the defense, the court, the government, and disciplinary authorities about the evidence in the government's possession and the government's conduct; and

f.   **Rule 8.4(d) (*Serious Interference with the Administration of Justice*)**, by engaging in conduct that seriously interfered with the administration of justice.

Respectfully submitted,

Hamilton P. Fox, III
Disciplinary Counsel

/s/ *Sean P. O'Brien*
Sean P. O'Brien
Assistant Disciplinary Counsel

OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C.  20001
(202) 638-1501

## VERIFICATION

I declare under penalty of perjury under the laws of the United States of America that I believe the facts stated in the Specification of Charges to be true and correct.  Executed on this 10th day of July 2024.

/s/ *Sean P. O'Brien*
Sean P. O'Brien
Assistant Disciplinary Counsel

43

**DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY**

In the Matter of             :
                             :
JENNIFER K. MUYSKENS, ESQUIRE,  :    **Disciplinary Docket Nos.
                             :    2018-D218, 2018-D262, 2018-
                             :    D300**
                             :
        Respondent,          :
                             :

RECEIVED

Jul 10 2024 10:16am
Board on Professional
Responsibility

## PETITION INSTITUTING FORMAL DISCIPLINARY PROCEEDINGS

A.      This Petition (including the attached Specification of Charges which is made part of this Petition) notifies Respondent that disciplinary proceedings are hereby instituted pursuant to Rule XI, § 8(c), of the District of Columbia Court of Appeals' Rules Governing the Bar (D.C. Bar R.).

B.      Respondent is an attorney admitted to practice before the District of Columbia Court of Appeals on the date stated in the caption of the Specification of Charges.

C.      A lawyer member of a Hearing Committee assigned by the Board on Professional Responsibility (Board) pursuant to D.C. Bar R. XI, § 4(e)(5), has approved the institution of these disciplinary proceedings.

D.      ***Procedures***

(1)   **Referral to Hearing Committee** – When the Board receives the Petition Instituting Formal Disciplinary Proceedings, the Board shall refer it to a Hearing Committee.

(2)   **Filing Answer** – Respondent must respond to the Specification of Charges by filing an answer with the Board and by serving a copy on the Office of Disciplinary Counsel within 20 days of the date of service of this Petition, unless the time is extended by the Chair of the Hearing Committee.   Permission to file an answer after the 20-day period may be granted by the Chair of the Hearing Committee if the failure to file an answer was attributable to mistake, inadvertence, surprise, or excusable neglect.  If a limiting date occurs on a Saturday, Sunday, or official holiday in the District of Columbia, the time for submission will be extended to the next business day.  Any motion to extend the time to file an answer, and/or any other motion filed with the Board or Hearing Committee Chair, must be served on the Office of Disciplinary Counsel at the address shown on the last page of this petition.

(3)   **Content of Answer** – The answer may be a denial, a statement in exculpation, or a statement in mitigation of the alleged misconduct.  Any charges not answered by Respondent may be deemed established as provided in Board Rule 7.7.

2

(4)    **<u>Mitigation</u>** – Respondent has the right to present evidence in mitigation to the Hearing Committee regardless of whether the substantive allegations of the Specification of Charges are admitted or denied.

(5)    **<u>Process</u>** – Respondent is entitled to fifteen days' notice of the time and place of hearing, to be represented by counsel, to cross-examine witnesses, and to present evidence.

E.    In addition to the procedures contained in D.C. Bar R. XI, the Board has promulgated Board Rules relating to procedures and the admission of evidence which are applicable to these procedures.  A copy of these rules is being provided to Respondent with a copy of this Petition.

**WHEREFORE**, the Office of Disciplinary Counsel requests that the Board consider whether the conduct of Respondent violated the District of Columbia Rules of Professional Conduct, and, if so, that it impose/recommend appropriate discipline.

*Hamilton P. Fox, III*
_____
Hamilton P. Fox, III
Disciplinary Counsel

OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C. 20001
Telephone: (202) 638-1501
Fax: (202) 638-0862

3

## Marin County Sheriff - Coroner Division
### Report Of Death Worksheet

| **1** | MODE | **Suicide** | CASE # | **CR2300020** | **Master File** | |
|---|---|---|---|---|---|---|
| | STATUS | **External Exam** | DEPUTY | **Emily Mandel** | | |

### CASE INFO

| REPORTED BY | | AGENCY | | DATE | TIME | Call Back Phone |
|---|---|---|---|---|---|---|
| Sergeant Dobbins | | Marin County Sheriffs Office (MCSO) | | 01-21-2023 | 1204 | |

| NEWS RELEASE | NAME RELEASABLE | ROLL-OUT? | | SPECIAL CIRCUMSTANCES | |
|---|---|---|---|---|---|
| No | Yes | Yes | | None | |

CONTROLLED DOCUMENT
Duplication or Reissuance Forbidden by Law

3/21/2023

Released by:
Marin County Sheriff's Office
Coroner Division

### DECEDENT INFO

| 1 NAME (FIRST) | 2 (MIDDLE) | 3 (LAST) |
|---|---|---|
| Darrick | Tracey | CHASE |

| AKA | PHONE |
|---|---|

| 20 ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| | Novato | CA | 94949 |

| 6 SEX | 14 RACE | 4 DOB | 5 AGE | RELATED CASE NUMBERS |
|---|---|---|---|---|
| Male | | | 58 yrs | |

| BODY BAG # | TOE TAG | 10 SS # | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|
| 3594648 | 2023020 | | | | | |

| DRIVER'S LIC # | STATE | HOW IDENTIFIED | |
|---|---|---|---|
| | CA | Fingerprint comparison to CADL. | |

### LEGAL NEXT OF KIN

### PLACE/DEATH OCCURRED

| 7 DATE | 8 TIME | | DAY OF DEATH | PRONOUNCED BY |
|---|---|---|---|---|
| 01-21-2023 | 1129 | FND | Saturday | Novato Fire Protection District Paramedic J. Pace |

| 101 PLACE OF DEATH | 102 IP-ER/OP-DOA | FAC OTHER THAN HOSPITAL |
|---|---|---|
| Garage of Own Residence | | Decedent's Home |

| 105 FACILITY ADDRESS OR LOCATION WHERE FOUND | 106 CITY |
|---|---|
| | Novato |

### INVESTIGATIVE SUMMARY

ADDITIONAL NARRATIVE ATTACHED  [X] YES   [ ] NO

MEDICAL HISTORY / SUMMARY / RX:

A 58-year-old male, with ██████████████████████████████████ The subject was last noted to be responsive in the early morning hours, on 01/21/2023, at approximately 0100 hours, during which time the subject's son heard the subject close his bedroom door and presumed he went to sleep for the night. The subject's son nor his son's girlfriend at the residence hear any noises throughout the night. At approximately 1105 hours, the subject's son went to the garage to locate cereal and noticed the subject to unresponsive. Emergency services were contacted, and the subject's son and MCSO Deputies attempted Cardiopulmonary Resuscitation prior to the arrival of Novato Fire Protection District personnel to the scene. Novato Fire Protection District Paramedic J. Pace pronounced the subject deceased at 1129 hours, with no additional resuscitative measures warranted. No signs of anything suspicious nor signs of foul play are suspected. The firearm was not altered, manipulated, or moved prior to my arrival. The subject utilized an unregistered pump action model 97 Winchester 12-gauge shotgun that reportedly belonged to his grandfather. A letter of intent/ holographic will was located by the subject's son on 01/22/2023 at their residence.

NOTE TO PATHOLOGY

# SUICIDE

Roger G. Fielding
CHIEF DEPUTY CORONER

Last Updated By Alexandra Torres on 01/26/2023    **1** of **7**    Date Printed: 02/27/2023 at 0408

## Marin County Sheriff - Coroner Division
### Report Of Death Worksheet

| **2** | MODE **Suicide** | CASE # **CR2300020** | **Master File** | |
|---|---|---|---|---|
| | STATUS **External Exam** | DEPUTY **Emily Mandel** | | |

### MEDICAL

| TRANSPORTED FROM | ADMITTED TO? | DATE | TIME | W/R ORDERED | MED REC # | BLOOD ORDERED |
|---|---|---|---|---|---|---|
| | | | | Yes  01/21/2023 | | |

### CAUSE OF DEATH

| 107 CAUSE | | TIME INTERVAL | 109 BIOPSY PERFORMED? |
|---|---|---|---|
| (A)  Penetrating Shotgun Wound to Chest | | Seconds | ☐ YES  ☒ NO |
| DUE TO | | | 110 AUTOPSY PERFORMED? |
| (B) | | | ☐ YES  ☒ NO |
| (C) | | | AUTOPSY # A0020-23 JC  EXAM # E0021-23 EM |
| (D) | | | INDIGENT # |

**112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 107**
None

**113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112?** IF "YES" LIST TYPE OF OPERATION & DATE
No

CONTROLLED DOCUMENT
Duplication or Reissuance Prohibited by Law
3/21/2023
Released by:
Marin County Sheriff's Office
Coroner Division

| ATTENDING PHYSICIAN | PHONE | DATE LAST ATTENDED | CAUSE GIVEN BY |
|---|---|---|---|
| | | | Joseph I Cohen, MD |

| 115 PHYSICIAN TO SIGN D.C. | ADDRESS | PHONE 415-473-6043 | DATE 01/26/2023  TIME 0928 |
|---|---|---|---|
| Coroner | 1600 Los Gamos Drive, Suite 205, San Rafael, CA 94903 | | |

### INJURY

| 119 SPECIFY MODE | 123 PLACE OF INJURY | 120 AT WK? | 121 DATE | 122 HOUR |
|---|---|---|---|---|
| Suicide | Garage of Own Residence | No | 01/21/2023 | Unknown |

**125 LOCATION (Include Zip Code)**

**DESCRIBE HOW INJURY OCCURRED**
Subject sustained a penetrating self-inflicted gunshot wound to the chest utilizing a shotgun.

### PROPERTY

| PROPERTY? | PROP RLS'D? |
|---|---|
| ☐ YES  ☒ NO | ☐ YES  ☒ NO |

### LAW ENFORCEMENT

| AGENCY | AGENT | REPORT NUMBER |
|---|---|---|
| Marin County Sheriff's Office (MCSO) | Deputy Thomas | SO23-00158 |

### AUTOPSY

| ORDERED BY | DATE | TOX ORDERED | TOX RECEIVED | AGENT(S) TO ATTEND |
|---|---|---|---|---|
| JC | 01-24-2023 | | | |

### DISPO OF REMAINS

| PRESENT LOCATION | MORGUE STATUS | VEHICLE TOWED BY | |
|---|---|---|---|
| RELEASE | | | |

| TRANSPORTED BY | NOTIFIED BY | DATE | TIME | ARRIVED |
|---|---|---|---|---|
| | Emily Mandel | 01/21/2023 | 1209 | 1340 |

| 44 MORTUARY | PHONE OF MORTUARY |
|---|---|
| | |

| ☐ 3 REVIEWED BY |
|---|

Last Updated By Alexandra Torres on 01/26/2023     2 of 7     Date Printed: 02/27/2023 at 14:40

## Marin County Sheriff - Coroner Division
### Report Of Death Worksheet

| **3** | MODE **Suicide** | CASE # **CR2300020** | **Master File** | |
|---|---|---|---|---|
| | STATUS **External Exam** | DEPUTY **Emily Mandel** | | |

## Coroner Investigation                                     02/27/2023

### MEDICAL HISTORY / SUMMARY / RX:

A 58-year-old male, ████████████████████████████████████████████ was found unresponsive in the garage of his unsecured residence, by his son, of an apparent self-inflicted gunshot wound to the chest. The subject was last noted to be responsive in the early morning hours, on 01/21/2023, at approximately 0100 hours, during which time the subject's son heard the subject close his bedroom door and presumed he went to sleep for the night. The subject's son nor his son's girlfriend at the residence hear any noises throughout the night. At approximately 1105 hours, the subject's son went to the garage to locate cereal and noticed the subject to unresponsive. Emergency services were contacted, and the subject's son and MCSO Deputies attempted Cardiopulmonary Resuscitation prior to the arrival of Novato Fire Protection District personnel to the scene. Novato Fire Protection District Paramedic J. Pace pronounced the subject deceased at 1129 hours, with no additional resuscitative measures warranted. No signs of anything suspicious nor signs of foul play were suspected. The firearm was not altered, manipulated, or moved prior to my arrival. The subject utilized an unregistered pump action model 97 Winchester 12-gauge shotgun that reportedly belonged to his grandfather. A letter of intent/ holographic will was located by the subject's son on 01/22/2023 at their residence.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

### REPORTING PARTY INITIAL STATEMENT:

On 01/21/2023, at approximately 1204 hours, Sergeant Dobbins with the Marin County Sheriff's Office (MCSO) contacted the MCSO Communications Center to report the death of Darrick Tracey CHASE. I immediately phoned Sergeant Dobbins, who advised me of the following information in summary:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

### DEATH / INJURY SCENE INVESTIGATION:

At approximately 1236 hours, I arrived on scene at the subject's residence and met with MCSO Deputy Robards and Thomas, who provided me with the following information in summary:

The subject was a divorce attorney with a lot of job-related stress and lack of sleep. Per the subject's son, the subject had one case as of recently that was particularly bothering him. Per the subject's son, the subject's son would make joking comments about suicide regarding schoolwork and the subject would reply "I'm not too far behind you." The subject had no reported history of prior suicidal ideations.

The subject was last noted to be responsive in the early morning hours, on 01/21/2023, at approximately 0100 hours, during which time the subject's son heard the subject close his bedroom door and presumed he went to sleep for the night. The subject's son nor his girlfriend at the residence hear any noises throughout the night.

The subject's residence was an approximately four bedroom/two bathroom residence with an attached single car garage at the back of a short driveway, facing toward ████████. The interior of the residence was overall well

## Marin County Sheriff - Coroner Division

### *Report Of Death Worksheet*

| 4 | MODE **Suicide** | CASE # **CR2300020** | **Master File** | |
|---|---|---|---|---|
| | STATUS **External Exam** | DEPUTY **Emily Mandel** | | |

kempt. I did not note any alcohol bottles or illicit substances in the kitchen, which led to the garage, where the subject was located. The garage was accessible from the outside of the residence and was not locked but was reportedly secured by its door at the time of the subject's passing. The garage was also accessible through the kitchen of the residence. The garage was extremely cluttered with boxes, baskets, clothing, books, cleaning supplies, and other miscellaneous household equipment. I observed a small to moderate amount biological fluid consistent with blood on a white one-gallon cleaning bottle located on the ground near the subject's left shoulder. I also observed a very small amount of fine presumed blood spatter on the front of the washing machine. Upon ▬▬▬▬▬▬▬▬ representatives moving the subject from his found position, I noted small areas and one area of coagulated presumed blood on the ground below, where the subject was previously located.

Four firearms to include a WINCHESTER LEVER ACTION MODEL 94 30 CALIBER RIFLE ▬▬▬▬▬ a HIGGINS BOLT ACTION 3006 WITH BLACK SCOPE, a SAVAGE ARMS SPORTER 22 LONG RIFLE, and a MARLIN FIREARM BOLT ACTION 22 RIFLE WITH 4X15 BLACK SCOPE were located in the attic space above the garage and collected by MCSO Deputy Thomas on scene for safekeeping. The firearm used in the subject's passing was taken from a wardrobe in the garage, per the subject's wife. MCSO Deputy Thomas was able to access the unsecured storage space by stepping on a table below. I did not note a letter of intent in the residence garage or kitchen at the time of my investigation.

The subject was located in a supine position to the left and slightly in front of the refrigerator upon entry into the garage from the kitchen. The subject was lying on a slight diagonal. The subject's head was facing the garage door and his feet were facing the door connecting the kitchen and garage.

The firearm utilized was an unregistered pump action model 97 Winchester 12-gauge shotgun ▬▬▬▬▬ MCSO Deputy Thomas advised me the firearm was not altered, moved, or manipulated prior to my arrival. I photographed the firearm in place. The firearm presumably used in the subject's passing was located leaning on a diagonal against the front of the washing machine with the barrel resting on the ground. The subject's left leg was in close proximity to the firearm. At approximately 1309 hours, per my request, MCSO Deputy Thomas rendered the shotgun safe and located and removed one spent three-inch 12-gauge FEDERAL brand birdshot shotgun casing from the firearm. I noted and photographed a dent present within the casing primer from the firing pin. There were no other shells inside the shotgun. MCSO did not locate any ballistics evidence on scene.

I measured the length of the shotgun barrel to be approximately 28 inches. I observed a small amount of biological fluid consistent with blood around the base of the gun barrel as well as in the interior of the barrel near the base. I took multiple photographs of the firearm in different orientations, which were saved to the subject's case file.

At approximately 1342 hours, I began my external examination of the subject's head, torso, and extremities. I located a black hat above the subject's head and a pair of reading glasses on the ground below the right side of his head, which were left in place. The subject was clad in a navy-blue hooded sweatshirt that was cut, presumably by first responder personnel prior to my arrival. MCSO Deputy Thomas advised me that upon his arrival to the scene, the subject's sweatshirt was zipped up and there was no overtly obvious sign of an open wound. Upon examining the sweatshirt, I noted an ovular defect on the left center of the sweatshirt, between the zipper and the "L" in the word "LAND". I photographed the defect in the sweatshirt and saved the photos to the subject's case file. The subject was also clad in blue jeans and a brown belt. I did not note any scars or tattoos on the subject. I did not note the subject to be wearing any jewelry. I located a quarter in the subject's left front pants pocket, which was photographed in place and left on the washer above the subject. I did not note any other personal effect items on or near the subject. I noted approximately three blue and white, electrocardiogram leads on the subject's upper chest and lower right torso. The aforementioned medical intervention was left in place for the Chief Forensic Pathologist to review during the subject's forensic examination.

The subject was cold to the touch with a moderate amount of rigor mortis set in his extremities. I did not note any livor mortis on his anterior body. I did not note or feel any open wounds or traumatic injury on the subject's head. A small amount of previously free flowing blood was located below the subject's right eye, which appeared to terminate above his right ear. I did not note any petechial hemorrhages on the sclera of the subject's eyes. I did not note any biological fluids in or around the subject's nares or mouth. The subject's maxillary frenulum and

CONTROLLED DOCUMENT
Duplication or Resistance
Forbidden by Law
3/21/2023
Released by:
Marin County Sheriff's Office
Coroner Division

## Marin County Sheriff - Coroner Division

### Report Of Death Worksheet

| 5 | MODE **Suicide** | CASE # **CR2300020** | **Master File** | |
|---|---|---|---|---|
| | STATUS **External Exam** | DEPUTY **Emily Mandel** | | |

mandibular frenula were present and intact. No hemorrhages were noted in the subject maxillary or mandibular alveolar mucosa. I did not note any open wounds or traumatic injury on or near the subject's neck. The subject's left fingernails were short and clean with no overt signs of trauma or indications a physical altercation took place. I observed biological fluid consistent with blood on the dorsal surface of the subject's hand (index, middle, and ring fingers) and presumed blood in and around his middle, ring, and pinky fingers without any overt signs of trauma or indications a physical altercation took place. I observed a moderate amount of blood in varying patterns throughout the subject's chest with a large area of coagulated blood on the subject's upper right chest. I observed an approximately 1 ¼ x 1-inch oval defect on the subject's middle left chest with an approximately 1/4th inch margin of abrasion on the right medial aspect of the defect. I did not observe any stippling on the skin adjacent to the open wound. I felt crepitus upon palpation of the subject's chest. I observed dark purple discoloration consistent with ecchymosis on the subject's left anterior lateral chest. I noted a small amount of dried presumed blood on the subject's left ring toe. The bottom of the subject's feet was slightly blackened and discolored.

At approximately 1347 hours, MCSO Deputy Thomas assisted me in moving the subject onto his right lateral side. I observed dark purple lividity on the back of the subject's head, neck, and back, with a large pressure void in his midback, consistent with his position. I did not observe any additional open wounds or traumatic injury on the subject's back or back of his head.

At approximately 1350 hours, the temperature of the scene was approximately 50.80 degrees Fahrenheit and 59.50 %RH humidity as measured using an E-RAY Humidity meter. At approximately 1351 hours, using a non-contact thermometer, I measured the subject's temperature to be approximately 69.4 degrees Fahrenheit.

On scene, MCSO Deputy Thomas provided me with a copy of Novato Fire Protection District's Field Determination of Death form, which reads as follows:

*The subject was found supine in his garage with a gunshot wound to the left chest. The subject was unconscious. The subject had an approximately 1" hole to the left chest with a small amount of blood. The subject appeared otherwise atraumatic.*

A copy of this form was saved to the subject's case file.

On 01/22/2023, the subject's son contacted MCSO Deputy Thomas to inform him he located a letter of intent/holographic will on scene. Photos of the letter were provided to MCSO Deputy Thomas and then later to me. The six-page letter included the following phrases with suicidal undertones to the best of my interpretation:

## Marin County Sheriff – Coroner Division
### *Report Of Death Worksheet*



| **6** | MODE | **Suicide** | CASE # | **CR2300020** | **Master File** |
|---|---|---|---|---|---|
| | STATUS | **External Exam** | DEPUTY | **Emily Mandel** | |

The letter was signed by the subject. The signature on the letter appeared consistent with the signature associated with the subject's signature from his California Driver's License obtained from the California Department of Justice's CAL-Photo Image Network.

Photos of these notes were saved to the subject's case file.

On 02/18/2023, at approximately 1630 hours, I spoke with the subject's wife, ███████████ who provided me with the following information in summary:

The subject was a family lawyer, who handled a number of intense cases, which resulted in overall stress over time as well as the subject not sleeping well. ████████ advised me when she would ask him if he was okay, he would advise her he was and that "it would pass". The subject did not have any history of diagnosed depression, prior suicidal ideations, or attempts.

The subject hunted with his grandfather when he was approximately 14 years old but did not have any history of recent use of firearms. He kept shotgun ammunition at the residence in case of emergencies, such as hunting for food in an apocalypse. A majority of the firearms in the residence had not been touched for approximately 30 years. Approximately five years prior to the subject's passing, ████████ moved the shotgun the subject used to prop up some banker's boxes in the garage.

She recently observed a dentation near the controls of the washing machine she suspected to be the location, where the subject placed the stock of the gun at the time of his passing.

Upon conclusion of my and MCSO Deputy Thomas' investigation, the subject's passing was deemed to be purposeful in nature. MCSO Deputy Thomas ruled out any signs of foul play after speaking with all involved parties, surveying the scene, and noting the position of the subject and the firearm. The conclusion of the manner's death was deemed to be purposeful due to the letter of intent later found that was left by the subject and the recent job stress reportedly expressed to his son and wife.

## MODE OF DECEDENT IDENTIFICATION:

The subject was presumptively identified as Darrick Tracey CHASE by his son, who was present on scene at the time of his passing.

The subject was presumptively identified as Darrick Tracey CHASE by photo comparison to his government issued California Driver's License ████████

Prior to scene arrival, I obtained a copy of the subject's antemortem photograph and thumbprint associated with his California Driver's License from the California Department of Justice's CAL-Photo Image Network. On scene, I used the FbF mobileOne QuickDock Mobile Biometric Identification System, its accompanying iPhone application, and my county-issued iPhone to obtain a digital image of the subject's right thumbprint. On 02/18/2023, at approximately 1533 hours, I compared the postmortem image to the right thumbprint associated with the subject's California Driver's License ████████ and confirmed the subject's identification as Darrick Tracey CHASE.

## PROPERTY & EVIDENCE / RELEASE:

I took digital photos of the scene and the subject's remains. All photos were retained at the Coroner Division.

The subject's government issued California Driver's License, ████████ was collected at scene and retained by the Coroner Division to be returned to the California Department of Motor Vehicles upon case closure.

No personal effect items were collected from the scene.

## Marin County Sheriff - Coroner Division

### Report Of Death Worksheet

| **7** | MODE **Suicide** | CASE # **CR2300020** | **Master File** | |
|---|---|---|---|---|
| | STATUS **External Exam** | DEPUTY **Emily Mandel** | | |

No medication bottles were collected from the scene.

### FUNERAL HOME / TRANSPORT:

On 01/21/2023 hours, at approximately 1209 hours, I contact the Coroner Division Transportation Service and requested a transportation team respond to the incident scene to transport the subject to the Coroner Division's Morgue.

Upon the arrival of ▮▮▮▮▮▮▮▮▮▮ transportation representatives to the scene at approximately 1340 hours, the subject was prepared for removal from the scene. An identification band originally bearing the subject's name spelled incorrectly was placed on the subject's left ankle and the subject was placed into a body pouch, which was sealed close with lock # 3594593. At approximately 1411 hours, a new identification band bearing the correct spelling of the subject's name, date of death, and case number was placed on his left ankle. The body pouch was resealed close with lock #3594648. The subject's remains were then transported to ▮▮▮▮▮▮▮▮▮▮ without incident.

### NEXT OF KIN CONTACT / SEARCH INVESTIGATION:

While on scene, I briefly spoke with the subject's wife and legal next-of-kin, ▮▮▮▮▮▮▮ via telephone as she was not present on scene. I explained the Coroner Division role, responsibilities, and my involvement in this case. She acknowledged her understanding and raised no objections or opposition at this time. I provided her brother-in-law on scene with the Coroner Division contact information, case number, my contact information, and a copy of the "Information for Survivors after a Death" informational pamphlet. I explained the Coroner Division's Chief Forensic Pathologist would be completing a forensic examination, taking biological specimens which, the Coroner Division would retain, and subsequently opining a cause of death. Upon completion of the examination, the subject would be available for release to the mortuary of her selection. I advised her to call our office should she have any questions.

CONTROLLED DOCUMENT
Duplication or Reissuance
Forbidden by Law
3/21/2023
Released by:
Marin County Sheriff's Office
Coroner Division

Last Updated By Alexandra Torres on 01/26/2023     7  of  7     Date Printed: 02/27/2023 at 14:40



**From:** ████████ ████████gmail.com 📎
**Subject:** Chronology of Key Events in ████████ v. Wang and the Death of Attorney Darrick Chase
**Date:** September 2, 2025 at 10:22 PM
**To:** ████████████████████████

JW

# Chronology of Key Events in ███████ *v. Wang* and the Death of Attorney Darrick Chase

## February 2019 – The Custody Case Begins

The custody dispute between ████████ ████████ **(CT)** and **Kailin Wang (KW)** commenced in February 2019, when the child was only three months old. Darrick Chase joined ████████ legal team as lead family law counsel at the inception of the case.

## March 6, 2019 – Ex Parte Hearing in San Francisco

At an ex parte hearing, the court record lists KW as *"Not Present, and Not Served."* Based on fabricated allegations advanced by CT and his attorney, Darrick Chase, the court issued a custody order that effectively excluded Wang from her infant child's life. Chase is regarded as the architect of the interstate transfer that moved jurisdiction from Utah to California. [3/6/19 RT 22:10–22]



## June 25, 2019 – Jurisdiction Reversed

Judge Darwin later reversed course, ordering the custody case to proceed in Utah after acknowledging his March 6 ruling to be erroneous. Under the **Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA)**, Utah was deemed the child's proper home state and the correct forum for litigation.

## January 9, 2023 – Motion to Terminate Contact

Through declarations by ██████ ████████ and his father, ████████████ the family petitioned to cut off all contact between Wang and her four-year-old son (DOB: November 13, 2018). They retained two expert witnesses—**Forensic Psychologist J. Reid Meloy** and **Dr. Robert Kaufman**—and requested a three-day evidentiary hearing under **Family Code § 217**.

At this time, ████████ was represented by five attorneys:

- **Michael G. Reedy** (Family Law, retained May 2022)
- **Darrick T. Chase** (Family Law, retained December 2018)
- **Douglas L. Rappaport** (Criminal Law, retained August 2019)
- **Michelene Insalaco** (Appeals, retained June 2019)
- **Erica T. Johnstone** (Internet Law, retained February 2019)

In stark contrast, Wang remained involuntarily self-represented (pro per) as she had been since 2019.

## January 15, 2023 – Suicide Note and Holographic Will

On this date, **Darrick Chase** drafted both a suicide note and a holographic will detailing his estate instructions and expressing profound distress. In the document later filed in Marin County Superior Court (Probate – Decedent's Estates, 11/16/23, p. 20 of 24), Chase wrote:

> "I want to extend my deepest and most sincere apologies to Bunny, Jack, and Sammy. **I feel very shit [sic] as a person**, spouse, parent and business person. I am forever disappointed in myself and look forward to being dead. Though I would have preferred to not have failed so much and been optimistic about my future."

He authorized his executor/trustee to exercise discretion in managing estate property sales, rentals, or related decisions.

> I want to extend my deepest and most sincere apologies to Bunny, Jack, and Sammy. I feel very shit as a Person, Spouse, Parent and business person. I am forever disappointed in myself and look forward to being dead. Though I would have preferred to not have failed so much and been optimistic about my future.
>
> I attest to this on January 15, 2023. Please carry out my wishes.
>
> The Executor/Trustor has the reasonable discretion to rent, leave, and/or sell the Rent property subject to this Testamentary bequest/Trust.
>
> Best to everyone
>
> Executed this day January 15, 2023.
> DARRICK T. CHASE
> 5 Montego Key
> Novato, CA 94949

## January 20, 2023 – Withdrawal of Lead Counsel

**Michael Reedy**, serving as lead family law attorney for the ████████ formally withdrew from the

custody case. This withdrawal left **Darrick Chase** once again as primary family law counsel for the matter.

# January 21, 2023 – The Death of Darrick Chase

On this day, **Darrick Chase**, a Novato attorney and elected official, died by suicide at his residence from a penetrating shotgun wound to the chest.

The **Marin County Sheriff-Coroner's Report of Death Worksheet (Case # CR2300020)** documents the official investigation. According to the report:

# January 21, 2023

Darrick Chase died by suicide.

On January 21, 2023, an elected official in Novato, Darrick Chase, apparently died of a "penetrating shotgun wound to chest" in the garage of his residence. The death was not reported by the local "paper of record" and was logged only recently by the Coroner Marin County Sheriff - Coroner Division.

According to Report Of Death Worksheet Suicide CASE# CR2300020 Master, DEATH/INJURY SCENE INVESTIGATION (p. 3 of 7):

> At approximately 1236 hours, I arrived on scene at the subject's residence and met with MCSO Deputy Robards and Thomas, who provided me with the following information in summary:
>
>> The subject was a divorce attorney with a lot of job-related stress and lack of sleep. Per the subject's son, the subject had one case as of recently that was particularly bothering him. Per the subject's son, the subject's son would make joking comments about suicide regarding schoolwork and the subject would reply *"I'm not too far behind you."* The subject had no reported history of prior suicidal ideations.

ATH / INJURY SCENE INVESTIGATION:

pproximately 1236 hours, I arrived on scene at the subject's residence and met with MCSO Deputy Robards Thomas, who provided me with the following information in summary:

subject was a divorce attorney with a lot of job-related stress and lack of sleep. Per the subject's son, the ject had one case as of recently that was particularly bothering him. Per the subject's son, the subject's son ld make joking comments about suicide regarding schoolwork and the subject would reply "I'm not too far ind you." The subject had no reported history of prior suicidal ideations.

subject was last noted to be responsive in the early morning hours, on 01/21/2023, at approximately 0100 rs, during which time the subject's son heard the subject close his bedroom door and presumed he went to p for the night. The subject's son nor his girlfriend at the residence hear any noises throughout the night.

subject's residence was an approximately four bedroom/two bathroom residence with an attached single car age at the back of a short driveway, facing toward ███████ The interior of the residence was overall well

Court records obtained by independent reporters with the Davis Vanguard show that the day before Chase's suicide, Michael Reedy, a now retired former partner at McManis Faulkner, was disassociated from the family law case on January 20, 2023.

Prior to leaving the case, ▆▆▆▆ filed a request to terminate all custody and visitation from the child's mother. That request was scheduled to be heard on Monday, January 23, 2023. Reedy's departure from the case left Chase to argue the father's request to strip custody from the child's mother. Chase took his own life before he took up that argument.

An email the mother obtained from the court shows that on the Sunday morning following Chase's death ▆▆▆▆ attorney, Doug Rappaport, wrote to Judge Flores, omitting the mother and reporting in the subject line; "Our friend, Darrick Chase… FDV-19814465 ▆▆▆▆ vs. Wang."

The email stated:

*" All, it is with a very heavy heart that I have to share the news that Darrick Chase passed away. I know that he always liked court staff very much and I think that everyone felt the same about him. Following the withdrawal of Michael Reedy  as the family law attorney representing Mr.* ▆▆▆▆ *Darrick was going to handle this role, albeit reluctantly given the excessive demands and pressure, and was intending to appear on Monday….."*



The coroner's report, family disclosures, Douglas Rappaport's 1/22/23 ex parte email to the San Francisco court, and 11/16/23 Marin Court probate filings collectively indicate that Chase was profoundly disturbed by a particular family law case. While he was also handling a routine divorce case in Sacramento, however, San Francisco Superior Court Case no.  (FDV-19-814465) ▆▆▆▆ v. Wang, a drawn-out, high-conflict case—marked by jurisdictional battles, ex parte orders, and efforts to terminate a mother's parental rights—was widely understood to be the central source of his distress.

 

2023-01-15
Darrick…ent.pdf

Chronology of
Key Ev…se.pdf

Judge Flores Undisclosed Ex Parte Communications with Thygesen



BROOKE JENKINS (SBN 276290)
District Attorney
DONALD du BAIN (SBN 155131)
Assistant District Attorney
Office of the District Attorney
350 Rhode Island Street
North Building, Suite 400N
San Francisco, California 94103
Telephone: (415) 558-2449

Attorneys for the People

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

| PEOPLE OF THE STATE OF CALIFORNIA, | |
|---|---|
| Plaintiff, | MCN 19016407 |
| | **MOTION TO AMEND COMPLAINT** |
| vs. | Date: May 29, 2024 |
| | Time: 9:00 a.m. |
| | Dept: 20 |
| KAILIN WANG | |
| Defendant. | |

TO DEFENDANT BY AND THROUGH HER ATTORNEY LILAH WOLF AND TO THE HONORABLE CHRISTINE VAN AKEN:

PLEASE TAKE NOTICE that on the above date, time, and in the above noted department of the above-entitled court the People will move the Court for an order amending the complaint in the above-entitled case and the filing of a first amended complaint. The motion will be based upon the records of this court, the authorities and declaration herein, and upon such other evidence as may be presented at the time of hearing.

//

//

//

//

//

I

## STATEMENT OF FACTS

Civil Restraining Orders

On March 6, 2019, a Civil Restraining Order was issued by the Honorable Richard Darwin in case FDV-19-814465. This civil restraining order was renewed by the Honorable Daniel Flores on October 21, 2022. The terms of the civil restraining order ordered Defendant to not "harass … disturb the peace … take any action, directly or through others, to obtain the addresses or locations of the persons in 1 and 3," which included ▇▇▇▇▇▇ T. and his family.

On February 15, 2023, a Findings and Order was issued in the same case ordering defendant to "redact the Minor Child's identifying information from her publicly-accessible internet postings, including those already made and postings that will be made in the future, until further notice of the Court."

Criminal Protective Orders

On October 23, 2019, a Criminal Protective Order was issued by the Honorable Christine Van Aken in this criminal case protecting ▇▇▇▇▇▇ T. and his family. The Criminal Protective Order was renewed on August 22, 2022. The terms of the Criminal Protective Order ordered Defendant to "not harass … disturb the peace" and "take no action to obtain the addresses or locations of the persons or their family members … unless good cause exists otherwise."

Welfare check on child by police requested by Defendant at victim's home

On March 3, 2024, the Menlo Park Police Department received an email from Defendant requesting a welfare check on the child of ▇▇▇▇▇▇ T. and Defendant. At 10:00 a.m., a police officer responded to ▇▇▇▇▇▇ T.'s home address and conducted a welfare check.

Defendant posted child's name and alleged plot by victim to kidnap him

On April 9, 2024, Defendant posted on Twitter that the victim and his parents were absconding with her 5-year-old child to Denmark permanently. Defendant added that "he's going to further disappear with my 5 year old once they are there, likely to Russia, he's already stopped bringing the child to court ordered vistitation for months."

Attached to this post is Defendant's post to Lawctopus that repeats Defendant's abduction claim and includes the name of her 5-year-old child as the abductee. The post also states that "a live international abduction is unfolding before our eyes, and its apparently legal if you have enough $$$. Baby ▇▇▇▇ ▇▇▇ ▇▇▇▇▇ Wang mommie loves you. Forever and ever."

//

2

Defendant obtained new, confidential home address of victim

On April 12, 2024, Defendant filed a Reply and Opposition to a motion filed in Family Court case FDV-19-814465 that disclosed the address of the victim's new home, which had been purchased under the name of a limited liability company, "D&C Jones LLC."

## ARGUMENT

Penal Code section 1009 permits amendment of accusatory pleadings

"The court in which an action is pending may order or permit an amendment of an indictment, accusation or information, or the filing of an amended complaint for any defect or insufficiency, at any stage of the proceedings . . . A complaint cannot be amended to charge an offense not attempted to be charged by the original complaint, except that separate counts may be added which might properly have been joined in the original complaint." (Penal Code section 1009.)

The statute has also been liberally applied to permit amendment "at *any* stage of the proceedings," including amendments to the charges on the day of trial (*People v. Hall* (1979) 95 Cal.App.3d 299, 314.); *People v. Byrd* (1960) 187 Cal.App.2d 840, 842), after jury selection *People v. Villagren* (1980) 106 Cal.App.3d 720, 724-725), in the middle of trial (*People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1580-1584 [before prosecution rested its case-in-chief], at the conclusion of the evidence (*People v. Miralrio* (2008) 167 Cal.App.4th 448, 454-459; *People v. Jones* (1985) 164 Cal.App.3d 1173, 1178-1179), during jury deliberations (*People v. Bolden* (1996) 44 Cal.App.4th 707, 716), and even after a mistrial (*People v. Williams* (1997) 56 Cal.App.4th 927, 932; *People v. Brown* (1973) 35 Cal.App.3d 317, 322-323; *People v. Flowers* (1971) 14 Cal.App.3d 1017, 1019-1021).

Whether an offered amendment should be permitted is a matter within the sound discretion of the court. (*Arevalo-Iraheta*, 193 Cal.App.4th at 1581.) In the absence of an abuse of discretion, a ruling permitting the amendment will not be disturbed on appeal. (*Miralrio*, 167 Cal.App.4th at 458; *Bolden*, 44 Cal.App.4th at 716.) "Liberality appears to have been countenanced in allowing such amendments under statutory provisions therefor, to simplify procedure, to further the ends of justice, and to 'save indictments against defects and deficiencies *of substance and form* by amendment stating the offense intended to be charged.' [Citation.]" (*People v. O'Moore* (1948) 83 Cal.App.2d 586, 591, 594., original emphasis.) For example, generally it is not an abuse of discretion to permit the prosecution to amend the accusatory pleading after a defendant offers to plead guilty to the existing charges but before the defendant's

3

https://www.sfexaminer.com/news/former-solano-county-da-working-in-sf-despite-shadow-of-alleged-misconduct/article_32c6eea3-190c-5f83-987f-93f0fcdb7a02.html

# Former Solano County DA working in SF despite shadow of alleged misconduct

By Jonah Owen Lamb
Jul 26, 2015



Don du Bain, right, spent decades as a prosecutor in Solano County before joining the S.F. District Attorney's Office last...

By Jonah Owen Lamb

For the past year or so, a gray-haired lawyer in his mid-50s named Don du Bain has been a common face around the Hall of Justice. He might be relatively new to San Francisco, but he is no novice attorney.

In fact, he's very experienced. He worked as a Solano County prosecutor for two decades, serving as the elected district attorney for more than 10 years of that time.

Last year, after a scandal involving a murder trial and narrow re-election defeat in 2013, du Bain was a man without a job. But that didn't last long, as he was given a job in San

Francisco.

Now, while he tries cases as a regular prosecutor, du Bain's checkered past might be catching up with him. The Solano County scandal, in which du Bain's office allegedly failed to properly disclose evidence during a trial, raises questions about his ethics.

"The issue of prosecutors who violate their duty to provide evidence of innocence is extremely troubling," said Public Defender Jeff Adachi. "It's a scourge on our criminal justice system. We've asked the courts to adopt a policy of requiring prosecutors to state on the record whether they have complied with Brady. We haven't heard back."

When the San Francisco District Attorney's Office hired du Bain, it knew about his record. The office also hired one of the attorneys at the center of the scandal that du Bain can't seem to leave behind.

That lawyer, Andrew Ganz, along with du Bain, was chastised by a judge in Solano County for alleged misconduct surrounding a murder trial, according to court documents. Yet those past misdeeds did not impact their hiring.

The trouble is, there is not a uniform disciplinary system for lawyers, and that leaves du Bain's case up in the air.

Ganz has been with the San Francisco office since March, and du Bain — who resigned from office in Solano County early in 2014 after his re-election bid failed — joined in late 2014.

"It was an opportunity I didn't want to pass up, because opportunities to work as a prosecutor with my years of experience are few and far between," du Bain said in August 2014 to the Vacaville Reporter, which also reported that San Francisco District Attorney George Gascon contributed to du Bain's re-election

campaign.

While both former Solano County prosecutors have clear disciplinary records with the state bar, the Solano County judge severely chastised them for their actions in a controversial murder trial that was linked to a coroner scandal that in part cost du Bain his job.

Nonetheless, Gascon's office stands behind the hires.

"We have reviewed the material involved, spoken to both attorneys, and are satisfied by what we have learned," said Alex Bastian, a spokesman for Gascon's office. "We were aware of the situation and the ruling of the court. We hold all of our employees to high standards, and we do that through extensive supervision and training."

The case in question was the murder trial of Michael Daniels, 61. Daniels was charged with the killing of 37-year-old Jessica Brastow in a Vallejo motel room in August 2012. Ganz was the chief prosecutor on the case, which ended in an acquittal.

The issues that eventually put the pair in hot water began before the trial. Solano County Superior Court Judge Daniel Healy held an evidentiary hearing on the matter of disclosure and issued a blistering opinion aimed squarely at Ganz and his boss.

The judge found that Ganz unsuccessfully tried to change the testimony of then-Coroner Susan Hogan in Daniels' murder case regarding whether Brastow's death was a homicide. The coroner said it was unclear if the death was a homicide, while Ganz was determined it was.

Du Bain's office also failed to disclose exculpatory evidence in the case regarding the autopsy notes and audio, along with his meeting with the coroner. Exculpatory evidence can exonerate or help exonerate a defendant.

The judge said Ganz's belief that he didn't need to inform the defense of this information "suggests a prosecutorial attitude either incapable of or disinterested in maintaining the minimum ethical standards that all prosecutors are sworn to uphold."

The judge's opinion also fell harshly on du Bain and the Solano County sheriff. "Their abject failure to adequately handle and discipline these materials is troubling, and their public effort to blame each other for what was a joint obligation is nothing short of disgraceful," wrote Healy.

Before the trial, Sheriff Tom Ferrara told du Bain he was launching an investigation into the coroner's competency. It eventually revealed many failures.

That investigation and its findings were not passed along to defense attorneys until months later, a fact Healy pointed out in his blistering opinion.

Healy also wrote that while du Bain had a written policy on making sure discovery was never in question, that policy had "no value when the prosecution's deeds do not match its words."

Du Bain, who said he could only comment to the San Francisco Examiner in a circumspect way about the matter since there are still open cases related to it, insisted he did nothing wrong. He refrained from commenting directly on Healy's decision.

Leslie Caldwell, Solano County's public defender, would not comment on du Bain beyond pointing to an appeals court opinion stating the prosecutor's responsibility to turn over all exculpatory evidence. All such material has to be turned over before trial. In the Daniels case, her office had to push for that from du Bain's office.

Although neither du Bain nor Ganz has a public record of discipline, according to the state bar, one legal expert and studies of prosecutorial misconduct said that alone does not necessarily tell the whole story.

Brady violations — the legal term for failure to turn over exculpatory evidence — happen all the time, said professor Morris Ratner of UC Hastings College of the Law. But there are few agencies keeping track of how often and when a lawyer has done wrong. That makes it hard to keep track of the disciplinary history.

The state bar, the main body doling out and recording wrongdoing, only makes public more serious discipline matters, said Ratner.

In other cases, it defers to judges' opinions since they are an arm of the state courts, even if the bar doesn't record or make public those decisions. Still, Ratner noted, some legal scholars say the very fact that a judge chastised a lawyer in a public document is itself punishment.

In either event, said Ratner, this leaves a massive hole in misconduct oversight. While the state bar is under-resourced and it defers to judges' rulings of misconduct in many cases, it does not publicize much of the misconduct that is handed down by judges. Yet the state bar remains the main source of easily available information on legal misconduct.

Several recent studies point to a lack of attorney oversight, especially when it comes to prosecutorial wrongdoing.

A study of statewide prosecutorial misconduct showed how true that is on a large scale. The Northern California Innocence Project, which authored the misconduct study in 2010, looked at the state bar's record on discipline from 1997 to 2009 and found that of the 4,741 public disciplinary actions reported in the bar's journal, "only 10 involved prosecutors, and only six of these were for conduct in the handling of a criminal case."

Even more troubling were the findings on the number of prosecutors publicly disciplined. Out of 600 cases in which courts found prosecutorial misconduct — and in which the study identified the prosecutors — 1 percent were publicly disciplined by the bar. It also noted that repeated misconduct was found in a majority of the lawyers in question.

In 2007, according to a Huffington Post story, the California Court of Appeals found Phil Cline, a Tulare County deputy district attorney, had "improperly withheld an exculpatory audiotape of a witness interview in the murder trial of Mark Soderston, who died in jail before the appeals court's decision.

Cline was never disciplined by the state bar, was elected district attorney in 1992 and continued to win re-election, even after the court's chastisement. The other prosecutor in the case, Ronald Couillard, became a judge.

Krishna Abrams, the deputy district attorney who won election over du Bain, also told the Vacaville Reporter in August 2014 she thought du Bain's resignation was abrupt.

"When Don informed me he was resigning … I was a little surprised and a little disappointed that he was leaving without finishing his term and on such short notice," Abrams told the Reporter. "Ideally, we would've liked more than a week's notice to transition."



# Provo Police

Officer Report for Incident 20PR18778

## ***CONFIDENTIALITY NOTICE***

The information in this document is CONFIDENTIAL and/or PRIVILEGED. It is intended to be reviewed by only the individual or organization it was disseminated to. If you are not the intended recipient, you are notified that any review, dissemination, or copying of this document and its attachments, if any, or the information contained herein, is prohibited. If you have received this document in error, advise the sender of your receipt of it and destroy and/or delete the document immediately.

## ***PROTECTED RECORD NOTICE***

This document is a PROTECTED RECORD under UCA 63G-2-305(10),(11) and (25). Further or secondary release would interfere with an ongoing criminal investigation or case, jeopardize the life or safety of the individual, and/or is a clearly unwarranted invasion of personal privacy, Release or dissemination of any summaries, transcripts and video/audio recordings or CJC interviews are also prohibited unless authorized by UCA 77-37-4(5) and (6).

**Nature:** HARASSMENT

**Location:** PR221

**Address:** 137 N FREEDOM BLVD; FOURTH DISTRICT COURT; N 200 WEST ST Provo UT 84601

**Offense Codes:**

**Received By:** Pratt G (PR)    **How Received:** O    **Agency:** PRPD

**Responding Officers:**

**Responsible Officers:** Patterson N PR    **Disposition:** SUM 10/12/20

**When Reported:** 14:02:45 08/24/20    **Occurred Between:** 14:02:45 08/24/20 and 14:02:45 08/24/20

**Assigned To:**    **Detail:**    **Date Assigned:** \*\*/\*\*/\*\*

**Status:**    **Status Date:** \*\*/\*\*/\*\*    **Due Date:** \*\*/\*\*/\*\*

**Complainant:**

**Last:**    **First:**    **Mid:**

**DOB:** \*\*/\*\*/\*\*    **Dr Lic:**    **Address:**

**Race:**    **Sex:**    **Phone:**    **City:** ,

Alert Codes:

( -

Offense Codes

12/14/20

|  |  |  |  |
|---|---|---|---|
| **Reported:** |  | **Observed:** | HARR Harassment |
| **Additional Offense:** | HARR Harassment |  |  |

## Circumstances

ARGOV Government Facility

| **Responding Officers:** |  | **Unit :** |  |
|---|---|---|---|
| Patterson N PR |  | 2J3272 |  |

|  |  |  |  |
|---|---|---|---|
| **Responsible Officer:** | Patterson N PR | **Agency:** | PRPD |
| **Received By:** | Pratt G (PR) | **Last Radio Log:** | \*\*:\*\*:\*\* \*\*/\*\*/\*\* |
| **How Received:** | O Officer Initiat | **Clearance:** | RTP Refer To Prosecutor |
| **When Reported:** | 14:02:45 08/24/20 | **Disposition:** | SUM **Date:** 10/12/20 |
| **Judicial Status:** |  | **Occurred between:** | 14:02:45 08/24/20 |
| **Misc Entry:** |  | **and:** | 14:02:45 08/24/20 |

| **Modus Operandi:** | **Description :** | **Method :** |
|---|---|---|

## Involvements

| Date | Type | Description |  |  |
|---|---|---|---|---|
| 10/07/20 | Name | WANG, KAILIN |  | Suspect |
| 10/07/20 | Name | ██████ ██████ PRICE |  | Victim |
| 10/07/20 | Name | ██████ ██████ |  | Victim |
| 10/12/20 | DS | UCAO |  | Dissemination |

12/14/20

## Narrative

Suspect is using the same evidence from different cases to file for protective orders and stalking injunctions against different male victims.

_____

Responsible LEO:

_____

Approved by:

_____

Date

12/14/20

## Supplement

Tue Sep 08 09:15:20 MDT 2020 Patterson, N 4272

-----------------
INVOLVED PARTIES
-----------------

KAILIN WANG - SUSPECT
████████  STANFORD ████████ - VICTIM
████  P ████ - VICTIM



DOUGLAS RAPPAPORT

 I was contacted by associates of V/████████  Stanford ████████  It was reported that ████████ had a short sexual relationship, approximately one week, with S/Kailin Wang. After the sexual encounter, S/Kailin began harassing and stalking V/████████  During this time ████████ was made aware Kailin had become pregnant with their child. Since that time, it is reported ████████ has gained full custody of the child.
After the two of them had met, S/Kailin became obsessed with V/████████ and began texting him, calling him and threatening him. During the past couple of years, Kailin has filed for Protective Orders against ████████ in Utah as well as against ████ P ████ in both Utah and California. This is the not first time Kailin has done the same thing. In 2013 while living in New York, she met a person who she began stalking, harassing, threatening and filing false police reports against. She also impersonated him on several online platforms putting his information out for people to go to his residence for sex and other things. She was arrested, charged and convicted in New York for these crimes.

-------------------------------
EVIDENCE IN SUPPORT OF PERJURY
-------------------------------
Incident #1 ████  ████

 S/Kailin Wang was arrested in 2017 in Spanish Fork Utah, for crimes against ████  ████  Kailin and ████ spoke via social media, text message and email but never met in person. ████ lives in San Francisco and has never lived in Utah.
After Kailin and ████ met, Kailin began obsessively text and calling ████ She later begins using his identity to post things about him online posing as him. She later travelled to California to find ████ and was eventually arrested for stalking in California.
After Kailin had returned from California, she filed for a stalking injunction against ████  ████ which was eventually granted by Judge Low of the Provo 4th District Court. That order was filed on January 22, 2018. On January 23, 2018, the order was granted by Judge Low. A few hours after the stalking injunction was issued, a post was submitted to "thedirty.com for publication. On January 26, 2018, the post went up on "thedirty.com". The post was a naked picture of Kailin Wang. Kailin was contacted by "a good Samaritan" via text message and asked if the picture was of her and stated they could help her get it taken down. Several screen shots of the text messages including the

 **Gmail**

Kailin Wang <kaywg2372@gmail.com>

---

**180400131 - Wang v. █████ Request for Certified Copy of the Request for Stalking Inunction filed on 1/22/18**

---

**Kailin Wang** <kaywg2372@gmail.com>                                          Wed, May 5, 2021 at 11:17 AM
To: Debbie Hill <debbieh@utcpd.com>, Mike Nelson <miken@utcpd.com>

Please see Provo Clerk's confirmation email below that the true and correct copy is 39-pages.

As noted in previous emails, the version █████ gave to Utah DA's is 25 pages, consisting of certified cover page 5 pgs. Of Req. for Stalking Inj. and 20 pages of exhibits, I have now ordered, and confirmed the true and correct copy is 39 pages, consisting of 34 pages of exhibits. █████ knows this as he has been filing in the *Wang v.* █████ case, he knowingly presented an altered copy, and presented it to Tim Taylor, he reassembled, and placed fraudulent texts in the altered version to the Utah Gov.

---------- Forwarded message ---------
From: **Siana Carsrud** <sianac@utcourts.gov>
Date: Wed, May 5, 2021 at 9:38 AM
Subject: Re: 180400131 - Wang v. █████ Request for Certified Copy of the Request for Stalking Inunction filed on 1/22/18
To: Kailin Wang <kaywg2372@gmail.com>

Good morning,

We have received your request for a certified copy of the *Request for Civil Stalking Injunction* in case number 180400131. We are happy to send this to you after the fee of $25.70 is paid.

To pay this fee, you will need to go online to utcourts.gov. Once there, on the right side of the page under "DO", click on "Pay Fines/Fees Online." From there, you will need to enter the case number of **180400131** and select "Provo District" for the Court option. There should be a fee of $25.70 listed. Once the fee is paid, we will send you the requested certified document in the mail.

The total number of pages in the document is 39.

If you have any questions or concerns, please let us know. Our number is 801-429-1000 or you can email back at this email address.

Thank you!

--
**Siana Carsrud**
**Judicial Assistant**
**sianac@utcourts.gov**
**Fourth District Court - Provo**
**137 North Freedom Blvd.**
**Suite 100**
**Provo, UT 84601**
**(801)-429-1000**

On Tue, May 4, 2021 at 1:35 PM ProvoFiling <provofiling@utcourts.gov> wrote:


---------- Forwarded message ---------
From: **Kailin Wang** <kaywg2372@gmail.com>
Date: Tue, May 4, 2021 at 12:45 PM
Subject: 180400131 - Wang v. ████ Request for Certified Copy of the Request for Stalking Inunction filed on 1/22/18
To: Provo Protective Order Filings <provofiling@utcourts.gov>


My Driver's License is attached. I will pay by Utah.gov website.

180400131 - Wang v. ████ Request for Certified Copy of the Request for Stalking Inunction filed on 1/22/18


Also is there a way for a clerk to declare how many pages this document has?


--
Kailin Wang
Phone: 801-645-1060

 Gmail

Kailin Wang <kaywg2372@gmail.com>

---

## Judge Low_Case: 180400131, 180400132, 180400133

---

**Kailin Wang** <kaywg2372@gmail.com>                                                    Fri, Apr 17, 2026 at 4:16 AM
To: Provo Protective Order Filings <provofiling@utcourts.gov>, Amber Evans <ambere@utcourts.gov>, joey.blanch2@usdoj.gov,
Conrad_Kaufman@utp.uscourts.gov, "Sorenson, Richard (FD)" <richard_sorenson@fd.org>, Erik Jacobson <erikj@utcpd.com>,
jaredp@utahcounty.gov, "Wolf, Lilah (PDR)" <lilah.wolf@sfgov.org>

Hi Amber,

We have copied UCAO and the federal prosecutors handling (USA v. Kailin Wang) on this email — yes, the same case has been recharged federally. We wanted to confirm something regarding Case No. 180400131, *Wang v.* ▮▮▮▮

We are also attaching a true and correct copy of the Request for Stalking Injunction, which is 39 pages — not the 5-page fraudulent copy that ▮▮▮▮ provided to prosecutors.

**Question:**

If a petitioner files on 1/22/18 and the court issues a temporary civil stalking injunction on 1/23/18, that order is ordinarily based on the petition and evidence submitted as of 1/22/18. It is not typically based on new, unfiled evidence that arose after that date unless such evidence was formally submitted to the court before the judge signed the temporary order.

In short, the default assumption is that the temporary injunction rests on what was included in the 1/22 filing and any supporting materials actually before the judge at that time — not on subsequently created evidence. **<--- Is this understanding correct?**

▮▮▮▮▮▮ **is claiming the following:**

> "Note that the evidence KW provided at the time of her January 22 filing to back up her claim that W was harassing her DOES NOT include the online post containing KW's nude photo, as that post did not yet exist on January 22. That post was uploaded to TheDirty on the evening of January 23 (the same day KW obtained her temporary civil stalking injunction against W), and the post went live on the website on January 26. (I have business records that document this, and can provide those as well, if needed.)

My questions are:

1. Were any nude photographs used to obtain the temporary civil stalking injunction in Case No. 180400131?
2. None of the exhibits filed in Case No. 180400131 appear to be sealed or protected, so I am assuming there are no nude photographs in any of the evidence used in Wang v. ▮▮▮▮ at least none that we are aware of. Is there any way you could please confirm this understanding with the prosecutors copied on this email?

As a general matter, a temporary civil stalking injunction is issued based on the evidence contained in the petition and supporting materials filed as of the filing date—not on new evidence that emerges the following day. In practice:

- A petitioner files a verified petition (for example, on 1/22/18) describing the alleged stalking and attaching any supporting evidence available at that time.
- A judge then conducts a paper review of the petition and its attachments to determine whether there is "reason to believe" that stalking has occurred.
- If the judge finds sufficient grounds, the court may issue a temporary (ex parte) civil stalking injunction, often on the same or next business day (for example, on 1/23/18).
- The ex parte temporary order is ordinarily based on what was filed with the petition, not on evidence that emerged afterward, unless that new evidence is formally submitted to the court by supplemental filing or at a later hearing.
- In practice, most temporary stalking injunctions are granted or denied on the original written record and revisited, if at all, at a subsequent hearing where both parties may present updated evidence.

Accordingly, if a petitioner files on 1/22/18 and the court issues a temporary civil stalking injunction on 1/23/18, that order is ordinarily based on the petition and evidence submitted as of 1/22/18. It is not typically based on

new, unfiled evidence that arose after that date unless such evidence was formally submitted to the court before the judge signed the temporary order. In short, the default assumption is that the temporary injunction rests on what was included in the 1/22 filing and any supporting materials actually before the judge at that time—not on subsequently created evidence.

Thank you for your attention to this. Please let us know if you are able to confirm whether any nude photographs were part of the evidence used to obtain the temporary civil stalking injunction in Case No. 180400131.

---

Lastly, thank you so much for coordinating between Kailin Wang and ▮▮▮▮▮▮ Danish family court proceedings.

Kailin had no idea that it was Judge Low who was going to supervise the Danish main hearing; if she had known, she certainly would never have had her family email the court to cancel that proceeding. As reflected in the materials, Kailin truly appreciates what a great judge Judge Low is. He is one of the few who consistently strives to get it right, even in very voluminous and demanding cases.

It also would have been extremely valuable for Judge Low to see ▮▮▮▮▮▮ forum shopping firsthand: first removing the child from Utah to California while claiming that California had jurisdiction despite Judge Darwin's ruling to the contrary, and then later asserting that California had no jurisdiction and that Denmark did instead. We truly wish we had known sooner that the Danish hearing was going to be supervised by Judge Low's staff; that knowledge would certainly have changed our position and, in hindsight, would have been greatly beneficial.

Oh, and if restitution is ordered in State of Utah v. Wang, Case No. 211100167, we want to ensure that any restitution is directed to you and your team, and not to the multi-millionaire ▮▮▮▮▮▮ family. https://www.investing.com/news/insider-trading-news/▮▮▮▮ ▮▮▮▮▮▮docusign-ceo-sells-125-million-in-docu-stock-93CH-4596651

Thanks again!

---

**4 attachments**

**Exhibit 2 01_22_18_Certified Request for Civil Stalking Injunction** ▮▮▮▮ ▮▮▮▮ **compressed.pdf**
5010K

**STATEMENT REGARDING JUDGE LOW, THE UTAH COURT CONTACTS, AND COMPARATIVE JUDICIAL CONDUCT.pdf**
4787K

**2026-03-04 Judge Boysen Disqualifies herself from GP case.pdf**
104K

▮▮▮▮▮▮ ▮▮▮▮ **C. - Insider Trades & Share Buys_Sales.pdf**
391K