Kailin Wang
2481 Fairway Dr.
Spanish Fork, Utah 84660
801-787-9755
kaywg2372@gmail.com

FILED
2026 APR 30
CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**KAILIN WANG**,<br><br>Defendant. | **DEFENDANT'S REPLY TO GOVERNMENT'S OBJECTION (ECF 201) TO RENEWED MOTION TO COMPEL DISCLOSURE OF IDENTITY OF "LOCAL LAW ENFORCEMENT" REFERRAL OFFICER**<br><br>Case No. 2:24-cr-00163-TS<br><br>Judge Ted Stewart |

## THE CENTRAL QUESTION BEFORE THE COURT

> **The PSR's +4 sentencing enhancement rests on the theory that Ms. Wang's IC3 complaints caused law enforcement to investigate CT/V1. The Government's own admissions establish that the FBI investigation was already open before the IC3 database was queried, and that no one referred the complaints. If the IC3 filings did not drive the investigation, they could not have caused CT/V1 to be "investigated by law enforcement" within the meaning of the enhancement. The identity of the referring officer is the key to resolving that factual question. Brady, Rule 16, and due process require the Court — not the Government — to review that evidence.**

## ARGUMENT

1

## I.  THE GOVERNMENT'S OPPOSITION FAILS TO ENGAGE WITH THE LEGAL FRAMEWORK

The Government's two-page opposition (ECF 201) offers two sentences of substantive response to a combined fifty-four pages of briefing (ECF 179 and ECF 179-2).

It does not address the *Strickler v. Greene* three-element Brady test. It does not address the Tenth Circuit's **"caliber of investigation"** materiality standard.

It does not address the Justice Manual's definition of the prosecution team as "police."

It does not address the in-camera review standard of *Pennsylvania v. Ritchie* or *United States v. Olsen*. It does not dispute any of the eight documented factors in ECF 179. I

t offers two assertions — "nothing relevant" and "motive is resolved by the plea agreement" — and stops there.

"Nothing relevant" is not a legal standard.

The controlling principle is that "the critical task of evaluating the usefulness and exculpatory value of the information is a matter primarily for defense counsel, who has a different perspective and interest from that of the police or prosecutor." *Miller v. United States*, 14 A.3d 1094, 1110 (D.C. 2011).

**The Brady Outline states explicitly:** "it is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited." That prohibition applies here with full force.

## II.  THE CAUSATION QUESTION: THE GOVERNMENT'S PLEA ARGUMENT DOES NOT ANSWER THE ENHANCEMENT THEORY

The Government's sole substantive argument is that the defendant admitted her IC3 motive in the plea agreement, so the referral source is irrelevant. ECF 201 at 2. This argument conflates motive with causation. They are not the same, and the distinction is controlling.

*The enhancement theory requires causation, not just motive.* The PSR's +4 enhancement under USSG § 2A6.2(b)(2) rests on the specific theory that Ms. Wang harassed CT/V1 by "having

2

[the victim] investigated by law enforcement" through the IC3 filings. PSR ¶¶ 54, 60. That enhancement is only viable if the IC3 filings actually caused law enforcement to investigate. Motive to cause an outcome does not establish that the outcome occurred.

***The Government's own admissions destroy the causal chain.***  ECF 164 at 2 confirms: (1) the FBI Task Force Officer received the January 15, 2024 referral email and opened the investigation on or after that date; (2) the IC3 database was queried after the investigation was already open; and (3) no one referred the IC3 complaints to the FBI. If the investigation was already underway before IC3 was queried, and no one referred the complaints, then the IC3 filings could not have caused CT/V1 to be investigated. The causal predicate of the +4 enhancement collapses.

***The Government's reply confirms the gap.***  "What 'drove' the FBI to find the IC3 complaints has nothing to do with defendant's motive in making them." ECF 201 at 2. That sentence is an admission that the IC3 filings did not drive the investigation. If the filings did not drive the investigation, they did not cause law enforcement to investigate CT/V1. The Government cannot simultaneously argue motive determines everything and causation determines nothing when causation is the linchpin of the enhancement theory.

> **The single factual question this disclosure would resolve: Did the IC3 filings cause the investigation, or did an independent referral — routed through CT/V1's private network — cause it? The Government holds the answer in the January 15, 2024 email. Brady requires the Court, not the Government, to evaluate that answer.**

***The §1001 materiality theory is also affected.***  The Tenth Circuit's decision in *United States v. Tao,* 107 F.4th 1179 (10th Cir. 2024), directly controls this analysis and confirms the causal gap the Government's opposition ignores. Tao holds that §1001 materiality requires proof of **"an actual agency decision capable of being influenced"** — not a theoretical or possible decision, but a real one. Id. at 1185. Evidence of influence "cannot rest on purely theoretical or metaphysical possibility." Id. The Tenth Circuit reversed a conviction where the government failed to identify an actual pending decision the defendant's statements could have affected. The parallel

here is direct: the Government confirms the FBI investigation was already open before IC3 was queried, and that no one referred the IC3 complaints.

**There was no actual pending investigative decision that the 2019 IC3 filings could have influenced** — because the investigation that produced them as evidence was already underway and was initiated by a different source entirely.

Under Tao, the §1001 materiality and the PSR's causal enhancement theory both fail on that record. Knowing who initiated the referral — and when, relative to the IC3 filings — is not peripheral: it is dispositive of the Tao analysis.

### III. BRADY REQUIRES DISCLOSURE OR IN CAMERA REVIEW: THE GOVERNMENT HAS MET NONE OF THE STRICKLER ELEMENTS

*Strickler v. Greene*, 527 U.S. 263, 281–82 (1999), provides the operative three-element test: evidence is subject to disclosure when it is (1) favorable, either because exculpatory or impeaching; (2) suppressed, either willfully or inadvertently; and (3) material. The Government has not addressed any element.

Under *Brady*, "the prosecution's good or bad faith is irrelevant." *United States v. Agurs*, 427 U.S. 97, 103 (1976). The government's apparent belief that the email was not discoverable does not relieve it of the disclosure obligation. Brady's duty to "learn of" favorable evidence has a specific dimension here. When the prosecution has actual notice of a referral from an identified local-law-enforcement source, it is obliged to search that source's files for material favorable to the defense. *Kyles*, 514 U.S. at 437–38. The government's failure to do so — or its refusal to disclose having done so — cannot be cured by affixing an "internal" label to the email.

The Justice Manual reinforces this. JM §9-5.001 defines the prosecution team to include **"federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case."** The local officer who emailed the FBI TFO on January 15, 2024, requesting federal prosecution review, plainly **"participated in the investigation."** The officer's identity, and any records bearing on the officer's relationship with private parties interested in the outcome, are within the prosecution team's constructive knowledge. JM §9-5.002 further specifies that classifying a document as

4

"internal" does not automatically exempt it from Brady disclosure. The government's contrary position — that the email is categorically non-discoverable because it is "internal" — is inconsistent with mandatory Department policy. The Tenth Circuit has applied the same rule. *McCormick v. Parker*, 821 F.3d 1240, 1247–48 (10th Cir. 2016); *Simpson v. Carpenter*, 912 F.3d 542, 569–70 (10th Cir. 2018). *United States v. Osorio*, 929 F.2d 753, 762 (1st Cir. 1991).

**Brady obligations at sentencing are likewise mandatory.** JM §9-5.001(D)(3) requires disclosure of favorable evidence "that is relevant to sentencing." The PSR's +4 enhancement under USSG §2A6.2(b)(2) and +2 under §2A6.2(b)(1) are predicated on a causal theory that Ms. Wang's 2019 IC3 filings prompted the FBI investigation. Evidence that the FBI TFO was instead tasked by a local officer at the behest of private counsel — regardless of the IC3 filings — is directly material to the enhancement calculation and must be disclosed before sentencing. JM §9-5.001(C)(4) directs prosecutors to assess the "cumulative impact" of withheld evidence, not each item in isolation. *Fontenot v. Crow*, 4 F.4th 982, 1013–14 (10th Cir. 2021) (materiality assessed cumulatively, not item by item).

*Favorability.* Evidence that the investigation originated through CT/V1's private network — rather than through independent law-enforcement judgment — is material, exculpatory, and favorable to defense evidence on two grounds: (1) it directly undermines the PSR's causal enhancement theory, and (2) it impeaches the independence of the investigation. That is quintessentially Brady/Giglio material. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

*Suppression.* The Government reviewed the email, concluded it was "internal," and withheld it. That is suppression under Brady regardless of intent. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57–58 (1987) makes clear that **it is the court — not the prosecution — that must evaluate withheld material when confidentiality is claimed.** The government's "internal" label does not govern the disclosure obligation. JM §9-5.002 confirms that **"the fact that a document is internal to the government does not, by itself, determine whether it is subject to disclosure."**

*Materiality.* The Tenth Circuit evaluates materiality by asking whether withheld evidence reflects on the "caliber of the investigation." *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 822 (10th Cir. 1995); *United States v. Bonnett*, 877 F.2d 1450 (10th Cir. 1989). *Kyles v. Whitley*, 514 U.S. 419, 445 (1995), requires assessment of "the thoroughness and good faith of the

investigation." Evidence that the investigation was initiated by CT/V1's private network rather than by neutral law enforcement goes directly to caliber.

This analysis intersects with Tao: if there was no actual pending agency decision that the IC3 filings could have influenced — because the investigation was already open and was initiated by a different source — then both the §1001 materiality predicate and the PSR's causal enhancement theory fail simultaneously. *United States v. Tao*, 107 F.4th 1179, 1185 (10th Cir. 2024) ("evidence of materiality cannot rest on purely theoretical or metaphysical possibility"). Materiality is assessed cumulatively, not item by item. *Fontenot v. Crow*, 4 F.4th 982, 1013–14 (10th Cir. 2021). Brady also applies at sentencing. *United States v. Camick,* 796 F.3d 1206, 1221 (10th Cir. 2015). JM §9-5.001(D)(3) requires disclosure of favorable evidence "that is relevant to sentencing." This evidence is.

*The prosecution team includes the referring officer.* JM §9-5.001 defines the prosecution team to include "federal, state, and local law enforcement officers and other government officials participating in the investigation." The officer who emailed the FBI TFO requesting federal prosecution plainly "participated in the investigation." Brady's duty to "learn of" favorable evidence, *Kyles*, 514 U.S. at 437, extends to that officer's files. The Government's failure to search them — or disclose having done so — cannot be cured by calling the email "internal."

## IV.  THE GOVERNMENT MISREADS THE PLEA AGREEMENT AND MISCHARACTERIZES THE MOTION'S ARGUMENT

A. *The motive admission does not resolve the enhancement's causal predicate.* The Government argues that because Ms. Wang admitted she made IC3 reports "in order to have [the victims] investigated by law enforcement in order to continue harassing and intimidating [them]," the question of what "drove" the FBI is irrelevant. ECF 201 at 2. This misreads the PSR's own enhancement theory.

The +4 enhancement under USSG § 2A6.2(b)(2) rests on the theory that Ms. Wang harassed CT/V1 by "having [the victim] investigated by law enforcement" through the IC3 filings. PSR ¶¶ 54, 60. That theory is only viable if the IC3 filings actually caused law enforcement to investigate CT/V1. The Government's own admissions in ECF 164 confirm the FBI Task Force Officer was already working the case before the IC3 database was queried, and that no one referred

6

the IC3 complaints. If the investigation was already open — initiated by CT/V1's private network — the IC3 filings could not have caused law enforcement to investigate anyone. The enhancement's factual predicate collapses.

**The Government's own words prove the point:** "What 'drove' the FBI to find the IC3 complaints has nothing to do with defendant's motive in making them." ECF 201 at 2. That is an admission that the IC3 filings did not drive the investigation. The Government cannot simultaneously argue that motive is dispositive and that causation is irrelevant when causation is the linchpin of the enhancement theory. Under *United States v. Tao*, 107 F.4th 1179, 1185 (10th Cir. 2024), § 1001 materiality also requires an actual pending agency decision capable of being influenced. The Government confirms no one referred the IC3 complaints. The IC3 filings could not have influenced any pending decision.

**B.  *The plea admission was coerced and is disputed.***  The language the Government relies upon was not freely given. Ms. Wang has consistently maintained that the plea-agreement admission was obtained under conditions that do not reflect her actual intent. A coerced admission cannot bootstrap a sentencing enhancement whose factual foundation the defendant disputes. Brady at sentencing is not limited by plea admissions — it encompasses any favorable information "relevant to sentencing." JM §9-5.001(D)(3).

**C.  *Brady applies at sentencing regardless.***  *United States v. Camick*, 796 F.3d 1206, 1221 (10th Cir. 2015); *Cone v. Bell*, 556 U.S. 449, 469–70 (2009). Due process independently prohibits a sentence based on materially false or unreliable information. *United States v. Tucker*, 404 U.S. 443, 447 (1972). Evidence that the investigation predated the IC3 filings and was channeled through CT/V1's private network is favorable at sentencing under both doctrines. The Government does not address this.

## V.  NEWLY DISCOVERED FRAUD EVIDENCE INDEPENDENTLY ESTABLISHES THAT DISCLOSURE IS COMPELLED

Since ECF 179 and 179-2 were filed, the record has been materially expanded by two categories of newly discovered evidence, each independently demonstrating why judicial oversight of who initiated this prosecution is not speculative but urgently required.

7

### A. 221B Partners Is CT/V1's Adversarial Intelligence Operation — Not an Independent Private Actor

As established in **Defendant's Reply to ECF 200**, 221B Partners is the successor firm to Hillard Heintze — the same organization, the same personnel — retained by CT/V1 continuously since December 2018 to surveil Ms. Wang and deliver intelligence to law enforcement. Jennifer Mackovjak, Christopher Brenner, and Adam Zoll appear in both firms' records with the same roles, the same address (30 South Wacker Drive, Chicago), and the same function.

**The documented methodology is consistent across six years.**

On March 6, 2019, Mark Brenzinger of Hillard Heintze called 911 in Spanish Fork, Utah — with CT/V1's mother and custody attorney on the line — to report the alleged "Kill Baby K" post and coordinate police action at Ms. Wang's home. The Utah Valley Dispatch Call Detail Report confirms Hillard Heintze as the official complainant. In March 2025, 221B Partners — the same firm, the same individuals — captured Ms. Wang's Google Drive using professional forensic tools (Page Vault) and delivered the URL and captures to the FBI. The Government's own discovery index confirms this (RM0014156, RM0014166).

This documented six-year adversarial intelligence operation with law enforcement as the consistent intended recipient is not independent private action. Under the Tenth Circuit's two-part test, *United States v. Smythe*, 84 F.3d 1240, 1242–43 (10th Cir. 1996), both elements — government acquiescence and intent to assist law enforcement — are established by documentary evidence the Government has never disclosed. The private search doctrine does not immunize this pattern of conduct.

The same pattern is directly relevant to who made the January 15, 2024 FBI referral. Chris Bertram — CT/V1's retained PI since December 2018, retired UPD Deputy Chief, FBI National Academy graduate — filed a sworn declaration in CT/V1's counsel's case two weeks before the referral. The Government has never disclosed whether Bertram, 221B Partners/Hillard Heintze, or any member of CT/V1's network was the "local law enforcement" source. That is precisely what this motion seeks to determine.

8

### B. CT/V1's Counsel Delivered an Altered Court Filing to Utah Prosecutors to Fabricate the Pattern-of-Conduct Narrative

As documented in ECF 179 at 15–16, and confirmed by the April 17, 2026 correspondence to the Provo court (copied to the Government), the true and correct Request for Civil Stalking Injunction in Wang v. W.S. (V2), Case No. 180400131, is a 39-page certified document. The version that CT/V1's counsel, Douglas Rappaport, supplied to Utah prosecutors was only 25 pages. Provo Police Report 20PR18778 adopted Rappaport's narrative verbatim (ECF 179-1 at 320–27), thereby creating the "pattern" theory that became the factual foundation of this federal prosecution.

#### Officer Report for Incident 20PR18778:

**Narrative:** The suspect is using the same evidence from different cases to obtain protective orders and stalking injunctions against different male victims. (Page 3 of 9.) *"I was contacted by associates of V1 ."* (Page 4 of 9)

Rappaport's theory — that the January 23, 2018 temporary injunction rested on a nude photograph posted the evening of January 23 — is facially impossible: a temporary ex parte injunction is issued based only on evidence before the court at the time of filing on January 22. The court clerk's records confirm no nude photographs were part of the January 22 petition. The entire pattern-of-conduct narrative Rappaport assembled and delivered to Utah prosecutors was fabricated.

That fabrication is classic Giglio material under *United States v. Bagley*, 473 U.S. 667, 676 (1985), and independently Brady material bearing on whether this prosecution reflects neutral law-enforcement judgment or the endpoint of a documented forum-shopping campaign built on manufactured evidence.

### C. The Pattern of Fraud Independently Satisfies the Strickler Elements

Evidence that CT/V1's network: (1) operated a six-year adversarial intelligence operation delivering evidence to law enforcement; (2) supplied fabricated and truncated court documents to Utah prosecutors; and (3) simultaneously filed referrals with both the FBI (January 15, 2024) and CPS (January 17, 2024) — both following the November 30, 2023 judicial denial, both premised on the same manufactured allegations, one independently closed as unfounded — satisfies

9

Strickler's favorability and materiality elements on the face of the record. The Government does not dispute any of these facts. Its silence is not a rebuttal

---

## VI. THE CHARGING PROSECUTOR'S ADJUDICATED PATTERN OF CONCEALING INVESTIGATIVE ORIGINS INDEPENDENTLY REQUIRES IN CAMERA REVIEW

The Government's treatment of the January 15, 2024 referral email follows the same methodology: classify materials by source ("internal"); affix a label that forecloses scrutiny ("not discoverable"); and represent completeness when challenged. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (due process bars allowing a false impression of material facts to stand). *Banks v. Dretke*, 540 U.S. 668, 691–92 (2004) (government misrepresentation of completeness amplifies *Brady* prejudice and warrants relief even where individual items might otherwise be close questions). The previously adjudicated pattern is directly probative of whether the Government's representation that there was "nothing relevant" is accurate.

Critically, the bar complaints against AUSA Muyskens—Disciplinary Docket Nos. 2018-D218, 2018-D262, and 2018-D300—were filed in 2018, six years before she signed the Wang indictment on May 8, 2024. Chief Judge Morin's underlying *Brady* finding likewise preceded the Wang indictment by several years. When AUSA Muyskens supervised the initial discovery decisions in this case, she was a prosecutor with an active, documented record of judicially adjudicated *Brady* violations. Good faith cannot simply be presumed; it must be assessed against the documented record of the actor asserting it. *Banks v. Dretke*, 540 U.S. at 694–95.

The absence of any investigation chronicle—no case-opening FD-302, no referral log, and no record reflecting how the FBI Task Force Officer evaluated the January 15, 2024 contact—is not neutral. In substantial federal investigations, such documentation is typically created and maintained.

**Its absence here is consistent with the pattern documented by the Hearing Committee:** investigative origins are obscured at the pipeline level before the material reaches the case prosecutor, enabling later representations of completeness. *Muyskens Report* at 53. Either the investigation chronicle was never created (itself an irregularity warranting inquiry), or

10

it exists and has not been produced. In either circumstance, the absence strengthens the case for in camera review under *Strickler*.

Empirical research further indicates that this form of pipeline suppression is a recurring feature of *Brady* violations. A study by Professor McAward analyzing 386 final *Brady* rulings found that 51% of successful claims involved material that never reached the case prosecutor because another actor in the investigative chain failed to disclose it. That pattern underscores the appropriateness of in camera review in circumstances involving incomplete investigative records. *Fontenot v. Crow*, 4 F.4th 982, 1013–14 (10th Cir. 2021). As Chief Judge Kozinski observed, courts play a central role in addressing disclosure failures: "there is an epidemic of Brady violations abroad in the land," and "only judges can stop them." *United States v. Olsen*, 737 F.3d 625, 626 (9th Cir. 2013) (Kozinski, C.J., dissenting).

## VII.  THE NAPUE DIMENSION: THE GOVERNMENT'S "INTERNAL / NOT DISCOVERABLE" REPRESENTATION IS ITSELF A REPRESENTATION TO THE COURT

The Government's written characterization of the January 15, 2024 email as "internal" and "not discoverable" is a representation to the Court about the scope of its disclosure obligations. If that characterization is false — i.e., if the email contains or leads to Brady material — the representation violates due process independently of the underlying Brady duty. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Giglio v. United States*, 405 U.S. 150 (1972). Where the government affirmatively asserts completeness, that assertion amplifies the prejudice from any undisclosed Brady material and supports relief even when the original withholding might have been a close question. *Banks v. Dretke*, 540 U.S. at 691–92.

Ms. Wang raised her concerns about AUSA Muyskens's handling of this prosecution in a handwritten letter to U.S. Attorney Trina A. Higgins dated June 20, 2024 — received by the USAO on June 26, 2024 — which is now part of the record at ECF 179-2. In that letter, written from Davis County Jail before she had access to the disciplinary record, Ms. Wang specifically identified that Muyskens was adopting CT/V1's allegations without independent verification, that

11

the charging indictment contained provably false allegations about the Wang v. Stone injunction, and that no IP addresses supported any of the charged conduct. The Government did not respond to those concerns. Instead, AUSA Blanch later confirmed in a March 11, 2026 email that the letter "is not something that required production back to you in discovery and/or under Brady, Giglio, and Rule 16 obligations" — a characterization that is itself contested on the record. This correspondence was not provided to defense counsel at the time, and the USAO's treatment of the letter is consistent with the pipeline-suppression pattern ECF 179-2 documents empirically.

## VIII.  IN CAMERA REVIEW IS THE MINIMUM APPROPRIATE REMEDY AND IS CONSTITUTIONALLY REQUIRED

The Brady Outline's pretrial standard requires prosecutors to disclose all "arguably material" favorable information, to "resolve doubtful questions in favor of disclosure," and in arguable cases the court "should insist upon reviewing" Brady material in camera before allowing non-disclosure. Brady Outline at 28–34. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57–58 (1987), makes this a constitutional requirement: it is the court — not the prosecution — that must evaluate withheld material when the prosecution claims non-discoverability.

The cumulative logic of *Fontenot v. Crow* applies with full force: the withheld referral email, the absent investigation chronicle, the unidentified referring officer, the documented six-year adversarial intelligence operation, the fabricated court filing delivered to Utah prosecutors, and the charging prosecutor's adjudicated history of concealing investigative origins together establish that in camera review is not merely appropriate — it is constitutionally required.

The Government has articulated no privilege, no safety risk, and no ongoing investigation concern. It has offered nothing beyond the assertion that the officer's identity is "nothing relevant." That assertion, standing alone, is legally insufficient to defeat in camera review where the defendant has presented the specific, articulable factual basis required by *United States v. Olsen*, 519 F.3d 1096, 1105 (10th Cir. 2008).

## IV.  THE DOCUMENTED REFERRAL CONTEXT PROVIDES SPECIFIC FACTUAL BASIS FOR IN CAMERA REVIEW

12

In camera review requires a "specific, articulable factual basis for believing" that Brady material exists. *United States v. Olsen*, 519 F.3d 1096, 1105 (10th Cir. 2008). That basis is amply documented here — in official law enforcement records, not speculation.

Ms. Wang does not seek disclosure of materials that are genuinely privileged, sensitive, or potentially endangering. She requests only what Brady and Pennsylvania v. Ritchie require: that the Court — not the Government — determine whether the January 15, 2024 referral email is "internal," or whether it contains or leads to material bearing on the factual accuracy of the PSR's sentencing enhancements.

The pretrial Brady standard requires disclosure of all "arguably material" favorable information, resolution of "doubtful questions in favor of disclosure," and in arguable cases the court "should insist upon reviewing" Brady material in camera before allowing non-disclosure. Brady Outline at 28–34. This is an arguable case. The Government has offered no privilege claim, no safety concern, and no ongoing investigation concern to justify withholding. Its only ground is "nothing relevant" — a conclusion, not an argument.

**RELIEF REQUESTED**

Ms. Wang respectfully requests that the Court:

Order production of the investigative origin record, including referral logs, FBI case-opening records, and communications between the FBI Task Force Officer and the referring officer.

Respectfully submitted,

/S/ KAILIN WANG, Defendant Pro Se

Dated: April 30, 2026

13