# COMPENDIUM OF CONTROLLING AND PERSUASIVE AUTHORITY

§ §

*First Amendment Decisions Vacating or Precluding Criminal Liability for Protected Online Speech*

| CASE | KEY SPEECH FACTORS | FIRST AMENDMENT HOLDING | RELEVANCE TO ONLINE PUBLIC POSTS | PDF PAGES |
|---|---|---|---|---|
| **United States v. Cassidy** *814 F.Supp.2d 574* *(D. Md. 2011)* | Thousands of Twitter and blog posts criticizing a religious leader; no direct communications required to view posts; recipient had to affirmatively seek out the content. | **Cyberstalking statute (§2261A) unconstitutional as applied to protected online speech directed at a public figure via publicly accessible platforms.** | Core precedent: Public blog and Twitter commentary about a person is protected speech where the recipient can avoid viewing it; government cannot criminalize public online criticism to shield a figure from unwanted attention. | pp. 1–16 |
| **United States v. Cook** *472 F.Supp.3d 326* *(N.D. Miss. 2020)* | Facebook posts about public officials; prosecution based solely on emotional distress caused by public posts; no private or direct communications at issue. | **Application of §2261A found to be a content-based restriction on speech subject to strict scrutiny; court declined to sustain conviction based on public post content alone.** | Nearly identical structure to online-speech prosecutions: government relied solely on the content of public posts to establish liability, implicating core First Amendment concerns identified in *Cassidy*. | pp. 47–60 |

| CASE | KEY SPEECH FACTORS | FIRST AMENDMENT HOLDING | RELEVANCE TO ONLINE PUBLIC POSTS | PDF PAGES |
|---|---|---|---|---|
| **United States v. Sryniawski** <br> *48 F.4th 583 (8th Cir. 2022)* | Series of emails to a political candidate exposing embarrassing family information and linking to public criminal records; emotional distress resulted; no true threats proven; alleged defamatory content tied to public record information. | **Cyberstalking conviction reversed — evidence was insufficient when §2261A was interpreted consistently with the First Amendment; speech intended to "trouble or annoy" remains protected absent true threats, defamation with actual malice, or separate criminal conduct.** | Highly relevant where speech exposes embarrassing or harmful information about public figures or public matters but lacks true threats or criminal conduct; confirms that emotional distress alone cannot sustain a §2261A conviction. | pp. 42–46 <br> *(core holding & reversal analy...* |
| **Elonis v. United States** <br> *575 U.S. 723 (2015)* | Defendant posted violent rap-style statements on Facebook directed at estranged wife, coworkers, and law enforcement; posts caused fear but were framed as expressive speech; no proof of subjective intent to threaten. | **Conviction reversed. Supreme Court held a negligence standard is insufficient; criminal liability requires proof of subjective intent — not merely that a reasonable person would feel threatened by the speech.** | Critical authority requiring proof of intent, not emotional reaction; establishes that online speech cannot be criminalized solely because others interpret it as threatening, regardless of the distress it causes. | pp. 17–41 <br> *(majority opinion)* |
| **People v. Bethea** <br> *2004 N.Y. Slip Op. 50007 (N.Y. Misc. 2004)* | Defendant publicly distributed handwritten fliers identifying the father of her child by name, photograph, address, and | **All harassment charges dismissed. Court held public criticism — even humiliating and offensive speech — is protected where it serves a** | Highly analogous to public accusations about parental conduct or abandonment; confirms that public | pp. 139–142 <br> *(core opinion)* |

| CASE | KEY SPEECH FACTORS | FIRST AMENDMENT HOLDING | RELEVANCE TO ONLINE PUBLIC POSTS | PDF PAGES |
|---|---|---|---|---|
| | employer; language harsh and insulting; purpose was to criticize his alleged failure to pay child support. | legitimate purpose and is not delivered as direct communications invading privacy. | denunciation and humiliation alone do not constitute harassment without direct, targeted communication to or at the victim. | |
| Mashaud v. Boone 295 A.3d 1139 (D.C. 2023) (en banc) | Defendant published a public blog about alleged misconduct; sent messages to victim's employer and professional contacts; speech caused reputational harm and emotional distress; no threats of violence made. | Conviction reversed; speech held protected. Court held that stalking statutes applied to online speech are content-based restrictions and cannot punish speech merely because it causes distress or reputational harm. | Extremely strong modern authority supporting protection of public accusations posted online about personal misconduct; confirms reputational harm is typically addressed through civil remedies, not criminal stalking law. | pp. 61–99 |
| Counterman v. Colorado 600 U.S. 66 (2023) | Defendant sent repeated Facebook messages to a musician; messages caused emotional distress but did not contain explicit threats of violence; conviction rested on an objective fear standard without proof of defendant's | Conviction reversed. Supreme Court held the First Amendment requires proof that the defendant acted *recklessly* — consciously disregarding a substantial risk that the statements would be viewed as threatening — before criminal | Court rejected broad rule allowing conviction based solely on how speech was received by the victim; required a limited interpretation demanding proof that the defendant was subjectively aware of the threatening | p. 100 *(slip opinion syllabus & recklessness* |

| CASE | KEY SPEECH FACTORS | FIRST AMENDMENT HOLDING | RELEVANCE TO ONLINE PUBLIC POSTS | PDF PAGES |
|---|---|---|---|---|
| | subjective mental state. | **liability may attach.** | character of the speech, not merely that a reasonable person felt fear. | |
| **People v. Peterson** *95 Cal.App.5th 1061, 1066–1067 (Cal. Ct. App. 2023)* | Defendant made statements at a public event, posted Facebook comments, and sent communications related to a political dispute over a school bond measure; speech caused public concern but involved political criticism and advocacy. | **Court required independent First Amendment review to determine whether statements constituted true threats; held that expressive conduct on public issues is protected unless it constitutes a serious expression of intent to commit unlawful violence.** | Court rejected broad interpretation of stalking based on emotional reaction or public alarm; required narrow interpretation limiting criminal liability to true threats — not criticism, frustration, or political speech — directly protecting online public commentary on civic matters. | *pp. 120–138 (true threat definition & independent revie* |
| **United States v. Yung** *37 F.4th 70 (3d Cir. 2022)* | Defendant created fake social media profiles and posted humiliating content about victim; conduct offensive and distressing but did not involve true threats or physical danger. | **Court held §2261A must be narrowly interpreted to avoid criminalizing protected speech; statute applies only where intent includes threatening, injuring, or intimidating — not merely causing distress or embarrassment.** | Court rejected broad reading of "harass" that would criminalize offensive speech; adopted limited interpretation requiring conduct tied to fear, threat, or injury — directly constraining overreach in online-speech prosecutions. | *pp. 183–204 (statutory narrowing & constitutional avoi* |

*All three cases address 18 U.S.C. §2261A (federal cyberstalking statute) and its application to public online speech. Citations are to official reporters.*

Criminal Case No. RWT 11-091
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

# United States v. Cassidy

40 Media L. Rep. (BNA) 1001
Decided Dec 15, 2011

Criminal Case No. RWT 11-091

12-15-2011

UNITED STATES OF AMERICA v. WILLIAM LAWRENCE CASSIDY Defendant

Roger W. Titus

## <u>MEMORANDUM OPINION</u>

The Indictment in this case alleges that the Defendant, William Lawrence Cassidy, violated a federal stalking statute, 18 U.S.C. § 2261A(2)(A), when, with the intent to harass and cause substantial emotional distress to a person in another state, he used an interactive computer service to engage in a course of conduct that caused substantial emotional distress to a person whose initials are A.Z by posting messages on www.Twitter.com and other Internet Websites. Defendant has filed a Motion to Dismiss the Indictment (ECF No. 20) in which he argues that 18 U.S.C. § 2261A(2)(A) violates the First Amendment. Defendant also filed a Motion Requesting a Hearing Pursuant to *Franks v. Delaware* and to Suppress Tangible and Derivative Evidence, as well as, a Motion to Suppress. *See* ECF Nos. 21 and 22. Finally, Defendant filed a Motion for a Bill of Particulars (ECF No.16).

## <u>FACTS</u>

### <u>(a) Blogs and Twitter</u>

This case involves allegations, described in greater detail below, that a crime was committed through the Defendant's use of two recent phenomena of the internet age, "Blogs" and "Twitter." Essential to the analysis of the legal issues in this case is an understanding of both of these phenomena, which have become almost ubiquitous. *2

A "Blog" is a shorthand term for a "web log," i.e. a log or web page maintained on the World Wide Web. A Blog is like a bulletin board and contains whatever material its sponsor decides to post. It does not send messages, and there is no limitation on the length of statements that may be contained on a Blog. Like a bulletin board, it does not communicate except to those who voluntarily choose to read what is posted on it.

According to its web page, "Twitter" is a "real-time information network that connects" users to the "latest information about what you find interesting. * * * At the heart of Twitter are small bursts of information called Tweets. Each Tweet is 140 characters in length . . . ."[1] Twitter users may choose to "follow" other users. If user



United States v. Cassidy    40 Media L. Rep. (BNA) 1001 (D. Md. 2011)

No. 1 decides to "follow" user No. 2, Twitter messages (Tweets) posted by user No. 2 will show up on the home page of user No. 1 where they can be read.[2]

> [1]   See *About Twitter,* https://Twitter.com/about#about (last visited December 2, 2011).

> [2]   See *Twitter 101: How Should I Get Started Using Twitter,* https://support.Twitter.com/groups/31-Twitter-basics/topics/104-welcome-to-Twitter-support/articles/215585-Twitter-101-how-should-i-get-started-using-Twitter and https://support.Twitter.com/groups/31-Twitter-basics/topics/108-finding-following-people/articles/14019-what-is-following (last visited December 2, 2011).

A Twitter user may choose to block someone, e.g., someone whose messages are deemed offensive, in which case the offending user will be unable to follow the offended user or add that user to his or her lists, and the blocked user's Tweets will not be delivered to the other user's home page. Twitter provides detailed instructions for blocking Tweets from another user as well as for "unfollowing" another user, i.e. blocking Tweets from a user that one used to follow.[3] *3

> [3]   See *How to Unfollow Users on Twitter,* https://support.Twitter.com/articles/117063-how-to-block-users-on-Twitter and https://support.Twitter.com/articles/15355-how-to-unfollow-users-on-Twitter (last visited December 2, 2011).

A Direct Message ("DM") is a private message sent from one Twitter user to another, but such messages can only be sent to another user who is a "follower." All Twitter users are provided with the ability to block other users, in which case one user cannot follow another and neither their "Tweets" nor their Direct Messages will be delivered.[4]

> [4]   See *What is a Direct Message,* https://support.Twitter.com/articles/14606-what-is-a-direct-message-dm (last visited December 2, 2011). There are also other forms of direct communication between Twitter users known as "@Replies" and "Mentions." As in the case of direct messages, a Twitter user has the ability to restrict the receipt of this form of communication. "@Replies" will only be seen by user if they are following both the sender and recipient of the update. "Mentions" will only be seen if they are posted by someone that the user is "following." Finally, users with protected accounts can only send replies to people they have approved to follow them. *See What are @Replies and Mentions,* http://support.Twitter.com/articles/14023-what-are-replies-and-mentions (last visited December 2, 2001).

Because this case involves First Amendment issues, terms that were in use by citizens when the Bill of Rights was drafted may help in understanding the legal context of Blogs and Twitter. Suppose that a Colonist erects a bulletin board in the front yard of his home to post announcements that might be of interest to others and other Colonists do the same. A Blog is like a bulletin board, except that it is erected in cyberspace rather than in one's front yard. If one Colonist wants to see what is on another's bulletin board, he would need to walk over to his neighbor's yard and look at what is posted, or hire someone else to do so. Now, one can inspect a neighbor's Blog by simply turning on a computer.

Twitter allows the bulletin board system to function so that what is posted on Colonist No. 1's bulletin board is automatically posted on Colonist No. 2's bulletin board for Colonist No. 2 to see. The automatic postings from one Colonist to another can be turned on or off by the owners of the bulletin boards, but there is no mandatory aspect of postings on one Colonist's *4 bulletin board showing up on the other's. It is entirely up to the two Colonists whether their bulletin boards will be interconnected in such a manner.

Blogs are of unlimited size in terms of content, but must be accessed one at a time. Twitter is limited to 140 characters, but allows unlimited voluntary connectivity with other users. That connectivity, however, is subject to change at the whim of a user who has the ability to "turn off" ("block" or "unfollow") communications from another user.

United States v. Cassidy    40 Media L. Rep. (BNA) 1001 (D. Md. 2011)

Whether couched in terms of the Internet or Colonial bulletin boards, there is one consistent aspect of both eras. One does not have to walk over and look at another person's bulletin board; nor does one Blog or Twitter user have to see what is posted on another person's Blog or Twitter account. This is in sharp contrast to a telephone call, letter or e-mail specifically addressed to and directed at another person, and that difference, as will be seen, is fundamental to the First Amendment analysis in this case.

## (b) The Defendant's Relationship With A.Z.

This case was initiated by the filing of a criminal complaint issued on February 2, 2011 by a magistrate judge of this Court based upon an affidavit submitted to him by F.B.I. Special Agent Jessica A. Nye. According to the Nye affidavit, A.Z. is an enthroned tulku or reincarnate master who was enthroned in 1988 as a reincarnate llama. (ECF No. 20-2) Following the enthronement ceremony, the Supreme Head of this particular Sect of Buddhism renamed the center where A.Z. taught as Kunzang Odsal Palyou Changchub Choling ("KPC" or the "Center"). KPC was designated as the Supreme Head's seat in the West, and A.Z. is believed by members of the KPC to be the only American-born female tulku. *5

According to Nye's affidavit, the Defendant, who was then known as William Sanderson, befriended one of the monks of the KPC in 2007; he claimed he was also a Buddhist American tulku and expressed an interest in meeting A.Z. Those close to A.Z. encouraged her to meet with the Defendant. Thereafter, A.Z. invited the Defendant to join her at her retreat in Arizona and Defendant asked to ride alone with her in her vehicle. While in the vehicle, Defendant proposed to A.Z., and she declined. He also asked her to pretend they were married. A.Z. confided in the Defendant and shared details of her personal life, including the sexual abuse she endured as a child and particulars of the failed relationship with her ex-husband. In response, Defendant asked A.Z. if she wanted him to kill her ex-husband, and A.Z. requested that her ex-husband not be harmed.

Nye's affidavit also alleges that when Defendant claimed to have Stage IV Lung Cancer, members of the KPC took care of him, as if these were his final days. At that time, it came to light that the Defendant's real name was William Cassidy. KPC members and A.Z. also began to notice that the Defendant's conduct was inconsistent with this Sect's teachings. For example, he would gossip even though the Sect considers gossip offensive. These incidents led A.Z. to investigate the Defendant's lineage in order to assess whether he was in fact a tulku. Despite these concerns, however, KPC promoted Defendant in February 2008 to the position of Chief Operating Officer of KPC. The Defendant only held this position for two weeks. On February 23, 2008, A.Z. learned that the Defendant was never a tulku and confronted him. The Defendant immediately left the retreat, taking with him a Buddhist nun, Nydia Alexandra.[5] The Nye affidavit asserts that, in the wake of his departure, the Defendant used Twitter and Blogs to harass KPC and A.Z. *6

[5] Nydia Alexandra also goes by the names "Julie Green" and "Jewel Lilly Annabella."

## (c) The Defendant's Use of Twitter and a Blog

According to the Nye affidavit, the Twitter account "Vajragurl" frequently posts Tweets. As of July 5, 2010, over 350 Tweets were posted on "Vajragurl" that allegedly were directed at A.Z. KPC believes that all but a few hundred of the alleged 8,000 Tweets on the "Vajragurl" account pertain to A.Z. and KPC.[6]

[6] Generally, the Tweets posted on the "Vajragurl" account fall into five categories: (1) threats directed at A.Z.; (2) criticism of A.Z. as a religious figure /criticism of KPC; (3) derogatory statements directed towards A.Z.; (4) responses to A.Z. and/or KPC; and (5) statements that may or may not be directed towards A.Z./KPC. Appendix A contains a categorization of the Defendant's Tweets by type.

United States v. Cassidy   40 Media L. Rep. (BNA) 1001 (D. Md. 2011)

On November 12, 2010, and December 11, 2010, Twitter was served with a grand jury subpoena for the IP addresses accessing the "Vajragurl," "aconlamho," "kpcwatch," and other Twitter accounts.[7] Some of these accounts are a slight variation of A.Z.'s name. On November 16, 2010, and December 16, 2010, Twitter responded that these accounts were accessed from IP Address 174.32.77.242, which is registered to Hughes Network. On December 2, 2010, and January 5, 2011, Hughes Network responded to a subpoena identifying William Cassidy, the Defendant, as the subscriber.

[7] The other Twitter accounts included "vajrawarrior," "alicezeoli," "zeoliayce," "alycezeoli," "MaliceZeholi," "tenparinpoche," "karmaKuchen," "PenorRinpoche," "femnikki," and "ahkonorbu."

KPC and A.Z. also claim that Defendant used Blogs to harass them. According to the Nye Affidavit, a Blog entitled "Digitial Tibetan Buddhist Altar," located at http://tibetanalter.Blogspot.com, contains two posts not necessarily directed at A.Z.,[8] a statement *7 pertaining to A.Z.,[9] and a derogatory statement about KPC.[10] On January 5, 2011, after receiving subpoena results from both Google and the Hughes Network, the Government learned that this Blog is registered to the Defendant.

[8] "Yes . . . beauty. A silver hammer on a hard head is beautiful, particularly if it is administered before one's funeral pyre catches blaze. Otherwise, one's head swells and explodes."

"Just for sake of example, lets pretend that once upon a time, you dreamed that somebody came clump, clump, clumping up the stairs to your bedroom and did you an injury. . . Maybe it was somebody you knew.. .The time, the body, and the circumstance no longer exist. This is to say that the body which was injured in the dream no longer exists, the apparent attack itself no longer exists, and the apparent attacker no longer exists. . . . The body which was attacked may with equal validity only be claimed as extant for the precise moment of the attack. We may also say that was the younger body, whereas now there is the older body."

[9] "This would be funny if it weren't so tragic. Back a couple of months ago, (A.Z.) (she calls herself "(A.Z.)," and claims she is a "living Buddha") called police near her Barnesville, Maryland home to report that, a "team of intruders" were observed "stalking the perimeter." Nothing wrong with that—can't be too careful these days."

[10] "Whenever I hear about a Buddhist cult, I immediately want to investigate. It is like watching hookers on the stroll. You never know when you'll find a really saucy one. Speaking personally, one whistled at me a while back, and she came right over to the car. I made the mistake of rolling down the window far enough for her to jump in. That led to my brief tenure as Chief Operating Office of KPC in all its farflung permutations and front operations. So, while I may not be an expert on Buddhist cults, at least I am entitled to an opinion, having examined one from the inside out, so to speak."

According to the Nye affidavit, Defendant's Tweets and Blog postings have caused A.Z. substantial emotional distress. She fears for her own safety and that of her fellow KPC members.

As a result of the alleged harassment, A.Z. has not left her house for a year and a half, except to see her psychiatrist. A.Z. was in such fear for her safety that she did not go to an October 2010 retreat.

## (d) The Charge Against The Defendant

On February 2, 2011, Nye submitted an affidavit (ECF No. 20-2) in support of an arrest warrant for the Defendant on the basis that the Defendant violated 18 U.S.C §§ 2261A(2)(A) and 2261A(2)(B), and an arrest warrant was issued that same day. On February 23, 2011, the Grand Jury *8 indicted Defendant on one count of interstate stalking under 18 U.S.C. § 2261A(2)(A), but not § 2261A(2)(B).

## DISCUSSION

casetext

## I. Background of 2261A(2)(A)

Section 2261A is an interstate stalking statute originally passed as part of the Violence against Women's Act. *See* Pub. L. No. 104-201, Div. A, Title X, § 1069(a), 110 Stat. 2422, 2655 (1996).

Prior to 2006, Section 2261A(2)(A) made it a crime, *inter alia,* to use the mail or any facility of interstate or foreign commerce to engage in a course of conduct with the intent to place a person in reasonable fear of the death of, or serious bodily injury to that person. The pre-2006 version of Section 2261A(2)(A) reads as follows:

Whoever

(2) with the intent

(A) to kill or injure a person in another State or tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States; or
(B) to place a person in another State or tribal jurisdiction, or within the special maritime and territorial jurisdiction of the United States, in reasonable fear of the death of, or serious bodily injury to—
(i) that person;
(ii) a member of the immediate family (as defined in section 115) of that person; or
(iii) a spouse or intimate partner of that person,

uses the mail or any facility of interstate or foreign commerce to engage in a course of conduct that places that person in reasonable fear of the death of, or serious bodily injury to, any of the persons described in clauses (i) through (iii), shall be punished as provided in section 2261(b).

Pub. L. No. 106-386, Div. B, Title I, § 1107(b)(1), 114 Stat. 1464, 1498 (2000).

In 2006, Section 2261A(2)(A) was amended substantially and now reads as follows: *9

Whoever

(2) with the intent

(A) to kill, injure, **harass,** or place under surveillance with intent to kill, injure, harass, or intimidate, or **cause substantial emotional distress** to a person in another State or tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States; or
(B) to place a person in another State or tribal jurisdiction, or within the special maritime and territorial jurisdiction of the United States, in reasonable fear of the death of, or serious bodily injury to—
(i) that person;
(ii) a member of the immediate family (as defined in section 115 of that person; or
(iii) a spouse or intimate partner of that person;

uses the mail, any **interactive computer service,** or any facility of interstate or foreign commerce to engage in a course of conduct that **causes substantial emotional distress** to that person or places that person in reasonable fear of the death of, or serious bodily injury to, any of the persons described in clauses (i) through (iii) of subparagraph (B) shall be punished as provided in Section 2261(b). (emphasis added)

Pub. L. No. 109-162, Title I, § 114(a), 119 Stat. 2690, 2987.

These amendments significantly broadened the scope of the law. The requisite *intent* no longer was limited to an intent to "kill or injure," but was broadened to include the intent to "harass or place under surveillance with the intent to . . . harass or intimidate or cause substantial emotional distress." The requisite *action* was also broadened so as to bring within the scope of the law a course of conduct that merely "causes substantial emotional distress." Prior to the 2006 change, the course of conduct was limited to one that places a person in reasonable fear of death or serious bodily injury. Finally, the 2006 changes expanded the *mechanisms of injury* to add use of an "interactive computer service" to the existing list which already included use of mail or any facility of interstate or foreign commerce. *10

## II. The Defendant's Motion To Dismiss

The Defendant has moved to dismiss the Indictment, alleging that (1) Section 2261A(2)(A) violates the Free Speech Clause of the First Amendment because it is overbroad and implicates a broad range of otherwise constitutionally protected speech; (2) Section 2261A(2) is unconstitutional as applied to the Defendant; (3) Section 2261A(2)(A) is unconstitutionally vague, thus violating the Defendant's due process rights under the Fifth Amendment because it does not give notice as to what specific conduct is unlawful; and (4) the Indictment fails to state a criminal offense.

## III. The Broad Protections Of The First Amendment

Under the First Amendment "Congress shall make no law... abridging the freedom of speech." U.S. Const. amend. I. From our nation's founding, there has been a tradition of protecting anonymous speech, particularly anonymous political or religious speech. *See Watchtower Bible & Tract Society v. Village of Stratton,* 536 U.S. 150, 162 (2002); *Lefkoe v. Jos. A. Bank Clothiers, Inc.,* 577 F.3d 240, 248 (4th Cir. 2009) ("Courts have typically protected anonymity under the First

Amendment when claimed in connection with literary, religious, or political speech.") For example, the Federalist Papers, written by James Madison, Alexander Hamilton, and John Jay, but published under the pseudonym "Publius," are in and of themselves the best example of anonymous political speech. *See McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 343 n.6 (1995). And the opponents of the federalists, the anti-federalists, also used pseudonyms to publish their views anonymously. *Id.* In 1960, the Supreme Court recognized the importance of this type of core anonymous speech stating that "leaflets, brochures and even books have played an important role in the progress of mankind [as] [p]ersecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." *Talley v. California,* 362 *11 U.S. 60, 65 (U.S. 1960). This is because anonymous speech allows individuals to express themselves freely without "fear of economic or official retaliation ... [or] concern about social ostracism."*McIntyre,* 514 U.S. at 341-42.

Moreover, the First Amendment protects speech even when the subject or manner of expression is uncomfortable and challenges conventional religious beliefs, political attitudes or standards of good taste. *See e.g., United States v. Stevens* 130 S.Ct. 1577, 1585 (2010). In *Cantwell v. Connecticut,* 310 U.S. 296, 310 (1940), the Supreme Court overturned the conviction of three individuals for passing out religious leaflets in violation of a Connecticut statute that made

United States v. Cassidy   40 Media L. Rep. (BNA) 1001 (D. Md. 2011)

it a crime to solicit and breach the peace and observed:

In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

Indeed, the Supreme Court has consistently classified emotionally distressing or outrageous speech as protected, especially where that speech touches on matters of political, religious or public concern. This is because "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate 'breathing space' to the freedoms protected by the First Amendment.'" *See Boos v. Barry,* 485 U.S. 312, 322 (1988) (citing *Hustler Magazine, Inc. v. Faldwell,* 485 U.S. 46, 66 (1988)); *See also New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964); *Snyder v. Phelps,* 131 S.Ct. 1207, 1219 (2011) (Because the emotionally distressing "speech was at a public place on a matter of public concern, that speech is entitled to 'special protection' *12 under the First Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt").

Even though the Internet is the newest medium for anonymous, uncomfortable expression touching on political or religious matters, online speech is equally protected under the First Amendment as there is "no basis for qualifying the level of First Amendment scrutiny that should be applied" to online speech. *Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 870 (1997). Indeed "whatever the challenges of applying the Constitution to ever-advancing technology, basic principles of freedom of speech and press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *See Brown v. Entm't Merch. Ass'n,* 131 S. Ct. 2729, 2733 (2011) (internal quotations omitted).

## IV. Limitations On The Protections Afforded To Free Speech

Even though numerous court decisions have made a point to protect anonymous, uncomfortable speech and extend that protection to the Internet, not all speech is protected speech. There are certain "well-defined and narrowly limited classes of speech" that remain unprotected by the First Amendment. *See Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-572 (1942). This type of unprotected speech is limited to, (a) obscenity, *Roth v. United States,* 354 U.S. 476 (1957), (b) defamation, *Beauharnais v. Illinois,* 343 U.S. 250, 254-255, (1952), (c) fraud, *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, (1976), (d) incitement, *Brandenburg v. Ohio,* 395 U.S. 444, 447-449 (1969) *(per curiam),* (e) true threats *Watts v. United States,* 394 U.S. 705 (1969), and (f) speech integral to criminal conduct, *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 498 (1949). Speech that does not fall into these exceptions remains protected. *See United States v. Stevens,* 130 S.Ct. 1577, 1586 (2010) (holding that statute *13 criminalizing "depictions of animal cruelty" remain protected because there is no "freewheeling authority to declare new categories of speech outside the scope of the First Amendment.").

Applying these standards, it is clear that the Government's Indictment is directed at protected speech that is not exempted from protection by any of the recognized areas just described. First, A.Z. is a well-known religious figure who goes by the names Alyce Zeoli or Catherine Burroughs. Martha Sherrill, a *Washington Post* journalist wrote a critical non-fiction book about A.Z. entitled *The Buddha from Brooklyn* (Random House 1st ed. 2000). Second, although in bad taste, Mr. Cassidy's Tweets and Blog posts about A.Z. challenge her character and qualifications as a religious leader. *See* Appendix A. And, while Mr. Cassidy's speech may have

United States v. Cassidy    40 Media L. Rep. (BNA) 1001 (D. Md. 2011)

inflicted substantial emotional distress, the Government's Indictment here is directed squarely at protected speech: anonymous, uncomfortable Internet speech addressing religious matters. Tellingly, the Government's Indictment is not limited to categories of speech that fall outside of First Amendment protection - obscenity, fraud, defamation, true threats,[11] incitement or speech integral to criminal conduct. Because this speech does not fall into any of the recognized exceptions, the speech remains protected.

> [11]  In its brief, the Government seems to shift its theory of the case from one based on emotional distress to one based on threats: "Defendant in this case engaged in a continual course of conduct intended to threaten and intimidate A.Z. and KPC." Opp'n. to Def.'s Mot. to Dismiss at 21 (ECF No. 27). Although "true threats" to another's physical safety are not protected, *Watts v. United States,* 394 U.S. 705 (1969), the Government, did not seek an Indictment on the basis that Defendant intentionally used the Internet to put A.Z. in reasonable fear of death or serious bodily injury. *See* 18 U.S.C. §2261A(2).

## V. Content-Based Restrictions On Speech

A content-based restriction on protected speech must survive strict scrutiny. *See United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 813 (2000). But, if the regulation is "unrelated *14 to the content of speech,"— i.e. content-neutral—it only need survive an intermediate level of scrutiny as these types of regulations "pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys. Inc. v. Fed. Comm'cns Comm.,* 512 U.S. 622, 642 (1994). In determining whether a statute is content-neutral, one must determine whether "the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). For example, "[a]s a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based," while laws that regulate "without reference to the ideas or views expressed are in most instances content-neutral." *Turner Broad. Sys.,* 512 U.S. at 643.

Typically, a restriction is content-based if it regulates speech based on the effect that speech has on an audience. For example in *Playboy Entertainment Group,* the Supreme Court held that the Telecommunications Act's "signal bleed" provision, requiring cable operators either to scramble sexually explicit channels in full or limit programming on such channels to certain hours, amounted to a content-based restriction. 529 U.S. at 811-812. The provision "single[d] out particular programming content for regulation" as well as "particular programmers," applying by its terms only to channels "primarily dedicated to sexually-oriented programming." 47 U.S.C. § 561(a) (1994 Supp. III.). Id. at 806. Because the provision focused only on the content of the speech and the direct impact that speech had on viewers, the provision was a content-based restriction. *Id.* at 812, *see also Boos v. Barry,* 485 U.S. 312, 321 (1988) (holding that a Washington, DC regulation making it unlawful, within 500 feet of a foreign embassy, either to display any sign that tends to bring the foreign government into "public odium" or "public disrepute" amounts to a content-based speech restriction because it focuses on the direct impact of the speech on a foreign government); *15 *Reno v. Am. Civ. Liberties Union,* 521 U.S. 844, 877 (1997) (holding that Provisions of the Communications Decency Act (CDA) prohibiting transmission of obscene or indecent communications by means of a telecommunications device to persons under the age of 18, or sending patently offensive communications through use of interactive computer service to persons under the age of 18 is a content-based restriction on speech as it focuses on the impact of that speech); *PSINet Inc. v. Chapman,* 362 F.3d 227, 233 (4th Cir. 2004) (same).

In the present case, the only portion of Section 2261A(2)(A) mentioned in the Indictment amounts to a content-based restriction. Section 2261A(2)(A) criminalizes anyone who:

(2) with the intent

(A) to kill, injure, **harass,** or place under surveillance with intent to kill, injure, harass, or intimidate, **or cause substantial emotional distress to a person** in another State or tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States... uses the mail, any interactive computer service, or any facility of interstate or foreign commerce to engage in a course of conduct that **causes substantial emotional distress to that person...** (emphasis added)

Mr. Cassidy allegedly violated the statute by intentionally causing substantial emotional distress to A.Z., specifically on Twitter and Blogs. The portion of Section 2261A(2)(A) relied on in the Indictment amounts to a content-based restriction because it limits speech on the basis of whether that speech is emotionally distressing to A.Z.

To survive strict scrutiny, the Government has the burden of showing that a content-based restriction "is necessary to serve a compelling state interest." *See PSI Net,* 362 F.3d at 234 (citing *Bank v. Belotti* 435 U.S. 765 (1978)). The Government indirectly argues that it has a compelling interest in protecting victims from emotional distress sustained through an interactive computer service. *See* Pl Mot. to Dismiss Indictment at 23 (ECF No. 20). However, the decision in *Playboy* *16 *Entertainment Group,* 529 U.S. at 865, underscores the fact that the Government's interest is not a compelling one:

> Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities simply by averting [our] eyes.

Here, A.Z. had the ability to protect her "own sensibilities simply by averting" her eyes from the Defendant's Blog and not looking at, or blocking his Tweets.

In *United States v. Stevens,* the Supreme Court affirmed the Third Circuit's decision holding that a content-based restriction of protected speech — i.e. a federal statute that criminalized the intentional creation, sale or possession of a depiction of animal cruelty — did not serve a compelling state interest on the basis that these types of content-based restrictions of protected speech are presumptively invalid. 130 S.Ct. 1577, 1584 (2010).[12] Because the Government's interest in criminalizing speech that inflicts emotional distress is not a compelling one, the statute does not survive strict scrutiny.

[12] *But see United States v. Lempley,* 573 F.2d 783, 787 (3d Cir. 1978) (stating that with respect to a statute that prohibits the intentional use of a telephone to harass and threaten, the "Congress had a compelling interest in the protection of innocent individuals from fear, abuse, or annoyance at the hand of persons who employ the telephone not to communicate, but for other unjustifiable motives.") That case is inapposite because A.Z. had the ability to not look at the Defendant's Blog or his postings on Twitter.

## VI. Conduct Or Speech?

The Government argues that Section 2261A(2)(A) regulates conduct and not speech, and any impact on speech is incidental and content-neutral. However, in *United States v. O'Brien,* 391 U.S. 367, 377 (1968), the Court stated that in situations where "'speech' and 'nonspeech' elements are combined in the same course of conduct" a government regulation must still pass *17 intermediate scrutiny. A content-neutral regulation of conduct that has an incidental impact on speech survives intermediate scrutiny if "'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" *See Satellite Broad. & Comm'cns Ass'n v. Fed. Comm'cns Comm.,* 275 F.3d 337, 355 (4th Cir. 2001) (citing *O'Brien,* 391 U.S. at 377).

Arguably, preventing the use of the Internet and other interactive computer services to inflict emotional distress on others serves an important governmental interest. Indeed, by analogy, the Fourth Circuit has held that "the government has a strong and legitimate interest in preventing the harassment of individuals" in the context of a Virginia telephone harassment statute that prohibited the intentional use of the telephone to harass others. *Thone v. Bailey,* 846 F.2d 241, 243 (4th Cir. 1988).

However, it is questionable whether the same interest exists in the context of the use of the Internet alleged in this case because harassing telephone calls "are targeted towards a particular victim and are received outside a public forum." *United States v. Bowker,* 372 F.3d 365, 379 (6th Cir. 2004). Twitter and Blogs are today's equivalent of a bulletin board that one is free to disregard, in contrast, for example, to e-mails or phone calls directed to a victim. *See id.* at 378 (contrasting why a federal telephone harassment statute serves a compelling governmental interest and a statute that made it a criminal offense for three or more persons to assemble on a sidewalk and to be "annoying" to a passerby did not serve a compelling governmental interest).[13] *18

[13] No court analyzing Section 2261A(2)(A) has upheld the constitutionality of this statute when applied to situations implicating both the "interactive computer service element" and the "substantial emotional distress element." For example, in *United States v. Bowker,* 372 F.3d 365 (6th Cir. 2004), the court upheld Section 2261A(2)(A), the case involed the pre-2006 version of the statute that did not sweep the use "of any interactive computer service . . . that causes substantial emotional distress" into the conduct element, or "intent to . . . cause substantial emotional distress" into the *mens rea* element. Similarly, in *United States v. Shrader,* No. 09-270, 2010 WL 2179572 (S.D.W.Va April 7, 2010) *aff'd* No. 09-0270, 2010 WL 2179570 (S.D.W.Va, May 26, 2010) the court upheld the constitutionality of the statute. Although *Shrader* relies on a post-2006 version of the statute, under the facts in *Shrader,* the defendant engaged in conduct that would have violated pre-2006 elements of the statute. In *Shrader,* the defendant, who murdered his ex-girlfriend's mother, was charged under Section 2261A(2) for sending a letter and making frequent harassing telephone calls to his ex-girlfriend. Unlike the Defendant's conduct in *Shrader,* Mr. Cassidy did not put his victim in the same reasonable fear of death or serious bodily injury and was not indicted under this portion of the statute. Moreover, in contrast to telephone calls, or letters which were directed to a specific person in *Shrader,* Mr. Cassidy's Tweets and Blogs existed in cyberspace and the victim was free to ignore them.

Assuming, however, that preventing the use of the Internet and other interactive computer services to inflict emotional distress on others qualifies as an important governmental interest, the issue here is whether the incidental restriction Section 2261A(2)(A) places upon speech is no greater than is essential to the furtherance of that interest. The facts of this case indicate that it does not. Defendant and the Amicus, the Electronic Frontier Foundation, point out that A.Z. is not merely a private individual but rather an easily identifiable public figure that leads a religious sect, and that many of the Defendant's statements relate to KPC's beliefs and A.Z.'s qualifications as a leader.[14] Thus, this statute sweeps in the type of expression that the Supreme Court has consistently tried to protect. *See e.g., New York Times Co. v. Sullivan,* 376 U.S. 254, 271 (1964) (the fundamental importance of the free flow of ideas and opinions on matters of public concern is the core of the First Amendment Protections, even where speech includes "vehement caustic and sometimes unpleasantly *19 sharp attacks."); *Boos v. Barry,* 485 U.S. 312, 322 (1988) (refusing to uphold a statute that restricted the use of displays critical of foreign governments in front of embassies or consulates in light of a "longstanding refusal to [punish speech] because the speech in question might have an emotional impact on its audience.").

[14] The Amicus, the Electronic Frontier Foundation, points out that A.Z. leads an "an ongoing public conversation on religion, addressing Internet users on a frequent basis from her own Verified Twitter account, which has 17,221 followers," "produced dozens of publicly accessible online video teachings which have been viewed over 143,000 times," and "makes her public teachings available to her followers through the Buddhist KPC website which she founded." Br. of Amicus Curiae in Supp. of Def., (ECF No. 24) at 8.

Indeed, the Government does not suggest that its interest in preventing the use of the Internet and other interactive computer services to inflict emotional distress on others would no longer be furthered if the statute did not apply to individuals engaging in political debates or critiques of religious leaders. *C.f. United States v. Popa,* 187 F.3d 672, 677 (D.C. Cir. 1999) (holding that a criminal statute prohibiting making anonymous phone calls with the intent to annoy could have been more narrowly drafted as applied to a defendant, who made calls to the US Attorney's Office containing racial epithets and complaints about police brutality, without loss of utility to the government by excluding individuals engaging in public or political discourse). Notably, the Government never challenges the notion that Defendant's Tweets and Blog postings are not political or religious in nature.

## VII. Facial Validity Of Section 2261A(2)(A)

Although the Defendant and the Government extensively briefed the issue of whether Section 2261A(2)(A) is overbroad or void for vagueness, this Court will not address these facial challenges to the statute because the Court concludes that the statute is invalid as applied. Where courts have found a statute to be unconstitutional as applied, they do not generally reach facial challenges to statutes based on overbreadth or vagueness. For example, in *United States v. Popa,* the court found unconstitutional, as applied, a federal telephone statute that prohibited making anonymous telephone calls with the intent to annoy abuse or harass to a defendant who used the *20 phone to call the U.S. Attorney's office and communicate racial epithets and complaints about police brutality. 187 F.3d 672, 678 (D.C. Cir. 1999). Applying intermediate scrutiny, the court reasoned that the defendant engaged in a type of political speech, and the statute could have been more narrowly drafted to exclude such speech from prosecution. *Id.*

Even though the defendant in *United States v. Popa* also challenged the statute on its face under the overbreadth doctrine, the court explicitly decided not to address that issue, stating that "because the statute is unconstitutional as applied to [defendant's] conduct, we shall not go on to inquire as to whether the statute is overbroad." Id. Indeed, this approach is not unique. *See Bd. of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 484-85 (1989) (holding that governmental restriction on commercial speech as applied to plaintiffs was unconstitutional and did not consider an overbreadth challenge, reasoning that "it is not the usual judicial practice . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily — that is before it is determined that the statute would be valid as applied.").[15] *21

---

[15] *See also Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 502 (1985) (invalidating statute regulating obscenity as applied to plaintiff but refusing to strike down statute in its entirety, reasoning "that a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it"); *United States v. Grace,* 461 U.S. 171, 175 (1983) (declining to invalidate a federal criminal statute on its face that prohibited demonstrations on the Supreme Court grounds and confining its holding to invalidate the statute as applied to the case at bar in which the challengers were picketing on the public sidewalks surrounding the building); *Commodity Trend Service, Inc., v. Commodity Futures Trading Comm'n.,* 149 F.3d 679, 689 n.5 (7th Cir. 1998) (noting that when considering an overbreadth challenge, it is a proper exercise of judicial restraint for courts to adjudicate as-applied challenges before facial ones in an effort to decide constitutional attacks on the narrowest possible grounds and to avoid reaching unnecessary constitutional issues); *Jacobsen v. Howard,* 109 F.3d 1268, 1275 (8th Cir. 1997) (holding that because the court concluded that criminal statutes were invalid as applied, it is appropriate not to consider the overbreadth issue).

In this case, the Court concludes that the statute is unconstitutional as applied, and thus it is unnecessary to address the parties' arguments as to whether the emotional distress via an interactive computer service portion of 28 U.S.C. § 2261A(2)(A) is facially invalid.

United States v. Cassidy    40 Media L. Rep. (BNA) 1001 (D. Md. 2011)

## CONCLUSION

For the reasons set forth above, the Court will, by separate Order, grant the Motion to Dismiss the Indictment and deny as moot all of the Defendant's remaining motions.

_____

Roger W. Titus

United States District Judge

*22

## Appendix A

### Type 1: Threats

<u>Sunday, May 30, 2010</u>: "ya like haiku? Here's one for ya: "Long, Limb, Sharp Saw, Hard Drop" ROFLMAO."[16]

> [16] ROLFMAO is Internet slang for Rolling on Floor Laughing My A** Off.

<u>Monday, July 5, 2010</u>: "and that sound that keeps buzzing in the back of your head (A.Z.) is my hand touching the ground."

<u>Tuesday, June 22, 2010</u>: "want it to all be over soon sweetie?"

<u>Saturday, September 25, 2010</u>: "Enough is enough. The final bit of magic begins now. Within 90 days, you will know. Owl and raven feathers separate... permanently."[17]

> [17] Owl and raven feathers separate" refers to a specific tantric magical invocation to "separate" (i.e., remove) the defenses of the enemy so that the enemy is then left defenseless against attack. This probably stems from the ancient belief in many aboriginal cultures that owls and ravens represent the two poles of "good" and "evil", based on white owl feathers and black raven feathers seen as symbols of polar opposites. Owl and raven feathers are also symbols of various protector deities in Vajrayana Buddhism. *See* http://protectingnyingma2.wordpress.comJpage/2/

<u>Tuesday, October 19, 2010</u>: "owl and raven feathers separate .... tick tock tick tock tick tock tick tock tick tock."

<u>Tuesday, October 19, 2010</u>: "owl and raven feathers separate .... tick tock tick tock tick tock"

<u>Sunday, October 24, 2010</u>: "Rain tomorrow should cover the tracks..."

<u>Tuesday, December 7, 2010</u>: "Got a wonderful Pearl Harbor Day surprise for KPC ....wait for it."

<u>Wednesday, December 8, 2010</u>: "@WuTangTulku '(A.Z.)' sees Tenpa Rinpoche every time she closes her eyes. He is everywhere."

<u>Thursday, December 9, 2010:</u> "(A.Z.) is over 60, in extremely bad health, and about to get worse: karma will be very rough on her due to conditions she has created."

<u>Thursday, December 9, 2010</u>: "Terrors in the night disturb Fat (A.Z.)'s sleep: she cannot sleep with taking something, and anxiety rules her body like a slavemaster." *23

<u>Thursday, December 9, 2010</u>: "A thousand voices callout to (A.Z.) and she cannot shut off the silent scream."

United States v. Cassidy    40 Media L. Rep. (BNA) 1001 (D. Md. 2011)

Monday, December 20, 2010: "I have this *amazing* present for a group of people who really, really deserve something *amazing*. Long time in preparation. Wait for it."

Monday, December 20, 2010: "I have a really *special* eclipse present for somebody who really, really deserves something *special.* Full circle karma. Wait for it."

Monday, December 20, 2010: "RT @religionnews: Former cult member murdered in Texas: http://bit.ly/h2P6S8#religion #cults"

Friday, May 28, 2010: "Last night I had a dream about Seems something sudden..."[18]

> [18]  From Twitter account kpcwatch.

Friday, May 28, 2010: ". . . something suddenly happened."[19]

> [19]  From Twitter account kpcwatch.

Friday, May 28, 2010: "Damn! I just heard more screams coming from the compound! Hope everything is OK! Worried!"[20]

> [20]  From Twitter account kpcwatch.

## Type 2: Criticism of A.Z. as a Religious Figure and/or Criticism of KPC Belief System

Sunday, May 30, 2010: "(A.Z.) is a demonic force who tries to destroy Buddhism"

Monday, June 7, 2010: "may the legion of dakinis[21] trample on the false guide (A.Z.)'s head and bring her to her knees in submission to pure lineage."

> [21]  Dakini is a goddess.

Monday, June 7, 2010: "if she leaves rainbow[22] I'll recant my words but all she'll ever leave is a [sic] shit stain on the [sic] sheets & another lying cover-up by her [sic] cult of fools"

> [22]  In the Tibetan Buddhist tradition, miraculous signs, such as rainbows may follow an accomplished Master's death. (Affidavit)

Friday, June 25, 2010: "(A.Z.) you are a liar & a fraud & you corrupt Buddhism by your very presence: go kill yourself." *24

Friday, July 9, 2010: "(A.Z.) is no dakini: shes a grossly overweight 61 yr old burnt out freak with bad bowels & a lousy outlook: her "crown" is a joke."

Tuesday, July 13, 2010: "attendees at NY Palyul annual retreat being told to avoid (A.Z.): being warned that she is "delusional!" Just finding that out?"

Wednesday, October 20, 2010: "The memory of Penor Rinpoche[23] in America has been DISGRACED by (A.Z.) and Steven Seagal. All the spin in the world cannot change that."

> [23]  Penor Rinpoche is a religious leader of the Sect.

Monday, October 25, 2010: "(A.Z.) is OBSESSED with Tenpa Rinpoche[24] because he knows ALL her dirty little secrets: she lives in fear of being outed by him."

casetext

24  Tenpa Rinpoche refers to the Defendant.

Monday, October 25, 2010: "(A.Z.)'s livelihood:" uneducated bitch makes her living off suckers who need to believe in fairy tales."

Wednesday, November 11, 2010: "(A.Z.) IS A SATANIC CORRUPTER OF DHARMA: A SHE-DEMON WHO MASQUERADES AS A "TEACHER" http://tinyurl.com/2fy21nd"

Thursday, December 2, 2010: "because that delusive belief set of hers forms the rationale for all her craziness: wow! one name must ring in her ears nite & day".

Sunday, December 5, 2010: "To call an overweight whore "mother of palyul" insults whores & palyul."

Sunday, December 5, 2010: "Watch (A.Z.) and KPC decompose."

Wednesday, December 8, 2010: "A LA LA HO! so keep on shoutin & sweatin (A.Z.) & showin us all yer credentials & tellin us how very fucking high you are."

Thursday, December 9, 2010: "A strong wind @ryderjaphy will blow down the KPC house of cards once and for all. They live by extortion now, and they live hand to mouth."

Monday, December 20, 2010: "Some people really react badly 2 the screams of their victims So annoying Such people are called sociopaths A group of them is called 'KPC.'" *25

Tuesday, December 28, 2010: "DOWN WITH KPC! The fascist insect that preys on the life of Buddhism in the West! DOWN WITH (Victim I)! The corrupt poser who has nothing."

Thursday, December 30, 2010: "Warning to KPC cult followers: your leader has become even more unstable. #dontdrinkthekoolaid She is clearly in psychic distress."

Thursday, December 30, 2010: "2011 looks cursed for (A.Z.) & KPC © (A.Z.) May all beings benefit! http://bit.ly/fSCcoa"

## Type 3: Derogatory Statements Directed Towards A.Z.

*Subpart A: Vulgarity*

Friday, June 4, 2010: "(A.Z.): somebody throw a couple shots of gin in the bitch & get her back on Twitter: shes fun 2 play with."[25]

25  This tweet occurred immediately after A.Z. closed her Twitter account and deleted her name. (Affidavit)

Monday, July 5, 2010: "Dedicate the merit & so forth ... & a hearty fuck you in the general direction of Maryland."

Thursday, August 19, 2010: "hey! great idea! Go save the dogs in Maryland! I know where there are some bitches that desperately need mental health care . . ."

*Subpart B: Criticism of Looks*

Wednesday, July 14, 2010: "ho bitch (A.Z.) so ugly that when she was born the doctor slapped her mother #hobitch (A.Z.)"

Wednesday, July 14, 2010: "that ho bitch (A.Z.) so fat if she falls & breaks her leg gravy will spill out."

Wednesday, July 14, 2010: "that ho bitch (A.Z.) so nasty her mama took her out on the stroll so she wouldn't have to kiss her goodbye."

*Subpart C: Encouraging A.Z. to Commit Suicide*

Sunday, July 25, 2010: "I have just one thing I want to say to (A.Z.), and its form the heart: do the world a favor and go kill yourself. P.S. Have a nice day."

Sunday, July 25, 2010: "(A.Z.) you called me a "sick low life pig" oh great Mandarava? Go kill yourself." *26

*Subpart D: Sexually Explicit*

Monday. October 25. 2010: "city girls use Vaseline, country girls use lard, fat (A.Z.) don't use nothing,' she gets it twice as . . . "

Sunday, December 5, 2010: "I do not believe (A.Z.) was a prostitute. I think that story is a made-up lie Prostitutes are professionals."

Sunday, December 5, 2010: "Can reputed ex-prostitute (A.Z.) weather the storm she has created for herself by obsessive online bullying & cyberstalking?"

Sunday, May 23, 2010: "what do you expect from the unwanted daughter of a weekend prostitute?"[26]

> [26] From Twitter account kpcwatch.

Sunday, May 23, 2010: "(A.Z.) is like a waterfront whore: her price goes down as the night wears on."[27]

> [27] From Twitter account kpcwatch.

*Subpart E: Regarding A.Z.'s Personality*

Thursday, December 2, 2010: "(A.Z.), if you don't like the results of your actions, try a new approach: stop your hate, fear, insecurity, and greed: STFU&STFD)."

Wednesday, December 8, 2010: "it ain't cause yer a woman (A.Z.) & it sure aint jealousy. you got that all wrong. its because yer a fucking hypocrite from way down the road."

Sunday, May 23, 2010: "(A.Z.)'s attendants say she shits the bed regularly and pisses it when she's drunk: at the moment of death such events are quite telling."[28]

> [28] From Twitter account kpcwatch.

## Type 4: Responses to A.Z. and/or KPC

Sunday, July 25, 2010: "(A.Z.) you called me a "sick low life pig" oh great Mandarava? Go kill yourself."

Tuesday, November 30, 2010: "@(A.Z.) sure hope you weren't referring to me as a felon, bitch, because as I'm sure your lawyer has informed you that could cost U money."

Thursday, December 2, 2010: "yet still the bitch maintains hate sites, uses anonymous avatars to do her dirty work and pretends to herself we don't see right through her" *27

Thursday, December 16, 2010: "@ryderjaphy @waylonlewis @elephantjournal first off, these KPC punks got nothing, so fuck their "legal" threats."

United States v. Cassidy    40 Media L. Rep. (BNA) 1001 (D. Md. 2011)

**Type 5: Statements not necessarily directed towards A.Z.**

Tuesday, October 19, 2010: "One name rings inside her head . . . over and over again . . . she can't get it out of her mind ... it comes to her every "practice" session . . . ."

Tuesday, October 19, 2010: "That name rings in her head a thousand times each day....."

Tuesday, October 19, 2010: "hey! who left the light on in the barn!"

Tuesday, October 19, 2010: "all for you . . . all for you . . . ."

Tuesday, October 19, 2010: "just for you . . . ."

Wednesday, October 20, 2010: "(A.Z.) I will sign off a bit early. Tomorrow is a big day, I'd like to be rested I will break retreat temporarily for important meetings"

Sunday, October 24, 2010: "But for tonight? Was that a noise in the trees? Is that a light? No, not there... over there!"

Wednesday, December 8, 2010: "because everybody knows that grabbing nickels tossed by crowds into your tambourine is what you do best . . . ."

Wednesday, December 8, 2010: "which pretty much makes Tenpa the Baddest Motherfucker With Blue Eyes on the face of the planet . . . because if what they say is true . . ."

Thursday, December,16, 2010: "So my unsolicited advice which I claim the right 2 give on grounds of being an obnoxious bitch is pop the fucking weasel & full speed ahead."

Thursday, May 13, 2010: "late at night at the edge da farm, somethin creepin in the woods gonna do ya harm all ya gots 2 do 2 make it go away is pay pay pay pay."[29]

29  From Twitter account "aconlamho."

--------



16

No. 13-983

Supreme Court of the United States

# Elonis v. United States

575 U.S. 723 (2015)   ·   135 S. Ct. 2001   ·   192 L. Ed. 2d 1   ·   83 U.S.L.W. 4360

Decided Jun 1, 2015

No. 13–983.

06-01-2015

Anthony Douglas ELONIS, Petitioner v. UNITED STATES.

John P. Elwood, Washington, DC, for Petitioner. Michael R. Dreeben, Washington, DC, for Respondent. Ronald H. Levine, Abraham J. Rein, Post & Schell, P.C., Philadelphia, PA, John P. Elwood, Counsel of Record, Ralph C. Mayrell, Vinson & Elkins LLP, Washington, DC, Daniel R. Ortiz, Toby J. Heytens, University of Virginia School of Law, Supreme Court Litigation Clinic, Charlottesville, VA, David T. Goldberg, Donahue & Goldberg LLP, New York, NY, Mark T. Stancil, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, DC, for Petitioner. Donald B. Verrilli, Jr., Solicitor General, Counsel of Record, Leslie R. Caldwell, Assistant Attorney General, Michael R. Dreeben, Deputy Solicitor General, Eric J. Feigin, Assistant to the Solicitor General, Sangita K. Rao, Attorney, Department of Justice, Washington, DC, for Respondent.

Chief Justice ROBERTS delivered the opinion of the Court.

John P. Elwood, Washington, DC, for Petitioner.

Michael R. Dreeben, Washington, DC, for Respondent.

Ronald H. Levine, Abraham J. Rein, Post & Schell, P.C., Philadelphia, PA, John P. Elwood, Counsel of Record, Ralph C. Mayrell, Vinson & Elkins LLP, Washington, DC, Daniel R. Ortiz, Toby J. Heytens, University of Virginia School of Law, Supreme Court Litigation Clinic, Charlottesville, VA, David T. Goldberg, Donahue & Goldberg LLP, New York, NY, Mark T. Stancil, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, DC, for Petitioner.

Donald B. Verrilli, Jr., Solicitor General, Counsel of Record, Leslie R. Caldwell, Assistant Attorney General, Michael R. Dreeben, Deputy Solicitor General, Eric J. Feigin, Assistant to the Solicitor General, Sangita K. Rao, Attorney, Department of Justice, Washington, DC, for Respondent.

Chief Justice ROBERTS delivered the opinion of the Court.*726 Federal law makes it a crime to transmit in interstate commerce "any communication containing any threat ... to injure the person of another." 18 U.S.C. § 875(c). Petitioner was convicted of violating this provision under instructions that required the jury to find that he communicated what a reasonable person would regard as a threat. The question is whether the statute also requires that the defendant be aware of the threatening nature of the communication, and—if not—whether the First Amendment requires such a showing.

I



A

Anthony Douglas Elonis was an active user of the social networking Web site Facebook. Users of that Web site may post items on their Facebook page that are accessible to other users, including Facebook "friends" who are notified when new content is posted. In May 2010, Elonis's wife of nearly seven years left him, taking with her their two young children. Elonis began "listening to more violent music" and posting self-styled "rap" lyrics inspired by the music. App. 204, 226. *2005 Eventually, Elonis changed the user name on his Facebook page from his actual name to a rap-style nom de plume, "Tone Dougie," to distinguish himself from his "on-line persona." *Id* ., at 249, 265. The lyrics Elonis posted as *727 "Tone Dougie" included graphically violent language and imagery. This material was often interspersed with disclaimers that the lyrics were "fictitious," with no intentional "resemblance to real persons." *Id.,* at 331, 329. Elonis posted an explanation to another Facebook user that "I'm doing this for me. My writing is therapeutic." *Id.,* at 329; see also *id.,* at 205 (testifying that it "helps me to deal with the pain").

Elonis's co-workers and friends viewed the posts in a different light. Around Halloween of 2010, Elonis posted a photograph of himself and a co-worker at a "Halloween Haunt" event at the amusement park where they worked. In the photograph, Elonis was holding a toy knife against his co-worker's neck, and in the caption Elonis wrote, "I wish." *Id.,* at 340. Elonis was not Facebook friends with the co-worker and did not "tag" her, a Facebook feature that would have alerted her to the posting. *Id.,* at 175; Brief for Petitioner 6, 9. But the chief of park security was a Facebook "friend" of Elonis, saw the photograph, and fired him. App. 114–116; Brief for Petitioner 9.

In response, Elonis posted a new entry on his Facebook page:

> "Moles! Didn't I tell y'all I had several? Y'all sayin' I had access to keys for all the f***in' gates. That I have sinister plans for all my friends and must have taken home a couple. Y'all think it's too dark and foggy to secure your facility from a man as mad as me? You see, even without a paycheck, I'm still the main attraction. Whoever thought the Halloween Haunt could be so f***in' scary?" App. 332.

This post became the basis for Count One of Elonis's subsequent indictment, threatening park patrons and employees.

Elonis's posts frequently included crude, degrading, and violent material about his soon-to-be ex-wife. Shortly after he was fired, Elonis posted an adaptation of a satirical sketch that he and his wife had watched together. *728 *Id.,* at 164–165, 207. In the actual sketch, called " It's Illegal to Say ...," a comedian explains that it is illegal for a person to say he wishes to kill the President, but not illegal to explain that it is illegal for him to say that. When Elonis posted the script of the sketch, however, he substituted his wife for the President. The posting was part of the basis for Count Two of the indictment, threatening his wife:

"Hi, I'm Tone Elonis.

Did you know that it's illegal for me to say I want to kill my wife? ...

It's one of the only sentences that I'm not allowed to say....

Now it was okay for me to say it right then because I was just telling you that it's illegal for me to say I want to kill my wife....

Um, but what's interesting is that it's very illegal to say I really, really think someone out there should kill my wife....

But not illegal to say with a mortar launcher.

Because that's its own sentence....

I also found out that it's incredibly illegal, extremely illegal to go on Facebook and say something like the best place to fire a mortar launcher at her house would be from the cornfield behind it because of easy access to a getaway road and you'd have a clear line of sight through the sun room....

2006*2006

Yet even more illegal to show an illustrated diagram. [diagram of the house]...." *Id.,* at 333.

The details about the home were accurate. *Id.,* at 154. At the bottom of the post, Elonis included a link to the video of the original skit, and wrote, "Art is about pushing limits. I'm willing to go to jail for my Constitutional rights. Are you?" *Id.,* at 333.

After viewing some of Elonis's posts, his wife felt "extremely afraid for [her] life." *Id.,* at 156. A state court granted her a three-year protection-from-abuse order against Elonis (essentially, a restraining order). *Id.,* at 148–150. Elonis referred to the order in another post on his "Tone Dougie" page, also included in Count Two of the indictment:

"Fold up your [protection-from-abuse order] and put it in your pocket

Is it thick enough to stop a bullet?

Try to enforce an Order

that was improperly granted in the first place

Me thinks the Judge needs an education

on true threat jurisprudence

And prison time'll add zeros to my settlement ...

And if worse comes to worse

I've got enough explosives

to take care of the State Police and the Sheriff's Department." *Id.,* at 334.

At the bottom of this post was a link to the Wikipedia article on "Freedom of speech." *Ibid.* Elonis's reference to the police was the basis for Count Three of his indictment, threatening law enforcement officers.

That same month, interspersed with posts about a movie Elonis liked and observations on a comedian's social commentary, *id.,* at 356–358, Elonis posted an entry that gave rise to Count Four of his indictment:

"That's it, I've had about enough

I'm checking out and making a name for myself

Enough elementary schools in a ten mile radius to initiate the most heinous school shooting ever imagined

And hell hath no fury like a crazy man in a Kindergarten class

The only question is ... which one?" *Id.,* at 335.

Meanwhile, park security had informed both local police and the Federal Bureau of Investigation about Elonis's posts, *730 and FBI Agent Denise Stevens had created a Facebook account to monitor his online activity. *Id.,* at 49–51, 125. After the post about a school shooting, Agent Stevens and her partner visited Elonis at his house. *Id.,* at 65–66. Following their visit, during which Elonis was polite but uncooperative, Elonis posted another entry on his Facebook page, called "Little Agent Lady," which led to Count Five:

"You know your s***'s ridiculous

when you have the FBI knockin' at yo' door

Little Agent lady stood so close

Took all the strength I had not to turn the b**** ghost

Pull my knife, flick my wrist, and slit her throat

Leave her bleedin' from her jugular in the arms of her partner

[laughter]

So the next time you knock, you best be serving a warrant

And bring yo' SWAT and an explosives expert while you're at it

Cause little did y'all know, I was strapped wit' a bomb

Why do you think it took me so long to get dressed with no shoes on?

2007*2007

I was jus' waitin' for y'all to handcuff me and pat me down

Touch the detonator in my pocket and we're all goin'

[BOOM!]

Are all the pieces comin' together?

S***, I'm just a crazy sociopath

that gets off playin' you stupid f***s like a fiddle

And if y'all didn't hear, I'm gonna be famous

Cause I'm just an aspiring rapper who likes the attention

who happens to be under investigation for terrorism

cause y'all think I'm ready to turn the Valley into Fallujah

731 *731



But I ain't gonna tell you which bridge is gonna fall

into which river or road

And if you really believe this s***

I'll have some bridge rubble to sell you tomorrow

[BOOM!][BOOM!][BOOM!]" *Id.,* at 336.

B

A grand jury indicted Elonis for making threats to injure patrons and employees of the park, his estranged wife, police officers, a kindergarten class, and an FBI agent, all in violation of 18 U.S.C. § 875(c). App. 14–17. In the District Court, Elonis moved to dismiss the indictment for failing to allege that he had intended to threaten anyone. The District Court denied the motion, holding that Third Circuit precedent required only that Elonis "intentionally made the communication, not that he intended to make a threat." App. to Pet. for Cert. 51a. At trial, Elonis testified that his posts emulated the rap lyrics of the well-known performer Eminem, some of which involve fantasies about killing his ex-wife. App. 225. In Elonis's view, he had posted "nothing ... that hasn't been said already." *Id.,* at 205. The Government presented as witnesses Elonis's wife and co-workers, all of whom said they felt afraid and viewed Elonis's posts as serious threats. See, *e.g., id.,* at 153, 158.

Elonis requested a jury instruction that "the government must prove that he intended to communicate a true threat." *Id.,* at 21. See also *id.,* at 267–269, 303. The District Court denied that request. The jury instructions instead informed the jury that

> "A statement is a true threat when a defendant intentionally makes a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual." *Id.,* at 301.

*732

The Government's closing argument emphasized that it was irrelevant whether Elonis intended the postings to be threats—"it doesn't matter what he thinks." *Id.,* at 286. A jury convicted Elonis on four of the five counts against him, acquitting only on the charge of threatening park patrons and employees. *Id.,* at 309. Elonis was sentenced to three years, eight months' imprisonment and three years' supervised release.

Elonis renewed his challenge to the jury instructions in the Court of Appeals, contending that the jury should have been required to find that he intended his posts to be threats. The Court of Appeals disagreed, holding that the intent required by Section 875(c) is only the intent to communicate words that the defendant understands, and that a reasonable person would view as a threat. 730 F.3d 321, 332 (C.A.3 2013).*2008 We granted certiorari. 573 U.S. ——, 134 S.Ct. 2819, 189 L.Ed.2d 784 (2014).

II

A



An individual who "transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another" is guilty of a felony and faces up to five years' imprisonment. 18 U.S.C. § 875(c). This statute requires that a communication be transmitted and that the communication contain a threat. It does not specify that the defendant must have any mental state with respect to these elements. In particular, it does not indicate whether the defendant must intend that his communication contain a threat.

Elonis argues that the word "threat" itself in Section 875(c) imposes such a requirement. According to Elonis, every definition of "threat" or "threaten" conveys the notion of an intent to inflict harm. Brief for Petitioner 23. See *United States v. Jeffries,* 692 F.3d 473, 483 (C.A.6 2012) (Sutton, J., *dubitante* ). *E.g.,* 11 Oxford English Dictionary 353 *733 (1933) ("to declare (usually conditionally) one's intention of inflicting injury upon"); Webster's New International Dictionary 2633 (2d ed. 1954) ("*Law,* specif., an expression of an intention to inflict loss or harm on another by illegal means"); Black's Law Dictionary 1519 (8th ed. 2004) ("A communicated intent to inflict harm or loss on another").

These definitions, however, speak to what the statement conveys—not to the mental state of the author. For example, an anonymous letter that says "I'm going to kill you" is "an expression of an intention to inflict loss or harm" regardless of the author's intent. A victim who receives that letter in the mail has received a threat, even if the author believes (wrongly) that his message will be taken as a joke.

For its part, the Government argues that Section 875(c) should be read in light of its neighboring provisions, Sections 875(b) and 875(d). Those provisions also prohibit certain types of threats, but expressly include a mental state requirement of an "intent to extort." See 18 U.S.C. § 875(b) (proscribing threats to injure or kidnap made "with intent to extort"); § 875(d) (proscribing threats to property or reputation made "with intent to extort"). According to the Government, the express "intent to extort" requirements in Sections 875(b) and (d) should preclude courts from implying an unexpressed "intent to threaten" requirement in Section 875(c). See *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

The Government takes this *expressio unius est exclusio alterius* canon too far. The fact that Congress excluded the requirement of an "intent to extort" from Section 875(c) is strong evidence that Congress did not mean to confine Section 875(c) to crimes of extortion. But that does not suggest that Congress, at the same time, also meant to exclude a requirement that a defendant act with a certain mental state *734 in communicating a threat. The most we can conclude from the language of Section 875(c) and its neighboring provisions is that Congress meant to proscribe a broad class of threats in Section 875(c), but did not identify what mental state, if any, a defendant must have to be convicted.

In sum, neither Elonis nor the Government has identified any indication of a *2009 particular mental state requirement in the text of Section 875(c).

B

The fact that the statute does not specify any required mental state, however, does not mean that none exists. We have repeatedly held that "mere omission from a criminal enactment of any mention of criminal intent" should not be read "as dispensing with it." *Morissette v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952). This rule of construction reflects the basic principle that "wrongdoing must be conscious to be criminal." *Id.,* at 252, 72 S.Ct. 240 . As Justice Jackson explained, this principle is "as universal and

persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Id.,* at 250, 72 S.Ct. 240. The "central thought" is that a defendant must be "blameworthy in mind" before he can be found guilty, a concept courts have expressed over time through various terms such as *mens rea,* scienter, malice aforethought, guilty knowledge, and the like. *Id* ., at 252, 72 S.Ct. 240 ; 1 W. LaFave, Substantive Criminal Law § 5.1, pp. 332–333 (2d ed. 2003). Although there are exceptions, the "general rule" is that a guilty mind is "a necessary element in the indictment and proof of every crime." *United States v. Balint,* 258 U.S. 250, 251, 42 S.Ct. 301, 66 L.Ed. 604 (1922). We therefore generally "interpret [ ] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *United States v. X–Citement Video, Inc.,* 513 U.S. 64, 70, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994).

This is not to say that a defendant must know that his conduct is illegal before he may be found guilty. The familiar *735 maxim "ignorance of the law is no excuse" typically holds true. Instead, our cases have explained that a defendant generally must "know the facts that make his conduct fit the definition of the offense," *Staples v. United States,* 511 U.S. 600, 608, n. 3, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), even if he does not know that those facts give rise to a crime.

*Morissette,* for example, involved an individual who had taken spent shell casings from a Government bombing range, believing them to have been abandoned. During his trial for "knowingly convert[ing]" property of the United States, the judge instructed the jury that the only question was whether the defendant had knowingly taken the property without authorization. 342 U.S., at 248–249, 72 S.Ct. 240. This Court reversed the defendant's conviction, ruling that he had to know not only that he was taking the casings, but also that someone else still had property rights in them. He could not be found liable "if he truly believed [the casings] to be abandoned." *Id.,* at 271, 72 S.Ct. 240 ; see *id.,* at 276, 72 S.Ct. 240.

By the same token, in *Liparota v. United States,* we considered a statute making it a crime to knowingly possess or use food stamps in an unauthorized manner. 471 U.S. 419, 420, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). The Government's argument, similar to its position in this case, was that a defendant's conviction could be upheld if he knowingly possessed or used the food stamps, and in fact his possession or use was unauthorized. *Id.,* at 423, 105 S.Ct. 2084. But this Court rejected that interpretation of the statute, because it would have criminalized "a broad range of apparently innocent conduct" and swept in individuals who had no knowledge of the facts that made their conduct blameworthy. *Id.,* at 426, 105 S.Ct. 2084. For example, the statute made it illegal to use food *2010 stamps at a store that charged higher prices to food stamp customers. Without a mental state requirement in the statute, an individual who unwittingly paid higher prices would be guilty under the Government's interpretation. *Ibid* . The Court noted that Congress *could* have intended to cover such a "broad range of conduct," but *736 declined "to adopt such a sweeping interpretation" in the absence of a clear indication that Congress intended that result. *Id.,* at 427, 105 S.Ct. 2084. The Court instead construed the statute to require knowledge of the facts that made the use of the food stamps unauthorized. *iD.,* at 425, 105 S.CT. 2084.

To take another example, in *Posters 'N' Things, Ltd. v. United States,* this Court interpreted a federal statute prohibiting the sale of drug paraphernalia. 511 U.S. 513, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994). Whether the items in question qualified as drug paraphernalia was an objective question that did not depend on the defendant's state of mind. *Id.,* at 517–522, 114 S.Ct. 1747. But, we held, an individual could not be convicted of selling such paraphernalia unless he "knew that the items at issue [were] likely to be used with illegal drugs." *Id.,* at 524, 114 S.Ct. 1747. Such a showing was necessary to establish the defendant's culpable state of mind.

And again, in *X–Citement Video,* we considered a statute criminalizing the distribution of visual depictions of minors engaged in sexually explicit conduct. 513 U.S., at 68, 115 S.Ct. 464. We rejected a reading of the statute which would have required only that a defendant knowingly send the prohibited materials, regardless of whether he knew the age of the performers. *Id.,* at 68–69, 115 S.Ct. 464. We held instead that a defendant must also know that those depicted were minors, because that was "the crucial element separating legal innocence from wrongful conduct." *Id.,* at 73, 115 S.Ct. 464. See also *Staples,* 511 U.S., at 619, 114 S.Ct. 1793 (defendant must know that his weapon had automatic firing capability to be convicted of possession of such a weapon).

When interpreting federal criminal statutes that are silent on the required mental state, we read into the statute "only that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.' " *Carter v. United States,* 530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) (quoting *X–Citement Video,* 513 U.S., at 72, 115 S.Ct. 464 ). In some cases, a general requirement that a defendant *act* knowingly is itself an adequate safeguard. For example, in *Carter,* we considered whether a conviction *737 under 18 U.S.C. § 2113(a), for taking "by force and violence" items of value belonging to or in the care of a bank, requires that a defendant have the intent to steal. 530 U.S., at 261, 120 S.Ct. 2159. We held that once the Government proves the defendant forcibly took the money, " the concerns underlying the presumption in favor of scienter are fully satisfied, for a forceful taking—even by a defendant who takes under a good-faith claim of right—falls outside the realm of ... 'otherwise innocent' " conduct. *Id.,* at 269–270, 120 S.Ct. 2159. In other instances, however, requiring only that the defendant act knowingly "would fail to protect the innocent actor." *Id.,* at 269, 120 S.Ct. 2159. A statute similar to Section 2113(a) that did not require a forcible taking or the intent to steal "would run the risk of punishing seemingly innocent conduct in the case of a defendant who peaceably takes money believing it to be his." *Ibid.* In such a case, the Court explained, the statute "would need to be read to require ... that the defendant take the money with 'intent to steal or purloin.' " *Ibid.* *2011 C

Section 875(c), as noted, requires proof that a communication was transmitted and that it contained a threat. The "presumption in favor of a scienter requirement should apply to *each* of the statutory elements that criminalize otherwise innocent conduct." *X–Citement Video,* 513 U.S., at 72, 115 S.Ct. 464 (emphasis added). The parties agree that a defendant under Section 875(c) must know that he is transmitting a communication. But communicating *something* is not what makes the conduct "wrongful." Here "the crucial element separating legal innocence from wrongful conduct" is the threatening nature of the communication. *Id.,* at 73, 115 S.Ct. 464. The mental state requirement must therefore apply to the fact that the communication contains a threat.

Elonis's conviction, however, was premised solely on how his posts would be understood by a reasonable person. Such a "reasonable person" standard is a familiar feature of civil *738 liability in tort law, but is inconsistent with "the conventional requirement for criminal conduct—*awareness* of some wrongdoing." *Staples,* 511 U.S., at 606–607, 114 S.Ct. 1793 (quoting *United States v. Dotterweich,* 320 U.S. 277, 281, 64 S.Ct. 134, 88 L.Ed. 48 (1943) ; emphasis added). Having liability turn on whether a "reasonable person" regards the communication as a threat—regardless of what the defendant thinks—"reduces culpability on the all-important element of the crime to negligence," *Jeffries,* 692 F.3d, at 484 (Sutton, J., *dubitante* ), and we "have long been reluctant to infer that a negligence standard was intended in criminal statutes," *Rogers v. United States,* 422 U.S. 35, 47, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (Marshall, J., concurring) (citing *Morissette,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 ). See 1 C. Torcia, Wharton's Criminal Law § 27, pp. 171–172 (15th ed. 1993); *Cochran v. United States,* 157 U.S. 286, 294, 15 S.Ct. 628, 39 L.Ed. 704 (1895) (defendant could face " liability in a civil action for negligence, but he could only be held criminally for an evil intent actually existing in his mind"). Under these principles, "what [Elonis] thinks" does matter. App. 286.

The Government is at pains to characterize its position as something other than a negligence standard, emphasizing that its approach would require proof that a defendant "comprehended [the] contents and context" of the communication. Brief for United States 29. The Government gives two examples of individuals who, in its view, would lack this necessary mental state—a "foreigner, ignorant of the English language," who would not know the meaning of the words at issue, or an individual mailing a sealed envelope without knowing its contents. *Ibid.* But the fact that the Government would require a defendant to actually know the words of and circumstances surrounding a communication does not amount to a rejection of negligence. Criminal negligence standards often incorporate "the circumstances known" to a defendant. ALI, Model Penal Code § 2.02(2)(d) (1985). See *id.,* Comment 4, at 241; 1 LaFave, Substantive Criminal Law § 5.4, at 372–373. Courts then ask, however, whether a reasonable person equipped with that knowledge, not the actual *739 defendant, would have recognized the harmfulness of his conduct. That is precisely the Government's position here: Elonis can be convicted, the Government contends, if he himself knew the contents and context of his posts, and a reasonable person would have recognized that the posts would be read as genuine threats. That is a negligence standard.

In support of its position the Government relies most heavily on *2012 *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). In that case, the Court rejected the argument that individuals could be convicted of mailing obscene material only if they knew the "legal status of the materials" distributed. *Id.,* at 121, 94 S.Ct. 2887. Absolving a defendant of liability because he lacked the knowledge that the materials were legally obscene "would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law." *Id.,* at 123, 94 S.Ct. 2887. It was instead enough for liability that "a defendant had knowledge of the contents of the materials he distributed, and that he knew the character and nature of the materials." *Ibid* .

This holding does not help the Government. In fact, the Court in *Hamling* approved a state court's conclusion that requiring a defendant to know the character of the material incorporated a "vital element of scienter" so that "not innocent but *calculated purveyance* of filth ... is exorcised." *Id.,* at 122, 94 S.Ct. 2887 (quoting *Mishkin v. New York,* 383 U.S. 502, 510, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966) ; internal quotation marks omitted). In this case, "calculated purveyance" of a threat would require that Elonis know the threatening nature of his communication. Put simply, the mental state requirement the Court approved in *Hamling* turns on whether a defendant knew the *character* of what was sent, not simply its contents and context.

Contrary to the dissent's suggestion, see *post,* at 2019 – 2020, 2022 – 2023 (opinion of THOMAS, J.), nothing in *Rosen v. United States,* 161 U.S. 29, 16 S.Ct. 434, 40 L.Ed. 606 (1896), undermines this reading. The defendant's contention in *Rosen* was that his indictment for mailing obscene material was invalid because it did not allege that *740 he was aware of the contents of the mailing. *Id.,* at 31–33, 16 S.Ct. 434. That is not at issue here; there is no dispute that Elonis knew the words he communicated. The defendant also argued that he could not be convicted of mailing obscene material if he did not know that the material "could be properly or justly characterized as obscene." *Id.,* at 41, 16 S.Ct. 434. The Court correctly rejected this "ignorance of the law" defense; no such contention is at issue here. See *supra,* at 2009.

* * *

In light of the foregoing, Elonis's conviction cannot stand. The jury was instructed that the Government need prove only that a reasonable person would regard Elonis's communications as threats, and that was error. Federal criminal liability generally does not turn solely on the results of an act without considering the

defendant's mental state. That understanding "took deep and early root in American soil" and Congress left it intact here: Under Section 875(c), "wrongdoing must be conscious to be criminal." *Morissette,* 342 U.S., at 252, 72 S.Ct. 240.

There is no dispute that the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat. See Tr. of Oral Arg. 25, 56. In response to a question at oral argument, Elonis stated that a finding of recklessness would not be sufficient. See *id.,* at 8–9. Neither Elonis nor the Government has briefed or argued that point, and we accordingly decline to address it. See *Department of Treasury, IRS v. FLRA,* 494 U.S. 922, 933, 110 S.Ct. 1623, 108 L.Ed.2d 914 (1990) (this Court is "poorly situated" to address an argument the Court of Appeals did not consider, the parties did not brief, and counsel addressed in "only the most cursory fashion at oral argument"). Given our disposition, it is not necessary to consider any First Amendment issues.

*2013 *741

Both Justice ALITO and Justice THOMAS complain about our not deciding whether recklessness suffices for liability under Section 875(c). *Post,* at 2013 – 2014 (ALITO, J., concurring in part and dissenting in part); *post,* at 2018 – 2019 (opinion of THOMAS, J.). Justice ALITO contends that each party "argued" this issue, *post,* at 2014, but they did not address it at all until oral argument, and even then only briefly. See Tr. of Oral Arg. at 8, 38–39.

Justice ALITO also suggests that we have not clarified confusion in the lower courts. That is wrong. Our holding makes clear that negligence is not sufficient to support a conviction under Section 875(c), contrary to the view of nine Courts of Appeals. Pet. for Cert. 17. There was and is no circuit conflict over the question Justice ALITO and Justice THOMAS would have us decide—whether recklessness suffices for liability under Section 875(c). No Court of Appeals has even addressed that question. We think that is more than sufficient "justification," *post,* at 2014 (opinion of ALITO, J.), for us to decline to be the first appellate tribunal to do so.

Such prudence is nothing new. See *United States v. Bailey,* 444 U.S. 394, 407, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) (declining to decide whether mental state of recklessness or negligence could suffice for criminal liability under 18 U.S.C. § 751, even though a "court may someday confront a case" presenting issue); *Ginsberg v. New York,* 390 U.S. 629, 644–645, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (rejecting defendant's challenge to obscenity law "makes it unnecessary for us to define further today 'what sort of mental element is requisite to a constitutionally permissible prosecution' "); *Smith v. California,* 361 U.S. 147, 154, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (overturning conviction because lower court did not require any mental element under statute, but noting that "[w]e need not and most definitely do not pass today on what sort of mental element is requisite to a constitutionally permissible prosecution"); cf. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 103–104, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981) (finding a lower court's order impermissible under the First Amendment but not deciding "what standards are mandated by the First Amendment in this kind of case").

We may be "capable of deciding the recklessness issue," *post,* at 2014 (opinion of ALITO, J.), but following our usual practice of awaiting a decision below and hearing from the parties would help ensure that we decide it correctly.

The judgment of the United States Court of Appeals for the Third Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

## It is so ordered.

Justice ALITO, concurring in part and dissenting in part.



Elonis v. United States, 575 U.S. 723 (2015)

In *Marbury v. Madison,* 1 Cranch 137, 177, 2 L.Ed. 60 (1803), the Court famously proclaimed: "It is emphatically the province and duty of the judicial department to say what the law is." Today, the Court announces: It is emphatically the prerogative of this Court to say only what the law is not.

The Court's disposition of this case is certain to cause confusion and serious problems. Attorneys and judges need to know which mental state is required for conviction under 18 U.S.C. § 875(c), an important criminal statute. This case squarely presents that issue, but the Court provides only a partial answer. The Court holds that the jury instructions in this case were defective because they required only negligence in conveying a threat. But the *2014 Court refuses to explain what type of intent was necessary. Did the jury need to find that Elonis had the *purpose* of conveying a true threat? Was it enough if he *knew* that his words conveyed such a threat? Would *recklessness* suffice? The Court declines to say. Attorneys and judges are left to guess.

This will have regrettable consequences. While this Court has the luxury of choosing its docket, lower courts and juries are not so fortunate. They must actually decide cases, and this means applying a standard. If purpose or knowledge is needed and a district court instructs the jury that recklessness suffices, a defendant may be wrongly convicted *743 . On the other hand, if recklessness is enough, and the jury is told that conviction requires proof of more, a guilty defendant may go free. We granted review in this case to resolve a disagreement among the Circuits. But the Court has compounded—not clarified—the confusion.

There is no justification for the Court's refusal to provide an answer. The Court says that "[n]either Elonis nor the Government has briefed or argued" the question whether recklessness is sufficient. *Ante,* at 2012 – 2013. But in fact both parties addressed that issue. Elonis argued that recklessness is not enough, and the Government argued that it more than suffices. If the Court thinks that we cannot decide the recklessness question without additional help from the parties, we can order further briefing and argument. In my view, however, we are capable of deciding the recklessness issue, and we should resolve that question now.

I

Section 875(c) provides in relevant part:

"Whoever transmits in interstate or foreign commerce any communication containing ... any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."

Thus, conviction under this provision requires proof that: (1) the defendant transmitted something, (2) the thing transmitted was a threat to injure the person of another, and (3) the transmission was in interstate or foreign commerce.

At issue in this case is the *mens rea* required with respect to the second element—that the thing transmitted was a threat to injure the person of another. This Court has not defined the meaning of the term "threat" in § 875(c), but in construing the same term in a related statute, the Court distinguished a "true 'threat' " from facetious or hyperbolic remarks. *Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (*per curiam* ). In my view, the term "threat" in § 875(c) can fairly *744 be defined as a statement that is reasonably interpreted as "an expression of an intention to inflict evil, injury, or damage on another." Webster's Third New International Dictionary 2382 (1976). Conviction under § 875(c) demands proof that the defendant's transmission was in fact a threat, *i.e.,* that it is reasonable to interpret the transmission as an expression of an intent to harm another. In addition, it must be shown that the defendant was at least reckless as to whether the transmission met that requirement.

Why is recklessness enough? My analysis of the *mens rea* issue follows the same track as the Court's, as far as it goes. I agree with the Court that we should presume that criminal statutes require some sort of *mens rea* for conviction. See *ante,* at 2008 – 2011. To be sure, this presumption marks a departure from the way in which we generally interpret statutes. We "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States,* 522 U.S. 23, 29, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997). But this step is justified by a well-established pattern in our criminal laws. "For several centuries (at least since 1600) the different common law crimes have been so defined as to require, for guilt, that the defendant's acts or omissions be accompanied by one or more of the various types of fault (intention, knowledge, recklessness or—more rarely—negligence)." 1 W. LaFave, Substantive Criminal Law § 5.5, p. 381 (2003). Based on these "background rules of the common law, in which the requirement of some *mens rea* for a crime is firmly embedded," we require "some indication of congressional intent, express or implied, ... to dispense with *mens rea* as an element of a crime." *Staples v. United States,* 511 U.S. 600, 605–606, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).

For a similar reason, I agree with the Court that we should presume that an offense like that created by § 875(c) requires more than negligence with respect to a critical element like the one at issue here. See *ante,* at 2010 – 2012. As the Court states, "[w]hen interpreting federal criminal statutes that *745 are silent on the required mental state, we read into the statute 'only that *mens rea* which is necessary to separate wrongful conduct from "otherwise innocent conduct." ' " *Ante,* at 2010 (quoting *Carter v. United States,* 530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) ). Whether negligence is morally culpable is an interesting philosophical question, but the answer is at least sufficiently debatable to justify the presumption that a serious offense against the person that lacks any clear common-law counterpart should be presumed to require more.

Once we have passed negligence, however, no further presumptions are defensible. In the hierarchy of mental states that may be required as a condition for criminal liability, the *mens rea* just above negligence is recklessness. Negligence requires only that the defendant "should [have] be [en] aware of a substantial and unjustifiable risk," ALI, Model Penal Code § 2.02(2)(d), p. 226 (1985), while recklessness exists "when a person disregards a risk of harm of which he is aware," *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ; Model Penal Code § 2.02(2)(c). And when Congress does not specify a *mens rea* in a criminal statute, we have no justification for inferring that anything more than recklessness is needed. It is quite unusual for us to interpret a statute to contain a requirement that is nowhere set out in the text. Once we have reached recklessness, we have gone as far as we can without stepping over the line that separates interpretation from amendment.

There can be no real dispute that recklessness regarding a risk of serious harm is wrongful conduct. In a wide variety of contexts, we have described reckless conduct as morally culpable. See, *e.g., Farmer, supra,* at 835–836, 114 S.Ct. 1970 (deliberate indifference to an inmate's harm); *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (criminal libel); *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (civil libel). Indeed, this Court has held that "reckless disregard for human life" may justify the death penalty. *Tison v. Arizona,* 481 U.S. 137, 157, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Someone who acts recklessly with respect *746 to conveying a threat necessarily grasps that he is not engaged in innocent conduct. He is not merely careless. He is aware that others could regard his statements as a threat, but he delivers them anyway.*2016 Accordingly, I would hold that a defendant may be convicted under § 875(c) if he or she consciously disregards the risk that the communication transmitted will be interpreted as a true threat. Nothing in the Court's non-committal opinion prevents lower courts from adopting that standard.

II



There remains the question whether interpreting § 875(c) to require no more than recklessness with respect to the element at issue here would violate the First Amendment. Elonis contends that it would. I would reject that argument.

It is settled that the Constitution does not protect true threats. See *Virginia v. Black,* 538 U.S. 343, 359–360, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) ; *R.A.V. v. St. Paul* , 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ; *Watts,* 394 U.S., at 707–708, 89 S.Ct. 1399. And there are good reasons for that rule: True threats inflict great harm and have little if any social value. A threat may cause serious emotional stress for the person threatened and those who care about that person, and a threat may lead to a violent confrontation. It is true that a communication containing a threat may include other statements that have value and are entitled to protection. But that does not justify constitutional protection for the threat itself.

Elonis argues that the First Amendment protects a threat if the person making the statement does not actually intend to cause harm. In his view, if a threat is made for a " 'therapeutic' " purpose, "to 'deal with the pain' ... of a wrenching event," or for "cathartic" reasons, the threat is protected. Brief for Petitioner 52–53. But whether or not the person making a threat intends to cause harm, the damage is the same. And the fact that making a threat may have a therapeutic *747 or cathartic effect for the speaker is not sufficient to justify constitutional protection. Some people may experience a therapeutic or cathartic benefit only if they know that their words will cause harm or only if they actually plan to carry out the threat, but surely the First Amendment does not protect them.

Elonis also claims his threats were constitutionally protected works of art. Words like his, he contends, are shielded by the First Amendment because they are similar to words uttered by rappers and singers in public performances and recordings. To make this point, his brief includes a lengthy excerpt from the lyrics of a rap song in which a very well-compensated rapper imagines killing his ex-wife and dumping her body in a lake. If this celebrity can utter such words, Elonis pleads, amateurs like him should be able to post similar things on social media. But context matters. "Taken in context," lyrics in songs that are performed for an audience or sold in recorded form are unlikely to be interpreted as a real threat to a real person. *Watts, supra,* at 708, 89 S.Ct. 1399. Statements on social media that are pointedly directed at their victims, by contrast, are much more likely to be taken seriously. To hold otherwise would grant a license to anyone who is clever enough to dress up a real threat in the guise of rap lyrics, a parody, or something similar.

The facts of this case illustrate the point. Imagine the effect on Elonis's estranged wife when she read this: " 'If I only knew then what I know now ... I would have smothered your ass with a pillow, dumped your body in the back seat, dropped you off in Toad Creek and made it look like a rape and murder.' " 730 F.3d 321, 324 (C.A.3 2013). Or this: "There's one way to love you but a thousand ways to kill you. I'm not going to rest until your body is a mess, soaked in blood and dying from all the little cuts." *Ibid.* Or this: "Fold up your [protection from abuse order] and put *2017 it in your pocket[.] Is it thick enough to stop a bullet?" *Id.,* at 325.*748 There was evidence that Elonis made sure his wife saw his posts. And she testified that they made her feel " 'extremely afraid' " and " 'like [she] was being stalked.' " *Ibid.* Considering the context, who could blame her? Threats of violence and intimidation are among the most favored weapons of domestic abusers, and the rise of social media has only made those tactics more commonplace. See Brief for The National Network to End Domestic Violence et al. as *Amici Curiae* 4–16. A fig leaf of artistic expression cannot convert such hurtful, valueless threats into protected speech.

It can be argued that § 875(c), if not limited to threats made with the intent to harm, will chill statements that do not qualify as true threats, *e.g.,* statements that may be literally threatening but are plainly not meant to be taken seriously. We have sometimes cautioned that it is necessary to "exten [d] a measure of strategic protection" to otherwise unprotected false statements of fact in order to ensure enough " 'breathing space' " for protected speech. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ). A similar argument might be made with respect to threats. But we have also held that the law provides adequate breathing space when it requires proof that false statements were made with reckless disregard of their falsity. See *New York Times,* 376 U.S., at 279–280, 84 S.Ct. 710 (civil liability); *Garrison,* 379 U.S., at 74–75, 85 S.Ct. 209 (criminal liability). Requiring proof of recklessness is similarly sufficient here.

III

Finally, because the jury instructions in this case did not require proof of recklessness, I would vacate the judgment below and remand for the Court of Appeals to decide in the first instance whether Elonis's conviction could be upheld under a recklessness standard.

We do not lightly overturn criminal convictions, even where it appears that the district court might have erred. To benefit from a favorable ruling on appeal, a defendant *749 must have actually asked for the legal rule the appellate court adopts. Rule 30(d) of the Federal Rules of Criminal Procedure requires a defendant to "inform the court of the specific objection and the grounds for the objection." An objection cannot be vague or open-ended. It must *specifically* identify the alleged error. And failure to lodge a sufficient objection "precludes appellate review," except for plain error. Rule 30(d) ; see also 2A C. Wright & P. Henning, Federal Practice and Procedure § 484, pp. 433–435 (4th ed. 2009).

At trial, Elonis objected to the District Court's instruction, but he did not argue for recklessness. Instead, he proposed instructions that would have required proof that he acted purposefully or with knowledge that his statements would be received as threats. See App. 19–21. He advanced the same position on appeal and in this Court. See Brief for Petitioner 29 (" Section 875(c) requires proof that the defendant *intended* the charged statement to be a 'threat' " (emphasis in original)); Corrected Brief of Appellant in No. 12–3798 (CA3), p. 14 ("[A] 'true threat' has been uttered only if the speaker acted with *subjective intent to threaten* " (same)). And at oral argument before this Court, he expressly disclaimed any agreement with a recklessness standard—which the Third Circuit remains free to adopt. Tr. of Oral Arg. 8:22–23 ("[W]e would say that recklessness is not justif[ied]"). I would therefore *2018 remand for the Third Circuit to determine if Elonis's failure (indeed, *refusal* ) to argue for recklessness prevents reversal of his conviction.

The Third Circuit should also have the opportunity to consider whether the conviction can be upheld on harmless-error grounds. "We have often applied harmless-error analysis to cases involving improper instructions." *Neder v. United States,* 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) ; see also, *e.g., Pope v. Illinois,* 481 U.S. 497, 503–504, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) (remanding for harmless-error analysis after holding that jury instruction misstated obscenity standard). And the Third Circuit has previously upheld *750 convictions where erroneous jury instructions proved harmless. See, *e.g., United States v. Saybolt,* 577 F.3d 195, 206–207 (2009). It should be given the chance to address that possibility here.

Justice THOMAS, dissenting.

We granted certiorari to resolve a conflict in the lower courts over the appropriate mental state for threat prosecutions under 18 U.S.C. § 875(c). Save two, every Circuit to have considered the issue—11 in total—has held that this provision demands proof only of general intent, which here requires no more than that a defendant knew he transmitted a communication, knew the words used in that communication, and understood the ordinary meaning of those words in the relevant context. The outliers are the Ninth and Tenth Circuits, which have concluded that proof of an intent to threaten was necessary for conviction. Adopting the minority position, Elonis urges us to hold that § 875(c) and the First Amendment require proof of an intent to threaten. The Government in turn advocates a general-intent approach.

Rather than resolve the conflict, the Court casts aside the approach used in nine Circuits and leaves nothing in its place. Lower courts are thus left to guess at the appropriate mental state for § 875(c). All they know after today's decision is that a requirement of general intent will not do. But they can safely infer that a majority of this Court would not adopt an intent-to-threaten requirement, as the opinion carefully leaves open the possibility that recklessness may be enough. See *ante,* at 2012 – 2013.

This failure to decide throws everyone from appellate judges to everyday Facebook users into a state of uncertainty. This uncertainty could have been avoided had we simply adhered to the background rule of the common law favoring general intent. Although I am sympathetic to my colleagues' policy concerns about the risks associated with threat prosecutions, the answer to such fears is not to discard *751 our traditional approach to state-of-mind requirements in criminal law. Because the Court of Appeals properly applied the general-intent standard, and because the communications transmitted by Elonis were "true threats" unprotected by the First Amendment, I would affirm the judgment below.

I

A

Enacted in 1939, § 875(c) provides, "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both." Because § 875(c) criminalizes speech, the First Amendment requires that the term "threat" be limited to a narrow class of historically unprotected communications *2019 called "true threats." To qualify as a true threat, a communication must be a serious expression of an intention to commit unlawful physical violence, not merely "political hyperbole"; "vehement, caustic, and sometimes unpleasantly sharp attacks"; or "vituperative, abusive, and inexact" statements. *Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (*per curiam* ) (internal quotation marks omitted). It also cannot be determined solely by the reaction of the recipient, but must instead be "determined by the interpretation of a *reasonable* recipient familiar with the context of the communication," *United States v. Darby,* 37 F.3d 1059, 1066 (C.A.4 1994) (emphasis added), lest historically protected speech be suppressed at the will of an eggshell observer, cf. *Cox v. Louisiana,* 379 U.S. 536, 551, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) ("[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise" (internal quotation marks omitted)). There is thus no dispute that, at a minimum, § 875(c) requires an objective showing: The communication must be one that "a reasonable observer would construe as a true threat to another." *752 *United States v. Jeffries,* 692 F.3d 473, 478 (C.A.6 2012). And there is no dispute that the posts at issue here meet that objective standard.

The only dispute in this case is about the state of mind necessary to convict Elonis for making those posts. On its face, § 875(c) does not demand any particular mental state. As the Court correctly explains, the word "threat" does not itself contain a *mens rea* requirement. See *ante,* at 2008 – 2009. But because we read criminal

statutes "in light of the background rules of the common law, in which the requirement of some *mens rea* for a crime is firmly embedded," we require "some indication of congressional intent, express or implied, ... to dispense with *mens rea* as an element of a crime." *Staples v. United States,* 511 U.S. 600, 605–606, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (citation omitted). Absent such indicia, we ordinarily apply the "presumption in favor of scienter" to require only "proof of *general intent* —that is, that the defendant [must] posses[s] knowledge with respect to the *actus reus* of the crime." *Carter v. United States,* 530 U.S. 255, 268, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000).

Under this "conventional *mens rea* element," "the defendant [must] know the facts that make his conduct illegal," *Staples, supra,* at 605, 114 S.Ct. 1793, but he need not know *that* those facts make his conduct illegal. It has long been settled that "the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law." *Bryan v. United States,* 524 U.S. 184, 192, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (internal quotation marks omitted). For instance, in *Posters 'N' Things, Ltd. v. United States,* 511 U.S. 513, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994), the Court addressed a conviction for selling drug paraphernalia under a statute forbidding anyone to " 'make use of the services of the Postal Service or other interstate conveyance as part of a scheme to sell drug paraphernalia,' " *id.,* at 516, 114 S.Ct. 1747 (quoting 21 U.S.C. § 857(a)(1) (1988 ed.) ). In applying the presumption in favor of scienter, the Court concluded that "although the Government must establish that the defendant knew that the items at issue are likely to be used with illegal drugs, it need not prove specific knowledge that the items are 'drug paraphernalia' *753 within the meaning of the statute." 511 U.S., at 524, 114 S.Ct. 1747.

Our default rule in favor of general intent applies with full force to criminal statutes addressing speech. Well over 100 years ago, this Court considered a conviction *2020 under a federal obscenity statute that punished anyone " 'who shall knowingly deposit, or cause to be deposited, for mailing or delivery,' " any " 'obscene, lewd, or lascivious book, pamphlet, picture, paper, writing, print, or other publication of an indecent character.' " *Rosen v. United States,* 161 U.S. 29, 30, 16 S.Ct. 434, 40 L.Ed. 606 (1896) (quoting Rev. Stat. § 3893). In that case, as here, the defendant argued that, even if "he may have had ... actual knowledge or notice of [the paper's] contents" when he put it in the mail, he could not "be convicted of the offence ... unless he knew or believed that such paper could be properly or justly characterized as obscene, lewd, and lascivious." 161 U.S., at 41, 16 S.Ct. 434. The Court rejected that theory, concluding that if the material was actually obscene and "deposited in the mail by one who knew or had notice at the time of its contents, the offence is complete, although the defendant himself did not regard the paper as one that the statute forbade to be carried in the mails." *Ibid.* As the Court explained, "Congress did not intend that the question as to the character of the paper should depend upon the opinion or belief of the person who, with knowledge or notice of [the paper's] contents, assumed the responsibility of putting it in the mails of the United States," because "[e]very one who uses the mails of the United States for carrying papers or publications must take notice of ... what must be deemed obscene, lewd, and lascivious." *Id.,* at 41–42, 16 S.Ct. 434.

This Court reaffirmed *Rosen* 's holding in *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), when it considered a challenge to convictions under the successor federal statute, see *id.,* at 98, n. 8, 94 S.Ct. 2887 (citing 18 U.S.C. § 1461 (1970 ed.) ). Relying on *Rosen* , the Court rejected the argument that the statute required "proof both of knowledge of the contents of the material *754 and awareness of the obscene character of the material." 418 U.S., at 120, 94 S.Ct. 2887 (internal quotation marks omitted). In approving the jury instruction that the defendants' "belief as to the obscenity or non-obscenity of the material is irrelevant," the Court declined to hold "that the prosecution must prove a defendant's knowledge of the legal status of the

materials he distributes." *Id.,* at 120–121, 94 S.Ct. 2887 (internal quotation marks omitted). To rule otherwise, the Court observed, "would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law." *Id.,* at 123, 94 S.Ct. 2887.

Decades before § 875(c)'s enactment, courts took the same approach to the first federal threat statute, which prohibited threats against the President. In 1917, Congress enacted a law punishing anyone

> "who knowingly and willfully deposits or causes to be deposited for conveyance in the mail ... any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, or who knowingly and willfully otherwise makes any such threat against the President." Act of Feb. 14, 1917, ch. 64, 39 Stat. 919.

Courts applying this statute shortly after its enactment appeared to require proof of only general intent. In *Ragansky v. United States,* 253 F. 643 (C.A.7 1918), for instance, a Court of Appeals held that "[a] threat is knowingly made, if the maker of it comprehends the meaning of the words uttered by him," and "is willfully made, if in addition to comprehending the meaning of his words, the maker voluntarily and intentionally utters them as the declaration of an apparent determination to carry them into execution," *id.,* at 645. The court consequently rejected the defendant's *2021 argument that he could not be convicted when his language "[c]oncededly ... constituted such a threat" but was meant only "as a joke." *Id.,* at 644. Likewise, in *755 *United States v. Stobo,* 251 F. 689 (Del.1918), a District Court rejected the defendant's objection that there was no allegation "of any facts ... indicating any intention ... on the part of the defendant ... to menace the President of the United States," *id.,* at 693 (internal quotation marks omitted). As it explained, the defendant "is punishable under the act whether he uses the words lightly or with a set purpose to kill," as " [t]he effect upon the minds of the hearers, who cannot read his inward thoughts, is precisely the same." *Ibid.* At a minimum, there is no historical practice requiring more than general intent when a statute regulates speech.

B

Applying ordinary rules of statutory construction, I would read § 875(c) to require proof of general intent. To "know the facts that make his conduct illegal" under § 875(c), see *Staples,* 511 U.S., at 605, 114 S.Ct. 1793, a defendant must know that he transmitted a communication in interstate or foreign commerce that contained a threat. Knowing that the communication contains a "threat"—a serious expression of an intention to engage in unlawful physical violence—does not, however, require knowing that a jury will conclude that the communication contains a threat as a matter of law. Instead, like one who mails an "obscene" publication and is prosecuted under the federal obscenity statute, a defendant prosecuted under § 875(c) must know only the words used in that communication, along with their ordinary meaning in context.

General intent divides those who know the facts constituting the *actus reus* of this crime from those who do not. For example, someone who transmits a threat who does not know English—or who knows English, but perhaps does not know a threatening idiom—lacks the general intent required under § 875(c). See *Ragansky, supra,* at 645 ("[A] foreigner, ignorant of the English language, repeating [threatening] words without knowledge of their meaning, may not knowingly have made a threat"). Likewise, the hapless mailman who *756 delivers a threatening letter, ignorant of its contents, should not fear prosecution. A defendant like Elonis, however, who admits that he "knew that what [he] was saying was violent" but supposedly "just wanted to express [him]self," App. 205, acted with the general intent required under § 875(c), even if he did not know that a jury would conclude that his communication constituted a "threat" as a matter of law.

Demanding evidence only of general intent also corresponds to § 875(c)'s statutory backdrop. As previously discussed, before the enactment of § 875(c), courts had read the Presidential threats statute to require proof only of general intent. Given Congress' presumptive awareness of this application of the Presidential threats statute—not to mention this Court's similar approach in the obscenity context, see *Rosen,* 161 U.S., at 41–42, 16 S.Ct. 434 —it is difficult to conclude that the Congress that enacted § 875(c) in 1939 understood it to contain an implicit mental-state requirement apart from general intent. There is certainly no textual evidence to support this conclusion. If anything, the text supports the opposite inference, as § 875(c), unlike the Presidential threats statute, contains no reference to knowledge or willfulness. Nothing in the statute suggests that Congress departed from the "conventional *mens rea* element" of general intent, *Staples, supra,* at 605, 114 S.Ct. 1793 ; I *2022 would not impose a higher mental-state requirement here.

C

The majority refuses to apply these ordinary background principles. Instead, it casts my application of general intent as a negligence standard disfavored in the criminal law. *Ante,* at 2010 – 2013. But that characterization misses the mark. Requiring general intent in this context is not the same as requiring mere negligence. Like the mental-state requirements adopted in many of the cases cited by the Court, general intent under § 875(c) prevents a defendant from being convicted on the basis of any *fact* beyond his awareness. See, *e.g., *757 United States v. X–Citement Video, Inc.,* 513 U.S. 64, 73, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (knowledge of age of persons depicted in explicit materials); *Staples, supra,* at 614–615, 114 S.Ct. 1793 (knowledge of firing capability of weapon); *Morissette v. United States,* 342 U.S. 246, 270–271, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (knowledge that property belonged to another). In other words, the defendant must *know* —not merely be reckless or negligent with respect to the fact—that he is committing the acts that constitute the *actus reus* of the offense.

But general intent requires *no* mental state (not even a negligent one) concerning the "fact" that certain words meet the *legal* definition of a threat. That approach is particularly appropriate where, as here, that legal status is determined by a jury's application of the legal standard of a "threat" to the contents of a communication. And convicting a defendant despite his ignorance of the legal—or objective—status of his conduct does not mean that he is being punished for negligent conduct. By way of example, a defendant who is convicted of murder despite claiming that he acted in self-defense has not been penalized under a negligence standard merely because he does not know that the jury will reject his argument that his "belief in the necessity of using force to prevent harm to himself [was] a reasonable one." See 2 W. LaFave, Substantive Criminal Law § 10.4(c), p. 147 (2d ed. 2003).

The Court apparently does not believe that our traditional approach to the federal obscenity statute involved a negligence standard. It asserts that *Hamling* "approved a state court's conclusion that requiring a defendant to know the character of the material incorporated a 'vital element of scienter' so that 'not innocent but *calculated purveyance* of filth ... is exorcised.' " *Ante,* at 2012 (quoting *Hamling,* 418 U.S., at 122, 94 S.Ct. 2887 (in turn quoting *Mishkin v. New York,* 383 U.S. 502, 510, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966) )). According to the Court, the mental state approved in *Hamling* thus "turns on whether a defendant knew the *character* of what was sent, not simply its contents and context." *Ante,* at 2012. It is unclear what the Court *758 means by its distinction between "character" and "contents and context." "Character" cannot mean *legal* obscenity, as *Hamling* rejected the argument that a defendant must have "awareness of the obscene character of the material." 418 U.S., at 120, 94 S.Ct. 2887 (internal quotation marks omitted). Moreover, this discussion was not part of *Hamling* 's holding, which was primarily a reaffirmation of *Rosen* . See 418 U.S., at 120–121, 94

S.Ct. 2887 ; see also *Posters 'N' Things,* 511 U.S., at 524–525, 114 S.Ct. 1747 (characterizing *Hamling* as holding that a "statute prohibiting mailing of obscene materials does not require proof that [the] defendant knew the materials at issue met the legal definition of 'obscenity' ").

The majority's treatment of *Rosen* is even less persuasive. To shore up its position, *2023 it asserts that the critical portion of *Rosen* rejected an " 'ignorance of the law' defense," and claims that "no such contention is at issue here." *Ante,* at 2012. But the thrust of Elonis' challenge is that a § 875(c) conviction cannot stand if the defendant's subjective belief of what constitutes a "threat" differs from that of a reasonable jury. That is akin to the argument the defendant made—and lost—in *Rosen* . That defendant insisted that he could not be convicted for mailing the paper "unless he knew or believed that such paper could be properly or justly characterized as obscene." 161 U.S., at 41, 16 S.Ct. 434. The Court, however, held that the Government did not need to show that the defendant "regard[ed] the paper as one that the statute forbade to be carried in the mails," because the obscene character of the material did not "depend upon the opinion or belief of the person who ... assumed the responsibility of putting it in the mails." *Ibid.* The majority's muddying of the waters cannot obscure the fact that today's decision is irreconcilable with *Rosen* and *Hamling* .

D

The majority today at least refrains from requiring an intent to threaten for § 875(c) convictions, as Elonis asks us to do. Elonis contends that proof of a defendant's intent to put *759 the recipient of a threat in fear is necessary for conviction, but that element cannot be found within the statutory text. "[W]e ordinarily resist reading words or elements into a statute that do not appear on its face," including elements similar to the one Elonis proposes. *E.g., Bates v. United States,* 522 U.S. 23, 29, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997) (declining to read an "intent to defraud" element into a criminal statute). As the majority correctly explains, nothing in the text of § 875(c) itself requires proof of an intent to threaten. See *ante,* at 2008 – 2009. The absence of such a requirement is significant, as Congress knows how to require a heightened *mens rea* in the context of threat offenses. See § 875(b) (providing for the punishment of "[w]hoever, with intent to extort ..., transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another"); see also § 119 (providing for the punishment of "[w]hoever knowingly makes restricted personal information about [certain officials] ... publicly available ... with the intent to threaten").

Elonis nonetheless suggests that an intent-to-threaten element is necessary in order to avoid the risk of punishing innocent conduct. But there is nothing absurd about punishing an individual who, with knowledge of the words he uses and their ordinary meaning in context, makes a threat. For instance, a high-school student who sends a letter to his principal stating that he will massacre his classmates with a machine gun, even if he intended the letter as a joke, cannot fairly be described as engaging in innocent conduct. But see *ante,* at 2006 – 2007, 2012 – 2013 (concluding that Elonis' conviction under § 875(c) for discussing a plan to " 'initiate the most heinous school shooting ever imagined' " against " 'a Kindergarten class' " cannot stand without proof of some unspecified heightened mental state).

Elonis also insists that we read an intent-to-threaten element into § 875(c) in light of the First Amendment. But our practice of construing statutes "to avoid constitutional questions *760 ... is not a license for the judiciary to rewrite language enacted by the legislature," *Salinas v. United States,* 522 U.S. 52, 59–60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (internal quotation marks omitted), and ordinary background principles of criminal law do not support *2024 rewriting § 875(c) to include an intent-to-threaten requirement. We have not altered our traditional approach to *mens rea* for other constitutional provisions. See, *e.g., Dean v. United States,* 556 U.S.

568, 572–574, 129 S.Ct. 1849, 173 L.Ed.2d 785 (2009) (refusing to read an intent-to-discharge-the-firearm element into a mandatory minimum provision concerning the discharge of a firearm during a particular crime). The First Amendment should be treated no differently.

II

In light of my conclusion that Elonis was properly convicted under the requirements of § 875(c), I must address his argument that his threatening posts were nevertheless protected by the First Amendment.

A

Elonis does not contend that threats are constitutionally protected speech, nor could he: "From 1791 to the present, ... our society ... has permitted restrictions upon the content of speech in a few limited areas," true threats being one of them. *R.A.V. v. St. Paul,* 505 U.S. 377, 382–383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ; see *id.,* at 388, 112 S.Ct. 2538. Instead, Elonis claims that only *intentional* threats fall within this particular historical exception.

If it were clear that intentional threats alone have been punished in our Nation since 1791, I would be inclined to agree. But that is the not the case. Although the Federal Government apparently did not get into the business of regulating threats until 1917, the States have been doing so since the late 18th and early 19th centuries. See, *e.g.,* 1795 N.J. Laws p. 108; Ill. Rev. Code of Laws, Crim. Code § 108 (1827) (1827 Ill. Crim. Code); 1832 Fla. Laws pp. 68–69. And that practice continued even after the States amended their constitutions *761 to include speech protections similar to those in the First Amendment. See, *e.g.,* Fla. Const., Art. I, § 5 (1838); Ill. Const., Art. VIII, § 22 (1818), Mich. Const., Art. I, § 7 (1835); N.J. Const., Art. I, § 5 (1844); J. Hood, Index of Colonial and State Laws of New Jersey 1203, 1235, 1257, 1265 (1905); 1 Ill. Stat., ch. 30, div. 9, § 31 (3d ed. 1873). State practice thus provides at least some evidence of the original meaning of the phrase "freedom of speech" in the First Amendment. See *Roth v. United States,* 354 U.S. 476, 481–483, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (engaging in a similar inquiry with respect to obscenity).

Shortly after the founding, several States and Territories enacted laws making it a crime to "knowingly send or deliver any letter or writing, with or without a name subscribed thereto, or signed with a fictitious name, ... threatening to maim, wound, kill or murder any person, or to burn his or her [property], though no money, goods or chattels, or other valuable thing shall be demanded," *e.g.,* 1795 N.J. Laws § 57, at 108; see also, *e.g.,* 1816 Ga. Laws p. 178; 1816 Mich. Territory Laws p. 128; 1827 Ill. Crim. Code § 108; 1832 Fla. Laws, at 68–69. These laws appear to be the closest early analogue to § 875(c), as they penalize transmitting a communication containing a threat without proof of a demand to extort something from the victim. Threat provisions explicitly requiring proof of a specific "intent to extort" appeared alongside these laws, see, *e.g.,* 1795 N.J. Laws § 57, at 108, but those provisions are simply the predecessors to § 875(b) and § 875(d), which likewise expressly contain an intent-to-extort requirement.

The laws without that extortion requirement were copies of a 1754 English threat statute subject to only a general-intent requirement. The statute made it a capital *2025 offense to "knowingly send any Letter without any Name subscribed thereto, or signed with a fictitious Name ... threatening to kill or murder any of his Majesty's Subject or Subjects, or to burn their [property], though no Money or Venison or other *762 valuable Thing shall be demanded." 27 Geo. II, ch. 15, in 7 Eng. Stat. at Large 61 (1754); see also 4 W. Blackstone, Commentaries on the Laws of England 144 (1768) (describing this statute). Early English decisions applying this threat statute indicated that the appropriate mental state was general intent. In *King v. Girdwood,* 1 Leach 142, 168 Eng. Rep. 173 (K.B. 1776), for example, the trial court instructed the jurors that, "if they were of

opinion that" the "terms of the letter conveyed an actual threat to kill or murder," "and that the prisoner knew the contents of it, they ought to find him guilty; but that if they thought he did not know the contents, or that the words might import any thing less than to kill or murder, they ought to acquit," *id.,* at 143, 168 Eng. Rep., at 173. On appeal following conviction, the judges "thought that the case had been properly left to the Jury." *Ibid.,* 168 Eng. Rep., at 174. Other cases likewise appeared to consider only the import of the letter's language, not the intent of its sender. See, *e.g., Rex v. Boucher,* 4 Car. & P. 562, 563, 172 Eng. Rep. 826, 827 (K.B. 1831) (concluding that an indictment was sufficient because "th[e] letter very plainly conveys a threat to kill and murder" and "[n]o one who received it could have any doubt as to what the writer meant to threaten"); see also 2 E. East, A Treatise of the Pleas of the Crown 1116 (1806) (discussing *Jepson and Springett's Case,* in which the judges disagreed over whether "the letter must be understood as ... importing a threat" and whether that was "a necessary construction").

Unsurprisingly, these early English cases were well known in the legal world of the 19th century United States. For instance, Nathan Dane's A General Abridgement of American Law—"a necessary adjunct to the library of every American lawyer of distinction," 1 C. Warren, History of the Harvard Law School and of Early Legal Conditions in America 414 (1908)—discussed the English threat statute and summarized decisions such as *Girdwood* . 7 N. Dane, A General Abridgement of American Law 31–32 (1824). And *763 as this Court long ago recognized, "It is doubtless true ... that where English statutes ... have been adopted into our own legislation; the known and settled construction of those statutes by courts of law, has been considered as silently incorporated into the acts, or has been received with all the weight of authority." *Pennock v. Dialogue,* 2 Pet. 1, 18, 7 L.Ed. 327 (1829) ; see also, *e.g., Commonwealth v. Burdick,* 2 Pa. 163, 164 (1846) (considering English cases persuasive authority in interpreting similar state statute creating the offense of obtaining property through false pretenses). In short, there is good reason to believe that States bound by their own Constitutions to protect freedom of speech long ago enacted general-intent threat statutes.

Elonis disputes this historical analysis on two grounds, but neither is persuasive. He first points to a treatise stating that the 1754 English statute was "levelled against such whose intention it was, (by writing such letters, either without names or in fictitious names,) to conceal themselves from the knowledge of the party threatened, that they might obtain their object by creating terror in [the victim's] mind." 2 W. Russell & D. Davis, A Treatise on Crimes & Misdemeanors 1845 (1st Am. ed. 1824). But the fact that the ordinary prosecution under this provision involved a defendant who intended to cause fear does not mean that such a mental *2026 state was *required* as a matter of law. After all, § 875(c) is frequently deployed against people who wanted to cause their victims fear, but that fact does not answer the legal question presented in this case. See, *e.g., United States v. Sutcliffe,* 505 F.3d 944, 952 (C.A.9 2007) ; see also Tr. of Oral Arg. 53 (counsel for the Government noting that "I think Congress would well have understood that the majority of these cases probably [involved] people who intended to threaten").

Elonis also cobbles together an assortment of older American authorities to prove his point, but they fail to stand up to close scrutiny. Two of his cases address the offense of *764 breaching the peace, *Ware v. Loveridge,* 75 Mich. 488, 490–493, 42 N.W. 997, 998 (1889) ; *State v. Benedict,* 11 Vt. 236, 239 (1839), which is insufficiently similar to the offense criminalized in § 875(c) to be of much use. Another involves a prosecution under a blackmailing statute similar to § 875(b) and § 875(c) in that it expressly required an "intent to extort." *Norris v. State,* 95 Ind. 73, 74 (1884). And his treatises do not clearly distinguish between the offense of making threats with the intent to extort and the offense of sending threatening letters without such a requirement in their discussions of threat statutes, making it difficult to draw strong inferences about the latter

category. See 2 J. Bishop, Commentaries on the Criminal Law § 1201, p. 664, and nn. 5–6 (1877); 2 J. Bishop, Commentaries on the Law of Criminal Procedure § 975, p. 546 (1866); 25 The American and English Encyclopædia of Law 1073 (C. Williams ed. 1894).

Two of Elonis' cases appear to discuss an offense of sending a threatening letter without an intent to extort, but even these fail to make his point. One notes in passing that character evidence is admissible "to prove *guilty knowledge* of the defendant, when that is an essential element of the crime; that is, the *quo animo,* the *intent* or design," and offers as an example that in the context of "sending a threatening letter, ... prior and subsequent letters to the same person are competent in order to show the intent and meaning of the particular letter in question." *State v. Graham,* 121 N.C. 623, 627, 28 S.E. 409, 409 (1897). But it is unclear from that statement whether that court thought an *intent to threaten* was required, especially as the case it cited for this proposition —*Rex v. Boucher,* 4 Car. & P. 562, 563, 172 Eng. Rep. 826, 827 (K.B. 1831)—supports a general-intent approach. The other case Elonis cites involves a statutory provision that had been judicially limited to " 'pertain to one or the other acts which are denounced by the statute,' " namely, terroristic activities carried out by the Ku Klux Klan. *Commonwealth v. Morton,* 140 Ky. 628, 630, 131 S.W. 506, 507 (1910) (quoting *Commonwealth*

*765

*v. Patrick,* 127 Ky. 473, 478, 105 S.W. 981, 982 (1907) ). That case thus provides scant historical support for Elonis' position.

B

Elonis also insists that our precedents require a mental state of intent when it comes to threat prosecutions under § 875(c), primarily relying on *Watts,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664, and *Virginia v. Black,* 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). Neither of those decisions, however, addresses whether the First Amendment requires a particular mental state for threat prosecutions.

As Elonis admits, *Watts* expressly declined to address the mental state required under the First Amendment for a "true threat." See 394 U.S., at 707–708, 89 S.Ct. 1399. True, the Court in *Watts* noted "grave doubts" about *Ragansky* 's construction *2027 of "willfully" in the presidential threats statute. 394 U.S., at 707–708, 89 S.Ct. 1399 . But "grave doubts" do not make a holding, and that stray statement in *Watts* is entitled to no precedential force. If anything, *Watts* continued the long tradition of focusing on objective criteria in evaluating the mental requirement. See *ibid* .

The Court's fractured opinion in *Black* likewise says little about whether an intent-to-threaten requirement is constitutionally mandated here. *Black* concerned a Virginia cross-burning law that expressly required " 'an intent to intimidate a person or group of persons,' " 538 U.S., at 347, 123 S.Ct. 1536 (quoting Va.Code Ann. § 18.2–423 (1996) ), and the Court thus had no occasion to decide whether such an element was necessary in threat provisions silent on the matter. Moreover, the focus of the *Black* decision was on the statutory presumption that "any cross burning [w]as prima facie evidence of intent to intimidate." 538 U.S., at 347–348, 123 S.Ct. 1536. A majority of the Court concluded that this presumption failed to distinguish unprotected threats from protected speech because it might allow convictions "based solely on the fact of cross burning itself," including cross burnings in a play or at a political rally. *Id.,* at 365–366, 123 S.Ct. 1536 (plurality opinion); *id.,* at 386, 123 S.Ct. 1536 (Souter, *766 J., concurring in judgment in part and dissenting in part) ("The provision will thus tend to draw nonthreatening ideological expression within the ambit of the

prohibition of intimidating expression"). The objective standard for threats under § 875 (c), however, helps to avoid this problem by "forc[ing] jurors to examine the circumstances in which a statement is made." *Jeffries,* 692 F.3d, at 480.

In addition to requiring a departure from our precedents, adopting Elonis' view would make threats one of the most protected categories of unprotected speech, thereby sowing tension throughout our First Amendment doctrine. We generally have not required a heightened mental state under the First Amendment for historically unprotected categories of speech. For instance, the Court has indicated that a legislature may constitutionally prohibit " 'fighting words,' those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction," *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) —without proof of an intent to provoke a violent reaction. Because the definition of "fighting words" turns on how the "ordinary citizen" would react to the language, *ibid.,* this Court has observed that a defendant may be guilty of a breach of the peace if he "makes statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended," and that the punishment of such statements "as a criminal act would raise no question under [the Constitution]," *Cantwell v. Connecticut,* 310 U.S. 296, 309–310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) ; see also *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572–573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (rejecting a First Amendment challenge to a general-intent construction of a state statute punishing " 'fighting' words"); *State v. Chaplinsky,* 91 N.H. 310, 318, 18 A.2d 754, 758 (1941) ("[T]he only intent required for conviction ... was an intent to speak the words"). The Court has similarly held that a defendant may be convicted of mailing obscenity under the First Amendment without proof that he knew the materials *767 were legally obscene. *Hamling,* 418 U.S., at 120–124, 94 S.Ct. 2887. And our precedents allow liability in tort for false statements about private persons on matters of private concern even if the speaker acted negligently with respect to the falsity of those statements. See *Philadelphia Newspapers,*

2028*2028

*Inc. v. Hepps,* 475 U.S. 767, 770, 773–775, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). I see no reason why we should give threats pride of place among unprotected speech.

\* \* \*

There is always a risk that a criminal threat statute may be deployed by the Government to suppress legitimate speech. But the proper response to that risk is to adhere to our traditional rule that only a narrow class of true threats, historically unprotected, may be constitutionally proscribed.

The solution is not to abandon a mental-state requirement compelled by text, history, and precedent. Not only does such a decision warp our traditional approach to *mens rea,* it results in an arbitrary distinction between threats and other forms of unprotected speech. Had Elonis mailed obscene materials to his wife and a kindergarten class, he could have been prosecuted irrespective of whether he intended to offend those recipients or recklessly disregarded that possibility. Yet when he threatened to kill his wife and a kindergarten class, his intent to terrify those recipients (or reckless disregard of that risk) suddenly becomes highly relevant. That need not—and should not—be the case.

Nor should it be the case that we cast aside the mental-state requirement compelled by our precedents yet offer nothing in its place. Our job is to decide questions, not create them. Given the majority's ostensible concern for protecting innocent actors, one would have expected it to announce a clear rule—any clear rule. Its failure to do so reveals the fractured foundation upon which today's decision rests.

Elonis v. United States, 575 U.S. 723 (2015)

I respectfully dissent.

casetext

No. 21-3487
United States Court of Appeals, Eighth Circuit

# United States v. Sryniawski

48 F.4th 583 (8th Cir. 2022)
Decided Sep 2, 2022

No. 21-3487

09-02-2022

UNITED STATES of America, Plaintiff - Appellee, v. Dennis SRYNIAWSKI, Defendant - Appellant.

Counsel who presented argument on behalf of the appellant and appeared on the appellant brief was David R. Stickman, FPD, of Omaha, NE. Counsel who presented argument on behalf of the appellee and appeared on the appellee brief was John Higgins, AUSA, of Omaha, NE.

COLLOTON, Circuit Judge.

Counsel who presented argument on behalf of the appellant and appeared on the appellant brief was David R. Stickman, FPD, of Omaha, NE.

Counsel who presented argument on behalf of the appellee and appeared on the appellee brief was John Higgins, AUSA, of Omaha, NE.

Before SMITH, Chief Judge, COLLOTON and SHEPHERD, Circuit Judges.

COLLOTON, Circuit Judge. *585 Dennis Sryniawski was charged with federal offenses of cyberstalking and extortion after he sent a series of e-mails to a candidate for the Nebraska legislature. A jury acquitted Sryniawski of extortion but convicted him of cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B). Sryniawski appeals the conviction, arguing that the e-mails constituted speech that is protected by the First Amendment, and that the evidence was insufficient to support a conviction. We conclude that the evidence was insufficient under a proper interpretation of the cyberstalking statute, and therefore reverse the conviction.

I.

Jeff Parris ran for the Nebraska legislature in 2018. At the time of the campaign, Parris was married to Diane Parris and was the step-father of Diane's adult daughter from a previous marriage. Jeff and Diane married in 1992, divorced in 1994, and then remarried in 2007. Between the two marriages, Diane was married to Dennis Sryniawski from 1994 to 1995.

In October 2018, during the legislative campaign, Sryniawski sent an e-mail to Parris's official campaign e-mail address from the name "Isaac Freely." The subject line of the e-mail was "Check your skeletons?" The e-mail called Parris's step-daughter a pedophile, and hyperlinked to two websites showing that she had been charged with online solicitation of a minor and sexual assault of a minor in Texas. The e-mail included a hyperlink to



the step-daughter's sexually explicit weblog, and asserted that the step-daughter's " 'Pansexuality' does not recognize age either." Sryniawski also implied that he might report the step-daughter for fraudulently crowdfunding tickets to see a concert. The message was signed "Until next time, Exposing the Hypocrites!"

The e-mail message also referred to Diane Parris's relationship with her father. When Diane and Sryniawski were married, Diane told him that her father had molested her, and that she took prescription medication to address her emotional condition. Referring to Diane's disclosures about her father's conduct, the e-mail said: "Which did he really? Or was the Multiple Personality Disorder all a hoax to be a Pharm Addict?" The e-mail warned that "this is only just the beginning," and that there was "[m]ore to come," especially because Jeff and Diane had a "dozen" ex-spouses between them who did not want to see Jeff in politics. The e-mail concluded with a "suggestion" that Jeff should "bow out of the race."

Two days later, over a period of eight hours, Sryniawski sent five more e-mails to the Parris campaign address. The first of these, the second e-mail overall, bore the subject line "Gone But Not Forgotten." Sryniawski again sent this message from the name "Isaac Freely," and signed "Sincerely, Exposing the Hypocrisy" at the bottom. The e-mail attached a screen shot of a comment that Sryniawski had posted on the Parris campaign Facebook page *586 under the name "Nicole Jacobs." The comment contained one of the same hyperlinks that Sryniawski sent in the first e-mail about the step-daughter's arrest for sexual assault and online solicitation of a minor. The body of the e-mail said that "the Ghosts will continue to haunt you," and included a statement as follows: "All we are asking, is Quit the Race. Step down from running for State Legislature, Never run for any Political Office again, & All will be Sweet, especially for the 'Good Life'."

The third e-mail was from "Dennis Sryniawski" with the subject line, "Good Day?" The entire text of the e-mail read, "I so see the resemblance in Mother and Daughter!" The e-mail contained four broken-image thumbnails, but no images.

Sryniawski sent the fourth e-mail under the name "Joe Poluka." Like the third e-mail, it bore the subject line "Good Day?" and contained the text, "I so see the resemblance in Mother and Daughter!" The fourth e-mail included four photographs as attachments. The first showed Diane Parris campaigning, and the second showed Parris's step-daughter wearing a camisole. The third photo purportedly depicted the step-daughter performing oral sex on a male, and the fourth photo depicted Diane Parris performing oral sex on a male.

Sryniawski sent the fifth e-mail as a reply to the fourth e-mail using the pseudonym "C Payne," who is an ex-husband of Diane. The body of the e-mail said only, "Do We Have Your Attention Now?" Sryniawski sent the sixth and final e-mail as a reply to the preceding two e-mails using the step-daughter's name as the sender. The text read: "Are we not entertained?"

Jeff Parris shared the e-mails with his family. Jeff testified that the e-mails hurt him and his family "immensely," and that the photographs were "devastating." His step-daughter described the e-mails as "jarring," "unsettling," and "messed up." When Diane saw the e-mails, she became "very emotional" and was "obviously upset." Diane was also "horrified" and "afraid," because she inferred that Sryniawski must be the sender. Sryniawski was one of only a few people to whom Diane had disclosed the abuse that she suffered as a child, her diagnosis with a psychological condition, and her use of medication for that condition. Diane testified that after seeing the e-mails, she became frightened for her safety.

The day after receiving the sixth e-mail, Jeff Parris reported the messages to the La Vista Police Department. A local investigator and an FBI agent contacted Sryniawski at his workplace the same day. Sryniawski initially denied sending the e-mails, but soon admitted that he sent all of them.

United States v. Sryniawski, 48 F.4th 583 (8th Cir. 2022)

A grand jury charged Sryniawski with cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B), and extortion, in violation of 18 U.S.C. § 875(d). The case proceeded to trial. At the close of the government's case and at the close of all evidence, Sryniawski moved for judgment of acquittal. He argued that the evidence was insufficient to support a conviction, and that the cyberstalking and extortion statutes violated the First Amendment as applied to him. The district court denied the motions. The jury was instructed that speech is not protected by the First Amendment "if it is intended to harass or intimidate and would be reasonably expected to cause emotional distress," but the terms "harass" and "intimidate" were not further defined.

The jury convicted Sryniawski of cyberstalking but acquitted him of extortion. The district court imposed a sentence of one year and one day in prison, followed by three years of supervised release, and a *587 $10,000 fine. Sryniawski appeals the conviction.

II.

Sryniawski contends that the cyberstalking statute, as applied to him, violates his right to freedom of speech under the First Amendment. He also contends that evidence was insufficient to sustain a conviction under the statute. In this case, Sryniawski's challenges merge into a single question: whether the evidence was sufficient to convict Sryniawski of cyberstalking under § 2261A(2)(B) when the statute is interpreted in a way that is consonant with the First Amendment.

A defendant is guilty of cyberstalking if he (1) "with the intent to ... harass [or] intimidate," (2) uses "any ... electronic communication system of interstate commerce ... to engage in a course of conduct," that (3) "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to" the victim or his immediate family. 18 U.S.C. § 2261A(2)(B).

The *mens rea* element, as charged in this case, requires that a defendant act with the intent to "harass" or "intimidate." *Id.* § 2261A(2). If these terms are construed in their broadest sense, however, they would infringe on rights protected by the First Amendment. Broadly defined, "harass" can mean simply "to vex, trouble, or annoy continually or chronically." *Webster's Third New International Dictionary of the English Language Unabridged* 1031 (1993). "Intimidate" can mean "to make timid or fearful." *Webster's Third New International Dictionary of the English Language Unabridged* 1184 (2002).

Even where emotional distress is reasonably expected to result, the First Amendment prohibits Congress from punishing political speech intended to harass or intimidate in the broad senses of those words. The Free Speech Clause protects a variety of speech that is intended to trouble or annoy, or to make another timid or fearful. In *Snyder v. Phelps* , 562 U.S. 443, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011), for example, the Supreme Court held that protestors at a serviceman's funeral had the right to display signs that read, "Thank God for Dead Soldiers," "God Hates Fags," and "You're Going to Hell." *Id.* at 448, 461, 131 S.Ct. 1207. In *R.A.V. v. City of St. Paul* , 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), the Court declared unconstitutional a criminal ordinance that prohibited the display of burning crosses, Nazi swastikas, and other symbols that the perpetrator had reasonable grounds to know would arouse "anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." *Id.* at 380, 391, 112 S.Ct. 2538. *Hustler Magazine, Inc. v. Falwell* , 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), held that the First Amendment protected a parody that depicted a prominent minister having drunken sex with his mother. *Id* . at 47-48, 50, 108 S.Ct. 876 ; *see also Saxe v. State Coll. Area Sch. Dist.* , 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.) ("There is no categorical 'harassment exception' to the First Amendment's free speech clause."). For this reason, the cyberstalking statute cannot be applied

constitutionally to a defendant who directs speech on a matter of public concern to a political candidate with intent merely to trouble or annoy the candidate. *United States v. Yung* , 37 F.4th 70, 78-79 (3d Cir. 2022) ; *United States v. Ackell* , 907 F.3d 67, 76 (1st Cir. 2018).

To sustain the conviction in this case, therefore, the government must identify sufficient evidence for a jury to find that Sryniawski acted with intent to "harass" or "intimidate" in a sense that is not protected under the First Amendment. *588 For example, "criminal harassment" is unprotected where it "constitutes true threats or speech that is integral to proscribable criminal conduct." *Ackell* , 907 F.3d at 76 ; *see United States v. Stevens* , 559 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). "Intimidation in the constitutionally proscribable sense of the word is a type of true threat," where the speaker intends to place the victim "in fear of bodily harm or death." *Virginia v. Black* , 538 U.S. 343, 360, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). The government does not maintain that Sryniawski's e-mails contained a true threat against Parris or his family, but suggests three categories of harassing speech that are unprotected: speech integral to criminal conduct, defamatory speech, and obscenity.

First, the government argues that Sryniawski's e-mails were integral to the criminal conduct of cyberstalking itself. That argument is circular and unpersuasive. Congress may not define speech as a crime, and then render the speech unprotected by the First Amendment merely because it is integral to speech that Congress has criminalized. To qualify as speech integral to criminal conduct, the speech must be integral to conduct that constitutes another offense that does not involve protected speech, such as antitrust conspiracy, *Giboney v. Empire Storage & Ice Co.* , 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949), extortion, *United States v. Petrovic* , 701 F.3d 849, 855 (8th Cir. 2012), or in-person harassment, *United States v. Osinger* , 753 F.3d 939, 941, 947 (9th Cir. 2014). The government points out that we upheld a cyberstalking conviction where the evidence was sufficient to support a finding that the defendant's speech was integral to an extortion that was not charged as a separate offense. *United States v. Hobgood* , 868 F.3d 744, 747-48 (8th Cir. 2017). In this case, however, the jury acquitted Sryniawski of extortion, and there is no other identified criminal conduct to which the jury could have found that Sryniawski's e-mail communications were integral.

Second, the government contends that Sryniawski's first e-mail contained three defamatory statements that are not protected by the First Amendment. The government asserts that Sryniawski communicated "false accusations" that Parris's wife had falsely reported childhood molestation and a psychological condition, that Parris's wife was addicted to prescription medication, and that Parris's step-daughter was a pedophile. The government did not advance this theory at trial, and there is no jury finding on defamation. The government's argument on appeal is limited to one paragraph. But considering the defamation theory on the assumption that we may affirm on any ground supported by the record, we believe the evidence is insufficient.

Under prevailing law, where an alleged victim of defamation is a public figure, a speaker's assertions are unprotected speech only if the speaker acted with "actual malice"—that is, with knowledge that his statements were false or with reckless disregard of their falsity. *See N.Y. Times Co. v. Sullivan* , 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Diane Parris was actively involved in Jeff's campaign, and served as campaign manager for a time. Spouses of candidates for public office who are actively involved in the campaign have been considered public figures. *E.g.* , *Krueger v. Austad* , 545 N.W.2d 205, 212 (S.D. 1996) ; *Burns v. Times Argus Ass'n* , 139 Vt. 381, 430 A.2d 773, 775 (1981) ; *see also Gertz v. Robert Welch, Inc.* , 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The government does not dispute that Diane was a public figure or argue that Sryniawski acted with actual *589 malice. Without a showing of actual malice, an allegedly false assertion alone is insufficient to make Sryniawski's comments about Diane defamatory.

The government argues briefly that Sryniawski defamed Parris's step-daughter, a non-public figure, by negligently asserting that she was a pedophile—*i.e.*, a person "sexually attracted to children." *The New Oxford American Dictionary* 1261 (2001). But the case was not tried on a defamation theory, and the record does not establish that Sryniawski's alleged statement was false. It was a matter of public record that the step-daughter had been charged in a criminal case with sexual assault and online solicitation of a minor. The step-daughter referred to those charges as "false allegations," and testified that they were "dismissed for lack of evidence." But the government did not present evidence that Sryniawski knew that the charges had been dismissed. Nor did the prosecution ask the step-daughter to deny that she is sexually attracted to minors, independent of whether she was guilty of making an online solicitation. On this record, therefore, the evidence is insufficient to support a finding that Sryniawski harassed Parris and his family with defamatory speech. *Cf. United States v. Gonzalez*, 905 F.3d 165, 178 (3d Cir. 2018).

Third, the government contends that a reasonable jury could have found that Sryniawski intended to harass the victims by causing them distress through the transmission of obscene materials. The government also did not advance this theory at trial, and the jury was not asked to determine whether the attachments to Sryniawski's fourth e-mail were legally obscene under the standard of *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). But even considering obscenity on the assumption that this unspoken theory could support the verdict, the transmission of explicit photographs attached to one e-mail is not sufficient to sustain the conviction. The cyberstalking statute as charged here requires proof that a defendant engaged in a "course of conduct" that consists of "2 or more acts, evidencing a continuity of purpose." 18 U.S.C. §§ 2261A(2), 2266(2). The transmission of one e-mail with obscene attachments is not a course of conduct. Lawful acts like logging onto a computer, opening an internet browser, and sending other e-mails cannot be aggregated with criminal conduct to establish a "course of conduct." Each "act" must be taken with the requisite criminal intent and reasonable expectation of causing substantial emotional distress. *Id.* § 2261A(2)(B). The government did not charge Sryniawski with the separate offense of transmitting of obscene materials via the internet, *see id.* § 1462, and its belated obscenity theory is insufficient to sustain the cyberstalking conviction.

For these reasons, we conclude that the evidence is insufficient to support the conviction, and the judgment of the district court is reversed.



casetext

5

NO: 3:20CR19

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF MISSISSIPPI

# United States v. Cook

472 F. Supp. 3d 326 (N.D. Miss. 2020)

Decided Jul 13, 2020

NO: 3:20CR19

2020-07-13

UNITED STATES of America v. Christopher Casey COOK

Paul D. Roberts, U.S. Attorney's Office, Oxford, MS, for United States of America. FPD, Federal Public Defender's Office, Merrill King Nordstrom, Hickman, Goza & Spragins, PLLC, Oxford, MS, for Christopher Casey Cook.

Michael P. Mills, UNITED STATES DISTRICT JUDGE

*327

Paul D. Roberts, U.S. Attorney's Office, Oxford, MS, for United States of America.

FPD, Federal Public Defender's Office, Merrill King Nordstrom, Hickman, Goza & Spragins, PLLC, Oxford, MS, for Christopher Casey Cook.

## **ORDER**

Michael P. Mills, UNITED STATES DISTRICT JUDGE

Presently before the Court is Defendant Christopher Casey Cook's ("Cook") Motion to Dismiss Indictment [36]. The United States ("the government") responded in opposition [39], and Cook replied [40]. Having reviewed these submissions, along *328 with relevant authorities, the Court is now prepared to rule.

## Facts

In 2018 Cook was prosecuted by the State of Mississippi for sale of a controlled substance. The case was widely publicized in the local news and public reference was made to Cook's local Calhoun County business. Cook was acquitted of all charges by a Calhoun County jury. Not content to quietly accept his victory, Cook made disparaging remarks on the internet about various players in his Calhoun County prosecution. He now finds himself defending a charge of internet harassment in Federal Court.

After his acquittal, Cook published a number of posts on his personal Facebook page about his experiences with the criminal justice system. An affidavit of Federal Bureau of Investigation Agent John Marsh specifically mentioned five Facebook posts made by Cook that Marsh believed supported a Criminal Complaint for cyberstalking. A review of these posts is in order. On June 27, 2019 Cook posted on his Facebook account:



I have a friend who had an issue in court. The date of her charge was changed for some reason. But she didn't have any documentation. So I asked if she took or received a lot of photos and she said yes. I asked her about the meta data and she said that her attorney said metadata can be altered. I asked if she posted photos on Facebook because they keep the photos on a "timeline" ... I doubt any party could alter Facebook's timeline .... unless they could be like Superman and reverse the spinning of the earth ... [that will be one heck of an "app for that!"] So my point is that a dated Facebook post of a photo could prove it was taken then or before ... .so this is how she can use Facebook in court. People that have secrets are equally concerned with Facebook because of the power it gives an average joe ... so socialize, enjoy, and post photos ... The great equalizer is the gun but Facebook runs a close 2nd ... and what you need is there ... ready to be revealed ... God willing ...

The government alleges Cook posted the following on Facebook on August 19, 2019[1] :

[1] Defendant's Attorney represented that she was unable to locate this alleged Facebook post in the government's discovery materials produced.

Cowards Creekmore[2] and Mueller[3] and cowardly judges. Cowardly crooked public defenders. Step down. Dixie Mafia likes to talk about making the wrong people mad. Well congratulations. You did. God gave me a good jury. Now I'm gonna give you what you have been giving my brothers and sisters ... you are finished. Because I'm coming and hell is coming with me. And I'm not just quoting a movie.

[2] Presumably refers to the District Attorney Ben Creekmore who prosecuted Cook in his state court case. [1]

[3] Presumably refers to the Assistant District Attorney Thad Mueller who prosecuted Cook in his state court case. [1]

The voluble Cook made two separate posts on January 21, 2020, first:

** *Image appearing to be a screenshot of information found on the internet regarding Mississippi Bureau of Narcotics officer Jon Lepicier, including an address and potential aliases* **

You know that moment when your undercover aliases gets listed as 'Jon Cop?'. don't worry I'm not going to put

329  *329

the fam on here.... that karma though ...

This was followed by a post several hours later stating:

One poem then but that's it ok? Dedicated to Jamar "JP Smooth" Peterson ... I'm in the class of 07 At Oak Hill Academy But that's Jonathan Lepicier Jon Davis is my name I tried to convince Casey That I'm really Jon M dad ain't Bob he's like Richard Leon I became a new guy in 2013 That's when JL hit the scene. I'm here I'm there super coll and super Fun. Don't you think Avery goes well with Jun? My folks got like 12 boats and a house in Odessa. sounds like my wife's alias kinda Without the O or the A Ol buddy you know when you stopped at my restaurant ... started your lyin? I'll never forget when they told me later "I thought his name was Brian" The end

Finally, on January 23, 2020 Cook posted the following status update:

United States v. Cook    472 F. Supp. 3d 326 (N.D. Miss. 2020)

For those of you who read the stuff about my run ins with supposed law enforcers of the state of MS, I'm going to try to explain it without getting too wordy. The first MBN guy that got after me was someone I had known for a while. He had issues with substance abuse during service among many other "questionable things. He saw me playing guitar at church and formed an idea that I was dealing drugs and hookers and using church as a front. His own ideas. I found out how extremely naïve it can be to believe a badge because of the badge. But the town soaked the rumor up like a sponge. This MBN guy was removed due to his own conduct and that is where the second guy came in. He got an alias and went undercover in 2013. His name pretty much vanished from the internet. He is the one who arrested me in my bathroom. They searched my home. Didn't find any meth anywhere. Had a rubber stamp warrant with my name on it. And a copied stamp of local judge. Judge rushes a few words by me. (I had a right to a hearing which I didn't get, etc. He couldn't talk about the case). Didn't know anything about it.) .. I bonded out for $575.00, meaning they really didn't have evidence of a sale of meth but that was the charge. Of course MBN wanted to use my personal knowledge and facilities to set up others but I refused. When I got out of jail the story on WTVA news was a picture of me, a mugshot, with a history of dealing dope out of my motel, it said they had investigated me for 6 months and that I had 3.5 grams of meth on me. That's when it hit me that the guys in jail were right. I had been used as a distraction. I later found out what happened that day. July 19, 2018. Knowing there could be no evidence so no grand jury, I went to work getting after their butt while they send in more people hoping to get the evidence they had already charged and arrested and slandered by fake news without ... I uncovered a Ponzi scheme indictment system, where the prosecution and many defenders across MS work together. They self indict every possible felony whether evidenced or not. The forgeries are endless and obvious to the untrained eye. They see what lawyer you have. He could be on the team. They aren't likely to dismiss because the ace in the hole is cheating in court ... we caught 3 errors that would have overturned had they gotten conviction. Not to mention the arresting officer has everything he needs already. He knows his team has his back. He even signed for foreman and ADA. The DA over the whole district came to help put me away because he knew I had discovered his bottom up frivolous indictment system. (I termed it BUFI). I emailed him many times. They know it's wrong and they know getting away with murder

330  *330



here is easy ... but Facebook gets them extremely stressed out. Just go to the courthouse and as ADA, who I refer to as TJ ... he is very angry over my facebook. But it's all true and that will come to light soon enough. The rest of the scheme is ... hold back discovery 8 months to a year and write continuances without consent to take asway Speedy trial right, hoping defendant will plead, which they do 100% of the time ... minus one case ... mine. Now for me it's war. I'm sick of the corruption in this state. Sick of the scapegoating and unsolved murders, cover ups and fake news so that the whole system is too busy covering up to do any justice elsewhere. It's a mess and the people turn a blind eye here. Those that could help remain passive. Those that can't pay just get stuck in the thing or get stuck in drug court whether they do drugs or not and those that try them, get cheated and sent off. They pay probating and restitution to the county, the arresting, the appointed lawyer and whatever else they can tack on. My own loved ones won't acknowledge my truth half the time, so I don't care what anyone thinks. I uncovered the family of the arresting person. His real name, parents, grandparents, sisters, wife, nephew, properties owned, past phone numbers, aliases of the whole family, in laws ... which had him very puzzled as to how I did it. But I was nice enough to use poetry that only he would understand when posting what I knew. This guy has had affairs and paid numerous people to get something on me since early 2017, including his only witness, a real meth dealer. How ironic (sigh) ... I guess carrying the torch of his brother in arms and certainly angry that I make them look like little Johnny in the 4th grade. And God willing I'm going to take them out. With or without the help of the people. So far he has been willing and all credit be to him.

The Indictment [18] is a one and a half page document in which a grand jury found that Cook threatened Mississippi Bureau of Narcotics Agent Jon Lepicier by "revealing the address of, and names of family members" and "did threaten him and his family by posting:

"I uncovered the family of the arresting person. His real name, parents, grandparents, sisters, wife, nephew, properties owned, past phone numbers, aliases of the whole family, in laws, ... which had him very puzzled as to how I did it. He has taken down some resources and Facebook pages or changed them. But I was nice enough to use poetry that only he would understand when posting what I knew;" and

"And God willing I'm going to take them out;" [18]

Interestingly, when you compare the "posts" the government presented to the grand jury in the indictment, to the full posts reproduced above, it appears that the government "cherry picked" certain statements and re-arranged them in a different sequence and context to give the posts a more ominous effect.[4] In the preceding and intervening sentences of the post that were cut out by the government in the indictment, Cook identified no less than six other persons or entities in the post with whom he had grievances (see references to the First MBN officer on *331 Cook's state court case, WTVA, the local elected state court judge, the ADA, the DA, and the "local meth dealer") regarding what he alleged was a fraudulent indictment scheme perpetuated by various elected government officials.

---

[4] This Court notes initially that it does not seem fair for the government to be allowed to present statements out of context to a grand jury when context is the critical issue in play. In a now famous interview, former New York State Chief Judge Sol Wachtler stated something along the lines of "a grand jury would 'indict a ham sandwich' if that's what [a prosecutor] wanted." In the same vein, it does not seem sporting for the government in this case to present evidence as a ham sandwich when all they have is baloney.

The Court also notes that the government has not alleged that Cook ever directly contacted Mr. Lepicier, any member of Lepicier's family, or any of the other people he named in his posts via direct message, email, telephone, letter or otherwise. So, for Mr. Lepicier or any of his family members to see Cook's posts, they would have to actively search for Cook's Facebook page and scroll through his "wall" to find the actual posts.

## Discussion

### I. *Background of § 2261A(2)(B)*

18 U.S.C. § 2261A, commonly referred to as the cyberstalking statute, was enacted in 1996 after the legislature realized that the Violent Crime Control and Law Enforcement Act of 1994, which aimed to protect current/former spouses and intimate partners from their stalkers, was so narrowly drafted that it did not address cases in which the victim was unrelated to the stalker. Since the Act's enactment, it has been amended four times, in 2000, 2006, 2013 and again in 2018. It is the 2013 version of the statute which applies in this case. The 2013 version of 18 U.S.C. § 2261A(2)(B) states that:

> Whoever—
>
> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that—
>
> (B) causes, attempts to cause, or would reasonably be expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A), shall be punished as provided in section 2261(b) of this title.

The most notable changes between the 2006 and the 2013 versions are (1) the addition of intent to "intimidate" among the offense's various possible mental states, and (2) the statute now criminalizes a course of conduct that "causes, <u>attempts to cause, or would be reasonably expected to cause</u> substantial emotional distress."

### II. Conduct or Speech?

By its own terms, § 2261A(2)(B) regulates <u>conduct</u>, or to be precise, "courses of conduct." However, " '[c]onduct,' ... may also enjoy First Amendment protection if it is significantly imbued with elements of communication." *United States v. Ackell* , 907 F.3d 67, 73 (1st Cir. 2018) ; citing *Texas v. Johnson* , 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

The United States Circuit Court for the First Circuit found in *United States v. Ackell* that § 2261A(2)(B) does not target speech. However, the facts before the *Ackell* Court were starkly different from the facts here. In *Ackell* , the defendant, who was over 40, was prosecuted because he was involved in a romantic internet relationship with a 16-year-old girl under the pretense that he was 21. When she attempted to end the relationship, he informed her through direct messages and emails that she could not opt out of the relationship because she was "caged," presumably because she had previously furnished compromising photos of herself, and he threatened that if she stopped sending him additional compromising photos that he would disseminate the photos of her to her friends, classmates, and family. In essence, Ackell had actual contact with the victim, and sent threats directly *332 to her numerous times. Indeed, Ackell was engaged in repeated <u>conduct</u> that was threatening to a victim and was prosecuted for the <u>acts of directly threatening the victim</u>.

In the case before us today, the government has not alleged that Cook ever directly contacted any of the subjects of his Facebook posts. Rather, Cook is being prosecuted solely on the <u>content of his public posts</u> – not the <u>act of posting</u>.

It is worth noting that the *Ackell* Court distinguished its holding, stating "while acknowledging that § 2261A(2)(B) could have an unconstitutional application, and remaining cognizant of the chilling-effect-related concerns ... [s]hould situations arise where the statute is applied to courses of conduct that are sufficiently expressive to implicate the First Amendment, we are confident that as applied challenges will properly safeguard the rights that the First Amendment enshrines." *United States v. Ackell* , 907 F.3d 67, 77 (1st Cir. 2018).

This Court will now examine implications of the First Amendment protection of speech as applied to this case.

## III. Broad Protections of The First Amendment

The First Amendment states in part, "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Indeed, "the First Amendment protects speech even when the subject or manner of expression is uncomfortable and challenges conventional religious beliefs, political attitudes or standards of good taste." *United States v. Cassidy* , 814 F.Supp.2d 574, 582 (D. Md. 2011) ; citing *United States v. Stevens* , 559 U.S. 460, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). Further, the Supreme Court has "consistently classified emotionally distressing or outrageous speech as protected, especially where that speech touches on matters of political, religious or public concern. This is because 'in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide "adequate breathing space" to the freedoms protected by the First Amendment.' " *Id.*

While the internet did not exist when our founders contemplated First Amendment protections in 1791, courts have routinely recognized that the internet is just the "newest medium for ... uncomfortable expression touching on political matters" and that the "First Amendment's command [does] not vary when a new and different medium for communication appears." *United States v. Cassidy* , 814 F.Supp.2d 574, 582 (D. Md. 2011) ; citing *Reno v. Am. Civil Liberties Union* , 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ; *Cassidy* also citing *Brown v. Entm't Merch. Ass'n* , 564 U.S. 786, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011).

Even though numerous court decisions have been published protecting uncomfortable speech posted on the internet, not all speech is protected. Indeed, "there are certain 'well-defined and narrowly limited classes of speech' that remain unprotected by the First Amendment." *United States v. Cassidy* , 814 F.Supp.2d 574, 582 (D. Md. 2011). The narrowly limited unprotected classes of speech include (a) obscenity, (b) defamation, (c) fraud, (d) incitement, (e) true threats, and (f) speech integral to criminal conduct.

The 'true threat' category of unprotected speech is the least developed exception to the First Amendment. The Supreme Court has only discussed true threats in a handful of cases, largely leaving Circuit Courts to develop their own approach. The Second Circuit in *U.S. v. Kelner* , has developed a particularly detailed approach stating that a true threat is one that "on its face and in the circumstances in which *333 it is made is so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *United States v. Kelner* , 534 F.2d 1020 (2nd Cir. 1976).

The Fifth Circuit's established approach is to ask whether a communication "in its context would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *U.S. v. Myers* , 104 F.3d 76, 79 (5th Cir. 1997). The Fifth Circuit has discussed the Second Circuit's analysis in *Kelner* , and has stated that "immediacy, or clarity of purpose, ... was the key to distinguishing true threats." *Shackelford v. Shirley* , 948 F.2d 935, 939 (1991). The Fifth Circuit has also stated that to distinguish "political hyperbole"

from a "true threat," the statements must be analyzed "in context" to determine if they are true threats punishable by law. *U.S. v. Morales* , 272 F.3d 284, 287 (5th Cir. 2001). Further, "[i]n order to convict, a fact finder must determine that the recipient of the in-context threat reasonably feared it would be carried out." *U.S. v. Morales* , 272 F.3d 284, 287 (5th Cir. 2001) ; citing *Myers* , 104 F.3d at 80.

## A. Cook's Facebook Posts are not "True Threats"

The Fifth Circuit has commented on "true threat" or "true threats" in 20 cases. Of these 20, only six discuss statements made by a citizen and whether that statement constituted a true threat. None of the cases discuss a public statement, like Cook's post on his Facebook.

*U. S. v. Howell* , a 1983 case, featured a hospital patient who was reported for making threatening statements against the President of the United States. *United States v. Howell* , 719 F.2d 1258 (1983). The defendant told an F.B.I. agent, who was sent to interview him, that he had a .357 caliber pistol and that there were two people he wanted to kill, one being the President. *Id.* Howell also made the statements "it's too bad that John Hinckley did not get him. I will kill the president if I get the chance" and "if released, I would make my way to Washington and kill him—I will kill the President." *Id.* The next day, Howell delivered a letter further outlining his statements regarding killing the President. *Id.* The Fifth Circuit affirmed the District Court ruling that the statements constituted true threats.

In the 2001 case of *U.S. v. Morales* , Morales, an 18 year old student repeatedly told a stranger in an internet chat room that he wanted to kill teachers and students at Milby High School in Houston, Texas and he attempted to make reference to Eric Harris (one of the perpetrators of the Columbine High School killings). *U.S. v. Morales* , 272 F.3d 284, 287 (5th Cir. 2001). The woman he relayed the threats to contacted the police because she was concerned about the Milby High School students. *Id.* The Court stated that under the *Myers* interpretation of 18 U.S.C. 875(c), all that was required was general intent. Here, in its context, Morales repeated his specific threats to kill several times, referred to a perpetrator of a violent and horrific school shooting and gave no indication that he was joking. *Id.* Nothing Morales said in that chat room could be construed as political speech, religious speech or public concern. In fact, Morales used the phrases "I will kill" and "YES F NE ONE STANDS N MY WAY WILL SHOT" [sic] which could not be mistaken. As such, the Fifth Circuit affirmed the District Court ruling that the speech was a true threat.

In 2004 the Fifth Circuit ruled in *Porter v. Ascension Parish School Board* that a drawing depicting a violent siege on a school by a 14 year old student of that school was not a true threat because it was *334 not intentionally communicated to the public. *Porter v. Ascension Parish School Bd.* , 393 F.3d 608 (2004). Because the student's drawing was completed in his home, stored in his home for two years, was never intended to find its way to the school, and was unwittingly taken to the school by his younger brother, the Fifth Circuit held that the Court did not have to determine whether the drawing would constitute a true threat because the student did not intentionally or knowingly communicate it. *Id.*

In 2011, the Fifth Circuit ruled in *U. S. v. Dwyer* , a case in which a bankruptcy court debtor emailed an employee of the bankruptcy court where his suit was pending stating:

Well, please convey to Judge Brown my belief that he can "try" to protect the CRIMINALS Duval, Lemelle and Dennis, but he can't protect them from themselves, and the "damage" is already done. As is the case with Judge Porteous, their impeachment is "just a matter of time". Also convey to Judge Brown a reminder that I have been totally without money since the weekend of January 8, 9, and 10, and that I have been without my anti-depressant medication, for which I have sought leave to pay Walgreen's from my most recent Social Security check, since last weekend. I could not sleep last night, which I attribute to the effects of abruptly stopping my medication on Sunday, the 24th (my pills "ran out", and I have no money to purchase more). Maybe my creditors would benefit from my suicide, but suppose I become "homicidal"? Given the recent "security breach" at 500 Poydras Street, a number of scoundrels might be at risk if I DO become homicidal. Please ask His Honor to consider allowing me to refill my prescription at Walgreen's, and allowing me to pay them, which is a condition for my obtaining a refill. Please communicate this missive to creditors and their counsel. Thank you.

The district court dismissed the indictment in *O'Dwyer* , finding that after reviewing the statement and its context, it did not constitute a true threat because it was hypothetical and conditional. Additionally, the email "did not threaten bodily harm to any particular individual." Even though the email was sent directly to a court employee with a message for Judge Brown, O'Dwyer never identified any individual whom he intended to harm. Further, the Fifth Circuit took into consideration that O'Dwyer had a documented history of using coarse and hyperbolic language in prior court proceedings. As such, O'Dwyer's email was not found to be a true threat, and the Fifth Circuit affirmed the dismissal of the indictment.

In 2015, *Bell v. Itawamba County School Board* was appealed to the Fifth Circuit for a third time. Bell involved a rap song sang and posted on the internet by a high school student referencing two coaches' inappropriate behavior towards female students and included some violent lyrics like "I'm going to hit you with my rueger (sic)" and "middle fingers up if you want to cap that [expletive]," which the school system found threatening, intimidating and harassing towards the coaches named. *Bell v. Itawamba County School Bd.* , 799 F.3d 379 (5th Cir. 2015). The Fifth Circuit found that *Tinker's* off-campus speech standards applied distinguishing *Bell* in a way providing little value to the analysis required here.

Certain common threads weave through all of the Fifth Circuit cases in which a true threat was found; first, the threat specifically identified a target; second, the threat was specific enough as to place, time or method to take the threat seriously; and finally, the threat was made directly to the intended target or to a third *335 party. None of these cases discuss what we shall call a "bulletin board threat."

Cook's Facebook posts are not "true threats" precluding him from First Amendment protection. Cook's posts, when read in context, lack entirely the specificity required to bring them under the umbrella of a true threat. Nowhere in any post does Cook explicitly state that he plans to physically harm Lepicier, or any other named public official." God willing I'm going to take them out" is not the same as telling an FBI agent you have a pistol and you will use it to kill the president or repeatedly and directly telling another person in a chat room that you were going to kill the students in your high school while making references to one of the Columbine shooters. See respectively, *United States v. Howell* , 719 F.2d 1258 (1983) ; *U.S. v. Morales* , 272 F.3d 284, 287 (5th Cir. 2001). In fact, in this Court's view, Cook's posts were even less severe than the one made in *O'Dwyer* , in that O'Dwyer emailed a court staffer directly, and specifically made mention of "homicide" and security breaches at the court's address which would provide opportunity. This Court finds that Cook's statement "And God willing I'm going to take them out. With or without the help of the people ..." is even more vague than the references O'Dwyer made using the word "homicide." Cook's phrase, when read with the succeeding sentence regarding the help of the people, could be interpreted to mean that he wishes to "take them out" of office or

their positions of power based on the context of the entire post being about the "fraudulent indictment scheme" or "BUFI" that Cook seemingly is warning the public about. When read in context, Cook's posts are nothing more than a manifesto of his grievances regarding people and processes which he perceived to have wronged him; they do not rise to the level of true threats.

Additionally, none of the Fifth Circuit cases discuss a situation in which a person's information, such as address or family members' names, is shared publicly; a phenomenon sometimes referred to a "doxing" or "doxxing".[5] Certainly, sharing public information, while potentially offensive and disagreeable, does not rise to the level of a true threat. As such, that portion of the indictment referring to "threaten[ing Jon Lepicier] and his family by posting" must be dismissed. [18]

[5] Merriam-Webster has stated that the term doxing or doxxing dates at least as far back as 2009, and means "to publicly identify or publish private information about a person – especially as a way of punishing the person or getting revenge," and is likely derived as a variation of "dropping docs" or "doc-dropping" which described the same act. https://www.merriam-webster.com/words-at-play/not-playing-nice-doxing-and-swatting

## B. Cook's Facebook Posts are Protected First Amendment Speech because they discuss Matters of Public Concern

The First Amendment protects those engaged in speech which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps* , 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) ; citing *Connick v. Myers* , 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Even when speech is arguably "inappropriate or controversial ... [it] is irrelevant to the question [of] whether it deals with a matter of public concern." *Snyder v. Phelps* , 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) ; citing *Rankin v. McPherson* , 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Deciding whether speech is of public or private concern requires the Court to examine the "content, form, and context" of *336 the speech throughout the "whole record." *Snyder v. Phelps* , 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). Additionally, the Fifth Circuit has held that "where speech 'complained of misconduct within the police department', it should be classified as speech addressing a matter of public concern." *Thompson v. City of Starkville, Miss.* , 901 F.2d 456, 463 (5th Cir. 1990) ; citing *Brawner v. City of Richardson* , 855 F.2d 187, 192 (5th Cir. 1988). Specifically, this district has said "speech complaining of misconduct within [a public entity] is speech addressing a matter of public concern." *Scott v. Corrections Corp. of America* , 2014 WL 4988383, at *9 (N.D. Miss. 2014) ; citing *Alexander v. Eeds* , 392 F.3d 138, 142 (5th Cir. 2004).

Here, it is clear that the Mississippi Bureau of Narcotics, the officers of the Mississippi Bureau of Narcotics, the publicly elected state court judge, the publicly elected District Attorney, and the public officials employed by the District Attorney are all either political figures, or public officials employed by public entities. While the Court does not find it to be in good taste to post publicly available identifying records, "poems" written which vaguely reference information known about employees of public entities, or to use phrases like "and god willing I'm going to take them out," the Court recognizes that Mr. Cook does have the constitutionally protected right to say such things. When viewed in their entirety, the five posts of Mr. Cook reproduced above read to be an attempt by Mr. Cook to expose what he views to be misconduct within the Mississippi Bureau of Narcotics, the District Attorney's Office and the Calhoun County Court System.

Counsel for the defendant argues in her brief that her client's internet chatter is no more threatening than the jabberings spewed daily from the bully pulpit of the highest office in the land. Indeed, it is a measure of our times that communications on so-called "social media," traveling under brand names such as Facebook and

Twitter, are often jejune and truculent, speaking in slogans, cartoons, symbols, and brief "come-aparts." Such speech, coarse as it may be, is protected. The Court will not recount all of the examples listed by Defense Counsel in her brief, but does note on February 25, 2020 President Trump "doxxed" a jury forewoman, both tweeting her name and going so far as to say:

> There has rarely been a juror so tainted as the forewoman in the Roger Stone case. Look at her background. She never revealed her hatred of "Trump" and Stone. She was totally biased, as is the judge. Roger wasn't even working on my campaign. Miscarriage of justice. Sad to watch![6]

> [6] @realDonaldTrump, Twitter (Feb. 25, 2020), https://twitter.com/realDonald Trump/status/1232395209 125707776

and as recently as June 20, 2020 the President of the United States tweeted:

> BIG COURT WIN against Bolton. Obviously, with the book already given out and leaked to many people and the media, nothing the highly respected Judge could have done about stopping it ... BUT, strong & powerful statements & rulings on MONEY & on BREAKING CLASSIFICATION were made .... Bolton broke the law and has been called out and rebuked for so doing, with a really big price to pay. He likes dropping bombs on people, and killing them. **Now he will have bombs dropped on him.** [7]

> [7] @realDonaldTrump, Twitter (June 20, 2020), https://twitter.com/realdonald trump/status/127436 6497360613381 ?lang=en. (*emphasis added*).

337 *337

If prosecutors choose to tolerate the above grievances coming from the highest office in the land, then surely a Calhoun County citizen should likewise be allowed to vent his grievances. Their complaints are cut from the same cloth. Otherwise, our criminal justice system suffers the appearance of selective enforcement.

## C. Criminalization of Cook's Facebook Posts would Amount to an Impermissible Content Based Restriction of Speech

The District Court of Maryland in *U.S. v. Cassidy* dismissed an indictment in a 2015 case where a man posted on Twitter, a blog and other internet websites about a local religious leader and her congregation. *U.S. v. Cassidy* , 814 F.Supp.2d 574, (D. Md. 2011). In *Cassidy* , the defendant befriended a monk of a Buddhist sangha (hereinafter "KPC")[8] claiming that he too was a Buddhist American and expressed an interest in meeting A.Z., the first (and possibly only) American born female tulku.[9] After Cassidy had been a member of KPC for some time, A.Z. invited the defendant to a retreat. While they were in the car, A.Z. confided to the defendant about her abusive past and a failed marriage. *U.S. v. Cassidy* , 814 F.Supp.2d 574 (D. Md. 2011). The Defendant then proposed marriage to A.Z., asked her to pretend they were married during the retreat, and also asked if she wanted him to kill her ex-husband – all of which A.Z. declined. *Id.* After some behavior inconsistent with the KPC's beliefs, A.Z. investigated Cassidy's lineage and learned that he was never a tulku. *Id.* Upon being confronted with his lie, Cassidy left the retreat, and began using Twitter and blogs to post about A.Z. and KPC. *Id.* In total, over 350 tweets were directed at A.Z., thousands of tweets discussed A.Z. and KPC, and a blogspot account contains two posts "not necessarily directed at A.Z., a statement pertaining to A.Z., and a derogatory statement about KPC." *U.S. v. Cassidy* , 814 F.Supp.2d 574 (D. Md. 2011). The Tweets, which are too numerous to reproduce here in their entirety, include the following:

> [8] The Sanskrit word *sangha* is the community of followers and practitioners of Buddha's path and teaching. https://www.britannica.com/topic/sangha

9  A tulku is the "corporeal existence of enlightened Buddhist masters in general" and are believed to be rebirths of previous tulkas. The most famous example of a tulku lineage is the Dalai Lamas, who are said to be rebirths of the previous thirteen Dalai Lamas. New World Encyclopedia, https://www.newworldencyclopedia.org/entry/Tulku.

*Sunday, May 20, 2010:* "ya like haiku? Here's one for ya: "Long, Limb, Sharp Saw, Hard Drop" ROFLMAO."

*Tuesday, June 22, 2010:* "want it to all be over soon sweetie?"

*Tuesday, December 7, 2010:* "Got a wonderful Pearl Harbor Day surprise for KPC ... wait for it."

*Friday, June 25, 2010:* "[A.Z.] you are a liar & a fraud & you corrupt Buddhism by your very presence: go kill yourself."

*Thursday, December 9, 2010:* "A strong wind @ryderjaphy will blow down the KPC house of cards once and for all. They live by extortion now, and they live hand to mouth."

*Tuesday, December 28, 2010:* "DOWN WITH KPC! The fascist insect that preys on the life of Buddhism in the West!! DOWN WITH (Victim I)! The corrupt poser who has nothing."

*Sunday, July 25, 2010:* "I have just one thing I want to say to [A.Z.], and its form the heart: do the world a favor

*338 and go kill yourself. P.S. Have a nice day."

*Id.* at Appendix A.

Likening posting on Twitter or a blog to a public bulletin board, the District Court of Maryland stated:

Because this case involves First Amendment issues, terms that were in use by citizens when the Bill of Rights was drafted may help in understanding the legal context of Blogs and Twitter. Suppose that a Colonist erects a bulletin board in the front yard of his home to post announcements that might be of interest to others and other Colonists do the same. A blog is like a bulletin board, except that it is erected in cyberspace rather than in one's front yard. If one Colonist wants to see what is on another's bulletin board, he would need to walk over to his neighbor's yard and look at what is posted, or hire someone else to do so. Now, one can inspect a neighbor's Blog by simply turning on a computer.

...

One does not have to walk over and look at another person's bulletin board; nor does one Blog or Twitter user have to see what is posted on another person's Blog or Twitter account. This is in sharp contrast to a telephone call, letter or email specifically addressed to and directed at another person, and that difference, as will be seen, is fundamental to the First Amendment analysis in this case.

*U.S. v. Cassidy* , 814 F.Supp.2d 574 (D. Md. 2011). Further, the district court noted that the Supreme Court has "consistently classified emotionally distressing or outrageous speech as protected, especially where that speech touches on matters of political, religious or public concern." *Id.* As such, the district court found that "while Mr. Cassidy's speech may have inflicted substantial emotional distress, the Government's Indictment here is aimed squarely at protected speech: anonymous, uncomfortable Internet speech addressing religious matters." *Id.* at 583.

The *Cassidy* court conducted a secondary analysis regarding content-based restrictions on public speech, reiterating, "[i]n determining whether a statute is content-neutral, one must determine whether "the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* at 584. Further, a law or restriction is content-based if it "regulates speech based on the effect that that speech has on an audience." *Id.* Cassidy allegedly violated the statute by "intentionally causing substantial emotional distress to A.Z., specifically on Twitter and blogs." *U.S. v. Cassidy* , 814 F.Supp.2d 574, 584 (D. Md. 2011). The Maryland Court found the restriction as applied to Cassidy to be a content based restriction because it limited speech on the basis of whether that speech was emotionally distressing to A.Z.

It is well settled that a content-based restriction on speech must survive strict scrutiny – meaning that to survive strict scrutiny the government must show that the content based restriction "is necessary to serve a compelling state interest." *Id.* The Maryland court did not find "protecting victims from emotional distress sustained through an interactive computer service" to rise to the necessary state interest level because the Supreme Court has underscored the fact that the above referenced interest is not a compelling one. *Id.* at 586. "Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities simply by averting [our] eyes." *Id.* ; quoting *339 *United States v. Playboy Entm't Grp., Inc.* , 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). The Maryland court ruled that A.Z. had the ability to protect "her own sensibilities simply by averting" her eyes from the Defendant's blog and by not looking at or blocking his Tweets. *U.S. v. Cassidy* , 814 F.Supp.2d 574, 585 (D. Md. 2011). And because the government's interest in criminalizing speech that inflicts emotional distress is not a compelling one, the statute as applied to Cassidy did not survive strict scrutiny. *Id.*

Of all the First Amendment cases reviewed in this Order, *Cassidy* is most similar to the instant case. In each case the defendant posted brash public commentary about an individual or group on an internet forum and was then prosecuted for the posts under § 2261A. But arguably, Cassidy's thousands of tweets/posts were far more numerous than the five Cook has been flagged for. One difference between the two is that Cassidy was posting about a religious leader, while Cook was posting about public entity employees, a public entity, and publicly elected political figures – but in the Supreme Court's eyes, religion, politics, and criticism of public entities as a form of public concern are all protected forms of speech under the First Amendment. This Court also reads the types of language and phrasing of the posts by both men to be eerily similar; both Cassidy and Cook like to use vague sayings whether it be Cook's "god willing I'm going to take them out," "I'm gonna give you what you have been giving my brothers and sisters ... you are finished. Because I'm coming and hell is coming with me. And I'm not just quoting a movie," or Cassidy's "want it to all be over soon," and his reference to a horrific day in history like Pearl Harbor.

Further, while the Court does not condone publishing publicly available personal information, like a person's address, there is simply no existing framework in the United States which criminalizes the act of "doxing" or "doxxing" private citizens; and certainly re-sharing a public record doesn't arise to the severity of sharing someone's bank records or social security number.

Just as in *Cassidy* , Cook is being prosecuted for the content of his public posts. His indictment very clearly states that he is being charged because his posts "caused and would reasonably be expected to cause substantial emotional distress to a person, a spouse of that person or an immediate family member of that person." [18] Because Cook's speech allegedly violated the statute by intentionally causing or knowingly reasonably causing emotional distress to Lepicier and/or his family specifically on Facebook, the portion of § 2261A(2)(B) relied on in the Indictment amounts to a content-based restriction.

Since the statute as applied to Cook is content-based, the Government has the burden of showing that the content-based restriction "is necessary to service a compelling state interest." *U.S. v. Cassidy* , 814 F.Supp.2d 574, 585 (D. Md. 2011) ; citing *First National Bank of Boston v. Bellotti* , 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Here though, just as in the Supreme Court's ruling in *United States v. Playboy Entm't Group, Inc.*[10] and in the District Court of Maryland's ruling in *Cassidy* , the benefit of the content based restriction to shield sensibilities of *340 the listener or reader is just not enough to supplant a citizen's right to uncomfortable public discourse. Here, Lepicier, his family, the local state court judge, the ADA, the DA, the local meth dealer, and the local news station all have the ability to protect their "own sensibilities simply by averting" their eyes from Cook's Facebook page, and as such § 2261A(2)(B) as applied to Cook's Facebook's posts does not survive strict scrutiny and the Indictment must be dismissed.

10    *United States v. Playboy Entm't Grp., Inc.* , 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (Supreme Court ruled it was unconstitutional to require cable television operators to "fully scramble or otherwise fully block" sexually oriented programming during hours when children are unlikely to be viewing between 10p.m. and 6a.m. because the statute was "unnecessarily restrictive content based legislation violative of the First Amendment").

## IV. Facial Validity of § 2261A(2)(B)

The Defendant's motion to dismiss his indictment argues that this Court should find the cyberstalking statute to be facially unconstitutional on several grounds, or to find the cyberstalking statute to be unconstitutional as applied to Cook because it is a content based restriction on speech regarding public concern.

The government heavily relies on a single case in its response, *U.S. v. Conlan* , a case in which the Fifth Circuit upheld the facial validity of the 2006 iteration of the cyberstalking act. The 2006 version was revised by Congress in 2013. As such, the government wholly failed to address a majority of the arguments raised by the defendant.

The Court has discussed at length the constitutionality of § 2261A(2)(B) as applied to Cook, and although the Defendant also raised the issue of facial validity of the statute as a whole, including arguments regarding overbreadth and vagueness, this Court will not address these facial challenges because the Court concludes that the statute is invalid as applied. The Supreme Court has reasoned that "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it" and "it is not the usual judicial practice ... nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily – that is before it is determined that the statute would not be valid as applied." See respectively *Brockett v. Spokane Arcades, Inc.* , 472 U.S. 491, 500–02, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) ; *Bd. Of Trustees of State Univ. of N.Y. v. Fox* , 492 U.S. 469, 484-85, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ; see *U. S. v. Cassidy* , 814 F.Supp.2d 574, 587 (D. Md. 2011) ; see also *U.S v. Popa* , 187 F.3d 672, 678 (D.C. Cir. 1999). As such, this Court will curtail its ruling of the constitutionality of the statute as a whole, as finding the statute unconstitutional as applied is all that is necessary in this case to dispose of the case before it.

## Conclusion

Because 18 U.S.C. § 2261A(2)(B) is unconstitutional as applied to Christopher Casey Cook, his Motion to Dismiss Indictment is **GRANTED** .

**SO ORDERED** , this the 13th day of July, 2020.

 casetext

**WESTLAW**

 Original Image of 295 A.3d 1139 (PDF)

295 A.3d 1139
District of Columbia Court of Appeals.

**Mashaud v. Boone**
District of Columbia Court of Appeals.   |   June 8, 2023   |   295 A.3d 1139   *(Approx. 42 pages)*

v.

Christopher BOONE, Appellee,

and

District of Columbia, Intervenor.

No. 16-FM-0383
Argued En Banc October 18, 2022
Decided June 8, 2023

### Synopsis
**Background:** Petitioner, who was involved in extramarital affair with intern working at his firm, sought a civil protection order (CPO) against intern's estranged husband on grounds of stalking and harassment. In a bench trial, the Superior Court, Fern Flanagan Saddler, J., entered the order. Husband appealed.

**Holdings:** On rehearing en banc, the Court of Appeals, Deahl, J., held that:

1 record supported finding that husband intended to cause petitioner emotional distress when he sent messages via email to petitioner's colleagues that addressed petitioner's affair with intern, an element necessary to support finding that husband committed offense of stalking;

2 record supported finding that husband intended to cause petitioner emotional distress when he sent 15 or more messages via social media platform to petitioner's family and friends that addressed petitioner's affair with intern, an element necessary to support finding that husband committed offense of stalking;

3 record supported finding that intern's husband should have known that he would cause a reasonable person in petitioner's shoes emotional distress when husband discussed the details of petitioner's affair with intern on his blog;

4 stalking statute was substantially overbroad;

5 stalking statute was to be narrowly construed so that it applied to speech that was beyond First Amendment protections, such as threats, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct; and

6 evidence was insufficient to establish intern's husband committed offense of stalking.

Reversed and remanded with instructions.

Howard, J., dissented as to Part III.C.

McLeese, J., filed an opinion dissenting in part and concurring in judgment in which AliKhan, J., joined.

Opinion, 256 A.3d 235, vacated.

| West Headnotes (22) | |
|---|---|
| | ☰ Change View |

**1**  **Appeal and Error**  🔑  Plain or palpable error
**Appeal and Error**  🔑  Total failure of proof

In reviewing the sufficiency of evidence in a bench trial, the Court of Appeals will not reverse unless an appellant has established that the trial court's factual findings are plainly wrong or without evidence to support them.

**2**  **Threats, Stalking, and Harassment**  🔑  Stalking

Record supported finding that husband of intern working at petitioner's firm intended to cause petitioner emotional distress when he sent messages via email to petitioner's colleagues that addressed petitioner's affair with intern, an element necessary to support finding that husband committed offense of stalking; emails highlighted the affair between petitioner, a vide-president, and an intern, noted the affair may be a violation of company's code of conduct and business ethics, detailed how affair occurred primarily in the workplace on company time, noted the potential sexual harassment claim the situation presented, and demanded corrective action, and the email posed a threat to petitioner's livelihood, financial wellbeing, and professional relationships. D.C. Code §§ 22-3132(8)(A), 22-3133.

**3**  **Evidence**  🔑  Knowledge, intent, or state of mind
**Evidence**  🔑  Circumstantial evidence

Intent must ordinarily be proved circumstantially.

**4**  **Threats, Stalking, and Harassment**  🔑  Stalking

Record supported finding that husband of intern working at petitioner's firm intended to cause petitioner emotional distress when he sent 15 or more messages via social media platform to petitioner's family and friends that addressed petitioner's affair with intern, an element necessary to support finding that husband committed offense of stalking; the messages revealed the details of the affair and petitioner's "morally reprehensible behavior," it included a picture of petitioner and intern, and closed with a Bible verse suggesting that petitioner could not keep the affair hidden, and husband had no apparent reason for alerting petitioner's friends and family of the affair except to hurt petitioner. D.C. Code §§ 22-3132(8)(A), 22-3133.

**5**  **Threats, Stalking, and Harassment**  🔑  Stalking

Record supported finding that intern's husband should have known that he would cause a reasonable person in petitioner's shoes emotional distress when husband sent messages via email to colleagues of petitioner addressing the details of petitioner's affair with intern, an element necessary to support finding that husband committed offense of stalking; emails were sent to a human resources representative and directors at petitioner's firm, email message implied that petitioner, a vice president at firm, sexually harassed intern on company time and indicated petitioner should face consequences for his behavior, and a reasonable person would suffer distress about the consequences of an affair with a married subordinate and intern. D.C. Code §§ 22-3132(8)(A), 22-3133.

**6**  **Threats, Stalking, and Harassment**  🔑  Stalking

Record supported finding that intern's husband should have known that he would cause a reasonable person in petitioner's shoes emotional distress when husband sent messages via social media platform to family and friends of petitioner addressing the details of petitioner's affair with intern, an element necessary to support finding that husband committed the offense of stalking; a

reasonable person would suffer distress after their family and friends were alerted to petitioner's workplace affair by a stranger, who included a picture of petitioner with intern, and accused petitioner for refusing to abide by a no-contact request. D.C. Code §§ 22-3132(8)(A), 22-3133.

---

**7    Threats, Stalking, and Harassment    🔑    Stalking**

Record supported finding that intern's husband should have known that he would cause a reasonable person in petitioner's shoes emotional distress when husband discussed the details of petitioner's affair with intern on his blog, an element necessary to support finding that husband engaged in offense of stalking; husband repeatedly referred to petitioner by name, he included at least five photographs of petitioner, he identified when petitioner worked, and petitioner's discovery of the blog posts prompted him to file a police report, as he thought husband meant him physical harm, and to notify his employer so it could implement additional security measures. D.C. Code §§ 22-3132(4), 22-3132(8)(A), 22-3133(a)(1).

---

**8    Constitutional Law    🔑    Overbreadth in general**

Court of Appeals will not strike down statute as substantially overbroad if it is readily susceptible to narrowing construction that would make it constitutional.

---

**9    Constitutional Law    🔑    Extortion, threats, stalking, and harassment**
**Threats, Stalking, and Harassment    🔑    Validity**

Stalking statute, which made it a crime for a person to engage in a course of conduct directed at another individual, including two or more communications to or about another individual that one knows or should know would reasonably cause another to suffer emotional distress, was substantially overbroad, in the absence of some narrowing construction; stalking statute was a content-based restriction on speech, as communications that could reasonably cause emotional distress were prohibited, whereas more innocuous statements were permitted, statute prohibited any speech that one should know would cause another to feel "seriously alarmed, disturbed, or frightened," and statute applied to private matters and to matters of public concern. D.C. Code §§ 22-3132(8)(A), 22-3133.

---

**10    Constitutional Law    🔑    Content-Based Regulations or Restrictions**

If a law requires enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred, it is a content-based restriction on speech. U.S. Const. Amend. 1.

---

**11    Constitutional Law    🔑    True threats**

First Amendment permits a State to ban a true threat, and to determine whether something is a true threat requires an examination of a statement's content. U.S. Const. Amend. 1.

---

**12    Constitutional Law    🔑    Particular Issues and Applications in General**

It is foundational principle of First Amendment that speech cannot be restricted simply because it is upsetting or arouses contempt. U.S. Const. Amend. 1.

---

**13    Constitutional Law    🔑    Offensive, vulgar, abusive, or insulting speech**

If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. U.S. Const. Amend. 1.

**14**    **Constitutional Law**    🔑    Substantial impact, necessity of

Even a statute with many permissible applications must nonetheless be struck down as overbroad when a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.

**15**    **Constitutional Law**    🔑    Use as last resort; sparing use

Court of Appeals may strike down constitutionally overbroad statute only as last resort.

**16**    **Constitutional Law**    🔑    Freedom of speech, expression, and press

**Threats, Stalking, and Harassment**    🔑    Validity

Stalking statute, which made it a crime for a person to engage in a course of conduct directed at another individual, including two or more communications to or about another individual that one knows or should know would reasonably cause another to suffer emotional distress and also stated it did not apply to "constitutionally protected activity," was overbroad and was to be narrowly construed so that it applied to speech that was beyond First Amendment protections, such as threats, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. U.S. Const. Amend. 1; D.C. Code §§ 22-3132(8)(A), 22-3133.

2 Cases that cite this headnote

**17**    **Constitutional Law**    🔑    Statutes

Void-for-vagueness doctrine requires that penal statute define criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited.

**18**    **Constitutional Law**    🔑    Strict or exacting scrutiny; compelling interest test

Whether speech has been permissibly regulated depends on how narrowly tailored regulation is to compelling interest. U.S. Const. Amend. 1.

**19**    **Constitutional Law**    🔑    Strict or heightened scrutiny; compelling interest

"Strict scrutiny" takes stock of the statute as a whole and asks whether it is narrowly tailored to achieve a compelling state interest, and a statute will fail that test if a narrower regulation would suffice to satisfy the state's interest.

**20**    **Constitutional Law**    🔑    Statutes

Prohibition of vagueness in criminal statutes guards against arbitrary or discriminatory law enforcement by insisting that statute provide standards to govern actions of police officers, prosecutors, juries, and judges; it requires that legislature define what conduct is sanctionable and what is not.

**21**    **Constitutional Law**    🔑    Stalking

**Threats, Stalking, and Harassment**    🔑    Stalking

Evidence was insufficient to establish intern's husband committed offense of stalking by engaging in two or more communications to or about another individual that he knew or should have known would reasonably cause another to suffer emotional distress, even though husband sent messages via email and by social media platform to petitioner's colleagues, family and friends detailing the affair between intern and petitioner at firm; the communications did not fall within one of the categories of speech that lacked first Amendment protections, as husband did not defame petitioner, as his statements were true, he did not threaten petitioner, his speech did not incite criminal activity, it was not obscene,

and it was not fraudulent, and the speech was not integral to a criminal act. U.S. Const. Amend. 1; D.C. Code §§ 22-3132(8)(A), 22-3133.

2 Cases that cite this headnote

**22    Constitutional Law**     Law Enforcement;  Criminal Conduct
While First Amendment does not protect speech integral to criminal conduct, speech must be integral to conduct that constitutes another offense that does not involve protected speech. U.S. Const. Amend. 1.

2 Cases that cite this headnote

**West Codenotes**

**Limited on Constitutional Grounds**
D.C. Code §§ 22-3132(8)(A), 22-3133

*\*1143* Appeal from the Superior Court of the District of Columbia (2014-CPO-000739), (Hon. Fern Flanagan Saddler, Trial Judge)

**Attorneys and Law Firms**

Matthew B. Kaplan, Arlington, VA, for appellant.

Governor E. Jackson, III, Towson, MD, for appellee.

Ashwin P. Phatak, Principal Deputy Solicitor General, with whom Karl A. Racine, Attorney General for the District of Columbia at the time, Caroline S. Van Zile, Solicitor General, Graham E. Phillips, Deputy Solicitor General, and Jeremy R. Girton, Assistant Attorney General, were on the brief, for intervenor.

Eugene Volokh, of the bar of the State of California, pro hac vice, by special leave of court, with whom Gene C. Schaerr, Erik S. Jaffe, Washington, DC, and Joshua J. Prince, Philadelphia, PA, were on the brief, for Professor Eugene Volokh and Protect the First Foundation as amicus curiae in support of appellant.

Arthur B. Spitzer and Scott Michelman, Washington, DC, were on the brief for American Civil Liberties Union of the District of Columbia as amicus curiae in support of appellant.

Before Blackburne-Rigsby, Chief Judge, and Beckwith, Easterly, McLeese, Deahl, Howard, AliKhan, and Shanker, [*] Associate Judges.

**Opinion**

Opinion for the court by Associate Judge Deahl, with whom Chief Judge Blackburne-Rigsby and Associate Judges Beckwith, Easterly, and Shanker join in full, and Associate Judge Howard joins as to all but Part III.C.

Opinion by Associate Judge McLeese, with whom Associate Judge AliKhan joins, dissenting in part and concurring in the judgment, at page 1171.

Deahl, Associate Judge:

The First Amendment restricts the government's ability to prohibit and punish speech. Its protections extend to speech that is offensive, outrageous, and emotionally distressing. As just one example, the Supreme Court has recognized that the First Amendment protects the right of protesters at military funerals to proclaim "Thank God for IEDs," "Thank God for 9/11," "Thank God for Dead Soldiers," and "You're Going to Hell." *Snyder v. Phelps*, 562 U.S. 443, 448, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). When it comes to expression, the First Amendment precludes the government from policing the bounds of polite society.

This appeal requires us to consider whether the District's stalking statute can be reconciled

with the First Amendment. That statute makes it a criminal offense to engage in a course of conduct—including two or more "communicat[ions] to or about another individual"—that one knows or should know would reasonably cause another to suffer emotional distress. *1144 D.C. Code §§ 22-3132(8)(A), -3133. By its terms, it restricts all manner of speech, without regard to its truth or falsity, and without regard to whether it is of public or purely private concern. The constitutional problems with the statute are glaring. *See Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("Content-based regulations are presumptively invalid."); *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned.").

People are generally allowed to say things that they know or should know will cause others emotional distress. Such speech is frequently socially valuable or, at the very least, accepted. Doctors tell patients that they likely have only months to live, or more distressing yet, that their children do. Spouses may knowingly inflict emotional distress by revealing a longstanding paramour and demanding a divorce. Police officers bring news of loved ones having been killed. Judges pronounce death sentences. All of those messages undoubtedly trigger extraordinary distress, and as a result, they are prohibited by the stalking statute's plain terms (at least if the messages need repeating). The statute is unconstitutional if read in that straightforward fashion, as "[s]peech may not be banned on the ground that it expresses ideas that offend." *Matal v. Tam*, 582 U.S. 218, 223, 137 S.Ct. 1744, 198 L.Ed.2d 366 (2017).

But the stalking statute has a savings clause, and we granted en banc review in this case to resolve its meaning. The stalking statute provides that "[t]his section does not apply to constitutionally protected activity." D.C. Code § 22-3133(b). To save the District's stalking statute from unconstitutionality, we interpret this clause to mean that, when speech is at issue, the statute covers only speech that fits within the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *United States v. Stevens*, 559 U.S. 460, 468-69, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). That includes threats, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. *Id.* at 468, 130 S.Ct. 1577. Outside of those narrow categories, speech is constitutionally protected activity that the statute does not apply to.

In this case, the Superior Court found that there was good cause to believe that Lauren Mashaud, a married man, stalked Christopher Boone when he truthfully revealed to Boone's family, friends, and colleagues that Boone had an affair with Mashaud's wife. Mashaud now appeals. Because Mashaud's speech was constitutionally protected activity—i.e., it does not fit within any of the categories outside of the First Amendment's protections—we conclude that he did not stalk Boone. We therefore reverse.

I.

*Boone's Affair and Mashaud's Exposure of It*

This case stems from an extramarital affair between Boone and Mashaud's wife, Kimberly Weatherspoon. [1] They met while *1145 working together at a consulting firm, where Weatherspoon was an intern and Boone was a vice president. After attending a company happy hour together, the two struck up a months-long affair. Boone testified that when the affair started, he believed Weatherspoon was in a "rocky relationship" with a boyfriend. According to Boone, when Weatherspoon finally disclosed that she was in fact married, he was "in a complete state of shock and disbelief" and told her that he could not knowingly engage in an extramarital affair. The next day, Weatherspoon told Boone that her husband, Mashaud, had found out about the affair. Mashaud was so upset that "he did not sleep for 48 continuous hours." While Weatherspoon told Mashaud that the affair was over, it in fact continued for about two more months.

A couple of months after Mashaud first learned of the affair, and around the same time it in

fact came to an end, Mashaud sent an email to three employees of Boone's firm. At least one of those employees was a member of the firm's human resources department, the others were described only as "select directors" of the firm, and Boone was cc'd on the email as well. The email's subject line was, "Christopher Boone – No Contact/Harassment," and its stated purpose was "to bring a matter to [their] attention that may be a violation of [the firm's] Code of Conduct and/or other policies, procedures, business ethics, and character or standard of the Company." The email went on to state that:

> Christopher Boone and my wife, Kimberly Weatherspoon, are involved in an extramarital affair that took place, primarily, in the workplace. Aside from the potential sexual harassment claims the situation presents, it also involves the inappropriate use of company resources and assets. Christopher Boone and Kimberly Weatherspoon have used company time and company resources to further their affair. ... I will anticipate a response from you once you have investigated these concerns and taken appropriate corrective action.

Boone testified that the email left him feeling violated, threatened, and embarrassed. Boone replied via email, telling Mashaud that he "would prefer that you leave me and my personal/business relationships out of a situation that is clearly between you and your wife." Boone added an apparent invitation to fisticuffs: "If you are a man ... I am more than happy to talk, meet, or whatever any time you're ready." Mashaud did not respond.

About three months later, Mashaud tracked down some of Boone's family and friends on Facebook and messaged them about the affair. As Mashaud explained, the privacy settings of Boone's Facebook account were configured so that anybody could see a list of people who had "liked" his photographs. And at the time, Facebook allowed users to pay to send messages to any other user, even if the two had no connection. Using this feature, Mashaud individually sent messages to at least fifteen people who had liked Boone's photos. Each message began by telling the recipient that they "should know the kind of person Christopher Boone really is." It went on to explain that Boone "had a sexual affair with [Mashaud's] wife" and that Boone showed he lacked "integrity and respect for himself" by "fail[ing] to respect the boundaries of a married woman." Mashaud attached a photo of Boone with Weatherspoon to his messages, which he closed with a Bible verse: "There is nothing covered that won't be uncovered, nothing hidden that won't be made known," citing Luke 12:2-3. Several recipients alerted Boone to these messages, and he testified that they again left him feeling "violated [and] threatened." He further testified to his confusion as to how Mashaud had obtained his friends' and family *1146* members' contact information, and he described his growing concern about his personal safety.

Mashaud also created a blog called "The Power of Light and Truth" discussing the affair and its aftermath. The publicly accessible blog repeatedly mentioned Boone by name, included at least five photographs of him, and identified his employer. Mashaud also "tagged" Boone by name in his posts so that internet searches for Boone's name would return hits to the blog detailing Boone's affair with Weatherspoon. For example, one post—titled "His name is Christopher Boone"—purported to "put a name and a face" to Boone and included links to his social media accounts and work profile. When Boone saw the blog, several months after he learned of the Facebook messages, "he was taken aback." Believing that Mashaud meant him physical harm, he notified his employer and apartment complex, both of which implemented additional security protocols. He also filed a police report and "started to see a mental health therapist for fairly aggressive treatment ... in a 12-week treatment program." Finally, Boone filed a petition in D.C. Superior Court for a civil protection order, or CPO.

### Superior Court and Appellate Proceedings

Boone sought a CPO on the basis that Mashaud had committed a criminal offense against him, namely, stalking. The trial court could issue a CPO so long as it concluded by a preponderance of the evidence that Mashaud had "committed or threatened to commit a

criminal offense against" Boone. D.C. Code § 16-1005(c).

Boone, Mashaud, and Weatherspoon all testified at a bench trial. Mashaud did not deny sending the various messages or authoring the blogposts, but instead argued (1) that his communications to and about Boone were protected by the First Amendment, and (2) that even if they were not protected, the messages would not have caused a reasonable person in Boone's shoes to fear for their safety, feel seriously alarmed, or suffer emotional distress. *See* D.C. Code § 22-3133.

The trial court disagreed as to both points. It reasoned that Mashaud's communications were not constitutionally protected because they were not "regarding matters of public concern" but "of a purely private nature."[2] The court then found by a preponderance of evidence that Mashaud had stalked Boone, concluding that a reasonable person in Boone's shoes would be "seriously alarmed, annoyed, frightened, or tormented" by Mashaud's email message, Facebook messages, and blogposts. The court therefore issued a CPO. The CPO ordered both Mashaud and Weatherspoon to stay away from Boone's person, home, workplace, and vehicle; not to contact Boone in any manner; and not to "communicate about [Boone] by name or by implication on the internet or social media." The court further ordered Mashaud to enroll in a domestic violence intervention program and to pay Boone $1,800 as reimbursement for his therapy.

Mashaud appealed, arguing (1) that his statements were protected by the First Amendment and (2) that the trial court had erroneously applied a repealed version of the stalking statute, which had since been amended to omit conduct that merely "annoys" or "torments" another. We agreed with Mashaud on the second ground while reserving judgment as to *\*1147* Mashaud's First Amendment challenge. We reversed the CPO and remanded for the trial court to make findings tethered to the revised statute. *Mashaud v. Boone*, No. 14-FM-894, Mem. Op. & J. at 2 n.2, 4-5, 133 A.3d 1004 (Feb. 29, 2016).

On remand, the trial court again rejected Mashaud's constitutional challenge. The court drew a bright line between speech regarding matters of public concern and matters of private concern, describing the former as "usually deemed constitutionally protected" and the latter as "less protected, if protected at all." Relying on this distinction, the court found—contrary to its earlier ruling—that all of the blogposts were constitutionally protected speech because they touched on matters of public concern (i.e., marriage and extramarital affairs). Conversely, it determined that neither the email nor the Facebook messages were constitutionally protected speech, as they involved matters of purely private concern. It then applied the current version of the stalking statute to the email and Facebook messages and once again found that Mashaud had stalked Boone. Describing Mashaud's conduct as "clearly demonstrat[ing] a vindictive motive," the court concluded that he had "engaged in this behavior repeatedly ... with the intent to cause [Boone] to feel seriously alarmed, disturbed, or frightened or suffer emotional distress." It also found that "any reasonable person" in Boone's shoes "would feel seriously alarmed, disturbed, or frightened," or would "suffer[ ] emotional distress" in response to Mashaud's conduct. The court thus reissued the CPO.

Mashaud appealed for a second time, once again arguing that the District's stalking statute infringed upon his First Amendment rights. A division of this court again did not reach that question, instead ruling that the trial court had "misapprehend[ed] the extent of protection provided by the First Amendment" when it suggested that speech of purely private concern was not constitutionally protected. *Mashaud v. Boone*, 256 A.3d 235, 239 (D.C. 2021). After correcting that misstep, the division opted to remand back to the trial court "to consider in the first instance whether the evidence proved stalking given that speech about matters of private concern may enjoy constitutional protection." *Id.* Judge Beckwith dissented, arguing that Mashaud's constitutional arguments were "fully briefed and conducive to resolution by this court on appeal," so it did not make sense to "leave the trial court with the confusing task of determining for a third time" whether Mashaud's speech was covered by the stalking statute. *Id.* at 246. Judge Beckwith concluded that the most sensible reading of the stalking statute was that it applies only to those "categories of speech the Supreme Court has recognized as unprotected by the First Amendment." *Id.* at 243.

Boone petitioned for en banc review and Mashaud joined his request, as did the American Civil Liberties Union of D.C. as amicus. In framing the issue that they agreed merited this court's en banc review, they asked us to determine how best to interpret the stalking statute's savings clause: "This section does not apply to constitutionally protected activity." D.C. Code § 22-3133(b). We granted en banc rehearing and vacated the division's opinion. *Mashaud v. Boone*, 269 A.3d 1022 (D.C. 2021) (order).

## II.

Before considering what the stalking statute's savings clause means when it exempts constitutionally protected activity, we first consider whether the evidence was sufficient to find that Mashaud stalked Boone independent of that clause. While Mashaud raises this argument, it is the District, as intervenor, that most forcefully *1148* presses the view that the evidence was insufficient to find that Mashaud had stalked Boone. No member of the division endorsed that view, though if it were correct, it would obviate the need to interpret the savings clause. [3]

The District's sufficiency challenge falters on two independent grounds. First, we have no basis to reject the trial court's findings that Mashaud intended both his initial email and various Facebook posts to cause Boone emotional distress, D.C. Code § 22-3133(a)(1), a finding we owe considerable deference to. Second, the evidence was sufficient to support the trial court's conclusion that a reasonable person in Boone's shoes would have been emotionally distressed by the email, the Facebook messages, and Mashaud's blogposts. *Id.* § 22-3133(a)(3). We discuss those points, respectively, in Parts II.A and II.B below. But first, we lay some legal groundwork.

The District's stalking statute makes it a criminal offense to "engage in a course of conduct directed at a specific individual" with the intent to cause them to "(A) Fear for his or her safety or the safety of another person; (B) Feel seriously alarmed, disturbed, or frightened; or (C) Suffer emotional distress." D.C. Code § 22-3133(a)(1). For concision's sake, we refer to those emotional states collectively as "emotional distress," the broadest of the three categories. Even where a defendant lacks the intent to inflict emotional distress, they will violate the stalking statute if they engage in a course of conduct that they know or "should have known would cause a reasonable person" to suffer emotional distress. *Id.* § 22-3133(a)(3). In either case, the statute does not require any showing that the targeted person in fact suffered emotional distress; it is enough that the defendant intended such distress or should have known that a reasonable person would suffer it. [4]

The statute further defines "emotional distress" as "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." *Id.* § 22-3132(4). It specifically covers "communicat[ions] *1149* to or about another individual." *Id.* § 22-3132(8)(A). Finally, to "engage in a course of conduct" requires "2 or more occasions" of distressing conduct, *id.*, and the defendant must "possess[ ] the requisite mental state" on each of those two (or more) occasions of distressing conduct, *Coleman v. United States*, 202 A.3d 1127, 1140 (D.C. 2019). [5]

That last part is critical to how the District frames its argument: (1) it argues that the trial court's most recent order found stalking based on the email message and Facebook messages alone, without regard to the blogposts, so we should follow suit; (2) it asserts that the Facebook messages should be viewed as a single unitary act, so that if either the email message or the Facebook messages were not sufficiently distressing (or intended to be sufficiently distressing), then Mashaud did not stalk Boone; and (3) it then takes primary aim at the email message as too innocuous to be emotionally distressing, either in design or in effect. The dissent accepts that framing of the sufficiency argument, and agrees with the District's conclusion (with the aid of an interpretive gloss, discussed in Part III.C). In our view, the framing is faulty and the conclusion unwarranted. The first premise is mistaken, the second is dubious, and the conclusion is wrong in any event.

Contrary to the District's view, we cannot discount the blogposts as irrelevant to the sufficiency equation. The trial court found that those blogposts were part of Mashaud's criminal course of conduct when it initially granted a CPO against him, and that the

blogposts would cause a reasonable person in Boone's shoes to suffer emotional distress. While the court did not again rely on those blogposts after our initial remand, that was only because it found they were of "public concern" and thus fell outside of the stalking statute's reach entirely. But nobody—not Mashaud, the District, Boone, the amici, or our dissenting colleagues—defends that reasoning. As explained by the division (unanimous on this point), the trial court was operating on the faulty premise that there is a public/private dichotomy as to speech, with the former enjoying absolute protection, and the latter receiving none. *See Mashaud*, 256 A.3d at 239. Disabused of that fallacy, there is no reason to ignore the blogposts when evaluating the sufficiency of the evidence.

Our colleagues assert that Boone did not challenge the trial court's decision to discount the blogposts. We disagree. In his en banc brief, Boone highlights the blogposts as the third activity in Mashaud's course of conduct that amounted to stalking, noting that Mashaud acted with the "intent of trying to permanently sully the personal and professional reputation of Mr. Boone" by "includ[ing] tags in the blog posts so that the blog was easily discoverable upon a Google search." He then made a more pointed attack on the trial court's decision to discount the blogposts, noting that the stalking statute's plain terms "encompass communications irrespective of the means—including a 'blog' " in which Mashaud "was not generally espousing his views on extramarital affairs in an informational manner. Rather, he was intentionally using the Internet as his weapon of choice." Our colleagues have also rejected the trial court's reasoning that statements *\*1150* of public concern are not covered by the stalking statute—their interpretation contains no such carve-out—so their refusal to apply their own test to those blogposts is puzzling.

It is also far from clear that we should treat the fifteen or more Facebook messages sent separately to distinct users as one collective act, rather than as separate acts, a critical component of our colleagues' rationale that they never justify. The District's only basis for urging us to treat them as a single act is its assertion, without citation, that "Boone has always characterized Mashaud's Facebook messages as a single act." That's wrong. Boone says exactly the opposite: that Mashaud "did not pay to have one Facebook message sent, but paid in separate, distinct, multiple transactions to have messages sent ... thereby furthering the legitimacy of the trial court's finding that there was an engagement in a 'course of conduct.' " The District points to nothing in the trial court record where Boone conceded they should be treated as a unitary act, and we do not detect such a concession ourselves. Nonetheless, because the evidence is sufficient even if we treat the Facebook messages as a single act in Mashaud's course of conduct, we will accept for the sake of argument this premise of the District's position.

As for the District's conclusion that Mashaud's conduct was too innocuous to be emotionally distressing, either in design or in effect, we now address why that is mistaken. We first explain why the trial court was not plainly wrong to find that Mashaud intended both his email message and Facebook messages to be emotionally distressing. We then explain why it did not err in concluding that the email message, Facebook messages, and blogposts would cause a reasonable person in Boone's shoes to suffer emotional distress.

### A. The Record Supports the Findings that Mashaud Intended to Cause Boone Emotional Distress.

1    "In reviewing the sufficiency of evidence in a bench trial, this court will not reverse unless an appellant has established that the trial court's factual findings are plainly wrong or without evidence to support them." *Holmon v. District of Columbia*, 202 A.3d 512, 521 (D.C. 2019) (citing *Jones v. United States*, 67 A.3d 547, 549 (D.C. 2013)). The trial court's first basis for granting a CPO was that Mashaud's email and Facebook messages each "demonstrated a vindictive motive" and that he sent them "with the intent to cause [Boone] to feel seriously alarmed, disturbed, or frightened or suffer emotional distress." *See D.C. Code § 22-3133(a)(1)*. That finding alone establishes a stalking charge under the terms of § 22-3133(a)(1), no matter whether a reasonable person in Boone's shoes would in fact have found those messages emotionally distressing.

Viewing the evidence "in the light most favorable" to the trial court's ruling, as we must on sufficiency review, we cannot say that no reasonable factfinder could have concluded that

Mashaud intended to cause Boone emotional distress when he sent the email and Facebook messages. *Johnson v. United States*, 40 A.3d 1, 14 (D.C. 2012). We owe the trial court's findings about Mashaud's intent considerable deference, particularly where Mashaud testified and questions of subjective intent turn largely on credibility assessments. *See Crawford-El v. Britton*, 523 U.S. 574, 599, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (disputes about intent "frequently turn on credibility assessments"); *Gaulden v. United States*, 239 A.3d 592, 597 (D.C. 2020) ("We defer to a judge's reasonable 'credibility determinations' because such determinations are 'the appropriate function of the fact finder.' ").

*\*1151 1. The email message*

2   Mashaud's initial email to Boone's colleagues, including at least one member of his firm's HR team, appears designed to get Boone fired. It begins by highlighting that the matter at issue, an affair between a vice president and an intern, "may be a violation of [the] Company's Code of Conduct and/or other policies, procedures, business ethics and character or standard of the Company." It then details how the affair "took place, primarily, in the workplace," and notes "the potential sexual harassment claims this situation presents." It closes by demanding a response "once you have investigated these concerns and taken appropriate corrective action." It raises a clear threat to Boone's livelihood, an implied threat of sexual harassment claims, and under the circumstances—where Boone does not dispute the truth of the email's contents—those threats stood a reasonable chance of bearing out. While the statute defines emotional distress as "significant mental suffering or distress that may" (but need not) require counseling, a substantiated threat to one's livelihood, financial wellbeing, and professional relationships clears that threshold. We see no basis for concluding that the trial court was plainly wrong in finding that Mashaud intended to cause Boone emotional distress. It is more than plausible—Mashaud had a clear motive to want Boone to suffer—and has abundant support in the record, most notably the email's contents. The District offers three counterpoints.

First, it asserts that the trial court, in support of its initial CPO that we vacated years ago, credited Mashaud's claim that he "did not mean to cause anyone any harm," and the District asserts that this factual finding cannot be reconciled with the trial court's subsequent finding that Mashaud sent his email with an intent to cause emotional distress. That's wrong. For starters, while the trial court noted in its findings that Mashaud "*testified* that he did not mean to cause anyone any harm," it never purported to credit that testimony. The trial court consistently noted the aspects of Mashaud's testimony that it found to be credible, and this claim was not among them. Also, this snippet of the trial court's recounting of Mashaud's uncredited testimony came in the context of discussing his blogposts, not his email to Boone's colleagues.

3   Second, the District claims that the record contained no "direct or indirect evidence" of Mashaud's mental state when sending the email to Boone's employer. We disagree. "Intent ... must ordinarily be proved circumstantially," *Abdulshakur v. District of Columbia*, 589 A.2d 1258, 1263 (D.C. 1991), as people tend not to admit to culpable states of mind. And here, there is no shortage of evidence that Mashaud intended to cause Boone emotional distress. Start with the fact that Boone had carried on a months-long affair with Mashaud's wife, which is a strong reason for Mashaud to want him to suffer. Then consider the contents of the email, leading with "Christopher Boone – No Contact/Harassment" in the subject line, then alluding to "sexual harassment claims" and demanding a response once "appropriate corrective action" had been taken. Add in the fact that, having alerted Boone's colleagues to the affair, Mashaud did not stop there, but instead went on to message dozens of Boone's Facebook friends and then create a blog littered with Boone's personal information. [6] The trial court's conclusion that Mashaud had "a vindictive motive" for sending his email is not only plausible; it is nearly inescapable.

Third, the District asserts that the stalking statute "is not designed to discourage *\*1152* truthful reporting of potential misconduct." One would hope that is true, but the plain terms of the stalking statute in fact capture such speech, and the District offers no narrowing construction that would keep it from doing so. The narrowing construction that we adopt in Part III would take truthful reports of potential misconduct outside of the stalking statute's

reach as constitutionally protected speech. Conversely, the District proposes no narrowing construction at all, but instead would simply have us counterfactually declare that truthful reports of misconduct will never cause, and can never be intended to cause, significant distress in another. That view is remarkably unrealistic. There are few things more emotionally distressing than one's darkest misdeeds coming to light, and no reason to think that the rightly implicated suffer less distress than the falsely accused; [7] the falsely accused can at least take some solace in the truth potentially absolving them. While we doubt anybody intended the stalking statute to prohibit accurate reports of misconduct, we cannot get around the statute's plain text by simply pretending that people do not in fact suffer distress from such reports. [8] Absent some narrowing construction, the statute and the District are saddled with that absurdity.

### 2. The Facebook messages

4    The Facebook messages, sent about three months after that initial email, present an even easier case. Recall that Mashaud had tracked down at least fifteen of Boone's Facebook friends—all strangers to Mashaud—and directly messaged them to reveal "the kind of person Christopher Boone really is" and "the dark reality of the[ ] affair." He revealed to them the details of the affair and Boone's "morally reprehensible behavior," including that it lasted for three months. The messages explained that Boone's friends and family should "know of his behavior" and Boone's "lack of integrity and respect for himself," before attaching a picture of Boone with Weatherspoon and closing with a Bible verse suggesting Boone could not keep the affair hidden. The trial court was not plainly wrong to conclude that Mashaud intended to cause Boone emotional distress through those numerous Facebook messages. He had strong reason to want to hurt Boone—the man had carried on an affair with his wife—and no other apparent reason for alerting so many of Boone's friends and family members to the affair.

The District makes a more halfhearted attack on this finding of intentionality, describing it as "a closer call." It makes two pointed attacks on it, each relegated to a single sentence. First, it contends that the trial court's finding of intentionality "cannot be reconciled with" its earlier conclusion that Mashaud did not harbor such an intent, an argument we have already rejected *1153 because the trial court never made that asserted finding. Second, it stresses that Mashaud testified that "exposing the affair to others was part of the process of healing his marriage." But even if the trial court credited that testimony, [9] the statute does not require that a stalker be motivated *solely* by a desire to cause another emotional harm, so the point does not help the District. Revenge and personal betterment are not mutually exclusive motivations. For some, getting revenge on those who have wronged them is part and parcel of the healing process. *See generally* Jeffrie Murphy, *Getting Even: Forgiveness and Its Limits* (1st ed. 2003).

After detailing the evidence in the record, the trial court found that Mashaud "intended, and I emphasize intended, to cause [Boone] to feel seriously alarmed, disturbed, or frightened or to suffer emotional distress by sending Facebook messages directly to [Boone's] family and friends discussing personal matters." The record contains plenty of evidence supporting that conclusion.

### B. The Record Supports that Mashaud Should Have Known He Would Cause a Reasonable Person in Boone's Shoes Emotional Distress.

Putting Mashaud's intentions aside, the record was also sufficient to support the trial court's findings that Mashaud should have known his actions would cause a reasonable person in Boone's shoes to suffer emotional distress. The District again challenges the evidentiary basis for this finding, but its arguments are similarly unpersuasive.

### 1. The email message

5    As we have already explained, Mashaud's email message to Boone's colleagues, including an HR representative and "select directors" of the firm, was a potent threat to Boone's livelihood. A reasonable person in Boone's shoes, having been outed for carrying out an affair "primarily, in the workplace," with a married subordinate and intern, might reasonably suffer serious distress about the consequences. They might reasonably suffer distress not only about losing their immediate job, but also about their long-term

professional prospects, particularly given Mashaud's reference to "sexual harassment claims" that are capable of sinking careers.

The District disagrees, and asserts that having one's extramarital affair involuntarily exposed "would not cause a reasonable person to experience fear, serious alarm, or emotional distress." It seems implausible on its face to say that such a revelation would not cause a reasonable person emotional distress. But even if it were true, that grossly understates what Mashaud's email exposed. He did not merely reveal Boone's affair; he plainly implied that Boone had sexually harassed an intern under his supervision, that he did so using company time and resources, that he would not leave her alone despite Weatherspoon's requests, and that he should face professional consequences for his misconduct. As the trial court found, "a reasonable person would feel alarmed, disturbed, or frightened or suffer emotional distress if an email was sent to their place of employment suggesting that the person may have engaged in sexual harassment of a coworker." We agree with that assessment.

### 2. The Facebook messages

6  The same is true of the Facebook messages. The trial court made a finding *1154 that Mashaud "knew or should have known that ... sending Facebook messages directly to [Boone's] family and friends discussing personal matters ... would cause a reasonable person in [Boone's] circumstances to feel seriously alarmed, disturbed, or frightened or to suffer emotional distress." That finding is well-supported by the evidence.

The District counters that no reasonable person would have suffered emotional distress as that term is properly understood, highlighting cases in which we have described emotional distress as requiring "something *markedly greater* than the level of uneasiness, nervousness, unhappiness or the like which is commonly experienced in day to day living." *Coleman*, 202 A.3d at 1145 (quoting *Wallace v. Van Pelt*, 969 S.W.2d 380, 386 (Mo. Ct. App. 1998)). But who could doubt that a reasonable person in Boone's shoes would suffer distress markedly greater than day-to-day worries? Having one's family and friends alerted to an extramarital workplace affair via Facebook message from a stranger, complete with pictorial evidence of the "dark reality of their affair" and accusations of refusing to abide by a no-contact request, is hardly just your ordinary day's hardship.

### 3. The blogposts

7  Finally, the District does not question that Mashaud's blogposts would cause a reasonable person in Boone's shoes to suffer emotional distress. And for good reason. As the District acknowledges, publicizing another's private information is a quintessential example of how some stalkers "use indirect means to threaten or monitor victims." The Nat'l Ctr. for Victims of Crime, *Model Stalking Code Revisited* 31 (2007). Mashaud's blog, "The Power of Light and Truth," repeatedly identified Boone by name, included at least five photographs of him, and specifically identified his employer. Boone's discovery of the blogposts prompted him to file a police report—thinking Mashaud meant him physical harm —and to notify his employer so that it could implement additional security measures. Also, in tandem with the email and Facebook messages, it caused Boone to start seeing "a mental health therapist for [a] fairly aggressive ... 12-week treatment program." We do not think that reaction was unreasonable, and it constitutes "significant mental suffering ... that may," and in this case apparently did, "require medical or other professional treatment or counseling." D.C. Code § 22-3132(4).

Rather than disputing that the blogposts would cause a reasonable person emotional distress, the District instead tries to take them out of the equation on the ground that the trial court did not rely on them in its most recent CPO ruling. As we explained above, unless the trial court's purely legal basis for discounting the blogposts was correct—and neither the District nor our dissenting colleagues opine that it was—that is a mistake. The trial court never renounced or contradicted its earlier findings that the blogposts would cause a reasonable person emotional distress. [10] *1155 Those public blogposts, viewed by some "25 to 30 thousand people" in the first two months of the blog's existence, were at least as distressing as the email and Facebook posts. For all the same reasons the email and Facebook messages were emotionally distressing, the blogposts were as well.

### III.

That brings us to Mashaud's primary argument: that by criminalizing "communicat[ions] to or about another individual" that would reasonably inflict emotional distress, the District has impermissibly restricted free speech, absent some narrowing construction of the statute. He is correct about that. Amici in support of Mashaud (the ACLU of D.C., Professor Eugene Volokh, and the Protect the First Foundation) further argue that the statute is unconstitutionally overbroad and would need to be struck down if it is not susceptible to a narrowing construction. Again, we agree. The stalking statute's plain terms prohibit a vast amount of speech—regardless of its truth, social value, or relation to public debate—based on its content. *See Forsyth*, 505 U.S. at 134, 112 S.Ct. 2395 ("Listeners' reaction to speech is not a content-neutral basis for regulation."). It is substantially overbroad and plainly contravenes the First Amendment because it is not narrowly tailored to advance a compelling state interest. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.").

8   Yet we will not strike down a statute as substantially overbroad if it is "readily susceptible to a narrowing construction that would make it constitutional," *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988), and that is where the savings clause comes in. It exempts "constitutionally protected activity" from the stalking statute's reach. D.C. Code § 22-3133(b). For the reasons that follow, we interpret this provision as narrowing the stalking statute's scope, in relation to communications to or about another person, to just those discrete categories of speech that fall outside the scope of the First Amendment's protections.

### A. The Stalking Statute Is Substantially Overbroad

9   We begin by explaining why the stalking statute is substantially overbroad in the absence of some narrowing construction. As a court we are unanimous that serious concerns about the statute's constitutionality require us to interpret the statute narrowly. Unlike the dissent, we conclude that substantial overbreadth is not just a serious concern, but a certainty, absent some narrowing construction.

10   To begin, the stalking statute is a content-based restriction on speech. If a law requires " 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred," it is a content-based restriction. *McCullen v. Coakley*, 573 U.S. 464, 479, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014). And here, to determine whether a given communication would reasonably cause its target to suffer emotional distress requires an examination of the content of the communication itself. In short, the statute "draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163, 135 S.Ct. 2218. Communications *1156 that could reasonably cause emotional distress are prohibited, whereas more innocuous statements are permitted.

Only Boone disputes this point, arguing that the stalking statute is merely a content-neutral regulation of how "speech is used by an alleged stalker." He misunderstands what it means for something to be a content-based regulation of speech. The statute applies to speech based on its content regardless of the manner in which the speech is conveyed. Presumably, Boone would not have sought a CPO had Mashaud emailed the consulting firm to praise him as a wonderful mentor to Weatherspoon or messaged his Facebook friends with similar praise without the affair in the background, and there is no reason to think that such messages would have caused a reasonable person emotional distress. Whether the statute prohibits Mashaud's speech requires some examination of the content of his speech, and it is therefore a content-based regulation. *McCullen*, 573 U.S. at 479, 134 S.Ct. 2518.

11   To be sure, not all content-based regulations are unconstitutional. For instance, the First Amendment "permits a State to ban a 'true threat,' " *see Virginia v. Black*, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), and to determine whether something is a true threat requires an examination of a statement's content. But the stalking statute is far broader than that, as it prohibits any speech that one should know would cause another to

feel "seriously alarmed, disturbed, or frightened" or suffer "emotional distress." D.C. Code § 22-3133(a). That does not merely creep over the line into constitutionally protected areas; it sets up camp there.

Consider the perfectly ordinary and socially valuable speech that may put others in serious emotional distress, but that the stalking statute's plain terms nonetheless prohibit (if repeated). Doctors deliver life-shattering prognoses that surely send reasonable people to suffer emotional tailspins of distress. Spouses knowingly inflict emotional distress by revealing longstanding paramours and demanding divorces. Police officers deliver news of loved ones having been killed. Judges pronounce death sentences. Employers tell staff that they are fired. They all know, or should know, the extraordinary distress their messages bring, and so fall within the statute's prohibitions. [11] Distressing speech is an important and often valuable part of life. A statute that prohibits speech indiscriminately based solely on its propensity for causing such distress is a constitutional nonstarter.

What's more, the statute's broad scope applies not only to speech concerning purely private matters, but also to communications on matters of public concern: speech that "occupies the highest rung of the hierarchy of First Amendment values." *Snyder*, 562 U.S. at 452, 131 S.Ct. 1207 (quoting *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The desire to elicit an extreme emotional reaction is "not an uncommon purpose, nor one held only by a few evil people." Eugene Volokh, *One-to-One Speech vs. One-to-Many Speech, Criminal Harassment Laws, and "Cyberstalking"*, 107 Nw. U.L. Rev. 731, 773 (2013). Consider the abortion rights opponent who tells clinic staff that they are murderers, or the animal rights activist whose messaging includes graphic images of slaughtered, mangled, and deformed infant livestock. Both speak on issues *1157 of public concern and are therefore entitled to the strongest First Amendment protections. But both invariably intend to evoke deep emotional distress with the hope of making their targets feel "socially ostracized ... and emotionally racked with guilt, regret, and a perception of social condemnation." *Id.* at 773. Yet both would be in violation of the plain text of the District's stalking statute, which includes no special carve-out for speech on matters of public concern.

[12] [13] It is a foundational principle of the First Amendment that "speech cannot be restricted simply because it is upsetting or arouses contempt." *Snyder*, 562 U.S. at 458, 131 S.Ct. 1207. "The First Amendment protects lots of speech that is substantially emotionally distressing." *United States v. Yung*, 37 F.4th 70, 77 (3d Cir. 2022); *see also United States v. Sryniawski*, 48 F.4th 583, 587 (8th Cir. 2022) ("The Free Speech Clause protects a variety of speech that is intended to ... make another timid or fearful."). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

The District's stalking statute runs headlong into that bedrock prohibition. Absent some narrowing construction, the District's statute would criminalize speech at the heart of many touchstone First Amendment cases. Protesters carrying signs reading "Thank God for IEDs" and "Thank God for Dead Soldiers" outside a deceased service member's funeral, *Snyder*, 562 U.S. at 460, 131 S.Ct. 1207, would likely be stalkers in the District, at least if their protests were repeated. The same is true for individuals who display burning crosses, swastikas, and other hateful symbols despite knowing that this expressive conduct will arouse "anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." *R.A.V.*, 505 U.S. at 380, 112 S.Ct. 2538. A repeat neo-Nazi march through a neighborhood that is home to numerous Holocaust survivors, *Nat'l Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43, 44, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977), would likewise be considered stalking. And when a national publication satirized an interview with Minister Jerry Falwell, indicating that his first time having sex was "a drunken incestuous rendezvous with his mother in an outhouse," that too would seem sufficiently distressing to be prohibited by the District's stalking statute. *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50-52, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). [12]

14  As the Supreme Court has long recognized, "the First Amendment needs breathing space." *Broadrick v. Oklahoma*, 413 U.S. 601, 611, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). We are particularly vigilant when the law at issue imposes criminal penalties, which create an especially high risk that an overbroad law "may deter or 'chill' constitutionally protected speech." ***1158** *Virginia v. Hicks*, 539 U.S. 113, 119, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003). Accordingly, even a statute with many permissible applications must nonetheless be struck down when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473, 130 S.Ct. 1577 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008)). If its scope were not somehow limited, the District's stalking statute would clearly be substantially overbroad. [13]

The District offers several arguments in response, but they are not persuasive. First, citing to *Coleman*, it argues that speech must go beyond "mere distress or annoyance" to constitute stalking under the statute. That is undisputed, but that fact does not bring the statute into alignment with the First Amendment. Even very distressing speech is constitutionally protected, as *Snyder*, *R.A.V.*, *Skokie*, and *Hustler* make vividly clear.

Second, the District faults Mashaud for not demonstrating "from actual fact" that a substantial number of instances exist in which the law cannot be constitutionally applied. *See N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988). That is not a requirement of an overbreadth challenge, and the case the District cites to suggest otherwise is inapposite. *New York State Club* was a case brought by a plaintiff who could not identify a single, non-hypothetical entity whose free speech would be impacted by the challenged statute. *Id.* at 13-14, 108 S.Ct. 2225. Not surprisingly, the Supreme Court declined to presume the existence of such an entity when none was before it. Here, in contrast, Mashaud has identified at least one case in which the law has been unconstitutionally applied: his own. And we have already catalogued a swath of everyday speech that the stalking statute would similarly prohibit if its plain terms are read without narrowing, including truthful disclosures of serious misconduct or other crimes (where the outed party would reasonably feel distress as a result).

Finally, the District argues that even if there are some potential scenarios where the stalking statute's prohibitions apply to constitutionally protected conduct, the law's "legitimate reach dwarfs its arguably impermissible applications." *See New York v. Ferber*, 458 U.S. 747, 773, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Again, the authority it relies on for this proposition is inapposite. *Ferber* was a challenge to New York's ban on the production and distribution of child pornography—material the Supreme Court held was entitled to no First Amendment protection. *Id.* at 765, 102 S.Ct. 3348. While the court agreed that New York's statute could conceivably apply to instances of protected expression (e.g., "pictorials in the National Geographic"), it voiced serious doubt that these cases "amount to more than a tiny fraction ***1159** of the materials within the statute's reach." *Id.* at 773, 102 S.Ct. 3348.

Here, we face the opposite scenario. By its plain language, the District's stalking statute criminalizes any "communicat[ions] to or about an individual" that would reasonably cause emotional distress. A substantial amount of upsetting, disturbing, and alarming speech is protected by the First Amendment, not a merely conceivable iota of it. The better analogy is to *Stevens*, a case involving a federal statute that prohibited the creation, sale, or possession of a "depiction of animal cruelty." 559 U.S. at 464, 130 S.Ct. 1577. While Congress's intent was evidently to prohibit so-called "crush videos"—videos "depict[ing] women slowly crushing animals to death," catering to those with "a very specific sexual fetish," *id.* at 465-66, 130 S.Ct. 1577—the defendant himself was charged with distributing videos of illegal dog fights, *id.* at 466, 130 S.Ct. 1577. The Supreme Court struck down the statute after determining that its plain meaning could extend to depictions of conduct as innocuous as hunting (and it did not require empirical evidence that the statute had been so applied, contrary to the District's argument above). *Id.* at 476-77, 130 S.Ct. 1577. Such a sweeping prohibition, the court held, was "substantially overbroad, and therefore invalid under the First Amendment," even if a more narrowly tailored statute could rightly ban crush videos. *Id.* at 482, 130 S.Ct. 1577.

The same reasoning applies here. We do not doubt that there is a compelling interest in prohibiting stalking, and that a narrowly tailored statute might prohibit at least some of the communications at issue here (probably not the email, though). As written, however, the statute is unconstitutionally overbroad and would need to be struck down unless some narrowing construction can save it from wholesale invalidation. *Am. Booksellers*, 484 U.S. at 397, 108 S.Ct. 636.

### B. The Stalking Statute Can Be Saved by Limiting Its Application to Speech that is Beyond the First Amendment's Protections.

**15** Because we may strike down a constitutionally overbroad statute only "as a last resort," *Broadrick*, 413 U.S. at 613, 93 S.Ct. 2908, we are obliged to determine if the stalking statute is " 'readily susceptible' to a narrowing construction that would make it constitutional," *Am. Booksellers*, 484 U.S. at 397, 108 S.Ct. 636.

The stalking statute gives us a natural entry point for that inquiry. It provides that it "does not apply to constitutionally protected activity." D.C. Code § 22-3133(b). Amici argue that we should read the savings clause as a categorical limitation on the statute's scope, as Judge Beckwith advocated in her dissent from the division's opinion. When it comes to communications to or about another person, they assert, the clause limits the definition of stalking to just those discrete, well-defined categories of speech that lack First Amendment protections: threats, defamation, and the like. The District counters that the savings clause states no more than a truism, leaving us to scrutinize on a case-by-case basis which of its particular applications run afoul of the Constitution.

For the reasons that follow, we conclude that the first approach is not only the superior of the two, but the only one that would save the statute from invalidation.

*1. The savings clause limits the statute's scope so that it applies only to speech that is beyond the First Amendment's protections.*

**16** Amici argue that we should read the savings clause as exempting entire categories of constitutionally protected speech ***1160*** from the stalking statute's reach. Under this reading, when the savings clause says it does not apply to "constitutionally protected" speech, it exempts all speech except that which fits within the "narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Stevens*, 559 U.S. at 468-69, 130 S.Ct. 1577. That would leave threats, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct within the stalking statute's reach, [14] *id.* at 468, 130 S.Ct. 1577, while leaving the balance of speech beyond it.

There are substantial advantages to this interpretation of the statute. Most importantly, it would eliminate the statute's unconstitutional overbreadth. The statute would proscribe only that speech that lacks First Amendment protections. It would likewise avoid any vagueness problems—which the District's interpretation suffers from, as discussed below—as a would-be perpetrator would not need to perform a full constitutional analysis to determine if their conduct falls within the statute's scope. *See* Volokh, *supra*, at 764 (noting that, if interpreted in this way, "the statute would be a combination of a criminal libel statute, a threat statute, a fighting words statute, and the like").

Giving meaning to the statute's savings clause would also be consistent with our normal approach to interpreting statutes. Reading the savings clause in the District's preferred way would render it pointless, creating a surplusage problem. One could write it out of the statute entirely without affecting its meaning, because it goes without saying that the statute cannot apply to constitutionally protected activity. *See Animal Legal Def. Fund v. Hormel Foods Corp.*, 258 A.3d 174, 183 (D.C. 2021) (describing the "basic principle of statutory interpretation that each provision of the statute should be construed so as to give effect to all of its provisions, not rendering any provision superfluous" (cleaned up)); *United States v. Menasche*, 348 U.S. 528, 538-39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted)).

The District argues that our reading of the savings clause is inconsistent with the Council's

intent, and that this construction "could immunize dangerous behavior that the Council has a compelling interest in prohibiting." Assuming the Council has a compelling interest in prohibiting speech that alarms, frightens, disturbs, or causes emotional distress, it must do so through legislation that is narrowly tailored to achieve that interest. *Reed*, 576 U.S. at 171, 135 S.Ct. 2218. To say, as the District does, that the Council intended to pass a statute that would criminalize all dangerous speech that it might otherwise prohibit through a more narrowly tailored statute is just to say the Council intended to pass an unconstitutional statute. If that were truly the only permissible reading of the statute, we would have to invalidate it wholesale. The District's concerns are also overstated. It highlights cases involving "harassing but non-threatening and non-obscene phone calls" that it worries would fall outside the stalking statute's reach under our reading, citing to *Atkinson v. United States*, 121 A.3d 780 (D.C. 2015), and *Whylie v. United States*, 98 A.3d 156 (D.C. 2014). But its worries are unfounded, as neither case depended on the sort of **\*1161** content-based speech restriction that would be excluded from the stalking statute's scope under the construction we adopt.

In *Atkinson*, for example, if we entirely ignore the content of the defendant's communications there is still no doubt that he committed stalking. In fact, by and large, we did ignore the content of his communications in that case. In *Atkinson*, the defendant's course of conduct included "multiple [phone calls] throughout the evening, often 'back-to-back,' " and "into the early morning hours," despite being told that he "needed to stop calling" and "I don't want you calling this house anymore." 121 A.3d at 782-83. When the complainant unplugged her phone, the defendant then called each of her parents and he was again told not to call. *Id.* A few days later, he showed up at the complainant's apartment building and "stood outside for a couple of minutes," until he was directed to leave by security. *Id.* Then he returned the following day again, and "security informed him that he was not permitted in the building." *Id.* Several months later, he again placed "nonstop calls" to the complainant from 1:30 a.m. to 3:00 a.m., and during that time he again showed up to the complainant's apartment and tried calling her from the apartment's call box. *Id.* at 783-84. He then tried sneaking into the apartment building to get to the complainant, but was again thwarted. *Id.* at 784.

Notice that we have not said one word about the content of the defendant's speech in *Atkinson*, because it was immaterial to his stalking conviction. He could have been trying to sell his victim a vacuum cleaner and the above actions would still have amounted to stalking. Our narrowed reading of the statute thus would have no impact on a course of conduct like that; it is only when a stalking charge depends on the content of one's speech that our narrow interpretation of the statute's application to speech comes into play. In *Atkinson*, the words spoken, and messages conveyed, were entirely beside the point (unlike here).

As for *Whylie*, not only did the course of conduct involve "more than a thousand calls" to the victim's workplace—so that one could ignore the content of those calls too—many of those calls included explicit and detailed threats against the victim's safety, which fall outside the First Amendment's protections. 98 A.3d at 160 & n.3. Our construction of the savings clause would not affect the statute's application to such constitutionally unprotected true threats. *Atkinson* and *Whylie* are the two lead examples the District offers to illustrate its practical concerns with our interpretation of the statute. Far from justifying the concerns, those cases demonstrate why they are unfounded.

A further caution comes from Mashaud, who warns that a broad reading of the savings clause in this case could have implications for District's law criminalizing the distribution of non-consensual pornography (often called "revenge porn"). Specifically, he notes that the revenge porn statute contains an identical exception for "constitutionally protected activity," which he suggests would be impacted by amici's proposed construction of the savings clause in this case. *See* D.C. Code § 22-3055(a)(1). But we see no risk of upsetting that statutory scheme. As explained, a narrow construction of the stalking statute is necessary only because the most natural reading of its prohibitions would be overbroad. While we have never considered the constitutionality of the District's revenge porn statute, similar prohibitions enacted by other jurisdictions have been consistently upheld as narrowly

tailored to serve a compelling government interest. *See, e.g.*, *Indiana v. Katz*, 179 N.E.3d 431, 456 (Ind. 2022); *\*1162 Minnesota v. Casillas*, 952 N.W.2d 629, 643 (Minn. 2020); *Vermont v. VanBuren*, 210 Vt. 293, 214 A.3d 791, 814 (2019); *see generally* Danielle Keats Citron & Mary Anne Franks, *Criminalizing Revenge Porn*, 49 Wake Forest L. Rev. 345 (2014). Assuming our revenge porn statute is similarly narrowly tailored to achieve a compelling state interest—and it seems to be at first blush—there would simply be no need to read the savings clause in a way that would narrow that statute's scope.

### 2. The savings clause does not simply state a truism.

The District counters that the savings clause should be read to state a truism: that like all legislative enactments, the stalking statute only applies to "conduct or expression," which we take to include expressive conduct, "that the Constitution does not shield after conducting the relevant constitutional analysis."

17    If read in this way, then it is technically true (as the District contends) that the statute would no longer be overbroad; by its literal terms, it would forbid nothing that the Constitution protects. But that walks right into a different and equally devastating constitutional problem: it substitutes vagueness for overbreadth, thereby leaving the statute on no firmer constitutional footing. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *United States v. Smith*, 685 A.2d 380, 384 (D.C. 1996) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). The doctrine serves two important functions. The first function is that vague laws "undermine the Constitution's separation of powers" by placing judges, rather than legislators, in the position of deciding when to "make an act a crime." *United States v. Davis*, ––– U.S. ––––, 139 S. Ct. 2319, 2325, 204 L.Ed.2d 757 (2019). The second function is that vague laws "contravene the first essential of due process of law" by failing to give people "fair notice of what the law demands of them." *Id.*; *see also Sessions v. Dimaya*, ––– U.S. ––––, 138 S. Ct. 1204, 1232, 200 L.Ed.2d 549 (2018) (Gorsuch, J., concurring) ("It leaves the people to guess about what the law demands—and leaves judges to make it up."). The stalking statute's savings clause, if interpreted as a truism in the manner proposed by the District, would typify both of these pitfalls.

18    First, it makes little sense to say (as the District asserts) that the stalking statute applies to all speech except that which the "Council could not permissibly prohibit under the Constitution." Whether speech has been permissibly regulated depends on how narrowly tailored the regulation is to a compelling interest. The Council cannot get around the narrow tailoring requirement by simply declaring that it is prohibiting all distressing speech that, through a narrowly tailored statute, it otherwise might. It must actually do the tailoring. A statute that simply directs judges to determine if speech of a particular type could be constitutionally proscribed lacks the requisite tailoring and is constitutionally infirm on its face. *See Stevens*, 559 U.S. at 482, 130 S.Ct. 1577 ("We therefore need not and do not decide whether a statute limited to crush videos or other depictions of extreme animal cruelty would be constitutional. We hold only that [this statute] is not so limited but is instead substantially overbroad."). The stalking statute is not narrowly tailored to a compelling state interest if we read the savings clause to state a truism, regardless of whether a variety of the speech it covers might be proscribed through a more targeted statute.

19    The District thus fundamentally misunderstands what strict scrutiny is when it counters that "[m]ost applications *\*1163* of the stalking law would survive even strict scrutiny" if the savings clause were interpreted as a mere truism. Strict scrutiny takes stock of the statute as a whole and asks whether it is narrowly tailored to achieve a compelling state interest, and a statute will fail that test if a "narrower regulation would suffice" to satisfy the state's interest. *See* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1328 (2007). It is a category error to say a statute would survive strict scrutiny in "most applications"; " 'overinclusive' statutes also fail strict judicial scrutiny." *Id.*

Second, a statute with terms requiring "application of the appropriate constitutional test" would leave the line between innocent and prohibited conduct a matter of guesswork for

most of the District's residents. As one treatise describes the problem, such a statute would be "patently vague":

> [T]he Constitution does not, in and of itself, provide a bright enough line to guide primary conduct, and [ ] a law whose reach into the protected sphere is limited only by the background assurance that unconstitutional applications will eventually be set aside is a law that will deter too much that is in fact protected.

Laurence H. Tribe, *American Constitutional Law* 1031 (2d ed. 1988) (emphasis omitted) (discussing the risk of vagueness in "judicial reconstruction" of unconstitutionally broad statutes). Even for trained attorneys, a statute requiring ex ante constitutional analysis to determine its scope fails to give adequate notice of its requirements. And particularly when that statute imposes criminal liability, the result of this vagueness is inevitably the impermissible chilling of protected speech. *See Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms." (cleaned up)).

[20]  "The prohibition of vagueness in criminal statutes ... guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Dimaya*, 138 S. Ct. at 1212 (plurality opinion). It requires that the legislature "define what conduct is sanctionable and what is not." *Id.* "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.' " *Kolender*, 461 U.S. at 358, 103 S.Ct. 1855. The legislature is not permitted to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large ... , substitut[ing] the judicial [and executive] for the legislative department of government." *Id.* at 358 n.7, 103 S.Ct. 1855 (quoting *United States v. Reese*, 92 U.S. 214, 221, 23 L.Ed. 563 (1875)). Adopting the District's interpretation would mean the Council did exactly that. It would countenance an overbroad statute with the promise that courts would, on a case-by-case basis, pare it back as needed to conform to constitutional requirements, leaving the public to guess as to what the statute actually prohibits and the courts to define the statute's true scope.

### C.

*1. The dissent's test is unclear, unworkable, and unconstitutional.*
Our dissenting colleagues endorse an alternative narrowing construction of the statute in which they effectively say the stalking statute's plain terms do not apply ***1164*** to conduct that we adjudge to be sufficiently worthy. [15] That proposed reading of the stalking statute is atextual and unworkable, and it does not solve the stalking statute's constitutional infirmities.

As best we can discern, our colleagues' test would carve out righteous speech (or conduct) from the stalking statute's ambit. They object to that characterization of their test, but the shoe fits, and their unwillingness to put a point on their test does not preclude us from doing so. In their own words, the stalking statute does not prohibit speech that is "justifiable" or is "not otherwise wrongful," i.e., that is righteous. Under that reading, justifiable speech simply does not trigger the kind of distress that counts under the stalking statute no matter how severe that distress might reasonably be, despite the statute's plain terms. The stalking statute's application thus turns on the relative worth that prosecutors and judges attach to the speech at issue. There is no textual hook for that interpretation in § 22-3133, which speaks purely in terms of the course of conduct's intended or reasonably anticipated effects on the target, without any concern for the righteousness of the conduct independent of those effects. Our colleagues instead rely on a vague phrase in § 22-3131, a statutory preface setting forth the "legislative intent" behind the stalking statute, which does not purport to define the offense of stalking at all, a task the Council undertook in §

22-3133. They import one particular phrase from that preface—"severe intrusions on the victim's personal privacy and autonomy"—into the statutory elements of stalking set forth in § 22-3133. How they landed on that particular phrase we do not know, but regardless, theirs is not a plausible reading of the statute and it does not remedy the statute's constitutional infirmities. [16]

Their approach is strikingly similar to the one the Supreme Court unanimously rejected in *Stevens*, 559 U.S. 460, 130 S.Ct. 1577. Recall that *Stevens* involved a statute targeted at so-called "crush videos," depicting a particular type of animal cruelty that doubles as a sexual fetish. *Id.* at 465-66, 130 S.Ct. 1577. But the statute was overbroad, as it would have banned any "depiction of animal cruelty ... for commercial gain," including hunting videos or videos depicting such cruelty only to raise funds to combat it. *Id.* at 464-65, 130 S.Ct. 1577. "Not to worry," the government argued in *Stevens*, the statute's prohibitions should be read to "reach only 'extreme' cruelty" that has no "redeeming social value." *Id.* at 478-80, 130 S.Ct. 1577. The Supreme Court unanimously—including the lone Justice who dissented on different grounds—rejected that narrow reading of the statute because it had no mooring in the relevant provision's plain terms. The *1165 same is true here. Our colleagues do not offer any kind of test for what constitutes stalking beyond whether it is offensive enough to their own sensibilities that they would deem it as such, the very same argument the Supreme Court shot down in *Stevens*.

In any event, carving out righteous speech does not come close to curing the statute's substantial overbreadth. Again, a bedrock principle of the First Amendment is that it protects even abhorrent speech. Carving out "justifiable" speech does not meaningfully temper the statute's substantial overbreadth because "[t]he First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits." *Stevens*, 559 U.S. at 470, 130 S.Ct. 1577. Speech that most people would describe as completely unjustified and abject remains protected. So while our colleagues claim that their reading "avoid[s] some of the constitutional difficulties" with the statute, in truth it leaves the statute's constitutional problems unabated.

Our colleagues' approach would also introduce intolerable vagueness into the statute. It is woefully unclear what counts as "a severe intrusion on ... personal privacy and autonomy" under their test. They counter that our interpretation has its own vagueness because some categories of unprotected speech are not so well-defined, highlighting "speech integral to criminal conduct." The Supreme Court seems to differ. *Stevens*, 559 U.S. at 468-69, 130 S.Ct. 1577 ("speech integral to criminal conduct" is among the "*well-defined* and narrowly limited classes of speech, the prevention and punishment of which have never been though to raise any Constitutional problem" (emphasis added)). The speech integral to criminal conduct exception has roots that are centuries deep. *See Frohwerk v. United States*, 249 U.S. 204, 206, 39 S.Ct. 249, 63 L.Ed. 561 (1919) ("[N]either Hamilton nor Madison, nor any other competent person then or later, ever supposed that to make criminal the counselling of a murder ... would be an unconstitutional interference with free speech."). The "severe intrusions on the victim's personal privacy and autonomy" test was coined just today, and our colleagues shed vanishingly little light on what it means in practice. Indeed, they do not even attempt to apply their test to the Facebook messages or blogposts at issue in this case, ignoring the latter based on the mistaken view that Mashaud has waived any reliance on them, and treating the former as a unitary act that was insufficient to establish a course of conduct.

We have no idea whether those communications satisfy our colleagues' test, not because they raise close questions—close questions are inevitable even when statutes are perfectly clear—but because it is not clear what the relevant question is under their proposed test. Emotional distress is a statutorily defined term used in regular parlance and backed by hundreds of years of precedents and scholarship illuminating the phrase in various legal contexts. But "a severe intrusion on the victim's personal privacy and autonomy" has no statutory definition, no regular usage, and it is not a legal concept in any context. And our colleagues do not exactly flesh it out. All they tell us is that Mashaud's email is not sufficiently intrusive to be covered by the stalking statute, but beyond that, we are left to guess. They would introduce a judicial gut-check into a criminal statute that regulates

speech; whether somebody has stalked another comes down to a prosecutor's or judge's sense of whether their conduct was "otherwise wrongful." That extraordinary vagueness is intolerable in a criminal statute that "abuts upon sensitive areas of basic First Amendment freedoms." *Grayned*, 408 U.S. at 109, 92 S.Ct. 2294 (cleaned up).

*\*1166* Finally, as a practical matter, reading a righteousness carve-out (or intrusiveness element) into the stalking statute would weaken the statute's protections even when no speech is at issue. Our statutory reading narrows only the stalking statute's application to speech, limiting its proscriptions to those expressions that fall outside the First Amendment's protections. In contrast, our colleagues' approach would narrow the stalking statute's application to all forms of conduct that might amount to stalking, such as following or monitoring another. While our own interpretation is that those acts need only be sufficiently emotionally distressing to constitute stalking, our colleagues would require that they also involve "severe intrusion[s] on ... personal privacy and autonomy" to qualify. While we have confessed our uncertainty as to what that test means, we have serious doubts about whether many of the stalking convictions that we have previously upheld would survive that narrowing of the statute.

Consider *Beachum v. United States*, where we upheld a stalking conviction in which the perpetrator had: (1) "regularly appeared on [the complainant's] block"; (2) rang her "doorbell and bang[ed] on [her] door for about a minute" on one occasion; (3) left a note in her mailbox that read "It's not about being your friend, it's about being your best friend. Can you? Hi."; and (4) once "tried to get [her] to come over and talk to him as he slid his hand down his pants." 197 A.3d 508, 509 (D.C. 2018). Under our colleagues' proposal, the government in that case would need to prove not only that at least two of these acts would reasonably cause somebody emotional distress, but further that they each amounted to severe intrusions on personal privacy and autonomy. Assuming the last act clears that bar, which of the others might? Banging on a door for about a minute could hardly be called a severe intrusion into another's personal autonomy. Leaving a note like the one above could not possibly be. And it is hard to see how simply being on the complainant's block routinely would qualify either, given the multitude of reasons Beachum might have had for being there. *Id.* at 509 (complainant first saw Beachum when he was "visiting one of [her] neighbors"). Those acts are no more objectively upsetting than Mashaud's own conduct in this case, which our colleagues find insufficient to trigger liability even if the statute applies to all manner of speech.

Our colleagues say they "very much disagree," and that Beachum did in fact severely intrude upon his victim's privacy and autonomy when he banged on her door for about a minute and left her a note saying that he wanted to be best friends. It is tough to argue the point because their preferred test seems to turn entirely on one's own sensibilities, and there are no authorities or precedents lending meaning to their test that might permit us to counter. But we suspect that if you took a poll and asked people what might be fairly described as a severe intrusion on their privacy—having a stranger expose their extramarital affair to work supervisors, or having their door banged on for about a minute— few would land on our colleagues' side of that divide. Far fewer still would say, as our colleagues do, that the trial court was plainly wrong in its own assessment of the evidence here. Theirs is a surprising view borne of an unpredictable test.

To put a point on it, our colleagues would weaken the statute's force for the sake of avoiding a First Amendment problem that they do not actually ameliorate.

### 2. The dissent's critiques of our interpretation are unpersuasive.

Our dissenting colleagues voice a host of qualms with our interpretation of the *\*1167* stalking statute's savings clause, though they have offered no interpretation of it themselves. They do not defend the District's position, that it states a mere truism, which is an untenable view for the reasons covered in Part III.B.2. Nor do they offer any other alternative to our interpretation. And the mismatch between their critique and their proposed remedy is telling.

If the savings clause were truly not susceptible to our narrowing interpretation of it, then the proper remedy would be to strike down the statute entirely as it is unconstitutionally

overbroad absent our interpretive gloss. *See, e.g.*, *Stevens*, 559 U.S. at 482, 130 S.Ct. 1577. That is just to say that our colleagues' critiques of our position are no points in favor of their own, which is untenable for the reasons we have described. Their critiques simply cast doubt on whether there can be any effective narrowing of the stalking statute that would save it from wholesale invalidation as overbroad. In any event, while the dissent offers nine critiques of our position, none raises serious concerns. [17]

First, our colleagues decry an imprecision in what we have called constitutionally "unprotected speech." They say the phrase elides a nuance in First Amendment jurisprudence, that no speech is in fact entirely unprotected. That is true only in a pedantic sense, but in no way that matters here. Both this court and the Supreme Court routinely refer to categories of unprotected speech in the exact manner that we have today. *See, e.g.*, *Stevens*, 559 U.S. at 470, 130 S.Ct. 1577 ("[T]his Court has often described historically unprotected categories of speech."); *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 446, 135 S.Ct. 1656, 191 L.Ed.2d 570 (2015) (discussing "factors in determining whether to recognize 'new categories of unprotected speech' "); *Brown v. Ent. Merchs. Assn.*, 564 U.S. 786, 791-92, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) (First Amendment's prohibition on content-based restrictions is "subject to a few limited exceptions for historically unprotected speech, such as obscenity, incitement, and fighting words"); *Ferber*, 458 U.S. at 764, 102 S.Ct. 3348 ("child pornography... like obscenity, is unprotected by the First Amendment"); *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003) ("fraudulent" speech "is unprotected speech"); *In re S.W.*, 45 A.3d 151, 156 (D.C. 2012) (describing "true threats" as "unprotected under the Constitution"); *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 (D.C. 2016) (asking whether "the speech in question actually falls within the unprotected category" (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984))). To analogize, describing the several categories of historically unprotected speech as such is like saying the sky is blue—readily understood and perfectly accurate for most purposes, even if one might interject a technical caveat that the sky only *appears* to be blue because of the optical phenomenon known as Rayleigh scattering. [18] The caveat *1168* is not wrong, it is just usually omitted and typically unnecessary.

Second, our colleagues discern a "large disconnect" between our view and the statutory text because we have not surveyed the field of other constitutional amendments and what activities might qualify as "constitutionally protected" under them. We have not suggested that the savings clause exempts only activity that is constitutionally protected by the First Amendment. But the only constitutional right implicated by this case is the right to free speech, and that is clearly the right that the stalking statute most obviously and palpably inhibits—few other constitutional rights can be easily "directed at a specific individual," a requirement of the stalking statute. And our colleagues, who under the banner of judicial restraint will not say anything at all about the savings clause's meaning, are hardly in a position to critique us for not explaining how the clause operates when other constitutional rights are implicated. We suspect that if a homeowner causes a soldier emotional distress by twice denying them shelter, as is their right under the Third Amendment, that too is exempted from the stalking statute's reach. The question is simply not implicated here.

Third, our colleagues allege a lack of clarity in our opinion. We have illustrated through multiple examples above (such as our discussions of *Atkinson* and *Whylie*) what it means to say that a stalking charge cannot depend on the content of one's speech, unless the speech fits within those historically recognized categories of unprotected speech. To the extent our colleagues have residual confusions, future cases can address those. In our view, we have gone to far greater lengths than our colleagues have in explaining how our test works. And while they counter that "both opinions decline to decide a number of issues," ours is the only opinion that decides the question we were asked to grant en banc review to resolve—the proper interpretation of the savings clause. Their own view in no way obviates the need to answer that question, it simply puts it off for yet another day.

Fourth, they claim our view introduces excessive complexity into the statute, because it is sometimes tricky to discern whether speech fits into one of the historically recognized categories of unprotected speech. But that same complexity exists in every statute

regulating threats, fraud, incitement, and the like, so this particular complexity is nothing new. And the complexity inheres in our colleagues' view as well, because even if they are of the view that the savings clause states a truism (they will not say if they are), they would still have to address as-applied constitutional challenges to the stalking statute, and tackle questions about the degree to which speech is constitutionally protected. Those questions can occasionally be difficult, to be sure, but our colleagues will have to answer them under their own test. And on top of that complexity, they have layered their opaque "severe intrusion on personal privacy and autonomy" test. If that test lacks complexity it is solely because it is entirely unmoored from any precedents or other authoritative guidance, leaving our colleagues to consult only their own sensibilities. That permits them to avoid the important questions we granted en banc review to resolve, but for the citizen who has to conform their behavior to their new test, and to the trial judge who would be left to guess what it means, it is hopelessly vague.

Fifth, our colleagues argue that our interpretation of the stalking statute may need additional narrowing to avoid an absurdity it posits. Perhaps, but the same is *1169 more obviously true of their preferred interpretation, which does not come close to resolving the stalking statute's substantial overbreadth (as discussed in the prior section). They do not even claim that it does. This critique, like the bulk of theirs, is more forceful when lodged against their own view.

Sixth, they assert that whether speech is a severe intrusion on the victim's personal privacy and autonomy under their test is no more vague than, say, whether speech is integral to criminal conduct or fits within other categories of unprotected speech. They are deeply mistaken; there is a huge difference between the occasional difficult legal question and vagueness. The speech integral to criminal conduct exception is a "well-defined and narrowly limited" category of unprotected speech, *Stevens*, 559 U.S. at 468-69, 130 S.Ct. 1577, with a historic pedigree going back hundreds of years, *Frohwerk*, 249 U.S. at 206, 39 S.Ct. 249, with many Supreme Court cases expounding upon its contours, *see, e.g., id.*; *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949), including one set to be decided this term, *see United States v. Hansen*, No. 22-179 (argued March 27, 2023). While it can sometimes be hard to discern whether a communication is integral to criminal conduct—or a threat, or defamatory, or obscene— these are questions we and courts across the country have grappled with in countless cases for decades, and sometimes centuries, to obviate any vagueness concerns. *See, e.g.*, *Carrell v. United States*, 165 A.3d 314, 319-25 (D.C. 2017) (en banc) ("over the years this court has addressed any vagueness concerns" with the threats statute); *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (defamation); *Ashcroft v. ACLU*, 535 U.S. 564, 574, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (obscenity). By contrast, no principles, precedents, or authorities underlie whether conduct severely intrudes on another's privacy and autonomy; our colleagues have invented that test and will tell us only that Mashaud's email does not amount to it, that Beachum's banging on a door does, and then leave us guessing about what side of the line the universe of other conduct falls. That is a textbook vagueness problem that is intolerable when First Amendment rights are implicated.

Seventh, our colleagues say that our reading will "exempt very disturbing behavior," positing a defendant who sends repeat letters proclaiming they are "glad your child is dead" would not have stalked under our test. They take no position on whether that conduct would be criminally culpable under their own test (so, yet again, their concern rings hollow). It is true that the above example will not be stalking as we have interpreted the statute, but that is because the D.C. Council has not narrowly tailored a statute to proscribe that conduct, not because of our efforts to rescue this statute from its plain overbreadth. The Council could more narrowly tailor a statute to, for instance, prohibit direct communications to another that are intentionally designed to cause, and would reasonably cause, extreme distress after the recipient has clearly stated their objections to the contacts. Maybe such a statute, with a carve-out for political speech, would pass constitutional muster. But the District's stalking statute is a far cry from that, as it instead prohibits all manner of acceptable (and often socially desirable) speech that we have described above, while inviting the courts to sort out which speech really merits criminal culpability on a case-by-case basis. Our colleagues take them up on that invitation when they should decline it.

Eighth, our colleagues say we have not abided by the general preference for constitutional avoidance, but that critique is misplaced. As explained, we have adhered *1170 to that very principle by "interpret[ing] ambiguous statutory language to avoid serious constitutional doubts." *Iancu v. Brunetti*, —— U.S. ——, 139 S. Ct. 2294, 2301, 204 L.Ed.2d 714 (2019). We do not strike down the statute due to its overbreadth, but have given it a limiting construction to avoid that end. If our colleagues are faulting us for opining that the statute would be unconstitutionally overbroad absent some narrowing construction—as opposed to merely expressing concerns that it might be, as they do—that constitutional issue does not call for avoidance because it is not difficult. [19] *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 787, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) ("[S]tatutes should be construed so as to avoid *difficult* constitutional questions." (emphasis added)). The avoidance canon does not constrain us to expressing concerns that a spade might be a spade rather than simply calling it one. And our colleagues' own route of constitutional avoidance is to adopt an implausible and atextual reading of the stalking statute, in the exact way the Supreme Court unanimously rejected in *Stevens*, 559 U.S. at 481, 130 S.Ct. 1577 ("This Court may impose a limiting construction on a statute only if it is readily susceptible to such a construction." (cleaned up)).

Ninth, our colleagues justify their dismissal of the blogposts on the basis that Boone did not adequately challenge the trial court's decision to do so, so they feel free to disregard them as well. We have already responded to the point: Boone clearly relies on the blogposts in his en banc brief as a component part of Mashaud's stalking. Our colleagues counter that Boone made no legal attack in his en banc brief on the trial court's decision to discount the blogposts, but that is no doubt because nobody defended the trial court's reasoning (which the division unanimously rejected).

\* \* \*

In sum, while the District's stalking statute would be unconstitutionally overbroad absent some narrowing construction, it is susceptible to just one narrowing construction that actually cures its First Amendment problems. When the statute says that it does not apply to "constitutionally protected activity," that must be understood to mean that it applies only to communications when they fall within the narrow categories of speech that lack First Amendment protections.

**IV.**

21    The only question remaining is whether Mashaud's speech fits within a narrow category of speech that lacks First Amendment protection. That is a pretty open and shut case: it does not. Mashaud did not defame Boone; it is undisputed that his statements were true. *Armstrong v. Thompson*, 80 A.3d 177, 183 (D.C. 2013). He did not threaten him. *See In re S.W.*, 45 A.3d 151, 156 & n.15 (D.C. 2012) (threats require "a serious expression of an intent to cause a present or future harm"). His speech did not incite criminal activity, and it was neither obscene nor fraudulent.

22    Boone counters that Mashaud's speech fits within one recognized exception to the First Amendment's protections, because it was integral to a criminal act—namely, stalking. This argument is fatally circular. While it is true that the First Amendment does not protect speech integral *1171 to criminal conduct, *see Giboney*, 336 U.S. at 498, 69 S.Ct. 684, "the speech must be integral to conduct that constitutes another offense that does not involve protected speech," *Sryniawski*, 48 F.4th at 588. The exception is typified by crimes like solicitation or conspiracy, which encourage others to participate in and thereby advance a non-speech offense. It makes no sense as an exception if the speech both constitutes the crime itself and thereby avoids First Amendment protections by being integral to its own commission. By Boone's reasoning, the government could prohibit any disfavored speech by first defining it as a crime and then claiming that the First Amendment no longer applies because that speech is now integral to that same offense. An exception like that would swallow the First Amendment whole and bears no resemblance to what this narrowly drawn exception actually is.

Because the course of conduct identified by the trial court consisted solely of "communications to or about another individual," and those communications did not fall

within one of the categories of speech that lack First Amendment protections, the court erred by finding that Mashaud committed the crime of stalking.

**V.**

For the foregoing reasons, the judgment of the Superior Court is reversed, and the case is remanded with instructions to vacate the CPO and dismiss Boone's petition.

*So ordered.*

McLeese, Associate Judge, with whom AliKhan, Associate Judge, joins, dissenting in part and concurring in the judgment:

I agree that the civil protection order (CPO) in this case should be reversed. I also agree that the court should interpret the stalking statute narrowly in light of serious concerns about the statute's apparent breadth. I disagree, however, about what narrowing interpretation to adopt in order to decide this case. This opinion focuses on the interpretation of the phrases "[f]eel seriously alarmed, disturbed, or frightened" and "[s]uffer emotional distress." D.C. Code § 22-3133(a)(1)(B)-(C), (2)(B)-(C), (3)(B)-(C). As I explain, this court has already adopted a narrow interpretation of those phrases. Under that interpretation, the evidence in my view is insufficient to support a finding that Dr. Mashaud committed stalking. I therefore dissent in part and concur in the judgment.

### I. The Narrowing Interpretation Adopted in *Coleman v. United States*

Among other things, the stalking statute prohibits communicating to or about another individual on two or more occasions, if the alleged stalker (1) intends to cause that individual to feel seriously alarmed, disturbed, or frightened or to suffer emotional distress; (2) knows that the individual would reasonably feel seriously alarmed, disturbed, or frightened, or suffer emotional distress; or (3) should have known that a reasonable person in the individual's circumstances would feel seriously alarmed, disturbed, or frightened or would suffer emotional distress. D.C. Code § 22-3132(3), (8); *id.* § 22-3133(a)(1)(B)-(C), (2)(B)-(C), (3)(B)-(C). "Emotional distress" is defined as "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." *Id.* § 22-3132(4).

In *Coleman v. United States*, 202 A.3d 1127, 1144-45 (D.C. 2019), this court interpreted the phrases "[f]eel seriously alarmed, disturbed, or frightened" and "[s]uffer emotional distress." D.C. Code § 22-3133(a)(1)(B)-(C), (2)(B)-(C), (3)(B)-(C). We stated generally that the "stalking statute is meant to prohibit seriously troubling conduct, not mere unpleasant or **\*1172** mildly worrying encounters that occur on a regular basis in any community." *Coleman*, 202 A.3d at 1144. More specifically, we cited with approval the statement that "emotional distress" should be interpreted to be a "feeling of mental anguish, something markedly greater than the level of uneasiness, nervousness, unhappiness or the like which is commonly experienced in day to day living." *Id.* at 1145 (brackets, emphasis, and internal quotation marks omitted). We explained that the phrase "serious alarm, disturbance, and fright should be understood as mental harms comparable to fear for one's safety or significant emotional distress." *Id.* We concluded that "to trigger criminal liability" under the stalking statute the conduct at issue must "involve a severe intrusion on the victim's personal privacy and autonomy." *Id.* (brackets and internal quotation marks omitted).

Our decision in *Coleman* rested on general considerations of statutory interpretation, and we did not address the potential significance of First Amendment concerns. 202 A.3d at 1144-45. In my view, those concerns confirm the prudence of the interpretation we adopted in *Coleman*. As a matter of ordinary language, the provisions at issue could be understood to give the stalking statute a troubling reach. For example, consider a case in which a citizen who justifiably believes that a government employee should be discharged for misconduct writes two letters to the employee's supervisor expressing that view. That conduct could certainly cause the employee to seriously fear being discharged and to be seriously alarmed and disturbed at that prospect. The citizen could also be inferred to have known that the employee would reasonably feel that way.

In my view, however, it would be absurd to think that the legislature intended to criminalize

the writing of such letters. *See, e.g.*, *Wade v. United States*, 173 A.3d 87, 95 (D.C. 2017) ("When interpreting statutes, we assume that the legislature acted logically and rationally and we avoid interpretations of statutes which lead to implausible results.") (internal quotation marks omitted). We also "have a duty to avoid constitutional difficulties by applying an appropriate narrowing construction where possible." *Grogan v. United States*, 271 A.3d 196, 210 (D.C. 2022) (internal quotation marks omitted). Interpreting the stalking statute to reach the writing of such letters would raise obvious constitutional difficulties. *See, e.g.*, **United States v. Yung**, 37 F.4th 70, 78 (3d Cir. 2022) ("The First Amendment protects at least some speech that persistently annoys someone and makes [that person] fearful or timid."). Our duty to adopt an appropriate narrowing interpretation is heightened under the stalking statute, because the legislature directed us to interpret the stalking statute so that it "does not apply to constitutionally protected activity." D.C. Code § 22-3133(b).

The interpretation of the stalking statute that we adopted in *Coleman* avoids at least some of the constitutional difficulties that would be posed by a broader reading of the statute. For example, the hypothetical citizen who justifiably complained about a government employee's misconduct is not subject to liability under the stalking statute as we interpreted that statute in *Coleman*. A good-faith complaint about an employee's performance simply does not constitute "a severe intrusion on ... personal privacy and autonomy." *Coleman*, 202 A.3d at 1145 (brackets and internal quotation marks omitted). Moreover, an employee's concerns about possible job loss as a result of such a complaint cannot plausibly be viewed as "anguish ... markedly greater than the level of uneasiness, nervousness, unhappiness or the like which is commonly experienced in day to day *\*1173* living." *Id.* (brackets, emphasis, and internal quotation marks omitted).

### II. The Insufficiency of the Evidence

In order to obtain a CPO, Mr. Boone bore the burden of proving by a preponderance of the evidence that Dr. Mashaud committed stalking. *E.g.*, *J.O. v. O.E.*, 100 A.3d 478, 481 & n.8 (D.C. 2014). This court reviews the trial court's finding on that issue deferentially, "giving full play to the right of the judge, as trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences." *In re K.M.*, 75 A.3d 224, 230 (D.C. 2013) (internal quotation marks omitted); *see also* D.C. Code § 17-305(a) (where trial judge acted as finder of fact, judgment "may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it").

As I have noted, the stalking statute requires conduct on two or more occasions. D.C. Code § 22-3132(8). In *Coleman*, we held that the required mental state of the defendant must separately be shown as to each of at least two occasions. 202 A.3d at 1139-42. In the present case, the trial court rested its finding of stalking on two occasions: (1) the sending of an email to Mr. Boone and Mr. Boone's employer and (2) the sending of Facebook messages to a number of Mr. Boone's family members and friends. I turn first to the sending of the email. Because I conclude that the evidence is insufficient as to that occasion, I do not consider the sending of the Facebook messages.

Dr. Mashaud's email accurately revealed that Mr. Boone, who was a company vice president, had had a sexual relationship with Dr. Mashaud's wife, who was an intern at the company. The email raised concerns about possible violations of sexual-harassment policies and inappropriate use of company resources. The trial court did not find that the email was false in any respect, and Mr. Boone's brief to the en banc court did not contend that the email was false in any respect. The email is temperate in tone and is not insulting, abusive, or graphic.

Mr. Boone's testimony about the effect of the email on him was that he felt "violated" and "embarrassed." Mr. Boone initially testified that he also felt threatened by the email, but he later clarified that he did not feel threatened until after subsequent conduct by Dr. Mashaud.

The trial court found that Dr. Mashaud intended the email to cause Mr. Boone to feel seriously alarmed, disturbed, or frightened, or to suffer emotional distress. The trial court also found that Dr. Mashaud knew or should have known that the email would cause a

reasonable person in Mr. Boone's circumstances to feel seriously alarmed, disturbed, or frightened, or to suffer emotional distress. In reaching those conclusions, the trial court did not have the benefit of our ruling in *Coleman*, which was not issued until several years after the trial court's ruling in this case. In explaining its ruling, the trial court emphasized that the affair was a personal matter and that the email raised concerns about possible workplace misconduct by Mr. Boone.

I conclude that the foregoing evidence does not adequately support a finding that Dr. Mashaud intended, knew, or should have known that the email would cause Mr. Boone (or a reasonable person in Mr. Boone's position) to feel "anguish" arising from "a severe intrusion on [Mr. Boone's] personal privacy and autonomy." *Coleman*, 202 A.3d at 1145 (brackets, citation, and internal quotation marks omitted). Dr. Mashaud may have intended, and certainly should have known, that the email might cause Mr. Boone to feel concern, embarrassment, and unhappiness. For the reasons I have explained, however, the stalking statute requires a substantially higher ***1174** showing. I conclude that Mr. Boone's brief testimony that he felt "violated" and "embarrassed" by the email provides inadequate support for a finding that the email was a "severe intrusion on personal privacy and autonomy" that foreseeably would cause Mr. Boone (or a reasonable person) to feel that his personal safety was threatened or to feel "anguish ... markedly greater than the level of uneasiness, nervousness, unhappiness or the like which is commonly experienced in day to day living." *Id.* (brackets, ellipses, emphasis, and internal quotation marks omitted).

Because the evidence does not support the requisite findings as to the sending of the email, the CPO must be reversed.

### III. Responses to the Opinion for the Court

The opinion for the court adopts a different approach to the troubling apparent breadth of the stalking statute. D.C. Code § 22-3133(b) provides that the stalking statute "does not apply to constitutionally protected activity." The opinion for the court interprets that language to mean that the stalking statute does not apply to any speech that falls outside certain "narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Supra* at 1144 (quoting *United States v. Stevens*, 559 U.S. 460, 468-69, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (internal quotation marks omitted)). The opinion for the court appears to indicate that its approach applies not only to pure speech but also to expressive conduct. *Supra* at 1157, 1162. For ease of reference, I hereinafter use "speech" to refer also to expressive conduct.

In my view, the approach adopted by the court presents many difficulties and uncertainties. I ultimately conclude that the stalking statute is not "readily susceptible" to the narrowing interpretation adopted by the court. *Stevens*, 559 U.S. at 481, 130 S.Ct. 1577 ("This Court may impose a limiting construction on a statute only if it is readily susceptible to such a construction.") (brackets and internal quotation marks omitted).

### A. Categories of "Unprotected" Speech

A basic premise of the court's approach is that there are "categories of speech that lack First Amendment protections." *Supra* at 1159. That premise does not appear to be sound. It is true that the Supreme Court has often referred to certain categories of speech as "not within the area of constitutionally protected speech." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (internal quotation marks omitted). The Court has also explained, however, that such language is a "shorthand" that is not "literally true" and "must be taken in context." *Id.* In *R.A.V.*, for example, the Court considered an ordinance criminalizing "fighting words" that insulted or provoked violence on the basis of race, color, creed, religion, or gender. *Id.* at 391, 112 S.Ct. 2538. The Court acknowledged that it had previously referred to "fighting words" as outside the scope of the First Amendment. *Id.* at 383-84, 112 S.Ct. 2538. Nevertheless, the Court held that the ordinance was facially invalid under the First Amendment, because the ordinance impermissibly discriminated among fighting words based on the content of the fighting words and the viewpoint of the speaker. *Id.* at 391-96, 112 S.Ct. 2538.

Speaking more broadly, the Court explained that the First Amendment does apply to
categories of speech sometimes referred to as unprotected:

> Our cases surely do not establish the proposition that the First Amendment
> imposes no obstacle whatsoever to regulation of particular instances of such
> proscribable expression, so that the government may regulate them freely.
> That would mean that a city council could *1175 enact an ordinance
> prohibiting only those legally obscene works that contain criticism of the city
> government or, indeed, that do not include endorsement of the city
> government. Such a simplistic, all-or-nothing-at-all approach to First
> Amendment protection is at odds with common sense and with our
> jurisprudence as well.

*R.A.V.*, 505 U.S. at 384, 112 S.Ct. 2538 (brackets, citation, and internal quotation marks
omitted).

In my view, it is quite undesirable to tie the interpretation of § 22-3133(b) to language that
the Supreme Court has acknowledged is not accurate. For example, consider "true
threats." The opinion for the court clearly intends that the stalking statute be understood to
apply to them. *Supra* at 1161–62. But the test that the court adopts would, by its own terms,
seemingly exclude true threats from the stalking statute. "True threats" are not entirely
unprotected by the First Amendment, and the punishment of "true threats" can "raise [a]
Constitutional problem." *Stevens*, 559 U.S. at 468-69, 130 S.Ct. 1577 (internal quotation
marks omitted); *see, e.g.*, *R.A.V.*, 505 U.S. at 388, 112 S.Ct. 2538 ("[T]he Federal
Government may not criminalize only those threats against the President that mention [the
President's] policy on aid to inner cities."); *State v. Vawter*, 136 N.J. 56, 642 A.2d 349, 359
(1994) (even if construed as limited to threats of violence, statute violated First Amendment
because statute proscribed only threats "on the basis of race, color, creed or religion" and
therefore impermissibly discriminated on basis of viewpoint).

The opinion for the court dismisses this problem as a "pedantic" "nuance." *Supra* at 1167.
As the Supreme Court's decision in *R.A.V.* illustrates, however, the idea that no speech is
wholly unprotected by the First Amendment is a quite important substantive principle of
First Amendment law.

The opinion for the court also appears to imply that the D.C. Council, in enacting § 22-
3133(b), probably relied on loose language in prior decisions of the Supreme Court and this
court describing certain categories of speech as unprotected. *Supra* at 1167–68. That is a
somewhat puzzling implication, given the court's apparent acknowledgment that its reading
of § 22-3133(b) "is inconsistent with the Council's intent." *Supra* at 1160. In other words, the
opinion for the court does not actually contend (and in my view could not plausibly contend)
that the D.C. Council intended the words "does not apply to constitutionally protected
activity" to mean "is wholly inapplicable to all speech except a few categories of speech
(loosely) referred to as 'unprotected' by the First Amendment." Moreover, as I will now try to
explain, the interpretation of § 22-3133(b) adopted by the opinion for the court in my view
cannot reasonably be reconciled with § 22-3133(b) 's text.

### B. Statutory Text

The opinion for the court attempts to address the problem just noted by in effect interpreting
§ 22-3133(b) to carve out all speech except for "categories of speech the Supreme Court
has sometimes loosely referred to as unprotected." *Supra* at 1167–68. In my view, that
response worsens another serious problem I see with the court's approach: the large
disconnect between the court's interpretation of § 22-3133(b) and the actual wording of that
provision.

Section 22-3133(b) refers to the Constitution generally, not the First Amendment, and to
"protected activity," not "protected speech." In my view, the court's opinion does not
adequately come to grips with those features of § 22-3133(b). I take as a given that § 22-

3133(b) must be read, *1176 consistent with its plain language, to implicate not only the First Amendment but also the Constitution generally, and to apply not only to speech but also more broadly to "activity" other than speech. I also take as a given that the words "constitutionally protected" must be given one consistent meaning under § 22-3133(b), rather than one meaning in the context of the First Amendment and a different meaning in the context of other constitutional protections, or one meaning when applied to "activity" other than speech and a different meaning when applied to the form of activity that is speech. *See, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 378, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (when interpreting single statutory phrase that modified three listed categories, Court explains that to give phrase "a different meaning for each category would be to invent a statute rather than interpret one"); *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 330, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000) ("As we have in the past, we refuse to adopt a construction that would attribute different meanings to the same phrase in the same sentence, depending on which object it is modifying.").

The opinion for the court does not shed light on how its interpretation of the words "constitutionally protected" for purposes of speech considered under the First Amendment can plausibly function when applied to constitutional protections other than the First Amendment and to activity other than speech. If the terms of § 22-3133(b) are given a consistent meaning, then under the court's approach the stalking statute would apply only to those non-speech activities that "fall within the narrow categories of [activity] that lack [constitutional] protection." *Supra* at 1170. That would be absurd, and I assume that the court does not intend for § 22-3133(b) to be read in that fashion. I note, however, that at oral argument one of the amici apparently took the position that § 22-3133(b) should be interpreted to preclude a finding of stalking based even in part on the fact that the defendant was standing outside the complaining witness's home displaying a firearm that the defendant lawfully possessed.

A more plausible textual reading of "constitutionally protected activity" is available, of course: the phrase could be read to mean "activity that it would be unconstitutional to consider as the basis of a stalking conviction." The court does not accept that reading in the context of speech and the First Amendment, however, so that reading of the phrase is unavailable to the court for purposes of construing § 22-3133(b) 's actual language in the context of other forms of conduct and other constitutional provisions. In my view, this problem by itself demonstrates that the court's interpretation of § 22-3133(b) is untenable.

The foregoing problems get worse when one adds the complication that the categories of speech identified by the court are not actually unprotected under the First Amendment. Thus, the court presumably must interpret "constitutionally protected activity" to mean something like "(a) speech that falls outside the categories of speech that the Supreme Court has sometimes loosely referred to as unprotected by the First Amendment and (b) other activities that it would violate the Constitution to consider as the basis of a stalking conviction." I do not view that as a plausible reading of the actual words of § 22-3133(b).

The opinion for the court suggests that these issues can properly be left for another day. *Supra* at 1167–68. I disagree. As the court acknowledges, *supra* at 1170, a narrowing construction to avoid constitutional issues is not permissible if the statute's text is not "susceptible to the narrowing construction." *Grogan v. United States*, 271 A.3d 196, 210 (D.C. 2022) (internal quotation marks omitted). I conclude that *1177 the court errs by adopting an interpretation of "constitutionally protected activity" solely for purposes of speech and the First Amendment that cannot plausibly be squared with any general understanding of those terms in § 22-3133(b).

### C. Clarity

The court's opinion is unclear about the nature of the limitation it would impose. Although this is not entirely clear (and the court's opinion is not explicit on the point), I assume that the court does not intend to suggest that evidence of "protected" speech is entirely out of bounds in a stalking case. For example, I assume that, even under the approach adopted by court, evidence that the defendant in a stalking case told the complaining witness that the defendant was hoping to make the complaining witness "suffer" would be admissible to

prove the defendant's mental state. Other questions remain, though. The court's opinion sometimes seems to indicate that "protected" speech cannot be one of the actions that form the course of conduct constituting a stalking offense. *Supra* at 1160 (speech that is not unprotected is not part of definition of "stalking"). At other times, however, the court's opinion seems to indicate that "protected" speech can be part of the course of conduct constituting a stalking offense as long as the offense does not "depend[ ] on" on the content of the speech. *Supra* at 1161. Also, it is unclear what the last formulation means. Does a stalking offense depend on the content of speech only if the content of speech is necessary to the jury's finding of guilt? In other words, may a jury in a stalking case consider the content of speech with no limit other than that the course of conduct found by the jury must include at least two acts that are not "protected" speech considered for its content?

### D. Complexity

The court's opinion in my view substantially underestimates the complexity of the offense that would be created by the narrowing interpretation the court adopts. The precise details might depend on how the uncertainties noted in the preceding paragraph were resolved. In any event, a stalking case that involved evidence of speech might present considerable complexity.

### 1. Identifying "Unprotected" Speech

First, if the prosecution relied on speech as part of the alleged course of conduct, the factfinder would have to determine whether the speech was "unprotected." *See Hasty v. United States*, 669 A.2d 127, 133 (D.C. 1995) ("Where a narrowing construction or interpretation has been placed upon a statute that, absent the narrowing construction, might otherwise be unconstitutional in some respect, that narrowing construction or interpretation, upon request and where supported by the evidence, must be the subject of proof at trial and should be submitted to the trier of fact for its determination."). Assuming that "unprotected" is understood to refer to categories of speech that the Supreme Court has sometimes loosely referred to as unprotected, juries in such cases might have to determine whether given speech was a true threat, was obscene, was defamatory, was fraudulent, constituted incitement, was integral to criminal conduct, constituted fighting words, was child pornography, or presented some grave and imminent threat. *Supra* at 1160 & n.14 (acknowledging that under its interpretation, stalking statute "would be a combination of a criminal libel statute, a threat statute, a fighting words statute, and the like") (internal quotation marks omitted).

Some of those categories have relatively well-settled contours, but others decidedly *\*1178* do not. One of the amici, Professor Eugene Volokh, has written a lengthy law-review article on the exception for speech that is integral to criminal conduct. *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981 (2016). In that article, Professor Volokh describes the exception as "long-dormant" and "little-defined," rooted in a Supreme Court decision that is "broadly and imprecisely written" and "has often been misinterpreted." *Id.* at 983, 1052. The opinion for the court decides one relatively straightforward issue about the exception: the exception cannot properly be interpreted to be entirely circular, and a legislature therefore could not define speech as a crime and then avoid First Amendment scrutiny on the theory that the speech is integral to that crime. *Supra* at 1170–71.

Other questions remain. Professor Volokh expresses the view that the exception also applies to speech integral to conduct that is merely "tortious" or "civilly actionable." 101 Cornell L. Rev. at 983 & n.1, 1012. The opinion for the court, however, refers only to criminal conduct. *E.g.*, *supra* at 1144, 1170–71. On the former view, the exception might well be quite substantial in scope. Moreover, relying on a single decision from a federal appellate court, the opinion for the court concludes that the exception applies only if the speech at issue is integral to "another offense that does not involve protected speech." *Supra* at 1171 (internal quotation marks omitted). I am not entirely certain what that means and whether the First Amendment imposes such a limitation. For example, consider a case in which the defendant is charged with stalking for repeatedly knocking on the complainant's door, despite having been asked to stop. I think it quite unclear whether the

First Amendment would prevent consideration of evidence that the defendant was yelling racial epithets or sexually explicit insults at the same time, to prove: (a) the defendant's mental state; (b) circumstances that tended to support the victim's claim of subjective fear and/or the objective reasonableness of the victim's fear; or (c) further evidence of the course of conduct constituting stalking, at least as long as the jury did not rest entirely on the content of "protected" speech in finding the elements of stalking. That is true, in my view, even if the defendant's conduct did not itself constitute a true threat or fit within some other category of speech that the Supreme Court has sometimes loosely referred to as "unprotected." More generally, I do not envy the task of trial judges and juries in grappling with such questions and other comparable questions that will arise in applying other exceptions acknowledged by the opinion for the court, such as the exception for speech that poses a "grave and imminent threat." *Supra* at 1160 n.14 (internal quotation marks omitted).

### 2. Identifying "Protected" Speech that May Still Constitute Stalking

Juries might also need to be instructed that even "protected" speech can be considered as part of the course of conduct constituting a stalking offense, as long as the offense does not depend on the content of the speech. *Supra* at 1161. Whether speech is being considered for its content is a question that courts and academics have found quite challenging. *See, e.g.*, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, ─── U.S. ───, 142 S. Ct. 1464, 1471-75, 212 L.Ed.2d 418 (2022) (five Justices holding that regulation was not content based); *id.* at 1479-81 (Alito, J., concurring in part and dissenting in part) (suggesting that regulation was content based); *id.* at 1481-92 (Thomas, Gorsuch, & Barrett, JJ., dissenting) (concluding that regulation was content based); *see generally, e.g.*, Leslie Kendrick, *Content Discrimination Revisited*, 98 Va. L. Rev. 231, 232-33, 233 n.3 (2012) (citing articles reflecting **\*1179** belief "that, whatever the merits of a content-discrimination principle as a conceptual matter, the Supreme Court's application of it has been unprincipled, unpredictable, and deeply incoherent"). The opinion for the court apparently might require, in cases presenting the issue, that trial judges attempt to craft an instruction defining the concept of content-based discrimination for juries and that juries then attempt to apply that concept. Those seem no easy tasks. For example, can the jury consider that the defendant was yelling angry words, or does that depend on whether the words were angry in tone, only angry in content, or both?

In my view, such complexities weigh significantly against the narrowing interpretation the court adopts.

### E. Incompleteness

One of the most obvious problems with the stalking statute is that, read broadly, the statute could be interpreted to reach entirely innocent conduct. The narrowing interpretation adopted by the court does not directly address that problem. For example, consider a case in which an employer justifiably suspends an employee without pay and then later discharges the employee. When the terms of the stalking statute are interpreted broadly and out of context, one could reasonably say that the employer "engaged in a course of conduct directed at" the employee that the employer "should have known would cause a reasonable person in the [employee's] situation to ... [s]uffer emotional distress." D.C. Code § 22-3133(a)(3)(C). I think that it would be absurd to interpret the stalking statute to criminalize the employer's conduct in those circumstances. I assume that the court would not take the view that suspending an employee without pay and then discharging the employee is a form of "protected" speech being considered for its content. It follows that the court leaves unremedied a distinct and serious problem with the stalking statute. Thus, the court seems to guarantee that an additional narrowing interpretation of the stalking statute will be necessary.

It is true, as the court notes (*supra* at 1164–65), that the narrowing interpretation I prefer will not necessarily solve all issues presented by the stalking statute. My point is that the opinion for the court certainly will not.

### F. Vagueness

The court states that its approach "avoid[s] any vagueness problems ... [because] a would-be perpetrator would not need to perform a full constitutional analysis to determine if ... conduct falls within the [stalking] statute's scope." *Supra* at 1160. As discussed, I think it doubtful that the approach reflected in the court's opinion would simplify the resolution of stalking cases or give clear guidance to trial judges and primary actors as to the permissible scope of the stalking statute. Rather, the court's opinion would in some cases require "would-be perpetrators" (and juries) to decide whether speech was a true threat, was obscene, was defamatory, was fraudulent, constituted incitement, was integral to criminal (or perhaps tortious or civilly actionable) conduct, constituted fighting words, was child pornography, or presented some grave and imminent threat. *Supra* at 1160 & n.14. The court indicates that a statute is unconstitutionally vague if the statute "requir[es] ex ante constitutional analysis to determine its scope." *Supra* at 1163. That, however, seems to be exactly what the stalking statute would require as interpreted by the court in this case.

### G. Magnitude of the Limitation

It is difficult to determine the extent to which the approach reflected in the court's opinion would diminish the reach of the ***1180** stalking statute, because it is not clear what exact limitation the court contemplates. In any event, however, the court's opinion does seem to exempt very disturbing behavior. Consider a case in which the complaining witness's young child has recently died, and the defendant each day for an extended period sends a letter to the complaining witness saying, "I am glad your child is dead. I hope you suffer every day for the rest of your life." Under the court's opinion, the stalking statute would seemingly not apply to that course of conduct. Moreover, the court excludes that conduct from the stalking statute without explicitly determining whether that conduct is "constitutionally protected activity" in the normal sense of that phrase, i.e., whether the First Amendment would preclude imposition of a criminal sanction for that conduct.

To be clear, I express no firm view as to whether the First Amendment would permit or preclude imposition of criminal liability based on such conduct. Although my leaning is that criminal liability could lawfully be imposed based on such conduct, that seems to me to be an unsettled question of First Amendment law that the court need not answer in this case. My point is that the court's opinion excludes such conduct from the stalking statute without even deciding whether the First Amendment requires that result.

### H. The Doctrine of Constitutional Avoidance

This court has said that it "ordinarily will not address constitutional issues ... when the case may be resolved on other grounds. The practice of avoiding constitutional issues if it is reasonably possible to do so is predicated on a fundamental rule of judicial restraint, which is perhaps more deeply rooted than any other doctrine of constitutional adjudication." *Gaynor v. United States*, 16 A.3d 944, 948 (D.C. 2011) (citation and internal quotation marks omitted). The opinion for the court resolves numerous constitutional issues, including that the stalking statute would be substantially overbroad unless given a narrowing construction, *supra* at 1155–59; that the First Amendment would be unconstitutionally vague if used as the basis for a criminal prohibition, *supra* at 1162–63; and that the exception for speech that is integral to a criminal act does not apply unless the criminal act "constitutes another offense that does not involve protected speech," *supra* at 1171 (internal quotation marks omitted). In contrast, I conclude that this case can be resolved without the need to decide such constitutional issues. The availability of a non-constitutional basis for resolving this case weighs heavily against the narrowing interpretation adopted by the court.

### I. Blogposts

The court concludes that, in assessing the sufficiency of the evidence, the court is required to consider the later blogposts Dr. Mashaud sent, even though the trial court held on remand that the blogposts could not constitutionally be considered. *Supra* at 1149–50. Mr. Boone, however, has not challenged the trial court's ruling on that issue in his briefing before the en banc court. I see no reason to consider that unchallenged ruling. *See generally, e.g., Grimes v. D.C., Bus. Decisions Info. Inc.*, 89 A.3d 107, 112 n.2 (D.C. 2014)

(declining to address issue that was not briefed on appeal).

The court contends that Mr. Boone did adequately raise this issue, citing two passing references to the blogposts in Mr. Boone's en banc brief. *Supra* at 1149–50. In my view, those passing references, unaccompanied by any legal analysis, do not suffice to adequately present a challenge to the trial court's constitutional ruling. *See, e.g.*, *Roth v. D.C. Bd. of Zoning Adjustment*, 279 A.3d 840, 845 (D.C. 2022) ***1181** (declining to consider issue mentioned in passing, because petitioner did not provide legal argument in support of passing suggestion). In sum, I agree with the District of Columbia and Dr. Mashaud that Mr. Boone did not adequately present a challenge to the trial court's constitutional ruling excluding consideration of the blogposts.

### J. The Court's Critique of the Dissent

The court identifies a number of perceived problems with the narrowing interpretation I prefer. I do not see any easy solution to the troubling apparent breadth of the stalking statute, and I agree that the interpretation I favor presents its own challenges. On balance, however, I am not persuaded that the approach adopted by the court is preferable. In any event, for reasons I have already explained, I do not believe that the approach adopted by the court is permissible. Rather, in my view, the stalking statute is not susceptible to the interpretation that the court adopts.

First, the court expresses uncertainty about the narrowing interpretation I prefer. *Supra* at 1163–64. To be clear, I do not propose to "ratchet[ ]" up the degree of anticipated harm beyond the level already reflected in our prior decisions. *Supra* at 1164 n.15. I do note, however, that our prior decisions, including *Coleman*, have emphasized that the level of anticipated harm under the stalking statute must be "severe." 202 A.3d at 1145. Rather, I conclude that—independent of First Amendment concerns, but also supported by such concerns—the stalking statute should not be interpreted to reach courses of conduct that are not otherwise wrongful but that foreseeably might cause severe alarm or emotional distress. As I have explained, absent such an interpretation, the stalking statute would have an absurd reach, criminalizing much innocent conduct.

Second, the court describes the narrowing interpretation I prefer as "carv[ing] out righteous speech." *Supra* at 1164. I disagree with that characterization. Under the interpretation adopted by this court in *Coleman*, the stalking statute requires that the conduct at issue (including speech) constitute "a severe intrusion on the victim's personal privacy and autonomy." *Coleman*, 202 A.3d at 1145. The conclusion that evidence in this case is insufficient is based on the application of that standard, not based on whether Dr. Mashaud's conduct could in some sense be viewed as "righteous."

Third, the court points out that there is no obvious "textual hook" in § 22-3133 itself for the narrowing interpretation I prefer. *Supra* at 1163–64. There is, however, such a textual hook in D.C. Code § 22-3131, which expresses the D.C. Council's intent in making stalking a crime. That provision states that "[s]talking involves severe intrusions on the victim's personal privacy and autonomy." I view that description of the offense as a natural place to look when adopting a narrowing interpretation of the offense to avoid absurdity. In fact, our decision in *Coleman* expressly relied on the D.C. Council's statement of intent in concluding that stalking must involve "a severe intrusion on ... personal privacy and autonomy." 202 A.3d at 1145 (brackets and internal quotation marks omitted). I note, moreover, that the court does not dispute that it would be absurd to interpret the stalking statute to reach entirely innocent conduct, does not propose an alternative solution to address the problem, and does not identify a "textual hook" for such a solution.

In any event, the narrowing interpretation I favor rests on the need to avoid absurdity. In that setting, it is well settled that "basic principles of statutory construction require that the actual language ***1182** of a statute be ignored or revised to avoid the absurdity that would result if it were read literally." *Young v. U-Haul Co.*, 11 A.3d 247, 250-51 (D.C. 2011) (brackets and internal quotation marks omitted).

Relatedly, I do not agree with the court's suggestion that adopting the narrowing

interpretation I prefer would in any way be inconsistent with the Supreme Court's decision in *Stevens*, 559 U.S. 460, 130 S.Ct. 1577. *Supra* at 1164–65. *Stevens* involved a proposed narrowing interpretation to avoid First Amendment problems, not a narrowing interpretation necessary to avoid absurdity. *Stevens*, 559 U.S. at 460, 130 S.Ct. 1577.

Fourth, the court correctly points out that the words "severe intrusion on ... personal privacy and autonomy" are not entirely clear. *Supra* at 1165. The same is true, however, of terms that the court would require juries to decide but the court does not attempt to define, such as "integral to criminal (and perhaps tortious or civilly actionable) conduct," and "grave and imminent threat." To the extent that the court contends that the phrase "severe intrusion on ... personal privacy and autonomy" is "intolerabl[y] vague[ ]" and "woefully unclear," *supra*, I disagree. The court fails to persuasively explain why those terms are unacceptably murkier than terms such as "integral to criminal (or tortious or civilly actionable) conduct" or many other terms in criminal law, such as "reasonable" or "adequate provocation," *see generally, e.g.*, *Parker v. United States*, 155 A.3d 835, 845 (D.C. 2017) (amount of force used in self-defense must be reasonable); *Carome v. Carome*, 262 A.3d 242, 247 (D.C. 2021) (destruction of property is not malicious if defendant acted based on "adequate provocation of the kind that would cause an ordinary, reasonable person to lose ... self-control") (internal quotation marks omitted).

Fifth, and relatedly, the court seems to suggest that the words "severe intrusion on ... personal privacy and autonomy" are a complete novelty insusceptible of reasonable understanding. *Supra* at 1165. To the contrary, however, there are preexisting torts that involve the concepts of invasion of privacy and intentional infliction of emotional distress. *See, e.g.*, *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1266 (D.C. 2015) (invasion of privacy); *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1037 (D.C. 2015) (intentional infliction of emotional distress). I do not mean to suggest that the elements of those torts should be imported into the stalking statute wholesale, but their existence indicates that these concepts are not contentless or inadministrable.

Sixth, the court states that the narrowing interpretation I prefer would not solve or even ameliorate the substantial overbreadth of the stalking statute. *Supra* at 1164–65, 1166–67. It seems clear that the narrowing interpretation that I prefer would at least ameliorate overbreadth concerns, because that interpretation would preclude stalking convictions in many of the hypothetical scenarios discussed by the court, such as when a doctor conveys bad news to a patient. *Supra* at 1143–44. I express no view as to whether the narrowing interpretation I prefer would completely solve overbreadth concerns, because I see no need to decide any constitutional issue in order to resolve this case. I do note, however, that the First Amendment analysis seems to me to be more complicated than is reflected in the court's opinion. For example, it appears to be unsettled to what extent the First Amendment prohibits the imposition of civil or criminal liability based on malicious speech on matters of private concern. *See* *Snyder v. Phelps*, 562 U.S. 443, 452-55, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (acknowledging that "First Amendment protections are often less rigorous" "where matters of ***1183** purely private significance area at issue"). Similarly, the Supreme Court has held that the First Amendment can in some circumstances permit the criminalization of cross-burning with bad intent. *Virginia v. Black*, 538 U.S. 343, 348, 352-363, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (upholding Virginia statute making it crime to burn cross with intent to intimidate). As previously noted, the novelty and difficulty of such questions counsel against unnecessarily reaching First Amendment issues in this case.

Seventh, the court states that the narrowing interpretation I prefer would "weaken the statute's protections even when no speech is at issue." *Supra* at 1166. I disagree. As I have explained (and as the court's opinion does not dispute), some sort of narrowing interpretation is necessary to avoid giving the stalking statute absurd application to innocent conduct. I do not view the avoidance of absurdity as "weaken[ing] the statute's protections." Moreover, the narrowing interpretation favored by the court would also, by definition, narrow the scope of the stalking statute from the scope the statute otherwise would apparently have had. For example, as previously noted, the narrowing interpretation preferred by the court would interpret the stalking statute as inapplicable to malicious speech on matters of private concern, even though the court does not hold that the First

Amendment precludes imposition of criminal liability based on such speech.

The sole specific example of "weaken[ing]" the opinion for the court provides is *Beachum v. United States*, 197 A.3d 508 (D.C. 2018). *Supra* at 1166. I do not view that example as well-chosen. The facts in *Beachum* were as follows: (1) beginning in the spring or summer of 2016, Mr. Beachum regularly tried to engage the complaining witness in conversation; (2) although the complaining witness rebuffed him each time, he persisted, making her feel uncomfortable; (3) in July 2016, Mr. Beachum tried to get the complaining witness to come over and talk to him while he slid his hand down his pants; (4) in the following months, Mr. Beachum continued to try to talk to the complaining witness, at one point offering her $50; (5) in January 2017, Mr. Beachum approached the complaining witness as she was entering her home and said he wanted to speak with her; (6) the complaining witness tried to ignore him, but he persisted, being "extremely more aggressive" than in previous encounters, causing the complaining witness to go into her home and call the police; (7) Mr. Beachum went to his van, wrote something on a piece of paper, returned to the complaining witness's house, and started ringing the doorbell and banging on the door for about a minute; (8) when the police arrived, the complaining witness found a note in her mailbox asking the complaining witness to be Mr. Beachum's best friend; and (9) the note and Mr. Beachum's escalating conduct made the complaining witness afraid. *Beachum, 197 A.3d at 509*. In my view, a reasonable factfinder could have found Mr. Beachum guilty of stalking on those facts under the narrowing interpretation I prefer. A reasonable factfinder could conclude that Mr. Beachum's conduct, on two separate occasions, was a severe intrusion on the complaining witness's personal privacy and autonomy and that Mr. Beachum intended, knew, or should have known that his conduct on each occasion would have put a reasonable person in the complaining witness's circumstances to fear for her personal safety. Specifically, when considered in light of the conduct that had preceded them, the incident described in (3) above and the incident described in (5)-(9) would each in my view reasonably support such findings. Although the court expresses the view that Mr. Beachum's conduct was "no more objectively upsetting than [Dr.] Mashaud's," *supra* at 1166, I very much disagree. *1184* That is particularly true given that, for reasons I have explained, I focus in this case solely on Dr. Mashaud's initial email.

Finally, the court repeatedly criticizes this opinion for not reaching out to decide other issues not necessary in my view to decide this case, while at the same time itself declining to resolve numerous issues that the court views as unnecessary to resolve. *E.g.*, *supra* at 1166–67, 1168, 1168–69. It is certainly true that both opinions decline to decide a number of issues. My point is not that all issues that can be raised must be decided. Rather, my point is that an accurate comparison of the two approaches requires a full understanding of the complexities and issues that each approach would create. My further point is that one of the issues left unresolved by the court—whether the phrase "constitutionally protected activity," understood as a whole and in the context of § 22-3133(b), is reasonably susceptible to the interpretation favored by the court—must properly be decided now.

For the foregoing reasons, I respectfully dissent in part and concur only in the judgment.

### All Citations

295 A.3d 1139

| Footnotes |
| --- |

| * | Senior Judge Glickman was a member of the en banc court at the time of argument. On December 21, 2022, he began his service as a Senior Judge and was replaced as a member of the en banc court by Associate Judge Shanker. *See* D.C. Code § 11-705(d); D.C. App. I.O.P. XI(C). |
| 1 | The facts are largely undisputed, though we rely on the trial court's factual findings to resolve any inconsistencies in the evidence. |
| 2 | The court opined that some of Mashaud's blogposts concerned topics of public concern, but reasoned that the posts that reference Boone by name "or |

include other personal information or details about [Boone], those ones are not constitutionally protected speech."

When the parties jointly pressed this court to grant en banc review, neither suggested this sufficiency claim was among the issues we should consider and Mashaud did not even allude to any sufficiency argument when pressing us to grant en banc review. We might exercise our discretion to bypass this question entirely on that ground alone, and treat Mashaud's failure to press his sufficiency argument at the petition stage as a waiver of the claim. *See Yarbrough v. Decatur Hous. Auth.*, 931 F.3d 1322, 1327 (11th Cir. 2019) (bypassing a question "[g]iven the narrow question presented for en banc review"); *cf. Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 306, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010) ("argument is properly 'deemed waived' " where no party raised it at the certiorari stage). Because our dissenting colleagues endorse a version of the sufficiency argument advanced by Mashaud and the District, we exercise our discretion to address it.

Our colleagues seem to interpret the statute as demanding evidence that Boone in fact suffered emotional distress, but that is not a statutory requirement. *See Coleman v. United States*, 202 A.3d 1127, 1146 n.24 (D.C. 2019). For instance, they highlight that while the trial court credited Boone's repeated testimony that Boone felt threatened by the initial email, he later seemed to contradict himself on that score. While we doubt it matters, and we attach no significance to that particular finding, our role on sufficiency review is to draw all reasonable inferences in favor of the trial court's ruling, and there was plenty of evidence (even if one inconsistency) that Boone felt threatened by that initial email. It was for the trial court to resolve that inconsistency, and for us to defer to it. *Medina v. United States*, 61 A.3d 637 (D.C. 2013) ("[I]t is the duty of the finder of fact to reconcile such inconsistencies" in witness testimony.). As we have said, the point is ultimately immaterial to our sufficiency analysis, though we think there is plenty of evidence to support the trial court's finding that Boone in fact suffered emotional distress in response to the email alone.

It is not obviously true from the statutory language alone that a defendant must possess the requisite mental state on each of two (or more) occasions, as opposed to merely engaging in a course of conduct while possessing the requisite mental state at some point along the way. But in *Coleman* we held that the defendant needed the requisite mental state on at least two occasions to constitute stalking, and no party asks us to revisit that ruling today, so we will not scrutinize it.

While we are here concerned only with Mashaud's intent when sending the email, his later acts can of course shed light on what that intent was.

Consider the Madoff family, where Bernie and his wife Ruth attempted suicide shortly after Bernie's fraud was exposed. *Madoff's Wife Says Couple Attempted Suicide: Report*, Reuters, Oct. 26, 2011, https://www.reuters.com/article/us-madoff-idUSTRE79P7NE20111026; https://perma.cc/T24V-6L2Q. Or take Jeffrey Epstein and Aaron Hernandez as more recent high-profile examples of suicides after heavily substantiated reports of criminal misconduct. While these are extreme examples, with the distress undoubtedly amplified by arrests and incarcerations, they illustrate the fallacy in the District's position that truthful reports of serious misconduct cannot cause extreme emotional distress.

The dissent also acknowledges that it would be absurd for the stalking statute to proscribe truthful reports of misconduct, but their approach to avoiding that absurdity is to say the statute does not apply to speech that is sufficiently righteous, which is not a plausible reading of the statute (and would not cure

its constitutional overbreadth in any event). *See infra* Part III.C.

It appears to have credited only the blogposts as being part of Mashaud's healing process, not the Facebook messages.

To be sure, the trial court's 2014 ruling was applying a superseded version of the statute, but that fact would at most counsel in favor of a remand for it to apply the correct statutory terms to the blogposts. Here, however, a remand is unwarranted as (1) nobody asks for a remand, (2) we do not need further factual findings to make our own assessment of whether the blogposts would cause a reasonable person in Boone's shoes to suffer emotional distress, *see Coleman*, 202 A.3d at 1137 (reviewing de novo sufficiency claim under the stalking statute), and (3) presumably the trial court would continue to find the blogposts sufficiently distressing if it applied the proper statute, as they are at least as distressing as the email and Facebook messages, both of which the court found would cause a reasonable person to suffer emotional distress.

It is hard to imagine that any of this speech would be prosecuted, of course, but that rejoinder is of little comfort to those with unpopular views to express. Those with popular views seldom need the First Amendment's protections; those with unpopular views are its principal beneficiaries.

The District claims that our statute "mirror[s] much of the federal stalking statute," which is superficially true only if one ignores the federal statute's malicious intent requirement. 18 U.S.C. § 2261A. That is no small difference. The "malicious intent requirement figures prominently in federal courts' decisions finding that the federal stalking statute is not overbroad." *In re A.J.B.*, 929 N.W.2d 840, 855-56 (Minn. 2019) (citing cases and contrasting federal statute with a state statute more akin to the District's, which the court held to be substantially overbroad). And even with this critical element of the federal stalking statute, federal courts still narrowly construe it in order to avoid First Amendment infirmities. *See, e.g.*, **Yung**, **37 F.4th at 77-81**; *Sryniawski*, 48 F.4th at 587-88.

The D.C. Council itself approved a proposed revision to the stalking statute that would ameliorate some of the current statute's overbreadth. *See* Revised Criminal Code Act of 2022, D.C. Act 24-789. As drafted, the revised statute would no longer have covered communications "about another individual," D.C. Code 22-3132(8)(A), but only repeatedly "[c]ontacting the complainant" when one should know the contact is "without the complainant's effective consent." D.C. Act 24-789, proposed § 22A-2801(a)(1)(C), (a)(2). The proposed revisions also included certain "[e]xclusions from liability," exempting some speech where "the actor is expressing an opinion on a political or public matter," unlike the current statute. *Id.* § 22A-2801(b)(1). While those proposed revisions did not take effect because the Revised Criminal Code did not become law, *see* H.J. Res. 26, 118th Cong. (2023) (enacted), they demonstrate just how sweeping the current statute is, and what a narrower legislative tailoring looks like.

This list is at least arguably not exhaustive. One might add "fighting words," "child pornography," and "speech presenting some grave and imminent threat" to it. *United States v. Alvarez*, 567 U.S. 709, 717, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012) (plurality opinion).

One might read the dissent as merely ratcheting up the statute's anticipated harm requirement, but it disavows that view, so we set it aside.

Our colleagues could just as easily (though equally mistakenly) have seized on § 22-3131's pronouncement that stalking is "a serious problem," or that it has "a long-lasting impact on the victim's quality of life," or that it "creates risks to the security and safety of the victim," and added any of those phrases

as elements to § 22-3133 's plain terms. The only explanation our colleagues give for their choice of controlling phrase is their assertion that *Coleman* already adopted the "severe intrusion" test. It did not. In *Coleman*—which is not binding on us as we now sit en banc—we contrasted what amounts to a "severe intrusion" with acts that would trigger "[o]rdinary 'uneasiness, nervousness, and unhappiness.' " *Coleman*, 202 A.3d at 1145. With the former phrase, we were merely illustrating how the emotional distress requirement is a high bar that must amount to "significant emotional distress," *id.*, a point that nobody disputes here. We never purported to introduce some independent assessment of the rectitude of Coleman's conduct, as our colleagues do now.

17    The nine critiques are in Part III A-I of the dissenting opinion.

18    *See* Lord Rayleigh (John Strutt), *On the Transmission of Light Through an Atmosphere Containing Small Particles in Suspension, and on the Origin of the Blue Sky*, The London, Edinburgh, & Dublin Phil. Mag. & J. of Sci., Vol. 47, Issue 287, 375 (1899). We are not saying that the nuance our colleagues highlight is not an important principle, we are simply saying it is a routinely omitted wrinkle in First Amendment discourse and has no impact on how best to interpret the stalking statute. To the extent our colleagues simply want us to acknowledge the nuance, then it is so acknowledged.

19    It is also immaterial to our disposition. The stalking statute's overbreadth is plain enough that constitutional avoidance does not prevent us from saying so, but nothing depends on that, as our analysis would be unaffected if we merely expressed concerns that the statute is constitutionally overbroad.

---

**End of Document**        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw. © **2024** Thomson Reuters  |  Privacy Statement  |  Accessibility  |  Supplier Terms  |  Contact Us  |  1-800-REF-ATTY (1-800-733-2889)  |  **Improve Westlaw/Report an error**

THOMSON REUTERS

*Thomson Reuters is not providing professional advice*

(Slip Opinion)        OCTOBER  TERM,  2022        1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## COUNTERMAN *v.* COLORADO

### CERTIORARI TO THE COURT OF APPEALS OF COLORADO

No. 22–138.   Argued April 19, 2023—Decided June 27, 2023

From 2014 to 2016, petitioner Billy Counterman sent hundreds of Facebook messages to C. W., a local singer and musician.  The two had never met, and C. W. did not respond.  In fact, she tried repeatedly to block him, but each time, Counterman created a new Facebook account and resumed contacting C. W.  Several of his messages envisaged violent harm befalling her.  Counterman's messages put C. W. in fear and upended her daily existence: C. W. stopped walking alone, declined social engagements, and canceled some of her performances.  C. W. eventually contacted the authorities.  The State charged Counterman under a Colorado statute making it unlawful to "[r]epeatedly . . . make[] any form of communication with another person" in "a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress."  Colo. Rev. Stat. §18–3–602(1)(c).  Counterman moved to dismiss the charge on First Amendment grounds, arguing that his messages were not "true threats" and therefore could not form the basis of a criminal prosecution.  Following Colorado law, the trial court rejected that argument under an objective standard, finding that a reasonable person would consider the messages threatening.  Counterman appealed, arguing that the First Amendment required the State to show not only that his statements were objectively threatening, but also that he was aware of their threatening character.  The Colorado Court of Appeals disagreed and affirmed his conviction.  The Colorado Supreme Court denied review.

*Held*: The State must prove in true-threats cases that the defendant had some subjective understanding of his statements' threatening nature, but the First Amendment requires no more demanding a showing than recklessness.  Pp. 4–14.

(a) The First Amendment permits restrictions upon the content of

Case 2:24-cr-00163-TS    Document 209-1    Filed 05/01/26    PageID.11388    Page 106 of 283

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ⏷

FREE SPEECH

## Court Strikes Down Injunction Banning Divorcing Parents from Disparaging Each Other

An important decision from the Massachusetts high court.

**EUGENE VOLOKH** | 5.8.2020 10:05 AM

*Shak v. Shak*, decided yesterday by the Massachusetts Supreme Judicial Court, involved a family court order addressed to two divorcing parents (the child was one year old at the time of the divorce):

> 1) Until the parties have no common children under the age of [fourteen] years old, neither party shall post on any social media or other Internet medium any disparagement of the other party when such disparagement consists of comments about the party's morality, parenting of or ability to parent any minor children. Such disparagement specifically includes but is not limited to the following expressions: 'cunt', 'bitch', 'whore', 'motherfucker', and other pejoratives involving any gender. The Court acknowledges the impossibility of listing herein all of the opprobrious vitriol and their permutations within the human lexicon.
>
> 2) While the parties have any children in common between the ages of three and fourteen years old, neither party shall communicate, by verbal speech, written speech, or gestures any disparagement to the other party if said children are within [one hundred] feet of the communicating party or within any other farther distance where the children may be in a position to hear, read or see the disparagement.

The court held this violated the First Amendment:

> [T]he judge properly noted that "the State has a compelling interest in protecting children from being exposed to disparagement between their parents." However, as important as it is to protect a child from the emotional and psychological harm that might follow from one parent's use of vulgar or disparaging words about the other, merely reciting that interest is not enough to satisfy the heavy burden of justifying a prior restraint.
>
> Assuming for the sake of discussion that the Commonwealth's interest in protecting a child from such harm is sufficiently weighty to justify a prior restraint in some extreme circumstances, those circumstances do not exist here. No showing was made linking communications by either parent to any grave, imminent harm to the child. The mother presented no evidence that the child has been exposed to, or would even understand, the speech that gave rise to the underlying motion for contempt.
>
> As a toddler, the child is too young to be able to either read or to access social media. The concern about potential harm that could occur if the child were to discover the speech in the future is speculative and cannot justify a prior restraint.

Case 2:24-cr-00163-TS    Document 209.1    Filed 05/01/26    PageID.11389    Page 107 of 283

Significantly, there has been no showing of anything in this particular child's physical, mental, or emotional state that would make him especially vulnerable to experiencing the type of direct and substantial harm that might require a prior restraint if at any point he were exposed to one parent's disparaging words toward the other. Cf. *Felton* v. *Felton* (Mass. 1981), and cases cited (reversing and remanding for further consideration probate judge's order restricting father's visitation unless he refrained from instructing children in his religion—"harm to the child … should not be simply assumed or surmised; it must be demonstrated in detail").

Because there has been no showing that any harm from the disparaging speech is either grave or certain, our analysis regarding the permissibility of the nondisparagement order issued in this case ends here. We note, however, that there are measures short of prior restraint available to litigants and judges in circumstances in which disparaging speech is a concern. For example, our ruling does not impact nondisparagement agreements that parties enter into voluntarily. Depending upon the nature and severity of the speech, parents who are the target of disparaging speech may have the option of seeking a harassment prevention order pursuant to G. L. c. 258E, or filing an action seeking damages for intentional infliction of emotional distress or defamation.

And certainly judges, who are guided by determining the best interests of the child, can make clear to the parties that their behavior, including any disparaging language, will be factored into any subsequent custody determinations. Of course, the best solution would be for parties in divorce and child custody matters to rise above any acrimonious feelings they may have, and, with the well-being of their children paramount in their minds, simply refrain from making disparaging remarks about one another.

We recognize that the motion judge put careful thought into his orders in an effort to protect a child caught in the middle of a legal dispute who was unable to advocate for himself. However, because there was no showing of an exceptional circumstance that would justify the imposition of a prior restraint, the nondisparagement orders issued here are unconstitutional.

I agree that the injunction here was unconstitutional, and I think the court's decision is a step in the right direction. But it seems to me that the right analysis should be somewhat different (as I discuss at length in my *Parent-Child Speech and Child Custody Speech Restrictions*, 81 NYU L. Rev. 631 (2006)).

[1.] I think that restrictions on non-ideological speech ("your mother is a whore" or "your father's new wife is a whore") said to the child, justified by the interest in protecting the child's relationship with the other parent should generally be constitutional. They seem unlikely to materially interfere with public discussion, and likely to protect both the children's best interests and the other parent's rights; and if framed as injunctions, they can be crafted in a way that is clear enough to comply with the void-for-vagueness doctrine (though of course it will often be hard to accurately adjudicate whether they

have been violated). The restrictions do burden parents' desire to express themselves, and may deny information to the children; but, as for reasons specific to parent-to-child speech that I discuss more in the article, these concerns shouldn't play as much of a role here as they do with speech to adults.

Advertisement



[2.] But rules that threaten to strip a parent of child custody because of the parent's speech are speech restrictions, as much as are rules that threaten to throw a parent in jail because of the parent's speech. Civil liability based on the content of one's speech presumptively violates the First Amendment, unless the speech falls within a First Amendment exception. So does a tax based on the content of one's speech. The same must apply to the far greater burden of losing part of one's parental rights based on the content of one's speech.

[3.] I appreciate the court's desire to limit injunctions to situations which involve clear and pressing threat of harm. Indeed, in this case it may well be that, by the time the child grows up enough to search social media, the parties might be less angry at each other and might have indeed by then deleted the insulting posts (or the posts would be otherwise not easily visible).

But I think that, even if the child were older and able to see the posts—and had been upset by the posts—I don't think that would justify threatening parents with jail for publicly disparaging the other parent's morality and parenting. It seems to me that people's First Amendment rights to discuss their lives to their Facebook friends and others, including to explain why they got divorced, why they are upset, and what problems they are facing, can't be trumped even by the desire to avoid psychological distress to their children.

I agree that publicly and harshly (and often even mildly) criticizing one's ex is usually best avoided, especially when there are children, for a wide variety of reasons. But I think the right to say such things is nonetheless part of our freedoms of speech.

In any case, though, this is an important and likely helpful decision.

To get the Volokh Conspiracy Daily e-mail, please sign up here.

**Email** *(Required)*

e.g. jane@example.com      **Submit**

---

*NEXT:* Are Spaniards "Persons of Spanish Culture"?

---

**EUGENE VOLOKH** is the Gary T. Schwartz Distinguished Professor of Law at UCLA and a Visiting Fellow (Senior Fellow starting May 2024) at the Hoover

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

POLITICS

# "[Mother] Shall Not Post on Social Media About [Her Parental Rights Termination] Case"

A Florida appellate court just overturned the injunction on First Amendment grounds.

**EUGENE VOLOKH** | THE VOLOKH CONSPIRACY | 1.2.2024 8:01 AM

From _Budlove v. Johnson_, decided Friday by the Florida Court of Appeal (Judge J. Andrew Atkinson, joined by Judge Craig C. Villanti):

> On January 15, 2021, the trial court issued a final judgment terminating Budlove's parental rights with regard to T.B., Budlove's biological child. Each of the appellees was involved in the dependency case that led to the termination….
>
> [O]n August 17, 2021, the trial court found that Budlove had been posting
>
>> multiple videos and information on social media, including, but not limited to the following: unredacted police reports from the investigation; confidential information about the child [T.B.] and the child, M.B.; photos of the child, T.B.; details from mediation; and names of all parties, including judges, attorneys, CPIs, detectives, and the caregiver.
>
> {M.B. is Budlove's ex-husband's niece and was previously in the care of Budlove and her ex-husband.} The trial court ordered Budlove to "remove all confidential information relating to [T.B.'s dependency case] from online or from any posting sites within twenty-four (24) hours of service of [the] order."
>
> After learning that Budlove continued to post some things online related to the dependency case even after the August 17 order—although Budlove maintains that none of those posts violated the orders—the five appellees all filed petitions for injunctions against Budlove for stalking. At hearings on the petitions, the appellees claimed that Budlove was harassing and cyberstalking them and causing Budlove's followers on social media platforms to do the same. On April 8, 2022, the trial court announced that it was granting all five petitions for injunctions against Budlove for stalking.
>
> The written order broadly prohibits Budlove from having any contact with the appellees. And "adding to the traditional language in the injunctions," the trial court ordered Budlove in open court to "not post online anything relating to [T.B.'s] dependency case." The trial court explained that "[t]his includes, but is not limited to, the names of parties related to the case, such as case managers, Assistant State Attorneys, caregivers, or other children in this case." The written order then stated the following: "[Budlove] shall not post on social media about case [redacted], includ[ing] but not limited to case managers, parties, and other minor children to [the] case. Anything already posted on social media about case #[redacted] shall be removed." …

"There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.* (3d Cir. 2001); *see also NAACP v. Claiborne Hardware Co.* (1982) (holding that "[s]peech does not lose its protected character" even when the speech involved publicly listing the names of individuals who did not participate in a boycott); *Org. for a Better Austin v. Keefe* (1971) (holding that First Amendment protection applied to the distribution of leaflets when those leaflets accused an individual of racism and provided personal information about the person, including his telephone number). While the Florida Legislature has found that individuals should under some circumstances be entitled to an injunction against harassment even when that harassment unquestionably limits a person's speech, courts are not permitted to enjoin a course of conduct to the extent that it encompasses constitutionally protected activity.

Here, the scope of the injunction exceeds that which is permitted under the First Amendment  …. Injunctions which prevent "communications *to*" an individual can be permissible under the First Amendment, but those enjoining "communications *about*" an individual are generally unlawful prior restraints. *David v. Textor* (Fla. 4th DCA 2016) (emphasis in original); *accord DiTanna v. Edwards* (Fla. 4th DCA 2021); *Krapacs v. Bacchus* (Fla. 4th DCA 2020) ("[W]e find that the portion of the trial court's order prohibiting Krapacs 'from posting Nisha Bacchus, Nisha Elizabeth Bacchus or any part thereof, on any social media or internet websites'" and ordering him to "'take down all social media and internet posts that reference Nisha Bacchus, Nisha Elizabeth Bacchus, or any part thereof immediately' is overbroad."). This distinction is consistent with several United States Supreme Court decisions, in which the Court distinguished in principle between communications directed at a single person and communications directed to the public. *See, e.g., Org. for a Better Austin* (holding that a party could not enjoin individuals from distributing leaflets that criticized the party's business practices anywhere in a city because, in part, he was "not attempting to stop the flow of information into his own household, but to the public"); *Rowan v. U.S. Post Off. Dep't* (1970) (upholding a ban on mailings sent to people who demanded that the mailer stop sending them mail because the restriction was on speech written to an unwilling reader because "no one has a right to press even 'good' ideas on an unwilling recipient").

Despite use of the qualifier "generally," our concurring colleague misreads the preceding paragraph as describing a categorical proscription on injunctions that enjoin speech *about* an individual. To the contrary, we would agree with our concurring colleague that whether the communication is directed *at* an individual or merely *pertains to* an individual is not necessarily "the determining factor." The distinction is, however, *a* factor, as First Amendment jurisprudence makes clear. And injunctions that enjoin the latter are likely to offend the Constitution because they constitute a content-based restriction on speech.

Similarly, our concurring colleague erroneously suggests that the majority opinion requires that the trial court upon remand must be limited to enjoining only activity "directed at" the appellees. Nothing in this opinion does, or should be construed to, so narrowly confine the trial court's discretion upon remand…. [We] agree with our concurring colleague insofar as he cautions against such a bright-line rule—which would not take into account communications about individuals that constitute *unprotected* speech such as incitement.

[T]he injunctions granted against Budlove do not merely prohibit Budlove from having any contact with the appellees, sending communications to the appellees, or causing others to send communications to the appellees or inflict some manner of harm against them. In addition to preventing any contact with or communications *to* the appellees, the trial court ordered that Budlove cease communicating publicly *about* the appellees, ordering that she refrain from "post[ing] online *anything relating to [T.B.]'s dependency case*." …

This content-based prior restraint on speech is not tailored at all, much less narrowly tailored. The prospective proscriptions on Budlove's social media communications are, for example, not confined to constitutionally unprotected speech such as "fighting words," "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction"; "true threats," "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"; or "incitement," communications "'directed [at] producing imminent lawless action,' and likely to do so."

To the extent that the injunctions broadly prohibit Budlove from merely making public statements about the appellees, T.B., or her dependency case, the injunctions are overbroad and impermissibly enjoin a constitutionally protected course of conduct.

Chief Judge Daniel H. Sleet concurred in the judgment but wrote a separate opinion, which sharply criticized the speech-about vs. speech-to line, but which ultimately seemed to rely simply on the fact that some speech about a person may be unprotected because it falls within a First Amendment exception (e.g., for incitement or threats):

Case 2:24-cr-00163-TS    Document 209-1    Filed 05/01/26    PageID.11393    Page 111 of 283

Surely, communications about an individual but not directed to that individual that incite others to violence are not constitutionally protected activity. Accordingly, I conclude that the trial court could enjoin Budlove from making future statements about the petitioners that incite others to violence against petitioners—regardless of whether those communications are directed at petitioners—without violating her First Amendment rights. However, the injunctions' broad ban on Budlove's posting anything at all about the dependency case is not particularly drawn and encompasses "activities [that] may be permissible and proper." Accordingly, I agree that portion of the final order must be reversed….

In conclusion, because many of Budlove's communications pertaining to petitioners amounted to incitements to unlawful actions, I agree that the portion of the trial court's orders finding the existence of previous stalking and thus imposing the injunctions should be affirmed. {[The concurrence apparently refers to this discussion earlier in the opinion:] Petitioners presented evidence that in her electronic posts, Budlove included their contact information, signaled that she condoned slapping by stating that "someone needs to slap her …. I aint saying kill nobody but you … could slap the s___ out of somebody every once and a while," and intimated threats by stating that no one involved in the dependency case would ever be able to live in happiness or bliss, that no one involved in the case would go unpunished, and that if she could not parent her child, no one involved would be able to parent theirs.} … I would reverse the injunctions only to the extent that they prohibit constitutionally protected activity and remand for the trial court to more narrowly craft the injunctions to ensure that no constitutionally protected activity is enjoined, but I would not limit the trial court to prohibiting only communications *directed at* petitioners. Finally, I would certify conflict with the Fourth District's *David* line of cases that suggest a bright-line rule that a prohibition by prior restraint on any communications about a petitioner violates the Constitution.

I think the majority got this right, and I think the speech-about / speech-to distinction is critical in such cases: Speech *about* a person generally can't be punished unless it fits within one of the narrow First Amendment exceptions, while unwanted speech *to* a person (e.g., unwanted phone calls, letters, e-mails, etc.) can in some situations be properly restricted even if it's outside one of those exceptions. For more on that, see this 2013 article, which focuses on criminal harassment / cyberstalking prosecutions, and this 2021 article, which focuses on overbroad injunctions.

Advertisement



Congress back to work as chance for partial government shutdown looms

POLITICS

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▾

FREE SPEECH

## Law Banning Distressing Speech "About" a Person Must Be Limited to Speech Within First Amendment Exceptions

So holds the D.C. Court of Appeals, D.C.'s equivalent of a state supreme court.

**EUGENE VOLOKH** | 6.8.2023 1:02 PM

From the 6-judge majority opinion in *Mashaud v. Boone*:

> [T]he District's stalking statute … makes it a criminal offense to engage in a course of conduct—including two or more "communicat[ions] to or about another individual"—that one knows or should know would reasonably cause another to suffer emotional distress. D.C. Code §§ 22-3132(8)(A), -3133. By its terms, it restricts all manner of speech, without regard to its truth or falsity, and without regard to whether it is of public or purely private concern. The constitutional problems with the statute are glaring. *See Forsyth County, Ga. v. Nationalist Movement* (1992) ("Listeners' reaction to speech is not a content- neutral basis for regulation."); *R.A.V. v. City of St. Paul* (1992) ("Content-based regulations are presumptively invalid."); *Garrison v. Louisiana* (1964) ("Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned.").
>
> People are generally allowed to say things that they know or should know will cause others emotional distress. Such speech is frequently socially valuable or, at the very least, accepted. Doctors tell patients that they likely have only months to live, or more distressing yet, that their children do. Spouses may knowingly inflict emotional distress by revealing a longstanding paramour and demanding a divorce. Police officers bring news of loved ones having been killed. Judges pronounce death sentences. All of those messages undoubtedly trigger extraordinary distress, and as a result, they are prohibited by the stalking statute's plain terms (at least if the messages need repeating). The statute is unconstitutional if read in that straightforward fashion, as "[s]peech may not be banned on the ground that it expresses ideas that offend."
>
> But the stalking statute has a savings clause, and we granted en banc review in this case to resolve its meaning. The stalking statute provides that "[t]his section does not apply to constitutionally protected activity." D.C. Code § 22-3133(b). To save the District's stalking statute from unconstitutionality, we interpret this clause to mean that, when speech is at issue, the statute covers only speech that fits within the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."
>
> That includes threats, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. Outside of those narrow categories, speech is constitutionally protected activity that the statute does not apply to.
>
> In this case, the Superior Court found that there was good cause to believe that Lauren Mashaud, a married man, stalked Christopher Boone when he truthfully revealed to Boone's family, friends, and colleagues that Boone had an affair with Mashaud's wife. Mashaud now appeals. Because Mashaud's speech was constitutionally protected activity—i.e., it does not fit within any of the categories outside of the First Amendment's protections—we conclude that he did not stalk Boone. We therefore reverse….

Quite right, I think. (Note that Schaerr | Jaffe's Gene Schaerr, Erik Jaffe, and Joshua Prince and I filed an amicus brief in the case, on behalf of Protect the 1st Foundation and myself, advocating for this result. Many thanks to UCLA First Amendment Amicus Brief Clinic law students Max Hyams, So-Young Kim, and Jason Lundry, who drafted the brief under my supervision; and to Scott & Cyan Banister, whose generosity makes the Clinic possible.)

A few excerpts from the very long opinion:

Case 2:24-cr-00163-TS   Document 209-1   Filed 05/01/26   PageID.11395   Page 113 of 283

What's more, the statute's broad scope applies not only to speech concerning purely private matters, but also to communications on matters of public concern: speech that "occupies the highest rung of the hierarchy of First Amendment values." The desire to elicit an extreme emotional reaction is "not an uncommon purpose, nor one held only by a few evil people." Consider the abortion rights opponent who tells clinic staff that they are murderers, or the animal rights activist whose messaging includes graphic images of slaughtered, mangled, and deformed infant livestock. Both speak on issues of public concern and are therefore entitled to the strongest First Amendment protections. But both invariably intend to evoke deep emotional distress with the hope of making their targets feel "socially ostracized … and emotionally racked with guilt, regret, and a perception of social condemnation." Yet both would be in violation of the plain text of the District's stalking statute, which includes no special carve-out for speech on matters of public concern.

It is a foundational principle of the First Amendment that "speech cannot be restricted simply because it is upsetting or arouses contempt." "The First Amendment protects lots of speech that is substantially emotionally distressing." "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."

The District's stalking statute runs headlong into that bedrock prohibition. Absent some narrowing construction, the District's statute would criminalize speech at the heart of many touchstone First Amendment cases. Protesters carrying signs reading "Thank God for IEDs" and "Thank God for Dead Soldiers" outside a deceased service member's funeral would likely be stalkers in the District, at least if their protests were repeated. The same is true for individuals who display burning crosses, swastikas, and other hateful symbols despite knowing that this expressive conduct will arouse "anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." A repeat neo-Nazi march through a neighborhood that is home to numerous Holocaust survivors, would likewise be considered stalking. And when a national publication satirized an interview with Minister Jerry Falwell, indicating that his first time having sex was "a drunken incestuous rendezvous with his mother in an outhouse," that too would seem sufficiently distressing to be prohibited by the District's stalking statute….

We do not doubt that there is a compelling interest in prohibiting stalking, and that a narrowly tailored statute might prohibit at least some of the communications at issue here (probably not the email, though). As written, however, the statute is unconstitutionally overbroad and would need to be struck down unless some narrowing construction can save it from wholesale invalidation….

Because we may strike down a constitutionally overbroad statute only "as a last resort," we are obliged to determine if the stalking statute is "'readily susceptible' to a narrowing construction that would make it constitutional."

The stalking statute gives us a natural entry point for that inquiry. It provides that it "does not apply to constitutionally protected activity." Amici argue that we should read the savings clause as a categorical limitation on the statute's scope, as Judge Beckwith advocated in her dissent from the division's opinion. When it comes to communications to or about another person, they assert, the clause limits the definition of stalking to just those discrete, well-defined categories of speech that lack First Amendment protections: threats, defamation, and the like. The District counters that the savings clause states no more than a truism, leaving us to scrutinize on a case-by-case basis which of its particular applications run afoul of the Constitution.

For the reasons that follow, we conclude that the first approach is not only the superior of the two, but the only one that would save the statute from invalidation….

Amici argue that we should read the savings clause as exempting entire categories of constitutionally protected speech from the stalking statute's reach.

Under this reading, when the savings clause says it does not apply to "constitutionally protected" speech, it exempts all speech except that which fits within the "narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." That would leave threats, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct [and] {"fighting words," "child pornography," and "speech presenting some grave and imminent threat"} within the stalking statute's reach, while leaving the balance of speech beyond it.

There are substantial advantages to this interpretation of the statute. Most importantly, it would eliminate the statute's unconstitutional overbreadth. The statute would proscribe only that speech that lacks First Amendment protections. It would likewise avoid any vagueness problems—which the District's interpretation suffers from, as discussed below—as a

Case 2:24-cr-00163-TS   Document 209-1   Filed 05/01/26   PageID.11396   Page 114 of 283

would-be perpetrator would not need to perform a full constitutional analysis to determine if their conduct falls within the statute's scope…. [I]f interpreted in this way, "the statute would be a combination of a criminal libel statute, a threat statute, a fighting words statute, and the like" ….

The District counters that the savings clause should be read to state a truism: that like all legislative enactments, the stalking statute only applies to "conduct or expression," which we take to include expressive conduct, "that the Constitution does not shield after conducting the relevant constitutional analysis."

If read in this way, then it is technically true (as the District contends) that the statute would no longer be overbroad; by its literal terms, it would forbid nothing that the Constitution protects. But that walks right into a different and equally devastating constitutional problem: it substitutes vagueness for overbreadth, thereby leaving the statute on no firmer constitutional footing. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited."

First, it makes little sense to say (as the District asserts) that the stalking statute applies to all speech except that which the "Council could not permissibly prohibit under the Constitution." Whether speech has been permissibly regulated depends on how narrowly tailored the regulation is to a compelling interest. The Council cannot get around the narrow tailoring requirement by simply declaring that it is prohibiting all distressing speech that, through a narrowly tailored statute, it otherwise might. It must actually do the tailoring. A statute that simply directs judges to determine if speech of a particular type could be constitutionally proscribed lacks the requisite tailoring and is constitutionally infirm on its face. The stalking statute is not narrowly tailored to a compelling state interest if we read the savings clause to state a truism, regardless of whether a variety of the speech it covers might be proscribed through a more targeted statute.

The District thus fundamentally misunderstands what strict scrutiny is when it counters that "[m]ost applications of the stalking law would survive even strict scrutiny" if the savings clause were interpreted as a mere truism. Strict scrutiny takes stock of the statute as a whole and asks whether it is narrowly tailored to achieve a compelling state interest, and a statute will fail that test if a "narrower regulation would suffice" to satisfy the state's interest. It is a category error to say a statute would survive strict scrutiny in "most applications"; "'overinclusive' statutes also fail strict judicial scrutiny."

Second, a statute with terms requiring "application of the appropriate constitutional test" would leave the line between innocent and prohibited conduct a matter of guesswork for most of the District's residents. As one treatise describes the problem, such a statute would be "patently vague":

> [T]he Constitution does not, in and of itself, provide a bright enough line to guide primary conduct, and [] a law whose reach into the protected sphere is limited only by the background assurance that unconstitutional applications will eventually be set aside is a law that will deter too much that is in fact protected.

Laurence H. Tribe, *American Constitutional Law* 1031 (2d ed. 1988) (discussing the risk of vagueness in "judicial reconstruction" of unconstitutionally broad statutes). Even for trained attorneys, a statute requiring ex ante constitutional analysis to determine its scope fails to give adequate notice of its requirements. And particularly when that statute imposes criminal liability, the result of this vagueness is inevitably the impermissible chilling of protected speech….

The only question remaining is whether Mashaud's speech fits within a narrow category of speech that lacks First Amendment protection. That is a pretty open and shut case: it does not. Mashaud did not defame Boone; it is undisputed that his statements were true. He did not threaten him. His speech did not incite criminal activity, and it was neither obscene nor fraudulent.

Boone counters that Mashaud's speech fits within one recognized exception to the First Amendment's protections, because it was integral to a criminal act— namely, stalking. This argument is fatally circular. While it is true that the First Amendment does not protect speech integral to criminal conduct, "the speech must be integral to conduct that constitutes another offense that does not involve protected speech." The exception is typified by crimes like solicitation or conspiracy, which encourage others to participate in and thereby advance a non-speech offense.

It makes no sense as an exception if the speech both constitutes the crime itself and thereby avoids First Amendment protections by being integral to its own commission. By Boone's reasoning, the government could prohibit any disfavored speech by first defining it as a crime and then claiming that the First Amendment no longer applies because that speech is now integral to that same offense. An exception like that would swallow the First Amendment whole and bears no resemblance to what this narrowly drawn exception actually is.


> Because the course of conduct identified by the trial court consisted solely of "communications to or about another individual," and those communications did not fall within one of the categories of speech that lack First Amendment protections, the court erred by finding that Mashaud committed the crime of stalking…

Judge McLeese, joined by Judge Alikhan, dissented from the court's analysis (though they agreed that the order should be reversed); they would have instead read the statute as limited to behavior that "involve[s] a severe intrusion on the victim's personal privacy and autonomy."

To get the Volokh Conspiracy Daily e-mail, please sign up here.

**Email** *(Required)*



| e.g. jane@example.com | **Submit** |

---

**_NEXT:_ Supreme Court Reaffirms Strong Presumption of Statutory Stare Decisis**

---

**EUGENE VOLOKH** is the Gary T. Schwartz Distinguished Professor of Law at UCLA and a Visiting Fellow (Senior Fellow starting May 2024) at the Hoover Institution (Stanford). Naturally, his posts here (like the opinions of the other bloggers) are his own, and not endorsed by any educational institution.

FREE SPEECH    HARASSMENT

MEDIA CONTACT & REPRINT REQUESTS

💬 Show Comments (5)

## RECOMMENDED

**Appellate Court Reverses Child Custody Decision That Was "Based on [a] Decade-Old Sexual Assault Allegation"**

**Court Strikes Down Injunction Banning Divorcing Parents from Disparaging Each Other**

**Court Reverses Order That Father "Shall Not Discuss Religion with" Child**

**Mother ordered not to say or imply that child has 'autism or developmental delays or other behavioral issues' (he apparently doesn't)**

**Massachusetts Appeals Court Strikes Down Child Custody Speech Restriction**



About

Browse Topics

Events

Staff

Jobs

Donate

Advertise

Subscribe

Contact

Media

Shop

![Judicial Council of California seal, 1926]

**Judicial Council** *of* **California**

Rules Committee

www.courts.ca.gov/rulescomm.htm
rulesmeetings@jud.ca.gov

# RULES COMMITTEE

## MINUTES OF OPEN VIDEOCONFERENCE MEETING

Tuesday, August 22, 2023

12:10 p.m.- 1:40 p.m. and 4:30 – 6:00 p.m.

| | |
|---|---|
| **Rules Committee Members Present:** | Hon. Carin Fujisaki, Hon Samuel Feng, Hon. Kimberly Merrifield, Hon. Glenn Mondo, and Hon. David Rosenberg. |
| **Rules Committee Members Absent:** | Hon. Kevin C. Brazile, Ms. Rachel W. Hill, Mr. Shawn Landry, and Mr. Maxwell Pritt. |
| **Rules Committee Staff Present:** | Ms. Anne M. Ronan and Ms. Benita Downs |
| **Advisory Bodies Staff Present** | Heather Anderson, James Barolo Kerry Doyle, Sarah Fleischer-Ihn, Ann Gilmour, Diana Glick, Jenny Grantz, Kendal Hannon, John Henzl, Frances Ho, Jason Mayo, Kara Portnow, Daniel Richardson, Leah Rose-Goodwin, Jamie Schechter, Gabrielle Selden, Marymichael Smrdeli, and Corby Sturges |
| **Other JC Staff Present** | Audrey Fancy, Michael Giden, Anna Maves, Christy Simons, Gregory Tanaka, Hisham Qutob, and Charina Zalzos. |

### OPEN MEETING

**Call to Order and Roll Call**

The chair called the meeting to order at 12:10 p.m., and Ms. Downs took roll call.

**Approval of Minutes**

The committee reviewed and approved the minutes of the March 29, April 5, April 13. June 2, June 29, July 31, and August 11, Rules Committee meetings with the following noted corrections:

- August 11, the minutes were not noted on the agenda provided to staff but were included in the binder.
- March 29, the title "Appellate Advisory Committee" was missing the letter "d" in word "advisory".
- April 5, Anne's sticky notes were removed from language in Item 11.

CALCRIM 2023-02
**Revised Jury Instructions**
All comments are verbatim unless indicated by an asterisk (*).

| Instruction No. | Commenter | Position | Comment | Committee Response |
|---|---|---|---|---|
| | | | • The modified instruction is complete and correct. <br> • **No comment is recommended**. | |
| 1244 | Superior Court of California, County of San Diego by Mike Roddy, Executive Officer. | AM | Pertaining to proposed revisions to CALCRIM 1244 (PC 236.1): the first and third elements refer to a "person" whereas the second element refers to a "minor," even though it is an independent element to have to prove the person is a minor or the defendant believed the person to be a minor (element 3). Consider whether the second element should instead refer to a "person." | The committee agrees and has changed "minor" to "the other person." |
| 1250 | James Mugridge, Lead Staff Attorney (Central Staff), California Fifth District Court of Appeal. | NI | • Adds a note explaining that "Penal Code section 278 does not require the prosecution to prove that a foreign court order or custody order had previously been registered in California pursuant to the UCCJEA. (*People v. Coulthard* (2023) 90 Cal.App.5th 743, 758 [307 Cal.Rptr.3d 383].)" (CALCRIM 2023-02 at p. 36) <br> • The summary is correct. The authority for the proposition is undisputed and based on long-established law. <br> • **No comment is recommended.** | No response necessary. |
| 1301 | Kailin Wang | NI | When will Cal-Crim amendments for Stalking under Penal Code 646.9 be amended in order to align with the recent US Supreme Court decision in Counterman v. Colorado 2023 which mandated that Stalking Laws change the objective reasonable person standard to the subjective of the speaker to a reckless standard. | In *Counterman v. Colorado* (2023) 600 U.S. 66, 69 [143 S.Ct. 2106, 216 L.Ed.2d 775], the United States Supreme Court examined a Colorado stalking statute and held that the First Amendment requires "that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening |

Positions:  A = Agree; AM = Agree if modified; N = Do not agree; NI = Not indicated.

022

CALCRIM 2023-02
**Revised Jury Instructions**
All comments are verbatim unless indicated by an asterisk (*).

| Instruction No. | Commenter | Position | Comment | Committee Response |
|---|---|---|---|---|
| | | | Note the California Court of Appeals recently cited to *Counterman v. Colorado* to overturn a Stalking Case based on violation of the First Amendment, however they still cited the "reasonable person" standard in *People v. Peterson*, No. A163458 (Cal. Ct. App. Sep. 26, 2023). <br><br> **Stalking** another by ~~following or~~ engaging in a course of conduct directed at a specific person ~~with no legitamate purpose that puts another person resonably in fear for one's saftey or~~ knowing or consciously disregarding a substantial and unjustifiable risk that the course of conduct would cause a reasonable person ~~to under the circumstances be frightened, intimidated or emotionally distessed~~ - (A) fear for their saftey or the saftey of others; or (B) suffer substantial emotional distress. <br><br> **Threats,** defined as communication of a serious expression of intent to commit an act of unlawful violence against an individual or identifiable group, such that the individual or group would reasonably fear violence, regardless of whether the communicating individual actually intends to carry out the threat, and in which the person engaging in the communication knew or consciously disregarded a substantial and unjustifuable risk that it would have such an effect on the individual or identifiable group. | violence." In response to *Counterman*, the committee reviewed several CALCRIM instructions including No. 1301, *Stalking*. The committee determined that the holding does not impact No. 1301 because this instruction already requires that the defendant intend to place the victim in reasonable fear. <br><br> *People v. Peterson* (2023) 95 Cal.App.5th 1061 [314 Cal.Rptr.3d 137] was recently decided and addressed a different issue: the nature of true threats in a stalking case. The committee will consider this case at its next meeting in the spring. |
| 1500 & 1551 | James Mugridge, Lead Staff Attorney (Central Staff), California Fifth District Court of Appeal. | NI | • Senate Bill No. 821 (Reg. Sess. 2023–2024) modified the amount of property damage required to be convicted of aggravated arson and modified the alternative condition that defendant have damaged or destroyed five or more "inhabited structures" to "inhabited dwellings." (Stats. 2023, ch. 706, § 1, subd. (a)(2)(A) & (a)(3).) The modified instruction for CALCRIM No. 1500 makes conforming changes. CALCRIM Nos. 1500 and 1551 also incorporate into the body of the instructions the alternative element/factor that defendant has been convicted of arson in the past 10 years. Previously, that alternative element was satisfied by giving | No response necessary. |

Positions:  A = Agree; AM = Agree if modified; N = Do not agree; NI = Not indicated.

023

Case 2:24-cr-00163-TS    Document 209-1    Filed 05/01/26    PageID.11401    Page 119 of 283

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▾

FREE SPEECH

## Grandmother Has Right to Publish Government Documents About Investigation into Grandson's Death

The Third Circuit holds that, once the government released the documents, it couldn't then forbid the grandmother (or others) from publishing them.

**EUGENE VOLOKH** | 7.20.2023 12:24 PM

The case is _Schrader v. District Attorney_, decided yesterday by the Third Circuit (in an opinion by Judge Stephanos Bibas, joined by Judges Patty Shwartz and Julio Fuentes). First, what I think is the heart of the First Amendment argument:

> The DA could have gotten a protective order stopping Bowie from sharing the discovery documents _before_ he did so. Instead, the DA got a protective order only _after_ Bowie had shared them. When "the government has failed to police itself in disseminating information," prosecuting someone who later publishes that information "can hardly be said to be a narrowly tailored means of safeguarding" confidentiality.

And now a longer excerpt:

> Child-abuse information matters to both victims and the public. The government encourages victims to report abuse by keeping their information private. But the public has a strong interest in holding the government accountable for how it confronts this serious crime. So once this information enters the public domain, the government can rarely claw it back.
>
> Victoria Schrader wants to use documents released by the government to criticize it for how it handled her grandson's life and untimely death. Yet she worries that Pennsylvania officials will use Pennsylvania law to punish her for doing so. Because the First Amendment protects her criticism, the District Court properly enjoined the officials from prosecuting her. But because one of her alleged injuries is too speculative, we will vacate the injunction with instructions to narrow it.
>
> **[I.] INVESTIGATING A TODDLER'S DEATH**
>
> Dante Mullinix died when he was only two. (Because the District Court used Dante's full name throughout its opinion and order, and Dante is no longer with us, we will too.) Before he died, his aunt, Sarah Mercado, thought he had been in danger. So she filed a report with the York County Office of Children and Youth Services, imploring them to protect him. Her report led Youth Services to investigate Dante's welfare. But that investigation would not save him.
>
> Tyree Bowie, who was dating Dante's mother, was charged with murdering him. In criminal discovery, Bowie got documents from the Youth Services investigation that were stored in a statewide database. He passed them along to Mercado, who believed he was innocent. Mercado wanted to advocate Bowie's innocence and blame Youth Services for failing to protect her nephew. So she started a Facebook group called "Justice for Dante" and posted some of the documents to the group. Bowie was eventually acquitted.



Case 2:24-cr-00163-TS    Document 209-1    Filed 05/01/26    PageID.11402    Page 120 of 283

In the meantime, those posts caught the eye of York County District Attorney David Sunday. The DA charged Mercado with violating Pennsylvania's Child Protective Services Law. The Law makes it a crime to "willfully release[ ] or permit[ ] the release of any information contained in the Statewide [child-abuse] database … to persons or agencies not permitted … to receive that information." The DA later dismissed the charge without prejudice.

Victoria Schrader, Dante's grandmother and Mercado's mother, shares Mercado's views. She wants to publish "documents that had been generated in the course of [Youth Services' investigation]," including the documents that Mercado has already posted on Facebook, to "further publicize [Youth Services'] failures and … [to] advoca[te] … Bowie's innocence." But she fears that she too will be prosecuted if she does so.

So Schrader sued to enjoin the DA and Pennsylvania's Attorney General from prosecuting her. Invoking the First Amendment, she claims that the Law is unconstitutional both on its face and as applied to her….

**[IV.] BECAUSE SCHRADER'S CONSTITUTIONAL CHALLENGE IS** LIKELY **TO SUCCEED, THE DISTRICT COURT RIGHTLY ENJOINED PROSECUTING HER**

Content-based laws are "those that target speech based on its communicative content." Some laws do that on their face by "regulat[ing] speech [based on its] particular subject matter." Others "regulate[ ] speech by its function or purpose" as a "proxy" for its subject matter. But that "subtler" strategy cannot evade content-based scrutiny.

The Law is one such function-or-purpose statute. Though the Law regulates the information by its source, the source itself is defined by its subject matter. Recall that it punishes a "person who willfully releases … any information contained in the Statewide [child-abuse] database" to unauthorized persons. By law, the Statewide database has twenty-three types of information about "child abuse." So the Law "single[s] out [a] topic or subject matter for differential treatment": child abuse. Because the database is a "proxy" for subject matter, the Law is content-based.

Thus, the DA must satisfy strict scrutiny. A content-based law like this one is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests."

The DA fails to meet this daunting burden. True, the state generally has a "compelling interest in protecting its child-abuse information." But the strength of those "privacy interests fade[s] once information already appears on the public record." Mercado has already posted on Facebook the child-abuse documents that Schrader wants to share.

Even if the state still has a compelling interest, prosecuting Schrader for republishing Mercado's documents is not narrowly tailored to serve that interest. To narrowly tailor, the state must choose "the least restrictive means among available, effective alternatives." But there are "available, effective alternatives" to prosecuting Schrader. Take these two:

First, there are protective orders. The DA could have gotten a protective order stopping Bowie from sharing the discovery documents *before* he did so. Instead, the DA got a protective order only *after* Bowie had shared them. When "the government has failed to police itself in disseminating information," prosecuting someone who later publishes that information "can hardly be said to be a narrowly tailored means of safeguarding" confidentiality.

Second, there are civil penalties. The Law could, for instance, authorize fines. Here, the DA "has offered little more than assertion and conjecture to support [his] claim that without criminal sanctions the objectives of [the Law] would be seriously undermined." *Landmark Commc'ns, Inc. v. Virginia* (1978).

The DA has not met his burden to explain away these two alternatives. Because the law is not narrowly tailored, the state may not apply it to stop or punish Schrader for publishing the Facebook documents….

Another strand of First Amendment law also protects Schrader's intended speech: the *Daily Mail* test. If one "lawfully obtains truthful information about a matter of public significance[,] then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." The *Daily Mail* test applies even when a content-neutral state law seeks to punish a publisher who is not part of the press. *Bartnicki v. Vopper* (2001)….

*Daily Mail*'s test supports Schrader's right to speak. First, she got the Facebook documents lawfully: "Even assuming the Constitution permitted a State to proscribe *receipt* of information, [Pennsylvania] has not taken this step." Instead, the Law bans only *releasing* confidential child-abuse information. Second, the Facebook documents are undisputedly authentic. And third, they are significant to the public: the government's investigation of child abuse, especially involving a child who ultimately died, is "a matter of paramount public import."



Case 2:24-cr-00163-TS    Document 209-1    Filed 05/01/26    PageID.11403    Page 121 of 283



Because Schrader meets the *Daily Mail* criteria, "punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order." And as explained earlier, the Law is not narrowly tailored as applied to Schrader. So under the *Daily Mail* test, the state cannot constitutionally use it to punish her….

Victoria Schrader wants answers for her grandson's death. In search of the truth, she seeks to criticize those in power by publishing the very information that they had before his death. Though Pennsylvania's Child Protective Services Law serves weighty interests, it cannot be used to punish her for doing so. We will vacate and remand to let the District Court enter a narrower injunction, which should still protect her on her search.

This generally seems correct to me, though I hope to have a post soon about a particular argument that might (or might not) be not quite right.

Aaron D. Martin (Mette Evans & Woodside) represents Schrader.

To get the Volokh Conspiracy Daily e-mail, please sign up here.

**Email** *(Required)*

e.g. jane@example.com    **Submit**

---

### *NEXT:* More from Pa. S. Ct. Justice David Wecht on Unenumerated Rights

---

**EUGENE VOLOKH** is the Gary T. Schwartz Distinguished Professor of Law at UCLA and a Visiting Fellow (Senior Fellow starting May 2024) at the Hoover Institution (Stanford). Naturally, his posts here (like the opinions of the other bloggers) are his own, and not endorsed by any educational institution.

FREE SPEECH

        MEDIA CONTACT & REPRINT REQUESTS

 Show Comments (7)

## *RECOMMENDED*

**Appellate Court Reverses Child Custody Decision That Was "Based on [a] Decade-Old Sexual Assault Allegation"**

**Court Strikes Down Injunction Banning Divorcing Parents from Disparaging Each Other**

**If You're Suing Just Me, You Can't Get An Injunction Against My Wife**

**"If Merely Using Profanity Can Cause a Parent to Lose Custody,"**

**Mother ordered not to say or imply that child has 'autism or developmental delays or other behavioral issues' (he apparently doesn't)**



About

Browse Topics

Events

Staff

Jobs

Donate

Advertise

Subscribe

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▼

VOLOKH CONSPIRACY

## Ex-Wife Prosecuted for Violating Order That She "Shall Not Post Anything" About Ex-Husband

But the judge threw out the prosecution, on the ground that the order violated the First Amendment.

**EUGENE VOLOKH** | 8.5.2020 12:56 PM

From Marin County (Cal.) Judge Roy O. Chernus's decision last week in *People v. Velyvis*:

> [T]he Family Law court granted petitioner John Velyvis' application for a Family Code § 6218 Domestic Violence Protective Order (DVPO) against his former wife Melissanne Velyvis (Velyvis or defendant), finding that she "harassed" petitioner in violation of Family Code§ 6320(a) by posting a March 13, 2018 "blog" on WordPress.com, entitled: "Non-Fatal Strangulation Administered by Husband Dr., John H. Velyvis, from Victim to Survivor … The Untold Story 2018."
>
> Among the prohibitions, the court ordered Velyvis to remove "all social media, blogs and internet" postings regarding petitioner and his children and barred her from making any new social media postings about them[:] …
>
> "The intent of this restraining order is to curtail ongoing posting and communications made by Melissanne Velyvis involving John Velyvis. While recognizing an individual's freedom of expression, in connection with this dissolution and given the relationship qualifying for a domestic violence restraining order, the court has found the statements to have been made for the purpose of harassing Petitioner, damaging Petitioner's reputation, interfering with Petitioner's professional livelihood and damaging Petitioner's personal relationships. Accordingly:
>
> "Melissanne Velyvis shall remove any postings on social media/biogs/internet regarding Petitioner or his children. This includes direct and indirect postings (Example referring to Petitioner as [']former husband/person with fiduciary duty['] and then using Melissanne Velyvis as identification of author).
>
> "Melissanne Velyvis shall not post anything on social media, biogs, and internet regarding Petitioner or his children.
>
> "Melissanne Velyvis shall cease and desist from publishing any information concerning Petitioner and his children for the duration of this restraining order. This includes, but is not limited to providing defamatory statements and documents to third parties about Petitioner. Melissanne Velyvis shall refrain from interjection into custody proceedings involving or related to John Velyvis, directly or indirectly, absent a court order.
>
> "Melissanne Velyvis shall remove John Velyvis' likeness from her own social posting and remove any references indicating they are currently married …."
>
> Six months later, the Marin County District Attorney filed a misdemeanor complaint against Velyvis .alleging one count of Penal Code§ 273.6; i.e., between July 19 to July 25, 2019 Velyvis "willfully, unlawfully, and knowingly" violated the DVPO "issued by Marin County Superior Court case number FL1603174."
>
> The complaint did not describe the offending activities. Defendant states, without contradiction, that she is charged with violating the "no speech" prohibition….

The court in the criminal case began by noting that, under California law, a criminal defendant who is being prosecuted for violating a court order can raise the unconstitutionality of the order as a defense. California thus rejects the "collateral bar" rule (which is applied in federal court for federal orders), under which the target of an order has to object to it by appealing it, and generally can't just violate it and defend herself by arguing that the order is unconstitutional.

And the court then went on to conclude that the family court order was indeed unconstitutional (quite correctly, I think, for reasons given in this article):

Defendant asserts the broad language in the DVPO that directs: "Melissanne Velyvis shall not post anything on social media, biogs, and internet regarding Petitioner or his children" and "Melissanne Velyvis shall cease and desist from publishing any information concerning Petitioner and his children for the duration of this restraining order," constitutes an invalid prior restraint that impermissibly infringes on her free speech rights …. Defendant contends this overbroad language of the DVPO unlawfully prevents her from sharing her life experiences and feelings she attributes to her marriage to petitioner with her family, friends and other adults willing to read her comments and criticisms ….

The People respond by asserting that the restraining order may lawfully limit speech that exhibits a pattern of conduct the court deems "abusive." As proof of this pattern of abuse, the People rely on evidence presented at the hearing which showed, in addition to posting the blog, … defendant interjected herself into other family law matters involving her ex-husband: she made unsolicited comments to a custody evaluator during the current contested custody hearing involving petitioner and his first ex-wife; and defendant made disparaging remarks about petitioner during his current girlfriend's divorce proceedings to another man. The People also cite defendant's plans to file a complaint against petitioner with the California Medical Board….

In California, a court must find that "extraordinary circumstances" exist in order to restrain the defendant's right to share independently obtained information about another adult with other willing adults. The fact the public sharing of these comments might be humiliating to the targeted adult, or cause emotional distress or even cause harm to the subject's professional reputation, does not rise to the level of a compelling or extraordinary circumstance.

In *In re Marriage of Candiotti* (1995) 34 Cal. App. 4th 718, the court struck down a protective order which permitted the ex-wife's (Debra) to share negative, independently obtained information about her ex-husband's new wife during contentious child custody proceedings, only to a specific set of adults and professionals associated with the court proceedings.

The court held that while the state has a compelling interest to restrain Debra from disparaging the new wife to the divorced couple's children or in the children's presence, "the order here went further, actually impinging on a parent's right to speak about another adult, outside the presence of the children. Such an order, under these circumstances, constitutes undue prior restraint of speech. *It would prevent Debra from talking privately to her family, friends, coworkers, or perfect strangers about her dissatisfaction with her children's living situation.*"

In reaching this conclusion, the court in *Candiotti* recognized that the emotional discomfort or harm to reputation that disparaging comments may cause to the targeted adult do not constitute sufficiently compelling reasons to restrain them:

"Thus, while we agree that the court certainly has the power to prevent Debra from undermining Thomas's parental relationship by alienating the children from Donna, the order here was much more far-reaching, aimed at conduct that might cause others, outside the immediate family, to think ill of Donna. Such remarks by Debra may be rude or unkind. They may be motivated by hostility. To the extent they are libelous, they may be actionable. But they are too attenuated from conduct directly affecting the children to support a prior restraint on Debra's constitutional right to utter them."

Likewise, in *Gilbert v. National Enquirer, Inc.* (1996) 43 Cal.App.4th 1135, the trial court issued a preliminary injunction prohibiting plaintiff actress Gilbert's ex-husband Brinkman from disclosing any information regarding Gilbert's drug or alcohol use or sexual relations with other men that Brinkman acquired before, during or after their marriage, to anyone (except as necessary to the current court proceedings).

The court held the preliminary injunction was an invalid prior restraint on Brinkman's free speech rights and that Gilbert's claimed emotional distress and reputational damage are not sufficiently compelling reasons to justify the prohibition….

Under circumstances similar to our case, the trial court in *Molinaro v. Molinaro, supra,* 33 Cal. App. 5th 824 issued a DVPO prohibiting the husband Michael from posting anything about his pending divorce from Bertha on Facebook. Bertha complained that Michael had physically obstructed her from moving out of the couple's home and had physically intimidated her. At a contested hearing on her application for the DVPO, Bertha complained that Michael was posting everything about the divorce case on Facebook; he gave their children ages 18, 17 and 13 years old, copies of Bertha's pleadings; he posted on Facebook false statements that Bertha ran away with $250,000 from the couple's home equity line of credit and that she is crazy and has hallucinations; and she said his behavior was getting worse and she feared for her life and her children's safety.

The DVPO issued by the court included a stay-away order and ordered Michael not "'to post anything about the case on Facebook'" and "'not to discuss the case with the children.'"

Case 2:24-cr-00163-TS    Document 209-1    Filed 05/01/26    PageID.11406    Page 124 of 283

On appeal from the DVPO, the appellate court held that the portion of the restraining order barring Michael from "posting anything about the case on Facebook" was unconstitutionally overbroad and impermissibly infringed on his free speech rights. It found that his "posts were not specifically directed to the minor children, but in many cases invited comments from Michael's adult friends and extended family," and that most of his posts "expressed his apparent despair about the divorce and his separation from the children." The court concluded, as did the court in *Candiotti,* that such comments were "'too attenuated from conduct directly affecting the children to support a prior restraint on [Michael's] constitutional right to utter them.'"

Our courts also recognize that a person has a constitutional right to repeat or comment upon public or private information, not previously found by a trial court to be defamatory. "'The attempt to enjoin the initial distribution of a defamatory matter meets several barriers, the most impervious being the constitutional prohibitions against prior restraints on free speech and press….'" *(Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1158 [injunction may properly issue *after* a trial prohibiting the defendant from repeating specific statements found at trial to be defamatory]; accord. *Evans, supra,* 162 Cal.App.4th at p. 1169 ["[A] court may not constitutionally prevent a person from uttering a 'defamatory' statement before it has been determined at trial that the statement was defamatory."].) There is nothing on the face of the complaint, or in the Family Court judge's judicially noticed fmdings of fact to indicate any of defendant's communications were previously found to be defamatory.

As stated in the DVPO, the Family Law judge found that defendant's statements about Dr. Velyvis were intentionally harassing, damaged his reputation and interfered with his personal relationships.

Based on the authorities discussed above, these reasons are insufficient to justify such a broad prohibition. The court finds that the portion of the DVPO restraining defendant from posting on the internet or communicating any information about defendant's ex-husband or his children is impermissibly overbroad and constitutes an invalid prior restraint under the federal and California constitutions. Violation of this portion of the DVPO, therefore, is not an actionable offense.

I'm particularly pleased to see the use of *Molinaro*; when that case was first handed down, it was as a nonprecedential opinion, but two groups and I filed letters asking that the First Amendment analysis be published—on the grounds that it would set a precedent that would be useful to future courts—and the Court of Appeal agreed. I'm pleased to see that this case justifies the predictions we had made.



To get the Volokh Conspiracy Daily e-mail, please sign up here.

**Email** *(Required)*

| e.g. jane@example.com | **Submit** |

---

### NEXT: Today in Supreme Court History: August 5, 1974

---

**EUGENE VOLOKH** is the Gary T. Schwartz Distinguished Professor of Law at UCLA and a Visiting Fellow (Senior Fellow starting May 2024) at the Hoover Institution (Stanford). Naturally, his posts here (like the opinions of the other bloggers) are his own, and not endorsed by any educational institution.

VOLOKH CONSPIRACY    FREE SPEECH    HARASSMENT

 MEDIA CONTACT & REPRINT REQUESTS

🗨 Show Comments (12)

No. A163458

California Court of Appeals, First District, Third Division

# People v. Peterson

Decided Sep 26, 2023

A163458 A163800

09-26-2023

THE PEOPLE, Plaintiff and Respondent, v. BRUCE PETERSON, Defendant and Appellant.

Marc J. Zilversmit for Defendant and Appellant. ACLU Foundation of Northern California, Hannah Kieschnick and Chessie Thacher as Amicus Curiae on behalf of Defendant and Appellant. Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and Katie L. Stowe, Deputy Attorneys General for Plaintiff and Respondent.

RODRIGUEZ, J.

Superior Court Costa County No. 52006922 Trial Judge: Hon. Charles B. Burch

Marc J. Zilversmit for Defendant and Appellant.

ACLU Foundation of Northern California, Hannah Kieschnick and Chessie Thacher as Amicus Curiae on behalf of Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and Katie L. Stowe, Deputy Attorneys General for Plaintiff and Respondent.

RODRIGUEZ, J.

Defendant Bruce Peterson was convicted of stalking a politician and the politician's family. (Pen. Code, § 646.9; further undesignated statutory references are to the Penal Code.) The conviction was based on: (1) Peterson's odd comments to the politician's wife at an open house event for a school bond issue; (2) his reposting on Facebook of a publicly available photo of the politician's family along with comments mentioning the open house event and the politician's children; and (3) his mailing of a rambling letter - criticizing local politics and containing a check made payable to "anyone who is not corrupt" - to the politician's wife. We reverse. On the specific facts of this case, we conclude a reasonable listener would not have found Peterson's speech or speech-related acts a true threat of violence.

## BACKGROUND

In February 2020, Lafayette City Councilmember and former Lafayette Mayor, Cameron Lee Burks, and his wife, Julia Ackley, hosted an open house event in their home in support of a school bond measure. The invitation *2 stated Burks was "hosting this event as an individual resident of Lafayette and a father of school-



aged children." Peterson attended and had an "odd" and "stilted" conversation with Ackley, during which he noted it had been 22 days since her birthday. Unaware her birthday was publicly available on her Facebook page, she felt "unnerved," "uncomfortable," and a "little freaked out." Her "spider-sense" that something was amiss was triggered by his odd behavior and appearance; she described him as wearing a shirt with "children's handprints all over it" and a pink fanny pack.

In March 2020, Peterson reposted on his Facebook page a photo from Ackley's public Facebook page. The photo depicted Ackley, and Burks and Ackley's two daughters. Peterson's post stated, "A politician's family. I have never met the younger 2 girls." In the comments, Peterson wondered "where [Burks and Ackley] hid the girls" during the open house event. He mused, "They live near Burton Valley School. Considering the politician, Cameron Burks, has a different name than his wife, I wonder what their daughters' last name is?" He also described Burks as "one of the Mayor's [*Sic*.] who abdicated his throne. But remained in power, on the Lafayette, Ca. City Council." One of Burks's colleagues sent him a screenshot of Peterson's Facebook post. Burks was "alarmed" and "immediately felt" Peterson "could be a threat" to his wife and daughters. But Ackley acknowledged the photo reposted by Peterson was publicly available on her Facebook page, as was her birthdate and other pictures of Burks and her daughters.[1]

[1] Ackley thought she made her Facebook page private after the March incident, but it remained publicly available as of April 2021.

In April 2020, Ackley received a "confusing" letter and check in the mail from Peterson. Written on the front of the check was, "Pay to order of anyone who is not corrupt." On the back of the check was written, "Thanks *3 for hosting the event on February 3rd, 2020. I do not recall your two daughters' names. Are they [. . .] and [. . .] or Molly and Harry?" Molly and Harry are the names of Ackley's parents, but she acknowledged the names and photos of her parents were publicly available at the time.

The letter was addressed to "Julia, 2 unnamed daughters, and their unnamed pets." The rambling letter was a screed against local politics. For example, Peterson said he had "a long list of liars," and Burks's Facebook "tells me that many of the: duplicitous, diabolical, lying, liars from hell, are his friends. Oh! They lied about me. They did not lie about him." He continued, "BTW. I have despised the Lafayette Police Department, since 1966. Before any of you were born. Wow! I've merely despised Lafayette Little League's: nasty, totalitarian jerks, since around 1998? How does a father of 2 daughters, live with himself, being a puppet for those totalitarian, nasty jerks from hell? They are above all laws, in this corrupt, little city."

Although Ackley thought the letter "didn't make a lot of sense" and "was written in a confusing manner," she was "really scared" it mentioned her by name, as well as the names of her daughters, and her parents. She also felt "helpless . . . to protect" her children. The idea that something could happen to her children filled her with a "sense of insecurity" and "doom." For his part, Burks felt "sick to [his] stomach" and "fearful" when he read the letter.

The defense called several witnesses who testified that, although Peterson was distrustful of the government and politicians, he was not violent. They described him as an "unusual" person who was prone to rants and hyperbolic speech - like when he said he "could have strangled the foul creature," referring to a former city supervisor - but there was "[a]bsolutely no follow-through or violence of any kind." *4

After a jury trial, Peterson was convicted of stalking and sentenced to two years of probation, with one year of home confinement.

People v. Peterson    No. A163458 (Cal. Ct. App. Sep. 26, 2023)

## DISCUSSION

Section 646.9, subdivision (a) provides: "Any person who . . . willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking."[2]Thus, the prosecution had to prove Peterson (1) harassed Burks and Ackley, (2) made a credible threat, and (3) did so with the intent to place them in reasonable fear for their safety or the safety of their immediate family. (See *People v. Ewing* (1999) 76 Cal.App.4th 199, 210; see also *People v. Carron* (1995) 37 Cal.App.4th 1230, 1238.)

[2] Section 646.9 also criminalizes the willful, malicious, and repeated following of another person, but the prosecution did not argue that theory.

A person" 'harasses'" when he or she "engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) A" 'course of conduct'" means "two or more acts occurring over a period of time, however short, evidencing a continuity of purpose." (*Id.*, subd. (f).) And a" 'credible threat'" is defined as "a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or *5 her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat." (*Id.*, subd. (g).) The definitions of" 'course of conduct'" and" 'credible threat'" expressly exclude "[c]onstitutionally protected activity" from their ambit. (*Id.*, subds. (f), (g).) But "true threats" of violence are unprotected by the First Amendment. (*Counterman v. Colorado* (2023) U.S. 143 S.Ct. 2106, 2111; U.S. Const., 1st Amend. (First Amendment).) The question here is whether Peterson engaged in constitutionally protected activities, thus precluding his stalking conviction as a matter of law. We conclude the answer is yes.

We begin with the standard of review. The Attorney General invokes the rule that "[c]laims challenging the sufficiency of the evidence to uphold a judgment are generally reviewed under the substantial evidence standard." (*In re George T.* (2004) 33 Cal.4th 620, 630 (*George T.*).) But Peterson correctly notes that, when a challenged finding implicates the First Amendment, the reviewing court conducts an independent review of the record as an added safeguard against infringement of constitutional rights. (*George T.*, at p. 632.) Independent review, "which 'assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact,' . . . 'is a rule of federal constitutional law. It is necessary 'because the reaches of the First Amendment are ultimately defined by facts it is held to embrace' and an appellate court must decide 'whether a given course of conduct falls on the near or far side of the line of constitutional protection.'" (*George T.,* at pp. 631-632, citations omitted.) The Attorney General contends *George T.* requires independent review only for criminal threat convictions (§ 422), not stalking. Citing *People v. Borrelli* (2000) 77 Cal.App.4th 703, 716-717, the Attorney General contends section 646.9 *6 is different because, unlike section 422, it" 'does not regulate the *content* of speech insomuch as *the manner* in which the communication is made.... The aim and effect of this statute are not to suppress speech, but to protect individuals in the exercise and enjoyment of their constitutional rights from invasive, oppressive conduct that infringes on those rights.'" [3]

[3] Section 422 provides in part as follows: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury . . ., with the specific intent that the statement, . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so

casetext

3

unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

Under the facts of this case, we believe Peterson has the better argument. Peterson's stalking conviction rested entirely on his speech - his remarks to Ackley at the open house event, his Facebook post and comments, and the letter and check - and its dissemination - the acts of posting on Facebook and mailing the letter. Moreover, the speech and its dissemination unquestionably occurred in a First Amendment context, concerning a school bond measure, local politics, and criticism of a politician. (*George T.*, *supra*, 33 Cal.4th at p. 632; *People v. Smolkin* (2020) 49 Cal.App.5th 183, 189 [applying independent review and concluding "as a matter of law, a 'reasonable listener' would not have understood [defendant's] letter to be a true threat"]; *In re Curtis S.* (2013) 215 Cal.App.4th 758, 762 [independently reviewing sufficiency of evidence for disturbing another by loud and unreasonable noise].) Thus, we independently review the conviction under the *George T.* standard. *7

We note, however, that independent review is different from de novo review; we do not make an entirely" 'original appraisal'" of the evidence. (*George T.*, *supra*, 33 Cal.4th at p. 634.) Rather, we defer to the credibility determinations of the trier of fact, who was "in a superior position to observe the demeanor of witnesses." (*Ibid.*) Moreover, we independently review only factual findings implicating the First Amendment, such as a finding that the communication at issue was a true threat and therefore unprotected by the First Amendment. (*George T.*, at p. 634.) In sum, we generally review for sufficiency of the evidence under the substantial evidence standard, but independently determine whether Peterson's expressive conduct was protected by the First Amendment or was a true threat.

"The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech." (*Virginia v. Black* (2003) 538 U.S. 343, 358 (*Black*).) Yet its protections "are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution." (*Ibid.*) As relevant here, the First Amendment "permits a State to ban a 'true threat.'" (*Black*, at p. 359.)" 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." (*Ibid.*) In *People v. Lowery* (2011) 52 Cal.4th 419, 427 (*Lowery*), the California Supreme Court followed *Black* in construing a statute relating to threats of violence against a crime witness or victim "as applying only to those threatening statements that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a true threat, namely, 'a serious expression of an intent to commit an act of unlawful violence' [citation], rather than an expression of jest or frustration." (*Lowery*, at p. 427.) *8

As noted, we independently examine the record to determine whether "the speech at issue is an unprotected true threat." (*George T.*, *supra*, 33 Cal.4th at pp. 632-633.) And because the material facts are not in dispute, we make an independent legal determination regarding whether a reasonable person would understand Peterson's remarks to Ackley, his Facebook post and comments, and the letter and check he mailed to Ackley as constituting a"' serious expression of an intent to commit an act of unlawful violence'" in "light of the context and surrounding circumstances." (*Lowery*, *supra*, 52 Cal.4th at p. 427.)

We conclude, as a matter of law, that a reasonable person would not understand Peterson's speech and its dissemination, whether considered separately or cumulatively, to be a true threat. (*George T.*, *supra*, 33 Cal.4th at pp. 637-638.) To be sure, Peterson's comment to Ackley about the exact number of days that had passed since her birthday was odd, and she was no doubt unnerved by his remark given her unawareness that her

birthday was publicly available on her Facebook page. But Peterson's mere reference to her birthday - leaving aside that anyone could find the information on Ackley's Facebook page - could hardly be seen as a" 'serious expression of an intent to commit an act of unlawful violence.'" (*Lowery*, *supra*, 52 Cal.4th at p. 427.) Peterson's remark does not rise to that level; eccentricity and being off-putting is not a criminal offense.

Peterson's Facebook post and comments fare no better. As noted, he reposted a photo of Ackley, and Burks and Ackley's daughters - a photo that was publicly available on Ackley's Facebook page. Peterson's post stated, "[a] politician's family," and in the comments to the post, he questioned the absence of the children at the open house event. He also wondered about the children's last name given that their parents did not have the same last name *9 as one another. And he described Burks as having "abdicated his throne" as mayor but remaining on the city council. Peterson's comments about the whereabouts and last names of the children were no doubt upsetting and even alarming to Burks and Ackley. But context is critical. The post and comments were made in the context of the school bond measure Burks and Ackley supported as parents of "school-aged children." Moreover, language in the political arena "is often vituperative, abusive, and inexact." (*Watts v.* U.S. (1969) 394 U.S. 705, 708.) Despite the unsettling and even disturbing nature of Peterson's post and comments, the school bond measure at the center of Peterson's speech was unquestionably a matter of public interest. (*Black*, *supra*, 538 U.S. at p. 358 ["The hallmark of the protection of free speech is to allow 'free trade in ideas'-even ideas that the overwhelming majority of people might find distasteful or discomforting."].)

Viewed in the light of the surrounding circumstances (*Lowery*, *supra*, 52 Cal.4th at p. 427), Peterson's Facebook post and comments did not constitute a true threat and they could not reasonably be interpreted as such. References to Burks and Ackley's daughters were surely discomfiting, but a reasonable person would not think, as the Attorney General suggests, that they reflected efforts "to learn about, locate, and contact Burks's teenage daughters." Direct threats of violence are not necessary, but something more than the mere mention of the children was required. (E.g., *People v. Falck* (1997) 52 Cal.App.4th 287, 298 [defendant's desire to spend eternity with victim, coupled with his stated proficiency with a rifle, and gift of black roses suggested murder-suicide]; *In re Ernesto H.* (2004) 125 Cal.App.4th 298, 303304, 313 [statement," 'Yell at me again and see what happens,'" along with a step toward victim and threatening stance was a true threat]; *People v. Halgren* (1996) 52 Cal.App.4th 1223, 1232 [statements that victim "would be *10 sorry she had been rude to him," "she would pay for her rudeness," and he was going to" 'fix her'" or" 'fix this'" were threats].) Nothing in Peterson's comments or their dissemination suggested even an implied threat to the children's safety. (*George T., supra,* 33 Cal.4th at pp. 637-638.)

Finally, there is the letter Peterson mailed to Ackley, in which he opined "100% of the politicians and their administrators, who are supposed to represent me, are corrupt." The enclosed check was made payable to "anyone who is not corrupt," and on the back of the check was written, "Thanks for hosting the event on February 3rd, 2020. I do not recall your two daughters' names. Are they [. . .] and [. . .] or Molly and Harry?" The Attorney General concedes the letter and check "criticized Burks's political activities" and were intended "to influence Burks politically." To the extent the Attorney General contends the act of mailing the letter itself constituted a threat, we disagree. The context surrounding the mailing of the letter "fail[s] to show that, as a threat, it was sufficiently unequivocal to convey" an intent to commit an act of unlawful violence. (*George T.*, *supra*, 33 Cal.4th at pp. 637-638.) The Attorney General also insists the "subtext" of these communications was that, because of his "anger about Burks's political involvement," Peterson "was trying to learn about, locate, and contact Burks's teenage daughters." We can discern no such "subtext." This case is different from *People v. Lopez* (2015) 240 Cal.App.4th 436 and *People v. Pineda* (2022) 13 Cal.5th 186, cited by the Attorney General.

NO: 3:20CR19

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF MISSISSIPPI

# United States v. Cook

472 F. Supp. 3d 326 (N.D. Miss. 2020)

Decided Jul 13, 2020

NO: 3:20CR19

2020-07-13

UNITED STATES of America v. Christopher Casey COOK

Paul D. Roberts, U.S. Attorney's Office, Oxford, MS, for United States of America. FPD, Federal Public Defender's Office, Merrill King Nordstrom, Hickman, Goza & Spragins, PLLC, Oxford, MS, for Christopher Casey Cook.

Michael P. Mills, UNITED STATES DISTRICT JUDGE

*327

Paul D. Roberts, U.S. Attorney's Office, Oxford, MS, for United States of America.

FPD, Federal Public Defender's Office, Merrill King Nordstrom, Hickman, Goza & Spragins, PLLC, Oxford, MS, for Christopher Casey Cook.

**<u>ORDER</u>**

Michael P. Mills, UNITED STATES DISTRICT JUDGE

Presently before the Court is Defendant Christopher Casey Cook's ("Cook") Motion to Dismiss Indictment [36]. The United States ("the government") responded in opposition [39], and Cook replied [40]. Having reviewed these submissions, along *328 with relevant authorities, the Court is now prepared to rule.

## Facts

In 2018 Cook was prosecuted by the State of Mississippi for sale of a controlled substance. The case was widely publicized in the local news and public reference was made to Cook's local Calhoun County business. Cook was acquitted of all charges by a Calhoun County jury. Not content to quietly accept his victory, Cook made disparaging remarks on the internet about various players in his Calhoun County prosecution. He now finds himself defending a charge of internet harassment in Federal Court.

After his acquittal, Cook published a number of posts on his personal Facebook page about his experiences with the criminal justice system. An affidavit of Federal Bureau of Investigation Agent John Marsh specifically mentioned five Facebook posts made by Cook that Marsh believed supported a Criminal Complaint for cyberstalking. A review of these posts is in order. On June 27, 2019 Cook posted on his Facebook account:



I have a friend who had an issue in court. The date of her charge was changed for some reason. But she didn't have any documentation. So I asked if she took or received a lot of photos and she said yes. I asked her about the meta data and she said that her attorney said metadata can be altered. I asked if she posted photos on Facebook because they keep the photos on a "timeline" ... I doubt any party could alter Facebook's timeline .... unless they could be like Superman and reverse the spinning of the earth ... [that will be one heck of an "app for that!"] So my point is that a dated Facebook post of a photo could prove it was taken then or before ... .so this is how she can use Facebook in court. People that have secrets are equally concerned with Facebook because of the power it gives an average joe ... so socialize, enjoy, and post photos ... The great equalizer is the gun but Facebook runs a close 2nd ... and what you need is there ... ready to be revealed ... God willing ...

The government alleges Cook posted the following on Facebook on August 19, 2019[1] :

[1]  Defendant's Attorney represented that she was unable to locate this alleged Facebook post in the government's discovery materials produced.

Cowards Creekmore[2] and Mueller[3] and cowardly judges. Cowardly crooked public defenders. Step down. Dixie Mafia likes to talk about making the wrong people mad. Well congratulations. You did. God gave me a good jury. Now I'm gonna give you what you have been giving my brothers and sisters ... you are finished. Because I'm coming and hell is coming with me. And I'm not just quoting a movie.

[2]  Presumably refers to the District Attorney Ben Creekmore who prosecuted Cook in his state court case. [1]

[3]  Presumably refers to the Assistant District Attorney Thad Mueller who prosecuted Cook in his state court case. [1]

The voluble Cook made two separate posts on January 21, 2020, first:

** *Image appearing to be a screenshot of information found on the internet regarding Mississippi Bureau of Narcotics officer Jon Lepicier, including an address and potential aliases* **

You know that moment when your undercover aliases gets listed as 'Jon Cop?'. don't worry I'm not going to put

329  *329

the fam on here.... that karma though ...

This was followed by a post several hours later stating:

One poem then but that's it ok? Dedicated to Jamar "JP Smooth" Peterson ... I'm in the class of 07 At Oak Hill Academy But that's Jonathan Lepicier Jon Davis is my name I tried to convince Casey That I'm really Jon M dad ain't Bob he's like Richard Leon I became a new guy in 2013 That's when JL hit the scene. I'm here I'm there super coll and super Fun. Don't you think Avery goes well with Jun? My folks got like 12 boats and a house in Odessa. sounds like my wife's alias kinda Without the O or the A Ol buddy you know when you stopped at my restaurant ... started your lyin? I'll never forget when they told me later "I thought his name was Brian" The end

Finally, on January 23, 2020 Cook posted the following status update:

For those of you who read the stuff about my run ins with supposed law enforcers of the state of MS, I'm going to try to explain it without getting too wordy. The first MBN guy that got after me was someone I had known for a while. He had issues with substance abuse during service among many other "questionable things. He saw me playing guitar at church and formed an idea that I was dealing drugs and hookers and using church as a front. His own ideas. I found out how extremely naïve it can be to believe a badge because of the badge. But the town soaked the rumor up like a sponge. This MBN guy was removed due to his own conduct and that is where the second guy came in. He got an alias and went undercover in 2013. His name pretty much vanished from the internet. He is the one who arrested me in my bathroom. They searched my home. Didn't find any meth anywhere. Had a rubber stamp warrant with my name on it. And a copied stamp of local judge. Judge rushes a few words by me. (I had a right to a hearing which I didn't get, etc. He couldn't talk about the case). Didn't know anything about it.) .. I bonded out for $575.00, meaning they really didn't have evidence of a sale of meth but that was the charge. Of course MBN wanted to use my personal knowledge and facilities to set up others but I refused. When I got out of jail the story on WTVA news was a picture of me, a mugshot, with a history of dealing dope out of my motel, it said they had investigated me for 6 months and that I had 3.5 grams of meth on me. That's when it hit me that the guys in jail were right. I had been used as a distraction. I later found out what happened that day. July 19, 2018. Knowing there could be no evidence so no grand jury, I went to work getting after their butt while they send in more people hoping to get the evidence they had already charged and arrested and slandered by fake news without ... I uncovered a Ponzi scheme indictment system, where the prosecution and many defenders across MS work together. They self indict every possible felony whether evidenced or not. The forgeries are endless and obvious to the untrained eye. They see what lawyer you have. He could be on the team. They aren't likely to dismiss because the ace in the hole is cheating in court ... we caught 3 errors that would have overturned had they gotten conviction. Not to mention the arresting officer has everything he needs already. He knows his team has his back. He even signed for foreman and ADA. The DA over the whole district came to help put me away because he knew I had discovered his bottom up frivolous indictment system. (I termed it BUFI). I emailed him many times. They know it's wrong and they know getting away with murder

330 *330

here is easy ... but Facebook gets them extremely stressed out. Just go to the courthouse and as ADA, who I refer to as TJ ... he is very angry over my facebook. But it's all true and that will come to light soon enough. The rest of the scheme is ... hold back discovery 8 months to a year and write continuances without consent to take asway Speedy trial right, hoping defendant will plead, which they do 100% of the time ... minus one case ... mine. Now for me it's war. I'm sick of the corruption in this state. Sick of the scapegoating and unsolved murders, cover ups and fake news so that the whole system is too busy covering up to do any justice elsewhere. It's a mess and the people turn a blind eye here. Those that could help remain passive. Those that can't pay just get stuck in the thing or get stuck in drug court whether they do drugs or not and those that try them, get cheated and sent off. They pay probating and restitution to the county, the arresting, the appointed lawyer and whatever else they can tack on. My own loved ones won't acknowledge my truth half the time, so I don't care what anyone thinks. I uncovered the family of the arresting person. His real name, parents, grandparents, sisters, wife, nephew, properties owned, past phone numbers, aliases of the whole family, in laws ... which had him very puzzled as to how I did it. But I was nice enough to use poetry that only he would understand when posting what I knew. This guy has had affairs and paid numerous people to get something on me since early 2017, including his only witness, a real meth dealer. How ironic (sigh) ... I guess carrying the torch of his brother in arms and certainly angry that I make them look like little Johnny in the 4th grade. And God willing I'm going to take them out. With or without the help of the people. So far he has been willing and all credit be to him.

The Indictment [18] is a one and a half page document in which a grand jury found that Cook threatened Mississippi Bureau of Narcotics Agent Jon Lepicier by "revealing the address of, and names of family members" and "did threaten him and his family by posting:

"I uncovered the family of the arresting person. His real name, parents, grandparents, sisters, wife, nephew, properties owned, past phone numbers, aliases of the whole family, in laws, ... which had him very puzzled as to how I did it. He has taken down some resources and Facebook pages or changed them. But I was nice enough to use poetry that only he would understand when posting what I knew;" and

"And God willing I'm going to take them out;" [18]

Interestingly, when you compare the "posts" the government presented to the grand jury in the indictment, to the full posts reproduced above, it appears that the government "cherry picked" certain statements and re-arranged them in a different sequence and context to give the posts a more ominous effect.[4] In the preceding and intervening sentences of the post that were cut out by the government in the indictment, Cook identified no less than six other persons or entities in the post with whom he had grievances (see references to the First MBN officer on *331 Cook's state court case, WTVA, the local elected state court judge, the ADA, the DA, and the "local meth dealer") regarding what he alleged was a fraudulent indictment scheme perpetuated by various elected government officials.

[4] This Court notes initially that it does not seem fair for the government to be allowed to present statements out of context to a grand jury when context is the critical issue in play. In a now famous interview, former New York State Chief Judge Sol Wachtler stated something along the lines of "a grand jury would 'indict a ham sandwich' if that's what [a prosecutor] wanted." In the same vein, it does not seem sporting for the government in this case to present evidence as a ham sandwich when all they have is baloney.

The Court also notes that the government has not alleged that Cook ever directly contacted Mr. Lepicier, any member of Lepicier's family, or any of the other people he named in his posts via direct message, email, telephone, letter or otherwise. So, for Mr. Lepicier or any of his family members to see Cook's posts, they would have to actively search for Cook's Facebook page and scroll through his "wall" to find the actual posts.

## Discussion

### I. *Background of § 2261A(2)(B)*

18 U.S.C. § 2261A, commonly referred to as the cyberstalking statute, was enacted in 1996 after the legislature realized that the Violent Crime Control and Law Enforcement Act of 1994, which aimed to protect current/former spouses and intimate partners from their stalkers, was so narrowly drafted that it did not address cases in which the victim was unrelated to the stalker. Since the Act's enactment, it has been amended four times, in 2000, 2006, 2013 and again in 2018. It is the 2013 version of the statute which applies in this case. The 2013 version of 18 U.S.C. § 2261A(2)(B) states that:

> Whoever—
>
> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that—
>
> (B) causes, attempts to cause, or would reasonably be expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A), shall be punished as provided in section 2261(b) of this title.

The most notable changes between the 2006 and the 2013 versions are (1) the addition of intent to "intimidate" among the offense's various possible mental states, and (2) the statute now criminalizes a course of conduct that "causes, <u>attempts to cause, or would be reasonably expected to cause</u> substantial emotional distress."

### II. Conduct or Speech?

By its own terms, § 2261A(2)(B) regulates <u>conduct</u>, or to be precise, "courses of conduct." However, " '[c]onduct,' ... may also enjoy First Amendment protection if it is significantly imbued with elements of communication." *United States v. Ackell* , 907 F.3d 67, 73 (1st Cir. 2018) ; citing *Texas v. Johnson* , 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

The United States Circuit Court for the First Circuit found in *United States v. Ackell* that § 2261A(2)(B) does not target speech. However, the facts before the *Ackell* Court were starkly different from the facts here. In *Ackell* , the defendant, who was over 40, was prosecuted because he was involved in a romantic internet relationship with a 16-year-old girl under the pretense that he was 21. When she attempted to end the relationship, he informed her through direct messages and emails that she could not opt out of the relationship because she was "caged," presumably because she had previously furnished compromising photos of herself, and he threatened that if she stopped sending him additional compromising photos that he would disseminate the photos of her to her friends, classmates, and family. In essence, Ackell had actual contact with the victim, and sent threats directly *332 to her numerous times. Indeed, Ackell was engaged in repeated <u>conduct</u> that was threatening to a victim and was prosecuted for the <u>acts of directly threatening the victim</u>.

In the case before us today, the government has not alleged that Cook ever directly contacted any of the subjects of his Facebook posts. Rather, Cook is being prosecuted solely on the content of his public posts – not the act of posting.

It is worth noting that the *Ackell* Court distinguished its holding, stating "while acknowledging that § 2261A(2) (B) could have an unconstitutional application, and remaining cognizant of the chilling-effect-related concerns ... [s]hould situations arise where the statute is applied to courses of conduct that are sufficiently expressive to implicate the First Amendment, we are confident that as applied challenges will properly safeguard the rights that the First Amendment enshrines." *United States v. Ackell* , 907 F.3d 67, 77 (1st Cir. 2018).

This Court will now examine implications of the First Amendment protection of speech as applied to this case.

## III. Broad Protections of The First Amendment

The First Amendment states in part, "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Indeed, "the First Amendment protects speech even when the subject or manner of expression is uncomfortable and challenges conventional religious beliefs, political attitudes or standards of good taste." *United States v. Cassidy* , 814 F.Supp.2d 574, 582 (D. Md. 2011) ; citing *United States v. Stevens* , 559 U.S. 460, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). Further, the Supreme Court has "consistently classified emotionally distressing or outrageous speech as protected, especially where that speech touches on matters of political, religious or public concern. This is because 'in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide "adequate breathing space" to the freedoms protected by the First Amendment.' " *Id.*

While the internet did not exist when our founders contemplated First Amendment protections in 1791, courts have routinely recognized that the internet is just the "newest medium for ... uncomfortable expression touching on political matters" and that the "First Amendment's command [does] not vary when a new and different medium for communication appears." *United States v. Cassidy* , 814 F.Supp.2d 574, 582 (D. Md. 2011) ; citing *Reno v. Am. Civil Liberties Union* , 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ; *Cassidy* also citing *Brown v. Entm't Merch. Ass'n* , 564 U.S. 786, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011).

Even though numerous court decisions have been published protecting uncomfortable speech posted on the internet, not all speech is protected. Indeed, "there are certain 'well-defined and narrowly limited classes of speech' that remain unprotected by the First Amendment." *United States v. Cassidy* , 814 F.Supp.2d 574, 582 (D. Md. 2011). The narrowly limited unprotected classes of speech include (a) obscenity, (b) defamation, (c) fraud, (d) incitement, (e) true threats, and (f) speech integral to criminal conduct.

The 'true threat' category of unprotected speech is the least developed exception to the First Amendment. The Supreme Court has only discussed true threats in a handful of cases, largely leaving Circuit Courts to develop their own approach. The Second Circuit in *U.S. v. Kelner* , has developed a particularly detailed approach stating that a true threat is one that "on its face and in the circumstances in which *333 it is made is so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *United States v. Kelner* , 534 F.2d 1020 (2nd Cir. 1976).

The Fifth Circuit's established approach is to ask whether a communication "in its context would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *U.S. v. Myers* , 104 F.3d 76, 79 (5th Cir. 1997). The Fifth Circuit has discussed the Second Circuit's analysis in *Kelner* , and has stated that "immediacy, or clarity of purpose, ... was the key to distinguishing true threats." *Shackelford v. Shirley* , 948 F.2d 935, 939 (1991). The Fifth Circuit has also stated that to distinguish "political hyperbole"

from a "true threat," the statements must be analyzed "in context" to determine if they are true threats punishable by law. *U.S. v. Morales* , 272 F.3d 284, 287 (5th Cir. 2001). Further, "[i]n order to convict, a fact finder must determine that the recipient of the in-context threat reasonably feared it would be carried out." *U.S. v. Morales* , 272 F.3d 284, 287 (5th Cir. 2001) ; citing *Myers* , 104 F.3d at 80.

## A. Cook's Facebook Posts are not "True Threats"

The Fifth Circuit has commented on "true threat" or "true threats" in 20 cases. Of these 20, only six discuss statements made by a citizen and whether that statement constituted a true threat. None of the cases discuss a public statement, like Cook's post on his Facebook.

*U. S. v. Howell* , a 1983 case, featured a hospital patient who was reported for making threatening statements against the President of the United States. *United States v. Howell* , 719 F.2d 1258 (1983). The defendant told an F.B.I. agent, who was sent to interview him, that he had a .357 caliber pistol and that there were two people he wanted to kill, one being the President. *Id.* Howell also made the statements "it's too bad that John Hinckley did not get him. I will kill the president if I get the chance" and "if released, I would make my way to Washington and kill him—I will kill the President." *Id.* The next day, Howell delivered a letter further outlining his statements regarding killing the President. *Id.* The Fifth Circuit affirmed the District Court ruling that the statements constituted true threats.

In the 2001 case of *U.S. v. Morales* , Morales, an 18 year old student repeatedly told a stranger in an internet chat room that he wanted to kill teachers and students at Milby High School in Houston, Texas and he attempted to make reference to Eric Harris (one of the perpetrators of the Columbine High School killings). *U.S. v. Morales* , 272 F.3d 284, 287 (5th Cir. 2001). The woman he relayed the threats to contacted the police because she was concerned about the Milby High School students. *Id.* The Court stated that under the *Myers* interpretation of 18 U.S.C. 875(c), all that was required was general intent. Here, in its context, Morales repeated his specific threats to kill several times, referred to a perpetrator of a violent and horrific school shooting and gave no indication that he was joking. *Id.* Nothing Morales said in that chat room could be construed as political speech, religious speech or public concern. In fact, Morales used the phrases "I will kill" and "YES F NE ONE STANDS N MY WAY WILL SHOT" [sic] which could not be mistaken. As such, the Fifth Circuit affirmed the District Court ruling that the speech was a true threat.

In 2004 the Fifth Circuit ruled in *Porter v. Ascension Parish School Board* that a drawing depicting a violent siege on a school by a 14 year old student of that school was not a true threat because it was *334 not intentionally communicated to the public. *Porter v. Ascension Parish School Bd.* , 393 F.3d 608 (2004). Because the student's drawing was completed in his home, stored in his home for two years, was never intended to find its way to the school, and was unwittingly taken to the school by his younger brother, the Fifth Circuit held that the Court did not have to determine whether the drawing would constitute a true threat because the student did not intentionally or knowingly communicate it. *Id.*

In 2011, the Fifth Circuit ruled in *U. S. v. Dwyer* , a case in which a bankruptcy court debtor emailed an employee of the bankruptcy court where his suit was pending stating:

Well, please convey to Judge Brown my belief that he can "try" to protect the CRIMINALS Duval, Lemelle and Dennis, but he can't protect them from themselves, and the "damage" is already done. As is the case with Judge Porteous, their impeachment is "just a matter of time". Also convey to Judge Brown a reminder that I have been totally without money since the weekend of January 8, 9, and 10, and that I have been without my anti-depressant medication, for which I have sought leave to pay Walgreen's from my most recent Social Security check, since last weekend. I could not sleep last night, which I attribute to the effects of abruptly stopping my medication on Sunday, the 24th (my pills "ran out", and I have no money to purchase more). Maybe my creditors would benefit from my suicide, but suppose I become "homicidal"? Given the recent "security breach" at 500 Poydras Street, a number of scoundrels might be at risk if I DO become homicidal. Please ask His Honor to consider allowing me to refill my prescription at Walgreen's, and allowing me to pay them, which is a condition for my obtaining a refill. Please communicate this missive to creditors and their counsel. Thank you.

The district court dismissed the indictment in *O'Dwyer* , finding that after reviewing the statement and its context, it did not constitute a true threat because it was hypothetical and conditional. Additionally, the email "did not threaten bodily harm to any particular individual." Even though the email was sent directly to a court employee with a message for Judge Brown, O'Dwyer never identified any individual whom he intended to harm. Further, the Fifth Circuit took into consideration that O'Dwyer had a documented history of using coarse and hyperbolic language in prior court proceedings. As such, O'Dwyer's email was not found to be a true threat, and the Fifth Circuit affirmed the dismissal of the indictment.

In 2015, *Bell v. Itawamba County School Board* was appealed to the Fifth Circuit for a third time. Bell involved a rap song sang and posted on the internet by a high school student referencing two coaches' inappropriate behavior towards female students and included some violent lyrics like "I'm going to hit you with my rueger (sic)" and "middle fingers up if you want to cap that [expletive]," which the school system found threatening, intimidating and harassing towards the coaches named. *Bell v. Itawamba County School Bd.* , 799 F.3d 379 (5th Cir. 2015). The Fifth Circuit found that *Tinker's* off-campus speech standards applied distinguishing *Bell* in a way providing little value to the analysis required here.

Certain common threads weave through all of the Fifth Circuit cases in which a true threat was found; first, the threat specifically identified a target; second, the threat was specific enough as to place, time or method to take the threat seriously; and finally, the threat was made directly to the intended target or to a third *335 party. None of these cases discuss what we shall call a "bulletin board threat."

Cook's Facebook posts are not "true threats" precluding him from First Amendment protection. Cook's posts, when read in context, lack entirely the specificity required to bring them under the umbrella of a true threat. Nowhere in any post does Cook explicitly state that he plans to physically harm Lepicier, or any other named public official." God willing I'm going to take them out" is not the same as telling an FBI agent you have a pistol and you will use it to kill the president or repeatedly and directly telling another person in a chat room that you were going to kill the students in your high school while making references to one of the Columbine shooters. See respectively, *United States v. Howell* , 719 F.2d 1258 (1983) ; *U.S. v. Morales* , 272 F.3d 284, 287 (5th Cir. 2001). In fact, in this Court's view, Cook's posts were even less severe than the one made in *O'Dwyer* , in that O'Dwyer emailed a court staffer directly, and specifically made mention of "homicide" and security breaches at the court's address which would provide opportunity. This Court finds that Cook's statement "And God willing I'm going to take them out. With or without the help of the people ..." is even more vague than the references O'Dwyer made using the word "homicide." Cook's phrase, when read with the succeeding sentence regarding the help of the people, could be interpreted to mean that he wishes to "take them out" of office or

their positions of power based on the context of the entire post being about the "fraudulent indictment scheme" or "BUFI" that Cook seemingly is warning the public about. When read in context, Cook's posts are nothing more than a manifesto of his grievances regarding people and processes which he perceived to have wronged him; they do not rise to the level of true threats.

Additionally, none of the Fifth Circuit cases discuss a situation in which a person's information, such as address or family members' names, is shared publicly; a phenomenon sometimes referred to a "doxing" or "doxxing".[5] Certainly, sharing public information, while potentially offensive and disagreeable, does not rise to the level of a true threat. As such, that portion of the indictment referring to "threaten[ing Jon Lepicier] and his family by posting" must be dismissed. [18]

[5] Merriam-Webster has stated that the term doxing or doxxing dates at least as far back as 2009, and means "to publicly identify or publish private information about a person – especially as a way of punishing the person or getting revenge," and is likely derived as a variation of "dropping docs" or "doc-dropping" which described the same act. https://www.merriam-webster.com/words-at-play/not-playing-nice-doxing-and-swatting

## B. Cook's Facebook Posts are Protected First Amendment Speech because they discuss Matters of Public Concern

The First Amendment protects those engaged in speech which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps* , 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) ; citing *Connick v. Myers* , 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Even when speech is arguably "inappropriate or controversial ... [it] is irrelevant to the question [of] whether it deals with a matter of public concern." *Snyder v. Phelps* , 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) ; citing *Rankin v. McPherson* , 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Deciding whether speech is of public or private concern requires the Court to examine the "content, form, and context" of *336 the speech throughout the "whole record." *Snyder v. Phelps* , 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). Additionally, the Fifth Circuit has held that "where speech 'complained of misconduct within the police department', it should be classified as speech addressing a matter of public concern." *Thompson v. City of Starkville, Miss.* , 901 F.2d 456, 463 (5th Cir. 1990) ; citing *Brawner v. City of Richardson* , 855 F.2d 187, 192 (5th Cir. 1988). Specifically, this district has said "speech complaining of misconduct within [a public entity] is speech addressing a matter of public concern." *Scott v. Corrections Corp. of America* , 2014 WL 4988383, at *9 (N.D. Miss. 2014) ; citing *Alexander v. Eeds* , 392 F.3d 138, 142 (5th Cir. 2004).

Here, it is clear that the Mississippi Bureau of Narcotics, the officers of the Mississippi Bureau of Narcotics, the publicly elected state court judge, the publicly elected District Attorney, and the public officials employed by the District Attorney are all either political figures, or public officials employed by public entities. While the Court does not find it to be in good taste to post publicly available identifying records, "poems" written which vaguely reference information known about employees of public entities, or to use phrases like "and god willing I'm going to take them out," the Court recognizes that Mr. Cook does have the constitutionally protected right to say such things. When viewed in their entirety, the five posts of Mr. Cook reproduced above read to be an attempt by Mr. Cook to expose what he views to be misconduct within the Mississippi Bureau of Narcotics, the District Attorney's Office and the Calhoun County Court System.

Counsel for the defendant argues in her brief that her client's internet chatter is no more threatening than the jabberings spewed daily from the bully pulpit of the highest office in the land. Indeed, it is a measure of our times that communications on so-called "social media," traveling under brand names such as Facebook and

Twitter, are often jejune and truculent, speaking in slogans, cartoons, symbols, and brief "come-aparts." Such speech, coarse as it may be, is protected. The Court will not recount all of the examples listed by Defense Counsel in her brief, but does note on February 25, 2020 President Trump "doxxed" a jury forewoman, both tweeting her name and going so far as to say:

> There has rarely been a juror so tainted as the forewoman in the Roger Stone case. Look at her background. She never revealed her hatred of "Trump" and Stone. She was totally biased, as is the judge. Roger wasn't even working on my campaign. Miscarriage of justice. Sad to watch![6]

> [6] @realDonaldTrump, Twitter (Feb. 25, 2020), https://twitter.com/realDonald Trump/status/1232395209 125707776

and as recently as June 20, 2020 the President of the United States tweeted:

> BIG COURT WIN against Bolton. Obviously, with the book already given out and leaked to many people and the media, nothing the highly respected Judge could have done about stopping it ... BUT, strong & powerful statements & rulings on MONEY & on BREAKING CLASSIFICATION were made .... Bolton broke the law and has been called out and rebuked for so doing, with a really big price to pay. He likes dropping bombs on people, and killing them. **Now he will have bombs dropped on him.** [7]

> [7] @realDonaldTrump, Twitter (June 20, 2020), https://twitter.com/realdonald trump/status/127436 6497360613381 ? lang=en. (*emphasis added*).

*337 *337

If prosecutors choose to tolerate the above grievances coming from the highest office in the land, then surely a Calhoun County citizen should likewise be allowed to vent his grievances. Their complaints are cut from the same cloth. Otherwise, our criminal justice system suffers the appearance of selective enforcement.

## C. Criminalization of Cook's Facebook Posts would Amount to an Impermissible Content Based Restriction of Speech

The District Court of Maryland in *U.S. v. Cassidy* dismissed an indictment in a 2015 case where a man posted on Twitter, a blog and other internet websites about a local religious leader and her congregation. *U.S. v. Cassidy*, 814 F.Supp.2d 574, (D. Md. 2011). In *Cassidy*, the defendant befriended a monk of a Buddhist sangha (hereinafter "KPC")[8] claiming that he too was a Buddhist American and expressed an interest in meeting A.Z., the first (and possibly only) American born female tulku.[9] After Cassidy had been a member of KPC for some time, A.Z. invited the defendant to a retreat. While they were in the car, A.Z. confided to the defendant about her abusive past and a failed marriage. *U.S. v. Cassidy*, 814 F.Supp.2d 574 (D. Md. 2011). The Defendant then proposed marriage to A.Z., asked her to pretend they were married during the retreat, and also asked if she wanted him to kill her ex-husband – all of which A.Z. declined. *Id.* After some behavior inconsistent with the KPC's beliefs, A.Z. investigated Cassidy's lineage and learned that he was never a tulku. *Id.* Upon being confronted with his lie, Cassidy left the retreat, and began using Twitter and blogs to post about A.Z. and KPC. *Id.* In total, over 350 tweets were directed at A.Z., thousands of tweets discussed A.Z. and KPC, and a blogspot account contains two posts "not necessarily directed at A.Z., a statement pertaining to A.Z., and a derogatory statement about KPC." *U.S. v. Cassidy*, 814 F.Supp.2d 574 (D. Md. 2011). The Tweets, which are too numerous to reproduce here in their entirety, include the following:

> [8] The Sanskrit word *sangha* is the community of followers and practitioners of Buddha's path and teaching. https://www.britannica.com/topic/sangha

9  A tulku is the "corporeal existence of enlightened Buddhist masters in general" and are believed to be rebirths of previous tulkas. The most famous example of a tulku lineage is the Dalai Lamas, who are said to be rebirths of the previous thirteen Dalai Lamas. New World Encyclopedia, https://www.newworld encyclopedia.org/entry/Tulku.

*Sunday, May 20, 2010:* "ya like haiku? Here's one for ya: "Long, Limb, Sharp Saw, Hard Drop" ROFLMAO."

*Tuesday, June 22, 2010:* "want it to all be over soon sweetie?"

*Tuesday, December 7, 2010:* "Got a wonderful Pearl Harbor Day surprise for KPC ... wait for it."

*Friday, June 25, 2010:* "[A.Z.] you are a liar & a fraud & you corrupt Buddhism by your very presence: go kill yourself."

*Thursday, December 9, 2010:* "A strong wind @ryderjaphy will blow down the KPC house of cards once and for all. They live by extortion now, and they live hand to mouth."

*Tuesday, December 28, 2010:* "DOWN WITH KPC! The fascist insect that preys on the life of Buddhism in the West!! DOWN WITH (Victim I)! The corrupt poser who has nothing."

*Sunday, July 25, 2010:* "I have just one thing I want to say to [A.Z.], and its form the heart: do the world a favor

338  *338

and go kill yourself. P.S. Have a nice day."

*Id.* at Appendix A.

Likening posting on Twitter or a blog to a public bulletin board, the District Court of Maryland stated:

> Because this case involves First Amendment issues, terms that were in use by citizens when the Bill of Rights was drafted may help in understanding the legal context of Blogs and Twitter. Suppose that a Colonist erects a bulletin board in the front yard of his home to post announcements that might be of interest to others and other Colonists do the same. A blog is like a bulletin board, except that it is erected in cyberspace rather than in one's front yard. If one Colonist wants to see what is on another's bulletin board, he would need to walk over to his neighbor's yard and look at what is posted, or hire someone else to do so. Now, one can inspect a neighbor's Blog by simply turning on a computer.
>
> ...
>
> One does not have to walk over and look at another person's bulletin board; nor does one Blog or Twitter user have to see what is posted on another person's Blog or Twitter account. This is in sharp contrast to a telephone call, letter or email specifically addressed to and directed at another person, and that difference, as will be seen, is fundamental to the First Amendment analysis in this case.

United States v. Cook    472 F.Supp. 3d 326 (N.D. Miss. 2020)

*U.S. v. Cassidy* , 814 F.Supp.2d 574 (D. Md. 2011). Further, the district court noted that the Supreme Court has "consistently classified emotionally distressing or outrageous speech as protected, especially where that speech touches on matters of political, religious or public concern." *Id.* As such, the district court found that "while Mr. Cassidy's speech may have inflicted substantial emotional distress, the Government's Indictment here is aimed squarely at protected speech: anonymous, uncomfortable Internet speech addressing religious matters." *Id.* at 583.

The *Cassidy* court conducted a secondary analysis regarding content-based restrictions on public speech, reiterating, "[i]n determining whether a statute is content-neutral, one must determine whether "the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* at 584. Further, a law or restriction is content-based if it "regulates speech based on the effect that that speech has on an audience." *Id.* Cassidy allegedly violated the statute by "intentionally causing substantial emotional distress to A.Z., specifically on Twitter and blogs." *U.S. v. Cassidy* , 814 F.Supp.2d 574, 584 (D. Md. 2011). The Maryland Court found the restriction as applied to Cassidy to be a content based restriction because it limited speech on the basis of whether that speech was emotionally distressing to A.Z.

It is well settled that a content-based restriction on speech must survive strict scrutiny – meaning that to survive strict scrutiny the government must show that the content based restriction "is necessary to serve a compelling state interest." *Id.* The Maryland court did not find "protecting victims from emotional distress sustained through an interactive computer service" to rise to the necessary state interest level because the Supreme Court has underscored the fact that the above referenced interest is not a compelling one. *Id.* at 586. "Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities simply by averting [our] eyes." *Id.* ; quoting \*339 *United States v. Playboy Entm't Grp., Inc.* , 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). The Maryland court ruled that A.Z. had the ability to protect "her own sensibilities simply by averting" her eyes from the Defendant's blog and by not looking at or blocking his Tweets. *U.S. v. Cassidy* , 814 F.Supp.2d 574, 585 (D. Md. 2011). And because the government's interest in criminalizing speech that inflicts emotional distress is not a compelling one, the statute as applied to Cassidy did not survive strict scrutiny. *Id.*

Of all the First Amendment cases reviewed in this Order, *Cassidy* is most similar to the instant case. In each case the defendant posted brash public commentary about an individual or group on an internet forum and was then prosecuted for the posts under § 2261A. But arguably, Cassidy's thousands of tweets/posts were far more numerous than the five Cook has been flagged for. One difference between the two is that Cassidy was posting about a religious leader, while Cook was posting about public entity employees, a public entity, and publicly elected political figures – but in the Supreme Court's eyes, religion, politics, and criticism of public entities as a form of public concern are all protected forms of speech under the First Amendment. This Court also reads the types of language and phrasing of the posts by both men to be eerily similar; both Cassidy and Cook like to use vague sayings whether it be Cook's "god willing I'm going to take them out," "I'm gonna give you what you have been giving my brothers and sisters ... you are finished. Because I'm coming and hell is coming with me. And I'm not just quoting a movie," or Cassidy's "want it to all be over soon," and his reference to a horrific day in history like Pearl Harbor.

Further, while the Court does not condone publishing publicly available personal information, like a person's address, there is simply no existing framework in the United States which criminalizes the act of "doxing" or "doxxing" private citizens; and certainly re-sharing a public record doesn't arise to the severity of sharing someone's bank records or social security number.

casetext

Just as in *Cassidy* , Cook is being prosecuted for the content of his public posts. His indictment very clearly states that he is being charged because his posts "caused and would reasonably be expected to cause substantial emotional distress to a person, a spouse of that person or an immediate family member of that person." [18] Because Cook's speech allegedly violated the statute by intentionally causing or knowingly reasonably causing emotional distress to Lepicier and/or his family specifically on Facebook, the portion of § 2261A(2)(B) relied on in the Indictment amounts to a content-based restriction.

Since the statute as applied to Cook is content-based, the Government has the burden of showing that the content-based restriction "is necessary to service a compelling state interest." *U.S. v. Cassidy* , 814 F.Supp.2d 574, 585 (D. Md. 2011) ; citing *First National Bank of Boston v. Bellotti* , 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Here though, just as in the Supreme Court's ruling in *United States v. Playboy Entm't Group, Inc.*[10] and in the District Court of Maryland's ruling in *Cassidy* , the benefit of the content based restriction to shield sensibilities of *340 the listener or reader is just not enough to supplant a citizen's right to uncomfortable public discourse. Here, Lepicier, his family, the local state court judge, the ADA, the DA, the local meth dealer, and the local news station all have the ability to protect their "own sensibilities simply by averting" their eyes from Cook's Facebook page, and as such § 2261A(2)(B) as applied to Cook's Facebook's posts does not survive strict scrutiny and the Indictment must be dismissed.

[10]  *United States v. Playboy Entm't Grp., Inc.* , 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (Supreme Court ruled it was unconstitutional to require cable television operators to "fully scramble or otherwise fully block" sexually oriented programming during hours when children are unlikely to be viewing between 10p.m. and 6a.m. because the statute was "unnecessarily restrictive content based legislation violative of the First Amendment").

## IV. Facial Validity of § 2261A(2)(B)

The Defendant's motion to dismiss his indictment argues that this Court should find the cyberstalking statute to be facially unconstitutional on several grounds, or to find the cyberstalking statute to be unconstitutional as applied to Cook because it is a content based restriction on speech regarding public concern.

The government heavily relies on a single case in its response, *U.S. v. Conlan* , a case in which the Fifth Circuit upheld the facial validity of the 2006 iteration of the cyberstalking act. The 2006 version was revised by Congress in 2013. As such, the government wholly failed to address a majority of the arguments raised by the defendant.

The Court has discussed at length the constitutionality of § 2261A(2)(B) as applied to Cook, and although the Defendant also raised the issue of facial validity of the statute as a whole, including arguments regarding overbreadth and vagueness, this Court will not address these facial challenges because the Court concludes that the statute is invalid as applied. The Supreme Court has reasoned that "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it" and "it is not the usual judicial practice ... nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily – that is before it is determined that the statute would not be valid as applied." See respectively *Brockett v. Spokane Arcades, Inc.* , 472 U.S. 491, 500–02, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) ; *Bd. Of Trustees of State Univ. of N.Y. v. Fox* , 492 U.S. 469, 484-85, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ; see *U. S. v. Cassidy* , 814 F.Supp.2d 574, 587 (D. Md. 2011) ; see also *U.S v. Popa* , 187 F.3d 672, 678 (D.C. Cir. 1999). As such, this Court will curtail its ruling of the constitutionality of the statute as a whole, as finding the statute unconstitutional as applied is all that is necessary in this case to dispose of the case before it.

## Conclusion

United States v. Cook    472 F. Supp. 3d 326 (N.D. Miss. 2020)

Because 18 U.S.C. § 2261A(2)(B) is unconstitutional as applied to Christopher Casey Cook, his Motion to Dismiss Indictment is **GRANTED** .

**SO ORDERED** , this the 13th day of July, 2020.



2003BX036814

Criminal Court of the City of New York, Bronx County

# People v. Bethea

2004 N.Y. Slip Op. 50007 (N.Y. Misc. 2004)
Decided Jan 13, 2004

2003BX036814.

Decided January 13, 2004.

Russell Neufeld, Legal Aid Society, Bronx (Rachel Dole, Esq., of counsel), for defendant.

Robert T. Johnson, District Attorney, Bronx (A.D.A. David Gavegnano, of counsel) for the People.

## OPINION OF THE COURT

ETHAN GREENBERG, J.

As a general matter, Americans are free to say and to write bad things about each other. Our right to free speech is protected by the First and Fourteenth Amendments to the U.S. Constitution. Article I Section 8 of the New York State Constitution is less familiar to the general public than the First Amendment, but it similarly declares: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or the press".

In this case the People charge that the defendant Linda Bethea posted numerous hand-written fliers that said some *very* bad things about Kareem Williams. It appears that Mr. Williams used to be Ms. Bethea's boyfriend and is the father of her child. The fliers indicate in colorful language that defendant Bethea hates Mr. Williams chiefly because she believes that he has failed to live up to his obligation to help support their child. The fliers include Mr. Williams' picture and read:

> Wanted for child support, Kareem Williams . . . Last seen fucking some whore bitch he pick up. Like all deadbeat he thinks he some kind of pimp daddy. He lives off people. And when he gets a dollar, he acts like he is God. That's how you can tell he a asshole, not use to shit. Any information please call Child Support Hotline 212-226-7125.

Kareem Williams

The fliers also list Mr. Williams' date of birth, social security number, address and phone number.

Based on the foregoing defendant Bethea has been arrested and charged with Aggravated Harassment in the Second Degree in violation of Penal Law § 240.30(1) and Harassment in the Second Degree in violation of Penal Law § 240.26(3). Defendant now moves to dismiss the Complaint as facially insufficient. For the reason detailed hereinafter, the motion is granted.

## *Harassment*



The standard applicable to a motion to dismiss is familiar and therefore will not be repeated here.

As to the charge of Harassment, the statutory provision relied upon by the People requires the People to show that defendant engaged in a course of conduct that annoys or alarms another person and that serves " *no legitimate purpose*". (Emphasis added).

Here, the Complaint does not allege that Mr. Williams was in fact annoyed or alarmed, and the Complaint is thus facially defective. However, that defect could likely be easily overcome by simple amendment because it seems very probable that Mr. Williams was indeed very annoyed; otherwise he would not have had Ms. Bethea arrested.

More important, accepting as true all the allegations of the Complaint (as the Court must on this motion), the Complaint does not show that defendant had "no legitimate purpose." *See People v. Stuart*, 100 NY2d 412, 428 (2003) (the phrase "no legitimate purpose" means "the absence of a reason or justification to engage someone other than to hound, frighten, intimidate or threaten.") To the contrary, the Complaint affirmatively demonstrates that defendant's self-evident purpose was to criticize, denounce and humiliate Mr. Williams because defendant believes he has been a poor father to their child. (Defendant may also have wished to enlist the aid of the Child Support Hot Line in locating Mr. Williams, but it is not clear whether her reference to the Hot Line was purely sarcastic.) That purpose is lawful and legitimate because Americans are, after all, free to criticize one another. *See People v. Hogan*, 172 Misc.2d 279 (Crim.Ct., Kings Co. 1997), *aff'd* 181 Misc.2d 388 (App. Term, 2nd Dept. 1998) (the "registering of displeasure with another is *legitimate* protected speech") (emphasis added).

## *Aggravated Harassment*

The Aggravated Harassment charge must fall for different but related reasons. It has long been recognized that the statute presents important constitutional concerns because in many cases it prohibits speech. The statute in relevant part makes it a Class A Misdemeanor (punishable by up to one year in prison) for a person acting with the intent to annoy or alarm another to make a written (or telephonic) communication that does annoy or alarm. If read literally, the statute would apply to all sorts of communications that plainly should not be regarded as criminal and that are clearly protected by the First Amendment. For example, as a literal matter, a sports writer who writes an article calling for his local team's manager to be fired might be guilty of Aggravated Harassment because his article was intended to annoy and did annoy the manager. Similarly, many "lawyer's letters" — stating one party's grievances against the other and demanding action — are designed in part to annoy or alarm and thus could fall within the literal scope of the statute. As an example closer to home, many rebellious teenagers and young adults go through a phase during which virtually every other day they call home with words calculated to cause their parents annoyance or alarm (or, ideally, both).

Accordingly, the Aggravated Harassment statute has been and must be read narrowly so as not to intrude on constitutionally protected speech. The statute was held to be constitutional in *People v. Smith*, 89 Misc.2d 789 (App. Term, 2nd Dept. 1977), *cert. den.* 434 U.S. 920 (1977), because the courts have in essence read additional elements into the statute. Specifically, the courts have held (consistent with both constitutional requirements and with the Legislature's Staff Commission Report that accompanied the statute) that in order to constitute "aggravated harassment" a communication must both annoy and alarm *and* must fall within one of several recognized categories of speech that may properly be prohibited consistent with the First Amendment:

We conclude that subdivision 1 was intended to include communications which are obscene; threats which are unequivocal and specific; communications which are directed to an unwilling recipient under circumstances wherein `substantial privacy interests are being invaded in an essentially intolerable manner'; communications which by their very utterance tend to incite immediate breach of the peace; and written communications intended to stimulate court process of any kind. The communication must, of course, also be made in a manner likely to cause annoyance or alarm and with intent to harass, annoy, threaten or alarm.

As so construed, subdivision 1 does not, in our opinion, suffer from constitutional infirmity.

*Smith*, 89 Misc.2d at 791-792 (internal citations omitted). *Accord People v. Miguez*, 153 Misc. 2d 442 (App. Term, 1st Dept. 1992).

The Court of Appeals in *People v. Dietze*, 75 NY2d 47, 50 (1989) reinforced the point that speech that is merely annoying or alarming, without more, cannot be punished:

Speech is often vulgar, derisive and provocative — yet it is still protected under the State and Federal Constitutional guarantees unless it is also much more than that . . . casual conversations may be `abusive' and intended to `annoy'; so too may light-hearted banter or the earnest expression of personal opinion or emotion. But unless speech presents a clear and present danger of some serious substantive evil, it may neither be forbidden or penalized.

As a consequence of these constitutional considerations, the most familiar factual situation that gives rise to a prosecution for verbal "harassment" is one where the words in question are "fighting words" that will likely lead to an immediate breach of the peace; the other typical form of Aggravated Harassment is where a defendant makes a series of unwanted phone calls that invade the privacy of the victim's home. Thus (with some limited exceptions briefly noted below), a charge of harassment usually involves a communication made by the defendant *directly to the victim*:

The basis of the crime of harassment — a penal sanction that punishes the exercise of speech — is that the prescribed conduct is likely to lead to a breach of the peace. This rationale, of course, loses much if not all of its force where the language complained of is not heard by or directly aimed as the complainant.

Thus constitutionally protected speech which cannot incite to violence because it is not communicated to the complainant may not form the basis for criminal prosecution . . . Without direct communications to the complainant a harassment conviction cannot be sustained.

People v. Viau, 50 NY2d 1052, 1054 (1980) (Cooke, Chief J., concurring).

The decision in *People v. Dupont*, 107 AD2d 247 (1st Dept. 1985) elaborates on these principles in a case very similar to the present one. Defendant Dupont was convicted of Aggravated Harassment because he distributed by hand a magazine called "Now East". "Now East" contained a number of stories and comics criticizing and lampooning Dupont's former attorney and identifying that attorney as a homosexual. The Appellate Division noted that the right of free speech embraces the right to distribute literature, including literature that may be annoying, distasteful or critical of others. "Plainly not every scurrilous or unsavory communication concerning an individual, no matter how repulsive or in what degree of poor taste, necessarily constitutes criminally harassing conduct. Where the interests of an individual are harmed, there may be a civil remedy by action for damages or injunctive relief. The criminal law may not be applied for this purpose. The harassment statute was not meant as a substitute for the laws of defamation." Accordingly, defendant DuPont's conviction was set aside.

Like defendant Dupont's "magazines" about his former attorney, defendant Bethea's fliers may be defamatory; they might on the other hand be true. But, in either event, they do not involve any threat of violence against Mr. Williams, and they do not ask any other person to commit any act of violence against Mr. Williams. Similarly, defendant's fliers do not invade the privacy of Mr. Williams' home. Defendant's fliers thus do not fall within any of the categories of speech set forth in *Smith* that may properly be regulated without invading freedom of expression. Admittedly, Mr. Williams may very well be extremely annoyed (or alarmed) that Ms. Bethea is criticizing him in public. But that does not mean that Ms. Bethea is guilty of Aggravated Harassment or any other crime. At most, Mr. Williams' remedy is a civil action for defamation or the like. *Dupont. Accord People v. Rissman*, NYLJ, Nov. 5, 1998, p. 23, col.2 (Crim.Ct., Queens Co. 1998). *See also People v. Goldstein*, 196 Misc.2d 741 (App. Term, 2nd Dept. 2003).

It is also worth noting that the People do not allege that defendant communicated directly with the complainant Mr. Williams. Like Chief Judge Cooke's concurring opinion in *Viau, DuPont* strongly suggests that a harassment charge must always involve comments made directly to the victim himself:

The harassment statute in all its various formulations, including the present codification, does not appear to have been relied upon as the basis for punishing any but annoying and harassing communications transmitted directly to the present complainant. It was not designed to prevent dissemination, let alone publication, of vexatious material about an individual. 107 AD2d at 252.

This suggestion may be slightly overbroad. In the last few years there have been a handful of "oddball" cases where, under peculiar circumstances, communications made to some one other than the victim may nevertheless be sufficient to make out a harassment charge. *See People v. Ort*, NYLJ, June 26, 2003, p. 27 col. 4 (Nass. Co. S.Ct.) (posting of racist literature intended to intimidate black potential home buyers constitutes Aggravated Harassment); *People v. Singh*, 187 Misc.2d 465 (Crim. Ct., Kings County 2001) (call to Child Abuse Hot Line worker threatening to kill judges and lawyers constitutes Aggravated Harassment); *People v. Kochanowski*, 186 Misc.2d 441 (App. Term, 2nd Dept.), *lv. den.* 95 NY2d 965 (2000) (posting internet message importuning others to harass complainant is a crime).

But the general rule still holds true; it is simply *not* a crime merely to speak or write bad things about another person.

Motion granted. Case dismissed.

This Opinion constitutes the Decision and Order of the Court.

 casetext

No. A-6
Supreme Court of New Jersey.

# State v. Burkert

231 N.J. 257 (N.J. 2017)   ·   174 A.3d 987
Decided Dec 19, 2017

A–6 Sept. Term 2016 077623

12-19-2017

STATE of New Jersey, Plaintiff–Appellant, v. William BURKERT, Defendant–Respondent.

Sarah Lichter, Deputy Attorney General, argued the cause for appellant (Christopher S. Porrino, Attorney General, attorney; Sarah Lichter, of counsel and on the briefs). Steven J. Kaflowitz argued the cause for respondent (Caruso Smith Picini, attorneys; Steven J. Kaflowitz on the briefs and Timothy R. Smith, of counsel and on the briefs). Edward L. Barocas argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Edward L. Barocas, Legal Director, and Rutgers Constitutional Rights Clinic Center for Law & Justice, attorneys; Edward L. Barocas, Jeanne M. LoCicero, Alexander R. Shalom, and Ronald K. Chen, of counsel and on the brief). J. Gregory Crane and Eugene Volokh of the California bar, admitted pro hac vice, submitted briefs on behalf of amicus curiae Pennsylvania Center for the First Amendment (Scott & Cyan Banister First Amendment Clinic, UCLA School of Law, attorneys; J. Gregory Crane and Eugene Volokh, on the briefs).

JUSTICE ALBIN delivered the opinion of the Court.

Sarah Lichter, Deputy Attorney General, argued the cause for appellant (Christopher S. Porrino, Attorney General, attorney; Sarah Lichter, of counsel and on the briefs).

Steven J. Kaflowitz argued the cause for respondent (Caruso Smith Picini, attorneys; Steven J. Kaflowitz on the briefs and Timothy R. Smith, of counsel and on the briefs).

Edward L. Barocas argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Edward L. Barocas, Legal Director, and Rutgers Constitutional Rights Clinic Center for Law & Justice, attorneys; Edward L. Barocas, Jeanne M. LoCicero, Alexander R. Shalom, and Ronald K. Chen, of counsel and on the brief).

J. Gregory Crane and Eugene Volokh of the California bar, admitted pro hac vice, submitted briefs on behalf of amicus curiae Pennsylvania Center for the First Amendment (Scott & Cyan Banister First Amendment Clinic, UCLA School of Law, attorneys; J. Gregory Crane and Eugene Volokh, on the briefs).

JUSTICE ALBIN delivered the opinion of the Court.\*262 The free-speech guarantees of our Federal and State Constitutions safeguard not only polite and decorous conversation and debate but also speech that we hate— speech that is crude, obnoxious, and boorish. A commitment to free discourse requires that we tolerate communication of which we strongly disapprove. This case tests the limits to which a broadly worded harassment statute can criminalize speech.

 casetext

William Burkert and Gerald Halton were corrections officers, who held positions in different unions representing distinct classes of corrections officers. Their relationship became particularly strained after Burkert read online comments attributed to Halton's wife that Burkert felt insulted him and his family. In response, Burkert downloaded a wedding photograph of Halton *263 and his wife that was *990 posted on social media and then inscribed degrading and vile dialogue on copies of the photograph. Copies of those photographs were found strewn in the employee parking garage and locker room of the Union County Jail.

Halton filed three complaints in municipal court charging Burkert with harassment in violation of N.J.S.A. 2C:33–4(c), which makes it an offense to have engaged in a "course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy [a] person." Halton's private attorney prosecuted this quasi-criminal offense on behalf of the State while Halton contemporaneously pursued a civil action against Burkert. A municipal court judge found Burkert guilty of harassment on two of the complaints, as did a Law Division judge after a trial de novo on the record.

The Appellate Division vacated Burkert's conviction, determining that although the flyers were wholly unprofessional and inappropriate for the workplace, they did "not amount to criminal harassment" in light of our constitutional free-speech guarantees.

We affirm. Criminal laws targeting speech that are not clearly drawn are anathema to the First Amendment and our state constitutional analogue because they give the government broad authority to prosecute protected expressive activities and do not give fair notice of what the law proscribes. Such laws also chill permissible speech because people, fearful that their utterances may subject them to criminal prosecution, may not give voice to their thoughts.

To ensure that N.J.S.A. 2C:33–4(c) does not exceed its constitutional reach in cases involving the prosecution of pure speech, repeated acts to "alarm" and "seriously annoy" must be read as encompassing only repeated communications directed at a person that reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable expectation of privacy. We consider that approach to be faithful to the legislative purpose in enacting subsection (c) of N.J.S.A. 2C:33–4 and consonant with the constitutional guarantees of free speech. *264 Burkert's intent to annoy was not a crime, and he did not engage in the type of repetitive acts contemplated by the statute. Therefore, Burkert is not guilty of a petty disorderly persons offense, although he may be subject to workplace discipline or a civil tort action. The language on the flyers, despite its vulgarity and meanness, is constitutionally protected from a criminal prosecution for harassment.

We therefore affirm the judgment of the Appellate Division, which dismissed the charges against Burkert.

I.

A.

On September 30, 2011, Halton filed three separate complaints, alleging that Burkert committed the petty disorderly persons offense of harassment on January 8, 9, and 11, 2011, in violation of N.J.S.A. 2C:33–4(c).[1] A three-day trial was held in the Elizabeth Municipal Court. Halton's privately retained attorney prosecuted the case on behalf of the State.[2]

---

[1] A petty disorderly persons offense is punishable by up to thirty days in jail. N.J.S.A. 2C:43–8.


casetext

2  Our court rules do not permit an attorney to appear as a private prosecutor on behalf of the State, except in cases involving cross-complaints, and then only on motion to the municipal court after review of "an accompanying certification submitted on a form approved by the Administrative Director of the Courts." R. 7:8–7(b). No objection was made to Halton's attorney acting as the prosecutor in the municipal court. After the conclusion of the municipal court proceedings, the Union County Prosecutor's Office represented the State in all matters concerning this case. Going forward, our municipal courts must strictly enforce Rule 7:8–7(b), which has the beneficent purpose of ensuring that quasi-criminal actions brought in the name of the State proceed in a disinterested manner.

At trial, Halton and Burkert testified, as did two other corrections officers. The testimony, much of which was undisputed, elicited the following.*991 *265

As of January 2011, Halton and Burkert had both worked as Union County correctional officers for more than twenty years. Halton served as a sergeant and also as the vice president of the Fraternal Order of Police (FOP), a union representing high-ranking corrections officers. Burkert served as a corrections officer and also as the treasurer of the Policemen's Benevolent Association (PBA), a union representing rank-and-file corrections officers. The rivalry between those two unions evidently caused friction in their personal relationship. The tension became much more acute when Burkert learned that Halton's wife was posting derogatory comments about him and his family on a public internet forum. Halton's wife referred to Burkert and his two brothers—who also were corrections officers—as bullies. According to Burkert, the postings also described him as "fat" and one of his brothers as "quirky" and "kind of retarded."

Angered by the insulting online comments, Burkert retaliated. Burkert downloaded the Haltons' wedding photograph, which Halton's wife apparently had posted on a social media website. He then copied the photograph and made two flyers, writing lewd dialogue in speech bubbles over the faces of the bride and groom. On Flyer # 1, over Halton's face were the words, "I know I'm a pussy with a little dick. Don't do the inmates please Laura," and over his wife's face were the words, "I wish you had a cock like the inmates." On Flyer # 2, over Halton's face, the writing stated, "Fam, I got me another whore." According to Halton, "fam" is a term denoting the corrections officers as family, and the dialogue on the flyers obliquely referenced his prior wife, a former corrections officer who he claimed had relations with another officer and an inmate.

Halton testified that on January 8, 2011, at approximately 10:45 p.m., he arrived at the employee garage of the Union County Jail, parked his vehicle, and saw papers "blowing all over the place." He picked one up and discovered Flyer # 1. Halton was offended and humiliated by the scurrilous writing over his wedding photograph. As he approached the gun locker area, Burkert and his *266 brother, Sergeant Kevin Burkert, stood in his path. As he walked between them, Halton asked, "What's up," and Burkert replied, "You're what's up." Later, while Halton was working at the booking area, he received a call from Burkert. During their conversation, Burkert mentioned that Halton's wife had called him fat; Halton denied having any knowledge of it. When asked, Burkert denied knowing about the flyers. The conversation came to an inconclusive end.

The next day, January 9, when Halton arrived at work, a sergeant handed him Flyer # 2, which the sergeant had found in the area of the officers' locker room. Halton identified the handwriting on both flyers as Burkert's.

On January 11, while Halton was off his usual schedule and engaged in union negotiations for the FOP, a lieutenant handed him Flyer # 2, stating, "This came out the other night." The flyer was the same one turned over to Halton two days earlier.[3] *992 Halton indicated that he "was a mess in negotiations," went home, and never returned to work. Halton explained that he felt embarrassed and concerned for his safety and received

psychological counseling and treatment. He received workers' compensation benefits for this work-related injury and retired on November 1, 2011. Halton acknowledged that he did not know who was responsible for placing the flyers in the various locations.

> 3  Lieutenant Patricia Mauko testified that she found twenty to thirty copies of one of the flyers during a routine inspection of the corrections officers' locker room on January 11.

Ten months after the January incidents, Halton filed the criminal harassment charges. Halton stated that he filed the charges only because the county had failed to properly discipline Burkert.[4] He also filed a civil lawsuit against Burkert.

> 4  Burkert received a work-imposed suspension for his conduct.

During the county's investigation into the flyers, Sergeant Stephen Pilot interviewed Burkert. Sergeant Pilot advised Burkert that a refusal to give a statement would jeopardize his *267 employment. Burkert admitted to Pilot that he had prepared the flyers but denied circulating them.[5]

> 5  At trial, Burkert claimed that the admission of his statement violated Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). The Garrity rule generally stands for the proposition that a statement taken from a public employee, threatened with termination from employment if he refuses to cooperate, is inadmissible in a criminal prosecution on the ground that such official coercion "interferes with the exercise of the Fifth Amendment privilege against self-incrimination." State v. Graves, 60 N.J. 441, 450, 291 A.2d 2 (1972). The municipal court did not formally rule on the defense's objection and did not reference Sergeant Pilot's testimony in its factual findings. The Garrity issue is not before us.

Burkert testified that he had been friends with Halton and became angry when he discovered that Halton's wife had been posting insulting comments about him and his brothers on a website for more than two years. While on the website, Burkert clicked a link to the wife's screen name, and the Haltons' wedding photograph appeared. He admitted downloading the photograph, inscribing the bubble dialogue over the Haltons' faces, and attaching the two flyers to the wall behind his desk in his union office. He denied, however, circulating the flyers that were later discovered in the garage and locker room. According to Burkert, on the evening of January 8, after the telephone conversation earlier described by Halton, he went to see Halton and said, "Here. I made the pictures. This is payback for what you did to my family." Burkert explained that he expressed himself through the flyers rather than "get physical with the guy." Burkert retired as a corrections officer in September 2012.

No testimony was elicited that Burkert worked either on January 9 or 11, 2011.

The municipal court entered a guilty verdict against Burkert for harassing Halton on January 8 and 11 in violation of N.J.S.A. 2C:33–4(c).[6] The court found that Burkert made and circulated the *268 flyers in the garage and locker room, that the bubble dialogue inscribed on the Haltons' wedding photograph was "lewd and obnoxious," and that such language would "seriously annoy any person, in this case Mr. Halton." The court imposed fines of $500 for each conviction and additional financial assessments and costs.

> 6  Although the court made no mention of the complaint relating to the January 9 incident, the municipal court disposition sheet indicates that complaint was "merged" into the two other charges.

B.



In a de novo trial on the record before the Law Division, the court found Burkert *993 guilty beyond a reasonable doubt of committing acts of harassment on January 8 and 11. The court determined that Burkert created and circulated the photographs and did so with the purpose to harass, and further that the harassing conduct was not protected by the First Amendment. More specifically, the court held that Burkert's intent in placing the vulgar language on the photos was to seriously annoy Halton in violation of N.J.S.A. 2C:33–4(c). The Law Division imposed the same fines, assessments, and costs as the municipal court.

C.

A panel of the Appellate Division reversed Burkert's conviction, concluding that "the commentary [Burkert] added to [Halton's] wedding photograph was constitutionally protected speech." State v. Burkert, 444 N.J. Super. 591, 594, 135 A.3d 150 (App. Div. 2016).[7] The panel accepted the argument that "the altered photograph ... was not directed to [Halton]," but rather to an audience of possibly willing listeners—other corrections officers. Id. at 601–02, 135 A.3d 150. The panel determined that the evidence did not support a finding that the flyers "were a direct attempt to alarm or seriously annoy" Halton or to invade his privacy rights. Id. at 601, 135 A.3d 150. The panel stated that the "uncouth annotations to [Halton's] wedding photograph" amounted to "constitutionally *269 protected expression, despite its boorish content, which bothered or embarrassed [Halton]." Ibid. The panel also found that the vulgar commentary on the flyers, although "unprofessional, puerile, and inappropriate for the workplace," did not constitute criminal harassment. Id. at 603, 135 A.3d 150. The panel did not address whether the flyers exposed Burkert to employment discipline. Ibid.

> [7] The Appellate Division did not consider the Garrity question because of its finding that Burkert's "conduct was non-actionable protected speech." Id. at 599, 135 A.3d 150.

We granted the State's petition for certification. 227 N.J. 377, 151 A.3d 977 (2016). We also granted the motions of the Pennsylvania Center for the First Amendment and the American Civil Liberties Union of New Jersey (ACLU–NJ) to participate as amicus curiae.

II.

A.

The State argues that the Appellate Division erred in vacating Burkert's harassment conviction on First Amendment grounds and that Burkert's conduct in creating and distributing the flyers was sufficient to justify the conviction. According to the State, "[t]he harassment statute restricts conduct, not speech," and the right to free speech "does not encompass a right to abuse or annoy another person intentionally." The State contends that "speech or writing used as an integral part of the harassing conduct is not entitled to First Amendment protection." The State rejects the notion that Burkert engaged in permissible speech with an audience that included willing listeners, suggesting that inmates may have been part of that audience and that a "workplace audience is 'captive.'" The State emphasizes that N.J.S.A. 2C:33–4(c) requires that a defendant act with the purpose to harass—"with a conscious object ... to annoy"—to demonstrate that permissible speech will not fall within the statute's sweep. To establish that Burkert's "course of conduct was alarming and injurious," the State points to Burkert's admission that "he made the flyers as an alternative to physically assaulting Halton" and, *270 from that admission, reasons that Burkert intended "the flyers to have the same effect as a fight."*994 B.

Burkert contends that the Appellate Division properly vacated his conviction, reasoning that "[u]nder the First Amendment, the State cannot prosecute an individual for publicly taunting another, even if done through crude language and with an intent to annoy." Burkert asserts that the speech on the flyers constituted an opinion and

cannot be criminalized by labeling it conduct. Burkert asks this Court to "reaffirm" that "the mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected."

C.

Amicus Pennsylvania Center for the First Amendment submits that the Appellate Division correctly reversed Burkert's conviction for the following reasons: (1) New Jersey jurisprudence has "applied the criminal harassment statute only to repeated communication to an unwilling listener, not speech about an unwilling listener"; (2) the flyers at issue conveyed words and pictures—traditional means of speech—and cannot be reclassified as conduct to evade the protections of the First Amendment; (3) the speech here did not fall into the category of speech integral to a criminal offense because the flyers were not ancillary to other conduct—rather, the expressions on the flyers were the only target of the prosecution; (4) speech does not lose its First Amendment protection, however vulgar the content, even when its purpose is simply to offend; and (5) Burkert's speech was no less deserving of constitutional protection because the matters addressed were personal rather than political.

D.

Amicus ACLU–NJ proposes that this Court adopt a "sensible construction" of the language "purpose to harass" in *271 N.J.S.A. 2C:33–4(c) that will keep the statute within constitutional bounds. The ACLU–NJ contends that a defendant's use of speech with the intent "to insult, embarrass or even humiliate" should not be sufficient to justify a harassment conviction under N.J.S.A. 2C:33–4(c), even though such conduct may trigger civil consequences, such as a private tort action or employment discipline. The ACLU–NJ suggests that we construe N.J.S.A. 2C:33–4(c) to require that a "defendant have the conscious object to cause in the victim the fear or apprehension of intrusion into the victim's safety, security, or seclusion." According to the ACLU–NJ, that interpretation is consistent with our case law and will make clear that the statute cannot criminalize "insulting and even vulgar communications" of the type in this case that are an inevitable part of the aggravations of daily existence.

III.

The issue before us is whether Burkert is guilty of harassment because, as he intended, the lewd flyers seriously annoyed Halton. In addressing that issue, we must determine whether the Legislature intended N.J.S.A. 2C:33–4(c) to criminalize the type of speech in this case.

To understand the meaning of N.J.S.A. 2C:33–4(c), we must look not only to the statutory language, but also to related provisions in surrounding statutes. State v. Crawley, 187 N.J. 440, 452, 901 A.2d 924 (2006) ("[W]e do not read [statutory words] in a vacuum, but rather 'in context with related provisions so as to give sense to the legislation as a whole.' " (quoting DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005) )). We begin with N.J.S.A. 2C:33–4, which provides:

[A] person commits a petty disorderly persons offense if, with purpose to harass another, he:

a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or



*272

> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

The statute distinguishes between "communications" and "language" that violate the statute in subsection (a), and "conduct" and "acts" that do so in subsection (c). Likewise, in surrounding statutes, the Legislature has clearly indicated when language and communication can be the basis for a criminal prosecution. The "disorderly conduct" statute targets "unreasonably loud and offensively coarse or abusive <u>language</u>" in a public place, N.J.S.A. 2C:33–2(b) (emphasis added), and the "cyber-harassment" statute targets certain online "<u>communication</u>[s]," N.J.S.A. 2C:33–4.1 (emphasis added). The Legislature has made clear when its primary objective is to classify speech as criminal in nature.

Although a "course of alarming conduct" or "repeatedly committed acts" can occur through communications and language alone, it is far from clear that the Legislature had in mind offensive speech as the object of N.J.S.A. 2C:33–4(c). This point comes into better focus by examining the Model Penal Code (MPC) Section 250.4, which is the source of N.J.S.A. 2C:33–4. <u>See</u> N.J.S.A. 2C:33–4 ; 1 <u>The New Jersey Penal Code: Final Report</u> § 2C:33–4 (Criminal Law Revision Comm'n 1971); <u>State v. Robinson</u>, 217 N.J. 594, 606, 92 A.3d 656 (2014) ("When a provision of the Code is modeled after the MPC, it is appropriate to consider the MPC and any commentary to interpret the intent of the statutory language.").

MPC Section 250.4, which is entitled "Harassment," provides:

> A person commits a petty misdemeanor if, with purpose to harass another, he:
>
> (1) makes a telephone call without purpose of legitimate communication; or
>
> (2) insults, taunts or challenges another in a manner likely to provoke violent or disorderly response; or
>
> (3) makes repeated communications anonymously or at extremely inconvenient hours, or in offensively coarse language; or
>
> (4) subjects another to an offensive touching; or
>
> (5) engages in any other course of alarming conduct serving no legitimate purpose of the actor.

Subsections (1) through (3) of MPC Section 250.4 correspond to N.J.S.A. 2C:33–4(a). The MPC Commentaries indicate that "[s]ubsections *273 (1) through (3) of [ MPC Section 250.4 ] proscribe harassment by communication." <u>Model Penal Code</u> (<u>MPC</u> ) § 250.4 cmt. 6 (Am. Law Inst. 1962). On the other hand, MPC Section 250.4(5), which directly corresponds to N.J.S.A. 2C:33–4(c), primarily prohibits "harassment by action rather than by communication," <u>ibid.</u>, and does not apply to harassment covered by the other subsections, <u>id.</u> § 250.4 cmt. 5. The MPC drafters provide three illustrations of conduct proscribed by subsection (5): "burning a cross on the lawn of a black family," "leaving animal carcasses on a neighbor's stoop," and "shining a spotlight into a parked car in order to embarrass or frighten the occupants." <u>Ibid.</u> Those examples suggest that subsection (5) focused on conduct intended to cause fright and threaten a person's *996 safety, security, or reasonable expectation of privacy.

Under subsection (5), the MPC drafters acknowledge a potential scenario "of harassing conduct [that] is so imbued with expressive content as to implicate first-amendment concerns." Id. § 250.4 cmt. 6. Nevertheless, the drafters believed that such concerns "would probably be excluded by the statutory requirements that the action serve no legitimate purpose of the actor and that there be a purpose to harass." Ibid.

Unlike MPC Section 250.4(5), N.J.S.A. 2C:33–4(c) allows for a harassment conviction based on conduct that "seriously annoys" another. As a consequence, N.J.S.A. 2C:33–4(c) criminalizes a much broader swath of conduct than the MPC. Additionally, unlike the MPC, N.J.S.A. 2C:33–4(c) does not limit prosecutions to expressive acts or conduct that have "no legitimate purpose." Overall, compared to our state harassment statute, MPC Section 250.4(5) is more narrowly drawn to insulate it from potential First Amendment concerns.

That the primary thrust of N.J.S.A. 2C:33–4(c) is not to interdict speech, but rather conduct, is reinforced in State v. Hoffman, 149 N.J. 564, 695 A.2d 236 (1997). In that case, we found that a defendant who ripped up a court support order and sent it to his estranged wife did not constitute harassment under *274 N.J.S.A. 2C:33–4(a). Id. at 584, 695 A.2d 236. In rendering that decision, we distinguished subsection (c) from subsection (a) of N.J.S.A. 2C:33–4. We explained that

> [t]he purpose of subsection (c) is to reach conduct not covered by subsections (a) and (b). For example, if a person were to ring a former companion's doorbell at 3:00 p.m. on Sunday, flash bright lights into her windows on Monday at 6:00 p.m., throw tomatoes into her front door on Tuesday at 6:30 p.m., throw eggs on her car on Wednesday, and repeat the same conduct over a two-week period, a judge could find that subsection (c) has been violated. We do not imply by that example that five or more episodes are required to establish a course of alarming conduct.
>
> [ Id. at 580–81, 695 A.2d 236.]

The example given in Hoffman indicates that the Court considered subsection (c)—which makes unlawful a "course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy"—as targeting harassment by action. Despite the Hoffman example, we do not doubt that, in certain clearly defined circumstances, speech can take the form of conduct and therefore be the appropriate focus of a subsection (c) prosecution. It is evident, however, that the Legislature was not homing in on speech in subsection (c).

In the cyber-harassment statute, N.J.S.A. 2C:33–4.1, which became effective in 2014, the Legislature made it a crime when a defendant, through an online electronic communication, "threatens to inflict injury or physical harm"; "threatens to commit any crime against [a] person or [a] person's property"; or knowingly sends lewd or obscene material with the "intent to emotionally harm a reasonable person." The cyber-harassment statute limits the criminalization of speech mostly to those communications that threaten to cause physical or emotional harm or damage. The cyber-harassment statute's precise and exacting standard thus stands in contrast to the more loosely worded language of N.J.S.A. 2C:33–4(c).

One further observation. At the time the Legislature passed the New Jersey Code of Criminal Justice, N.J.S.A. 2C:1–1 to 104–9, it repealed New Jersey's last criminal libel statute, N.J.S.A. 2A:120–1. L. 1978, c. 95, § 2C:98–2 (eff. Sept. 1, 1979). In doing so, the Legislature signaled that the criminal law would not be used as a *997 *275 weapon against defamatory remarks, thereby aligning our new criminal code with the Model Penal Code.

The MPC Commentaries reveal that a criminal libel provision was not included in the MPC because "penal sanctions cannot be justified merely by the fact that defamation is evil or damaging to a person in ways that entitle him to maintain a civil suit." Model Penal Code (MPC Tentative Draft ) § 250.7 cmt. 2 (Am. Law Inst., Tentative Draft No. 13, 1961). Criminal laws are usually reserved "for harmful behavior which exceptionally disturbs the community's sense of security," not for "personal calumny." State v. Browne, 86 N.J. Super. 217, 228, 206 A.2d 591 (App. Div. 1965) (quoting MPC Tentative Draft § 250.7 cmt. 2).[8]

> [8] Defamatory speech that is protected from criminal prosecution may nonetheless be subject to a civil action and damages. New Jersey, like many other states, has made tort remedies available to those who suffer such affronts. See, e.g., Senna v. Florimont, 196 N.J. 469, 958 A.2d 427 (2008).

Accordingly, the Legislature framed the New Jersey Code of Criminal Justice with a conscious deference to the right of free expression. We now turn to the constitutional constraints placed on overly broad criminal statutes that threaten the right to free speech.

IV.

A.

The First Amendment protects "freedom of speech," U.S. Const. amend. I., as does Article I, Paragraph 6 of the New Jersey Constitution, which states that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right."

Laws may "not transgress the boundaries fixed by the Constitution for freedom of expression." Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 92 L.Ed. 840 (1948). Accordingly, "the scrutiny to be accorded legislation that trenches upon first amendment *276 liberties must be especially scrupulous." State v. Cameron, 100 N.J. 586, 592, 498 A.2d 1217 (1985). The constitutional guarantee of free speech, moreover, imposes higher "standards of certainty" on criminal laws than civil laws. Winters, 333 U.S. at 515, 68 S.Ct. 665. "Penal laws ... are subjected to sharper scrutiny and given more exacting and critical assessment under the vagueness doctrine than civil enactments." Cameron, 100 N.J. at 592, 498 A. 2d 1217.

Criminal laws touching on speech must give fair notice of where the line is set between what is permissible and proscribed and must be drawn "with appropriate definiteness." Winters, 333 U.S. at 515, 68 S.Ct. 665 (quoting Pierce v. United States, 314 U.S. 306, 311, 62 S.Ct. 237, 86 L.Ed. 226 (1941) ); accord Cantwell v. Connecticut, 310 U.S. 296, 304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Vague and overly broad laws criminalizing speech have the potential to chill permissible speech, causing speakers to silence themselves rather than utter words that may be subject to penal sanctions. Reno v. ACLU, 521 U.S. 844, 871–72, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ; NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Such laws also give government authorities undue prosecutorial discretion, thus increasing "the risk of discriminatory enforcement." See Reno, 521 U.S. at 872, 117 S.Ct. 2329 (citing Denver Area Educ. Telcomms. Consortium v. FCC, 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) ).

"A court can invalidate a statute that is substantially overbroad on its face" if "the statute 'reaches a substantial amount of constitutionally protected conduct.' " *998 State v. Mortimer, 135 N.J. 517, 530, 641 A.2d 257 (1994) (quoting Houston v. Hill, 482 U.S. 451, 458–59, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) ). Such a drastic remedy, however, is not the only—and not even the preferred—approach. State Chamber of Commerce v. Election Law Enf't Comm'n, 82 N.J. 57, 81, 411 A.2d 168 (1980) (holding that "narrow and discriminate construction of the key terms of the legislation serves to overcome its major overbreadth objections" and is done "to salvage the Legislature's own product"). When a *277 statute's constitutionality is subject to doubt

because of ambiguity in its wording, we proceed under "the assumption that the legislature intended to act in a constitutional manner." State v. Johnson, 166 N.J. 523, 540–41, 766 A.2d 1126 (2001) (quoting Right to Choose v. Byrne, 91 N.J. 287, 311, 450 A.2d 925 (1982) ). Provided that a statute is "reasonably susceptible" to an interpretation that will render it constitutional, we must construe the statute to conform to the Constitution, thus removing any doubt about its validity. State v. Profaci, 56 N.J. 346, 350, 266 A.2d 579 (1970) ; see also State Bd. of Higher Educ. v. Bd. of Dirs. of Shelton Coll., 90 N.J. 470, 478, 448 A.2d 988 (1982).

In short, we must construe a statute that criminalizes expressive activity narrowly to avoid any conflict with the constitutional right to free speech. For example, in State v. Rosenfeld, this Court affirmed the overturning of the defendant's conviction under N.J.S.A. 2A:170–29(1) for using foul language (the words "Mother F ing") in a school auditorium during a municipal discussion on racism. 62 N.J. 594, 603–04, 303 A. 2d 889 (1973). N.J.S.A. 2A:170–29(1) —a predecessor statute to N.J.S.A. 2C:33–2 and -4—made it an offense for a person to "utter[ ] loud and offensive or profane or indecent language in any ... place to which the public is invited." The Court noted, "the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us." Rosenfeld, 62 N.J. at 603, 303 A.2d 889 (quoting Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) ). The Court constrained the broadly worded statute so that it only "prohibits indecent language which is spoken loudly in a public place and is of such nature as to be likely to incite the hearer to an immediate breach of the peace." Ibid. (emphasis added).

In rendering its decision, the Rosenfeld Court cited extensively to Gooding v. Wilson, in which the United States Supreme Court vacated the conviction of a defendant who violated a Georgia misdemeanor statute that prohibited the use of "opprobrious words or abusive language, tending to cause a breach of the *278 peace." Rosenfeld, 62 N.J. at 600, 303 A.2d 889 (quoting Gooding v. Wilson, 405 U.S. 518, 519, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) ). The United States Supreme Court found the statute unconstitutionally overbroad because the statute made it a misdemeanor "merely to speak words offensive to some who hear them." Ibid. (quoting Gooding, 405 U.S. at 527, 92 S.Ct. 1103 ).

Significantly, this Court has construed the language in subsection (a) of N.J.S.A. 2C:33–4 —which proscribes communications made in any "manner likely to cause annoyance or alarm"—as encompassing, "for constitutional reasons, only those modes of communicative harassment that 'are also invasive of the recipient's privacy,' " Cesare v. Cesare, 154 N.J. 394, 404, 713 A.2d 390 (1998) (quoting Hoffman, 149 N.J. at 583, 695 A.2d 236 ), and that constitute threats to safety, see id. at 414–15, 713 A.2d 390. In that vein, our courts have upheld harassment convictions pursuant to N.J.S.A. 2C:33–4(a) where a defendant scrawled racially offensive graffiti on a victim's home, Mortimer, 135 N.J. 517, 641 A.2d 257, made persistent unwanted telephone *999 calls, which included a racial slur, to the victim's workplace, State v. Fin. Am. Corp., 182 N.J. Super. 33, 440 A.2d 28 (App. Div. 1981), and repeatedly knocked on the door and rang the doorbell of a home in which the defendant's physically abused wife had sought shelter, State v. Reyes, 172 N.J. 154, 796 A.2d 879 (2002).

B.

How courts in other states have addressed harassment statutes is also instructive.

In People v. Norman, the Colorado Supreme Court declared the state's harassment statute unconstitutional due to vagueness. 703 P.2d 1261, 1267 (Colo. 1985). Colo. Rev. Stat. Section 18–9–111(1)(d) (1978) (repealed, H.B. 90–1118, 57th Gen. Assemb., 2d Reg. Sess. (Colo. 1990))—like N.J.S.A. 2C:33–4(c) —provided that a person commits the crime of harassment if, "with intent to harass, annoy, or alarm another person," he "engages in conduct or repeatedly commits acts that alarm or seriously annoy another *279 person and that serve no legitimate purpose." The Colorado high court found the statute constitutionally infirm on due process grounds

because it provided no limiting standards "to assist citizens, courts, judges or police personnel to define what conduct is prohibited and, conversely, what conduct is permitted" and gave prosecutors "unfettered" discretion. Norman, 703 P.2d at 1267.

Norman followed an earlier Colorado Supreme Court decision that struck down a subsection of Colorado's harassment statute similar to N.J.S.A. 2C:33–4(a). Bolles v. People, 189 Colo. 394, 541 P.2d 80, 84 (1975). The court found that the statute was impermissibly overbroad and impinged on free-speech rights. Ibid. The court determined that the terms "annoy" and "alarm" were so vague that even innocuous comments about noteworthy but unpleasant topics might subject a person to criminal prosecution. Id. at 82–83.

Likewise, the United States Court of Appeals for the Fifth Circuit struck down on vagueness grounds a Texas harassment statute similar to N.J.S.A. 2C:33–4(a). Kramer v. Price, 712 F.2d 174, 178 (5th Cir. 1983). The Fifth Circuit found that the absence of clear enforcement guidelines gave prosecutors "unbounded discretion" and subjected the exercise of First Amendment rights to an "unascertainable standard." Ibid.

In People v. Dietze, the New York Court of Appeals declared a subsection of New York's harassment statute, N.Y. Penal Law § 240.25(2) (1988) (current version at N.Y. Penal Law § 240.26 ), overbroad and therefore unconstitutional because of its potential infringement on free-speech rights. 75 N.Y.2d 47, 550 N.Y.S.2d 595, 549 N.E.2d 1166, 1167 (1989). N.Y. Penal Law Section 240.25(2) stated: "A person is guilty of harassment when, with intent to harass, annoy or alarm another person ... [i]n a public place, he uses abusive or obscene language, or makes an obscene gesture." In overturning subsection (2), the Court of Appeals cautioned that "any proscription of pure speech must be sharply limited to words which, by their utterance alone, inflict injury or *280 tend naturally to evoke immediate violence or other breach of the peace." Dietze, 550 N.Y.S.2d 595, 549 N.E.2d at 1168.

Those cases reinforce the notion that harassment statutes must be written with sufficient precision to ensure that protected speech does not fall within the realm of a potential criminal prosecution and to give fair notice of where free speech ends and criminal conduct begins.

V.

A.

We conclude that the vaguely and broadly worded standard in *1000 N.J.S.A. 2C:33–4(c) does not put a reasonable person on sufficient notice of the kinds of speech that the statute proscribes. The statute's vagueness also gives prosecuting authorities undue discretion to bring charges related to permissive expressive activities. That, in turn, means that the statute—if not more narrowly defined—has the capacity to chill permissible speech.

Although patterned after the MPC, N.J.S.A. 2C:33–4(c) is more broadly written than its MPC counterpart and therefore more likely to impinge on protected expressive activities. Whereas N.J.S.A. 2C:33–4(c) permits the conviction of a person who acts with the purpose to "seriously annoy" another person, under the corresponding MPC provision a conviction may be premised only on "alarming conduct." Unlike its MPC counterpart, N.J.S.A. 2C:33–4(c) is not restricted to conduct that serves "no legitimate purpose of the actor." See N.J.S.A. 2C:33–4(c).

The circularity of the language of N.J.S.A. 2C:33–4, moreover, does not place limits on the statute. Under N.J.S.A. 2C:33–4, an accused may not be convicted unless he acts "with the purpose to harass." However, one common definition of harass is to annoy. See Black's Law Dictionary 784 (9th ed. 2009); Webster's Third New

International Dictionary 1031 (1981). Accordingly, the words "harass" and "annoy" are interchangeable. By that reckoning, under subsection (c), a person who, with the purpose to seriously *281 annoy another, does seriously annoy another is guilty of harassment.

Speech, however, cannot be transformed into criminal conduct merely because it annoys, disturbs, or arouses contempt. See Houston, 482 U.S. at 461, 107 S.Ct. 2502 (stating that speech cannot be punished unless it is "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest" (quoting Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) )); cf. Snyder v. Phelps, 562 U.S. 443, 458, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). "There is no categorical 'harassment exception' to the First Amendment's free speech clause." Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 204 (3d Cir. 2001).

The First Amendment protects offensive discourse, hateful ideas, and crude language because freedom of expression needs breathing room and in the long run leads to a more enlightened society. See Terminiello, 337 U.S. at 4, 69 S.Ct. 894. Outside of the category of obscenity, courts should not play the role of censor by engaging in a weighing of an expression's value or "relative social costs and benefits." United States v. Stevens, 559 U.S. 460, 470, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) ; see also Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 792–93, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011). Speech cannot be criminalized merely because others see no value in it. "The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." R.A.V. v. St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (citations omitted).

Nonetheless, neither the First Amendment nor Article I, Paragraph 6 of our State Constitution prohibits the State from criminalizing certain limited categories of speech, such as speech that is integral to criminal conduct, speech that physically threatens or terrorizes another, or speech that is intended to incite imminent unlawful conduct. See *282 United States v. Alvarez, 567 U.S. 709, 717, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012) ; cf. Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 264, 716 A.2d 1137 (1998). For example, a robber's command that a victim turn over *1001 money is unprotected speech because the expressive activity is integral to the commission of a crime. Likewise, laws that punish threats of physical harm are constitutional because the State has a strong interest in "protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." R.A.V., 505 U.S. at 388, 112 S.Ct. 2538 ; see also United States v. Turner, 720 F.3d 411, 420–21 (2d Cir. 2013) (holding that defendant's threatening statements to judges, despite political content, were not protected by First Amendment).

The First Amendment also does not bar states from enacting laws that punish expressive activity when "substantial privacy interests are being invaded in an essentially intolerable manner." See Cohen, 403 U.S. at 21, 91 S.Ct. 1780. Although the "presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense," the government, for example, may "prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue." Ibid. A speaker using a bullhorn in a town square may voice objectionable ideas to passing members of the public who are seemingly a captive audience without offending the First Amendment, but the Constitution will not protect the speaker with a bullhorn bellowing outside a home in the early morning hours. See Frisby v. Schultz, 487 U.S. 474, 484, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (noting that although "[o]ne important aspect of residential privacy is protection of the unwilling listener," " 'we are often "captives" outside the sanctuary of the home and subject to objectionable speech' " (quoting Rowan v. Post Office Dep't, 397 U.S. 728, 738, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) )).

In Hoffman, we determined that the catchall language of N.J.S.A. 2C:33–4(a) —"any other manner likely to cause annoyance *283 or alarm"—was intended to "encompass only those types of communications that also are invasive of the recipient's privacy," a purpose that would not run amiss of any constitutional proscription. See 149 N.J. at 583–84, 695 A.2d 236. According to another court, the constitutional right to free expression does not protect one who "repeatedly invade[s]" another person's reasonable expectation of privacy "through the use of acts and threats that evidence a pattern of harassment designed to inflict substantial emotional distress." People v. Borrelli, 77 Cal.App.4th 703, 91 Cal.Rptr.2d 851, 859–60 (2000).

Recognizing that the First Amendment and Article I, Paragraph 6 of our State Constitution allow the State to punish threatening speech or speech that invades a person's reasonable expectation of privacy in an intolerable manner informs our analysis in construing the broad language of N.J.S.A. 2C:33–4(c) within constitutional bounds.

B.

Unlike some of our sister jurisdictions that have struck down overly broad and vague harassment statutes, our approach is to conform subsection (c) of N.J.S.A. 2C:33–4"to the Constitution in a way that the Legislature would have intended." See State v. Natale, 184 N.J. 458, 485–86, 878 A.2d 724 (2005). In adopting N.J.S.A. 2C:33–4(c), which was patterned after its MPC counterpart, the Legislature's apparent intent was to address harassment by action rather than communication. See MPC § 250.4 cmt. 6. We cannot say that the Legislature intended to criminalize speech that poses no threat to a person's safety or security or speech that does not *1002 intolerably interfere with a person's reasonable expectation of privacy. We have come to that conclusion by comparing subsection (c) of N.J.S.A. 2C:33–4 to subsection (a), to N.J.S.A. 2C:33–2, and to the cyber-harassment statute; by our analysis of the MPC Commentaries; and by our review of case law, including the example given in Hoffman of conduct proscribed by subsection (c). We also find the limitations that we have placed on the catch-all *284 provision of subsection (a) instructive. See Cesare, 154 N.J. at 404, 414–15, 713 A.2d 390 ; Hoffman, 149 N.J. at 583, 695 A.2d 236.

The constraint we place on the overbroad language of subsection (c) is compelled by the principles animating our free-speech guarantees. We now return to the specific language of the statute at issue.

C.

N.J.S.A. 2C:33–4 provides:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, he:
>
> ...
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

In cases based on pure expressive activity, the amorphous terms "alarming conduct" and "acts with purpose to alarm or seriously annoy" must be defined in more concrete terms consonant with the dictates of the free-speech clauses of our Federal and State Constitutions. Narrowly reading the terms alarm and annoy—as we have done in past cases involving subsection (a) of N.J.S.A. 2C:33–4 —will save the statute from constitutional infirmity. See Cesare, 154 N.J. at 404, 713 A.2d 390 (stating that "provision in N.J.S.A. 2C:33–4(a) prohibiting conduct communicated in any manner likely to cause annoyance or alarm encompasses, for constitutional

reasons, only those modes of communicative harassment that 'are also invasive of the recipient's privacy' " (quoting Hoffman, 149 N.J. at 583, 695 A.2d 236 )). We believe the Legislature would prefer a subsection (c) prohibiting verbal harassment that conforms to the First Amendment than no such provision at all.

Therefore, for constitutional reasons, we will construe the terms "any other course of alarming conduct" and "acts with purpose to alarm or seriously annoy" as repeated communications directed at a person that reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable *285 expectation of privacy. Of course, the Legislature may decide to amend subsection (c) with other language that conforms to the requirements of our free-speech clauses.

To be clear, the standard set forth above applies only in those cases where the alleged harassing conduct is based on pure expressive activity. Under that standard, repeated threats or menacing communications that reasonably place a person in fear for his safety or security are not protected expressive activities. Likewise, a person who repeatedly makes unwanted communications to a subject, thereby intolerably interfering with his reasonable expectation of privacy, will not find shelter behind the First Amendment. Thus, a person who every day, over the course of a week, either repeatedly yells outside an ex-partner's house during the night, or repeatedly follows closely next to a woman importuning her for a date or making other unwanted comments, despite constant demands to stop, would violate subsection (c).

Subsection (c) was never intended to protect against the common stresses, shocks, and insults of life that come from exposure to crude remarks and offensive *1003 expressions, teasing and rumor mongering, and general inappropriate behavior. The aim of subsection (c) is not to enforce a code of civil behavior or proper manners.

The prosecution in this case targeted purely expressive activity and therefore we apply the heightened standard of subsection (c) set forth above.

VI.

We recognize that neither the municipal court nor Law Division judge who sat in this case had the benefit of the standard developed in this opinion. They applied the statute as written. Although in other circumstances a remand might be appropriate, we see no point here because even the most indulgent view of the record favoring the State would not support a harassment conviction under N.J.S.A. 2C:33–4(c).*286 First, we note that, based on the issuance of separate summonses, Burkert was charged with and convicted of committing acts of harassment on discrete dates, January 8 and 11, 2011. However, a conviction under N.J.S.A. 2C:33–4(c) requires the finding of a "course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy." Neither the municipal court nor Law Division judge specifically found that Burkert engaged in a course of conduct or repeatedly committed acts.

The record soundly supports the municipal court's finding that Burkert circulated the flyers in the correctional facility's garage on January 8. Although the municipal court found that Burkert distributed the flyers discovered in the locker room on January 11, no testimony was offered that Burkert worked on that date.

The record unquestionably supports the finding of the municipal court—echoed by the Law Division—that the bubble dialogue Burkert scribbled on Halton's wedding photograph was "lewd and obnoxious" and seriously annoyed Halton as it would have any reasonable person. Burkert clearly intended to seriously annoy Halton because he believed that Halton's wife had insulted Burkert and members of his family on an internet website. The issue is not whether Burkert's expressive activity—placing offensive dialogue on Halton's wedding photograph and then circulating the flyers—was boorish, crude, utterly unprofessional, and hurtful. Of that there can be no doubt. Within a workplace setting, such conduct was grossly inappropriate.

However, our task here is to determine whether Burkert violated a criminal statute. Even assuming that the circulation of the flyers constituted a course of conduct or repetitive acts, the State did not present sufficient evidence to support a conviction under N.J.S.A. 2C:33–4(c). The flyers were intended to and did humiliate Halton. The flyers, however, did not threaten or menace him. Nothing in the record suggests that Halton's safety or security were put at risk by the flyers, or that any inmates got ahold of them.*287 The record, moreover, does not establish that Burkert had repeated unwanted communications with Halton. Burkert's only direct interaction with Halton concerning the flyers occurred on January 8. The rude and loutish dialogue on the flyers obliquely referred to a matter apparently of common knowledge among many corrections officers—that Halton's former wife allegedly had relations with a corrections officer and inmate. Although Burkert displayed appalling insensitivity, he did not engage in repeated unwanted communications with Halton that intolerably interfered with his reasonable expectation of privacy.

The facts in this case—even when viewed in the light most favorable to the State—do not satisfy the elements necessary for a subsection (c) violation of the harassment statute.*1004 Having come to that conclusion does not foreclose other potential remedies or sanctions for the behavior at issue in this case. Indeed, workplace discipline was imposed on Burkert, and Halton filed a civil action.

VII.

For the reasons stated, we affirm the judgment of the Appellate Division, which dismissed the harassment charges.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ–VINA, and TIMPONE join in JUSTICE ALBIN's opinion. JUSTICE SOLOMON filed a separate opinion, dissenting in part.

Justice Solomon, concurring in part and dissenting in part.

I agree with the majority's conclusion that N.J.S.A. 2C:33–4(c) (harassment statute) required clarification because subsection (c)'s language is impermissibly vague when viewed through the lens of First Amendment free speech protections. However, even under the majority's clarification of the statutory requirements for subsection (c), I find that defendant Burkert's conduct violates the harassment statute. Thus, I respectfully dissent as to the majority's *288 conclusion that Burkert escapes prosecution under the Court's clarification of N.J.S.A. 2C:33–4(c)'s statutory requirements.

Preliminarily, as a reviewing court, we cannot "disturb the factual findings ... of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). "However, legal issues are subject to de novo review; the appellate court owes no deference to legal conclusions drawn by the trial court." H.S.P. v. J.K., 223 N.J. 196, 215, 121 A.3d 849 (2015) (citing M.S. v. Millburn Police Dep't, 197 N.J. 236, 246 n.10, 962 A.2d 515 (2008) ). Here, Burkert admitted under oath that he created, posted, and personally handed the offensive flyers to Halton. The trial court found that Burkert circulated the flyers in the parking garage of the correctional facility and in the employee locker room. Burkert further admitted under oath that he created and posted these flyers only "as payback for what [Halton] did to [Burkert's] family." As the majority concedes, "Burkert clearly intended to seriously annoy Halton." Ante at 286, 174 A.3d at 1003.

Burkert's conduct conflicts with the majority's enunciated requirements of subsection (c)(1)—"constru[ing] the terms 'any other course of alarming conduct' and 'acts with purpose to alarm or seriously annoy' as any repeated communications directed at a person that reasonably puts that person in fear for his safety or security."

The flyers were copied and posted in the men's locker room and in the employee parking lot of Halton's place of employment, the Union County Jail, where Halton worked as a sergeant. As a sergeant, Halton had frequent contact with inmates and held a position of authority over other correctional officers. Moreover, Burkert knew Halton's position and duties within the jail because they worked together for twenty years. Thus, Burkert knew that Halton's safety could reasonably be threatened by posting the *289 flyers within the jail where co-workers and inmates could easily see them.

The content of the flyers, see ante at 265, 174 A.3d at 991, was such as to inspire mockery and potential disobedience by inmates. Halton testified that the flyers made him fearful because inmates might have seen or redistributed the flyers. Halton testified that "inmates clean [the locker room] ... [s]o I was afraid that an *1005 inmate got a hold of it ... part of my anxiety [was] that they got a hold of it and they were showing it to all the inmates in the jail and that my authority was going to be undermined." Halton also testified that he felt the flyers undermined his authority with co-workers as well, which led him to fear that his safety at the jail was in jeopardy. As this Court stated in Cesare v. Cesare, although "courts should not consider the victim's actual fear, courts must still consider a plaintiff's individual circumstances and background in determining whether a reasonable person in that situation would have" felt fearful. 154 N.J. 394, 403, 713 A.2d 390 (1998). Here, it was reasonable to find that Halton feared for his safety considering he worked in a position of authority in a county jail where Burkert distributed the two profane flyers.

I now turn to the majority's contention that the flyers were not "repeated communications." New Jersey jurisprudence has scant instruction on the boundaries of what constitutes "repeated" conduct in the context of harassment. What instruction is available points toward a broad definition of "repeated communications." See N.J.S.A. 2C:12–10(a)(2) (defining "[r]epeatedly" as conduct "on two or more occasions" in the context of stalking); Webster's Second New College Dictionary 939 (2d ed. 2001) (defining "repeat" as "[t]o do or say something again"). Therefore, "repeated" conduct, as generally understood by a person of ordinary intelligence, is conduct done more than once. See State v. Goodwin, 224 N.J. 102, 112, 129 A.3d 316 (2016) (noting that, in construing statutes, courts "ascribe to the statutory words their ordinary meaning and significance" and view those words in context (quoting State v. Crawley, 187 N.J. 440, 452, 901 A.2d 924 (2006) )).*290 Although the majority does not directly cite to State v. Hoffman, 149 N.J. 564, 695 A.2d 236 (1997), to support a narrow construction of "repeatedly," Hoffman must be distinguished to avoid confusion. In Hoffman, this Court did not come to its holding based on the number of mailings (two) the defendant sent to the victim. 149 N.J. at 583, 695 A.2d 236. Rather the Court found the two mailings were insufficient to run afoul of N.J.S.A. 2C:33–4(a) because the mailings "were not sent anonymously, or at an extremely inconvenient hour, or in offensively coarse language"—thus, the mailings did not invade the victim's privacy. Ibid.

However, as noted by the majority, N.J.S.A. 2C:33–4(c) was modeled after Model Penal Code (MPC ) Section 250.4(5). See State v. Robinson, 217 N.J. 594, 606, 92 A.3d 656 (2014). The comments to MPC Section 250.4(5) provide three illustrations of conduct that would fall within the subsection and be considered harassment. MPC § 250.4 cmt. 5 (Am. Law Inst. 1980). The illustrations include "burning a cross on the lawn of a black family," "leaving animal carcasses on a neighbor's stoop," and "shining a spotlight into a parked car in order to embarrass or frighten the occupants." Ibid. Using the majority's logic in this case, the MPC illustrations would not be harassment if the perpetrator did not directly interact with the black family regarding


casetext

the cross burning or if the spotlight shone into the car illuminated conduct that was "common knowledge" to some of the community. The majority's interpretation adds unreasonable and illogical requirements to "repeated communication" under N.J.S.A. 2C:33–4(c).

Burkert's conduct also conflicts with the majority's new requirements for subsection (2)—"repeatedly makes unwanted communications to a subject that intolerably interfere with that person's reasonable expectation of privacy." New Jersey recognizes a limited right to privacy in the workplace. See *1006 Stengart v. Loving Care Agency, Inc., 201 N.J. 300, 322, 990 A.2d 650 (2010) (finding plaintiff had reasonable expectation of privacy in "e-mails ... exchanged with her attorney on her personal, password-protected, *291 web-based e-mail account, accessed on a company laptop"); Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 102, 609 A.2d 11 (1992) (finding employer's safety concerns could override employee's right to privacy in mandating drug testing in workplace); Bresocnik v. Gallegos, 367 N.J. Super. 178, 183, 842 A.2d 276 (App. Div. 2004) (finding "a single hand-delivered letter to a work place does not illegally invade privacy").

New Jersey also recognizes the common law tort of intrusion upon seclusion. Hennessey, 129 N.J. at 94, 609 A.2d 11. Although that tort is not at issue here, its elements are instructive and are as follows: an "intentional[ ] intru[sion], physical[ ] or otherwise, upon the solitude or seclusion of another or his private affairs or concerns ... if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts, § 652B (Am. Law Inst. 1977). Because New Jersey case law regarding privacy in the workplace focuses on the limits of illegal searches, intrusion upon seclusion is an illustrative parallel to this case.

I believe that, under New Jersey jurisprudence, it is clear that Halton had a reasonable expectation of privacy in his personal relationship with his wife. Included in that expectation of privacy is the expectation that his personal life would not be brought into his place of employment for all of his co-workers, and possibly inmates, to see, discuss, and ridicule. Furthermore, unlike cases that have balanced an employer or the public's interest against the employee's interest in privacy, the employer in this case does not have a competing interest. The flyers in this case served no overarching purpose or interest other than to harass Halton.

Thus, following subsection (2), Burkert's conduct constitutes the criminal act of harassment. The communications found in the flyers were "unwanted" by Halton. The communications were repeated, as previously discussed. And the communications "intolerably interfere[d] with [Halton's] reasonable expectation of privacy."*292 It is clear to me that Burkert's conduct falls squarely within the prohibited conduct of N.J.S.A. 2C:33–4(c) as interpreted by the majority. Therefore, I respectfully dissent.

 casetext

In *Lopez*, the defendant engaged in a years-long campaign of letters, emails, packages, and in-person visits to the victim, all with inappropriate and unwanted romantic overtones. (*People v. Lopez*, *supra*, 240 Cal.App.4th at pp. 438-445.) Affirming the stalking conviction, the court held an invitation for the victim to meet the defendant for "cleansing or healing *11 ceremonies at the labyrinth, dressed in white, conjured images of undefined rituals that would be understood by a reasonable person" as ominous in light of persistent, unwanted contacts. (*Id.* at pp. 453-455.) This is unlike Peterson's two references to the children, neither of which conveyed an inappropriate or threatening undertone.

Similarly inapt is *Pineda*, which involved a defendant who repeatedly called another inmate "a rat" and incited other inmates to join him in chanting" 'Benji is a rat.'" (*People v. Pineda*, *supra*, 13 Cal.5th at pp. 248249.) Given that it is well understood snitches are" 'widely reviled within the correctional system,'" *Pineda* held that even though the defendant did not expressly declare that he or someone else would harm Benji," 'rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render [threat statutes] powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat.'" (*Id.* at p. 249.) No such threats - veiled or otherwise - can be found here.

Also instructive is *U.S. v. Lincoln* (9th Cir. 2005) 403 F.3d 703. There, the imprisoned defendant attempted to send a letter to the President stating he would die soon because" 'they'" promised he would, apparently referring to followers of Osama Bin Laden. (*Id.* at pp. 705-706.) The Ninth Circuit held it was unconstitutional to convict the defendant of threatening the President because the letter was not a "true threat." (*Id.* at p. 706.) The court relied on the absence of a literal threat in the letter, reasoning it "does not connote anything that it does not literally say. To the contrary, it literally says what it means, that President Bush will die because 'they' said he will. The fact that [defendant] stated six months earlier that he planned *12 to shoot the President does not give new meaning to [defendant's] statement that Bin Laden or Al Qaeda will kill the President." (*Id.* at p. 707.) Similarly, in determining whether Peterson's letter and check constituted a true threat, we look at what those documents literally said - which was that politicians were corrupt. The Attorney General's "subtext" argument lacks evidentiary or even circumstantial support.

Having independently examined the record, we conclude Peterson's speech acts were constitutionally protected activities; thus, there is insufficient evidence his conduct violated section 649.9, and we reverse his conviction. In light of our conclusion, we need not address Peterson's other claims. We note, however, that Peterson also argues the trial court prejudicially erred in responding to a jury question during deliberations, and the Attorney General agrees and concedes reversal is required.[4]

> [4] The jury asked, "Does a credible threat to one's safety have to only be a physical threat, or can it be nonphysical in nature as well?" Ultimately, the trial court referred the jury to the given CALCRIM No. 1301 instruction on stalking and further explained a" 'credible threat' can be explicit or implied. It includes a threat of causing an injury or some harm to the person, or the immediate family of the named victim." The Attorney General acknowledges it "is reasonably likely that the jury understood" the court's answer as sweeping in conduct that does not constitute a true threat.

## DISPOSITION

The judgment is reversed. *13

WE CONCUR: Tucher, P. J. Fujisaki, J.

M Gmail

Kailin Wang <kailinwang121314@gmail.com>

## This Case does a Very Good Analysis of Criminal v. Constitutional Speech

3 messages

**Kailin Wang** <kailinwang121314@gmail.com>                    Sun, Dec 5, 2021 at 6:16 PM
To: "Wolf, Lilah (PDR)" <lilah.wolf@sfgov.org>, Debbie Hill <debbieh@utcpd.com>, Thomas Johnson <johnsonfamily7@msn.com>, Shuer <Yunlong88cong@gmail.com>

This case does a thorough analysis of my favorite case *USA v. Cassidy.* Excellent, as we will be dealing with the same elements in our case/ context is everything, there are no threats, there are no direct messages.

*United States v. Cook,* 472 F. Supp. 3d 326, 331-32 (N.D. Miss. 2020) ("In essence, Ackell had actual contact with the victim, and sent threats directly to her numerous times. Indeed, Ackell was engaged in repeated <u>conduct</u> that was threatening to a victim and was prosecuted for the <u>acts of directly threatening the victim</u>. In the case before us today, the government has not alleged that Cook ever directly contacted any of the subjects of his Facebook posts. Rather, Cook is being prosecuted solely on the <u>content of his public posts</u> – not the <u>act of posting</u>.")

*United States v. Cook,* 472 F. Supp. 3d 326, 332 (N.D. Miss. 2020) ("Indeed, "the First Amendment protects speech even when the subject or manner of expression is uncomfortable and challenges conventional religious beliefs, political attitudes or standards of good taste." *United States v. Cassidy* , 814 F.Supp.2d 574, 582 (D. Md. 2011) ; citing *United States v. Stevens* , 559 U.S. 460, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). Further, the Supreme Court has "consistently classified emotionally distressing or outrageous speech as protected, especially where that speech touches on matters of political, religious or public concern. This is because 'in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide "adequate breathing space" to the freedoms protected by the First Amendment.' " *Id.*")

*United States v. Cook,* 472 F. Supp. 3d 326, 332 (N.D. Miss. 2020) ("Even though numerous court decisions have been published protecting uncomfortable speech posted on the internet, not all speech is protected. Indeed, "there are certain 'well-defined and narrowly limited classes of speech' that remain unprotected by the First Amendment." *United States v. Cassidy* , 814 F.Supp.2d 574, 582 (D. Md. 2011). The narrowly limited unprotected classes of speech include (a) obscenity, (b) defamation, (c) fraud, (d) incitement, (e) true threats, and (f) speech integral to criminal conduct. ")

*United States v. Cook,* 472 F. Supp. 3d 326, 334 (N.D. Miss. 2020) ("Additionally, the email "did not threaten bodily harm to any particular individual." Even though the email was sent directly to a court employee with a message for Judge Brown, O'Dwyer never identified any individual whom he intended to harm. Further, the Fifth Circuit took into consideration that O'Dwyer had a documented history of using coarse and hyperbolic language in prior court proceedings. As such, O'Dwyer's email was not found to be a true threat, and the Fifth Circuit affirmed the dismissal of the indictment.")

*United States v. Cook,* 472 F. Supp. 3d 326, 334-36 (N.D. Miss. 2020) ("Certain common threads weave through all of the Fifth Circuit cases in which a true threat was found; first, the

threat specifically identified a target; second, the threat was specific enough as to place, time or method to take the threat seriously; and finally, the threat was made directly to the intended target or to a third party. None of these cases discuss what we shall call a "bulletin board threat." Cook's Facebook posts are not "true threats" precluding him from First Amendment protection. Cook's posts, when read in context, lack entirely the specificity required to bring them under the umbrella of a true threat. Nowhere in any post does Cook explicitly state that he plans to physically harm Lepicier, or any other named public official." God willing I'm going to take them out" is not the same as telling an FBI agent you have a pistol and you will use it to kill the president or repeatedly and directly telling another person in a chat room that you were going to kill the students in your high school while making references to one of the Columbine shooters. See respectively, *United States v. Howell* , 719 F.2d 1258 (1983) ; *U.S. v. Morales* , 272 F.3d 284, 287 (5th Cir. 2001). In fact, in this Court's view, Cook's posts were even less severe than the one made in *O'Dwyer* , in that O'Dwyer emailed a court staffer directly, and specifically made mention of "homicide" and security breaches at the court's address which would provide opportunity. This Court finds that Cook's statement "And God willing I'm going to take them out. With or without the help of the people ..." is even more vague than the references O'Dwyer made using the word "homicide." Cook's phrase, when read with the succeeding sentence regarding the help of the people, could be interpreted to mean that he wishes to "take them out" of office or their positions of power based on the context of the entire post being about the "fraudulent indictment scheme" or "BUFI" that Cook seemingly is warning the public about. When read in context, Cook's posts are nothing more than a manifesto of his grievances regarding people and processes which he perceived to have wronged him; they do not rise to the level of true threats. Additionally, none of the Fifth Circuit cases discuss a situation in which a person's information, such as address or family members' names, is shared publicly; a phenomenon sometimes referred to a "doxing" or "doxxing". Certainly, sharing public information, while potentially offensive and disagreeable, does not rise to the level of a true threat. As such, that portion of the indictment referring to "threaten[ing Jon Lepicier] and his family by posting" must be dismissed. [18]

## B. Cook's Facebook Posts are Protected First Amendment Speech because they discuss Matters of Public Concern

The First Amendment protects those engaged in speech which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps* , 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) ; citing *Connick v. Myers* , 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Even when speech is arguably "inappropriate or controversial ... [it] is irrelevant to the question [of] whether it deals with a matter of public concern." *Snyder v. Phelps* , 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) ; citing *Rankin v. McPherson* , 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Deciding whether speech is of public or private concern requires the Court to examine the "content, form, and context" of the speech throughout the "whole record." *Snyder v. Phelps* , 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). Additionally, the Fifth Circuit has held that "where speech 'complained of misconduct within the police department', it should be classified as speech addressing a matter of public concern." *Thompson v. City of Starkville, Miss.* , 901 F.2d 456, 463 (5th Cir. 1990) ; citing *Brawner v. City of Richardson* , 855 F.2d 187, 192 (5th Cir. 1988). Specifically, this district has said "speech complaining of misconduct within [a public entity] is speech addressing a matter of public concern."

**Google, Facebook Surveillance, and Corruption are matters of Public Concern, Google Money, Entitled Tech Executives**

*United States v. Cook*, 472 F. Supp. 3d 326, 336 (N.D. Miss. 2020) ("The Court will not recount all of the examples listed by Defense Counsel in her brief, but does note on February 25, 2020 President Trump "doxxed" a jury forewoman, both tweeting her name and going so far as to say:

> There has rarely been a juror so tainted as the forewoman in the Roger Stone case. Look at her background. She never revealed her hatred of "Trump" and Stone. She was totally biased, as is the judge. Roger wasn't even working on my campaign. Miscarriage of justice. Sad to watch! and as recently as June 20, 2020 the President of the United States tweeted:

> BIG COURT WIN against Bolton. Obviously, with the book already given out and leaked to many people and the media, nothing the highly respected Judge could have done about stopping it ... BUT, strong & powerful statements & rulings on MONEY & on BREAKING CLASSIFICATION were made .... Bolton broke the law and has been called out and rebuked for so doing, with a really big price to pay. He likes dropping bombs on people, and killing them. Now he will have bombs dropped on him.")

*United States v. Cook*, 472 F. Supp. 3d 326, 337 (N.D. Miss. 2020) ("If prosecutors choose to tolerate the above grievances coming from the highest office in the land, then surely a Calhoun County citizen should likewise be allowed to vent his grievances. Their complaints are cut from the same cloth. Otherwise, our criminal justice system suffers the appearance of selective enforcement.

## C. Criminalization of Cook's Facebook Posts would Amount to an Impermissible Content Based Restriction of Speech

> The District Court of Maryland in *U.S. v. Cassidy* dismissed an indictment in a 2015 case where a man posted on Twitter, a blog and other internet websites about a local religious leader and her congregation. *U.S. v. Cassidy* , 814 F.Supp.2d 574, (D. Md. 2011). ")

> *United States v. Cook*, 472 F. Supp. 3d 326, 337-40 (N.D. Miss. 2020) ("In total, over 350 tweets were directed at A.Z., thousands of tweets discussed A.Z. and KPC, and a blogspot account contains two posts "not necessarily directed at A.Z., a statement pertaining to A.Z., and a derogatory statement about KPC." *U.S. v. Cassidy* , 814 F.Supp.2d 574 (D. Md. 2011). The Tweets, which are too numerous to reproduce here in their entirety, include the following:

*Sunday, May 20, 2010:* "ya like haiku? Here's one for ya: "Long, Limb, Sharp Saw, Hard Drop" ROFLMAO." *Tuesday, June 22, 2010:* "want it to all be over soon sweetie?" *Tuesday, December 7, 2010:* "Got a wonderful Pearl Harbor Day surprise for KPC ... wait for it." *Friday, June 25, 2010:* "[A.Z.] you are a liar & a fraud & you corrupt Buddhism by your very presence: go kill yourself." *Thursday, December 9, 2010:* "A strong wind @ryderjaphy will blow down the KPC house of cards once and for all. They live by extortion now, and they live hand to mouth." *Tuesday, December 28, 2010:* "DOWN WITH KPC! The fascist insect that preys on the life of Buddhism in the West!! DOWN WITH (Victim I)! The corrupt poser who has nothing." *Sunday, July 25, 2010:* "I have just one thing I want to say to [A.Z.], and its form the heart: do the world a favor and go kill yourself. P.S. Have a nice day."

> *Id.* at Appendix A. Likening posting on Twitter or a blog to a public bulletin board, the District Court of Maryland stated:

Because this case involves First Amendment issues, terms that were in use by citizens when the Bill of Rights was drafted may help in understanding the legal context of Blogs and Twitter. Suppose that a Colonist erects a bulletin board in the front yard of his home to post announcements that might be of interest to others and other Colonists do the same. A blog is like a bulletin board, except that it is erected in cyberspace rather than in one's front yard. If one Colonist wants to see what is on another's bulletin board, he would need to walk over to his neighbor's yard and look at what is posted, or hire someone else to do so. Now, one can inspect a neighbor's Blog by simply turning on a computer. ... One does not have to walk over and look at another person's bulletin board; nor does one Blog or Twitter user have to see what is posted on another person's Blog or Twitter account. This is in sharp contrast to a telephone call, letter or email specifically addressed to and directed at another person, and that difference, as will be seen, is fundamental to the First Amendment analysis in this case.

*U.S. v. Cassidy* , 814 F.Supp.2d 574 (D. Md. 2011). Further, the district court noted that the Supreme Court has "consistently classified emotionally distressing or outrageous speech as protected, especially where that speech touches on matters of political, religious or public concern." *Id.* As such, the district court found that "while Mr. Cassidy's speech may have inflicted substantial emotional distress, the Government's Indictment here is aimed squarely at protected speech: anonymous, uncomfortable Internet speech addressing religious matters." *Id.* at 583. The *Cassidy* court conducted a secondary analysis regarding content-based restrictions on public speech, reiterating, "[i]n determining whether a statute is content-neutral, one must determine whether "the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* at 584. Further, a law or restriction is content-based if it "regulates speech based on the effect that that speech has on an audience." *Id.* Cassidy allegedly violated the statute by "intentionally causing substantial emotional distress to A.Z., specifically on Twitter and blogs." *U.S. v. Cassidy* , 814 F.Supp.2d 574, 584 (D. Md. 2011). The Maryland Court found the restriction as applied to Cassidy to be a content based restriction because it limited speech on the basis of whether that speech was emotionally distressing to A.Z. It is well settled that a content-based restriction on speech must survive strict scrutiny – meaning that to survive strict scrutiny the government must show that the content based restriction "is necessary to serve a compelling state interest." *Id.* The Maryland court did not find "protecting victims from emotional distress sustained through an interactive computer service" to rise to the necessary state interest level because the Supreme Court has underscored the fact that the above referenced interest is not a compelling one. *Id.* at 586. "Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities simply by averting [our] eyes." *Id.* ; quoting *United States v. Playboy Entm't Grp., Inc.* , 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). The Maryland court ruled that A.Z. had the ability to protect "her own sensibilities simply by averting" her eyes from the Defendant's blog and by not looking at or blocking his Tweets. *U.S. v. Cassidy* , 814 F.Supp.2d 574, 585 (D. Md. 2011). And because the government's interest in criminalizing speech that inflicts emotional distress is not a compelling one, the statute as applied to Cassidy did not survive strict scrutiny. *Id.* Of all the First Amendment cases reviewed in this Order, *Cassidy* is most similar to the instant case. In each case the defendant posted brash public commentary about an individual or group on an internet forum and was then prosecuted for the posts under § 2261A. But arguably, Cassidy's thousands of tweets/posts were far more numerous than the five Cook has been flagged for. One difference between the two is that Cassidy was posting about a religious leader, while Cook was posting about public entity employees, a public entity, and publicly elected political figures – but in the Supreme Court's eyes, religion, politics, and criticism of public entities as a form of public concern are all protected forms of speech under the First Amendment. This Court also reads the types of language and phrasing of the posts by both men to be eerily similar; both Cassidy and Cook like to use vague sayings whether it be Cook's "god willing I'm going to take them out," "I'm gonna give you what you have been giving my brothers and sisters ... you are finished. Because I'm coming and hell is coming with me. And I'm not just quoting a movie," or Cassidy's "want it to all be over soon," and his

reference to a horrific day in history like Pearl Harbor. Further, while the Court does not condone publishing publicly available personal information, like a person's address, there is simply no existing framework in the United States which criminalizes the act of "doxing" or "doxxing" private citizens; and certainly re-sharing a public record doesn't arise to the severity of **sharing someone's bank records or social security number.** Just as in *Cassidy* , Cook is being prosecuted for the content of his public posts. His indictment very clearly states that he is being charged because his posts "caused and would reasonably be expected to cause substantial emotional distress to a person, a spouse of that person or an immediate family member of that person." [18] Because Cook's speech allegedly violated the statute by intentionally causing or knowingly reasonably causing emotional distress to Lepicier and/or his family specifically on Facebook, the portion of § 2261A(2)(B) relied on in the Indictment amounts to a content-based restriction. Since the statute as applied to Cook is content-based, the Government has the burden of showing that the content-based restriction "is necessary to service a compelling state interest." *U.S. v. Cassidy* , 814 F.Supp.2d 574, 585 (D. Md. 2011) ; citing *First National Bank of Boston v. Bellotti* , 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Here though, just as in the Supreme Court's ruling in *United States v. Playboy Entm't Group, Inc.* and in the District Court of Maryland's ruling in *Cassidy* , the benefit of the content based restriction to shield sensibilities of the listener or reader is just not enough to supplant a citizen's right to uncomfortable public discourse. Here, Lepicier, his family, the local state court judge, the ADA, the DA, the local meth dealer, and the local news station all have the ability to protect their "own sensibilities simply by averting" their eyes from Cook's Facebook page, and as such § 2261A(2)(B) as applied to Cook's Facebook's posts does not survive strict scrutiny and the Indictment must be dismissed.

## IV. Facial Validity of § 2261A(2)(B)

> The Defendant's motion to dismiss his indictment argues that this Court should find the cyberstalking statute to be facially unconstitutional on several grounds, or to find the cyberstalking statute to be unconstitutional as applied to Cook because it is a content based restriction on speech regarding public concern. The government heavily relies on a single case in its response, *U.S. v. Conlan* , a case in which the Fifth Circuit upheld the facial validity of the 2006 iteration of the cyberstalking act. The 2006 version was revised by Congress in 2013. As such, the government wholly failed to address a majority of the arguments raised by the defendant.")

> *United States v. Cook*, 472 F. Supp. 3d 326, 340 (N.D. Miss. 2020) ("Because 18 U.S.C. § 2261A(2)(B) is unconstitutional as applied to Christopher Casey Cook, his Motion to Dismiss Indictment is GRANTED .")

 **USA v. Cook Cyberstalking Analysis Excellant Citations.pdf**
125K

---

**Kailin Wang** <kailinwang121314@gmail.com>      Mon, Aug 29, 2022 at 11:58 PM
To: "Wolf, Lilah (PDR)" <lilah.wolf@sfgov.org>

[Quoted text hidden]

---

 **USA v. Cook Cyberstalking Analysis Excellant Citations.pdf**
125K

---

**Kailin Wang** <kailinwang121314@gmail.com>      Thu, Apr 13, 2023 at 1:11 PM
To: "Wolf, Lilah (PDR)" <lilah.wolf@sfgov.org>

---------- Forwarded message ---------
From: **Kailin Wang** <kailinwang121314@gmail.com>
Date: Sun, Dec 5, 2021 at 6:16 PM
Subject: This Case does a Very Good Analysis of Criminal v. Constitutional Speech
To: Wolf, Lilah (PDR) <lilah.wolf@sfgov.org>, Debbie Hill <debbieh@utcpd.com>, Thomas Johnson <johnsonfamily7@msn.com>, Shuer <Yunlong88cong@gmail.com>

[Quoted text hidden]

---

📄 **USA v. Cook Cyberstalking Analysis Excellant Citations.pdf**
125K

FILED

JUL 2 7 2020

JAMES M. KIM, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By M. Murphy, Deputy

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF MARIN**

PEOPLE OF THE STATE OF
CALIFORNIA,

    Plaintiff,

vs.

MELISSANE VELYVIS,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: CR211376A

**ORDER SUSTAINING
DEMURRER TO COMPLAINT**

Following a contested evidentiary hearing on May 2, 2018 during the couple's dissolution proceedings, the Family Law court granted petitioner John Velyvis' application for a Family Code § 6218 Domestic Violence Protective Order (DVPO) against his former wife Melissanne Velyvis (Velyvis or defendant), finding that she "harassed" petitioner in violation of Family Code § 6320(a) by posting a March 13, 2018 "blog" on WordPress.com, entitled: "Non-Fatal Strangulation Administered by Husband Dr., John H. Velyvis, from Victim to Survivor . . . The Untold Story 2018."

Among the prohibitions, the court ordered Velyvis to remove "all social media, blogs and internet" postings regarding petitioner and his children and barred her from making any new social media postings about them.

**ORDER SUSTAINING DEMURRER TO COMPLAINT**

1

In open court the judge explained her ruling to the parties:

> I am making an order that you remove any posting on social media on Internet regarding Dr. John Velyvis and that you not post anything on social media regarding Dr. Velyvis or his children directly or indirectly. That means referring to ["]my husband, a person who owed me a fiduciary duty["] because that's all just an indirect reference to him. I am going to order that you prevent disseminating any information about Dr. Velyvis to any parties absent a court order or a subpoena.

Thereafter, the court issued a written form DV-130 protection order that included no-contact and stay-away orders from John Velyvis and his children. In an attachment to the DVPO, the court restrained these additional activities:

> The intent of this restraining order is to curtail ongoing posting and communications made by Melissanne Velyvis involving John Velyvis. While recognizing an individual's freedom of expression, in connection with this dissolution and given the relationship qualifying for a domestic violence restraining order, the court has found the statements to have been made for the purpose of harassing Petitioner, damaging Petitioner's reputation, interfering with Petitioner's professional livelihood and damaging Petitioner's personal relationships. Accordingly:
>
> Melissanne Velyvis shall remove any postings on social media/blogs/internet regarding Petitioner or his children. This includes direct and indirect postings (Example referring to Petitioner as ["]former husband/person with fiduciary duty["] and then using Melissanne Velyvis as identification of author).
>
> Melissanne Velyvis shall not post anything on social media, blogs, and internet regarding Petitioner or his children.
>
> Melissanne Velyvis shall cease and desist from publishing any information concerning Petitioner and his children for the duration of this restraining order. This includes, but is not limited to providing defamatory statements and documents to third parties about Petitioner. Melissanne Velyvis shall refrain from interjection into custody proceedings involving or related to John Velyvis, directly or indirectly, absent a court order.]
>
> Melissanne Velyvis shall remove John Velyvis' likeness from her own social posting and remove any references indicating they are currently married . . . .

Six months later, the Marin County District Attorney filed a misdemeanor complaint against Velyvis alleging one count of Penal Code § 273.6; i.e., between July 19 to July 25, 2019

**ORDER SUSTAINING DEMURRER TO COMPLAINT**                    2

Velyvis "willfully, unlawfully, and knowingly" violated the DVPO "issued by Marin County Superior Court case number FL1603174."

The complaint did not describe the offending activities. Defendant states, without contradiction, that she is charged with violating the "no speech" prohibition. (Supp. Response, p. 7.)

Defendant demurs to the criminal pleading (Penal Code § 1004), contending: 1 – the complaint fails to allege a public offense was committed since the DVPO is an unconstitutional prior restraint on defendant's right to free speech and is unenforceable; 2 – the DVPO is too vague to satisfy the Due Process guarantees of notice and fair trial; and 3 – the complaint does not comply with Penal Code §§ 950 and 952.

For the reasons discussed below, the court sustains defendant's demurrer to the criminal complaint.

DISCUSSION

1.

Demurrer is Procedurally Proper

A demurrer to a criminal complaint properly lies when it appears on the face of the pleading: "4. That the facts stated do not constitute a public offense"; or "5. That it contains matter which, if true, would constitute a legal justification or excuse of the offense charged, or other legal bar to the prosecution." (Penal Code § 1004 (a).)

"A demurrer is not a proper means of testing the sufficiency of the *evidence* supporting an accusatory pleading. (*People v. Williams* (1979) 97 Cal.App.3d 382, 391 & fn. 5.) Rather, a demurrer lies only to challenge the sufficiency of the *pleading*. It is limited to those defects appearing on the face of the accusatory pleading and raises only issues of law. (Pen. Code, § 1004; *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1090.)" (*People v. Biane* (2013) 58 Cal.4th 381, 388.)

**ORDER SUSTAINING DEMURRER TO COMPLAINT**                    3

It is settled that a defendant may use a demurrer to collaterally attack the validity of a criminal complaint charging defendant with misdemeanor violation of an injunctive order on the ground the underlying order is unconstitutional, if the complaint sets forth the terms of the order or incorporates the order by reference. (See *People v. Gonzalez* (1996) 12 Cal.4th 804, 817 [violation of a void preliminary injunction barring certain street gang activity is not punishable as criminal contempt for willful disobedience of a lawfully issued court order under Pen. Code §166(a)(4)].)

In *Gonzalez,* the Supreme Court ruled that the municipal court improperly refused to hear defendant's demurrer to the contempt complaint, which demurrer asserted the underlying injunction issued by the Superior Court was constitutionally invalid. (*Id.* at p. 808.) Defendant was charged with misdemeanor criminal contempt in violation of Pen. Code § 166(a)(4), making it a misdemeanor to engage "willful disobedience of any process or order lawfully issued by any court."

Relying on settled California law "that a void order cannot be the basis for a valid contempt judgment", the Supreme Court held that an unconstitutional injunctive order is in excess of the issuing court's jurisdiction and the invalid order cannot produce a valid judgment of contempt. (*Id.,* 12 Cal.4th at p. 817, citing *In re Berry* (1968) 68 Cal.2d 137, 147 [a defendant cannot be tried in the municipal court for misdemeanor contempt when the superior court's injunctive order violates defendant's First Amendment rights].)

The *Gonzalez* court further held that the defendant was not required to directly attack the validity of the injunction in the issuing court, but instead he " '*could have* demurred to the misdemeanor complaint in the municipal court on the ground of the invalidity of the superior court's TRO, if the complaint in municipal court had set forth the TRO or referred to it other than 'generically.' [Citation.]" (*People v. Gonzalez, supra,* 12 Cal.4th at p. 818.)

Here, the misdemeanor complaint expressly incorporates the DVPO by referring to its Family Court case number. This court takes judicial notice of the contents of that order in the court files. (Evid. Code § 452(d).)

Pen. Code § 273.6 makes "any intentional and knowing violation of a protective order" issued pursuant to Family Code § 6320, to be a misdemeanor. The DVPO was issued pursuant to § 6320, which statute provides in part:

> (a) The court may issue an ex parte order enjoining a party from . . . <u>harassing,</u> telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, <u>contacting, either directly or indirectly, by mail or otherwise,</u> coming within a specified distance of, <u>or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members.</u>

(*Emphasis added.*)

Here, defendant Velyvis is being criminally charged with a misdemeanor for the "intentional and knowing" violation of the DVPO pursuant to Pen. Code § 273.6; an offense functionally similar to the charges of misdemeanor contempt for willful disobedience of a superior court's order (Pen. Code § 166(a)(4)) in the *Gonzalez* and *Berry* decision . If Velyvis is correct, under *Gonzalez* the Family Law judge exceeded her jurisdiction and that order cannot support a criminal judgment. (*Id.* 12 Cal.4th at p. 817.)

"Because under settled law there can be no contempt of a void injunctive order, and because we have long recognized the propriety of collateral attacks on void orders it seems evident that the trial court is a proper forum in which to raise the issue of the validity of the injunction." (*Gonzalez, supra,*, 12 Cal.4th at pp. 8200821.)

In fact, the California Judicial Council Criminal Jury Instruction 2701 recognizes the propriety of using a demurrer to mount a facial challenge to the misdemeanor complaint for violating the DVPO.

In its standard jury instruction describing the elements to support a conviction for violation of a court order for *contempt* under Pen. Code §166(c)(1) for the "willful and knowing

**ORDER SUSTAINING DEMURRER TO COMPLAINT**                    5

violation of a protective order" issued pursuant to Family Code § 6230, or the "intentional and knowing violation of a [§ 6230 ] protective order" under Pen. Code § 273.6, as alleged here, the Judicial Council's "Bench Notes" instruct that a demurrer can be brought in the criminal trial court to challenge the constitutionality of the underlying protective or contempt order:

> The defendant may not be convicted for violating an order that is unconstitutional, and the defendant may bring a collateral attack on the validity of the order as a defense to this charge. (*People v. Gonzalez, supra,* 12 Cal.4th at pp. 816–818; *In re Berry* (1968) 68 Cal.2d 137, 147.) The defendant may raise this issue on demurrer but is not required to. (*People v. Gonzalez, supra,* 12 Cal.4th at pp. 821, 824; *In re Berry, supra,* 68 Cal.2d at p. 146.)

(CalCrim 2701, "Bench Notes.")

Under these circumstances at bench, a demurrer is the proper pre-trial vehicle to attack the complaint on the ground "the facts stated do not constitute a public offense" under Pen. Code § 1004(a)(4).

The People argue that this case is distinguishable from the contempt prosecutions in *Gonzalez* and *Berry*, since the Superior Court orders in those cases were preliminary injunctions issued without giving defendants a chance to challenge the validity of the order in the issuing court. (Oppo. p. 4.)

That is not an accurate reading of *Gonzalez.* The court made a point of noting that California courts do not follow the "collateral bar" rule, which requires persons affected by injunctive orders to challenge that order in the issuing court. (*Id.* at p. 818.) Instead, California affords the enjoined party two alternatives:

> As we said in *Berry, supra,* 68 Cal.2d 137, unlike in jurisdictions that do not permit collateral challenges to injunctive orders, "[i]n this state a person affected by an injunctive order has available to him two alternative methods by which he may challenge the validity of such order on the ground that it was issued without or in excess of jurisdiction. He may consider it a more prudent course to comply with the order while seeking a judicial declaration as to its jurisdictional validity. [Citation.] On the other hand, he may conclude that the exigencies of the situation or the magnitude of the rights involved render immediate action worth the cost of peril. In the latter event, such a person, under California law, may disobey the order and raise his jurisdictional contentions *when he is sought to be punished for such disobedience.* If he has correctly assessed his legal position, and it is

ORDER SUSTAINING DEMURRER TO COMPLAINT

6

> therefore finally determined that the order was issued without or in excess of jurisdiction, his violation of such void order constitutes no punishable wrong." (*Id.* at pp. 148-149, italics added.)

(*People v. Gonzalez, supra,* 12 Cal.4th at pp. 818–819, quoting *Berry, supra,* 68 Cal.2d at pp. 148-149.)

The fundamental policy described by *Gonzalez* court applies with the equal force where the order is issued after a court reviews competing evidence submitted by declarations or affidavits at the hearing on the preliminary injunction, or as here, where the underlying restraining order was issued following a contested, evidentiary hearing with live testimony. The DVPO issued by the Family Law judge is as much an "injunctive order" as the preliminary injunctions reviewed in *Gonzalez* and *Berry.* If the § 6230 DVPO is constitutionally invalid, it cannot support a criminal judgment and defendant should not be made to stand trial for violation. of that order. (See *Gonzalez, supra*, 12 Cal.4th at p. 817.) There is no logical reason to treat these two types of restraining orders differently.

Finding defendant may use this demurrer to assert the facial invalidity of the underlying DVRO, the court will now address the legal merits of defendant's claims.

2.

### The No-Speech Portion of the DVPO is an Invalid Prior Restraint

Defendant asserts the broad language in the DVPO that directs: "Melissanne Velyvis shall not post anything on social media, blogs, and internet regarding Petitioner or his children."; and "Melissanne Velyvis shall cease and desist from publishing any information concerning Petitioner and his children for the duration of this restraining order", constitutes an invalid prior restraint that impermissibly infringes on her free speech rights under the federal and California constitutions.

Defendant contends this overbroad language of the DVPO unlawfully prevents her from sharing her life experiences and feelings she attributes to her marriage to petitioner with her family, friends and other adults willing to read her comments and criticisms, and the order was

**ORDER SUSTAINING DEMURRER TO COMPLAINT**                    7

made without the required showing of a compelling, countervailing public interest. (MPA p. 10-11.) She asserts this blanket restriction to disseminate any information regarding her ex-husband to adult friends and extended family (but not directed to Dr. Velyvis' minor children) is extreme and is not narrowly tailored to accomplish any lawful objective. (See *Gilbert v. National Enquirer* (1996) 43 Cal. App. 4th 1135, 1136.) (MPA pp. 12-15.)

The People respond by asserting that the restraining order may lawfully limit speech that exhibits a pattern of conduct the court deems "abusive". (Supp. Brief in Opposition to the Demurrer pp. 4-5.) As proof of this pattern of abuse, the People rely on evidence presented at the hearing which showed, in addition to posting the blog, *ante,* defendant interjected herself into other family law matters involving her ex-husband: she made unsolicited comments to a custody evaluator during the current contested custody hearing involving petitioner and his first ex-wife; and defendant made disparaging remarks about petitioner during his current girlfriend's divorce proceedings to another man. The People also cite defendant's plans to file a complaint against petitioner with the California Medical Board. (Oppo. p. 5-6.)

A.

## Prior Restraint Generally

"'The right to free speech is ... one of the cornerstones of our society,' and is protected under the First Amendment of the United States Constitution and under an 'even broader' provision of the California Constitution. (*Hurvitz v. Hoefflin* (2000) 84 Cal.App.4th 1232, 1241; see Cal. Const., art. I, § 2, subd. (a).) An injunction that forbids a citizen from speaking in advance of the time the communication is to occur is known as a 'prior restraint.' (*DVD Copy, supra,* 31 Cal.4th at p. 886; *Hurvitz v. Hoefflin, supra,* 84 Cal.App.4th at p. 1241.) A prior restraint is "'the most serious and the least tolerable infringement on First Amendment rights."' (*DVD Copy, supra,* 31 Cal.4th at p. 886; *Near v. Minnesota* (1931) 283 U.S. 697, 713.) Prior restraints are highly disfavored and presumptively violate the First Amendment. (*Maggi v. Superior Court* (2004) 119 Cal.App.4th 1218, 1225; *Hurvitz v. Hoefflin, supra,* 84 Cal.App.4th

at p. 1241.) This is true even when the speech is expected to be of the type that is not constitutionally protected. (See *Near v. Minnesota, supra*, 283 U.S. at pp. 704–705 [rejecting restraint on publication of any periodical containing 'malicious, scandalous and defamatory' matter].)" (*Evans v. Evans* (2008) 162 Cal.App.4th 1157, 1166–1167.)

"To establish a valid prior restraint under the federal Constitution, a proponent has the heavy burden to show the countervailing interest is compelling, the prior restraint is necessary and would be effective in promoting this interest, and less extreme measures are unavailable. [Citations.] A permissible order restraining future speech 'must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order.' [Citation.]

"The California Constitution is more protective of free speech rights than the federal Constitution, and California courts require 'extraordinary circumstances' before a prior restraint may be imposed. (*Wilson v. Superior Court of Los Angeles County* (1975) 13 Cal.3d 652, 658-661; *In re Marriage of Candiotti* (1995) 34 Cal.App.4th 718, 724.) Nonetheless, in determining the validity of a prior restraint, California courts engage in an analysis of various factors similar to the federal constitutional analysis [citation], and injunctive relief restraining speech under the California Constitution may be permissible where the relief is necessary to 'protect private rights' and further a 'sufficiently strong public policy.' [Citation.]" (*Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824 831–832, some internal citations omitted.)

B.

The Misdemeanor Complaint Does Not Charge An Actionable Offense

Because this is a demurrer to the misdemeanor complaint, the court is restricted to the face of the complaint in deciding if the allegations fail to state a public offense as a matter of law. (See *People v. Biane, supra*, 58 Cal.4th at p. 388.)

Defendant objects to the portion of the DVPO which prohibits her from "ongoing posting and communications made by Melissanne Velyvis involving John Velyvis", and that she "shall

ORDER SUSTAINING DEMURRER TO COMPLAINT                    9

cease and desist from publishing any information concerning Petitioner and his children for the duration of this restraining order." (MPA p. 8)  The Family Law court's order found this prohibition to be necessary to prevent defendant from "harassing Petitioner, damaging Petitioner's reputation, interfering with Petitioner's professional livelihood and damaging Petitioner's personal relationships."

In California, a court must find that "extraordinary circumstances" exist in order to restrain the defendant's right to share independently obtained information about another adult with other willing adults. The fact the public sharing of these comments might be humiliating to the targeted adult, or cause emotional distress or even cause harm to the subject's professional reputation, does not rise to the level of a compelling or extraordinary circumstance.

In *In re Marriage of Candiotti* (1995) 34 Cal. App. 4th 718, the court struck down a protective order which permitted the ex-wife's (Debra) to share negative, independently obtained information about her ex-husband's new wife during contentious child custody proceedings, only to a specific set of adults and professionals associated with the court proceedings. (*Id.* at p. 721.)

The court held that while *the state has a compelling interest to restrain* Debra from disparaging the new wife to the divorced couple's children or in the children's presence, "the order here went further, actually impinging on a parent's right to speak about another adult, outside the presence of the children.  Such an order, under these circumstances, constitutes undue prior restraint of speech.  It would prevent Debra from talking privately to her family, friends, coworkers, or perfect strangers about her dissatisfaction with her children's living situation." (*Id.*, 34 Cal. App. 4th at p. 725, *emphasis added.*)

In reaching this conclusion, the court in *Candiotti, supra,* recognized that the emotional discomfort or harm to reputation that disparaging comments may cause to the targeted adult do not constitute sufficiently compelling reasons to restrain them:

> Thus, while we agree that the court certainly has the power to prevent Debra from undermining Thomas's parental relationship by alienating the children from Donna, the order here was much more far-reaching, aimed at conduct that might

**ORDER SUSTAINING DEMURRER TO COMPLAINT**     10

cause others, outside the immediate family, to think ill of Donna. Such remarks by Debra may be rude or unkind. They may be motivated by hostility. To the extent they are libelous, they may be actionable. But they are too attenuated from conduct directly affecting the children to support a prior restraint on Debra's constitutional right to utter them.

(*In re Marriage of Candiotti, supra,* 34 Cal.App.4th 718, 726.)

Likewise, in *Gilbert v. National Enquirer, Inc.* (1996) 43 Cal.App.4th 1135, the trial court issued a preliminary injunction prohibiting plaintiff actress Gilbert's ex-husband Brinkman from disclosing any information regarding Gilbert's drug or alcohol use or sexual relations with other men that Brinkman acquired before, during or after their marriage, to anyone (except as necessary to the current court proceedings). (*Id.* at p. 1142.)

The court held the preliminary injunction was an invalid prior restraint on Brinkman's free speech rights and that Gilbert's claimed emotional distress and reputational damage are not sufficiently compelling reasons to justify the prohibition. (*Id.* at pp. 1141, 1145-1146.) "Even if this were a family law action, the preliminary injunction went beyond precluding Brinkman from making disparaging remarks about Gilbert in [their child] Dakota's presence. As in *Candiotti*, the order in this case restrained Brinkman from talking privately to family, friends, and coworkers about his dissatisfaction with Gilbert as a parent." (*Gilbert, supra* 43 Cal.App.4th at p. 1146.)

The *Gilbert* court also found that since Gilbert actively sought publicity as a well-known actress, Brinkman's free speech rights outweighed her reduced privacy interest to keep these matters out of the public sphere. (*Id.* at p. 1146-1147.)

Under circumstances similar to our case, the trial court in *Molinaro v. Molinaro, supra,* 33 Cal. App. 5th 824 issued a DVPO prohibiting the husband Michael from posting anything about his pending divorce from Bertha on Facebook. Bertha complained that Michael had physically obstructed her from moving out of the couple's home and had physically intimidated her. (*Id.* at pp. 826-827.) At a contested hearing on her application for the DVPO, Bertha complained that Michael was posting everything about the divorce case on Facebook; he gave their children ages 18, 17 and 13 years old, copies of Bertha's pleadings; he posted on Facebook

ORDER SUSTAINING DEMURRER TO COMPLAINT                    11

false statements that Bertha ran away with $250,000 from the couple's home equity line of credit and that she is crazy and has hallucinations; and she said his behavior was getting worse and she feared for her life and her children's safety. (*Id.* at p. 828.)

The DVPO issued by the court included a stay-away order and ordered Michael not " 'to post anything about the case on Facebook'" and " 'not to discuss the case with the children.'" (*Molinaro, supra,* 33 Cal.App.5th at p. 830.)

On appeal from the DVPO, the appellate court held that the portion of the restraining order barring Michael from "posting anything about the case on Facebook" was unconstitutionally overbroad and impermissibly infringed on his free speech rights. (*Id.* at p. 408.) It found that his "posts were not specifically directed to the minor children, but in many cases invited comments from Michael's adult friends and extended family, . ." and that most of his posts "expressed his apparent despair about the divorce and his separation from the children. . . ."

The court concluded, as did the court in *Candiotti*, that such comments were " 'too attenuated from conduct directly affecting the children to support a prior restraint on [Michael's] constitutional right to utter them.' [Citation.]" (*Molinaro, supra,* 33 Cal.App.5th 824 [33 Cal.App.5th at p. 833.)

Our courts also recognize that a person has a constitutional right to repeat or comment upon public or private information, not previously found by a trial court to be defamatory. " 'The attempt to enjoin the initial distribution of a defamatory matter meets several barriers, the most impervious being the constitutional prohibitions against prior restraints on free speech and press....' [Citation.]" (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1158 [injunction may properly issue *after* a trial prohibiting the defendant from repeating specific statements found at trial to be defamatory]; accord. *Evans, supra,* 162 Cal.App.4th at p. 1169 ["[A] court may not constitutionally prevent a person from uttering a 'defamatory' statement before it has been determined at trial that the statement was defamatory."].)

There is nothing on the face of the complaint, or in the Family Court judge's judicially-noticed findings of fact to indicate any of defendant's communications were previously found to be defamatory.

As stated in the DVPO, the Family Law judge found that defendant's statements about Dr. Velyvis were intentionally harassing, damaged his reputation and interfered with his personal relationships.

Based on the authorities discussed above, these reasons are insufficient to justify such a broad prohibition. The court finds that the portion of the DVPO restraining defendant from posting on the internet or communicating any information about defendant's ex-husband or his children is impermissibly overbroad and constitutes an invalid prior restraint under the federal and California constitutions. Violation of this portion of the DVPO, therefore, is not an actionable offense.

Since, as the court has been informed, the misdemeanor complaint issued based on defendant's alleged violation of this "no speech" provision of the DVPO, the demurrer to the misdemeanor complaint is sustained.

There are no further issues pertinent to this demurrer that require the court to address defendant's remaining attacks on the DVPO.

SO ORDERED.

Dated: July 27, 2020

_____
Roy O. Chernus
Judge

**ORDER SUSTAINING DEMURRER TO COMPLAINT**                    13

## MARIN COUNTY SUPERIOR COURT
3501 Civic Center Drive
P.O. Box 4988
San Rafael, CA 94913-4988

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA**<br><br>vs.<br><br>**MELISSANE VELYVIS** | CASE NO. **CR211376A**<br><br>**PROOF OF SERVICE BY FIRST CLASS MAIL**<br><br>*Code of Civil Procedure Sections 1013a and 2015.5* |

I am an employee of the Marin County Superior Court. I am over the age of 18 years and not a party to this action. My business address is 3501 Civic Center Drive, Hall of Justice, San Rafael, California.

On July 28, 2020, I served the following document(s): **ORDER SUSTAINING DEMURRER TO COMPLAINT** in said action to all interested parties, by placing the envelope for collection and mailing on the date shown thereon, so as to cause it to be mailed on that date following standard court practices. I am readily familiar with the court's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

MARIN COUNTY DISTRICT ATTORNEY  WILL MOREHEAD, ESQ.
ATTN; ROOPA KRISHNA, ESQ.     407 SAN ANSELMO AVENUE, #201
ROOM 130            SAN ANSELMO, CA 94960

**VIA INTER OFFICE MAIL**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

JAMES M. KIM
Court Executive Officer

Executed at San Rafael, California
On: July 28, 2020

By:/ _____
M, Murphy, DEPUTY

---

CV037 / CR037         **PROOF OF SERVICE**         Rev. 8/3/15

3/31/23, 2:46 PM Court Limits Ban on Speech That Causes "Substantial Emotional Distress" with Intent to Harass or Intimdate"

Case 2:24-cr-00163-TS Document 209-1 Filed 05/01/26 PageID.11468 Page 186 of 283

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▼

FREE SPEECH

## Court Limits Ban on Speech That Causes "Substantial Emotional Distress" with "Intent to Harass or Intimdate"

The court concludes that the federal "cyberstalking" statute covers only speech intended to "put the victim in fear of death or bodily injury" or to "distress the victim by threatening, intimidating, or the like."

**EUGENE VOLOKH** | 6.13.2022 4:37 PM

From *U.S. v. Yung*, decided today by the Third Circuit, in an opinion by Judge Stephanos Bibas, joined by Judges Felipe Restrepo and Jane Roth:

> Congress enacted the cyberstalking law in 2006 and broadened it in 2013. As amended, it makes a defendant a cyberstalker if he checks three boxes:
>
> - *An act.* The defendant must "use[] the mail, any interactive computer service or electronic communication service or … system …, or any other facility of interstate or foreign commerce" at least twice. 18 U.S.C. § 2261A(2); *see also* 2266(2).
> - *An intent.* He must have acted "with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person." § 2261A(2).
> - *A result.* Finally, his actions must cause some emotional response. They must either put the target "in reasonable fear of … death … or serious bodily injury," or "cause[ ], attempt[] to cause, or … be reasonably expected to cause substantial emotional distress." § 2261A(2)(A), (B). Because Yung pleaded guilty to the emotional-distress result element, we focus on that one….
>
> [I]f we can, we must read the statute narrowly enough to avoid constitutional problems. And here, a narrow reading of the statute's intent element is plausible….
>
> By itself, the act element does not prevent overbreadth…. [W]e reject the government's position that the cyberstalking "statute focuses on conduct, not speech." Rather, it reaches a lot of speech: it targets emails, texts, and social media posts ….
>
> The result element does little to confine the law to unprotected speech. The law, for instance, punishes people for acting in a way that "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress." True, the "[s]ubstantial" emotional distress must be "fairly large," more than mere annoyance.
>
> Even so, the law captures much speech, in part because it does not require that emotional distress be objectively reasonable. Though we hope that Americans can discuss sensitive issues without taking offense, that is not always so. And the law penalizes speech even when a listener's distress is unexpected or idiosyncratic.

That is a problem. The First Amendment protects lots of speech that is substantially emotionally distressing. Protesters may picket a marine's funeral with signs like "Thank God for Dead Soldiers," "God Hates Fags," and "You're Going to Hell." *Snyder v. Phelps* (2011). And a pornographer may parody a famous minister as having drunken sex with his mother. *Hustler Mag. v. Falwell* (1988). These statements are deeply offensive, yet still covered by the First Amendment.

So neither the act nor the result element suffices to narrow the law's wide reach….

**The intent element, narrowly construed, saves the statute**

[If we read] "intent to … harass [or] intimidate" … broadly, the law will reach protected speech. Take the verb "harass." It can mean aggression, even violence: "worry[ing] and imped[ing] by repeated attacks." But "harass" can also mean "to vex, trouble, or annoy continually or chronically." These poles mark a spectrum from repeated annoyance to outright violence.

Like harassment, intimidation has both narrow and broad meanings. To "intimidate" can mean a specific, violent action. It "esp[ecially]" means "to force [someone] to or deter [him] from some action by threats or violence." But "intimidate" can also mean broadly "[t]o render timid, inspire with fear; to overawe, cow."

Harassment and intimidation, narrowly construed, are punishable. "Intimidation in the constitutionally proscribable sense of the word … plac[es] the victim *in fear of bodily harm or death*." Harassing debt collection and coercive threats are also unprotected. *See, e.g.*, *Barr v. Am. Ass'n of Pol. Consultants* (2020) (suggesting that the Constitution lets Congress regulate the way people collect debts); *Saxe v. State Coll. Area Sch. Dist.* (3d Cir. 2001) (Alito, J.).

Yet the broader definitions of "harass" and "intimidate" can describe nonviolent, nonthreatening speech. Filling a city councilman's voicemail box with complaints about his vote on a controversial municipal ordinance may "vex" or "cow" him. Ranting in the comments section of a website that a senator voted to lock refugee kids in cages could well "annoy [her] continually or chronically" or "render [her] timid." Or, to take a couple more mundane examples, "negative restaurant reviews left on Google or Yelp, irate emails sent to service providers (contractors, plumbers, etc.), … or antagonistic comments left on news sites" are often persistently annoying or even scary. Each might satisfy the statute's act and intent elements, read broadly, and (depending on the recipient's reaction) the result element too.

But criminalizing that speech would collide with the First Amendment. The First Amendment protects at least some speech that persistently annoys someone and makes him fearful or timid. As then-Judge Alito observed: "There is no categorical 'harassment exception' to the First Amendment's free speech clause." Though "non-expressive, physically harassing *conduct* is entirely outside [its] ambit," "deeply offensive" *speech* is not. On the contrary, "the free speech clause protects a wide variety of speech that listeners may consider deeply offensive."

Thus, broad harassment laws that punish offensive speech "steer[] into the territory of the First Amendment." *DeAngelis v. El Paso Mun. Police Officers Ass'n* (5th Cir. 1995) (Title VII); *see also Dambrot v. Cent. Michigan Univ.* (6th Cir. 1995) (university speech policy). And courts have often struck them down. *See, e.g.*, *State v. Brobst* (N.H. 2004) (holding overbroad a harassment statute covering any speech made "with the intent to annoy or alarm another"); *Ex parte Barton* (Tex. Ct. App. 2019) (same); *Moreno* (same). So here too, we must ensure that the cyberstalking statute does not "present[] a 'realistic danger' [that] the [Government] could compromise" First Amendment protections….

[The court then analyzes why a narrow reading is consistent with the text, even if a broader reading would be, too, and concludes that the narrow reading is called for to avoid First Amendment problems: -EV]

To "intimidate," we hold, a defendant must put the victim in fear of death or bodily injury. And to "harass," he must distress the victim by threatening, intimidating, or the like. That reading limits intent to harass to "criminal harassment, which is unprotected because it constitutes true threats or speech that is integral to proscribable criminal conduct." It also limits "intent to intimidate" to what it "especially" means, a form of true threats or speech integral to a crime. Those narrow readings ensure that protected speech largely escapes the law's net. Thus, we can avoid the "strong medicine" of invalidating the statute as facially overbroad….

Definitely an improvement over the broad reading (though I should note that the "integral to proscribable criminal conduct" language always complicates matters). For some thoughts on why some such narrowing is constitutionally required, see my *One-to-One Speech, One-to-Many Speech, Criminal Harassment Laws, and "Cyberstalking"* and my *Overbroad Injunctions Against Speech (Especially in Libel and Harassment Cases)*.

To get the Volokh Conspiracy Daily e-mail, please sign up here.

Email Address

**Subscribe**

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 19-1640 & 20-3448

_____

UNITED STATES OF AMERICA

v.

HO KA TERENCE YUNG,
                    Appellant.

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:17-cr-00014-001)
District Judge: Honorable Leonard P. Stark

_____

Argued: January 12, 2022

Before: RESTREPO, BIBAS, and ROTH, _Circuit Judges_

(Filed:  June 13, 2022)

_____

Peter Goldberger                           [ARGUED]
50 Rittenhouse Place
Ardmore, PA 19003

Edson A. Bostic
Tieffa N. Harper
FEDERAL PUBLIC DEFENDER'S OFFICE
800 King Street, Suite 200
Wilmington, DE 19801
   *Counsel for Appellant*

Ruth Mandelbaum                [ARGUED]
Shawn A. Weede
UNITED STATES ATTORNEY'S OFFICE
1313 N. Market St.
Hercules Building, Suite 400
Wilmington, DE 19801
   *Counsel for Appellee*

———————————

## OPINION OF THE COURT

———————————

BIBAS, *Circuit Judge*.

The First Amendment limits the government's power to punish offensive or annoying speech. Convicted under a cyberstalking statute, Ho Ka Terence Yung challenges that law as overbroad. But to avoid this problem, we read the statute narrowly and so will affirm his conviction.

Yung also challenges his restitution order. Yung had waived much of his right to appeal, including any challenge to the restitution order. But enforcing that waiver would threaten the separation of powers, so we must hear Yung's challenge. And because part of the restitution order was not authorized by statute, we will vacate that order.

2

## I. THE SPURNED APPLICANT TURNS CYBERSTALKER

Yung wanted to go to Georgetown Law. He had good grades and strong test scores. So Georgetown invited him to interview with an alumnus. But that interview went poorly. Yung thought his interviewer was insensitive and rude. And a few weeks later, Georgetown rejected him.

Though Yung eventually got into a good law school, Georgetown's rejection still stung. So a year later, he struck back against the interviewer. First, he launched a cyber-campaign: he created fake obituaries for the interviewer's wife and son; social-media profiles littered with Ku Klux Klan content in the interviewer's name; and blog posts as the interviewer, bragging about raping women, a boy, and an eight-year-old girl. A Google search of the interviewer's name revealed thousands of similar posts. As a reader of the posts remarked: "Someone is really out to nail this guy to a cross." JA 219.

Next, Yung filed false reports. Posing as a female Georgetown applicant on law school fora, he accused the interviewer of groping, bigotry, and threatening professional retaliation. And in reports to the Better Business Bureau, he accused the interviewer of sexually assaulting a female associate and berating prospective employees. He "strongly encouraged [the interviewer's employer] to fire this dirty old man." JA 176.

Yung's cyber-harassment spilled over into the real world. Impersonating the interviewer's wife, he published an online ad seeking a sex slave. When one man responded to the ad, Yung ordered him to spy on the family. The wife, another ad

3

claimed, "like[d] it when a man puts his hand around [her] throat and threaten[s] [her] with a knife" and "gun" before forcing her to have sex. JA 168. Because of Yung's antics, the interviewer's family got hundreds of phone calls from men seeking sex with the interviewer, his wife, or their son. "[Y]ou pick up the phone and the first thing they ask is how big is your … genitalia," the interviewer testified. JA 325. Responding to other sexual ads, strange men even came to the interviewer's home in the wee hours of three consecutive mornings.

This harassment campaign turned the family's life into a "nightmare." JA 295. They were terrified that every strange visitor sought to "rape and murder" them. JA 296. They worked with police to plan safe hiding places in their home in case someone broke in. They disconnected their phone every night and quit walking around the neighborhood. And they feared that they would "never know [normalcy] again." JA 296.

Because the family's son studied at Georgetown, the family informed it of the threat. Georgetown worried that the son would be targeted there too, so it added security.

Eventually, the interviewer hired lawyers and cyber-investigators, "begging" them to track down the puppeteer. JA 162. Working with the FBI, the investigators traced it all back to Yung.

Yung was charged with cyberstalking. 18 U.S.C. §§ 2261A(2)(B) & 2261(b). Faced with a mountain of evidence, he challenged the cyberstalking law as overbroad under the First Amendment. But when that challenge failed, he

4

pleaded guilty. Though he waived most of his right to appeal, he reserved his right to appeal the overbreadth ruling and any sentence above the statutory maximum.

Yung was sentenced to nearly four years in prison plus three years of probation. He was also ordered to pay restitution for the interviewer's investigative costs (nearly $70,000) and Georgetown's security measures ($130,000).

On appeal, Yung revives his overbreadth challenge and contests the restitution order. The government responds that his plea agreement lets him appeal only overbreadth, not restitution. We review each issue de novo. *United States v. Gonzalez*, 905 F.3d 165, 190 (3d Cir. 2018); *United States v. Quillen*, 335 F.3d 219, 221 (3d Cir. 2003).

## II. THE CYBERSTALKING STATUTE IS NOT OVERBROAD

Yung first challenges his conviction under the cyberstalking law. He does not argue that it restricts his protected speech or is improper as applied to him. And he likely could not. The First Amendment does not protect defaming a private person or making "true threats": that is, "serious[ly] express[ing] an intent to commit an act of unlawful violence to" particular people. *Virginia v. Black*, 538 U.S. 343, 359 (2003); *see Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

Rather than challenge the law as applied, Yung attacks it as overbroad and thus facially invalid. He says it "punishes a substantial amount of [others'] protected free speech." Yung Br. at 18–19 (quoting *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003)).

5

Overbreadth doctrine is a constitutional anomaly. Ordinarily, litigants lack standing to challenge laws simply because they "may conceivably be applied unconstitutionally to others." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973). But we have relaxed that standing requirement in First Amendment cases to stop overbroad laws from chilling protected speech. *Id.* at 612.

Yet invalidating a law as overbroad is "strong medicine" that we should use "sparingly." *Id.* at 613. Courts must hesitate before stopping the government from prosecuting conduct that it has the power to ban. *Id.* at 615. And the overbreadth exception to ordinary standing rules has been cogently criticized. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1583–88 (2020) (Thomas, J., concurring). So we will not expand it. Before striking down a law, we must ensure that any overbreadth is both "real" and "substantial." *Broadrick*, 413 U.S. at 615. Because we can avoid reading this statute as overbroad, we will. *Id.* at 613; *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982).

### A. The statute

Congress enacted the cyberstalking law in 2006 and broadened it in 2013. As amended, it makes a defendant a cyberstalker if he checks three boxes:

- *An act.* The defendant must "use[ ] the mail, any interactive computer service or electronic communication service or … system …, or any other facility of interstate or foreign commerce"

6

at least twice. 18 U.S.C. §2261A(2); *see also* §2266(2).

- *An intent.* He must have acted "with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person." §2261A(2).

- *A result.* Finally, his actions must cause some emotional response. They must either put the target "in reasonable fear of … death … or serious bodily injury," or "cause[], attempt[] to cause, or … be reasonably expected to cause substantial emotional distress." §2261A(2)(A), (B). Because Yung pleaded guilty to the emotional-distress result element, we focus on that one.

This is not the first time that we have entertained an overbreadth challenge to the statute. A few years ago, we rejected an overbreadth challenge to the 2006 version of Section 2261A. *Gonzalez*, 905 F.3d at 190 n.10. But the 2013 amendment broadened its scope. Now the law punishes not only those who intend to harass, but also those who intend to intimidate. *Compare* 18 U.S.C. §2261A(2) (2006), *with id.* (2013). Plus, a defendant no longer has to *cause* substantial emotional distress. It is enough that his conduct be "reasonably expected to cause" such distress. *Compare id.* (2006), *with id.* (2013). Because the revised law reaches further, we must review it again.

The government argues that the act, intent, and result elements limit prosecution to "prohibited actions with a serious criminal intent" that "cause serious harm." Gov't Br. 27; *see*

7

*United States v. Ackell*, 907 F.3d 67, 74–77 (1st Cir. 2018) (adopting the government's position). Read that way, there would be no First Amendment problem. Yung counters that the law punishes lots of protected speech.

Ultimately, we reject Yung's argument. True, if read broadly, the statute *would* punish protected speech. We agree with Yung that the act and result elements are not enough to save it. But if we can, we must read the statute narrowly enough to avoid constitutional problems. And here, a narrow reading of the statute's intent element is plausible. So the statute is not overbroad.

### B. The act element captures both conduct and speech

By itself, the act element does not prevent overbreadth. The more speech a law punishes, the likelier it is to be overbroad. *Hicks*, 539 U.S. at 124. Here, we reject the government's position that the cyberstalking "statute focuses on conduct, not speech." Gov't Br. at 24. Rather, it reaches a lot of speech: it targets emails, texts, and social media posts, like the ones Yung wrote. Thus, we must decide whether the speech it reaches is protected by the First Amendment.

### C. The result element alone does not save the statute

The result element does little to confine the law to unprotected speech. The law, for instance, punishes people for acting in a way that "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress." 18 U.S.C. §2261A(2)(B). True, the "[s]ubstantial" emotional distress must be "fairly large," more than mere annoyance. *Substantial* (def. 9), *The Oxford English Dictionary* (2d ed. 2000).

8

Even so, the law captures much speech, in part because it does not require that emotional distress be objectively reasonable. Though we hope that Americans can discuss sensitive issues without taking offense, that is not always so. And the law penalizes speech even when a listener's distress is unexpected or idiosyncratic.

That is a problem. The First Amendment protects lots of speech that is substantially emotionally distressing. Protesters may picket a marine's funeral with signs like "Thank God for Dead Soldiers," "God Hates Fags," and "You're Going to Hell." *Snyder v. Phelps*, 562 U.S. 443, 448 (2011). And a pornographer may parody a famous minister as having drunken sex with his mother. *Hustler Mag. v. Falwell*, 485 U.S. 46, 47–48, 51 (1988). These statements are deeply offensive, yet still covered by the First Amendment.

So neither the act nor the result element suffices to narrow the law's wide reach.

### D. The intent element, narrowly construed, saves the statute

*1. Broadly construing intent to harass or intimidate would raise constitutional problems.* Recall that the statute punishes only defendants who "inten[d] to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person." 18 U.S.C. § 2261A(2). Even speech "directed to inciting or producing imminent lawless action" is unprotected by the First Amendment. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam). So "intent to kill,

9

injure, … or place under surveillance with intent to kill, [or] injure" is unprotected. §2261A(2).

But "intent to … harass [or] intimidate" is another matter. *Id.* If we read those words broadly, the law will reach protected speech. Take the verb "harass." It can mean aggression, even violence: "worry[ing] and imped[ing] by repeated attacks." *Harass* (def. 1b), *Webster's Third New International Dictionary of the English Language Unabridged* (1966); *accord Harass* (def. 3), *Oxford English Dictionary* (2d ed. 1989) (*OED*). But "harass" can also mean "to vex, trouble, or annoy continually or chronically." *Harass* (def. 2b), *Webster's Third*; *see also Harass* (def. 4), *OED*. These poles mark a spectrum from repeated annoyance to outright violence.

Like harassment, intimidation has both narrow and broad meanings. To "intimidate" can mean a specific, violent action. It "esp[ecially]" means "to force [someone] to or deter [him] from some action by threats or violence." *Intimidate*, *OED*; *accord Intimidation*, *Black's Law Dictionary* (10th ed. 2014) ("Unlawful coercion; extortion."). But "intimidate" can also mean broadly "[t]o render timid, inspire with fear; to overawe, cow." *Intimidate*, *OED*.

Harassment and intimidation, narrowly construed, are punishable. "Intimidation in the constitutionally proscribable sense of the word … plac[es] the victim *in fear of bodily harm or death*." *Black*, 538 U.S. at 360 (emphasis added). Harassing debt collection and coercive threats are also unprotected. *See, e.g.*, *Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2347 (2020) (suggesting that the Constitution lets Congress regulate the way people collect debts); *Saxe v. State Coll. Area*

*Sch. Dist.*, 240 F.3d 200, 208 (3d Cir. 2001) (Alito, J.) (describing a "robber's demand 'your money or your life'" as an unprotected threat); *cf. Bronson v. Kinzie*, 42 U.S. 311, 315–16 (1843) (recognizing the ability of a state to "secure its citizens from unjust and harassing litigation").

Yet the broader definitions of "harass" and "intimidate" can describe nonviolent, nonthreatening speech. Filling a city councilman's voicemail box with complaints about his vote on a controversial municipal ordinance may "vex" or "cow" him. Ranting in the comments section of a website that a senator voted to lock refugee kids in cages could well "annoy [her] continually or chronically" or "render [her] timid." Or, to take a couple more mundane examples, "negative restaurant reviews left on Google or Yelp, irate emails sent to service providers (contractors, plumbers, etc.), … or antagonistic comments left on news sites" are often persistently annoying or even scary. *People v. Moreno*, 2022 WL 894725, at *5 (Colo. Mar. 28, 2022). Each might satisfy the statute's act and intent elements, read broadly, and (depending on the recipient's reaction) the result element too.

But criminalizing that speech would collide with the First Amendment. The First Amendment protects at least some speech that persistently annoys someone and makes him fearful or timid. As then-Judge Alito observed: "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe*, 240 F.3d at 204. Though "non-expressive, physically harassing *conduct* is entirely outside [its] ambit," "deeply offensive" *speech* is not. *Id.* at 206 (emphasis added). On the contrary, "the free speech clause protects a wide

11

variety of speech that listeners may consider deeply offensive." *Id.*

Thus, broad harassment laws that punish offensive speech "steer[ ] into the territory of the First Amendment." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995) (Title VII); *see also Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995) (university speech policy). And courts have often struck them down. *See, e.g.*, *State v. Brobst*, 857 A.2d 1253, 1255–56 (N.H. 2004) (holding overbroad a harassment statute covering any speech made "with the intent to annoy or alarm another"); *Ex parte Barton*, 586 S.W.3d 573, 584–85 (Tex. Ct. App. 2019) (same); *Moreno*, 2022 WL 894725, at *5–6 (same). So here too, we must ensure that the cyberstalking statute does not "present[ ] a 'realistic danger' [that] the [Government] could compromise" First Amendment protections. *Dambrot*, 55 F.3d at 1183.

*2. Though the text supports the broad reading, constitutional avoidance tells us to select the narrow one.* To decide between the broad and narrow readings, we use ordinary tools of statutory interpretation. Here, those tools support the broad reading of the statute. Even so, the narrow reading is textually plausible. Because that definition will not "twist the text beyond what it will bear," we must adopt it. Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 Boston U. L. Rev. 109, 141 (2010) (defining constitutional avoidance); *see Ferber*, 458 U.S. at 769 n.24.

To start, we acknowledge the strong textual arguments in favor of the broad reading. For one, reading the statute broadly

fits with two canons of construction: consistent usage and surplusage. One of the statute's result elements tracks the narrow definition of "intimidate" word for word: "places that person in reasonable fear of … death … or serious bodily injury." 18 U.S.C. § 2261A(2)(A); *Black*, 538 U.S. at 360. Yet the intent element merely says "intimidate," without elaborating. So if we read the intent element's use of "intimidate" to mean "placing [a person] in fear of bodily harm or death," we create an inconsistent-usage problem. *Black*, 538 U.S. at 360. Normally, where Congress uses different words, we read those words to have different meanings. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) (presumption of consistent usage). And that suggests Congress meant "intimidate" to mean something different from "intent to cause fear of harm or death." The broad reading produces that result; the narrow one does not.

Plus, the other result element requires only that the act "cause[d] … substantial emotional distress." § 2261A(2)(B). So causing "substantial emotional distress" presumably includes something other than putting someone in fear of bodily harm. And someone who fears death or injury is usually distressed too. Thus, the narrow reading would let the government charge most crimes under § 2261A(2)(B), leaving § 2261A(2)(A)'s fear element almost "meaningless." *Yates v. United States*, 574 U.S. 528, 543 (2015) (canon against surplusage); *see* §§ 2261(b), 2261B(a) (setting the same penalties for both crimes). Statutes typically do not work that way.

But though that problem borders on surplusage, it does not foreclose the narrower reading. Even under our narrow

13

reading, the result elements would not be entirely superfluous. Imagine a defendant who intended to make his victim fear death or injury but produced a lesser emotional result: perhaps an incompetent criminal whose vague "threats" succeed only in upsetting their recipient through sheer persistence. The emotional-distress result element would let the statute reach that cyberstalker.

Besides, these surplusage and consistent-usage concerns are "not absolute." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004). Congress is not always precise when drafting statutes; it occasionally "use[s] different words to denote the same concept." Scalia & Garner, *Reading Law* 170. Thus, concerns about redundancy only "supply a clue as to the better interpretation of the statute." *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019). And courts may accept a reading that creates surplusage if "some maxim point[s] in a different direction." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (internal quotation marks omitted). For instance, presuming "inartful drafting," the Supreme Court has accepted a construction of the Affordable Care Act that it acknowledged created surplusage. *See King v. Burwell*, 576 U.S. 473, 491 (2015).

A second point in favor of the broad reading: it fits with how juries infer intent. We often instruct them to "consider the natural and probable results or consequences" of a defendant's acts and ask if he "intended those results or consequences." *United States v. Sussman*, 709 F.3d 155, 177 (3d Cir. 2013). Here, a jury would consider whether a defendant intended to cause the "substantial emotional distress" that resulted. On that approach, "intent to intimidate" could include intentionally

14

causing an emotional reaction generally (the broader reading), not just intentionally causing fear of physical harm (the narrower reading).

But harassment statutes sometimes do limit a jury's ability to lean on the natural and probable causes of conduct to infer the defendant's intent. Indeed, a few states require prosecutors to show "intent to place [a] person in imminent fear of death or bodily injury" even when the result is mere "substantial emotional distress." *Commonwealth v. Cullen*, 947 N.E.2d 1147, 1150 (Mass. App. Ct. 2011); *accord State v. Diez*, 811 So. 2d 1020, 1024 (La. Ct. App. 2002).

Thus, though these textual clues suggest that the broader reading is the better reading, they do not render the narrower reading implausible. And other textual clues justify the narrower reading too: neighboring terms reinforce reading "intimidate" and "harass" narrowly. When construing a word, we give it "more precise content" that fits with "the neighboring words with which it is associated." *Williams*, 553 U.S. at 294 (explaining the "commonsense canon of *noscitur a sociis*"). Here, both "kill" and "injure" are violent verbs. After those verbs, one naturally reads "intimidate" to mean putting the victim in fear of death or injury. And one naturally reads "harass" to mean a course of conduct designed to distress the victim by threatening, intimidating, or the like. Yung's campaign of terror, inciting sexual violence against the interviewer and his family at their home, exemplifies the narrower kind of harassment and intimidation.

To "intimidate," we hold, a defendant must put the victim in fear of death or bodily injury. And to "harass," he must

15

distress the victim by threatening, intimidating, or the like. That reading limits intent to harass to "criminal harassment, which is unprotected because it constitutes true threats or speech that is integral to proscribable criminal conduct." *Ackell*, 907 F.3d at 76. It also limits "intent to intimidate" to what it "especially" means, a form of true threats or speech integral to a crime. *Id.*; *Intimidate*, *OED*. Those narrow readings ensure that protected speech largely escapes the law's net. Thus, we can avoid the "strong medicine" of invalidating the statute as facially overbroad. *Broadrick*, 413 U.S. at 613.

In reading the statute narrowly, we reaffirm our earlier decision upholding the cyberstalking statute. *Gonzalez*, 905 F.3d at 190 n.10 (2006 version). And we join every other circuit that has evaluated the law. *United States v. Fleury*, 20 F.4th 1353, 1362–63 (11th Cir. 2021) (current version); *Ackell*, 907 F.3d at 77 (same); *see also United States v. Sayer*, 748 F.3d 425, 436 (1st Cir. 2014) (2006 version); *United States v. Bowker*, 372 F.3d 365, 379 (6th Cir. 2004) (same), *vacated on other grounds*, 543 U.S. 1182 (2005); *United States v. Petrovic*, 701 F.3d 849, 856 (8th Cir. 2012) (same); *Osinger*, 753 F.3d at 944–45 (same).

### E.  We will affirm, not vacate, Yung's conviction

Because we adopt this "limiting construction" to save the statute, Yung urges us not to affirm. Yung Br. 27 n.22. Rather, he claims, we should "vacate [his] conviction and remand with leave to withdraw his plea and reconsider his options under that new legal landscape." *Id.* His brief does not say why. But at argument, his counsel hinted that, because Yung did not know

16

how we would later read the statute, his plea could not have been "knowing and intelligent." Oral Arg. Tr. 9:13.

Not so. For a defendant's guilty plea to be knowing and intelligent, he must be of sound mind, understand the nature of the charges and the direct penal consequences, and have the advice of competent counsel. *Brady v. United States*, 397 U.S. 742, 755–56 (1970). But he may not later withdraw his plea just because he "did not correctly assess every relevant factor entering into his decision." *Id.* at 757. For instance, even if a defendant pleaded guilty to avoid the threat of the death penalty, and a court later struck that threat down, his plea still stands as knowing. *Id.* at 755.

Indeed, at argument, Yung's counsel argued that to vacate his conviction, we would have to craft a new guilty-plea rule for overbreadth challenges. Oral Arg. Tr. 10:13–11:9. But even if we were to consider that novel idea, Yung forfeited it: he tucks it into a single footnote, without supporting authority or analysis. *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (Alito, J.). So his conviction stands.

## III. THE DISTRICT COURT PROPERLY ORDERED RESTITUTION TO THE INTERVIEWER, BUT NOT GEORGETOWN

The District Court ordered Yung to pay restitution to his victim and Georgetown. Yung challenges both orders, claiming that the statute does not authorize them. The government counters that Yung waived his right to appeal the orders. But any such waiver is unenforceable. And on the merits, only restitution to the interviewer is authorized by statute.

### A. Yung could not waive his claim that the restitution order exceeds the statute

In his plea agreement, Yung waived "the right to file any appeal," with limited exceptions. JA 122 ¶10. For instance, he "reserve[d] the right" to renew his overbreadth challenge and to contest any "sentence exceed[ing] the statutory maximum." *Id.* Yet he never reserved the right to challenge the restitution order.

Yung disagrees, arguing that his restitution order "exceeds the statutory maximum" because it is not "clearly authorized by [statute]." Reply Br. 8. But we have held that a restitution order can never exceed the "statutory maximum." *United States v. Leahy*, 438 F.3d 328, 337–38 (3d Cir. 2006). That term implies some "range" of potential sentences from which the sentencing court must pick. *Id.* Yet restitution statutes authorize only one award: "the full amount of each victim's losses." *Id.* (quoting 18 U.S.C. § 3664(f)(1)(A)). "Thus, there is no restitution range" and no statutory maximum. *Id.*

Even so, we will not enforce Yung's waiver of his right to challenge the restitution order. *See United States v. Gordon*, 480 F.3d 1205, 1209–10 (10th Cir. 2007) (holding likewise). Doing so would let litigants subvert the Constitution's structure and thus "amount[] to a miscarriage of justice." *United States v. Khattak*, 273 F.3d 557, 562 (3d Cir. 2001); *see also United States v. Teeter*, 257 F.3d 14, 25 n.10 (1st Cir. 2001).

True, we let defendants waive most of their individual rights because we treat plea bargains like contracts. *See United States v. Williams*, 510 F.3d 416, 422 (3d Cir. 2007). A

defendant, for instance, can waive his rights to counsel, to a jury trial, and even to confront his accusers, if he does so knowingly and voluntarily. *United States v. Mezzanatto*, 513 U.S. 196, 200–01 (1995).

Still, there are limits. Plea bargains are agreements between the executive branch, charged with "tak[ing] Care that the Laws be faithfully executed," and a defendant subject to those laws. U.S. Const. art. II, §3. Judges must ensure that a bargain respects those laws. So if it offends these structural principles, we need not enforce it. *See* Nancy J. King, *Priceless Process: Nonnegotiable Features of Criminal Litigation*, 47 UCLA L. Rev. 113, 154–58, 166–72 (1999).

Thus, when the executive branch threatens to intrude upon the legislature's power in a case before us, judges must rebuff that encroachment. For instance, we should not let a defendant waive his right to appeal a conviction for acts that are not a crime. *Cf. Brady*, 397 U.S. at 758; King, *Priceless Process*, at 168–69. Otherwise, we would let the government and a private party de facto create a new crime. But only Congress has that power in our limited government. *United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 32 (1812). Even if the defendant consents, we cannot turn a blind eye to punishment for acts not criminalized by Congress. The judiciary must safeguard the separation of powers.

Likewise, a defendant cannot waive his right to appeal a sentence unauthorized by Congress. And we cannot enforce such a waiver. *United States v. Cohen*, 459 F.3d 490, 497–98 (4th Cir. 2006); *United States v. Thomas*, 932 F.3d 1139, 1140–41 (8th Cir. 2019); *United States v. Phillips*, 174 F.3d 1074,

19

1076 (9th Cir. 1999); *Gordon*, 480 F.3d at 1209; *see also United States v. Chem. & Metal Indus.,* 677 F.3d 750, 752 (5th Cir. 2012). If we did so, we would be crafting our own punishment and thus "intrud[ing] into areas committed to [an]other branch[] of government." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). So Yung could not have waived his right to challenge whether the statute authorized his restitution order, and we must hear his appeal.

### B. The interviewer is entitled to restitution

Now on to the merits. The District Court ordered Yung to pay the interviewer restitution for his investigative costs and attorney's fees. The special restitution statute for cyberstalking victims is broad: it lets victims recover "attorneys' fees" and "any … losses suffered … as a proximate result of the offense." 18 U.S.C. § 2264(b)(3)(E), (G); *see also Lagos v. United States*, 138 S. Ct. 1684, 1689 (2018) (discussing § 2264). The question, then, is whether the interviewer's losses were a "direct and foreseeable" result of the crime. *Paroline v. United States*, 572 U.S. 434, 449 (2014) (parsing 18 U.S.C. § 2259(b), worded similarly to § 2264(b)).

They were. Yung used pseudonyms to defame the interviewer and recruited others to threaten his family. To make that campaign of harassment stop, they needed to track Yung down, report him to the authorities, and get charges filed against him. Because those expenses were foreseeable, this restitution order is valid.

20

### C. Georgetown is not entitled to restitution

But Georgetown should not get restitution. Unlike the interviewer, Georgetown was never itself harassed. Though it worried that Yung might eventually target its campus, he never did. So Georgetown does not qualify for the special cyberstalking restitution statute. *See* 18 U.S.C. §2264(c) (defining "victim[s]" eligible under that statute). Instead, it could claim restitution only under the general restitution statute. That law is far more limited. It allows recovery only if Georgetown showed that Yung's "offense result[ed] in damage to or destruction of property." 18 U.S.C. §3663(b)(1). The government claims that the property that Yung damaged "was the safety and security of Georgetown's campus." Oral Arg. Tr. 27:13.

That is not enough, for two reasons. First, Georgetown cannot show that Yung damaged its *property*. Yung harmed no land, buildings, intellectual property, or the like. Rather, he threatened the safety of the campus, forcing Georgetown to beef up its security systems. We do not treat safety and security as a property right. True, we once extended restitution beyond tangible property to uphold restitution for a prosecutor's loss of "hard-won convictions." *United States v. Hand*, 863 F.2d 1100, 1104 (3d Cir. 1988). But *Hand* offered no definition or even explanation of how convictions could be property. And convictions are not analogous to safety on Georgetown's campus. So *Hand* does not persuade us to depart from the ordinary understanding of property here. *See Gov't of V.I. v. Davis*, 43 F.3d 41, 46 (3d Cir. 1994) (distinguishing and limiting *Hand*).

21

Even if safety and security were property, Georgetown showed no *damage* to them. "Damage … reduces the value or usefulness of the [property] or spoils its appearance." *United States v. Quillen*, 335 F.3d 219, 225 (3d Cir. 2003) (quoting *Oxford American Dictionary* 214 (1980)). For instance, we held that an anthrax scare damaged a mail room by making it temporarily "unusable." *Id.* at 222. Yet Yung's threats never made Georgetown's campus unusable for students and faculty, or its security systems unusable for run-of-the-mill disturbances. Nor does Georgetown say that its security systems were unhelpful in dealing with Yung. It says only that it "had to deploy numerous, continuous security measures above and beyond the customary means and methods" to protect its property. JA 518–19. That is not enough.

\* \* \* \* \*

Cyberstalking is a serious crime that calls for serious punishment. But courts must be vigilant to keep crimes and punishments within the bounds of law. Cyberstalking laws must be read narrowly to avoid punishing protected speech. We cannot enforce appellate waivers that violate the separation of powers. And we must keep penalties within the confines authorized by Congress.

Here, we are confident that Yung's conviction is lawful, as is his duty to compensate the interviewer for the harm he caused. But because Georgetown suffered no damage to any property right, we will vacate that restitution order.

22

# North Carolina Criminal Law

A UNC School of Government Blog

## Court Vacates Stalking Convictions on First Amendment Grounds



Posted on Mar. 20, 2019, 8:00 pm by Shea Denning

Yesterday the court of appeals vacated Brady Lorenzo Shackelford's convictions for felony stalking on the basis that the prosecution of Shackelford for violating G.S. 14-277.3A impermissibly infringed upon his constitutional right to free speech. This post will review the court's opinion in _State v. Shackelford_, ___ N.C. App. ___ (March 19, 2019), consider how it might affect future prosecutions, and suggest statutory amendments to stave off future constitutional challenges.

**What is felony stalking?** A person is guilty of stalking if he or she

(1) willfully

(2) without legal purpose

harasses another person on more than one occasion or

engages in a course of conduct directed at a specific person

(3) knowing that the harassment or course of conduct would cause a reasonable person to

fear for the person's safety or the safety of the person's immediate family or close personal associates or

suffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment.

G.S. 14-277.3A(c).

_Harassment_ is "[k]nowing conduct, including written or printed communication or transmission . . . telephonic communication . . . and electronic mail messages or other computerized or electronic transmissions directed at a specific person that torments, terrorizes or terrifies that person and that serves no legitimate purpose." G.S. 14-277.3A(b)(2).

Case 2:24-cr-00163-TS  Document 209-1  Filed 05/01/26  PageID.11493  Page 211 of 283

A *course of conduct* is "[t]wo or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, is in the presence of, or follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property." G.S. 14-277.3A(b)(1).

Stalking generally is a Class A1 misdemeanor. If, however, a person commits the offense of stalking after having previously been convicted of a stalking offense, the offense is a Class F felony. And stalking while a court order prohibiting stalking is in place is a Class H felony. G.S. 14-277.3A(d).

**Facts in *Shackelford*.** Brady Shackelford met "Mary" (a pseudonym) in April 2015 at a church service in Charlotte. Mary worked for the church's communications department and briefly chatted with Shackelford before the service began. Two weeks later, Shackelford emailed Mary asking for help with a company communications plan. Mary said she would be happy to help him and suggested a time to meet. Shackelford followed up with an email stating that he would pay Mary "100K out of the convertible note proceeds AND take [her] out to dinner at any restaurant in Charlotte." This email "set off a lot of red flags " for Mary. She emailed Shackelford to cancel the meeting. Shackelford tried to reschedule. Mary said she would not be able to meet and instructed Shackelford to contact her boss with further questions.

Two weeks later, Shackelford mailed a five-page handwritten letter to Mary at work telling her, among other things, that when he saw her he thought he had found his soul mate, that he was "highly attracted" to her and asking her to go on a date.

A week after that, Shackelford mailed a seven-page handwritten letter to Mary at her home address.

Mary showed both letters to her supervisors and asked for their help.  A church minister contacted Shackelford in June 2015 and told him to stop contacting Mary.

That same month, Mary discovered posts that Shackelford had made on his Google Plus account (which was public) referring to her by name. He wrote that God had chosen Mary to be his soul mate and that he wanted God to please make Mary his wife. After the minister contacted Shackelford, he continued to post about his desire for Mary and his belief that she was his soul mate, but did not use her full name.  (One post used her initials and another used a shortened version of her name.)

Then, in August, Mary received a box of cupcakes at her work with a note stating: "I never properly thanked you for the help you gave me regarding my company's communication plan, so, with these cupcakes, please accept my thanks."

After she received the cupcakes, Mary filed a police report. Shackelford was subsequently charged with and arrested for misdemeanor stalking. Nevertheless, he continued to post missives about his desire for Mary on his Google Plus account.

Mary petitioned for and was granted a <u>no contact order</u> on September 1, 2015. The order prohibited Shackelford from contacting Mary and from "posting any information about her on social media." Apparently undeterred, Shackelford continued to post, referring to Mary on multiple occasions as his "future wife" and on one occasion as his "wife." In November and December 2015, Shackelford emailed one of Mary's friends, referencing Mary and the protective order.

**Procedural history.** Based on the posts and emails, Shackelford was indicted for eight counts of stalking. Four of the counts alleged felony stalking based on Shackelford's conviction in Virginia in 1992 for stalking. The other four alleged felony stalking based on violations of the no-contact order. The trial judge dismissed the latter counts based upon its concern that the language in the no-contact order prohibiting Shackelford from posting about Mary on social media was unconstitutional. The jury convicted Shackelford of the remaining four counts.

Shackelford appealed, alleging that prosecuting him for the content of his posts and emails violated his constitutional right to free speech.

**Analysis.** The court of appeals first noted that posting information on the internet is speech and that the government generally has no power to restrict speech based on its content. Laws that target such speech are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve a compelling state interest.

**Do free speech protections apply?** Limited categories of speech are, however, excluded from protection under the First Amendment and its state constitutional counterpart. Speech that is integral to criminal conduct is among the categories excluded from protection, and the State argued that Shackelford's speech fell within this exclusion. The court of appeals disagreed.

The State's theory of criminal culpability was that Shackelford's posts amounted to a course of conduct prohibited by the stalking statute. A course of conduct consists of acts in which the stalker communicates to or about a person. The court reasoned that Shackelford's posts were not integral to some additional criminal conduct. Instead, they *were* the criminal conduct. Because Shackelford's speech itself was the crime, the court determined that Shackelford's right to free speech was directly implicated by his prosecution.

**Strict scrutiny.** Having determined that Shackelford's speech was protected by the state and federal constitution, the court considered whether the content-based

restrictions in G.S. 15A-277.3A were narrowly tailored to serve a compelling government interest. Accepting for the sake of argument that G.S. 15A-277.3A served a compelling government interest by preventing the escalation of stalking into more dangerous behavior, the court nevertheless determined that applying the statute to Shackelford's posts was not the least restrictive means of accomplishing that goal. The court noted that Mary had already sought and received a protective order that prohibited Shackelford from approaching or contacting her. That order was a means less restrictive than criminal prosecution by which the State could prevent Shackelford from engaging in a criminal act against Mary.

*Shackelford* cited as support the North Carolina Supreme Court's determination in *State v. Bishop*, 368 N.C. 869 (2016) (discussed [here](#)), that provisions of the cyberbullying statute that made it unlawful to post on-line private, personal or sexual information about a minor with the intent to intimidate or torment a minor failed strict scrutiny. *Bishop* concluded that the statute swept "far beyond the State's legitimate interest in protecting the psychological health of minors[,]" stating that while "protection of minors' mental well-being may be a compelling governmental interest . . . it is hardly clear that teenagers require protection via the criminal law from online annoyance." *Id.* at 878–79 (2016).

*Shackelford* also cited favorably *People v. Relerford*, 104 N.E.3d 341(Ill. 2017), a case in which the Supreme Court of Illinois determined that provisions of its state stalking statute that prohibited two or more communications "to or about" a person that would cause a reasonable person to suffer emotional distress were unconstitutionally overbroad. The *Relerford* court reasoned that such language could be construed to prohibit a person from attending a town meeting at which he or she repeatedly complained about pollution caused by a local business owner and advocated for a boycott of the business. A person could be prosecuted, the court said, if he or she persisted in complaining after being told to stop by the business owner and the person knew or should knew that the complaints would cause the business owner to suffer emotional distress due to the economic impact of a possible boycott.

Unlike *Releford* and *Bishop*, the *Shackelford* court did not strike down provisions of the stalking statute as overbroad. Instead, it ruled the provisions unconstitutional as applied to Shackelford's conduct. But even though the statute was not ruled facially unconstitutional, the court's holding effectively bars any stalking prosecution founded solely on indirect, public communication about a person.

**How might the statute be amended?** Many provisions of the stalking statute regulate conduct rather than speech. For example, the course of conduct prohibited by the statute includes following, monitoring, observing, surveilling or threatening a person. None of those prohibitions raise constitutional concerns.

Similarly, the statute's provisions prohibiting distressing and unwanted one-to-one speech are not of particular constitutional concern. Judge Murphy's concurrence in *Shackelford* emphasized this point, citing Eugene Volokh, *One–to–One Speech vs. One–to–Many Speech, Criminal Harassment Laws, and "Cyberstalking,"* 107 Nw. U. L. Rev. 731, 742 (2013) ("[Laws addressing telephone harassment, stalking, and unwanted mailings] have one thing in common: In the great bulk of their applications, they restrict what one may call 'unwanted one-to-one' speech – speech said to a particular person in a context where the recipient appears not to want to hear it, whether because the recipient has expressly demanded that the speech stop or because the speaker intends to annoy or offend the recipient. The laws are aimed at restricting speech *to* a person, not speech *about* a person. And that is the context in which they have generally been upheld against First Amendment challenge.")).

To alleviate constitutional concerns of the sort that arose in *Shackelford*, the General Assembly could amend G.S. 15A-277.3A to eliminate the prohibition against "communicat[ing] to or about a person." This would remove public statements about a person from the statute's reach as well as the town-hall business-owner type of communication referenced in *Releford*.

Category: <u>Crimes and Elements</u> | Tags: <u>14-277.3A</u>, <u>first amendment</u>, <u>free speech</u>, <u>harassment</u>, <u>stalking</u>, <u>state v. shackelford</u>, <u>strict scrutiny</u>

This blog post is published and posted online by the School of Government to address issues of interest to government officials. This blog post is for educational and informational Copyright © 2009 to present School of Government at the University of North Carolina. All rights reserved. use and may be used for those purposes without permission by providing acknowledgment of its source. Use of this blog post for commercial purposes is prohibited. To browse a complete catalog of School of Government publications, please visit the School's website at www.sog.unc.edu or contact the Bookstore, School of Government, CB# 3330 Knapp-Sanders Building, UNC Chapel Hill, Chapel Hill, NC 27599-3330; e-mail sales@sog.unc.edu;

eport a Digital Access Issue

© 2023 Copyright,
North Carolina Criminal Law
at the School of Government with the
University of North Carolina at Chapel Hill

No. COA18-273
COURT OF APPEALS OF NORTH CAROLINA

# State v. Shackelford

264 N.C. App. 542 (N.C. Ct. App. 2019)   ·   825 S.E.2d 689
Decided Mar 19, 2019

No. COA18-273

03-19-2019

STATE of North Carolina v. Brady Lorenzo SHACKELFORD

Attorney General Joshua H. Stein, by Solicitor General Matthew W. Sawchak and Assistant Solicitor General Kenzie M. Rakes, for the State. Appellate Defender Glenn Gerding, by Assistant Appellate Defender James R. Grant, for defendant-appellant.

---

DAVIS, Judge.

Attorney General Joshua H. Stein, by Solicitor General Matthew W. Sawchak and Assistant Solicitor General Kenzie M. Rakes, for the State.

Appellate Defender Glenn Gerding, by Assistant Appellate Defender James R. Grant, for defendant-appellant.

DAVIS, Judge.*543 In this appeal, we address the question of whether a defendant's criminal prosecution for violations of North Carolina's stalking statute infringed upon his constitutional right to free speech. Brady Lorenzo Shackelford ("Defendant") was convicted of four counts of felony stalking based primarily upon the content of posts made by him on his Google Plus account. Because we conclude that the application of the statute to Defendant's posts amounts to a violation of his right to free speech under both the First Amendment to the United States Constitution and Article 1, Section 14 of the North Carolina Constitution, we vacate his convictions.

## Factual and Procedural Background

The State presented evidence at trial tending to establish the following facts: Defendant met "Mary"[1] on 3 April 2015 at a church in Charlotte, North Carolina prior to the start of a Good Friday worship service. Mary was employed in the church's communications department. The two of them were seated at the same table and briefly made small talk in a group setting before separating at the beginning of the service. Upon leaving church that day, Mary did not give any further thought to her encounter with Defendant.

[1] A pseudonym is used throughout this opinion to protect the identity of the subject of Defendant's posts.

On 22 April 2015, Mary received an email from Defendant on her work email account that referenced their 3 April meeting and asked "for help with a company communications plan." Mary replied to his email later that day, informing him that she would be happy to assist him and *544 suggesting a time for them to meet. Defendant responded shortly thereafter, agreeing to meet Mary on the date she had suggested.

 casetext

Later that same night, Defendant sent another email to Mary "to give [her] some information about [his] business[.]" In the email, Defendant detailed his plan to create a new business based in the British Virgin Islands. In the final paragraph of his email, Defendant wrote that he would pay Mary "100K out of the convertible note proceeds AND take [her] out to dinner at any restaurant in Charlotte."

Defendant's email "set off a lot of red flags" for Mary. On 27 April 2015 she emailed Defendant to "cancel[ ] the meeting, thinking that his intentions were not really professional, and informed [her] boss" about the exchange. Later that day and again on 5 May 2015, Defendant emailed Mary in an attempt to reschedule their meeting. On 5 May 2015, Mary replied with links to online resources and wrote: "I won't be able to meet. If you have further questions, you can contact my boss[.]"

On 19 May 2015, Defendant mailed a five-page handwritten letter to Mary's work address. At trial, Mary testified as follows with regard to this letter:

> The gist of it was that when [Defendant] first saw me at the Good Friday service he thought he had found his soul mate, and that the feelings he felt were so intense he couldn't talk to me. And then he goes on to

*692

> say that he used the communications plan to talk to me, to ask me out, rather than for professional reasons[.]

Defendant ended the letter by writing that he was "highly attracted" to Mary and asking her to go on a date with him. The following day, Mary gave the letter to her work supervisors and asked them to intervene on her behalf, and they agreed to do so. She did not respond to Defendant's letter.

On 26 May 2015, Defendant sent Mary a second handwritten letter, which was seven pages long and mailed to her home address. At trial, Mary provided a summary of the second letter:

> He starts by apologizing for sending this to me without me giving him my address. He says he found it on a website. And he also says that he would not harass or stalk me, and that if I felt uncomfortable to notify him and he would cease communication. Then he goes on to talk about some of his personal history, and the last line says that I need to go on a date with him or tell him to leave me alone.

*545

Mary showed Defendant's letter to her supervisors, who once again told her that they would handle the situation.

On 9 June 2015, Reverend Bill Roth, the Minister of Pastoral Care at the church, spoke to Defendant over the phone about his communications with Mary. During this phone call, Reverend Roth told Defendant "to stop making any contact [with Mary] and [that] there could be legal actions if he did, and that the contacts were unwanted." Following this conversation, Defendant did not send Mary any further emails or letters.

In June of 2015, Mary logged into an account she had created on the social media service Google Plus. Upon doing so, she discovered that Defendant had "followed" her account sometime in late April of 2015 and had made four separate posts on his own Google Plus account in early June that referred to her by name. The posts on Defendant's Google Plus account were not specifically directed to Mary but were shared publicly on his account where any user of the service could read them.

The first post, dated 2 June 2015, stated that "God chose [Mary]" to be Defendant's "soul mate." In the other three posts, Defendant wrote, among other things, that he "freely chose [Mary] as [his] wife" and wanted God to "please make [Mary]" his wife. After viewing these posts, Mary immediately blocked Defendant's account. Shortly thereafter, she deleted her own Google Plus account. Mary continued, however, to monitor Defendant's publicly shared posts by checking his Google Plus page "[a]t least once a week."

Following his 9 June 2015 phone call with Reverend Roth, Defendant continued to post about Mary. None of his posts after that date referenced Mary by name, although one used her initials and another referred to her by a shortened version of her first name.

On 19 June 2015, Defendant wrote the following post on his Google Plus account:

> There is a woman from my church that is turning me bat crazy. She is the first thing I see when I wake up in the morning and the last thing I see before I lay down at night. I strongly believe that she is an angel in disguise, that she is the girl that God sent down from heaven for me. I strongly believe that she is my soul mate, that she is my destiny. My heart aches for her.

*546

He posted as follows on 28 June 2015:

> I'm feeling depressed. There's a woman at my church that I want really, really bad, but she doesn't want me. I've prayed to God asking him to relieve this pain in my heart by allowing me to view just a small glimpse of her angelic face while in church, but God won't even give me that.?

On 19 July 2015, Defendant wrote the following post:

> I've changed my relationship status because too many single & looking women are adding me to their circles. There is only one woman that I want, and her initials are [Mary's initials]. Even though we aren't dating yet, you might as well mark me down as being in a relationship because I am not interested in other women.

He also posted a message on 2 August 2015 stating that "I believe the woman who *693 introduced me to my soul mate at my church's Good Friday service is jealous and envious of my love for my soul mate and would rather me be with her instead of my soul mate."

On 13 August 2015, a box of cupcakes was delivered to Mary's office at her work. Attached to the box was a typed, unsigned note that read: "[Mary], I never properly thanked you for the help you gave me regarding my company's communication plan, so, with these cupcakes, please accept my thanks."

Upon receiving the cupcakes, Mary filed a police report with Detective Stephen Todd, an off-duty Charlotte-Mecklenburg Police Department officer who worked at the church, because she "felt like she was being stalked." Based upon Mary's report, Detective Todd applied for an arrest warrant against Defendant on a charge of misdemeanor stalking. Defendant was arrested on 14 August 2015 and subsequently released on bail.

The same day that he was arrested, Defendant posted the following message on his Google Plus account:

A woman I was interested in really, really bad has let it be known in no uncertain terms that she is not interested in me. Therefore, with a much heavy heart, I announce that I am officially single. :(

The pain hurts because I dreamt about this woman and believed that she was my soul mate. How could God be so wrong???

*547

On 16 August 2015, Defendant posted another message:

I study all religions, and I have been searching them all for the past day trying to find something, some quote, that would console me in my time of heartbreak. I just read something by Buddha that, instead of consoling me, actually made me angry. He said, "In the end, only three things matter: how much you loved, how gently you lived, and how gracefully you let go of things not meant for you."

My question for Buddha is this: How do you know when something is not meant for you if you give up at the first sign of difficulty? Sometimes, God places difficulties in our lives because he wants us to be persistent in the face of those difficulties. For example, if a boy really wanted a girl, and the girl turned him down the first time he asked her out on a date, should he take Buddha's advice and gracefully let go of something not meant for him or should he continue courting the girl with the hope that she will one day say yes? If every guy let go of the girl who turned him down the first time, then there would be lots of marriages that never took place because he wasn't persistent. Had he been persistent, his persistence would have won her over by proving to her just how much he loved her. ...

Later that same day, Defendant posted as follows on his Google Plus account:

I have courted three Venus in Scorpios over the years, so I decided earlier this summer to learn everything that I could about Scorpios and Venus in Scorpios. I was reading this website about Scorpios this evening when I read a sentence that made me break out laughing so hard from the truth that I nearly died. The author was talking about their obsessiveness and stated, "Don't run away (you'll only be stalked)." I LMAO because I saw the behavior in all three women. Moreover, the Scorpio Ascendant in me completely understood where they were coming from.

On 21 August 2015, Mary filed a petition for a no-contact order against Defendant in Mecklenburg County District Court. On 1 September 2015, the Honorable Becky Tin issued an order prohibiting Defendant from contacting Mary or "posting any information about [her] on social media."*548 Later that month, Defendant authored the following post on his Google Plus account on the same date that Mary attended a Carolina Panthers football game: "Who is your favorite Carolina Panthers cheerleader? Mine is ... I'm not telling, least [sic] I upset my Venus in Scorpio future wife. ..." On 28 September 2015, Defendant posted: "OK, I've teased my Venus in Scorpio long enough. My favorite Carolina Panthers cheerleader is Emily. If she shows up missing, [shortened form of Mary's name], I'll know who to blame."*694 Several weeks later, following a heavy rainstorm in South Carolina – where Mary's family lives – Defendant posted: "South Carolina got pummeled with rain. I pray my future wife's family is OK." On 4 October 2015, Defendant posed the following question on his account: "If you really loved someone and wanted to be with them forever, would you fly down to the Caribbean and secretly elope with them on a deserted island?"

In an undated Google Plus post that was introduced as evidence at his trial, Defendant wrote, in relevant part, as follows:

I would love to learn more about the dynamic between me and my future wife, but I don't know her personality type. I do know that she is either an INFJ or an INFP because of a pin on her Pinterest board. Unfortunately, her pin is confusing because she says that she is an INFP while the image she pinned is that of an INFJ. I guess I will just have to study both of them.

On 24 November 2015, Defendant sent an email to a close friend of Mary's. The email began as follows:

I know that you are best friends with [Mary]. In fact, I knew that you were best friends with Mary before you even added me to your circles on Google+. My question for you is this: You were present in the courtroom when [Mary] obtained a protective order against me, so why would you even add me to your circles if I am supposedly stalking [Mary]?

Later in the email, Defendant wrote that Mary had a "moral responsibility to tell the full truth as to why she really charged me when we show up in court" and that the friend should "encourage [Mary] to tell the truth when we show up in court[.]"

On Monday, 14 December 2015, Defendant posted the following on his Google Plus account:

*549

I'm going to send a personal email on Friday using my corporate email account, which doesn't have tracking software, instead of my Gmail account, which does have tracking software, because the final recipient knows that I have tracking software on my Gmail account, and I want her to share the email with as many people as possible without fear of me knowing who she is forwarding the email to.

Two days later, he wrote: "I am so eager to marry my future wife that I would rather elope with her now than marry her in our church seven months from now."

On Friday, 18 December 2015, Defendant sent another email to Mary's friend. In this email, he detailed his plans to issue a $500 million note as part of a viral marketing campaign that would ultimately result in him taking a polygraph test on CNN to prove that he had "talked to God over 20 times and seen his face 5 times[.]" According to Defendant, his televised polygraph test would provide Mary with an opportunity to save face and "tell the judge that I am obviously a righteous man and was in no way a threat towards her." Three days after sending this email, Defendant posted the following on his Google Plus account: "I just realized that I forgot my wife's birthday last week. I'm sorry, Babe[.]"

Mary's friend forwarded both of the emails she had received from Defendant to Detective Todd. Based on these emails along with Defendant's Google Plus posts, Detective Todd obtained an arrest warrant against Defendant on 24 December 2015 for felony stalking. Defendant was subsequently indicted by a grand jury on eight additional counts of felony stalking on 4 April 2016. On 4 August 2017, Defendant filed a motion to dismiss all charges against him on the ground that the Google Plus posts giving rise to his charges were protected under the First Amendment.

Defendant's jury trial began on 15 August 2017 in Mecklenburg County Superior Court before the Honorable Yvonne Mims Evans. Prior to the beginning of trial, the court denied the State's motion to amend the date on one of Defendant's indictments, and the State dismissed that charge. At the close of the State's evidence, the trial court granted Defendant's motion to dismiss the four stalking charges premised upon violations of the 1 September 2015 no-contact order. The court stated that it was doing so based upon its concern that the language in the no-contact order prohibiting Defendant from posting *695 about Mary on social media "may be unconstitutional."*550 On 18 August 2017, Defendant was convicted of each of the four remaining stalking

offenses that were submitted to the jury. All of these convictions were based upon conduct that occurred after his 9 June 2015 phone call with Reverend Roth during which he was directed to cease his attempts to communicate directly with Mary. The trial court consolidated Defendant's convictions in 16 CRS 10028 and 16 CRS 10029 and sentenced him to a term of 17 to 30 months imprisonment. The court also imposed a consecutive sentence of 15 to 27 months imprisonment for his conviction in 16 CRS 10030. With regard to Defendant's conviction in 16 CRS 10034, the court sentenced Defendant to a term of 15 to 27 months imprisonment, suspended the sentence, and placed him on 36 months of supervised probation. Defendant gave notice of appeal in open court.

## Analysis

On appeal, Defendant argues that the trial court erred by denying his motion to dismiss the four stalking charges for which he was ultimately convicted. He contends that because all of these charges were based — either in whole or in part — upon the content of his Google Plus posts, he could not constitutionally be convicted of stalking due to the resulting infringement of his right to free speech under the First Amendment to the United States Constitution and Article 1, Section 14 of the North Carolina Constitution. As such, he is asserting an as-applied challenge to North Carolina's stalking statute, N.C. Gen. Stat. § 14-277.3A.

## I. As-Applied Challenge to N.C. Gen. Stat. § 14-277.3A

## A. As-Applied Challenges Generally

With regard to the distinction between facial and as-applied constitutional challenges, this Court has stated the following:

> [T]here is a difference between a challenge to the facial validity of [a statute] as opposed to a challenge to the [statute] as applied to a specific party. The basic distinction is that an as-applied challenge represents a plaintiff's protest against how a statute was applied in the particular context in which plaintiff acted or proposed to act, while a facial challenge represents a plaintiff's contention that a statute is incapable of constitutional application in any context. ... Only in as-applied challenges are facts surrounding the plaintiff's particular circumstances relevant.

*Town of Beech Mountain v. Genesis Wildlife Sanctuary, Inc.* , 247 N.C. App. 444, 460, 786 S.E.2d 335, 347 (2016) (internal citations, *551 quotation marks, and brackets omitted), *aff'd per curiam* , 369 N.C. 722, 799 S.E.2d 611 (2017).

Here, Defendant's constitutional challenge is strictly an as-applied one. Thus, this case does not require us to consider the facial validity of N.C. Gen. Stat. § 14-277.3A.

"The standard of review for alleged violations of constitutional rights is *de novo* ." *State v. Roberts* , 237 N.C. App. 551, 556, 767 S.E.2d 543, 548 (2014) (citation and quotation marks omitted), *disc. review denied* , 368 N.C. 258, 771 S.E.2d 324 (2015). Under the *de novo* standard, this Court "considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams* , 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citation and quotation marks omitted).

## B. Overview of N.C. Gen. Stat. § 14-277.3A

N.C. Gen. Stat. § 14-277.3A provides, in pertinent part, as follows:

(c) **Offense.** — A defendant is guilty of stalking if the defendant willfully on more than one occasion harasses another person without legal purpose or willfully engages in a course of conduct directed at a specific person without legal purpose and the defendant knows or should know that the harassment or the course of conduct would cause a reasonable person to do any of the following:

....

(2) Suffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment.

N.C. Gen. Stat. § 14-277.3A (2017).

"Course of conduct" is defined in the statute as "[t]wo or more acts, including, but not *696 limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means ... communicates to or about a person[.]" *Id.* N.C. Gen. Stat. § 14-277.3A defines "harassment" as "[k]nowing conduct, including written or printed communication or transmission ... and electronic mail messages or other computerized or electronic transmissions directed at a specific person that torments, terrorizes, or terrifies that person and that serves no legitimate purpose." *Id.* In this appeal, the State argues that Defendant's convictions were proper based on the theory that he engaged in an illegal "course of conduct" directed at Mary as that phrase is statutorily defined.*552 **C. First Amendment Principles**

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws abridging the freedom of speech." *Reed v. Town of Gilbert, Ariz.* , —— U.S. ——, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236, 245 (2015) (citation and quotation marks omitted). Article 1, Section 14 of the North Carolina Constitution provides that "[f]reedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse." N.C. Const. art. I, § 14. Our appellate courts have held that the free speech protections contained in the federal and North Carolina constitutions are "parallel and has addressed them as if their protections were equivalent." *State v. Petersilie* , 334 N.C. 169, 184, 432 S.E.2d 832, 841 (1993) (citation omitted).

"Posting information on the Internet — whatever the subject matter — can constitute speech as surely as stapling flyers to bulletin boards or distributing pamphlets to passersby — activities long protected by the First Amendment." *State v. Bishop* , 368 N.C. 869, 873, 787 S.E.2d 814, 817 (2016) (citation omitted). Indeed, "the protections of the First Amendment extend in full not just to the Internet, but to all new media and forms of communication that progress might make available[.]" *Id.* at 874, 787 S.E.2d at 818 (internal citation omitted).

The United States Supreme Court has stated that "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of City of Chicago v. Mosley* , 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 216 (1972) (citation omitted). As a result, "[c]ontent-based laws — those that target speech based on its communicative content — are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed* , —— U.S. at ——, 135 S.Ct. at 2226, 192 L.Ed.2d at 245 (citation omitted). Conversely, "[g]overnment regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism* , 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661, 675 (1989) (citation and quotation marks omitted).

In *Bishop* , our Supreme Court recently addressed a constitutional challenge to North Carolina's cyberbullying statute. *Bishop* , 368 N.C. at 872, 787 S.E.2d at 817. Although *Bishop* involved a facial — rather than an as-applied — challenge, we nevertheless find the Supreme Court's decision instructive in guiding our analysis in the present case.*553 The provision of the cyberbullying statute being challenged in *Bishop* provided, in relevant part, as follows:

> (a) Except as otherwise made unlawful by this Article, it shall be unlawful for any person to use a computer or computer network to do any of the following:
>
> (1) With the intent to intimidate or torment a minor:
>
> ....
>
> d. Post or encourage others to post on the Internet private, personal, or sexual information pertaining to a minor.

N.C. Gen. Stat. § 14-458.1(a)(1)(d) (2015).

In assessing the constitutionality of that provision, our Supreme Court first analyzed whether the regulation implicated the First Amendment by restricting protected speech. *697 *Bishop* , 368 N.C. at 872, 787 S.E.2d at 817. After determining that the statute did, in fact, regulate protected speech because it "outlawed posting particular subject matter, on the internet, with certain intent[,]" the Court proceeded to its "second threshold inquiry" — whether N.C. Gen. Stat. § 14-458.1(a)(1)(d) was a content-based or content-neutral restriction. *Id.* at 873, 874, 787 S.E.2d at 817, 818. The Court explained the importance of this distinction as follows:

> This central inquiry determines the level of scrutiny we apply here. Content based speech regulations must satisfy strict scrutiny. Such restrictions are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. In contrast, content neutral measures ... are subjected to a less demanding but still rigorous form of intermediate scrutiny. The government must prove that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

*Id.* at 874-75, 787 S.E.2d at 818 (internal citations and quotation marks omitted). The Supreme Court ultimately concluded that the cyberbullying statute was content-based because it "defines regulated speech by its particular subject matter" in "criminaliz[ing] some messages but not others, and makes it impossible to determine whether the accused has *554 committed a crime without examining the content of his communication." *Id.* at 876, 787 S.E.2d at 819 (citation, quotation marks, and brackets omitted).

The Court then proceeded to examine whether the challenged provision of the cyberbullying statute survived strict scrutiny. After determining that the protection of minors from online bullying represented a compelling governmental interest, it analyzed whether N.C. Gen. Stat. § 14-458.1(a)(1)(d) "embodies the least restrictive means of advancing the State's compelling interest in protecting minors from this potential harm." *Id.* at 878, 787 S.E.2d at 820. The Court ultimately held that the provision failed the strict scrutiny test and therefore violated the First Amendment, concluding as follows:

Were we to adopt the State's position, it could be unlawful to post on the Internet any information relating to a particular minor. Such an interpretation would essentially criminalize posting *any* information about *any* specific minor if done with the requisite intent.

... N.C. Gen. Stat. § 14-458.1(a)(1)(d) could criminalize behavior that a robust contemporary society must tolerate because of the First Amendment, even if we do not approve of the behavior. ...

In sum, however laudable the State's interest in protecting minors from the dangers of online bullying may be, North Carolina's cyberbullying statute creates a criminal prohibition of alarming breadth.

*Id.* at 879, 787 S.E.2d at 821 (citations, quotation marks, and brackets omitted).

## 1. "Speech Integral to Criminal Conduct" Exception

Having reviewed the pertinent legal principles implicated by Defendant's arguments on appeal, we now turn our attention to Defendant's constitutional argument itself. Before we apply the analysis applicable to challenges brought under the First Amendment, however, we must first address the threshold issue raised by the State that Defendant's Google Plus posts are excluded from First Amendment protection. Specifically, the State contends that Defendant's posts constitute "speech that is integral to criminal conduct" — a category of speech that falls outside of the protection provided by the First Amendment. We disagree.*555 Although it is well established that content-based speech restrictions are presumptively invalid, certain categories of expression are wholly excluded from First Amendment protection. *See U.S. v. Stevens* , 559 U.S. 460, 468-69, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435, 444 (2010) (listing obscenity, defamation, fraud, and "speech integral to criminal conduct" as examples of "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem" (internal citations and quotation marks omitted) ). "[I]t rarely has been suggested that the constitutional freedom for *698 speech ... extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *New York v. Ferber* , 458 U.S. 747, 761-62, 102 S.Ct. 3348, 3357, 73 L.Ed.2d 1113, 1125-26 (1982) (citation and quotation marks omitted); *see id.* at 758-59, 102 S.Ct. at 3355, 73 L.Ed.2d at 1124 (holding ban on distribution of child pornography "passes muster under the First Amendment" because speech at issue was "intrinsically related to the sexual abuse of children").

In evaluating the State's argument on this issue, we find the decision from the Illinois Supreme Court in *People v. Relerford* , 2017 IL 121094, ¶1, 422 Ill.Dec. 774, 104 N.E.3d 341 to be helpful.[2] In *Relerford* , the court invalidated certain provisions of Illinois' stalking and cyberstalking statutes as facially violative of the First Amendment. *Id.* at ¶63, 422 Ill.Dec. at 789, 104 N.E.3d at 356. The challenged provision of the stalking statute — which was very similar to the pertinent language from N.C. Gen. Stat. § 14-277.3A — stated that "two or more nonconsensual communications to or about a person that the defendant knows or should know would cause a reasonable person to suffer emotional distress constitute a course of conduct sufficient to establish the offense of stalking." *Id.* at ¶29, 422 Ill.Dec. at 782, 104 N.E.3d at 349. In determining that the above-quoted provision was constitutionally invalid, the Illinois court rejected the state's argument that the statutory provision merely regulated speech integral to criminal conduct:

[2] Although it is axiomatic that we are not bound by decisions from the appellate courts of another state unless we are applying the law of that jurisdiction, we are permitted to consider them as persuasive authority. *See State v. Williams* , 232 N.C. App. 152, 157, 754 S.E.2d 418, 422 ("While we recognize that decisions from other jurisdictions are, of course, not binding on the courts of this State, we are free to review such decisions for guidance." (citation and quotation marks omitted) ), *appeal dismissed and disc. review denied* , 367 N.C. 784, 766 S.E.2d 846 (2014).

In light of the fact that a course of conduct can be premised exclusively on two communications to or about a person, this ... is a direct limitation on speech that does not require any relationship — integral or otherwise — to

*556

unlawful conduct. Under [the statute], the speech *is* the criminal act.

*Id.* at ¶45, 422 Ill.Dec. at 785, 104 N.E.3d at 352.

As noted above, N.C. Gen. Stat. § 14-277.3A provides, in pertinent part, as follows:

> (c) **Offense.** — A defendant is guilty of stalking if the defendant willfully on more than one occasion ... engages in a course of conduct directed at a specific person without legal purpose and the defendant knows or should know that the ... course of conduct would cause a reasonable person to do any of the following:
>
> ....
>
> (2) Suffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment.

N.C. Gen. Stat. § 14-277.3A. Moreover, "[c]ourse of conduct" is defined in the statute as "[t]wo or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means ... communicates to *or about* a person[.]" N.C. Gen. Stat. § 14-277.3A(b)(1) (emphasis added).

Thus, the pertinent statutory language at issue here is virtually identical to the statutory provision declared to be unconstitutional in *Relerford* in that two or more communications by a defendant to or about another person can constitute a course of conduct sufficient to support a stalking conviction. Here, all four of Defendant's indictments were premised either entirely or in part upon social media posts referencing Mary — posts that he wrote *about* Mary but did not send directly *to* her (or, for that matter, to anyone else). Pursuant to the language of N.C. Gen. Stat. § 14-277.3A, no additional conduct on his part was needed to support his stalking convictions. Rather, his speech itself was the crime.

For this reason, the First Amendment is directly implicated by Defendant's prosecution under N.C. Gen. Stat. § 14-277.3A. We therefore reject the State's argument *699 that Defendant's posts fall within the "speech integral to criminal conduct" exception. *See United Food & Commer. Workers Local 99 v. Bennett* , 934 F.Supp.2d 1167, 1208 (D. Ariz. 2013) *557 ("[The statute] does not incidentally punish speech that is integral to a criminal violation; the speech itself is the criminal violation.").[3]

---

3   While threats also constitute a type of speech that does not receive First Amendment protection, *see Virginia v. Black* , 538 U.S. 343, 359, 123 S.Ct. 1536, 1547, 155 L.Ed.2d 535, 552 (2003) ("[T]he First Amendment also permits a [s]tate to ban a true threat." (citation and quotation marks omitted) ), the State conceded at oral argument that none of Defendant's Google Plus posts constituted threats against Mary.

## 2. Analysis Under First Amendment

Having concluded that the First Amendment is, in fact, triggered by Defendant's convictions, we next proceed to analyze Defendant's free speech argument within the framework adopted by the United States Supreme Court. As an initial matter, in order to determine the appropriate level of scrutiny to apply, we must first decide whether the application of N.C. Gen. Stat. § 14-277.3A to Defendant's posts represented a content-based or content-neutral restriction on speech.

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. ... Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be justified without reference to the content of the regulated speech[.]

*Reed* , ⸺ U.S. ⸺, 135 S.Ct. at 2227, 192 L.Ed.2d at 245 (internal citations and quotation marks omitted). Restrictions are also content-based if they are "concerned with undesirable effects that arise from the direct impact of speech on its audience or listeners' reactions to speech." *McCullen v. Coakley* , 573 U.S. 464, 481, 134 S.Ct. 2518, 2531–32, 189 L.Ed.2d 502, 517 (2014) (citation and quotation marks omitted).

> Once again, we find *Relerford* to be helpful to our analysis of this issue. There, the court concluded that the challenged provision of the Illinois stalking statute was a content-based restriction because the prohibition contained in the statutory language against "communications to or about a person that negligently would cause a reasonable person to suffer emotional distress criminalizes certain types of speech based on the impact that the communication has on the recipient." *Relerford* , 2017 IL 121094 at ¶34, 422 Ill.Dec. at 783, 104 N.E.3d at 351.

> Under the relevant statutory language, communications that are pleasing to the recipient due to their nature or

substance are not prohibited, but communications that the speaker knows or should know are distressing due to their nature or substance are prohibited. Therefore, it is clear that the challenged statutory provision must be considered a content-based restriction because it cannot be justified without reference to the content of the prohibited communications.

*Id.* (citation omitted). Similarly, in *Bishop* our Supreme Court determined that N.C. Gen. Stat. § 14-458.1(a)(1)(d) was a content-based restriction because the language of North Carolina's cyberbullying statute made it "impossible to determine whether the accused has committed a crime without examining the content of his communication." *Bishop* , 368 N.C. at 876, 787 S.E.2d at 819.

In the present case, based on the text of N.C. Gen. Stat. § 14-277.3A Defendant was subject to prosecution if he knew or should have known that his Google Plus posts "would cause a reasonable person to ... [s]uffer substantial emotional distress[.]" N.C. Gen. Stat. § 14-277.3A(c)(2). Such a determination simply could not be made without reference to the content of his posts. *See Forsyth Cty. v. Nationalist Movement* , 505 U.S. 123, 134, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101, 114 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation." (citation omitted) ).

Therefore, we hold that as applied to Defendant N.C. Gen. Stat. § 14-277.3A constituted a content-based restriction on speech. *700 As a result, our final step in the analysis is to determine whether the application of N.C. Gen. Stat. § 14-277.3A to the messages contained in Defendant's social media posts satisfies strict

scrutiny review. We conclude that it does not.

In order to survive a strict scrutiny analysis, "the State must show that the statute serves a compelling governmental interest, and that the law is narrowly tailored to effectuate that interest." *Bishop* , 368 N.C. at 876, 787 S.E.2d at 819. As our Supreme Court has explained, "[t]he State must show not only that a challenged content based measure addresses the identified harm, but that the enactment provides the least restrictive means of doing so. Given this exacting scrutiny, it is perhaps unsurprising that few content based restrictions have survived this inquiry." *Id.* at 877-78, 787 S.E.2d at 820 (internal citations and quotation marks omitted).

In *Bishop* , the Supreme Court held that the challenged statute failed strict scrutiny because it did not "embod[y] the least restrictive means of advancing the State's compelling interest in protecting minors *559 from [cyberbullying]." *Id.* at 878, 787 S.E.2d at 820. As discussed above, that statute criminalized "[p]ost[ing] or encourag[ing] others to post on the Internet private, personal, or sexual information pertaining to a minor" with the intent "to intimidate or torment a minor." N.C. Gen. Stat. § 14-458.1. In concluding that the statute failed strict scrutiny, the Supreme Court reasoned that "as to both the motive of the poster and the content of the posting, the statute sweeps far beyond the State's legitimate interest in protecting the psychological health of minors." *Bishop* , 368 N.C. at 878, 787 S.E.2d at 821. The Court was particularly troubled by the scope of the statutory language prohibiting the posting of "private, personal, or sexual information pertaining to a minor," which "would essentially criminalize posting *any* information about *any* specific minor if done with the requisite intent." *Id.* at 879, 787 S.E.2d at 821.

The Illinois Supreme Court invalidated the challenged provision of the stalking statute at issue in *Relerford* due to similar concerns about overbreadth. In concluding that the provision was unconstitutional, the court stated as follows:

> [S]ubsection (a) embraces a vast array of circumstances that limit speech far beyond the generally understood meaning of stalking. Indeed, the amended provision criminalizes any number of commonplace situations in which an individual engages in expressive activity that he or she should know will cause another person to suffer emotional distress. The broad sweep of subsection (a) reaches a host of social interactions that a person would find distressing but are clearly understood to fall within the protections of the first amendment.

*Relerford* , 2017 IL 121094 at ¶52, 422 Ill.Dec. at 786–87, 104 N.E.3d at 353-54.

Here, the State contends that the application of N.C. Gen. Stat. § 14-277.3A to Defendant's Google Plus posts is sufficient to withstand strict scrutiny because (1) the prevention of stalking "before it escalates into more harmful or lethal criminal behavior" is a compelling state interest; and (2) the statute is the least restrictive means of accomplishing this goal in that it "is limited to willful or knowing conduct, directed at a specific person, that would cause a reasonable person to suffer fear or substantial emotional distress." However, even assuming *arguendo* that the statute serves a compelling governmental interest in preventing the escalation of stalking into more dangerous behavior, we are not persuaded that the application of N.C. Gen. Stat. § 14-277.3A to Defendant's posts represented the least restrictive means of accomplishing that goal.*560 Prior to Defendant's indictments, Mary had already sought and received a no-contact order in district court that prohibited him from approaching or contacting her. Given the existence of a no-contact order against Defendant, strict enforcement of the terms of that order clearly represented a less restrictive means by which the State could have pursued its interest in preventing Defendant from engaging in a criminal act against her.[4]

*701 The pertinent language of N.C. Gen. Stat. § 14-277.3A that formed the basis for Defendant's convictions is virtually identical to the provision in the Illinois stalking statute struck down as overbroad in *Relerford* . We

believe the reasoning of the Illinois Supreme Court on this issue is both sound and equally applicable to the present case. As in *Bishop* , Defendant was convicted pursuant to a "criminal prohibition of alarming breadth" that "could criminalize behavior that a robust contemporary society must tolerate because of the First Amendment, even if we do not approve of the behavior." *Bishop* , 368 N.C. at 879, 787 S.E.2d at 821 (citation and quotation marks omitted). For these reasons, we hold that the application of N.C. Gen. Stat. § 14-277.3A to Defendant's social media posts constitutes a violation of his First Amendment rights in that applying the statute to him under these circumstances amounts to a content-based restriction on his speech that fails to satisfy strict scrutiny.

> 4   The trial court dismissed Defendant's stalking charges premised upon his violation of the portion of the no-contact order that prohibited him from "posting any information about [Mary] on social media" due to constitutional concerns. However, as counsel for Defendant acknowledged at oral argument, no similar concerns would have existed with regard to the provisions of the order requiring Defendant to refrain from approaching or directly contacting Mary.

## II. Remedy

Having determined that Defendant's Google Plus posts could not constitutionally form the basis for his convictions, we must separately examine the conduct giving rise to each of his four convictions to determine the extent to which each conviction was impermissibly premised upon his social media activity.

## A. 16 CRS 10028-30

Defendant's conviction in 16 CRS 10028 was premised entirely upon five Google Plus posts that he made to his account between 27 September and 4 October 2015. Therefore, because the State did not rely on any other acts by him during this time period to support this charge, we vacate the conviction.*561 With regard to 16 CRS 10029 and 10030, the date ranges on their respective indictments overlap. 16 CRS 10029 includes conduct that occurred between 13 August 2015 and 16 August 2015 while 16 CRS 10030 covers the time period from 2 June 2015 to 28 August 2015. Both charges are premised upon multiple Google Plus posts made by Defendant as well as the 13 August 2015 delivery of cupcakes to Mary's workplace — an act that fell within the date ranges of both indictments.

Defendant's delivery of cupcakes to Mary — unlike his Google Plus posts — constituted non-expressive conduct rather than speech and therefore was not protected under the First Amendment. *See id.* at 872, 787 S.E.2d at 817 ("We must first determine whether [the statute] restricts protected speech or expressive conduct, or whether the statute affects only nonexpressive conduct. Answering this question determines whether the First Amendment is implicated." (citation omitted) ). However, under the definition of the phrase "course of conduct" contained in N.C. Gen. Stat. § 14-277.3A, a single act is not enough to support a stalking conviction. Rather, "two or more acts" are required. N.C. Gen. Stat. § 14-277.3A(b)(1). Therefore, Defendant's convictions in 16 CRS 10029 and 10030 must also be vacated.

## B. 16 CRS 10034

Defendant's indictment in 16 CRS 10034 encompassed the time period between 11 November 2015 and 22 December 2015. His indictment on that charge was premised upon three of his Google Plus posts along with the two emails that Defendant sent to Mary's friend.

Even assuming — without deciding — that Defendant's emails to her friend are not entitled to First Amendment protection, this conviction must likewise be vacated. It is well established that where a defendant's conviction may have rested on a constitutional ground or an unconstitutional ground and it cannot be determined which ground the jury relied upon, the conviction must be vacated. *See, e.g., Griffin v. United*

*States* , 502 U.S. 46, 53, 112 S.Ct. 466, 471, 116 L.Ed.2d 371, 379 (1991) ("[W]here a provision of the Constitution forbids conviction *702 on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground."); *Bachellar v. Maryland* , 397 U.S. 564, 569-70, 90 S.Ct. 1312, 1315, 25 L.Ed.2d 570, 575 (1970) ("[T]he jury could have rested its verdict on any of a number of grounds. ... [P]etitioners may have been found guilty ... because they advocated unpopular ideas. Since conviction on this ground would violate the Constitution, it is our duty to set aside petitioners' convictions.").*562 In the present case, the jury returned general verdicts that did not state the specific acts forming the basis for each conviction. For this reason, based on the record before us we cannot determine whether Defendant's conviction in 16 CRS 10034 was premised upon his social media posts, the emails to Mary's friend, or a combination of the two. Therefore, because this conviction may have likewise rested upon an unconstitutional ground, it must be vacated as well. *See Stromberg v. California* , 283 U.S. 359, 369-70, 51 S.Ct. 532, 536, 75 L.Ed. 1117, 1123 (1931) ("The first clause of the statute being invalid upon its face, the conviction of the appellant, which so far as the record discloses may have rested upon that clause exclusively, must be set aside.").

* * *

As this case aptly demonstrates, difficult issues arise in attempting to balance, on the one hand, society's laudable desire to protect individuals from emotional injury resulting from unwanted and intrusive comments with, on the other hand, the free speech rights of persons seeking to express themselves on social media. Our courts will no doubt continue to grapple with these issues going forward. In the present case, however, it is clear that Defendant's convictions violated his constitutional right to free speech. His Google Plus posts about Mary — while understandably offensive to her — constituted protected speech that cannot constitutionally be prohibited by the State. As such, we are compelled to vacate his convictions.[5]

> [5] Based on our ruling, we need not address the additional arguments Defendant has raised in this appeal.

## Conclusion

For the reasons stated above, we vacate Defendant's convictions for felony stalking.

VACATED.

Judge HUNTER, JR. concurs.

Judge MURPHY concurring by separate opinion.

MURPHY, Judge, concurring by separate opinion.

I concur with the Majority that Defendant's convictions under N.C. Gen. Stat. § 14-277.3A should be vacated. I write separately to *563 express additional thoughts regarding the inapplicability of the First Amendment's speech integral to criminal conduct exception to Defendant's convictions.

The U.S. Supreme Court, as the Majority notes, has long made clear that First Amendment protections of freedom of speech do not extend to "speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Giboney v. Empire Storage & Ice Co.* , 336 U.S. 490, 498, 69 S.Ct. 684, 688, 93 L.Ed. 834, 841 (1949). It has been noted that the "boundaries and underlying rationale [of the speech integral to criminal conduct exception] have not been clearly defined, leaving the precise scope of the exception unsettled." *U.S. v. Osinger* , 753 F.3d 939, 950 (9th Cir. 2014) (Watford, J., concurring). The difficulties of applying this nebulous exception are compounded in the context of stalking crimes, where the lines between speech and non-speech

conduct are often blurred. Thus, it is necessary to return to the basic tenet of the exception and carefully analyze the actions of a defendant to determine the exception's applicability, lest all speech be relabeled conduct and stripped of its First Amendment protections.[6]

[6] *See* Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception* , 101 Cornell L. Rev. 981, 1039-40 (2016).

The State contends that this exception necessarily applies to the crime of stalking. It argues, "Stalking harasses and intimidates its victims. When these harms flow from any *703 expressive aspect of stalking, that expressive aspect is integral to the crime." This is an oversimplification of the exception. "[S]peech or writing used as an *integral part* of conduct in violation of a valid criminal statute" falls within the exception and is unprotected by the First Amendment. *Giboney* , 336 U.S. at 498, 69 S.Ct. at 687, 93 L.Ed. at 841 (emphasis added). Thus, the speech itself must be proximately linked to a criminal act and cannot serve as the basis for the criminal act itself. *See Relerford* , 2017 IL 121094 at ¶ 45, 422 Ill.Dec. at 785, 104 N.E.3d at 352 (2017). Stated differently, there must be non-speech conduct to which the speech is integral.

Here, the Majority notes that each indictment was "premised either entirely or in part upon social media posts referencing Mary – posts that he wrote *about* Mary but did not send directly *to* her (or, for that matter, to anyone else)." Section I(C)(1), *supra* . I believe this is a critical distinction in this case, as the nature of these posts cannot be conduct that serves as the basis for a stalking conviction. As our Supreme Court has noted, "[p]osting information on the Internet – whatever the subject matter – can constitute speech as surely as stapling flyers to bulletin *564 boards or distributing pamphlets to passersby – activities long protected by the First Amendment." *State v. Bishop* , 368 N.C. 869, 873, 787 S.E.2d 814, 817 (2016). This is of significant import under a First Amendment analysis, as one court has noted in an as-applied challenge to the federal statute, "[o]ne does not have to walk over and look at another person's bulletin board; nor does one Blog or Twitter user have to see what is posted on another person's Blog or Twitter account. This is in sharp contrast to a telephone call, letter or e-mail specifically addressed to and directed at another person ...." *See U.S. v. Cassidy* , 814 F.Supp.2d 574, 578 (D. Md. 2011). In the latter situation, there is speech *to* a person individually, whereas the former is merely speech *about* a person.[7]

[7] *See* Eugene Volokh, *One–to–One Speech vs. One–to–Many Speech, Criminal Harassment Laws, and "Cyberstalking,"* 107 Nw. U. L. Rev. 731, 742 (2013) ("[Laws addressing telephone harassment, stalking, and unwanted mailings] have one thing in common: In the great bulk of their applications, they restrict what one may call 'unwanted one-to-one' speech – speech said to a particular person in a context where the recipient appears not to want to hear it, whether because the recipient has expressly demanded that the speech stop or because the speaker intends to annoy or offend the recipient. The laws are aimed at restricting speech *to* a person, not speech *about* a person. And that is the context in which they have generally been upheld against First Amendment challenge.")

This is a key distinction because in cases where speech is made, such as through telephone harassment or unwanted contact through mailings, to a single recipient repeatedly, First Amendment considerations of protecting the communication of ideas is diminished when the recipient is an unwilling listener. The expressive value is diminished. *See Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.* , 547 U.S. 47, 66, 126 S.Ct. 1297, 1310, 164 L.Ed.2d 156, 175 (2006) ("Instead, we have extended First Amendment protection only to conduct that is inherently expressive[, such as flag burning]."). Yet, a public posting that is not aimed or directed at a single person retains its expressive value (assuming no other exceptions, such as true threats, is applicable to the speech). Of course, the ubiquitous nature of social media in modern society and the ability of posters to "tag" or "direct message" other users may impact this analysis; however, that is not the case with Defendant's Google+ postings. These postings, while numerous, cannot themselves constitute "conduct." *See Bishop* , 368

N.C. at 874, 787 S.E.2d at 818 ("Such communication does not lose protection merely because it involves the 'act' of posting information online, for much speech requires an 'act' of some variety – whether putting ink to paper or paint to canvas, or hoisting a picket sign, or donning a message-bearing jacket.")

To be clear, there was action taken by Defendant that constituted non-speech conduct – sending cupcakes to Mary. However, *565 N.C. Gen. Stat. § 14-277.3A permitted the jury to base their conviction in each indictment on the social media posts made to the public alone. *See* N.C. Gen. Stat. § 14-277.3A(b)(1) (defining course of conduct as "[t]wo or more acts ... in which the stalker *704 ... communicates to or *about* a person ...") (emphasis added). As the Majority notes, this impermissibly allowed "the speech itself [to be] the crime" and did not require speech to be integral to separate conduct. *See* Section I(C)(1) *supra* .

I also wish to address the State's citation of *Osinger* in support of its argument that Defendant's posts were speech integral to criminal conduct and explain why such a case upholding the constitutionality of the federal interstate stalking statute is distinguishable from the case and the statute before us. In *Osinger* , while analyzing the defendant's as-applied challenge to the federal interstate stalking statute, the Ninth Circuit held that "[a]ny expressive aspects of Osinger's speech were not protected under the First Amendment because they were 'integral to criminal conduct' in intentionally harassing, intimidating or causing substantial emotional distress." *Osinger* , 753 F.3d at 947. The *Osinger* case is fully distinguishable on two bases. First, Congress defined "course of conduct" as "a pattern of *conduct* composed of 2 or more acts, evidencing a continuity of purpose." *Id.* at 944 (citing 18 U.S.C. § 2266(2) ) (emphasis added). Congress included no language indicating that a course of conduct could be established solely by two communications about a person, as is the case with N.C. Gen. Stat. § 14-277.3A. Moreover, as the *Osinger* concurrence noted, that case did not present the court with the question of whether a stalking prosecution would be constitutional in situations where "the defendant caused someone substantial emotional distress by engaging only in otherwise protected speech." *Osinger* , 753 F.3d at 954 (Watford, J., concurring). Accordingly, our as-applied analysis differs from that in *Osinger* .

In conclusion, I recognize the challenges that modern social media present in the context of stalking crimes. These challenges will continue to produce difficult questions of how to apply First Amendment principles, such as the speech integral to criminal conduct exception, in these increasingly complex situations. While many of these questions go beyond the scope of this concurrence or our Majority opinion, I concur in the case before us, as the First Amendment requires us to vacate Defendant's convictions.

 casetext

16

Case No. 2D19-2891
DISTRICT COURT OF APPEAL OF FLORIDA SECOND DISTRICT

# Craft v. Fuller

298 So. 3d 99 (Fla. Dist. Ct. App. 2020)
Decided May 27, 2020

Case No. 2D19-2891

05-27-2020

Frank CRAFT, a/k/a Frank Smythe Craft, Appellant, v. Christopher FULLER, a/k/a Christopher Elwin Fuller, Appellee.

James P. Mancuso of James P. Mancuso, PA, St. Petersburg, for Appellant. Marc N. Pelletier of Russo Pelletier & Sullivan, P.A., St. Petersburg, for Appellee.

---

VILLANTI, Judge.

James P. Mancuso of James P. Mancuso, PA, St. Petersburg, for Appellant.

Marc N. Pelletier of Russo Pelletier & Sullivan, P.A., St. Petersburg, for Appellee.

VILLANTI, Judge.

Frank Craft appeals the final judgment for injunction against cyberstalking that was entered in favor of Christopher Fuller. Because the evidence was legally insufficient to support entry of the injunction, we reverse and remand for dismissal of the petition.[1]

> [1] Craft also argued that entry of the injunction violated his First Amendment rights. Because we conclude that the injunction was improper under the requirements of the applicable statute, we need not address this issue.

Craft and Fuller are former friends and business partners who had a falling out of some sort several years ago. Since the falling out, they have filed petitions for injunction against stalking against each other at various times. In October 2018, they agreed to leave each other alone, and they voluntarily dismissed their respective injunction petitions. Nevertheless, shortly thereafter, Craft began posting tweets on his own personal Twitter feed using the hashtag "spoofingschmuck." Some of these tweets contained other comments as well, but none of them referenced Fuller by name. Fuller does not follow Craft on Twitter; however, some of Fuller's friends and family told him about Craft's tweets, and Fuller believed that those tweets were a direct reference to him because he had been arrested in the past for spoofing.[2]

> [2] Wikipedia defines "caller ID spoofing," which is what Craft tweeted about in this case, as "the practice of causing the telephone network to indicate to the receiver of a call that the originator of the call is a station other than the true originating station. This can lead to a caller ID display showing a phone number different from that of the telephone from which the call was placed." https://en.wikipedia.org/wiki/Caller_ID_spoofing (accessed Mar. 25, 2020). Florida law makes caller ID spoofing a crime under certain circumstances. See § 817.487, Fla. Stat. (2019).



Case 2:24-cr-00163-TS    Document 209-1    Filed 05/01/26    PageID.11514    Page 232 of 283

Craft v. Fuller    298 So. 3d 928 (Fla. Dist. Ct. App. 2020)

In response to being notified of these tweets, Fuller filed a new petition for injunction against Craft. In that petition, *102 Fuller alleged that Craft's tweets using the "spoofingschmuck" hashtag were directed at him and that as a result of these tweets, he had suffered substantial emotional distress. At a hearing on the petition, Fuller testified that while he does not follow Craft on Twitter, the fact that friends and family notified him of Craft's tweets demonstrated that other people believed the posts to be about Fuller. Fuller also testified that because of his prior arrests for spoofing and the prior antagonism between the parties, he had suffered substantial emotional distress over the tweets, including losing the ability to sleep and eat.

For his part, Craft denied that the tweets were in reference to Fuller. Instead, he testified that he was annoyed by spoofing in general and that he was using this hashtag to track spoofed calls to his phone in a way that would allow him to express his annoyance and disdain for anyone who would make spoof calls. He also testified that he enjoys posting tweets and uses it as a means of entertainment.

After considering this evidence, the trial court concluded that Craft's tweets were "directed at" Fuller and that a reasonable person in Fuller's position, i.e., one who had been arrested several times for spoofing, would suffer substantial emotional distress over the tweets. The court also concluded that Craft's tweets served no purpose other than harassment. Based on these conclusions, the court entered a five-year injunction against Craft, which he now appeals.

The injunction in this case was issued pursuant to section 784.0485(1), Florida Statutes (2018). This court has previously addressed the scope of this statute:

> Section 784.0485(1), Florida Statutes (2014), provides that "[f]or the purposes of injunctions for protection against stalking under this section, the offense of stalking shall include the offense of cyberstalking." Section 784.048(1)(d) defines cyberstalking as "engag[ing] in a course of conduct to communicate, or to cause to be communicated, words, images, or language by or through the use of electronic mail or electronic communication, <u>directed at a specific person, causing substantial emotional distress to that person and serving no legitimate purpose.</u>" Harassment is "a course of conduct <u>directed at a specific person</u> which causes substantial emotional distress ... and serves no legitimate purpose." § 784.048(1)(a). Thus, cyberstalking is harassment via electronic communications.

<u>Scott v. Blum</u>, 191 So. 3d 502, 504 (Fla. 2d DCA 2016) (alterations in original) (emphasis added).[3] Hence, to be entitled to the injunction, Fuller was required to prove that Craft's tweets were "directed at a specific person," namely him, that a reasonable person would have suffered substantial emotional distress as a result of the tweets, and that the tweets served no legitimate purpose.

---

[3] The version of the statute applicable in this case contains substantially the same language.

## 1. Directed at a Specific Person

First, Fuller was required to prove that Craft's tweets, which were posted on Craft's personal Twitter feed and which did not directly reference Fuller, were nevertheless "directed at" Fuller. While the trial court concluded that they were, this ruling is contrary to the law.

This court and others have held that postings on one's own social media page do *103 not constitute actions "directed at a specific person" as a matter of law. For example, in <u>Horowitz v. Horowitz</u>, 160 So. 3d 530, 531 (Fla. 2d DCA 2015), this court held that postings on the defendant's own Facebook page were not "directed at" his ex-wife.

> Mr. Horowitz's Facebook posts do not meet the statutory definition of cyberstalking for two reasons. First, the posts were not "directed at a specific person." § 784.048(1)(d). The testimony showed that Mr. Horowitz posted the information to his own Facebook page. Screenshots of the posts admitted into evidence confirm that they were posted to Mr. Horowitz's page and that Mrs. Horowitz was not "tagged" or mentioned, nor were the posts directed to her in any obvious way.

Id. Similarly, in Logue v. Book, 44 Fla. L. Weekly D2083, ⸺ So.3d ⸺⸺, 2019 WL 3807987 (Fla. 4th DCA Aug. 14, 2019), the Fourth District held that tweets and other social media posts, even though they clearly referred to the petitioner, did not constitute conduct "directed at" the petitioner because such tweets and posts are available for all to see and therefore are directed at a broad audience, of which the petitioner is only one. And in David v. Textor, 189 So. 3d 871, 875 (Fla. 4th DCA 2016), the court held that "where comments are made on an electronic medium to be read by others, they cannot be said to be directed to a particular person." See also Chevaldina v. R.K./FL Mgmt., Inc., 133 So. 3d 1086, 1092 (Fla. 3d DCA 2014) ("Angry social media postings are now common. Jilted lovers, jilted tenants, and attention-seeking bloggers spew their anger into fiber-optic cables and cyberspace. But analytically, and legally, these rants are essentially the electronic successors of the pre-blog, solo complainant holding a poster on a public sidewalk in front of an auto dealer that proclaimed, 'DON'T BUY HERE! ONLY LEMONS FROM THESE CROOKS!' "); compare United States v. Cassidy, 814 F. Supp. 2d 574, 577-78 (D. Md. 2011) (comparing Twitter postings to papers tacked to a bulletin board and noting that unlike the case with a telephone call, letter, or email specifically addressed to and directed at another person, "[o]ne does not have to walk over and look at another person's bulletin board").

Here, the evidence at the hearing established that the disputed tweets were posted on Craft's own personal Twitter feed. These tweets did not reference Fuller by name, and Craft did not "tag" or otherwise draw Fuller's attention to the tweets. Instead, the tweets were simply expressions of Craft's annoyance with whomever may have been spoofing him. As tweets posted on Craft's own Twitter feed, they were not "directed at" any specific person but were instead directed at his entire collection of followers, which notably did not include Fuller. And even if one or more of the tweets may have been an indirect reference to Fuller, such indirect references posted on a private Twitter feed are insufficient as a matter of law to support a conclusion that the tweets were "directed at" Fuller. Therefore, Fuller failed to prove, as a matter of law, that Craft's tweets constituted a course of conduct "directed at" Fuller for purposes of the cyberstalking statute.

## 2. Substantial Emotional Distress

In addition to showing that the tweets were "directed at" him, Fuller was also required to prove that an objectively reasonable person would have suffered substantial emotional distress as a result of the tweets. While the trial court concluded that Fuller proved this element based on his own personal reaction to the tweets, this conclusion was based on the incorrect legal standard.*104 In the context of a petition for injunction against cyberstalking, the question of "[w]hether a communication causes substantial emotional distress should be narrowly construed and is governed by the reasonable person standard." Scott, 191 So. 3d at 504 (emphasis added) (quoting David, 189 So. 3d at 875 ); see also Leach v. Kersey, 162 So. 3d 1104, 1106 (Fla. 2d DCA 2015) ("In determining whether substantial emotional distress occurred, the courts look to the standard of a reasonable person in the petitioner's shoes."). Moreover, "[t]he 'substantial emotional distress' that is necessary to support a stalking injunction is greater than just an ordinary feeling of distress" or simple embarrassment. Venn v. Fowlkes, 257 So. 3d 622, 624 (Fla. 1st DCA 2018). Hence, the question before the trial court was not whether Fuller subjectively suffered substantial emotional distress; it was whether a reasonable person learning of the tweets in question would have suffered substantial emotional distress.

Case 2:24-cr-00163-TS    Document 209-1    Filed 05/01/26    PageID.11516    Page 234 of 283

Craft v. Fuller    298 So. 3d 98 (Fla. Dist. Ct. App. 2020)

Case law shows that the bar for establishing that a reasonable person would suffer substantial emotional distress is set fairly high. For example, in <u>Scott</u>, this court held that a reasonable person would not have felt substantial emotional distress as a result of numerous embarrassing emails about him that were sent by Blum to business associates and friends. <u>Scott</u>, 191 So. 3d at 505. In <u>Goudy v. Duquette</u>, 112 So. 3d 716, 717 (Fla. 2d DCA 2013), this court held that a reasonable person would not have suffered substantial emotional distress as a result of an angry telephone call between a dance team coach and a parent, "however one-sided or hostile it might have been." Similarly, in <u>Slack v. Kling</u>, 959 So. 2d 425, 426 (Fla. 2d DCA 2007), this court held that a voice message telling Kling to stay away from Slack's wife or Slack would make an "arrangement," while perhaps mildly threatening, would not have caused a reasonable person substantial emotional distress. Likewise, in <u>Touhey v. Seda</u>, 133 So. 3d 1203, 1204 (Fla. 2d DCA 2014), this court held that a reasonable person would not suffer substantial emotional distress as a result of Touhey visiting Seda's business on one occasion and calling twice or as a result of a single slightly menacing text message.

Here, the record shows that Craft's tweets were neither threatening nor menacing nor hostile nor, frankly, even embarrassing. They did not mention Fuller by name, they did not tag Fuller so as to single him out, and they did not occur in response to some otherwise threatening event that might have changed their character. No objectively reasonable person—not even one with a prior arrest for spoofing—would have suffered "substantial emotional distress" as a result of these tweets. Therefore, Fuller's evidence was insufficient to prove this element as well.

### 3. No Legitimate Purpose

Finally, Fuller was also required to prove that Craft's tweets served no legitimate purpose, i.e., that they served no purpose other than to harass Fuller. The trial court concluded that the tweets had no legitimate purpose based solely on its earlier finding that the tweets were "directed at" Fuller. Again, the court did not apply the proper legal standard.

The question of "whether a communication serves a legitimate purpose is broadly construed and will cover a wide variety of conduct." <u>David</u>, 189 So. 3d at 875. "Whether the purpose for [a particular] contact is 'legitimate' is evaluated on a case-by-case basis. ... However, courts have generally held that contact is legitimate when there is a reason for the contact other than to harass the victim." <u>Venn</u>, 257 So. 3d at 624 (quoting *105 <u>O'Neill v. Goodwin</u>, 195 So. 3d 411, 413 (Fla. 4th DCA 2016) ). So, for example, in <u>O'Neill</u>, when the alleged harasser contacted the victim to advise her of an upcoming documentary, the court concluded that there was a legitimate purpose for the contact. <u>See O'Neill</u>, 195 So. 3d at 414 ; <u>see also Goudy</u>, 112 So. 3d at 717 (holding that when a father was transporting his child to participate in dance team activities, his contacts with the dance team coach had a legitimate purpose); <u>Alter v. Paquette</u>, 98 So. 3d 218, 220 (Fla. 2d DCA 2012) (holding that a series of six text messages served a legitimate purpose other than to harass when they requested repayment of a loan the sender had previously made to the recipient).

In this case, the only evidence on the issue of the purpose of the tweets was Craft's testimony that they were a way for him to log the prank calls he received and that it was entertaining for him to do so in this fashion. The trial court rejected this explanation, finding that it was not credible. And having rejected Craft's testimony, the court then found that his tweets had no legitimate purpose solely based on its earlier ruling that the tweets were "directed at" Fuller. This ruling is in contravention of the law for two reasons.

First, the trial court misapplied the applicable burdens of proof. Regardless of how misguided Craft's tweets may have been, Fuller had the burden to prove that they served no purpose other than to harass Fuller. <u>See Leach</u>, 162 So. 3d at 1106 ("To support an injunction against stalking, <u>the petitioner</u> must prove each incident

of stalking by competent, substantial evidence.") (emphasis added) (citing Touhey, 133 So. 3d at 1204 ). Craft did not have the burden to prove that his tweets had a legitimate purpose; Fuller had the burden to prove that they did not. This he failed to do.

Second, the mere fact that tweets or other communications are "directed at" an individual does not establish, as a matter of law, that they have no legitimate purpose. As long as there is a reason for the communications other than harassment, the communications will have a legitimate purpose even if they are directed at someone who does not welcome them. See O'Neill, 195 So. 3d at 414 (communication to advise person of a documentary was a legitimate purpose); Goudy, 112 So. 3d at 717 (communications about dance team activities had a legitimate purpose); Alter, 98 So. 3d at 220 (communications about a loan repayment had a legitimate purpose). The court could not simply rely on its finding that the tweets were "directed at" Fuller to also conclude that they ipso facto had no legitimate purpose. And the evidence presented here supports no such conclusion.

In sum, Fuller failed to present legally sufficient evidence to establish each of the elements required for him to be entitled to an injunction against cyberstalking, and hence the trial court erred by entering the injunction against Craft. Accordingly, we reverse the final injunction and remand for dismissal of Fuller's petition. We also take this opportunity to remind the parties that injunctions "are not a panacea to be used to cure all social ills. In fact, nowhere in the statutory catalog of improper behavior is there a provision for court-ordered relief against uncivil behavior." Polanco v. Cordeiro, 67 So. 3d 235, 238 (Fla. 2d DCA 2010) (Villanti, J., concurring); see also Power v. Boyle, 60 So. 3d 496, 498 (Fla. 1st DCA 2011) (noting that courts may not "enter injunctions simply 'to keep the peace' between parties who, for whatever reason, are unable to get along and behave civilly towards each other"). The parties agreed in 2018 to go their separate ways and leave each other alone. It would behoove them to honor this agreement.*106  Reversed and remanded for dismissal of the petition.

SILBERMAN and LUCAS, JJ., Concur.



No. 223PA15
Supreme Court of North Carolina.

# State v. Robert Bishop

368 N.C. 869 (N.C. 2016)    ·    787 S.E.2d 814
Decided Jun 10, 2016

No. 223PA15

06-10-2016

STATE of North Carolina v. Robert BISHOP

Roy Cooper, Attorney General, by Kimberly N. Callahan, Assistant Attorney General, for the State. Glenn Gerding, Appellate Defender, by James R. Grant, Assistant Appellate Defender, for defendant-appellant. Ellis & Winters LLP, Raleigh, by C. Scott Meyers ; and Eugene Volokh, pro hac vice, UCLA School of Law, for Electronic Frontier Foundation, amicus curiae.

---

HUDSON, Justice.

Roy Cooper, Attorney General, by Kimberly N. Callahan, Assistant Attorney General, for the State.

Glenn Gerding, Appellate Defender, by James R. Grant, Assistant Appellate Defender, for defendant-appellant.

Ellis & Winters LLP, Raleigh, by C. Scott Meyers ; and Eugene Volokh, pro hac vice, UCLA School of Law, for Electronic Frontier Foundation, amicus curiae.

HUDSON, Justice.*869 On 9 February 2012, defendant Robert Bishop was arrested and charged with one count of cyberbullying under North Carolina's cyberbullying statute, N.C.G.S. § 14–458.1. Under that statute, it is "unlawful for any person to use a computer or computer network to ... [p]ost or encourage others to post on the Internet private, personal, or sexual information pertaining to a minor" "[w]ith the intent to intimidate or *870 torment a minor." N.C.G.S. § 14–458.1(a)(1)(d) (2015). On 5 February 2014, defendant was convicted on that sole charge by a jury in the Superior Court in Alamance County. On appeal, the Court of Appeals concluded that the cyberbullying statute "prohibits conduct, not speech"; that any burden on speech is "merely incidental"; and that this "incidental" burden "is no greater than necessary" to further the State's "substantial" interest in protecting children from the harmful effects of bullying and harassment. *State v. Bishop* , —— N.C.App. ——, ——, 774 S.E.2d 337, 344–45, 349 (2015). We now conclude that N.C.G.S. § 14–458.1(a)(1)(d) restricts speech, not merely nonexpressive conduct; that this restriction is content based, not content neutral; and that the cyberbullying statute is not narrowly tailored to the State's asserted interest in protecting children from the harms of online bullying. Accordingly, we reverse the decision of the Court of Appeals and hold that the statute violates the First Amendment as applied to the states through the Fourteenth Amendment.

## I. FACTS AND PROCEDURAL BACKGROUND

During the 2011–2012 school year, defendant and Dillion Price were students at Southern Alamance High School. Starting in the fall of 2011, some of Price's classmates began to post negative pictures and comments about Price on Facebook, including on Price's own Facebook page. In September 2011, a male classmate



posted on Facebook a screenshot of a sexually themed text message Price had inadvertently sent him. Below that post, several individuals commented, including Price and defendant. Price accused the posting student of altering or falsifying the screenshot and threatened to fight him over the matter; defendant commented that the text was "excessively homoerotic" and accused others of being "defensive" and "pathetic for taking the [I]nternet so seriously."

At least two other Facebook postings with similar tone and attitude followed, all involving Price, defendant, and other commenters. *816 Many of the messages that ensued included comments and accusations about each other's sexual proclivities, along with name-calling and insults.

Late one night in December 2011, Price's mother found him very upset in his room, crying, throwing things, and hitting himself in the head. She saw on his cellphone some of the comments and pictures that his classmates had posted. Fearing for his well-being and concerned that Price might harm himself, Price's mother contacted the police, who used undercover Facebook accounts to view the Facebook postings and take screenshots of postings relevant to the investigation.*871 On 9 February 2012, defendant was arrested and charged with one count of cyberbullying in violation of N.C.G.S. § 14–458.1. Some, but not all, of the other students involved in these discussions were also arrested or charged under the cyberbullying statute.[1]

[1] According to the trial transcript, it appears that six students were charged in connection with these online conversations.

Defendant was tried and convicted in district court, after which he appealed to the Superior Court in Alamance County for a trial de novo. In the superior court, defendant filed a pretrial motion to dismiss, contending that N.C.G.S. § 14–458.1(a)(1)(d) is unconstitutional under the First and Fourteenth Amendments. After hearing the matter on 24 April, the trial court denied defendant's motion in an order entered on 17 May 2013. Defendant's case came on for trial at the 3 February 2014 criminal session of the Superior Court in Alamance County, and on 5 February, defendant was convicted by a jury of one count of cyberbullying. Defendant appealed to the Court of Appeals.

At the Court of Appeals, defendant argued, *inter alia* , that the cyberbullying statute, specifically N.C.G.S. § 14–458.1(a)(1)(d), restricts speech protected under the First Amendment; that this restriction is content based; and that it sweeps too broadly to satisfy the exacting demands of strict scrutiny. In a unanimous opinion, the Court of Appeals rejected those arguments. Instead, applying de novo review, that court concluded that N.C.G.S. § 14–458.1(a)(1)(d) regulates conduct, not speech, and specifically that the statute "punishes the *act* of posting or encouraging another to post on the Internet *with the intent* to intimidate or torment" a minor. *Bishop* , —— N.C. App. at ——, 774 S.E.2d at 343. The Court of Appeals also concluded that "[t]o the extent the Cyber-bullying Statute touches upon or regulates some aspects of some speech, the burden on speech and expression is merely incidental." *Id.* at ——, 774 S.E.2d at 344 (citing *Hest Techs., Inc. v. State ex rel. Perdue* , 366 N.C. 289, 300, 749 S.E.2d 429, 437 (2012), *cert. denied* , —— U.S. ——, 134 S.Ct. 99, 187 L.Ed.2d 34 (2013) ). And regarding that "incidental" burden, the Court of Appeals concluded that it "is no greater than necessary" because the statute "only prohibits disclosure of 'private, personal, or sexual information pertaining to [a] minor' on the Internet with the specific intent to intimidate or torment a minor" and "does not prohibit any other speech or communication on the Internet outside of this context." *Id.* at ——, 774 S.E.2d at 344–45 (quoting N.C.G.S. § 14–458.1(a)(1)(d) ). Partly on this basis, and after rejecting several other arguments defendant raised before that court, *872 the Court of Appeals ultimately found no error in defendant's conviction under the cyberbullying statute. *See id.* at ——, 774 S.E.2d at 349. On 20 August 2015, we allowed defendant's petition for discretionary review.

## II. ANALYSIS

Here, defendant again contends that the cyberbullying statute, specifically N.C.G.S. § 14–458.1(a)(1)(d), is unconstitutional under the First Amendment, as incorporated and applied to the states through the Fourteenth Amendment, because it criminalizes protected speech based on its content, and because, in doing so, the law extends well beyond the government's asserted interest in protecting children from the harms caused by online bullying. The challenged provision makes it "unlawful for any person to use a computer or computer network" to "[p]ost or encourage others to post on the Internet private, personal, or sexual information pertaining to a minor" "[w]ith the intent to intimidate or torment a minor." *817 N.C.G.S. § 14–458.1(a)(1)(d). For the reasons that follow, we hold that section 14–458.1 restricts speech, and not just nonexpressive conduct; that the restriction created is content based, not content neutral; and that the statute's scope is not sufficiently narrowly tailored to serve the State's asserted interest in protecting children from the harms resulting from online bullying. Accordingly, we conclude that N.C.G.S. § 14–458.1(a)(1)(d) violates the First Amendment. We therefore reverse the decision of the Court of Appeals.

## A. The Statute Burdens Speech, Not Just Nonexpressive Conduct.

We must first determine whether N.C.G.S. § 14–458.1(a)(1)(d) restricts protected speech or expressive conduct, or whether the statute affects only nonexpressive conduct. Answering this question determines whether the First Amendment is implicated. *See, e.g. , Texas v. Johnson* , 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989) (stating that conduct acquires First Amendment protection only when it "possesses sufficient communicative elements"). Yet this inquiry is not always easy or straightforward. On one hand, the Supreme Court of the United States has recognized that expressive conduct falls within the ambit of the First Amendment's protections—at least when that conduct is "inherently" expressive. *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.* , 547 U.S. 47, 66, 126 S.Ct. 1297, 1310, 164 L.Ed.2d 156 (2006) ("Instead, we have extended First Amendment protection only to conduct that is inherently expressive[, such as flag burning]." (citing *Johnson* , 491 U.S. at 406, 109 S.Ct. at 2540 )). On the other, that Court has also long held that otherwise proscribable criminal conduct does not become protected by the First *873 Amendment simply because the conduct happens to involve the written or spoken word. *See, e.g. , United States v. Alvarez* , —— U.S. ——, 132 S.Ct. 2537, 2544, 183 L.Ed.2d 574 (2012) (plurality opinion) (noting that "speech integral to criminal conduct" remains a category of historically unprotected speech); *accord Giboney v. Empire Storage & Ice Co.* , 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." (citations omitted)); *see also R.A.V. v. City of St. Paul* , 505 U.S. 377, 389, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets) ...."); *State v. Camp* , 59 N.C.App. 38, 42–43, 295 S.E.2d 766, 768–69 (opining that a statute barring use of a telephone to harass another person implicated conduct, not speech, and therefore did not violate the First Amendment), *appeal dismissed and disc. rev. denied* , 307 N.C. 271, 299 S.E.2d 216 (1982). Against this blurred doctrinal landscape, the line is not always bright between what is protected by the First Amendment and what is not.

Here, however, we are satisfied that N.C.G.S. § 14–458.1(a)(1)(d) applies to speech and not solely, or even predominantly, to nonexpressive conduct. As noted, the statute prohibits anyone, on threat of criminal punishment, from "[p]ost[ing] or encourag[ing] others to post on the Internet [any] private, personal, or sexual information pertaining to a minor" "[w]ith the intent to intimidate or torment a minor." N.C.G.S. § 14–458.1(a)(1)(d). In contrast with the statute we upheld in *Hest* , which proscribed operating or placing into operation "an

electronic machine or device" to conduct a sweepstakes, 366 N.C. at 292, 749 S.E.2d at 432, this statute outlawed posting particular subject matter, on the internet, with certain intent. The statute at issue in *Hest* regulated conduct, *id* . at 296, 749 S.E.2d at 434 ; the statute here regulates protected speech.

Posting information on the Internet—whatever the subject matter—can constitute speech as surely as stapling flyers to bulletin boards or distributing pamphlets to passersby—activities long protected by the First Amendment. *See, e.g.* , *Lovell v. City of Griffin* , 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) ("The [First Amendment] is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets *818 of Thomas Paine and others in our own history abundantly attest."); *see also* *874 *Jamison v. Texas* , 318 U.S. 413, 416, 63 S.Ct. 669, 672, 87 L.Ed. 869 (1943) ("This right [to express one's views in an orderly fashion] extends to the communication of ideas by handbills and literature as well as by the spoken word." (citations omitted)). Such communication does not lose protection merely because it involves the "act" of posting information online, for much speech requires an "act" of some variety—whether putting ink to paper or paint to canvas, or hoisting a picket sign, or donning a message-bearing jacket. *See, e.g.* , *Cohen v. California* , 403 U.S. 15, 18–19, 26, 91 S.Ct. 1780, 1784–85, 1789, 29 L.Ed.2d 284 (1971) (holding that wearing a jacket with an antiwar vulgarity constituted protected speech, not merely conduct). Nor is such communication subject to any lesser protection simply because it occurs online. As the United States Supreme Court has made clear, the protections of the First Amendment extend in full not just to the Internet, *see Reno v. ACLU* , 521 U.S. 844, 870, 117 S.Ct. 2329, 2344, 138 L.Ed.2d 874 (1997) ("[O]ur cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to [the Internet]."), but to all new media and forms of communication that progress might make available, *see Brown v. Entm't Merchs. Ass'n* , 564 U.S. 786, 790, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011) ("And whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." (quoting *Joseph Burstyn, Inc. v. Wilson* , 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952) )). Accordingly, we conclude that N.C.G.S. § 14–458.1(a)(1)(d) of North Carolina's cyberbullying statute implicates the First Amendment because that provision restricts speech and not merely conduct.

## B. The Statute is Content Based.

Having concluded that N.C.G.S. § 14–458.1(a)(1)(d) limits speech, we now consider a second threshold inquiry: whether this portion of the cyberbullying statute is content based or content neutral. This central inquiry determines the level of scrutiny we apply here. Content based speech regulations must satisfy strict scrutiny. Such restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert* , —— U.S. ——, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236 (2015) (citing *R.A.V.* , 505 U.S. at 395, 112 S.Ct. at 2549 and *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.* , 502 U.S. 105, 115, 118, 112 S.Ct. 501, 508, 509, 116 L.Ed.2d 476 (1991) ). In contrast, content neutral measures—such as those governing only the time, manner, or place of First Amendment-protected expression—are subjected to a less demanding but still rigorous form of intermediate scrutiny. The government must *875 prove that they are "narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *McCullen v. Coakley* , —— U.S. ——, 134 S.Ct. 2518, 2529, 189 L.Ed.2d 502 (2014) (quoting *Ward v. Rock Against Racism* , 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) ).

State v. Robert Bishop, 368 N.C. 869 (N.C. 2016)

Until recently, it was unclear how a court should determine whether a speech restriction is content based or content neutral. In some cases, the Supreme Court of the United States has suggested that a reviewing court should focus on the intent behind the measure; in others, it has emphasized the plain text of the statute and how it would operate in practice. *Compare Ward* , 491 U.S. at 791, 109 S.Ct. at 2754 ("The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." (citing *Clark v. Cmty. for Creative Non–Violence* , 468 U.S. 288, 295, 104 S.Ct. 3065, 3070, 82 L.Ed.2d 221 (1984) )), *with McCullen* , —— U.S. ——, 134 S.Ct. at 2531 ("The Act would be content based if it required 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." (quoting *FCC v. League of Women Voters of Cal.* , 468 U.S. 364, 383, 104 S.Ct. 3106, 3119, 82 L.Ed.2d 278 (1984) )), *and R.A.V.* , 505 U.S. at 391, 112 S.Ct. at 2547 ("In its practical operation, moreover, the ordinance goes even beyond mere content discrimination, to actual viewpoint discrimination."). At times, the Court suggested both emphases within the course of a single opinion. *Compare Sorrell v. IMS Health Inc.* , 564 U.S. 552, 563–64, 131 S.Ct. 2653, 2663, 180 L.Ed.2d 544 (2011) ("On its face, [the challenged measure] enacts content- and speaker-based restrictions on the sale, disclosure, and use of prescriber-identifying information."), *with id.* at 565, 131 S.Ct. at 2663–64 ("Given the legislature's expressed statement of purpose, it is apparent that [the challenged measure] imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint.").

Recently, however, in *Reed v. Town of Gilbert* that Court clarified that *several* paths can lead to the conclusion that a speech restriction is content based and therefore subject to strict scrutiny. This determination can find support in the plain text of a statute, or the animating impulse behind it, or the lack of any plausible explanation besides distaste for the subject matter or message.[2] In short, "[b]ecause strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Reed* , —— U.S. ——, 135 S.Ct. at 2228.

[2] As the Supreme Court of the United States summarized:

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

> Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content based regulations of speech: laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the speech conveys. Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

> *Reed* , —— U.S. ——, 135 S.Ct. at 2227 (brackets, internal citations, and internal quotation marks omitted).

Here, it is clear that the cyberbullying statute is content based, on its face and by its plain text, because the statute "defin[es] regulated speech by [its] particular subject matter." *Id.* at ——, 135 S.Ct. at 2227. The provision under which defendant was arrested and prosecuted prohibits "post[ing] or encourag[ing] others to

post ... private, personal, or sexual information pertaining to a minor." N.C.G.S. § 14–458.1(a)(1)(d). The statute criminalizes some messages but not others, and makes it impossible to determine whether the accused has committed a crime without examining the content of his communication. The State's justification for the cyberbullying statute "cannot transform [this] facially content based law into one that is content neutral," *Reed* , —— U.S. ——, 135 S.Ct. at 2228, and we therefore reverse the Court of Appeals holding to the contrary.

## C. The Statute Fails Strict Scrutiny.

Because we have concluded that N.C.G.S. § 14–458.1(a)(1)(d) creates a content based restriction on protected speech, we can uphold this portion of the cyberbullying statute only if the State can demonstrate that it satisfies strict scrutiny. To do so, the State must show that the statute serves a compelling governmental interest, and that the law is narrowly tailored to effectuate that interest. *See, e.g.* , *id.* at ——, 135 S.Ct. at 2226.*877 That protecting children from online bullying is a compelling governmental interest is undisputed. While the State would normally be required specifically to "identify an 'actual problem' in need of solving," *Entm't Merchs. Ass'n* , 564 U.S. at 799, 131 S.Ct. at 2738 (quoting *United States v. Playboy Entm't Grp.* , 529 U.S. 803, 822, 120 S.Ct. 1878, 1891, 146 L.Ed.2d 865 (2000) ), and to "demonstrate with clarity that its 'purpose or interest is both constitutionally permissible and substantial' " *820 *Fisher v. Univ. of Tex. at Austin* , —— U.S. ——, 133 S.Ct. 2411, 2418, 186 L.Ed.2d 474 (2013) (quoting *Regents of the Univ. of Cal. v. Bakke* , 438 U.S. 265, 305, 98 S.Ct. 2733, 2756, 57 L.Ed.2d 750 (1978) (plurality opinion)), here the State asserts, and defendant agrees, that the General Assembly has a compelling interest in protecting children from physical and psychological harm. We also note that the special status of minors is a subject for which the Supreme Court of the United States has shown a particular solicitude. That Court's long-standing recognition that "youth is more than a chronological fact," *Eddings v. Oklahoma* , 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982), has led it, on one hand, to recognize a compelling interest in the protection of minors, *see, e.g.* , *Sable Commc'ns of Cal., Inc. v. FCC* , 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989), and, on the other, to prohibit the imposition of the most serious criminal punishments for offenses committed before the age of eighteen, *see Roper v. Simmons* , 543 U.S. 551, 575, 125 S.Ct. 1183, 1198, 161 L.Ed.2d 1 (2005) (holding that the death penalty cannot be imposed for offenses committed by a juvenile); *Graham v. Florida* , 560 U.S. 48, 82, 130 S.Ct. 2011, 2034, 176 L.Ed.2d 825 (2010) ("The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."); *Miller v. Alabama* , —— U.S. ——, 132 S.Ct. 2455, 2460, 183 L.Ed.2d 407 (2012) ("[M]andatory life without parole for those under the age of 18 at the time of their crimes [even for homicide offenses] violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " (quoting U.S. Const. amend. VIII )). Accordingly, in line with these consistent and converging strands of precedent, we reaffirm that the State has "a compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns* , 492 U.S. at 126, 109 S.Ct. at 2836.

But just as the Court has shown a particular cognizance of the vulnerabilities of minors, so too has it shown a particular wariness of allowing strict scrutiny to become "strict in theory but feeble in fact." *Fisher* , —— U.S. ——, 133 S.Ct. at 2421. The State must show not only that a challenged content based measure addresses the identified harm, but that the enactment provides "the least restrictive means" of doing so. *McCutcheon v. FEC* , —— U.S. ——, 134 S.Ct. 1434, 1444, 188 L.Ed.2d 468 (2014) (plurality opinion) (citing *Sable Commc'ns* , 492 U.S. at 126, 109 S.Ct. at 2836 ). Given this "exacting scrutiny," *id.* at ——, 134 S.Ct. at 1444, it is *878 perhaps unsurprising that few content based restrictions have survived this inquiry. *See Williams–Yulee v. Fla. Bar* , —— U.S. ——, 135 S.Ct. 1656, 1672, 191 L.Ed.2d 570 (2015) (upholding a provision that prohibited judicial candidates from personally soliciting campaign contributions but allowed them to raise funds in other ways and to conduct other campaign activities); *Holder v. Humanitarian Law Project* , 561 U.S. 1, 38–39, 130 S.Ct. 2705, 2729–30, 177 L.Ed.2d 355 (2010) (upholding, in the interest of national security, a specific application of

a statute barring the provision of material aid to foreign terrorist groups); *Burson v. Freeman* , 504 U.S. 191, 210–11, 112 S.Ct. 1846, 1857–58, 119 L.Ed.2d 5 (1992) (plurality opinion) (upholding a buffer zone around election sites as a measure to safeguard the right to vote freely and effectively); *see also Wood v. Moss* , —— U.S. ——, 134 S.Ct. 2056, 2061, 188 L.Ed.2d 1039 (2014) (holding, in light of the "overwhelming importance" of "safeguarding the President," that the Secret Service had not violated the clearly established rights of protestors by moving them farther away than supporters during an unexpected presidential stop).

With these principles in mind, we now turn to sub-subdivision 14–458.1(a)(1)(d) of the cyberbullying statute. Again, that provision makes it a criminal offense "for any person to use a computer or computer network to ... [p]ost or encourage others to post on the Internet private, personal, or sexual information pertaining to a minor" "[w]ith the intent to intimidate or torment a minor." N.C.G.S. § 14–458.1(a)(1)(d). The central question then becomes whether this language embodies the least restrictive means of advancing the State's compelling interest in protecting minors from this potential harm.

We hold that it does not. At the outset, it is apparent that the statute contains no requirement that the subject of an online posting suffer injury as a result, or even that he or she become aware of such a posting. In *821 addition, as to both the motive of the poster and the content of the posting, the statute sweeps far beyond the State's legitimate interest in protecting the psychological health of minors. Regarding motive, the statute prohibits anyone from posting forbidden content with the intent to "intimidate or torment" a minor. However, neither "intimidate" nor "torment" is defined in the statute, and the State itself contends that we should define "torment" broadly to reference conduct intended "to annoy, pester, or harass."[3] The protection of minors' mental well-being *879 may be a compelling governmental interest, but it is hardly clear that teenagers require protection via the criminal law from online annoyance.

> [3] Similarly, the State encourages us to define "to intimidate" as "to make timid; fill with fear." While we need not, and do not, address a hypothetical statute limited to proscribing unprotected "true threats"—which the United States Supreme Court has defined as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," *Virginia v. Black* , 538 U.S. 343, 359, 123 S.Ct. 1536, 1548, 155 L.Ed.2d 535 (2003) (citations omitted)—we do note that such a statute might present a closer constitutional question. *Cf. Elonis v. United States* , —— U.S. ——, 135 S.Ct. 2001, 2004, 2012, 192 L.Ed.2d 1 (2015) (reversing the defendant's conviction under a federal statute that made "it a crime to transmit in interstate commerce 'any communication containing any threat ... to injure the person of another,' " and for that reason, seeing no need to consider related First Amendment concerns (alteration in original) (quoting 18 U.S.C. § 875(c) )).
>
> --------

The description of the proscribed subject matter is similarly expansive. The statute criminalizes posting online "private, personal, or sexual information pertaining to a minor." *Id.* Again, these terms are not defined by the statute. The State has suggested that we interpret this language by defining "private" to mean "[s]ecluded from the sight, presence, or intrusion of others," or "[o]f or confined to the individual." The State would then define "personal" as "[o]f or relating to a particular person," or "[c]oncerning a particular person and his or her private business, interests, or activities." And it would define "sexual" as "[o]f, relating to, involving, or characteristic of sex, sexuality, the sexes, or the sex organs and their functions," or "[i]mplying or symbolizing erotic desires or activity." While all of these definitions are broad, the State's proposed definition of "personal" as "[o]f or relating to a particular person" is especially sweeping. Were we to adopt the State's position, it could be unlawful to post on the Internet any information "relating to a particular [minor]." Such an interpretation would essentially criminalize posting *any* information about *any* specific minor if done with the requisite intent.

Finally, we note that, while adding a mens rea requirement can sometimes limit the scope of a criminal statute, reading the motive and subject matter requirements in tandem here does not sufficiently narrow the extensive reach of the cyberbullying statute. Even under the State's proposed construction of the statutory terms, N.C.G.S. § 14–458.1(a)(1)(d) could criminalize behavior that a robust contemporary society must tolerate because of the First Amendment, even if we do not approve of the behavior. Civility, whose definition is constantly changing, is a laudable goal but one not readily attained or enforced through criminal laws.

In sum, however laudable the State's interest in protecting minors from the dangers of online bullying may be, North Carolina's cyberbullying statute "create[s] a criminal prohibition of alarming breadth." *United States v. Stevens* , 559 U.S. 460, 474, 130 S.Ct. 1577, 1588, 176 L.Ed.2d 435 (2010), *superseded by statute* , Pub. L. No. 111–294, § 3(a), 124 Stat. 3178 (2010) *880 (narrowing the scope of the law at issue). Even under the State's interpretation of N.C.G.S. § 14–458.1, the statute prohibits a wide range of online speech—whether on subjects of merely puerile interest or on matters of public importance—and all with no requirement that anyone suffer any actual injury. In general, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Entm't Merchs. Ass'n* , 564 U.S. at 799, 131 S.Ct. at 2738 (quoting *United States v. Playboy Entm't Grp.* , 529 U.S. at 818, 120 S.Ct. at 1889 ). Certainly, N.C.G.S. § 14–458.1(a)(1)(d) of the cyberbullying statute is not.*822 **III. CONCLUSION**

For the foregoing reasons, we conclude that N.C.G.S. § 14–458.1(a)(1)(d) restricts speech, not merely nonexpressive conduct; that this restriction is content based; and that it is not narrowly tailored to the State's asserted interest in protecting children from the harms of online bullying. As such, the statute violates the First Amendment's guarantee of the freedom of speech. We therefore reverse the decision of the Court of Appeals finding no error in defendant's conviction for cyberbullying.

REVERSED.

 casetext

No. 4D14-4352

DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA FOURTH DISTRICT

# David v. Textor

189 So. 3d 871 (Fla. Dist. Ct. App. 2016)

Decided Jan 6, 2016

No. 4D14–4352.

01-06-2016

Alkiviades A. DAVID, Appellant, v. John TEXTOR, Appellee.

Ryan G. Baker of Baker Marquart LLP, Los Angeles, California, and Gary S. Betensky, Manuel Farach, and Leslie A. Metz of Richman Greer, P.A., West Palm Beach, for appellant. Alan M. Burger and Mary F. April of McDonald Hopkins LLC, West Palm Beach, for appellee. Nancy G. Abudu, Miami, and Benjamin James Stevenson, Pensacola, for Amici Curiae American Civil Liberties Union of Florida and Legal Scholars.

---

WARNER, J.

Ryan G. Baker of Baker Marquart LLP, Los Angeles, California, and Gary S. Betensky, Manuel Farach, and Leslie A. Metz of Richman Greer, P.A., West Palm Beach, for appellant.

Alan M. Burger and Mary F. April of McDonald Hopkins LLC, West Palm Beach, for appellee.

Nancy G. Abudu, Miami, and Benjamin James Stevenson, Pensacola, for Amici Curiae American Civil Liberties Union of Florida and Legal Scholars.

Opinion

WARNER, J.

Alkiviades A. David appeals a non-final order denying his motion to dissolve an ex parte injunction prohibiting cyberstalking, obtained by the appellee, John Textor. David, a non-resident, contends that the conduct alleged in Textor's ex parte petition for the injunction does not constitute cyberstalking, and the injunction violates the First Amendment. We agree and reverse.

David and Textor both have companies which produce holograms used in the music industry. In May 2014, shortly before the Billboard Music Awards show, it was announced that Textor's company, Pulse Entertainment, would show a Michael Jackson hologram performance. Immediately thereafter, David's company, Hologram USA, Inc., and others filed suit for patent infringement against Pulse in the U.S. District Court in Nevada, a suit which continues. Pulse countered by filing a business tort suit against David in California in June 2014, which eventually was dismissed.

In July 2014, Textor filed an ex parte petition for protection pursuant to sections 784.046 and 784.0485, Florida Statutes (2014), which concern cyberstalking. The petition alleged that David was a California resident. Textor alleged that there were no pending suits between the parties, not mentioning the substantial litigation between

their companies.

The alleged acts of cyberstalking were (1) a May 2014 text from David to Textor, demanding that Textor give credit to David's company at the Billboard Awards show for the hologram, for which David would drop his patent infringement suit; otherwise, he threatened to increase damages in that suit and stated, "You will be ruined I promise you"; (2) an e-mail from David to business associates (other than Textor) that he had more information *874 about Textor that would be released soon, but not specifying what that information was; (3) an online article from July 2014 on Entrepreneur.com, in which David was quoted as saying that he "would have killed [Textor] if he could"; and (4) articles about Textor that David posted and reposted in various online outlets.

Textor alleges that this is cyberstalking. He alleges fear of violence from David and therefore requested an ex parte injunction prohibiting David from communicating with him or posting anything about him on any websites, as well as ordering David to remove any material posted regarding Textor from his website.

The trial court ordered a hearing on the petition. Before the hearing, Textor amended the petition to allege that David had written another email regarding settlement of the lawsuit in which he threatened to expose photographs, lawsuits by disgruntled employees of Textor, and illicit money transfers if Textor did not end the lawsuit by his company. At the end of the e-mail, David wrote, "I hope for you and your family's sake you are man enough to put an end to this now." David also "tagged" Textor's Instagram account with a photo of Hitler and a caption, "Sorry if I have offended any #neonazis." This tagging allowed any followers of Textor to see the Hitler photo and the caption. Attached to the petition were the e-mails, the Hitler photo, and tweets sent by David referring to various suits involving Textor, including the State of Florida's attempt to recoup the cash it had provided Textor's Florida company, Digital Domain.

The trial court granted the amended petition, prohibiting David from communicating with Textor or posting any information about him online, and ordering that he remove any materials he already had posted from the websites.

David then made a limited appearance, without waiving his objection to jurisdiction, and moved to dissolve the ex parte injunction. After a non-evidentiary hearing, the court denied the motion to dissolve and amended its order to prohibit David from communicating with Textor either through electronic means, in person, or through third parties. The amended order also provided:

> Respondent David shall immediately cease and desist from sending any text messages, e[-]mails, posting any tweets (including the re-tweeting or forwarding), posting any images or other forms of communication directed at John Textor without a legitimate purpose. Threats or warnings of physical or emotional harm or attempts to extort Textor or any entity associated with Textor by Respondent David, personally or through his agents, directed to John Textor, directly or by other means, are prohibited.

From this order, David appeals.

David claims that none of the allegations in the petition constitute cyberstalking, but are merely heated rhetoric over a business dispute. Further, he claims that the injunction constitutes a prior restraint on speech, which violates the First Amendment. Whether the conduct alleged constitutes statutorily-defined cyberstalking also resolves the question of whether the petition made sufficient allegations to bring David within the jurisdiction of the court. Because we conclude that the conduct alleged in the petition is not cyberstalking and the injunction violates the First Amendment, we reverse and do not further address the issue of jurisdiction.

Section 784.0485, Florida Statutes (2014), allows an injunction against stalking, including cyberstalking. The statute must be read in conjunction with section 784.046(1)(b), Florida Statutes (2014), *875 which requires at least two incidences of stalking to obtain an injunction. *See Wyandt v. Voccio,* 148 So.3d 543, 544 (Fla. 2d DCA 2014). Additionally, section 784.048 defines stalking, including cyberstalking:

> (a) "Harass" means to engage in a course of conduct **directed at a specific person** which causes substantial emotional distress to that person and serves no legitimate purpose.

> (b) "Course of conduct" means a **pattern of conduct composed of a series of acts over a period of time,** however short, which evidences a continuity of purpose. **The term does not include constitutionally protected activity such as picketing or other organized protests.**

> ....

> (d) "**Cyberstalk" means to engage in a course of conduct to communicate,** or to cause to be communicated, words, images, or language by or through the use of electronic mail or electronic communication, **directed at a specific person, causing substantial emotional distress to that person and serving no legitimate purpose.**

§ 784.048(1), Fla. Stat. (2014) (emphasis added).

Whether a communication causes substantial emotional distress should be narrowly construed and is governed by the reasonable person standard. *See Bouters v. State,* 659 So.2d 235, 238 (Fla.1995); *Goudy v. Duquette,* 112 So.3d 716, 717 (Fla. 2d DCA 2013). In contrast, whether a communication serves a legitimate purpose is broadly construed and will cover a wide variety of conduct. *See, e.g., Goudy,* 112 So.3d at 717 (finding that a parent calling about his daughter's dance team participation serves a legitimate purpose); *Alter v. Paquette,* 98 So.3d 218, 220 (Fla. 2d DCA 2012) (finding that communications demanding payment of loan serve a legitimate purpose); *Touhey v. Seda,* 133 So.3d 1203, 1205 (Fla. 2d DCA 2014) (finding that communications regarding disputes over the dissolution of a business serve a legitimate purpose). Further, where comments are made on an electronic medium to be read by others, they cannot be said to be directed to a particular person. *See Chevaldina v. R.K./FL Mgmt., Inc.,* 133 So.3d 1086, 1091–92 (Fla. 3d DCA 2014).

In this case, Textor alleged that two communications came directly from David to him, both of which were demands that Textor drop his lawsuit. In neither of them did David make any threat to Textor's safety. From the full e-mail, David's threats that Textor would be "sorry" if he didn't settle must be taken in the context of the lawsuit and its potential cost to Textor. Because of the existence of the various lawsuits and the heated controversy over the hologram patents, these e-mails had a legitimate purpose in trying to get Textor to drop what David considered a spurious lawsuit. Moreover, nothing in the e-mails should have caused substantial emotional distress to Textor, himself a sophisticated businessman. Indeed, that they did not is reflected in Textor's refusal to settle or adhere to their terms.

The postings online are also not communications which would cause substantial emotional distress. Most of them are simply retweets of articles or headlines involving Textor. That they may be embarrassing to Textor is not at all the same as causing him substantial emotional distress sufficient to obtain an injunction. Moreover, the postings are more like the blog posts in *Chevaldina,* which the Third District found were not directed at a specific person, as they were simply generally *876 criticizing the business involved to the blogging public. 133 So.3d at 1092.

Even the alleged physical threat made by David in an online interview, that David would have killed Textor if he could have, would not cause a reasonable person substantial emotional distress. In the online article the author stated that "David joked" when stating that he would have killed Textor. Spoken to a journalist for publication, it hardly amounts to an actual and credible threat of violence to Textor.

In sum, none of the allegations in Textor's petition show acts constituting cyberstalking, in that a reasonable person[1] would not suffer substantial emotional distress over them. Those communications made directly to Textor served a legitimate purpose.

[1] The reasonable person standard is applied to a person in the position of the party, in this case an adult businessman.

An injunction in this case would also violate First Amendment principles. "[A] temporary injunction directed to speech is a classic example of prior restraint on speech triggering First Amendment concerns." *Vrasic v. Leibel,* 106 So.3d 485, 486 (Fla. 4th DCA 2013). An injunction may not be directed to prevent defamatory speech. *Id.* at 487; *Chevaldina,* 133 So.3d at 1090. " '[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.' " *Concerned Citizens for Judicial Fairness, Inc. v. Yacucci,* 162 So.3d 68, 73 (Fla. 4th DCA 2014) (quoting *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)). Section 784.048 itself recognizes the First Amendment rights of individuals by concluding that a "course of conduct" for purposes of the statute does not include protected speech. § 784.048(1)(b), Fla. Stat. (2014). This includes speech that may be offensive or vituperative. *See Watts v. U.S.,* 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969).

Here, the online postings simply provide information, gleaned from other sources, regarding Textor and the many lawsuits against him. The injunction prevents not only communications *to* Textor, but also communications *about* Textor. Such prohibition by prior restraint violates the Constitution. If David's communications about Textor are defamatory, then Textor can sue David for damages.

For the foregoing reasons, we reverse the temporary injunction and remand with directions to dismiss the petition.

FORST and KLINGENSMITH, JJ., concur.

*See Pallas v. State,* 636 So.2d 1358, 1363 (Fla. 3d DCA 1994). Thus, the standard is case specific.

 casetext

4

H038576

COURT OF APPEAL OF THE STATE OF CALIFORNIA SIXTH APPELLATE DISTRICT

# Shoemaker v. Gianopoulos

Decided Jan 29, 2014

H038576

01-29-2014

BECKY SHOEMAKER, Plaintiff and Respondent, v. JOHN GIANOPOULOS, Defendant and Appellant.

ELIA

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

(Santa Cruz County

Super. Ct. No. CV173740)

Defendant John Gianopoulos, in propria persona, appeals from a Code of Civil Procedure section 527.6 civil harassment restraining order issued upon the petition of Becky Shoemaker, which prohibits him from harassing Ms. Shoemaker for a period of three years. Much of Mr. Gianopoulos's opening brief is devoid of any record references.[1] The most we can derive from the brief is that he attacks the credibility of \*2 Ms. Shoemaker and others, as it pertains to a medical malpractice lawsuit (hereafter the underlying lawsuit) that he filed against Radiology Medical Group (RMG) at some point in time; in addition he attacks the factual assertions that Ms. Shoemaker made in her request for a restraining order and her testimony at the hearing on her request for a restraining order. We point out that it is for the trial court to determine credibility. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266.) Credibility is an issue for the fact finder, and as such, we do not reweigh evidence or reassess the credibility of witnesses. (*Cowan v. Krayzman* (2011) 196 Cal.App.4th 907, 915.) "Conflicts in the evidence, conflicting interpretations thereof and conflicting inferences which reasonably may be drawn therefrom, present issues of fact for determination by the trier of fact who 'is the sole judge of the credibility of the witnesses'. . . ." (*Church of Merciful Saviour v. Volunteers of America, Inc.* (1960) 184 Cal.App.2d 851, 856-857.) Our task is merely to determine whether the judgment in this case is supported by substantial evidence (*Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1137-1138), whether the facts are legally sufficient to constitute civil harassment under section 527.6,[2] and whether the restraining order passes constitutional muster. (*DVD Copy Control Ass'n v. Bunner* (2003) 31 Cal.4th 864, 890.)

---

[1] We deny Ms. Shoemaker's request to strike significant portions of Mr. Gianopoulos's opening brief and reply brief on the basis that Mr. Gianopoulos makes factual assertions without citation to the record in violation of California Rules of Court, rule 8.204(a)(1)(C). When an appellate brief contains references to matters not supported by the record on



appeal, we can simply ignore these references rather than strike them. (Cal. Rules of Court, rule 8.204(e)(2)(C); *Connecticut Indemnity Co. v. Superior Court* (2000) 23 Cal.4th 807, 813, fn. 2.) Ignoring these references we will address Mr. Gianopoulos's issues. Further, we deny Mr. Gianopoulos's motion for sanctions against Ms. Shoemaker and her attorney Benjamin Ikuta. In essence, Mr. Gianopoulos is claiming that Mr. Ikuta and Ms. Shoemaker made false claims to obtain the restraining order. An appellate court may impose sanctions where a party or attorney included in the record any matter not reasonably material to the *appeal's determination;* filed a frivolous motion; or committed any other unreasonable violation of the California Rules of Court. (Cal. Rules of Court, rule 8.276(a)(2)-(4), italics added.) Mr. Gianopoulos's motion for sanctions is directed at what went on in the lower court, not what is happening on appeal.

2   All unspecified section references are to the Code of Civil Procedure.

## *Background*

## Restraining Order Petition and Allegations

Ms. Shoemaker sought a civil harassment restraining order for herself, members of her family and several of her coworkers. Ms. Shoemaker alleged that the harassment she had suffered was "a result of a combination" of her familial relationship with Mr. *3

Gianopoulos and well as her employment at RMG.[3] Ms. Shoemaker explained that on June 22, 2006, Mr. Gianopoulos had filed a complaint in Santa Cruz County Superior Court, case number CV 169200 against RMG; that in the complaint, Mr. Gianopoulos had alleged that in December 2005, the radiologist and technician on duty at RMG had injected him with a contrast dye solution during an MRI procedure; that as a result of the contrast, Mr. Gianopoulos alleged he had suffered an allergic reaction; that a two week jury trial commenced in February 2008; that Jennafer Gianopoulos[4] testified on behalf of Mr. Gianopoulos; that at trial Jennafer Gianopoulos had disclosed private and personal information surrounding her employment and termination from RMG; that after a two week jury trial in February 2008, the jury awarded a defense verdict in favor of RMG and after RMG filed a memorandum of costs was awarded $28,929.94 as the prevailing party; that her father was disgusted by Mr. Gianopoulos at trial and by the personal information that Jennafer Gianopoulos had disclosed on the witness stand and as a consequence had written the entire Gianopoulos family out of his will and trust; that the harassment she had endured was a result of Mr. Gianopoulos's anger toward his family being written out of her father's will and trust and was an attempt by Mr. Gianopoulos to have her fired from her employment with RMG and an attempt to hurt RMG financially.

3   Ms. Shoemaker stated that she was related to Mr. Gianopoulos through marriage and described Mr. Gianopoulos as her "stepsister's ex-husband's twin brother." Ms. Shoemaker explained that her birth father was married to her step-sister's mother.

4   According to Ms. Shoemaker, Jennafer Gianopoulos is her step-sister's daughter and also Mr. Gianopoulos's niece; and she had been employed as a receptionist at RMG.

Ms. Shoemaker described the harassment as Mr. Gianopoulos creating various websites on which he had stated that she was "Guilty of perjury, conspiracy and intentionally violating laws made to protect patients"; that online he had posted photographs of her house and posted her personal telephone number, address and her personal email account; that on his website www.liarliarliar.com he had accused her of *4 being involved in many illegal and unethical activities and inferred that she had engaged in sexual acts and "other 'acts of perversion' " with RMG employees and RMG attorneys; that Mr. Gianopoulos had put a sign on a residence approximately one mile away from RMG on the lawn of a home occupied by an RMG employee that stated:

**"Press Release: Dominican MRI Center/Radiology Medical**

**Group Acts of Perversion**

**Acts of Perversion**

**Felony Conspiracy**

**Criminal Extortion"**

Ms. Shoemaker alleged that the sign had a link to Mr. Gianopoulos's website www.radiologyofsantacruz.com.

In addition to the foregoing, Ms. Shoemaker alleged that Mr. Gianopoulos had started to park his vehicle in the RMG parking lot. On the vehicle were references to his websites www.liarliarliar.com and wwwdominicanmricenter.com, as well as a sign that stated:

**"Conspiracy, Fraud & Liars**

**Criminals**

**John Rider**

**Dr. Spellman**

**Linda Lantry**

**Becky Shoemaker"**

Furthermore, multiple times a week Mr. Gianopolous had posted things on Craigslist that named her, as well as other employees of RMG; according to Ms. Shoemaker, these postings made disparaging, dishonest, and harassing comments about her and the RMG employees. Specifically, Ms. Shoemaker alleged that on March 23, 2012, Mr. Gianopoulos posted on the Sacramento Craigslist "RMG Manager Becky Shoemaker guilty of deviant acts . . . . [¶] Santa Cruz Comprehensive Imaging/Radiology Medical *5 Group Manager Becky Shoemaker intentionally violated several laws made to protect patients. [¶] I did not want my personal medical information being told to whomever Becky Shoemaker saw fit to tell. She conspired to cover up an intentional act of battery and lied about her involvement and the involvement of her coworkers." Ms. Shoemaker claimed that similar disparaging remarks were made on various other websites, as well as posted in advertisements in the local newspapers; the postings accused her of engaging in deviant sexual acts, of committing perjury in court and of blackmailing other RMG employees into lying in court. According to Ms. Shoemaker, repeatedly, the posts stated that she had been convicted of numerous criminal acts.

Finally, Ms. Shoemaker alleged that Mr. Gianopoulos had set up a telephone number and had notified Yellow Pages as well as 411.com and other listing websites that RMG was associated with the number. She alleged the recorded message stated that caller had reached "Radiology of Santa Cruz"; and that an investigation into RMG and Dominican MRI center had found, among other things, "criminal acts of perversion against a patient."

Shoemaker v. Gianopoulos    H038573 (Cal. Ct. App. Jan. 29, 2014)

## Answer to Request to Stop Harassment

Mr. Gianopoulos filed an answer to Ms. Shoemaker's request for a restraining order. In essence, he stated that the allegations were untrue and that Ms. Shoemaker had lied. The place where the sign was posted was his property; and he had not parked his vehicle in the RMG lot for "at least 5 years." Mr. Gianopoulos attached a 21-page document in which he made allegations that Ms. Shoemaker and RMG were harassing him in order to force him to take down websites and comments about their criminal activity. Mr. Gianopoulos detailed his version of the facts underlying his lawsuit against RMG. In sum, he claimed to have posted true comments about individuals that had directly or indirectly committed criminal acts against him about which he felt that the public had a right to be informed. *6

## Civil Harassment Petition Hearing and Order

At the hearing on Ms. Shoemaker's petition, Ms. Shoemaker was extensively cross examined by Mr. Gianopoulos's attorney concerning her allegations and supporting documentation. At one point in the hearing, defendant's counsel asked Ms. Shoemaker about an allegation she made that defendant notified the "yellow pages" as well as "411.com" and other listing websites that RMG was associated with a particular telephone number. The court asked for the telephone number and had it dialed by the courtroom clerk. The court reporter took down the content of the message as follows: "Hello, you have reached Radiology of Santa Cruz. Our ongoing investigation has found Radiology Medical Group of Santa Cruz County, Dominican MRI Center, also known as RMG, guilty of criminal acts of perversion against a patient. Some of this deviant behavior was performed at the facility owned by RMG which includes Dominican MRI Center, Dominican Breast Center, Santa Cruz Comprehensive Imaging, and South County Imaging. At least one patient was permanently injured when MRI technician John Rider illegally injected a patient with contrast dye. Technician Rider ignored both the patient's direct written order and the patient's doctor's written referral not to inject this contrast. This injection of contrast immediately caused the patient to go into anaphylactic shock. Without regard to the patient or the law, no physician (inaudible) doing the injection as required by law. [¶] Doctor Michael Stone, a radiologist and shareholder of Radiology Medical Group (inaudible) RMG manager, Becky Shoemaker, and staff members, (inaudible) to alter the patient's medical records in an attempt to hide their illegal and unethical acts. [¶] For more details of Dominican MRI Center and Radiology Medical Group's illegal activity, you may wish to visit the website www.radiologyofsantacruz.com and www.liarliarliar.com. Thank you."

After listening to the message, the court ordered that Mr. Gianopoulos disable the telephone number and the message. The court found it "entirely inappropriate" as it was *7 "a fraudulent message" that "purports to state" that it is "a message that is given by Radiology Medical Group." The court reasoned that the message was "fraudulent" and ordered Mr. Gianopoulos to "disable it."

Mr. Gianopoulos's counsel asked Ms. Shoemaker about a photograph of Mr. Gianopoulos's vehicle that she alleged Mr. Gianopoulos had parked in the RMG parking lot; according to Mr. Gianopoulos's counsel the vehicle has www.liarliarliar.com on the windshield. On redirect, Ms. Shoemaker's counsel asked her to look at the photograph and read all of what was on the windows of the vehicle. Ms. Shoemaker stated the following: "www.liarliarliar.com, www.dominicanmricenter.com, again, www.liarliarliar.com. It's two more times; that's on the back. On the side it says: Unsafe Medical Care, www.dominicanmricenter.com, www.liarliarliar.com, conspiracy, fraud and liars, criminals, John Rider, Dr. Spillman, Linda Lantree, Becky Shoemaker. That's on the right side of the vehicle."

After Ms. Shoemaker finished testifying, the court allowed Mr. Gianopoulos to testify "for the purpose of his explaining" to the court "what legitimate purpose he has in consolidating and publishing Ms. Shoemaker and her family members' personal information on his website, what legitimate purpose he has in posting photographs of her house on his website, what constitutional rights he alleges authorize him to misrepresent his phone number as an RMG phone number and contain a voicemail message ascribing these bad acts and conduct to employees of RMG, and what legitimate purpose he has in describing Ms. Shoemaker as a criminal being guilty of acts of perversion, engaging in . . . deviant acts."

Mr. Gianopoulos testified that he had never attempted to contact Ms. Shoemaker and the personal information he got about Ms. Shoemaker he got from doing a search on the internet and posted it because the "public should know what they're doing." Mr. Gianopoulos denied posting anything personal about Ms. Shoemaker, he reiterated that it was information he found on the internet. When the court asked why he had put Ms. *8 Shoemaker's telephone number and her address and her email on his website, Mr. Gianopoulos responded, "There is no specific purpose. I just put it on, just the same thing I did with the attorneys." Mr. Gianopoulos could not give an explanation of why he posted a photograph on Ms. Shoemaker's house on his website.

Defendant stated that everything he said about RMG and the criminal activity meaning perjury, conspiracy, fraud, and illegal injection of contrast, was true. Mr. Gianopoulos said that he had put a description of what perversion and deviant behavior mean on his website. He denied that he ever stated that Ms. Shoemaker was involved in any sexual perversion with any attorneys or employees. Mr. Gianopoulos admitted that he owned a business called Radiology of Santa Cruz that has a telephone number;[5] he admitted that on the telephone message he talks about the criminal activity of RMG. However, he denied that he contacted the yellow pages and 411.com to link his accounts with RMG. Mr. Gianopoulos claimed that he was not harassing Ms. Shoemaker, rather he was exercising his constitutionally protected right to free speech.

> [5] Later, Mr. Gianopoulos confirmed that the telephone number the court had dialed was the number created for his business.

On cross examination, Mr. Gianopoulos admitted that he owned the websites www.liarliarliar.com and www.dominicanmricriminalactivity.com and www.dominicanmricenter.com. He said he named them appropriately "because of the activity that they perpetrated against" him. When asked if he owned the website www.radiologyofsantacruz.com, Mr. Gianopoulos responded affirmatively; he explained that he named it that so "the people that wanted to research things on the Internet would come up to my site and see what Radiology Medical Group's criminal activities are." Counsel for Ms. Shoemaker showed Mr. Gianopoulos a document printed out from this website; counsel asked Mr. Gianopoulos to read what was on the posting after he confirmed that he had written it. The posting read, "10-26-11 -- It has been brought to *9 my attention some people may believe the acts of perversion of Radiology Medical Group RMG, employees (Dr. Michael Spillman, MRI technician John Rider, manager Becky Shoemaker) and attorney Barry Marsh are involved in is sexual in nature. The facts I am presenting are not due to any sexually perverse or sexually deviant acts they may be involved in. I cannot make any statements as to their sexual preferences, only their proven illegal activities." Mr. Gianopoulos said the purpose of putting this on the website was because friends had said that people may have taken the references to perversion and deviant behavior as something of a sexual nature and he wanted to make clear that was not what he meant, he did not want to mislead people. Mr. Gianopoulos denied that he wanted to associate Ms. Shoemaker's name with sexual perversion in a Google search.

Counsel for Mr. Gianopoulos argued to the court that Mr. Gianopoulos's course of conduct was "in the realm of personal speech, not commercial speech." Counsel pointed out that "[p]ersonal speech is subject to the strictest test of speech as distinct from commercial speech. And it is the government intervening on chilling a person's free speech rights that requires a legitimate government interest, not the speaker who is expressing himself, I believe in a legitimately protected area of consumer rights, most particularly in an environment of monopoly, control of local market radiology services, as well as the fact that it pertains to medical care of the citizens in our fairly small and isolated community." Counsel pointed out that no one had asked Mr. Gianopoulos to stop what he was doing and there was no evidence that he was out of control. Counsel explained to the court that he had looked up the words "perversion, "pervert" and "deviant" and the "number one definition of deviant is departing from the norm"; and the "[n]umber one definition of perversion is the alteration of something from its original course, meaning or state to (inaudible) others corruption from what was first intended. [¶] And Mr. Ginaopoulos'[s] view is that he believes that the defendants perverted from *10 the ordinary, distorted from the norm, the legal processes by Ms. Shoemaker and the other defendants in the malpractice case, modifying medical records . . . ."

At the end of the hearing, the court gave a tentative ruling that an injunction would issue and asked Ms. Shoemaker's counsel to prepare a proposed order. The court set a hearing for the purpose of crafting the final order. Subsequently, at the next hearing the court expressed concern as to whether Mr. Gianopoulos's harassment "occurred within the meaning of [section] 527.6 [subdivision] (b)(3) by making harassing telephone calls to the individual or sending harassing correspondence to an individual, by means including, but not limited to, the use of public or private mails, interoffice mail, fax or computer e-mail. [¶] And so the question I have is if someone publishes something in the public domain, creating a website or creating a pre-recorded tape voicemail message then it gets mailed to the Plaintiff, that isn't done by way of telephone call or communicating directly to the Plaintiff. [¶] My concern is . . . that all the reported cases that I'm familiar with involve a direct communication and a repeated course of direct communications to the Plaintiff as opposed to creating some publication which the Plaintiff has to go to herself and look up in some other location in order to find the harassing material."[6]

[6] The court stated for the record that there was "no evidence that Mr. Gianopoulos engaged in unlawful violence. There is no evidence he made credible threats of violence." Further, the court found that there was no evidence Mr. Gianopoulos "phoned her directly, that he mailed anything to her directly." Rather, in the court's view what "he did was made these harassing, in my view, unprotected accusations and statements that did harass her and would harass a reasonable person . . . ."

After listening to argument from both Mr. Gianopoulos's counsel and Ms. Shoemaker's counsel the court set a briefing schedule to address the issue of "whether the methodology by which [Mr. Gianopoulos] engaged in this conduct is covered by the statute."[7] The court did inform Ms. Shoemaker's counsel that he would give counsel *11 "[p]retty much everything" he had asked for as long as the court was "persuaded that it's covered by the statute, given that you are conceding that there is no evidence that he phoned her, he e-mailed her, he mailed her directly, he delivered any materials to her place of business, of employment, he delivered any of these materials to her home. And instead, they were in the ether on an internet site, which she had to access herself in order to see the harassing material."

[7] The court asked counsel to address one more legal issue. Specifically, whether, in light of the conclusion that there was no credible threat of violence by Mr. Gianopoulos, the court could delete from the order the prohibition against ownership or possession of firearms, since the Mr. Gianopoulos had "a legitimate need for possession of a firearm, given the nature of his business."

Mr. Gianopoulos's counsel informed the court that Mr. Gianopoulos had voluntarily taken off the recorded telephone message the court had listened to, including any reference to Ms. Shoemaker that was in the message.

Ultimately, in a lengthy written order filed on May 29, 2012, the court granted the injunction. The court found that Mr. Gianopoulos had engaged in acts of harassment against Ms. Shoemaker within the meaning of section 527.6, subdivision (b)(3); and that the "harassment consisted of a knowing and willful course of conduct directed at Plaintiff that has seriously alarmed, annoyed and harassed her." The court found that "despite [Mr. Gianopoulos]'s claims that he was merely exercising his free speech rights, his conduct served no legitimate purpose." Accordingly, the court ordered Mr. Gianopoulos to remove his three websites— www.radiologyofsantacruz.com, www.dominicanMRIcenter.com, and www.santacruzradiology.com—in their entirety; remove from "any and all websites he created on the Internet" all "references to and refrain from posting" Becky Shoemaker's, Amy Shoemaker's and Steven Shoemaker's "address, telephone numbers, email addresses, and any photographs of their residence" as well as "remove all [existing] references to and refrain from posting that Becky Shoemaker is a 'deviant,' is a 'pervert,' has engaged in 'acts of perversion,' or engaged in 'perverted activity,' " or "has engaged in any criminal activity" or "sexual misconduct." *12

The court permitted Mr. Gianopoulos to maintain www.liarliarliar.com and www.dominicanmricriminalactivity.com, subject to the aforementioned limitations. However, Mr. Gianopoulos was ordered to remove the voicemail message on the number (831) 464-3664 and refrain from impersonating RMG or any RMG employee or agent in any voicemail recording. The court ordered Mr. Gianopoulos to stay 100 yards away from Ms. Shoemaker's residence, and places of employment on Soquel Drive, however the order did not prevent him from traveling on Soquel Drive, as long as he did not park within 100 yards of Ms. Shoemaker's place of employment. Mr. Gianopoulos was ordered to refrain from contacting Ms. Shoemaker and her family members directly or indirectly, "including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by e-mail, by text message, by fax, or by other electronic means."[8] The court imposed the order for three years.

[8] The court stated that Code of Civil Procedure section 527.6, subdivision (t), which would have restricted Mr. Gianopoulos from owning, possessing, purchasing, receiving, or attempting to purchase or receive a firearm or ammunition while the protective order was in effect, "would not apply" to the order.

## Discussion

Section 527.6, subdivision (a)(1), provides, "A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an injunction prohibiting harassment as provided in this section." Section 527.6, subdivision (b)(3) provides: " 'Harassment' is unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." A course of conduct is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, *including following or* *13 *stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, fax, or computer e-mail.* Constitutionally protected activity is not included within the meaning of 'course of conduct.' " (§ 527.6, subd. (b)(1), italics added.)

Section 527.6, subdivision (b)(6) states: " 'Temporary restraining order' and 'injunction' mean orders that include any of the following restraining orders, whether issued ex parte or after notice and hearing: [¶] (A) An order enjoining a party from harassing, intimidating, molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, abusing, telephoning, including, but not limited to, making annoying telephone calls, as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, or coming within a specified distance of, or disturbing the peace of, the petitioner. [¶] (B) An order enjoining a party from specified behavior that the court determines is necessary to effectuate orders described in subparagraph (A)."

On appeal, as noted, the appropriate test is whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record. (*Bookout v. Nielsen, supra,* 155 Cal.App.4th 1131, 1137-1138, [injunctions under section 527.6 are reviewed to determine whether factual findings are supported by substantial evidence; trial court's determination of controverted facts will not be disturbed on appeal].) "Under the substantial evidence standard of review, 'we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment.' " (*ASP Properties* *14 *Group, L.P. v. Fard, Inc., supra,* 133 Cal.App.4th at p. 1266.) However, whether the facts, when construed most favorably in Ms. Shoemaker's favor, are legally sufficient to constitute civil harassment under section 527.6, and whether the restraining order passes constitutional muster, are questions of law subject to de novo review. (*DVD Copy Control Ass'n v. Bunner, supra,* 31 Cal.4th 864, 890, [reviewing court independently examines whether facts come within First Amendment]; *Smith v. Selma Comm. Hosp.* (2008) 164 Cal.App.4th 1478, 1515 [existence or nonexistence of substantial evidence is question of law].)

"Section 527.6 was enacted 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.' [Citations.] It does so by providing expedited injunctive relief to victims of harassment. [Citation.]" (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412.) The purpose of an injunction under section 527.6 is not to punish for past acts of harassment, but rather to provide quick relief and prevent future harassment. (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 403.) An injunction restraining future conduct is authorized under section 527.6 only when it appears from the evidence that the harassment is likely to recur in the future. (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 189.) In evaluating the likelihood that the harassment will continue, the court may consider the totality of the circumstances, "including evidence of conduct that might not itself constitute harassment." (*Id.* at pp. 189-190.)

We are satisfied there was substantial evidence of the conduct that Ms. Shoemaker alleged Mr. Gianopoulos engaged in; Ms. Gianopoulos admitted that he had posted most of the things that Ms. Shoemaker alleged constituted the harassment. However, having determined the acts occurred, there is a separate legal question of whether the facts, as found by the trial court, are *legally* sufficient to constitute civil harassment under section 527.6, and whether the restraining order is constitutional. These determinations are subject to a de novo standard of review. (*R.D. v. P.M., supra,* 202 Cal.App.4th at p. 188.) Similar to the lower court, our concern is whether the course of conduct Mr. Gianopoulos *15 *engaged in is legally sufficient to constitute civil harassment under section 527.6 given that there was no evidence that Mr. Gianopoulos telephoned, emailed, or

mailed anything directly or indirectly to Ms. Shoemaker at her place of business or her home, or tried to contact Ms. Shoemaker in person; rather Mr. Gianopoulos posted things about Ms. Shoemaker and the underlying lawsuit on the internet and on his vehicle and a sign that he displayed in the front yard of a piece of property.

Ms. Shoemaker argues that a harassing course of conduct does not require that the harasser communicate solely toward the individual as long as it comprises a series of acts that seriously alarm, annoy, or harass the person, and that serves no legitimate purpose under sections 527.6, subdivisions (b)(1) and (3). In support of this position, Ms. Shoemaker cites to *Brekke v. Wills, supra,* 125 Cal.App.4th 1400 (*Brekke*).

In *Brekke, supra,* 125 Cal.App.4th 1400, the Third District Court of Appeal addressed the requirements for an actionable course of conduct under section 527.6. In that case, the plaintiff's 16-year-old daughter, Danielle, began dating the defendant and soon thereafter Danielle's school performance suffered and her relationship with her parents deteriorated. The plaintiff told her daughter the relationship with the defendant must end. Thereafter, the defendant called the plaintiff and she attempted to explain why she was concerned about his relationship with her daughter. However, the defendant " 'argued every point' " and would not listen to what she had to say. He also laughed and cussed at her. The plaintiff became frustrated and ended the conversation. When the plaintiff began fearing Danielle was using drugs, she searched Danielle's room and found letters to Danielle from the defendant that she considered disturbing. Some contained instructions on how Danielle might retaliate against the plaintiff. (*Id.* at p. 1405.)

Knowing the plaintiff had been searching Danielle's room, the defendant gave Danielle three letters to plant in the room with the expectation that the plaintiff would read them. In one letter, the defendant described a plan to provoke the plaintiff or her husband into physically attacking him and then suing them for money. The letter also *16 directed the plaintiff to turn to page eight, which was a separate letter to the plaintiff containing highly abusive language and expressing the defendant's belief in the futility of trying to keep him and Danielle apart. (*Brekke, supra,* 125 Cal.App.4th at pp. 1405-1407.) In the third letter, the defendant set forth a "fantastical scheme of torture-murder" involving rabid dogs whereby he and Danielle could kill her parents. (*Id.* at p. 1407.)

After reading the three letters, the plaintiff sought a temporary restraining order and injunction against the defendant pursuant to section 527.6. (*Brekke, supra,* 125 Cal.App.4th at p. 1407.) The trial court issued the requested injunction. (*Id.* at p. 1408.)

On appeal, the defendant argued, among other things, that there was insufficient evidence of a course of conduct sufficient to satisfy the requirement of section 527.6. The Court of Appeal rejected that argument, finding sufficient evidence of a course of conduct from the three threatening letters, the earlier letters written to Danielle instructing her on how to retaliate against her parents, and the taunting telephone conversation between the plaintiff and the defendant. (*Brekke, supra,* 125 Cal.App.4th at p. 1413.) The Court of Appeal explained: "It is readily apparent from the tone and content of his letters and telephone call that defendant had no intention of ceasing his behavior toward plaintiff. Thus, we have no trouble concluding that all of his actions constituted a course of conduct, i.e., 'a series of acts over a period of time, however short, evidencing a continuity of purpose . . . .' " (*Id.* at pp. 1413-1414.)

Ms. Shoemaker argues that *Brekke* illustrates that correspondence or conduct does not have to be addressed to a person to be "directed" at that person. Ms. Shoemaker is missing the point. The question is whether Mr. Gianopolous's course of conduct of posting disparaging remarks about Ms. Shoemaker falls within section 527.6, subdivision (b).

Ms. Shoemaker argues that although section 527.6, subdivision (b)(1) provides three examples of harassing courses of conduct—stalking, telephone calls to an individual, and correspondence to an individual—the word "including" as used in this \*17 section is ordinarily a term of enlargement rather than a limitation. We do not disagree. Certainly, " 'the statutory definition of a thing as "including" certain things does not necessarily place thereon a meaning limited to the inclusions.' " (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 774.) However, here we are guided by the doctrine of *ejusdem generis* in determining whether the course of conduct that Mr. Gianopoulos engaged in is "included" within section 527.6, subdivision (b)(1).

"[T]he doctrine of *ejusdem generis* [also known as Lord Tenterden's rule] . . . states that where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The rule is based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage." (*Scally v. Pacific Gas & Electric Co.* (1972) 23 Cal.App.3d 806, 819; see Civ. Code, § 3534 [particular expressions qualify those which are general]; *Matter of Petition of Johnson* (1914) 167 Cal. 142.) The doctrine of *ejusdem generis* seeks to ascertain common characteristics among things of the same kind, class, or nature when they are cataloged in legislative enactments. (*Lawrence v. Walzer & Gabrielson* (1989) 207 Cal.App.3d 1501, 1506; *Martin v. Holiday Inns, Inc.* (1988) 199 Cal.App.3d 1434, 1437 (*Holiday Inns, Inc.*) *Ejusdem generis* is illustrative of the more general legal maxim *nocitur a sociis*—"it is known from its associates." (*Holiday Inns, Inc., supra,* 199 Cal.App.3d at p. 1437.)

Applying the *ejusdem generis* maxim, the conduct found here, without more, is simply not similar to the examples listed in the statute; the examples listed in the statute have one thing in common—they all consist of directly contacting a particular person. Since the conduct found here is not similar to the examples listed in the statute, it cannot be included in the definition of "course of conduct." \*18

The case of *R.D. v. P.M., supra,* 202 Cal.App.4th 181 (*R.D.*) is instructive. In that case, the course of conduct that was found to come within the statute included the defendant, a former patient of the plaintiff therapist, confronting the plaintiff at a local market, posting negative consumer reviews on the internet and distributing flyers at the plaintiff's office on nine occasions over a period of seven days and at the school plaintiff's son attended with disparaging messages about the plaintiff, and engaging in volunteer activities at the school plaintiff's children attended. (*Id.* at pp. 183, 189.) The Second District Court of Appeal concluded that the evidence showed that "P.M. had come to the market at which R.D. regularly shopped in order to confront R.D. in a threatening manner; that she had come to R.D.'s son's school to distribute flyers in order to continue her harassment and stalking of R.D. and her family; and that she had on many occasions come in and around R.D.'s office building in a successful effort to alarm R.D. and to put her in fear for her safety." (*Id.* at p. 189.)

The restraining order in R.D. required P.M. to stay at least 100 yards away from R.D. and members of her immediate family, their home, workplaces, vehicles, and schools. It specified acts of personal conduct that P.M. was to refrain from doing to R.D. or to members of her immediate family, including harassing, attacking, threatening, assaulting, or stalking them, destroying their personal property, keeping them under surveillance, or blocking their movements. (R.D., *supra,* at p. 187.) On appeal, P.M contended that the order impermissibly infringed her constitutional freedom of speech rights, because her distribution of flyers about R.D. addressed a matter of public concern, and because the order constituted an overbroad content-based prior restraint that burdened her speech more than is necessary to prevent the harassment. (*Id.* at p. 191.) The Court of Appeal concluded, "To the extent the order limits P.M.'s speech, it does so without reference to the content of her speech. The restraining order does not prevent P.M. from expressing her opinions about R.D. in any one of

many different ways; she is merely prohibited from expressing her message in close proximity to R.D. and her *19 family. [¶] The order does not mention or explicitly prohibit P.M. from engaging in any particular form of speech with respect to R.D.—including the sorts of speech about which R.D. had complained in her restraining order requests. It does not mention or prohibit P.M. from making statements on any subject or of any content, as long as she does so at a distance, and the statements' contents do not constitute illegal harassment within the meaning of section 527.6. It does not prohibit P.M. from contacting R.D.'s licensing agency, from distributing flyers about R.D., or from posting derogatory criticisms of R.D. on internet sites. It only restrains P.M. from doing those acts (or any others) within 100 yards of R.D. and members of her immediate family, their home, workplaces, vehicles, and schools." (*Ibid.*) The Court of Appeal recognized that the trial court "was careful to disclaim any reliance on either the truth or falsity of P.M.'s disparaging messages, or the contents of her internet postings, which it recognized to be constitutionally protected." (*Ibid.,* fn. 10.) Thus, implicitly, the R.D. court recognized that posting disparaging comments about people on internet sites is constitutionally protected activity.[9]

> [9] That is not to say that Ms. Shoemaker could not bring a defamation action or other tort action, including invasion of privacy, or intentional infliction of emotional distress against Mr. Gianopolous.
>
> --------

We are mindful that the injunction imposed in this case poses a danger that permanent injunctive relief does not: that is that potentially protected speech was enjoined prior to an adjudication on the merits of the Mr. Gianopoulos's First Amendment claims. A judicial injunction, such as the one imposed here that prohibits speech prior to a determination that the speech is unprotected constitutes a prior restraint on that speech. (See *Near v. Minnesota* (1931) 283 U.S. 697.) Any system of prior restraints of speech comes to this court bearing a heavy presumption against its constitutional validity. (*Southeastern Promotions, Ltd. v. Conrad* (1975) 420 U.S. 546, 558; *Bantam Books, Inc. v. Sullivan* (1963) 372 U.S. 58, 70; *New York Times Co. v.* *20 *United States* (1971) 403 U.S. 713, 714; *Organization for a Better Austin v. Keefe* (1971) 402 U.S. 415, 419.)

This case involves an injunction issued prior to "a final adjudication on the merits that the speech is unprotected." Hence, the danger posed by prior restraint is present in this case. Certainly, valid time, place and manner restrictions which do not functionally prohibit all means of communication are not prior restraints" (see, e.g., *Poulos v. New Hampshire* (1953) 345 U.S. 395, 408; *Cox v. New Hampshire* (1941) 312 U.S. 569, 574-576; cf. *Organization for a Better Austin v. Keefe, supra,* 402 U.S. at pp. 418-419), such as the one imposed in R.D., *supra,* at page 187. The injunction in this case, however, is subject-matter censorship— entirely prohibiting Mr. Gianopoulos from publishing a particular type of information related to Ms. Shoemaker and the underlying medical malpractice case. Therefore, it poses the precise danger of prior restraint identified in *Pittsburgh Press Co. v. The Pittsburgh Commission on Human Relations* (1973) 413 U.S. 376 (*Pittsburgh Press Co.*); that is, "the special vice . . . that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." (*Id.* at p. 390.) Further, as the United States Supreme Court pointed out in *Snyder v. Phelps* (2011) 562 U.S ___ *1207 (*Snyder*), "speech cannot be restricted simply because it is upsetting or arouses contempt. 'If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.' [Citation.] Indeed, 'the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.' [Citation.]" (*Id.* at p. 1219.)

Furthermore, "[i]n most circumstances, 'the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, . . . the burden normally falls upon the viewer to avoid further bombardment of [his] [or her] sensibilities simply by averting [his] [or her] eyes.' [Citation.] As a result, '[t]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.' [Citation.]" (*Snyder, supra,* at p. 1220.)

Mr. Gianopoulos believes that Ms. Shoemaker has something to do with a conspiracy to cover up medical malpractice. His speech is certainly hurtful and its contribution to public discourse may be insignificant. However, it is quite apparent that he believes that he is addressing a matter of public concern—a conspiracy to cover up medical malpractice in the health care industry. As such, unless or until his First Amendment claims are *fully adjudicated* and determined to not be protected, and he communicates his tirade directly to Ms. Shoemaker, an injunction such as the order filed on May 29, 2012, in this case cannot lie.

## Disposition

The order filed May 29, 2012, is reversed. In the interests of justice, each party shall bear their own costs on appeal. *22

_____

ELIA, J.
WE CONCUR: _____
RUSHING, P. J.

_____

PREMO, J.



# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▼

FREE SPEECH

## "[Anti-Harassment] Injunctions Are Not a Remedy for Interpersonal Conflict"

So reasons a Florida appellate court, though other courts in other states seem to take a different view.

**EUGENE VOLOKH** | 4.30.2026 8:01 AM

From _Carvajal v. Ferretti_, decided yesterday by the Florida Court of Appeal, in an opinion by Justice Mark Klingensmith, joined by Justices Shannon Shaw and Johnathan Lott:

> Wife and her husband separated in 2021 and initiated divorce proceedings in 2022. Girlfriend began a relationship with the husband in 2019, prior to the dissolution proceedings.
>
> In October 2024, Wife filed a petition for an injunction for protection against stalking, alleging four categories of conduct occurring between August 2023 and October 2024:
>
> 1. **August 2023 social media post:** Girlfriend accused Wife of manipulating others, using her child to spy, and included language Wife perceived as threatening.
> 2. **February 2024 social media post:** Girlfriend again accused Wife of stalking behavior, tagged Wife's workplace, and warned others about her. Wife testified this led to a meeting with her employer.
> 3. **October 16, 2024 text message:** Girlfriend contacted Wife regarding a child support payment being sent via Zelle and requested identifying information. Wife provided the information and confirmed receipt through a court-approved communication application.
> 4. **October 23, 2024 communications:** Following an incident involving Wife's cousin, Girlfriend sent Wife a series of messages calling her derogatory names, accusing her of stalking, and telling her to stay away. When Wife blocked her number, Girlfriend resent the same messages via WhatsApp and email within minutes and referenced possibly appearing at Wife's workplace….
>
> The trial court found the statutory requirements satisfied and entered a three-year injunction prohibiting Girlfriend from contacting Wife….

> Section 784.0485(1), Florida Statutes (2024), authorizes injunctions for protection against stalking. "Stalking" occurs when a person "willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person." "Harass" means engaging in a course of conduct directed at a specific person that:
>
> 1. Causes substantial emotional distress; and
> 2. Serves no legitimate purpose.
>
> A "course of conduct" is a pattern of conduct composed of a series of acts over time evidencing continuity of purpose….
>
> Because the "harassment" must be "repeated[ ]" for an injunction to issue, at least two instances of "harassment" are required. Critically, "[t]wo or more acts that are part of one continuous course of conduct are legally insufficient to qualify as separate instances of

The court overturned the injunction on the grounds that the incidents didn't qualify as "a series of acts over time evidence continuity of purpose," that they wouldn't cause "substantial emotional distress" to a reasonable person, and that they "served legitimate purposes." But it also had this to say more broadly, under the heading "Injunctions Are Not a Remedy for Interpersonal Conflict":

The trial court's ruling focused on the parties' contentious relationship and the perceived impropriety of Girlfriend's communications stemming from her involvement with husband and his personal affairs with Wife. Though Florida courts have repeatedly cautioned against this practice in other cases, the message bears repeating: stalking injunctions are not designed to regulate contentious personal disputes.

The law draws a firm—but still misunderstood—line between conduct that is unlawful and conduct that is simply unpleasant, offensive, or emotionally charged. That distinction becomes especially important in cases involving requests for injunctions against stalking, where courts are frequently asked to intervene in deeply personal disputes.

At first glance, it is easy to see why someone embroiled in an acrimonious relationship might turn to the courts for relief. Words are exchanged, accusations are made, reputations feel threatened, and emotions run high. The concern can be real. But the legal question is not whether the conflict is intense, it is whether the conduct meets section 784.048's definition of "stalking." And that definition is intentionally narrow.

Florida courts have long recognized that injunctions are extraordinary remedies, not tools for refereeing personal disputes…. [I]njunctions are not available "to stop someone from uttering insults or falsehoods." That principle reflects a broader judicial reluctance to transform everyday conflict into legally actionable wrongdoing…. [I]njunctions are not meant "to keep the peace between parties who, for whatever reason, are unable to get along." In other words, the law does not—and cannot—guarantee harmonious relationships.

This restraint is rooted first in section 784.048 itself. Section 784.048 does not prohibit rude behavior, social media arguments, or even harsh personal attacks. Instead, section 784.048 targets a specific kind of conduct: repeated, directed actions that cause 1) **substantial emotional distress,** and 2) serve **no legitimate purpose**. That standard excludes much of what occurs in interpersonal disputes. Arguments between neighbors, former romantic or business partners, disputes involving family members, and emotionally charged communications often arise from recognizable—if imperfect—human motives. Such communications may be regrettable, but are not necessarily unlawful.

Section 784.048's requirement of "substantial emotional distress" further underscores this limitation. Courts evaluate distress using an objective standard, asking how a reasonable person would respond and not how the affected individual before the court subjectively felt…. [T]his standard is "narrowly construed." The law assumes that reasonable people can withstand a certain level of friction, insult, and discomfort without requiring judicial intervention. Everyday emotions like embarrassment, anger, and anxiety are part of the human condition. Section 784.048 is concerned only with conduct that is so extreme it would overwhelm an ordinary person, not merely upset them.

Another important limitation is the concept of "legitimate purpose." Human interactions, even contentious ones, often have underlying reasons. A message about child support, a demand to cease contact, or even a heated response to perceived wrongdoing may all serve legitimate ends…. [C]onduct does not lose its legitimacy simply because the conduct is accompanied by anger or hostility. This principle prevents section 784.048 from sweeping too broadly and ensures that courts do not penalize individuals for engaging in ordinary though less-than-perfect communication.

Overlaying all of this is a constitutional concern. Many interpersonal disputes are carried out through speech: texts, emails, social media posts. When a court issues an injunction restricting communication, the court is not merely resolving a dispute—it is limiting expression…. [S]uch orders can function as prior restraints on speech, which are viewed with deep skepticism under the First Amendment. If courts were to issue injunctions whenever speech was offensive or upsetting, they would risk suppressing protected expression and overstepping constitutional boundaries.

A practical dimension also exists. Courts are institutions designed to resolve legal disputes, not to manage ongoing personal relationships. If injunctions were available whenever a relationship deteriorated into hostility, the judicial system would become a forum for supervising human behavior at its most personal level. Courts are not in the business of monitoring arguments, policing tone, and adjudicating grievances that, while real, are not legal violations. The law resists this role. Instead, the law intervenes only when conduct crosses a defined threshold into repeated, harmful, and unjustified behavior.

Ultimately, the limitation serves an important purpose. By reserving injunctions for true stalking or harassment—by conduct that is repeated, malicious, and seriously distressing—the law preserves the remedy for those who genuinely need protection. At the same time, the law acknowledges a difficult truth: not all harmful interactions are legally remediable. Some conflicts must be managed outside the courtroom, through personal boundaries, social consequences, or other legal avenues better suited to address the dispute.

While a trial judge may understandably feel compelled to resolve the full scope of a bitter and emotionally charged dispute brought into court, the judge's authority is not guided by sympathy or a desire to restore harmony, but by the limits of the law itself. The judiciary's role is not to mediate every personal conflict or to impose civility where relationships have broken down, but to determine whether the specific legal standards established by the Legislature have been met…. [I]njunctions are not a means "to keep the peace between parties who, for whatever reason, are unable to get along," nor are injunctions available simply to restrain offensive speech or interpersonal friction. However compelling the circumstances may appear, a judge must resist the temptation to act beyond those bounds and instead apply the law as written, granting relief only where the statutory requirements are satisfied….

Start your day with *Reason*. Get a daily brief of the most important stories and trends every weekday morning when you subscribe to *Reason Roundup*.

| Email Address | Subscribe |

---

**NEXT:** **Today in Supreme Court History: April 30, 1789**

---

**EUGENE VOLOKH** is the Thomas M. Siebel Senior Fellow at the Hoover Institution at Stanford, and the Gary T. Schwartz Distinguished Professor of Law Emeritus and Distinguished Research Professor at UCLA School of Law. Naturally, his posts here (like the opinions of the other bloggers) are his own, and not endorsed by any institution. He is also the co-host of the *Free Speech Unmuted* podcast.

FREE SPEECH    HARASSMENT

         MEDIA CONTACT & REPRINT REQUESTS

💬 Show Comments (5)

---

## RECOMMENDED

**Alleged Arkansas predator walks due to federal overreach**

**Federal judge lists 8 ways Trump violated the Constitution by punishing a law firm**



© 2026 Reason Foundation | Accessibility | Privacy Policy | Terms Of Use

This site is protected by reCAPTCHA and the Google **Privacy Policy** and **Terms of Service** apply.

© 2026 Reason Foundation | Accessibility | Privacy Policy | Terms Of Use

This site is protected by reCAPTCHA and the Google **Privacy Policy** and **Terms of Service** apply.

DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**HEATHER SAWYER CARVAJAL,**
Appellant,

v.

**DANIELLE SANTOS FERRETTI,**
Appellee.

No. 4D2024-3293

[April 29, 2026]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Stefanie C. Moon, Judge; L.T. Case No. 062024DR019428AXDVCE.

Heather Sawyer Carvajal, Pompano Beach, pro se.

Hollis Elizabeth Mandell, of The Law Offices of Hollis E. Mandell, Davie, for appellee.

KLINGENSMITH, J.

Appellant ("Girlfriend") seeks review of a final judgment of injunction for protection against stalking entered for Appellee ("Wife"). Because the record does not contain competent, substantial evidence establishing the statutorily required two separate instances of harassment, we reverse.

## I. Background

The parties' dispute arises from a contentious domestic situation. Wife and her husband separated in 2021 and initiated divorce proceedings in 2022. Girlfriend began a relationship with the husband in 2019, prior to the dissolution proceedings.

In October 2024, Wife filed a petition for an injunction for protection against stalking, alleging four categories of conduct occurring between August 2023 and October 2024:

1. **August 2023 social media post:** Girlfriend accused Wife of manipulating others, using her child to spy, and included language Wife perceived as threatening.
2. **February 2024 social media post:** Girlfriend again accused Wife of stalking behavior, tagged Wife's workplace, and warned others about her. Wife testified this led to a meeting with her employer.
3. **October 16, 2024 text message:** Girlfriend contacted Wife regarding a child support payment being sent via Zelle and requested identifying information. Wife provided the information and confirmed receipt through a court-approved communication application.
4. **October 23, 2024 communications:** Following an incident involving Wife's cousin, Girlfriend sent Wife a series of messages calling her derogatory names, accusing her of stalking, and telling her to stay away. When Wife blocked her number, Girlfriend resent the same messages via WhatsApp and email within minutes and referenced possibly appearing at Wife's workplace.

At the hearing, both parties appeared pro se. The trial court found the statutory requirements satisfied and entered a three-year injunction prohibiting Girlfriend from contacting Wife.

## II. Standard of Review

"Trial courts have broad discretion in granting . . . injunctions, and unless a clear abuse of discretion is demonstrated, appellate courts will not disturb the trial court's decision." *Garcia v. Soto*, 337 So. 3d 355, 359 (Fla. 4th DCA 2022) (quoting *DiTanna v. Edwards*, 323 So. 3d 194, 200 (Fla. 4th DCA 2021)).

However, "the question of whether the evidence is legally sufficient to justify imposing an injunction is a question of law reviewed de novo." *Id.* at 359-60 (citation modified). Likewise, "legal sufficiency . . . as opposed to evidentiary weight, is the appropriate concern of an appellate tribunal." *Rosaly v. Konecny*, 346 So. 3d 630, 632 (Fla. 4th DCA 2022) (citation modified).

## III. Governing Law

Section 784.0485(1), Florida Statutes (2024), authorizes injunctions for protection against stalking. "Stalking" occurs when a person "willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person." § 784.048(2), Fla. Stat. (2024).

2

"Harass" means engaging in a course of conduct directed at a specific person that:

1.  Causes substantial emotional distress; and
2.  Serves no legitimate purpose.

§ 784.048(1), Fla. Stat. (2024).

A "course of conduct" is a pattern of conduct composed of a **series of acts over time evidencing continuity of purpose**.  § 784.048(1)(b), Fla. Stat. (2024).

Thus, to obtain an injunction against "stalking" based on allegations of "harassment," the petitioner must prove  "willful[], malicious[], and repeated[] . . . harass[ment]."   § 784.048(2), Fla. Stat. (2024).   Each instance of "harassment" must be comprised of a "course of conduct" (that is, a pattern of a series of acts over time evidencing continuity of purpose) that both causes substantial emotional distress and serves no legitimate purpose.  § 784.048(1), Fla. Stat. (2024).  Because the "harassment" must be "repeated[]" for an injunction to issue, at least two instances of "harassment" are required.  §§ 784.048(1)-(2), Fla. Stat. (2024); *see Carter v. Malken*, 207 So. 3d 891, 893-94 (Fla. 4th DCA 2017) (citation modified) ("Stalking requires proof of repeated acts . . . . A minimum of two incidents of harassment are required to establish stalking.").  Critically, "[t]wo or more acts that are part of one continuous course of conduct are legally insufficient to qualify as separate instances of harassment."  *Garcia*, 337 So. 3d at 360 (quoting *Cash v. Gagnon*, 306 So. 3d 106, 109 (Fla. 4th DCA 2020)).  A qualifying course of conduct requires acts "separated by time or distance."  *Id.*; *see also Eichelberger v. State*, 949 So. 2d 358, 361 (Fla. 2d DCA 2007).

## IV. Analysis

### A. The Record Does Not Establish Two Separate Instances of Harassment

#### 1. The October 23 communications constitute a single incident

The October 23, 2024 communications—sent via text message, WhatsApp, and email—were transmitted within minutes, contained substantially identical content, and arose from a single triggering event.

Under Florida law, this constitutes a **single "course of conduct."**  *See Garcia*, 337 So. 3d at 360 (multiple approaches during a single encounter

constitute one act); *Cash*, 306 So. 3d at 111; *Eichelberger*, 949 So. 2d at 361 (different forms of contact within a short time frame may constitute one continuous episode). Accordingly, even if any of these communications equated to qualifying incidents, these communications would be considered only one "course of conduct" giving rise to, at most, one instance of "harassment," and not multiple.

### 2. The remaining incidents lack continuity of purpose

The remaining alleged acts do not combine to form a second qualifying instance of "harassment."

The August 2023 and February 2024 social media posts were separated by months and were reactive in nature. The posts do not demonstrate the continuity of purpose required to establish a course of conduct. *See* § 784.048(1)(b), Fla. Stat. (2024).

The October 16, 2024 communication concerned child support and was unrelated in purpose to the earlier posts. Communications about financial support for a child constitute conduct with a legitimate purpose and are analytically distinct from alleged harassment. *See Reid v. Saunders*, 282 So. 3d 151, 152 (Fla. 1st DCA 2019).

Thus, these incidents are discrete and disconnected, not part of a unified course of conduct.

### 3. No legally sufficient second instance exists

The difficulty in this case is not the absence of conflict, but the absence of the kind of **repeated, legally distinct conduct** which section 784.048 requires. The record reflects a relationship marked by hostility, accusation, and reactive communication. But when the allegations are carefully examined through the lens of the governing law, the allegations collapse into **either a single continuous episode or isolated, unrelated events**—neither of which satisfies the requirement of two separate instances of "harassment."

The October 23 communications illustrate the point most clearly. On that date, Girlfriend sent a rapid succession of messages to Wife, first by text and then, after being blocked, through WhatsApp, and shortly thereafter, by email. The messages were substantively identical, sent within minutes of each other, and prompted by the same triggering event involving Wife's cousin. Although transmitted through multiple platforms,

4

the messages were part of a single, uninterrupted effort to convey the same message.

Florida courts have repeatedly rejected the notion that such conduct can be artificially divided into multiple acts. In *Garcia*, we held that multiple encounters during a single evening constituted only one act of harassment, emphasizing that conduct must be meaningfully distinct—not merely repeated in quick succession—to qualify as separate instances. 337 So. 3d at 361. Likewise, in *Cash*, we explained that multiple communications forming one continuous episode cannot be parsed into separate acts to meet the statutory threshold. 306 So. 3d at 111. And in *Eichelberger*, the court recognized that different forms of contact occurring within a short period and reflecting a single purpose constitute one course of conduct, not multiple qualifying incidents. 949 So. 2d at 361. Under these principles, the October 23 barrage of messages, however offensive the Wife may deem the messages to be, amounts to only one incident as a matter of law to be considered under section 784.048.

That leaves the remaining allegations: two social media posts made months apart and a single communication regarding child support. But these events, which also lack the necessary continuity of purpose, likewise do not combine to form a second qualifying instance of harassment for our consideration. Section 784.048 requires a "course of conduct," meaning a pattern of behavior evidencing a sustained objective. § 784.048(1)(b), Fla. Stat. (2024). Here, the August 2023 and February 2024 posts were temporally remote and reactive, each tied to discrete grievances. The October 16 communication, by contrast, concerned the transmission of child support and was wholly unrelated in purpose. Such disconnected acts cannot be stitched together to create a qualifying course of conduct. As *Garcia* explains, section 784.048 requires acts that are not only multiple, but meaningfully related and separated by time or circumstance in a way that demonstrates repetition and not randomness. 337 So. 3d at 360.

What remains, then, is a record showing one short episode of continuous communication, and several isolated incidents spread over more than a year. That is not enough. Section 784.048 demands two separate, legally sufficient instances of "harassment," not one incident supplemented by unrelated or non-qualifying conduct. To hold otherwise would be to dilute the statutory requirement and permit injunctions based on the very type of intermittent, emotionally charged exchanges that Florida courts have repeatedly held fall outside the scope of stalking. Because Wife failed to prove two separate instances of harassment, the injunction cannot stand. *See Garcia*, 337 So. 3d at 360-61.

5

**B. The Nature of the Conduct Does Not Satisfy the Statutory Definition of Harassment**

Although our conclusion regarding the lack of two qualifying instances of harassment is dispositive for resolving this matter, the communications' nature and alleged effect similarly reinforce the insufficiency of the evidence to satisfy section 784.048's definition of stalking or harassment.

**1. No substantial emotional distress under an objective standard**

"Whether a communication causes substantial emotional distress should be narrowly construed and is governed by the reasonable person standard." *Rosaly*, 346 So. 3d at 633 (quoting *David v. Textor*, 189 So. 3d 871, 875 (Fla. 4th DCA 2016)).

"A reasonable person does not suffer substantial emotional distress easily." *Kaye v. Wilson*, 363 So. 3d 1155, 1159 (Fla. 2d DCA 2023) (citation modified). Rather, the conduct must be "extreme and outrageous." *Rosaly*, 346 So. 3d at 633.

Even accepting Wife's testimony that she felt frightened, lost sleep, and experienced anxiety as a result of Girlfriend's conduct, the law requires more than a subjective reaction. Section 784.048 demands proof of **"substantial emotional distress" measured by an objective, reasonable person standard**, and Florida courts have consistently emphasized that threshold is high. § 784.048(1)(a), Fla. Stat. (2024). This objective standard does not elevate generalized concern or unease into legally sufficient distress. As explained in *Rosaly*, the inquiry is "narrowly construed" and turns not on how this particular petitioner subjectively felt, but on whether a reasonable person in the same circumstances objectively would suffer distress of a truly significant magnitude. 346 So. 3d at 633. In other words, section 784.048 does not protect against all emotional discomfort, but instead targets only conduct so extreme that it would overwhelm an ordinary person. *See Kaye*, 363 So. 3d at 1159 ("'[S]ubstantial emotional distress' connotes an unjustifiable infliction of stress of great proportion, in the nature of fear and concern.") (quoting *Washington v. Brown*, 300 So. 3d 338, 341 (Fla. 2d DCA 2020)).

Measured against that standard, the conduct here does not qualify. The record reflects insults, accusations, and disparaging social media posts, namely being called a "psychopath," a "stalker," or an "abuser," and being criticized publicly. While such statements are undoubtedly offensive and may be embarrassing or upsetting, Florida courts have repeatedly held, as stated above, that this type of speech does not rise to the level of

causing substantial emotional distress.  Similarly, in *Shannon*, the court held that even conduct causing embarrassment in a professional setting does not meet the statutory threshold.  278 So. 3d 173, 175-76 (Fla. 1st DCA 2019).

Nor do the communications here approach the type of "extreme and outrageous" conduct required to satisfy the standard.  Florida courts reserve that label for behavior far more severe—such as repeated, intrusive surveillance or conduct that invades a person's physical sense of security. *See Rosaly*, 346 So. 3d at 633.  By contrast, the communications here were electronic, intermittent, and easily avoidable—demonstrated by the fact that Wife blocked Girlfriend's number and did not respond to further messages.  Courts have recognized that a reasonable person is expected to possess a degree of resilience in the face of unpleasant communications, particularly where those communications can be ignored or avoided. "Unpleasant, uncivil, and distasteful communications do not rise to the level required to support a permanent injunction against stalking."  *Id.* (citation modified).

As noted in *Kaye*, a reasonable person does not suffer substantial emotional distress easily; the law requires a showing of something more than worry or discomfort arising from a contentious relationship.  363 So. 3d at 1159.  Section 784.048 is not triggered simply because a party feels uneasy or wishes to prevent further unpleasant interactions.  Mere irritation, annoyance, embarrassment, exasperation, aggravation, and frustration, without more, does not equate to 'substantial emotional distress.' *See Shannon*, 278 So. 3d at 175-76.

In sum, the record reflects a series of emotionally charged exchanges, but not conduct that would cause a reasonable person to experience the level of distress which section 784.048 requires.  Thus, even accepting Wife's testimony that she felt threatened or lost sleep, the conduct does not meet the objective threshold which section 784.048 requires as a matter of law.  *See Johnstone v. State*, 298 So. 3d 660, 665 (Fla. 4th DCA 2020); *Rosaly*, 346 So. 3d at 633.  Because the alleged behavior amounts, at most, to embarrassment, frustration, and interpersonal conflict, it does not satisfy the objective standard for substantial emotional distress and, therefore, cannot support the issuance of a stalking injunction.

## 2. The conduct served legitimate purposes

Conduct cannot constitute harassment if it serves a legitimate purpose. § 784.048(1)(a), Fla. Stat (2024).  "Conduct is legitimate when there is a

reason for the conduct other than to harass the victim." *Gonzalez v. Funes*, 300 So. 3d 679, 683 (Fla. 4th DCA 2020) (citation modified).

Here, the record demonstrates that the communications at issue, even if contentious or poorly worded, were not undertaken without purpose. Rather, the communications were rooted in identifiable, legitimate objectives falling outside of section 784.048's definition of "harassment." Section 784.048 requires proof that the conduct "serves no legitimate purpose," and Florida courts have consistently interpreted that limitation broadly, recognizing that human interactions, particularly those arising out of domestic disputes, often carry mixed motives without becoming unlawful. § 784.048(1)(a), Fla. Stat. (2024).

The October 16 communication regarding child support is the clearest example. Girlfriend contacted Wife to facilitate payment of child support on the husband's behalf, requesting the information necessary to complete the transaction. Even if Girlfriend herself had no independent legal obligation to make the payment, the communication plainly related to the financial support of the husband's and Wife's minor child where Girlfriend was involved in paying those financial obligations. Florida courts have held that such communications are inherently legitimate. In *Reid*, for example, the court concluded that messages concerning child support, "although worded harshly," served an underlying legitimate purpose and therefore could not support an injunction. 282 So. 3d at 152. Similarly, in *Gonzalez*, the court recognized that a third party may have a legitimate reason to involve herself in communications where the subject matter concerns a shared financial or relational interest. 300 So. 3d at 683. Here, Girlfriend's involvement in transmitting child support on husband's behalf places her squarely within that principle.

The remaining communications likewise reflect purposes that courts have deemed legitimate, even when expressed in an accusatory or emotional manner. Much of Girlfriend's messaging—particularly the October 23 communications—was directed at telling Wife to cease contact and to stay away following an incident involving Wife's cousin. Florida courts have expressly recognized that such communications serve a lawful function. In *Leach*, the court held that contacting another person to demand that they leave one's relationship or personal affairs alone constitutes a legitimate purpose. 162 So. 3d 1104, 1106 (Fla. 2d DCA 2015). This is notwithstanding the communication's confrontational tone. *See Gonzalez*, 300 So. 3d at 683. The same reasoning applies here. A demand for distance, even if delivered with hostility, is not the kind of purposeless harassment which section 784.048 contemplates.

8

Importantly, the presence of anger, insult, or even an ulterior motive does not negate legitimacy. As explained in *Gonzalez*, conduct remains legitimate so long as it is driven by some reason other than pure harassment, even if that reason is accompanied by personal animus. 300 So. 3d at 683. Human communications, especially those in strained relationships, are rarely devoid of emotion. The law does not require civility. Rather, the law requires only that the conduct not be wholly without legitimate purpose.

Viewed in this light, the communications at issue—addressing child support, responding to perceived interference, and demanding cessation of contact—fall within the realm of legitimate, even if contentious, interpersonal interaction. Because the communications were not undertaken solely to harass, the communications cannot satisfy the statutory requirement that the conduct serve "no legitimate purpose," and thus cannot support the issuance of an injunction for stalking.

## C. Injunctions Are Not a Remedy for Interpersonal Conflict

The trial court's ruling focused on the parties' contentious relationship and the perceived impropriety of Girlfriend's communications stemming from her involvement with husband and his personal affairs with Wife. Though Florida courts have repeatedly cautioned against this practice in other cases, the message bears repeating: stalking injunctions are not designed to regulate contentious personal disputes.

The law draws a firm—but still misunderstood—line between conduct that is unlawful and conduct that is simply unpleasant, offensive, or emotionally charged. That distinction becomes especially important in cases involving requests for injunctions against stalking, where courts are frequently asked to intervene in deeply personal disputes.

At first glance, it is easy to see why someone embroiled in an acrimonious relationship might turn to the courts for relief. Words are exchanged, accusations are made, reputations feel threatened, and emotions run high. The concern can be real. But the legal question is not whether the conflict is intense, it is whether the conduct meets section 784.048's definition of "stalking." And that definition is intentionally narrow.

Florida courts have long recognized that injunctions are extraordinary remedies, not tools for refereeing personal disputes. In *Logue*, we made this point plainly: injunctions are not available "to stop someone from uttering insults or falsehoods." 297 So. 3d 605, 614 (Fla. 4th DCA 2020).

9

That principle reflects a broader judicial reluctance to transform everyday conflict into legally actionable wrongdoing. Similarly, in *Klemple*, the court cautioned that injunctions are not meant "to keep the peace between parties who, for whatever reason, are unable to get along." 197 So. 3d 1283, 1286 (Fla. 4th DCA 2016) (citation modified). In other words, the law does not—and cannot—guarantee harmonious relationships.

This restraint is rooted first in section 784.048 itself. Section 784.048 does not prohibit rude behavior, social media arguments, or even harsh personal attacks. Instead, section 784.048 targets a specific kind of conduct: repeated, directed actions that cause 1) **substantial emotional distress,** and 2) serve **no legitimate purpose**. That standard excludes much of what occurs in interpersonal disputes. Arguments between neighbors, former romantic or business partners, disputes involving family members, and emotionally charged communications often arise from recognizable—if imperfect—human motives. Such communications may be regrettable, but are not necessarily unlawful.

Section 784.048's requirement of "substantial emotional distress" further underscores this limitation. Courts evaluate distress using an objective standard, asking how a reasonable person would respond and not how the affected individual before the court subjectively felt. As explained in *Rosaly*, this standard is "narrowly construed." 346 So. 3d at 633. The law assumes that reasonable people can withstand a certain level of friction, insult, and discomfort without requiring judicial intervention. Everyday emotions like embarrassment, anger, and anxiety are part of the human condition. Section 784.048 is concerned only with conduct that is so extreme it would overwhelm an ordinary person, not merely upset them.

Another important limitation is the concept of "legitimate purpose." Human interactions, even contentious ones, often have underlying reasons. A message about child support, a demand to cease contact, or even a heated response to perceived wrongdoing may all serve legitimate ends. As *Gonzalez* recognized, conduct does not lose its legitimacy simply because the conduct is accompanied by anger or hostility. 300 So. 3d at 683. This principle prevents section 784.048 from sweeping too broadly and ensures that courts do not penalize individuals for engaging in ordinary though less-than-perfect communication.

Overlaying all of this is a constitutional concern. Many interpersonal disputes are carried out through speech: texts, emails, social media posts. When a court issues an injunction restricting communication, the court is not merely resolving a dispute—it is limiting expression. As noted in

10

*DiTanna*, such orders can function as prior restraints on speech, which are viewed with deep skepticism under the First Amendment. 323 So. 3d at 204. If courts were to issue injunctions whenever speech was offensive or upsetting, they would risk suppressing protected expression and overstepping constitutional boundaries.

A practical dimension also exists. Courts are institutions designed to resolve legal disputes, not to manage ongoing personal relationships. If injunctions were available whenever a relationship deteriorated into hostility, the judicial system would become a forum for supervising human behavior at its most personal level. Courts are not in the business of monitoring arguments, policing tone, and adjudicating grievances that, while real, are not legal violations. The law resists this role. Instead, the law intervenes only when conduct crosses a defined threshold into repeated, harmful, and unjustified behavior.

Ultimately, the limitation serves an important purpose. By reserving injunctions for true stalking or harassment—by conduct that is repeated, malicious, and seriously distressing—the law preserves the remedy for those who genuinely need protection. At the same time, the law acknowledges a difficult truth: not all harmful interactions are legally remediable. Some conflicts must be managed outside the courtroom, through personal boundaries, social consequences, or other legal avenues better suited to address the dispute.

While a trial judge may understandably feel compelled to resolve the full scope of a bitter and emotionally charged dispute brought into court, the judge's authority is not guided by sympathy or a desire to restore harmony, but by the limits of the law itself. The judiciary's role is not to mediate every personal conflict or to impose civility where relationships have broken down, but to determine whether the specific legal standards established by the Legislature have been met. Again, as Florida courts have cautioned, injunctions are not a means "to keep the peace between parties who, for whatever reason, are unable to get along," *Klemple*, 197 So. 3d at 1286, nor are injunctions available simply to restrain offensive speech or interpersonal friction. *Logue*, 297 So. 3d at 614 ("[I]njunctions are not available to stop someone from uttering insults or falsehoods."). However compelling the circumstances may appear, a judge must resist the temptation to act beyond those bounds and instead apply the law as written, granting relief only where the statutory requirements are satisfied.

The record here reflects precisely that type of acrimonious dispute. Seciton 784.048, however, imposes a higher threshold that was not met.

11

Section 784.048 exists to address specific, defined harms and where those harms are not present, an injunction is not the appropriate remedy.

## V. Conclusion

The record reflects a highly acrimonious dispute involving overlapping personal relationships, accusations, and emotionally charged communications. But section 784.048 requires more than hostility, offensiveness, or discomfort. And, because the evidence does not establish two separate instances of "harassment" supported by competent, substantial evidence, the injunction was improperly entered and is hereby reversed.

*Reversed.*

SHAW and LOTT, JJ., concur.

*    *    *

**Not final until disposition of timely-filed motion for rehearing.**

B282014

Court of Appeal, Second District, Division 3, California.

# **Molinaro v. Molinaro**

33 Cal.App.5th 824 (Cal. Ct. App. 2019)  ·  245 Cal. Rptr. 3d 402

Decided Feb 26, 2019

B282014

02-26-2019

Bertha A. MOLINARO, Plaintiff and Respondent, v. Michael M. MOLINARO, Defendant and Appellant.

Michael M. Molinaro, in pro. per., for Defendant and Appellant. Lauren Longeretta, Encino, for Plaintiff and Respondent. Geoffrey L. Graybill, Sacramento, for The National Coalition for Men as Amicus Curiae on behalf of Defendant and Appellant.

---

EGERTON, J.

Certified for Partial Publication.[*]

> [*] The opinion in the above-entitled matter filed on February 26, 2019, was not certified for publication in the Official Reports. For good cause, it now appears the opinion should be certified for publication in the Official Reports with the exception of parts 1, 2, 4, and 5 of the Discussion.

Michael M. Molinaro, in pro. per., for Defendant and Appellant.

Lauren Longeretta, Encino, for Plaintiff and Respondent.

Geoffrey L. Graybill, Sacramento, for The National Coalition for Men as Amicus Curiae on behalf of Defendant and Appellant.

EGERTON, J.*826 *404

Michael Molinaro appeals from a restraining order issued under the Domestic Violence Prevention Act (DVPA) ( Fam. Code, § 6200 et seq. ).[1] We conclude the part of the restraining order prohibiting Michael from posting anything about his divorce case on Facebook constitutes an overbroad, invalid restraint on his freedom of speech. We therefore will reverse that provision and direct the trial court to strike it from the restraining order. We affirm the restraining order in all other respects.[2]

> [1] Statutory references are to the Family Code unless otherwise noted. For clarity, we will refer to the parties by their first names.

> [2] In his opening brief, Michael appeared to challenge a custody and visitation order issued concurrently with the domestic violence restraining order. However, at oral argument he acknowledged the interim order is not subject to our appellate jurisdiction.

## FACTS AND PROCEDURAL BACKGROUND



On July 11, 2016, Bertha Molinaro filed a petition for dissolution of her marriage to her husband Michael, citing "irreconcilable differences." The Molinaros had been married since June 1997.

On January 6, 2017, Bertha filed an ex parte application for a domestic violence restraining order using the prescribed Judicial Council Form DV-100. *827 In a supporting declaration, Bertha asserted the following: On January 1, 2017, Bertha began to move out of the family home with the help of her siblings and other family. After a verbal altercation with Bertha and some of the family members, Michael moved his car to block the moving truck from exiting the home's driveway. Bertha called the police, who eventually detained Michael. Later that day, she removed the rest of her belongings from the house. Michael had physically restricted Bertha from leaving the home on two other occasions—once by blocking the front door and another time by blocking her car in the home's carport. Before filing for divorce, Bertha had installed locks on her bedroom door "because [Michael] was acting erratic and [she] was afraid of him." Michael threatened to "throw a chair though the bedroom window" if she did not remove the locks.

Bertha declared she was "afraid of what Michael might do in retaliation for my moving out." She continued, "I wanted to keep my address confidential but he found out where I moved to and he is now posting on social media derogatory comments about me and he posted a picture of my new residence and he included the address. He is angry at me for moving out and I am afraid for my safety and the safety of my children."

The application requested a domestic violence restraining order (and a temporary restraining order in advance of a hearing) commanding Michael to stay at least 100 yards away from Bertha and their three children—their 18-year-old daughter and their two sons, then ages 17 and 13, respectively. She also asked the court to order Michael to attend a batterer intervention program. On a separate Form DV-105, Bertha requested legal and physical custody of the couple's two minor sons, and no visitation for Michael until the hearing.*405 The court denied the request for a temporary restraining order and set a January 26, 2017 hearing to receive further evidence on the application. In denying the temporary restraining order, the court checked a box on Form DV-109 indicating: "The facts as stated in form DV-100 do not show reasonable proof of a past act or acts of abuse."

On January 26, 2017, Michael filed a request to continue the hearing. The parties appeared before Judge Thomas Trent Lewis the same day. Bertha did not oppose the request, but asked that Michael "please stop posting everything about the case on Facebook," and "stop giving the children all of my pleadings." Michael responded that he had only given the children copies of "the domestic violence restraining order, not of the divorce petition." When the court asked, "what makes it okay to give the 13-year-old and the 17-year-old copies of the court papers," Michael answered, "My best judgment, Your Honor."*828 The court explained to Michael that it intended to "issue an order against you today that precludes you from discussing the matter with the 13-year-old and the 17-year-old," warning him that courts may "consider parents insinuating children into the court process" in making custody determinations. Michael objected to the order, arguing Bertha had "emptied [their] home equity of $ 250,000 [*sic* ]" and "relocated [his] children to a mystery house without informing [him]." The court acknowledged the objection, but asked Michael to confirm he understood the terms of the order. Michael responded, "Okay. I understand the what. I question the sanity." The court clarified the order did not preclude Michael from posting on Facebook, except to the extent those postings "would otherwise violate the no-discussion order."

On the parties' stipulation, the court continued the hearing to February 15, 2017. Judge Lewis's written order stated, "Neither party is to discuss any aspect of the case with the minor children until further order of the court —including Facebook postings [about the] subject case matter."

On February 15, 2017, the parties appeared before Judge Amy M. Pellman. The court clerk swore both Bertha and Michael. Bertha testified Michael had "showed up uninvited to the house" where she and the couple's children were living, had posted on Facebook "about the divorce, about everything that's happening," and had sent police to the house "to do a wellness check on the kids" when she was at her teaching job. Bertha said Michael "posted to Facebook that [she] stole $ 250,000 from [their] home equity line, that [she] used it all and ran away with it." She continued, "He says that I'm crazy and having hallucinations." Bertha said Michael had concluded some emails to her and her attorney with "F.O.A.D." She looked the acronym up and it "stands for fuck off and die." Bertha testified she "wasn't sure" if the "F.O.A.D." comment was directed at her or her lawyer, but noted that Michael had called her "a bitch a few times." Bertha said Michael's "name calling" was "unsettling" and "very stressful." She also testified the couple's sons were "both depressed" and their daughter "was particularly upset because she had to go back to the house to visit her dogs and [Michael] ... threatened to euthanize the dogs."

Bertha testified she "fear[ed] for her safety and [Michael's] conduct [was] just getting worse and worse." She said Michael's behavior toward her at the earlier hearing was "threatening." She repeated, *406 "I fear for my safety and that of my children."[3] *829 Michael declined the court's invitation to cross-examine Bertha, and said he would not testify on his own behalf. The court asked if Michael planned to call any witnesses. He responded, "I'd like to call my children." The court denied the request, stating, "I don't need to hear" from the children. Although Michael suggested that Judge Lewis had made a "previous court order that [the children] attend," he made no offer of proof regarding the relevance of their testimony. When Judge Pellman responded that she was not bound by the "previous court," which had not had the benefit of Bertha's testimony, Michael acknowledged the ruling and responded, "Quite sure. No evidence."[4]

[3] Michael objected to several parts of Bertha's testimony, including a hearsay objection to their daughter's statement about Michael's threat to euthanize the dog. He also made a lay opinion objection to the testimony describing his behavior as "threatening." The court overruled the objections, and we find no error in the evidentiary rulings. The court properly admitted the daughter's out of court statement as circumstantial evidence of her state of mind—that is, why she was "upset" when she returned from visiting her dogs. (Evid. Code, § 1250, subd. (a)(1) ; see also *People v. Frye* (1985) 166 Cal.App.3d 941, 950, 213 Cal.Rptr. 319 ["Evidence of a declarant's statement is not hearsay if it relates facts other than declarant's state of mind and is offered to circumstantially prove the declarant's state of mind."].) As for Michael's lay opinion objection, the court properly received the testimony as evidence that Bertha felt threatened by Michael's conduct. (Evid. Code, § 800 ; *People v. Farnam* (2002) 28 Cal.4th 107, 153, 121 Cal.Rptr.2d 106, 47 P.3d 988 ["A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony."].)

[4] Michael argues the trial court erred by barring the children's testimony; however, as discussed, the record shows he made no offer of proof, before the hearing he did not file and serve a witness list with a brief description of the anticipated testimony (see § 217, subd. (c) ), and, on appeal, he has made no attempt to show how he was prejudiced by the exclusion of the testimony. He has forfeited the issue as a basis for appellate relief. (See *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 308, 140 Cal.Rptr.3d 459 ["appellant bears the burden to show it is reasonably probable he or she would have received a more favorable result at trial had the error not occurred"].)

The court granted Bertha's application for a restraining order, stating the order would be for three years and Michael was to stay 100 yards away from Bertha and the three children. The court also ordered Michael not "to post anything on Facebook ... in regards to this action" and "not to contact the mother or the children regarding this action."

The court asked Michael if he understood the order. Michael responded, "No, I don't. I think you're insane. I don't understand a word you are saying. It lacks reason, Your Honor. There was no evidentiary foundation for your order. And the prior order of court dated January 6, 2017, that said the facts as stated do not show reasonable proof of past act or acts of abuse was the correct order." The court acknowledged Michael's objection, and asked the parties what they requested regarding custody and visitation of the minor children.

Bertha's counsel asked to arrange "reasonable visitation with the kids." She suggested the parties go down to the mediation office to "work out the parenting plan for the kids." The court suggested mediation might not be productive at the moment, in view of Michael's "behavior." Michael interrupted the court, demanding to know "[w]hat behavior." The bailiff asked Michael not to "scream," and the court *407 noted Michael had been "[y]elling in court."

The court ordered Michael would have monitored visits with the children in "a neutral setting." Michael asked that the visits take place at the children's residence. The court denied the request, admonishing Michael that he was to stay 100 yards away from the residence. The court also ordered that he was to work with Bertha's counsel to find a professional monitor. Michael responded, "No, I'm not." The court granted legal and physical custody to Bertha.

At Bertha's request, the court also ordered Michael to attend anger management classes. Michael responded, "On what basis? There's been no abuse, Your Honor."[5] The court explained it was ordering anger management, not a 52-week batterer's intervention program. Michael continued to respond indignantly: He told the judge, "Why don't you put me behind bars[?]"; asked, "How fast can I commit contempt of court by going to none of them, Your Honor?"; and told the court, "I have no respect for the court, Your Honor."

[5]  The objection prompted another exchange in which the court and bailiff cautioned Michael against screaming or "raising [his] voice and yelling." When the bailiff, for a third time, admonished Michael not to scream, Michael responded by disparaging the "family law bar."

On February 15, 2017, the court entered the restraining order and child custody and visitation order. The order listed the couple's three children as "additional protected persons," provided for an expiration date in three years, included no-contact and stay-away orders, and ordered Michael to attend anger management classes once a week for six months. In an attachment to the restraining order, the court ordered the parties "not to post anything about the case on Facebook" and "not to discuss the case with the children."

On March 10, 2017, Michael filed a motion for a new trial "and/or to vacate judgment/order dated February 15, 2017." Among other things, Michael argued the court committed "misconduct" by precluding him from calling his children as witnesses; there was no evidence of "abuse" to support the restraining order; the order was the product of unfair "surprise" because the parties had not conducted a mandatory mediation on child custody; and the order was "based on written conduct" that was constitutionally protected free speech. On March 30, 2017, the court denied Michael's new trial motion, finding "no legal basis for granting the motion."*831 Michael timely appealed from the February 15, 2017 domestic violence restraining order.[6]

[6]  Bertha contends Michael is "appealing a non-appealable issue" and he "should have filed a writ" petition. Bertha is mistaken. The issuance of a restraining order is appealable as an order granting an injunction under Code of Civil Procedure section 904.1, subdivision (a)(6).

On December 18, 2017, Michael filed a motion to strike Bertha's respondent's brief and a request for sanctions, arguing the brief " 'unreasonably' " violated the California Rules of Court governing the form and content of appellate briefs. We originally deferred ruling on the motion until we had had an opportunity to consider the merits of the appeal. We

later vacated the order and denied the motion to strike. Michael then filed a renewed motion to strike and for sanctions, which we denied. To the extent there is any doubt about our ruling on the December 18, 2017 request for sanctions, that request for sanctions is also denied.

## DISCUSSION *408 1.-2. **

** See footnote *, *ante* .

## 3. *The Restraining Order Is Overbroad to the Extent It Prohibits Michael from Posting on Facebook*

Although we have found the evidence sufficient to support the court's issuance of a domestic violence restraining order, we conclude the part of the order prohibiting Michael from posting "anything about the case on Facebook" is overbroad and impermissibly infringes upon his constitutionally protected right of free speech.[7]

[7] To the extent Michael purports to appeal a similar part of the January 26, 2017 order continuing the restraining order hearing, we conclude his challenge to the speech restriction is moot, having been superseded by the subsequent order that we address above.

"[P]rior restraints on speech ... are the most serious and the least tolerable infringement on First Amendment rights." ( *Nebraska Press Ass'n v. Stuart* (1976) 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 ( *Nebraska Press* ).) Orders enjoining the right to speak on a particular topic are disfavored and presumptively invalid. ( *Id* . at p. 558, 96 S.Ct. 2791.) However, courts have recognized a prior restraint may be permissible under certain limited circumstances. ( *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 143, 87 Cal.Rptr.2d 132, 980 P.2d 846 ( *Aguilar* ); see *Hobbs v. County of Westchester* (2d Cir. 2005) 397 F.3d 133, 149 ( *Hobbs* ).)

To establish a valid prior restraint under the federal Constitution, a proponent has the heavy burden to show the countervailing interest is *832 compelling, the prior restraint is necessary and would be effective in promoting this interest, and less extreme measures are unavailable. (See *Hobbs, supra,* 397 F.3d at p. 149 ; see also *Nebraska Press, supra,* 427 U.S. at pp. 562-568, 96 S.Ct. 2791.) A permissible order restraining future speech "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." ( *Carroll v. President & Com'rs of Princess Anne* (1968) 393 U.S. 175, 183-184, 89 S.Ct. 347, 21 L.Ed.2d 325.)

The California Constitution is more protective of free speech rights than the federal Constitution, and California courts require "extraordinary circumstances" before a prior restraint may be imposed. ( *Wilson v. Superior Court of Los Angeles County* (1975) 13 Cal.3d 652, 658-661, 119 Cal.Rptr. 468, 532 P.2d 116 ; *In re Marriage of Candiotti* (1995) 34 Cal.App.4th 718, 724, 40 Cal.Rptr.2d 299 ( *Candiotti* ).) Nonetheless, in determining the validity of a prior restraint, California courts engage in an analysis of various factors similar to the federal constitutional analysis ( *Aguilar, supra,* 21 Cal.4th at pp. 145-146, 87 Cal.Rptr.2d 132, 980 P.2d 846 ), and injunctive relief restraining speech under the California Constitution may be permissible where the relief is necessary to "protect private rights" and further a "sufficiently strong public policy" ( *id* . at p. 167, 87 Cal.Rptr.2d 132, 980 P.2d 846 (conc. opn. of Werdegar, J.) ).

Applying these principles, the court in *Candiotti* held a custody order limiting a parent's right to communicate with third parties about matters related to the custody proceeding was an unconstitutional prior restraint. ( *Candiotti, supra,* 34 Cal.App.4th at pp. 724-726, 40 Cal.Rptr.2d 299.) There, the order prohibited a mother from disclosing negative information about *409 her former husband's new wife to anyone except certain

specified professionals. ( *Id* . at p. 720, fn. 3, 40 Cal.Rptr.2d 299.) The *Candiotti* court recognized that courts "are given broad authority to supervise and promote the welfare of children" and may constitutionally order parents to refrain from disparaging their former spouse in front of their children. ( *Id* . at p. 725, 40 Cal.Rptr.2d 299.) However, the court observed the challenged order "went further, actually impinging on a parent's right to speak about another adult, outside the presence of the children." ( *Ibid* . ) The court held the order was overbroad in this respect and constituted an undue prior restraint of speech under the California Constitution, reasoning the order "would prevent [the mother] from talking privately to her family, friends, coworkers, or perfect strangers about her dissatisfaction with her children's living situation." ( *Ibid.* ) Although the trial court "certainly ha[d] the power to prevent [the mother] from undermining [the father's] parental relationship by alienating the children from [the stepmother]," the *Candiotti* court found the challenged order to be "much more far-reaching, aimed at conduct that might cause others, outside the immediate family, to think ill of [the stepmother]." ( *Id.* at p. 726, 40 Cal.Rptr.2d 299.) The court explained: "Such remarks by [the mother] may be rude or unkind. They may be motivated by hostility. To the extent they are *833 libelous, they may be actionable. But they are too attenuated from conduct directly affecting the children to support a prior restraint on [the mother's] constitutional right to utter them." ( *Ibid* . )

The same reasoning applies to the part of the restraining order prohibiting Michael from posting information about the case to Facebook. The record shows Michael's Facebook posts were not specifically directed to the minor children, but in many cases invited comments from Michael's adult friends and extended family, some of whom urged him not to dwell on the divorce, while others suggested he seek legal representation. Moreover, although the trial court plainly had the power to prohibit Michael from disparaging Bertha in the children's presence (see *In re Marriage of Hartmann* (2010) 185 Cal.App.4th 1247, 1251, 111 Cal.Rptr.3d 242 ), the order here, like the order in *Candiotti* , was "much more far-reaching," proscribing speech only peripherally related to the case and speech that might, at worst, "cause others, outside the immediate family, to think ill" of Bertha. (*Candiotti, supra,* 34 Cal.App.4th at p. 726, 40 Cal.Rptr.2d 299.) Indeed, most of Michael's earlier posts were of this variety—they expressed his apparent despair about the divorce and his separation from the children, but did not directly disparage Bertha or openly seek to alienate her from the children. Posts of this sort are "too attenuated from conduct directly affecting the children to support a prior restraint on [Michael's] constitutional right to utter them." ( *Ibid* . )

"It is certainly in the best interests of any children of divorce that the adults in their lives act in a mature and courteous manner" ( *Candiotti, supra,* 34 Cal.App.4th at p. 726, 40 Cal.Rptr.2d 299 ); however, where a restraint on the freedom of speech is concerned, the restriction must be necessary and narrowly tailored to promoting those interests. The part of the restraining order prohibiting Michael from posting about the case on Facebook does not meet this test. We conclude it is overbroad, constituting an invalid prior restraint, and must be stricken from the domestic violence restraining order. ( *Id.* at pp. 724-726, 40 Cal.Rptr.2d 299.)*410 **4.-5.** ***

    *** See footnote *, *ante* .

    --------

## DISPOSITION

The part of the restraining order prohibiting Michael Molinaro from posting "anything about the case on Facebook" is reversed, and the trial court *834 is directed to strike the provision from the order. The restraining order is affirmed in all other respects. Each party will bear his and her own costs on appeal.

We concur:

LAVIN, Acting P.J.

DHANIDINA, J.

---

casetext