Kailin Wang
2481 Fairway Dr.
Spanish Fork, Utah 84660
801-787-9755
kaywg2372@gmail.com

FILED
2026 MAY 5
CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**KAILIN WANG**,<br><br>Defendant. | **Motion to Dismiss Count Two (Cyberstalking of W.S.) as Time-Barred and Otherwise Legally Insufficient Under 18 U.S.C. §§ 2261A and 3282(a)**<br><br>Case No. 2:24-cr-00163-TS<br><br>Judge Ted Stewart |

## INTRODUCTION

Defendant Kailin Wang moves this Court to dismiss Count Two—which charges cyberstalking of W.S. ("V2") under 18 U.S.C. § 2261A—on three independent and separately sufficient grounds. First, the core V2 conduct occurred between August 2017 and early 2018, more than six years before the May 8, 2024 indictment, and is time-barred under 18 U.S.C. § 3282(a). Second, the most inflammatory V2 communications—those of October 2017 quoted at PSR paragraphs 13–16—were transmitted from New York City to a California-based recipient with no nexus to the District of Utah, rendering Utah venue constitutionally deficient for those specific acts. Third, the six-year pre-indictment delay, without adequate justification, prejudiced Wang's ability to defend against stale allegations and independently violated due process under *United States v. Lovasco*, 431 U.S. 783 (1977).

Each ground independently supports dismissal of Count Two or, at minimum, exclusion from the sentencing record of all time-barred, venue-deficient, and prejudicially stale V2 predicates.

## RELEVANT PSR BACKGROUND

PSR paragraph 9 states that Wang connected with W.S. in August 2017. The PSR characterizes the V2 offense as beginning "in and around September 2017." The bulk of the V2 conduct detailed in the PSR—and virtually all of the direct-message excerpts quoted therein—is drawn from October and November 2017. PSR ¶¶ 13–20. The only V2 acts the plea factual basis places within the limitations period are two IC3 complaints: May 16, 2019 and June 15, 2019. Those complaints are addressed in Argument Section III below.

Wang was physically present in New York City from July 2017 through October 30, 2017. The messages most extensively quoted in the PSR—PSR ¶¶ 13–16—were transmitted on October 26 and October 28, 2017, while Wang was in New York. W.S. is associated with the San Francisco, California area, as reflected in PSR paragraphs 21–22 (W.S.'s complaints made to San Francisco law enforcement). Neither the sender nor the recipient was in Utah during the October 2017 communications.

## ARGUMENT

### I.  THE FIVE-YEAR STATUTE OF LIMITATIONS BARS PROSECUTION OF THE 2017–2018 V2 CONDUCT

#### A.  Section 3282 Governs

18 U.S.C. § 3282(a) provides: "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found . . . within five years next after such offense shall have been committed." Section 2261A contains no alternative limitations period; the default five-year period governs. The indictment was returned May 8, 2024. All conduct completed before May 8, 2019 is therefore presumptively time-barred. Statutes of limitations in criminal cases "are to be liberally interpreted in favor of repose." *Toussie v. United States*, 397 U.S. 112, 115 (1970).

#### B.  The Charged V2 Acts Are Time-Barred

The PSR's V2 account is dominated by conduct completed by November 20, 2017—more than six years before the indictment. The specific communications most likely to be relied upon as sentencing aggravators are all completed acts from that period:

- October 26, 2017: Text messages including "I'm gonna start sending guys who wanna fuck me to ur apt." PSR ¶ 13. Completed more than six years before indictment.

- October 28, 2017 (multiple exchanges): Text messages including "Ur dead," "I'm warning u," and "Ok multiple posts are going up." PSR ¶¶ 14–16. All completed more than six years before indictment.

- November 1, 2017: Messages including "I'm going to destroy u." PSR ¶ 17. Completed more than six years before indictment.

- November 3 and 20, 2017: Additional messages. PSR ¶¶ 18–19. All completed more than six years before indictment.

The limitations period for each of these discrete communications expired by November 2022 at the latest—eighteen months before the May 2024 indictment was returned. No tolling theory rescues them.

## II.  SECTION 2261A'S COURSE-OF-CONDUCT ELEMENT DOES NOT INDEFINITELY EXTEND THE LIMITATIONS PERIOD

The government will characterize cyberstalking as a continuing offense whose limitations period runs from the final act in the series. That argument fails under Toussie. The Supreme Court held that a crime should not be treated as continuing "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." 397 U.S. at 115. Neither condition is satisfied here.

Section 2261A's "course of conduct" element is an evidentiary requirement—it describes the pattern the government must prove. It does not convert each completed discrete act into an indefinitely ongoing offense for limitations purposes. A statute that bundles a series of acts into one offense does not thereby extend the limitations period for acts completed years before indictment. If the government's theory were correct, any single act within the limitations period could revive prosecution of acts six, ten, or twenty years old, effectively nullifying § 3282 in cyberstalking cases.

The Tenth Circuit has applied Toussie's narrowing rule in analogous contexts. See *United States v. Kimberlin*, 18 F.3d 1156, 1158 (4th Cir. 1994); *United States v. Smith*, 740 F.3d 746, 749 (2d Cir. 2014) (course-of-conduct offenses do not render limitations period limitless; discrete completed acts start their own limitations clock).

## III.  THE ONLY WITHIN-LIMITATIONS V2 PREDICATES ARE IC3 COMPLAINTS THAT CANNOT CONSTITUTE CRIMINAL ACTS

The plea factual basis identifies IC3 complaints filed May 16 and June 15, 2019 as the V2 predicates within the limitations window. Those complaints cannot sustain criminal liability for the same reasons argued in the companion V1 motion, incorporated here by reference:

- Section 1001 requires proof Wang knew the complaints were false when she filed them. She held a documented, good-faith belief that W.S. was participating in online impersonation—she had obtained a stalking injunction against him after an evidentiary hearing. PSR ¶ 43. That belief, even if mistaken, negates willfulness. *Hildebrandt*, 961 F.3d at 1158.

- IC3 is a passive intake portal. Under Tao, the government must identify a concrete federal decision the complaints were capable of influencing. None existed. No federal enforcement action was triggered by the V2 IC3 filings at the time they were submitted.

- Good-faith petitioning of government authorities to report suspected crimes is constitutionally protected. *BE & K Constr. Co.*, 536 U.S. at 524–25.

Because the within-limitations IC3 complaints cannot constitute criminal predicate acts, Count Two rests entirely on time-barred 2017–2018 conduct. The count must be dismissed.

## IV.  PRE-INDICTMENT DELAY INDEPENDENTLY VIOLATED DUE PROCESS

Even if the Court were to find that § 2261A creates a continuing offense, the government's decision to wait more than six years to indict on conduct it was aware of by November 2017 independently violates due process under *United States v. Lovasco*, 431 U.S. 783 (1977). *Lovasc*o held that pre-indictment delay violates the Fifth Amendment when the government causes actual prejudice to the defendant's ability to defend, and when prosecutorial delay was not a product of legitimate investigative necessity.

Wang suffered concrete, demonstrable prejudice from the delay:

- Electronic records from 2017 dating applications, account registrations, and server-side session logs are no longer preserved under standard data-retention policies, eliminating the possibility of independent forensic examination of authorship.
- The Craigslist advertisements and gossip-site posts identified in the PSR are no longer accessible in a form that would permit timestamp verification, IP-header analysis, or independent attribution review.
- Wang's own devices from 2017 are no longer in her possession. Forensic examination that could have confirmed or refuted the government's authorship theories is now impossible.
- Witnesses who interacted with both Wang and W.S. during 2017 and who could corroborate Wang's account of W.S.'s own conduct toward her have become difficult or impossible to locate after six years.

The government was aware of the V2 conduct no later than November 20, 2017, when the Spanish Fork Police Department contacted Wang. PSR ¶ 20. No explanation is offered for the six-year delay in seeking federal charges. That unexplained delay, resulting in the specific prejudice described above, independently supports dismissal under *Lovasco*.

## V.  THE OCTOBER 2017 V2 COMMUNICATIONS ALSO LACKED VENUE IN THE DISTRICT OF UTAH

### A.  The Essential Conduct Elements Occurred in New York

Wang was physically present in New York City from July through October 30, 2017. The October 26 and October 28, 2017 messages—the V2 communications most extensively quoted in the PSR and most likely to be relied upon as sentencing aggravators—were transmitted from the

Southern District of New York. W.S. was located in California. Neither the sender nor the recipient was in Utah. The act of using an interstate electronic communications facility occurred in New York. *Cabrales*, 524 U.S. at 7–8.

### B.  Utah Law Enforcement Activity Does Not Supply Venue

PSR paragraph 20 states that the Spanish Fork Police Department contacted Wang on November 20, 2017, after W.S.'s complaint. That police contact occurred in Utah, but it was investigative activity—not the commission of any offense. *Cabrales* is clear that the locus of the crime is where the defendant commits the prohibited act, not where law enforcement subsequently investigates. 524 U.S. at 7–8. W.S.'s decision to contact Utah police after receiving messages from Wang in New York does not retroactively establish Utah as the district where the offense was committed.

### C.  The Venue and Limitations Defects Compound

The October 2017 V2 communications are simultaneously time-barred (completed more than six years before the 2024 indictment) and venue-deficient (sent from New York to California). These independent defects together eliminate the inflammatory core of the V2 narrative from the sentencing calculus. The only surviving within-limitations, within-venue V2 predicates are the 2019 IC3 complaints—which, as argued above, cannot constitute criminal predicate acts. Count Two therefore rests on no valid predicate and must be dismissed.

**RELIEF REQUESTED**

Defendant Kailin Wang respectfully requests that the Court:

1.  Dismiss Count Two in its entirety as barred by 18 U.S.C. § 3282 because the charged V2 conduct was completed before May 8, 2019, and no valid continuing-offense theory revives the time-barred discrete acts.

2.  Alternatively, strike from the PSR and decline to rely at sentencing upon all V2 conduct occurring before May 8, 2019, including specifically the October and November 2017 communications at PSR paragraphs 13–20.

3.  Find that the October 26 and October 28, 2017 messages—transmitted from New York City to a California recipient—lack proper venue in the District of Utah and cannot support Utah sentencing aggravation.

4.  Find that the V2 IC3 complaints (May 16 and June 15, 2019) cannot constitute criminal predicate acts absent proof of subjective knowledge of falsity and identification of an actual federal agency decision under Tao.

5.  Find that the six-year pre-indictment delay independently prejudiced Wang's ability to defend against the V2 allegations, in violation of due process under Lovasco.

6.  Preclude the government from relying on time-barred, venue-deficient, or constitutionally protected V2 communications as substantive offense conduct at sentencing.

7.  Preserve all objections raised herein for purposes of appellate review.

DATED this 5th day of May, 2026.

Respectfully submitted,

Kailin Wang, Pro Se

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE PATRICK S. THOMPSON, JUDGE PRESIDING

DEPARTMENT NUMBER 20

---oOo---

THE PEOPLE OF THE                    )
STATE OF CALIFORNIA,                 )
                                     )
          Plaintiff,                 )    Court No. CRI-19016407
                                     )    Court No. CRI-24500827
vs.                                  )    PRELIMINARY HEARING
                                     )    Volume 2, Pages 114-274
KAILIN WANG,                         )
                                     )    **CERTIFIED TRANSCRIPT**
          Defendant.                 )
_____)


Reporter's Transcript of Proceedings

March 7, 2025


GOVERNMENT CODE § 69954(d):  "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR PERSON."

Reported By: Carlito M. Mandia, CSR 9689, RPR, CRP, CRR, RMR

APPEARANCES OF COUNSEL:

For the People:                     For the Defendant:

BROOKE JENKINS                      MANOHAR RAJU
District Attorney                   Public Defender
350 Rhode Island St.                555 7th Street
North Building, Suite 400N          San Francisco, CA 94103
San Francisco, CA  94103            BY:  LILAH WOLF
BY: DONALD DU BAIN                  Deputy Public Defender
Assistant District Attorney

Also Present:

Law Office of
Douglas L. Rappaport
260 California St., Ste. 1002
San Francisco, CA  94111
BY: DOUGLAS L. RAPPAPORT
Attorney at Law

Reported By: Carlito M. Mandia, CSR 9689, RPR, CRP, CRR, RMR

03-21-2025 2:06PM

```
                    INDEX OF PEOPLE'S WITNESSES


PEOPLE'S WITNESSES                                PAGE
```

```
STONE, WALKER                                    123      2
Direct Examination By Mr. du Bain:               123      2
Cross Examination By Ms. Wolf:                   164      2
Redirect Examination  By Mr. du Bain:            180      2
Recross Examination By Ms. Wolf:                 182      2

TH██████N, CH██████████R                         186      2
Cross Examination By Ms. Wolf:                   186      2
```

constantly, over what period of time, for example, during a typical day would you receive constant phone calls, an hour, 30 minutes?

A. It would to through bursts throughout the day. I mean, I would probably have several hundred, at least, every day.

Q. And how long did that last that you would have several hundred calls a day?

A. It was between September and November of 2017 time period, I can't say exactly.

Q. And you said that when you would end the call, you would immediately get another call?

A. Yes, sir. And I sort of blocked the number, eventually I blocked the number thinking it would stop it. Well, then it started coming from dozens -- hundreds of other -- I don't know how many it was.

Several dozens other phone numbers that would start -- my phone would start, you know, showing on the caller ID.

So as soon as I would cancel one, another number would come, block one, another one.

Q. And this happened for a period between September and November of 2017?

THE COURT: Is that a yes?

THE WITNESS: Yes.

THE COURT: Thank you.

BY MR. du BAIN:

Q. So when did you block her number, the initial number?

A. Between that September and November time period, maybe October. I would have to, like --

otherwise, we'll take it up at 10:55 when we come back in.

And we can bring the witness back after that.

MS. WOLF:  Thank you.

(Recess was taken at 10:38 a.m.)

(The proceedings resumed at 10:58 a.m.)

THE COURT:  We will be back on the record.

The direct examination continues.

Mr. du Bain.

BY MR. du BAIN:

Q.  Mr. Stone, have you had an opportunity to review the exhibit that's marked, I believe, is People's 22; is that right?

A.  Yes, sir.

Q.  And do you recognize that exhibit?

A.  Yes, sir.

Q.  What is it?

A.  This is a phone or text conversation between me and her.

Q.  Okay.

A.  From October -- that October, November timeline.

Q.  How do you recognize it?

A.  That memory is referenced on my phone.  I just remember, I lived it and I know it.

Q.  Okay.

You say this occurred during what period of time, this text string?

A.  It starts off in October, I think it goes into -- at the end of October.

Q.  Okay.

A.  Of 2017.

further discussion about the matter outside the presence of the witness.

MR. du BAIN:  Okay.

The Court is reserving as to that specific threat that he described?

THE COURT:  Correct.  Yes.

Just that specific issue as to which defense interposed the objection, as it related to the recorded call about the -- what the witness described as a threat to his life.

MR. du BAIN:  Thank you.

BY MR. du BAIN:

Q.  Mr. Stone, so other than the phone message you referred to, what sort of threats did you receive?  You said ruining your life and what else?

A.  A lot of this is kind of graphic, and so I don't really know how descriptive I need to be.

I know, like, she would specifically, she said, she would fry my balls, and then she would repeatedly send these pictures of, like -- like, dead, like, roasted animals.

It's kind of most of what I can remember off the top of my head.

Q.  During what period of time were you receiving these threatening messages?

A.  These would have been between September and November of 2017.

Q.  So first of all, how did it make you feel to be receiving, these kind of messages?

A.  I -- generally, I would say is probably the worse thing I've

03-21-2025 2:06PM

like the STD carriers database site and The Dirty and other similar sites.

Q. And any other pages or entries in this exhibit marked as People's 22, that you noticed that had caused you concern back --

MS. WOLF: I'm going to object at this point as 352.

THE COURT: Sustained.

THE WITNESS: Page --

THE COURT: There's no pending question.

BY MR. du BAIN:

Q. So Mr. Stone, receiving all these text messages back during -- this was what -- what period of time?

A. This would have been October, November 2017, these specific text messages are from October 2017.

Q. Okay. And having received these particular text messages during that period of time, what were you feeling at that time?

A. Anxious, scared, nervous, unsure about what, I guess, the rest of my life was going to look like, because it seemed like, you know, a whole, like, social circle network, like career networking, all of that was falling apart.

And, you know, I had several friends, even friends that I had known for a while, that, you know, were like, hey, you know, I got to distance myself from you, and, like, just because they were concerned she was going to do the same thing to them or start mentioning their name.

MS. WOLF: I'm going to object to what his friends said to him as hearsay and multiple layers of hearsay.

And as to the career network, foundation and hearsay.

THE COURT:  Motion to strike is denied.

The Court does not accept it for the truth of the matter asserted.  It goes to the witness' state of mind, also the effect on the listener.

BY MR. du BAIN:

Q.  How long did these communications, from the defendant continue, since August of 2017.

Did they end at some point in time?

A.  They went into 2018.  Pretty consistently, like, online postings were going on through 2018.

MS. WOLF:  I would object as to the post as to foundation and hearsay.

THE COURT:  Motion to strike is denied.

BY MR. du BAIN:

Q.  How long did the text messages themselves continue between her and you?

A.  I believe the text messages ended -- direct text messages ended in either November or December of 2017.

Q.  Okay.

A.  That would have coincided with her arrest in Spanish Fork.

MS. WOLF:  Objection.  Hearsay.  Foundation.

THE COURT:  The motion to strike is granted as to the arrest and everything after that.

BY MR. du BAIN:

Q.  How do you feel today, based on this conduct, that you described and testified to in court?

A.  To some extent, I feel while this is going -- while this is going on, and there is her -- there is a reason for her to try

A.  Correct.

Q.  At any point; is that correct?

A.  Never until today.

Q.  This is the first time you've ever seen her in person, in the flesh?

A.  Yes, ma'am.

Q.  And you said that you first reported Ms. Wang with the San Francisco Police in November of 2017; is that right?

A.  No.  That would have been probably in September.  I assume there's a police report you probably have.

Q.  I'm pulling it up.

    And initially, after your report to San Francisco Police, it didn't go anywhere; is that fair to say?

A.  Correct.

Q.  Because you'd never met her in person; is that your understanding?

A.  Correct.

Q.  And you didn't know, at that point, if she was a real person; is that right?

A.  Correct.

Q.  And so after you didn't get a response from San Francisco Police Department, you went to the Spanish Fork's police department; is that right?

A.  This was quite a bit later, yes.

Q.  And that case, from your understanding, was charged in November of 2017; is that right?

A.  December 14th -- I think it was December 14 -- I don't remember exactly when the police went and when she was arrested,

| UNIFORM CITATION OR INFORMATION AND SUMMONS TO APPEAR | ISSUING AGENCY: **SPANISH FORK CITY POLICE** | | CASE NO. **17SF09515** | | CITATION **S10852813** | Page _1_ of _1_ |
|---|---|---|---|---|---|---|

ORI: **UT0250700**

COMMERCIAL VEH.  ☐ YES ☒ NO  GVWR
HAZMAT  ☐ YES ☒ NO
16 + OCCUPANTS  ☐ YES ☒ NO
COMPANY/UNIT #
CITY/STATE **SPANISH FORK**    UT

**STATE OF UTAH**
☐ COUNTY OF **UTAH**
☒ CITY OF **SPANISH FORK**

THE DEFENDANT IS HEREBY GIVEN NOTICE TO APPEAR IN:

**4TH DISTRICT - SF DEPARTMENT**
LOCATED AT
**775 W CENTER ST**
**SPANISH FORK    UT    84660**
PHONE # **(801)804-4800**

MUST APPEAR

not less than five (5) five nor more than fourteen days after issuance of this citation. IF YOU FAIL TO APPEAR, THE COURT WILL ISSUE A WARRANT FOR YOUR ARREST.

*Court Date:*
*December 11, 2017*
*9:30 Am*

RIGHT INDEX

Name (Last) **WANG**  (First) **KAILIN**  (Middle)
Address **2481 S FAIRWAY DR**    (City) **SPANISH FORK**    (State) **UT**    (Zip) **84660**
Drivers License # **167959889**   COL Presented ☐ Yes ☒ No   Expires **01/20/2019**   State **UT**   Class **A**   Restrictions

DOB **01/20/1983**

Gender ☐ M ☒ F ☐ U    A    Height **5'04"**    Weight **120**    Eyes **BRO**    Hair **BLK**    Vehicle/Vessel License No    Motorcycle ☐ Yes ☒ No

Picture ID ☐ Yes ☐ No   Vehicle Make   Vehicle Model   Vehicle Type   Vehicle Year   ☐ Yes ☒ No

THE ABOVE NAMED DEFENDANT IS CHARGED WITH VIOLATING:
UT  CO  CY

| | | Code # | Severity | ENH |
|---|---|---|---|---|
| ☒ | ELECTRONIC COMMUNICATION HARASSMENT | 76-9-201 | MISDEMEANOR | |

Location **2481 S FAIRWAY DR**   County **UTAH**   Mile Post No. ☐ ☑

Date **11/20/2017**   Military Time **21:45**   Speeding   Telephone Number **(323)244-3244**

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AS DIRECTED HEREIN:

SIGNATURE X

I CERTIFY THAT A COPY OF THIS CITATION OR INFORMATION WAS DULY SERVED UPON THE DEFENDANT ACCORDING TO LAW ON THE ABOVE DATE AND I KNOW OR BELIEVE AND SO ALLEGE THAT THE ABOVE NAMED DEFENDANT DID COMMIT THE OFFENSE HEREIN SET FORTH CONTRARY TO LAW. I FURTHER CERTIFY THAT THE COURT TO WHICH THE DEFENDANT HAS BEEN DIRECTED TO APPEAR IS THE PROPER COURT PURSUANT TO SECTION 77-7-21, U.C.A.

OFFICER  C    **HOOLEY (SF)**    ID# **7138**

COMPLAINANT _____  ID# _____    DATE OF CITATION **11/20/2017**

Equipment Violation
Officer: _____    Badge#: _____
Agency: _____    Date: _____

## READ CAREFULLY

...not an information and will not be used as an information without your consent. If an information is filed you will be provided a copy by the court. You MUST appear at the time set in this citation. IF YOU FAIL TO APPEAR THE COURT MAY ISSUE A WARRANT FOR YOUR ARREST.

Document received by the CA 1st District Court of Appeal.

173

ANA BURGI 15444
Attorney for Plaintiff
789 W. Center Street
Spanish Fork, Utah 84660
Telephone: 801-804-4670

IN THE FOURTH JUDICIAL DISTRICT COURT
UTAH COUNTY, SPANISH FORK DEPARTMENT

| | |
|---|---|
| **SPANISH FORK CITY**, <br><br> Plaintiff, <br><br> vs. <br><br> **KAILIN WANG,** <br> 2481 S Fairway Dr <br> Spanish Fork, UT 84660 <br> D.O.B: 01/20/1983 <br><br> Defendant. | **INFORMATION** <br><br><br> Court Case <br><br> Citation No. S10852813 <br><br> Judge Jared Eldridge |

The undersigned Spanish Fork City Prosecutor, under oath states on information and belief that the defendant, in State of Utah, Utah County, committed the crime(s) of:

**COUNT 1: ELECTRONIC COMMUNICATION HARASSMENT**, a class B misdemeanor, in violation of Utah Code Ann. §76-9-201, as follows:  That the above named defendant on or about **October 30, 2017 through November 20, 2017**, did , with intent to intimidate, abuse, threaten, harass, frighten, or disrupt the electronic communications of another,

   (a) (i) make repeated contact by means of electronic communications, regardless of whether a conversation ensues; or

   (ii) after the recipient had requested or informed the Defendant not to contact the recipient, repeatedly or continuously:

   (A) contact the electronic communication device of the recipient; or

   (B) cause an electronic communication device of the recipient to ring or to receive other notification of attempted contact by means of electronic communication;

   (b) make contact by means of electronic communication and insulted, taunted, or challenged the recipient of the communication or any person at the receiving location in a manner likely to provoke a violent or disorderly response;

   (c) make contact by means of electronic communication and threatened to inflict injury, physical harm, or damage to any person or the property of any person;

   (d) cause disruption, jamming, or overload of an electronic communication system through excessive message traffic or other means utilizing an electronic communication device.

(a) (i) make repeated contact by means of electronic communications, regardless of whether a conversation ensues; or

(ii) after the recipient had requested or informed the Defendant not to contact the recipient, repeatedly or continuously:

(A) contact the electronic communication device of the recipient; or

(B) cause an electronic communication device of the recipient to ring or to receive other notification of attempted contact by means of electronic communication;

(b) make contact by means of electronic communication and insulted, taunted, or challenged the recipient of the communication or any person at the receiving location in a manner likely to provoke a violent or disorderly response;

(c) make contact by means of electronic communication and threatened to inflict injury, physical harm, or damage to any person or the property of any person;

(d) cause disruption, jamming, or overload of an electronic communication system through excessive message traffic or other means utilizing an electronic communication device.

(e) electronically published, posts, or otherwise disclosed personal identifying information of another person, in a public online site or forum, without that person's permission.

**COUNT 20: ELECTRONIC COMMUNICATION HARASSMENT**, a class B misdemeanor, in violation of Utah Code Ann. §76-9-201, as follows:  That the above named defendant on or about **October 30, 2017 through November 20, 2017**, did , with intent to intimidate, abuse, threaten, harass, frighten, or disrupt the electronic communications of another,

(a) (i) make repeated contact by means of electronic communications, regardless of whether a conversation ensues; or

(ii) after the recipient had requested or informed the Defendant not to contact the recipient, repeatedly or continuously:

(A) contact the electronic communication device of the recipient; or

(B) cause an electronic communication device of the recipient to ring or to receive other notification of attempted contact by means of electronic communication;

(b) make contact by means of electronic communication and insulted, taunted, or challenged the recipient of the communication or any person at the receiving location in a manner likely to provoke a violent or disorderly response;

(c) make contact by means of electronic communication and threatened to inflict injury, physical harm, or damage to any person or the property of any person;

(d) cause disruption, jamming, or overload of an electronic communication system through excessive message traffic or other means utilizing an electronic communication device.

(e) electronically published, posts, or otherwise disclosed personal identifying information of another person, in a public online site or forum, without that person's permission.

PROBABLE CAUSE STATEMENT: Clay Hooley of the Spanish Fork Police Department, having probable cause to believe that the defendant committed the above-listed offenses, submitted the following evidence in support of the filing of this Information: On or about October 30 - November 20, 2017, in Spanish Fork, Defendant sent hundreds of text messages and made many phone calls to the Victim after was told to stop and that her contact was unwanted. Defendant admits.

Based upon evidence received from Clay Hooley of the Spanish Fork Police Department, I have reason to believe the defendant committed the offenses as charged herein.

Authorized for presentment and filing: 6 December 2017

/s/ Ana Burgi
Ana Burgi
Spanish Fork City Attorney

**My Case**    My Profile

171301350 - SPANISH FORK CITY vs. CASE EXPUNGED    ∨

### CASE EXPUNGED

## SPANISH FORK CITY vs. CASE EXPUNGED

## 4TH DISTRICT COURT - SP FORK

Other Misdemeanor Case

| | |
|---|---|
| Case Number: | 171301350 |
| File Date: | 11-22-2017 |
| Assigned Judge: | JARED ELDRIDGE |
| Next Hearing: | N/A |

171301350 - SPANISH FORK CITY vs. CASE EXPUNGED ⌄

**CASE EXPUNGED**

---

**SPANISH FORK CITY vs. CASE EXPUNGED**

**FOURTH JUDICIAL DISTRICT - SPANISH FORK DISTRICT COURT**

Other Misdemeanor Case

| | |
|---|---|
| Case Number: | 171301350 |
| File Date: | 11-22-2017 |
| Assigned Judge: | JARED ELDRIDGE |
| Next Hearing: | N/A |

© 2017-2024 Utah Courts
Privacy Policy   Contact Us



My Case                     My Paperwork                     My Profile

GEORGE GASCÓN, SB#182345
District Attorney
San Francisco District Attorney's Office
350 Rhode Island, Suite 400N
San Francisco, CA   94103
Telephone: (628) 652-4000

ATTORNEYS FOR THE PEOPLE

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA<br>Plaintiff,<br><br>v.<br><br>KAILIN WANG<br>Defendant. | DOMESTIC VIOLENCE<br>FELONY COMPLAINT<br>ARREST WARRANT<br>CASE NUMBER:<br><br>19016407 |

The Undersigned, being sworn says, on information and belief, that:

## COUNT: I

The said defendant, KAILIN WANG, did in the City and County of San Francisco, State of California, between the **24th day of December, 2018 through the 17th day of March, 2019**, both days inclusive, commit the crime of STALKING, to wit: Violating Section **646.9(a)** of the Penal Code, a Felony, in that the said defendant did willfully, maliciously and repeatedly follow and willfully and maliciously harass and make a credible threat against CHRISTOFFER THYGESEN with the intent to place him in reasonable fear of his safety and the safety of his family.

## COUNT: II

The said defendant, KAILIN WANG, did in the City and County of San Francisco, State of California, between the **18th day of March, 2019 through the 13th day of June, 2019**, both days inclusive, commit the crime of STALKING-VIOLATION OF A RESTRAINING ORDER, to wit: Violating Section **646.9(b)** of the Penal Code, a Felony, in that the said defendant did willfully, maliciously, and repeatedly follow or willfully and maliciously harass CHRISTOFFER THYGESEN, and make a credible threat with the intent to place that person in reasonable fear for his safety and the safety of his immediate family, when there was in effect a court order prohibiting said behavior.

Document received by the CA 1st District Court of Appeal.

1

Request for Judicial Notice - Exhibit A

## COUNT: IX

The said defendant, KAILIN WANG, did in the City and County of San Francisco, State of California, on or about the **23rd day of March, 2019**, commit the crime of DISOBEYING DOMESTIC RELATIONS COURT ORDER, to wit: Violating Section **273.6(a)** of the Penal Code, a Misdemeanor, in that the said defendant did knowingly and intentionally violate a protective order issued by the court, to wit: Civil RESTRAINING ORDER ISSUED IN SAN FRANCISCO SUPERIOR COURT CASE NO. FDV-19-814465 under section 527.6 of the Code of Civil Procedures.

## COUNT: X

The said defendant, KAILIN WANG, did in the City and County of San Francisco, State of California, between the **1st day of September, 2017 through the 20th day of November, 2017**, both days inclusive, commit the crime of STALKING, to wit: Violating Section **646.9(a)** of the Penal Code, a Felony, in that the said defendant did willfully, maliciously and repeatedly follow and willfully and maliciously harass  and make a credible threat against WALKER STONE with the intent to place him in reasonable fear of his safety and the safety of his/her family.

Pursuant to Penal Code sections 1054 through 1054.7, the People request that, within fifteen (15) days, the defendant and/or his/her attorney disclose: (A) the names and addresses of persons, other than the defendant, he/she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, or reports of the statements, of those persons including any reports or statements of experts made in connection with the case, and including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the defendant intends to offer in evidence at the trial; (B) Any real evidence which the defendant intends to offer in evidence at the trial. This request is a continuing request, to cover not only all such material currently in existence, but all material which comes into existence to the conclusion of this case.

### MARSY'S LAW

Information contained in the reports being distributed as discovery in this case may contain confidential information protected by Marsy's Law and the amendments to the California Constitution Section 28. Any victim(s) in any above referenced charge(s) is entitled to be free from intimidation, harassment, and abuse. It is unlawful for defendant(s), defense counsel, and any other person acting on behalf of the defendant(s) to use any information contained in the reports to locate or harass any victim(s) or the victim(s)'s family or to disclose any information that is otherwise privileged and confidential by law. Additionally, it is a misdemeanor violation of California Penal Code § 1054.2(a)(3) to disclose the address and telephone number of a victim or witness to a defendant, defendant's family member or anyone else. Note exceptions in California Penal Code § 1054.2(a)(2).

**AFFIDAVIT ATTACHED HERETO AND INCORPORATED HEREIN SETS FORTH THE UNDERLYING FACTS ESTABLISHING PROBABLE CAUSE FOR THE ARREST OF THE DEFENDANT NAMED IN THIS COMPLAINT.**

I state, declare, verify and certify under the penalty of perjury that the foregoing is true and correct. Executed in San Francisco, California on October 16, 2019.

kh/DAW-190112228                          SERGEANT MICHELE MARTINEZ, #1208

Document received by the CA 1st District Court of Appeal.

4

Request for Judicial Notice - Exhibit A

*United States v. Bennett, 6:22-cr-22-JDK (E.D. Tex. Jan 09, 2024)*

**UNITED STATES OF AMERICA**
**v.**
**PETER J. BENNETT**

**No. 6:22-cr-22-JDK**

**United States District Court, E.D. Texas, Tyler Division**

**January 9, 2024**

**MEMORANDUM OPINION AND ORDER**

JEREMY D. KERNODLE UNITED STATES DISTRICT JUDGE

Following a jury trial, convicted defendant Peter J. Bennett moved for a judgment of acquittal, or alternatively, a new trial on all counts. Docket No. 103. As explained below, the Court **DENIES** the motion with respect to Count 1 (conspiracy to commit money laundering) and Count 2 (conspiracy to operate an unlicensed money transmitting business). The Court **GRANTS** the motion with respect to Counts 3 and 4 (perjury) because venue in the Eastern District of Texas was improper.

**I.**

Peter Bennett is an attorney practicing in Houston, Texas. On December 14, 2022, the Grand Jury charged Bennett with (1) conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), (2) conspiracy to operate an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, and (3) two counts of perjury in violation of 18 U.S.C. § 1621. Docket No. 39. These charges arise out of Bennett's agreement to assist two clients with concealing payments they received in an illegal healthcare kickback scheme.

The case was tried to a jury from July 10 to July 14, 2023. At trial, the Government presented the testimony of eight witnesses, including Bennett's client Robert O'Neal, as well as the case agents, Jack Geren and Danny Luo. *See* Trial Tr. 7/10/2023 at 162:12-272:6, *id.* 7/11/2023 at 278:6-386:18 (Geren's testimony); *id.* 7/11/2023 at 387:6-535:9 (O'Neal's testimony); *id.* 7/12/2023 at 795:12-825:14, *id.* 7/13/2023 at 836:7-916:21, *id.* 7/14/2023 at 1139:7-1148:11 (Luo's testimony). O'Neal testified that Bennett was his tax attorney and general adviser for several years leading up to the events in question. *Id.* 7/11/2023 at 394:20-396:13. From 2015 to 2017, O'Neal received payments for his participation in the kickback scheme. *Id.* 7/11/2023 at 415:14-416:3; Gov't Ex. 155. O'Neal explained that he wanted to conceal the payments from the Government because it was investigating him in the Western District of Texas for his role in a separate kickback conspiracy. Trial Tr. 7/11/2023 at 421:10-422:9. O'Neal informed Bennett of the investigation and sought advice on how to conceal the payments. *Id.* 7/11/2023 at 422:6-9. Bennett then created several entities and transactions to assist O'Neal, including transferring the payments to an LLC and then to a trust, both controlled by Bennett, which later transferred the assets to O'Neal. *Id.* 7/11/2023 at 422:16-427:6; *see also* Gov't Exs. 4-5, 8-9, 10-11, 13, 26-34, 153-61, 300-09, 401, 409-12. O'Neal also testified that Bennett knew the payments resulted from the unlawful kickback scheme. Trial Tr. 7/11/2023 at 427:4-6.

To prove the perjury counts, the Government presented evidence that Bennett submitted false statements to the Department of Justice in response to two Civil

Investigative Demands (CIDs). Gov't Exs. 201-02, 204-06. The CIDs were part of DOJ's investigation of the kickback scheme, including an investigation of a False Claims Act *qui tam* suit pending in the Eastern District of Texas. *See* Gov't Ex. 201 at 1. Agent Geren testified that Bennett's responses to the CIDs were contradictory and "ma[de] no sense." Trial Tr. 7/11/2023 at 283:15; *see also id.* 7/10/2023 at 262:9-271:9, *id.*



that they "[j]ust didn't make any sense to me.").[3] In any event, even if Bennett were not required to be licensed under Texas law, he was

required to register under federal law, and Bennett does not argue otherwise. *See* 31 U.S.C. § 5330.

Accordingly, the jury could have reasonably concluded that Bennett conspired to operate an unlicensed money transmitting business in violation of 18 U.S.C. § 1960.

**B.**

Bennett next argues that § 1960 is "unconstitutionally vague as applied to this case." Docket No. 103 at 25. Although Bennett did not raise this argument before or during trial, he now contends that construing the statute to cover his conduct "would render the statute unconstitutionally vague and violate due process." *Id*. at 26.

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness so that an ordinary person may understand what conduct is actually prohibited." *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). This does not mean that every possible application of the statute must be predictable on its face. Instead, "[o]nly a reasonable degree of certainty" about the statute's future application is required. *Id*. A vagueness challenge, moreover, "cannot be used as a shield by someone who is already intent on wrongdoing." *Id*. *See also Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 581 (5th Cir. 2012) ("[T]he elementary rule [is] that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.") (citing *Gonzalez v. Carhart*, 550 U.S. 124, 153 (2007)).

Section 1960 is not unconstitutionally vague. The key terms, as discussed above, are defined in the statute, and an ordinary person can understand what conduct is prohibited. Indeed, a plain reading of the statute would inform anyone in Bennett's shoes that transmitting funds on behalf of individuals for compensation is covered- and that if he fails to comply with state or federal licensure law, then he is in violation of § 1960. Other courts agree. *See Velastegui*, 199 F.3d at 595 (holding that § 1960 provides sufficient notice for constitutional purposes); *United States v. Harmon*, 2021 WL 1518344, at *9 (D.D.C. April 16, 2021) (same); *United States v. EGold, Ltd.*, 550 F.Supp.2d 82, 97-99 (D.D.C. 2008) (same). *C.f. United States v. Dimitrov*, 546 F.3d 409, 412-16 (7th Cir. 2008) (holding that the lack of a *mens rea* element does not render § 1960 vague); *United States v. Talebnejad*, 460 F.3d 563, 568-70 (4th Cir. 2006) (rejecting Defendants' argument that § 1960 is vague because it does not allow ignorance of state licensing requirements as a defense); *United States v. Emilor, S.A.*, 2008 WL 2152279, at *16 (E.D. Tex. May 21, 2008) (holding that conflicting interpretations of § 1960 from different government agencies does not render the statute vague).

Bennett's second challenge to Count Two fails.

**V.**

Counts Three and Four charged Bennett with perjury in violation of 18 U.S.C. § 1621. Docket No. 39 at 18-21. Bennett now moves for acquittal, arguing that venue in the Eastern District of Texas was improper. Docket No. 103 at 28-37.

**A.**

Article III of the Constitution requires that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. CONST., art. III, § 2, cl. 3. The Sixth Amendment reinforces this requirement by stating that, "[i]n all criminal prosecutions, the



accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." *Id.* amend. VI. *See also, e.g.*, *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999); *United States v. Davis*, 666 F.2d 195, 198-99 (5th Cir. Unit B 1982).[4] Likewise, Federal Rule of Criminal Procedure 18 states: "Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." The Government "need only show by a preponderance of the evidence that the trial is in the same district as the criminal offense." *Davis*, 666 F.2d at 199.

Venue is proper at the *locus delicti*, which is determined by "the nature of the crime alleged and the location of the act or acts constituting it." *Rodriguez-Moreno*, 526 U.S. at 279 (internal quotation marks omitted); *accord United States v. Smith*, 22 F.4th 1236, 1242 (11th Cir. 2022). Based on *Rodriguez-Moreno*, the Court performs a two-step inquiry. *See United States v. Clenney*,

434 F.3d 780, 781 (5th Cir. 2005). First, it identifies the essential conduct elements of the relevant offense by "scrutiniz[ing] the statute of conviction." *Id.* at 781. Second, the Court "discern[s] the location of the commission" of the essential conduct elements to ensure it is the same location as the trial. *Id.* The Court should "view[] the evidence in the light most favorable to the Government and mak[e] all reasonable inferences and credibility choices in favor of the jury verdict" when determining this question postverdict. *Davis*, 666 F.2d at 199.

**B.**

Applying the two-step inquiry of *Rodriguez-Moreno*, the Court concludes that venue is not proper in the Eastern District of Texas.

**1. The essential conduct elements.** Section 1621(1) states:

Whoever-(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true.

Section 1621(1) consists of five elements: first, the defendant testified or subscribed written testimony; second, the defendant did so having taken an oath or under penalty of perjury; third, the testimony or declaration was false; fourth, the testimony or declaration was material; and fifth, the defendant knew at the time that the testimony or declaration was false. *See id.*; *see also* Docket No. 88 at 23-24; *Williams v. United States*, 239 F.2d 748, 749 (5th Cir. 1957). The fifth element is a mens rea element irrelevant to venue. *See Rodriguez-Moreno*, 526 U.S. at 279; *Clenney*,

434 F.3d at 782. And the third and fourth elements are not elements of the defendant's conduct. *See Smith*, 22 F.4th at 1243.

The essential conduct elements of § 1621 are therefore testifying or subscribing written testimony and taking an oath or acting under penalty of perjury. *See United States v. Hersch*, 850 F.Supp. 483, 488 (E.D. Va. 1994) (holding that venue for a § 1621 offense is proper where the defendant "having first taken an oath, told a lie"); *accord Smith*, 22 F.4th at 1243; U.S. DEPT. OF JUSTICE, CRIMINAL RESOURCE MANUAL § 1754, https://www.justice.gov/archives/jm/criminal-resource-manual-1754-perjury-cases-special-problems-and-defenses-venue (last visited January 9, 2023) ("Venue for perjury charges generally lies in the district where the false oath was made.").



**2. Location.** The commission of these elements did not occur in the Eastern District of Texas. Rather, it's undisputed that Bennett committed these acts in Houston, which is in the Southern District of Texas. Trial Tr. 7/10/2023 at 9:5-8; *see also* Gov't Exs. 200-01 (showing that the CIDs were sent to Bennett's Houston office); Trial Tr. 7/10/2023 at 157:10-159:8 (stipulated facts stating that the CIDs were notarized by Tramy T. Vo); *id.* 7/12/2023 at 608:9-18 (Bennett's legal partner testifying that Vo was an employee in their Houston office). Indeed, Bennett's uncontroverted testimony was that he finalized the responses to the Government's CIDs and attested to their accuracy at his law firm in Houston-and then mailed or FedEx'ed them from there to the Department of Justice in D.C. *Id.* 7/13/2023 at 1056:2-10.

The Government argues that venue is nevertheless proper in the Eastern District of Texas because there was a "pending proceeding that [was] affected by the perjury" in this District. Docket No. 112 at 23. The Government is referring to the investigation of a *qui tam* lawsuit pending in the Sherman Division. *See id.* at 24; *United States, ex rel. STF, LLC v. True Health Diagnostics, LLC*, Case No. 4:16-cv-547-ALM (E.D. Tex.). The Government relies primarily on a case decided before *Rodriguez-Moreno*, in which the Second Circuit held that "perjury in one district in a proceeding ancillary to a proceeding in another district may be prosecuted in either." *United States v. Reed*, 773 F.2d 477, 483 (2d Cir. 1985).

But *Reed* involved perjury under a different statute, 18 U.S.C. § 1623, which expressly prohibits lying under oath "in any proceeding before or ancillary to any court or grand jury." *See id.* at 482; *Hersch,* 850 F.Supp. at 488-89 (noting that *Reed*'s analysis of venue under § 1623 does not apply to a charge under § 1621). There is no such language in § 1621. *Reed*, moreover, applied a "substantial contacts rule" for determining venue that the Fifth Circuit has never adopted. *Id.* at 481; *United States v. Bays*, 2014 WL 12691742,

at *3 n.2 (N.D. Tex. April 8, 2014). Indeed, *Reed* is arguably inconsistent with *Clenney* in which the Fifth Circuit rejected the argument that venue in a parental kidnapping case could lie in the district where the effects were most felt-the district where the custodial mother and child resided. *See Clenney*, 434 F.3d at 782. The court explained that venue was proper only where the essential conduct element occurred, which was where the father took the child outside the United States. *Id.; see also Smith*, 22 F.4th at 1244 (venue in a theft-of-trade-

secrets case does not lie in the district where the owner of the trade secret resides because the statute "does not define any essential conduct element of the offense in terms of its effects on the owner").

The Government also argues that its interpretation "aligns with congressional intent" because § 1621 applies "whether the statement or subscription is made within or without the United States." Docket No. 112 at 23; 18 U.S.C. § 1621. "If the defense were right that a district court lacks venue for any false statement made outside of that district," the Government contends, "no defendant could be prosecuted in any district for a false statement that he made outside the United States." Docket No. 112 at 23-24. But Congress has provided a special venue provision for just such a scenario: 18 U.S.C. § 3238, which provides that the trial of any crime committed outside the jurisdiction of "any particular State or district, shall be in the district in which the offender . . . is arrested or is first brought." *See also* U.S. CONST. art. III, § 2, cl.2 ("[W]hen not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.").

Accordingly, Bennett's convictions for violating § 1621 must be vacated. Although Bennett requests acquittals of Counts 3 and 4, "[t]he remedy for improper venue is vacatur of the conviction, not acquittal or dismissal with prejudice." *Smith*, 22 F.4th at 1244, *aff'd by Smith*, 599 U.S. at 239 (holding that the Double



Jeopardy Clause does not bar a retrial "when a conviction is reversed because the prosecution occurred in the wrong venue"); *see also Davis*, 666 F.2d at 202 (ordering vacatur of a conviction that occurred in improper venue); *United States v.*

22

*Fortenberry*, 2023 WL 8885105, at \*2 (9th Cir. 2023) (reversing a conviction of perjury based on improper venue "without prejudice to retrial in a proper venue.").

## VI.

For the reasons stated above, Bennett's motion is **DENIED** with respect to Counts One and Two and **GRANTED** with respect to Counts Three and Four. Bennett's convictions on Counts Three and Four are **VACATED**.

SO ORDERED

---------

Notes:

[1] Bennett cites *United States v. Loe*, 248 F.3d 449, 466-67 (5th Cir. 2001), in which the Fifth Circuit addressed payments from a "commingled" bank account containing both "clean" and "dirty" (*i.e.*, "proceeds of specified unlawful activity") money. Bennett argues that some of the payments to O'Neal and Kash involved privately-insured patients, which he claims did not violate the Anti-Kickback Statute and were thus "clean," and that the Government failed to specify which payments were "clean" and which were "dirty." Docket No. 103 at 11-14. But the Government presented evidence that all of the payments to O'Neal and Kash were "dirty" because they compensated O'Neal and Kash for their roles in the unlawful kickback scheme. Witnesses testified, moreover, that the payments for privately-insured patients were made in part to induce the referrals of Medicare and Tricare patients. Trial Tr. 7/11/2023 at 315:23-316:1 (Geren stating that "it seemed to be a package deal the way these things

operated."); *see also id.* 7/10/2023 at 183:4-7, *id.* 7/11/23 at 419:16-18. *Loe* is therefore inapposite.

[2] After the parties filed their briefs, a new version of Chapter 151 took effect. S.B. 895, 88th Legislature (Tex. 2023). Neither side argues that the new version governs here or that it would change the analysis. Accordingly, the Court will cite to the version of Chapter 151 in effect during the relevant period.

[3] Further, Section 151.003 did not include an exception for "a trust company" until 2017, after Bennett had committed the majority of his unlawful activities here. *See* TEX. FIN. CODE § 151.003 (2015) (amended 2017) (current version at TEX. FIN. CODE. § 152.004).

[4] Article III, § 2, cl. 3, is "a venue provision, since it fixes the place of trial," while the clause in the Sixth Amendment "is a vicinage provision, since it deals with the place from which the jurors are to be selected." Wright & Miller, 2 FED. PRAC. & PROC. CRIM. § 301 (4th ed.). The Vicinage Clause "reinforces the coverage of the Venue Clause because, in protecting the right to a jury drawn from the place where a crime occurred, it functionally prescribes the place where a crime must be held." *Smith v. United States*, 599 U.S. 236, 245 (2023) (cleaned up) (citing *Rodriguez-Moreno*, 526 U.S. at 278). These rights were "highly prized by the founding generation," which "forcefully objected to trials in England before loyalist juries." *Id*. at 247-48.

---------





⚑ **Disagreed With by** United States v. Brennan,  |  E.D.Pa.,  |  April 7, 2020

📄 Original Image of 641 F.3d 1200 (PDF)

641 F.3d 1200
United States Court of Appeals, Tenth Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Paul L. SMITH, Defendant–Appellant.

No. 10–6039
April 12, 2011.

## Synopsis

**Background:** Defendant was convicted in the United States District Court for the Western District of Oklahoma of embezzlement from an employee benefit plan and making false statements to a government agent, and was sentenced to 27 months in prison and two years' supervised release, as well as community service, a special assessment, and restitution. Defendant appealed.

**Holdings:** The Court of Appeals, Paul J. Kelly, Jr., Circuit Judge, held that:
1 there was insufficient evidence to support a conviction for embezzlement from an employee benefit plan, and
2 proper venue for prosecution on the charge of making false statements to a government agent was Minnesota, not Oklahoma.

Reversed.



**West Headnotes (8)**

⊟

▦ Change View

**1**   **Criminal Law**  🔑  Review De Novo
Review by the Court of Appeals is de novo as to the sufficiency of the evidence and denial of a motion for judgment of acquittal.

7 Cases that cite this headnote

**2**   **Criminal Law**  🔑  Construction of Evidence
**Criminal Law**  🔑  Reasonable doubt
Court of Appeals views the evidence in the light most favorable to the verdict to ascertain whether any rational trier of fact could have found a defendant guilty beyond a reasonable doubt.

6 Cases that cite this headnote

**3**   **Criminal Law**  🔑  Construction in favor of government, state, or prosecution
**Criminal Law**  🔑  Weighing evidence
**Criminal Law**  🔑  Province of jury or trial court
Determining witness credibility and weighing the evidence is not the function of the Court of Appeals; the court merely asks whether a rational trier of fact could find each element of the offense charged viewing that evidence in the

light most favorable to the government.

3 Cases that cite this headnote

**4    Embezzlement** 🔑    Weight and Sufficiency of Evidence

There was insufficient evidence to support a conviction for embezzlement from an employee benefit plan, despite claim that a board of directors' approval of contributions for two fiscal years created a contractual right in the plan to collect those contributions, which defendant defeated by engaging in certain deceptive practices; government's argument that "defeating" or "concealing" the plan's right to collect constituted embezzlement, theft, abstraction or conversion under the governing statute was premised on an erroneous reading of the statute and case law, and contributions that were approved as part of a prospective budget, but were not paid, did not constitute plan assets. 18 U.S.C.A. § 664.

2 Cases that cite this headnote

**5    Criminal Law** 🔑    Offenses against United States

If a crime constitutes a continuing offense, that is, if it was begun in one district and completed in another, it may be prosecuted in any district in which the offense was begun, continued, or completed, but if the crime began, continued, and was completed in only one district, it must be prosecuted in that district. Fed.Rules Cr.Proc.Rule 18, 18 U.S.C.A.

7 Cases that cite this headnote

**6    Criminal Law** 🔑    Offenses against United States

Generally, the locus delicti of a crime, for venue purposes, must be determined from the nature of the crime alleged and the location of the act or acts constituting it; the terms of the statute dictate the nature and acts that constitute the crime. Fed.Rules Cr.Proc.Rule 18, 18 U.S.C.A.

4 Cases that cite this headnote

**7    Criminal Law** 🔑    Offenses against United States

For venue purposes, the locus delicti of making false statements to a government agent is where the defendant makes the false statement. 18 U.S.C.A. § 1001(a)(2); Fed.Rules Cr.Proc.Rule 18, 18 U.S.C.A.

11 Cases that cite this headnote

**8    Criminal Law** 🔑    Offenses against United States

Proper venue for a prosecution on a charge of making false statements to a government agent was Minnesota, not Oklahoma; the defendant made his allegedly false statement during an interview conducted in his home in Minnesota, the interview was not recorded, transcribed, or otherwise preserved for use in Oklahoma, and the only connection between Oklahoma and the defendant's statements was that the subject-matter of the allegedly false statements relayed events that occurred in Oklahoma, and at the time there was an investigation in Oklahoma. 18 U.S.C.A. § 1001(a)(2); Fed.Rules Cr.Proc.Rule 18, 18 U.S.C.A.

6 Cases that cite this headnote

## Attorneys and Law Firms

***1201** Mack K. Martin, of Martin Law Office, Oklahoma City, OK, for Defendant–Appellant.

Suzanne Mitchell, Assistant United States Attorney, Oklahoma City, OK (and ***1202** Sanford C. Coats, United States Attorney, and Vicki Zemp Behenna, Assistant United States Attorney, on the brief), for Plaintiff–Appellee.

Before KELLY, HOLLOWAY, and LUCERO, Circuit Judges.

## Opinion

PAUL KELLY, JR., Circuit Judge.

Defendant–Appellant Paul Smith appeals his convictions for embezzlement from an employee benefit plan under 18 U.S.C. § 664 and making false statements to a government agent under 18 U.S.C. § 1001(a)(2). He contends that the evidence was insufficient to sustain the § 664 convictions and that venue was improper for the false statements convictions. We agree and reverse both convictions.

*Background*

From 1989 to 2004, Defendant–Appellant Paul Smith served as the executive director of Marie Detty, a private non-profit youth and family service center in Lawton, Oklahoma. Aplt.App. 49, 51–52. Marie Detty received funding from multiple sources, including the Oklahoma Department of Mental Health, United Way, private donations, and federal grants. *Id.* at 50. As executive director, Mr. Smith was in charge of compiling and managing the budget. *Id.* at 54. The Board of Directors (the "Board") approved an annual budget. *Id.* at 110. However, Marie Detty was not always able to pay the budgeted amounts, given the sometimes-uncertain nature of donations and grants as well as rising costs, particularly insurance costs. *Id.* at 80, 138–40.

Marie Detty had an employee profit-sharing plan (the "Plan"). *Id.* at 94. The Plan was entirely discretionary; that is, the Board decided on an annual basis whether to contribute to the plan. *Id.* at 97–98. Although the Board generally contributed to the Plan, on at least one occasion it decided not to fund the Plan. *Id.* at 227. For fiscal years 2002 and 2003, the Board approved 5% (roughly $171,000) and 3% (roughly $94,000) contributions as part of the operating budget. *Id.* at 68, 117–18, 136.

During both 2002 and 2003, Marie Detty's fiscal director, Donald Hall, made out checks to fund the Plan. *Id.* at 119, 137. However, Mr. Smith directed Mr. Hall to hold the checks. *Id.* at 119. Mr. Hall did so. Mr. Hall testified that he and Mr. Smith did not make the contributions because Marie Detty did not have adequate funds to cover the checks at that time. *Id.; see id.* at 82. Although there were some federal funds available from the Head Start program, those funds could not be used because the Plan benefitted all employees—not just employees funded by Head Start grants. *Id.* at 142. Mr. Hall testified that he and Mr. Smith intended to make the 2002 and 2003 contributions when they received $350,000 that the Oklahoma Department of Mental Health was, in their view, wrongfully withholding. *Id.* at 78, 142. The $350,000 was part of Marie Detty's operating budget for 2002 and 2003, *id.* at 78, but although Marie Detty hired a lawyer to obtain the withheld funds, by 2004 the money had not been received. *Id.* at 78–79, 142–43. As of 2004, the contributions approved by the board for fiscal years 2002 and 2003 had not been made. According to Mr. Hall, the contributions were never made because Marie Detty never received the full amount of money owed to it by Oklahoma. *Id.* at 143.

At the end of fiscal year 2002, Mr. Smith directed Mr. Hall to void the outstanding

contribution check—which Mr. Hall was holding at Mr. Smith's direction—so that it did not appear as an outstanding obligation in an audit. *Id.* at 121. He wrote a new check the next year, which he intended to pay if the Oklahoma funds came in. **\*1203** *Id.* at 122. The same occurred in 2003—the check was voided before the end of the year, and re-written the next to avoid appearing as an outstanding obligation during the year-end audit. *Id.* at 121–24.

Mr. Smith never informed the Board that the contributions were not made. *Id.* at 88. However, he did notify the Board that Marie Detty was having cash-flow issues, and that Marie Detty was not meeting "certain obligations." *Id.* at 213. In 2004, in response to an inquiry by Head Start, the President of the Board acknowledged that the Plan was not funded during 2002 and 2003 because of difficulties with cash flow. *See* Aplee. Supp.App. 7–8.

The CPA who audited Marie Detty in 2002 and 2003 testified that Marie Detty was in "adequate financial status" for 2002 and was doing well for 2003, based solely upon an increase in net assets. Aplt.App. 152–53, 159–160. However, she could not testify as to whether Marie Detty was operating within its budget, because she was not provided with budget comparisons, and she offered no opinion as to whether Marie Detty could have made the approved plan contributions. *Id.* at 159. The President of the Board testified that if she had known the contributions had not been made, she would have done things differently to ensure that the plan was funded. *Id.* at 175, 177, 195.

During the course of his employment, Mr. Smith suggested that Marie Detty contract with Paradigm Associates, PA to provide administrative support or consulting services. *Id.* at 130, 178. The Board agreed, and the President signed a contract under which Marie Detty paid Paradigm $2,000 per month. *Id.* at 130, 146–47. Mr. Smith signed the contract on behalf of Paradigm, and the contract contained a paragraph explicitly disclosing that Mr. Smith had a financial interest in Paradigm. *Id.* at 146–47, 177–80. However, Mr. Smith assured the Board that he would not receive direct financial benefit from the contract. *Id.* at 210.

Marie Detty honored its contract to Paradigm, and made the required monthly payments during fiscal years 2002 and 2003. *Id.* at 130. At trial, the government presented evidence that the checks issued to Paradigm were deposited directly into an account over which Mr. Smith exercised sole control, and that Paradigm was a shell company that had no employees and performed no services. *Id.* at 216–17, 251–52.

A. *Investigation and Indictment.*

At some point, Marie Detty's new financial director noticed that the checks issued to Paradigm were deposited in the same account as Mr. Smith's paychecks. *Id.* at 216. An investigation ensued, and Mr. Smith resigned and moved to Minnesota. As part of a federal investigation, an FBI agent flew to Minnesota to interview Mr. Smith. *Id.* at 260. During that interview, Mr. Smith stated that he did not receive any financial benefit from Paradigm and that Paradigm was a legitimate company with employees that performed services for Marie Detty. *Id.* at 263. The agent did not record the interview in any way; after the interview, she compiled a report from her notes, neither of which were introduced at trial. *Id.* at 306–08. Upon return to Oklahoma, the agent was unable to find any of the employees Mr. Smith mentioned, and evidence showed that the checks made out to Paradigm were deposited in Mr. Smith's personal account. *Id.* at 264, 267, 217.

A grand jury indicted Mr. Smith on ten counts: counts one and two alleged violation of 18 U.S.C. § 664, specifically that Mr. Smith "defeated the plan's right to collect amounts contractually due from the employer ... by engaging in certain deceptive practices," *id.*

at 11; counts three through eight alleged violation of ***1204** 18 U.S.C. §§ 2 and 1341, using the mails to facilitate a scheme to defraud Marie Detty, *id.* at 12–15; and counts nine and ten alleged violation of 18 U.S.C. § 1001(a)(2), based on Mr. Smith's allegedly false statements to the federal agent, *Id.* at 15–16. The indictment alleged that Mr. Smith made false statements "in the Western District of Oklahoma." *Id.*

After the government presented its case, Mr. Smith rested and moved to dismiss for lack of evidence and improper venue under Fed.R.Crim.P. 29. *Id.* at 327–28. The district court granted the motion as to counts three through eight, on the ground that the government had not produced sufficient evidence that Mr. Smith used the mail in his fraudulent scheme. *Id.* at 332. The district court denied the motion as to counts one, two, nine and ten, and those counts were submitted the jury. *Id.* The court noted with regard to venue that it "makes sense … in terms of judicial economy, that [the false statement] charges could and should be pursued where other charges are brought." *Id.* at 333. Over Mr. Smith's objection, the court submitted to the jury a venue instruction that provided, "If you find, by a preponderance of the evidence, that it is more probable than not, that the substance of that [false] statement *relayed facts, events, or circumstances which occurred in or related to the alleged wrongdoing occurring in this district,* you must find venue is proper in this district and render a verdict of guilty." *Id.* at 19 (emphasis added). The instruction also indicated that "[t]he parties stipulate that the statements referred to in Counts 9 and 10 were made in Minnesota." *Id.* The jury returned a guilty verdict on all submitted counts. *Id.* at 22.

B. *Sentencing.*
The district court sentenced Mr. Smith to 27 months in prison and two years' supervised release, along with 104 hours of community service, a special assessment of $400.00, and restitution of $91,689.69. *Id.* at 23–26. The sentence was based on a total offense level of 18 and a criminal history category of one. *Id.* at 380, 382. The total offense level included two, two-level enhancements—one for employing sophisticated means and one for abusing a position of trust. 2 Aplt.App. 397.

Mr. Smith timely appealed. Aplt.App. 28. On appeal, he argues that (1) the government's evidence was insufficient to support his conviction on counts one and two, embezzlement or conversion in violation of 18 U.S.C. § 664; (2) venue was improper for counts nine and ten, false statements in violation of 18 U.S.C. § 1001(a)(2), because the statements were made in Minnesota, not Oklahoma; and (3) the district court impermissibly "double counted" by increasing his sentence twice for the same conduct. Aplt. Br. 9–10. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). After oral argument, we notified the district court to set conditions of release and instructed the government to cease collection efforts on the restitution amounts. *See United States v. Sanders,* 240 F.3d 1279, 1280 n. 1 (10th Cir.2001). We now reverse with instructions to the district court to vacate the judgment and sentence, and enter a judgment of acquittal for counts one and two and to dismiss counts nine and ten. There was plainly insufficient evidence to support Mr. Smith's conviction for counts one and two, and venue was improper for counts nine and ten.

*Discussion*

A. *Violation of 18 U.S.C. § 664.*
[1] [2] [3] Our review is de novo as to the sufficiency of the evidence and denial of a motion for judgment of acquittal. *United States v. Delgado–Uribe,* 363 F.3d 1077, 1081 (10th Cir.2004). We view the evidence in the light most favorable to the ***1205** verdict to ascertain whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.* Determining witness credibility and weighing the evidence is not our function; we merely ask whether a rational trier of fact could find

each element of the offense charged viewing that evidence in the light most favorable to the government. *Id.*

4    In relevant part, 18 U.S.C. § 664 imposes criminal sanctions upon "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, ... or other assets of any employee welfare benefit plan or employee pension benefit plan." 18 U.S.C. § 664. The employee plans referred to include "any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974." *Id.* Mr. Smith does not dispute that the Plan falls within the ambit of § 664.

To establish violation of § 664, as the court instructed in this case, the government must prove beyond a reasonable doubt that (1) the Plan was subject to ERISA, (2) Mr. Smith embezzled, stole, or abstracted or converted to his use or the use of another an asset of the Plan, and (3) that Mr. Smith acted unlawfully and wilfully. Aplt.App. 346; *see* 18 U.S.C. § 664.

Mr. Smith argues that the government failed to introduce evidence sufficient to support his conviction. In particular, he notes that the evidence showed only that there was insufficient money to fund the plan—the Board approved the contributions only as part of a non-binding budget, and Oklahoma's withholding of funds deprived Marie Detty of sufficient funds to make the contributions. Aplt. Br. 16–17. Further, he notes that "there was no evidence shown at trial that [he] deprived anyone of property." *Id.* at 17. He also argues that there was insufficient evidence that he acted with the requisite intent. *Id.*

In its response brief, the government contends that Mr. Smith misapprehends the nature of the case: the government never alleged that Mr. Smith actually embezzled, stole, abstracted, or converted funds belonging to the plan. Rather, the government argues—and has always argued—that Mr. Smith "defeated the plan's right to collect amounts contractually due from the employer or its agent by engaging in certain deceptive practices." Aplt.App. 11–12. This argument is premised on the notion that the Board's approval of contributions for fiscal years 2002 and 2003 created a contractual right in the Plan to collect those contributions, and these contractual rights were "plan assets" within the meaning of § 664. Aplee. Br. 19. Mr. Smith, the government argues, "converted" those contractual rights by concealing from the Board the Plan's right to collect the approved-but-unpaid contributions. *Id.* at 21.

We hold that the government failed to introduce sufficient evidence to sustain the conviction. Specifically, the government failed to introduce evidence that (1) Mr. Smith engaged in embezzlement, theft, abstraction or conversion, and (2) the Board's approval of the contributions created in the Plan an "asset" within the meaning of § 664.

First, the government's theory of the case is premised on an erroneous interpretation of § 664. In relevant part, the indictment alleges: "[T]he defendant *defeated the plan's right to collect amounts contractually due* from the employer or its agent by *engaging in certain deceptive practices.*" Aplt.App. 11 (emphasis added), 12 (same). Notably, the specific conduct alleged diverges from the conduct the statute criminalizes, namely embezzlement, theft, abstraction or conversion. *See* 18 U.S.C. § 664. On appeal the government does not argue that Mr. Smith *\*1206* actually embezzled, stole, abstracted or converted an asset of the Plan. Rather, it argues that "Mr. Smith's offense centered around the concealment of [the Plan's] *right* to collect funds from Marie Detty, and not the concealment of any actual funds," and that "[a] reasonable jury could conclude that Mr. Smith, instead of notifying the Board, intentionally engaged in a number of deceptive practices designed to make the Board believe that contributions to [the Plan]

had been made." Aplt. Br. 21–22. This argument implicitly equates "concealment" or "defeat" with embezzlement, theft, abstraction or conversion. According to the government, if it proved that Mr. Smith concealed the Plan's alleged right to collect contributions by deceiving the Board, his conviction should be sustained. *Id.*

This argument is unavailing. The government cites only one supporting authority. *See* Aplt. Br. 20–21. In *United States v. LaBarbara*, the Second Circuit affirmed the defendants' conviction for aiding and abetting conversion of a plan asset in violation of § 664. 129 F.3d 81, 88 (2d Cir.1997). There, Strathmore Concrete Company engaged in a fraudulent "double breasting" scheme to avoid contributing funds to a union pension plan. *Id.* at 83. The defendant, an officer of the labor union, received $130,000 in kickbacks to ensure the union's cooperation in the scheme. *Id.* The Second Circuit held that the collective bargaining agreement between Strathmore and the union created a contractual obligation to contribute to the pension fund, and that the contractual right was an asset of the plan. *Id.* at 88. Thus, the defendant's "acquiescence in the use of the [shell business] as a vehicle to convert those assets to [the principal] and to conceal Strathmore's contractual obligations *aided or abetted a violation of section 664*." *Id.* (emphasis added) (citations omitted).

The government's reading of *LaBarbara*, then, is off base. The Second Circuit did not hold that concealment of the pension plan's contractual right to collect funds itself violated § 664. Rather, it held that the defendant's concealment of the plan's contractual right aided and abetted *Strathmore's* conversion of plan assets. *Id.* Thus, the Second Circuit did not conflate concealment with embezzlement or conversion, as the government argues. In the instant case, there is simply no evidence of embezzlement, theft, abstraction, or conversion, and *LaBarbara* is inapposite.

Second, the government failed to produce evidence from which a reasonable jury could conclude that the approved contributions were assets of the Plan. The government cites *In re Luna,* 406 F.3d 1192 (10th Cir.2005), for the proposition that they were. Aplt. Br. 19–20. However, in *Luna* management had entered into a collective bargaining agreement under which it was contractually obligated to make monthly contributions to the pension plan—indeed, the defendants conceded their contractual obligation to make contributions. 406 F.3d at 1197, 1198–99. We noted that this contractual right to collect contributions fit the normal definition of "asset," because under common-law property principles the plan owned a "future interest in the collection of the contractually-owed contributions." *Id.* at 1199. In other words, we held that the collective bargaining agreement created in the pension fund a valuable property right— the right to collect the contractually-owed contributions. *Id.*

In this case, there is no contract. Contributions to the profit-sharing plan were purely discretionary, and on at least one occasion the Board did not fund the Plan. Aplt.App. 227. Further, the Board approved the contributions only as part of a *\*1207* prospective budget. *Id.* at 110, 117–18. Government witnesses testified that the budget was just a proposal or estimate—it was not legally binding, and was subject to funding. *Id.* at 80, 139–40. Further, the government did not identify to the district court, and does not identify to us, any common-law property concept that supports the notion that the Board's approval of the contributions vested in the Plan a valuable property right. Accordingly, there is no evidence from which a reasonable jury could conclude that the approved-but-unpaid contributions constituted Plan assets within the meaning of § 664. Mr. Smith is therefore correct in arguing that "there was no evidence shown at trial that [he] deprived anyone of any property."[1] Aplt. Br. 17.

Needless to say, in this case—as in all criminal cases—the government bore the burden of establishing each element of the alleged crime beyond a reasonable doubt. The

government chose to indict based upon Mr. Smith's actions allegedly defeating the Plan's right to collect the approved-but-unpaid contributions. Yet, the government's argument that "defeating" or "concealing" the Plan's right to collect constitutes embezzlement, theft, abstraction or conversion under § 664 is premised on an erroneous reading of the statute and *LaBarbara*. We decline to impose liability for conduct the statute does not forbid.

B. *Venue for Convictions Under 18 U.S.C. § 1001(a)(2).*

"Both Rule 18 of the Federal Rules of Criminal Procedure and the Constitution require that a person be tried for an offense where that offense is committed." *United States v. Cabrales,* 524 U.S. 1, 5, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998) (internal quotation marks and citation omitted). If the crime constitutes a "continuing offense"—that is, if it was "begun in one district and completed in another"—it may be "prosecuted in any district in which [the] offense was begun, continued, or completed." 18 U.S.C. § 3237(a). If, however, the crime "began, continued, and w[as] completed" in only one district, *Cabrales,* 524 U.S. at 8, 118 S.Ct. 1772, it must be prosecuted in that district. *Id.*

Determining where a crime is committed is not always an easy task. Generally, "the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales,* 524 U.S. at 6–7, 118 S.Ct. 1772 (internal quotation marks and citation omitted). The terms of the statute dictate the nature and acts that constitute a crime. *See, e.g., United States v. Ryan,* 894 F.2d 355, 360 (10th Cir.1990). While not an exclusive test, it is often helpful to look to the verb or verbs used in the criminal statute to determine where the crime was committed. *United States v. Rodriguez–Moreno,* 526 U.S. 275, 280, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999).

Title 18 U.S.C. § 1001(a)(2) imposes criminal punishment on "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully ... *makes* any materially false, fictitious, or fraudulent statement or representation...." 18 U.S.C. § 1001(a)(2) (emphasis added). The statute does not contain a venue clause, nor is there any language suggesting any "essential conduct element" other than making a false statement. *See Rodriguez–Moreno,* 526 U.S. at 280, 119 S.Ct. 1239. Therefore, the *locus delicti* is where the defendant makes the false statement. *See \*1208 United States v. Wiles,* 102 F.3d 1043, 1064–65 (10th Cir.1996) (en banc), *vacated on other grounds by United States v. Schleibaum,* 522 U.S. 945, 118 S.Ct. 361, 139 L.Ed.2d 282 (1997).

In this case, Mr. Smith made his allegedly false statement in Minnesota. The agent did not record the statement. Aplt.App. 301, 306–307. It was not a deposition for use in Oklahoma. *Id.* At trial, the agent did not introduce any notes she took during the interview; rather, she used a report—which she compiled only after she had returned to Oklahoma—to refresh her memory. *Id.* Indeed, the only connection between Oklahoma and Mr. Smith's statements is that the subject-matter of the allegedly false statements relayed events that occurred in Oklahoma, and at the time there was an investigation in Oklahoma. These circumstances compel the conclusion that the false statements were "made" in Minnesota, and that Mr. Smith's alleged crime occurred in Minnesota. [2]

Tellingly, the government does not argue that Mr. Smith actually made the false statements in Oklahoma—despite the fact that the indictment clearly alleges that Mr. Smith made false statements "in the Western District of Oklahoma." *Id.* at 15–16. Rather, on appeal the government argues—consistent with the submitted jury instruction, *id.* at 19—that although the alleged false statements were made in Minnesota, they conveyed events that occurred in Oklahoma, and therefore venue was

proper because the crime had substantial contacts with Oklahoma. Aplt. Br. 29–30 (citing *United States v. Reed,* 773 F.2d 477 (2d Cir.1985)).

We decline to adopt this "substantial contacts" test. The Constitution and Rule 18 are clear: a crime must be prosecuted in the district *where it was committed. See* U.S. CONST. art. III, § 2, cl. 3; Fed.R.Crim.P. 18. It is true that in some cases a crime may be committed in multiple districts. For example, a false tax return is "made" both where the form itself is completed and where it is filed with the IRS. *Wiles,* 102 F.3d at 1064–65. However, that a crime may be committed in multiple districts means only that venue may be proper in any district where the crime was committed—not that venue is proper in every district which has "substantial contacts" with the crime. Further, the Second Circuit has limited the "substantial contacts" rule to continuing offenses. *See United States v. Ramirez,* 420 F.3d 134, 139 (2d Cir.2005). Because, as we discuss below, the crime in this case is not a continuing offense, even if we were to adopt the Second Circuit's test it would not apply here.

The government also argues that violation of § 1001(a)(2) is a "continuing offense" and venue is therefore governed by § 3237(a). We have held that giving a false statement may be a continuing offense, where the statement is "made" in more than one district. *See Wiles,* 102 F.3d at 1064–65. However, that does not mean that all violations of § 1001(a)(2) are continuing violations. *Cf. Cabrales,* 524 U.S. at 8, 118 S.Ct. 1772 (recognizing that while money laundering may be a continuing violation where the launderer transports money across state lines, it is not where the entire crime takes place in a single district).

In this case, the alleged crime occurred during an interview conducted in Mr. Smith's home in Minnesota. The false statements began, continued, and ended *1209* during the interview. The interview was not recorded, transcribed, or otherwise preserved for use in Oklahoma. Aplt.App. 301, 306–07. Under these circumstances, any violation of § 1001(a)(2) occurred in Minnesota, and consequently venue lay in Minnesota, not Oklahoma.

In light of our disposition on the first two issues, we do not reach Mr. Smith's arguments regarding sentencing.

REVERSED with instructions for the district court to vacate the judgment and sentence, and to enter a judgment of acquittal on counts one and two and DISMISS counts nine and ten for improper venue.

### All Citations

641 F.3d 1200, 50 Employee Benefits Cas. 2712

| Footnotes |
|---|

| 1 | We do not reach the question of whether the government could have proven that the approved contributions create a property right in the Plan, only that in this case it failed to do so. |
| 2 | Mr. Smith disputes that the statements were false. Because of our holding that venue was improper, we do not address whether the government introduced sufficient evidence that Mr. Smith's statements were indeed false. |

**End of**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 **Distinguished by** United States v. Gessen,    N.D.Cal.,    January 16, 2024

📄 Original Image of 89 F.4th 702 (PDF)

89 F.4th 702
**United States** Court of Appeals, **Ninth Circuit**.

**UNITED STATES** of America, Plaintiff-Appellee,

v.

Jeffrey **FORTENBERRY**, Defendant-Appellant.

No. 22-50144
Argued and Submitted July 11, **2023** Pasadena, California
Filed December 26, **2023**

**Synopsis**
**Background:** Defendant was convicted in the **United States** District Court for the Central District of California, Stanley Blumenfeld, Jr., J., of scheming to falsify and conceal material facts and making false statements to federal investigators, and he appealed.

**Holding:** The Court of Appeals, Donato, District Judge, sitting by designation, held that venue was proper only in districts in which defendant allegedly made false statements.

Reversed.



| **West Headnotes (10)** | | ⊟ |
|---|---|---|
| | | ☰ Change View |
| **1** **Criminal Law** | 🔑 | |
| Court of Appeals reviews de novo legal basis of district court's venue decision. | 110 | Criminal Law |
| | 110XXIV | Review |
| | 110XXIV(L) | Scope of Review in General |
| | 110XXIV(L)13 | Review De Novo |
| | 110k1139 | In general |
| **2** **Criminal Law** | 🔑 | |
| When Congress does not expressly designate venue of offense, locus delicti—location of crime—must be determined from nature of crime alleged and location of act or acts constituting it. U.S. Const. art. 3, § 2, cl. 3; U.S. Const. Amend. 6. | 110 | Criminal Law |
| | 110IX | Venue |
| | 110IX(A) | Place of Bringing Prosecution |
| | 110k113 | Offenses against **United States** |
| **3** **Criminal Law** | 🔑 | |
| To determine nature of crime for venue purposes, court looks to offense's essential | 110 | Criminal Law |
| | 110IX | Venue |

conduct elements.

| | 110IX(A) | Place of Bringing Prosecution |
| | 110k113 | Offenses against **United States** |

**4  Fraud**



Conviction for making false statements in matter within jurisdiction of department or agency of **United States** requires government to prove beyond reasonable doubt that defendant: (1) made statement; (2) that was false; and (3) material; (4) with specific intent; (5) in matter within agency's jurisdiction. 18 U.S.C.A. § 1001.

| 184 | Fraud |
| 184III | Criminal Responsibility |
| 184k68.10 | Fraud on Government |
| 184k68.10(1) | In general; false statements or entries |

| 184 | Fraud |
| 184III | Criminal Responsibility |
| 184k69 | Prosecution and Punishment |
| 184k69(5) | Weight and sufficiency of evidence |

**5  Criminal Law**



It was defendant's act of uttering false statement that was criminal behavior essential to liability for making false statement to federal investigators, and thus venue was proper only in districts in which defendant allegedly made statements, not in district in which investigators were based and in which alleged illegal activity they were investigating occurred, despite government's contentions that venue could properly include any district in which false statement's effect were felt, and that defendant's communications could be prosecuted as continuing offenses that spanned space and time. U.S. Const. art. 3, § 2, cl. 3; U.S. Const. Amend. 6; 18 U.S.C.A. §§ 1001, 3237.

| 110 | Criminal Law |
| 110IX | Venue |
| 110IX(A) | Place of Bringing Prosecution |
| 110k113 | Offenses against **United States** |

3 Cases that cite this headnote

**6  Criminal Law**



Venue in criminal prosecution turns on action by defendant that is essential to offense, and where that

| 110 | Criminal Law |
| 110IX | Venue |
| 110IX(A) | Place of Bringing Prosecution |
| 110k113 | Offenses against **United States** |

specific action took place.

1 Case that cites this headnote



**7**  **Criminal Law**

For venue purposes, materiality is not essential conduct element of offense of making false statements to federal agency. 18 U.S.C.A. § 1001.

1 Case that cites this headnote

| 110 | Criminal Law |
|---|---|
| 110IX | Venue |
| 110IX(A) | Place of Bringing Prosecution |
| 110k113 | Offenses against **United States** |

**8**  **Criminal Law**
    **Jury**

Venue and Vicinage Clauses command that trial be held where crime was committed, and preclude trial in locale where crime did not occur. U.S. Const. art. 3, § 2, cl. 3; U.S. Const. Amend. 6.

| 110 | Criminal Law |
|---|---|
| 110IX | Venue |
| 110IX(A) | Place of Bringing Prosecution |
| 110k113 | Offenses against **United States** |

| 230 | Jury |
|---|---|
| 230II | Right to Trial by Jury |
| 230k30 | Denial or Infringement of Right |
| 230k33 | Constitution and Selection of Jury |
| 230k33(3) | Selection from vicinage |

**9**  **Criminal Law**

Even though the most convenient trial venue for defendant would presumably be where he lives, Venue Clause is keyed to location of alleged crimes, and does not allow variation for accused's convenience. U.S. Const. art. 3, § 2, cl. 3.

| 110 | Criminal Law |
|---|---|
| 110IX | Venue |
| 110IX(A) | Place of Bringing Prosecution |
| 110k113 | Offenses against **United States** |

**10**  **Criminal Law**
    **Jury**

Venue and Vicinage Clauses may not be disregarded simply because it suits convenience of federal prosecutors. U.S. Const. art. 3, § 2, cl. 3; U.S. Const. Amend. 6.

| 110 | Criminal Law |
|---|---|
| 110IX | Venue |
| 110IX(A) | Place of Bringing Prosecution |
| 110k113 | Offenses against **United States** |

| 230 | Jury |
|---|---|
| 230II | Right to Trial by Jury |
| 230k30 | Denial or Infringement of Right |
| 230k33 | Constitution and Selection of Jury |
| 230k33(3) | Selection from vicinage |

***703** Appeal from the **United States** District Court for the Central District of California, Stanley Blumenfeld, Jr., District Judge, Presiding, D.C. No. 2:21-cr-00491-SB-1

### Attorneys and Law Firms

Kannon K. Shanmugam (argued), William T. Marks, and Matteo Godi, Paul Weiss Rifkind Wharton & Garrison LLP, Washington, D.C.; Jing Yan, Paul Weiss Rifkind Wharton & Garrison LLP, New York, New York; Glen E. Summers, Bartlit Beck LLP, Denver, Colorado; John L. Littrell, Jr., Bienert Katzman Littrell Williams LLP, San Clemente, California; Ryan V. Fraser, Bienert Katzman Littrell Williams LLP, Los Angeles, California; for Defendant-Appellant.

Alexander P. Robbins (argued), Assistant United States Attorney, Criminal Appeals Section; James J. Buxton and Susan Har, Assistant United States Attorneys, Public Corruption and Civil Rights Section; Bram M. Alden, Assistant United States Attorney, Criminal Appeals Section Chief; Mack E. Jenkins, Assistant United States Attorney, Criminal Division Chief; E. Martin Estrada, United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

Before: Gabriel P. Sanchez and Salvador Mendoza, Jr., Circuit Judges, and James Donato, [*] District Judge.

### OPINION

DONATO, District Judge:

Federal agents interviewed Jeffrey Fortenberry at his home in Lincoln, Nebraska, and his lawyer's office in Washington, D.C., in connection with an investigation into illegal campaign contributions made by a foreign national through conduit donors. At the time, Fortenberry was a member of the House of Representatives elected to multiple terms by voters in Nebraska's 1st congressional district. The federal agents were based in Los Angeles, California, where the illegal contribution activity was said to have occurred. At the *704 end of the investigation, Fortenberry was charged with making false statements during the interviews in violation of 18 U.S.C. § 1001, but not with a violation of the federal election laws. He was tried and convicted by a federal jury in Los Angeles.

Fortenberry appeals his conviction on two grounds. He contends that the district court incorrectly denied his motion to dismiss the case because venue was improper in the Central District of California. He also appeals a declined jury instruction as error.

The Constitution plainly requires that a criminal defendant be tried in the place where the criminal conduct occurred. The district court determined, and the government urges on appeal, that a Section 1001 violation occurs not only where a false statement is made but also where it has an effect on a federal investigation. We conclude that an effects-based test for venue of a Section 1001 offense has no support in the Constitution, the text of the statute, or historical practice. Consequently, we reverse Fortenberry's conviction without prejudice to retrial in a proper venue.

### BACKGROUND

Former congressman Jeffrey Fortenberry is a Nebraskan who spent decades in elective office. A resident of Lincoln, Nebraska, he served on the Lincoln City Council. Beginning in 2004, he was elected to several terms in Congress, representing Nebraska's 1st district.

In October 2015, the Federal Bureau of Investigation (FBI), in conjunction with other federal agencies, began investigating a foreign national suspected of improperly financing several U.S. political campaigns. [1] This multi-agency investigation was run by the FBI's Los Angeles field office, located in the Central District of California.

Over the course of the investigation, the FBI came to believe that the foreign national had made conduit contributions to Fortenberry's campaign, namely at a fundraiser held for Fortenberry in Los Angeles in 2016. In June 2018, a cooperating witness placed a telephone call to Fortenberry with an FBI agent secretly listening in. The witness told Fortenberry that the foreign national was probably the source of $30,000 of donations that Fortenberry had received at the fundraiser.

About nine months later, in March 2019, two federal agents from Los Angeles traveled to Lincoln, Nebraska, and interviewed Fortenberry in his home there. During the interview, Fortenberry, who did not have a lawyer present, denied awareness of any foreign or conduit contributions to his campaign. After the interview, Fortenberry retained an attorney who contacted the FBI and was referred to the U.S. Attorney's Office for the Central District of California. The attorney set up a second meeting between Fortenberry and federal investigators that occurred in July 2019 in Washington, D.C. During the meeting, Fortenberry said again that he was not aware of any illegal contributions to his campaign.

On October 19, 2021, Fortenberry was indicted in the Central District of California on one count of scheming to falsify and conceal material facts in violation of 18 U.S.C. § 1001(a)(1), and two counts of making false statements in violation of 18 U.S.C. § 1001(a)(2). Fortenberry moved to dismiss the case for improper venue; the district court denied his motion. The case went to a jury trial, and Fortenberry was found guilty on all counts. The jury found that Fortenberry had made false statements *705 in the March 2019 interview in Nebraska and the July 2019 interview in Washington, D.C. The district court sentenced Fortenberry to two years of probation, 320 hours of community service, and a $25,000 fine. Fortenberry resigned his seat in Congress.

## DISCUSSION

### I. Venue, Vicinage, and Section 1001 Essential Conduct

1  Fortenberry's main contention on appeal is that venue was improper in the Central District of California and the district court should have granted his motion to dismiss on that ground. We review *de novo* the legal basis of the district court's venue decision. *See United States v. Hui Hsiung*, 778 F.3d 738, 745 (9th Cir. 2015); *United States v. Corona*, 34 F.3d 876, 878 (9th Cir. 1994).

"Questions of venue in criminal cases ... are not merely matters of formal legal procedure." *United States v. Johnson*, 323 U.S. 273, 276, 65 S.Ct. 249, 89 L.Ed. 236 (1944). They present policy concerns deeply rooted in the Constitution. "Aware of the unfairness and hardship to which trial in an environment alien to the accused exposes him," *id.* at 275, 65 S.Ct. 249, the Framers drafted the Venue Clause, which "mandates that the 'Trial of all Crimes ... shall be held in the State where the ... Crimes shall have been committed.' " *Smith v. United States*, 599 U.S. 236, 242–43, 143 S.Ct. 1594, 216 L.Ed.2d 238 (2023) (quoting U.S. Const. art. III, § 2, cl. 3). This command is reinforced by the Vicinage Clause of the Sixth Amendment, which "guarantees 'the right to ... an impartial jury of the State and district wherein the crime shall have been committed.' " *Id.* at 244–45, 143 S.Ct. 1594 (quoting U.S. Const. amend. VI).

2   3   Congress did not expressly designate the venue of a Section 1001 offense, and so the "*locus delicti*," the location of the crime, "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Anderson*, 328 U.S. 699, 703, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946) (internal citations omitted); *see also United States v. Rodriguez-Moreno*, 526 U.S. 275, 279, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999) ("[A] court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the

commission of the criminal acts."). "To determine the nature of the crime, we look to the essential conduct elements of the offense." *United States* v. *Lukashov,* 694 F.3d 1107, 1120 (**9th Cir**. 2012) (internal quotations and citation omitted).

4 Section 1001 of Title 18 imposes criminal liability on "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the **United States**, knowingly and willfully ... (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact" or "(2) makes any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a). "A conviction under § 1001 requires the government to prove beyond a reasonable doubt that the defendant: 1) made a statement, 2) that was false, and 3) material, 4) with specific intent, 5) in a matter within the agency's jurisdiction." *United States* v. *Selby,* 557 F.3d 968, 977 (**9th Cir**. 2009).

The question of venue in this case is answered by determining which of these statutory elements is the essential conduct of a Section 1001 offense, and which is a "circumstance element" that is necessary for a conviction but not a factor in deciding the location of the offense for venue purposes. *\*706 Rodriguez-Moreno,* 526 U.S. at 280 n.4, 119 S.Ct. 1239. To illustrate, in a money laundering case, trial was proper where the laundering alleged in the indictment had occurred, but not where the criminal activity generating the illicit currency (*i.e.,* the unlawful distribution of cocaine) had taken place, because the relevant statutes "interdict[ed] only the financial transactions ... [and] not the anterior criminal conduct that yielded the funds allegedly laundered." *United States* v. *Cabrales,* 524 U.S. 1, 3–4, 7, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998). In other words, "[t]he existence of criminally generated proceeds was a circumstance element of the offense but the proscribed conduct—defendant's money laundering activity—occurred ' "after the fact" of an offense begun and completed by others.' " *Rodriguez-Moreno,* 526 U.S. at 280 n.4, 119 S.Ct. 1239 (quoting *Cabrales,* 524 U.S. at 7, 118 S.Ct. 1772). In drawing this distinction between essential conduct elements and circumstance elements here, our reading of Section 1001 is guided, but not limited, by the principle that the verb or verbs used in a criminal statute have "value as an interpretive tool" to "determine the nature of the substantive offense." *Id.* at 280, 119 S.Ct. 1239. [2]

5 The text of the statute plainly identifies the essential conduct of a Section 1001 offense to be the making of a false statement. As the Tenth Circuit has observed, Section 1001(a)(2) "does not contain a venue clause, nor is there any language suggesting any 'essential conduct element' other than making a false statement." *United States* v. *Smith,* 641 F.3d 1200, 1207 (10th Cir. 2011) (quoting *Rodriguez-Moreno,* 526 U.S. at 280, 119 S.Ct. 1239). It is the act of uttering a false statement that is the criminal behavior essential to liability under Section 1001.

The district court, citing *United States* v. *Salinas,* 373 F.3d 161, 166–67 (1st Cir. 2004), and *United States* v. *Coplan,* 703 F.3d 46, 79 (2d Cir. 2012), went a step further to hold that materiality was also an essential conduct element. It concluded that venue could properly include any "district in which the effects of the false statement [were] felt." *Salinas,* 373 F.3d at 167. This was because materiality, in the district court's view, necessarily depends on how a listener would perceive the utterance, wherever the listener might be located.

The government urges the same analysis here. It argues that the district court was right to hold that materiality is an "essential conduct element" of Section 1001, and because conduct is "often defined by its effects," there is "nothing anomalous about prosecuting a false statement based on the location of the government action that the statement could potentially influence.' "

This argument misses the mark. It is certainly true that Congress did not intend to criminalize trivial falsehoods under Section 1001, which the materiality requirement addresses. Materiality is a key element of the statutory definition of the crime that prosecutors must prove, with all the other elements, to obtain a conviction. *See Mathis v. United States*, 579 U.S. 500, 504, 136 S.Ct. 2243, 195 L.Ed.2d 604 (2016) (" 'Elements' are the 'constituent parts' of a crime's legal definition—the things the 'prosecution must prove to sustain a conviction.' ") (quoting Black's Law Dictionary 634 (10th ed. 2014)).

6    *\*707* But the inquiry that determines venue is different. It turns on the action by the defendant that is essential to the offense, and where that specific action took place. Materiality is not conduct because it does not require anything to actually happen. We have previously held that materiality requires only that a statement have the capacity to influence a federal agency. As we stated:

> [T]he materiality requirement of a § 1001 violation is satisfied if the statement is *capable* of influencing or affecting a federal agency. The false statement need not have actually influenced the agency, and the agency need not rely on the information in fact for it to be material. In other words, the "test is the *intrinsic* capabilities of the false statement itself, rather than the possibility of the actual attainment of its end as measured by collateral circumstances."

*United States v. Serv. Deli Inc.*, 151 F.3d 938, 941 (**9th Cir**. 1998) (internal citations omitted) (emphasis in original).

We have made a similar point in other Section 1001 cases. *See United States v. King*, 735 F.3d 1098, 1108 (**9th Cir**. 2013) ("A misstatement need not actually influence the agency decision in order to be material; propensity to influence is enough."); *see also United States v. Green*, 745 F.2d 1205, 1208 (**9th Cir**. 1984) ("Under section 1001, the false statement need not be made directly to the government agency; it is only necessary that the statement relate to a matter in which a federal agency has power to act."); *United States v. King*, 660 F.3d 1071, 1081 (**9th Cir**. 2011) ("A false statement need not be made to a federal agent to support a conviction under § 1001(a)(2)."). The upshot of our prior holdings is that the false statement offense is complete when the statement is made. It does not depend on subsequent events or circumstances, or whether the recipient of the false statement was in fact affected by it in any way.

7    Consequently, materiality is not an essential conduct element of a Section 1001 violation. The Supreme Court's holding in *Rodriguez-Moreno* does not compel a different result. There, the Court vacated on venue grounds a conviction under 18 U.S.C. § 924(c)(1) for using or carrying a firearm "during and in relation to any crime of violence." The crime of violence in that case was a kidnapping, and the Third Circuit had determined that venue was proper only in the district where the defendant used or carried a firearm, and not in the districts where the kidnapping occurred. *Rodriguez-Moreno*, 526 U.S. at 278, 119 S.Ct. 1239. The Supreme Court reversed. It concluded that using and carrying a firearm, as well as the related crime of violence, *i.e.*, the kidnapping, were both essential conduct elements of Section 924(c)(1). *Id.* at 280–81, 119 S.Ct. 1239 ("Section 924(c)(1) criminalized a defendant's use of a firearm 'during and in relation to' a crime of violence; in doing so, Congress proscribed both the use of the firearm *and* the commission of acts that constitute a violent crime." (emphasis in original)).

Section 1001 is different. It proscribes the act of making a materially false statement. Materiality is not separate conduct akin to kidnapping or another action by a criminal defendant, and so cannot play a role in determining the *locus delicti* for purposes of

venue.

## II. Decisions of Other Circuits

The government says there is a "wall" of circuit authority in its favor, to the effect that "the essential conduct prohibited by § 1001(a)(2) is the making of a *materially* false, fictitious, or fraudulent statement." *Coplan,* 703 F.3d 46, 79 (2d Cir. 2012) ***708*** (emphasis added); *see also* **United States** *v. Oceanpro Indus., Ltd.,* 674 F.3d 323, 329 (4th Cir. 2012); **United States** *v. Ringer,* 300 F.3d 788, 791 (7th Cir. 2002). These courts concluded that, because "the essential conduct constituting the offense inherently references the effects of that conduct," *Oceanpro,* 674 F.3d at 329, venue is proper where the effects of the false statements may be felt, namely wherever the relevant investigation or official proceeding is located.

This "wall" is less imposing than the government would have it because the Tenth and Eleventh Circuits have reached the same result we reach here. *Smith,* 641 F.3d at 1207; **United States** *v. John,* 477 F. App'x. 570, 572 (11th Cir. 2012) (unpub.). It is also the case that the Supreme Court has left open the broader questions of whether and when an effects-based venue might be permissible. *See Rodriguez-Moreno,* 526 U.S. at 279 n.2, 119 S.Ct. 1239 ("The government argues that venue also may permissibly be based upon the effects of a defendant's conduct in a district other than the one in which the defendant performs the acts constituting the offense.... [W]e express no opinion as to whether the Government's assertion is correct.").

The logic of the circuit cases cited by the government is questionable for all the reasons already discussed. The Second Circuit upheld venue in New York for false statements made in Tennessee because "[p]roving the materiality of [the defendant's] false statements in Tennessee necessarily requires evidence that those statements were conveyed to or had an effect on the IRS investigators working in the Southern District of New York." *Coplan,* 703 F.3d at 79 (citing *Oceanpro,* 674 F.3d at 329). Why that is "necessarily" so is left unsaid, other than a passing remark to the effect that it just makes sense. *Id. Coplan* is also in tension with **United States** *v. Rodgers,* 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984), which held that a false statement to the FBI need not affect an existing investigation to run afoul of Section 1001. In addition, while the Second Circuit in *Coplan* recognized that a defendant's liability under Section 1001 depended on the "capacity of [his] statements to influence the decisionmaking body at issue," 703 F.3d at 79, it nonetheless thought that proof of actual effect would be required. We have concluded otherwise in *Service Deli,* 151 F.3d at 941, and similar cases.

In *Oceanpro,* the Fourth Circuit analogized Section 1001 to the Hobbs Act and obstruction-of-justice statutes to affirm a Section 1001 conviction in Maryland for false statements made in the District of Columbia. *See Oceanpro,* 674 F.3d at 329–30. The court stated that, "just as Congress defined the effects of conduct in the Hobbs Act and 18 U.S.C. § 1503, it defined the effects in § 1001 to include the element of materiality," and that "proving materiality necessarily requires evidence of the existence of the federal investigation in Maryland and the potential effects of [the defendant's] statement on that investigation." *Id.* at 329. The court determined that venue was proper because "the District of Maryland had a substantial connection to [the defendant's] conduct and to the charges based on that conduct against him." *Id.*

This discussion is not persuasive. The analogy of Section 1001(a)(2) to the Hobbs Act or obstruction of justice is doubtful. For example, "in a prosecution under the Hobbs Act, venue is proper in any district where commerce is affected because the terms of the statute itself forbid *affecting commerce* in particular ways." **United States** *v. Bowens,* 224 F.3d 302, 313 (4th Cir. 2000) (citing 18 U.S.C. § 1951(a) (punishing anyone who "in

any way or degree obstructs, delays, or affects commerce" by *709 robbery)). In a similar vein, the obstruction of justice statute expressly prohibits "endeavors to influence, obstruct, or impede, the due administration of justice," 18 U.S.C. § 1503(a), and so venue might be proper in the jurisdiction where the affected judicial proceeding is being held, *see* **United States** *v. Smith,* 22 **F**.**4th** 1236, 1243–44 (11th Cir. 2022) (discussing **United States** *v. Barham,* 666 F.2d 521 (11th Cir. 1982)).

To be sure, Section 1001, the Hobbs Act, and the obstruction statute contemplate that the proscribed conduct might have an effect on something else (a matter within the jurisdiction of the executive, legislative, or judicial branches; interstate commerce; the administration of justice). But that is where the similarities end. The Hobbs Act expressly forbids conduct affecting commerce in particular ways, and the obstruction statute conduct affecting court cases. Section 1001, by contrast, proscribes making materially false statements—not actually affecting or interfering with a federal agency's investigation through the making of the statements.

The likelihood of highly problematic venue outcomes is another reason to decline the government's effects test. Consider the facts here. An investigation was staffed by agents in California. In connection with the investigation, the agents traveled to Nebraska and Washington, D.C. to interview Fortenberry, who made false statements in those locations. The only connection between Fortenberry and the Central District of California, where he was tried and convicted, was that the agents worked in a Los Angeles office. What if the investigation had been conducted by federal agents in Los Angeles and Oklahoma? What if the government had transferred the investigation to agents in Massachusetts? What if an investigating agent simply moved from Los Angeles to Hawaii for personal reasons but maintained a lead role in prosecuting the case? What if the government chose to base every single Section 1001 investigation in Washington, D.C., where federal agencies are headquartered? The government's effect test would say that venue is proper in any one of those locations, irrespective of where the false statement was actually made. This would be an odd and troubling result for an offense that does not require an actual effect on the investigators.

**8  9**  This outlandish outcome cannot be squared with the Constitution. The Venue and Vicinage Clauses command that a trial be held where the crime was committed. This is not necessarily a boon to a defendant. Even though the "most convenient trial venue for a defendant would presumably be where he lives, the Venue Clause is keyed to the location of the alleged 'Crimes,' " and "does not allow variation for the convenience of the accused." *Smith,* 599 U.S. at 243, 143 S.Ct. 1594 (cleaned up). But the clauses equally "*preclude* trial" in a locale where the crime did not occur. *Id.* at 244, 143 S.Ct. 1594 (emphasis in original).

**10**  The Venue and Vicinage Clauses may not be disregarded simply because it suits the convenience of federal prosecutors. The government emphasizes that (1) Fortenberry's fundraiser where the conduit contributions were made was held in Los Angeles, and (2) he knew when his counsel set up the meeting in Washington, D.C. that the investigation was being conducted by the U.S. Attorney's Office in the Central District of California. But the location of investigators in the Central District, or the presence there of witnesses to the campaign contribution events, do not speak to the *locus delicti* of Fortenberry's Section 1001 offenses.

So too of the fact that Fortenberry was aware, at the time of his interview in *710 Washington, D.C., that his statements would be taken back to and analyzed by the U.S. Attorney's Office in the Central District of California. We are not at liberty to create a new temporal element for Section 1001—tied to defendant's awareness at the time the statement at issue was made—that is not evident in the plain text of the statute.

Moreover, a complex case may involve investigators spread across several jurisdictions. To take again the Los Angeles and Oklahoma scenario, adding a temporal element would still have permitted **Fortenberry** to be tried in Oklahoma simply because an investigator based there happened to be sitting in **Fortenberry's** living room in Nebraska when he spoke to the agents.

### III. Continuing Offenses

As an alternative approach, the government suggests that venue was proper in the Central District of California under 18 U.S.C. § 3237(a), because communications can be prosecuted as "continuing offenses" that "span space and time." We disagree. [3]

To start, the government's reliance on Section 3237 simply begs the question of venue under Section 1001. Section 3237 permits the prosecution of "any offense against the **United States** begun in one district and completed in another, or committed in more than one district ... in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). This text says nothing about where a Section 1001 defendant like **Fortenberry** began or completed the offense. It merely invites the next step of determining the essential conduct of a Section 1001 crime. As discussed, this analysis does not come out in favor of the effects test the government advocates here.

The government's heavy reliance on our decision in **United States** v. Angotti, 105 F.3d 539 (**9th Cir**. 1997), is also misplaced. The district court did not cite Angotti, but it is a centerpiece of the government's case on appeal. Angotti involved an appeal, on venue grounds, of a conviction under 18 U.S.C. § 1014, "which punishes anyone who 'knowingly makes any false statement ... for the purpose of influencing ... the action' of a federally insured institution." Id. at 542. The defendant made false statements to a financial institution through an agent in the Northern District of California, but was tried and convicted in the Central District of California where the institution was located. Id. at 541. The panel concluded that a false statement under Section 1014 was a continuing offense because "the act of making" the false statement continued until the statements were received by the person whom they were ultimately intended to influence. Id. at 543.

Angotti is readily distinguishable from the circumstances here. Section 1014 expressly contemplates the effect of influencing the action of a financial institution. No such language is used in Section 1001. To determine whether a statement is misleading in a *material* way, we probe the "*intrinsic* capabilities of the false statement itself, rather than the possibility of the actual attainment of its end as measured by collateral circumstances." Serv. Deli Inc., 151 F.3d at 941 (citing **United States** v. Salinas-Ceron, 731 F.2d 1375, 1377 (**9th Cir**. 1984), *vacated on other grounds by* 755 F.2d 726 (**9th Cir**. 1985)). Further, we have distinguished Angotti for this reason in other criminal venue cases involving conceptually similar statutes. *See, e.g., \*711* **United States** v. Marsh, 144 F.3d 1229, 1242 (**9th Cir**. 1998) ("The problem with Angotti as analogy is that the crime of endeavoring to impede the IRS is complete when the endeavor is made.").

As the government points out, there certainly are crimes that may be prosecuted where their effects are felt. *See, e.g., Palliser v.* **United States**, 136 U.S. 257, 265–66, 10 S.Ct. 1034, 34 L.Ed. 514 (1890) ("It is universally admitted that, where a shot fired in one jurisdiction strikes a person in another jurisdiction, the offender may be tried where the shot takes effect, and the only doubt is whether he can be tried where the shot is fired."); 18 U.S.C. § 3236 ("In all cases of murder or manslaughter, the offense shall be deemed to have been committed at the place where the injury was inflicted, or the poison administered or other means employed which caused the death, without regard to the place where the death occurs."). But those situations are markedly different from

a Section 1001 offense, for which no statute nor universal recognition permits a prosecution where the effects of a statement are felt, and serve only to illustrate that Congress is well equipped to identify the circumstances in which an effects-based venue rule is appropriate. Congress did not deem Section 1001 to be such a situation.

## IV. Historical Practices and Traditions

Our holding today is in line with our national historical practices and traditions with respect to venue. *See United States v. Gaudin*, 515 U.S. 506, 515, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) ("We do not doubt that historical practice is relevant to what the Constitution means by such concepts as trial by jury.").

The Supreme Court recently examined the history of the Venue and Vicinage Clauses, and that discussion is relevant here. As the Court stated:

> [T]he relevant starting point ... is the common-law "vicinage" right, which presumptively entitled defendants to a jury of the "neighbourhood" where the crime was allegedly committed. 4 W. Blackstone, Commentaries on the Laws of England 344 (1769) (Blackstone). As a practical matter, this right imposed a venue requirement: trials needed to be held at the location where "the matter of fact issuable" allegedly occurred to allow the "Inhabitants whereof" to serve on the jury. 1 E. Coke, Institutes of the Laws of England § 193, at 125 (1628) (Coke).
>
> ...
>
> There is no question that the founding generation enthusiastically embraced the vicinage right and wielded it "as a political argument of the Revolution." Prior to the Revolution, Parliament enacted measures to circumvent local trials before colonial juries, most notably by authorizing trials in England for both British soldiers charged with murdering colonists and colonists accused of treason. The Continental Congress and colonial legislatures forcefully objected to trials in England before loyalist juries, characterizing the practice as an affront to the existing "common law of England, and more especially to the great and inestimable privilege of being tried by ... peers of the vicinage." The Declaration of Independence also denounced these laws, under which, it said, British soldiers were "protect[ed] ... by a mock Trial" and colonists were "transport[ed] ... beyond the Seas to be tried for pretended offences."

*Smith*, 599 U.S. at 246–47, 143 S.Ct. 1594 (footnotes omitted). Justice Story also noted that the Venue Clause operates to protect criminal defendants from being "dragged to a trial in some distant state" that bears little or no connection to a *712 controversy and then "subjected to the verdict of mere strangers." 3 J. Story, Commentaries on the Constitution of the United States § 1775, at 654 (1st ed. 1833).

Relevant historical practices in perjury prosecutions supply useful insights in a context close to Section 1001. By statute and at common law, perjury prohibits material false statements. *See Bronston v. United States*, 409 U.S. 352, 357, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) ("The words of the statute confine the offense to the witness who 'willfully ... states ... any material matter which he does not believe to be true.' ") (quoting 18 U.S.C. § 1621(1)); *Anonymous*, 1 F. Cas. 1032, 1036 (Washington, Circuit Justice, C.C.D. Pa. 1084) (No. 475) ("[T]he common law description of perjury is, a false oath taken in some judicial proceeding in a matter material to the issue."). The prevailing rule is "that the crime of perjury in an affidavit is complete the moment the oath is taken with the necessary intent. It is immaterial and irrelevant that the false affidavit is never used." *Steinberg v. United States*, 14 F.2d 564, 567 (2d Cir. 1926); *see also United States v. Noveck*, 273 U.S. 202, 206, 47 S.Ct. 341, 71 L.Ed. 610 (1927) ("The crime of perjury is complete when the oath is taken with the necessary intent, although the false affidavit is never used."); *Commonwealth v. Carel*, 105 Mass. 582,

586 (1870) ("The perjury is complete when the oath is taken, whether the criminal effects his purpose or not.").

Sir Lloyd Kenyon, Lord Chief Justice of the King's Bench, reached similar conclusions in 1797:

> The affidavit, on which the perjury is assigned, might have been sworn in a distant part of the kingdom; it might have been sent up by the post, and detained in the hands of any person here for some time; and according to the doctrine urged on behalf of the defendant, the guilt or innocence of the person making the affidavit in the country is to depend on the circumstance of the person into whose hands it comes, bringing it forward. But surely the guilt of the party cannot depend on the act of another person, when all that he had to do has been already consummated. In the instance of making an affidavit in the country the party is not to be indicted here where the affidavit may happen to be used, but in the county where the offence was complete by making the false oath.

*R v. Crossley* (1797) 101 Eng. Rep. 994, 996; 7 T.R. 315 (KB) 318–19 (Lord Kenyon CJ).

Consequently, history confirms what the Constitution commands. The founding generation had a deep and abiding antipathy to letting the government arbitrarily choose a venue in criminal prosecutions. Implying an effects-based test for venue in Section 1001 cases, when Congress has not so specified, would allow just that, in derogation of our historical principles. Because a Section 1001 offense is complete at the time the false statement is uttered, and because no actual effect on federal authorities is necessary to sustain a conviction, the location of the crime must be understood to be the place where the defendant makes the statement.

**V. Materiality Jury Instructions**

Fortenberry contends that the district court erred by declining to adopt his additional proposed instruction to the jury that "a false statement is not material merely because it causes the government to investigate the veracity, truth, or falsehood of the statement itself." Because we hold that Fortenberry was tried in an improper venue, we do not reach this contention of instructional error.

*713 CONCLUSION

Fortenberry's trial took place in a state where no charged crime was committed, and before a jury drawn from the vicinage of the federal agencies that investigated the defendant. The Constitution does not permit this. Fortenberry's convictions are reversed so that he may be retried, if at all, in a proper venue. *See Smith*, 599 U.S. 236, 143 S.Ct. 1594, 216 L.Ed.2d 238. The case is remanded for further proceedings that are consistent with this decision.

**REVERSED.**

**All Citations**

89 F.4th 702, 23 Cal. Daily Op. Serv. 9, 2023 Daily Journal D.A.R. 12,030

| Footnotes |
| --- |
| * | The Honorable James Donato, United States District Judge for the |

Northern District of California, sitting by designation.

1    Federal election law prohibits foreign nationals from contributing directly or indirectly to a campaign for federal, state, or local office. *See* 52 U.S.C. § 30121.

2    Neither party has suggested that the venue analysis under Section 1001(a)(2) differs from the analysis under Section 1001(a)(1), at least with respect to the facts presented in this case. For the purposes of resolving this appeal, the Section 1001(a)(2) analysis is dispositive.

3    The district court did not reach the question whether venue was proper under the government's continuing offense theory.

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw. © 2024 Thomson Reuters    |    Privacy Statement    |    Accessibility    |    Supplier Terms    |    Contact Us    |    1-800-REF-ATTY (1-800-733-2889)    |    **Improve Westlaw/Report an error**

 THOMSON REUTERS

*Thomson Reuters is not providing professional advice*