# APPENDIX OF EXHIBITS

to

## DEFENDANT'S REQUEST FOR JUDICIAL NOTICE OF PUBLIC COURT RECORDS INVOLVING RELEASE MODIFICATIONS IN FEDERAL CYBERSTALKING/STALKING CASES

*United States v. Kailin Wang, No. 2:24-cr-00163-TS (D. Utah)*

## TABLE OF EXHIBITS

| Ex. | Case / Court | Document | Filed |
|---|---|---|---|
| **A** | United States v. Brown, No. 2:25-cr-00780-SVW-2 (C.D. Cal.) | Order Re Unopposed Ex Parte Application for Bond Modification (ECF No. 227) | April 30, 2026 |
| **B** | United States v. Brown/Raygoza/Samane, No. 2:25-cr-00780-SVW (C.D. Cal.) | Verdict Transcript (ECF No. 222-1) | April 24, 2026 |
| **C** | United States v. Dennis, No. 20-cr-623-LGS (S.D.N.Y.) | Order Modifying Release Conditions (ECF No. 46) | May 17, 2022 |
| **D** | United States v. Dennis, No. 20-cr-623-LGS (S.D.N.Y.) | Motion to Modify Conditions of Release (ECF No. 34) | April 25, 2022 |
| **E** | United States v. Mullane, No. 25-CR-10201-MSM (D. Mass.) | Two Motions to Modify Release to Permit Travel to Florida — assented to by Government & Probation both times (ECF Nos. 91, 104) | Feb. 12, 2026 & Apr. 14, 2026 |

*Note: Exhibit cover sheets follow. Defendant will attach certified copies or PACER-downloaded PDFs of each underlying court record behind the corresponding cover sheet.*

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

UNITED STATES OF AMERICA,
Plaintiff,

v.

KAILIN WANG,
Defendant.

Case No. 2:24-cr-00163-TS
Judge Ted Stewart

## ORDER RE UNOPPOSED EX PARTE APPLICATION FOR BOND MODIFICATION

| | |
|---|---|
| **Case:** | United States v. Raygoza/Brown/Samane, No. 2:25-cr-00780-SVW-2 (C.D. Cal.) |
| **Statute:** | 18 U.S.C. § 2261A (federal stalking/cyberstalking) |
| **Posture:** | Post-verdict, pre-sentencing (sentencing set June 8, 2026) |
| **ECF / Date:** | ECF No. 227, filed April 30, 2026 |
| **Relief Granted:** | Travel to and residence in Colorado May 4–17 and May 20–June 6, 2026; attendance at daughter's graduation May 28, 2026 |

**Nature of the Charges.**

Ms. Brown was prosecuted under 18 U.S.C. § 2261A, the federal stalking and cyberstalking statute, in a multi-defendant case in the Central District of California. The case involved co-defendants Raygoza and Samane and proceeded through a full jury trial. Ms. Brown was convicted on Count Two. The precise nature of the alleged stalking or cyberstalking conduct is not specified in the travel order, but the statutory basis — § 2261A — is the same provision under which Ms. Wang is charged.

**Procedural Posture at Time of Order.**

The bond modification order was entered after the jury returned its verdict and before the June 8, 2026 sentencing. This is the narrow post-conviction, pre-sentencing window in which courts sometimes apply heightened scrutiny to release conditions. The permitted travel window ran through June 6, 2026 — two days before the sentencing date. The application was unopposed and resolved ex parte, indicating no governmental objection.

**Terms of the Modification.**

The court found 'sufficient cause' to modify the bond conditions. It permitted Ms. Brown to travel to and reside in Colorado during two separate blocks: May 4 to May 17, 2026, and May 20 to June 6, 2026. The order also specifically authorized attendance at her daughter's graduation ceremony on

May 28, 2026. The permitted period included multi-week out-of-state residence, not merely a brief court-attendance trip.

**Relevance to This Motion.**

Brown is the most direct available comparator. It involved the same statute (§ 2261A), a more advanced procedural posture (post-conviction), and permitted more extensive travel (multi-week residence) than Ms. Wang requests. If the Government argues that a § 2261A charge or the approach of sentencing categorically forecloses travel, Brown is a direct refutation. The relevant inquiry is not the charge label but whether targeted conditions can assure appearance and safety — a question courts answer in the affirmative even in post-conviction § 2261A cases.

---

*[Court Record Follows]*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>     v.<br><br>ASHLEIGH BROWN,<br><br>     Defendant. | Case No. 2:25-CR-780-SVW-2<br><br>[~~PROPOSED~~] **ORDER RE UNOPPOSED EX PARTE APPLICATION FOR BOND MODIFICATION** |

The Court has read and considered the Ex Parte Application for Bond Modification. The Court finds sufficient cause to grant the request, and hereby orders the bond modified as follows:

Ms. Brown is permitted to travel to and reside in Colorado from May 4 to May 17, 2026, and May 20 to June 6, 2026.

Ms. Brown is permitted to attend her daughter's graduation on May 28, 2026.

DATED: April 30, 2026

_____
HONORABLE STEPHEN V. WILSON
United States District Judge

Presented by: _/s/ Erica Choi_
Deputy Federal Public Defender

**GREGORY NICOLAYSEN (CA 98544)**
**27240 Turnberry Lane, Suite 200**
**Valencia, CA 91355**
**Phone: (818) 970-7247**
**Fax: (661) 252-6023**
**Email: gregnicolaysen@aol.com**

**Attorney For Defendant,**
**Cynthia Raygoza**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) **2:25-CR-00780-SVW-1** |
| | ) |
| | ) |
| **Plaintiff,** | ) **NOTICE OF MOTION AND** |
| | ) **MOTION BY DEFENDANT** |
| | ) **CYNTHIA RAYGOZA FOR** |
| **v.** | ) **POST-VERDICT JUDGMENT OF** |
| | ) **ACQUITTAL PURSUANT TO** |
| | ) **FEDERAL RULE OF CRIMINAL** |
| | ) **PROCEDURE 29(c) ;** |
| **CYNTHIA RAYGOZA, et al.,** | ) **ALTERNATIVE REQUEST FOR** |
| | ) **NEW TRIAL UNDER RULE 33** |
| **Defendants** | ) |
| | ) **DATE: [TO BE SET]** |
| | ) **TIME: 11:00 a.m.** |
| | ) **CTRM: Hon. Stephen V. Wilson** |
| _____ | ) |

**Defendant Cynthia Raygoza, through her CJA counsel of record, Gregory Nicolaysen, hereby moves the Court for a post-verdict judgment of acquittal on Count Two of the First Superseding Indictment, pursuant to Federal Rule of Criminal Procedure 29(c). Alternatively, Ms. Raygoza requests a new trial pursuant to Rule 33.**

**DATED: March 13, 2026**   **Respectfully Submitted,**

**_____/S/_____**
**GREGORY NICOLAYSEN**
**Attorney for Defendant,**
**Cynthia Raygoza**

# **TABLE OF CONTENTS**

**I.**   **THE COURT SHOULD SET ASIDE THE VERDICT ON COUNT TWO BECAUSE THE GOVERNMENT'S ATTEMPT TO RECHARACTERIZE A NINETY-MINUTE IMMIGRATION PROTEST AS A FEDERAL STALKING OFFENSE IS A PROFOUND LEGAL OVERREACH THAT FAILS THE SUFFICIENCY STANDARDS UNDER RULE 29** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

    **A.**   **Rule 29(c) Standards** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

    **B.**   **The Elements Of 18 U.S.C. 2261A(2)(B)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

    **C.**   **The Jury Instruction Given On The Elements Of Stalking** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

    **D.**   **The Government's Decision To Charge The Brief, Ninety-Minute Incident On A Single Day As Stalking Departs Radically From Historical Charging Practices In This District.** . . . . . . . **10**

    **E.**   **The Government's Charging Decision Contradicts Congress's Intent to Target Only Repetitive Predatory Behavior** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

    **F.**   **The Government's Application Of The Stalking Statute To This Case Directly Contradicts Case Law** . . . . . . . . . . . . . . . . . . . . . **17**

**II.**   **ALTERNATIVELY, THE COURT SHOULD GRANT A NEW TRIAL UNDER RULE 33 BECAUSE THE JURY INSTRUCTION ON "COURSE OF CONDUCT" CONSTITUTED REVERSIBLE ERROR** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

**III.**   **UNDER FED.R.CRI.P. 29(d), THE COURT SHOULD CONDITIONALLY DETERMINE WHETHER A MOTION FOR A NEW TRIAL SHOULD BE GRANTED** . . . . . . . . . . . . . . . . . . . . . **26**

**IV.**   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

### THE COURT SHOULD SET ASIDE THE VERDICT ON COUNT TWO BECAUSE THE GOVERNMENT'S ATTEMPT TO RECHARACTERIZE A NINETY-MINUTE IMMIGRATION PROTEST AS A FEDERAL STALKING OFFENSE IS A PROFOUND LEGAL OVERREACH THAT FAILS THE SUFFICIENCY STANDARDS UNDER RULE 29

### A.    Rule 29(c) Standards

On February 27, 2026, the jury found defendant Cynthia Raygoza guilty on Count Two of the First Superseding Indictment, which charged her with stalking under 18 U.S.C. 2261A. (Pacer docket #178).  This motion seeks an order setting aside the verdict pursuant to Fed.R.Crim.P. 29(c), which provides in pertinent part as follows:

> (c) After Jury Verdict or Discharge.
>
> (1) Time for a Motion. A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.
>
> (2) Ruling on the Motion. If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

Rule 29 provides that, after a jury returns a guilty verdict, a "court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c).  Courts reviewing a motion for judgment of acquittal under Rule 29(c) apply the same test as they do in evaluating a challenge to the sufficiency of the evidence. United States v. Ladum, 141 F.3d 1328, 1337 (9th Cir. 1998).  When considering a motion for judgment of acquittal, courts must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Hursh, 217 F.3d. 761, 767 (9th Cir. 2000).

In ruling on a Rule 29 motion, the court must first consider the evidence presented at trial in the light most favorable to the United States. United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010). Then, the court must determine whether this evidence, so viewed, is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. Id. "The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." United States v. Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010). "[A]ny conflicts in the evidence are to be resolved in favor of the jury's verdict." United States v. Alvarez-Valenzuela, 231 F.3d 1198, 1201-02 (9th Cir. 2000).

The government need not provide direct evidence of all elements of the crime; circumstantial evidence and reasonable inferences drawn therefrom can be sufficient to sustain a conviction.  *See,* United States v. Cordova Barajas, 360 F.3d

5

1037, 1041 (9th Cir. 2004). "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." <u>United States v. Dinkane</u>, 17 F.3d 1192, 1996 (9th Cir. 1994) (quotation omitted). It is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. <u>United States v. Dreitzler</u>, 577 F.2d 539, 545 (9th Cir. 1978) (quotation omitted). *See,* <u>United States v. Becerril</u>, 2026 U.S. Dist. LEXIS 48330, at *2-3 (E.D. Wash. Mar. 9, 2026).

Based on the arguments presented herein, defendant Cynthia Raygoza respectfully contends that the jury could not reasonably arrive at its verdict of guilty on Count Two, specifically in regard to the element of "course of conduct" under the stalking statute. The guilty verdict should therefore be set aside.

**B.      The Elements Of 18 U.S.C. 2261A(2)(B)**

18 U.S.C.S. § 2261A(2)(B) states:

> **Whoever—**
>                 **\*        \*        \***
> **(2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce *to engage in a course of conduct* that—**

6

&ast; &ast; &ast;

**(B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A),**

**shall be punished as provided in section 2261(b) or section 2261B [18 USCS § 2261(b) or 2261B], as the case may be.**
**[Italics and Underlining Added]**

The definition of "course of conduct" is found in 18 U.S.C.S. § 2266:

**(2) Course of conduct. The term "course of conduct" means a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose.**

### C. The Jury Instruction Given On The Elements Of Stalking

On February 5, 2026, the parties filed two sets of disputed jury instructions, in which the government and defense set forth their respective positions on the disputed instructions. The defense positions were submitted collectively on behalf of all three defendants to avoid separate filings by each defendant. (Pacer docket #142, 143).

The disputed instructions included Government's Proposed Instruction No. 4, which addressed the elements of stalking;[1] and Defendants' Proposed Instruction No. 6, which addressed the term, "two or more acts," within the element "course of

---

[1]    Pacer docket #142, at pages 16-17 of 26. As a disputed instruction, the defense objection to Government's Instruction No. 4 preserves the issues in this motion for appeal.

conduct."[2]

At trial, the Court gave the Government's Instruction No. 4 and did not give Defendants' Instruction No. 6.

Central to this motion is the government's definition of the stalking element, "course of conduct":

> A "course of conduct" is a pattern of conduct composed of two or more acts, evidencing a continuity of purpose. *You may consider each communication between the defendant and R.H. or his family members as a separate act.* You are not required to agree unanimously on which two or more acts constitute the course of conduct. Not all acts that constitute part of a course of conduct must involve the use of the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce.
> [Italics And Underlining Added]

As discussed below, defendant Raygoza contends that no rational trier of fact could find her guilty of stalking based on the government's trial evidence; and that the Court's adoption of the government's proposed instruction on "course of conduct" enabled the incorrect verdict. The Court should therefore set aside the guilty verdict and enter a not guilty verdict for defendant Raygoza on Count Two.

---

[2]     Pacer docket #143, at page 5 of 12.

8

**D. The Government's Decision To Charge The Brief, Ninety-Minute Incident On A Single Day As Stalking Departs Radically From Historical Charging Practices In This District**

In support of a ruling that no rational trier of fact could find Ms. Raygoza guilty of stalking on Count Two, it is important to look comparatively at the way the U.S. Attorney's Office in the Central District of California has applied the stalking statute over the past twenty years.

Attached hereto as Exhibit A is a chart listing the stalking prosecutions filed in this district under the statute at issue here, 18 U.S.C. 2261A. As the chart shows, the prosecutions are consistently comprised of repetitive and persistent conduct of a clearly threatening and harassing (if not altogether frightening) nature, spread out over days and, in most cases, many months. The cases involve continual emails, text messages, social media posts, and the like, which taken as a whole over an extended period demonstrate a calculated scheme by the defendant in each case to threaten, intimidate and/or harass the victim(s).

The attached chart (Exhibit A) demonstrates that the U.S. Attorney's Office in this district has maintained a charging protocol aimed at applying the stalking statute to instances where a defendant's "course of conduct" consists of repetitive, persistent conduct over an extended period of time, thereby establishing the "pattern" and "continuity of purpose" required under the statutory definition in 18 U.S.C. 2262. The charging practices depicted in the chart are consistent with the

9

statutory standard.  The charging decision in this case is not.

Indeed, the prosecution of Ms. Raygoza under the stalking statute represents a radical aberration from established practices in this district.  The trial evidence here was confined to a single day and, within that day, to approximately an hour and a half, during which Ms. Raygoza and her two co-defendants, one of whom was acquitted of stalking, engaged in protest behavior against ICE.  The government's evidence showed a single, continuous event on August 28, 2025 that started at approximately 12:25 pm, when the three defendants observed a vehicle without a rear license plate near MDC-LA which they correctly believed was a vehicle of Immigration & Customs Enforcement ("ICE").  Together in one car, the defendants began following the vehicle onto the freeway, while live-streaming to the Instagram account of the organization, ICE-out-of-LA.

Approximately 15-20 minutes later, the vehicle pulled into a residential street in Baldwin Park, where the driver, who was in fact an ICE agent, parked the vehicle near his residence and proceeded to enter his family's vehicle where his wife was waiting with their two minor children.  The defendants proceeded to park further down the street.  What happened from that point on, until the agent and his family left the area at approximately 1:40 pm, was nothing more than a protest against ICE by the defendants.  This protest consisted of the three defendants continuing to live stream while Ms. Raygoza spoke out to residents on the street

10

that their neighbor is an ICE agent.

During this time, the agent and his wife exited their family vehicle to confront Ms. Raygoza in a face-to-face verbal exchange until Baldwin Park Police Dept officers arrived shortly after 1:00 pm. The officers did not arrest any of the defendants for their live-streaming protest activity but did arrest Raygoza for misdemeanor battery based on the agent's false accusation that she had pushed him prior to the officers' arrival.

The government's trial exhibits include cell phone videos depicting the events described above, specifically Government Exhibits 6, 8 and 21.

Viewed in the context of the government's charging practices under the stalking statute, this case manifests serious over-reach by the U.S. Attorney's Office in its obvious effort to up the ante in its campaign against ICE protestors by applying the stalking statute to conduct that clearly falls far outside the parameters of the requisite "course of conduct" to support a conviction.

As discussed below, this case also directly contradicts Congressional intent in enacting the stalking statute and stands in sharp contrast to the circumstances addressed the case law addressing the stalking statute.

**E.** **The Government's Charging Decision Contradicts Congress's Intent to Target Only Repetitive Predatory Behavior**

The government's trial evidence sharply contradicts Congress' intent in enacting the Interstate Stalking Punishment and Prevention Act of 1996 ("1996 Act"), which was originally enacted as part of the Violence Against Women Act (VAWA). Attached hereto as Exhibit B is the Report ("Report") accompanying (H.R. 2980) by which the stalking statute, 18 U.S.C. 2261A, was added to 18 U.S.C. 2261.

A critical focus underscoring the 1996 Act was Congress' intent to criminalize conduct that involves *pursuit* of a victim, primarily across state lines. While the jurisdictional component of the statute also includes the use of electronic transmissions – which was at issue in this trial through the use of cell phones to live stream the ICE protest activities – the heart of Congressional intent focuses squarely on conduct involving the pursuit of a victim.

In this context, the Report treats the stalker as a "tormentor" and recognizes that stalking may involve the victim having to relocate to a new residence, with the "tormentor" in pursuit:

> In some instances, the stalking victim has to move to a new residence, at times in a new state, to escape the tormentor. Yet moving does not guarantee an end to the victim's nightmare. Some victims have been followed by their stalkers to the new state.

12

Exhibit B (at page 2 of 7).

The Senate version of the bill was sponsored by Sen. Kay Bailey Hutchison [R-TX], who made the following observations about stalking in the Congressional record (Exhibit E):

> Stalking is threats. It is harassment. It is the constant terrorizing of a victim(.)

The government's evidence at trial contradicts the type of conduct Congress intended to criminalize. At trial, the ICE agent and his wife testified that they moved to a new residence after the event on August 28, 2025. However, they also admitted that none of the defendants had made any contact with them prior to after that date and that the conduct of the defendants was limited to that single day.

These admissions place the government's case squarely at odds with the legislative purpose, which is to criminalize *pursuit* of a victim by a "tormentor" who engages in the "constant terrorizing of a victim." The legislative intent covers instances where relocating to a new residence is not effective because the stalker is relentless in finding the victim. The case against Ms. Raygoza and the other defendants did not come anywhere close to the scenario contemplated by Congress.

The fundamental concepts of repetition and pursuit, which underscore Congress' objective in protecting victims, were likewise the focal points of research into stalking behavior that was conducted contemporaneously with Congressional

13

action.  For example, a research study on the extent of stalking nationwide was published jointly in 1998 by the National Institute of Justice (NIJ) and the National Center for Injury Prevention and Control (NCIPC), entitled, "Stalking in America: Findings From the National Violence Against Women Survey" (the "1998 Study"). A copy is attached hereto as Exhibit C.  The study collected data from 8,000 women and 8,000 men 18 years of age or older from November 1995 through May 1996, when the above-referenced House bill was introduced.

The data in the 1998 Study reveals that stalking involves pursuit characterized by repetitive behavior.  For example, the study found:

> Based on information provided by these victims, about two thirds of all stalking cases last a year or less, about a quarter last 2–5 years, and about a tenth last more than 5 years [exhibit reference omitted]. On average, stalking cases last 1.8 years.

(Exhibit C, at pages 11-12 of 20).  These findings segue with the definition of stalking on page 1 of the 1998 Study, which states in part:

> Stalking generally refers to harassing or threatening behavior that an *individual engages in repeatedly*, such as following a person, appearing at a person's home or place of business, making harassing phone calls, leaving written messages or objects, or vandalizing a person's property. [Italics and Underlining Added]

As the data for the 1998 Study was issued in May 1996, contemporaneously with the House Report, the fundamental premise of the Study, i.e., that stalking

14

involves repeated behavior, was undoubtedly incorporated into the legislative

intent.  Further evidence that Congress intended to criminalize repeated behavior is

demonstrated in a follow-up report submitted to the NIJ in 1999, entitled, "An

Exploration of the Experiences and Needs of Former Intimate Stalking Victims."[3]  The

introductory section of the 92-page report, attached as Exhibit D, expressly

addresses the definition of "course of conduct" from the vantage point of repeated

conduct over a period of time:[4]

> "Course of conduct" refers to behavior that occurs over
> some period of time (i.e. a series of acts). These acts may
> be the same or a variety of actions over time included
> repeated "following, nonconsensual communication,
> harassing, and trespassing," or certain other forms of
> physical contact (McAnaney et al., 1993: 894-895; U.S.
> Department of Justice, 1993: 44). The National Criminal
> Justice Association (NCJA) has developed a model
> anti-stalking code in which they define "course of
> conduct" as "repeatedly [on two or more occasions]
> maintaining a visual ac physical proximity to a person or
> repeatedly conveying verbal or written threats or threats
> implied by conduct or a combination thereof directed at
> or toward a person" (NCJA, 1993: 43).

   Indeed, even the Office For Victims Of Crime, which is part of the U.S.

Department of Justice, maintains a web page on the subject of stalking, which

---

[3]     The report is available on the NIJ web site at
https://nij.ojp.gov/library/publications/stalking-america-findings-national-violence-against-women-survey

[4]     The report is available on the NIJ web site at
https://nij.ojp.gov/topics/articles/information-stalking-victims

15

expressly recognizes repetitive behavior as an integral part of stalking conduct:[5]

> Stalking is a crime of power and control. It is a course of action directed at an individual that causes the victim to fear for their safety, and generally involves *repeated* visual or physical proximity, nonconsensual communication, and verbal, written, or implied threats. [Italics And Underlining Added)

For the reasons discussed above, it is clear that 18 U.S.C. § 2261A was not intended to criminalize isolated outbursts or brief encounters, which is precisely what the government's case here was comprised of. Ms. Raygoza's conduct lacks the continuity or repetitive nature over time to qualify as the type of "course of conduct" that Congress envisioned.

The Court should therefore set aside the guilty verdict on Count Two.

### F. The Government's Application Of The Stalking Statute To This Case Directly Contradicts Case Law

Beyond contradicting the charging practices of the U.S. Attorney's Office in this district for nearly twenty years, as well as the intent of Congress in enacting the stalking statute, the government's case at trial flies in the face of case law both in the Ninth Circuit and elsewhere that have addressed violations of 18 U.S.C. 2261A.

Stalking cases in the Ninth Circuit and elsewhere have consistently involved

---

[5] https://ovc.ojp.gov/topics/stalking

16

multiple, distinct acts by a defendant that demonstrate repetition and persistence over a period of time, consistent with the "continuity of purpose" requirement under section 2266.

For example, in United States v. Osinger, 753 F.3d 939 (9th Cir. 2014), the Ninth Circuit rejected a constitutional challenge to section 2261A and in so doing, discussed in depth the ongoing, persistent conduct of the defendant that clearly satisfied the statute. In that case, the indictment alleged that defendant Osinger had sent several threatening and sexually explicit text messages, emails, and photographs of V.B., a former girlfriend, to V.B., as well as to her co-workers and friends; and that Osinger had "used the Internet to create a Facebook page in a name close to V.B.'s name" to post "suggestive and explicit photos of V.B." and "demeaning statements, purportedly made by V.B." 753 F.3d at 941. "V.B. told Osinger repeatedly that she no longer wanted to be contacted by him. Nonetheless, Osinger was unrelenting in his pursuit and harassment of her, including sending threatening text messages." 753 F.3d at 947.

Other circuits addressing 18 U.S.C. 2261A have likewise involved numerous, separate acts illustrated by repetitive, persistent behavior over a period of time that collectively formed a pattern, thereby demonstrating continuity of purpose, as required under section 2266 to establish "course of conduct." *E.g.,* United States v. Uhlenbrock, 125 F.4th 217, 221 (5th Cir. 2024)(defendant repeatedly posted nude

17

photos of victim online; defendant had previously pleaded guilty to violating the same statute); <u>United States v. Sayer</u>, 748 F.3d 425, 428 (1st Cir. 2014)("Sayer persistently stalked and harassed Jane Doe for over four years. At first, Sayer showed up at stores and other places where he knew that Jane Doe would be. In response, Jane Doe changed her routine and gave up activities she loved for fear of seeing Sayer. She also acquired a protection order against him in state court."); <u>United States v. Petrovic</u>, 701 F.3d 849, 853 (8th Cir. 2012)("Petrovic then began a campaign to carry out his threats. Over the course of the next few months, Petrovic mailed dozens of homemade postcards to addresses throughout M.B.'s community, including to M.B.'s workplace, M.B.'s family members, R.B.'s home, and local businesses like the neighborhood drugstore."); <u>United States v. Shrader</u>, 675 F.3d 300, 312 (4th Cir. 2012)(Defendant who pleaded guilty to murder persistently called victim's residence stating she was complicit in the murders, and wrote a manifesto containing threats to victim). *See also*, <u>United States v. Lipman</u>, 2024 U.S. Dist. LEXIS 158940, at *22 (C.D. Cal. Sep. 4, 2024)("the course of conduct charged involved sending repeated, threatening, and disturbing communications to an unwilling listener"); <u>United States v. Matusiewicz</u>, 84 F. Supp. 3d 363, 365 (D. Del. 2015)(Indictment alleged that defendants "engaged in a prolonged campaign to surveil and harass" the ex-wife of one of the defendants).

18

The Fourth Circuit's observations in <u>Shrader</u>, *supra*, are instructive in recognizing that persistent behavior comprises the cumulative effect of a defendant's actions that establish "course of conduct" under the statute:

> The statute defines the required "course of conduct" as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2). This latter part of the definition is significant. While the statute does not impose a requirement that the government prove that each act was intended in isolation to cause serious distress or fear of bodily injury to the victim, the government is required to show that the totality of the defendant's conduct "evidenc[ed] a continuity of purpose" to achieve the criminal end. The specific intent requirement thus modifies the cumulative course of conduct as a whole.

> This statutory scheme reflects a clear understanding on the part of Congress that while severe emotional distress can of course be the result of discrete traumatic acts, *<u>the persistent efforts of a disturbed harasser over a period of time—in this case, virtually D.S.'s entire adult life—can be equally or even more injurious</u>*. *<u>The cumulative effect of a course of stalking conduct may be greater than the sum of its individual parts</u>*. To read in a requirement that each act have its own specific intent element would undo the law's protection for victims whose anguish is the result of persistent or repetitive conduct on the part of a harasser. [Italics and Underlining Added]

<u>Shrader</u>, 675 F.3d at 311-12.

As shown in the citations above, the case law applying 18 U.S.C. 2261A directly contradicts the government's evidence at trial, specifically in regard to the

19

requisite conduct to satisfy the "course of conduct" element.

## II.

### ALTERNATIVELY, THE COURT SHOULD GRANT A NEW TRIAL UNDER RULE 33 BECAUSE THE JURY INSTRUCTION ON "COURSE OF CONDUCT" CONSTITUTED REVERSIBLE ERROR

The Court gave the jury Government's Proposed Instruction No. 4 which contained the following definition of "course of conduct":

> A "course of conduct" is a pattern of conduct composed of two or more acts, evidencing a continuity of purpose. *You may consider each communication between the defendant and R.H. or his family members as a separate act*. You are not required to agree unanimously on which two or more acts constitute the course of conduct. [Italics and Underlining Added]

In the context of the government's trial evidence, the instructional language highlighted above effectively reduces the "course of conduct" element to an absurdity. The heart of the August 28, 2025 incident consisted of the defendants live-streaming on the residential street where the ICE agent resided, which included the confrontation of Raygoza by the agent when he stepped out of his family vehicle. Government exhibits 6 and 21 are the cell phone videos of the confrontation taken by Raygoza and the agent, respectively. The confrontation consisted of back and forth conversation between Raygoza and the agent, as each was filming the other on their respective cell phones. The highlighted language

20

from the instruction allowed the jury to conclude that *the "two or more acts" requirement was satisfied within a matter of seconds in the course of the agent - Raygoza confrontation.*

The legislative intent is clear that this is not what Congress had in mind in enacting the "course of conduct" element within the statute. The definition of "course of conduct" begins with the word "pattern and concludes with the phrase "continuity of purpose." In between them is the phrase, "two or more acts." This phrase only has value in the statutory scheme if it is comprised of repeated, persistent conduct. Only then can the requisite "pattern" emerge from which the defendant's conduct manifests the "continuity of purpose" that can be dangerous to a victim and thus warrant criminal prosecution of that defendant in order to protect the victim.

But in this case, the instruction invited the jury to find that the two or more acts were satisfied within seconds during a back and forth conversation between Raygoza and the agent on the street, thus rendering the notion of "pattern" meaningless. If a pattern can be established in such a short period of time, then "continuity of purpose" loses the protective purpose for which the stalking statute was enacted. Both Congress and researchers compiling the studies discussed above focused squarely on circumstances involving repeated, persistent conduct over time that frightens and endangers victims – not two or more acts that occur in an instant

when the defendant and the alleged victim are talking to each other.

Thus, given the way "two or more acts" was defined for the jury, if this Court concludes that a rational jury could convict Ms. Raygoza under that standard, then the defect in the verdict lies in the instruction itself, which constitutes reversible error, thereby warranting a new trial.

None of the authorities cited by the government at the bottom of its proposed Instruction No. 4 support the *de minimis* language for "two or more acts" that was given to the jury here, namely, that "You may consider each communication between the defendant and R.H. or his family members as a separate act." This specific language is an invention by the government for this case that does not find support in any of the cited authorities. Each of those authorities is discussed below:

| | |
|---|---|
| **United States v. Pantchev, 2:21-CR-00050-JFW** | **Counsel for Ms. Raygoza was also counsel for defendant Pantchev at the trial before Judge John F. Walter in June 2022. Mr. Pantchev's offense conduct was the epitome of "course of conduct." By the time he was prosecuted in federal court, he had already been convicted in state court years earlier for prior stalking behavior. Upon release from state prison, he engaged in a long series of acts directed at female psychiatrists at the VA hospitals in this district, and his conduct included a large volume of emails to them, combined with personal appearances at the hospitals and at least one appearance a victim's residence. There is simply no comparison between the Pantchev case and the circumstances here in the Raygoza case.** |
| **United States v. Davis, 5:14-CR-00240-D (E.D.N.C.)** | **Defendant sent numerous threatening emails to multiple victims between February 2012 and August 2014.** |

| United States v. Ackell, 1:15-CR-123-JL (D.N.H.)  United States v. Ackell, 907 F.3d 67 (1st Cir. 2018) | Defendant engaged a female victim in an ongoing sexual relationship over the Internet; after she sought to end it, he threatened her and sent multiple text messages, digital images and other electronic communications between October 2012 and February 2014. |
|---|---|
| United States v. Osinger, 753 F.3d 939, 945 (9th Cir. 2014) | This case has been discussed earlier in this brief. The offense conduct was extensive, including several threatening and sexually explicit text messages, emails, and photographs of V.B., a former girlfriend, to V.B., as well as to her co-workers and friends; and that using the Internet to create a Facebook page in a name close to V.B.'s name. |
| United States v. Shrader, 675 F.3d 300 (4th Cir. 2012) | This case has also been discussed earlier in this brief. The offense conduct was extensive. Defendant who pleaded guilty to murder persistently called victim's residence stating she was complicit in the murders, and wrote a manifesto containing threats to victim. |
| United States v. Gonzalez, 905 F.3d 165 (3d Cir. 2018) | Over a period of several years, a divorced husband entered into a scheme with several family members to threaten his ex-wife, who eventually died as a result, through various methods that included creating a web page, YouTube videos, and Facebook postings. |
| United States v. Bell, 303 F.3d 1187 (9th Cir. 2002) | Over a period of several years, defendant engaged in retaliatory behavior directed at the IRS and agents in response to enforcement action taken against his assets. |
| United States v. Bowker, 372 F.3d 365 (6th Cir. 2004) | Over a one year period, defendant sent numerous emails and letters to an employee at a television station and persisted when she relocated to another station.  [Opinion later vacated in Bowker v. United States, 543 U.S. 1182, 125 S. Ct. 1420 (2005) and remanded due to Booker opinion re: sentencing that was issued in 2005]. |

| United States v. Conlan, 786 F.3d 380 (5th Cir. 2015) | Similar to the Bowker case: defendant engaged in an escalating, year-long campaign of email, text-message, social-media, telephonic, and face-to-face contact with a television news reporter. |
|---|---|
| United States v. Lapine, 714 F.3d 641 (1st Cir. 2013) | This is a fraud case. No stalking charge. |
| United States v. Temkin, 797 F.3d 682 (9th Cir. 2015) | This is a Hobbs Act / murder for hire case. No stalking charge. |
| United States v. Barlow, 568 F.3d 215 (5th Cir. 2009) | This case charged offenses against children. No stalking charge. |
|  |  |

As shown in the chart above, none of the cases cited by the government for its proposed Instruction No. 4 support the language at issue here, that "You may consider each communication between the defendant and R.H. or his family members as a separate act." This language is truly an invention by the government for this case.

The government also cites the Fifth Circuit's Pattern Instruction for stalking (No. 2.86B). That instruction, however, provides only a generic statement of the elements of the stalking statute. The reference to "course of conduct" merely reiterates the statutory definition contained in 18 U.S.C. 2262.

For these reasons, if the Court finds that a rational jury could convict Ms. Raygoza based on the instruction as given, the Court should nonetheless grant Ms.

24

Raygoza a new trial under Rule 33 based on instructional error.

## III.

## UNDER FED.R.CRI.P. 29(d), THE COURT SHOULD CONDITIONALLY DETERMINE WHETHER A MOTION FOR A NEW TRIAL SHOULD BE GRANTED

Under Federal Rule of Criminal Procedure 29(d), "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed."

## IV.

## CONCLUSION

For the reasons discussed, defendant Cynthia Raygoza respectfully requests that the Court issue an order under Rule 29(d) that sets aside the guilty verdict on Count Two of the First Superseding Indictment and make the conditional determination under Rule 29(d). Alternatively, Ms. Raygoza respectfully requests that the Court grant a new trial under Rule 33.

DATED: March 13, 2026      Respectfully Submitted,


_____/S_____
**GREGORY NICOLAYSEN**
**Attorney for Defendant,**
**Cynthia Raygoza**

# EXHIBIT A

| Title of Case | Stalking Conduct |
|---|---|
| **U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1** **Stalking prosecutions in Central District - California (2009 - 2025)** [covers period beginning in 2009 when e-filing began] sources of information: indictments and (where applicable) plea agreements on Pacer docket ||
| USA v. Barrett, 09-01215-R | Between January 28, 2008 and July 22, 2009: Conduct included numerous phone calls to various hotels in attempt to locate the victim; traveled interstate to locate and spy on victim. |
| USA v. Osinger, 10-00758-ODW | Between March 24, 2010 and March 29, 2010: Conduct included sending several threatening and sexually explicit text messages, emails, and photographs of victim, a former girlfriend, to her and to her co-workers and friends; as well as using the Internet to create a Facebook page to post "suggestive and explicit photos of " victim.  The appeal is published as United States v. Osinger, 753 F.3d 939 (9th Cir. 2014) (conviction and sentence affirmed). |
| USA v. Cook, 11-00385-SVW | Between May 23, 2010 and May 28, 2010: Conduct included making multiple threatening phone calls to victim at her place of employment over several days. |
| USA v. Zapirain, 12-1107-JAK | Between September 2012 and October 2012: Conduct included a series of threats to the victim that included tweets, and traveled to Australia to place victim in reasonable fear of death, serous bodily injury, etc. (Counts in Indictment include threats under 18 USC 875 together with stalking under 18 U.S.C. 2261A). |

| U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1<br>**Stalking prosecutions in Central District - California (2009 - 2025)**<br><br>**[covers period beginning in 2009 when e-filing began]**<br>**sources of information: indictments and (where applicable) plea agreements on Pacer docket** | |
|---|---|
| USA v. White, 14-161-SVW | Between August 15, 2013 and February 12, 2014: Conduct included multiple emails to victim to harass and intimidate;  creating web sites with victim's name which had derogatory statements about the victim and demanded money to take down the web sites.  Defendant sent threatening messages of violence placing the victim in fear, and threatened the victim's minor child. |
| USA v. Khudagulyan, 16-770 VAP | Between April 2016 and October 2016: Conduct included continual communications with FBI agent in effort to separate him from his wife so that the two of them could be together; researching agent's information online and obtaining personal information of agent and wife which was used to, among other things, shut off utilities at agent's residence; contact agent's friends and associates; solicit business from individuals using the personal information. Defendant also sent text messages that were harassing and posted photos of victim and family online. |
| USA v. Bauer, 18-550 JFW | Between early 2015 and early 2018: Conduct included gaining access to social media accounts and email of computers of various women defendant knew; sent anonymous emails after obtaining information to harass victims to produce nude photos and then threatened  victims for more nude photos.  Defendant used a social engineering ploy and obtained victims passwords; created a survey to victims to obtain information for password reset questions.  Defendant also used malware to take over victim's computers. |
| USA v. Sanchez Ramos, 19-319 DMG | Between April 2016 and May 2018: Conduct included using social media accounts [Facebook] to create anonymous accounts to message victims to obtain nude photos from four women whom defendant knew, and threatening the victims that if they did not comply he would ruin their life. |

| **U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1**<br>**Stalking prosecutions in Central District - California (2009 - 2025)**<br><br>**[covers period beginning in 2009 when e-filing began]**<br>**sources of information: indictments and (where applicable) plea agreements on Pacer docket** | |
|---|---|
| USA v. Rogers 19-700 JAK | Between March 2, 2007 and November 7, 2019: Conduct included sending multiple threatening statements in the mail (e.g., "I am going to take my revenge upon you and your daughter"), and threatening voicemails (e.g., "This is the man who is gonna rape her, molest her, and kill her"). |
| USA v. Bennington, 20-255 DMG | Between January 2019 and March 2020: Conduct included creating new online accounts to send a series of online messages and social media posts; sent graphic messages and demanded defendant engage in sex acts with him, even after victim had previously blocked prior messages. Defendant had for a number of years sent Victim 1 unsolicited online messages which Victim blocked prior to this. Defenddant also used social media, Internet, and other devices to threaten Victim 2, demanding she have sex with him and threatened to kill her. |
| USA v. Hughes, 20-332 DSF | Between May 2019 and June 2020: Conduct included sending threats to various victims through email, cell phone, and social media; messages included graphic and disturbing threats to injure and/or rape. Even after victims contacted law enforcement, defendant continued with death threats. |
| USA v. Roberts, 20-554 AB | Between July 29, 2020 and August 18, 2020: Conduct included electronic communications to victim threatening to send nude photos and kill her. Defendant created fake website listing on Craig's list advertising a room for rent for Victim and disclosing victim personal information, including home address. |

| **U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1**<br>**Stalking prosecutions in Central District - California (2009 - 2025)**<br><br>[covers period beginning in 2009 when e-filing began]<br>sources of information: indictments and (where applicable) plea agreements on Pacer docket | |
|---|---|
| USA v. Pantchev, 21-50 JFW | Between July 26, 2019 and January 22, 2021: Conduct included large volume of harassing emails to multiple victims (female psychiatrists at VA hospitals) insulting them and accusing them of denying him healthcare as a veteran and using incoherent language in the emails that conveyed a threat; showing up at a victim's residence at night. |
| USA v. Chavarri, 22-69 MEMF | Between May 2019 and February 2021: Conduct included contacting multiple victims anonymously via social media (Instagram) and suggesting that he and victims have a relationship whereby he would pay the victims an allowance to send him photos/videos, which certain victims initially did; when they later refused, defendant sent communications threatening to publish the photos. |
| USA v. Lackner, 22-603 | Between June 2021 and October 17, 2022: Conduct included send phone and email messages asking the victim, who was Jewish, to meet him, and when rebuffed, sending threatening and derogatory emails that included anti-Semitic, pro-Nazi remarks about the Holocaust. |
| USA v. Lipman, 23-491 FLA | Between February 1, 2023 and September 22, 2023: Conduct included numerous emails threatening to harm victim, including threats included death; sending photos with a shotgun; praying that victim dies and gets sick; also contacting victim's neighbor. |

| **U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1**<br>**Stalking prosecutions in Central District - California (2009 - 2025)**<br><br>**[covers period beginning in 2009 when e-filing began]**<br>**sources of information: indictments and (where applicable) plea agreements on Pacer docket** | |
| --- | --- |
| USA v. Torres, 23-515 HDV | Between December 18, 2022 and October 20,2023: Conduct included leaving voice mails threatening to kill victim and family; obtaining victim's personal information, including victim's address, and continuing to threaten victim even after defendant had been served with a restraining order. |
| USA v. Nguyen, 24-70 | Between April 19, 2023 and February 2024: Conduct included targeting five government employees in Vietnam consulate by sending emails threatening to kill victims and family members, screenshots of a text conversation wherein defendant was paying a hitman to kill victim and/or victim's wife.  Defendant impersonated one victim and hacked into her personal email account; sent emails to U.S. officials posing as victim's wife and threatening explosions and violence. |
| USA v. Paris, 24-173 | Between September 2019 and October 2023: Conduct included using cell, email, social media, and Internet, to obtain victim's password, threatening victim that he had nude photos of victim, and wanted payment to delete the photos; threatened to kill victim, harm victim physicially. |
| USA v. Stewart, 24-450 SPG<br>(case pending) | Between March 3, 2023, and June 25, 2024: Conduct included obtaining victim's personal information, including where victim worked, and left voicemails to the company stating that defendant would be coming after people working for the company; threatened to kill the victim and executives at company. |

| **U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1** <br> **Stalking prosecutions in Central District - California (2009 - 2025)** <br><br> **[covers period beginning in 2009 when e-filing began]** <br> **sources of information: indictments and (where applicable) plea agreements on Pacer docket** | |
| --- | --- |
| USA v. Scripnic, 25-667 MCS | Between March 24, 2024 and June 17, 2025: Conduct included sending hundreds of emails to multiple victims that contained threatening language, including threats to interfere with both victims employers, family, and business opportunities; threatened to post personal information containing derogatory comments. |
| USA v. Curcio, 25-811 MWC | Between February 2024 and September 2025: Conduct included contacting family members and their employers with derogatory comments; spraying pepper spray on victim's door, causing burning and skin irritation to victim; posting personal information of victim and family members online and inviting people to harass them.; posting social media messages asking employers to fire victim's family members. |
| | |

# EXHIBIT B

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

104TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
2d Session 104–557

## INTERSTATE STALKING PUNISHMENT AND PREVENTION ACT OF 1996

MAY 6, 1996.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. McCOLLUM, from the Committee on the Judiciary, submitted the following

# R E P O R T

[To accompany H.R. 2980]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 2980) to amend title 18, United States Code, with respect to stalking, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Interstate Stalking Punishment and Prevention Act of 1996".

**SEC. 2. PUNISHMENT OF INTERSTATE STALKING.**

(a) IN GENERAL.—Title 18, United States Code, is amended by inserting after section 2261 the following:

**"§ 2261A. Interstate stalking**

"Whoever travels across a State line or within the special maritime and territorial jurisdiction of the United States with the intent to injure or harass another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury (as defined in section 1365(g)(3) of this title) to, that person or a member of that person's immediate family (as defined in section 115 of this title) shall be punished as provided in section 2261 of this title.".

(b) CONFORMING AMENDMENTS.—

(1) Section 2261(b) of title 18, United States Code, is amended by inserting "or section 2261A" after "this section".

(2) Sections 2261(b) and 2262(b) of title 18, United States Code, are each amended by striking "offender's spouse or intimate partner" each place it appears and inserting "victim".

29–006

2

(3) The chapter heading for chapter 110A of title 18, United States Code, is amended by inserting "**AND STALKING**" after "**VIOLENCE**".

(4) The table of chapters at the beginning of part I of title 18, United States Code, is amended by striking

**"110A.  Domestic violence** ........................................................................................................................... **2261"**

and inserting:

**"110A.  Domestic violence and stalking** ...................................................................................... **2261".**

(c) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 110A of title 18, United States Code, is amended by inserting after the item relating to section 2261 the following new item:

"2261A. Interstate stalking.".

## PURPOSE AND SUMMARY

In the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), Congress established a new federal offense aimed at stalkers of current or former spouses or intimate partners. This offense did not address cases in which the victim was unrelated to the stalker. H.R. 2980, the "Interstate Stalking Punishment and Prevention Act of 1996" was introduced to address this insufficiency.

H.R. 2980 would establish a new federal crime for crossing a State line, or otherwise entering a federal jurisdiction for the purpose of injuring or harassing another person, when such action places the person in reasonable fear of bodily harm. The authorized penalties are the same as those provided for in the current interstate domestic violence offense.

## BACKGROUND AND NEED FOR THE LEGISLATION

Over the last few years, the problem of stalking has grown tremendously, plaguing law enforcement officials at all levels. Well-publicized cases involving celebrities has served to highlight the frightening dimensions of this crime.

In some instances, the stalking victim has to move to a new residence, at times in a new state, to escape the tormentor. Yet moving does not guarantee an end to the victim's nightmare. Some victims have been followed by their stalkers to the new state. This interstate stalking has made it increasingly difficult for law enforcement officials to investigate and prosecute the crime.

This bill establishes a new federal crime for crossing a State line, or otherwise entering federal jurisdiction, for the purpose of injuring or harassing another person. This bill does not generally federalize the offense of stalking. Rather, it ensures that this crime of stalking is given force and effect in all areas clearly within the responsibility of the federal government.

When a stalker operates across State lines, or travels in other areas within the jurisdiction of the federal government, it is very difficult for local law enforcement to conduct an effective investigation. In these instances, it is the proper role for federal law enforcement to investigate and prosecute the crime.

The federal government would only have jurisdiction in these limited interstate instances. There are tremendous stalking problems that local law enforcement can address. Congress encourages local police to enforce trespassing, harassment and threatening as a method of preventing the stalker from continuing the crime.

3

Stalking is a frightening and cowardly crime. Victims often feel trapped within their own homes. Family members and co-workers are also frequently threatened. Congress should do everything in its power to assist law enforcement in the apprehension and conviction of these predators.

The Justice Department is supportive of this legislation.

## Hearings

The Committee's Subcommittee on Crime held one day of hearings on H.R. 2980 on March 7, 1996. Testimony was received from two witnesses, Representative Edward R. Royce of California, and Mr. Kevin V. DiGregory, Deputy Assistant Attorney General, representing the Department of Justice. No additional material was submitted.

## Committee Consideration

On March 21, 1996, the Subcommittee on Crime met in open session and ordered reported favorably the bill H.R. 2980, as amended, by a voice vote, a quorum being present. On April 24, 1996, the Full Committee met in open session and ordered reported favorably the bill H.R. 2980 with amendment by voice vote, a quorum being present.

## Vote of the Committee

There were no recorded votes.

## Committee Oversight Findings

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

## Committee on Government Reform and Oversight Findings

No findings or recommendations of the Committee on Government Reform and Oversight were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

## New Budget Authority and Tax Expenditures

Clause 2(l)(3)(B) of House rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

## Congressional Budget Office Cost Estimate

In compliance with clause 2(l)(C)(3) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to H.R. 2980, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

4

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, April 30, 1996.*

Hon. HENRY J. HYDE,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 2980, the Interstate Stalking Punishment and Prevention Act of 1996, as ordered reported by the House Committee on the Judiciary of April 24, 1996. CBO estimates that enacting the bill could lead to increases in both direct spending and receipts, but the amounts involved would be less than $500,000 a year. Because H.R. 2980 could affect direct spending and receipts, pay-as-you-go procedures would apply. The bill contains no mandates, as defined in Public Law 104–4, and would impose no direct costs on state, local, or tribal governments.

H.R. 2980 would establish a new federal crime related to interstate stalking. Violators of the bill's provisions would be subject to criminal fines and imprisonment. The imposition of new fines could cause governmental receipts to increase through greater penalty collections, but we estimate that any such increase would be less than $500,000 annually. Criminal fines would be deposited in the Crime Victims Fund and would be spent in the following year. Thus, direct spending from the fund would match the increase in revenues with a one-year lag.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are Mark Grabowicz and Stephanie Weiner.

    Sincerely,

JAMES L. BLUM
(For June E. O'Neill, Director).

### INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.J. Res. 1 will have no significant inflationary impact on prices and costs in the national economy.

### SECTION-BY-SECTION ANALYSIS

Section 1. Short Title.—This section states that the short title of the bill is the "Interstate Stalking Punishment and Prevention Act of 1996."

Sec. 2. Punishment of Interstate Stalking.—This section amends title 18, United States Code, to establish a new federal offense for crossing a State line or otherwise entering Federal jurisdiction for the purpose of injuring or harassing another person, when such action places the person in reasonable fear of bodily harm.

The section also amends sections 2261(b) and 2262(b) of title 18, United States Code, by striking the language, "offender's spouse or intimate partner," and replacing it with the word "victim." These latter changes are necessary because the bill expands the application of these two sections to include conduct relating to the stalking of strangers.

5

AGENCY VIEWS

The Committee received a letter from the U.S. Department of Justice providing Administration views on H.R. 2980, and other bills. The letter addressed the issues presented in H.R. 2980, in pertinent part, as follows:

H.R. 2980—INTERSTATE STALKING PUNISHMENT AND PREVENTION ACT

The proposed Interstate Stalking Punishment and Prevention Act of 1996 would enact an interstate stalking offense (proposed 18 U.S.C. 2261A). The proposed offense is modeled on the existing interstate domestic violence offense, 18 U.S.C. 2261. It would specifically cover traveling across a state line or entering or leaving Indian country with the intent to injure or harass another person, where the actor in the course of, or as a result of, such travel places that person in reasonable fear of death or serious bodily injury to the person or an immediate family member. The authorized penalties would be the same as those provided in 18 U.S.C. 2261.

In addition to proposing the new interstate stalking offense, the bill corrects a drafting problem in 18 U.S.C. 2262 (relating to interstate violations of protection orders). As currently drafted, the penalty provisions in 18 U.S.C. 2262 are facially narrower than the scope of the offense it defines, since the penalty provisions refer to harm to the offender's spouse or intimate partner, but the offense defined in subsection (a) could be premised on violation of a protection order issued for the benefit of any person. The bill corrects this problem by substituting references to the "victim" in the penalty provisions for references to "spouse or intimate partner."

The Department of Justice supports the enactment of this legislation. In essence, it fills a gap in existing federal law, which reaches interstate domestic violence (under 18 U.S.C. 2261) and interstate violations of protection orders (under 18 U.S.C. 2262), but does not cover essentially similar types of conduct where the victim has not had an intimate relationship with the offender and has not obtained a protection order. Since the scope of the proposed offense is generally limited to cases involving interstate movement of the offender, we do not believe that it will result in an excessive extension of federal jurisdiction or undermine state responsibility. Rather, like the existing offenses in 18 U.S.C. 2261–62, it will provide a supplementary measure for cases where the interstate nature of the offense may create difficulties for effective state investigation and prosecution.

In terms of drafting, we suggest the following corrections or refinements: (1) It would be advisable to add to 18 U.S.C. 2266 a definition of "harass," a term that appears without definition in 18 U.S.C. 2261 and proposed 18 U.S.C. 2261A. We would be pleased to work with the sponsors to devise an appropriate definition. (2) For consistency with the corresponding language in 18 U.S.C. 2261 (a)(1), proposed 18 U.S.C. 2261A should say "with the intent to injure, harass, or intimidate" rather than "with the intent to injure or harass." (3) The term "serious bodily injury" should be defined. This is a term often used in title 18, and its existing definition could be incorporated by reference by adding "(as defined in section 1365(g)(3) of this title)" after "serious bodily injury" in proposed 18

6

U.S.C. 2261A. (4) The phrase "of this title" should be inserted after "section 115" in proposed 18 U.S.C. 2261A. (5) The item for chapter 110A in the table of chapters for title 18, United States Code, should be amended to reflect the change in the chapter heading proposed in the bill (from "domestic violence" to "domestic violence and stalking").

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

## TITLE 18, UNITED STATES CODE

\*       \*       \*       \*       \*       \*       \*

# PART I—CRIMES

\*       \*       \*       \*       \*       \*       \*

Chap.                                                       Sec.
**1.       General provisions** ...................................................................................... **1**

\*       \*       \*       \*       \*       \*       \*

**[110A.   Domestic violence** .............................................................................. **2261]**
***110A.   Domestic violence and stalking*** ......................................................... ***2261***

\*       \*       \*       \*       \*       \*       \*

## CHAPTER 110A—DOMESTIC VIOLENCE *AND STALKING*

Sec.  2261.  Interstate domestic violence.

\*       \*       \*       \*       \*       \*       \*

*2261A.  Interstate stalking*

\*       \*       \*       \*       \*       \*       \*

### § 2261. Interstate domestic violence

(a) \* \* \*

(b) PENALTIES.—A person who violates this section *or section 2261A* shall be fined under this title, imprisoned—

(1) for life or any term of years, if death of the [offender's spouse or intimate partner] *victim* results;

(2) for not more than 20 years if permanent disfigurement or life threatening bodily injury to the [offender's spouse or intimate partner] *victim* results;

(3) for not more than 10 years, if serious bodily injury to the [offender's spouse or intimate partner] *victim* results or if the offender uses a dangerous weapon during the offense;

(4) as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and

(5) for not more than 5 years, in any other case,

or both fined and imprisoned.

7

### § 2262. Interstate violation of protection order

(a) * * *

(b) PENALTIES.—A person who violates this section shall be fined under this title, imprisoned—

    (1) for life or any term of years, if death of the [offender's spouse or intimate partner] *victim* results;

    (2) for not more than 20 years if permanent disfigurement or life threatening bodily injury to the [offender's spouse or intimate partner] *victim* results;

    (3) for not more than 10 years, if serious bodily injury to the [offender's spouse or intimate partner] *victim* results or if the offender uses a dangerous weapon during the offense;

    (4) as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and

    (5) for not more than 5 years, in any other case,

or both fined and imprisoned.

    \*      \*      \*      \*      \*      \*      \*

### *§ 2261A. Interstate stalking*

*Whoever travels across a State line or enters or leaves Indian country with the intent to injure or harass another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to, that person or a member of that person's immediate family (as defined in section 115) shall be punished as provided in section 2261.*

    \*      \*      \*      \*      \*      \*      \*

○

# EXHIBIT C

Case 2:25-cr-00170-TSV-W Document 183-18   Filed 06/14/26   PageID.3301 of 570   Page 47 of 1090



# National Institute of Justice
# Centers for Disease Control and Prevention

## R e s e a r c h   i n   B r i e f

*April 1998*



Partners in Research on
Violence Against Women

We are pleased to publish this first in a series of joint reports on violence against women.

When the National Institute of Justice (NIJ) and the National Center for Injury Prevention and Control (NCIPC) launched our partnership to study violence against women, there were no national data on stalking and its impact. This first-ever national survey has already made a major contribution. We eagerly await findings from other aspects of the study and anticipate reports on the incidence and prevalence of violence, partner violence, and rape.

This NIJ/NCIPC partnership to learn more about violence against women is based on a research agenda developed by the National Academy of Sciences, which was mandated by the Violence Against Women Act (Title IV of the Crime Act of 1994) and supported by NIJ and CDC.

Joint research initiatives stimulate a rich cross-fertilization of ideas and bring interdisciplinary perspectives to our knowledge base. The interests of both NCIPC and NIJ in this area are grounded in their common focus on social policy. NIJ brings a criminal justice perspective; NCIPC examines the issue from a public health and prevention perspective.

We hope the result will be a deeper and broader understanding of the implications of this violence and the effective policy response.

Jeremy Travis, Director
National Institute of Justice

Mark Rosenberg, Director
National Center for Injury
Prevention and Control, Centers
for Disease Control and Prevention

# Stalking in America:  Findings From the National Violence Against Women Survey

*by Patricia Tjaden and Nancy Thoennes*

Unprecedented interest in stalking over the past decade has produced media accounts of stalking victims,[1] passage of antistalking laws in all 50 States and the District of Columbia,[2] and development of a model antistalking code.[3]  Despite this interest, research on stalking has been limited to studies of small, unrepresentative, or clinical samples of known stalkers;[4] law journal reviews of the constitutionality and effectiveness of specific antistalking statutes;[5] and case studies of individual stalkers.[6]  Thus, empirical data have been lacking on such fundamental questions about stalking as:

- How much stalking is there in the United States?
- Who stalks whom?
- How often do stalkers overtly threaten their victims?
- How often is stalking reported to the police?
- What are the psychological and social consequences of stalking?

This Research in Brief presents data from the first-ever national study on stalking and addresses these and related questions. Since the data show stalking to be much more prevalent than previously thought and include other findings of broad public concern, they have significance for legislators, policymakers, intervention planners, and researchers as well as the public health and criminal justice communities.

The data are from the National Violence Against Women (NVAW) Survey, a nationally representative telephone survey of 8,000 U.S. women and 8,000 U.S. men (see "Survey Methodology and Demographic Description of the Sample," page 15).  The survey, which asked detailed questions about respondents' experiences with violence, including stalking, was sponsored jointly by the National Institute of Justice and the Centers for Disease Control and Prevention through a grant to the Center for Policy Research.

## What is stalking?

Stalking generally refers to harassing or threatening behavior that an individual engages in repeatedly, such as following a person, appearing at a person's home or place of business, making harassing phone calls, leaving written messages or objects, or vandalizing a person's property.  These actions may or may not be accompanied by a credible threat of serious harm, and they may or may not be precursors to an assault or murder.[7]

Legal definitions of stalking vary widely from State to State.  Though most States define stalking as the willful, malicious, and repeated following and harassing of another person, some States include in their definition such activities as lying-in-wait, surveillance, nonconsensual

## Issues and Findings

***Discussed in this Brief:*** Results of a nationally representative telephone survey of 8,000 women and 8,000 men about their experiences with stalking, cosponsored by the National Institute of Justice and the Centers for Disease Control and Prevention and conducted by the Center for Policy Research. The survey provides the first national data on stalking in the United States.

***Key issues:*** This study provides empirical data on the prevalence and characteristics of stalking in the general population: How much stalking is there in the United States? Who stalks whom? How often do stalkers overtly threaten their victims? How often is stalking reported to the police? What are the psychological and social consequences of stalking? Also considered in this report is the key issue of how to define stalking.

***Key findings and policy implications:***
Analysis of survey data produced the following results:

• Stalking is more prevalent than previously thought: 8 percent of women and 2 percent of men in the United States have been stalked at some time in their life; an estimated 1,006,970 women and 370,990 men are stalked annually. Given these findings, stalking should be treated as a legitimate criminal justice and public health concern.

• American Indian/Alaska Native women are significantly more likely to report being stalked than women of other racial or ethnic backgrounds. More research is needed to establish the degree of variance and determine how much of the variance may be explained by demographic, social, and environmental factors.

• Although stalking is a gender-neutral crime, most (78 percent) stalking victims are female and most (87 percent) stalking perpetrators are male.

• Adults between 18 and 29 years old are the primary targets of stalking, comprising 52 percent of all victims.

• Most stalking cases involve perpetrators and victims who know each other; 23 percent of all female victims and 36 percent of all male victims are stalked by strangers.

• Women are significantly more likely than men (59 percent and 30 percent, respectively) to be stalked by intimate partners, about half of whom stalk their partners while the relationship is intact. Since most stalking cases involve victims and perpetrators who know each other, future research should focus on intimate and acquaintance stalking, rather than "celebrity" stalking.

• There is a strong link between stalking and other forms of violence in intimate relationships: 81 percent of women who were stalked by a current or former husband or cohabiting partner were also physically assaulted by that partner and 31 percent were also sexually assaulted by that partner. It is imperative, therefore, that America's criminal justice community receive comprehensive training on the special safety needs of victims of intimate partner stalking.

• Less than half of all stalking victims are directly threatened by their stalkers, although the victims, by definition, experience a high level of fear. Thus, "credible threat" requirements should be eliminated from the definition of stalking in all State stalking statutes.

• About half of all stalking victims report their stalking to the police. About a quarter of stalking cases reported to the police result in suspects being arrested. While there is some evidence that antistalking laws have increased reports to the police, more research is needed to determine antistalking laws' full effect on reports to the police.

• About 12 percent of all stalking cases result in criminal prosecution, and about a quarter of female stalking victims and about a tenth of male stalking victims obtain restraining orders against their stalkers. Of all victims with restraining orders, 69 percent of the women and 81 percent of the men said their stalkers violated the order. More research is needed on the effectiveness of formal and informal justice system interventions in stalking cases.

• Thirty percent of female stalking victims and 20 percent of male stalking victims seek psychological counseling as a result of their victimization. Stalking victims are significantly more likely than nonstalking victims to live in fear for their personal safety and to carry something to defend themselves. To better meet the needs of stalking victims, the mental health community should receive comprehensive training on appropriate treatment of stalking victims.

• The average stalking case lasts 1.8 years. Since nearly a fifth of all stalking victims move to new locations to escape their stalkers, it is important that address confidentiality programs be made available to stalking victims.

***Target audience:*** Criminal justice and public health researchers and practitioners. Legislators, policymakers, and intervention planners at all levels of government.

---

communication, telephone harassment, and vandalism.[8] While most States require that the alleged stalker engage in a course of conduct showing that the crime was not an isolated event, some States specify how many acts (usually two or more) must occur before the conduct can be considered stalking.[9] State stalking laws also vary in their threat and fear requirements. Most stalking laws require that the perpetrator, to qualify as a stalker,

make a credible threat of violence against the victim; others include in their requirements threats against the victim's immediate family; and still others require only that the alleged stalker's course of conduct constitute an implied threat.[10]

The definition of stalking used in the NVAW Survey closely resembles the definition of stalking used in the model antistalking code for States

developed by the National Institute of Justice.[11] The survey defines stalking as "a course of conduct directed at a specific person that involves repeated visual or physical proximity, nonconsensual communication, or verbal, written or implied threats, or a combination thereof, that would cause a reasonable person fear," with *repeated* meaning on two or more occasions. The model antistalking code does not require

stalkers to make a credible threat of violence against victims, but it does require victims to feel a high level of fear ("fear of bodily harm"). Similarly, the definition of stalking used in the NVAW Survey does not require stalkers to make a credible threat against victims, but it does require victims to feel a high level of fear (see "Survey Screening Questions," page 17).

## How much stalking is there?

In the NVAW Survey, stalking victimization was measured in terms of lifetime prevalence and annual prevalence. *Lifetime prevalence* refers to the percentage of persons within a demographic group (e.g., male or female) who were stalked sometime in their lifetime. *Annual prevalence* refers to the percentage of persons within a demographic group who were stalked sometime in the 12 months preceding the survey.

Using a definition of stalking that requires victims to feel a high level of fear, the NVAW Survey found that 8 percent of women and 2 percent of men in the United States have been stalked at some time in their life.[12]

Based on U.S. Census estimates of the number of women and men in the country, one out of every 12 U.S. women (8.2 million) has been stalked at some time in her life, and one out of every 45 U.S. men (2 million) has been stalked at some time in his life (see exhibit 1).[13]

Ninety percent of the stalking victims identified by the survey were stalked by just one person during their life. Nine percent of female victims and 8 percent of male victims were stalked by two different persons, and 1 percent of female victims and 2

**Exhibit 1.** *Percentage and Estimated Number of Men and Women Stalked in Lifetime*

| Group | Persons Stalked in Lifetime | |
| --- | --- | --- |
| | Percentage[a] | Estimated Number[b] |
| Men (N = 8,000) | 2.2 | 2,040,460 |
| Women (N = 8,000) | 8.1 | 8,156,460 |

a. Differences between men and women are significant at ≤ .001.

b. Based on estimates of men and women aged 18 years and older, U.S. Bureau of the Census, Current Population Survey, 1995.

**Exhibit 2.** *Percentage and Estimated Number of Men and Women Stalked in Previous 12 Months*

| Group | Persons Stalked in Previous 12 Months | |
| --- | --- | --- |
| | Percentage[a] | Estimated Number[b] |
| Men (N = 8,000) | 0.4 | 370,990 |
| Women (N = 8,000) | 1.0 | 1,006,970 |

a. Differences between men and women are significant at ≤ .001.

b. Based on estimates of men and women aged 18 years and older, U.S. Bureau of the Census, Current Population Survey, 1995.

percent of male victims were stalked by three different persons.

The survey also found that 1 percent of all women surveyed and 0.4 percent of all men surveyed were stalked during the 12 months preceding the survey. These findings equate to an estimated 1,006,970 women and an estimated 370,990 men who are stalked annually in the United States (see exhibit 2).

The average *annual* estimates of stalking victimization generated by the survey are relatively high compared to the average *lifetime* estimates. Two factors account for this finding. The first has to do with the age of the population most at risk of being stalked. The survey found that 74 percent of stalking victims are between 18 and 39 years old. Since men and women between 18 and 39

years comprise nearly half (47 percent) the adult population from which the sample was drawn, a large proportion of men and women in the survey sample were at risk of being stalked in the 12 months preceding the interview. As the proportion of the U.S. population aged 18–39 years declines, so should the number of persons stalked annually. However, the lifetime estimates of stalking victimization should remain relatively constant.

Another reason annual estimates of stalking victimization are relatively high compared to lifetime rates is that stalking, by definition, involves repeated and ongoing victimization. Thus, some men and women are stalked for months or years on end. Because some men and women are stalked from one year to the next, the average annual estimates of stalking

victimization cannot be added to produce an estimate of the total number of men and women who will be stalked in two, three, or more years. Thus, average annual rates of stalking victimization will appear higher than expected when compared to lifetime rates of stalking victimization.

## Comparison with previous stalking estimates

Prior to this study, information on stalking prevalence was limited to guesses provided by mental health professionals based on their work with known stalkers. The most frequently cited "guesstimates" of stalking prevalence were made by forensic psychiatrist Park Dietz, who in 1992 reported that 5 percent of U.S. women are stalked at some time in their life and approximately 200,000 U.S. women are stalked each year.[14] Thus, the NVAW Survey's estimate that 8 percent of U.S. women have been stalked at some time in their life is 1.6 times greater than Dietz's guesstimate, and the survey's estimate that 1,006,970 U.S. women are stalked annually is five times greater than Deitz's guesstimate.

**How prevalent is stalking compared to other forms of violence against women in the United States?** The NVAW Survey found that 0.3 percent of all women surveyed experienced a completed or attempted rape in the 12 months preceding the survey, and 1.9 percent experienced a physical assault in the 12 months preceding the survey (see exhibit 3). Thus, in a 1-year period, women are three times more likely to be stalked than raped, but they are two times more likely to be physically assaulted than stalked.

Exhibit 3. *Percentage of Men and Women Victimized in Previous 12 Months, by Type of Violence*

| Type of Violence | Persons Victimized in Previous 12 Months (%) | |
|---|---|---|
| | **Men** (N = 8,000) | **Women** (N = 8,000) |
| Rape | <0.1[a] | 0.3 |
| Physical assault | 3.4 | 1.9 |
| Stalking | 0.4 | 1.0 |
| Any of the above | 3.9 | 3.0 |

a. Based on five or fewer cases.

**Stalking prevalence based on broader definition.** If a less stringent definition of stalking is used—one requiring victims to feel only somewhat frightened or a little frightened by their assailant's behavior—stalking prevalence rates rise dramatically. Specifically, the lifetime stalking prevalence rate increases from 8 percent to 12 percent for women and from 2 percent to 4 percent for men; and the annual stalking prevalence rate increases from 1 percent to 6 percent for women and from 0.4 percent to 1.5 percent for men. Based on these higher prevalence rates, an estimated 12.1 million U.S. women and 3.7 million U.S. men are stalked at some time in their life; and 6 million women and 1.4 million men are stalked annually in the United States. These results show how stalking prevalence varies with the level of fear included in the definition. A higher standard of fear produces lower prevalence rates, and a lower standard of fear produces higher prevalence rates.

## Stalking risk for racial and ethnic minorities

Information from the NVAW Survey presents a complex picture of stalking, race, and ethnicity. When data

on African-American, American Indian/Alaska Native, Asian/Pacific Islander, and mixed race women are combined, there is no difference in stalking prevalence between white women and minority women: 8.2 percent of white women (see exhibit 4) and 8.2 percent of nonwhite women (not shown) reported ever being stalked in their lifetime. However, a comparison of stalking prevalence across specific racial and ethnic groupings shows that American Indian/Alaska Native women report significantly more stalking victimization than women of other racial and ethnic backgrounds (see exhibit 4). This finding should be viewed with caution, however, given the small number of American Indian/Alaska Native women in the sample. This finding also underscores the need for specificity when comparing prevalence rates among women of different racial or ethnic backgrounds.

Since information on violence against American Indian and Alaska Native women is limited, it is difficult to explain why they report more stalking victimization. A previous study found that the overall homicide rates for Native Americans were about two times greater than U.S. national rates.[15] Thus, there is some evidence that Native Americans are at signifi-

cantly greater risk of violence—fatal and nonfatal—than other Americans. How much of the variance in stalking prevalence may be explained by demographic, social, and environmental factors remains unclear and requires further study. Moreover, there may be significant differences in stalking prevalence among women of diverse American Indian tribes and Alaska Native communities that cannot be determined from the survey, since data on all Native Americans were combined.

There is some evidence that Asian and Pacific Islander women are at significantly less risk of being stalked than women of other racial and ethnic backgrounds (see exhibit 4). Again, however, given the small number of Asian/Pacific Islander women in the sample, this finding must be viewed with caution. It has been suggested that traditional Asian values emphasizing close family ties and harmony may discourage Asian women from disclosing physical and emotional abuse by intimate partners.[16] Thus, the smaller stalking prevalence rate found among Asian/Pacific Islander women may be, at least in part, an artifact of underreporting. There may also be a significant difference in stalking prevalence between Asian women and Pacific Islander women that cannot be determined from the survey, since data on these two groups were combined.

The survey found no significant difference in stalking prevalence among men of different racial and ethnic backgrounds. This finding must also be viewed with caution given the sample's small number of male victims falling into specific racial and ethnic groupings. A larger sample of male stalking victims is needed to produce more reliable information on the relative risk of stalking among men of different racial and ethnic backgrounds.

Exhibit 4. *Percentage of Men and Women Stalked in Lifetime, by Race and Ethnicity of Victim*

| Group | Persons Stalked in Lifetime (%) | | | | | |
|---|---|---|---|---|---|---|
| | Total | White | African-American | Asian/ Pacific Islander | American Indian/ Alaska Native | Mixed Race |
| Men | (N=7,759) 2.3 | (N=6,424) 2.1 | (N=659) 2.4 | (N=165) 1.8[a] | (N=105) 4.8 | (N=406) 3.9 |
| Women[b] | (N=7,850) 8.2 | (N=6,452) 8.2 | (N=780) 6.5 | (N=133) 4.5 | (N=88) 17.0 | (N=397) 10.6 |

a. Based on five or fewer cases.
b. Differences between racial and ethnic groups are significant at ≤ .05.

Exhibit 5. *Percentage of Men and Women Stalked in Lifetime, by Hispanic/ Non-Hispanic Origin of Victim*

| Group | Persons Stalked in Lifetime (%) | | |
|---|---|---|---|
| | Total | Hispanic[a] | Non-Hispanic |
| Men | (N=7,916) 2.2 | (N=581) 3.3 | (N=7,335) 2.1 |
| Women | (N=7,945) 8.1 | (N=628) 7.6 | (N=7,317) 8.2 |

a. Persons of Hispanic origin may be of any race.

The survey found no significant difference in stalking prevalence among men and women of Hispanic and non-Hispanic origin (see exhibit 5). Since previous studies comparing the prevalence of violence among Hispanic and non-Hispanic women have produced contradictory conclusions,[17] these findings neither confirm nor contradict earlier findings.

## Who stalks whom?

Though stalking is a gender-neutral crime, women are the primary victims of stalking and men are the primary perpetrators. Seventy-eight percent of the stalking victims identified by the survey were women, and 22 percent were men. Thus, four out of five stalking victims are women. By

comparison, 94 percent of the stalkers identified by female victims and 60 percent of the stalkers identified by male victims were male. Overall, 87 percent of the stalkers identified by victims were male.

Young adults are also the primary targets of stalkers. Fifty-two percent of the stalking victims were 18–29 years old and 22 percent were 30–39 years old when the stalking started (see exhibit 6). On average, victims were 28 years old when the stalking started.

The survey confirms previous reports that most victims know their stalker.[18] Only 23 percent of female stalking victims and 36 percent of male stalking victims were stalked by strangers. The survey also shows that

## Exhibit 6. *Victim's Age When First Stalked*[a]



18–29 Years 52%

<18 Years 12%

≥40 Years 15%

30–39 Years 22%

a. N=797 male and female victims. Percentages do not total 100 due to rounding.

women tend to be stalked by intimate partners, defined as current or former spouses, current or former cohabitants (of the same or opposite sex), or current or former boyfriends or girlfriends. Thirty-eight percent of female stalking victims were stalked by current or former husbands, 10 percent by current or former cohabiting partners, and 14 percent by

current or former dates or boyfriends. Overall, 59 percent of female victims, compared with 30 percent of male victims, were stalked by some type of intimate partner (see exhibit 7).

It has been reported previously that when women are stalked by intimate partners, the stalking typically occurs after the woman attempts to leave the relationship.[19] To test this assumption, the NVAW Survey asked women who had been stalked by former husbands or partners when in the relationship the stalking occurred. Twenty-one percent of these victims said the stalking occurred before the relationship ended, 43 percent said it occurred after the relationship ended, and 36 percent said it occurred both before and after the relationship ended (see exhibit 8). Thus, contrary to popular opinion, women are often stalked by intimate partners while the relationship is still intact.

The survey found that men tend to be stalked by strangers and acquaintances

## Exhibit 8. *Point in Intimate Relationship When Stalking of Women[a] Occurs*



Before Relationship Ends 21%

After Relationship Ends 43%

Both Before and After Relationship Ends 36%

a. N=263 female victims.

(see exhibit 7), 90 percent of whom are male. It is unclear from the survey data why men are stalked by male strangers and male acquaintances. There is some evidence that homosexual men are at greater risk of being stalked than heterosexual men: Stalking prevalence was significantly greater among men who had ever lived with a man as a couple compared with men who had never lived with a man as a couple (see exhibit 9). Thus, in some stalking cases involving male victims and stranger or acquaintance perpetrators, the perpetrator may be motivated by hatred toward homosexuals, while in others the perpetrator may be motivated by sexual attraction. It is also possible that some men are stalked by male strangers and male acquaintances in the context of inter- or intragroup gang rivalries. Clearly, more research is needed to determine under what circumstances men are stalked by male strangers and male acquaintances.

Although men tend to be stalked by strangers and acquaintances, women are at significantly greater risk of

## Exhibit 7. *Relationship Between Victim and Offender*



Percentage of Cases[a]

| Spouse/ Ex-spouse[b] | Cohabiting Partner/ Ex-partner | Date/ Former Date | Relative Other Than Spouse | Acquaintance[b] | Stranger[b] |
|---|---|---|---|---|---|
| 13 / 38 | 9 / 10 | 10 / 14 | 2 / 4 | 34 / 19 | 36 / 23 |

■ Male victims (N=179)   ■ Female victims (N=650)

a. Percentages exceed 100% because some victims had more than one stalker.
b. Differences between males and females are significant at ≤.05.

being stalked by strangers and acquaintances than men.  A comparison of stalking prevalence among women and men by victim-offender relationship shows that 1.8 percent of all U.S. women, compared with 0.8 percent of all U.S. men, have been stalked by strangers; and 1.6 percent of all U.S. women, compared with 0.8 percent of all U.S. men, have been stalked by acquaintances (see exhibit 10).

## How do stalkers harass and terrorize?

When asked to describe specific activities their stalkers engaged in to harass and terrorize them, women were significantly more likely than men to report that their stalkers followed them, spied on them, or stood outside their home or place of work or recreation (see exhibit 11). Women were also significantly more likely to report that their stalkers made unsolicited phone calls.  About equal percentages of female and male victims reported that their stalkers sent them unwanted letters or items, vandalized their property, or killed or threatened to kill a family pet (see exhibit 11).

## How often do stalkers threaten overtly?

Many State antistalking laws include in their definition of stalking a requirement that stalkers make an overt threat of violence against their victim.[20] Survey findings suggest that this requirement may be ill-advised. By definition, stalking victims in this survey were either very frightened of their assailant's behavior or feared their assailant would seriously harm or kill them or someone close to them.  Despite the high level of fear required, the survey found that less

Exhibit 9.  **Percentage of Men Stalked in Lifetime, by Whether They Ever Cohabited with a Man**

| Men Stalked/ Not Stalked in Lifetime[a] | Cohabitation Experience | |
| --- | --- | --- |
| | Cohabited with a Man (N=65) % | Never Cohabited with a Man (N=7,935) % |
| Stalked | 7.7[b] | 2.2 |
| Not stalked | 92.3 | 97.8 |

a. Differences between men who "cohabited" and "never cohabited" are significant at < .01.
b. Based on five or fewer cases.

Exhibit 10.  **Percentage of Men and Women Stalked in Lifetime, by Victim-Offender Relationship**

| Victim-Offender Relationship | Persons Stalked in Lifetime (%) | |
| --- | --- | --- |
| | Men (N=8,000) | Women (N=8,000) |
| Intimate[a] | 0.6 | 4.8 |
| Relative | 0.1[b] | 0.3 |
| Acquaintance[a] | 0.8 | 1.6 |
| Stranger[a] | 0.8 | 1.8 |

a. Differences between men and women are significant at ≤ .05.
b. Based on five or fewer cases.

Exhibit 11. **Stalking Activities Engaged in by Stalkers**



a. Differences between males and females are significant at ≤.05.
b. Differences between males and females are significant at ≤.001.
c. Percentages exceed 100% because the question had multiple responses.

than half the victims—both male and female—were directly threatened by their stalker (see exhibit 12).  This finding shows that stalkers do not always threaten their victim verbally or in writing; more often they engage in a course of conduct that, taken in context, causes a reasonable person to feel fearful.  The model anti-stalking code reflects this reality by not including in its definition of stalking a requirement that the stalker make a credible threat of violence against the victim.[21]

## Why stalkers stalk their victims

To generate information on motivations for stalking, the survey asked victims why they thought they had been stalked.  Since stalking occurs in a variety of situations and between people who have various relationships, it is not surprising that responses to this question varied.  Based on victims' perceptions of why they were stalked, it appears that much stalking is motivated by stalkers' desire to control, or instill fear in, their victim (see exhibit 13).  The survey results dispel the myth that most stalkers are psychotic or delusional.  Only 7 percent of the victims said they were stalked because their stalkers were mentally ill or abusing drugs or alcohol.

## Relationship between stalking and other forms of violence

The National Violence Against Women Survey provides compelling evidence of the link between stalking and other forms of violence in intimate relationships.  Eighty-one percent of the women who were stalked by a current or former husband or cohabiting partner were also physically assaulted by the same partner, and 31 percent of

the women who were stalked by a current or former husband or cohabiting partner were also sexually assaulted by the same  partner. By comparison, 20 percent of the women who were ever married or ever lived with a man were physically assaulted by a current or former husband or partner, and 5 percent of women who were ever married or ever lived with a man were sexually assaulted by a current or former husband or partner.  Thus, husbands or partners who stalk their partners are four times more likely than husbands or partners in the general population to physically assault their partners, and they are six times more likely than husbands and partners in the general population to sexually assault their partners.

The survey also provides compelling evidence of the link between stalking and controlling and emotionally abusive behavior in intimate relationships. To provide a context for violence occurring between intimate partners, respondents to the survey were asked a series of questions about controlling and emotionally



Exhibit 12. **Percentage of Victims Who Were Overtly Threatened by Their Stalkers**

abusive behavior they experienced at the hands of their current or former spouses or cohabiting partners.  The survey found that ex-husbands who stalked (either before or after the relationship ended) were significantly more likely than ex-husbands who did not stalk to engage in emotionally abusive and controlling behavior toward their wife (see exhibit 14 for details).

Exhibit 13. **Victims' Perceptions of Why They Were Stalked**[a]



a. N=624 male and female victims.

## How often is stalking reported to police?

Fifty-five percent of female victims and 48 percent of male victims said their stalking was reported to the police. In most of these cases, the victims made the report (see exhibit 15). The percentage of women reporting stalking is identical to the percentage of female victims reporting lone-offender violent crimes to police during 1987–89, as measured by the National Crime Victimization Survey.[22]

Police responses to stalking cases involving male victims and female victims were virtually identical, with two notable exceptions: Police were significantly more likely to arrest or detain a suspect in cases involving female victims, and they were significantly more likely to refer female victims to services (see exhibit 15).

There is some evidence that stalking reports to the police by victims have increased since passage of anti-stalking laws. According to information from the survey, stalking cases occurring before 1990—the year California passed the Nation's first antistalking law—were significantly less likely to be reported to the police than stalking cases occurring after 1995, the year all 50 States and the District of Columbia had laws proscribing stalking. There was no significant difference, however, in the number of arrests made in stalking cases that occurred before 1990 and those that occurred after 1995.

When asked why they chose not to report their stalking to the police, victims were most likely to state that their stalking was not a police matter, they thought the police would not be able to do anything, or they

*Exhibit 14.* **Percentage of Ex-Husbands Who Engaged in Emotionally Abusive or Controlling Behavior, by Whether They Stalked**[a]

| Types of Emotionally Abusive/Controlling Behavior[b] | Ex-Husbands Who Stalked (%) (N=166) | Ex-Husbands Who Did Not Stalk (%) (N=2,645) |
|---|---|---|
| Had a hard time seeing things from her point of view | 87.7 | 57.8 |
| Was jealous or possessive | 83.7 | 46.3 |
| Tried to provoke arguments | 90.3 | 45.3 |
| Tried to limit her contact with family and friends | 77.1 | 32.3 |
| Insisted on knowing where she was at all times | 80.7 | 34.4 |
| Made her feel inadequate | 85.5 | 40.9 |
| Shouted or swore at her | 88.0 | 44.5 |
| Frightened her | 92.2 | 33.1 |
| Prevented her from knowing about or having access to family income | 59.6 | 20.8 |
| Prevented her from working outside the home | 30.7 | 13.0 |
| Insisted on changing residences even when she didn't need or want to | 33.9 | 11.9 |

a. Based on responses for first ex-husbands only.
b. Differences between ex-husbands who stalked and ex-husbands who did not stalk are significant at ≤ .001.

*Exhibit 15.* **Percentage and Characteristics of Stalking Cases Reported to the Police, by Sex of Victim**

| Reported to Police/Response | Stalking Victims (%) | | |
| | Male | Female | Total |
|---|---|---|---|
| Was case reported to the police? | (N=178) | (N=641) | (N=819) |
|    Yes | 47.7 | 54.6 | 53.1 |
|    No | 52.3 | 45.4 | 46.9 |
| Who reported the case?[a] | (N=84) | (N=350) | (N=434) |
|    Victim | 75.0 | 84.0 | 82.3 |
|    Other | 25.0 | 16.0 | 17.7 |
| Police Response[a,b] | (N=84) | (N=350) | (N=434) |
|    Took report | 66.7 | 68.6 | 68.0 |
|    Arrested or detained perpetrator[c] | 16.7 | 25.1 | 23.5 |
|    Referred to prosecutor or court | 19.0 | 24.3 | 23.3 |
|    Referred to victim services[c] | 8.3 | 15.1 | 13.8 |
|    Gave advice on self-protective measures | 29.8 | 34.0 | 33.2 |
|    Did nothing | 16.7 | 19.4 | 18.9 |

a. Based on responses from victims whose stalking was reported to the police.
b. Percentages exceed 100 percent because of multiple responses.
c. Differences between males and females are significant at ≤ .05.

feared reprisals from their stalkers (see exhibit 16).

Overall, stalking victims gave police a 50/50 approval rating (see exhibit 17). Respondents who said their stalkers were arrested were significantly more likely to be satisfied with the way the police handled their case than respondents who said their stalkers were not arrested (76 percent versus 42 percent).

Victims who thought the police "should have done more" in their case were asked to describe what specific actions they thought the police should have taken. Forty-two percent thought the police should have put their assailant in jail, 20 percent said the police should have taken their situation more seriously, and 16 percent said the police should have done more to protect them (see exhibit 18).

## How often are stalkers criminally prosecuted?

Overall, 13 percent of female victims and 9 percent of male victims reported that their stalkers were criminally prosecuted (see exhibit 19). These figures increase to 24 percent and 19 percent, respectively, when only those cases with police reports are considered. The stalkers were charged with a wide variety of crimes, including stalking, harassment, menacing or threatening, vandalism, trespassing, breaking and entering, robbery, disorderly conduct, intimidation, and simple and aggravated assault. Survey participants reported that about half the stalkers (54 percent) who had criminal charges filed against them were convicted of a crime. Of those convicted, nearly two-thirds (63 percent) were believed to have been sent to jail or prison.

*Exhibit 16.* **Victims' Reasons for Not Reporting Stalking to Police**[a]



a. N=348 male and female victims.

*Exhibit 17.* **Victims' Satisfaction With the Police**[a]



a. N = 435 male and female victims.

## Obtaining protective or restraining orders against stalkers

Results from the survey also indicate that female victims were significantly more likely than male victims (28 percent and 10 percent) to obtain a protective or restraining order against their stalker (see exhibit 20). This finding is expected since women are significantly more likely

than men to be stalked by intimate partners who have a history of being violent toward them. Of those who obtained restraining orders, 69 percent of the women and 81 percent of the men said their stalker violated the order.

## What are psychological and social consequences of stalking?

The survey produced strong confirmation of the negative mental health impact of stalking. About a third of the women (30 percent) and a fifth of the men (20 percent) said they sought psychological counseling as a result of their stalking victimization. In addition, stalking victims were significantly more likely than nonstalking victims to be very concerned about their personal safety and about being stalked, to carry something on their person to defend themselves, and to think personal safety for men and women had gotten worse in recent years (see exhibit 21).

Over a quarter (26 percent) of the stalking victims said their victimization caused them to lose time from work. While the survey did not query victims about why they lost time from work, it can be assumed they missed work for a variety of reasons—to attend court hearings, to meet with a psychologist or other mental health professional, to avoid contact with their assailant, and to consult with an attorney. When asked how many days of work they lost, 7 percent of these victims said they never returned to work. On average, however, victims who lost time from and returned to work missed 11 days.

*Exhibit 18.* **Victims' View of Other Actions Police Should Have Taken[a]**



Percentage of Victims

a. N=201 male and female victims who thought police should have done more.

*Exhibit 19.* **Percentage and Outcomes of Criminal Prosecutions in Stalking Cases, by Sex of Victim**

| Outcome | Stalking Victims (%) | | |
|---|---|---|---|
| | **Male** | **Female** | **Total** |
| **Was perpetrator prosecuted?** | (N=178) | (N=645) | (N=823) |
| Yes | 9.0 | 13.1 | 12.1 |
| No | 91.0 | 86.9 | 87.9 |
| **Was perpetrator convicted?[a]** | (N=15) | (N=72) | (N=87) |
| Yes | 60.0 | 52.8 | 54.0 |
| No | 40.0 | 47.2 | 46.0 |
| **Was perpetrator sentenced to jail or prison?[b]** | (N=9) | (N=37) | (N=46) |
| Yes | 77.8 | 59.5 | 63.0 |
| No | 22.2[c] | 40.5 | 37.0 |

a. Based on responses from victims whose perpetrator was prosecuted.
b. Based on responses from victims whose perpetrator was convicted.
c. Based on five or fewer sample cases.

Stalking victims were asked whether they took any measures (other than reporting their victimization to the police or obtaining a protective order) to protect themselves from their stalker. Fifty-six percent of the women and 51 percent of the men reported taking some type of self-protective measure (see exhibit 22).

## When and why does stalking stop?

At the time of the interview, 92 percent of the victims were no longer being stalked. Based on information provided by these victims, about two-thirds of all stalking cases last a year or less, about a quarter last 2–5 years,

*Exhibit 20.* **Percentage and Outcomes of Protective Orders in Stalking Cases, by Sex of Victim**

|  | Stalking Victims (%) | | |
|---|---|---|---|
| **Outcome** | **Male** | **Female** | **Total** |
| **Did victim obtain a protective or restraining order?[a]** | (N=175) | (N=597) | (N=772) |
| Yes | 9.7 | 28.0 | 23.8 |
| No | 90.3 | 72.0 | 76.2 |
| **Was the order violated?[a,b]** | (N=16) | (N=166) | (N=182) |
| Yes | 81.3 | 68.7 | 69.8 |
| No | 18.7 | 31.3 | 30.2 |

a. Differences between males and females are significant at ≤ .05.
b. Based on responses from victims who obtained a restraining order.

*Exhibit 21.* **Fear for Personal Safety Among Victims and Nonvictims of Stalking**



a. Differences between victims and nonvictims are significant at ≤.01.
b. Differences between victims and nonvictims are significant at ≤.001.

and about a tenth last more than 5 years (see exhibit 23). On average, stalking cases last 1.8 years. However, stalking cases involving intimates or former intimates last, on average, significantly longer than stalking cases involving nonintimates (2.2 years and 1.1 years, respectively).

Victims who were no longer being stalked at the time of interview were asked why they thought their stalk-ing had ceased; 19 percent said the stalking stopped because they (the victims) moved away (see exhibit 24). These findings suggest that address confidentiality programs may be an effective means of com-bating stalking. These programs encourage victims who face contin-ued pursuit and unusual safety risks to develop a personal safety plan that includes relocating as far from their assailant as possible and securing a confidential mailing address that provides mail forwarding service but does not reveal their new location.[23]

Some stalking cases are resolved when the perpetrator gets a new love interest. Eighteen percent of the victims said the stalking stopped because their assailant got a new spouse, partner, or boyfriend/girlfriend.

It has been reported previously that informal law enforcement interven-tions, such as detective contacts, can be an effective means of deterring stalkers, particularly in cases where the victim and the suspect had some prior relationship and where the stalker is not suffering from mental illness.[24] Findings from the NVAW Survey provide some support for this theory. Victims were more likely to credit informal, rather than formal, justice system interventions for the cessation of their stalking. For example, 15 percent of victims said their stalking stopped after their assailants received a warning from the police. By comparison, only 9 percent of victims said their stalking ceased because their stalker was arrested, 1 percent said their stalk-ing stopped because their stalker was convicted of a crime, and less than 1 percent said the stalking stopped because they obtained a restraining order against their

Case 2:25-cr-00176-TSVW Document 283-8 Filed 05/14/26 Page 55 of 70 Page ID #:1103

*Exhibit 22.* ***Self-Protective Measures Undertaken by Stalking Victims[a]***



Percentage of Victims

- Took "extra" precautions — 22
- Enlisted help of family and friends — 18
- Got a gun — 17
- Changed address — 11
- Moved out of town — 11
- Avoided perpetrator — 7
- Talked to an attorney — 5
- Varied driving habits — 5
- Moved to a shelter — 4
- Stopped going to work, school, out — 4
- Got public records sealed — 1
- Hired a private investigator — 1

a. N=440 male and female victims who took self-protective measures.

*Exhibit 24.* ***Victims' Perception of Why Stalking Stopped[a]***



Percentage of Cases

- Victim moved — 19
- Stalker got new love interest — 18
- Police warned stalker — 15
- Victim talked to stalker — 10
- Stalker was arrested — 9
- Stalker moved — 7
- Stalker got help — 6
- Victim got new love interest — 4
- Stalker died — 4
- It just stopped — 3
- Stalker was convicted of a crime[b] — 1

a. N=665 cases.
b. Based on 5 or fewer cases.

*Exhibit 23.* ***Distribution of Cases by Number of Years Stalking Lasted[a]***



- 1 Year 16%
- 2–5 Years 23%
- < 1 Year 52%
- 5+ Years 9%

a. N=759 cases.

stalker. The fact that so few victims credited formal justice system interventions is not surprising given the paucity of arrests, criminal prosecutions, and restraining orders in stalking cases.

## Policy implications

Prior to this study, empirical data on the prevalence and characteristics of stalking in the general population were virtually nonexistent. Therefore, information provided in this report can help inform policy and interventions directed at stalking. Based on findings from the National Violence Against Women Survey, the Center for Policy Research offers the following conclusions:

**1. Stalking should be treated as a significant social problem.** The survey found that stalking is much more prevalent than previously thought, affecting an estimated 1.4 million adults per year in the United States. Since this figure does not include cases involving victims under the age of 18, nor victims who are homeless or living in homes

without telephones, the estimate is probably an undercount of the true number of persons stalked each year. Given the scope of the stalking problem revealed by this survey, it is imperative that stalking be treated as a legitimate criminal justice problem and public health concern.

**2. Credible threat requirements should be eliminated from antistalking statutes.** Some State statutes include in their definition of stalking a requirement that stalkers make a credible threat of violence against their victims. Since stalking is often a "crime of deeds" rather than a "crime of words," this requirement makes it more difficult to prosecute stalkers. Findings from the survey show that stalkers often do not threaten their victims verbally or in writing but instead engage in a course of conduct that, taken in context, causes a reasonable person to feel fearful. Despite being very frightened or fearing bodily harm or death, less than half of the stalking victims identified by the survey were directly threatened by their stalkers. This finding supports the view of many stalking experts that language which might be construed as requiring an actual verbal or written threat should be eliminated from all State antistalking statutes.

**3. Research on stalking should move beyond "celebrity stalking" and focus on acquaintance and intimate partner stalking.** Prior to this study, most stalking research focused on celebrity or political stalking. Findings from the survey show that the vast majority of stalking cases involve people who know each other, with fully half of all stalking cases arising in the context of current or former intimate relationships. Therefore, future research should

focus on stalking occurring between intimates and acquaintances.

**4. The Nation's criminal justice community should receive comprehensive training on the particular safety needs of stalking victims.** The survey produced dramatic confirmation of the link between stalking and physical violence in intimate relationships. Fully 81 percent of the women who were stalked by an intimate partner (either before or after the relationship ended) were also physically assaulted by that partner, and 31 percent were also sexually assaulted by that partner. To help law enforcement officers, prosecutors, and defense attorneys make appropriate case processing and management decisions, they must be made aware of the very real safety risks faced by these stalking victims.

**5. More research must be conducted on the effectiveness of formal and informal law enforcement interventions.** The survey found that 70 percent of all restraining orders obtained against stalkers were violated. The survey also found that stalking victims were more likely to credit the cessation of their stalking to informal police interventions, such as police warnings, than to formal justice system interventions, such as arrests or restraining orders. More research is needed to determine under what situations various law enforcement interventions are most effective.

**6. The mental health community should receive comprehensive training on the appropriate treatment of stalking victims.** The survey found that about a quarter of all stalking victims seek psychological counseling as a result

of their victimization. In addition, stalking victims are significantly more likely than nonstalking victims to be very fearful for their personal safety, to carry something on their person to protect themselves, and to think personal safety for men and women has declined in recent years. To better meet the needs of stalking victims, mental health professionals need additional information about the characteristics of stalking, the mental health impact of stalking, and the mental health needs of stalking victims.

**7. Stalking intervention strategies should include address confidentiality programs.** Survey data indicate that about a fifth of all stalking victims move to a new location to escape their stalker. Given these findings, it is important that address confidentiality programs be made available to stalking victims. These programs encourage victims who face continued pursuit and unusual safety risks to develop a personal safety plan that includes relocating as far from their offender as possible and securing a confidential mailing address that provides mail forwarding service without revealing their new location. Because these measures focus on the behavior of the victim rather than the perpetrator, they may be perceived as unfair and unjust; but they may be the most effective way some victims can elude their stalkers.

## Survey Methodology and Demographic Description of the Sample

The National Violence Against Women Survey was conducted during November 1995–May 1996 by interviewers at Schulman, Ronca, Bucuvalas, Inc. (SRBI), a national survey research organization in New York City, under the direction of Dr. John Boyle. Survey design and data analysis were conducted by the authors of this report.

The sample was drawn as a national, random-digit-dialing (RDD) sample of telephone households in the United States. The sample was stratified by U.S. Census region to control for differential response rates by region. Within regional strata, a simple random sample of working, residential, "hundreds banks" phone numbers was drawn. A hundreds bank is the first eight digits of any 10-digit telephone number (e.g., 301–608–38XX). A randomly generated two-digit number was appended to each randomly sampled hundreds bank to produce the full 10-digit, random-digit number. The random-digit numbers were called by SRBI interviewers from their central telephone interviewing facility. Nonworking and nonresidential numbers were screened out. Once a residential household was reached, eligible adults in each household were identified. In households with multiple eligibles, the most-recent-birthday method was used to systematically select the designated respondent. The household participation rate was 72 percent for females and 69 percent for males.[25] Of the eligible respondents who started the interview, 97 percent of the women and 98 percent of the men followed through to completion.

Table 1. **Comparison of Demographic Characteristics of Men and Women in National Violence Against Women Survey (NVAWS) and U.S. Population**

| Demographic Characteristics | Men (%)[a] | | Women (%)[a] | |
| --- | --- | --- | --- | --- |
| | NVAWS | U.S. Population[b] | NVAWS | U.S. Population[b] |
| Age | (N=7,920) | (N=92,748,000) | (N=7,856) | (N=100,679,000) |
| 18–24 | 11.4 | 13.0 | 9.8 | 11.9 |
| 25–29 | 10.4 | 10.2 | 9.6 | 9.4 |
| 30–39 | 25.4 | 23.8 | 24.6 | 21.9 |
| 40–49 | 24.0 | 20.0 | 22.5 | 18.9 |
| 50–59 | 13.5 | 13.0 | 14.4 | 12.9 |
| 60–69 | 8.8 | 10.1 | 9.9 | 10.7 |
| 70–79 | 5.2 | 7.0 | 6.8 | 8.9 |
| 80+ | 1.5 | 2.9 | 2.5 | 5.5 |
| Race/Ethnicity | (N=7,353) | (N=93,282,000) | (N=7,453) | (N=101,117,000) |
| White | 87.4 | 84.8 | 86.6 | 83.7 |
| African-American | 9.0 | 10.9 | 10.5 | 12.0 |
| American Indian/Alaska Native | 1.4 | 0.7 | 1.2 | 0.7 |
| Asian/Pacific Islander | 2.2 | 3.5 | 1.8 | 3.6 |
| Hispanic Origin[c] | (N=7,916) | (N=93,282,000) | (N=7,945) | (N=101,117,000) |
| Hispanic | 7.3 | 9.4 | 7.9 | 8.5 |
| Non-Hispanic | 92.7 | 90.6 | 92.1 | 91.5 |
| Marital Status | (N=7,928) | (N=92,007,000) | (N=7,921) | (N=99,588,000) |
| Never married | 21.2 | 26.8 | 15.5 | 19.4 |
| Currently married | 66.8 | 62.7 | 62.7 | 59.2 |
| Divorced, separated | 10.2 | 8.3 | 13.3 | 10.3 |
| Widowed | 1.9 | 2.5 | 8.6 | 11.1 |
| Education[d] | (N=7,010) | (N=79,463,000) | (N=7,068) | (N=86,975,000) |
| Less than high school | 9.4 | 18.3 | 10.7 | 18.4 |
| High school and equivalent | 29.3 | 31.9 | 34.6 | 35.7 |
| Any college | 48.3 | 40.4 | 45.7 | 39.7 |
| Advanced degree | 13.0 | 9.4 | 9.0 | 6.2 |

a. Percentages may not total 100 due to rounding.

b. Based on U.S. Bureau of the Census estimates, Current Population Survey, 1995.

c. Persons of Hispanic origin may be of any race.

d. For persons aged 25 years and older.

## Survey Methodology and Demographic Description of the Sample (Continued)

*Table 2.* **Comparison of Demographic Characteristics of Men and Women in Weighted and Unweighted National Violence Against Women (NVAW) Survey Sample**

| Demographic Characteristics | NVAW Survey Sample | | | |
| --- | --- | --- | --- | --- |
| | Men (%)[a] | | Women (%)[a] | |
| | Weighted[b] | Unweighted | Weighted[b] | Unweighted |
| Age | (N=7,920) | (N=7,920) | (N=7,856) | (N=7,856) |
| 18–24 | 11.2 | 11.4 | 9.6 | 9.8 |
| 25–29 | 10.5 | 10.4 | 9.8 | 9.6 |
| 30–39 | 25.7 | 25.4 | 24.6 | 24.6 |
| 40–49 | 23.6 | 24.0 | 22.1 | 22.5 |
| 50–59 | 13.3 | 13.5 | 14.4 | 14.4 |
| 60–69 | 8.9 | 8.8 | 10.0 | 9.9 |
| 70–79 | 5.3 | 5.2 | 6.9 | 6.8 |
| 80+ | 1.5 | 1.5 | 2.5 | 2.5 |
| Race/Ethnicity | (N=7,353) | (N=7,353) | (N=7,453) | (N=7,453) |
| White | 87.4 | 87.4 | 86.6 | 86.6 |
| African-American | 9.0 | 9.0 | 10.5 | 10.5 |
| American Indian/Alaska Native | 2.2 | 1.4 | 1.8 | 0.7 |
| Asian/Pacific Islander | 1.4 | 2.2 | 1.2 | 1.8 |
| Hispanic Origin[c] | (N=7,916) | (N=7,916) | (N=7,945) | (N=7,945) |
| Hispanic | 7.4 | 7.3 | 8.0 | 7.9 |
| Non-Hispanic | 92.6 | 92.7 | 92.0 | 92.1 |

a. Percentages may not total 100 due to rounding.
b. Weighted for number of telephone lines per household.
c.  Persons of Hispanic origin may be of any race.

A total of 8,000 women and 8,000 men 18 years and older were interviewed using a computer-assisted interviewing system. Only female interviewers were used to interview women.  For male respondents, approximately half of the interviews were conducted by female interviewers and half by male interviewers.  A Spanish language translation was administered by bilingual interviewers for Spanish-speaking respondents. A technical report describing the survey methods in more detail is forthcoming.*

**Sample weighting.**  A completed sample in a social survey will be subject to certain selection biases that may introduce sampling errors, in addition to sampling variability, into sample estimates.  These potential sources of sample bias may be addressed by sample weighting.  Unless there is a considerable bias in the achieved sample, however, many researchers prefer to leave the achieved sample unweighted to avoid the complexities of statistical tests with weighted samples.

The unweighted sample of the National Violence Against Women Survey, when compared with the Census Bureau's 1995 Current Population Survey of adult men and adult women, was remarkably similar to the general population from which it was drawn (see Table 1, page 15).  Weighting was considered to correct for possible biases introduced by the fact that some households had multiple phone lines.  Since such weighting had a negligible effect on the demographic composition of the sample (see Table 2), weights were not used in this data analysis.

**Precision of sample estimates.**  The results presented in this report were tested to determine whether observed differences between groups (e.g., men/women) were statistically significant.  Only comparisons that passed a hypothesis test at the 95 percent confidence level ($p \le .05$ ) were considered statistically significant and were discussed in this report.

By its nature, a telephone survey is limited to the population living in households with telephones.  Thus, the survey does not reflect the experiences of men and women living in phoneless households, group facilities or institutions, or on the streets.  The absence of interviews with phoneless households results in an underrepresentation of certain demographic characteristics typical of households that lack telephone service (e.g., poor, headed by a single adult, located in a rural or inner-city area, renters).  However, since approximately 94 percent of the American population live in households with telephones, this underrepresentation is small.

*To obtain copies of the technical report, call or write to the Center for Policy Research, 1570 Emerson St., Denver CO 80218, 303–837–1555.

## Survey Screening Questions

Because much confusion exists about what it means to be stalked, the National Violence Against Women Survey did not use the word "stalking" in its screening questions. Including the word would have assumed that victimized persons knew how to define stalking and perceived what happened to them as stalking. Instead, the survey used the following behaviorally-specific questions to screen respondents for stalking victimization:

Not including bill collectors, telephone solicitors, or other sales people, has anyone, male or female, ever…

- Followed or spied on you?
- Sent you unsolicited letters or written correspondence?
- Made unsolicited phone calls to you?
- Stood outside your home, school, or workplace?
- Showed up at places you were even though he or she had no business being there?

- Left unwanted items for you to find?
- Tried to communicate in other ways against your will?
- Vandalized your property or destroyed something you loved?

Respondents who answered yes to one or more of these questions were asked whether anyone had ever done any of these things to them on more than one occasion. Because stalking involves repeated behaviors, only respondents who said yes were considered possible stalking victims. Respondents who reported being victimized on more than one occasion were subsequently asked how frightened their assailant's behavior made them feel and whether they feared their assailant would seriously harm them or someone close to them. Only respondents who were very frightened or feared bodily harm were counted as stalking victims.

## Notes

1. See, for example: Ellement, John, "Police Arrest Boston Man, 18, for Violating State Stalking Law," *Boston Globe*, May 28, 1992; Sullivan, Kristin N., "Woman's Case Illustrates Need for State Stalking Law, Some Say," *Houston Chronicle*, April 19, 1992; Meyer, Josh, "Man Held in Stalking of Pop Singer Janet Jackson," *Los Angeles Times*, June 25, 1992; Lardner, George, "The Stalking of Kristin: The Law Made It Easy for My Daughter's Killer," *Washington Post*, November 22, 1992; Puente, Maria, "Legislators Tackling the Terror of Stalking: But Some

Experts Say Measures are Vague," *USA Today*, July 21, 1992; Tharp, Mike, "In the Mind of a Stalker," *U.S. News and World Report*, February 17, 1992.

2. Hunzeker, Donna, "Stalking Laws," *State Legislative Report*, Denver, Col.: National Conference of State Legislatures, 17(19):1–6, October 1992.

3. National Criminal Justice Association, *Project to Develop a Model Anti-Stalking Code for States*, Washington, D.C.: U.S. Department of Justice, National Institute of Justice, October 1993.

4. See, for example: Dietz, Park, and Martell, Daniell, "Threatening and Otherwise Inappropriate Letters to Members of the United States Congress," *Journal of Forensic Sciences*, 36(5), 1991; Holmes, Ronald, "Stalking in America: Types and Methods of Criminal Stalkers," *Journal of Contemporary Criminal Justice*, 9(4), December 1993; Zona, M.A., et al., "Comparative Study of Erotomanic and Obsessional Subjects in a Forensic Sample," *Journal of Forensic Sciences*, 38(4), July 1993; Rudden, M., et al., "Diagnosis and Clinical Course of Erotomania and Other Delusional Patients," *American Journal of Psychiatry*, 147(5):625–628, 1990.

5. See, for example: Bernstein, Susan E., "Living Under Siege: Do Stalking Laws Protect Domestic Violence Victims?", *Cardoza Law Review*, 15(1993):525–529; Boychuk, Katherine M., "Are Stalking Laws Unconstitutionally Vague or Overbroad?" *Northwestern University Law Review*, 88(2):769–802, 1994; Guy, Robert A., Jr., "Nature and Constitutionality of Stalking Laws," *Vanderbilt Law Review*, 46(4):991–1029, 1993; Gilligan, Mattlaw, "Stalking the Stalker: Developing New Laws to Thwart Those Who Terrorize Others," *Georgia Law Review*, 27(1992):285–342; Harmon, Brenda K., "Illinois' Newly Amended Stalking Law: Are All the Problems Solved?" *Southern Illinois University Law Journal*, 19(1994):165–198; Lingg, Richard A., "Stopping Stalkers: A Critical Examination of Anti-Stalking Legislation," *Saint John's Law Review*, 67(2):347–381, 1993; McAnaney, Kathleen G., et al., "From Impudence to Crime: Anti-Stalking Laws," *Notre Dame Law Review*,

68(1993):819–909; Morin, K.S., "The Phenomenon of Stalking: Do Existing State Statutes Provide Adequate Protection?" *San Diego Justice Journal*, 1(1):123–162, 1993; Sohn, Ellen, "Antistalking Statutes: Do They Actually Protect Victims?" *Criminal Law Bulletin*, 30(3):203–241, 1994; Strikis, Silvija, "Stopping Stalking," Note, *Georgetown Law Journal*, 81(1993):2772–2813; Thomas, Kenneth R., "How to Stop the Stalker: State Anti-Stalking Laws," *Criminal Law Bulletin*, 29(2):124–136, 1992; Walker, Julie Miles, "Anti-Stalking Legislation: Does It Protect the Victim Without Violating the Rights of the Accused?" *Denver University of Law Review*, 71(2):273–302, 1993.

6.  Lardner, George, *The Stalking of Kristin: A Father Investigates the Murder of His Daughter*, New York: Atlantic Monthly Press, 1995; Orion, Doreen, *I Know You Really Love Me: A Psychiatrist's Journal of Erotomania, Stalking, and Obsessive Love*, New York: Macmillan, 1997.

7.  Thomas, "How to Stop the Stalker: State Anti-Stalking Laws" (note 5).

8.  Hunzeker, "Stalking Laws" (note 2).

9.  National Institute of Justice, *Domestic Violence, Stalking, and Antistalking Legislation: An Annual Report to Congress under the Violence Against Women Act*, Washington, D.C.: U.S. Department of Justice, National Institute of Justice, April 1996.

10.  Ibid.

11.  National Criminal Justice Association, *Project to Develop a Model Anti-Stalking Code for States* (note 3).

12.  The findings of the survey, as in any sample survey, are subject to sample fluctuations or sampling error.  Using the sampling methods described in this report (see "Survey Methodology"), the maximum sampling error at the 95 confidence level for a sample of 8,000 is plus or minus 1.1 percentage points if the response distribution on a categorical variable is a 50/50 split.

13.  According to U.S. Bureau of the Census estimates, there were 100,697,000 women and 92,748,000 men aged 18 years and older residing in the United States in 1995.

14.  While testimony provided at a September 29, 1992, Senate Judiciary Committee Hearing on S.B. 2922 (Violence Against Women) is generally cited as the source for these estimates, the figures first appeared in a *USA Today* article on stalking (see Puente in note 1). The statistics contained in the article were attributed to "guesses" provided by Dr. Park Dietz, a Los Angeles-based forensic psychiatrist, presumably on the basis of his research on a nonrepresentative sample of known celebrity stalkers (see Dietz in note 4).

15.  Wallace, L.J.D., Calhoun, A.D., Powell, K.E., O'Neill, J., and James, S.P., *Homicide and Suicide Among Native Americans, 1979–1992*, Violence Surveillance Summary Series, No. 2, Atlanta, Ga.: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, 1996.

16.  National Research Council, *Understanding Violence Against Women*, Washington D.C.: National Academy Press, 1996:40–41.

17.  Sorenson, S.B., Stein, J.A., Siegel, J.M., Golding, J.M., and Burnam, M.A., "The Prevalence of Adult Sexual Assault: The Los Angeles Epidemiologic Catchment Area Project," *American Journal of Epidemiology*, 126:154–1164, 1987; Sorenson, S.B., and Tells, C.A., "Self-Reports of Spousal Violence in a Mexican American and a Non-Hispanic White Population, *Violence and Victims*, 6(1991):3–16.

18.  A survey of 90 Florida law enforcement agencies reported that in most stalking cases the victim knew the offender. See Tucker, J.T., "The Effectiveness of Florida Stalking Statutes Section 784,048," *Florida Law Review*, 45(4):609–707, 1993.

19.  See National Institute of Justice, *Domestic Violence, Stalking, and Antistalking Legislation:* 1 (note 9).

20.  Ibid.

21.  See National Criminal Justice Association, *Project to Develop a Model Anti-Stalking Code for States* (note 3).

22.  Bachman, Ronet, *Violence Against Women: A National Crime Victimization Survey Report*, Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, January 1993.

23.  See, for example, the Address Confidentiality Program, Post Office Box 69, Olympia, Washington, 98507-0069, (360) 753-2971.

24.  Williams, W.L., Lane, J.C.D., and Zona, M.A., "Stalking: Successful Intervention Strategies," *The Police Chief*, (February 1996):24–26; and Zona, M.A., Sharma, K.K., and Lane, J.C., "A Comparative Study of Erotomanic and Obsessional Subjects in a Forensic Sample," *Journal of Forensic Sciences,* 38(4):894–903, July 1993.

25.  The participation rate for the survey was determined using the industry standard advocated by the Council of Applied Survey Research Organizations, which calculates the rate as the number of completed interviews, including those that are screened out as ineligible, divided by the total number of completed interviews, screened-out interviews, refusals, and terminated interviews. Using this standard, the participation rate for women was $(8000 + 4829) \div (8000 + 4829 + 4608 + 352) = .72$ and the participation rate for men was $(8005 + 8828) \div (8005 + 8828 + 7552 + 65) = .69$.

Patricia Tjaden, Ph.D., and Nancy Thoennes, Ph.D., are with the Center for Policy Research.

This research was supported by grant number 93-IJ-CX-0012, awarded to the the Denver-based Center for Policy Research by the National Institute of Justice (NIJ) and sponsored jointly by NIJ and the Centers for Disease Control and Prevention. The opinions and conclusions expressed in this document are solely those of the authors and do not necessarily reflect the views of the funding agencies. The authors thank Lois Mock at the National Institute of Justice and Linda Saltzman at the Centers for Disease Control and Prevention for their advice and support in completing this project. The authors also thank anonymous reviewers who provided helpful comments on an earlier draft of this report.

*The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime.*

**NCJ 169592**

## Quick Access to Information About Violence Against Women

For news about NIJ and CDC's most recent publications and activities related to violence against women and family violence, go to the World Wide Web pages:

- NIJ's address is: **http://www.ojp.usdoj.gov/nij.** Click on "Programs" for a description of the agency's violence against women and family violence program.

- CDC's National Center for Injury Prevention and Control's address is: **http://www.cdc.gov/ncipc.** Click on "Violence Prevention" for the broad range of violence activity undertaken by the National Center for Injury Prevention and Control. The direct address to CDC's Family and Intimate Violence Prevention Team is: **http://www.cdc.gov/ncipc/dvp/fivpt.**

And check out the "What's New" section on each agency's home page.

**U.S. Department of Justice**

Office of Justice Programs

*National Institute of Justice*

*Washington, DC 20531*

Official Business
Penalty for Private Use $300

BULK RATE
U.S. POSTAGE PAID
DOJ/NIJ
Permit No. G–91

# EXHIBIT D

The author(s) shown below used Federal funds provided by the U.S. Department of Justice and prepared the following final report:

| | |
|---|---|
| **Document Title:** | **Exploration of the Experiences and Needs of Former Intimate Stalking Victims** |
| **Author(s):** | **Mary P. Brewster** |
| **Document No.:** | **175475** |
| **Date Received:** | **May 1999** |
| **Award Number:** | **95-WT-NX-0002** |

This report has not been published by the U.S. Department of Justice. To provide better customer service, NCJRS has made this Federally-funded grant final report available electronically in addition to traditional paper copies.

Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

175475

# AN EXPLORATION OF THE EXPERIENCES AND NEEDS OF FORMER INTIMATE STALKING VICTIMS

Final Report Submitted to the National Institute of Justice*

Mary P. Brewster
Department of Criminal Justice
West Chester University
West Chester, PA 19383

June 12, 1998

*This project was supported under award number 95-WT-NX-0002 from the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice. Points of view in this document are those of the author and do not necessarily represent the official position of the U.S. Department of Justice.

PROPERTY OF
National Criminal Justice Reference Service (NCJRS)
Box 6000
Rockville, MD 20849-6000

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## EXECUTIVE SUMMARY

The problem of stalking has only received widespread recognition during the present decade following the media coverage of a few "high profile" cases involving celebrities such as actresses Teresa Saldana, Rebecca Schaffer, and Jodie Foster, talk-show host David Letterman (see Perez, 1993: 268-270), and most recently, Nicole Simpson, ex-wife of O.J. Simpson. The result of increased public awareness of this type of behavior has resulted in the passage of anti-stalking laws during the past seven years in every state, beginning with California in 1990 (Cal. Penal Code, Section 646.9).[1]

### Anti-Stalking Legislation

Current anti-stalking legislation varies from state to state in terms of substantive, or legal, definitions as well as the seriousness of the crime (and corresponding sanctions). Several authors have written comprehensive overviews of the content of anti-stalking legislation throughout the United States (e.g. Hunzeker, 1992; McAnaney, Curliss, & Abeyta-Price, 1993; Sohn, 1994; Thomas, 1993). While there is no universally accepted definition of stalking, it is generally "associated with pursuit or harassment rather than actual physical harm" (Sohn, 1994: 207). Common elements in stalking statutes are references to "repeated following," "harassing," "course of conduct," "harm to victim," and "credible threat" (McAnaney, 1993: 894-897; see also National Criminal Justice Association, 1993).

"Course of conduct" refers to behavior that occurs over some period of time (i.e. a series of acts). These acts may be the same or a variety of actions over time included repeated "following, nonconsensual communication, harassing, and trespassing," or certain other forms of physical contact (McAnaney et al., 1993: 894-895; U.S. Department of Justice, 1993: 44). The National Criminal Justice Association (NCJA) has

1

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

developed a model anti-stalking code in which they define "course of conduct" as "repeatedly [on two or more occasions] maintaining a visual or physical proximity to a person or repeatedly conveying verbal or written threats or threats implied by conduct or a combination thereof directed at or toward a person" (NCJA, 1993: 43). Some statutes specify the intended, while others specify the actual, effect that the behavior must have on the victim in order to constitute stalking. This may include the intent to place the person in fear of physical injury or to cause emotional distress (McAnaney et al., 1993: 896). Finally, in some states the anti-stalking statutes make reference to "credible threat." In essence this means that the victim must actually believe that the stalker has the capacity to carry out a threat (e.g. "that would cause an individual to reasonably fear for [his/her safety or] the safety of another individual" (McAnaney et al., 1993: 896-897)).

In addition to substantive variations in stalking laws, the classification of the crime according to seriousness (and resulting sanctions) also varies from state to state. Typically, stalking is classified as a misdemeanor, however several states have provisions in their statutes whereby certain aggravating circumstances can result in the behavior being classified a felony. For example, if a stalker is violating a temporary restraining order or an order of protection, or if a convicted stalker commits subsequent stalking behavior, the individual can receive a harsher sentence (McAnaney et al., 1993: 900-901).

**Extent of the Stalking Problem**

Although only a handful of highly-publicized cases (and the resultant public pressure) appears to have been the impetus for anti-stalking statutes, a recent national

2

This document is a research report submitted to the U.S. Department of Justice.
This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# EXHIBIT E

floor, and he certainly has been persistent, and today at least he has taken the floor criticizing the President for what he has not done.

The minority leader just finished reading the statement in the Chamber that describes accurately the circumstances of the filing on behalf of the President, and it categorically rejects the assertions just made by the Senator from Iowa. But it is an even-numbered year. We all know what that means. And being President certainly means you are subject to criticism. I understand that, as do others who serve in public office. I believe the American people understand all of us have things about us that are positive, things that are not so positive perhaps. None of us are perfect.

This President, like President Bush and President Reagan, President Carter and others before them, I suspect, resides in the White House trying to figure out how to do the best job he can to move this country forward and serve the best interests of this country.

It is easy to be critical. I hope all of us would understand that the job of the President of the United States is a tough job. It is tough for Republicans and tough for Democrats. This is a country with a lot of good and a lot of opportunity, and I hope all of us can work together to help this President and future Presidents realize that opportunity.

————

### NATIONAL MISSILE DEFENSE

Mr. DORGAN. Mr. President, I take the floor to say that it appears to me we may be talking about National Missile Defense or the Defend America Act very soon. Perhaps it will even be laid down before we finish tonight so there is a cloture vote when we come back. I am not sure.

I want to observe—and I have done this for years that I have been in Congress—that we just finished a budget in which there was a lot of talk about reducing the Federal deficit, the need to reduce Federal spending, and the Defend America Act, or the National Missile Defense Program, is a program, according to the Congressional Budget Office, that just to build—not to operate, just to build—will cost between $30 billion and $60 billion. Now, the operational costs will be much, much greater than that.

It seems to me the funding question ought to be posed and ought to be answered by those who bring a spending program to the floor of the Senate that says let us spend up to an additional $60 billion more on a program that I do not think this country needs because the National Missile Defense Program, or the Defend America Act, will not truly be an astrodome over our country that will defend us against incoming missiles. It presumes that we should build a defense against ICBM's in the event a rogue nation would launch an ICBM with a nuclear tip against our country, or in the event there is an ac-

cidental nuclear launch against our country.

Of course, a nuclear device might very likely come from a less sophisticated missile like a cruise missile. We have thousands and thousands and thousands of cruise missiles proliferating this world. They are much easier to get access to. A nuclear-tipped cruise missile is a much more likely threat to this country than the ICBM, or perhaps a suitcase and 20 pounds of plutonium and the opportunity to turn it into a nuclear device, or perhaps a glass vile no larger than this with the most deadly biological agents to mankind.

Of course, we will spend $60 billion on a star wars program, at the end of which it will be obsolete and will not protect this country against that which we advertise we need protection.

We had an ABM system built in North Dakota. Billions and billions of dollars in today's money went into that in northeastern North Dakota. It was declared mothballed the same month it was declared operational. In other words, the same month they declared operational a system which they said we desperately needed they decided would no longer be needed, and it sits up there as a concrete monument to bad planning. It was an expenditure of the taxpayers' money that, in my judgment, need not have been made.

Now we are told that we have the need for a national defense program, or Defend America Act, of some type that will defend us only against a very narrow, limited threat, not a full-scale nuclear attack from an adversary, because it will not defend us against that, will not defend us against a nuclear attack of cruise missiles. It cannot do that. It will not defend us against a nuclear attack by a terrorist nation putting a nuclear bomb in a suitcase in the trunk of a Yugo car, a rusty old Yugo at a dock in New York City. But we are told $60 billion to build and how many tens of billions of dollars to operate is what is necessary.

I say to those who will bring that to the floor, while you do that, please bring us a plan telling us who is going to pay the tax to build it. Where are you going to get the money? Who is going to pay the tax? And then describe why that is necessary and the fact when you get done you have not created the defense for America you say you are going to create.

There are many needs that we have in this country in defense. Many remain unmet. This kind of proposal ranks well down, in my judgment, in the order of priorities. If it is technologically feasible to be built to protect this country, it ranks well down in the order of priorities. My hope is that we will have a full, aggressive, interesting debate on this because it is not a debate about pennies. It is a debate about a major, sizable spending program, new spending program at a time when we are trying to downsize and at a time when we are talking about the need to control Federal spending.

Those who bring this to the floor of the Senate have an obligation to tell us how it is going to be paid for. The announcement of this so-called Defend America Act was made at a press conference recently, and the question was asked: Where do you get the money for this? And the answer at the press conference by Members of the Senate was: Well, we will leave that to the experts.

No, it will not be left to the experts. This Congress will have to decide who pays for a new Federal spending program that will cost $60 billion plus and after being built will not in fact defend this country against a nuclear attack.

There are many needs that we have in our defense system in this country. Some worry that we are in a circumstance where we will decide to downsize in defense too much: We will be unprepared to meet an adversary; we will be unprepared to meet a threat.

I understand that. I understand this country has gone through this in previous periods, and I do not want us to be in that position. But I also understand that in every area of the armed services there are weapons programs that simply seem to have a life of their own and they tend to build and build, and they become not so much a justifiable program that is necessary to defend our country, but they become a program that is supported by a range of politicians and corporations and other interests that give it a life of its own, even when it becomes unnecessary or when the science and the technology demonstrate it is not needed.

I hope we will have an aggressive discussion about this, about the threat and about the amount of proposed expenditure, and about who is going to come up with the money, and especially about whether, in fact, this is needed for this country's defense.

Mr. President, I thank you for your indulgence. I yield the floor, and I make a point of order that a quorum is not present.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mrs. HUTCHISON. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

————

### THE INTERSTATE STALKING ACT

Mrs. HUTCHISON. Mr. President, I want to talk about a bill that I hope we can clear tonight in the Senate because it is a very important bill that will begin to protect the victims of stalking all over this country. You know, we did not really know much about stalking until the last few years. That is because it was a hard crime to pin down. Stalking is threats. It is harassment. It is the constant terrorizing of a victim, whether the act that is said would be done is actually perpetrated or if, sometimes, it is not. But whether it is or is not, it is a very tough thing for a

victim to continue to be in fear, to wonder, ''Am I going to have someone stick a knife in my back? Am I going to be able to walk in my neighborhood without fear? Am I going to be able to go to sleep at night without fear?''

Then, in fact, we have found that the victims of this stalking actually become victims sometimes. When Congressman ED ROYCE and I started working on this we had a press conference in which we had some incredible stories of stalking victims. A woman from California who was constantly threatened, who moved to Florida to escape this stalking from this person that she really did not know and who was clearly demented—she moved to Florida and one night did become a victim. The person broke into her home and threatened her with a knife. She did get away without injury.

But then there was the stalking victim whose husband was outside with his wife and she was shot to death, he was shot, and this was from a person who had constantly threatened his wife. So they could have prevented it if there had been some way to do it, but, in fact, there was no way to do it because stalking was not a crime until recently.

Now we have the situation in which you have the stalking in one State, the person moves to another State, and they do not have the coverage in the other State because the actual harassment was in the first State and when it happened in the second State you had to establish it. The Interstate Stalking Act will make it a Federal crime to cross State lines to do the State crime of stalking. It does not make stalking a Federal crime, but it does make crossing State lines to do it, when it is a crime, a crime. That would give protection to the woman who moved from California to Florida. It will give protection to more of the people who have had the terrorizing experience of being constantly barraged by threats from another person. Many people in public life have had this experience. It is a scary thing to happen. To live in fear most of the time, or some of the time, is something we do not have to put up with in our society.

This is a bill that passed unanimously in the House a couple of weeks ago. It was passed out of the Judiciary Committee today on a very bipartisan basis. I thank Senator HATCH and Senator BIDEN for expeditiously having hearings on this bill and putting it through the committee. Now I am very concerned because I thought this would be a bill that would not cause any problem and I would, of course, like to see it go through tonight because I think the President will sign this bill. I think the President is going to see the need for this bill. I think if he can sign it before we come back from the Memorial Day recess, that that might save a life. It might save a victim from being harassed. It really might help a victim. If it helps one victim in this country, then why not do it?

If we pass it tonight, it will go straight to the President because the bill is in the form that it passed the House. This should not be a tough bill.

I am asking my colleagues on the Democratic side to clear this bill. We thought that it was cleared. Perhaps it was not. Perhaps they can make a phone call, if someone has a concern on their side. I think we ought to be able to do what is right. This is a bill that ought to pass. It is a bill that has merit. It is a bill that is not controversial or it would have been stopped before now.

So I hope my colleagues on the other side of the aisle will see fit to find out if there is a real problem with this bill. Or if it is a problem with something else, perhaps they will clear this bill, because it might save one life. It might save one person from being victimized and it would be worth it if we could do that.

This is a bill that passed along with Megan's law on the House of Representative's side. Megan's law has already been signed by the President. This will allow victims of any kind of domestic violence harassment or if it is not a domestic partner or a spouse but a stranger who is doing the harassment, it will also provide protection if a person crosses State lines to do that.

Mr. President, I hope it is not too late tonight. I would like to see this bill cleared because it is important. It is the right thing. It is bipartisan and I think there may be something on the other side that could easily be worked out.

I just ask my colleagues on the Democratic side of the aisle to expedite this. We might save a life and it would be worth it.

The PRESIDING OFFICER. The majority leader.

## DEFEND AMERICA ACT

Mr. DOLE. Mr. President, yesterday President Clinton acknowledged—belatedly—that the post-cold-war era presents us with new national security challenges. He stated, ''The end of communism has opened the door to the spread of weapons of mass destruction * * *.'' Unfortunately, while the President is finally willing to recognize the threat posed by the proliferation of weapons of mass destruction, he remains unwilling to seriously respond to it—with progress, as opposed to pronouncements—on national missile defense.

Most Americans do not know—let me underscore—most Americans do not know that the United States has no defense against ballistic missiles. If you were to ask the average American, in fact to ask anybody in this Chamber unless they are on the Armed Services Committee, they might not know. If you were asked a question, ''If a missile, an incoming missile was headed toward Chicago, what should the President of the United States do?'' and the people will tell you in these little focus groups, ''Shoot it down''—we can't. We don't have a defense. So, if a rogue state such as North Korea launched a single missile at the United States, we could do nothing to stop its deadly flight towards an American town or city.

In his speech yesterday President Clinton pointed to his $3 billion budget request for missile defense programs as evidence of a ''strong, sensible national missile defense program.'' This happens to be 21 percent less than the President's own national security advisers proposed in their Bottom-Up review of U.S. defense needs. It is also 30 percent less than what the Senate Armed Services Committee provides in this year's defense authorization bill. In short, it is not enough for a determined and effective effort to defend the American people from the threat of ballistic missiles.

President Clinton attacked the Defend America Act, which I introduced 2 months ago, claiming:

They have a plan that Congress will take up this week that would force us to choose now a costly missile defense system that could be obsolete tomorrow.

This is simply not true. The Defend America Act only forces to commit now to deploy a national missile defense system by the year 2003. The choice of what type of system is left up to the Secretary of Defense who will report back to the Congress on the requirements for an effective ballistic missile defense system. And making a decision to go forward with missile defense now will not, as the President argued yesterday, lead to America deploying an obsolete system.

The programs we currently have in development can serve as the building blocks for a system that meets the missile threat as it emerges. Furthermore, as with the procurement of any weapons system, moving from development to deployment requires lead time. You cannot do it in a week or a year or 18 months. It does not happen overnight. The President's assertions contradict those of his own Secretary of Defense, who recently stated that these technologies ''would be quite capable of defending against the much smaller and relatively unsophisticated ICBM threat that a rogue or a terrorist could mount any time in the foreseeable future.''

That is the Secretary of Defense.

I would like to address the issue of cost. There has been quite an uproar about a Congressional Budget Office estimate of the cost of deploying a national missile defense system pursuant to the Defend America Act. The CBO stated that total acquisition costs for the year 2010 would range from $31 billion to $60 billion, if such a system largely consists of advanced space-based components. However, the Defend America Act does not specify any required components of a national missile defense system to include space-based components. On the other hand, the CBO says that a ground-based system with upgraded space-based sensors

CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ERICA CHOI (Bar No. 302351)
(E-Mail: erica_choi@fd.org)
SHANNON COIT (Bar No. 298694)
(E-Mail: shannon_coit@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
ASHLEIGH BROWN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. 2:25-CR-780-SVW-2 |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT ASHLEIGH BROWN'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL, OR FOR A NEW TRIAL** |
| ASHLEIGH BROWN, | |
| Defendant. | **Hearing: May 18. 2026. at 11:00 a.m.** |

The defendant Ashleigh Brown, by and through her attorneys, Erica Choi and Shannon Coit, submits her Reply In Support of her Motion for Judgment of Acquittal, Or For a New Trial.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: April 24, 2026     By _/s/ Erica Choi_

ERICA CHOI
SHANNON COIT
Deputy Federal Public Defenders
Attorney for ASHLEIGH BROWN

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................1

II. ARGUMENT ........................................................................................................2

    A.    Ms. Brown is Entitled to a Judgment of Acquittal ...................................2

        1.    Ms. Brown's Actions Were Protected by the First Amendment .......2

            a.    *Snyder v. Phelps* Requires a Judgment of Acquittal ..............4

            b.    Ms. Brown's Actions Related to a Matter of Public Concern: Widespread ICE Operations in Los Angeles ..........6

            c.    Ms. Brown's Actions Do Not Fall Within the Narrow Exception for Speech Incident to Independent Criminal Conduct .............................................................................9

            d.    *Osinger* Did Not Hold Otherwise ........................................13

        2.    The Government Failed to Prove a "Course of Conduct," which Requires "A Pattern of Conduct . . . Evidencing a Continuity of Purpose" ...............................................................15

        3.    The Government's Brief Relies on Non-Admitted Evidence and Erroneous Assertions About the Court's Prior Rulings ..................17

    B.    Alternatively, Ms. Brown is Entitled to a New Trial ................................20

        1.    The Cyberstalking Jury Instruction Misstated the Law ..................20

            a.    The Instruction Allowed the Jury to Convict for First Amendment Protected Activity ...........................................20

            b.    The Instruction Incorrectly Stated That "Each Communication Constituted a Separate Act" ......................22

            c.    The Instruction Failed to Distinguish Between Ordinary Emotional Distress and Substantial Emotional Distress .......24

        2.    The Government Repeatedly Misstated the Law During Closing Argument ...........................................................................25

III. CONCLUSION ..................................................................................................26

i

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Federal Cases**

*Adams v. Ford Motor Co.*,
653 F.3d 299 (3d Cir. 2011) ........................................................................... 21

*Am. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ......................................................................................... 3

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) ....................................................................... 11

*Askins v. U.S. Dep't of Homeland Sec.*,
899 F.3d 1035 (9th Cir. 2018) ............................................................. 8, 10, 11

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ............................................................................ *passim*

*City of San Diego v. Roe*,
543 U.S. 77 (2004) (per curiam) ..................................................................... 7

*Cohen v. California*,
403 U.S. 15 (1971)..................................................................................... 10, 11

*Dun & Bradstreet, Inc. v. Greenmoss Builders*,
Inc., 472 U.S. 749 (1985) ............................................................................... 6

*Frisby v. Schultz*
U.S. 474 (1988) ............................................................................................... 8

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) ...................................................................................... 10

*Hernandez v. City of Phoenix*,
43 F.4th 966 (9th Cir. 2022) ........................................................................... 6

Holder v. Humanitarian Law Project
561 U.S. 1, 16, 21-22 (2010)................................................................... 10, 15

*Hunter v. Hughes*,
794 F. App'x 654 (9th Cir. 2020) .......................................................... 7-8, 10

*Imperial Sovereign Court of Mont. v. Knudsen*,
170 F.th 820, 832, 842-55 (9th Cir. 2026) ..................................................... 4

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) (en banc) ................................................... 14, 15

*Obsidian Fin. Grp., LLC v. Cox*,
740 F.3d 1284 (9th Cir. 2014) ................................................................ 6, 7, 8

*Snyder v. Phelps*,
562 U.S. 443 (2011) ................................................................................ *passim*

*United States v. Ackell*,
907 F.3d 67 (1st Cir. 2018) ...................................................................... 13, 23

ii

## <u>TABLE OF AUTHORITIES</u>

Page(s)

*United States v. Bell*,
   303 F.3d 1187 (9th Cir. 2002) ................................................................ 16

*United States v. Boylan*,
   167 F.4th 1266 (9th Cir. 2026) ......................................................... 18, 19

*United States v. Davis*,
   5:14-CR-240 (E.D.N.C. 2014) .............................................................. 23

*United States v. Enriquez*,
   131 F.4th 940 (9th Cir. 2025) ............................................................... 20

*United States v. Fanyo-Patchou*,
   2020 WL 4816296 (W.D. Wash. Aug. 19, 2020) .................................. 15

*United States v. Freeman*,
   761 F.2d 549 (9th Cir. 1985) ................................................................ 21

*United States v. Jubert*,
   139 F.4th 484 (5th Cir. 2025) ......................................................... 16, 17

*United States v. Nukida*,
   8 F.3d 665 (9th Cir. 1993) .................................................................... 20

*United States v. Olano*,
   507 U.S. 725 (1993) ....................................................................... 24, 25

*United States v. Osinger*,
   753 F.3d 939 (9th Cir. 2014) ......................................................... *passim*

United States v. Pantchev,
   2:21-CR-50-JFW (C.D. Cal. 2021) ....................................................... 23

*United States v. Sryniawski*,
   48 F.4th 583 (8th Cir. 2022) ................................................................ 14

*United States v. Yung*,
   37 F.4th 70 (3d Cir. 2022) ...................................................................... 9

*Vazquez v. R&L Carriers Shared Servs., LLC*,
   2025 WL 1109009 (C.D. Cal. Mar. 7, 2025) ........................................ 16

*Veile v. Martinson*,
   258 F.3d 1180 (10th Cir. 2001) ............................................................ 21

**Federal Statutes**

18 U.S.C. § 2266(2) ..................................................................... 15, 16

18 U.S.C. § 2261A ............................................................................ 21

Fed. R. Crim. P. 29 ............................................................................ 20

**Other Authorities**

ABA Model Rule 3.5(c) ....................................................................... 21

iii

# TABLE OF AUTHORITIES

Page(s)

Geoff Bennett & Winston Wilde, *Homan Vows 'Massive Changes' and ICE Drawdown if Minnesota Officials Cooperate* (PBS Jan. 29, 2026), https://www.pbs.org/newshour/show/homan-vows-massive-changes-and-ice-drawdown-if-minnesota-officials-cooperate ................................................................ 3

USAO Press Release, *Court of Appeals Confirms Conviction of Massachusetts Man Sentenced to 33 Months in Prison for Stalking* (Nov. 5, 2018), https://www.justice.gov/usao-nh/pr/court-appeals-affirms-conviction-massachusetts-man-sentenced-33-months-prison-stalking ................................................................ 24

USAO Press Release, *Virginia Man Sentenced to 12 Years for Cyberstalking and Communicating Interstate Threats* (Mar. 22, 2018), https://www.justice.gov/usao-ednc/pr/virginia-man-sentenced-12-years-cyberstalking-and-communicating-interstate-threats ................................................................ 23

iv

## I. INTRODUCTION

The government does not dispute that it has never charged cyberstalking under circumstances anything like those presented in this case. That is because until now, the government recognized that an hour-long public interaction between two strangers could not conceivably be considered *stalking*. Its brief provides no sound basis for upholding this unprecedented conviction. Indeed, the flaws in this prosecution are even clearer than when Ms. Brown's motion was filed.

A few weeks ago, the Supreme Court reiterated that the government cannot do what it has tried to do here: punish First Amendment protected activity by attempting to re-label it as unprotected "conduct." *Chiles v. Salazar*, 146 S. Ct. 1010 (2026). That holding is fatal to the government's theory of this case. As the government does not meaningfully dispute, Ms. Brown did nothing beyond speak and passively film on public streets—activities that are squarely protected by the First Amendment.

The government's contrary arguments are unpersuasive. The government has no convincing answer for the Supreme Court's decision in *Snyder v. Phelps*, which held that actions much more extreme than Ms. Brown's were constitutionally protected. The government's claim that Ms. Brown's activities centering around ICE's operations in Los Angeles somehow did not pertain to a matter of public concern is plainly incorrect. And its concession that the rights to film and protest extend to residential neighborhoods dooms its "conduct" theory. If the First Amendment protects the right to film and protest on residential streets, it must also protect the act of *driving to* that street to film and protest. The government's theory that the act of driving can be separated out as unprotected "conduct" would render the underlying rights meaningless.

The government's course-of-conduct arguments fare no better. It ignores the ordinary meaning of the statute, which requires a "pattern of conduct" evidencing a "continuity of purpose"—something that self-evidently cannot be formed in seconds or minutes. Instead, its primary response is to fault Ms. Brown for not identifying any case

1

setting a minimum time limit. *Of course* there is no case, because the government has never previously tried to charge cyberstalking based on conduct that lasted less than an hour. But now that the government has aggressively challenged the boundaries of the statute, the Court must enforce its limits. Both the text and common sense make clear that a less-than-hour long interaction between two strangers who never met again cannot possibly supply the persistent course of conduct necessary to commit stalking.

Each of these reasons independently requires a judgment of acquittal. But at the very least, Ms. Brown is entitled to a new trial. The government does not persuasively defend the instructional errors and misstatements of law made in its closing argument. The cases it cites to support the challenged jury instructions are inapt. Each involved repeated harassing communications, threats, and in-person contacts occurring on numerous dates over extended periods of time. By contrast here, Ms. Brown did not speak directly to Officer Huitzilin, distanced herself from the situation, left the scene at the first opportunity, and never contacted him or his family again. At a minimum, the instructional errors and repeated misstatements of law in the government's closing warrant a new trial.

## II. ARGUMENT

### A. Ms. Brown is Entitled to a Judgment of Acquittal

#### 1. Ms. Brown's Actions Were Protected by the First Amendment

Before diving into the doctrine, it is worth appreciating the First Amendment interests at stake. There is no dispute that Ms. Brown did not intend to follow Officer Huitzilin to his home—she believed she was documenting an ICE raid and ended up on Chelsfield Street by accident. Once there, she did very little beyond passively filming. She did not confront Officer Huitzilin, she did not yell insults or threats at him, and she did not attempt to invade his property. Instead, she reacted as anyone in that unexpected situation might: she remained in a public area, intentionally kept her distance, intermittently filmed, and tried to leave within minutes, which she would have done had she not been blocked in by Officer Huitzilin's wife.

2

If that could be prosecuted as "cyberstalking," the chilling effects would be enormous. Across this country, ordinary citizens have mobilized to follow and film ICE vehicles to document ICE's activities. These citizen-created videos allowed the public to see firsthand the circumstances of the fatal shootings of American citizens and many other instances of ICE misconduct. They have also been widely credited with persuading the government to change its approach to immigration enforcement— exactly the type of persuasion the First Amendment was designed to protect.[1]

But if unintentionally ending up at an ICE agent's home while filming could result in a felony conviction and up to five years in prison, who would take the risk? It is in precisely these circumstances that the Constitution steps in to provide the "breathing space" that "First Amendment freedoms need . . . to survive." *Am. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021). And it is in precisely these circumstances that the Court's intervention is most needed. Though the jury system has many virtues, when emotionally charged speech is at issue, "a jury is unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the expression of vehement, caustic, and sometimes unpleasant expression." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (cleaned up). It is the role of the Court to guard against this "unacceptable" risk. *Id.*

The government purports to agree that the First Amendment robustly protects the right to speak and film on matters of public concern, including in residential neighborhoods. Opp. 11. But its arguments for upholding Ms. Brown's conviction would render that right nearly impossible to exercise without risking criminal prosecution. Because established First Amendment law makes clear that everything

---

[1] *See, e.g.,* Geoff Bennett & Winston Wilde, *Homan Vows 'Massive Changes' and ICE Drawdown if Minnesota Officials Cooperate* (PBS Jan. 29, 2026), https://www.pbs.org/newshour/show/homan-vows-massive-changes-and-ice-drawdown-if-minnesota-officials-cooperate.

3

Ms. Brown said and did was constitutionally protected, the Court should enter a judgment of acquittal.[2]

### a. *Snyder v. Phelps* Requires a Judgment of Acquittal

As the Motion explained, the Supreme Court's decision in *Snyder v. Phelps* controls this case. Mot. 10-12 (discussing *Snyder v. Phelps*, 562 U.S. 443 (2011)). In *Snyder*, the Supreme Court held that the First Amendment protected the actions of a group that intentionally targeted a private funeral with extraordinarily offensive messages—including "Thank God for Dead Soldiers" and "You're Going to Hell"—resulting in severe emotional distress to the father of the deceased. 562 U.S. at 448-50. The conduct of the defendants in *Snyder* was much more extreme than anything Ms. Brown did. As the government does not meaningfully dispute, Ms. Brown kept her distance from Officer Huitzilin and did little more than passively film. The Court's holding that the conduct in *Snyder* was constitutionally protected necessarily means that Ms. Brown's was too.

The government has no meaningful response to *Snyder*. It nods at the fact that *Snyder* was a civil case but does not explain how that could matter. Opp. 13. If the First Amendment protects a person from liability for tort damages in a suit by a private party, it certainly protects them from the much-harsher penalty of criminal punishment by the federal government. *See, e.g.*, *Imperial Sovereign Court of Mont. v. Knudsen*, 170 F.th 820, 832, 842-55 (9th Cir. 2026) (applying the same First Amendment analysis to a statute that carried both civil and criminal penalties).

The government also claims that *Snyder* was different because that case involved "pure speech" while Ms. Brown engaged in "conduct." Opp. 13. But any "conduct" Ms. Brown engaged in is materially indistinguishable from what the defendants did in

---

[2] To the extent the government suggests that the jury rejected Ms. Brown's First Amendment arguments, that is simply wrong. The jury was never instructed on the requirements of the First Amendment and was never asked to decide whether Ms. Brown's conduct was constitutionally protected. Indeed, the failure to instruct the jury on that point requires at least a new trial. Mot. 18-24; Section II.B.1, *infra*.

4

*Snyder*. Like the defendants in *Snyder*, she traveled to a location on a public street—a place the government now concedes is the archetype of a traditional public forum. *See Snyder*, 562 U.S. at 448-49 (noting that the defendants congregated on "public land" next to the private funeral, necessarily meaning that they must have traveled there); *see* Opp. 11 (conceding that residential streets are public forums). And she filmed and narrated what she observed to share it with a larger audience, just as the defendants in *Snyder* took their own steps to attract publicity. *See Snyder*, 562 U.S. at 455 (noting that there was "no doubt" the defendants chose the location of their protest "to increase publicity for [their] views").

The Supreme Court had little trouble concluding that the "conduct" of exploiting a private funeral did not strip away the protections of the First Amendment. *Id.* That was true even though the *Snyder* defendants *intentionally* targeted the funeral, while Ms. Brown ended up on Officer Huitzilin's street only by accident. If the actions of the defendants in *Snyder* fell within the scope of the First Amendment, the same must be true for Ms. Brown's much milder conduct.

The government also claims that Ms. Brown's speech "did not touch upon a matter of concern as the speech in *Snyder* did." Opp. 13. As explained in more detail below, that is obviously wrong. Section II.A.1.b, *infra*. It was undisputed that Ms. Brown ended up on Chelsfield Street while trying to document ICE's operations—something that was the subject of widespread public discourse in Los Angeles at the time. Her speech and filming had a clearer connection to matters of public concern than the defendants in *Snyder* directing messages like "Thank God for Dead Soldiers" and "You're Going to Hell" toward family members attending their dead son's funeral. *Snyder*, 562 U.S. at 448-50. The Supreme Court concluded that these actions deserved the strongest First Amendment protection, and the same must be true for Ms. Brown's.

In short, there is no world in which the defendants' actions in *Snyder* were protected by the First Amendment, but Ms. Brown's much-tamer actions were not. *Snyder*'s reasoning therefore requires a judgment of acquittal.

5

**b.  Ms. Brown's Actions Related to a Matter of Public Concern: Widespread ICE Operations in Los Angeles**

Although *Snyder* is enough to resolve this case, the government's specific arguments also fail on the merits.

The government first claims that Ms. Brown was not "engaged in politically protected speech about a matter of public concern." Opp. 11. That is a difficult argument for the government to make. Matters of public sweep extremely broadly, encompassing *anything* that "can be fairly considered as relating to *any* matter of political, social, or other concern to the community" or that would be "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453 (cleaned up and emphasis added). The "arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Id.* (cleaned up).

Matters of private concern, by contrast, are limited to those that "concern[] no public issue"—for example, the contents of a private individual's credit report. *Id.* (discussing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985)).

Ms. Brown's activities, which centered around ICE's operations, plainly related to a matter of public concern. ICE's activities in Los Angeles in the summer of 2025 were the subject of widespread news coverage and arguably *the* preeminent topic of public interest. *See Hernandez v. City of Phoenix*, 43 F.4th 966, 978 (9th Cir. 2022) ("Subjects that receive media coverage almost by definition involve matters of public concern." (cleaned up)). Indeed, the fact that hundreds of people evidently watched Ms. Brown's videos itself makes clear that they concerned matters of broad public interest. Mot. Ex. A at 25:16; Mot. Ex. H at 00:38-00:40; *Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1292 (9th Cir. 2014) (blog post was on a matter of public concern when it was "published to the public at large," rather than being "solely in the individual interest of the speaker and its specific business audience").

In resisting this conclusion, the government asks the Court to compare the Supreme Court's decisions in *Snyder v. Phelps* and *City of San Diego v. Roe*. Opp. 12. Ms. Brown welcomes the comparison. As the motion detailed, *Snyder* held that the defendants' activities related to matters of public concern even though they chose a private funeral for their protest and used extraordinarily offensive slogans like "Thank God for Dead Soldiers" and "You're Going to Hell." Mot. 10; *Snyder*, 562 U.S. at 448, 454. *Doe*, by contrast, held only that the First Amendment did not protect a police officer from being fired for making a video of himself "stripping off a police uniform and masturbating." *City of San Diego v. Roe*, 543 U.S. 77, 78, 84 (2004) (per curiam) (noting that the pornographic video "did nothing to inform the public about any aspect of the [police department's] functioning or operation"). Ms. Brown's activities were obviously closer to the protestors in *Snyder* than the rogue police officer in *Roe*—they centered around documenting ICE's operations in Los Angeles. They easily cleared the low bar of being related to a matter of public concern. *See Snyder*, 562 U.S. at 453.[3]

At bottom, the government's position appears to be that because Officer Huitzilin was off duty, the incident necessarily involved only private matters. *See* Opp. 11. That is simply wrong. For one thing, regardless of whether Officer Huitzilin was off duty (something Ms. Brown did not know at the time), the incident began when Ms. Brown observed him driving an official ICE vehicle without license plates, in violation of California law. The government does not—and cannot—dispute that filming a government vehicle, particularly one engaged in unlawful conduct, is a matter of public concern. *Obsidian*, 740 F.3d at 1292 ("Public allegations that someone is involved in crime generally are speech on a matter of public concern."); *Hunter v.*

---

[3] *Roe* is also far off point because it involved a government entity's authority to act against its own employee. As *Roe* explained, "a government employer may impose certain restrictions on the speech of its employees" even though those restraints "would be unconstitutional if applied to the general public." 543 U.S. at 80. *Roe*'s holding that a police officer's public employment could be terminated for making pornographic videos says nothing about whether civilians like Ms. Brown can be criminally prosecuted for very different expressive activity.

7

*Hughes*, 794 F. App'x 654, 654 (9th Cir. 2020) ("Matters of public concern include allegations of wrongdoing, misconduct, or illegal activity by government employees . . . .").

For another, even the government conceded at trial that Ms. Brown reasonably believed that she was documenting an ICE raid in progress—again, something that qualifies as a matter of public concern. Brown Ex. C at 171:20-23; *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018). Once Ms. Brown learned there was no raid, she did not continue returning to Chelsfield Street to harass Officer Huitzilin because of some purely personal motivation; she attempted to leave within minutes and never tried to contact him or his family again. Nothing about the incident on Chelsfield Street suggested that Ms. Brown's activities centering around ICE were "intended to mask an attack on [Officer Huitzilin] over a private matter." *Snyder*, 562 U.S. at 445.

Finally, matters of public concern are not limited to on-duty conduct—indeed, they do not require the involvement of the government at all. *See, e.g.*, *Obsidian*, 740 F.3d at 1292 (a "claim that a mobile home park operator charged excessive rent" was a matter of public concern). They instead encompass anything that would interest the public, as Ms. Brown's videos plainly did. *Snyder*, 562 U.S. at 453.

In short, the First Amendment does not operate on a strict liability basis. If a person intending to document official activity accidentally stumbles upon an officer's residence, the Constitution does not suddenly evaporate. As long as the person remains in public spaces (as Ms. Brown did) and does not engage in independent criminal conduct (as Ms. Brown did not), they may continue to film, or even protest, without risking criminal prosecution. The First Amendment protects their "right to be where they were."[4] *Snyder*, 562 U.S. at 457.

---

[4] Although purporting to agree that the right to assemble and protest applies to residential streets, the government cites *Frisby* to suggest that it was somehow unlawful

8

Because Ms. Brown's activities related to matters of public concern, they "occupie[d] the highest rung of the hierarchy of First Amendment values" and were "entitled to special protection." *Id.* at 452. They cannot be the basis of criminal charges, even assuming they were "upsetting or arouse[d] contempt." *Id.* at 458. And the claim that they caused emotional distress likewise provides no basis for stripping them of First Amendment protection. *Snyder*, 562 U.S. at 450 (overturning a jury verdict despite undisputed evidence that the defendants caused severe emotional distress); *United States v. Yung*, 37 F.4th 70, 77 (3d Cir. 2022) ("The First Amendment protects lots of speech that is substantially emotionally distressing."). Everything Ms. Brown said and did was fully protected by the First Amendment.

> **c.** **Ms. Brown's Actions Do Not Fall Within the Narrow Exception for Speech Incident to Independent Criminal Conduct**

The government also argues that Ms. Brown's actions fall within the exception to the First Amendment for speech incident to independent criminal conduct. *See* Opp. 9 (citing *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014)). But the government fundamentally misunderstands the scope of that narrow exception.

As the Supreme Court reiterated just a few weeks ago, the question under the speech-incident-to conduct exception "is not whether a law mostly addresses conduct and only sometimes sweeps in speech." *Chiles v. Salazar*, 146 S. Ct. 1010, 1026 (2026).[5] Instead, the exception applies only when the activity at issue "bears a close

---

for Ms. Brown to be on Chelsfield Street. Opp. 11 (citing *Frisby v. Schultz*, 487 U.S. 474, 487 (1988)). But *Frisby* made clear that the restriction it upheld was limited to protests directed **at a single residence**. 487 U.S. at 483. It took pains to distinguish that narrow restriction from a broader ban on "marching through residential neighborhoods" or "walking a route in front of an entire block of houses." *Id.* The government's suggestion that *Frisby* governs activities that undisputedly were not directed at Officer Huitzilin's specific house—indeed, there was no evidence Ms. Brown even knew which house was his—significantly mischaracterizes the limited holding of that case.

[5] The decision in *Chiles* was issued after Ms. Brown filed her motion (though before the government filed its opposition). She therefore properly addresses it for the first time here.

9

causal connection to some separately unlawful conduct like a traditional crime"—for example the "sale of contraband." *Id.*; *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) (speech incident to a violation of antitrust laws).

The requirement that the conduct be similar to a traditional crime ensures that the government cannot "recast" protected activity by re-labeling it as conduct. *Chiles*, 146 S. Ct. at 1024-25. For example, in *Cohen v. California*, the Court rejected California's claim that it could prosecute the defendant for the disorderly *conduct* of wearing a "Fuck the Draft" jacket in a municipal courthouse. 403 U.S. 15 (1971); *see Chiles*, 146 S. Ct. at 1022-23 (discussing *Cohen*). And in *Holder v. Humanitarian Law Project*, the Court held that the protected act of providing advice to certain groups could not be recast as the *conduct* of providing material support to terrorism. 561 U.S. 1, 16, 21-22 (2010); *see Chiles*, 146 S. Ct. at 1022 (discussing *Holder*). Similarly, the defendants in *Snyder* could also be seen as engaging in conduct: they sought out and intentionally targeted a private funeral, created inflammatory signs, and then traveled across several states to the protest site. *See* 562 U.S. at 448-49. But because these non-speech acts were inseparable from the defendants' protected activity, it was obvious to the Supreme Court that they could not be penalized. *Id.* at 455-56.

The same result is required here. The government is trying to do precisely what *Cohen*, *Chiles*, and the other Supreme Court cases forbid: recast physical acts that were inextricably bound up with Ms. Brown's protected First Amendment activity as unprotected "conduct." For example, the government identifies the act of following Officer Huitzilin home from work as "conduct" it believes it can prosecute. Opp. 10. But as the government has conceded, Ms. Brown reasonably believed she was documenting an ICE raid. Mot. Ex. C at 171:20-23. And there is no dispute that she actually documented an official ICE vehicle illegally driving without a license plate. Mot. Ex. G at 00:30-00:36. Her acts of documenting these events were not unprotected conduct—they were protected First Amendment activity. *Askins*, 899 F.3d at 1044; *Hunter*, 794 F. App'x at 654.

The government's position also cannot be reconciled with its own concession that the First Amendment protects the right to speak and film on matters of public concern, including in residential neighborhoods. Opp. 11. The First Amendment protects not only expressive activity itself but also acts attendant to engaging in that activity. *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-63 (9th Cir. 2010); *see Askins*, 899 F.3d at 1044 ("[T]he process of creating pure speech is entitled to the same First Amendment protection as the product of that process."). The rights to film and protest in a neighborhood would be meaningless if—as the government's brief suggests—it could treat the "conduct" of traveling to the neighborhood as an independent crime. *See Askins*, 899 F.3d at 1044; *Cohen*, 403 U.S. at 16 (state could not charge the defendant for the "conduct" of wearing an inflammatory jacket in a courtroom).

Nor can the government re-label the constitutionally protected acts of filming and protesting in a neighborhood as "in person harassment." *See* Opp. 12. No doubt many individuals who are the target of a protest feel as if they are being harassed—the servicemember's father in *Snyder* did. *See* 562 U.S. at 449-50. But whether protest activity is protected by the First Amendment does not turn on the target's subjective reaction or whether they were physically present. Indeed, the right to protest in a neighborhood—a right the government does not dispute—would be useless if it could be exercised only when no one was around. Instead, the question is whether Ms. Brown had "the right to be where [she was]." *Id.* at 457. Because she remained on public streets and sidewalks—archetypical public forums where she had the right to be—and did nothing but speak and film, her mere presence cannot be punished as criminal "harassment."

The only "conduct" Ms. Brown engaged in was following and filming an official ICE vehicle on public thoroughfares and standing and filming on public streets and sidewalks. She did not confront, threaten violence, or use profanity toward Officer Huitzilin. And within minutes, she tried to leave. The government has not—and

11

cannot—identified any "traditional crime" these protected activities were similar to. *But see Chiles*, 146 S. Ct. at 1026 (emphasizing this requirement). Because everything Ms. Brown did either consisted of First Amendment protected activity or was a necessary component of engaging in that activity, her conduct cannot serve as the basis for a cyberstalking charge.

Finally, the government's claim that this case was only about "conduct" cannot be reconciled with both the cyberstalking jury instruction and the government's repeated statements during closing argument, which informed that the jury that "each *communication*" between Ms. Brown and Officer Huitzilin or his family could be treated "as a separate act" establishing a conviction. ECF 209 (Instruction 12) (emphasis added); Mot. Ex. C at 173:18-20, 174:8-9, 174:12-13 ("You may consider each communication between the Defendant and Mr. Reyes or his family members as a separate act. There are several communications between each Defendant and Mr. Reyes. . . . Defendant Brown: Immigration on your street. Defendant Brown: Immigration, immigration in the neighborhood. . . . Each of those is a separate act. And you only need to find that there were two acts by each of these Defendants that intimidated or harassed during that course of conduct."). Both the instruction and the government itself invited the jury to convict Ms. Brown *only* for her speech—there was no requirement that the jury find separate unprotected non-speech conduct. That the government explicitly prosecuted "speech as speech" makes abundantly clear that this prosecution infringed Ms. Brown's First Amendment rights.[6] *Chiles*, 146 U.S. at 1026 (the First Amendment applies when the government "regulates 'speech as speech'").

---

[6] At one point in its brief, the government claims that "the jury did not convict Brown based solely on her speech." But how could the government know? The government explicitly argued in closing that statements by Ms. Brown—*i.e.*, her speech—were all the jury needed to find in order to convict, a theory that the jury instructions supported. Mot. Ex. C at 173:18-20, 174:8-9, 174:12-13; ECF 209 (Instruction 12). As the Motion noted, the defense requested an instruction specifically to avoid the possibility that Ms. Brown could be convicted only for protected speech, but the Court declined to give it. *See* Mot. 19:16-22 (discussing the defense's objections to the government's proposed instructions).

12

### d.     *Osinger* Did Not Hold Otherwise

Nothing in the Ninth Circuit's decision in *Osinger* is to the contrary. For one thing, the government appears to misunderstand *Osinger*'s reasoning addressing the facial challenge. Contrary to what the government suggests, *Osinger*'s rejection of a facial challenge does not mean that the cyberstalking statute is constitutional in *every* application. Opp. 23-24 (wrongly characterizing *Osinger* as holding that the statute was "facially constitutional"). Quite the opposite: to defeat the facial challenge, the government had to show only that the statute could be constitutionally applied in *some* situations, leaving the specific boundaries to be set through as-applied challenges in individual cases. *See Osinger*, 753 F.3d at 944 (holding only that the statute was "not facially *invalid*" (emphasis added)). Indeed, as one of the government's own cases recognized, the cyberstalking statute *can* reach "highly expressive conduct," and in those cases, an as-applied challenge is warranted "to properly safeguard the rights that the First Amendment enshrines." *United States v. Ackell*, 907 F.3d 67, 77-78 (1st Cir. 2018). This is such a case.

Nor is *Osinger*'s as-applied reasoning helpful, because the fact-pattern there was dramatically different. As the motion explained, the defendant in *Osinger* committed several acts that constituted traditional crimes: creating a fake Facebook page in his ex-girlfriend's name and using it to post sexually explicit photos, knocking on her doors and windows at early hours of the morning, visiting her place of employment, and sending nude photos of her to co-workers. Mot. 21. The defendant's as-applied challenge failed because, in *Osinger*'s words, he "intended to harass and intimidate a private individual by circulating sexually explicit publications that were never in the public domain." *Osinger*, 753 F.3d at 984.

This case is the opposite of *Osinger* in nearly every respect. Ms. Brown's actions were limited to filming and speaking about the conduct of a *public* official on *public* streets involving only *publicly observable* information. *Contrast id.* And everything she

13

did centered around a matter of public concern—a situation in which the First Amendment's protections are at their apex. *Snyder*, 562 U.S. at 452.

The government's attempt to characterize both cases as involving "in-person harassment," Opp. 10, 12, operates at "far too high a level of generality." *Chiles*, 146 S. Ct. at 1027. There are obvious differences between banging on an ex-girlfriend's doors and windows at "1, 2 in the morning," *Osinger*, 753 F.3d at 941, and passively filming a public official from a public sidewalk in the middle of the day—the first constitutes the traditional crime of trespass; the second is constitutionally protected. Because Ms. Brown engaged only in activity protected by the First Amendment—indeed, the government explicitly asked the jury at trial to convict Ms. Brown for her speech, Mot. Ex. C at 173:18-174:15—the cyberstalking statute cannot be constitutionally applied to her. *United States v. Sryniawski*, 48 F.4th 583, 588-89 (8th Cir. 2022) (cyberstalking statute cannot be applied to someone who engages only in First Amendment protected activity); *Osinger*, 753 F.3d at 954 (Watford, J., concurring) (explaining the problems with such a prosecution).

Finally, although Ms. Brown is entitled to a judgment of acquittal even under *Osinger* as it stands, *Osinger*'s reasoning is clearly irreconcilable with the Supreme Court's recent decision in *Chiles* and therefore no longer good law. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc) (Ninth Circuit opinions are no longer binding when their "reasoning or theory" is "clearly irreconcilable with the reasoning or theory of intervening higher authority"). As *Chiles* made clear, in applying the exception for speech incident to criminal conduct, courts cannot simply ask "whether a law mostly addresses conduct and only sometimes sweeps in speech." 146 S. Ct. at 1026. But that is exactly what *Osinger* did: it upheld the constitutionality of the cyberstalking statute because the "proscribed acts [were] tethered to . . . underlying criminal conduct," and it found it hard to imagine that it could reach constitutionally protected speech. 753 F.3d at 944.

14

*Chiles* makes clear that this reasoning was wrong.[7] As *Chiles* explained, the mere fact that a statute is written in terms of conduct does not mean that it cannot threaten protected speech—indeed, the Supreme Court's earlier decisions in *Cohen* and *Holder* made clear that conduct-oriented statutes can pose grave threats to speech. *See Chiles*, 146 S. Ct. at 1025. And there is no question that *Osinger* did not address the questions *Chiles* made clear must be asked instead: "whether the law in question restricts speech only because it is integrally related to unlawful conduct" or "whether the law restricts expressive conduct only for reasons unrelated to its content." *Id.* at 1026. Because *Osinger*'s reasoning is irreconcilable with *Chiles*, it no longer governs and does not support the government's position. *Miller*, 335 F.3d at 893.

**2.      The Government Failed to Prove a "Course of Conduct," which Requires "A Pattern of Conduct . . . Evidencing a Continuity of Purpose"**

Ms. Brown is independently entitled to a judgment of acquittal because the government failed to prove the course-of-conduct element of cyberstalking.

The cyberstalking statute defines "course of conduct" to mean "a pattern of conduct composed of 2 or more acts, evidencing continuity of purpose." 18 U.S.C. § 2266(2). As the motion explained, the ordinary meaning of "pattern" requires "frequent or widespread incidence"—a pattern is something that happens in a "regular and repeated way." Mot. 12:23-28 (quoting *Pattern*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pattern). And the ordinary meaning of the phrase "continuity of purpose" is a *consistent* purpose that "does not change or stop as time passes." Mot. 12:28-13:4 (quoting *Continuity*, The Brittanica Dictionary, https://www.britannica.com/dictionary/continuity). The plain text of the cyberstalking statute therefore requires that the conduct persist over an appreciable period of time.

---

[7] Even before *Chiles*, courts questioned the soundness of *Osinger*'s reasoning. *See United States v. Fanyo-Patchou*, 2020 WL 4816296, at *3 n.3 (W.D. Wash. Aug. 19, 2020) ("The Court admits that it is skeptical of how *Osinger* construed § 2261A.").

15

The government ignores the ordinary meanings of "pattern" and "continuity of purpose" because it has no answer for them. It does not address the definitions provided in Ms. Brown's motion, nor does it try to provide alternative definitions of its own. The closest it comes to offering its own interpretation is the bizarre suggestion that only the passage of *too much* time could defeat a continuity of purpose. Opp. 15. But courts have held exactly the opposite. *United States v. Jubert*, 139 F.4th 484, 494 (5th Cir. 2025) (explaining that the course-of-conduct definition "narrows" the statute by "exlud[ing] isolated statements" and instead focusing on "persistent behavior"). And the government's brief cites no authority to support its claim that the shortness of the period of time is completely irrelevant. Opp. 15:1-16:3 (citing no cases, dictionary definitions, treatises, law review articles, or anything else).

If the government were correct that actions over minutes, or even seconds, could satisfy the course-of-conduct requirement, the Ninth Circuit's decision in *Bell* would have been decided differently. As the Motion explained, *Bell* rejected the claim that preparing to send a fax, and sending a fax, could be subdivided into the separate acts necessary to constitute cyberstalking. *United States v. Bell*, 303 F.3d 1187, 1192 (9th Cir. 2002). The government's brief does not even mention *Bell* because, again, it has no answer for that case. *See Vazquez v. R&L Carriers Shared Servs., LLC*, 2025 WL 1109009, at *5 (C.D. Cal. Mar. 7, 2025) ("Arguments to which no response is supplied are deemed conceded.").

Contrary to the government's claim that "[n]either the statute nor case law impose any specific timeline," Opp. 15, the timing requirement comes straight from the statutory text: there must be a "pattern of conduct" that persists long enough to "evidence[] a continuity of purpose." 18 U.S.C. § 2266(2). And the government's complaints about line-drawing are misplaced, because wherever the line is drawn, this case is firmly on the wrong side of it. *See* Opp. 16 (questioning how the requirement would apply to a defendant "who commits 40 acts over 23 hours"—a fact-pattern nowhere close to the facts of this case). An hour-long interaction between individuals

16

who had never previously met and would never meet again simply cannot be enough to establish a continuous purpose that "does not change or stop *as time passes*." *Continuity*, The Brittanica Dictionary (emphasis added).

Without any authority affirmatively supporting its position, the government attempts to point the finger at *Ms. Brown* for failing to identify a case imposing a minimum duration requirement. Opp. 15. But the government has never previously *charged* cyberstalking based on events lasting less than an hour. As the government does not dispute, *every* cyberstalking case charged in this district since 2009 has involved conduct that persisted for days, months, or even years. *See* Ex. A to Raygoza Mot. It is therefore unsurprising that no court has addressed whether conduct over minutes or seconds could constitute cyberstalking. Before today, no court has confronted that extreme fact-pattern.

Contrary to what the government claims, holding that Ms. Brown's actions did not establish the required course of conduct would not "reward the most efficient stalkers." Opp. 16. Rather, it would uphold Congress's judgment—expressed in the "pattern of conduct" and "continuity of purpose" requirements—that an hour-long interaction between strangers is *simply not stalking*. *See Jubert*, 139 F.4th at 494. Because the government failed to prove that Ms. Brown engaged in a "pattern of conduct" evidencing a "continuity of purpose," a judgment of acquittal is required.

### 3. The Government's Brief Relies on Non-Admitted Evidence and Erroneous Assertions About the Court's Prior Rulings

Apart from the specific issues addressed above, Ms. Brown notes a series of overarching errors repeated throughout the government's brief.

*First*, the government's brief fails to distinguish between the separate defendants, repeatedly asserting that actions were taken by "the defendants" (collectively), when those actions were only taken by Ms. Raygoza or Ms. Samane—not by Ms. Brown. For example, the government's brief claims that the "defendants" screamed at Officer Huitzilin and "verbally attack[ed] him and his family." Opp. 1-2 (detailing statements

17

that the brief itself concedes were made only by Ms. Raygoza). But there is no dispute that Ms. Brown *never* verbally attacked anyone. As the motion explained (and the government does not dispute), Ms. Brown intentionally kept her distance from the confrontation on the sidewalk, and her conduct was mostly limited to passively filming. Mot. 2-3. Similar mislabeling occurs throughout the government's brief. *See, e.g.*, Opp. 14 (listing actions purportedly taken by "the defendants" when many were done only by Ms. Raygoza).

Each defendant must be considered individually. *See* ECF 209 (Instruction 9) (instructing the jury on this point). Whether Ms. Brown's actions were protected by the First Amendment or whether the government proved that she committed the elements of cyberstalking turns on what she did *herself*. The government cannot muddle the clear distinctions between the defendants by attempting to treat Ms. Brown as guilty-by-association with Ms. Raygoza.[8]

*Second*, the government's brief cites evidence that was never admitted at trial. It discusses pretrial release conditions from a separate criminal case against Ms. Brown, even though those were never introduced here. Opp. 2, 14. And it relies on Trial Exhibit 3 (Exhibit A to the government's brief), *see, e.g.*, Opp. 4, even though the government never moved to admit that exhibit into evidence, so it is not part of the evidentiary record.[9] Questions of the sufficiency of the evidence turn on the evidence

---

[8] In a cursory footnote, the government suggests that Ms. Brown's conviction could be upheld on an aiding-and-abetting theory. Opp. 10 n.5. But the government never mentioned aiding and abetting during closing argument, rendering it extraordinarily unlikely that the jury considered it. Brown Ex. C 104-181; *see United States v. Boylan*, 167 F.4th 1266, 1272 (9th Cir. 2026) (rejecting claim that a verdict rested on a theory in the jury instructions that the government never argued). And regardless, even on an aiding-and-abetting theory, it is not enough to "merely associate[] with the person committing the crime," be "present at the scene," or "unknowingly or unintentionally [do] things that were helpful to that person." ECF 209, Instruction 13. The government does not try to specify which (unprotected) actions by Ms. Brown it believes intentionally facilitated specific (unprotected) unlawful conduct by Ms. Raygoza. It does not because it cannot.

[9] The government played one clip from Exhibit 3 at trial, but it never sought to move the exhibit into evidence, apparently because it incorrectly believed it had already

18

that was actually admitted. The government's discussion of non-admitted evidence must be disregarded.

*Third*, the government claims it "proved each of the eleven acts listed in Count Two of the superseding indictment that constitute defendants' course of conduct." Opp. 14. That is false. The government did not prove all eleven acts listed in Count Two.[10] There was no evidence at trial that "defendants provided directions as they were following R.H. to his personal residence" (ECF 103 at 5 (¶2(c))); and no evidence that "[o]n or about August 28, 2025, BROWN, while livestreaming on social media, zoomed in on R.H. and stated, 'there's the ICE agent - this is where he lives apparently,' and 'now the entire block knows they have an ICE agent living on their street'" (*id.* at ¶2(f)). The remaining "acts" in Count Two describe the defendants following Huitzilin home *by accident* (¶2(a), (b)), Ms. Brown's livestreamed disclosure of her location while detained by Baldwin Park Police (¶2(g)), and statements made by Samame and Raygoza (¶2(e), (h), (i), (j), (k)). Nothing in these facts suggests that Ms. Brown *cyberstalked* Huitzilin, and only underscore why the government did not prove its case.

*Fourth*, the government falsely claims "four or five masked individuals gathered outside the victim's home." Opp. 4. No one gathered outside of Officer Huitzilin's home at 12847 Chelsfield Street. After Ms. Brown announced her location, other masked individuals approached the Baldwin Park Police, filmed the Baldwin Park officers, and yelled at them on the street. Mot. Ex. C at 42:16-21. Then they left. No one "gathered outside the victim's home."

*Fifth*, the government claims Ms. Brown "could have got into Brown's car and drove away," and that she "linger[ed]" to harass Officer Huitzilin and his family. Opp. 3, 23. That is false. As the trial evidence showed, Ms. Brown was quickly blocked in by

---

been admitted. Brown Ex. C at 37:21-24 (AUSA incorrectly describing Exhibit 3 as "admitted" the first time it was mentioned). But Exhibit 3 was never admitted at trial. *See* Mot. Ex. A-C.

[10] *See* Exhibit P, Jury Tr. Day 4, 4-7.

Jessica Herrera's car and also by Officer Huitzilin's body. After BPPD arrived, she was detained and not free to leave. Ms. Brown wanted to leave, but was physically and legally unable to.

*Finally,* the government is wrong to claim that the Court already rejected the arguments here in its ruling on the motions to dismiss the superseding indictment. In deciding the motions to dismiss, the Court was limited to the allegations in the superseding indictment, which it was required to accept as true. *United States v. Enriquez*, 131 F.4th 940, 943 (9th Cir. 2025). It could not have considered the sufficiency of the evidence because no evidence had been presented yet. *United States v. Nukida*, 8 F.3d 665, 679 (9th Cir. 1993) (factual arguments must be raised through a Rule 29 motion, not a pretrial motion to dismiss). At trial, the government failed to prove all of the indictment's allegations, particularly as to Ms. Brown. Mot. 7-10. The Court's pretrial rulings therefore do not control her arguments about the evidence introduced *at* trial.

## B.     Alternatively, Ms. Brown is Entitled to a New Trial

The government does not convincingly defend against the instructional errors at trial, nor its misstatements of law in its closing argument.

### 1.     The Cyberstalking Jury Instruction Misstated the Law

#### a.     The Instruction Allowed the Jury to Convict for First Amendment Protected Activity

The government does not dispute that the plain language of the cyberstalking instruction allowed the jury to convict Ms. Brown for merely "annoy[ing]" Officer Huitzilin with speech that caused him to feel "disappointment," "embarrassment," "dejection," or "shame." And it does not appear to dispute that "annoying" a government official into feeling "shame" could describe all manner of protected protest. Yet it still argues that the instruction did not permit the jury to convict Ms. Brown for First Amendment protected activity. It is impossible to bridge that logical gap.

20

"Where there is some evidence . . . that the purpose of the speaker or the tendency of his words are directed to ideas or consequences remote from the commission of the criminal act, a defense based on the First Amendment is a legitimate matter for the jury's consideration." *United States v. Freeman*, 761 F.2d 549, 551 (9th Cir. 1985). Ms. Brown requested two jury instructions: one instruction that set forth the essential elements of § 2261A(2), ECF 142 at 16 (Fifth Circuit Model Instruction 2.68(B)), and another that instructed the jury that acts constituting the "course of conduct" cannot consisted solely of speech protected by the First Amendment. ECF 143 at 1, 5-8. The instruction in this case not only quashed her First Amendment defense, it allowed the jury to convict for conduct protected by the First Amendment.

To oppose a new trial, the government argues the jury instruction for "harass" is the same definition used by the Ninth Circuit in *Osinger*. Opp. 19. But *Osinger* does not control. Beyond the fact that *Osinger* involved very different facts and has since been abrogated by the Supreme Court's decision in *Chiles*, *Osinger* was not a case about jury instructions.

*Osinger* involved (1) the defendant's facial and as-applied challenge to § 2261A, and (2) appeal of his sentence. 753 F.3d at 944-45, 948. In his facial challenge, Osinger argued the statute was unconstitutionally *vague* because it did not define "harassment" or "substantial emotional distress. 753 F.3d at 944-45. In rejecting that argument, the Ninth Circuit explained "harass" and "substantial emotional distress" were not *vague*-- that is, they were "not esoteric or complicated terms devoid of common understanding." *Id.* at 945 (citing *Adams v. Ford Motor Co.*, 653 F.3d 299, 307 (3d Cir. 2011) (examining whether an attorney "harassed" a juror in violation of ABA Model Rule 3.5(c)) and *Veile v. Martinson*, 258 F.3d 1180, 1188 (10th Cir. 2001) (examining sufficiency of evidence under Wisconsin's stalking statute)). In parenthetical citations, *Osinger* briefly referenced dictionary definitions citing commonly understood meanings of those terms.

21

The Ninth Circuit did not say that courts should provide those definitions to juries wholesale. To the contrary, since "harass" and "substantial emotional distress" "are not esoteric or complicated terms devoid of common understanding," *Osinger*, 753 F.3d at 944-45, no definitions were needed. Presumably for that reason, the Fifth Circuit model instruction (which the defense requested) left the terms undefined.

At least in this case, it was erroneous to give instructions that permitted the jury to convict Ms. Brown for First Amendment protected activity. For example, the government claims it "presented substantial evidence at trial that Brown harassed [Rogelio Huitzilin] and his family in-person on August 28, 2025," Opp. 20, but tellingly fails to state what that harassment was. Standing on the sidewalk? Recording on her phone in public (which Huitzilin and his wife were also doing)? Honking her horn while trying to leave? Under the instruction, the jury could easily have found that this conduct "annoy[ed]" Office Huitzilin. But there is no question that this conduct was protected by the First Amendment. Because the plain language of the instruction allowed the jury to convict Ms. Brown for actions protected by the Constitution, a new trial is required.

### b. The Instruction Incorrectly Stated That "Each Communication Constituted a Separate Act"

The government argues "courts across the country" have instructed that juries "may consider each communication between the defendant and [the victim] as a separate act" in stalking cases. Opp. 21. But the cases cited by the government involved numerous emails, threats, and in-person contacts occurring across several dates. There is no dispute there was only one interaction between Ms. Brown and Officer Huitzilin.

The government says there is "no reason why in-person communications should be treated any differently than . . . letters or electronic communications." Opp. 21:21-23. But that only underscores the problem with the instruction here. One letter or telephone call would be *one* communication. Even the government does not claim that it could treat every sentence in a letter or phone call as a separate act, such that writing

22

or speaking two sentences would be enough to satisfy the course-of-conduct requirement. But that is exactly what the instruction did in this case with Officer Huitzilin's *single* face-to-face interaction with the defendants. Because there was only one conversation in this case, the instruction wrongly suggested to the jury that each *sentence* of that conversation could be a separate act. That is especially true because the government explicitly argued that point in closing--claiming that essentially every single phrase each defendant spoke could be treated as an individual act. Mot. Ex. C at 173:18-20, 174:8-9, 174:12-13. The instruction was misleading and grossly prejudicial under the facts of this case.

The cases cited by the government involved significantly repeated contacts between the defendant and victim over months and years. In *United States v. Pantchev*, 2:21-CR-50-JFW (C.D. Cal.), the defendant sent Victim A harassing emails on five different dates, appeared at her workplace to deliver a harassing letter, mailed documents to her work leadership calling the victim disparaging names and including a pornographic image. ECF 23 (Indictment). In *United States v. Davis*, 5:14-CR-240 (E.D.N.C.), the defendant "initiated a relentless campaign of harassment and intimidation" against victim S.B., later sent "email communications . . . which contained detailed threats of violence and rape," and "stalked [S.B.] by threatening her life and the lives of her family, as well as impersonating an FBI agent."[11] And in *United States v. Ackell*, 1:15-CR-123-JL (D.N.H.), between October 2012 and February 2014, the defendant "sen[t] text messages, digital images, and other electronic communications" to a minor victim (ECF 27 (Indictment)), then "threaten[ed] to send

---

[11] USAO Press Release, Virginia Man Sentenced to 12 Years for Cyberstalking and Communicating Interstate Threats (Mar. 22, 2018), https://www.justice.gov/usao-ednc/pr/virginia-man-sentenced-12-years-cyberstalking-and-communicating-interstate-threats.

23

the victim's [partially nude photographs to her family and friends" and "told the victim that if she ended their relationship, a 14-year-old girl would be raped."[12]

Again, in cases involving phone calls made on different days, it may make sense to tell the jury that each can be considered a separate act. But the instruction almost certainly misled the jury into thinking it could subdivide Officer Huitzilin's single conversation with the defendants into an untold number of separate "acts." Because the government grounded its entire course-of-conduct argument on this erroneous instruction and misstatement of law, a new trial is required.

### c. The Instruction Failed to Distinguish Between Ordinary Emotional Distress and Substantial Emotional Distress

The government argues that because the word "substantial" is part of "substantial emotional distress," it was "built into the legal standard." Opp. 19. That makes no sense. The instruction *defined* "substantial emotional distress" to mean things that are not typically understood as substantial. The jury was specifically instructed to convict if Huitzilin or his wife felt "embarrassment" or "nervousness." Embarrassment and nervousness are everyday human feelings, not substantial emotional distress warranting criminal liability.

When a term is defined in jury instructions, the jury is presumed to follow the definition. The government's theory that the jury would have somehow ignored the definition and applied its own standard of what substantial emotional distress meant has no basis in law or logic. *United States v. Olano*, 507 U.S. 725, 740 (1993) ("[We] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.").

---

[12] USAO Press Release, Court of Appeals Confirms Conviction of Massachusetts Man Sentenced to 33 Months in Prison for Stalking (Nov. 5, 2018), https://www.justice.gov/usao-nh/pr/court-appeals-affirms-conviction-massachusetts-man-sentenced-33-months-prison-stalking

## 2. The Government Repeatedly Misstated the Law During Closing Argument

The government did not merely repeat the jury instructions in its closing argument. In its arguments, the government told the jury that a course of conduct could occur in five minutes, and that all it needed to do was show that Ms. Brown spoke multiple phrases aloud, regardless of whether those statements constituted a "pattern" or evidenced a "continuity of purpose" as required by the statute. Mot. 25 (citing Ex. C at 105:12-19, 150:2-151:8, 162:9-24, 174:16-20). The government does not meaningfully defend again these points.

The government also should never have broached the topic of "correct" ways to protest. Yet it repeatedly told the jury that the sidewalk on Chelsfield Street is not a "public forum," and that by protesting there, Ms. Brown was engaging in illegal harassment and intimidation. Mot. Ex. C at 180:22-24 ("There are forums for this, public forums. The sidewalk two doors down from someone's house isn't that forum. That's harassment. That's intimidation."); *id.* at 178:23-179:6 (AUSA: "[T]he word protest has come up a lot. Use your common sense. What protest involves three people targeting a wife, a husband, and his two children on a neighborhood where no one else is? No signs, no picketing, no bullhorns, no parade. Three women, two parents, and their two children. You heard about some of the good work Defendants do in expressing their speech . . . . But this wasn't that."). The government's claim that it did not say the sidewalk the Chelsfield Street was not a public forum is flatly contradicted by the transcript of its own argument.

The government's repeated misstatements of law prejudiced Ms. Brown by inviting the jury to conclude she was acting unlawfully by being where she was when in reality, the First Amendment protected her right to free speech on the sidewalk on Chelsfield Street. A new trial free of these misstatements of law is required.

25

## III. CONCLUSION

For the foregoing reasons, the Court should enter a judgment of acquittal on Count Two. In the alternative, the Court should grant a new trial.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: April 24, 2026          By  */s/ Erica Choi*

ERICA CHOI
SHANNON COIT
Deputy Federal Public Defenders
Attorney for ASHLEIGH BROWN

26

# EXHIBIT P

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

UNITED STATES OF AMERICA,
Plaintiff,

v.

KAILIN WANG,
Defendant.

Case No. 2:24-cr-00163-TS
Judge Ted Stewart

---

## VERDICT TRANSCRIPT

| | |
|---|---|
| **Case:** | United States v. Raygoza/Brown/Samane, No. 2:25-cr-00780-SVW (C.D. Cal.) |
| **Statute:** | 18 U.S.C. § 2261A (federal stalking/cyberstalking) |
| **Posture:** | Verdict proceedings; sentencing thereafter set for June 8, 2026 |
| **ECF / Date:** | ECF No. 222-1, filed April 24, 2026 |
| **Purpose:** | Establishes post-verdict procedural posture underpinning the Exhibit A travel order |

**Nature of the Charges.**

Same prosecution as Exhibit A. United States v. Raygoza/Brown/Samane was a multi-defendant federal stalking/cyberstalking case brought in the Central District of California under 18 U.S.C. § 2261A. Ms. Brown was one of three defendants. The case proceeded to a jury trial.

**Contents of the Transcript.**

The verdict transcript reflects the jury's return and the court's acceptance of the verdict finding Ms. Brown guilty on Count Two of the indictment. The transcript also reflects the court's scheduling of a sentencing date of June 8, 2026. These two facts — the guilty verdict and the June 8 sentencing date — establish the procedural context in which the Exhibit A travel order was entered six days later.

**Relevance to This Motion.**

This transcript is offered not for the truth of disputed facts but solely to establish the procedural timeline for judicial notice purposes. It confirms that Exhibit A is a post-verdict, pre-sentencing travel order in an active § 2261A case. That procedural context matters because it shows courts allow travel in the most restrictive window of a criminal case — not just in the more permissive pretrial period.

---

*[Court Record Follows]*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:25-cr-00780-SVW |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| CYNTHIA RAYGOZA, | ) | Friday, February 27, 2026 |
| ASHLEIGH BROWN, | ) | |
| SANDRA CARMONA SAMANE, | ) | (9:42 a.m. to 10:13 a.m.) |
| | ) | (1:22 p.m. to  1:27 p.m.) |
| Defendants. | ) | (6:06 p.m. to  6:17 p.m.) |

JURY TRIAL - DAY 4 (VERDICT)

BEFORE THE HONORABLE STEPHEN V. WILSON,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**          SEE PAGE 2


Court Reporter:          Recorded; CourtSmart


Courtroom Deputy:        Daniel Tamayo


Transcribed by:          Exceptional Reporting Services, Inc.
                         20079 Stone Oak Pkwy. Suite 1105-237
                         San Antonio, TX 78258
                         361 949-2988



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

**APPEARANCES:**

<pre>
For Plaintiff:              AUSA CLIFFORD MPARE
                            AUSA LAUREN E. BORDER
                            U.S. Attorney's Office
                            312 N. Spring St., 15th Floor
                            Los Angeles, CA 90012

For Cynthia Raygoza:        GREGORY NICOLAYSEN, ESQ.
                            Gregory Nicolaysen Law Offices
                            27240 Turnberry Lane
                            Suite 200
                            Valencia, CA 91355
                            818-970-7247

For Ashleigh Brown:         DFPD ERICA CHOI
                            DFPD SHANNON M. COIT
                            Federal Public Defender's Office
                            321 East 2nd Street
                            Los Angeles, CA 90012
                            213-894-2854

For Sandra Carmona          ROBERT M. BERNSTEIN, ESQ.
Samane:                     Law Offices of Robert M. Bernstein
                            9465 Wilshire Boulevard
                            Suite 300
                            Beverly Hills, CA 90212
                            310-477-1480
</pre>

EXHIBIT P - Page 2 of 26

3

**Los Angeles, California; Friday, February 27, 2026; 9:42 a.m.**

**(Call to Order)**

**(Outside the presence of the jury)**

THE COURT: Present with counsel and the parties. We received note Number 1 from the jury. They request additional copies of -- additional copies of definitions of counts and charges. Wait a second. I have two notes here. Is this -- oh, is this the only one note?

THE CLERK: Yeah, that's the response.

THE COURT: Oh, okay.

THE CLERK: They put the -- name on it but they're asking for the charging document and --

THE COURT: Okay. Additional copies of definitions of counts and charges. I guess they've seen indictment. Document 103, page 1 through 6; pages ID Number 624 to 629; additional copies of closing jury instructions. I can't read the writing. Anyone read the writing of the foreperson?

MR. BERNSTEIN: We haven't seen --

MR. NICOLAYSEN: We don't have a copy yet. So we don't have copies of the note, Your Honor.

THE COURT: Oh, oh, oh, here. I want you to see the note, yeah. I thought you had seen the note. Both sides could look at it.

**(Pause; counsel conferring)**

Can I see the note, Daniel.

4

In any event, I can now read the name of -- the foreman's Juror Number 7, Atijera. I'm not going to give them additional copies of the jury instructions. I'm not going to give them additional copies of the indictment. I think that's a bad practice. And with regard to Document 103 and so forth, I don't know what that -- those documents are. I have no objection. Why -- why they're requesting something -- are they requesting something that's not in evidence?

MR. MPARE: No, Your Honor. They're just citing to the indictment. That's the header at the top of the document.

THE COURT: Oh, okay. So I'll respond by the Court will not provide any additional copies or instructions.

MR. MPARE: Understood.

MS. COIT: Your Honor, we want to raise an issue. The superseding indictment that was sent back to them, actually includes statements accredited to our clients that is not in evidence. So we request the indictment actually be removed from them, the jury room.

MR. NICOLAYSEN: Join, Your Honor. There are listed facts in -- especially in the stalking count that are not in the trial record so we would ask that the jury only rely on its --

THE COURT: Well then I mean is that -- do you agree with that?

MS. BORDER: I believe there might be a comment about

EXCEPTIONAL REPORTING SERVICES, INC

5

let's stalk some that didn't make it in, Your Honor, on the stalking count but Your Honor has instructed them that the indictment is not evidence. And I believe perhaps maybe the solution to that would be to re-instruct them that the indictment is not evidence.

MR. NICOLAYSEN: May we have a redacted indictment; that is, the elements that are --

THE COURT: What overt act is it? I'll just tell them to --

MS. BORDER: May I have a second, Your Honor?

THE COURT: Yes.

MS. COIT: Yeah, we have several. I need to listen to --

THE COURT: Just tell me what the overt act is.

MR. BERNSTEIN: Your Honor, may we get a hard copy printed out so that we can --

THE COURT: One hard copy of what?

MR. BERNSTEIN: Of the indictment printed out. I don't have a hard copy printed out with me.

THE COURT: I'll give you one if we have one. Do we have a copy?

MS. COIT: Well it says "Overt Act Number 1," Your Honor. Talking about the defendants followed an employee, a federal agent in one of them. And it talks about the federal agent being followed to the personal -- from his personal

**EXCEPTIONAL REPORTING SERVICES, INC**

6

residence.  It was pretty -- it was clear from the evidence that they don't know that they're following a single federal agent to his personal residence.

THE COURT:  Well it was a conspiracy charge so the way the indictment reads it was their intent.  So what is the overt act that is in question?

MS. COIT:  There's also Overt Act Number 2.  It says that the defendants posted a live video going from the building to his personal residence.  That's not the video was posted.  It stops when he just gets off the freeway.  And Overt Act Number 3 it says, "Defendants provided directions to his personal residence."

THE COURT:  Well I will tell them again that the indictment is not evidence and should not be looked at as evidence if --

MS. COIT:  I think there's another statement from Ms. Brown and I think it's 2-F on page 5 that says, "There's an ICE agent.  This is where he lives apparently and now the entire block knows they have an ICE agent living on their street."  That's mostly livestreaming when she is -- I believe this is like when she's with Officer Goble.  That did not come into evidence.  I have to check one more video but maybe the government correct me.

THE COURT:  I mean at the time there was an objection to having the indictment sent to the jury.  As a matter of

7

practice, the indictment is sent to the jury and the indictment is the indictment. The government doesn't have to prove everything they said in the indictment. It's up to the jury to determine from the evidence what was proven and what wasn't. So I don't see the point. There's always something in an indictment that wasn't proven at trial. The government doesn't have to prove everything in the indictment.

MS. COIT: Your Honor, I think that's the point. The government does not need to prove anything in the indictment so the jurors do not need the indictment. It's clear they're looking at it and focused on it and that's highly prejudicial.

THE COURT: I don't know what is clear or not. It seems to me that they're asking for additional copies of instructions and the indictment.

With regard -- let me just ask you. One second here.

With regard to the documents, how should I respond to that? Document 103, Page 1 --

MR. BERNSTEIN: That is the indictment, Your Honor. We would ask --

THE COURT: Oh, that's the indict -- okay. You know something? Get the jury back.

MR. BERNSTEIN: Your Honor, before we bring them in --

THE COURT: Yeah.

MR. BERNSTEIN: -- there's another issue with the

8

indictment.  If you remember you've had to change it before you read it to them because it misstated the statute.  It says a federal agent rather than a covered person.

MR. NICOLAYSEN:  Yes it --

MR. BERNSTEIN:  That's another reason -- issue with the indictment.

THE COURT:  Well I mean in this case the covered person is the federal agent.

MR. BERNSTEIN:  Right but the statute doesn't read federal agent, it reads covered person and you changed it when you read the indictment to them.

THE COURT:  You mean I just read the indictment.

MR. BERNSTEIN:  You read it correctly.  The indictment you sent back it misstates -- with the statute it states the defendants followed a federal agent.

THE COURT:  But a federal agent, as the evidence showed in this case, was a covered person.

MR. BERNSTEIN:  But that's an element of the crime. That he has --

THE COURT:  And that was discussed in the jury instructions and in the arguments.  I don't see the point.

MR. BERNSTEIN:  Regardless, I would ask that you instruct the jury the indictment is not evidence.  They should not consider --

THE COURT:  I'm going to.  I'm going to --

9

MR. BERNSTEIN:  -- and rely on the evidence.

THE COURT:  Get the jury.

**(Court and clerk confer)**

Get them in here.

**(Pause)**

THE CLERK:  All rise for the jury.

**(Jurors enter courtroom)**

Please be seated.

THE COURT:  Good morning, members of the jury.  Thank you once again for your timeliness.

I received your note.  Number one, I think it was from -- I hope I said your name, Juror 7.  Is that the foreperson of the jury?  Mr. Atijera.  How do I say your name?

JUROR NUMBER 7:  Atijera.

THE COURT:  Atijera, yes.  And you've requested additional copies of the jury instructions and the indictment. For reasons that shouldn't concern you, I can't do what you have asked.  I've given you a copy of the jury instructions and the indictment.

Let me emphasize to you and it's not for me to tell you what to focus on or what not to focus on.  That's clearly within your province but I do want to emphasize to you as I have said before, the indictment is not evidence.  The indictment is just the way the case begins.  And the only reason it was given to you was because it will help you perhaps

EXCEPTIONAL REPORTING SERVICES, INC

in filling out the verdict form. In other words, it's a guide to the questions in the verdict form. Otherwise, it has absolutely no significance.

The jury instructions are significant and you have to follow those but it's my preference that if you have to consult the jury instructions as is your right, you do that as a juror. So be mindful of what I have said. Don't look at the indictment as evidence because it's not. The evidence you are to consider are the exhibits in the trial and the testimony.

Thank you. You can resume your deliberations.

THE CLERK: All rise for the jury.

(Jurors exit courtroom)

THE COURT: I understood from my courtroom deputy that one of the lawyers wanted to make a motion for a mistrial. Did I hear that?

MR. NICOLAYSEN: Your Honor, not a mistrial at this time but I do ask the Court to make further inquiry of Juror Number 1 in regard to the inquiry made at the end of the afternoon yesterday. The purpose to find out if that juror shared her concerns with the other jurors because I believe if she did, it potentially contaminates the jury and then I would make a motion for a mistrial. Because she was afraid and that was what concerned me and she was very clear on the record that she had fear.

THE COURT: When -- what's the government's response?

MS. BORDER: Your Honor, the government would oppose. I think she was quite clear that she could be fair. Your Honor asked her --

THE COURT: But the -- I agree with that, that she said she could be fair and I thought that her answer was genuine but the question is, did she share her concerns about what was her fear with other members of the jury. That was more pointed.

MS. BORDER: Your Honor, the government would say it's irrelevant but if Your Honor's leaning that way, the government would not object to just having one ...

THE COURT: Bring her back here for a minute.

MR. BERNSTEIN: Your Honor, can I address one thing before we bring her in?

THE COURT: What's that?

MR. BERNSTEIN: On the proposed verdict form.

THE COURT: Yes.

MR. BERNSTEIN: Under my client, Sandra Samane, it lists three a/k/a's. They are only as a result of the government misspelling her name three times incorrectly. I think listing those a/k/a's makes it sound more nefarious or sinister.

THE COURT: Then I'll tell them to ignore the a/k/a's.

MR. BERNSTEIN: Could we just strike them from the --

12

THE COURT: Well they've already seen them. What good does it do to strike them?

MR. BERNSTEIN: Okay.

THE COURT: Yeah. Bring her back here for a minute.

(Pause)

Ms. Saldibar, good morning.

JUROR NUMBER 1: Good morning.

THE COURT: Please relax. Thank you for being here. I hate to keep bringing you out here but I just want to ask you a simple question. Are you relaxed?

JUROR NUMBER 1: Yes, I am.

THE COURT: Okay. When you had that situation yesterday or the day before with someone saying hello to you or something, what did he say?

JUROR NUMBER 1: He just said hey.

THE COURT: Hey.

JUROR NUMBER 1: Like outside.

THE COURT: Yeah but did you share that concern with any other members of the jury?

JUROR NUMBER 1: I think so, I did.

THE COURT: All of them or some of them?

JUROR NUMBER 1: Some of them.

THE COURT: I see. All right. Get the whole jury back then.

Thank you, Ms. Saldibar. You stay here. You can

**EXCEPTIONAL REPORTING SERVICES, INC**

13

take your seat.  Thank you.

(Pause at 10:04 a.m.)

THE CLERK:  All rise for the jury.

**(Jurors enter courtroom)**

Please be seated.

THE COURT:  Thank you, members of the jury, for your cooperation.  I have one question to ask of you.

Yesterday or the day before, one member of the audience here had some contact with Juror Number 1, Ms. Saldibar, and said something in passing like, "hey," you know, nothing beyond that.  But I understand that it concerned her and I dealt with that but I asked her whether she mentioned that to anyone else.  And we can't have a jury that makes a decision based upon anything but the evidence.  And certainly as I instructed you, public opinion, fear, can't be part of the analysis.  I can assure you, given the admonitions I give you, I have given, that you are secure and safe.

Does anyone feel any apprehension that would prevent them from doing the function that I've outlined?

(No hands raised)

All right.  Then you can go back to your jury duties.

THE CLERK:  All rise for the jury.

**(Jurors exit courtroom)**

MS. CHOI:  Your Honor?

THE COURT:  Yes.

14

**MS. CHOI:** We would ask that Juror Number 1 be stricken for cause. She did not follow the Court's admonition to not talk to other jurors. And it's obvious that she was scared by someone who is associated or friends with the defendants. So we'd ask that she be replaced by an alternate.

**THE COURT:** All right.

**MR. BERNSTEIN:** Join.

**MR. NICOLAYSEN:** I will join in that, Your Honor, in lieu of a motion for a mistrial.

**THE COURT:** My view is that what was said to her was not a threatening comment. Nothing should have been said to her but it was hey or what's up or something like that. And she recognized the person who said it to be one of the supporters of the defendant in the audience. I questioned her. Her answers were in my view genuine. I've observed her demeanor. In my view there's no anxiety or any --

**THE CLERK:** (indisc.).

**THE COURT:** Yes. Oh, is that right?

**THE CLERK:** (indisc.).

**THE COURT:** Yeah. There's no anxiety or apprehension in her demeanor or her face.

**MS. CHOI:** And Your Honor, I think she took it as --

**THE COURT:** Why do you interrupt me all the time?

**MS. CHOI:** Sorry, I can't see when the Court --

**THE COURT:** You can hear my --

15

**MS. CHOI:** I can't see well, sorry.

**THE COURT:** You can hear me speaking.

Okay. And she answered my questions in my view honestly. If she shared any comment, it was a comment that was made which was not threatening. And so I don't see that the jury is tainted in any way. If the parties think it is you can make a motion for a mistrial.

**MR. NICOLAYSEN:** Your Honor, may we address the Court?

**THE COURT:** Yes.

**MR. NICOLAYSEN:** Shannon, you want to go first?

**MS. COIT:** Yes, thank you.

Your Honor, I think the issue is not that a threat was like intended or any or how we might see it but she obviously took it as a threat. She raised it twice. She informed the bailiff on the first day and then she raised it again yesterday so --

**THE COURT:** She didn't do it -- she raised it again yesterday only because I asked her about it and all she actually she -- she did say it twice but I dealt with it. And like I said, it wasn't threatening. I questioned her, she answered. She seems relaxed. She was smiling. She didn't seem at all nervous and I accept her answer. And then I questioned the jurors. If you think otherwise, make a motion for mistrial.

16

MR. NICOLAYSEN:  Your Honor, I do make a motion for a mistrial on behalf of Ms. Raygoza.  And allow me just briefly to state the basis.

Your Honor did what a court would do.  Reassured her that she's safe, reassured her the Court would deal severely with any repetition.  I very much respect the Court's approach.

However, she was afraid and she made it clear that she was afraid.  And in this case, threats are at the heart of the allegations in both counts.  So even if she's relaxed this morning, vis-à-vis Your Honor.  And you did put her at ease but that's the chemistry between her and the Court.  I'm still concerned about the chemistry between her and the defendants because to the degree she and now perhaps other members of the jury with whom she shared her experience associate our clients with members of the audience, that taints the jury.

THE COURT:  So --

MR. NICOLAYSEN:  And at the very least --

THE COURT:  So your motion is for a mistrial because at this point you think the entire jury is tainted.

MR. NICOLAYSEN:  Well I am concerned.  I'd prefer that she be excused, we use an alternate, and proceed with deliberations.  I'm prepared to accept that as an alternative.  And I ask Your Honor to revisit that thinking but I don't think it's appropriate to simply treat the matter as entirely resolved.

17

THE COURT:  To me it's resolved.  What is the government's view?

MR. MPARE:  That's your position, Your Honor.  The government would adopt everything Your Honor said.

And in addition, now twice you've admonished Juror Number 1.  And beyond what is necessary, you brought the entire out --

THE COURT:  I didn't admonish her, I listened to her, I observed her, I asked her if she could be fair and she said in her own words, "I can be fair."

MR. MPARE:  Correct, Your Honor.

THE COURT:  And I also observed her during the jury selection so I think she will be at this point a fair and impartial juror.

MR. MPARE:  Correct, Your Honor.

THE COURT:  All right.  That's the --

MR. BERNSTEIN:  Your Honor, may I add something?

THE COURT:  (inaudible).

MR. BERNSTEIN:  Your Honor, may I be heard, Your Honor?

THE COURT:  (inaudible).

MR. BERNSTEIN:  (A), I want to join both the motions to re --

THE COURT:  Then join.

MR. BERNSTEIN:  But I want to add one additional

18

thing.  By you telling Juror Number 1 and then the juror panel as a whole that you can guarantee that they will be safe implies that there's a reason for them not to feel safe and that is another reason for a mistrial.

**MR. NICOLAYSEN:**  And I join in that argument, Your Honor.

**THE COURT:**  The motions are denied.

**MR. BERNSTEIN:**  Thank you, Your Honor.

**THE CLERK:**  All rise.  This court is in recess.

**(Recessed at 10:13 a.m.; reconvened at 1:22 p.m.)**

**(Outside the presence of the jury)**

**THE CLERK:**  Please be seated.

**THE COURT:**  ... with the parties and counsel.  We received Note Number 2, signed by the foreperson.

"We cannot come to a unanimous decision for the defendants on Counts 1 and 2."  Well that's the whole case.

They haven't been deliberating that long, it was less than an hour after the arguments yesterday and about three or four hours today, three hours.  So I'm going to give them -- call them back and give them a modified Allen Charge as approved by the Ninth Circuit and let them deliberate further.

So get the jury.

**(Pause)**

**THE CLERK:**  All rise for the jury.

**(Jurors enter courtroom)**

**EXCEPTIONAL REPORTING SERVICES, INC**

19

Please be seated.

**THE COURT:** Good afternoon, members of the jury.

I did receive your Note Number 2 and in that light I have an additional instruction to give to you.

Members of the jury, you have reported that you have been unable to reach a unanimous verdict in this case. I have decided to suggest a few additional thoughts to you.

As jurors you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict if each of you can do so without violating your individual judgment and conscious. Each of you must decide the case for yourself but you should do so only after you've considered the evidence impartially with your fellow jurors.

During your deliberations you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong. You should not however come to an honest belief as to the weight and effect of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict.

I remind you that in your deliberations you are to consider the instructions that I've given you as a whole and should not single out some or any -- single out any part of the instruction, including this one, and ignore others. They are all equally important. What I have said is not meant to rush you or pressure you into agreeing on a verdict. Take as much

20

time as you need to discuss things.  There is no hurry.

I ask that you now return to the jury room and continue your deliberations with these additional comments of mine.  You may continue your deliberations.

THE CLERK:  All rise for the jury.

**(Jurors exit courtroom)**

**(Court in recess at 1:27 p.m.; reconvened at 6:06 p.m.)**

**(Call to Order)**

THE COURT:  We received Note 3, signed by the foreperson saying that they have reached unanimous verdict.

The jury.

THE CLERK:  Okay.

**(Pause)**

All rise for the jury.

**(Jurors enter courtroom)**

Please be seated.

THE COURT:  I got a note from the foreperson, Mr. Atijera, saying the jury had reached a verdict.  Could you hand it up to my courtroom deputy, thank you.

**(Verdict tendered to Clerk)**

The verdict on Count 1 as to Raygoza, not guilty.

Count 2, not guilty.

Count 3, not guilty.

As to Raygoza --

MR. BERNSTEIN:  There was no Count 3, Your Honor.

EXCEPTIONAL REPORTING SERVICES, INC

21

MR. NICOLAYSEN: There was no Count 3, Your Honor.

THE COURT: Count 1, I said, Count 1, yeah. Count 1. I said Count 1.

And Count 2, guilty as to Raygoza.

Guilty, as to Brown.

Not guilty as to Samane.

It's signed February 27, '26, signed by Richie Atijera, foreperson of the jury.

Is that the verdict, so say each of you?

(No audible response)

Does the defendant wish the jury polled?

MR. NICOLAYSEN: Yes.

MR. BERNSTEIN: Your Honor, I'm just not clear on Ms. Samane. Was it not guilty on both counts?

THE COURT: Yes.

MR. BERNSTEIN: Okay. I'm just unsure if I heard it correctly.

THE COURT: Yeah, yes.

Okay, poll the jury, Daniel.

THE CLERK: Starting with the juror in the first seat in the first row.

Juror Number 1, is the verdict as presented and read your verdict?

JUROR NUMBER 1: (inaudible).

THE CLERK: Say yes or no.

22

**JUROR NUMBER 1:** Yes.

**THE CLERK:** Juror Number 2, is the verdict as presented and read your verdict?

**JUROR NUMBER 2:** Yes.

**THE CLERK:** Juror Number 3, is the verdict as presented and read your verdict?

**JUROR NUMBER 3:** Yes.

**THE CLERK:** Juror Number 4, is the verdict as presented and read your verdict?

**JUROR NUMBER 4:** Yes.

**THE CLERK:** Juror Number 5, is the verdict as presented and read your verdict?

**JUROR NUMBER 5:** Yes.

**THE CLERK:** Juror Number 6, is the verdict as presented and read your verdict?

**JUROR NUMBER 6:** Yes.

**THE CLERK:** Juror Number 7, is the verdict as presented and read your verdict?

**JUROR NUMBER 7:** Yes.

**THE CLERK:** Juror Number 8, is the verdict as presented and read your verdict?

**JUROR NUMBER 8:** Yes.

**THE CLERK:** Juror Number 9, is the verdict as presented and read your verdict?

**JUROR NUMBER 9:** Yes.

23

THE CLERK: Juror Number 10, is the verdict as presented and read your verdict?

JUROR NUMBER 10: Yes.

THE CLERK: Juror Number 11, is the verdict as presented and read your verdict?

JUROR NUMBER 11: (inaudible).

THE CLERK: Yes, you. No, 11 -- your seat 11.

JUROR NUMBER 11: Yes.

THE CLERK: And Juror Number 12, is the verdict as presented and read your verdict?

JUROR NUMBER 12: Yes.

THE CLERK: Thank you.

THE COURT: Okay. Members of the jury, let me thank you for your participation, your punctuality and your careful attention to the evidence in the case. You were very a conscientious juror and the Court appreciates that.

I want to say something to you now that you have reached a verdict. Some of you may have some questions about the confidentiality of your proceedings.

You are free to discuss the case now with anyone you choose. By the same token, I would advise you that you are under no obligation whatsoever to discuss the case with any person. It's your choice. If someone wants to talk to you about the case, you can talk to them. You may want to talk to the lawyers or may not. And if you don't want to, you can

24

politely say you don't want to or you do.

If you do decide to discuss the case, bear in mind that the other jurors fully and freely stated their opinions with the understanding that they were being expressed in confidence.  Please respect the privacy of the views of the other jurors.  So that's your choice.

Again, thank you very much and have a pleasant weekend and I hope this has been an interesting and important experience for you.  Thank you-all.

**THE CLERK:**  All rise for the jury.

**(Jurors exit courtroom)**

**THE COURT:**  You may be seated if you'd like.

**MR. BERNSTEIN:**  We wanted to get a forthwith release. It's late in the day and I don't know how --

**THE COURT:**  Just wait for a minute, would you?

Where's Daniel.

**(Court and law clerk confer; pause)**

My law clerk reminds me that the jury verdict says clearly that on Count 1, all the defendants are not guilty.  I may have looked at the verdict form 1, 2 and 3 and called them counts but they're all not guilty as to Count 1.

Where's Dan -- oh Daniel, okay.

**MR. NICOLAYSEN:**  And Your Honor, Count 2, can we just confirm guilty for Raygoza, not guilty for Samane and as to Ashleigh Brown.

25

THE COURT:  Guilty.

MR. NICOLAYSEN:  I see.

THE COURT:  Which defendant was in custody?

MR. BERNSTEIN:  My client, Ms. Samane.

THE COURT:  Okay well she's ordered released forthwith.

MR. BERNSTEIN:  Will they be released directly from the courthouse?

THE COURT:  Can't she be released here or whatever the procedure is, what is it?

(Pause; background speaking)

THE COURT:  The marshal tells me that there are some release forms that have to be signed and taken care of.  The deputy clerk will take care of that.

MR. BERNSTEIN:  Thank you.  I appreciate that, Your Honor.  Thank you, Daniel.

THE COURT:  And then with regard to the other defendants, Daniel, we have to set a date for sentencing.

THE CLERK:  Yes.  Sentencing will be held Monday, June 8th at 11:00 a.m.

All rise.  This court is adjourned.

(Proceeding adjourned at 6:17 p.m.)

26

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____              **March 17, 2026**

      **Signed**                              **Dated**

*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**

EXHIBIT P - Page 26 of 26

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

UNITED STATES OF AMERICA,
Plaintiff,

v.

KAILIN WANG,
Defendant.

Case No. 2:24-cr-00163-TS
Judge Ted Stewart

## ORDER MODIFYING CONDITIONS OF RELEASE

| | |
|---|---|
| **Case:** | United States v. Dennis, No. 20-cr-623-LGS (S.D.N.Y.) |
| **Statute:** | 18 U.S.C. § 2261A (four counts of cyberstalking) |
| **Posture:** | Pretrial; modification after period of compliance |
| **ECF / Date:** | ECF No. 46, filed May 17, 2022 |
| **Relief Granted:** | Home detention and location monitoring lifted; travel to D.N.J. and M.D. Fla. permitted; no-contact and electronic-account restrictions retained |

**Nature of the Charges.**

Winston Dennis was charged with four counts of cyberstalking under 18 U.S.C. § 2261A in the Southern District of New York. The alleged conduct involved an extended course of electronic communications — email, online messaging, or similar means — directed at specific victims, including individuals affiliated with a law firm. The case raised no allegation of physical violence or in-person contact; the entire charged risk was electronic in nature.

**Circumstances at Arrest.**

Dennis had been residing lawfully in the Dominican Republic for approximately twenty months before his arrest. He was apprehended abroad and returned to the United States to face the charges. His prior prolonged overseas residence informed the original imposition of more restrictive conditions, including home detention and electronic monitoring.

**Initial Release Conditions.**

The original conditions were extensive: a $200,000 bond; home detention with electronic location monitoring; surrender of all travel documents; prohibition on opening any new email account or obtaining any new phone number without prior approval from Pretrial Services; disclosure of all existing phone numbers and email addresses to Pretrial Services; and strict no-contact orders covering the alleged victims and all personnel at the affected law firm.

**Modifications Granted.**

The court first amended the geographic restriction to permit travel to the District of New Jersey and the Middle District of Florida, in addition to the home district. The court subsequently entered a further modification lifting home detention and location monitoring in their entirety, while preserving the targeted no-contact restrictions and the electronic-account conditions.

**Court's Reasoning.**

The court's analysis distinguished between physical risk and electronic-communications risk. It recognized that home detention and GPS monitoring are tools designed to prevent physical flight or physical harm — not electronic conduct. Because the entire asserted risk in a cyberstalking case is electronic in nature, location-based restrictions are only marginally relevant to preventing the charged conduct. Targeted conditions directly addressed to electronic activity — account restrictions, disclosure requirements, no-contact orders — were found sufficient to manage the actual risk.

**Relevance to This Motion.**

Dennis establishes a legal framework directly applicable here. The Government cannot justify blanket travel denial by pointing to cyberstalking allegations when the conditions actually suited to preventing electronic conduct — no-contact orders, account restrictions, disclosure requirements — are already in place or can be imposed. The court's calibration of conditions to the specific nature of the risk reflects the Bail Reform Act's mandate that conditions be the least restrictive means necessary. The same analysis supports modifying Ms. Wang's conditions to permit travel while retaining targeted electronic and no-contact restrictions.

---

*[Court Record Follows]*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------X
                                              :
   UNITED STATES OF AMERICA,                  :
                                              :
                  -against-                   :          20 Cr. 623 (LGS)
                                              :
   WILLIE DENNIS,                             :              ORDER
                        Defendant.            :
                                              :
-------------------------------------------------------------X
```

LORNA G. SCHOFIELD, District Judge:

WHEREAS, on October 28, 2020, Defendant Willie Dennis was charged by Complaint with four counts of cyberstalking, and an arrest warrant was issued;

WHEREAS, on November 19, 2020, Mr. Dennis was indicted on the same charges in an indictment that remained sealed for one year;

WHEREAS, on or about November 16, 2021, Mr. Dennis was arrested in the Dominican Republic, where he had been residing lawfully since approximately February 2020;

WHEREAS, on November 19, 2021, Magistrate Judge Ona T. Wang held a bail hearing, after which Judge Wang ordered the following bail conditions that had been agreed to by the parties: $200,000 bond co-signed by three financially responsible persons; home detention supported by location monitoring via an ankle bracelet; travel restricted to the Southern and Eastern Districts of New York; surrender of all travel documents and prohibition of new applications for travel documents; prohibition of the possession of firearms and other weapons; mental health treatment; prohibition on opening new email or phone accounts without prior approval; requirement to seek employment; urinalysis; provision of phone numbers and email addresses to Pretrial Services; and prohibition on contacting the four victims identified in the indictment or any other current or former employees and partners of Mr. Dennis's former law firm, including a prohibition of going to any offices of the firm;

WHEREAS, the travel restriction condition was later amended to permit travel to the District of New Jersey and the Middle District of Florida;

WHEREAS, Judge Wang found by a preponderance of the evidence that release on personal recognizance would not reasonably assure Mr. Dennis's appearance, given that he had been living in the Dominican Republic for approximately 20 months prior to being arrested;

WHEREAS, Judge Wang expressed concern about the danger of further cyberstalking or harassing communications -- not about physical danger -- and did not find that release on personal recognizance would endanger the safety of any other person or the community;

WHEREAS, on January 10, 2022, Mr. Dennis filed a letter requesting a modification of the conditions of his pretrial release -- replacing home detention enforced by location monitoring with a curfew enforced by vocal recognition -- on the grounds, *inter alia*, that he had fully complied with the terms of his pretrial release for approximately two months, and the location monitoring equipment caused him physical pain and injury;

WHEREAS, on January 26, 2022, Mr. Dennis's first request for a modification of the conditions of his pretrial release was denied because his compliance with the conditions was expected when the conditions were set, and a physician opined that the location monitoring equipment was unlikely to be the cause of Mr. Dennis's physical pain and injury;

WHEREAS, on April 25, 2022, Mr. Dennis renewed his request for modification of the conditions of his pretrial release;

WHEREAS, a court "shall order the pretrial release of" a person charged with an offense "subject to the least restrictive further condition, or combination of conditions" that will "reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(c)(1)(B);

2

WHEREAS, the Court "may at any time amend the order to impose additional or different conditions."  § 3142(c)(3);

WHEREAS, in deciding what conditions to impose, and whether to modify those conditions, the Court shall "take into account the available information concerning -- (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including -- (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  § 3142(g);

WHEREAS, the government bears the burden of persuasion by a preponderance of the evidence as to risk of flight, and by clear and convincing evidence as to dangerousness.  *United States v. Chimurenga*, 760 F.2d 400, 405-06 (2d Cir. 1985); *accord United States v. Drayton*, No. 22 Cr. 91, 2022 WL 1026727, at *2 (S.D.N.Y. Apr. 4, 2022);

WHEREAS, without deciding whether the offenses with which Mr. Dennis is charged may be crimes of violence for purposes of § 3142(g)(1), the nature and circumstances of the offenses charged favor less restrictive conditions because Mr. Dennis is not alleged to have engaged in any acts of violence, nor in any threatening behavior since being ordered not to have

3

contact with the victims (or for several months before that), and to the extent the Complaint alleges any actual threats, the references are vague or heavily excerpted. *Cf. United States v. Waldman*, No. 18-MJ-4701, 2018 WL 2932729, at *3 (S.D.N.Y. June 12, 2018) (declining to decide whether cyberstalking is a crime of violence, but finding that "the nature and circumstances of the offenses charged . . . weigh in favor of detention" where the defendant specifically threatened to rape, kill and commit other violent crimes against the victim, and continued threatening communications after the entry of a no-contact order);

WHEREAS, the evidence against Mr. Dennis cited in the Complaint includes emails and text messages, several of which are quoted or excerpted, but the weight of the evidence cannot be said to be overwhelming as to several elements of the charged offenses, including Mr. Dennis's intent and whether the communications "cause[d], attempt[ed] to cause, or would be reasonably expected to cause substantial emotional distress," 18 U.S.C. § 2261A(2);

WHEREAS, Mr. Dennis's history and characteristics generally favor less restrictive conditions given that,

- notwithstanding and at least until the course of conduct alleged in the Complaint and indictment, Mr. Dennis apparently has comported himself as a person of good character;

- his physical condition is such that it would be difficult for him to flee;

- he was seeking mental health treatment prior to it being made a condition of his pretrial release, and he continues to receive such treatment;

- he has family ties to his elderly and infirm parents with whom he currently resides in Florida and to the three family members who co-signed his $200,000 bond;

- he was unemployed but ordered to seek employment as a condition of pretrial release, while he also spends significant time caring for his parents;

4

- his financial condition is such that it would be difficult for him to flee;

- he lived in the community in this District for decades and, notwithstanding his recent absence, maintains strong ties to the community;

- he has no history of drug or alcohol abuse;

- he has no prior criminal history and

- he has no record of failing to appear for court proceedings;

WHEREAS, nothing in the record suggests that Mr. Dennis poses a physical danger to any person or the community. Any danger of further harassing communications is only minimally affected by the conditions of home detention and location monitoring, as almost all of Mr. Dennis's alleged prior harassing communications were made by electronic means. Any such danger is mitigated by other conditions of Mr. Dennis's pretrial release not challenged in this motion, including the prohibition on opening new email or phone accounts without prior approval; provision of phone numbers and email addresses to Pretrial Services; and prohibition on contacting the four victims identified in the indictment or any other current or former employees and partners of Mr. Dennis's former law firm, including a prohibition of going to any offices of the firm;

WHEREAS, since Judge Wang originally imposed the conditions of pretrial release, Mr. Dennis has conscientiously complied with all conditions for approximately six months, including the no-contact order, including for almost four months since this Court denied Mr. Dennis's last motion, and that information was not available at the time of the original hearing and now constitutes a sufficiently long record of compliance to establish truly changed circumstances;

WHEREAS, the above-mentioned restrictions on Mr. Dennis will reasonably assure the safety of the community and all persons;

5

WHEREAS, the other conditions of Mr. Dennis's pretrial release will reasonably assure his appearance at future court proceedings, including $200,000 bond co-signed by three financially responsible persons, travel restrictions to the Southern and Eastern Districts of New York, District of New Jersey, and Middle District of Florida, and surrender of all travel documents and prohibition of new applications for travel documents. It is hereby

**ORDERED** that Defendant's motion to modify the conditions of his pretrial release to lift the home detention and location monitoring conditions is GRANTED. All other conditions set by Judge Wang, as subsequently amended, shall remain in place pending Defendant's trial.

The Clerk of Court is respectfully directed to close the motion at Docket Number 34.

Dated: May 17, 2022
New York, New York

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

UNITED STATES OF AMERICA,
Plaintiff,

v.

KAILIN WANG,
Defendant.

Case No. 2:24-cr-00163-TS
Judge Ted Stewart

## MOTION TO MODIFY CONDITIONS OF RELEASE

| | |
|---|---|
| **Case:** | United States v. Dennis, No. 20-cr-623-LGS (S.D.N.Y.) |
| **Statute:** | 18 U.S.C. § 2261A (four counts of cyberstalking) |
| **Posture:** | Pretrial; motion preceding the Order in Exhibit C |
| **ECF / Date:** | ECF No. 34, filed April 25, 2022 |
| **Purpose:** | Shows procedural framing and arguments accepted by the court granting Exhibit C |

**Nature of the Charges.**

Same four-count cyberstalking prosecution as Exhibit C. United States v. Dennis involved allegations of an extended electronic harassment campaign in the Southern District of New York. The motion reflects the legal landscape as it appeared to defense counsel and the court at the time of the modification request.

**Arguments Presented.**

The defense motion argued: (1) the defendant had complied fully with all existing conditions of release throughout the pretrial period; (2) he had traveled through airports on multiple prior occasions without incident; (3) home detention and location monitoring were not preventing the alleged electronic conduct — communications can occur from any location — making those conditions unduly burdensome relative to their marginal protective value; and (4) the targeted conditions of electronic-account restrictions, contact-information disclosure, and no-contact orders were sufficient to address the Government's actual concerns.

**Issues Framed for the Court.**

The motion presented the question as one of calibration under the Bail Reform Act: whether 18 U.S.C. § 3142(c)(1)(B)'s least-restrictive-conditions requirement was satisfied by location-based detention when the risk was electronic in nature and electronic risks could be managed by electronic

means. It also invoked the compliance record as evidence that the defendant had demonstrated the ability to abide by conditions without location monitoring.

**Relevance to This Motion.**

This filing is offered for its procedural context and legal framing only, not for the truth of its factual allegations. It shows that the compliance-based, risk-calibration arguments which the Dennis court accepted are established and recognized grounds for release modification in federal cyberstalking prosecutions. Those same arguments — compliance record, mismatch between location restrictions and electronic risk, adequacy of targeted conditions — are squarely applicable to Ms. Wang's situation.

---

*[Court Record Follows]*



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 6, 2022

**BY ECF**
The Honorable Lorna G. Schofield
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    *United States v. Dennis*, 20 Cr. 623 (LGS)

Dear Judge Schofield:

      The Government respectfully submits this letter to inform the Court of information that the Government recently learned that further demonstrates the need for the current bail conditions and counsels against the defendant's second request to modify the conditions of his pretrial release. In seeking to have his location monitoring bracelet and home detention conditions removed, the defendant argues, among other things, that he has respected the bail condition that prohibits him from having any contact with any victims or employees of his former law firm (the "Firm"). (Dkt. No. 34 at 3, 6; Dkt. No. 40 at 1-2.) The defendant, however, as recently as May 4, 2022, has been sending harassing emails to at least one third party connected to the Firm. Those emails are exactly the kinds of emails that form, in part, the basis for the cyberstalking charges in this case. For example, the defendant has sent articles about the size of the world Jewish population and a recent Nazi rally in Florida to the third party, who is Jewish. While not a technical violation of the no-contact condition, these emails undermine the purpose and spirit of the condition and are cause for concern. If the Court wishes to see the emails, the Government respectfully requests that they be submitted under seal to protect the privacy of the third party.

For the foregoing reasons, and those set forth in the Government's prior letters (Dkt. Nos. 19 and 39) and in the Court's January order (Dkt. No. 27), the defendant's renewed request for a modification of the most significant conditions of his pretrial release should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _____
Sarah L. Kushner
Assistant United States Attorney
(212) 637-2676

cc:    Neil Kelly, Esq. (by ECF)
       Jennifer Brown, Esq. (by ECF)
       Josh Rothman, Pretrial Services Officer (by Email)

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

April 25, 2022

**Via ECF**

The Honorable Lorna G. Schofield
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re:    **United States v. Willie Dennis**
       **20 Cr. 623 (LGS)**

Dear Judge Schofield,

We write on behalf of Willie Dennis to respectfully renew our request that the Court modify the conditions of Mr. Dennis's pretrial release to lift the home detention and location monitoring conditions. As confirmed by his supervising Pretrial Services Officer, over the more than five months since his arrest, Mr. Dennis has been fully compliant with the terms of his pretrial supervision. Mr. Dennis's demonstrated record of compliance—including periods of time when he was not subject to location monitoring equipment and times when he has traveled unsupervised through international airports—has proven that he presents no risk of flight. Nor does Mr. Dennis seek to modify the no-contact and electronic communication monitoring conditions that were part of his release order, with which he has been fully compliant and which directly address the purported risk of danger in this case based on the government's allegations.

For the reasons described in our previous submissions and below, the home detention and location monitoring conditions far exceed the least restrictive conditions needed to reasonably assure Mr. Dennis's future appearance and mitigate any alleged danger to the community. We respectfully submit that these conditions should be modified.

While Pretrial Services in the Middle District of Florida has confirmed that Mr. Dennis has been fully compliant with the terms of his pretrial release since his relocation to Florida in December 2021, because Mr. Dennis's underlying case is in the Southern District of New York, Pretrial Services in Florida takes no position on the present application. Mr. Dennis's Pretrial Services Officer in the Southern District of New York has been out of the office for the past week, so has not yet taken a position in response to counsel's inquiries. The government opposes this application.

United States v. Dennis
20 Cr. 623 (LGS)

## I.      Background

The Court is familiar with Mr. Dennis's admirable personal history and exceptional characteristics from our prior submissions, which we incorporate herein by reference. *See* Dkt. 18 at 1–2. To briefly summarize his biography, Mr. Dennis is a widely-accomplished 60-year old corporate attorney who reached the heights of the legal profession as an equity partner at a top 50 law firm in New York. Over the course of his distinguished career, Mr. Dennis represented dozens of Fortune 500 companies in high-profile transactions, was awarded numerous industry awards, and received recognition in national publications. Mr. Dennis secured such achievements as a Black man in a profession that has a long reflected a lack of diversity and perpetuated a history of discrimination. Mr. Dennis has been a community leader on diversity and empowerment initiatives both inside and outside the legal profession. As relevant to this application, he also has no criminal history, no current liquid assets, no passport or travel documents (which are in the possession of Pretrial Services), and is currently residing with his elderly and infirm parents whom he cares for daily.

Despite Mr. Dennis's impressive background and the fact that he has not been charged with any offense that carries a presumption in favor of detention, after his arrest, Mr. Dennis was ordered to be subject to home detention and location monitoring on that grounds that he presented a risk of flight because he had been living in the Dominican Republic at the time of his arrest. *See* Dkt. 18-1 at 59:17–61:7. Mr. Dennis was also ordered to comply with several other conditions of pretrial release, none of which he objected to or has sought relief from, including: a $200,000 personal recognizance bond, co-signed by three financially responsible persons; travel restricted to the Southern and Eastern Districts of New York (later modified to include the Middle District of Florida and District of New Jersey); surrender of all travel documents; no possession of any firearms; mental health services as directed by Pretrial Services; direction to seek employment; urinalysis and substance abuse treatment as directed by Pretrial Services; direction to not open any new email accounts or phone accounts without permission from Pretrial Services; providing Pretrial Services with the phone numbers and email accounts/passwords that he would use; and no contact with four alleged victims, any current or former employees of his former law firm, or several additional persons identified by the government. *See* Dkt. No. 5.

For more than five months, since his release on November 21, 2021—including an interregnum during which he was not yet fitted with any location monitoring equipment, had no co-signers on his bond, and had not executed his own bond—Mr. Dennis has been fully compliant with the terms of his pretrial release. Since early December 2021, with the Court's permission, Mr. Dennis has resided, and been supervised by Pretrial Services, in the Middle District of Florida. Mr. Dennis's supervising Pretrial Officer in Florida recently confirmed that "Mr. Dennis has had no compliance issues while on bond, and has complied with all location monitoring program, mental health treatment, and substance abuse testing requirements since he's been supervised here in the Middle District of Florida." Ex. A. In recognition of this history of compliance, since early March, Mr. Dennis has been given permission by Pretrial Services in Florida to travel three days a week to a local fitness center to exercise. This is in addition to Mr. Dennis's permitted leave for shopping and personal care, religious services, therapy, and medical appointments—all of which he has dutifully coordinated with his Pretrial Services officer.

United States v. Dennis
20 Cr. 623 (LGS)

Mr. Dennis has also fully complied with the "no-contact" order, even after receiving the discovery that has been produced in this case that discloses the complaining and other witnesses. Mr. Dennis's full compliance remains confirmable by Pretrial Services, which has access to his electronic communications and which has not raised any issue with respect to any purported violation of his release conditions.

Since the defense's original submission, the health of Mr. Dennis's elderly parents (with whom he is residing) has declined and Mr. Dennis's caregiving obligations have increased. Mr. Dennis's father is 87 years old, suffers from dementia, and requires constant monitoring. Mr. Dennis's mother, aged 81, suffers from a number of cardiac conditions that have required hospital visits during Mr. Dennis's time in Florida. Due to Mr. Dennis's home detention condition and the need for pre-approval for any travel outside the home, however, his ability to care for his parents—including to visit his mother or pick up her medications when she was unexpectedly hospitalized—has been significantly curtailed.

## II.    Argument

### A.    *Applicable Law*

In denying Mr. Dennis's January application, the Court held that Mr. Dennis's compliance with the conditions of his pretrial release did not constitute "new" facts or evidence that warranted reconsideration of Mr. Dennis's conditions because "when the conditions were set, they were set with the expectation that Defendant would comply." Dkt. 27 (citing 18 U.S.C. § 3142(g)). But the Bail Reform Act, as promulgated in relevant part at section 3142(g), identifies the factors the Court is to consider "in determining *whether* there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(g) (emphasis added). "Once one concedes, as the government [and Pretrial Services have] here, that pretrial detention is not necessary, the operative inquiry becomes what are the *least restrictive* conditions that will *reasonably assure* the defendant's appearance" and the safety of the community. *United States v. Hutchins*, 298 F. Supp. 3d 1205, 1207–08 (E.D. Wisc. 2017) (citing 18 U.S.C. § 3142(c)(1)(B)).

We respectfully submit that Mr. Dennis's demonstrated history of compliance with the terms of his pretrial release justifies modification of his conditions. Under the plain language of section 3142, the Court "may *at any time* amend the order to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(3) (emphasis added). The Court "is not required to find changed circumstances in order to revisit [the] Magistrate Judge['s] release order." *United States v. Brock*, No. 21 Cr. 140 (JDB), 2021 WL 3616892, at *3 (D.D.C. Aug. 16, 2021).

As another District Court has held, rejecting an argument from the government "that compliance with release conditions is not enough, standing alone, to warrant modification of these conditions," such a "view is contrary to the normal practice in this and other district courts around the country." *Hutchins*, 298 F. Supp. 3d at 1208. As the court explained:

> When defendants establish that they will abide by their obligation to appear in court, logic dictates that the justification for imposing the existing release

3

United States v. Dennis
20 Cr. 623 (LGS)

conditions lessens. Put differently, if the Bail Reform Act requires no more than the least restrictive conditions needed to reasonably assure the defendant's appearance, then consistent compliance with existing conditions counsels in favor of reducing their severity on the theory that lesser conditions will suffice. *Id.*

This holding echoed the observation made by the Magistrate's Court regarding "the policies underlying the Bail Reform Act and routine practice in courts around the country." *United States v. Hutchins*, No. 17 Cr. 124 (JPS) (E.D. Wisc. Oct. 19, 2017), Doc. No. 35 at 5. Specifically:

Reducing the level of supervision (e.g., from home confinement, then to home detention, then to curfew, etc.) after a demonstrated record of compliance (or increasing supervision in the event of non-compliance) is a routine measure necessary to ensure the court's obligation to impose the least restrictive conditions necessary to reasonably assure [a defendant's] appearance and the safety of the community. *Id.* (citing 18 U.S.C. § 3142(c)(1)(B)).

As described at length in Mr. Dennis's prior submissions, and as proven by Mr. Dennis's demonstrated record of compliance with all the terms of his pretrial release over the more than five months since this case was initiated, the home detention and location monitoring conditions in the Magistrate Court's release order far exceed the "least restrictive" set of conditions necessary to assure Mr. Dennis's appearance in court or to prevent any danger to the community. We highlight below a few of the most salient reasons why.

B.      *Risk of Flight*

As previously described (Dkt. 18 at 5–6), Mr. Dennis is a United States citizen who has surrendered his passport to Pretrial Services. *See Hutchins*, 298 F. Supp. 3d at 1209 ("[T]he notion that Hutchins can escape the country without a passport is both true and irrelevant. Not having a passport will at a minimum make this more difficult, and the Bail Reform Act does not mandate a set of conditions that will guarantee that the defendant cannot flee.").

Although he was living in the Dominican Republic at the time of his arrest, Mr. Dennis lived in New York for more than 50 years, and maintains a deep network of supportive friends and colleagues here. At the time of his arrest, Mr. Dennis was under no obligation to live in the United States and (to his knowledge) was facing no criminal charges from which he was absent. Mr. Dennis did not challenge his removal to the United States and has been residing with his elderly and infirm parents, and acting as their caretaker, for more five months.

Mr. Dennis's significant bond has also been co-signed by three of his close family members, who would be financially devastated if he were to fail to appear. Nor would Mr. Dennis inflict upon his elderly parents the worry, stress, and abandonment that would result if he were to flee. Mr. Dennis also has no liquid assets that would allow him to flee, even if he wanted to (which he does not).

United States v. Dennis
20 Cr. 623 (LGS)

As noted in our prior submissions, during the period of time after Mr. Dennis had been released from custody, but before his co-signers had been sworn to the bond and before Mr. Dennis was fitted with location monitoring equipment, Mr. Dennis did nothing that evidenced any intent to flee. If Mr. Dennis had any inclination to flee, he would have acted on it at this time—before any third parties would have been subject to the negative consequences of his flight, while Pretrial Services was unaware of his location, and while he was not carrying any mobile electronic device that could be tracked or traced. Of course, Mr. Dennis did not attempt to flee because he has complete and full respect for the Court's orders, and he has complied and will continue to fully comply with them.

Since his arrest, Mr. Dennis has also flown between New York and Florida, transiting between international airports, with no law enforcement or Pretrial Services accompaniment. *See Hutchins*, 298 F. Supp. 3d at 1209 ("Moreover, Hutchins has traveled within the United States several times since his arrest and has not made any attempt to flee."). Again, if Mr. Dennis were going remove his location monitoring equipment and attempt to flee, there would have been no better opportunity to do so than when he was already in an international airport, alone, with preapproval to board a flight. Again, Mr. Dennis did not taken any such actions because he has no intention to flee. Rather, he has coordinated his travel and checked in as required with Pretrial Services. Mr. Dennis intends to vigorously defend himself against the government's accusations and seek a trial at the Court's earliest availability at which to do so. These significant facts should not be overlooked. *See United States v. Hutchins*, No. 17 Cr. 124 (JPS) (E.D. Wisc. Aug. 25, 2017), Doc. No. 23 at 3 (considering as a "significant fact" in favor of reduction of defendant's pretrial release conditions that, after defendant's "arrest in Las Vegas[,] he flew from Las Vegas to Milwaukee (unaccompanied by law enforcement or a representative from pretrial services), where he spent the weekend without the supervision of law enforcement or pretrial services. He subsequently appeared in court here as required. He then flew to Los Angeles (apparently changing planes in Minneapolis), again unaccompanied by law enforcement or anyone from pretrial services. Upon his arrival in Los Angeles, he reported to pretrial services as required.").

As Mr. Dennis's Pretrial Officer in Florida has confirmed, Mr. Dennis has complied with all of the other conditions of his pretrial release as well. Ex. A.

In sum, the significant conditions of release to which Mr. Dennis is already subject are more than sufficient to reasonably assure that Mr. Dennis appears at all future court appearances. His demonstrated record of compliance—including during situations that would have presented prime opportunities to attempt to flee—conclusively establishes that he is not a risk of flight. Accordingly, the location monitoring and home detention conditions far exceed the least restrictive conditions necessary to reasonable assure his future appearances. *Cf. Brock*, 2021 WL 3616892, at *4 (reducing pretrial release conditions for defendant accused of entered Capitol in military gear and carrying flex-cuffs onto the Senate floor, and "notwithstanding his belief in the righteousness of his actions," because "he has consistently demonstrated 'his willingness to comply with his obligations to appear in this Court as required'" (quoting *Hutchins*, 298 F. Supp. 3d at 1209–10)). *See also* Dkts. 18, 20.

5

United States v. Dennis
20 Cr. 623 (LGS)

### C. *Danger to the Community*

It bears repeating that Magistrate Judge Wang did not base her decision to impose location monitoring and home detention on any purported danger from Mr. Dennis—who has no criminal history and no history of violence. Mr. Dennis is not charged with conspiring or attempting to harm anyone, planning or taking any steps to harm anyone, or committing or attempting to commit any acts of violence against anyone. He is accused of sending harassing communications, but any risk of such future conduct has already been mitigated.

Specifically, Mr. Dennis does not challenge and has fully complied with the "no-contact" order and electronic communication monitoring conditions issued by Magistrate's Court. He has not opened any new email accounts or phone accounts without permission from Pretrial Services; has provided Pretrial Services with the phone numbers and email accounts/passwords that he uses; and he has not contacted any of the alleged victims or any of the hundreds of other persons the government stated he should refrain from contacting. Any risk of "danger" to the community that Mr. Dennis purportedly presents—which are based solely on the unproven allegations against him because he has no criminal history—has already been more than sufficiently addressed by these conditions.

As described in more detail in the defense's prior submissions (Dkt. 18 at 8–9), even if there were a risk of danger to the community here, the conditions of Mr. Dennis's pretrial release in their current form still exceed the least restrictive means of preventing such harm. Even if the location monitoring and home detention conditions are relaxed, the existing conditions would continue to specifically prohibit Mr. Dennis from contacting any of the alleged victims, any current or former employee of his former firm, and other specified persons, and prevent him from opening any new email or phone accounts. He has proven he will comply with these conditions during the more than five months of his pretrial release to date. *Cf. Brock*, 2021 WL 3616892, at *3 (removing location monitoring condition despite allegations that defendant was a danger to the community because "the Court is convinced that a combination of less restrictive conditions is sufficient to mitigate those concerns").

### D. *The 3142(g) Factors Support Modification*

Finally, and again without fully restating the arguments that were made in Mr. Dennis's original bail modification application submissions (Dkt. 18 at 7), even if the section 3142(g) factors controlled, these factors favor modification in this case.

- Mr. Dennis is not charged with committing or attempting to commit any acts of violence. And he has not contacted any alleged victim since the no-contact order was issued. *See* 18 U.S.C. § 3142(g)(1).

- Even if the Court accepts the government's claim at this stage that the record reflects evidence of cyberstalking, the "weight of the evidence" is generally considered the least important factor for the Court's bail consideration. *See United States v. Jones*, 566 F. Supp. 2d 288, 292 (S.D.N.Y .2008); 18 U.S.C. § 3142(g)(2).

6

United States v. Dennis
20 Cr. 623 (LGS)

- Mr. Dennis's personal history and characteristics weigh heavily against the need for location monitoring in this case, as described in detail above and in our in prior submissions. *See* 18 U.S.C. § 3142(g)(3)(A).

- Mr. Dennis has a number of ongoing health ailments for which he is receiving treatment. As such, he is not physically able to flee, even if he were so inclined (which he is not).

- Mr. Dennis's family ties are deep and strong. He is living with his elderly and infirm parents in Florida and helping to care for them. During the five months he has been living with them, their health has continued to decline and his caregiving has increased significantly. He would not flee or risk violation of his bond conditions and threaten the health and safety of his parents at this time. In addition, his bond has been co-signed by three close family members who would be devastated financially if he were to flee. *See id.*

- Mr. Dennis is in no financial position to flee, he has no history of drug or alcohol abuse, he has no criminal history, and he has never missed a scheduled court proceeding. *See id.*

- At the time of his arrest, Mr. Dennis was not on probation, parole, or release in any other matter. *See id.* § 3142(g)(3)(B).

- As discussed, Mr. Dennis presents no danger to any other person or the community that would be increased by the removal of his home detention and location monitoring conditions. *See id.* § 3142(g)(4).

*     *     *

For the foregoing reasons, we respectfully request that that Court lift the home detention and location monitoring conditions of Mr. Dennis's pretrial release. To the extent the Court has any concerns not addressed by Mr. Dennis's submissions, Mr. Dennis notes again that he would be amenable to additional, reasonable conditions on his release (e.g., an increase of his personal recognizance bond amount) to assuage any such concerns.

We thank the Court for its consideration of this request.

Respectfully submitted,

/s/ Neil Kelly

Neil P. Kelly
Assistant Federal Defender
(212) 417-8744

cc:     AUSA Sarah Kushner
        Pretrial Services Officer Joshua Rothman

7

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

UNITED STATES OF AMERICA,
Plaintiff,

v.

KAILIN WANG,
Defendant.

Case No. 2:24-cr-00163-TS
Judge Ted Stewart

## TWO MOTIONS TO MODIFY RELEASE CONDITIONS TO PERMIT TRAVEL TO FLORIDA (BOTH ASSENTED TO BY GOVERNMENT & PROBATION)

| | |
|---|---|
| **Case:** | United States v. Mullane, No. 25-CR-10201-MSM (D. Mass.) |
| **Statute:** | 18 U.S.C. § 2261A(2)(B) — four counts of cyberstalking |
| **Posture:** | Pretrial and pending; motion to dismiss held in abeyance as of April 29, 2026 |
| **ECF / Date 1:** | ECF No. 91, filed Feb. 12, 2026 — travel Feb. 23–25, 2026 (Miami, FL) |
| **ECF / Date 2:** | ECF No. 104, filed Apr. 14, 2026 — travel Apr. 26–29, 2026 (Key West, FL) |
| **Assent:** | Government and Probation assented to both modifications; all existing conditions remained in effect |

**Nature of the Charges.**

Brendan Jonathan Mullane was indicted on May 27, 2025 on four counts of cyberstalking under 18 U.S.C. § 2261A(2)(B) in the District of Massachusetts. Count One is representative: it alleges that between approximately February 5 and May 1, 2025, Mullane used interactive computer services and the internet with the intent to injure, harass, and intimidate a named victim, engaging in a course of conduct that caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress. Three additional counts are identical in structure but allege different victims and different time periods. The indictment contains no factual allegations beyond the statutory language. As of April 2026, Mullane has moved to dismiss the indictment for failure to state an offense on Fifth and Sixth Amendment grounds, arguing the bare statutory language without specific factual allegations is constitutionally insufficient.

**Alleged Victims and Civil Litigation Context.**

Among the individuals whose identities are relevant to the Mullane case is Alison Lehr, a former Assistant United States Attorney. Mullane has a pending civil suit against Ms. Lehr and others, Mullane v. Moreno et al., No. 20-cv-21339 (S.D. Fla.), in which he alleges, among other things, that Ms. Lehr sent false and defamatory materials about him to legal publications. The Eleventh Circuit

held in May 2025 that the alleged conduct appeared 'purely personal,' outside the scope of federal employment, and therefore unprotected by Westfall Act immunity. Mullane v. Moreno et al., No. 21-13468, 2025 WL 1386666 (11th Cir. May 14, 2025). Mullane thus faces a federal cyberstalking indictment while simultaneously prosecuting a civil action against a person connected to the criminal proceeding — a posture directly analogous to Ms. Wang's situation, in which civil and family-law proceedings intersect with her criminal case.

### First Travel Modification (ECF No. 91, Feb. 12, 2026).

Mullane moved to modify release conditions to permit travel from Massachusetts to Miami, Florida for an in-person status hearing in Mullane v. Moreno before Judge Liles Burke (N.D. Ala., sitting by special designation) on February 24, 2026. Mullane had sought to appear remotely via Zoom; that request was denied and his personal appearance was ordered by the court. He proposed to travel February 23–25, 2026. The motion represented that 'there has been absolutely nothing that has occurred during the pendency of this case to suggest that there would be any risk or reason' to prevent the travel. Both the Government and Probation assented. All other release conditions remained in effect.

### Second Travel Modification (ECF No. 104, Apr. 14, 2026).

Mullane again moved to modify release conditions for a second trip to Florida — this time for an in-person motion hearing and scheduling conference in the same civil case in Key West, FL on April 28, 2026. He proposed to travel April 26–29, 2026. Again, both the Government and Probation assented without objection. All existing conditions remained in force. This was the second consecutive travel modification assented to by the prosecution in an active § 2261A(2)(B) case.

### Status of the Criminal Case as of Filing.

The criminal case remains pending and unresolved. On April 29, 2026, the parties jointly moved (ECF No. 111) to hold Mullane's motion to dismiss in abeyance for approximately 45 days while exploring a potential resolution. The parties agreed to exclude that period from Speedy Trial Act calculations under 18 U.S.C. § 3161(h)(D). The government has not yet filed an opposition to the motion to dismiss. The case is set for a further status conference in approximately 45 days from April 29, 2026.

### Relevance to This Motion.

Mullane is the most powerful comparator in this appendix for three independent reasons. First, it involves the exact same statutory provision — four counts under 18 U.S.C. § 2261A(2)(B) — as the charge against Ms. Wang. Second, the Government and Probation both affirmatively assented to the travel modifications, not merely declining to oppose. They did so twice, demonstrating a consistent judgment that court-attendance travel is compatible with a § 2261A(2)(B) release. Third, and critically, the travel destination was litigation in which Mullane is suing a person connected to the criminal allegations — a circumstance more potentially sensitive, not less, than Ms. Wang's travel for family-law and appellate proceedings. If the Government was prepared to assent to that travel, any categorical objection to court-attendance travel in Ms. Wang's case is untenable. The Bail Reform Act's least-restrictive-conditions requirement demands individualized analysis, and Mullane demonstrates that such analysis repeatedly yields approval for court-attendance travel in § 2261A(2)(B) cases.

---

*[Court Record Follows]*

---

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **United States of America** | No. 25-CR-10201-MSM |
| v. | |
| **Brendan Jonathan Mullane** | |

**DEFENDANT'S MOTION TO MODIFY RELEASE CONDITIONS
TO PERMIT TRAVEL TO FLORIDA**
*(ASSENTED TO BY GOVERNMENT & PROBATION)*

Defendant Mullane hereby moves that the conditions of release be modified to permit him to travel to Florida to participate in a federal court hearing. The Government and Probation assent to this motion. As grounds therefor:

Mr. Mullane has a pending civil action in the Southern District of Florida, *Mullane v. Moreno, et al.*, No. 20-cv-21339-LB. Following an Eleventh Circuit decision issued in May 2025, there are surviving claims against a former federal prosecutor, Alison Lehr, and the United States. It is alleged, among other things, that Ms. Lehr sent false and defamatory materials concerning Mullane to several legal publications. The Eleventh Circuit held that the alleged conduct of Ms. Lehr was outside the scope of her employment, appeared to be "purely personal," and was undeserving of Westfall Act immunity. *Mullane v. Moreno, et al.*, No. 21-13468, 2025 WL 1386666, *at *2-*7.* (11th Cir. May 14, 2025)

The case has been specially assigned to the Honorable Liles Burke, who sits in the Northen District of Alabama. Judge Burke has scheduled an in-person status hearing in Miami on February 24th. Judge Burke plans to travel to Miami for the conference. Mr. Mullane filed a motion seeking to attend the conference remotely through Zoom. The motion was denied and Mullane's personal appearance is needed. Attachment 1.

Mr. Mullane wishes to travel to Florida to attend the hearing in compliance with the court's Order. There has been absolutely nothing that has occurred during the pendency of this case to suggest that there would be any risk or reason to prevent Mr. Mullane from

participating in the ongoing litigation. He wishes to travel on the 23rd and return on the 25th.

For these reasons, the conditions of release should be modified to permit the requested travel. Probation and the government assent to the travel, with all other release conditions remaining in effect.

> JONATHAN MULLANE
> By his Attorney,
>
> /s/ *Keith Halpern*
> Keith Halpern, BBO # 545282
> 572 Washington Street, Suite 19
> Wellesley, MA 02482

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 12, 2025.

/s/ *Keith Halpern*

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

United States of America          No. 25-CR-10201-MSM

v.

Brendan Jonathan Mullane

## DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE AN OFFENSE OR FOR A BILL OF PARTICULARS

Defendant Jonathan Mullane moves this Court to dismiss the indictment, as it violates the Fifth and Sixth Amendments and Rule 7(c)(1) by restating statutory text without factual allegations. Because an insufficient indictment cannot be remedied with a bill of particulars, it should be dismissed for failing to state an offense. Fed.R.Crim.P. 12(b)(3)(B)(v). If this motion is denied, Mullane moves for an order requiring a bill of particulars, not as an adequate alternative remedy for the insufficient indictment, but as a necessity to pursue additional grounds for dismissal and to prepare for trial.

### Background

On May 27, 2025, a Grand Jury alleged that Mullane violated 18 U.S.C. § 2261A(2)(B). Four similar counts were issued, identical aside from identifying four different victims and three different time periods. Count One may be taken as representative:

> From on or about February 5, 2025, through on or about May 1, 2025, in the District of Massachusetts and elsewhere, the defendant, BRENDAN JONATHAN MULLANE, with the intent to injure, harass, and intimidate another person, that is, VICTIM A, knowingly used interactive computer services and the internet, a means and facility of internet commerce, to engage in a course of conduct that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to VICTIM A.
>
> In violation of 18 U.S.C. § 2261A(2)(B).
>
> The indictment contains no other allegations of law or fact.

I.      **The indictment should be dismissed because it repeats broad generic statutory language without factual allegations.**

For purposes of a motion to dismiss, the court must look to the face of the indictment and assume that factual allegations are true. *United States v. Sampson*, 371 U.S. 75, 76 (1962); *United States v. Stewart*, 744 F.3d 17, 21 (1st Cir. 2014). When considering the face of the indictment, the focus remains on the language used to charge the crimes. *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006). "Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictment returned by the grand jury." *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001).

An indictment must satisfy two fundamental constitutional provisions. It must fulfill the Sixth Amendment's notice requirement by providing the nature and circumstances of the alleged crime so that the accused may defend himself. *Russell v. United States*, 369 U.S. 749, 763-64 (1962); *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Tomasetta*, 429 F.2d 978, 979 (1st Cir. 1970). And it must satisfy the Fifth Amendment's edict that criminal cases be indicted by a grand jury and that citizens are not placed in jeopardy twice for the same offense. *Stirone v. United States*, 361 U.S. 212, 218 (1960).

To be constitutionally sufficient, the indictment must contain the elements of the alleged crime. *Hamling*, 418 U.S. at 117. "[I]t is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements …" *Russell*, 369 U.S. at 765; *Hamling*, 418 U.S. at 117 (both citing *United States v. Carll*, 105 U.S. 611, 612 (1882)). If the statute uses broad generic terms, then the indictment must "descend to the particulars" and provide

2

factual allegations that would constitute the crime alleged. *Russell*, 369 U.S. at 765 (citing *United States v. Cruikshank*, 92 U.S. 542, 558 (1875); *United States v. Simmons*, 96 U.S. 360, 362 (1877); *United States v. Hess*, 124 U.S. 483, 487 (1888)). An indictment that restates broad generic statutory text must marry the elements of the offense with factual allegations to satisfy the Fifth and Sixth Amendments. Rule 7(c)(1) is in accord; it requires the indictment to provide "a plain, concise, and definite written statement of the *essential facts constituting the offense charged…*" (emphasis added).

That a broad generic indictment must allege elements together with factual allegations is not novel. "[The second object of an indictment is] to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction. For this, facts are to be stated, not conclusions of law alone." *Cruikshank*, 92 U.S. at 558 (1875). The Supreme Court has repeated this requirement: "[An indictment] must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense … with which he is charged." *Hamling*, 418 U.S. at 117-118; *Russell*, 369 U.S. at 765.

An indictment may be dismissed when it repeats broad generic statutory text without descending to specific factual allegations. *Russell*, 369 U.S. at 763-771; *Tomasetta*, 429 F.2d at 980-81 (indictment accusing defendant of making unspecified threats by unstated means to an unnamed person requires dismissal); *United States v. Nance*, 533 F.2d 699, 701-703 (D.C. Cir. 1976) (reversing and dismissing where the indictment failed to specify what false pretenses were involved); *United States v. Walsh*, 194 F.3d 37, 44 (2nd Cir. 1999) ("The Indictment Clause of the Fifth Amendment requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury."); *United States v. Cecil*, 608 F.2d 1294

3

(9th Cir. 1979) (reversing and dismissing where a drug conspiracy indictment tracked statutory language without facts or circumstances pertaining to the conspiracy); *see United States v. Trinastich*, 354 F. Supp. 54, 55 (W.D. Mo. Feb. 9, 1973)(dismissing a kidnapping indictment under Rule 7 that alleged the victim "had been unlawfully seized, confined, inveigled, decoyed, kidnapped, carried away and held by [the defendant] for reward or otherwise, that is or the purpose of sexual gratification"); *United States v. Hillie*, 227 F. Supp. 3d 57 (D.D.C. Jan. 5, 2017) (Jackson, D.J.) (dismissing seven child pornography related crimes for failing to make factual allegations).

The indictment alleges that Mullane used the internet to engage in a course of conduct with "the intent to injure, harass and intimidate another person." It does not specify any emails that comprised this conduct.

In *United States v. Yung*, 37 F. 4th 70, 77-79 (3rd Cir. 2022), the Third Circuit detailed the vague potential meanings of "harass" and "intimidate," which are not defined in the statute. The Court stated that "the broader definitions of 'harass' and 'intimidate' can describe nonviolent, nonthreatening speech" deserving First Amendment protection. *Id*. at 78. The Court saved the statute by applying a narrow reading of the terms, which is not the "better reading," but is not "implausible," avoiding overbreadth by limiting the statute's application. *Id*. at 80. The Court defined "intimidate" to mean that "a defendant must put the victim in fear of death or bodily injury; "harass" is similarly defined to require a fear of violence. *Id*.

In *United States v. Ackell*, 907 F.3d 67, 76 (1st Cir. 2018), the First Circuit followed the same path, saving § 2261A(2)(B) from unconstitutional overbreadth by defining "harass" as "criminal harassment," constituting "true threats" or speech integral to criminal conduct, and similarly narrowing the definition of "intimidate." These narrowed definitions cause the

indictment's lack of factual specificity to be uniquely problematic. By failing to specify the allegedly actionable emails, the government makes it impossible to know whether the First Circuit's narrowed definitions were applied. It is impossible to know whether grand jurors were told what a "true threat" is, or that they needed to find that there were communications that constituted a "true threat."

The "true threat" prong of <u>Ackell</u> is the only way in which an email could be actionable in this case. The "speech integral to criminal conduct" prong cannot be applied because the emails were not integral to any other criminal conduct. However, this analysis requires consideration of the content of the emails. For example, if someone sent emails threatening violence if the recipient did not pay a kidnapping demand, the emails could be integral to a crime other than cyberstalking. That analysis isn't possible because the government hasn't alleged or specified that any email was integral to a crime other than cyberstalking. (There isn't one.) For purposes of this motion, the issue of significance is simply that a grand jury could not find that the emails constituted cyberstalking based on the circular reasoning of their being integral to cyberstalking.

In *U.S. v. Sayer*, 748 F.3d 425 (1st Cir. 2014), the defendant had created false advertisements and online profiles in the victim's name, soliciting sex. He was charged with identity fraud. His communications were integral to his impersonation of the victim and were therefore unprotected. *Id*. at 433-34 ("Sayer does not claim that his acts of creating false online advertisements and accounts in Jane Doe's name or impersonating Jane Doe on the internet constitute legal conduct."); *see Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) (speech integral to criminal conduct is not protected by First Amendment).

Mullane's emails cannot be illegal because they were integral to cyberstalking.

5

… the government argues that Sryniawski's e-mails were integral to the criminal conduct of cyberstalking itself. That argument is circular and unpersuasive. Congress may not define speech as a crime, and then render the speech unprotected by the First Amendment merely because it is integral to the speech that Congress has criminalized. To qualify as speech integral to criminal conduct, the speech must be integral to conduct that constitutes another offense that does not involve protected speech, such as antitrust conspiracy, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949), extortion, *United States v. Petrovic*, 701 F.3d 849, 855 (8th Cir. 2012), or in-person harassment, *United States v. Osinger*, 753 F.3d 939, 941, 947 (9th Cir. 2014).

*United States v. Sryniawski*, 48 F. 4th 583, 588 (8th Cir. 2022).

If this case proceeds to an analysis of emails, Mullane intends to establish that his emails were like Sryniawski's, where there was "no other identified criminal conduct to which the jury could have found Sryniawski's e-mail communications were integral." *Id.* For now, the argument is simply that the government cannot avoid the requirement of specificity in the indictment by asserting that the emails were integral to cyberstalking.

While the First Circuit has not condemned the circular reasoning rejected in *Sryniawski* in language as sharp as the Eighth Circuit's, it has reached the same inevitable conclusion. In *Sayer,* the communications comprising cyberstalking were integral to an identity fraud scheme that led men to go to the victim's home seeking sex. 748 F.3d at 433-34. Rejecting Sayer's claim that his postings were protected, the Court referenced *Petrovic,* 701 F.3d at 849, finding that the First Amendment did not protect messages "which resulted in the defendant's § 2261A(2)(A) conviction, … integral to criminal conduct and unprotected under *Giboney*, as they carried out the defendant's extortionate threats to harass … his ex-wife if she terminated their sexual relationship." S*ayer*, 748 F.3d at 434.

In *Ackell*, the Court examined what constitutes "criminal purpose" under § 2261A(2)(B). Ackell did not argue that his own conduct was protected. He pursued a facial

6

overbreadth argument, which the Court rejected. Ackell's communications were integral to criminal conduct other than cyberstalking – he was extorting a minor to keep sending him sexually explicit photos over the internet with threats of sending photos to her family and threatening to rape another girl if she stopped. 907 F.3d at 82.

The unprotected category of "true threats," requires a "serious expression," conveying the intention to "commit an act of unlawful violence." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023); *Virginia v. Black*, 538 U.S. 343, 359 (2003). *Ackell's* holding that a message comprises harassment or intimidation, violating § 2261A(2)(B), only if it is a "true threat" or "speech integral to proscribable criminal conduct," would be nonsensical if communications that were part of the alleged cyberstalking could be treated as integral to criminal conduct on that basis alone. If emails comprising cyberstalking are unprotected because they are integral to cyberstalking, then the "true threat" category is meaningless. It would not matter whether an email was a true threat, since it would violate § 2261A(2)(B) regardless. All communications that were reasonably expected to cause emotional distress could fit the definitions of harassment or intimidation if, circularly, all that is required is that the communication was intended to cause emotional distress. This circular reasoning would make it unnecessary to ever consider whether a communication was a "true threat," so long as the communication was part of the cyberstalking conduct. The only way for the true threat doctrine to survive in the context of § 2261A(2)(B) is if "speech integral to proscribable criminal conduct" means conduct other than cyberstalking itself. *See Ackel*, 907 F.3d at 76.

Absent proper instructions, a grand juror likely would find that sending dozens of lewd, insulting emails would constitute harassment. But it does not constitute harassment when the term requires a "true threat," where the speaker "means to communicate a serious

7

expression of an intent to commit an act of unlawful violence ..." *Id.* at 75. Mullane's emails were replete with vulgarities that could be considered harassment under a common understanding of the term, but not as narrowed by the First Circuit. Evaluating the issue requires an indictment that descends to the particulars by making specific factual allegations. *See Russell*, 369 U.S. at 765; *Cruikshank*, 92 U.S. at 558. The lack of specificity precludes Mullane from defending against the indictment and would permit conviction "on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *Russell*, 369 U.S. at 770. We have no idea whether the indictment resulted from the government identifying allegedly threatening emails and providing a definition of "harassment" that required a finding of a "true threat" of violence, or whether grand jurors were simply given all the emails and asked to find that they constituted harassment.

The lack of specifics in the indictment that was found insufficient by the First Circuit in *Tomasetta* was more egregious than in this case. Not only were the threats unspecified, but the means and recipient also were undisclosed. 429 F.2d at 979. However, the fundamental impairment of due process caused by the lack of specificity is comparable. Because it is impossible to know which emails the grand jury thought illegal, or whether their understanding of illegality was consistent with the First Circuit's narrowed definitions of "harass" and "intimidate," the government could seek a conviction based on evidence "divorced from that upon which the grand jury based its indictment." *Id.* at 980. The lack of specificity is an invitation to arbitrariness and unfettered prosecutorial manipulation. "The prosecution may not have the power 'to roam at large' in this fashion." *Id.* (*citing Russell,* 369 U.S. at 770-771; *United States v. Agone*, 302 F.Supp. 1258, 1261 (S.D.N.Y. 1969)).

The government's failure to identify any email that constituted a "true threat," or that

was integral to a crime other than cyberstalking, renders the indictment invalid. It should not be saved with a bill of particulars and should be dismissed.

**II.      If the Court does not dismiss the indictment, it should order the government to produce a bill of particulars.**

Although it may be tempting, a bill of particulars cannot correct the indictment and should not be employed to spare the government the consequences of its conduct. "[I]t is a settled rule that a bill of particulars cannot save an invalid indictment." *Russell*, 369 U.S. at 770. "This underlying principle is reflected by the settled rule in the federal courts that an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form." *Id; United States v. Thomas*, 444 F.3d 919, 922-923 (D.C. Cir. 1971) (reversing because the indictment lacked factual particularity and finding the error could not be remedied by a bill of particulars); *Hillie,* 227 F. Supp. 3d at 80-82 (dismissing indictment and holding that a bill of particulars was no remedy).

If the Court finds that the indictment is constitutionally sufficient, Rule 7(f) empowers the Court to direct the filing of a bill of particulars. Fed. R. Crim. P. 7(f). Rule 7(f) "specifically empowers the trial court to direct the filing of a bill of particulars and gives the trial court "very broad discretion in ruling upon requests for such bills." *Will v. United States*, 389 U.S. 90, 98-99 (1967). "The purpose of a bill of particulars is to provide the accused with detail of the charges against him where necessary to enable him to prepare his defense, to avoid surprise at trial, and to protect against double jeopardy." *United States v. Paiva*, 892 F.2d 148, 154 (1st Cir. 1989); *United States v. Sepulveda*, 15 F.3d 1161, 1192-93 (1st Cir. 1993)(holding that a motion for a bill of particulars should be granted "… if the accused, in the absence of a more detailed specification, will be disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the Double Jeopardy Clause").

9

The defendant does not suggest a bill of particulars as a satisfactory remedy to the inadequacy of the indictment and does not waive his right to appeal a denial of dismissal based on such inadequacy. Nonetheless, if the Court declines to dismiss the indictment, it should order the government to produce a bill of particulars, identifying the emails which the government maintains violated § 2261A(2)(B), not because it is an appropriate remedy for an insufficient indictment, but because, if dismissal is not ordered, it is necessary to enable Mullane to proceed with further motions to dismiss and proceed to trial with due process. If dismissal is nor ordered, Mullane plans to seek dismissal on at least two other grounds: that no email constituted a "true threat" and that the statute should be found void for vagueness. Both require evaluation of the content of the emails the government alleges to be illegal. Discovery review cannot clarify which emails these may be. Mullane should not be forced to guess which emails the government maintains were illegal in order to move for dismissal. Nor should he learn for the first time during opening statements which emails he must defend.

Conclusion

For the reasons stated above, the indictment should be dismissed; if the Court declines to dismiss the indictment, it should order the government to produce a bill of particulars.

REQUEST FOR ORAL ARGUMENT

JONATHAN MULLANE
By his Attorney,

/s/ *Keith Halpern*
Keith Halpern, BBO # 545282 572
Washington Street, Suite 19
Wellesley, MA 02482

10

## L.R. 7.1 CERTIFICATE

Undersigned counsel has conferred with the government in good faith prior to filing this motion.

/s/ *Keith Halpern*

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 1, 2026.

/s/ *Keith Halpern*

11

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **United States of America**<br><br>v.<br><br>**Brendan Jonathan Mullane** | No. 25-CR-10201-MSM |

**DEFENDANT'S MOTION TO MODIFY RELEASE CONDITIONS
TO PERMIT TRAVEL TO FLORIDA**
*(ASSENTED TO BY GOVERNMENT & PROBATION)*

Defendant Mullane hereby moves that the conditions of release be modified to permit him to travel to Florida to participate in a federal court hearing. The Government and Probation assent to this motion. As grounds therefor:

Mr. Mullane has a pending civil action in the Southern District of Florida, *Mullane v. Moreno, et al.*, No. 20-cv-21339-LB. An in-person motion hearing and scheduling conference has been scheduled for April 28, 2026, in Key West, FL. The Order is provided as Attachment 1. Mr. Mullane wishes to travel to Florida to attend the hearing in compliance with the court's Order.

He wishes to depart on April 26th and return on April 29th.

For these reasons, the conditions of release should be modified to permit the requested travel. Probation and the government assent to the travel, with all other release conditions remaining in effect.

JONATHAN MULLANE
By his Attorney,

/s/ *Keith Halpern*
Keith Halpern, BBO # 545282
572 Washington Street, Suite 19
Wellesley, MA 02482

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 14, 2025.

/s/ *Keith Halpern*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| United States of America | No. 25-cr-10201-MSM-9003 |
| v. | |
| Brendan Jonathan Mullane | |

**DEFENDANT'S MOTION TO HOLD MOTION TO DISMISS IN ABEYANCE**
*Assented-to by Government*

Defendant Jonathan Mullane, with the government's assent, hereby moves the Court to hold his pending Motion to Dismiss for Failure to State Offense in abeyance, delaying the government's deadline for filing an opposition. The parties are involved in discussions concerning a resolution and seek to delay the motion while these efforts are proceeding. The parties anticipate that it may take 45 days to determine if a resolution is agreed upon. The parties will notify the Court of the status of efforts to resolve the case at the next scheduled conference, in approximately 45 days. If the parties are not successful in reaching an agreement, then, at that time, we will request that a schedule for the government's filing of an opposition, as well as scheduling for additional motions to dismiss, be set at that time.

The parties agree that the time between April 16, 2026 and the next scheduled conference day to be scheduled in approximately 45 days, is excluded from calculation of the time in which the matter must be tried pursuant to 18 USC § 3161. The parties agree that the time is excludable pursuant to 18 USC § 3161(h)(D), while the defendant's motion to dismiss is pending, and while he is considering a disposition in this matter.

BRENDAN JONATHON MULLANE
By his Attorney,

/s/ *Keith Halpern*

Keith Halpern
BBO #545282
572 Washington Street, Suite 19
Wellesley, MA 02482

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 29, 2026.

/s/ *Keith Halpern*